IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PROTECT OUR PARKS, INC.,                 )

NICHOLS PARK ADVISORY COUNCIL,     )

STEPHANIE FRANKLIN,                    )

SID E. WILLIAMS,                         )

BREN A. SHERIFF,                         )

W. J. T. MITCHELL, and                )

JAMIE KALVEN,                       )

           Plaintiffs,           )

v.                               )     No.

PETE BUTTIGIEG,                   )
SECRETARY OF THE U.S. DEPARTMENT )
OF TRANSPORTATION,             )

STEPHANIE POLLACK, ACTING      )
ADMINSTRATOR OF THE FEDERAL    )
HIGHWAY ADMINISTRATION,       )

ARLENE KOCHER, DIVISION        )
ADMINISTRATOR OF THE           )
FEDERAL HIGHWAY ADMINISTRATION, )
ILLINOIS DIVISION,               )

MATT FULLER, ENVIRONMENTAL   )
PROGRAMS ENGINEER,             )
FEDERAL HIGHWAY ADMINISTRATION, )
ILLINOIS DIVISION,               )

DEB HAALAND, SECRETARY OF THE U.S. )
DEPARTMENT                      )
OF THE INTERIOR,                )
                                )

SHAWN BENGE, DEPUTY DIRECTOR,          )
OPERATIONS, EXERCISING THE DELEGATED)
AUTHORITY OF THE DIRECTOR OF THE       )
NATIONAL PARK SERVICE,                 )
                                       )
JOHN E. WHITLEY, ACTING SECRETARY      )
OF THE ARMY,                           )
                                       )
PAUL B. CULLBERSON, COMMANDING         )
OFFICER OF THE ARMY CORPS OF           )
ENGINEERS, CHICAGO DISTIRCT,           )
                                       )
THE CITY OF CHICAGO,                   )
                                       )
THE CHICAGO PARK DISTRICT, and         )
                                       )
THE OBAMA FOUNDATION,                  )
                                       )
                    Defendants.        )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

For their complaint against the Defendants, Plaintiffs state as follows:

### NATURE OF THE CASE

1.      This is an action seeking declaratory and injunctive relief from any and all activities

that may adversely affect the environment, natural, scenic, cultural and/or historic resources

associated with the roadwork and construction of the Obama Presidential Center (the "OPC"). The

City of Chicago has proposed, and the federal agencies have approved, a plan to locate the OPC

on 19.3 prime acres at the center of Jackson Park on Chicago's southeast side. In addition, the

vast undertaking of building out the OPC will require the City to take and destroy another

approximately 10 acres of land from Jackson Park, needed only if the OPC is completed, in order

to reconstruct a new roadwork plan needed to minimize the traffic disruptions in and around the

proposed OPC. In total, project completion requires the removal and occupation of almost 30

acres of Jackson Park. Necessarily, that massive endeavor would permanently destroy Jackson

Park's roadways, trees and overall integrity, thereby dismantling a unique and treasured asset of the City of Chicago. Jackson Park is a cultural landscape masterpiece designed by the landscape architect Frederick Law Olmsted in 1871. His basic conception has been continuously maintained since the Park's founding.

2. The magnitude, location and funding of the proposed project has triggered several major federal reviews. The first is pursuant to Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c) ("Section 4(f)") and 23 U.S.C. § 138(a); the second is pursuant to Section 106 of National Historic Preservation Act of 1966, 54 U.S.C. § 306108 ("Section 106"); a further review is under the Urban Park and Recreation Recovery Act ("UPARR") (54 U.S.C.§§ 200501-200511); the fourth is under the National Environmental Policy Act 42 U.S.C. §§ 4321-4347 ("NEPA"). All of these federal regulatory reviews require a comprehensive review of alternatives to determine how to best address the adverse effects and impacts created by the OPC, by seeking ways to avoid, minimize, and mitigate those impacts. In each case, the applicable government agency must evaluate opportunities for the avoidance, minimization or mitigation of future adverse effects.

3. This complaint is necessitated by the faulty conclusions of all the named Defendants in their evaluation of the OPC in Jackson Park. Contrary to both the letter and spirit of these statutes, all the federal agencies and other Defendants have largely ignored the detailed regulatory framework set out in the various statutes, while also ignoring the City's public trust obligations created by the 1869 grant that binds not only the Park District but any assignee, including the City of Chicago, that takes title from it. NEPA, Section 106 of Historic Preservation Act, and Section 4(f) of the Transportation Act offer a precise methodology that instructs government agencies as to what factors should be considered and the strict lexical order in which

3

that examination should take place. The common thread that runs through these diverse proceedings is they all ignored the methodology and regulatory framework, which requires the review of viable and obvious less-harmful alternatives to the Jackson Park site.

4.     Under these statutory schemes, the first order of business is avoidance of adverse effects to the physical, historical and cultural environment of Jackson Park by the simple expedient of locating the OPC outside of Jackson Park. A proper, non-predetermined process yields a clear answer in the affirmative. Even though the defendant administrators were fully aware of their statutory obligations, they all refused to consider any avoidance alternatives to the Jackson Park site for the OPC, including but not limited to a site located just to the west of Washington Park, on nonpark lands, which offers a better location for the OPC that is much less harmful to protected resources, and is wholly consistent with the applicable statutory framework and underlying policies.

5.     Likewise, minimization of adverse impacts was also deliberately ignored: there was no consideration of moving the OPC to another location in Jackson Park, reducing its size, or both.

6.     Finally, the brief consideration of mitigation efforts proposed only meager and cosmetic responses, focusing more on documenting the existing grandeur of Jackson Park, but not to preserving it.

7.     The political forces exerted by Defendants City of Chicago and the Chicago Park District that were four-square behind the Obama Foundation, led to the wholesale delegation of decision-making authority. Thus, the results of the City's cursory review process were foreordained from the outset. Indeed, the City of Chicago improperly delegated to the Obama

Foundation the decision on the location and site plans to the OPC. Thereafter, it rubber-stamped its approval and became its primary advocate and enforcer throughout the entire review process.

8.      Each of these multiple reviews and reports rested on the illegal practice of project segmentation. The relevant agencies purposefully and improperly split the OPC project into two or more smaller pieces, solely to escape federal review of the project's most objectionable features: the shutting down and altering of four major roads within Jackson Park, the cutting down of close to 1000 mature and established trees, and construction of the OPC at the heart of Jackson Park, destroying the Midway Plaisance, the Women's Garden and other recreational features and open spaces within this historic landscape.

9.      This artificial segmentation technique led to agency reports that ignored any avoidance or minimization alternatives that could prevent or reduce significant and permanent changes to the historic and environmental underpinnings of Jackson Park.  That artificial truncation forced the various reviews to concentrate exclusively on road reconstruction only *after* the destruction of land within Jackson Park, its roadways, trees, lagoons, and architectural features embedded in the overall project. Put differently, the federal reviews fractionated the OPC project in an effort to force the agencies to turn a blind eye to the true magnitude of the destructive impacts to Jackson Park and other historic and environmental resources.

10.      Plaintiffs' challenge herein also includes, under the doctrine of supplemental jurisdiction, certain of Plaintiffs' state law claims, including the violation of the venerable public trust doctrine, in part by having the City and Park District improperly delegate decision-making authority over the OPC to the Obama Foundation, a private entity with its own purposes. That purported delegation effectively negates the limitations contained in the original grant from the Illinois legislature that ordered the trust property, including both Jackson and Washington Parks,

to remain free and open, neither of which will occur if the construction of the OPC is allowed to gut Jackson Park. Further, the City's orchestration of this one-sided deal is both *ultra vires*, and in violation of key provisions of the Illinois Constitution. These include prohibitions against using or taking public property for private purposes, and for improper delegation of authority in violation of the basic constitutional principle of separation of powers.

## PARTIES

11.     Plaintiff Protect Our Parks Inc. ("POP") is an Illinois not for profit entity that acts as an advocacy group designed to keep public parks open, free, and to maintain their aesthetic beauty and recreational access.  Herbert Caplan is the president of Protect Our Parks.

12.     The individual members of POP reside near Jackson Park, and have been actively involved in community organizing and in the regulatory and administrative actions in order to secure the adequate consideration of alternatives that did not involve the destruction of historic resources such as Jackson Park, the Midway Plaisance and the Chicago Boulevard Historic District and other adverse impacts to nearby historic and environmental resources.  Mr. Caplan and other members of Protect Our Parks use Jackson Park, the Midway Plaisance and the Chicago Boulevard Historic District, have used them for years, enjoyed and appreciated Jackson Park and utilized the various roads within and around the park, including but not limited to the roads such as Cornell, Hayes and Marquette.  POP and its members furthermore have interest in the aesthetics and animal populations of Jackson Park, which was created by the world-renowned landscape architect, Frederick Law Olmsted.  POP and its members intend to continue to use and enjoy Jackson Park, the Midway Plaisance and the surrounding roads and areas as they have, including studying and enjoying the landscape architecture, its historic resources, plantings, environment and similar recreational, social and cultural events.  Given the proposed reconfiguration and partial destruction

6

of Jackson Park, POP and its members believe the aesthetic and recreational values of Jackson Park would be irreparably diminished and harmed by the proposed OPC.

13.     Plaintiff Nichols Park Advisory Council (NPAC) qualifies as an Illinois not-for-profit entity under the financial sponsorship of the Hyde Park - Kenwood Community Conference (HPKCC), a south side 501c-3 organization registered with the state of Illinois.  The NPAC's primary focus is the stewardship of Nichols Park, a park located on the south side of Chicago, but also works with other South Side Parks, including but not limited to Jackson Park, to ensure that public Parks remain open and free, and maintain their aesthetic beauty and public recreational access. In that capacity, NPAC was a consulting party to the federal reviews that were performed in regard to the OPC, which are now the subject of this complaint. Stephanie Franklin is the president of NPAC.

14.     The individual members of NPAC reside near Jackson Park, and have been actively involved in community organizing and in the regulatory and administrative actions in order to secure the adequate consideration of alternatives that do not involve the destruction of historic resources such as Jackson Park, the Midway Plaisance, the Paul Douglas Nature Sanctuary (Wooded Island) and other adverse impacts to nearby historic and environmental resources. Ms. Franklin and other members of NPAC use Jackson Park, the Midway Plaisance and Wooded Island, enjoy and appreciate Jackson Park, have volunteered there, and use the various roads within and around the park, including but not limited to Cornell, Hayes, and Marquette Drives. NPAC and its members furthermore have interest in the aesthetics, trees, bird and animal populations of Jackson Park. NPAC and its members intend to continue to use and enjoy Jackson Park, the Midway Plaisance and the surrounding roads and areas as they have, including enjoying the landscape architecture, its historic resources, plantings, natural environment and similar

7

recreational, social and cultural events, such as the bird walks. Given the proposed reconfiguration and destruction of Jackson Park, NPAC and its members believe the aesthetic, environmental, and recreational values of Jackson Park would be irreparably diminished and harmed.

15.     Plaintiff Sid E. Williams is a Chicago resident, and long-time Hyde Park resident and homeowner, having lived there since he was a child in the 1950s. Mr. Williams throughout his life has used Jackson Park, whether as a youth playing football games, or now as he enjoys walks in Jackson Park and its aesthetic beauty. Mr. Williams similarly enjoyed and uses the Midway Plaisance and the Chicago Boulevard Historic District (of which Jackson Park is a part). Mr. Williams uses Cornell Drive and other thoroughfares within Jackson Park. Given the proposed reconfiguration and destruction of lands within Jackson Park, Mr. Williams believes the aesthetic and recreational values of Jackson Park would be irreparably diminished and harmed by the proposed OPC.

16.     Plaintiff Stephanie Franklin is a Chicago resident, and long-time Hyde Park resident and homeowner in the area. Ms. Franklin throughout her life has used Jackson Park, and enjoys walks in Jackson Park and has used and continues to use Jackson Park for walks and has enjoyed its aesthetic beauty, including its trees and gardens, including but not limited to the Woman's Garden. Ms. Franklin similarly enjoyed and uses the Midway Plaisance and the Chicago Boulevard Historic District (of which Jackson Park is a part). Ms. Franklin also uses the roadway system in Jackson Park. Ms. Franklin was actively involved in the federal review process in her role as the head of Nichols Park Advisory Council. Given the proposed reconfiguration and destruction of lands within Jackson Park, Ms. Franklin believes the aesthetic and recreational values of Jackson Park would be irreparably diminished and harmed by the proposed OPC.

17.     Plaintiff Bren A. Sheriff is a Chicago resident, and long-time resident and homeowner in the South Shore neighborhood near Jackson Park.  Ms. Sheriff throughout her life has used Jackson Park, and enjoys walks in Jackson Park and its aesthetic beauty.  Ms. Sheriff similarly enjoys and uses the Midway Plaisance and the Chicago Boulevard Historic District (of which Jackson Park is a part).  Ms. Sheriff also uses the roadways in Jackson Park including Cornell Drive.  Given the proposed reconfiguration and destruction of lands within Jackson Park, Ms. Sheriff believes the aesthetic and recreational values of Jackson Park would be irreparably diminished and harmed by the proposed OPC.

18.     Plaintiff Dr. W. J. T. Mitchell is the Gaylord Donnelley Distinguished Service Professor of English and Art History at the University of Chicago.  Dr. Mitchell has been teaching at the University of Chicago since 1978, and for the last 42 years has been the Editor of the interdisciplinary humanities journal, *Critical Inquiry*.  Dr. Mitchell is a Chicago resident, and long-time Hyde Park resident where he is a homeowner.   Dr. Mitchell is very familiar with Jackson Park as a frequently used recreational space, and as a historic landscape and the idea of public space.  His book, *Landscape and Power* (2nd ed. 2005) connects Jackson Park to the traditions underlying Olmsted's brilliant updating of landscape arts to the demands of democracy. Dr. Mitchell has used and continues to use Jackson Park, is a frequent visitor to Jackson Park as he enjoys walks with students in Jackson Park, discussing its landscape architecture and its aesthetic beauty.   Dr. Mitchell similarly enjoys and regularly uses the Midway Plaisance and the Chicago Boulevard Historic District (of which Jackson Park is a part).  Dr. Mitchell uses Cornell Drive and other roadways within Jackson Park.  Given the proposed reconfiguration and the destruction of lands within Jackson Park, Dr. Mitchell believes the aesthetic and recreational values of Jackson Park as well as the Midway Plaisance would be irreparably diminished and harmed.

19.     Plaintiff Jamie Kalven is a Chicago resident, and long-time Hyde Park resident and homeowner.  Mr. Kalven is a writer and human rights activist, who has worked on many critical issues in the City including but not limited to affordable housing issues and police misconduct issues.  Throughout his life, Mr. Kalven has used and continues to use Jackson Park, utilizing the entirety of the park as an active runner, and enjoys walks in Jackson Park and its aesthetic beauty.  Mr.  Kalven similarly enjoys and regularly uses the Midway Plaisance and the Chicago Boulevard Historic District (of which Jackson Park is a part).  Mr. Kalven uses Cornell Drive and other roadways within Jackson Park.  Given the proposed reconfiguration and the destruction of lands within Jackson Park, Mr. Kalven believes the aesthetic and recreational values of Jackson Park would be irreparably diminished and harmed.

20.     The interests of POP, NPAC, the individual Plaintiffs, and others are within the zone of interests intended to be protected by Section 4(f), Section 106, UPARR, NEPA, and other regulations set forth in this Complaint.  The interests of Plaintiffs and Plaintiffs' members have been and will continue to be aggrieved and adversely effected by the actions of the Defendants complained of herein.  Neither the numerous claims asserted herein, nor the relief requested, requires the participation of individual members of the Plaintiff organization[s] in this lawsuit.

21.     Given the interest in advocacy on behalf of protecting Jackson Park and the other nearby historic and environmental resources, Plaintiffs have a strong interest in ensuring that Defendants comply with the mandates of Section 4(f), UPARR, Section 106 and NEPA and the other federal and state regulations described in this complaint.

22.     Furthermore, the Plaintiffs (and/or their members) are municipal taxpayers who have standing to bring causes of action here as the City is responsible for payment of various aspects of the project, including but not limited to expenses associated with environmental

remediation costs as well as roadwork-related costs within Jackson Park which project has been characterized as "local."

23.     Defendant Pete Buttigieg has been named here solely in his official capacity as Secretary of the United States Department of Transportation.  In that capacity, Defendant is responsible for the administration, operations, and activities of the Department of Transportation, including the Federal Highway Administration ("FHWA") and for the federal government's compliance with Section 4(f), Section 106 and NEPA.

24.     Defendant Stephanie Pollack is named here solely in her official capacity as Acting Administrator of the FHWA. In that capacity, Defendant Pollack is responsible for ensuring the FHWA's compliance with Section 4(f), Section 106, and NEPA reviews.

25.     Defendant Arlene K. Kocher is named here solely in her official capacity as the Division Administrator of the Illinois Division of the FHWA.  In that capacity, Defendant Kocher is responsible for ensuring the FHWA's compliance with Section 4(f), Section 106, and NEPA reviews.

26.     Defendant Matt Fuller is named here solely in his official capacity as the Environmental Programs Engineer of the Illinois Division of the FHWA.  In that capacity, Defendant Fuller is responsible for carrying out the Section 106 review process as well as involvement in the Section 4(f), UPARR and NEPA reviews.

27.     Defendant Anthony Quigley, P.E., is named here solely in his official capacity as the Deputy Director, Region 1 Engineer of the Illinois Department of Transportation.  In that capacity, Defendant Quigley has worked with Defendant Kocher on the Section 4(f) review.

28.     Defendant Deb Haaland is named here solely in her capacity as Secretary of the United States Department of the Interior.  In that capacity, Defendant is responsible for the

administration, operations and activities of the Interior Department, including the National Park Service, and for compliance with Section 106, UPARR and NEPA.

29.     Defendant Shawn Benge, is named here solely in his capacity as Deputy Director, Operations, Exercising the Delegated Authority of the Director of the National Park Service.  In that capacity, Defendant Benge is responsible for carrying out the NEPA review, as well as a review under UPARR.

30.     Defendant John E. Whitley is named here solely in his capacity as Acting Secretary of the Army.  Defendant Whitley has been responsible for and involved with approvals for certain permits and modifications associated with the Great Lakes Fishery and Ecosystem Restoration project that has been ongoing in Jackson Park.

31.     Defendant Paul B. Cullberson is named here solely in his capacity as Commanding Officer of the Army Corps of Engineers.    Defendant Cullberson has been responsible for and involved with approvals for certain permits and modifications associated with the Great Lakes Fishery and Ecosystem Recovery project that has been ongoing in Jackson Park.

32.     Defendant City of Chicago (the "City") is a municipal corporation which is named here as both the entity that has transferred public trust property to a private entity, as well as the ostensible applicant for the various reviews conducted by the federal agencies.

33.     Defendant Chicago Park District received the deed to Jackson Park on behalf of the public, which it transferred in part to the City to allow the further transfer to a private party, namely defendant Obama Foundation.

34.     Defendant Obama Foundation (sometimes the "Foundation") is a private not-for-profit entity responsible for the construction of the Obama Presidential Center on various portions of Jackson Park.  Further, the Obama Foundation is the real party in interest for the various federal

reviews, which were necessitated by the Foundation's decision to place and construct the OPC in Jackson Park, and as further set forth below, has been the party to whom authority has been delegated from various state and federal authorities. The Foundation also has been designated as the party to which various properties and rights have been transferred that are the subject of this dispute. Moreover, the Foundation is a necessary party to effectuate both injunctive and declarative relief.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331(a), 28 U.S.C. §§ 2201-2202, 28 U.S.C. § 1361 and 5 U.S.C. §§ 701-706. Venue is proper in this district under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

## RELEVANT FACTS

36.     Jackson Park is one of the most historically famous urban parks in the nation. Over a century ago, Frederick Law Olmsted — perhaps this country's most famous and revered landscape architect — designed Jackson Park. Olmstead's ingenious and resplendent design remains largely intact to this day.

37.     Jackson Park was dedicated by a specific land grant from the Illinois legislature in 1869, placing it in public trust. The Illinois General Assembly deeded the real estate comprising Jackson Park to what would become the Defendant Chicago Park District. Such grant was subject to restrictions in perpetuity on the purposes for which the property may be used, as the grant expressly provided that the demised property "shall be held, managed and controlled by [the Commissioners] and their successors as a public park, for the recreation, health and benefit of the public, and free to all persons forever."

38.     Significantly, Jackson Park's historic character was publicly recognized in 1972 by placing the site on the National Register of Historic Places, which is administered by defendant National Park Service. 54 U.S.C. § 302103. The Park's roadways, including Cornell Drive and the Midway Plaisance, likewise remain important thoroughfares whose special vistas allow everyone to see and appreciate Jackson Park and its environs, while offering crucial surface transportation links to the urban area enveloping Jackson Park, extending from northern Indiana to the Chicago loop area.  A prominent Chicago Park District historian described Jackson Park as follows:

> Jackson Park is a nationally significant landscape on the south side of Chicago, famed for its connections to Frederick Law Olmsted and Daniel Burnham, and as the site of the 1893 World's Columbian Exposition. This session will discuss techniques for preserving this valuable historic resource. Jackson Park is one of the most significant and complex historic landscapes in Chicago and the nation. Originally designed by Olmsted & Vaux in 1871, the site was redeveloped by Olmsted and Daniel H. Burnham, and the Wooded Island in the park is considered one of '150 great places in Illinois.'

### Washington Park Is Found To Be<br>The Best Location For The Obama Presidential Library

39.     The ultimate decision to site the OPC in Jackson Park has taken a set of long and circuitous turns.  The journey began in March 2014, when the Foundation, a private, not-for- profit entity, began searching for a future site for an Obama Presidential Library.

40.     The initial proposals were received from around the world, including locations in Hawaii and the other places in the United States, including Washington D, C. New York and Chicago.  When the Obama Foundation settled on Chicago for the location of the then-library, several sites were identified on the south side of Chicago, each sponsored by its own entity.  The University of Chicago proposed sites in Washington Park and Jackson Park; these proposals offered existing University-owned land and, if necessary, offered to acquire additional lands.  Put differently, its initial proposal contemplated that private land would be used for the development

by the Obama Foundation. The University of Illinois at Chicago ("UIC") also made a proposal for the library to be built in the North Lawndale area.

41. Ultimately, based on those proposals, the Foundation ranked the Washington Park site as its first choice for the library, with Jackson Park second, and the site in North Lawndale third. The Foundation's analysis did not discuss potential negative impacts of its massive development plans on the proposed locations or surrounding communities.

42. The University of Chicago commissioned Anderson Economic Group ("AEG") to prepare an economic impact analysis, which also ranked Washington Park as the top location for what was then the proposed new Obama Presidential Library. The Washington Park site "would most amenably accommodate new businesses and investment that might come into the area due to the presence of a presidential library." In contrast, AEG concluded: "There is not a current base of industry in place that would serve the demand of visitors to Jackson Park within half a mile of the proposed location. There is some room for growth, but a lot of the nearby land is taken up by public parks or large institutions and developments." Similarly, a 2016 report by Deloitte for the Chicago Community Trust did not identify Jackson Park as the best location for the Library.

***The City Council Expressly Delegates Decision Making Authority Regarding The Siting And Construction Of The Presidential Library To The Obama Foundation***

43. The Foundation communicated to the City the results of its study but provided no specific information that compared the pros or cons of any locations, for example comparing a Jackson Park location to a Washington Park location. Rather than performing such a review on its own initiative, the City Council unanimously passed an ordinance ("the 2015 Ordinance") that solely reflected the *Foundation's plan* for a presidential library, a museum, and "the Foundation's executive and administrative offices, and other ancillary facilities, such as parking and landscaped open space." (Exhibit 1 hereto)

44.     The 2015 Ordinance specified that the City would review or recommend sites, submitted by the University of Chicago and UIC (those being the Washington Park, Jackson Park, and North Lawndale locations). However, the ordinance also provided that the City had already decided to forgo making its own independent evaluation of the sites to see which choice would on balance offer the best benefits to the City and its citizens. From start to finish the supposed review by the City was intended solely to rubber-stamp the choice of the Foundation.

45.     The City explicitly delegated *the entire selection process and choice* of final location to the Foundation and its namesake:

> WHEREAS, While the City Council is **confident** in the quality and thoroughness of both UIC's and UChicago's proposals, ***the City defers to the sound judgment of the President and his Foundation as to the ultimate location of the Presidential Library.*** (Emphasis supplied)

At no point did the 2015 Ordinance address any conflicts between the Foundation and the City as a whole. But it did conclude:

> It is anticipated that the City and the Foundation will enter into a long-term ground lease that will allow the Foundation to develop, construct and operate the Presidential Center, and that the Foundation will enter into a use agreement, sublease or other agreement with NARA [National Archives and Records Administration] to operate the Library and Museum.

46.     The 2015 Ordinance notes the Foundation "expressed concern" over the City's "lack of control over the proposed park sites" (even though owned by the Park District). Accordingly, the City enacted a provision that led ultimately to the transfer of ownership of critical and numerous acres of Jackson Park to the City. The City's plan was designed to take and then distribute public trust parkland in an effort to escape the public trust obligations that attached to the land and were explicitly made binding on any assignee, public or private, that took the property. transferred.

47.     The transfer of the Jackson Park land to the City was also done in an effort to escape the obligation of the Chicago Park District to find new replacement lands to dedicate to public use after the transfer to the Obama Foundation, a private party, was complete.  Specifically, 70 ILCS 1205/10-7, governs the transfer of public land to private parties, saying:

> Any park district owning or holding any real estate is authorized to convey such property to a nongovernmental entity in exchange for other real property of substantially equal or greater value as determined by 2 appraisals of the property and of substantially the same or greater suitability for park purposes without additional cost to such district.

48.     At a minimum, the curious transfer from the Park District to the City, and the Foundation's insistence that the City "lack[ed] control" over the site, were done to improperly facilitate the transfer of parkland to a non-governmental entity, thereby circumventing the governing statute above.

### The Museum Act Is Suddenly Modified

49.     About this same time, the Illinois legislature enacted an amendment to the existing Illinois Aquarium and Museum Act, which became effective on January 1, 2016 ("2016 Amendment") in order to ease the transfer of Jackson Park land to the Obama Foundation.

50.     This Amendment to the Museum Act, for the first time and only after the City had approved (and abdicated its own role regarding) the presidential library, added new language, *inter alia,* allowing edifices to be used as aquariums or as museums of art, industry, science, or natural or other history, including a new category of presidential libraries, centers, and museums, such aquariums and museums "consisting of all facilities for their collections, exhibitions, programming and associated initiatives...."  Despite this being new language, and without any basis for its conclusory statements, the 2016 Amendment provides that: "The changes made to this Section by

this amendatory Act of the 99th General Assembly are declaratory of existing law and shall not be construed as a new enactment."

### The Foundation And Former President Obama Select Jackson Park As The Site For The Presidential Center

51.     On July 29, 2016, without any further input or analysis from the City, former President Obama and his Foundation selected Jackson Park as the site for the new development.

52.     Neither the Foundation nor the City prepared a report which either considered or suggested means to address negative aspects of choosing Jackson Park, such as road closings, disrupted traffic patterns, the mass destruction of mature trees, and the adverse impact of the new construction on the visual and operational and historic integrity of Jackson Park.  None considered the site's physical ability to accommodate the proposed library, given its location on the edge of the West Lagoon that is directly connected to the rising waters of Lake Michigan, which pose serious logistical issues in construction and future usage.

53.     Their reports offered no comparison of the pros and cons of the Jackson Park site, compared with sites located in or near Washington Park (or other locations). It did not consider the impact on general traffic patterns in and near the two parks; nor did it evaluate the visual impacts of the proposed Obama Library on the two respective sites.  It did not consider the impact of the construction of a large tower on the migratory bird population that flies north and south close to the western edge of Lake Michigan.

54.     The design plans first unveiled in May 2017, and modified in January 2018, called for an expanded campus of four buildings and a large parking lot.  But the Presidential Library referred to in the 2015 Ordinance, as subject to NARA obligations, was no more.  Instead, Presidential archives were to be housed by NARA at a different and as yet undetermined location. The centerpiece of the new OPC was a 180-foot structure, later increased to 235 feet, that by design

18

would tower above the (Griffin) Museum of Science and Industry located just to its northeast, towering over every other structure located in or near Jackson Park. The new OPC complex would occupy 19.3 acres at the heart of Jackson Park on a different footprint from that identified in the 2015 ordinance, thus requiring road closures, the widening of Lake Shore Drive and Stony Island Avenue, the closing of Cornell Avenue and of the Midway Plaisance going east. It would also require cutting of near 1000 mature trees, and encompass at least an additional ten acres for the roadwork solely needed to provide access to the new OPC.

55.     The main Museum building would house the Foundation offices on two of its floors. The other floors are slated to offer a mix of permanent exhibits about the Obama presidency and galleries for temporary exhibits, relating to the main themes of his administration.

56.     One of the buildings would be occupied by a Chicago Public Library branch, far removed from local residents and not under the authority of NARA. The Forum Building would house collaborative and creative spaces for various conferences, meetings and public events.

57.     The athletic space would be used for basketball, other sports, and other non-athletic events, even though today athletic space is already available at the recently rehabilitated YMCA and the Jackson Park Fieldhouse, both located just a block or two from the proposed OPC site. Originally, the OPC plans called for the construction of a parking facility located above ground on nearby public parklands outside Jackson Park, but that plan was scrapped after strenuous public objections (*not* from the City) were raised against locating the facility in that location. Instead, the new plans called for the construction of a costly underground parking facility for more than 400 vehicles on the central OPC campus.

***The Chicago Plan Commission***
***Unanimously Approves The Obama Foundation's Applications In One Day***

58.     In early 2018, the Foundation submitted applications for construction to the Chicago Plan Commission seeking: (i) approvals under the Lakefront Protection Ordinance, and (ii) rezoning to allow the OPC to proceed as a Planned Development.  The Chicago Department of Transportation submitted a companion application seeking approval under the Lakefront Protection Ordinance for the related road removals and realignments.

59.     These elaborate applications generated significant public interest and controversy. The Chicago Plan Commission devoted one public hearing, on May 17, 2018, to reviewing all applications. City officials gave a quick public summary of its findings, followed by Foundation presentations, and brief remarks by interested Aldermen.  Public comment was tightly controlled, limited to remarks of three minutes by groups, most of which had serious reservations about the project.

60.     The Plan Commission unanimously approved all applications on the same day they were presented, without adjourning to deliberate, and without preparing any new documentation reflecting the testimony received at the hearing.  In addition, the Plan Commission adopted in toto all the recommendations that the report made pertaining to the Lakefront Ordinance.

61.     Less than a week later, on May 22, 2018, the City Council's Zoning Committee approved the necessary zoning amendments, again without significant public input or notice. A day later the City Council, by a vote of 47 to 1, approved the recommendations of the Plan Commission and the Zoning Committee without further debate or discussion.

62.     The Foundation then secured a zoning change, from "POS-1," Regional or Community Park, to "IPD" Institutional Planned Development, which marked the conversion of public trust parkland to land slated for private development.

***On October 31, 2018, The City Council Abdicates All Decision-Making Authority
Over The Obama Presidential Center To The Obama Foundation***

63.     Consistent with its delegation of authority to the Foundation, the Obama Foundation demanded, and the City supplied, both property and money for its benefit. Thus, on October 31, 2018 the City Council passed an ordinance that authorized the Park District to transfer to the City ownership of 19.3 acres in the heart of Jackson Park, including portions of Cornell Drive and the Midway Plaisance. (*See* Exhibit 2)

64.     The 2018 Ordinance did not refer either to the ground lease contemplated in the 2015 Ordinance, nor to any prospective agreement with NARA to operate a presidential library. Instead, it approved a novel "Use Agreement," which transferred 19.3 acres for a term of 99 years from the City to the Foundation, again exactly as was demanded by the Foundation, without any reference to NARA in overseeing a presidential library.  Instead, the newly branded "Use Agreement" gave the Foundation the sole right to construct and install buildings, and the sole right to use, occupy, maintain and operate those buildings as it saw fit, and provided the Foundation with all naming rights, and revenues from the operations over the Jackson Park site.  The effect of this transfer of public trust parkland was to vest in the Foundation for at least 99-years (with renewal rights) the most usable acres in Jackson Park.  No longer would these acres be open, public and free as provided for in the original grant of 1869.  Instead, total control of this property was turned over to a private body.

65.     The Use Agreement also committed the City to pay for environmental remediation of the entire campus site, including the main Museum building and the underground parking garage, both to be constructed on marshy areas.  Extensive caissons far underground will be needed to protect the oversized tower from the rising water table of Lake Michigan.  Recent preliminary estimates (available information is at least two years old), for these environmental liabilities

preliminarily range anywhere from $3.7 to $8.7 million dollars, but those estimates could well be low in light of the recent rise in the level of Lake Michigan.

66.     This 2018 Ordinance announced alleged "extensive benefits" and "purported enhancements" and "improvements" including large-scale road closures, none of which were mentioned or described in the 2015 Ordinance.  These were being implemented to relocate the new museum to an even more prominent space right on the Midway Plaisance: "***the Foundation has proposed shifting the boundaries of the Original Site to the North and east to incorporate portions of the Midway Plaisance and Cornell Drive, and CDOT has proposed closing these and additional road segments with the park.***" (Emphasis supplied.)  In so doing, the Foundation appropriated recreational land for private non-recreational use, in violation of UPARR, which requires new parkland to be found to replace recreational space that has been appropriated.  The 2018 Ordinance peremptorily ordained the eastern end of the Midway Plaisance as replacement parkland solely to accommodate the Obama Foundation's decision to construct the OPC in Jackson Park.

67.     Furthermore, the multiple road closures in Jackson Park that necessitated expansion of Lake Shore Drive and Stony Island would eat away nearly 11 additional acres of parkland, at a cost (as of 2016) of at least $175 million of taxpayer monies, plus additional project costs totaling at least $10 million.

68.     In making these arrangements, the so-called "use" agreement was prepared solely to avoid the use of the term "lease," because the City and Foundation well knew that any lease would count as a property transfer of 19.3 acres of public park land in violation of the public trust doctrine. This terminological sleight of hand embodied in the "use" agreement, however, was a

distinction without a difference, as the use agreement gave the Obama Foundation all exclusive rights embodied in an ordinary lease agreement.

69.     In order to bolster its position during federal reviews, the City exaggerated its figures of new parkland created by, for example, treating existing parkland (including Cornell Drive and the east end of the Midway Plaisance) as newly created parkland.

### The Federal Statutory Reviews Begin And
### Are Dominated And Controlled By The Applicant, And Not The Federal Agencies

70.     Jackson Park has long been listed on the National Register of Historic Places, and referred to therein as the Jackson Park Historic Landscape District given its distinction as a cultural landscape and its historical importance.  The Midway Plaisance is also listed on the National Register of historic places.  In light of the protected status of Jackson Park and the Midway Plaisance, over the years the City and the Park District, along with private groups, have made significant and expensive efforts at restoration, which proved highly successful.

71.     Jackson Park's national register status, as well as the fact that it is parkland, requires that any modification of the site as contemplated by the City and Foundation must receive various permits and approvals that can only be issued after a full and impartial review in accordance with various federal and/or state statutory schemes.  Furthermore, any request for federal and/or state funding and permitting for any part of any project also triggers a host of reviews to ensure that the project has satisfied various statutory requirements.

72.     Accordingly, starting in approximately December 2017, the federal review process began, led by the Federal Highway Administration and the National Park Service, as well as involvement from other federal agencies such as the Army Corps of Engineers.

73.     The purposes and scope of the project in Jackson Park are recognized by the federal agencies as follows:  "the undertaking comprises the construction of the OPC in Jackson Park by

the Obama Foundation, the closure of roads to accommodate the OPC and to reconnect fragmented parkland, the relocation of an existing track and field on the OPC site to adjacent parkland in Jackson Park, and the construction of a variety of roadway, bicycle and pedestrian improvements in and adjacent to the park."  (*See* Exhibit 3, January 16, 2020 Assessment of Effect Report at 1)

74.     With this vast project undertaking, the division of labor for the reviews generally was assigned as follows:  Federal Highway Administration assumed responsibility for handling the Section 106 review and the Section 4(f) review, while the National Park Service assumed responsibility for the NEPA review and the handling of UPARR-related reviews.  The Army Corps of Engineers oversees any project relating to Lake Michigan, including the Great Lakes Fishery and Ecosystem Restoration Project ("GLFER") that has recently been completed in Jackson Park after years of work at a cost of over seven million dollars.  Notwithstanding these explicit federal statutory responsibilities, in practice the review process throughout was largely controlled by the applicant City of Chicago, whose actions were, in turn, being coordinated with the Obama Foundation.  Indeed, virtually every public meeting was controlled by hand-picked City officials, and the agencies legally responsible for review, while present, largely deferred to the City of Chicago representatives.

### *The Section 106 Review*

75.     The Section 106 review under the National Historic Preservation Act was initiated in December 2017 while other reviews were held in abeyance.

76.     From the start, the conveners of the Section 106 review (FHWA and NPS representatives, as well as other statewide representatives from the Defendants) largely ignored the oft-expressed objection that the City of Chicago exerted excessive control over the process.

77.     In July, 2019, during the initial stages of the Section 106 process, a report from the Federal Highway Administration dealing with the Assessment of Effects ("AOE") identified extraordinary and extensive adverse effects that the construction of the OPC would have on Jackson Park and the Midway Plaisance.  The summary reads as follows:

*The undertaking will have an adverse effect to Jackson Park Historic Landscape District and Midway Plaisance because it will alter, directly or indirectly, characteristics of the historic property that qualify it for inclusion in the National Register.*

The significance of Jackson Park and the Midway Plaisance is manifested in the integrity of extant landscape characteristics. Explanation of the integrity and features of the cultural landscape is included in Appendix F of the HPI. The overall historic property conveys the character present during the period of significance from 1875-1968 and currently possesses historic integrity of location, design, setting, materials, workmanship, feeling, and association. The undertaking diminishes the historic property's integrity of design, materials, workmanship, and feeling.

•     Primary physical changes that are concentrated in the western perimeter of Jackson Park and the eastern Midway Plaisance impact adjacent park areas including the Lagoons, Fields, and Lake Shore. The changes alter the legibility of the design of the cultural landscape in ways that diminish the overall integrity of spatial organization in the property as a whole.

•     While most impacts to the cultural landscape occur in a limited spatial area, they diminish the historic property's overall integrity by altering historic, internal spatial divisions that were designed as a single entity.

•     The undertaking impacts the overall historic road network, altering the historic property's designed spatial organization and the relationship between interconnected systems of pedestrian and vehicular circulation.

•     The undertaking alters the shape, form, and function of the historic primary entrance to the property by changing the historic symmetrical roadway design and spatial patterns that define the connection between Jackson Park and the Midway Plaisance.

•     Spatial organization and the landscape setting of some contributing resources (Cheney-Goode Memorial and Statue of the Republic) are transformed in ways that are inconsistent with the Secretary of the Interior's Standards for the Treatment of Historic Properties.

- The undertaking removes, replaces, or otherwise alters historic resources and landscape features within portions of the historic property. New materials with modern functions differ from historic materials at a scale and intent that does not conform to the Secretary of the Interior's Standards. Integrity of workmanship is obscured by changes to the integrity of park design, the addition of new features and materials, and by the removal and alteration of historic fabric that relates to material integrity.

- The size and scale of new buildings within the historic district diminish the intended prominence of the Museum of Science and Industry building and alter the overall composition and design intent of balancing park scenery with specific built areas.

- The combined changes diminish the sense of a particular period of time within the historic property and impact the integrity of feeling. The changes impact how Jackson Park and the Midway Plaisance reflect conscious decisions made by the Olmsted firm in determining the organization, forms, patterns of circulation, relationships between major features, arrangement of vegetation, and views.

(Exhibit 4, at 22-23) (emphasis supplied)

78. The AOE thus mentions numerous acts that comprise the permanent destruction of critical elements of Jackson Park, including parkland and its Olmsted design and character, its unique gardens, its trees, and its roadway vistas. For example, it was written that "**Implementation of the OPC proposed design will affect the overall site (cultural landscape)**, the Perennial Garden/Women's Garden, the English Comfort Station, and the Western Perimeter Playground (E.62nd Street Playground)." (Exhibit 4 at 30) The report goes into greater specifics about the destruction of the cultural landscape in numerous ways:

Changes to the cultural landscape directly north of the proposed OPC buildings but within the project footprint remove physical features that contribute to the significance of the historic property. . . . The symmetrical layout of concentric rings of planting beds and paths will be replaced with a series of asymmetrical winding paths, gathering spaces, stormwater catchment areas, and plant beds. Historic materials including stone edged terraced planting beds, steps and vegetation will be removed. The symmetrical triangular path intersections at the east side of the space that define the transition from the Midway Plaisance to Jackson Park will be replaced with asymmetrical paths [citation omitted]. Removal of the relatively uniform topographic setting surrounding the sunken garden and replacement with undulating hills and swales does not correspond to the formality of the historic

26

design in relation to its setting.  **Implementation of the new garden physically damages this part of the site (cultural landscape) that contributes to the historic property.**

With the exception of the English Comfort Station [citation omitted] the remainder of the contributing historic features south of the Perennial Garden/Women's Garden to 62nd Street will be removed or altered to accommodate elements associated with the OPC. ... **The change to this portion of the historic property is not consistent with SOI [Secretary of the Interior] guidelines that stipulate the need to preserve contributing historic features and discourage "placing a new feature where it may cause damage to, or be intrusive in spatial organization and land patterns."**

*    *    *    *

Historic views are part of the site (cultural landscape) that contributes to the historic property.  Construction of the OPC includes the addition of new visual elements that diminish the integrity of views along the western park perimeter within the historic property.  Tall buildings exist outside of the historic property, not within it. Within the historic property, the comparatively low-lying Museum of Science and Industry building was intended to be the only building to be a "dominating object of interest" inside of Jackson Park and the Midway Plaisance.  The proposed OPC Museum Building affects views within the historic property by drawing specific focus to an exceptionally prominent building.  This building **will disrupt historic, designed views over parkland from the East Lagoon (Music Court) Bridge [citation omitted], the Wooded Island North Bridge [citation omitted] and the west side of Wooded Island.**

**The OPC construction alters historically important topography that defines spaces, forms a unifying element along the western perimeter, and provides a sense of physical and visual separation between uses.  Within the OPC footprint, the historic berms between E. 60th Street and E. 62nd Street and west of S. Cornell Drive are removed in some locations to provide level access and accentuated in height in other areas. . . . .**

**Construction of the OPC also changes existing historic vegetation in a way that is inconsistent with SOI standards which emphasize the retention, preservation, protection, and maintenance of historic materials and features.**

(Exhibit 4 at 30-32) (emphasis supplied)

79.    Similarly, the various proposed road closures tied to the construction of the OPC

were determined to create adverse effects to the Park:

**The closure and subsequent removal of roadways results in physical damage to the historic vehicular network in the south and west part of the historic property.**

Historic road segments proposed for removal include: Midway Plaisance (South Roadway; eastbound); between Stony Island Avenue and Cornell Drive; Cornell Drive between[] 59th and 62nd Streets; the northbound portion of the Cornell Drive south of Hayes Drive from 65th Street to 66th Place; and Marquette Drive between Stony Island Avenue and Richards Drive. *These roads retain historic alignments and continue to define interior spaces, compose the historic sequence of people's movement through the landscape, and provide access to key historic locations as intended by the historic design of the site (cultural landscape).*

*Road closures remove historic roadways that are part of the historic property and replace them with parkland. This action alters the historic circulation network. . . . Removal of historic roadways alters spatial organization of the overall park, reduces differentiation of landscape character areas within the historic property, and is not consistent with SOI standards that recommend the retention and preservation of historic land patterns and circulation systems.*

(Exhibit 4 at 29) (emphasis supplied)

80.     A later report (Exhibit 3), heavily influenced by the applicant, tried to walk back many of these statements, without ever confronting the categorical conclusions of earlier findings. Nonetheless, these later efforts did not deny that the OPC project created significant adverse effects to historic resources including Jackson Park, Midway Plaisance and another resource identified for the first time, the Chicago Boulevard Historic District.

81.     A few public meetings were held to discuss the adverse effects determinations, but these were largely controlled by the City, not by the federal agencies whose representatives participated in a supporting role. For example, at a meeting held on August 5, 2019, the City representative, Abby Monroe of the City's Planning and Development Department, filtered and censored questions from a restive audience that frequently cried out in protest against her heavy-handed tactics. After a few rounds of questions, the moderator gaveled the open meeting to a close before less than half the allotted time had passed, and instructed to the audience that it could speak privately to various panel members in the lobby. The entire object of this planned filibuster was to shut down public input before it could generate a critical mass of criticism addressing the entire heavy-handed process. (*See* Exhibit 5)

82.     One of the critiques made at the meeting stressed that the Section 106 regulatory scheme requires that any study of the adverse effects to historic resources address (in strict order) alternatives that could avoid, minimize and/or mitigate those adverse effects on the historic resources.  Such study requires that the consideration of alternative locations, changes in design, size, surrounding or, as a last resort, mitigating the adverse effects of such a large and distinctive project, must occur before the Section 106 review can be properly and satisfactorily completed. *See* 36 C.F.R. §§ 800.1(a), 800.6(a), 800.6(b)(2), 800.11(e)(5) (process for 106 review, and to be completed prior to an adverse action being taken).

83.     The federal agencies repeatedly refused, often in response to direct questions, to consider any avoidance and minimization measures whatsoever. Instead, they focused exclusively upon mitigation measures, which is precisely what the City (and the Foundation) desired.  For example, at the August 5, 2019 meeting discussed above, the only items presented before the meeting was shut down dealt with mitigation, not avoidance or minimization.  (Exhibit 6, Slide called "Mitigation Examples")

84.     To further advance its predetermined approvals, the FHWA also implemented the practice of segmentation, stating that, while it could identify a massive amount of serious adverse effects of the whole project, its statutory mandate required that it only look at the expansion of Lake Shore Drive and Stony Island Avenue.  (*See, e.g.,* Exhibit 3 at 8) It dismissed other aspects of the larger project as a "local action" and thus purportedly outside of its jurisdiction.  Put differently, despite the undertaking at issue, the FHWA failed to acknowledge that the damage caused by removing the construction of the OPC and closures of certain critical Jackson Park roadways fell within its purview even though these consequences were not just reasonably foreseeable as a cumulative effect, but a known certainty of the total undertaking.  And, as a result,

the FHWA deliberately refused to consider the many avoidance, minimization or mitigation alternatives related to the OPC project. It was as though the destruction of land from Jackson Park, its trees and its roadway system will never have taken place, so that meek mitigation measures will be regarded as if they were sufficient to compensate for the massive damages slated to be imposed by the OPC project.

85. After the AOE report was released and the process moved to the effort to resolve adverse effects, the FHWA repeated its refusal to address any measures to avoid or minimize adverse effects as they related to the OPC (including those previously considered, of which there were none). The FHWA ultimately negotiated a Memorandum of Agreement ("MOA") between itself, the City of Chicago, the State of Illinois Department of Transportation, the Advisory Council on Historic Preservation and others. But that MOA only reaffirmed the flawed segmented definition of the project that plagued the review process from the beginning, and implemented a series of largely meaningless and vague mitigation tasks, which themselves are largely toothless. (*See* Exhibit 7)

### *UPARR Review*

86. The National Park Service ("NPS") was responsible for the review and approvals under the Urban Park and Recreation Recovery Act ("UPARR") (54 U.S.C. §§ 200501-200511) as the construction of the OPC and its encroachment upon certain recreational land in Jackson Park and the Midway Plaisance entailed a "conversion" of such land to non-recreational uses. *Id.* § 200507. NPS has a statutory obligation to review the recreational impacts of decisions affecting UPARR-assisted parks such as Jackson Park, and is required to consider whether or not to approve such conversion. *Id.* Separately, the NPS also took over as the lead review agency under NEPA, which continued to be in abeyance while the Section 106 Review was proceeding.

87.     Specifically, the proposed OPC project impacted lands currently managed in Jackson Park consistent with the UPARR program, under which federal funds were previously provided to support improvements to Jackson Park in the early 1980s.  The NPS proclaimed that a review under UPARR is necessitated because the National Park Service determined that the OPC project, including the placement of the four buildings (including the massive 235- foot tower), will take indisputable recreational lands and convert them into non-recreational spaces.

88.     The governing regulations require the NPS to consider and address many issues, including, but not limited to, demanding that the applicant demonstrate that "*all* practical alternatives to the proposed conversion have been evaluated."  36 C.F.R. § 72.72(b)(1) (emphasis supplied).  Indeed, in a public informational meeting held in September 2018 NPS representatives suggested at the time that no decision had been reached on the conversion and that alternatives would be considered.

89.     But all practical alternatives were not examined.  Instead, the eastern end of the Midway Plaisance, which was included by the City of Chicago as part of the AOE Report issued in July 2019 and the aforementioned public meeting on August 5, 2019, remained the predetermined focus.

90.     Indeed, the UPARR regulations provide exacting preconditions to approval of such a request including*, inter alia,* locating new "adequate recreation properties and opportunities of reasonably equivalent usefulness and location."  36 C.F.R. § 72.72(b)(3).  It is also recognized that "[r]eplacement property need not necessarily be directly adjacent to or close by the converted site.  This policy provides the administrative flexibility to determine location recognizing that the property should meet existing public recreation needs."  *Id*. § 72.72(b)(3)(ii).  As such, land located in Woodlawn and South Shore, for example – where parkland is needed – could have been a large

focal point of efforts to locate and house new public recreational space. However, the sole focus of the City of Chicago and the Foundation was on the eastern end of the Midway Plaisance, which is itself already a recreational space and a property listed on the National Register of Historic Places. Yet no new Section 106 review was undertaken to evaluate the new proposed impact upon the Midway that was being insisted upon by the City. Instead, the ultimate Memorandum of Agreement (Exhibit 7) identified the eastern end of the Midway Plaisance as the replacement parkland, subject to "design guidelines" for usage.

### *Section 4(f) Review*

91.     Section 4(f) of the U.S. Department of Transportation Act of 1966, (commonly called Section 4(f)), requires a searching and substantive review of a transportation project that implicates park and recreation lands, wildlife and waterfowl refuges, and historic sites. *See* 49 U.S.C. §303 and 23 U.S.C. §138; 23 C.F.R. Part 774.  "**Before approving a project that uses Section 4(f) property, FHWA must determine that there is no feasible and prudent alternative that avoids the Section 4(f) properties and that the project includes all possible planning to minimize harm to the Section 4(f) properties; or, FHWA makes a finding that the project has a de minimis impact on the Section 4(f) property. Section 4(f) protects publicly owned park and recreation areas that are open to the general public, publicly owned wildlife and waterfowl refuges, and public or privately owned historic sites.**" (*See* Exhibit 8 at 1)

92.     The FHWA admits that a Section 4(f) review was required prior to approving the OPC project given the nature of the project and the request of federal transportation funds to assist in its completion.

93.    A few months after the Section 106 process began, elements of the Section 4(f) review were mentioned, but those references were sporadic and incomplete, and largely downplayed.  Indeed, back in 2017, the City and the federal agencies did not even mention, let alone discuss, the necessity of the 4(f) review.  Subsequently, and without discussion, FHWA "purposes and need" drafts were posted on the City of Chicago website between February and April 2018.  After those postings, ***nothing*** further was added until September 2020, over two years later when a draft of the FHWA's Section 4(f) report was included in the draft NEPA review issued by the NPS (discussed further below), subject to comments due thirty days later, on October 30, 2020.

94.    A final Section 4(f) report was completed and issued on December 18, 2020. (Attached hereto as Exhibit 8 without exhibits, which can be obtained on-line at https://www.chicago.gov/content/dam/city/depts/dcd/supp_info/jackson/section_4f_final.pdf)

95.    Like the Section 106 report, the Section 4(f) report ignores much of the total project for its analysis, segmenting and excluding consideration of the partial destruction of Jackson Park on the supposed ground that it counts as a "local" project that falls outside the scope of federal review. That arbitrary determination precluded consideration of the relocation of the OPC as a feasible and prudent alternative that is needed to avoid and minimize the harm to Section 4(f) properties.  By using this analysis, the FHWA's Section 4(f) report evades analyzing, for example, a South Side alternative near Washington Park (or other alternatives) that is situated (in whole or in part) on private lands on the South Side, with better access to transportation and far lower costs of construction, and that would avoid ripping out roads and trees from an internationally recognized park.  (Overviews of such an alternative are attached as Exhibit 9)

96.     Indeed, the Final Section 4(f) report admits that its "analysis" included no alternative whatsoever based on the condition of Jackson Park and the roadways prior to the planned destruction of those roadways and construction of the OPC.  (*See* Exhibit 8, Section 3.1 at page 5)

97.     The Final Section 4(f) reports admits that it did not consider avoidance measures to eliminate adverse effects from the construction of the OPC in Jackson Park, or to examine the adverse effects from closing the roadway system through Jackson Park. (*See* Exhibit 8, Section 5.1 at 43-44)

98.     Instead, the Final Section 4(f) report explicitly relies exclusively upon the nominal mitigation measures of the Section 106 review (Exhibit 7), without addressing any of the distinctive substantive requirements of the Section 4(f) review.

99.     While no comments were received from many officials with jurisdiction, the Chicago Park District, having engineered the process, was more than happy to voice its unconditional and predetermined support.

### *NEPA Review*

100.     NEPA requires that a "hard look" be performed by a federal agency on all new project proposals.  An Environmental Assessment ("EA") is to rigorously explore and objectively evaluate the impacts, both positive and negative, of all reasonable alternatives, including the no action alternative, which in this instance meant no construction of the OPC or its related road work in Jackson Park.  40 C.F.R. § 1502.14(a).  That study was never undertaken under NEPA.

101.     Instead, on September 28, 2020, the National Park Service issued, pursuant to NEPA, a draft EA report with several attachments.  (Attached as Exhibit 10 without exhibits, but which exhibits can be obtained at

https://parkplanning.nps.gov/document.cfm?parkID=534&projectID=83280&documentID=1067 46)  The EA report rests on the same flawed methodology and analysis utilized in the Section 4(f) report and the Section 106 report, segmenting the project into smaller pieces precisely to avoid review of the construction of the OPC and the required review of alternatives.

102.    Section 4 of the EA discusses the various alternatives that are included in its analysis of the purpose and need.  Alternative A is called "No Action;" Alternative B is called "No Build."  The "no build" analysis, however, assumes that construction of the OPC has already been completed, even though no roadwork expansion of Lakeshore Drive or Stony Island has yet occurred.  Alternative C incorporates every demand from the City and the Obama Foundation and labels it the "preferred alternative," blessing the construction of the OPC at its exact proposed location, with the removal of all roadways needed to complete the proposed plan, plus the addition of new roadwork to replace in part that which will be removed.

103.    Much like the Section 106 and Section 4(f) reviews, the entire analysis of the EA starts from Alternative B, which assumes that the OPC will already be built, and so simply presents a baseline situation that ignores the obstacles in the path of its construction, while simultaneously refusing to consider all of the road closures, the destruction of 1,000 mature trees and other significant cumulative environmental and cultural impacts.  The EA then only evaluates the transportation void that will be left when the initial project is completed.  Put differently, Alternative B is the official basis of comparison with Alternative C.  Shortcutting any analysis of Alternative A as the true baseline to measure the alternatives is, as further discussed below, a manifest violation of the NEPA requirements, given that the proposed project is the entire transformation from Alternative A to Alternative C.

104.     The EA contains other structural issues and problems and failures, as it largely adopted a predetermined outcome and analysis, which incorporates much of the flawed Section 106 and 4(f) decisions.  Further it contains other glaring errors involving, *inter alia*, (i) reliance upon a predetermined set of findings to support the purposes; (ii) a systematic failure to review alternatives; (iii) failures to properly view cumulative and indirect impacts; and (v) failure to adequately and accurately characterize adverse impacts in order to lay the groundwork to improperly avoid performing an environmental impact statement.  *See also discussion in* Count II, *infra.*

105.     POP and others provided substantive comments and critiques, which at a minimum necessitated the preparation of an environmental impact statement.

106.     On February 1, 2021, despite the flawed EA, and the other flawed reviews described above incorporated therein, the Department of Interior and Department of Transportation issued a finding of no significant impact (FONSI) (attached hereto as Exhibit 11). By issuing this FONSI, no environmental impact statement was mandated, thereby acting to ostensibly suggest that all of the federal statutory hurdles have been addressed.

107.     While suggesting that the work being done in and adjacent to Jackson Park does not significantly impact the human environment, the underlying analysis supporting the FONSI is flawed given that it is expressly based on the EA, which itself expressly (and improperly) failed to review any alternatives to the placement of the OPC in Jackson Park and its commensurate road closures, claiming once again that such review was outside of its purview.

108.     The FONSI then adopts in largely conclusory and predetermined fashion the conclusions of the EA asserting that none of the numerous impacts would be significant.  That conclusion was reached to avoid preparing an environmental impact statement, which entails a

36

much more stringent and probing review, and would have delayed the process. Thus, the loss of recreational spaces was downplayed by solely pointing to already existing recreational spaces, without determining that those were sufficient.

109.    The FONSI also adopts the EA's conclusion that impacts on traffic would not be significant, claiming that the preferred alternative will allow an "acceptable level of service," which is itself conclusory and inaccurate, and based on a faulty Section 4(f) review.  Similarly, while acknowledging a loss of parking spaces, the FONSI claims there is enough parking already (a conclusion at odds with the City and the Foundation's claim that there will be on onslaught of visitors to the new OPC).

110.    The FONSI also acknowledges an impact on cultural resources, but pronounces it insignificant because the area impacted is smaller than Jackson Park, claiming that "the development of the 19.3-acre OPC site would alter contributing physical elements of Jackson Park; however, the area of change would be small in scale given the size of the historic resources." (FONSI at 7)  This pronouncement contains no analysis, but offers a post hoc justification that improperly ignores the fact that the 20 key acres of the park that will be destroyed cannot be replaced, given that so much of Jackson Park is occupied with large lagoons or other features.

111.    Indeed, the federal agencies compound their error by referring to and relying upon the inadequate "mitigation" measures under the Section 106 process, which were the product of the flawed review process described above.

112.    Social and economic issues were also dealt with in conclusory fashion.  Curiously, the only citation to economic development refers solely to temporary construction jobs to build the OPC and then for work on the campus. But there is no evidence that the OPC will improve the overall economic development on the South Side, given that even greater economic benefit can be

obtained from other south side locations, including land located just to the west of Washington Park.

113.     Without meaningful discussion, the FONSI proclaims that the criteria for Environmental Justice are met, and that the activity "would not impact community cohesion or otherwise geographically divide or isolate the residents or businesses."

114.     The FONSI completely downplays the impacts to the Great Lakes Fishery and Ecosystem Restoration project ("GLFER"), a carefully crafted, multiyear, multi-million-dollar effort. Although admitting "both permanent and temporary impacts," these impacts are characterized as not significant largely because there would be replacement of the lost areas. This superficial analysis ignores the GLFER, whose careful creation is not amenable to such plug-and-play analysis, and that the impacts would permanently disrupt the balance of the GLFER.

115.     The FONSI's discussion of cumulative impacts relies on the EA, which is cursory, incomplete and conclusory.

116.     In addition, the FONSI largely ignores critical issues such as rising lake levels, the massive destruction of trees, and the disruption of the flight paths of migratory birds along Lake Michigan.

### Permit Reviews And Modifications By The Army Corps Of Engineers

117.     As noted, the GLFER is a large multi-year, multi-million-dollar project in Jackson Park designed to restore ecological systems, to combat climate change, and to ensure that the park would be become a year-round habitat and migratory haven. This project has been under the jurisdiction of the Army Corps of Engineers (the "Corps").

118.     The OPC project has significant and permanent impacts on the GLFER and required several actions by the Corps.

119.     First, the widening of Lake Shore Drive and modifications to the 59th Street Inlet Bridge and repairs to the Hayes Drive bridge which are necessitated by the OPC project result in impacts to waters under the jurisdiction of the Corps under Section 404 of the Clean Water Act. 33 U.S.C. § 1344.   As a result of these impacts, a Section 404 Regional Permit was required, and approved by the Corps on January 21, 2021.  (Exhibit 14)

120.     Separately, the Corps recognized that the impacts of the OPC to the GLFER project would include a request to alter the project pursuant to the procedures of Section 408 of the Rivers and Harbors Act,  33 U.S.C. § 408. Section 408 approvals were also issued by the Corps on January 21, 2021. (Exhibit 15)

### *Irreparable Harm*

121.     Given the unique environmental and historic nature of Jackson Park, Midway Plaisance and the Chicago Boulevard Historic District, any adverse action taken by any of the Defendants would constitute irreparable injury to the Plaintiffs and the public. Indeed, well recognizing the irreparable harm that would be inflicted on these resources, while the various federal reviews were ongoing, it was recognized that neither the City (nor anyone else) could take any adverse action on such resources given that the applicable legal standards under all three federal statutes require a thorough review and consideration of alternatives to avoid, minimize or mitigate the adverse effects and impacts to these valuable resources which could only be effectuated by keeping those resources intact. The various approvals received from the Chicago Plan Commission and the 2018 Ordinance recognized as well that they were subject to the completion of those federal reviews.

122.    There is no adequate remedy at law that applies once Jackson Park has been destroyed or altered. The statutory scheme requires maintenance of the status quo to protect the Plaintiffs' and the public's interests and these environmental, historical and cultural resources.

## COUNT I
### (Violation of Section 4(f) of the Department of Transportation Act)
### (Against Federal and State Transportation and Highway
### Administration Defendants, City, Park District & Foundation)

123.    Plaintiffs reassert and reallege Paragraphs 1 through 122 as if fully set forth herein.

124.    Section 4(f) of the Department of Transportation Act provides, in part, that the Secretary of Transportation

> *shall not approve* any program or project . . . which requires the use . . . of any land from an historic site of national, State or local significance . . . unless (1) *there is no feasible and prudent alternative to the use of such land*, and (2) such program includes all possible planning to minimize harm to such . . . site resulting from such use.

23 U.S.C. § 138(a) (emphasis supplied); *see also* 49 U.S.C. § 303(c).

125.    The proposed OPC requires the "use" of Jackson Park and the Midway Plaisance within the meaning of Section 4(f).

126.    The Section 4(f) process culminated in the Section 4(f) report issued by the FHWA, which failed to consider feasible and prudent alternatives to the use of land "from a historic site of national, State or local significance." The Section 4(f) report openly segmented the project into various pieces, including a so-called "local" portion, and thereby purposely excluded from its statutorily mandated and substantive analysis, a review of feasible and prudent alternatives to the multiple road closures, all of which involve the use of land "from a historic site of national, State or local significance."

127.    Instead, the only activities reviewed for feasible alternatives involved are slated to occur *after* the construction of the OPC and commensurate road closures, even though the central

40

purpose of the statute is to force government actors to take into account all adverse impacts of a unified project before, not after, construction has begun. The Defendants' interpretation of the statute would render Section 4(f) a dead letter in the very cases where it is supposed to have its maximum impact.

128.    Commensurately, the Section 4(f) review conducted here also improperly used a baseline for its analysis that assumed that the OPC and related road closures were already in place, and thereby foreclosed a review of feasible and prudent alternatives to the actions, which would destroy nearly 20 acres of Jackson Park, create road closures, and which were the necessary reasons for expanding Lake Shore Drive and Stony Island Avenue, requiring the destruction of another 10 acres of parkland.

129.    If the government agencies had reviewed all feasible and prudent alternatives for the entire project, they would have identified feasible and prudent substitutes for construction of the OPC in Jackson Park, including the area adjacent to Washington Park. Further, a report looking at traffic in the Washington Park area shows that there are far fewer traffic issues, all of which can be resolved at lower costs than under the plan predetermined to be used in the Section 4(f) report:

> Analyses have been conducted under existing and future conditions of the intersections in the study area to determine the impact from the proposed Barack Obama Presidential Library (OPL) Washington Park site. The capacity analysis results indicate that the implementation of geometric and signal improvements permits the surrounding roadways to operate at acceptable levels of service under all design hours to accommodate the increase in projected traffic due to the OPL, along with general traffic growth associated with new development in the surrounding area. Overall, vehicles will be able to easily access the site and the OPL will not have a significant impact on the traffic operations in the neighborhoods.

(Exhibit 12, Washington Park Traffic Study (prepared by Sam Schwartz) at page 32)

Additionally, the same report notes that parking is largely not an issue in the Washington Park area, given that there are approximately 3,725 on street spaces in the overall area. Further,

41

that survey indicates the usage of these spaces on "a weekday and Saturday is approximately 30%" leaving 70% of the existing parking spaces available for use. The need for parking during the busiest times (adding approximately 404 spaces), additional bicycle parking, and the provision of five bus sparking spaces, would be much easier to implement near Washington Park, without incurring the costs of making adjustments in Jackson Park (for example, including construction of an underground garage).

130. The flawed methodologies included and relied upon in the Section 4(f) report (and adopted in the EA) are wrong and inconsistent, as seen, for example, by the following.

### *Failure To Use Average Travel Speed And Other Proper Design Parameters*

131. The EA offers travel time comparisons, without first explaining what counts as an "acceptable" travel time. Average travel speed, rather than total travel time, is typically used to measure time intervals on urban street segments, again without documentation as to source and validity. Studies utilizing average travel speeds were not performed.

132. The roadways shown in Table 1 of the EA do not all utilize constant design parameters throughout the study area, such that the maximum projected capacity necessarily varies for each roadway segment. Given that omission, the EA (and the Section 4(f) report) fail to explain how the maximum projected capacity values shown in Table 1 were either calculated or obtained.

### *Failure To Adequately Consider Traffic And Parking Impacts*

133. Section 3.2.1 of the EA denies any direct traffic impacts associated with Alternative B, again relying upon the inadequate Section 4(f) study. That is wholly improbable. When Alternative B closes Cornell Drive and Midway Plaisance South, thereby shifting traffic to other routes, the extra traffic is likely to cause significant delays that the report does not address.

134.    The report's parking assessment relies on the parking counts collected in the 2018 Sam Schwartz study, which were made in the fall when Jackson Park usage is usually lower than in the summer months.    Therefore, the parking demand referenced within the technical memorandum fails to reflect typical parking conditions.

135.    As seen in Section 3.3.1.1 of the EA, the loss of on-street parking is noted for some roadways, but not for all.

136.    The Section 4(f) and EA report wrongly excludes the Marquette Drive on-street parking supply (125 spaces) from the Alternative C Parking Supply Summary (Table 14) for two reasons:  (a) on-street parking is legal along Marquette Drive and should be recognized; (b) it fails to observe parked vehicles along Marquette Drive. The parking occupancy counts were collected by Sam Schwartz in the fall when Jackson Park has much lower activity than in summer, and thus understates typical use conditions.

137.    The 2018 Sam Schwartz study wrongly relied on assumptions that yielded low traffic and parking values for the proposed Obama Presidential Center.  For example, the study erroneously assumed a high average auto occupancy value, without fully considering other multimodal factors (transit, pedestrian/bicycle, taxi/Uber/Lyft, school bus, etc.).  The 2018 report also ignored any special events at the proposed OPC, which could generate significant parking and traffic impacts.  The 2020 Traffic Congestion Technical Memorandum continues to rely on these artificially low traffic and parking numbers.

***Improper Reliance Upon South Lakefront Framework Plan***

138.    The technical memorandum notes 680 additional parking spaces are to be constructed at the completion of the South Lakefront Framework Plan.  The Plan, however, only offers an abstract long-term vision for the park, prepared without construction timelines or funding

43

commitments. As such, it would be wrong to count these spaces towards parking mitigation for the immediate loss of surface spaces from the planned OPC construction.

139. In any event, any reliance on the South Lakefront Framework Plan fails to support the decision, as the original plan created in the 1999-2000 time period never called for the closure of any roadways. This was changed after the City acquiesced to the Foundation's demand that the OPC be placed in Jackson Park.

140. Furthermore, the flawed 4(f) report also ignores other feasible and prudent and less expensive options that meet the same goals advanced by the Foundation and the City, without destroying the acreage needed to construct the OPC and its ancillary road network.

141. The Section 4(f) report also violates a separate provision of the Transportation Act that requires "all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c)(2). Its segmentation strategy, along with the application of an improper baseline, allowed the FHWA not to do "all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge" that comprises Jackson Park.

142. The Section 4(f) report disregards these statutory requirements to avoid and minimize harm, in favor of endorsing "mitigation" measures that cannot satisfy the statute's substantive mandate. These meaningless gestures fail to address the statutory obligations under Section 4(f) to adopt a less harmful alternative that is feasible and prudent.

143. Defendants also violated and continue to violate Section 4(f) by issuing the Final Section 4(f) report without addressing their obligation to provide "all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use."

44

144.     Each of these failures was arbitrary, capricious, an abuse of discretion, and contrary to law. Accordingly, Defendants should be enjoined from any and all activities in connection with their OPC project that may adversely affect the environment, natural, scenic, cultural and/or historic resources under review until such time as Defendants have fully complied with Section 4(f).

**COUNT II**
**(Violation of NEPA)**
**(Against All Defendants)**

145.     Plaintiffs reassert and reallege Paragraphs 1 through 144 as if fully set forth herein.

146.     The National Environmental Policy Act ("NEPA") requires federal agencies to prepare a detailed statement evaluating the environmental impacts of and alternatives to any proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

147.     Section 102(E) of NEPA requires federal agencies to "study, develop and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(2)(E). The FONSI and the EA that it relies upon fail to develop or review any such alternatives, and incorporate many of the flawed analysis and determinations that marred the Section 4(f) and Section 106 reviews, solely to avoid undertaking an environmental impact statement (an "EIS"). That FONSI determination is properly reviewed at this time.

148.     The EA, and its FONSI determination, improperly used segmentation throughout its analysis, which improperly ignored many relevant issues solely to avoid examining site alternatives for the location and construction of the OPC outside Jackson Park. The EA analysis starts from Alternative B, which assumes that the OPC will be built, and thus constructs a baseline

condition that ignores the construction of the OPC, all of the road closures, and other significant initial impacts. It then only evaluates the transportation void that is left when the initial project is completed. Alternative B is the official basis of comparison with Alternative C. Shortcutting any analysis of Alternative A—the status quo ante—as the true baseline to measure the alternatives manifestly violates the NEPA requirements, which must evaluate the entire transformation from Alternative A to Alternative C.

149. Instead of working to correct these flaws, the NPS and FHWA reached a predetermined outcome by issuing the FONSI based on incomplete and inaccurate data to attempt to avoid a much-needed EIS. There is a failure to adequately and accurately characterize adverse impacts. They failed to properly examine cumulative and indirect impacts. There is a systematic disregard of factors of significance including "the degree to which the effects on the quality of the human environment are likely to be highly controversial;" "the degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places;" and the "unique characteristics of the geographic area such as proximity to historic or cultural resources." 40 C.F.R. §§ 1508.27(b)(3), (4) and (8) (1978). Further issues that were not adequately or accurately addressed and which demonstrate the need for an EIS are discussed below.

### Social And Economic Analysis Is Based On Outdated And Inaccurate Data

150. The FONSI and EA admit the serious impacts on social and economic areas, but insists that they are insignificant. (E.g. Exhibit 11, FONSI at 8) The EA's erroneous discussion of socioeconomic impacts relies solely on an outdated 2016 consulting report that fails to justify placing the OPC in Jackson Park. Moreover, that report necessarily ignores the effects of the pandemic, the economic downturn, and the City's anticipated deficits, all of which postdate the

2016 Report. By way of example only, consider this conclusory statement devoid of record support:

> With the construction occurring later than originally estimated, shifting economic conditions between 2016 and the OPC's actual construction timeline have the potential to affect the realized impacts. However, the IMPLAN multipliers experience only small shifts over time. As a result, if the modeling were completed with updated figures, any changes are expected to be insignificant. Therefore, the results of the economic impact analysis continue to be accurate and reliable.

151. Rather than updating the study to account for the massive pandemic-induced changes, the EA rests on a wide array of untested assumptions and outdated data about housing, employment and the like, gathered some five years ago.

152. The EA also turns a blind eye to the severe budget deficits deriving from the pandemic, unemployment and the like. Likewise, its cursory treatment of environmental justice provides no actual detail whatsoever to support its conclusions. Instead, the EA leads with a gross and misleading statement that there is a plethora of parks on the South Side. These errors are compounded by such unsupported statements as "housing trends are not anticipated to be affected" (Exhibit 11, FONSI at 7) in the face of heightened community concerns over neighborhood displacement that would follow the construction of the OPC in Jackson Park. In contrast, construction of the OPC near Washington Park would enhance environmental justice by allowing development in areas of low density far away from the sensitive shores of Lake Michigan. An EIS is needed to remedy this superficial analysis.

153. In addition, the road congestion and traffic situation brought about by putting the OPC on the Jackson Park site would create sheer havoc for the impacted community. Blocking the Midway going east will further separate the South Side from the rest of the City, for the continuous new growth on the Midway requires better, not worse, access to the Jackson Park area. In contrast, the traffic is lighter near Washington Park, and the grid has clean rectilinear crossings,

with no awkward T-junctions that snarl traffic. The Washington Park neighborhood also contains large tracts of developable land to facilitate expansion without local disruption, community strife, and political machinations that will multiply if the OPC is built in Jackson Park. These urgent concerns make imperative an EIS to remedy the manifest gaps of the current EA.

### The FONSI's Analysis Of Traffic Congestion Is Incomplete And Inaccurate

154.    The FONSI and EA rely upon the same flawed and inaccurate traffic information used in Section 4(f) report, described in Paragraphs 117-137 *supra*.

### The FONSI's And EA's Analysis Of Cultural Resources Is Based On Flawed And Inaccurate Information

155.    As it relates to its analysis of cultural resources, the FONSI and the EA adopt a largely flawed, inaccurate and incomplete analysis similar to that in the Section 106 Report. From the outset, the Agencies were prepared to consider only mitigation in the most meager and minimal fashion, as in the August 5, 2019 meeting in which the City focused exclusively on "mitigating" the damage by tree screening, documentation, and public outreach—thereby sidestepping the mandatory prior review of avoidance and second, minimization of adverse impacts. In so doing, it stressed the "small" fraction of the land devoted to the OPC, without noting, first, that much of Jackson Park consists of two lagoons, and, second, that the lands expropriated are the most valuable portions of the park, as measured by the intensity of use.

156.    The City also offers only vague and hollow assurances that the draconian result of delisting Jackson Park and Midway Plaisance from the National Register of Historic Places will not occur as a result of the proposed OPC. Not only is that not the applicable standard as to whether to perform an EIS, but its conclusory vigor is undermined by the massive and permanent destruction of land within Jackson Park, the Midway, and adverse impacts on the Chicago Boulevards Historic District.

48

### *The Analysis Of Loss Of Recreation Space Is Inaccurate And Flawed*

157.     The FONSI's inaccurate conclusory analysis of recreation space cannot serve as a proper basis for avoiding an EIS.  It is not the case that recreational spaces will increase, given the loss of acreage to the OPC and the road expansions, and given that much of the new land included is, like the east end of the Midway, already park land.

### *The Impact On The GLFER Is Understated And Inaccurate*

158.     The EA and FONSI admit that the OPC will have both permanent and temporary impacts to various parts of the GLFER project, only to downplay these effects in a transparent effort to avoid and EIS:

> "All impacts to GLFER areas would be restored or replaced within Jackson Park. Areas impacted temporarily by construction would be restored in place using the GLFER planting palate as a guide. Permanently impacted GLFER areas would be replaced on the east side of the Jackson Park Inner Harbor to the south of Hayes Drive. This area was included in the original USACE GLFER restoration planting plans but has not yet been implemented. Therefore, implementing the GLFER planting in this area would serve as a replacement for the permanent impacts by providing a net gain of 1.11 acres compared to the existing restoration area. This implementation is consistent with the overall restoration plan. Replacement and restoration area plans are included in Attachment J-5. All replacement and restoration locations were coordinated with the CPD and the USACE. Table 4 provides a summary of the GLFER impact replacement areas."

159.     The analysis is unsupported and inaccurate. First, its approach on mitigation improperly assumes that the only issue involves acreage, not the specific purpose, placement, or value of the GLFER areas slated to be permanently destroyed, whether or not they are "replaced" elsewhere.  Contrary to the analysis relied upon, the GLFER areas do not all share a uniform, cookie-cutter design.  Indeed, years were spent in the effort to specifically develop and implement the GLFER project, which is based on the working interrelationship of various features and elements designed to meet critical environmental, ecological, historical and other goals.  Contrary

to the current suggestion, it fully undermines the conditions, purposes and outputs of the GLFER project to simply take out one piece of land and plug another piece elsewhere.

160.    Furthermore, the EA ignores the profound land use changes since the GLFER project was conceived and designed in 2012-14.

161.    The EA ignores the deleterious effects of tearing out Cornell Drive along a significant edge of the GLFER project area between 59th and 63rd streets. The plan further replaces the buffer between the GLFER acreage and the locally used portion of the park, which currently includes a track, playground, and (former) athletic playing field.  That space is also designed to allow tourists to frequent the entire acreage up to the edge of the west lagoon.  The change in usage of the GLFER acreage between the west lagoon and Cornell Drive on the GLFER is also ignored, as are the significant impacts on the purposes and outputs of the GLFER project (and also supports the denial of the permits and modifications granted by the Corps, discussed *infra*).  An EIS is needed to evaluate these stark transformations.

162.    Likewise, the EA ignores that the present OPC landscape design plan envisions collecting storm water on the site, which will then be directed to the west lagoon, all actions that are *neither part of or consistent with the* GLFER project.  Given that Lake Michigan is expected to rise further, this one new feature is likely to impact significantly a major portion of the GLFER project acreage, thereby interfering with the project's goals and output.  The record contains no evidence that these massive actions will not undermine the GLFER project. The problem is still more acute because (as with traffic) the EA makes no effort to measure both peak and average effects.  Ignoring the former is to overlook the risk of a major environmental collapse. It is necessary therefore to consider variations of every relevant element: season, time of day, holidays,

and more, because even one breakdown could result in damage that extends for weeks, months and years.

163.    This analysis extends to the creation of a berm and adjacent narrow area of GLFER plantings on the west side of S. Lake Shore Drive between the 59th street bridge and the approach to Hayes Drive, which was a carefully considered design element of the GLFER project. That berm is to be permanently destroyed in the name of supposed "roadway improvements" needed to close a portion of Cornell Drive to accommodate the OPC.  Indeed, the addition of one southbound lane of Lake Shore Drive will impose further dislocations in exactly that same area.  Both events together will result in the clear destruction of large and critical elements of historic Jackson Park. The negative environmental impacts of removing GLFER design elements cannot be mitigated by construction elsewhere. An EIS is needed to correct the evident shortfalls of the EA.

### The Significant Impact Of Massive Tree Removal Is Downplayed And/Or Ignored, And The Analysis Provided Is Flawed

164.    The EA largely ignores any adverse impact from the planned removal of a nearly 1,000 mature and established trees by characterizing the impacts as temporary and insignificant because of the supposed equivalence of new saplings for mature trees:

> "In conclusion, the alternatives would result in no impacts on recognized natural areas, the Lake Michigan Shoreline, or on nesting for migratory birds. Additionally, any temporary impacts to wildlife habitat due to tree removal within Jackson Park would be minor, with ample habitat remaining throughout the property. Because Jackson Park is an urban park, wildlife within Jackson Park is acclimated to human activity and development. The proposed actions would not alter the overall quality of the wildlife habitat of Jackson Park. Therefore, the impact topic of other wildlife and wildlife habitat is not carried forward for further analysis."

EA at 30.  The FONSI adopts this analysis.

165.    The analysis downplays the destruction of close to 1,000 trees covering nearly 30 acres that must be cut to make way for the proposed OPC. The removal of these trees counts as a permanent loss that is not eliminated by planting small saplings in their place.  At no point does

the EA compare the social and ecological value of the trees removed with those to be planted in their stead. The alleged 1-to-1 ratio of removal to replacement is not mitigation, as it ignores these stark differences. For example, and just focusing on the removal of the 417 trees solely to accommodate changes to the local road system, of those trees, 301 trees are classified as being in good condition, and 242 trees vary in diameter from 6 to 19 inches; ninety-seven (97) trees have a diameter between 20 and 59 inches. According to its tree memorandum (Appendix D), the City is proposing to plant a motley mix of 2.5-inch and 4-inch caliper trees, largely at the smaller end, as a supposed form of mitigation, oblivious of the simple proposition that in this context a tree is not just a tree.

166. The EA also ignores completely all aesthetic impacts from the massive removal of 30 acres of trees, both at the center of Jackson Park and along both Lake Shore Drive and Stony Island Avenue, including the wholesale destruction of the visual screen.

### The Significant Impacts On Migratory Birds, Endangered Species, And Wildlife Are Ignored

167. Similarly, the EA improperly characterizes and underestimates the impacts of the OPC project on migratory birds, endangered species and wildlife. Jackson Park is part of an Audubon Important Bird Area (Chicago Lakefront) that runs along the Lake Michigan shoreline throughout Illinois. According to the Audubon Society, "More than three-fourths of all bird species seen in Illinois have passed through or paused to rest and feed along the Chicago lakefront. The vegetation along the lakefront provides the rest and shelter birds need as they are migrating along Lake Michigan, which is on the Mississippi Flyway." (https://www.audubon.org/important-bird-areas/state/illinois)

168. Section 5.1.2 of the EA ignores this significant impact on migratory birds, which includes several endangered and threatened species. The EA's meager analysis ignores any impact

of the massive tower and other buildings in the OPC complex on both these endangered species and the many migratory birds in the Mississippi Flyway. The EA also omits any discussion of the impact of road construction on local wildlife, including nesting birds, which are especially vulnerable to external impact.

169. Moreover, the EA offers no documentation to support its conclusion that Alternative C is expected to have no adverse impact on migratory birds that fly through Jackson Park. That unsupported assertion is flatly false, as birds and wildlife are significantly and adversely impacted by the removal of 1,000 mature and established trees, whose impact the EA never addresses.

170. Indeed, the EA offers no analysis or understanding of the impact that tree removal has on wildlife. For example, nesting species of birds in the park will never be able to nest in the tiny "mitigation trees" that the City offers up as a weak substitute. Nests are only built in places which are inaccessible and are concealed from view. Mitigation trees do not offer any viable nesting sites because their low height and relative lack of foliage exposes the nests to a heightened risk of predators and the elements. As an example, the scarlet tanager prefers to build nests 30 feet or higher in a tree, located on a horizontal branch well away from the trunk. Mitigation trees do not have those indispensable characteristics and cannot obtain them for years.

171. Nor can these small mitigation trees supply the same amount of food as the larger trees that will be cut down. The buds, flowers, and leaves of large trees, particularly large native trees, attract insects that in turn attract birds. The mitigation trees will be too immature to provide anything close to the same volume of insects as is now routinely supplied by the trees they are intended to replace. It is wholly improper to use the word "temporary" to describe the adverse consequences that will last for generations after the tree removal program is implemented. The EA

makes the ludicrous assumption that a tree is a tree when it comes to sustaining a wildlife habitat. Yet it generally takes oak trees 20 to 30 years before they produce acorns; sugar maples can take 30 years before they produce seeds. The wholesale tree removal in Jackson Park will be one of the most destructive project impacts, which will permanently decimate migrant songbirds, resident birds and wildlife. Yet none of these environmental losses are addressed, let alone rectified. An EIS is needed to fill the large gaps in the current EA.

### *The Significant Impact On Water Resources And Related Issues Is Ignored And The Analysis Is Flawed*

172. The EA also fails to properly analyze the impact on water resources, including most importantly rising water levels in Lake Michigan that in turn expand the lagoons in Jackson Park, which today literally come within feet of the foundations of the proposed OPC. The EA ignores the critical role that these lagoons play as depositories for storm water needed to buffer the serious risks of intermittent and permanent flooding of the areas surrounding Lake Michigan.

173. The EA's Impact Summary Table states that the impact of Alternatives B and C is confined to a 0.4-acre wetland (Wetland 1) in Midway Plaisance. The proposed mitigation for that wetland impact would be located, far removed, at the Cedar Creek A1 wetland bank site in Will County, southwest of Chicago. While the proposed mitigation will result in no net loss of wetlands on a regional basis, the stormwater storage and sediment retention function the local wetland performed will be lost by relocating the project area far away. Accordingly, the "no change" rating in the Impact Summary Table is inaccurate.

174. The EA analysis of flood plain impacts also fails to consider how the staging of the OPC will remain possible as the waters of Lake Michigan continue to rise. At a minimum, the major logistic challenges in staging the OPC will require both expanded site construction and longer construction times, both of which will necessarily increase the disruption and disarray in

the area, thereby placing additional stress on all the complex environmental systems that operate within Jackson Park and its immediate environs. None of these maneuvers would be necessary if the proposed OPC is not built in Jackson Park, as by, for example, moving it to a site near Washington Park. The EA's no-mitigation claim ignores these dislocations, just as it ignores the possible consequences on the internal operations of the park from the removal of parklands on the west side of Jackson Park to widen Stony Island Avenue.

175.   The EA offers no express analysis of how the erection of a mammoth 235-foot tower interacts with the specter of the rising lake levels, or the possibility of groundwater flooding. Nor does it specify the engineering steps that will be required for temporary and long-term stability of the OPC and its related buildings and underground parking facilities. Relatedly, creating a large underground garage is downplayed as an incidental action of no consequence, even though its underground location demands a careful analysis of how its construction, maintenance and operation will be affected by the specter of rising lake levels.

### The EA Ignores Significant Impacts Of The OPC On Air Quality

176.   The EA virtually ignores all air quality impacts, including those that are caused by creating new T roads (in which traffic from the base of the T has to move into both of its branches) which slows down the movement of cars, increases noise and pollution, and reduces overall access to the Jackson Park area. The regular rectangular grid of major thoroughfares near Washington Park makes it highly unlikely that any EA could identify similar traffic, noise or congestion difficulties from constructing the OPC at that location.

177.   Furthermore, the EA never addresses the degraded air quality that follows from the removal of hundreds of mature trees that each currently removes 5.8 tons of carbon and 341.5 pounds of air pollutants. Nor does it address the loss of any of the significant and well-recognized

health benefits that these trees supply to city residents and visitors alike. (*See* https://www.chicago.gov/content/dam/city/depts/dcd/supp_info/jackson/OPC-Tree-Study.pdf)

### *The Significant Impact Of Noise Is Inaccurately Characterized*

178.    The EA also understates the negative impact of the proposed OPC on noise levels. The Impact Summary Table states that Alternative B (referred to as the No Build) would have no noise impacts, and Alternative C (Preferred Alternative) would have impacts at only 20 receptor sites, 15 of which are located in Jackson Park and 5 are located in nearby residential areas outside the park.   Table A-3.1 of that analysis represents the existing noise levels and includes the improvements made in Alternative B. However, the statement in that Table is incorrect insofar as it asserts that Alternative B would have no noise impacts relative to the earlier baseline of Alternative A, which leaves Jackson Park in its current state.

179.    The Future Modeled Existing Condition noise levels at the 5 residential receptors adversely affected by Alternative C are 66 to 67 dBA, which means they are adversely affected by Alternative B.  Of the 15 park receptors adversely affected by Alternative C, the Future Modeled Existing Condition noise levels at 13 of the receptors are considered adverse impacts.

180.    Furthermore, the displacement of traffic from the four thoroughfares will put extra pressure on the new one-lane expansion, going south on Lake Shore Drive, thereby increasing the delays that are already common at the 57th Street turnoff.  Cars and other vehicles will face longer waits at this key junction, generating more noise and higher pollution levels on both roads.  The EA has not made a complete analysis of traffic noise and pollution levels under both ordinary and peak load conditions.

181.    Overall, even if the EA could point to some actual "mitigation" on site, it must also determine how the environmental effects of the proposed project are aggregated with the

foreseeable effects from other environmental projects, ongoing human activities and natural occurrences. The EA here has not only improperly characterized significant activities as insignificant, but it fails to take into account how those mischaracterizations undercut its overall analysis.

### *Failure To Adequately Consider Cumulative Impacts*

182.    An assessment of cumulative effects properly and necessarily asks whether a project whose individual effects may be "mitigated-to-insignificant" may yet result in the aggregate in significant, foreseeable, and negative environmental impacts. Such an analysis was not performed, or performed improperly, in this review. A finding of significant adverse impact cannot be avoided by terming an action temporary or by breaking it down into small component parts. 40 C.F.R. § 1508.27(b)(4), (5), (7) (1978).

183.    The FONSI and EA are an inadequate and superficial effort to dismiss these cumulative impacts. Their statements set forth are conclusory and superficial, and ignore various impacts and fail to properly and adequately consider others in order to determine significance. The EA is loaded with inaccurate claims of effective mitigation, including the statement that the removal of 1,000 trees is not significant because the losses so created are temporary, when they will take generations to undo. Furthermore, use of the wrong baseline and segmented analysis is a further effort to ignore a cumulative impact associated with the construction of the OPC.

184.    The Defendants' refusal to recognize the many significant and varied adverse impacts of the OPC project on the environment, and then not to proceed with an environmental impact statement, was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

185.    Accordingly, Defendants should be enjoined from any and all activities in connection with their OPC project that may adversely affect the environment, natural, scenic, cultural and/or historic resources under review until such time as Defendants have fully complied with NEPA.

**COUNT III**
**(Violation of UPARR)**
**(Against Interior Department, NPS, City, Park District and Foundation)**

186.    Plaintiffs reassert and reallege Paragraphs 1 through 185 as if fully set forth herein.

187.    Once park land has been "improved or developed" with funding from the UPARR program, the statute prohibits the "conversion" of that park land to anything "other than public recreation uses," unless approved by the Secretary of the Interior, and "only on such conditions as the Secretary considers necessary to ensure the provision of adequate recreation properties and opportunities of reasonably equivalent location and usefulness." 54 U.S.C. § 200507.

188.    The proposed OPC project impacts UPARR lands currently managed in Jackson Park, covering much of Jackson Park. The land became UPARR protected as a result of the City of Chicago accepting two grants, one in 1980 and another in 1982. The 1980 grant provided federal funds to the Woodlawn Organization to purchase and plant trees and shrubs. The 1982 grant was used to replace approximately 700 trees and the restoration of 7,000 square yards of landscaped area.

189.    Defendant NPS, the entity that administers the UPARR program, determined that the OPC project converts recreational property subject to UPARR to non-recreational uses, triggering a review under UPARR associated with that conversion. The review requires, without limitation, that the applicant demonstrate that "*all* practical alternatives to the proposed conversion have been evaluated." 36 C.F.R. § 72.72(b)(1). In addition, any UPARR approval requires new

land be identified for recreational purposes and that there remain "adequate recreation properties and opportunities of reasonably equivalent usefulness and location." 54 U.S.C. § 200507.

190.    NPS failed to implement UPARR's stringent requirements here because it never conducted an adequate evaluation that required and ensured that "all practical alternatives to conversion" were reviewed.  Instead, the City and Foundation (to which decision making was improperly delegated through the City of Chicago) designated *only* land on the eastern end of the Midway Plaisance—itself a historic property on the National Register of Historic Places—as substitute property, even though it was already used for recreational purposes.  Yet the statute states that "[r]eplacement property need not necessarily be directly adjacent to or close by the converted site. This policy provides the administrative flexibility to determine location recognizing that the property should meet existing public recreation needs." 36 C.F.R. § 72.72(b)(3)(ii).

191.    Here, the OPC project impacts not only Hyde Park, but South Shore and Woodlawn, with their marked lack of recreational space.  But possible alternatives in those locations were not given adequate or proper consideration given the City's (and the Foundation's) predetermined unwillingness to consider alternatives.

192.    This predetermined review does not comply with requirements of reviewing "all practical alternatives to the conversion," which the NPS was required to enforce. *Id.* § 72.72(b)(1). Indeed, the City announced publicly that this was their choice in the 2018 Ordinance, and then reiterated that in July 2019, all without any reference to any other alternatives (because none were actually considered).

193.    NPS' analysis in regards to the conversion of UPARR recreation land from the expansions of Lake Shore Drive and Stony Island is similarly perfunctory and inadequate. NPS looks to the road closures in Jackson Park for the creation of new parkland—the same road closures

that it purposefully ignored from its own segmented review in regards to its NEPA review, which treated the construction of the OPC as a local matter (even though those roads were previously considered parkland in conjunction with Jackson Park's National Register nomination).

194.    Each of these failures was arbitrary, capricious, an abuse of discretion, and contrary to law. Accordingly, Defendants should be enjoined from any and all activities in connection with their OPC project that may adversely affect the environment, natural, scenic, cultural and/or historic resources under review until such time as Defendants have fully complied with UPARR.

**COUNT IV**
**(Violation of Section 106 of the National Historic Preservation Act)**
**(Against All Defendants)**

195.    Plaintiffs reassert and reallege Paragraphs 1 through 194 as if fully set forth herein.

196.    The federal review process performed under Section 106 of the National Historic Preservation Act defined the undertaking as the OPC project and related roadwork.  (*See* Exhibit 3 at 1)

197.    The Section 106 review properly determined that the undertaking would create adverse impacts upon various historic resources, including but not limited to Jackson Park, the Midway Plaisance and the Chicago Boulevard Historic District.

198.    Once any adverse impact is identified, the federal agencies were mandated to examine measures that would avoid, minimize or mitigate those adverse effects on the historic resources.

199.    That was not done.  Initially, the FHWA improperly adopted a segmented process that excluded from any review of the actions being taken in Jackson Park in regards to the construction of the OPC.  The FHWA refused to consider the actions associated with the OPC itself, despite its inclusion as part of the undertaking being reviewed (*see* Exhibit 3 at 1) and the

fact that the parts of the project that the FHWA claims it has authority to review are the reasonably foreseeable consequences of the OPC's construction and related roadwork. That itself was erroneous, and requires that the Section 106 process be reopened to properly consider those activities.

200. FHWA made clear that the process to resolve the adverse effects would not include any discussion of avoidance, minimization and mitigation issues in regards to OPC project and related road work on the ground that the agencies supposedly lacked authority to require the City to revise the scope or design or location of the OPC project despite its being part of the undertaking under review, as it noted the following in regards to the OPC project *before* any meetings were held in order to resolve the adverse effects that were just identified:

> However, avoidance or minimization measures that have previously been proposed by consulting parties, and dismissed, will not be re-considered.
> For example, as we noted in our March 17, 2020 letter to the Advisory Council on Historic Preservation, the Federal agencies considered comments from multiple consulting parties suggesting that the Obama Presidential Center (OPC) be relocated outside of Jackson Park to avoid an adverse effect to historic properties. The Federal agencies concluded that they cannot require the City of Chicago to change the location of OPC from Jackson Park to another location nor can they require changes in the scope or design of the OPC site because it is not within the scope of their Federal authorities to do so.

201. This statement embodies the fatally flawed process that led to the predetermined and Final MOA (Exhibit 7). It affirms the FHWA's failure to actually consider avoidance or mitigation measures associated with the OPC, and a decision to not consider such issues even though the meetings to discuss resolution of adverse effects had not even begun. This improperly curtailed the discussion of the adverse effect of the undertaking, and ignored the cumulative impacts of the undertaking, all contrary to the governing statutes and regulatory framework. Further, the FHWA's and the other Defendants' unilateral preclusion of such discussion was done to improperly evade the statutory requirements that allows the public to fully participate in order

to explore such concerns and review and discuss avoidance and minimization actions, not solely mitigation. This cursory process also involved delegating federal agency obligations to the applicant and private party in interest, in contravention of the mandated process under Section 106.

202. FHWA's segmentation of the project led to the use of the wrong baseline that paved the way for approving the partial destruction of land inside Jackson Park—applying in essence a carbon copy of the flawed analysis of the Section 4(f) report. But FHWA is precluded as part of the Section 106 process from piggy-backing its own conclusion on the City's wholly inadequate internal reviews and the City's proposed consideration of alternatives, but instead is to hold a public process where the public can participate in such discussions, as exemplified by the City of Chicago's domineering behavior at the meeting in August 2019, discussed above at ¶¶ 81-83. (*See* Exhibit 5 and 7)

203. Furthermore, not only were no avoidance or minimization measures considered by the FHWA in relation to the OPC, the FHWA paid lip service only to such principles relative to the expansion of Lakeshore Drive and Stony Island. The FHWA and others repeatedly refused to consider such alternatives even though numerous participants noted their erroneous construction of the statutory language. Instead, only meager mitigation measures were taken into consideration and implemented, reflected by the fact that numerous consulting parties did not sign the MOA.

204. Each of these failures was arbitrary, capricious, an abuse of discretion, and contrary to law. Accordingly, Defendants should be enjoined from any and all activities in connection with their OPC project that may adversely affect the cultural and/or historic resources under review until such time as Defendants have fully complied with Section 106.

**COUNT V**
**(Violations of Rivers and Harbor Act and Clean Water Act)**
**Regarding Permits and Modifications to GLFER**
**(Against Corps Defendants, City and Park District)**

205.    Plaintiffs reassert and reallege Paragraph 1 through 204 as if fully set forth herein.

206.    The Great Lakes Fishery and Ecosystem Restoration Project at Jackson Park originated as a restoration of ecological systems, designed to combat climate change and to ensure that the park would be become a year-round habitat and migratory haven.

207.    The project was carefully designed so as to address issues of climate change and its direct impact on the South Side of Chicago.  The specific and thoughtful elements of the GLFER project were designed to create improvements in air and water quality, and increase the density of park vegetation.  As noted in a recent publication, "[t]he rebuilding of ecosystems with native terrestrial and aquatic plantings improves water quality and reduces the urban heat island effect. The park will be a cool refuge that will aid in moderating temperatures in the dense surrounding neighborhoods."

208.    The GLFER was not cobbled together haphazardly, but instead involved years of planning and five years of implementation.  The careful planning involved significant efforts to develop a fabric of interconnected relationships that comprised the project so as to enhance the ability to deal with general environmental concerns as well as specific issues including but not limited to ecology, conservation, sustainability, climate change, and historic preservation.

209.    The GLFER project has been led by Defendant Army Corps of Engineers, and is and has been a major project within Jackson Park.  Because of the nature of the GLFER project and the Corps involvement, and because of the proposed OPC and its impacts on the GLFER project, certain modifications to permits have been requested by the applicants to the Army Corps,

including modifications pursuant to Section 408 of the Rivers and Harbors Act and Section 404 of the Clean Water Act.

210.    Section 408 of the Rivers and Harbors Act provides that modification can only be given when the following circumstances are met: "the Secretary of the Army may, on recommendation of the Chief of Engineers, grant permission for the alteration of a public work so long as that alteration is not injurious to the public interest and will not impair the usefulness of the work."  As set forth below, this standard has not been met.

211.    Originally, notice of a request for comments associated with the modifications being requested by the applicant under Section 408 was dated April 1, 2020 but was not made known through the typical public notice forum that has been utilized such as the City of Chicago's website where other federal review notices were published.  Despite a lack of adequate notice , the deadline for comments was set for May 1, 2020.  (Exhibit 13) Various complaints led to an extension of 15 days, but this fundamental lack of notice and opportunity to comment was prejudicial.

212.    After the comment period, no further meetings or follow up regarding the issues was made by the Corps, despite the significant impacts on the GLFER project (described *supra* and below).  Instead, in January 2021, approval letters appear to have been issued and later posted to the City of Chicago's website which granted modifications under Sections 404 and 408. (Exhibits 14 and 15 respectively)

213.    Beyond the procedural failures noted above, the Corps approval process is compounded by other errors that make the decisions regarding the modifications under Sections 408 erroneous and unsupported, as they are both injurious to the public interest and impair the usefulness of the GLFER project.  To that point, and by way of example, the admitted temporary

and permanent proposed changes permanently disrupt those carefully considered and integrated actions discussed below.

214.    For instance, the Corps identifies the purpose of the GLFER project as "to restore ecological health to natural areas of Jackson Park while preserving the historical and cultural integrity of the Park." (Application 19-17 at 2)  Those goals are undermined by the OPC project, leaving the project injurious to the public and impairing the usefulness of the project.

215.    For example, while identifying the purpose of the GLFER project as promoting ecological health, such efforts are permanently undermined by the massive clear cutting of mature trees described earlier.

216.    Furthermore, the GLFER project also was designed to address the historic significance of the Olmsted design, which was done to strike a balance between historic preservation and ecological concerns.  Indeed, in preparing the plans for GLFER, the Corps sought and received approval from the State Historic Preservation Office that the GLFER plans for planting and lagoon restoration were in accordance with the Olmstedian features of the park as defined in the 1905 plan.  The State Historic Preservation Office singled out certain defining features, including the roadway configuration, as particularly significant and deserving of protection.  However, the construction of the OPC, which now demands modification to the GLFER project, permanently disrupts both those historic preservation concerns and the ecological concerns through, *inter alia*, the destruction the roadway system, destruction of the Midway Plaisance, removal of berms, the destruction of trees and the expansion of Lakeshore Drive and Stony Island.  Accordingly, the usefulness of GLFER is being impaired.

217.    Furthermore, the Corps admits that there will be permanent damage to the GLFER project, but claims such damage will be mitigated by already planned but incomplete work.  This

analysis is fatally flawed and ignores impairment of the usefulness of the GLFER project because such "mitigation" improperly assumes that the only issue is acreage, not the specific purpose, placement, or value of the GLFER project areas to be permanently destroyed, whether or not they are "replaced" elsewhere. The GLFER areas did not have a uniform, cookie-cutter design. Years were spent, and millions of dollars spent, in the effort to specifically develop and implement the GLFER project which is based on the working interrelationship of various features and elements designed to work together to meet the various and critical environmental, ecological, historical and other goals. Contrary to the current suggestion, it fully undermines the conditions, purposes and outputs of the GLFER project to simply take out one part and plug something else in elsewhere. This further establishes the arbitrary and capricious decision making engaged in by Corps.

218. Relatedly, the approvals ignore the changed reality since the GLFER project was conceived and designed in 2012-14, given that the OPC project will involve the construction of roadway improvements (i.e the tearing out of Cornell Drive between 59th and 63rd), relocating utilities, resurfacing and connection of walking paths. To proceed as if the context is the same as it was in 2012-14 is factually inaccurate and analytically invalid particularly given the interconnected development of the original GLFER project.

219. Further, the lagoons played an important role in the GLFER project, which will dramatically and permanently change as a result of the OPC and requested modification. Changes that are ignored include the fact that the OPC design plan envisions collecting storm water on the site and directing it to the west lagoon. This feature will have a significant impact on a major portion of the GLFER project acreage and interfere with the project's goals and output.

220. Similarly, the approval of Section 404 permit (Exhibit 15) related to the expansions of Lake Shore Drive and other related actions fail for similar reasons. For example, the creation

of a berm and adjacent narrow area of GLFER plantings on the west side of S. Lake Shore Drive between the 59th street bridge and the approach to Hayes Drive was a carefully considered and important design element of the GLFER project. That berm is to be permanently destroyed by another of the "roadway improvements" planned to accommodate the desires of the Obama Foundation to close a portion of Cornell Drive—the addition of one southbound lane of Lake Shore Drive in exactly that area. This is a prime example of a GLFER design element that cannot be merely relocated, and is an impairment of its usefulness.

221. The removal and destruction of the berm (and its replacement with an expanded expressway) removes and destroys the ecological and aesthetic bases for the creation of the berm and the adjacent GLFER planting (as well as impacting the other elements of the GLFER project to which these are interrelated). The grant of the Section 404 permit and the modification under Section 408 all ignore these impacts to the GLFER project, and are detrimental to the public interests served by the project.

222. As such, all of the benefits the GLFER project noted, i.e., "conservation, economic development, historic properties, cultural resources, environmental impacts, water quality, flood hazards, residual risk, and induced damages, etc." are severely and negatively impacted from a public benefit standpoint by the temporary and permanent alterations which are at issue, and leave the approvals of those permit modifications arbitrary and capricious.

223. The decision to issue the permits and modifications was arbitrary, capricious, an abuse of discretion, and contrary to law. Accordingly, Defendants should be enjoined from any and all activities in connection with their OPC project that may adversely affect the environment, natural, scenic, cultural and/or historic resources under review until such time as Defendants have fully complied with applicable federal regulations.

## COUNT VI
### (Public Trust Violation – Against City, Park District and Foundation)

224.     Plaintiffs reassert and reallege Paragraphs 1 through 223 as if fully set forth herein.

225.     The following cause of action arises generally from a common set of operative facts that inform and underlie the other causes of actions set forth herein involving the conduct of the various federal reviews.  As such, and as a matter of judicial efficiency and economy—consistent with principles of supplemental jurisdiction under 28 U.S.C. § 1367(a)—Plaintiffs bring this cause of action, and its other state law cause of actions, here as part of this lawsuit.

226.     Jackson Park was established through an 1869 grant by the Illinois legislature to a public commission which provides in relevant part that the demised property "shall be held, managed and controlled by [the Commissioners] and their successors as a public park, for the recreation, health and benefit of the public, and free to all persons forever."

227.     Jackson Park is by grant a protected public trust property under Illinois law.  Public trust property is held by the City and Park District in trust for the public at large who owns fractional interests in such property.

228.     As trustees over the public trust property, the City and Park District are subject to a well-established set of fiduciary duties, including but not limited to duties of diligence, loyalty, care and candor, imposed upon their actions in the management and control of the public trust property.  These duties have been violated as described earlier and below.

229.     As an initial matter, the City and Park District have at no time performed their fiduciary duty in their decisions to transfer this public trust property to the Obama Foundation for the completion of the OPC.  In addition, as applied to the use and disposition of this public trust property, the City expressly and improperly delegated its decision-making authority regarding

68

location and related issues to the Obama Foundation, a private party, in violation of its nondelegable duties of loyalty and care over Jackson Park.

230.    This lack of diligence and insider favoritism is further confirmed by the utter unwillingness of the City at any time to consider alternatives to Jackson Park for the siting of the OPC.  Indeed, the choice of land was made exclusively by the Obama Foundation, which dictated its demands to the City solely to advocate and maximize its interests.  Avoidance of diligence measures was embraced and facilitated by then Mayor Rahm Emanuel, former President Obama's Chief of Staff in 2009 and 2010, during his term of office from 2011 to 2019.  That continued with the currently administration, who continued to advocate and advance the position of the Foundation through the conclusion of the federal review process.

231.    The breach of the City's fiduciary duties of loyalty and care has had more serious consequences in light of the COVID pandemic that has wreaked havoc upon the economic well-being of the City, the reduction of its population, the increased size of its public debt, and the closure of much of its educational and artistic institutions. The flawed delegation of decisions over Jackson Park to the Obama Foundation makes it all the more important for the City and Park District to reevaluate the initial pat assumptions about the viability of the OPC, the levels of attendance, the costs of its operation, and the wealth of other economic and social calculations said to justify the initial public commitment of massive resources to the OPC.

232.    The City's breach of its fiduciary duties is further evidenced by its creation of a one-sided "use" agreement that was approved and attached to the 2018 Ordinance. That disguised arrangement was drafted specifically to avoid the use of the word "lease", while still giving virtually total use and control of public trust property to a private entity (the Obama Foundation). The 2015 Ordinance had made clear the City's initial intention to lease the land to the Foundation.

The 2018 "use" agreement never defines the term "use", nor even states whether that use is "exclusive." But in its broader context, its unmistakable intention is to confer on the Obama Foundation the same rights that it would receive under a standard ninety-nine-year exclusive lease of the same key acreage in Jackson Park. (*See* Exhibit 2 hereto, §§ 6.4, 6.11)

233. The private party here, once the OPC is constructed, will also have exclusive control over the area, in direct breach of the legislative grant governing the disposition of public trust property. Nor at any point did either the City or the Obama Foundation make the required appraisal of the fair market value of the property transferred, but settled on the derisory $10 figure to disguise an outright transfer of the property in violation of public trust law, as a prelude to the wholesale destruction of land within Jackson Park. The sham "use" agreement with the Obama Foundation was done to support the ostensible claim that the City would maintain "title" to the land, even though it has only a reversion over the 99-year lease/use agreement, which represents virtually all the economic value of the subject property.

234. The giveaway of public property is further compounded by the City's decision to expend close to $200 million dollars for the ostensible purpose of "improving" the road system that only takes place to accommodate the unwise placement of the OPC in Jackson Park. The City and Park District also appear to provide the Foundation an open checkbook by agreeing to foot the bill for any and all environmental liabilities that will occur at the proposed location, owing to rising lake levels and other environmental perils.

235. The flawed transactions that the City and Park District have entered into with the Obama Foundation require a heightened degree of scrutiny given both the lack of diligence and self-evident insider favoritism described above.

236.     As a result of the breach of these duties, the ordinance authorizing the giveaway to the Obama Foundation should be voided and of no effect, and all the transactions undone so that the full title of the subject property once again vests with the City and Park District as they did before these transactions were undertaken in 2015.

**COUNT VII**
**(*Ultra Vires* – Against City and Park District)**

237.     Plaintiffs reassert and reallege Paragraphs 1 through 236 as if fully set forth herein.

238.     The acts of the City of Chicago and the Park District relative to the transfer of property for the OPC and to the Obama Foundation were illegal and outside the scope of lawful authority.

239.     Those illegal activities began with the transfer of the subject property in Jackson Park from the Park District to the City of Chicago (as demanded by the Obama Foundation), which was done in an apparent effort to circumvent the applicable limitations imposed upon the divestment of public property to a private entity.  That transaction was undertaken only to allay justifiable concerns that a transfer directly from the Park District to the Foundation would be struck down as outside the powers of the Park District, given that Illinois law prohibits the Park District from a transfer to a non-governmental entity without an "exchange for other real property of substantially equal or greater value."  The 2015 Ordinance codifies the demand of the Obama Foundation that the Park District first transfer such property to the City, who then acted as if it were free of the need to receive adequate consideration from the transferee, and transferred control over such property to the Foundation.  Such purposeful circumvention does not excuse blatant disregard of applicable statutory requirements, and requires that the illegal transfer be nullified.

240.     Similarly, the 2018 Ordinance later adopted by the City of Chicago suggests that the relationship between the Obama Foundation and the government was not captured by the lease

71

referred to in the 2015 ordinance. Instead, artificial language was utilized to create the fiction that the City would enter into a defective use agreement (see ¶¶ 232-33, supra), which is also a form of *ultra vires* activity that runs afoul of the explicit command of 50 ILCS 605/1, and requires that for a public-to-public transfer—here between the Park District and the City—a public transferee must use and occupy the land. The City, however, is not occupying the transferred land, given that it has transferred exclusive possession to the Obama Foundation under the fictitious use agreement. Consequently, that last transaction must be set aside because neither the Park District nor the City had any right to effectuate that transfer.

241. In addition, this purported transfer does not comport with conditions found in the Illinois Museum Act, which also requires that a lease be utilized by the City. That statute cannot be evaded by the City's repeated and erroneous claim that relationship with the Obama Foundation is not one of lessor and lessee. *See* 70 ILCS 1290/1.

## COUNT VIII
### (Violation of Illinois Constitution Article VIII, Section 1)
### (Against City, Park District and Obama Foundation)

242. Plaintiffs reassert and reallege Paragraphs 1 through 241 as if fully set forth herein.

243. Article VIII, Section 1 of the Illinois Constitution states as follows: "(a) Public funds, property or credit shall be used only for public purposes."

244. Here, public property in the form of world-renowned Jackson Park has been transferred to a private party (namely the Obama Foundation). That transfer has been done at the direction of the Obama Foundation and for its sole benefit. The Foundation will be controlling the land and buildings, and it will create significant public upheaval through road work, the destruction of the integrity of Jackson Park, as well as the GLFER project.

245.    Put differently, the transfer of property to the Foundation is not "used only for public purposes" but rather for the benefit of a private entity at the expense of the public.

## COUNT IX
**(Violation of Illinois Constitution Takings Clause)**
**(Against City, Park District and Obama Foundation)**

246.    Plaintiffs reassert and reallege Paragraphs 1 through 245 as if fully set forth herein.

247.    Article I, Section 15 of the Illinois Constitution prohibits the taking of certain property, as it sets forth the following: "Private property shall not be taken or damaged for public use without just compensation as provided by law. Such compensation shall be determined by a jury as provided by law."

248.    Here, the transfer of property to the Obama Foundation by the City of Chicago comprises the most usable and critical portions of Jackson Park, as well as the destruction of approximately 1000 mature and established trees and represents the transfer and damage of public trust property.

249.    The Plaintiffs and other citizens of Illinois have a beneficial fractional ownership interest in such public trust property.

250.    The giveaway and damage of the public trust property outlined above has been done without payment of any compensation, let alone just compensation.  To the contrary, the most usable and critical acres of the Jackson Park were given away to the Obama Foundation for $10. Furthermore, there has not been compensation for the damage to the landscape, destruction of the integrity of the park, the loss of hundreds of trees, the Women's Garden, and the roadways that comprise this special and unique Olmsted park.  As such, Article, Section 15 has been violated.

## COUNT X
### (Improper Delegation Of Authority Under Federal Statutes)
### (Against All Defendants)

251.     Plaintiffs reassert and reallege Paragraphs 1 through 250 as if fully set forth herein.

252.     Throughout the federal review process associated with the Section 106 review, Section 4(f), UPARR and NEPA, the agency Defendants unlawfully delegated decision-making authority to the applicant (the City of Chicago) in various ways.  Making such matters worse, even though the applicant in name is the City of Chicago, in fact the Obama Foundation is the real party in interest, given the abdication of authority by the City of Chicago to the Foundation, leading to the proposed destruction of land within Jackson Park, which has necessitated these federal agency reviews.

253.     Such impermissible delegation of legislative authority left the applicant and real party in interest largely in control of all public meetings held during the review process, where its dominant position allowed it to dictate the outcomes, by, among other actions, drafting and/or editing key reports in order to advance its predetermined decision to take off the table from the outset all avoidance alternatives or minimization measures.

254.     In so doing, the federal agencies have violated Article I, Section 1 of the U.S. Constitution, by delegating their authority to private parties who are not entitled to play a role in deciding on the devolution and management of public lands.

## COUNT XI
### (Illinois Constitution – Improper Delegation of Authority)
### (Against City, Park District and Obama Foundation)

255.     Plaintiffs reassert and reallege Paragraphs 1 through 254 as if fully set forth herein.

256.    As the 2015 Ordinance makes clear, the City of Chicago delegated its decision-making authority over the location and design to a private party, the Obama Foundation.  The 2015 Ordinance provides in part:

> WHEREAS, While the City Council is **confident** in the quality and thoroughness of both UIC's and UChicago's proposals, ***the City defers to the sound judgment of the President and his Foundation as to the ultimate location of the Presidential Library.***  (Emphasis supplied)

257.    Pursuant to this delegation of legislative authority, the private entity later selected Jackson Park, including precisely where in Jackson Park, and all material related and foreseeable elements of such location and design, all of which later was rubber stamped by the City and Park District as they included that location, roadwork and the like in their 2018 ordinance which they advanced through the federal review processes described above through its recent conclusion.

258.    The delegation of legislative authority from a legislative body to a private party violates the separation of powers and is unconstitutional under Article II, Section 1 of the Illinois Constitution which provides: "The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another."

### COUNT XII
### (Violation of Illinois Constitution Article I, Section 2)
### (Against City, Park District and Obama Foundation)

259.    Plaintiffs reassert and reallege Paragraph 1 through 258 as if fully set forth herein.

260.    Plaintiffs have a fractional beneficial interest in public trust property including that in Jackson Park.

261.    Article I, Section 2 provides in relevant part the following: "No person shall be deprived of life, liberty or property without due process of law nor denied the equal protection of the law."

75

262.     In allowing a private foundation to control critical decision making, by rubber stamping those demands in transferring critical elements of public trust land to the private entity, the City failed to provide procedural and substantive due process protections guaranteed to Illinois residents under the Illinois Constitution.

263.     Furthermore, the conduct of this process and its acceleration during the ongoing coronavirus pandemic further curtailed the ability of Plaintiffs to meaningfully participate in the various meetings and reviews, further curtailing their rights.

### COUNT XIII
### (Violation of Illinois Constitution Article I, Section 16)
### (Against City and Obama Foundation)

264.     Plaintiffs reassert and reallege Paragraph 1 through 263 as if fully set forth herein.

265.     Article I, Section 16 provides as follows: "No ex post facto law, or law impairing the obligation of contracts or making an irrevocable grant of special privileges or immunities, shall be passed."

266.     Here, the City's approval of a 99-year use agreement provides an irrevocable and special privilege to the Obama Foundation, supplying perpetual and largely full control over a large portion of Jackson Park.   In this capacity, the 2018 Ordinance and agreements which approved the Use Agreement and transfer to the Obama Foundation violate Article 1, Section 16.

### COUNT XIV
### (Violation of Section 110(k) of the National Historic Preservation Act)
### (Against All Defendants)

267.      Plaintiffs reassert and reallege Paragraphs 1 through 223 as if fully set forth herein.

268.     Under Section 110(k) of the National Historic Preservation Act, it is incumbent upon all federal agencies who receive requests for funds, permits and licenses to ensure that no

funds or permits are awarded to applicants who commit or allow acts of anticipatory demolition. The applicable statute provides as follows:

> Each Federal agency shall ensure that the agency will not grant a loan, loan guarantee, permit, license, or other assistance to an applicant that, with intent to avoid the requirements of Section 306108 of this title, has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed the significant adverse effect to occur, unless the agency, after consultation with the Council, determines that circumstances justify granting the assistance despite the adverse effect created or permitted by the applicant.

54 U.S.C. § 306113.

269.    Here, the City, Park District and Foundation have requested federal funding for roadwork from the Federal Highway Administration in the amount of at least $175 million, as well as federal permits from the Army Corps of Engineers.

270.    Since December of 2017, the federal reviews for the OPC have been ongoing, starting with the review under Section 106 of the NHPA. The City, the Park District, and the Foundation were well aware of and participating in these federal reviews, and further recognized that no adverse actions were to be taken against historic and environmental resources that were under review.

271.    Nonetheless, not later than August 6, 2018, the City and the Park District in fact took such actions, which involved not only the intentional destruction of trees but the intentional demolition of an athletic field in Jackson Park, all to accommodate the OPC, and all well before the federal review process concluded. (Exhibit 16)

272.    The trees and field that were intentionally destroyed were within the Jackson Park Historic Landscape District and Midway Plaisance, and listed in the National Register of Historic Places.

273.    The work performed by City and the Park District in this regard was unquestionably for the benefit of the Obama Foundation and to advance the OPC, which is part of the undertaking under review.  Such acts were contemplated and performed pursuant to a "Donation Agreement" dated February 26, 2018 between Chicago Park District and the Obama Foundation which provided, *inter alia,*

> WHEREAS, the Foundation is tasked with finding, planning and construction of the Obama Presidential Center ("OPC") in Jackson Park on land owned by the Park District that will be transferred to the City of Chicago pursuant to Park District Board and City Council approval, in recognition of the long-standing ties the former President has with the community and;
>
> WHEREAS, the site selected for the OPC would necessitate the relocation of an existing multi-use artificial turf field with a running track (the "Original Field"), and;
>
> WHEREAS, the Park District has designated an area within Jackson Park as described on attached Exhibit A ("Field Site"), as land for the relocation, construct [sic] and operation of the Field, and;
>
> WHEREAS, the Foundation has agreed to fund the construction of a replacement Field on the Field Site (the "Project"), as further described in the plans set forth in Exhibit B, attached and incorporated by this reference, and;
>
> WHEREAS, The Foundation agrees to donate an amount not to exceed $3,500,000.00 to the Park District to assist with the construction of the Project; ...

274.    The Donation Agreement goes on to detail the work that the Park District will perform to demolish the existing track and field in Jackson Park and to build a new track and field, all solely to accommodate the Obama Center.   (See Exhibit 17)

275.    The acts taken by the City, Park District and Foundation constitute anticipatory demolition in violation of Section 110(k).

276.    As a result of such actions, the statutory prohibition precludes the FHWA from approving the federal funds requested for the roadwork, "unless the agency, after consultation with

the [Advisory Council on Historic Preservation], determines that circumstances justify granting the assistance despite the adverse effect created or permitted by the applicant." 54 U.S.C. § 306113.

277.    Although Section 110(k) does authorize the approval of federal funding and permits under limited circumstances, notwithstanding anticipatory demolition, any such approval requires a special consultation process that was not followed here:

> [T]he agency official shall notify the Council and provide documentation specifying the circumstances under which the adverse effects to the historic property occurred and the degree of damage to the integrity of the property. This documentation shall include any views obtained from the applicant, SHPO/THPO, an Indian tribe if the undertaking occurs on or affects historic properties on tribal lands, and other parties known to be interested in the undertaking.

36 C.F.R. § 800.9(c)(2), The FHWA did not invoke this process, and thus the FHWA's authorization of federal transportation funding for the project is unlawful in violation of Section 110(k).

278.    Similarly, Section 110(k) prohibits the Army Corps from authorizing any permits relating to the OPC project unless and until the Corps goes through the special consultation process spelled out in the regulations. The Army Corps failed to invoke the special consultation process, and thus any permits issued by the Corps related to components of the OPC project are unlawful in violation of Section 110(k) of the NHPA.

279.    Each of these failures was arbitrary, capricious, an abuse of discretion, and contrary to law. Accordingly, Defendants should be enjoined from any and all activities in connection with the OPC project that may adversely affect the cultural and/or historic resources until such time as Defendants have fully complied with Section 110(k).

**COUNT XV**
**(In the Alternative to Counts I, II and IV**
**Violation of Illinois State Agency Historic Preservation Resources Act)**
**(Against All State Officials, City, Park District and Obama Foundation)**

280. Plaintiffs reassert and reallege Paragraphs 1 through 122 as if fully set forth herein.

281.    The Illinois State Agency Historic Resources Preservation Act was enacted "to provide Illinois State government leadership in preserving, restoring, and maintaining the historic resources of the State."  20 ILCS 3420/1.

282.    A historic resource is defined to include any property that is listed on the National Register of Historic Places.  20 ILCS 3420/3(c).

283.    Jackson Park, the Midway Plaisance and the Chicago Boulevard Historic District are historic resources under this statute.

284.    The construction of the OPC, including but not limited to the construction of the various OPC buildings, the closure of the Olmsted roads, destruction of the Women's Garden and the expansion of roads that will further destroy Jackson Park and the Midway Plaisance, represent undertakings (as defined in the Act) which will adversely affect these historic resources.

285.    These undertakings are being carried out pursuant to a state permit, including an Illinois DNR Water Resources Permit, as well as other local municipal funding sources.

286.    The Act provides that when an undertaking occurs that involves an adverse effect on a historic resource, there must be a review of alternatives so that the adverse effects can be avoided.  The Act expressly provides as follows:

> the State agency shall consult with the Director and shall discuss alternatives to the proposed undertaking which could eliminate, minimize, or mitigate its adverse effect. During the consultation process, the State agency shall explore all feasible and prudent plans which eliminate, minimize, or mitigate adverse effects on historic resources. Grantees, permittees, licensees, or other parties in interest and representatives of national, State, and local units of government and public and private organizations may participate in the consultation process. The process may

involve on-site inspections and public informational meetings pursuant to regulations issued by the Department of Natural Resources.

20 ILCS 3420/4(d).

287.    Notwithstanding the adverse effects of the OPC project, none of the required Illinois reviews have been performed by state or city officials. Even though the partial destruction of Jackson Park and the construction of the OPC has been characterized as a "local" action under their jurisdiction, they have not undertaken any review of those actions.

288.    This Court must therefore order that state and local officials, pursuant to the Illinois Act, "explore all feasible and prudent plans which eliminate, minimize, or mitigate adverse effects on historic resources," and must begin as soon as possible.

WHEREFORE Plaintiffs respectfully request the following relief:

a.    A declaration that the Defendants have failed to comply fully with the requirements of Section 4(f) of the Department of Transportation Act, 23 U.S.C. § 138(a), the National Environmental Policy Act, 42 U.S.C. §§ 4321-4347, Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108, and the Urban Park and Recreation Recovery Act ("UPARR") (54 U.S.C. § 200507), Section 408 of the Rivers and Harbors Act, Section 404 of the Clean Water Act as well as other violations of the U.S. and Illinois Constitutions which must be remedied prior to any further financing, contracting or construction of the Obama Presidential Center;

b.    Declare that the transfer of land and partial destruction of Jackson Park violates the public trust doctrine, the Illinois constitution and is *ultra vires*;

c.    Issue injunctive relief prohibiting all Defendants from any further acquisition of properties, contracting, financing or construction of the Obama Presidential Center until the Defendants have fully complied with the requirements of Section 4(f),

NEPA, Section 106 and UPARR and any other related permitting necessary from the Army Corps of Engineers that may be necessary related to the GLFER project;

d. Void any effort to convey the property that the Foundation is to receive under the 99-year "use" agreement to the City of Chicago and the Chicago Park District;

e. Award Plaintiffs their attorneys' fees, costs and disbursements pursuant to applicable laws, including but not limited to the Equal Access to Justice Act, and Section 305 of the NHPA, 54 U.S.C. § 307105; and

f. Award such other relief as the Court may deem appropriate.

**PLAINTIFFS DEMANDS A TRIAL BY JURY FOR ANY CLAIMS
PROPERLY TRIED TO A JURY**

Dated: April 14, 2021                    Respectfully submitted,

                                         By:     /s/ Michael Rachlis
                                                 One of their attorneys

Richard Epstein
16 Thomas Place
Norwalk CT 06853
Raepstein43@gmail.com

Michael Rachlis (IL Bar No. 6203745)
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, Illinois 60605
(312) 733-3950 (gen.)
(312) 733-3952 (fax)
mrachlis@rdaplaw.net