# EXHIBIT 1



JT. BUDGET,
HOUSING,
SP- EV-

### OFFICE OF THE MAYOR
#### CITY OF CHICAGO

RAHM EMANUEL
MAYOR

January 21, 2015

TO THE HONORABLE, THE CITY COUNCIL
OF THE CITY OF CHICAGO

Ladies and Gentlemen:

At the request of the Commissioner of Planning and Development, I transmit herewith, together with Aldermen Moreno, Dowell, Burns, Sawyer, Holmes, Harris, Beale, Pope, Balcer, Cardenas, Quinn, Burke, Foulkes, Thompson, Thomas, Lane, O'Shea, Cochran, Brookins, Chandler, Solis, Maldonado, Burnett, Ervin, Graham, Reboyras, Suarez, Mell, Austin, Colon, Mitts, Cullerton, Laurino, P. O'Connor, M. O'Connor, Reilly, Smith, Tunney, Cappleman, Osterman, Moore and Silverstein, an ordinance authorizing the execution of an intergovernmental agreement with the Chicago Park District and associated transfer of land for the Barack Obama Presidential Center.

Your favorable consideration of this ordinance will be appreciated.

Very truly yours,

Rahm Emanuel

Mayor

## O R D I N A N C E

**WHEREAS**, the City of Chicago (the "City") is a municipal corporation and home rule unit of government under Article VII, Section 6(a) of the 1970 Constitution of the State of Illinois and, as such, may exercise any power and perform any function pertaining to its government and affairs; and

**WHEREAS**, the Chicago Park District (the "Park District") is a body politic and corporate created pursuant to the Chicago Park District Act, 70 ILCS 1505/0.01, et seq., and a unit of local government under Article VII, Section 1 of the 1970 Constitution of the State of Illinois, and as such, has the authority to exercise control over and supervise the operation of all parks within the corporate limits of the City; and

**WHEREAS**, The Barack Obama Foundation, a nonprofit corporation organized under the laws of the District of Columbia (the "Foundation"), was established in January 2014 in order to plan and develop a multi-unit facility consisting of a library in which the presidential records of the Barack Obama presidency will be available for review and analysis ("Library"), a museum dedicated to the Barack Obama presidency ("Museum"), an academic institute to enhance the pursuit of the President's initiatives beyond 2017, the Foundation's executive and administrative offices, and other ancillary facilities, such as parking and landscaped open space (collectively, the "Presidential Center"); and

**WHEREAS**, the Foundation has been recognized as a tax-exempt organization under Section 501(c)(3) by the Internal Revenue Service; and

**WHEREAS**, the presidential records and artifacts of President Barack Obama and his administration will be under the custody and management of the National Archives and Records Administration of the United States ("NARA"), in accordance with the Presidential Libraries Acts of 1955 and 1986, the Presidential Records Act of 1978, the Presidential Historical Records Preservation Act of 2008, and any other statutes, regulations and executive orders governing Presidential libraries, and in connection therewith, the Foundation contemplates entering into a written agreement with NARA governing such custody and management; and

**WHEREAS**, in March 2014, the Foundation initiated a broad search for the future site of the Presidential Center, beginning with a Request for Qualifications open to all interested parties; and

**WHEREAS**, after narrowing the field to four institutions, including the University of Illinois-Chicago ("UIC") and the University of Chicago ("UChicago"), the Foundation requested comprehensive proposals from each institution; and

**WHEREAS**, UIC and UChicago submitted their proposals to the Foundation on December 11, 2014; and

**WHEREAS**, UIC's proposal includes two sites: the first consisting of approximately 23 acres in the North Lawndale neighborhood, near West Roosevelt Road and South Kostner Avenue, which would be the location of the Library and Museum, and the second on the east end of UIC's campus, which would house the Library's visitor center and "04" academic institute; and

1

WHEREAS, UChicago's proposal identifies three potential locations for the future Presidential Center, a location in the northwest portion of Washington Park, a location southwest of the Museum of Science and Industry in Jackson Park, and a location near the South Shore Cultural Center in Jackson Park; and

WHEREAS, the Park District is the owner of the park land identified in UChicago's proposal; and

WHEREAS, in early January, the Foundation raised concerns about both UIC's and UChicago's proposals; and

WHEREAS, with respect to UIC, the Foundation expressed concerns about a pending change in leadership and the uncertainty this raised about the university's long-term commitment to the proposal; and

WHEREAS, UIC was able to address the Foundation's concerns quickly and without City action; and

WHEREAS, the City supports the conveyance of City land in the North Lawndale community for the Library and Museum and the City Council will work to ensure that conveyance is conducted quickly and at minimal cost; and

WHEREAS, with respect to UChicago, the Foundation expressed concerns regarding the City's lack of control over the proposed park sites, and indicated that consolidating ownership of the sites and local decision-making authority in the City was a prerequisite to a successful bid; and

WHEREAS, a response from UChicago requires the City's intervention; and

WHEREAS, the City wishes to demonstrate its robust commitment to bringing the Presidential Center to Chicago, as it would indelibly seal President Obama's close and abiding relationship to the City, as well as provide a unique cultural and economic opportunity for Chicago's residents, and, therefore, the City is committed to doing everything it reasonably can to help both universities and their respective bids remain competitive; and

WHEREAS, the City and the Park District have eliminated the South Shore Cultural Center location from consideration as a potential location for the Presidential Center, but strongly support the location of the Presidential Center in either of the other two proposed locations in UChicago's proposal; and

WHEREAS, the Park District's portion of the Washington Park location is comprised of approximately 21 acres, and is legally described on Exhibit A and generally depicted on Exhibit B attached hereto (the "Washington Park Site"); and

WHEREAS, the Washington Park Site is generally bounded by South Martin Luther King Drive on the west, South Ellsworth Drive on the east, East Garfield Boulevard on the south, and East 51st Street on the north; and

WHEREAS, the proposed Washington Park location also includes land west of Martin Luther King Drive across the street from the Washington Park Site, but this land is owned

2

primarily by UChicago and the Chicago Transit Authority and is not the subject of this ordinance; and

WHEREAS. the Jackson Park location is comprised of approximately 20 acres, and is legally described on Exhibit C and generally depicted on Exhibit D attached hereto (the "Jackson Park Site"), and

WHEREAS, the Jackson Park Site is generally bounded by South Stony Island Avenue on the west, South Cornell Drive on the east, East 60th Street on the north, and East 63rd Street on the south; and

WHEREAS, it is expected that the Foundation would devote approximately five (5) acres of the selected project site to the Presidential Center, and the remaining land would remain landscaped open space; and

WHEREAS, it is unknown at this time whether the Foundation will select UChicago's proposal and, if selected, whether the Foundation will prefer the Washington Park location (or a portion thereof) or the Jackson Park location (or a portion thereof) as the future location of the Presidential Center (the portion of either location, if selected, owned by the Park District being herein referred to as the "Selected Site"); and

WHEREAS, in order to satisfy the Foundation's request for consolidated ownership and control in the event UChicago has the winning bid, the City wishes to acquire the Selected Site from the Park District, and the Park District wishes to convey the Selected Site to the City; and

WHEREAS, the announcement of the winning bid for the Presidential Center is expected to occur in the spring of 2015; and

WHEREAS, if UChicago has the winning bid, the final selection of the site for the Presidential Center is expected to occur in the fall or winter of 2015; and

WHEREAS, unless and until the Foundation selects UChicago as having the winning bid, title to and possession of the Washington Park Site and the Jackson Park Site shall remain vested in the Park District; and

WHEREAS, if UChicago has the winning bid, the deed from the Park District to the City for the Selected Site will contain a reversionary clause, providing that the Selected Site will revert to the Park District if it is not used as part of the Presidential Center; and

WHEREAS, the Park District is interested in acquiring land from the City in exchange for the loss of green space resulting from the construction of the Presidential Center, which the Park District and the City have mutually agreed to identify at a later date; and

WHEREAS, the Mayor is committed to assembling a group of leaders from open space and community groups to identify nearby land that can be converted to green space to replace the green space lost to the construction of the Presidential Center, and to look for opportunities to reinvest in and restore Olmsted parks; and

3

WHEREAS, the City will introduce a separate ordinance authorizing the development, construction and operation of the Presidential Center on the Selected Site, if UChicago's proposal is selected; and

WHEREAS, it is anticipated that the City and the Foundation will enter into a long-term ground lease that will allow the Foundation to develop, construct and operate the Presidential Center, and that the Foundation will enter into a use agreement, sublease or other agreement with NARA to operate the Library and Museum; and

WHEREAS, the City Council finds that it is necessary and convenient to acquire the Selected Site from the Park District in order to facilitate the location, development, construction and operation of the Presidential Center in Chicago; and

WHEREAS, in providing UChicago with the ability to effectuate its proposal if selected, the City Council believes the City will have provided two equally viable proposals for the Presidential Center, one from UIC and one from UChicago, giving our City the greatest chance for selection; and

WHEREAS, the City Council stands in enthusiastic support behind both UIC and UChicago; and

WHEREAS, the City Council finds that the development of the Presidential Center in Chicago will expand the City's cultural resources, promote economic development, strengthen surrounding communities, beautify and increase the use of existing park land or vacant land (depending on which institution and which site is selected), bring greater national and international visibility to the City, and serve other important public purposes; and

WHEREAS, Article VII, Section 10 of the 1970 Constitution of the State of Illinois, authorizes state and local governing bodies to cooperate in the performance of their responsibilities by contracts and other agreements; and

WHEREAS, the Intergovernmental Cooperation Act, 5 ILCS 220/1 *et seq.*, similarly authorizes public agencies, including units of local government and school districts, to contract with one another to perform any governmental service, activity or undertaking; and

WHEREAS, the Local Government Property Transfer Act, 50 ILCS 605/0.01 *et seq.*, authorizes and provides for municipalities to convey, grant or transfer real estate held by the municipality to any other municipality upon the agreement of the corporate authorities governing the respective parties; and

WHEREAS, while the City Council is confident in the quality and thoroughness of both UIC's and UChicago's proposals, the City defers to the sound judgment of the President and his Foundation as to the ultimate location of the Presidential Library; *now, therefore,*

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF CHICAGO:

SECTION 1. The foregoing recitals are hereby adopted as the findings of the City Council.

4

**SECTION 2.** It is hereby determined and declared and found that it is useful, desirable, necessary and convenient that the City acquire the Selected Site for the public purpose of facilitating the location, development, construction and operation of the Presidential Center in Chicago.

**SECTION 3.** The City's acquisition of the Selected Site from the Park District for $1.00 is hereby approved. The Department of Planning and Development (the "Department") is hereby authorized to accept on behalf of the City a deed of conveyance from the Park District for the Selected Site, subject to the approval of the Corporation Counsel.

**SECTION 4.** The Commissioner of the Department (the "Commissioner"), or the Commissioner's designee, is each hereby authorized, subject to the approval of the Corporation Counsel, to negotiate, execute and deliver an intergovernmental agreement between the City and the Park District in substantially the form attached hereto as Exhibit E (the "IGA"), and to execute such other documents and take such other actions as may be necessary or appropriate for the Department to accept title to the Selected Site on behalf of the City and to implement the provisions of this ordinance.

**SECTION 5.** If any provision of this ordinance shall be held to be invalid or unenforceable for any reason, the invalidity or unenforceability of such provision shall not affect any of the other provisions of this ordinance.

**SECTION 6.** All ordinances, resolutions, motions or orders in conflict with this ordinance are hereby repealed to the extent of such conflict.

**SECTION 7.** This ordinance shall take effect immediately upon its passage and approval.

Attachments: Exhibit A – Legal Description of Washington Park Site
Exhibit B – Depiction of Washington Park Site
Exhibit C – Legal Description of Jackson Park Site
Exhibit D – Depiction of Jackson Park Site
Exhibit E – Intergovernmental Agreement

EXHIBIT A

## LEGAL DESCRIPTION OF WASHINGTON PARK SITE

## (SUBJECT TO FINAL SURVEY AND TITLE COMMITMENT)

THAT PART OF THE WEST 1/2 OF THE SOUTHEAST 1/4 OF SECTION 10, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT THE POINT OF INTERSECTION OF THE SOUTH LINE OF THE 66.00 FOOT WIDE EAST 51ST STREET (IN THE EAST 1/2 OF THE SOUTHWEST 1/4 OF SAID SECTION 10) EXTENDED EASTERLY WITH A LINE DRAWN 66.00 FEET EASTERLY OF AND PARALLEL WITH THE WEST LINE OF THE 33.00 FOOT WIDE SOUTH DR. MARTIN LUTHER KING DRIVE (IN THE EAST 1/2 OF THE SOUTHWEST 1/4 OF SAID SECTION 10); THENCE ALONG AN ASSUMED BEARING OF SOUTH 01°34'05" EAST ALONG SAID PARALLEL LINE 51.85 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 19°58'40" EAST 92.02 FEET; THENCE SOUTHEASTERLY 505.51 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 87159.85 FEET CONCAVE NORTHEASTERLY AND WHOSE CHORD BEARS SOUTH 27°02'11" EAST, A DISTANCE OF 505.51 FEET; THENCE SOUTHEASTERLY 61.33 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 230.53 FEET CONCAVE NORTHEASTERLY AND WHOSE CHORD BEARS SOUTH 40°50'31" EAST, A DISTANCE OF 61.15 FEET; THENCE SOUTHEASTERLY 165.93 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 4235.68 FEET CONCAVE NORTHEASTERLY AND WHOSE CHORD BEARS SOUTH 47°41'13" EAST, A DISTANCE OF 165.92 FEET; THENCE SOUTHEASTERLY 118.21 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 583.37 FEET CONCAVE SOUTHWESTERLY AND WHOSE CHORD BEARS SOUTH 41°42'03" EAST, A DISTANCE OF 118.01 FEET; THENCE SOUTHEASTERLY 79.53 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 409.31 FEET CONCAVE SOUTHWESTERLY AND WHOSE CHORD BEARS SOUTH 30°28'31" EAST, A DISTANCE OF 79.40 FEET; THENCE SOUTHERLY 86.06 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 211.92 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS SOUTH 16°26'07" EAST, A DISTANCE OF 85.47 FEET; THENCE SOUTHERLY 207.65 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 2269.24 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS SOUTH 01°21'41" WEST, A DISTANCE OF 207.58 FEET; THENCE SOUTHERLY 229.24 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 4492.41 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS SOUTH 03°56'09" WEST, A DISTANCE OF 229.22 FEET; THENCE SOUTHERLY 216.89 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 2368.61 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS SOUTH 08°25'16" WEST, A DISTANCE OF 216.82 FEET; THENCE SOUTHERLY 231.88 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 3587.52 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS SOUTH 12°59'28" WEST, A DISTANCE OF 231.84 FEET; THENCE SOUTHERLY 163.66 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 6472.30 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS SOUTH 15°04'36" WEST, A DISTANCE OF 163.65 FEET; THENCE SOUTHERLY 232.94 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 1033.90 FEET CONCAVE EASTERLY AND WHOSE CHORD BEARS SOUTH 09°03'34" WEST, A DISTANCE OF 232.44 FEET; THENCE SOUTHERLY 177.24 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 13976.54 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS SOUTH 02°23'46" WEST, A DISTANCE OF 177.24 FEET; THENCE SOUTHERLY 77.65 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 3613.77 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS SOUTH 01°52'55" WEST, A DISTANCE OF 77.65 FEET; THENCE SOUTHERLY 33.77 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 368.19 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS SOUTH 05°29'43" WEST, A DISTANCE OF 33.76 FEET; THENCE SOUTHWESTERLY 42.61 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 100.03 FEET CONCAVE NORTHWESTERLY AND WHOSE CHORD BEARS SOUTH 29°51'20" WEST, A DISTANCE OF 42.29 FEET; THENCE SOUTH 88°06'57" WEST 279.75 FEET TO THE AFOREMENTIONED PARALLEL; THENCE NORTH 01°34'05" WEST ALONG SAID PARALLEL LINE 2532.49 FEET TO THE POINT OF BEGINNING.

AREA OF PROPERTY = 909,301 SQ. FT. 20.87 ACRES

EXHIBIT B

## DEPICTION OF WASHINGTON PARK SITE

(LAND SHADED IN BLACK AND IDENTIFIED WITH LETTER "A" BELOW)



EXHIBIT C

## LEGAL DESCRIPTION OF JACKSON PARK SITE

(SUBJECT TO FINAL SURVEY AND TITLE COMMITMENT)

THAT PART OF THE WEST 1/2 OF THE SOUTHWEST 1/4 OF SECTION 13, TOWNSHIP 38 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE POINT OF INTERSECTION OF THE NORTH LINE OF LOT A EXTENDED EASTERLY (BEING ALSO THE SOUTH LINE OF EAST 60TH STREET) WITH A LINE DRAWN 83.00 FEET EAST OF AND PARALLEL WITH THE EAST LINE OF SAID LOT A IN MIDWAY PLAISANCE SUBDIVISION OF LOTS 1 AND 2 IN JACKSON PARK, BEING A SUBDIVISION OF PART OF THE SOUTH 1/2 OF THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 14, TOWNSHIP AND RANGE AFORESAID; THENCE ALONG AN ASSUMED BEARING OF SOUTH 01°28'20" EAST ALONG SAID PARALLEL LINE (BEING ALSO A LINE DRAWN 83.00 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SOUTH STONY ISLAND AVENUE) A DISTANCE OF 1947.76 FEET TO ITS POINT OF INTERSECTION WITH THE EASTERLY EXTENSION OF THE NORTH LINE OF EAST 63RD STREET; THENCE NORTH 88°49'33" EAST ALONG THE LAST MENTION NORTH LINE 443.73 FEET; THENCE NORTHEASTERLY 18.07 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 17.60 FEET CONCAVE NORTHWESTERLY AND WHOSE CHORD BEARS NORTH 27°56'23" EAST, A DISTANCE OF 17.29 FEET; THENCE NORTHERLY 86.95 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 716.01 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS NORTH 03°32'22" EAST, A DISTANCE OF 86.90 FEET; THENCE NORTHERLY 275.01 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 8170.68 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS NORTH 00°36'55" WEST, A DISTANCE OF 275.08 FEET; THENCE NORTHERLY 274.19 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 35202.06 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS NORTH 01°32'21" WEST, A DISTANCE OF 274.19 FEET; THENCE NORTHERLY 370.38 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 46381.16 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS NORTH 02°00'00" WEST, A DISTANCE OF 370.37 FEET; THENCE NORTHERLY 289.18 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 4320.08 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS NORTH 03°29'29" WEST, A DISTANCE OF 289.12 FEET; THENCE NORTHERLY 78.74 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 1339.63 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS NORTH 08°06'06" WEST, A DISTANCE OF 78.73 FEET; THENCE NORTHERLY 124.30 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 1708.00 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS NORTH 10°13'51" WEST, A DISTANCE OF 124.27 FEET; THENCE NORTHERLY 103.38 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 1554.40 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS NORTH 13°44'00" WEST, A DISTANCE OF 103.36 FEET; THENCE NORTHERLY 115.67 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 2362.24 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS NORTH 16°41'26" WEST, A DISTANCE OF 115.65 FEET; THENCE NORTHERLY 131.39 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 5124.48 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS NORTH 19°38'49" WEST, A DISTANCE OF 131.39 FEET; THENCE NORTHERLY 70.16 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 1518.99 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS NORTH 17°01'57" WEST, A DISTANCE OF 70.15 FEET; THENCE NORTHERLY 36.40 FEET ALONG THE ARC OF A CIRCLE HAVING A RADIUS OF 220.63 FEET CONCAVE WESTERLY AND WHOSE CHORD BEARS NORTH 27°00'59" WEST, A DISTANCE OF 36.35 FEET TO ITS POINT OF INTERSECTION WITH THE EASTERLY EXTENSION OF THE AFORESAID SOUTH LINE OF EAST 60TH STREET; THENCE SOUTH 88°44'53" WEST ALONG THE LAST MENTIONED SOUTH LINE 294.20 FEET TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS

CONTAINING 851,194 SQUARE FEET. OR 19.54 ACRES MORE OR LESS.

EXHIBIT D

## DEPICTION OF JACKSON PARK SITE

(LAND SHADED IN BLACK AND IDENTIFIED WITH LETTER "B" BELOW)



## INTERGOVERNMENTAL AGREEMENT

This Intergovernmental Agreement ("Agreement") is made and entered into on or as of the _____ day of _____, 2015, by and between the Chicago Park District, an Illinois municipal corporation (the "Park District"), and the City of Chicago, an Illinois municipal corporation and home rule unit of government (the "City"), acting by and through its Department of Planning and Development ("DPD").

### RECITALS

WHEREAS, the Park District is the owner of the real property legally described on Exhibit A attached hereto and depicted on Exhibit B attached hereto (the "Washington Park Site"), and

WHEREAS, the Washington Park Site is comprised of approximately 21 acres and is located in the northwest portion of Washington Park; and

WHEREAS, the Washington Park Site is generally bounded by South Martin Luther King Drive on the west, South Ellsworth Drive on the east, East Garfield Boulevard on the south, and East 51st Street on the north; and

WHEREAS, the Park District is also the owner of the real property legally described on Exhibit C attached hereto and depicted on Exhibit D attached hereto (the "Jackson Park Site"); and

WHEREAS, the Jackson Park Site is comprised of approximately 20 acres and is located southwest of the Museum of Science and Industry in Jackson Park; and

WHEREAS, the Jackson Park Site is generally bounded by South Stony Island Avenue on the west, South Cornell Drive on the east, East 60th Street on the north, and East 63rd Street on the south; and

WHEREAS, The Barack Obama Foundation, a nonprofit corporation organized under the laws of the District of Columbia (the "Foundation") was established in January 2014 in order to plan and develop a multi-unit facility consisting of a library in which the presidential records of the Barack Obama presidency will be available for review and analysis ("Library"), a museum dedicated to the Barack Obama presidency ("Museum"), an academic institute to enhance the pursuit of the President's initiatives beyond 2017, the Foundation's executive and administrative offices, and other ancillary facilities, such as parking and landscaped open space (collectively, the "Presidential Center"); and

WHEREAS, in March 2014, the Foundation initiated a broad search for the future site of the Presidential Center, beginning with a Request for Qualifications open to all interested parties; and

WHEREAS, after narrowing the field to four institutions, including the University of Illinois-Chicago ("UIC") and the University of Chicago ("UChicago"), the Foundation requested comprehensive proposals from each institution, and

WHEREAS, UIC and UChicago submitted their proposals to the Foundation on December 11, 2014; and

1

WHEREAS, UChicago's proposal identifies the Washington Park Site and the Jackson Park Site as potential locations for the future Presidential Center; and

WHEREAS, in early January, the Foundation expressed concerns regarding the City's lack of control over these sites, and indicated that consolidating ownership of the sites and local decision-making authority in the City was a prerequisite to a successful bid, and

WHEREAS, the City and the Park District wish to address the Foundation's concerns and demonstrate their mutual commitment to bringing the Presidential Center to Chicago, and

WHEREAS, the City and the Park District strongly support the location of the Presidential Center in either proposed location; and

WHEREAS, it is unknown at this time whether the Foundation will select UChicago's proposal and, if selected, whether the Foundation will prefer the Washington Park Site (or a portion thereof) or the Jackson Park Site (or a portion thereof) as the future location of the Presidential Center (either site, if selected, or any portion thereof, the "Selected Site"); and

WHEREAS, in order to satisfy the Foundation's request for consolidated ownership and control in the event UChicago has the winning bid, the City wishes to acquire the Selected Site from the Park District, and the Park District wishes to convey the Selected Site to the City; and

WHEREAS, the announcement of the winning bid for the Presidential Center is expected to occur in the spring of 2015; and

WHEREAS, if UChicago has the winning bid, the final selection of the site for the Presidential Center is expected to occur in the fall or winter of 2015; and

WHEREAS, unless and until the Foundation selects UChicago as having the winning bid, title to and possession of the Washington Park Site and the Jackson Park Site shall remain vested in the Park District; and

WHEREAS, Article VII, Section 10 of the 1970 Constitution of the State of Illinois authorizes state and local governing bodies to cooperate in the performance of their responsibilities by contracts and other agreements; and

WHEREAS, the Intergovernmental Cooperation Act, 5 ILCS 220/1 et seq., similarly authorizes public agencies, including units of local government and school districts, to contract with one another to perform any governmental service, activity or undertaking; and

WHEREAS, the Local Government Property Transfer Act, 50 ILCS 605/0.01 et seq., authorizes and provides for municipalities to convey, grant or transfer real estate held by the municipality to any other municipality upon the agreement of the corporate authorities governing the respective parties; and

WHEREAS, by resolution adopted on _____, 2015, the Board of Commissioners of the Park District authorized the execution of this Agreement by the Park District's General Superintendent and the Park District's performance of its obligations hereunder; and

2

WHEREAS, by ordinance adopted by the City Council of the City on _____, 2015 and published at pages _____ to _____ in the Journal of the Proceedings of the City Council of such date, the City authorized the execution of this Agreement by the commissioner of DPD, and the City's performance of its obligations hereunder.

NOW, THEREFORE, in consideration of the mutual promises, terms and conditions set forth herein, and for the purpose of intergovernmental cooperation, the parties agree as follows:

1      Transfer of Selected Site to the City   The Park District agrees to convey by quitclaim deed, and the City agrees to accept, all of the Park District's right, title and interest in the Selected Site on the Closing Date as defined in Section 3 hereof and subject to the terms of this Agreement. The City agrees to accept the Selected Site in its "as is" condition and subject to a reversionary clause, providing that the Selected Site will revert to the Park District if it is not used for the Presidential Center. The transfer of the Selected Site to the City is contingent upon the Foundation selecting UChicago as having the winning bid for the Presidential Center. Unless and until the Foundation selects UChicago, title to and possession of the Selected Site shall remain vested in the Park District.

2      No Obligation to Provide Title and Survey; No Warranties. The Park District shall have no obligation to provide a survey of the Selected Site, title insurance or any other documentation of any nature concerning the Selected Site. The City acknowledges and agrees that it is not relying on any express or implied warranties, promises, guarantees, or representations made by the Park District or anyone acting or claiming to act on behalf of the Park District in acquiring the Selected Site. The City hereby expressly disclaims any express or implied warranties or covenants as to the value, character, quality, quantity or condition of the Selected Site or any improvements thereon.

3.      Closing Date. The closing date for transfer of title to the Selected Site ("Closing Date") will occur at a date designated by the City, but in no event earlier than the date the Foundation selects UChicago as having the winning bid.

4.      Delivery of Possession. Possession of the Selected Site shall be delivered on the Closing Date.

5.      Park District's Continuing Right to Use. From the Closing Date through the date the City and the Foundation have satisfied or waived all conditions to closing on the execution of a ground lease for the Selected Site, which is not expected to occur until the Foundation is ready to begin construction on the Presidential Center (the "Turnover Date"), the Park District shall have the right to continue to use the Selected Site for its existing purposes, subject to the terms and conditions of this Agreement. The Park District shall be named as an additional insured on any liability insurance policies obtained by the City, the Foundation or their contractors with respect to the Selected Site, and the City shall be named as an additional insured on any liability insurance policies obtained by the Park District or its contractors or licensees with respect to the Selected Site. The Park District shall not enter into any agreements for the development, improvement or use of the Selected Site without the prior written consent of the City, which shall be in the City's sole discretion. The foregoing prohibition shall exclude only improvement and use agreements entered into by the Park District in the ordinary course of business and necessary to the continued use and operation of the Selected Site. Prior to the Turnover Date, the Park District shall maintain the Selected Site in good condition and repair, in a manner consistent with all other similarly situated Park District properties.

3

6    Land Approvals  The Park District shall have no obligation to obtain any zoning or other land use approvals that may be required for the Presidential Center, provided, however, the Park District agrees to cooperate with the City to the extent necessary to obtain such approvals

7    Environmental Condition

(a)    The City acknowledges and agrees that the Park District has made no representations concerning the presence or absence of Hazardous Substances (as defined below) on the Selected Site or any property adjacent thereto and that the Park District has made no representations concerning the existence or non-existence of any violation, past or present, of Environmental Laws (as defined below) affecting the Selected Site. The City hereby waives any and all claims, actions, causes of action, suits or demands of any nature against the Park District which it may have now or in the future for damages, payments, costs, or expenses (including, without limitation, claims of contribution or indemnity and any expenses of investigation of the condition of the Selected Site, regardless of the results of such investigation) suffered by the City as a result of the presence or possible presence of any Hazardous Substances on or near the Selected Site or the violation, at any time in the past, present, or future, of any Environmental Laws affecting the Selected Site. This waiver shall survive the Closing.

(b)    As used in this Agreement, the following terms shall have the following meanings:

"Environmental Laws" means any and all Laws relating to the regulation and protection of human health, safety, the environment and natural resources now or hereafter in effect, as amended or supplemented from time to time, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., any and all regulations promulgated under such Laws, and all analogous state and local counterparts or equivalents of such Laws, including, without limitation, the Illinois Environmental Protection Act, 415 ILCS 5/1 et seq., and the common law, including, without limitation, trespass and nuisance.

"Hazardous Substances" means any toxic substance, hazardous substance, hazardous material, hazardous chemical or hazardous, toxic or dangerous waste defined or qualifying as such in (or for the purposes of) any Environmental Laws, or any pollutant, toxic vapor, or contaminant, and shall include, but not be limited to, petroleum (including crude oil or any fraction thereof), any radioactive material or by-product material, polychlorinated biphenyls and asbestos in any form or condition.

"Laws" means all applicable federal, state, county, municipal or other laws (including common law), statutes, codes, ordinances, rules, regulations, executive orders or other requirements, now or hereafter in effect, as amended or supplemented from time to time, and any applicable judicial or administrative interpretation thereof.

4

including any applicable judicial or administrative orders, consent decrees or judgments.

8      Right of Entry.  The Park District hereby grants to the City and the Foundation, and their contractors, a right of entry to perform reasonable investigations and inspections of the Washington Park Site and the Jackson Park Site from the date hereof through the Closing Date, provided that the City shall have no obligation to perform such investigations under this Agreement  The Foundation also shall have the right, provided it obtains the prior consent of the City and the Park District, which consent shall not be unreasonably withheld, to maintain periodic community, media and/or fundraising events on the Washington Park Site and the Jackson Park Site prior to the Closing  Prior to exercising such right of entry, the City shall provide, or shall require and cause the Foundation or its contractor(s) to provide, to the Park District insurance reasonably acceptable to the Park District (naming the Park District as an additional insured) as a condition to entering the Washington Park Site or the Jackson Park Site, as applicable, to protect the Park District from losses, claims, damages, including property damages and death, arising out of or resulting from the conduct or activities of such contractor or other person at such site.  The City hereby releases the Park District from any claims, liabilities, costs, or expenses incurred as a result of its activities or presence on the Washington Park Site and the Jackson Park Site.

9      Warranties and Representations.  In connection with the execution of this Agreement, the City and Park District each warrant and represent that it is legally authorized to execute and perform or cause to be performed this Agreement under the terms and conditions stated herein.

10.      Non-liability of Public Officials.  No official, employee or agent of the City or the Park District shall be charged personally by the other party with any liability or expense of defense or be held personally liable under any term or provision of this Agreement or because of the City's or Park District's execution or any breach hereof.

11.      Entire Agreement.  This Agreement, and the exhibits attached hereto and incorporated herein, shall constitute the entire Agreement between the parties. There are no representations, warranties, conditions or other agreements, whether direct or collateral, or express or implied, that form part of or affect this Agreement, or that induced any party to enter into this Agreement or on which reliance is placed by any party, except as specifically set forth in this Agreement.

12.      No Third Party Beneficiary.  Except for the limited rights granted to the Foundation and its contractors pursuant to Section 8 above, this Agreement is for the sole and exclusive benefit of the City, the Park District and their respective successors and assigns.

13.      Counterparts.  This Agreement is comprised of two or more identical counterparts, each of which may be fully executed by the parties and, executed, will be deemed an original having identical legal effect.

14.      Governing Law.  This Agreement shall be governed by and construed in accordance with Illinois law, without regard to its conflicts of law principles

15.      Authority.  The conveyance and acceptance of the Selected Site is authorized under the Local Government Property Transfer Act.

16    Amendments   No changes, amendments, modifications or discharge of this Agreement, or any part hereof, shall be valid unless in writing and signed by authorized officers of the City and Park District or their respective successors and/or assigns.

17    Severability  If any provisions of this Agreement shall be held or deemed to be or shall in fact be inoperative or unenforceable as applied in any particular case in any jurisdiction or in all cases because it conflicts with any other provision or provisions hereof or of any constitution, statute, ordinance, rule of law or public policy, or for any other reason, such circumstances shall not have the effect of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatever. The invalidity of any one or more phrases, sentence clauses or sections contained in this Agreement shall not affect the remaining portions of this Agreement or any part thereof.

18.    Interpretation.  Any headings of this Agreement are for convenience of reference only and do not define or limit the provisions thereof.  Words of any gender shall be deemed and construed to include correlative words of the other genders   Words importing the singular number shall include the plural number and vice versa, unless the context shall otherwise indicate.  All references to any exhibit or document shall be deemed to include all supplements and/or amendments to any such exhibits or documents entered into in accordance with the terms and conditions thereof.  All references to any person or entity shall be deemed to include any person or entity succeeding to the rights, duties and obligations of such persons or entities in accordance with the terms and conditions of this Agreement.

19.    Cooperation.  The City and Park District agree at all times to cooperate fully with one another in the implementation of this Agreement.

20.    Assignment.  Neither the City nor the Park District shall assign, delegate or otherwise transfer all or any part of their rights or obligations under this Agreement, or any part hereof, unless as approved in writing by the other party.  The absence of written consent shall void the attempted assignment, delegation or transfer and shall render it of no effect.

21.    Force Majeure.  Neither the City nor Park District shall be obligated to perform any of their obligations hereunder if prevented from doing so by reasons outside of their reasonable control, including but not limited to, events of force majeure.

22.    Time of Essence.  Time is of the essence in this Agreement.

23.    Waiver.  The failure by either party to enforce any provisions of this Agreement shall not be construed as a waiver or limitation on that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

24.    Notices.  All notices and communications concerning this Agreement shall be sent as follows:

If to the Park District:              Chicago Park District
                                      541 North Fairbanks
                                      Chicago, Illinois 60611
                                      Attn: General Superintendent

With a copy to:                       Chicago Park District
                                      Office of the General Counsel

6

541 North Fairbanks
Chicago, Illinois 60611
Attn: General Counsel

If to the City:

City of Chicago
Department of Planning and Development
121 North LaSalle Street
Room 1000
Chicago, Illinois 60602
Attn: Commissioner

With a copy to:

City of Chicago
Department of Law
Real Estate and Land Use Division
121 N. LaSalle Street, Room 600
Chicago, Illinois 60602
Attn: Deputy Corporation Counsel

Unless otherwise specified, any notice, demand, communication or request required hereunder shall be given in writing at the addresses set forth above and shall be effective (a) if given by personal service, upon delivery, (b) if sent by overnight courier, effective on the business day after delivery to such courier, or (c) if sent by registered or certified mail, return receipt requested, effective three (3) business days after mailing. The notice address for a party may be changed by giving notice in the manner provided in this section.

25.     Termination.     This Agreement shall commence as of the date of execution and shall terminate on the Closing Date, upon which any contractual responsibilities to the other party shall terminate; provided, however, if the Foundation selects a site other than the Washington Park Site or the Jackson Park Site as the location of the Presidential Center, this Agreement and all provisions herein and any associated documentation shall automatically be extinguished and shall be considered null and void with no legal effect whatsoever, and such extinguishment shall require no further action by the Park District Board of Commissioners, General Superintendent or any delegates or assigns and shall be effective at such time as an official selection announcement is made.

(Signature Page Follows)

7

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

CITY OF CHICAGO, a municipal corporation and home rule unit of government.

By:_____

Andrew J. Mooney
Commissioner of Planning and Development

CHICAGO PARK DISTRICT, an Illinois municipal corporation

By:_____

Michael P. Kelly
General Superintendent and CEO

APPROVED AS TO FORM AND LEGALITY:

By:_____

First Deputy General Counsel

8

## EXHIBIT A

## LEGAL DESCRIPTION OF WASHINGTON PARK SITE

(SEE "EXHIBIT A" ATTACHED TO ORDINANCE)

# EXHIBIT 2

(Published by the Authority of the City Council of the City of Chicago)

**COPY**



# JOURNAL of the PROCEEDINGS
## of the
# CITY COUNCIL
## of the
# CITY of CHICAGO, ILLINOIS

Regular Meeting -- Wednesday, October 31, 2018

at 10:00 A.M.

(Council Chamber -- City Hall -- Chicago, Illinois)

**OFFICIAL RECORD.**

**VOLUME I**

**RAHM EMANUEL**
**Mayor**

**ANDREA M. VALENCIA**
**City Clerk**

At this point in the proceedings, Alderman Burke moved to *Suspend the Rules Temporarily* for the purpose of going out of the regular order of business to consider matters otherwise discussed in the Reports of Committees portion of the meeting. The motion *Prevailed.*

## COMMITTEE ON HOUSING AND REAL ESTATE.

AMENDMENT OF INTERGOVERNMENTAL USE AGREEMENT WITH CHICAGO PARK DISTRICT FOR USE OF PROPERTY AS OBAMA PRESIDENTIAL CENTER.
[SO2018-7136]

The Committee on Housing and Real Estate submitted the following report:

CHICAGO, October 31, 2018.

*To the President and Members of the City Council:*

Your Committee on Housing and Real Estate, for which a meeting was held on October 11, 2018, having had under consideration the substitute ordinance introduced by Mayor Rahm Emanuel on October 11, 2018, this being the amendment of an intergovernmental use agreement with the Chicago Park District for property to be used as the Obama Presidential Center, begs leave to recommend that Your Honorable Body *Pass* said substitute ordinance transmitted herewith.

This recommendation was concurred in by a voice vote of all committee members present, with no dissenting votes.

Respectfully submitted,

(Signed)    JOSEPH A. MOORE,
                *Chairman*

On motion of Alderman J. Moore, the said proposed substitute ordinance transmitted with the foregoing committee report was *Passed* by yeas and nays as follows:

*Yeas* -- Aldermen Moreno, Hopkins, Dowell, King, Hairston, Sawyer, Mitchell, Harris, Beale, Sadlowski Garza, Thompson, Cárdenas, Quinn, Burke, Lopez, Foulkes, D. Moore, Curtis, O'Shea, Brookins, Muñoz, Tabares, Scott, Solis, Maldonado, Burnett, Ervin, Taliaferro, Reboyras, Santiago, Waguespack, Mell, Austin, Ramirez-Rosa, Villegas, Mitts, Sposato, Laurino, Napolitano, Reilly, Smith, Tunney, Arena, Cappleman, Pawar, Osterman, J. Moore, Silverstein -- 48.

*Nays* -- None.

Alderman Harris moved to reconsider the foregoing vote. The motion was lost.

At this point in the proceedings, the Honorable Rahm Emanuel, Mayor, rose and expressed his appreciation to the many individuals who helped to make the Obama Presidential Center a reality. Reflecting on the long process that led to this moment, Mayor Emanuel observed that President Barak Obama began his public service career as a community organizer on the city's South Side and that the journey will now come full circle with the completion of the Obama Presidential Center in the Jackson Park community. Reading a letter from President Obama who conveyed his appreciation to the Mayor and members of the City Council for their support and expressed his excitement for this unique resource and amenity for the City of Chicago, Mayor Emanuel noted that the Obama Presidential Center is the beginning of a new chapter in Chicago's history and a legacy to generations to come that will serve as a reminder to young visitors -- from around this city and the world -- that their potential is limitless.

The following is said ordinances as passed:

WHEREAS, The City of Chicago (the "City") is a municipal corporation and home rule unit of government under Article VII, Section 6(a) of the 1970 Constitution of the State of Illinois and, as such, may exercise any power and perform any function pertaining to its government and affairs; and

WHEREAS, The Chicago Park District (the "Park District") is a body politic and corporate created pursuant to the Chicago Park District Act, 70 ILCS 1505/0.01, et seq., and a unit of local government under Article VII, Section 1 of the 1970 Constitution of the State of Illinois, and as such, has the authority to exercise control over and supervise the operation of all parks within the corporate limits of the City; and

WHEREAS, The Barack Obama Foundation is a 501(c)(3) non-partisan, not-for-profit corporation organized under the laws of the District of Columbia (the "Foundation"); and

WHEREAS, A core project of the Foundation is to build the Obama Presidential Center (the "OPC") in Jackson Park on the South Side of Chicago; and

WHEREAS, The central mission of the OPC is to house and operate, among other facilities, a presidential museum telling the story of our nation's first African-American President and First Lady, their journey to the White House, their historical connection to Chicago, and the countless individuals, communities, and social currents that shaped their journey; and

WHEREAS, The museum will allow visitors to experience firsthand the historic Obama presidency and its successes and challenges; and

WHEREAS, The OPC will contain a variety of spaces designed to offer opportunities for visitors to participate in activities that connect them to the values and skills of civic engagement and community building that have inspired the Obamas' lives and careers; and

WHEREAS, Each modern President has spearheaded the development of a presidential museum and facilities for related non-partisan educational and programmatic activities; and

WHEREAS, The Foundation has selected Chicago, and Jackson Park in particular, as the location for the OPC over other available and feasible out-of-state locations; and

WHEREAS, The OPC will be the 14th presidential museum displaying presidential artifacts owned by the National Archives and Records Administration ("NARA"); and

WHEREAS, The Park District Aquarium and Museum Act, 70 ILCS 1290/0.01, et seq. (the "Museum Act"), allows cities to authorize private institutions to build and operate museums and aquariums in public parks; and

WHEREAS, The Museum Act specifies that a presidential center is an authorized public park use under the Museum Act; and

WHEREAS, In addition to express legislative authorization for privately-operated museums in public parks, the Illinois Supreme Court has recognized the propriety of operating a museum within a public park; and

WHEREAS, Chicago has a long history of establishing museums in its parks as evidenced by the eleven "Museums in the Park" currently operating in Burnham Park (Adler Planetarium, Field Museum, John G. Shedd Aquarium), Grant Park (Art Institute of Chicago), Harrison Park (National Museum of Mexican Art), Humboldt Park (Institute of Puerto Rican Arts and Culture), Jackson Park (Museum of Science and Industry), Lake Shore Park (Museum of Contemporary Art), Lincoln Park (Peggy Notebaert Nature Museum, Chicago History Museum), and Washington Park (DuSable Museum of African American History); and

WHEREAS, These eleven museums are joined by the Lincoln Park Zoo, whose 49 acres are operated by the Lincoln Park Zoological Society; and

WHEREAS, These institutions are all operated by private, not-for-profit organizations, and all depend on private donations and private management and curatorial expertise; and

WHEREAS, Each uses park land free of charge and each has along-term right to occupy its buildings rent-free, so long as the buildings are used for museum purposes in compliance with the Museum Act; and

WHEREAS, Chicago's history of building museums in parks is part of a larger national tradition of combining culture, education and recreation through the placement of museums and other major cultural institutions in parks, including, to give just a few examples: the Los Angeles County Museum of Art and Page Museum in Hancock Park; the California Science Center, the Natural History Museum, and the California African American Museum in Exposition Park in Los Angeles; the San Diego Natural History Museum and 26 other arts, cultural and science institutions in Balboa Park; the California Academy of Sciences and the de Young Museum in Golden Gate Park; the Philadelphia Museum of Art in Fairmount Park; the Asian Art Museum in Seattle's Volunteer Park; and the Saint Louis Art Museum, Missouri History Museum and Saint Louis Science Center in Forest Park; and

WHEREAS, The 1972 Lakefront Plan of Chicago adopted by the Chicago Plan Commission (the "Lakefront Plan"), whose policies continue to govern approval of applications under the Lake Michigan and Chicago Lakefront Protection Ordinance, Chapter 16-4 of the Chicago Municipal Code (the "LPO"), celebrates the history of museums in Chicago's parks, and endorses the placement of cultural facilities "within the lakeshore parks" and "other large park locations" in the City; and

WHEREAS, Before the Lakefront Plan, Daniel Burnham and Edward Bennett's 1909 Plan of Chicago advocated building great public institutions, such as the Field Museum, in parks along Chicago's lakefront; and

WHEREAS, Jackson Park, like Lincoln Park, is a regional park, and just as the Lincoln Park Zoo, the Chicago History Museum and the Notebaert Nature Museum have welcomed visitors from throughout Chicago and beyond, the OPC will be a local, national and even global destination; and

WHEREAS, The OPC is one of a number of major improvements considered in the Park District's 2017/2018 update to its 1999 South Lakefront Framework Plan; and

WHEREAS, Locating the OPC in Jackson Park will generate momentum for the development of a "Museum Campus South", one of the initiatives identified in the Chicago Cultural Plan of 2012, which has the goal of connecting major institutions on the South Side and creating new opportunities for collaboration and growth; and

WHEREAS, The OPC is consistent with the Museum Act, the Lakefront Plan, the Chicago Cultural Plan, and the South Lakefront Framework Plan update, and is a legally permissible use of park land; and

WHEREAS, The City, with its home rule authority and large planning, transportation and other infrastructure departments, is well-situated to facilitate the various large-scale infrastructure and investment initiatives in and around the OPC and to oversee the development and operation of the OPC in accordance with the agreements as described herein; and

WHEREAS, On March 18, 2015, the City Council adopted an ordinance (the "2015 Ordinance"), authorizing the City to acquire land in Jackson Park (the "Original Site") from the Park District that the City would subsequently authorize the Foundation to use for the construction, operation and maintenance of the OPC, in accordance with an Intergovernmental Agreement attached to the 2015 Ordinance (the "2015 IGA"); and

WHEREAS, The Original Site is generally bounded by South Stony Island Avenue on the west, South Cornell Drive on the east, the eastbound lanes of Midway Plaisance on the north, and East Hayes Drive on the south, as legally described in the 2015 Ordinance (the "Original Legal Description") and depicted in a survey attached to the 2015 Ordinance (the "Original Survey"); and

WHEREAS, After passage of the 2015 Ordinance and with the benefit of in-depth engagement with neighboring communities spanning over two years, the Foundation, the Chicago Department of Planning and Development ("DPD"), the Chicago Department of Transportation ("CDOT") and the Park District determined that the construction of the OPC presented a rare opportunity for the City, in coordination with other local, state and federal entities, to enhance the Foundation's investment in the park by improving the road and trail network, reconnecting fragmented park land, improving bicycle and pedestrian connectivity to the lagoons and lakefront, improving traffic safety, reducing vehicle conflict with visitors to the park and enhancing outdoor spaces that currently exist; and

WHEREAS, In order to help accomplish this vision, and to improve the connection of the OPC Site to the Museum of Science and Industry, the Foundation has proposed shifting the boundaries of the Original Site to the north and east to incorporate portions of the Midway Plaisance and Cornell Drive, and CDOT has proposed closing these and additional road segments within the park and making additional Transportation Improvements (as hereinafter defined); and

WHEREAS, The City Council has determined it advances the public interest to accept such proposals; and

WHEREAS, The revised OPC project site (the "OPC Site") consists of approximately 19.3 acres and is legally described on Exhibit A attached hereto (the "Revised Legal Description") and depicted on Exhibit B attached hereto (the "Revised Survey"); and

WHEREAS, The original and reconfigured sites are approximately the same size (20 acres and 19.3 acres, respectively), and are depicted side-by-side for comparison purposes on Exhibit C attached hereto; and

WHEREAS, The City and the Park District desire to amend the 2015 Ordinance and the 2015 IGA to replace the Original Legal Description with the Revised Legal Description and the Original Survey with the Revised Survey; and

WHEREAS, The 2015 Ordinance contemplated the construction of a traditional "Presidential Library" operated by NARA that would serve, in part, as a repository for artifacts, paper records and historical materials from the Obama administration; and

WHEREAS, After passage of the 2015 Ordinance, the Foundation began working cooperatively with NARA to establish a new model of a presidential library in which the Foundation would digitize the paper records so that NARA can operate a virtual Obama Presidential Library in a more cost-effective manner and the Foundation would establish and maintain a museum promoting understanding of the presidency and the American experience; and

WHEREAS, The Foundation is funding and collaborating with NARA to digitize all residential records created during the Obama administration, which will give researchers, educators, students and any other interested persons the opportunity to study presidential history from any location around the world; and

WHEREAS, Like a traditional NARA-operated facility, at the core of the OPC will be a museum with interactive exhibits and displays of artifacts and records from the Obama presidency, but instead of dedicating space to a physical archive that would have limited public access for NARA-overseen documents, the Foundation will use the remaining space in the OPC for cultural enrichment, public outreach, educational programs, a public library and community programs available to all (as further described herein, the "Revised Proposal"); and

WHEREAS, The OPC is designed as a campus consisting of four buildings and an underground parking facility, complemented by a plaza, play areas, pedestrian and bicycle pathways and other landscaped open space, as described and depicted in the Use Agreement (as hereinafter defined) and in Institutional Planned Development Number 1409 adopted by the City Council on May 23, 2018 and published in the *Journal of the Proceedings of the City Council of the City of Chicago* such date on pages 77185 through 77214 ("PD 1409"); and

WHEREAS, The four OPC buildings include the Museum Building, the Forum Building and the Library Building (which buildings will be connected below grade at the garden level and wrap around a plaza), and the Program, Athletic and Activity Center at the southern end of the site, as described in the Use Agreement and depicted in P.D. 1409; and

WHEREAS, The Museum Building is designed to establish the OPC as an important civic space in the City, and will house exhibits that tell the story of the people and events of the Obama administration within a broader historical context; and

WHEREAS, Drawing from the broader story of American history, the history of civil rights and the powerful place of Chicago in American history, the museum will frame President and Mrs. Obama's lives and careers, the 2008 and 2012 presidential elections, and the Obama presidency in the context of the movements and milestones that helped to shape the nation over time; and

WHEREAS, The museum will be a tribute to the American journey and celebrate the arc to the first African-American president of the United States; and

WHEREAS, The museum will feature presidential artifacts from President Obama's eight years in office that will be owned and loaned by NARA to the Foundation on a rotating basis, as well as artifacts from other sources and time periods that help tell the Obamas' story; and

WHEREAS, The Foundation will implement specific admission policies for the museum benefitting City residents and low-income individuals and families and will comply with all free admission requirements of the Museum Act; and

Case: 1:21-cv-02024 Document #: 1-45 Filed: 04/15/2021 Page 29 of 342 PageID #:3972

WHEREAS, The Library Building and Forum Building are low-lying, two-story buildings (with one level below-grade), which will include accessible, landscaped green roofs and be integrated into the surrounding landscape; and

WHEREAS, The Library Building will include a branch of the Chicago Public Library housing a multimedia collection and spaces for reading and study, as well as a dedicated children's area and a meeting space that will be available for public use; and

WHEREAS, The Library Building will also house a President's Reading Room which will serve as an extension of the museum experience, providing visitors to the Library Building with an accessible and inspiring setting for reading as well as for programs and small exhibits devoted to the importance of literacy, education and community service, and also featuring a special collection of books that have been significant to the President and manuscripts and other materials related to his life as a reader, writer, thinker and public servant; and

WHEREAS, The Forum Building will house collaboration and creative spaces, including an auditorium, multipurpose meeting rooms, recording and broadcast studios, a winter garden and a restaurant; and

WHEREAS, The Program, Athletic and Activity Center will be a multi-purpose facility hosting a variety of large-scale indoor programs including presentations, events, concerts and athletics, and will be used for formal and informal recreation activities; and

WHEREAS, The Museum Building, Forum Building, Library Building and Program, Athletic and Activity Center will be required to be open to the public in a manner substantially consistent with how other museums in the park are open to the public; and

WHEREAS, The Foundation intends to provide free public access to many interior spaces within the OPC, including: portions of the garden and plaza levels in the Museum Building; the top floor of the Museum Building, which will feature an observation and reflection space with views of Jackson Park, Lake Michigan and the surrounding city; the winter garden, restaurant and multi-purpose meeting rooms in the Forum Building; a new branch of the Chicago Public Library and the President's Reading Room in the Library Building; and

WHEREAS, The green space surrounding the OPC will include play areas for children; contemplative spaces for young and old; a sledding hill; a sloped lawn for picnicking, recreation and community and special events; additional walking paths surrounding the Women's Garden and Lawn; a nature walk along the lagoon; and new pathways; and

WHEREAS, The OPC will not only benefit Chicago residents and attract visitors from around the world, but will also enhance both accessibility and usability of Jackson Park; and

WHEREAS, In its current state, the OPC Site is isolated from the rest of Jackson Park and from the surrounding neighborhood by busy roadways, including six lanes of traffic on South Cornell Drive to the east, two lanes of traffic on South Stony Island Avenue to the west, two lanes of traffic on the westbound Midway Plaisance to the north, and two lanes of traffic on East Hayes Drive to the south; and

WHEREAS, Residents and visitors using the OPC Site in its current state cannot access the contiguous parts of Jackson Park, such as the lagoons and the lakefront, without crossing six lanes of traffic at road-level on South Cornell Drive; and

WHEREAS, In its current state, the OPC Site includes the historic Women's Garden and Lawn and the Women's Garden and Lawn is currently bounded on all sides by roadways; and

WHEREAS, The planned improvement of the OPC Site and associated Road Closures (as hereinafter defined) and Transportation Improvements (as hereinafter defined) will enhance pedestrian access from the neighborhood to the OPC Site and from there to the lakefront, through the reconfiguration of roadways and the construction of additional pedestrian underpasses, signalized crossings and pedestrian refuge islands; and

WHEREAS, The development will create off-street parking supply for the OPC without visual impact to the community through the construction of an underground parking garage to further enhance access to the OPC Site while maximizing available natural areas and parkland; and

WHEREAS, The Foundation's planned project will also enhance Jackson Park by improving public safety in and around the park, including by adding improved lighting and resurfaced pathways with clearer sightlines to create a safer means of traversing through Jackson Park; and

WHEREAS, The planned landscaping and development of the OPC Site will also increase the diversity of trees and plantings within Jackson Park and along South Stony Island Avenue; will improve ecological performance of planting at Jackson Park, including by using native plantings to promote and maintain wildlife habitats; and will introduce varied topography and increased biodiversity and hydrology features, including new storm water run-off management that will mitigate current storm water run-off issues from Jackson Park into the lagoon; and

WHEREAS, Construction of the OPC and development of the OPC Site will support local businesses and encourage additional investments in the area; and

WHEREAS, The Foundation will strive to award a minimum of 50 percent of subcontracts to diverse firms, far greater than the City's required minimum goal of 26 percent MBE and 6 percent WBE participation; and

WHEREAS, In light of the extensive benefits that the OPC will bring to Chicago residents, to the City and to the Park District, the City and the Park District desire to amend the 2015 Ordinance and the 2015 IGA to approve the Revised Proposal; and

WHEREAS, On May 17, 2018, the Chicago Plan Commission approved the construction of the OPC under the LPO, finding that the proposal complied with the applicable policies of the 1972 Lakefront Plan of Chicago and the purposes of the LPO; and

WHEREAS, At the same meeting on May 17, 2018, the Chicago Plan Commission recommended approval of P.D. 1409 for the OPC, and on May 23, 2018, as previously described, the City Council adopted an ordinance approving PD 1409; and

WHEREAS, The base zoning of P.D. 1409 is POS-1 (Parks and Open Space District, Regional or Community Park), which expressly allows "cultural exhibits and libraries" (including museums) as planned developments; and

WHEREAS, Pursuant to Section 17-6-0201 of the Municipal Code, the "POS" zoning district is "intended to preserve, protect and enhance lands set aside for public open space, public parks and public beaches" in order to provide "cultural and recreation opportunities", among other public benefits; and

WHEREAS, The City desires to enter into a use agreement with the Foundation for a term of 99 years in consideration of the Foundation's obligation to construct, operate and maintain the OPC, at its sole cost and expense, with title to the improvements constructed by the Foundation to be transferred to the City upon their completion, subject to and in accordance with the restrictions and provisions contained in a use agreement substantially in the form attached hereto as Exhibit D (the "Use Agreement"); and

WHEREAS, The Use Agreement permits the Foundation to use the OPC Site for a Presidential Center consistent with purposes accorded to and limitations imposed by the Foundation's status as a non-profit, non-partisan entity exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Service Code, and for no other purpose; and

WHEREAS, The City has the right to terminate the Use Agreement if the Foundation fails to use the OPC Site for its permitted Presidential Center uses, including if the Foundation ceases to operate a museum within the OPC Site; and

WHEREAS, During the term of the Use Agreement, the City will enjoy the benefits of the OPC Site in the form of the beautification of grounds, the Foundation's ongoing financial and operational support of public historical, cultural and recreational enrichment activities, and the City's receipt of title to all OPC buildings and improvements (in the manner set forth in the Use Agreement) without any payment to the Foundation and with the Foundation's agreement to operate, maintain and insure such buildings and improvements for the term of the Use Agreement; and

WHEREAS, In addition to the Use Agreement, the City and the Foundation intend to enter into a Master Agreement in substantially the form attached hereto as Exhibit E (the "Master Agreement") and an Environmental Remediation and Indemnity Agreement in substantially the form attached hereto as Exhibit F (the "Environmental Agreement"); and

WHEREAS, The Master Agreement establishes the conditions precedent to the execution of the Use Agreement, and sets forth the representations, warranties and covenants of both parties with respect to their authority to enter into the transaction and the condition of the OPC Site, among other matters; and

WHEREAS, Pursuant to the Master Agreement, the City is not obligated to enter into the Use Agreement until the Foundation establishes an endowment for the OPC and the OPC Site, and has submitted to the City a certificate confirming that the Foundation has received funds and/or written gift pledge commitments equaling or exceeding the projected total construction costs of the OPC as described in the Master Agreement; and

WHEREAS, The Environmental Agreement obligates the Foundation to perform an environmental investigation of the OPC Site and remediate contamination exceeding residential remediation standards, if any; and

WHEREAS, The Environmental Agreement obligates the City to reimburse the Foundation for up to $75,000 in investigation costs plus any incremental costs of remediating the site (i.e., additional costs the Foundation would not otherwise incur to construct the OPC but for the pre-existing contamination and the required remediation work); and

WHEREAS, Two federal actions related to the OPC and the OPC Site have triggered review under the National Environmental Policy Act of 1969, 42 U.S.C. § 4331, et seq. ("NEPA") and Section 106 of the National Historic Preservation Act of 1966, 54 U.S.C. § 306108 ("Section 106"): first, the City's request for approval from the Federal Highway Administration ("FHWA") under the Federal Aid Highway Program of funding for the Transportation Improvements (as hereinafter defined); and second, the City's request for approval from the National Park Service ("NPS") to amend two grant agreements affecting Jackson Park funded under the Urban Park and Recreation Recovery ("UPARR") program (one from 1980 in the amount of $125,300, and the other from 1981 in the amount of $135,870) for the partial conversion of UPARR-assisted parkland to anon-recreational use; and

WHEREAS, With respect to the Federal-aid Highway funding, CDOT has proposed and the Park District's 2018 update to the South Lakefront Framework Plan envisions the closure of four road segments in Jackson Park, as depicted on Exhibit G attached hereto (the "Road Closures") and the construction of a variety of multi-modal transportation improvements to mitigate the impacts of the Road Closures, as well as improve traffic safety and multi-modal access to and through the park, as described on Exhibit H-1 attached hereto and depicted on Exhibit H-2 attached hereto (collectively, the "Transportation Improvements"); and

WHEREAS, On May 17, 2018, the Chicago Plan Commission approved the Road Closures and Transportation Improvements under the LPO; and

WHEREAS, Construction of the OPC and development of the OPC Site along with the roadway changes in and around Jackson Park will result in a net gain of approximately three to four acres of new, added green space within Jackson Park; and

WHEREAS, With respect to the UPARR grants, NPS has preliminarily indicated that the Program, Athletic and Activity Center and the green space surrounding the OPC Site will remain in recreational use, but that certain proposed uses of the Museum, Forum and Library Buildings (for example, proposed educational uses) constitute a partial conversion under UPARR; and

Case: 1:11-cv-02424 Document #: 1-4 Filed: 09/02/19 Page 33 of 342 PageID #:1952

WHEREAS, The City has asked NPS to approve amendments to the UPARR grant agreements (the "UPARR Grant Agreement Amendments") to remove the grant conditions from the footprint of the Museum, Library and Forum Buildings, and to transfer those conditions to the eastern end of the Midway Plaisance, or other park property of reasonably equivalent location and recreational usefulness ("UPARR Replacement Land"); and

WHEREAS, The City and the Park District will seek community input in order to develop recreational programming for the UPARR Replacement Land; and

WHEREAS, The City is in the process of completing the NEPA and Section 106 reviews, and anticipates that it may be necessary to enter into binding commitments to resolve and/or mitigate adverse effects, if any, identified as part of these reviews, including, but not limited to, a Memorandum of Agreement under Section 106 (collectively, "Mitigation Agreements"); and

WHEREAS, The requirements and restrictions in the Museum Act, the LPO, PD 1409 and the Use Agreement preserve substantial control by the City over the OPC Site; and

WHEREAS, Article VII, Section 10 of the 1970 Constitution of the State of Illinois, authorizes state and local governing bodies to cooperate in the performance of their responsibilities by contracts and other agreements; and

WHEREAS, The Intergovernmental Cooperation Act, 5 ILLS 220/1, et seq., similarly authorizes public agencies, including units of local government and school districts, to contract with one another to perform any governmental service, activity or undertaking; and

WHEREAS, The Local Government Property Transfer Act, 50 ILCS 605/0.01, et seq., authorizes and provides for municipalities to convey, grant or transfer real estate held by the municipality to any other municipality upon the agreement of the corporate authorities governing the respective parties; and

WHEREAS, By Resolution Number 18-039-21 and Resolution Number 18-042-21, adopted on May 17, 2018, the Chicago Plan Commission found that the City's acquisition of the OPC Site from the Park District, and the subsequent long-term authorization to the Foundation for use of the OPC Site, were in conformance with the City's long-range planning objectives; and

WHEREAS, The Foundation's selection of Chicago for the OPC is a great honor and unparalleled opportunity for the State of Illinois, all of the City, and especially the South Side; and

WHEREAS, The location of the OPC in Jackson Park will underscore the vital role the OPC plays in the public life of Chicago and will encourage greater use and enjoyment of the park and lakefront; and

Case 1:18-cv-04209 Document #: 4946 Filed 09/02/19 Page 34 of 342 PageID #:3952

WHEREAS, The City recognizes the potential for demographic change and displacement arising from large-scale public and private investment in urban neighborhoods and is committed to closely monitoring property values and other indicators of neighborhood change and implementing measures to preserve economic diversity, home ownership and affordability for long-term residents in the communities surrounding the OPC; and

WHEREAS, In sum, the OPC will feature a museum that memorializes and examines President Obama's historic presidency within the larger story of American history, inspire visitors to engage actively in their own communities, showcase the South Side and Jackson Park to the nation and world, enhance the park's recreational value, attract cultural tourism to the South Side, create direct and indirect economic development benefits, strengthen Chicago's reputation as a global city, and enable the City to directly advance its previously adopted Cultural Plan; now, therefore,

*Be It Ordained by the City Council of the City of Chicago:*

SECTION 1. The foregoing recitals are hereby adopted as the findings of the City Council and are incorporated herein and made a part of this Ordinance.

SECTION 2. It is hereby determined and declared and found that it is useful, desirable, necessary and convenient that the City acquire the OPC Site from the Park District for the public purpose of facilitating the construction and operation of the OPC in Chicago.

SECTION 3. The 2015 Ordinance and the 2015 IGA are hereby amended to replace the Original Legal Description, Original Survey and Original Proposal with the Revised Legal Description, Revised Survey and Revised Proposal.

SECTION 4. The City's acquisition of the OPC Site from the Park District is hereby approved. The Department of Planning and Development (the "Department") is hereby authorized to accept on behalf of the City a deed of conveyance from the Park District for the OPC Site, which shall provide that the OPC Site will revert to the Park District if the land is not used for the OPC. The Commissioner of the Department (the "Commissioner") or a designee of the Commissioner (either, the "Authorized Officer"), is each hereby authorized, subject to the review and approval of the City's Corporation Counsel as to form and legality, to negotiate, execute and deliver a revised IGA between the City and the Park District (the "IGA"), and to execute such other documents and take such other actions as may be necessary or appropriate for the Department to accept title to the OPC Site on behalf of the City and to carry out and comply with the provisions of the IGA, with such changes, deletions, insertions, terms and provisions as the Authorized Officer deems appropriate.

SECTION 5. The City is hereby authorized to grant rights of use of the OPC Site, including any roads to be vacated within the OPC Site, to the Foundation in accordance with, subject to the terms of, and in consideration of the obligations of the Foundation in, the Use Agreement. The City is further authorized to accept ownership from the Foundation of the "Project Improvements" (as defined in the Use Agreement) once constructed by the Foundation within the OPC Site. The Authorized Officer is hereby authorized, subject to the review and approval of the Corporation Counsel as to form and legality, to negotiate, execute and deliver, on behalf of the City, the Use Agreement, and

to execute such other documents and take such other actions as may be necessary or appropriate for the City to carry out and comply with the provisions of the Use Agreement, with such changes, deletions, insertions, terms and provisions as the Authorized Officer deems appropriate.

SECTION 6. The Authorized Officer is hereby authorized, subject to the review and approval of the Corporation Counsel as to form and legality, to negotiate, execute and deliver, on behalf of the City, the Master Agreement, the Environmental Agreement, the UPARR Grant Agreement Amendments, and the Mitigation Agreements (collectively, the "Transaction Documents"), and to execute such other documents and take such other actions as may be necessary or appropriate for the City to carry out and comply with the provisions of the Transaction Documents, with such changes, deletions, insertions, terms and provisions as the Authorized Officer deems appropriate. With respect to the Environmental Agreement, the City shall appropriate amounts sufficient to pay the obligations of the City pursuant to the Environmental Agreement, and the City hereby covenants to take timely action as required by law to carry out the appropriation provisions of this sentence.

SECTION 7. If any provision of this ordinance shall be held to be invalid or unenforceable for any reason, the invalidity or unenforceability of such provision shall not affect any of the other provisions of this ordinance.

SECTION 8. All ordinances, resolutions, motions or orders in conflict with this ordinance are hereby repealed to the extent of such conflict.

SECTION 9. This ordinance shall take effect immediately upon its passage and approval.

[Exhibits "B" and "C" referred to in this ordinance printed
on pages 85889 and 85890 of this *Journal*.]

Exhibits "A", "D" and "E" referred to in this ordinance read as follows:

*Exhibit "A".*
(To Ordinance)

*Revised Legal Description.*

(Subject To Final Survey And Title Commitment)

Parcel 1:

That part of the northwest quarter and the fractional northeast quarter of Section 13, Township 38 North, Range 14 East of the Third Principal Meridian, lying west of

Case 1:18-cv-04204 Document #: 14-4 Filed 09/05/23 Page 36 of 342 PageID #:1982

Lake Michigan, (except that portion lying west of the east line of South Shore Drive and north of the south line of 56th Street) and (except that part falling in South Stoney Island Avenue), and that part of the southwest quarter and the fractional southeast quarter of Section 13, Township 38 North, Range 14 East of the Third Principal Meridian, lying west of west line of Lake Michigan, (excepting that part falling in South Stoney Island Avenue), described as follows:

beginning at the intersection of the south line of East 60th Street Extended Easterly with a line 67.00 feet east of and parallel with the west line of Section 13, Township 38 North, Range 13 East of the Third Principal Meridian, being the east line of South Stony Island Avenue as opened and used; thence north 01 degree, 28 minutes, 30 seconds west along said parallel line 510.04 feet; thence north 42 degrees, 06 minutes, 05 seconds east 28.98 feet to a curve, being the southerly line of East Midway Plaisance Drive north as opened and used; thence northeasterly along the arc of said curve concave north, being said southerly line, having a radius of 476.54 feet, having a chord bearing north 61 degrees, 55 minutes, 33 seconds east for a distance of 375.10 feet; thence north 88 degrees, 43 minutes, 12 seconds east 66.79 feet to the east edge of the easterly public walk for South Cornell Drive, being the east line of said South Cornell Drive as opened and used; thence along said east edge of walk, being said east line, the following described nine (9) courses and distances: 1) southerly along the arc of a curve concave east, having a radius of 38.54 feet, having a chord bearing south 00 degrees, 21 minutes, 42 seconds west for a distance of 12.87 feet; 2) thence south 06 degrees, 51 minutes, 19 seconds east 163.49 feet; 3) thence southerly along the arc of a curve concave west, having a radius of 1,120.31 feet, having a chord bearing south 05 degrees, 04 minutes, 57 seconds east for a distance of 157.87 feet; 4) thence southerly along the arc of a curve concave west, having a radius of 3,760.39 feet, having a chord bearing south 03 degrees, 25 minutes, 41 seconds west for a distance of 315.35 feet; 5) thence southerly along the arc of a curve concave east, having a radius of 393.46 feet, having a chord bearing south 06 degrees, 53 minutes, 25 seconds east for a distance of 180.73 feet; 6) thence south 18 degrees, 29 minutes, 44 seconds east 67.10 feet; 7) thence southerly along the arc of a curve concave west, having a radius of 2,172.82 feet, having a chord bearing south 15 degrees, 02 minutes, 50 seconds east for a distance of 267.87 feet; 8) thence southerly along the arc of a curve concave west, having a radius of 1,681.10 feet, having a chord bearing south 07 degrees, 06 minutes, 32 seconds east for a distance of 316.89 feet; 9) thence south 02 degrees, 30 minutes, 19 seconds east 396.02 feet; thence south 88 degrees, 54 minutes, 14 seconds west 213.25 feet; thence north 01 degrees, 28 minutes, 06 seconds west 86.69 feet; thence south 88 degrees, 54 minutes, 14 seconds west 70.75 feet; thence south 01 degree, 28 minutes, 06 seconds east 86.69 feet; thence south 88 degrees, 54 minutes, 14 seconds west 265.03 feet to aforesaid parallel line; thence north 01 degree, 28 minutes, 30 seconds west along said parallel line 1,162.61 feet to the point of beginning; said parcel of land herein described contains 19.30 acres, more or less, all in Cook County, Illinois.

Total Area: 840,848 square feet ±, or 19.30 acres ±

10/31/2018

COMMUNICATIONS, ETC.

85889

Exhibit "B".
(To Ordinance)

Revised Survey.



JOURNAL--CITY COUNCIL--CHICAGO

*Exhibit "C".*
(To Ordinance)

## COMPARISON OF ORIGINAL AND REVISED SITES

### PROPOSED 2015 SITE BOUNDARIES



### REVISED 2018 SITE BOUNDARIES



Case 1:18-cv-03424 Document #: 144 Filed: 04/30/19 Page 39 of 342 PageID #:3952

*Exhibit "D".*
(To Ordinance)

*Use Agreement With The Barack Obama Foundation.*

This **USE AGREEMENT** ("**Agreement**") is made as of _____, 20___ (the "**Commencement Date**"), by and between the **CITY OF CHICAGO**, an Illinois municipal corporation and home rule unit of government (the "**City**"), acting by and through its Department of Planning and Development, having its principal offices at City Hall, 121 North LaSalle Street, Chicago, Illinois 60602, and **THE BARACK OBAMA FOUNDATION**, a District of Columbia nonprofit corporation and tax exempt entity under Section 501(c)(3) of the Internal Revenue Code (the "**Foundation**"), having offices at 5235 South Harper Court, Suite 1100, Chicago, Illinois 60615.

## RECITALS

A. The City is the owner of certain real property in Jackson Park, which consists of approximately 19.3 acres of land and is more particularly described on Exhibit A attached hereto and depicted on the map attached hereto as Exhibit B (the "**Subject Property**").

B. Jackson Park contains a total of 548 acres, including the Subject Property.

C. The City acquired the Subject Property from the Chicago Park District, a municipal corporation organized and existing pursuant to the laws of the State of Illinois, 70 ILCS 1505/1 *et seq.* (the "**Park District**"), in order to facilitate the development of the Presidential Center (as hereinafter defined).

D. The Park District Aquarium and Museum Act, 70 ILCS 1290/0.01 *et seq.* (the "**Museum Act**"), allows cities to authorize private institutions to build and operate museums and aquariums in public parks.

E. The Museum Act specifies that a presidential center is an authorized public park use under the Museum Act.

F. A core project of the Foundation is to build the Presidential Center in Jackson Park.

G. The central mission of the Presidential Center is to house and operate a presidential museum that will present President and Mrs. Obama's story within the broader story of American history, the history of civil rights, and the powerful place of Chicago in American history.

H. The museum will frame President and Mrs. Obama's lives and careers, the 2008 and 2012 presidential elections, and the Obama Presidency in the context of the movements and milestones that helped to shape the Nation over time.

I. The Presidential Center will contain a variety of spaces designed to offer opportunities for visitors to participate in activities that connect them to the values and skills of civic engagement and community building that have inspired the Obamas' lives and careers.

J. The Presidential Center will be the 14th presidential museum displaying presidential artifacts owned by NARA (as defined herein).

K.     In connection with the development of the Presidential Center, the Foundation proposes to develop the Subject Property to include four buildings and an underground parking facility, complemented by a plaza, play areas, pedestrian and bicycle pathways and other landscaped open space, as described herein and in the PD (as hereinafter defined).

L.     The four Presidential Center buildings include the Museum Building, the Forum Building, the Library Building, and the Program, Athletic and Activity Center (each as hereinafter defined), as described in this Agreement and depicted in the PD.

M.     The green space surrounding the Presidential Center will include play areas for children, contemplative spaces for young and old, a sledding hill, a sloped lawn for picnicking, recreation and community and special events, walking paths, and a nature walk along the lagoon.

N.     The Presidential Center will not only benefit Chicago residents and attract visitors from around the world, but will also enhance both accessibility and usability of Jackson Park.

O.     The Presidential Center will showcase the South Side and Jackson Park to the nation and world, enhance the park's recreational value, attract cultural tourism to the South Side, create direct and indirect economic development benefits and strengthen Chicago's reputation as a global city.

P.     This Agreement is being entered into pursuant to the terms of that certain Master Agreement dated as of _____, 2018 between the City and Foundation (the "**Master Agreement**").

Q.     On _____, 2018, the City Council adopted an ordinance approving and authorizing the execution of this Agreement  (Journal of Proceedings, pp. _____-_____), the recitals of which describe a rationale for and benefits of this Agreement, the Master Agreement and certain other Subject Property Documents (as defined herein).

R.     On _____, 2018, the Board of Directors of the Foundation adopted a resolution approving and authorizing the execution of this Agreement.

**NOW, THEREFORE,** for and in consideration of the mutual covenants and agreements set forth herein, together with other good and valuable consideration, the receipt and sufficiency of which are hereby confirmed and acknowledged by each of the parties hereto, and each of the parties intending to be bound thereby, the City and the Foundation agree as follows:

### ARTICLE I
### DEFINITIONS

As used in this Agreement, or any Exhibits to this Agreement, except where a different definition is clearly and expressly given, the following words or phrases, capitalized as shown, shall have the following meanings:

"**Agreement**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Alterations**" means any alterations, modifications, changes, additions, improvements, demolition and/or removal of or to the Project Improvements or Subject Property made following completion of Construction of the Project Improvements.

"**Ancillary Uses**" has the meaning assigned to such term in Section 6.1 of this Agreement.

"**Architect**" means the architect licensed in the State and engaged by the Foundation to design the Project Improvements or any portion thereof. As of the Commencement Date, the Architect for the Presidential Center Architectural Spaces is Tod Williams Billie Tsien Architects, which is working together with Interactive Design Architects.

"**Award**" means all compensation, damages or interest paid or awarded for a Taking whether pursuant to a judgment, an agreement or otherwise.

"**Bankruptcy Proceeding**" means any bankruptcy, composition, insolvency, reorganization, or similar proceeding, whether voluntary or involuntary, under Title 11, United States Code, or any other or successor federal or state bankruptcy, insolvency, reorganization, moratorium, or similar law for the relief of debtors, including any assignment for the benefit of creditors and any adversary proceeding, proceedings for the appointment of a receiver or trustee, or similar proceeding.

"**Business Days**" means all days other than (a) Saturdays, (b) Sundays, and (c) weekdays on which City offices are not open for business.

"**Casualty Restoration Escrow Agreement**" has the meaning assigned to such term in Section 13.1(c) of this Agreement.

"**City**" has the meaning assigned to such term in the introductory paragraph of this Agreement. Except where clearly and expressly provided otherwise in this Agreement, any action to be taken by the City may be taken for the City by the Commissioner.

"**City Parties**" has the meaning assigned to such term in Section 19.1 of this Agreement.

"**Commencement Date**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Commissioner**" means the commissioner of the Department, or such successor position as the City Council of the City may designate. The defined term "Commissioner" shall also include any person designated by the Commissioner to act on behalf of the Commissioner.

"**Condemnation Restoration Escrow Agreement**" has the meaning assigned to such term in Section 15.1(b) of this Agreement.

"**Construction**" has the meaning assigned to such term in Section 4.1 of this Agreement.

"**County**" means Cook County, Illinois.

"**Cornell MOT Plan**" has the meaning assigned to such term in Section 4.14(a) of this Agreement.

"**Cornell Parcel**" means that portion of the Cornell Segment that is within the boundaries of the Subject Property.

"**Cornell Segment**" means the public roadway known as Cornell Drive, and the attendant public right-of-way adjacent thereto, between 59th Street and Hayes Drive in Chicago, Illinois.

"**Department**" means the Department of Planning and Development of the City, as a party to this Agreement, and any successor department thereto, or any department that the City Council may from time to time designate to fulfill the responsibilities and exercise the rights of the City hereunder.

"**Demolish**" or "**Demolition**" means the demolition of the Project Improvements, the removal of all construction materials and debris, the excavation and removal of any foundations, the capping or removal of all utility lines the maintenance, repair and replacement of which are the responsibility of the Foundation, and the grading of the Subject Property to the then surrounding grade and restoration of the Subject Property as nearly as possible to its original parkland condition.

"**Endowment**" means an endowment established by the Foundation having as its sole purpose paying, as and when necessary, the costs to operate, enhance and maintain the Project Improvements (including the Presidential Center) during the Term.

"**Environmental Conditions**" has the meaning assigned to such term in Section 9.1(a) of this Agreement.

"**Environmental Remediation Agreement**" has the meaning assigned to such term in Section 9.1(b) of this Agreement.

"**Event of Default**" has the meaning assigned to such term in Section 16.1 of this Agreement.

"**Exhibit Installations**" means structures, fixtures and other improvements installed in the Presidential Center to display, or as part of, any exhibit or installation to be made available for viewing by the general public.

"**Excluded Items**" has the meaning assigned to such term in Section 4.4 of this Agreement.

"**Federal Governmental Determinations**" shall mean the (i) securing of final decision/approval documents under the National Environmental Policy Act ("**NEPA**") from the National Park Service for a conversion under the Urban Park and Recreation Recovery Act, (ii) securing of final decision/approval documents under NEPA from the Federal Highway Administration in anticipation of funding under the Federal-Aid Highway Act for roadway improvements in Jackson Park, and (iii) completion of a consultation process under Section 106

of the National Historic Preservation Act, including if necessary, entry by the City into a memorandum of agreement to address known adverse effects on historic properties.

"**Final Completion Date**" means the date upon which the last of the punch list items for any Project Improvements has been completed as determined by the Architect.

"**Force Majeure Event**" means an act of god, fire, earthquake, floods, explosion, adverse weather, war, terrorism, invasion, insurrection, riot, mob violence, sabotage, inability to procure or general shortage of labor, equipment, facilities, materials, supplies, products or services in the open market, failure of transportation, strikes, lockouts, action of labor unions, condemnation, requisition, change in Laws, decisions or orders of governmental or civil or military or naval authorities, failure by the party hereto that is not asserting the existence of a Force Majeure Event to timely perform any of its obligations under the Subject Property Documents or any other cause, whether similar or dissimilar to the foregoing, in each case beyond the control of the applicable party.

"**Forum Building**" means a building comprising a portion of the Presidential Center that will be used principally for programming and events, including the roof and exterior area immediately above such building.

"**Foundation**" has the meaning assigned to such term in the introductory paragraph of this Agreement, including the Foundation's successors and permitted assigns.

"**Foundation Parties**" has the meaning assigned to such term in Section 6.7(b) of this Agreement.

"**Governmental Approvals**" means all licenses, building permits and other permits and governmental approvals required for the Construction of the Project Improvements and the Foundation's intended use of the Subject Property.

"**Governmental Authority**" means the United States, the State, the County, the City, and any other governmental authority having jurisdiction on or over the Subject Property or the Project Improvements, and any agency, department, commission, board, bureau or instrumentality of any of them.

"**Governmental Function**" means any regulatory, legislative, permitting, enforcement (including police power), licensing or other functions which the City is authorized or required to perform in its capacity as a Governmental Authority in accordance with applicable Laws. The entering into this Agreement and the performance by the City of its obligations under this Agreement shall not be considered a "Governmental Function."

"**Great Lawn**" means a sloped area located on the Subject Property as depicted in Exhibit D (as such Exhibit may be modified with approval from the Department to reflect Part II approvals issued from time to time under the PD), which will be used as a gathering space in warm weather periods and as a sledding hill or for other cold weather outdoor activities during cold weather periods.

Case 1:18-cv-06200 Document #: 146 Filed: 04/20/21 Page 44 of 342 PageID #:3962

"**Green Space**" means all portions of the Subject Property excluding the Presidential Center.

"**Hazardous Materials**" has the meaning assigned to such term in Section 9.1(c) of this Agreement.

"**Impositions**" means all real property and personal property taxes (whether designated as *ad valorem* taxes or in some other manner and however calculated), if any, and other taxes, assessments (general and special), impositions and other governmental charges, general and special, ordinary and extraordinary, of any kind or nature, which are assessed against or otherwise attributable to real or personal property by any Governmental Authority.

"**Imposition Lien**" has the meaning assigned to such term in Section 10.1(a) of this Agreement.

"**Laws**" means all present and future laws (including, without limitation, laws relating to Hazardous Materials or environmental, health, safety, industrial hygiene, pollution, or related matters), ordinances, statutes, codes, requirements, orders, directions, rules and regulations of all federal, state, county and municipal governments and of all other Governmental Authorities having or claiming jurisdiction over the City, the Foundation, the Subject Property, the Project Improvements or any appurtenances thereto or any part thereof, and of all the respective departments, bureaus and officials of any such authorities, common law and strict liability provisions, and any judicial or administrative interpretations thereof, including any governmental, judicial or administrative judgments, orders or directives.

"**Liabilities**" has the meaning assigned to such term in Section 19.1 of this Agreement.

"**Library Building**" means a building comprising a portion of the Presidential Center that will be used principally for educational purposes and the support of the other Project Improvements, including the roof and exterior area immediately above such building.

"**Liens**" means consensual liens (such as deeds of trust and mortgage liens) and judgment liens. This term does not include Mechanic's Liens or Imposition Liens.

"**Master Agreement**" has the meaning assigned to such term in the Recitals.

"**Material Damage**" has the meaning assigned to such term in Section 14.2(c) of this Agreement.

"**Material Taking**" has the meaning assigned to such term in Section 15.1(c) of this Agreement.

"**Mechanic's Lien(s)**" has the meaning assigned to such term in Section 6.6(a) of this Agreement.

"**Midway MOT Plan**" has the meaning assigned to such term in Section 4.14(b) of this Agreement.

Case 1:18-cv-03424 Document #: 14-4 Filed 05/02/19 Page 45 of 342 PageID #:3272

"**Mission**" means the mission of the Presidential Center, as described on Exhibit C attached hereto.

"**Museum Act**" has the meaning assigned to such term in the Recitals.

"**Museum Building**" means a building comprising a portion of the Presidential Center that will be used principally as a museum open to the public.

"**Museums in the Park**" means the museums located on the Park District's land that are supported by the Aquarium and Museum Operating Fund, which as of the date hereof consists of the following museums: the Adler Planetarium, the Art Institute of Chicago, the Chicago History Museum, the DuSable Museum of African American History, The Field Museum, the John G. Shedd Aquarium, the Museum of Contemporary Art, the Museum of Science and Industry, the National Museum of Mexican Art, the National Museum of Puerto Rican Arts & Culture, and The Peggy Notebaert Nature Museum.

"**NARA**" means the National Archives and Records Administration, an agency of the federal government.

"**North Midway Plaisance Segment**" has the meaning assigned to such term in Section 4.14(b) of this Agreement.

"**Outside Completion Date**" means the date that is the later to occur of (a) the fourth (4th) anniversary of the Commencement Date, and (b) the third (3rd) anniversary of the date on which the later of the Cornell Parcel and the South Midway Plaisance Segment is delivered to the Foundation in the condition required in the Subject Property Documents.

"**Park District**" has the meaning assigned to such term in the Recitals.

"**PD**" means Planned Development No. 1409, as amended from time to time during the Term.

"**Permit Plans**" means, for each phase of the Project Improvements, the construction plans and specifications prepared by the Architect, and submitted to the City as the basis for obtaining the general building permits for Construction of such phase of the Project Improvements.

"**Permitted Use**" has the meaning assigned to such term in Section 6.1 of this Agreement.

"**Plaza**" means the principal exterior plaza located on the Subject Property lying in front of the Museum Building, Forum Building and Library Building.

"**Presidential Center**" means the portion of the Subject Property depicted on Exhibit D (as such Exhibit may be modified with approval from the Department to reflect Part II approvals issued from time to time under the PD), which is comprised of the Presidential Center Green Space, the Presidential Center Architectural Spaces, and all other improvements and fixtures constructed, installed or located by the Foundation on such portion of the Subject Property in accordance with this Agreement.

Case 1:18-cv-04204 Document #: 194-4 Filed: 05/02/19 Page 46 of 342 PageID #:3282

"**Presidential Center Architectural Spaces**" means the Museum Building (including its exterior courtyards and eastern bustle), the Forum Building (and its roof area), the Library Building (and its roof area), the Program, Athletic and Activity Center, the Underground Parking Facility, the Plaza, and any other buildings constructed or installed on the portion of the Subject Property labeled "Presidential Center" depicted on Exhibit D (as such Exhibit may be modified with approval from the Department to reflect Part II approvals issued from time to time under the PD), and other facilities and improvements ancillary to any of the foregoing constructed, installed or located on the Subject Property by the Foundation, such as, for example, loading/receiving areas and service drives.

"**Presidential Center Green Space**" means all portions of the Presidential Center other than the Presidential Center Architectural Spaces.

"**Program, Athletic and Activity Center**" means a building comprising a portion of the Presidential Center that will be used principally for purposes of programming, presentations, events, athletics and recreation.

"**Project**" means the design, financing and Construction of the Project Improvements.

"**Project Improvements**" means, collectively, the Presidential Center Architectural Spaces and all other improvements constructed, installed or located on the Subject Property by the Foundation in accordance with the terms of this Agreement.

"**Record Drawings**" means final as-built drawings of the Project Improvements. Upon reasonable advance request, the Record Drawings shall be made available for review by the City and its representatives at the Subject Property, subject to the Foundation's reasonable security protocols.

"**Remediation**" has the meaning assigned to such term in Section 9.1(d) of this Agreement.

"**Rules**" has the meaning assigned to such term in Section 6.2(b) of this Agreement.

"**Soft Costs**" means all architectural, engineering, consulting and other non-construction costs with respect to the Construction of the Project Improvements.

"**South Midway Plaisance Segment**" has the meaning assigned to such term in Section 4.14(b) of this Agreement.

"**State**" means the State of Illinois.

"**Subject Property**" has the meaning assigned to such term in the Recitals.

"**Subject Property Documents**" means this Agreement, the Master Agreement, the Environmental Remediation Agreement, and any other agreement relating to the Subject Property executed by the City and the Foundation.

"**Taking**" means the taking of all or a portion of the Subject Property or the Project Improvements for any public or quasi-public use, by eminent domain proceedings, by a

Governmental Authority or by an action in the nature of eminent domain (whether permanent or temporary) or the sale or other transfer of all or a portion of the Subject Property or the Project Improvements in lieu thereof.

"**Term**" has the meaning assigned to such term in Section 2.2 of this Agreement.

"**Termination Exercise Notice**" has the meaning assigned to such term in Section 16.5(a) of this Agreement.

"**Third-Party Vendor(s)**" has the meaning assigned to such term in Section 12.2 of this Agreement.

"**Total Construction Costs**" means all costs and expenses incurred in the Construction of the Project Improvements, which shall not include (a) any costs or expenses for which the City is responsible, pursuant to the Subject Property Documents, (b) any Soft Costs, and (c) any Exhibit Installations.

"**Turnover Date**" has the meaning assigned to such term in Section 4.14(c) of this Agreement.

"**Underground Parking Facility**" means a below-surface parking garage located on the Subject Property.

## ARTICLE II
## GRANT AND TERM

**Section 2.1**    Grant.    Subject to the terms, provisions, covenants, agreements and conditions of this Agreement, the City hereby gives and grants to the Foundation for the Term the following rights with respect to the Subject Property:

(a)    the right to construct and install the Project Improvements (including the Presidential Center);

(b)    the right to occupy, use, maintain, operate and alter the Presidential Center Architectural Spaces; and

(c)    the right to use, maintain, operate and alter the Presidential Center Green Space and Green Space.

The Subject Property shall be made available by the City to the Foundation as of the Commencement Date, subject to Section 4.14.

**Section 2.2**    Term.    The term ("**Term**") of this Agreement shall commence on the Commencement Date and shall expire on the day immediately prior to the 99th annual anniversary of the Commencement Date, unless this Agreement is earlier terminated pursuant to the provisions of this Agreement, in which case the Term shall end on the date of such termination.

### ARTICLE III
### CONSIDERATION

The consideration for this Agreement is Ten and 00/100 Dollars ($10.00) payable by the Foundation on the Commencement Date, the receipt and sufficiency of which, when taken together with the construction, development, operation, maintenance and repair of the Presidential Center and the other Project Improvements by the Foundation, the vesting of ownership of the Project Improvements by the Foundation in the City (as contemplated herein), as well as the material covenants and agreements set forth herein to be performed and observed by the Foundation, are hereby acknowledged by the City.

### ARTICLE IV
### DESIGN/CONSTRUCTION OF AND TITLE TO IMPROVEMENTS

**Section 4.1**    Construction. The Foundation shall, at its sole cost and expense, design and construct the Project Improvements in conformance with this Agreement, the Master Agreement, the PD, all applicable Laws, sound building and engineering practices and substantially in conformity with the Permit Plans (the physical construction of the Project Improvements being referred to herein as the "**Construction**"). The Foundation shall be solely responsible for the design and Construction of the Project Improvements, including the selection, termination and replacement of all architects, contractors, engineers and consultants involved in such Construction, subject to the requirements set forth in Exhibit F, and for the safety and structural soundness of all Project Improvements. Subject to delays to the extent resulting from Force Majeure Events, the Foundation (a) shall commence Construction of the Project Improvements on the Subject Property no later than the first (1st) anniversary of the Commencement Date, and (b) shall complete Construction of the Project Improvements (other than non-material Project Improvements, and subject to normal and customary punch list and finish items), and open the Presidential Center to the public, no later than the Outside Completion Date; provided, however, the Commissioner of the Department may extend the construction commencement and completion dates by up to one (1) year each (or two (2) years in the aggregate) if the Foundation encounters unexpected delays or difficulties.

**Section 4.2**    Project Costs. The City shall not be liable or otherwise responsible in any manner (a) for any of the Total Construction Costs, any of the Soft Costs, or, except as required pursuant to the Subject Property Documents, for any other costs, expenses, obligations, taxes, fees, penalties, Governmental Approvals or liabilities arising out of the planning, design, construction, furnishing, or operation of the Project Improvements; or (b) for any costs arising out of the financing of the Total Construction Costs or Soft Costs (if and to the extent any such financing is permitted hereunder). The immediately preceding sentence, however, is not intended to and shall not relieve the City from its responsibilities (and liabilities attendant thereto) relating to the exercise of its ordinary police powers and paying for any costs incurred in connection therewith (to the extent ordinarily paid by the City), or from any of the City's obligations expressly provided in the Subject Property Documents.

**Section 4.3**    Indemnification by Architect and Contractor. The Foundation shall cause the Architect employed or engaged by the Foundation in connection with the Construction to indemnify the City against all claims and liabilities arising out of the negligent performance of

professional services by such Architect with respect to the design of the Project Improvements, and shall cause the general contractor employed or engaged by the Foundation in connection with the Construction to indemnify the City against all claims and liabilities arising out of the negligent performance of work by such general contractor with respect to the Construction of the Project Improvements, in each instance to the extent permitted by applicable Law. The Foundation also shall cause such Architect and the general contractor, as applicable, to obtain and keep in full force and effect appropriate insurance for the benefit of the City to insure the City against any and all commercially insurable claims and liabilities asserted by third parties arising out of the design and construction of the Project Improvements.

**Section 4.4** <u>Title to Project Improvements</u>.  Except for exhibits and Foundation-installed art and sculptures on the Subject Property ("**Excluded Items**"), title to which shall remain vested in the Foundation unless conveyed to the City by separate instrument, any and all Project Improvements placed or constructed by the Foundation on the Subject Property shall, upon completion thereof, become the property of the City and shall remain the property of the City during the Term. The Foundation shall, reasonably promptly after the City's request therefor, execute, acknowledge and deliver such documents as may be necessary or convenient in the City's discretion for the purpose of further evidencing that title to the Project Improvements (other than the Excluded Items) is vested in the City. After the expiration of the Term or earlier termination of this Agreement, title to such Project Improvements shall remain vested in the City, subject to and as provided in <u>Section 18.1</u> of this Agreement.

**Section 4.5** <u>Easements, Rights of Way and Dedications</u>. The City shall promptly and reasonably cooperate with the Foundation regarding the grant by the City of any easements, rights of way or dedications affecting the Subject Property which are required by (a) any Governmental Authority (including the City) having jurisdiction over the Subject Property, or (b) public or private utilities, in connection with the development and/or alteration of the Subject Property by the Foundation.

**Section 4.6** <u>Performance and Payment Bond</u>.  Prior to the commencement of Construction of any portion of the Project Improvements involving work in the public way or work that constitutes a "public work" under applicable state law and is required to be bonded under such state law, the City may require the Foundation to require that the applicable contractor (or, at the Foundation's election, the general contractor) be bonded for its performance and payment by sureties having an AA rating or better using a bond in a form reasonably acceptable to the City. The City shall be named as obligee or co-obligee on any such bonds.

**Section 4.7** <u>City Resident Worker and MBE/WBE Requirements</u>. The Foundation covenants and agrees to abide by, and contractually obligate the general contractor and each subcontractor engaged in connection with the Construction of the Project Improvements to abide by the terms set forth in <u>Sections 1</u> and <u>2</u> (City Resident Construction Worker Employment Requirement) and <u>Section 3</u> (MBE/WBE Commitment) of <u>Exhibit F</u>. The Foundation shall deliver to the City on a quarterly basis written progress reports detailing compliance with such requirements. If any such reports indicate a shortfall in compliance, the Foundation shall also deliver a plan to the Department which shall outline, to the Department's satisfaction, the manner in which the Foundation shall correct any shortfall.

**Section 4.8**    Prevailing Wage.  The Foundation covenants and agrees to pay, and to contractually obligate the general contractor and each subcontractor engaged in connection with the Construction of the Project Improvements to pay, not less than the prevailing wage rate as ascertained by the Illinois Department of Labor, to all employees.  All such contracts shall list the specified rates to be paid to all laborers, workers and mechanics for each craft or type of worker or mechanic employed pursuant to such contract.  If the Department of Labor revises such prevailing wage rates, the revised rates shall apply to all such contracts.  Upon the City's request, the Foundation shall provide the City with copies of all such contracts entered into by the Foundation, the general contractor and any subcontractors to evidence compliance with this Section 4.8.

**Section 4.9**    City Inspection during Construction.  For the period commencing on the Commencement Date and continuing through the Final Completion Date for the Project Improvements, the Foundation shall permit access by an authorized representative of the City designated in writing by the City to all portions of the Project Improvements and the Subject Property at all reasonable times and upon reasonable prior notice for the purpose of determining whether the Foundation is constructing the Project Improvements in accordance with the terms of this Agreement and all applicable Laws.

**Section 4.10**    Barricades.  Prior to the commencement of any construction activity relating to the Project Improvements requiring barricades, the Foundation shall install barricades constructed in compliance with all applicable Laws.  The Foundation shall erect all barricades so as not to interfere with or affect any bus stop adjacent to the Subject Property.

**Section 4.11**    Limited Purpose of Approvals.  Any approval given by the Department pursuant to this Agreement is for the purpose of this Agreement only and does not constitute the approval required by the City's Department of Buildings or any other City department, nor does such approval constitute an approval of the quality, structural soundness or safety of any Project Improvements located or to be located on the Property, or the compliance of said Project Improvements with any Laws, private covenants, restrictions of record, or any agreement affecting the Subject Property or any part thereof.

**Section 4.12**    Completion of the Project Improvements.  The Foundation, promptly following the Final Completion Date for the Project Improvements, shall deliver to the City a certificate in form and substance satisfactory to the City, signed by an authorized representative of the Foundation, certifying (except as to (b) below, which shall be provided by the Architect): (a) that all insurance required under this Agreement has been obtained; (b) that all Construction has been completed in accordance with the provisions of this Agreement and substantially in accordance with the Permit Plans; (c) that within ten (10) Business Days following the Final Completion Date specified in the certificate, the Presidential Center will be placed in service, and (d) all amounts payable with respect to the Construction of the Project Improvements have been paid or will be paid by a specified date.

**Section 4.13**    Site Closure.  In order to facilitate the safe, secure and efficient construction and development of the Presidential Center and the other Project Improvements by the Foundation, but subject to the rights of the City pursuant to Section 4.9 to inspect the Project Improvements and the Subject Property, for the period commencing on the Commencement Date and continuing

through the Final Completion Date for the Project Improvements, the Foundation shall be permitted to install and erect construction fencing and barricades, and otherwise prohibit or restrict access to the Subject Property in accordance with applicable Law.

**Section 4.14**   Closure of Roads within OPC Site.

(a)   Cornell Drive. The Foundation acknowledges that as of the date hereof Cornell Drive is an active roadway, and that the Cornell Parcel will not be made available to the Foundation for its use until such time as the City has obtained all approvals and/or permits required for the permanent closure of the Cornell Segment, and the Cornell Segment (or the applicable portion thereof) shall have been vacated with title thereto vested in the City. The City will use best efforts to obtain the approvals and/or permits required for such vacation and permanent closure, to vacate and permanently close the Cornell Segment, and to make the Cornell Parcel available to the Foundation for its use as herein provided, by December 31, 2020. The Foundation acknowledges, however, that the permanent closure of the Cornell Segment depends on the completion by the City of transportation improvements on Lake Shore Drive, Hayes Drive, and the portion of Stony Island Avenue located between East 63rd Street/Hayes Drive and the North Midway Plaisance Segment, and certain utility work within the right-of-way of the Cornell Segment. Prior to the permanent closure of the Cornell Segment, the City will work with the Foundation to secure IDOT's approval to temporarily close the west 24 feet of the roadway within the Cornell Segment (two southbound lanes) to traffic, it being understood that such temporary lane closures will be conditioned on the design, funding and implementation by the Foundation of a maintenance of traffic plan for such temporary lane closures (the "**Cornell MOT Plan**"). Upon securing such IDOT approval, the City will temporarily close the west 24 feet of the roadway within the Cornell Segment to traffic and make such portion of the Cornell Segment available to the Foundation for implementation of the Cornell MOT Plan and its use as herein provided. The City will use best efforts to secure the approvals and/or permits required for such temporary lane closures by the date that is the later to occur of (i) the 90th day following receipt of the Federal Governmental Determinations, and (ii) June 1, 2019.

(b)   Midway Plaisance. The Foundation acknowledges that as of the date hereof the eastbound lanes of Midway Plaisance Drive between Stony Island Avenue and Cornell Drive (the "**South Midway Plaisance Segment**") are part of an active roadway, and will not be made available to the Foundation for its use until such time as the City has obtained all approvals and/or permits required for the permanent closure of the South Midway Plaisance Segment, and the South Midway Plaisance Segment shall have been vacated with title thereto vested in the City. The City will use best efforts to obtain the approvals and/or permits required for such closure by the date that is the later to occur of (i) the 30th day following receipt of the Federal Governmental Determinations, and (ii) March 15, 2019. The Foundation acknowledges, however, that the permanent closure of the South Midway Plaisance Segment depends on IDOT approval of a plan to temporarily re-route eastbound traffic from the South Midway Plaisance Segment to the westbound lanes of the Midway Plaisance (the "**North Midway Plaisance Segment**"), with such temporary re-routing involving the temporary conversion of the North Midway Plaisance Segment from one-way to two-way traffic. The City will work with the Foundation to secure IDOT approval

for the temporary redesign of the North Midway Plaisance Segment to accommodate eastbound and westbound traffic, it being understood that such temporary redesign and re-routing of traffic will be conditioned on the design, funding and implementation by the Foundation of a maintenance of traffic plan for such temporary re-design and re-routing (the "**Midway MOT Plan**"). The engineering, construction and maintenance work necessary for the temporary re-routing of traffic to North Midway Plaisance will be the responsibility of the Foundation until such time as the City completes the transportation improvements necessary to permanently reconfigure North Midway Plaisance to accommodate two-way traffic. Upon securing such IDOT approval, the City will make the South Midway Plaisance Segment available to the Foundation for its implementation of the Midway MOT Plan and its use as herein provided.

(c)     Turnover Dates. At such time as the City is prepared to make the Cornell Parcel (or any portion thereof) or the South Midway Plaisance Segment available to the Foundation as herein contemplated, the City shall so notify the Foundation, whereupon the City and the Foundation shall agree upon the date(s) on which the applicable portion(s) of the Cornell Parcel or the South Midway Plaisance Segment shall be made available to the Foundation (each such date, as applicable, being hereinafter referred to as a "**Turnover Date**"). Upon each applicable Turnover Date, the applicable portion of the Cornell Parcel or the South Midway Plaisance Segment shall be made available to the Foundation for construction of the Project Improvements and the use of the Subject Property thereafter as herein contemplated, whereupon it will become part of the Subject Property, subject to all of the rights and obligations applicable thereto set forth in this Agreement. Until such time as the applicable Turnover Date occurs and the applicable portion of the Cornell Parcel or the South Midway Plaisance Segment is made available to the Foundation as herein contemplated, such portion of the Cornell Parcel or the South Midway Plaisance Segment shall not be part of the Subject Property, and the Foundation shall have no rights or obligations with respect to such parcel pursuant to this Agreement.

(d)     Responsibility for Existing Roadway Improvements. Once each applicable Turnover Date shall have occurred, the Foundation shall be responsible for removing all then-existing pavement and related above-ground features from the Cornell Parcel and the South Midway Plaisance Segment, including curbs, street lights and signage. Any work taking place within the public right-of-way must be completed in accordance with latest edition of CDOT's Rules and Regulation for Openings in the Public Way, to the extent applicable to the work in question.

## ARTICLE V
## AUTHORITY TO EXECUTE AGREEMENT

At the Commencement Date of this Agreement, each party represents and warrants that (a) it has full right, power and authority to enter into this Agreement, (b) the person executing this Agreement on behalf of such party has the authority to do so, (c) this Agreement constitutes the legal, valid and binding obligation of such party enforceable in accordance with its terms, subject to Laws applicable generally to creditor's rights, municipalities, and applicable principles of equity, and (d) performance of this Agreement does not result in any breach of, or constitute any default under, any agreement or other instrument to which such party is a party, or by which such

party is bound. The City agrees that, if the City's authority to enter into this Agreement is challenged, the City will defend the validity and enforceability of this Agreement.

## ARTICLE VI
## USE AND CONDITION OF THE SUBJECT PROPERTY

**Section 6.1**    Permitted Use. The Foundation, at all times during the Term, shall be permitted to use the Subject Property solely for the following purposes (all in accordance with the Museum Act and all applicable Laws): (a) constructing, modifying, improving, maintaining, repairing and restoring the Project Improvements, including any Foundation-installed art and sculptures; (b) operating the Presidential Center, including the museum therein and all uses set forth in Exhibit E, in accordance with the Mission of the Presidential Center and the Museum Act's free admission requirements, and consistent with the purposes accorded to and limitations imposed on the Foundation by its 501(c)(3) status; (c) managing and maintaining the Green Space in accordance with Section 6.2; (d) hosting a public library branch and operating and maintaining other educational, cultural and exhibit spaces, including but not limited to a broadcast studio, a test kitchen and a teaching garden; (e) hosting performances, special exhibits and events, and otherwise offering recreational, instructional and cultural programming to support the Mission of the Presidential Center; and (f) operating a gift shop, providing food and beverage services, operating a public parking facility, and otherwise offering services to support the Presidential Center and serve its patrons and guests (all of the uses described in this clause (f) (the "**Ancillary Uses**") being subordinate to the other uses for which the Subject Property may be used pursuant to this Section 6.1). Such Ancillary Uses shall include, in addition to those uses specified above, those ancillary uses which are present in other Museums in the Park. The purposes described in clauses (a) through (f) of this Section 6.1 are collectively referred to in this Agreement as the "**Permitted Use**."

**Section 6.2**    Public Access.

(a)     Subject to subsections (b) and (c) below and applicable security requirements imposed by Law or governmental policies (whether those of NARA, the Department of Homeland Security, or otherwise), (i) the Presidential Center Architectural Spaces shall be open to the public at a minimum in a manner substantially consistent with the manner in which other Museums in the Parks are open to the public, and (ii) the Presidential Center Green Space, the Green Space and the Plaza shall be open to the public during Chicago Park District hours.

(b)     The Foundation, in consultation with the City, may adopt reasonable rules ("**Rules**") for the health, safety and protection of the facilities and patrons of the Presidential Center Green Space and the Green Space, which may include, but not be limited to, prohibiting or regulating activities that may unreasonably disrupt pedestrian traffic flow or the enjoyment of the Presidential Center and its daily activities and special events. The Foundation shall submit the Rules, and any proposed amendments thereto, to the Department for its review and approval, which approval shall not be unreasonably withheld. The Department shall have thirty (30) Business Days to approve the Rules or propose changes. If the Department proposes changes, the Foundation shall revise the Rules in good faith to respond to the Department's comments and resubmit the Rules to

Case 1:11-cv-08220 Document #: 41-4 Filed: 04/17/19 Page 54 of 342 PageID #:1061

the Department for approval. This process shall continue until the Rules are finalized. Such Rules shall promote access by the general public to, through and within the Presidential Center Green Space and the Green Space for recreational purposes, while concurrently addressing public safety and welfare considerations, the purpose and design of each portion of the Presidential Center Green Space and the Green Space, and the maintenance of sensitive landscaping.

(c)    Subject to compliance with applicable Law, including the PD and any regulations governing PD amendments, the Foundation may use the Presidential Center Green Space and Plaza for:

(i)    temporary exhibits and permanent sculpture and other works of art, provided the placement and number of such exhibits, sculptures and works of art may not materially obstruct the public's access to, through and within the Presidential Center Green Space or Plaza for the active and passive recreational uses described or depicted in the PD;

(ii)    events and activities open to the public related to the Mission of the Presidential Center and the Presidential Center's programs, such as outdoor classes, films, concerts, music and dramatic performances, and other educational, recreational and cultural events and activities, provided that the Foundation shall preserve the public's access to, through and within the Presidential Center Green Space and/or Plaza (as applicable) to the greatest extent practicable during such events; and

(iii)    private Foundation events that relate to or support the Presidential Center's Mission and programs ("OPC Events"), or private third-party events that are customary for support of the other Museums in the Park ("Support Events"); provided that: (x) no portion of the Presidential Center Green Space may be closed off for OPC Events more than eight (8) days per year and/or for Support Events more than four (4) days per year, and, during any such closures for private events in the Presidential Center Green Space, the Foundation shall preserve the public's access to, through and within the Presidential Center Green Space to the greatest extent practicable during such closures; and (y) no portion of the Plaza may be closed off for OPC Events and Support Events more than three (3) days per year, and, during any such closures in the Plaza that occur within the operating hours of the Forum Building, Museum Building and/or Library Building, public access to and from such buildings shall be preserved.

The Foundation shall conduct the events and activities described in Section 6.2(c)(ii) and (iii) above in accordance with standards and procedures set forth in a written agreement to be negotiated in good faith between the City, the Park District and the Foundation. This agreement shall address such matters as the advance notification by the Foundation to the City and the Park District of the scheduling of closures for events in the Presidential Center Green Space and/or Plaza with more than 50 people and the coordination among the parties on the advance scheduling of events so as to account for security considerations, the

Case: 1:21-cv-02006 Document #: 49-4 Filed: 04/04/22 Page 55 of 342 PageID #:1371
Case: 1:21-cv-02006 Document #: 91-4 Filed: 04/04/22 Page 55 of 342 PageID #:4301

avoidance of conflict with other events in and around Jackson Park and other logistical and public access considerations.

**Section 6.3**    Compliance with Law.

(a)     The Foundation shall not operate or occupy, or authorize the operation or occupancy of, the Subject Property or Project Improvements, in whole or in part, in a manner which would violate any certificate of occupancy issued for the Project Improvements, or make void or voidable any insurance obtained by or on behalf of the Foundation then in force with respect to the Subject Property or Project Improvements, or which would make it impossible to obtain fire or other insurance thereon required to be furnished by the Foundation under this Agreement, or which would constitute a public nuisance.

(b)     The Foundation shall not use or occupy, or authorize the use or occupancy of, the Subject Property or the Project Improvements, in whole or in part, in a manner which would violate any applicable Laws.

(c)     Without limiting the generality of the foregoing, the Foundation shall be responsible for compliance, including all costs of compliance, with the Americans with Disabilities Act of 1990 (42 U.S.C. §12101, *et seq.*) and any and all other applicable Laws related to the accessibility of the Project Improvements to persons with disabilities.

(d)     The Foundation shall not use or allow the Subject Property to be used for political fundraisers or use or occupy, or authorize the use or occupancy of, the Subject Property or Project Improvements, in whole or in part, in a manner that would be inconsistent with the Foundation's status as a tax exempt entity under Section 501(c)(3) of the Internal Revenue Code.

(e)     So long as artifacts owned by NARA are displayed within any portions of the Presidential Center, the Foundation agrees that any such portions of the Presidential Center will be built and maintained in accordance with NARA-imposed standards.

(f)     The Foundation shall not discriminate on the basis of race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military discharge status, or source of income, all as defined in the City of Chicago Human Rights Ordinance, Chapter 2-160 *et. seq.* of the Chicago Municipal Code, except as otherwise provided by said ordinance and as amended from time to time, in the use or occupancy of the Subject Property or any part thereof.

**Section 6.4**    Right of Entry; Other Uses by City.    The City and its authorized representatives, agents and employees shall have the right to enter upon the Subject Property at any and all reasonable times (which, in the case of any such entry into the interior portions of the Presidential Center Architectural Spaces, shall be within operating hours of the Presidential Center Architectural Spaces) for the purposes of inspection and observation, and for determining the Foundation's compliance with this Agreement. The City shall conduct such inspections and observations in a manner and at such times and intervals calculated to minimize disruption to the use and enjoyment of the Subject Property by the Foundation, its employees and patrons. Said

JOURNAL--CITY COUNCIL--CHICAGO 10/31/2018

inspections may be made by persons identified to the Foundation as City employees or by independent contractors engaged by the City. Any inspections of the interior portions of the Presidential Center Architectural Spaces shall be made with prior notice of at least forty-eight (48) hours during operating hours (except in the case of emergency, where no notice is required) and at such reasonable times and intervals and for such reasonable duration as the City and the Foundation shall agree, and shall be conducted in accordance with the reasonable security protocols of the Foundation. Consistent with the use of the Subject Property for the Permitted Use, and with the public nature of the Presidential Center Green Space and the Green Space as described in Section 6.2 hereof, the City agrees that, except to the extent required by applicable Law and/or expressly provided in this Agreement (including the terms of this Section 6.4) or the other Subject Property Documents, the City (acting in its proprietary capacity as a party to this Agreement, as opposed to the exercise of its Governmental Functions, as more particularly described in Section 6.8 below) will not use or occupy the Subject Property during the Term for any purpose without the prior written consent of the Foundation.

**Section 6.5**    Annual IRS Form 990. The Foundation at all times shall maintain its status as a Section 501(c)(3) tax exempt organization, and provide or make available to the City its IRS Form 990 (or other applicable tax form for such tax-exempt organizations), including all supporting statements and schedules filed with the Internal Revenue Service in connection therewith, on an annual basis at the time it is filed with the Internal Revenue Service.

**Section 6.6**    Mechanic's Liens and Liabilities.

(a)    Neither the City nor the Foundation shall be liable for any labor or materials furnished or to be furnished to the other upon credit, and no mechanic's or other lien for labor or materials ("**Mechanic's Lien**") shall attach to or affect the rights or interests of the other in and to the Subject Property or the Project Improvements. Nothing in this Agreement shall be deemed or construed in any way as constituting the consent or request of the City, express or implied, by inference or otherwise, to any person to perform any labor or furnish any materials to the Subject Property or the Project Improvements, that would give rise to any Mechanic's Lien against the interest of the City in and to the Subject Property or the Project Improvements.

(b)    Any third party entering into a contract with the Foundation for Project Improvements to be located on the Subject Property, or any other party claiming under said third party, is hereby put on notice that it can in no way hold the City liable for satisfaction of any claims of any nature arising in any way out of a contract or other arrangement with the Foundation.

(c)    The Foundation shall not place, or permit to be placed, any Mechanic's Lien upon the City's interest or the Foundation's rights in the Subject Property or the Project Improvements or any part thereof, and shall cause any such Mechanic's Lien to be discharged or bonded over by appropriate legal proceeding promptly following the Foundation's receipt of notice of the filing or recording of same. If the Foundation elects to contest any such Mechanic's Lien, such right to contest shall be conditioned upon the Foundation obtaining a stay of the enforcement of such Mechanic's Lien pending such

contest or the provision of appropriate bond or other protection against any such enforcement.

**Section 6.7**     Condition of the Subject Property.

(a)     The Foundation acknowledges that, other than the representations, warranties and covenants contained in the Subject Property Documents: (i) the Foundation has inspected and accepts the Subject Property in its present condition as suitable for the Permitted Use; (ii) no covenants, representations or warranties, express or implied, of any kind, have been made by the City as to the condition of the Subject Property, including without limitation, any warranty of merchantability, habitability, suitability or fitness for a particular purpose; (iii) the Foundation is accepting the Subject Property in its "as is" and "where is" condition, and with all faults and defects, latent or otherwise, and makes no requirements of the City concerning the condition of the Subject Property, and (iv) the City has made no promises or covenants to improve the Subject Property in any manner.

(b)     Except for claims or causes of action arising from the City's breach of the representations, warranties and covenants contained in the Subject Property Documents, the Foundation, on behalf of itself and its successors, assigns, officers, directors, employees, members, managers, agents and representatives (collectively, the "**Foundation Parties**"), expressly releases, renounces and waives any claims or causes of action it or they may have against the City or the Park District, and their respective officers, elected officials, agents and employees, under any existing or future theory of law (federal, state or local, or by common law), whether grounded in tort or contract or otherwise, in any and all courts or other forums, of whatever kind or nature, whether known or unknown, foreseen or unforeseen, now existing or occurring after the Commencement Date, based upon, arising out of or in any way connected with, directly or indirectly, the structural, physical or environmental condition of the Subject Property, including, without limitation, the presence or suspected presence of hazardous or toxic materials, substances, wastes or other environmentally regulated substances, or other contaminants or pollutants in, on, under or about the Subject Property.

(c)     The provisions of this Section 6.7 shall survive the expiration or other termination of this Agreement.

**Section 6.8**     Police Powers.

(a)     The City is entering into this Agreement in its proprietary capacity (i.e., as an independent contracting party to the Foundation), and any obligations imposed or restrictions placed by this Agreement on the City shall be limited to that capacity and shall not relate to or otherwise affect any activity of the City in its governmental capacity, including, but not limited to, enacting Laws, inspecting structures, reviewing and issuing permits, and all other legislative, administrative, or enforcement functions of the City pursuant to applicable Laws.

(b)     The Foundation acknowledges that the City exercises police powers, taxation powers and other Governmental Functions of general application which affect the

Case 1:18-cv-03242 Document #: 41-4 Filed 04/30/19 Page 59 of 342 PageID #:4005

Subject Property and the Project Improvements, and that nothing in this Agreement shall be construed to limit the City's police powers over the entire Subject Property. Any action, omission or circumstance arising out of the performance by the City of the City's Governmental Functions shall not cause or constitute a default by the City under this Agreement or give rise to any rights or claims against the City in its proprietary capacity (i.e., as a party hereunder), it being acknowledged that the Foundation's remedies for any injury, damage or other claim resulting from any such action, omission or circumstance arising out of the Governmental Functions of the City shall be governed by the Laws concerning claims against the City as a Governmental Authority. The operations of any private security firm retained by the Foundation on the Subject Property shall be subject to the City's police and regulatory powers.

**Section 6.9**    Ancillary Income. The revenues collected by the Foundation from general and special admission fees, parking and other visitor services, third-party use fees, food and beverage sales and retail sales shall be used solely for (a) the use, maintenance and management of the Project Improvements and the Subject Property; or (b) deposit into the Endowment. The Foundation, upon the request of the Commissioner, shall provide the Commissioner with such accountings as the Commissioner shall reasonably request to demonstrate compliance with this Section 6.9.

**Section 6.10**    Admission Fees and Parking Rates. The Foundation's general admission fee policies for admission to the museum situated at the Presidential Center (exclusive of special exhibitions or special events for which there may be a supplemental charge) for members of the public who are (a) City residents, or (b) low-income individuals and their families participating in the Supplemental Nutrition Assistance Program (or such equivalent program as may be implemented after the date hereof) from time to time, shall be substantially consistent with comparable general admission fee policies for such categories of patrons maintained from time to time by other Museums in the Park. The fees for visitor use of the Underground Parking Facility shall be substantially consistent with the parking rates charged from time to time to the general public in the parking garage of the Museum of Science and Industry or in the North Garage adjacent to the Field Museum and John G. Shedd Aquarium.

**Section 6.11**    Naming Rights. The Foundation shall have the right to name (and to re-name from time to time) the Presidential Center and any components thereof, and any exhibits, art, sculptures and benches situated therein, together with the right to install signage containing and/or designating such names, subject to the PD and any approvals required thereunder; provided, however, the Foundation may not use corporate logos in any identification signage installed on the exterior portions of the Presidential Center. A principal purpose of the naming rights granted under this Section 6.11 is to assist the Foundation in raising funds for the construction, operation, maintenance and repair of the Project Improvements. The City agrees not to name (or authorize any other person or entity to name) the Subject Property or any component or element thereof.

### ARTICLE VII
### MAINTENANCE, REPAIRS AND ALTERATIONS.

**Section 7.1**    Maintenance. The Foundation shall at all times during the Term, at its sole cost and expense, keep the Subject Property and the Project Improvements (interior and exterior,

Case 1:18-cv-06296-DDD Document #: 1-45 Filed: 06/08/18 Page 59 of 342 PageID #:4006

including all sidewalks, lawns and landscaped areas, parking and loading areas and other public access areas located on the Subject Property) in good condition and repair, and in accordance with all applicable Laws. For improvements installed by the Foundation (or by the City at the Foundation's request in the case of non-standard streetscape elements and finishes) within the public right-of-way adjacent to the Subject Property, the City shall grant the Foundation a license, in a form acceptable to both the City and the Foundation, to maintain such improvements following the completion of Construction.

**Section 7.2**   Limitation on City Responsibility. Except for (a) damage or destruction caused by the City in its proprietary capacity as a party to this Agreement (and not in the exercise of its Governmental Functions) or (b) as otherwise provided in any Subject Property Document, the City shall not be obligated to maintain or make any repairs to the Subject Property or the Project Improvements during the Term, it being understood that the Foundation shall be responsible for the condition, repair, replacement, maintenance and management of the Subject Property and the Project Improvements during the Term, subject to the terms of this Agreement.

**Section 7.3**   Alterations.

(a)      The Foundation, at its sole cost and expense, shall have the right to make Alterations, so long as such Alterations are made in compliance with applicable Law, including the PD and any regulations governing PD amendments, and the requirements of Section 4.3, Section 4.6, and Section 4.8 (and Section 4.7 and Section 4.12 in connection with Alterations that require a PD amendment) of this Agreement are satisfied.

(b)      Consistent with the use of the Subject Property for the Permitted Use, the City agrees that, except to the extent required by applicable Law and/or expressly provided in the Subject Property Documents, the City will not make or perform alterations, modifications, changes, additions or improvements to the Subject Property (or demolish or remove any improvements thereon) without the prior written consent of the Foundation. Notwithstanding the foregoing, nothing herein shall limit the City's exercise of its police powers.

## ARTICLE VIII
## GOVERNMENTAL APPROVALS

The City, from time to time on the reasonable request of the Foundation, and to the extent necessary as the owner of the Subject Property, shall execute such documents or join in such petitions, applications and authorizations as may be appropriate related to the Construction of the Project Improvements in conformance with this Agreement.

## ARTICLE IX
## ENVIRONMENTAL

**Section 9.1**   Certain Environmental Definitions.

(a)      **"Environmental Conditions"** means conditions at, on, under, from, or affecting the Subject Property that relate to or arise out of, in any manner, the release or threatened release, discharge, use, ownership, possession, control, generation, treatment,

Case 1:18-cv-04204-DD Document ##1145 Filed 00/50/23 Page 60 of 342 PageID #:4007

storage, disposal, handling, transportation, migration, existence, or presence of Hazardous Materials or other activities that impact or otherwise involve Hazardous Materials (including, without limitation, the later migration or degradation of such Hazardous Materials, whether or not known at any point in time) which conditions require Remediation under any Law.

(b)     "**Environmental Remediation Agreement**" means that certain Environmental Indemnification and Remediation Agreement between the City and the Foundation dated as of _____.

(c)     "**Hazardous Materials**" has the same meaning as is assigned to such term in the Master Agreement.

(d)     "**Remediation**" means, without limitation, investigation, characterization, testing, sampling, monitoring, corrective actions, removal actions, response actions, remedial actions, transportation, or disposal of Hazardous Materials, restoration, cleanup, and similar activities.

**Section 9.2**     Hazardous Materials.

(a)     The Foundation shall not, following the Commencement Date, permit any Hazardous Materials at or on the Subject Property, except those that are used, stored or otherwise maintained on the Subject Property for cleaning, along with other supplies ordinarily used in the Foundation's operations which might be considered Hazardous Materials, so long as the Foundation's use, storage, and maintenance of such Hazardous Materials is in compliance with all Laws and manufacturer's recommended standards and procedures, and such Hazardous Materials are present only in such quantities as are reasonably required by the Foundation for operations conducted on the Subject Property. The Foundation shall not dispose of Hazardous Materials in, on, or about the Subject Property.

(b)     The Foundation shall be solely responsible for any Hazardous Materials used, stored, or otherwise introduced by it (including, without limitation, Hazardous Materials that are released or disposed of at the Subject Property contrary to the provisions of this Agreement) at, on, under or emanating from, the Subject Property following the Commencement Date.

(c)     The Foundation shall, at its sole cost and expense, diligently undertake, and pursue until completion, all necessary Remediation with respect to Environmental Conditions that it or its agents, vendors, concessionaires, licensees, invitees or any of the Foundation Parties caused. The Foundation shall obtain from the appropriate regulatory authorities written confirmation that all necessary Remediation for which the Foundation has responsibility has been completed to attain cleanup standards protective of human health and the environment and appropriate for the current and anticipated use of the Subject Property and surrounding properties, as the case may be.

(d)     Nothing in this Agreement shall abrogate, impair or otherwise limit the liability of the City, if any, arising from or related to the representations and warranties

Case 1:18-cv-04206-DD Document ##414-5 Filed 04/03/19 Page 61 of 342 PageID #:1408

made by the City in the Subject Property Documents or the obligations of the City under the Subject Property Documents.

**Section 9.3**     Environmental Notices.  Each party shall give prompt written notice to the other of:

(a)     any threatened or pending proceeding or inquiry by any Governmental Authority with respect to the presence of any Hazardous Materials at, under or emanating from the Subject Property or related to any loss or injury alleged to result from any Hazardous Materials;

(b)     all claims made or threatened by any third party against such party, or the Subject Property, relating to any loss or injury alleged to result from any Hazardous Materials or Environmental Condition; and

(c)     discovery of any Environmental Condition at, on, under or emanating from, the Subject Property (including, without limitation, any condition that could cause the Subject Property to be subject to any restriction on occupancy or use under any Law).

## ARTICLE X
## PROPERTY TAXES, IMPOSITIONS AND UTILITIES

**Section 10.1**  Payment of Taxes.

(a)     In light of the exempt status of the City, and the non-profit status of the Foundation, it is anticipated that there will be no Impositions assessed or imposed on the Subject Property or the Project Improvements during the Term.  Subject to the balance of this Article X, however, in the event any such Impositions are assessed or imposed, the Foundation shall pay such Impositions levied on or against the fee interest in the Subject Property and any interest in the Subject Property and/or the Project Improvements (whether assessed against the Foundation or the City), before the same become delinquent, which during the Term may be assessed, levied, imposed upon, or arise from, or become due and payable out of or in respect of, or become a lien on, the fee interest in the Subject Property and any interest in the Subject Property or the Project Improvements, or any part thereof or any appurtenance thereto (an **"Imposition Lien"**).  If the Foundation fails to timely pay any such Impositions, the City may, in its sole discretion, pay such Impositions, and the Foundation shall, upon demand by the City, reimburse such amount to the City, together with any interest, penalties or late fees accrued.

(b)     The Foundation may contest the amount or validity of any Imposition which the Foundation is obligated to pay under this Section 10.1 by appropriate legal proceedings, diligently pursued, provided that:  (i) the Foundation, if required to be paid pending resolution of such contest, makes all such contested payments (which may be made by the Foundation under protest if the Foundation so desires) prior to delinquency, (ii) neither the Subject Property nor the Project Improvements nor any part thereof nor any interest therein is subject to being immediately sold, forfeited, lost or interfered with by virtue of such contest, and (iii) all expenses (including without limitation any fees, penalties or interest) which are assessed or incurred in connection with or as a result of any such proceedings

Case 1:18-cv-04204 Document #: 4145 Filed: 05/08/19 Page 62 of 342 PageID #:1001

are paid by the Foundation when due. Upon the termination of such proceeding, the Foundation, upon the City's written request therefor, shall deliver to the City proof of the amount of the Imposition as finally determined and of payment thereof.

(c)     The Foundation shall be liable for Impositions levied or assessed against personal property, furniture or fixtures placed or situated on the Subject Property by the Foundation during the Term.

(d)     During the Term, the City shall reasonably cooperate with the Foundation with respect to the Foundation's efforts to (i) obtain and maintain exemptions from Impositions on the Subject Property, and (ii) minimize the effect of such Impositions, if any; provided, however, the City shall not be obligated to so cooperate if the City determines in its good faith judgment that such efforts by the Foundation or the City's cooperation in such efforts would materially and adversely affect the City's ownership interest in the Subject Property.

(e)     If any Imposition is imposed against the fee interest in the Subject Property or Project Improvements, the Foundation's rights to the Subject Property or the Foundation's rights to the Project Improvements after the City, directly or indirectly, sells, assigns, transfers, leases or otherwise alienates the fee interest in the Subject Property or any part thereof, and if such Imposition would not have been so imposed had the City still owned its interest in the Subject Property at the date of such Imposition or assessment, the Foundation shall have no obligation to pay such Imposition, and the City shall pay, or cause to be paid, such Imposition prior to delinquency. The City shall be entitled to protest any such Imposition so long as the payment of such Imposition is made prior to delinquency.

(f)     The City, as owner of the fee interest in the Subject Property and (after the Final Completion Date) Project Improvements, shall maintain an exemption from *ad valorem* real estate taxes and assessments to which it is entitled relative to the Subject Property and Project Improvements, except to the extent such taxes are the result of this Agreement or the operation of the Project Improvements.

**Section 10.2**   Utilities and Other Services.   The City shall provide reasonable access across property owned by the City where required in order to make available to the Subject Property access to utility facilities and services, including without limitation, water, gas, heat, light, electricity, telephone, sewer, sprinkler, trash removal and cable services. The City, however, shall not be required to furnish to the Foundation any such services, including, without limitation, security, janitorial, landscaping, trash removal, or other facility services, except to the extent such services are typically provided by or on behalf of the City to other non-residential owners and users within the City.

**Section 10.3**   Costs.   It is the purpose and intent of the City and the Foundation, that except to the extent of obligations of the City arising under the Subject Property Documents, and except to the extent resulting from or arising out of the gross negligence or willful misconduct of any of the City Parties or any breach of the City's obligations under this Agreement, all costs and expenses and obligations of every kind and nature whatsoever relating to events or occurrences at, or the use or condition of, the Subject Property and the Project Improvements which may arise or

become due during the Term shall be paid by the Foundation. The preceding sentence shall not be deemed to require the Foundation to pay or incur costs, expenses or obligations resulting from or arising out of the Governmental Functions of the City that are not generally directly payable or reimbursable by members of the public.

## ARTICLE XI
## PROHIBITION ON MORTGAGES AND OTHER LIENS

Neither the Foundation nor the City shall place, or permit to be placed, any Lien upon its respective rights or interests in the Subject Property or Project Improvements or any part thereof. Notwithstanding the foregoing, the Foundation shall have the right to enter into an assignment or pledge of income accruing to the Foundation, derived from activities permitted to be conducted by the Foundation under the terms of this Agreement, to secure a loan or other credit arrangements, provided the proceeds of such loan or other credit arrangement are used in connection with the Presidential Center or other Project Improvements.

## ARTICLE XII
## TRANSFER AND ASSIGNMENT

**Section 12.1**  General Prohibition. The Foundation shall not transfer or assign (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise) its interest in this Agreement, enter into any agreement granting rights of use or occupancy, in whole or in part, of the Subject Property or any part thereof, sell its rights to the Project Improvements or any portion thereof, or grant any other rights or interest in this Agreement, the Subject Property or the Project Improvements without the prior written approval of the City.

**Section 12.2**  Ancillary Use and Exceptions. Notwithstanding anything to the contrary set forth in this Article XII, the Foundation may:

(a)     Enter into use, license, space, occupancy or similar agreements for Ancillary Uses with third parties ("**Third-Party Vendors**"). Each use, license, space, occupancy or similar agreement with a Third-Party Vendor will provide that the use and occupancy of any portion of the Subject Property by the applicable Third-Party Vendor in all instances shall be subject to the terms of this Agreement, including the Permitted Use, and will require such Third-Party Vendor to provide commercially reasonable insurance coverage naming the Foundation and the City as additional insureds. The City shall have the right to approve, prior to execution, any occupancy agreements proposed to be entered into with Third-Party Vendors applicable to the Green Space; and

(b)     Enter into use, license, space, occupancy or similar agreements with the Chicago Public Library (through the City's Department of Fleet and Facilities Management or any successor department thereto), addressing the use and operation of any public library facilities included in the Presidential Center.

The Foundation shall promptly provide the City with copies of any occupancy agreements entered into pursuant to this Section 12.2.

JOURNAL--CITY COUNCIL--CHICAGO

**Section 12.3** Prohibited Transfers Void Ab Initio. Any attempt by the Foundation to sell, transfer, assign or otherwise convey an interest in this Agreement, the Subject Property or the Project Improvements in violation of the terms of this Agreement, by agreement or operation of law, shall be void and confer no rights on any third party. Absent a written agreement with the City to the contrary, any assignee of the Foundation's interest in this Agreement shall be deemed to have assumed all of the obligations of the Foundation under this Agreement. No transfer or assignment, with or without City consent, shall relieve the Foundation of its obligations or liability under or in connection with this Agreement, except where the City Council consents to the transfer or assignment and expressly relieves the Foundation of such obligations and liability.

**Section 12.4** Assignment by the City. The City shall have the right to sell, transfer or convey the Subject Property, and to assign its interest in this Agreement, to any other Governmental Authority; provided, that (a) the Governmental Authority that is the transferee to any such sale, transfer or conveyance, and/or assignee to any such assignment, shall assume the obligations and liabilities of the City under this Agreement arising and/or accruing after the date of such sale, transfer, conveyance or assignment; and (b) no such sale, transfer, conveyance or assignment shall relieve the City of its obligations or liability under or in connection with this Agreement. Consistent with the use of the Subject Property for the Permitted Use, the City agrees not to (i) sell, transfer, assign or otherwise convey, directly or indirectly, the Subject Property or its interest in this Agreement, except as provided above to another Governmental Authority; or (ii) grant or confer any rights of use or occupancy of the Subject Property or any part thereof to any third party, except as expressly provided in this Agreement and/or the Subject Property Documents.

## ARTICLE XIII
## INSURANCE

**Section 13.1** Property Insurance.

(a) At all times during the Term, the Foundation shall maintain, at its sole cost and expense, a policy or policies of "causes of loss – special form" (formerly, "all risks") property insurance (or comparable coverage by whatever name denominated) on all Project Improvements in an amount equal to not less than 100% of the replacement costs of the Project Improvements against loss or damage by fire or other casualties. Such policy or policies shall be endorsed to provide that the Foundation's insurance is primary in the event of any overlapping coverage with the insurance carried by the City, if any (with any policies of the City being excess, secondary and noncontributing).

(b) At all times during the Term, the Foundation shall maintain, at its sole cost and expense, a policy or policies of causes of loss – special form (formerly, "all risks") insurance (or comparable coverage by whatever name denominated) on all personal property (including removable trade fixtures, supplies and movable furniture and equipment) located on the Subject Property or the Project Improvements, against loss or damage by fire or other casualties, in an amount equal to not less than 100% of the replacement costs of such personal property and endorsed to provide that the Foundation's insurance is primary in the event of any overlapping coverage with the insurance carried

Case 1:18-cv-00420-DD Document ##1415 Filed 04/05/19 Page 65 of 342 PageID #:4072

by the City, if any (with any policies of the City being excess, secondary and non-contributing).

(c) To the extent the Foundation is obligated to Demolish the Project Improvements or elects to restore the Project Improvements following a fire or other casualty pursuant to Article XIV hereof, the Foundation and/or the City shall cause the proceeds of all property insurance policies to be deposited into a separate segregated escrow account to be held in trust by an escrow agent approved by the City and the Foundation (which approval shall not be unreasonably withheld or delayed), and to be disbursed and applied in accordance with an escrow agreement, the terms and provisions of which shall be reasonably satisfactory to the City and the Foundation (the "**Casualty Restoration Escrow Agreement**"). The terms and provisions of the Casualty Restoration Escrow Agreement shall be consistent with the terms and provisions of this Agreement and shall contain certain conditions for the disbursement of the escrowed funds established by the City and the Foundation, which shall include provisions regarding customary (i) holdbacks or retainages of funds payable to engineering, architectural, construction and supply contractors to assure completion of work, (ii) waivers of lien (partial or full, as applicable) and contractors' sworn statements, (iii) engineer's and architect's inspections and certificates, (iv) title insurance coverage, and (v) other evidence of satisfactory progress or completion and payment for work. The Foundation shall deposit with the escrow agent under the Casualty Restoration Escrow Agreement any excess costs of the Demolition or restoration over the amount of insurance proceeds held by the escrow agent prior to commencement of the Demolition or restoration. At all times the undisbursed balance remaining on deposit with the escrow agent under the Casualty Restoration Escrow Agreement shall be at least sufficient to pay for the cost of completion of the Demolition or restoration free and clear of liens. All insurance proceeds in excess of the costs of Demolition or restoration shall be returned or paid to the Foundation upon the completion of the Demolition or restoration and the final payment in full for all costs and expenses relating to the completion of the Demolition or restoration.

(d) During the Construction of any Project Improvements or material Alterations, the insurance required by Section 13.1(a) of this Agreement shall be in the form commonly known as "Builder's Risk" on an "all risk" basis, including without limitation, coverage against fire, lightning, wind damage, hail and collapse. The policy shall be obtained and maintained by the Foundation or its general contractor in a form and amount not less than 100% of the replacement costs of the Project Improvements. Coverage shall include all materials, supplies and equipment that are intended for specific installation in or on the Project Improvements while such materials, supplies and equipment are located in or on the Subject Property, in transit, or while temporarily located away from the Subject Property for the purpose of repair, adjustment or storage at the risk of one of the insured parties.

**Section 13.2** Liability Insurance. At all times during the Term, the Foundation, at its sole cost and expense, shall maintain a policy or policies of commercial general public liability insurance (utilizing the then ISO form or an equivalent form) covering the Subject Property and the Project Improvements and the Foundation's use (and every Third-Party Vendor's use) thereof against claims for personal or bodily injury or death or property damage (including contractual

indemnity and liability coverage) occurring upon, in or about the Subject Property or the Project Improvements, with the premiums thereon fully paid on or before the due date, and such policies shall provide minimum limits of not less than $10 million (subject to adjustment pursuant to Section 13.7) combined single limit primary coverage per occurrence of bodily injury, property damage, or combination thereof. The Foundation shall cause such insurance policies to (a) contain an endorsement that the Foundation's insurance is primary and non-contributory for claims arising out of an incident or event occurring upon, in or about the Subject Property or the Project Improvements (with any policies of the City being excess, secondary and non-contributing); and (b) contain a provision naming the City as an additional insured and include coverage for the contractual liability of the Foundation to indemnify the City pursuant to the terms of this Agreement. Such additional insured coverage for the City may be provided by a policy provision or by an endorsement providing coverage at least as broad as Insurance Services Office (ISO) Additional Insured endorsement form CG2010 1185 or an equivalent or successor form. The Foundation may provide the coverage required through the use of a primary liability policy or through a combination of primary liability and umbrella excess liability policies.

**Section 13.3**  Automobile Liability Insurance.  At all times during the Term, the Foundation, at its sole cost and expense, shall maintain a policy or policies of automobile liability insurance covering owned, non-owned and hired vehicles with limits of not less than $2 million per occurrence for bodily injury and property damage. The City shall be named as an additional insured on a primary, non-contributory basis. Such additional insured coverage for the City may be provided by a policy provision or by an endorsement providing coverage at least as broad as ISO form CA2048 or an equivalent or successor form. The Foundation may provide the coverage required through the use of a primary liability policy or through a combination of primary liability and umbrella excess liability policies.

**Section 13.4**  Workers' Compensation and Employer's Liability Insurance.  At all times during the Term, the Foundation, at its sole cost and expense, shall maintain a policy or policies of (a) workers' compensation insurance in an amount not less than that necessary to satisfy all statutory limits and other requirements of law concerning such workers' compensation coverage for the Foundation's use and operations upon, in or about the Subject Property and the Project Improvements, , and (b) employer's liability insurance with limits of not less than One Million Dollars ($1,000,000.00) per accident, One Million Dollars ($1,000,000.00) each employee for bodily injury due to disease and One Million Dollars ($1,000,000.00) policy limit on bodily injury due to disease.  Such policy shall contain a waiver of subrogation endorsement reasonably acceptable to the City and will include an Illinois Waiver of Kotecki Cap. The Foundation may provide the coverage required through the use of a primary liability policy or through a combination of primary liability and umbrella excess liability policies.

**Section 13.5**  Certificates; Renewals.  The Foundation shall furnish the City certificates of insurance pertaining to all insurance required by this Article XIII to be carried by the Foundation, in form reasonably satisfactory to the City, prior to the commencement of the Term. Whenever requested by the City, the Foundation shall also reasonably satisfy the City that such insurance is in full force and effect and that the City is named thereunder as an additional insured.

**Section 13.6**  Insurance Requirements.  The Foundation shall cause all insurance as required by this Article XIII to be procured from companies licensed to do business in the State

having an A.M. Best Rating of "A-VIII" or better (or an equivalent rating if Best's ratings are substantially revised or discontinued). All such policies shall contain a provision or endorsement that requires the applicable insurer to endeavor to provide at least 30 days prior written notice to the City prior to any such policy being cancelled (10 days prior written notice of cancellation due to non-payment of premiums therefor).

**Section 13.7**   Adjustments to Insurance Coverages and Limits. Notwithstanding anything to the contrary contained herein, the City and the Foundation from time to time, but in any case every ten (10) years during the Term, shall reexamine the insurance coverages and amounts required to be maintained by the Foundation hereunder, and will make such adjustments as are reasonably necessary to ensure that the insurance required to be maintained hereunder from time to time is sufficient to insure the parties hereto against appropriate risks with generally available insurance products priced at commercially reasonable rates.

**Section 13.8**   Waiver of Subrogation. Notwithstanding any provision to the contrary contained herein, each party hereto hereby waives and releases any and every claim which arises or may arise in its favor and against the other party hereto and/or such party's officers, directors, trustees, employees and agents during the Term or any extension or renewal thereof for any and all loss of, or damage to, any of its property or any injuries to or death of any person **(REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE IS THE RESULT OF OR CAUSED BY THE NEGLIGENT ACTS OR OMISSIONS OF THE RELEASED PARTY OR ANY STRICT LIABILITY)** which loss or damage is covered by valid insurance policies required under this Agreement, to the extent that such loss or damage is recovered under said insurance policies. Said waivers shall be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Agreement with respect to any loss or damage to property of the parties hereto. Each party hereto hereby agrees immediately to give to each insurance company which has issued to it policies of property insurance written notice of the terms of said mutual waivers, if necessary, and to have said insurance policies properly endorsed, if necessary, to prevent the invalidation of said insurance coverages by reason of said waivers.

### ARTICLE XIV
### DAMAGE OR DESTRUCTION

**Section 14.1**   Notice. If all or any material part of the Project Improvements are destroyed or damaged by fire or other casualty, the Foundation shall promptly deliver written notice thereof to the City.

**Section 14.2**   Restoration Obligation.

(a)   Material Damage. If all or a portion of the Project Improvements is destroyed or damaged by fire or other casualty and such damage constitutes Material Damage (hereinafter defined), the Foundation shall have the right to terminate this Agreement as of the date of such casualty by delivering written notice of such termination to the City pursuant to Section 16.4, in which event the Foundation shall Demolish the Project Improvements, with any insurance proceeds first being applied to pay the costs of such Demolition. If the Agreement is not so terminated, then subject to delays resulting from Force Majeure Events and the availability of insurance proceeds therefor, the

Foundation shall restore the Project Improvements diligently, in a good and workmanlike manner and at its sole cost and expense, taking into account, in connection with the scope and design of such restoration, the amount of insurance proceeds available to the Foundation, it being the intent that following such restoration, the Project Improvements, including the Presidential Center, will be fully operable and open to the public. Such restoration shall commence promptly after the date on which claims made by the Foundation under property insurance covering such fire and other casualty loss shall have been settled or otherwise resolved. The Foundation shall in good faith diligently pursue all claims under such insurance.

(b)    Non-Material Damage. If a portion of the Project Improvements is destroyed or damaged by fire or other casualty, and such damage does not constitute Material Damage, then subject to delays resulting from Force Majeure Events and the availability of insurance proceeds therefor, the Foundation shall restore the Project Improvements diligently, in a good and workmanlike manner and at its sole cost and expense, promptly after the date on which claims made by the Foundation under property insurance covering such fire and other casualty loss shall have been settled or otherwise resolved. The Foundation shall in good faith diligently pursue all claims under such insurance.

(c)    Material Damage Defined. As used herein, the term "**Material Damage**" shall mean damage to the Project Improvements (i) which in the Foundation's good faith opinion, after consulting with appropriate architects, engineers and contractors, is not estimated to be completed within eighteen (18) months following the date of the receipt of insurance proceeds following such fire or other casualty; or (ii) which results from a cause not covered by insurance required to be maintained by the Foundation hereunder.

(d)    No Modification of Insurance Requirements. Nothing in this Article XIV shall diminish or modify in any respect the Foundation's obligation to maintain insurance in accordance with Article XIII hereof.

**Section 14.3**    Application of Insurance Proceeds. The proceeds of all insurance policies maintained by or on behalf of the Foundation, together with any claims, defenses and rights of settlement pertaining to such insurance policies, at all times shall be and remain the property of the Foundation, subject, however, to the escrow requirements set forth in Section 13.1(d) and the Foundation's obligation to either restore or Demolish the Project Improvements as aforesaid.

## ARTICLE XV
## CONDEMNATION

**Section 15.1**    Taking.

(a)    Material Taking. If all or a portion of the Subject Property or all or a portion of the Project Improvements is subject to a Taking, and such Taking constitutes a Material Taking (hereinafter defined), the Foundation shall have the right to terminate this Agreement by delivering written notice of such termination to the City pursuant to Section 16.4, in which event (i) this Agreement shall terminate as of the date the

Case 1:18-cv-00420-DD Document ##1145-5 Filed 04/10/23 Page 69 of 342 PageID #: 4806

condemning authority has the right to possession of the property or interest being condemned, and (ii) if a portion of the Project Improvements shall have been the subject of such Taking, then, at the City's option, the Foundation shall Demolish the remainder of the Project Improvements that were not the subject of the Taking. If the Agreement is not so terminated and all or a portion of the Project Improvements shall have been the subject of such Taking, then the Foundation shall restore the Project Improvements in accordance with the terms and provisions of Section 15.1(b) below.

(b)    Non-Material Taking. If a portion of the Subject Property or the Project Improvements is subject to a Taking, and such Taking does not constitute a Material Taking, then this Agreement shall not terminate and the City and the Foundation shall cause the condemnation proceeds to be deposited into a separate, segregated escrow account to be held in trust by an escrow agent approved by the City and the Foundation (which approval shall not be unreasonably withheld or delayed), and to be disbursed and applied in accordance with an escrow agreement containing the same provisions, conditions and requirements as set forth in any Casualty Restoration Escrow Agreement described in Section 13.1(d) of this Agreement ("**Condemnation Restoration Escrow Agreement**"). Subject to delays resulting from Force Majeure Events and the availability of condemnation proceeds therefor, the Foundation shall restore the Project Improvements diligently, in a good and workmanlike manner and at its sole cost and expense, taking into account, in connection with the scope and design of such restoration, the amount of condemnation proceeds available to the Foundation, it being the intent that following such restoration the Project Improvements, including the Presidential Center, will be fully operable and open to the public. The Foundation shall in good faith diligently pursue any condemnation proceeds available to it and shall commence restoration promptly after the date on which the Taking shall have been settled or otherwise resolved and the condemnation proceeds applicable thereto shall have been deposited into escrow. When the restoration has been completed, any condemnation proceeds then remaining in the escrow account shall be allocated in accordance with the provisions of Section 15.2 below.

(c)    Material Taking Defined. As used herein, the term "**Material Taking**" shall mean a Taking which in the Foundation's good faith judgment will render the remaining Subject Property and Project Improvements unsuitable for the continued use and operation by the Foundation of the Presidential Center.

**Section 15.2**    Allocation of Condemnation Award. The entire award paid in connection with a Taking shall be (net of reimbursement to the City and the Foundation of all reasonable fees and expenses incurred in collecting the award, and, if applicable, the costs of Demolishing the Project Improvements in accordance with Section 15.1(a)) equitably apportioned between the City and the Foundation based on all relevant facts existing at the time of the Taking (including, without limitation, the Foundation's rights during the then-remaining portion of the Term with respect to the Subject Property and Project Improvements, as described herein), taking into account the Foundation's investment in the Project Improvements and other improvements to the Subject Property. Except as provided in the preceding sentence, neither the City nor the Foundation shall have any right in or to any award made to the other by the condemning authority.

Case 1:18-cv-06204 Document #14-5 Filed 04/10/21 Page 70 of 342 PageID #:1897

**Section 15.3**   Cooperation.   In the event a Governmental Authority other than the City shall initiate or threaten to initiate any Taking, the Foundation and the City shall cooperate in defending and/or settling any such proceeding, but each of the City and the Foundation shall have the right to pursue and settle its own award in connection with such Taking.

**Section 15.4**   Temporary Requisition.   If the use or occupancy of the Subject Property or the Project Improvements shall be temporarily requisitioned by any Governmental Authority, civil or military, then this Agreement shall continue in full force and effect notwithstanding such requisition, and the Foundation shall be entitled to receive the entire Award payable by reason of such temporary requisition.

## ARTICLE XVI
## EVENT OF DEFAULT, TERMINATION AND OTHER REMEDIES

**Section 16.1**   Events of Default.   Each of the following occurrences shall constitute an "**Event of Default**" under this Agreement:

(a)   By the Foundation.   The Foundation fails to comply with, or observe, in any material respect, any term, condition, obligation, covenant or other provision of this Agreement, and (except for defaults specified in Section 16.2 and Section 16.3 which have their own cure periods) such failure shall continue for 90 days after written notice from the City to the Foundation specifying such failure (except that if the nature of such term, condition, obligation or covenant is such that more time is required in order to cure such failure, and the Foundation commences to cure within such 90 day period, then such period shall be extended beyond such 90 day period so long as the Foundation is using commercially reasonable efforts to cure such failure); or

(b)   By the City.   The City fails to comply with, or observe, in any material respect, any term, condition, obligation, covenant or other provision of this Agreement, and (except for defaults specified in Section 16.2 and Section 16.4 which have their own cure periods) such failure shall continue for 90 days after written notice from the Foundation to the City specifying such failure (except that if the nature of such term, condition, obligation or covenant is such that more time is required in order to cure such failure, and the City commences to cure within such 90 day period, then such period shall be extended beyond such 90 day period so long as the City is using commercially reasonable efforts to cure such failure).

**Section 16.2**   Termination of Agreement by Either Party.   Either the City or the Foundation may terminate this Agreement if, after the initial opening of the Presidential Center to the public, the Presidential Center ceases to be used for the Permitted Use, including at all times the operation of a museum, but excluding closures thereof for (a) the time period necessary to perform maintenance, repairs, restoration, renovations and Alterations, (b) the time period necessary to receive proceeds from any insurance policy covering any portion of the Subject Property or the Project Improvements in the event of a casualty, (c) the time period necessary to perform reconstruction in the event of a casualty or Taking in accordance with this Agreement, or (d) Force Majeure Events. The City's right to terminate shall be expressly conditioned on such non-use continuing for 60 days following the date on which the Foundation receives a Termination

Exercise Notice from the City pursuant to Section 20.2, expressly stating the City's exercise of its right to terminate this Agreement should the Foundation fail to cure such non-use within such 60 day period. The Foundation's right to terminate shall be expressly conditioned on the Project Improvements being in compliance in all material respects with all applicable Laws on the date on which the Foundation is obligated to surrender the Subject Property to the City. Nothing contained in the preceding sentence shall be deemed to limit the Foundation's obligations under Section 7.1. Each of the City and the Foundation acknowledges and agrees that its right to terminate this Agreement upon the occurrence of the event specified in this Section 16.2 shall be the sole and exclusive remedy of the parties with respect to such event, with each party waiving all other remedies available to it at law or in equity; provided, however, the City shall be entitled to all remedies available under Law to recover all costs, expenses and disbursements (including attorneys' fees) incurred by the City in exercising its cure rights under Section 16.7, whether such costs, expenses and disbursements are incurred before or after any termination hereunder, with interest at the rate specified in Section 16.7.

**Section 16.3**   Termination by the City.  The City (but not the Foundation) may terminate this Agreement upon the occurrence of any of the following events:

(a)      the Construction of the Presidential Center is not commenced by the first (1st) anniversary of the Commencement Date, which date shall be extended by one (1) day for each day by which such Construction is delayed as a result of Force Majeure Events (and which date may be extended further by up to one year by the Commissioner of the Department if the Foundation encounters unexpected delays or difficulties, as described in Section 4.1 above), and the City sends the Foundation a written notice pursuant to Section 20.2 of this Agreement describing such default and stating that if such default is not remedied within 90 days after such written notice is delivered, the City shall have the option to terminate this Agreement, and the Foundation fails to remedy such failure within 90 days after delivery of such written notice;

(b)      the Project Improvements are not substantially completed (other than non-material Project Improvements, and subject to normal and customary punch list and finish items) and open to the public on or before the Outside Completion Date, which date shall be extended by one (1) day for each day by which such substantial completion is delayed as a result of Force Majeure Events (and which date may be extended further by up to one year by the Commissioner of the Department if the Foundation encounters unexpected delays or difficulties, as described in Section 4.1 above), and the City sends the Foundation a written notice pursuant to Section 20.2 of this Agreement describing such default and stating that if such default is not remedied within 90 days after such written notice is delivered, the City shall have the option to terminate this Agreement, and the Foundation fails to remedy such default within 90 days after delivery of such written notice;

(c)      after the damage or destruction of all or part of the Project Improvements by fire or other casualty, following which the Foundation shall have not terminated this Agreement pursuant to Section 14.2 hereof, and the Foundation fails to rebuild, restore and repair such Project Improvements in accordance with said Section 14.2 of this Agreement, and the City sends the Foundation a written notice pursuant to Section 20.2 of this

Agreement describing such failure and stating that if such failure is not remedied within 90 days after such written notice is delivered, the City shall have the option to terminate this Agreement, and the Foundation fails to remedy such failure within 90 days after delivery of such written notice;

(d)      after a Taking of a portion of the Subject Property or the Project Improvements, following which the Foundation shall have not terminated this Agreement pursuant to Section 15.1 hereof, the Foundation fails to restore the Subject Property and the Project Improvements in accordance with said Section 15.1 of this Agreement and the City sends the Foundation a written notice pursuant to Section 20.2 of this Agreement describing such failure and stating that if such failure is not remedied within 90 days after such written notice is delivered, the City shall have the option to terminate this Agreement, and the Foundation fails to remedy such failure within 90 days after delivery of such written notice;

(e)      the Foundation fails to maintain the insurance required to be maintained by the Foundation pursuant to Article XIII of this Agreement, and the City sends the Foundation a written notice pursuant to Section 20.2 of this Agreement describing such failure and stating that if such failure is not remedied within thirty (30) days after such written notice is delivered, the City shall have the option to terminate this Agreement, and the Foundation fails to remedy such failure within thirty (30) days after delivery of such written notice;

(f)      (x) a Mechanic's Lien is filed against (i) the City's interest in the Subject Property due to the Foundation's failure to pay an obligation of the Foundation that is lienable, (ii) the Foundation's rights to the Subject Property, or (iii) the Project Improvements, and (y) a court of competent jurisdiction issues a final non-appealable order that the applicable interest or Project Improvements be sold to satisfy such lien and the applicable amount is not paid or bonded by the Foundation contemporaneously with the entry of such order (no cure period following delivery of written notice);

(g)      a judgment lien (other than a judgment in favor of the City) or a federal tax lien is filed against the Foundation's rights to the Project Improvements or the Foundation's rights to the Subject Property and a court of competent jurisdiction issues a final non-appealable order that such right of the Foundation be sold to satisfy such lien and the applicable amount is not paid or bonded by the Foundation contemporaneously with the entry of such order (no cure period following delivery of written notice);

(h)      the Presidential Center is abandoned by the Foundation, and the City sends the Foundation a written notice pursuant to Section 20.2 of this Agreement describing such default and stating that if such default is not remedied within thirty (30) days after such written notice is delivered, the City shall have the option to terminate this Agreement, and the Foundation fails to remedy such failure within thirty (30) days after delivery of such written notice; or

Case 1:18-cv-04200-CDD Document #: 14-5 Filed 08/08/18 Page 73 of 342 PageID #:1081

(i)     the Foundation rejects this Agreement or does not or is unable to assume this Agreement in a Bankruptcy Proceeding of the Foundation (no cure period following delivery of written notice).

**Section 16.4**     Termination by the Foundation.  The Foundation (but not the City) may terminate this Agreement upon the occurrence of any of the following events:

(a)     if all or a portion of the Project Improvements is or are destroyed or damaged by fire or other casualty and such damage constitutes Material Damage; or

(b)     if all or a portion of the Subject Property or the Project Improvements is or are subject to a Taking and such Taking constitutes a Material Taking.

**Section 16.5**     Termination as Remedy Procedure.

(a)     To exercise the right to terminate this Agreement following the occurrence of any of the events specified in Section 16.2, Section 16.3 and Section 16.4 of this Agreement giving rise to such right to terminate, any party having such termination right shall give written notice of such termination to the other party (a "**Termination Exercise Notice**") in the manner specified in Section 20.2 hereof.  If the event specified in Section 16.2, Section 16.3 and Section 16.4 above giving rise to the right to terminate this Agreement shall have been cured prior to the date on which the non-performing party shall have received such Termination Exercise Notice, such Termination Exercise Notice shall be null and void and of no force and effect.

(b)     This Agreement shall not terminate or be revoked for any reason other than those specified in Section 16.2, Section 16.3 and Section 16.4 above, and the City and the Foundation hereby waive their right to terminate or revoke this Agreement for any reason other than the reasons specified above.  The breach by the Foundation or the City of any other covenant, condition or provision of this Agreement, the Master Agreement or any other agreement of any kind shall in no event result in the termination or revocation of this Agreement.  The provisions of this Section 16.5 shall in no event prevent the City or the Foundation from exercising their remedies under the provisions of Section 16.6 of this Agreement.

(c)     The termination of this Agreement pursuant to this Article XVI shall be in addition to the expiration of the Term of this Agreement as provided in Section 2.2 of this Agreement.

**Section 16.6**     Other Remedies.  Except for the limitations on remedies provided in Section 16.2, if an Event of Default occurs under this Agreement, the non-defaulting party shall be entitled to all remedies available under Law (other than termination of this Agreement, which shall be available to the City and the Foundation only as provided in Section 16.2, Section 16.3 and Section 16.4 of this Agreement), including the right to sue for damages, specific performance and injunctive relief as a result thereof; provided, however, that notwithstanding the foregoing, or anything to the contrary contained in this Agreement:  (a) in no event shall either party have the right to terminate the other party's respective rights and/or interests under this Agreement without termination of this Agreement as a whole (and, in the case of any such termination, only as

JOURNAL--CITY COUNCIL--CHICAGO

provided in Section 16.2, Section 16.3 and Section 16.4 above); and (b) in no event shall the City have the right to eject or remove the Foundation from the Subject Property (or any portion thereof) except in accordance with judicial procedure.

**Section 16.7**   City's Cure Right.  If the Foundation fails to make any payment required to be made by the Foundation pursuant to Section 16.3(f) or Section 16.3(g) of this Agreement contemporaneously with the entry of the applicable order referenced therein, or fails to maintain insurance pursuant to Section 16.3(e) by the thirtieth (30th) day following its receipt of a written notice referred to in said Section 16.3(e), or fails to maintain the exterior portions of the Subject Property (including the Presidential Center Green Space, the Green Space and the exterior portions of the Project Improvements located thereon) pursuant to Section 7.1, and such failure is not remedied by the thirtieth (30th) day following the date the Foundation receives from the City a written notice pursuant to Section 20.2 of this Agreement describing such failure, the City, without obligation to do so and without thereby waiving such failure or any resulting Event of Default, may make such payment for the account of the Foundation or otherwise cure such failure, and the Foundation shall, on demand, pay all costs, expenses and disbursements (including attorneys' fees) incurred by the City in making such payment or curing such failure, with interest at the rate of ten percent (10%) annually from the date of the City's payment until the date of reimbursement by the Foundation.  Any such payment by the City shall not be a waiver of any rights the City may have under and pursuant to any provision of this Agreement.  This Section 16.7 shall survive the expiration or earlier termination of this Agreement.

**Section 16.8**   Remedies Cumulative.  Except for the limitations on remedies provided in Section 16.2, and subject to the terms of Section 16.6 above, each right, power and remedy of the City or the Foundation provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and (subject to the foregoing) shall be in addition to every other right, power or remedy provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by the City or the Foundation of any one or more of the rights, powers or remedies provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by the City or the Foundation of any or all such other rights, powers or remedies.

**Section 16.9**   No Waiver.  The failure of the City or the Foundation to insist upon strict performance of any obligation of the other party under this Agreement in one or more instances shall not be deemed a waiver of that party's right to insist upon the full and strict performance of the same or any other obligation of the other party at a subsequent time nor shall the failure of the City or the Foundation to seek redress for the violation of any obligation or covenant be deemed to preclude said party from seeking redress for any subsequent violation nor to prevent a subsequent act which would originally have constituted a violation from having all the force and effect of an original violation.

**Section 16.10** Notification.  The Foundation shall promptly send notice to the City of the determination that an Imposition required by Section 10.1 of this Agreement to be paid by the Foundation is owed or that a Mechanic's Lien, judgment lien or federal tax lien has been filed against the fee interest in the Subject Property or the Foundation's right to the Subject Property or

Case 1:18-cv-02404 Document #: 1-45 Filed: 05/08/19 Page 76 of 342 PageID #:1601

the Project Improvements. The Foundation shall periodically send the City notice of material developments in the filing of such liens or litigation or other legal proceedings relating thereto.

## ARTICLE XVII
## SPECIAL PROVISIONS

**Section 17.1**   No Merger of Title. There shall be no merger of the right, title or interests of the Foundation created by this Agreement with the right, title and interests of the City in the Subject Property by reason of the fact that the same person may acquire or hold (a) any right, title or interest created by this Agreement or any interest therein; and (b) the right, title and interests of the City in the Subject Property or any interest therein. No such merger shall occur unless and until all persons having any interest in (i) all of the right, title and interests created by this Agreement; and (ii) the fee estate in the Subject Property, join in a written instrument effecting such merger and shall duly record the same.

**Section 17.2**   Estoppel Certificates.

(a)   The Foundation agrees at any time and from time to time (but in any case not more frequently than quarterly), upon not less than 60 days prior written notice from the City, to execute, acknowledge and deliver, without charge, to the City, a statement in writing certifying that this Agreement is in full force and effect and is unmodified (or if there have been modifications, identifying the same by the date thereof and specifying the nature thereof), that there are no existing Events of Default of which the Foundation has received or delivered notice, that to the knowledge of the Foundation, no Event of Default by the City exists hereunder (or if any such Event of Default does exist, specifying the same), and that the Foundation to its knowledge has no claims against the City hereunder (or if the Foundation has any such claims, specifying the same).

(b)   The City agrees at any time and from time to time (but in any case not more frequently than quarterly), upon not less than 60 days prior written notice from the Foundation, to execute, acknowledge and deliver, without charge, to the Foundation (or the then current assignee of this Agreement), a statement in writing certifying that this Agreement is in full force and effect and is unmodified (or if there have been modifications, identifying the same by the date thereof and specifying the nature thereof), that there are no existing Events of Default of which the City has received or delivered notice, that to the knowledge of the City, no Event of Default by the Foundation exists hereunder (or if any such Event of Default does exist, specifying the same), and that the City to its knowledge has no claims against the Foundation hereunder (or if the City has any such claims, specifying the same).

**Section 17.3**   Annual Reporting. Not later than the annual date on which the Foundation provides to the City its IRS Form 990 (or other applicable tax form for Section 501(c)(3) tax-exempt organizations) as contemplated by Section 6.5, the Foundation shall provide to the Commissioner an annual report concerning the operations of the Presidential Center for the same year covered by the applicable IRS Form 990 addressing: (a) the extent of visitation to the Presidential Center, paid and unpaid, (b) the nature and scope of events and activities open to the public at the Presidential Center, (c) the total revenues arising from the activities described in

Case 1:18-cv-02204 Document #: 41-5 Filed: 05/02/19 Page 76 of 342 PageID #:1061

Section 6.9 and the Foundation's disposition of such revenues, and (d) such other topics as may be mutually agreed upon between the parties.

**Section 17.4**    Advisory Operations Committee. The Foundation and the City shall, by the Final Completion Date, form an advisory committee concerning operations of the Presidential Center and Green Space. Such advisory committee shall consist of members in equal number (totaling no fewer than 4 and no more than 8) appointed by the Foundation and the City, and shall meet no less frequently than twice yearly to address ongoing operational matters pertaining to the Presidential Center and Green Space, and/or operational concerns arising from nearby and adjacent areas of Jackson Park. If any dispute between the Foundation and the City arises with respect to operational matters covered in this Agreement, the Foundation and the City shall attempt initially to resolve such dispute through a convening of the advisory committee.

### ARTICLE XVIII
### SURRENDER; HOLDING OVER

**Section 18.1**    Surrender of the Subject Property and the Project Improvements. Upon the expiration of the Term or other termination of this Agreement, without cost or charge to the City (a) the Foundation shall quit and surrender to the City the Subject Property and the Project Improvements (except for any Excluded Items which the Foundation elects to remove) and their respective appurtenances; (b) the Foundation shall remove the Foundation's personal property within one hundred twenty (120) days following the date of expiration or termination; and (c) title to all the Project Improvements (other than Excluded Items) shall remain vested in and belong to the City without any compensation to the Foundation or further action on the part of either party hereto. The Foundation shall, within five days after the City's request therefor, execute, acknowledge and deliver such documents as may be necessary or convenient in the City's discretion for the purpose of further evidencing that title to all of the Subject Property and (except for Excluded Items) the Project Improvements are vested in the City. Notwithstanding the foregoing, (x) the Foundation shall have no obligation to remove any of the Project Improvements (except to the extent required following a termination pursuant to Section 14.2(a) or Section 15.1(a) of this Agreement, or following a termination pursuant to Section 16.2 of this Agreement if necessary to cause the Project Improvements to comply in all materials respects with applicable Law) and (y) all Excluded Items, fixtures, trade fixtures and equipment, no matter how affixed to the Subject Property, may be removed by the Foundation in its discretion, at any time and from time to time, during the Term of this Agreement (it being agreed that, upon any such removal, the applicable Excluded Items and other items so removed shall cease to constitute Project Improvements for purposes hereof). Upon the expiration of the Term or other termination of this Agreement, at the City's request, the Foundation shall remove the Foundation's personal property, which removal shall be at the Foundation's sole cost and expense, and the Foundation shall repair all damage caused by such removal. All items not so removed shall be deemed to have been abandoned by the Foundation, and may be appropriated, sold, stored, destroyed or otherwise disposed of by the City without notice to the Foundation and without any obligation to account for such items. The City shall not be liable or responsible for any loss of or damage to any of the Foundation's personal property which may be on the Subject Property when the City takes occupancy of it, nor will the City be required to account for any of the Foundation's personal property.

Case 1:18-cv-03204-DLC Document #: 41-5 Filed: 05/03/19 Page 77 of 342 PageID #:1604

**Section 18.2** <u>No Continued Occupancy</u>. Upon termination of this Agreement (whether by expiration of the Term or otherwise) the Foundation shall, at its sole cost and expense, immediately vacate the Subject Property and the Project Improvements. The Foundation has no right to retain occupancy of the Subject Property or any part thereof beyond the expiration or earlier termination of this Agreement. Notwithstanding the foregoing, the Foundation shall have a period of one hundred twenty (120) days following the expiration or termination of the Agreement to remove all Excluded Items, personal property and trade fixtures and no such period shall be deemed a holdover period. The insurance and indemnification provisions of this Agreement shall remain in full force and effect during such 120-day period. Except as so stated above, no occupancy by the Foundation after the expiration or other termination of this Agreement shall be construed to extend the Term.

## ARTICLE XIX
## INDEMNIFICATION; LIABILITY

**Section 19.1** <u>Indemnification by the Foundation</u>. The Foundation agrees to assume all risk of damage or loss to property and injury or death to persons by reason of or incident to the occupancy and/or use of the Subject Property or the Project Improvements, or the activities conducted by any of the Foundation Parties or Third-Party Vendors under this Agreement. The Foundation Parties and Third-Party Vendors expressly waive all claims against the City Parties (except claims arising from the gross negligence or willful misconduct of the City acting in its proprietary capacity as a party to this Agreement, and not in the exercise of its Governmental Functions, or a breach of the City's obligations under this Agreement) for any such loss, damage, personal injury or death caused by or occurring as a consequence of such occupancy and/or use of the Subject Property or Project Improvements or the conduct of activities (including activities performed by Third-Party Vendors) under this Agreement. Unless arising from the gross negligence or willful misconduct of the City or a breach of the City's obligations under this Agreement, the Foundation, on behalf of itself, the Foundation Parties and the Third-Party Vendors, hereby agrees to indemnify, defend and save the City, and its officers, elected officials, employees and agents (collectively, the "**City Parties**") harmless from and against any and all liabilities, claims, suits, fines, penalties, damages, losses, charges, costs, expenses and fees (including attorney's fees) (collectively, "**Liabilities**") which may be imposed upon, incurred by or asserted against the City Parties by any third party (including any employees of any of the Foundation Parties or Third-Party Vendors) by reason of any of the following occurring during the Term:

(a)    the physical condition of the Subject Property (or any part thereof) or the Project Improvements (or any part thereof), or any use, occupation, operation, repair, maintenance or management of the Subject Property (or any part thereof) or the Project Improvements (or any part thereof) by the Foundation Parties or any concessionaire, licensee or invitee thereof (including, without limitation, any Third-Party Vendors);

(b)    any act or omission on the part of the Foundation Parties or any concessionaire, licensee or invitee thereof (including, without limitation, any Third-Party Vendors), or any of its or their agents, contractors, servants, employees, licensees or invitees relating to the Subject Property or the Project Improvements or this Agreement;

(c)     any accident, injury (including death) or damage to any person or property occurring (i) in the Presidential Center, or any part thereof, regardless of the cause thereof, or (ii) in the Green Space, or any part thereof, and arising out of the physical condition of the Green Space, the maintenance of (or failure to maintain) the Green Space, or for any of the reasons specified in subsections (a), (b), (d) and (e) of this Section 19.1;

(d)     any gross negligence or willful misconduct on the part of the Foundation Parties or Third-Party Vendors; and

(e)     any breach of the Foundation's obligations under this Agreement.

Nothing in this Section 19.1, however, shall abrogate or otherwise limit any of the loss, cost or damage for which the City is responsible or otherwise liable pursuant to the Subject Property Documents.

**Section 19.2**   Indemnification by the City.  Unless arising from the gross negligence or willful misconduct of a Foundation Party or a Third-Party Vendor or a breach of the Foundation's obligations under this Agreement, the City, on behalf of itself and the City Parties, hereby agrees to indemnify, defend and save the Foundation Parties harmless from and against any and all Liabilities which may be imposed upon, incurred or asserted by any third party against the Foundation Parties by reason of any of the following occurring during the Term:

(a)     any use of the Subject Property by the City Parties;

(b)     any gross negligence or willful misconduct on the part of the City Parties (acting in the City's proprietary capacity as a party to this Agreement, and not in the exercise of its Governmental Functions), and

(c)     any breach of the City's obligations under this Agreement.

Nothing in this Section 19.2, however, shall abrogate or otherwise limit any of the loss, cost or damage for which the Foundation is responsible or otherwise liable pursuant to the Subject Property Documents.  Nor shall anything in this Section 19.2 be deemed to limit in any way the liability or non-liability provisions of the Local Government and Governmental Employees Tort Immunity Act (745 ILCS 10/1-101 *et seq.*), or any other immunities and defenses generally available to the City.

**Section 19.3**   Limitation of the City's Liability.  No agent, representative, official or employee of the City shall be personally liable to the Foundation, or any successor in interest to the Foundation, in the event of any default or breach by the City under the terms of this Agreement. IN NO EVENT SHALL THE CITY BE LIABLE FOR CONSEQUENTIAL OR SPECIAL DAMAGES ARISING FROM THIS AGREEMENT OR THE CITY'S PERFORMANCE OF ITS OBLIGATIONS HEREUNDER.

**Section 19.4**   Limitation of the Foundation's Liability.  No officer, director, trustee, member of the board of trustees, employee, agent, or representative of the Foundation shall have any personal liability under any provision of this Agreement.  If the Foundation breaches any of the Foundation's obligations under this Agreement or otherwise, the City shall look solely to the

(c)     any accident, injury (including death) or damage to any person or property occurring (i) in the Presidential Center, or any part thereof, regardless of the cause thereof, or (ii) in the Green Space, or any part thereof, and arising out of the physical condition of the Green Space, the maintenance of (or failure to maintain) the Green Space, or for any of the reasons specified in subsections (a), (b), (d) and (e) of this Section 19.1;

(d)     any gross negligence or willful misconduct on the part of the Foundation Parties or Third-Party Vendors; and

(e)     any breach of the Foundation's obligations under this Agreement.

Nothing in this Section 19.1, however, shall abrogate or otherwise limit any of the loss, cost or damage for which the City is responsible or otherwise liable pursuant to the Subject Property Documents.

**Section 19.2**   Indemnification by the City.  Unless arising from the gross negligence or willful misconduct of a Foundation Party or a Third-Party Vendor or a breach of the Foundation's obligations under this Agreement, the City, on behalf of itself and the City Parties, hereby agrees to indemnify, defend and save the Foundation Parties harmless from and against any and all Liabilities which may be imposed upon, incurred or asserted by any third party against the Foundation Parties by reason of any of the following occurring during the Term:

(a)     any use of the Subject Property by the City Parties;

(b)     any gross negligence or willful misconduct on the part of the City Parties (acting in the City's proprietary capacity as a party to this Agreement, and not in the exercise of its Governmental Functions), and

(c)     any breach of the City's obligations under this Agreement.

Nothing in this Section 19.2, however, shall abrogate or otherwise limit any of the loss, cost or damage for which the Foundation is responsible or otherwise liable pursuant to the Subject Property Documents.  Nor shall anything in this Section 19.2 be deemed to limit in any way the liability or non-liability provisions of the Local Government and Governmental Employees Tort Immunity Act (745 ILCS 10/1-101 *et seq.*), or any other immunities and defenses generally available to the City.

**Section 19.3**   Limitation of the City's Liability.  No agent, representative, official or employee of the City shall be personally liable to the Foundation, or any successor in interest to the Foundation, in the event of any default or breach by the City under the terms of this Agreement. IN NO EVENT SHALL THE CITY BE LIABLE FOR CONSEQUENTIAL OR SPECIAL DAMAGES ARISING FROM THIS AGREEMENT OR THE CITY'S PERFORMANCE OF ITS OBLIGATIONS HEREUNDER.

**Section 19.4**   Limitation of the Foundation's Liability.  No officer, director, trustee, member of the board of trustees, employee, agent, or representative of the Foundation shall have any personal liability under any provision of this Agreement.  If the Foundation breaches any of the Foundation's obligations under this Agreement or otherwise, the City shall look solely to the

Foundation and not to the assets, interests or rights of any officer, director, trustee, board member, employee, agent, or representative of the Foundation for satisfaction of the City's remedies on account thereof.    IN NO EVENT SHALL THE FOUNDATION BE LIABLE FOR CONSEQUENTIAL OR SPECIAL DAMAGES ARISING FROM THIS AGREEMENT OR THE FOUNDATION'S PERFORMANCE OF ITS OBLIGATIONS HEREUNDER.

**Section 19.5**  Survival.  The provisions of this Article XIX shall survive the expiration or other termination of this Agreement.

## ARTICLE XX
## MISCELLANEOUS

**Section 20.1**  Provisions Subject to Applicable Law.  All rights, powers and remedies provided herein may be exercised only to the extent that the exercise thereof does not violate any applicable Laws, and all such rights, powers and remedies are intended to be limited to the extent necessary so that they shall not render this Agreement invalid or unenforceable under any applicable Laws.

**Section 20.2**  Notice.  Any notice or communication required or permitted under this Agreement shall be given in writing, sent by (a) personal delivery; (b) commercial courier or delivery service with proof of delivery; or (c) United States regular, registered or certified mail, postage prepaid:

| | |
|---|---|
| If to the City: | City of Chicago<br>Department of Planning & Development<br>121 North LaSalle Street, Room 1000<br>Chicago, Illinois 60602<br>Attn: Commissioner |
| With a copy to: | City of Chicago Department of Law<br>121 North LaSalle Street, Suite 600<br>Chicago, Illinois 60602<br>Attn: Corporation Counsel |
| If to the Foundation: | The Barack Obama Foundation<br>5235 South Harper Court, Suite 1100<br>Chicago, Illinois 60615<br>Attn: Executive Director |
| With a copy to: | Katten Muchin Rosenman LLP<br>525 West Monroe Street<br>Chicago, Illinois 60661 3693<br>Attn: Seth R. Madorsky, Esq. |
| With an additional copy to: | Sidley Austin LLP<br>One South Dearborn Street<br>Chicago, Illinois 60603<br>Attn: Scott E. Saef, Esq. |

Case: 1:12-cv-04240 Document #: 41-4 Filed: 04/24/21 Page 81 of 342 Page ID #:1637

or to such other address or to the attention of such other person as hereafter shall be designated in writing by the applicable party sent in accordance herewith. Any such notice or communication shall be effective when delivered during normal business hours. If delivery of a notice is refused, it shall be deemed to have been delivered at the time of such refusal of delivery.

**Section 20.3** Modification. Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except as provided herein or by an instrument in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

**Section 20.4** Successors and Assigns. This Agreement and all terms, provisions, covenants and conditions contained in this Agreement shall apply to, be binding upon and shall inure to the benefit of and be enforceable by each of the parties hereto and the respective successors and permitted assigns of the parties hereto.

**Section 20.5** Gender and Number; Other Interpretational Rules. Words of any gender used in this Agreement shall be held and construed to include any other gender, and words in the singular or plural number shall be held to include the other, unless the context otherwise requires. For purposes of this Agreement, whenever the words "include," "includes," "including," "e.g.," or "for example" are used, they shall be deemed to be followed by the words "without limitation" (to the extent that such words do not, in fact, so follow). When this Agreement provides that a party's consent or approval shall not be "unreasonably withheld," the phrase shall be deemed to include "conditioned or delayed" (to the extent that such words are not, in fact, so included).

**Section 20.6** Titles and Subtitles. The titles of the articles, sections, paragraphs and subparagraphs of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

**Section 20.7** Multiple Counterparts. This Agreement may be executed in any number of counterparts, each of which is an original, but all of which constitute one instrument.

**Section 20.8** Governing Law; Venue. This Agreement shall be governed and interpreted and the rights of the parties to this Agreement governed in accordance with the Laws of the State applicable to an agreement executed, delivered and performed in the State. Each party to this Agreement hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Northern District of Illinois, and, if such court does not have jurisdiction, to the courts of the State of Illinois in Cook County, for the purposes of any action arising out of this Agreement, or the subject matter of this Agreement brought by any other party. Each party hereto hereby agrees to venue in Cook County, Illinois.

**Section 20.9** Rule of Construction Inapplicable. The parties to this Agreement acknowledge and confirm that their respective attorneys have participated jointly in the review and revision of this Agreement and that this Agreement has not been written solely by counsel for one of the parties. The parties to this Agreement therefore stipulate and agree that the rule of

Case 1:18-cv-02426 Document #: 41-4 Filed: 04/14/21 Page 82 of 342 PageID #:4698

construction to the effect that any ambiguities are to or may be resolved against the drafting party shall not be employed in the interpretation of this Agreement to favor either party against the other.

**Section 20.10** Severability. If any provision of this Agreement or the application thereof to any person or circumstance is invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

**Section 20.11** No Joint Venture. Nothing in this Agreement shall be deemed or construed by the parties hereto, nor by any third party, as creating a relationship of principal and agent or of partnership or of joint venture between the parties hereto or otherwise, it being understood and agreed that no provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of independent contracting parties.

**Section 20.12** Recording. Either the City or the Foundation may file this Agreement and/or any amendment or renewal hereof for record in the Office of the Recorder of Deeds of Cook County, Illinois, or in any other public place, the cost of which shall be borne by the party so filing or recording this Agreement.

**Section 20.13** Professional Fees. If any party hereto institutes any action or proceeding against the other party with regard to this Agreement, the prevailing party in such action shall be entitled to recover from the losing party, in addition to the costs and expenses of and related to the suit, its actual reasonable attorneys' fees.

**Section 20.14** No Third-Party Beneficiaries. Nothing in this Agreement is intended or shall be construed to confer upon any person or entity (other than the parties hereto and their respective successors and permitted assigns) any benefit, right, remedy or cause of action under or by reason of this Agreement.

**Section 20.15** Force Majeure Event. Whenever a period of time is herein prescribed for action to be taken by either party hereunder, such party shall not be liable or responsible for, and there shall be excluded from the computation for any such period of time, any delays due to a Force Majeure Event. If a Force Majeure Event occurs which either the City or the Foundation intends to assert for purposes of this Section 20.15, such asserting party shall, after deciding to assert such event, promptly notify the other party of such event in writing.

**Section 20.16** Entire Agreement. This Agreement, together with all Exhibits attached hereto, embodies the entire agreement between the parties relative to the subject matter hereof, and there are no oral or written agreements between the parties, nor any representations made by either party, relative to the subject matter hereof which are not expressly set forth herein. This Agreement may be amended only by a written instrument executed by the parties hereto.

**Section 20.17** Survival. Each provision of this Agreement containing rights and obligations that by their nature require the payment of money or the performance of obligations after the expiration or earlier termination of the Term shall survive any such expiration or earlier termination.

**IN WITNESS WHEREOF,** this Use Agreement is executed by the City and the Foundation as of the Commencement Date.

> **CITY OF CHICAGO**, an Illinois municipal
> corporation and home rule unit of government

> By: _____
>
>       David L. Reifman
>       Commissioner of Planning & Development

> **THE BARACK OBAMA FOUNDATION,** a
> District of Columbia nonprofit corporation and tax
> exempt entity under Section 501(c)(3) of the Internal
> Revenue Code

> By: _____
> Name: _____
> Its: _____

[(Sub)Exhibit "A" referred to in this Use Agreement with
The Barack Obama Foundation constitutes Exhibit "A"
to ordinance printed on pages 85887
and 85888 of this *Journal*.]

[(Sub)Exhibits "B" and "D" referred to in this Use Agreement
with The Barack Obama Foundation printed on
pages 85943 and 85944 of this *Journal*.]

(Sub)Exhibits "C", "E" and "F" referred to in this Use Agreement with The Barack Obama
Foundation read as follows:

*(Sub)Exhibit "C".*
(To Use Agreement With The Barack Obama Foundation)

*Description Of The Mission Of The Presidential Center.*

The Obama Presidential Center ("OPC") is a core project of The Barack Obama Foundation. The central mission of the OPC is to house and operate a Presidential Museum that will present President and Mrs. Obama's story and the narrative of the Obama Administration in a broader historical context. Drawing from African American history, the history of civil rights, and the powerful place of Chicago in American history, the Museum will frame President and Mrs. Obama's lives and careers, the 2008 and 2012 presidential elections, and the Obama Presidency in the context of the movements and milestones that helped to shape the Nation over time.

Through the Museum experience, visitors from around the world will learn the story of our Nation's first African-American President and First Lady. Exhibits will take visitors through the lives of President and Mrs. Obama, illustrating President Obama's multicultural childhood in Hawaii and Indonesia, as well as the First Lady's family story and its ancestral connections to slavery and the Great Migration. Visitors will also experience the Obama Presidency firsthand. Exhibits will feature a rotating series of original artifacts from the Obama Administration as well as original artifacts from other sources and time periods that help tell the Obamas' story. Important White House rooms, such as a replica of the Oval Office, will be displayed—enhanced at times with technology, including virtual and augmented reality, to allow visitors to engage with key aspects of the Obama Presidency. And the Museum will bring President and Mrs. Obama's iconic speeches to life: visitors will see the original manuscripts of selected speeches and experience the speeches as delivered through an immersive multimedia installation. The Museum will also offer opportunities for visitors to participate in activities that connect them to the values and skills of civic engagement and community building that have inspired the Obamas' lives and careers.

Other important missions of the OPC are tied directly to its location on the South Side of Chicago: Educational and community programming linked to the Obama Presidency and the lives of President and Mrs. Obama, which will interest visitors from around the world, will be easily available to residents of the South Side neighborhoods next to the OPC—the very communities where Mrs. Obama was raised, where President Obama began and developed his career as a community organizer, law professor, state senator, and U.S. Senator, and where the Obamas lived and raised their family.

Case 1:18-cv-03424 Document #: 41-4 Filed: 04/30/21 Page 85 of 342 PageID #:1670

The OPC will also provide educational and community programming linked to its mission on its campus beyond the Presidential Museum itself. As examples:

- A branch of the Chicago Public Library and a President's Reading Room, featuring curated collections and displays of archival material, will enhance reading and educational opportunities for the local community, and provide digital access to Obama Administration records.

- The Forum Building will house collaboration and creative spaces, including an auditorium, multipurpose meeting rooms, recording and broadcast studios, a winter garden, and a restaurant.

- The Program, Athletic, and Activity Center will host a variety of public programs including presentations, events, athletics, and recreation.

- A variety of new outdoor facilities—including a great lawn that can be used as a sledding hill, playgrounds, woodland walk, and formal gardens—will beautify and enhance the recreational opportunities on the site, creating a fun, safe environment for visitors to enjoy in all seasons.

Finally, the OPC will fulfill its mission to honor the history of the Obamas and the adjacent South Side communities by enhancing Jackson Park, not only beautifying the OPC site itself but also reconnecting it with the bordering elements of historic Jackson Park, previously separated by a busy, six-lane road. OPC visitors will be able to walk safely across parkland—without obstruction by traffic—to other beautiful parts of Jackson Park, past the lagoons, and onto the lakeshore.

*(Sub)Exhibit "E".*
(To Use Agreement With The Barack Obama Foundation)

*Certain Uses Of The Presidential Center.*

- Museum containing artifacts and exhibits (including presidential artifacts and exhibits) presenting, among other themes, President and Mrs. Obama's story within the broader story of American history, the history of civil rights and the place of Chicago in American history
- Special exhibition areas
- Publicly accessible areas (which may include contemplative top floor space, interactive lower level space and wintergarden)
- Auditoriums
- Community collaborative workspaces (which may include media production areas)
- Programming areas
- Ancillary support areas, including food service and gift shops
- Conference, meeting and presentation spaces and multi-purpose meeting spaces
- Publicly accessible document areas (which may include presidential documents, and which may include electronic and/or digitally-based)
- Public library area
- Public and special interior and/or exterior events
- Hard-surfaced court for large-scale indoor events and for basketball, dance and other sports and recreation (including supporting areas)
- Accessory and non-accessory parking (in the Underground Parking Facility)
- Non-public areas supporting Foundation activities, including offices and back-of-house space (including mechanical areas)
- Publicly accessible ingress, egress and access
- Displays of art, sculpture and exhibits
- Organic garden
- Publicly accessible rooftops
- Sledding hill
- Great Lawn
- Landscaping, including grasses, trees, bushes and flowers
- Play areas, picnic areas and outdoor seating areas
- Exterior contemplative spaces
- Gradually sloped exterior areas and pathways accessible to persons with disabilities

*(Sub)Exhibit "F"*.
(To Use Agreement With The Barack Obama Foundation)

*Construction Commitments.*

1.     Employment Opportunity. The Foundation agrees, and shall contractually obligate its various contractors, subcontractors and any Affiliate of the Foundation operating on the Subject Property (collectively, the "**Employers**" and individually, an "**Employer**") to agree, that during the Construction of the Project Improvements:

(a)     Neither the Foundation nor any Employer shall discriminate against any employee or applicant for employment based upon race, religion, color, sex, national origin or ancestry, age, handicap or disability, sexual orientation, military discharge status, marital status, parental status or source of income as defined in the City of Chicago Human Rights Ordinance, Section 2-160-010 *et seq.* of the Municipal Code, as amended from time to time (the "**Human Rights Ordinance**"). Applicants will be hired and employed without discrimination based upon the foregoing grounds, and treated in a non-discriminatory manner with regard to all job-related matters, including, without limitation: employment, upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.     The Foundation and each Employer agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the City setting forth the provisions of this nondiscrimination clause. In addition, the Foundation and each Employer, in all solicitations or advertisements for employees, shall state that all qualified applicants shall receive consideration for employment without discrimination based upon the foregoing grounds.

(b)     To the extent feasible, the Foundation and each Employer shall (i) present opportunities for training and employment of low and moderate income residents of the City, and (ii) provide that contracts for work in connection with the Construction of the Project Improvements be awarded to business concerns which are located in or owned in substantial part by persons residing in, the City.

(c)     The Foundation and each Employer shall comply with all federal, state and local equal employment and affirmative action statutes, rules and regulations, including, without limitation, the Human Rights Ordinance and the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.* (1993), both as amended from time to time, and any regulations promulgated thereunder.

(d)     The Foundation, in order to demonstrate compliance with the terms of this Section 1, shall cooperate with and promptly and accurately respond to inquiries by the City, which has the responsibility to observe and report compliance with equal employment opportunity regulations of federal, state and municipal agencies.

(e)     The Foundation and each Employer shall include the foregoing provisions of subparagraphs (a) through (d) in every contract entered into in connection with the

Case: 1:18-cv-03424 Document #: 42-6 Filed: 04/20/21 Page 88 of 342 PageID #:1006

Construction of the Project Improvements, and shall require inclusion of these provisions in every subcontract entered into by any subcontractors, so that each such provision shall be binding upon each contractor or subcontractor, as the case may be, during the Construction of the Project Improvements.

2.      City Resident Employment Requirement. The Foundation agrees, and shall contractually obligate each Employer to agree, that during the Construction of the Project Improvements:

(a)      the Foundation and each Employer shall comply with the minimum percentage of total worker hours performed by actual residents of the City of Chicago as specified in Section 2-92-330 of the Municipal Code (at least fifty percent); provided, however, that in addition to complying with this percentage, the Foundation and each Employer shall be required to make good faith efforts to utilize qualified residents of the City in both unskilled and skilled labor positions.

(b)      The Foundation and the Employers may request a reduction or waiver of this minimum percentage level of Chicagoans as provided for in Section 2-92-330 of the Municipal Code in accordance with standards and procedures developed by the chief procurement officer of the City of Chicago.

(c)      "**Actual residents of the City of Chicago**" shall mean persons domiciled within the City of Chicago. The domicile is an individual's one and only true, fixed and permanent home and principal establishment.

(d)      The Foundation and the Employers shall provide for the maintenance of adequate employee residency records to ensure that actual Chicago residents are employed on the Construction of the Project Improvements. The Foundation and the Employers shall maintain copies of personal documents supportive of every Chicago employee's actual record of residence.

(e)      The Foundation and the Employers shall submit weekly certified payroll reports (U.S. Department of Labor Form WH-347 or equivalent) to the Department in triplicate, which shall identify clearly the actual residence of every employee on each submitted certified payroll. The first time that an employee's name appears on a payroll, the date that the Foundation or the Employer hired the employee should be written in after the employee's name.

(f)      The Foundation and the Employers shall provide full access to their employment records to the chief procurement officer, the Department, the Superintendent of the Chicago Police Department, the inspector general, or any duly authorized representative thereof. The Foundation and the Employers shall maintain all relevant personnel data and records for a period of at least three (3) years after the issuance of the Certificate of Completion.

(g)      At the direction of the Department, the Foundation and the Employers shall provide affidavits and other supporting documentation to verify or clarify an employee's actual address when doubt or lack of clarity has arisen.

(h)     Good faith efforts on the part of the Foundation and the Employers to provide work for actual Chicago residents (but not sufficient for the granting of a waiver request as provided for in the standards and procedures developed by the chief procurement officer) shall not suffice to replace the actual, verified achievement of the requirements of this Section 2 concerning the worker hours performed by actual Chicago residents.

(i)     If the City determines that the Foundation or an Employer failed to ensure the fulfillment of the requirements of this Section 2 concerning the worker hours performed by actual Chicago residents or failed to report in the manner as indicated above, the City will thereby be damaged in the failure to provide the benefit of demonstrable employment to Chicagoans to the degree stipulated in this Section 2. If such non-compliance is not remedied in accordance with the breach, notice and cure provisions of Section 16.1(a) of the Agreement, the parties agree that 1/20 of 1 percent (.05%) of the aggregate hard construction costs set forth in the budget shall be surrendered by the Foundation to the City in payment for each percentage of shortfall toward the stipulated residency requirement. Failure to report the residency of employees entirely and correctly shall result in the surrender of the entire liquidated damages as if no Chicago residents were employed in either of the categories. The willful falsification of statements and the certification of payroll data may subject the Foundation and/or the other Employers or employees to prosecution.

(j)     Nothing herein provided shall be construed to be a limitation upon the "Notice of Requirements for Affirmative Action to Ensure Equal Employment Opportunity, Executive Order 11246" and "Standard Federal Equal Employment Opportunity, Executive Order 11246," or other affirmative action required for equal opportunity under the provisions of the Agreement.

(k)     The Foundation shall cause or require the provisions of this Section 2 to be included in all construction contracts and subcontracts related to the construction of the Project Improvements.

3.     The Foundation's MBE/WBE Commitment. The Foundation agrees for itself and its successors and assigns, and, if necessary to meet the requirements set forth herein, shall contractually obligate the general contractor to agree, that during the Construction of the Project Improvements:

(a)     Consistent with the findings which support, as applicable, (i) the Minority-Owned and Women-Owned Business Enterprise Procurement Program, Section 2-92-420 et seq., Municipal Code (the "**Procurement Program**"), and (ii) the Minority- and Women-Owned Business Enterprise Construction Program, Section 2-92-650 et seq., Municipal Code (the "**Construction Program**," and collectively with the Procurement Program, the "**MBE/WBE Program**"), and in reliance upon the provisions of the MBE/WBE Program to the extent contained in, and as qualified by, the provisions of this Section 3, during the course of Construction of the Project Improvements, at least 26% of the aggregate hard construction costs shall be expended for contract participation by minority-owned businesses and at least 6% of the aggregate hard

construction costs shall be expended for contract participation by women-owned businesses.

(b) For purposes of this Section 3 only:

(i) The Foundation (and any party to whom a contract is let by the Foundation in connection with Construction of the Project Improvements) shall be deemed a "contractor" and the Agreement (and any contract let by the Foundation in connection with Construction of the Project Improvements) shall be deemed a "contract" or a "construction contract" as such terms are defined in Sections 2-92-420 and 2-92-670, Municipal Code, as applicable.

(ii) The term **"minority-owned business"** or **"MBE"** shall mean a business identified in the Directory of Certified Minority Business Enterprises published by the City's Department of Procurement Services, or otherwise certified by the City's Department of Procurement Services as a minority-owned business enterprise, related to the Procurement Program or the Construction Program, as applicable.

(iii) The term **"women-owned business"** or **"WBE"** shall mean a business identified in the Directory of Certified Women Business Enterprises published by the City's Department of Procurement Services, or otherwise certified by the City's Department of Procurement Services as a women-owned business enterprise, related to the Procurement Program or the Construction Program, as applicable.

(c) Consistent with Sections 2-92-440 and 2-92-720, Municipal Code, the Foundation's MBE/WBE commitment may be achieved in part by the Foundation's status as an MBE or WBE (but only to the extent of any actual work performed on the Project Improvements by the Foundation) or by a joint venture with one or more MBEs or WBEs (but only to the extent of the lesser of (i) the MBE or WBE participation in such joint venture, or (ii) the amount of any actual work performed on the Project Improvements by the MBE or WBE); by the Foundation utilizing a MBE or a WBE as the general contractor (but only to the extent of any actual work performed on the Project Improvements by the general contractor); by subcontracting or causing the general contractor to subcontract a portion of the Construction of the Project Improvements to one or more MBEs or WBEs; by the purchase of materials or services used in the Construction of the Project Improvements from one or more MBEs or WBEs; or by any combination of the foregoing. Those entities which constitute both a MBE and a WBE shall not be credited more than once with regard to the Foundation's MBE/WBE commitment as described in this Section 3. In accordance with Section 2-92-730, Municipal Code, the Foundation shall not substitute any MBE or WBE general contractor or subcontractor without the prior written approval of the Department.

(d) The Foundation shall deliver quarterly reports to the City's monitoring staff during the Construction of the Project Improvements describing its efforts to achieve compliance with this MBE/WBE commitment. Such reports shall include, inter alia, the

name and business address of each MBE and WBE solicited by the Foundation or the general contractor to work on the Project Improvements, and the responses received from such solicitation, the name and business address of each MBE or WBE actually involved in the Construction of the Project Improvements, a description of the work performed or products or services supplied, the date and amount of such work, product or service, and such other information as may assist the City's monitoring staff in determining the Foundation's compliance with this MBE/WBE commitment. The Foundation shall maintain records of all relevant data with respect to the utilization of MBEs and WBEs in connection with the Construction of the Project Improvements for at least five (5) years after completion of the Project Improvements, and the City's monitoring staff shall have access to all such records maintained by the Foundation, on prior notice of at least five (5) Business Days, to allow the City to review the Foundation's compliance with its commitment to MBE/WBE participation and the status of any MBE or WBE performing any portion of the Construction of the Project Improvements.

(e)     Upon the disqualification of any MBE or WBE general contractor or subcontractor, if the disqualified party misrepresented such status, the Foundation shall be obligated to discharge or cause to be discharged the disqualified general contractor or subcontractor, and, if possible, identify and engage a qualified MBE or WBE as a replacement. For purposes of this subsection (e), the disqualification procedures are further described in Sections 2-92-540 and 2-92-730, Municipal Code, as applicable.

(f)     Any reduction or waiver of the Foundation's MBE/WBE commitment as described in this Section 3 shall be undertaken in accordance with Sections 2-92-450 and 2-92-730, Municipal Code, as applicable.

4.     Pre-Construction Conference and Post-Closing Compliance Requirements. Not less than fourteen (14) days prior to the Closing Date (as defined in the Master Agreement), the Foundation and the Foundation's general contractor and all major subcontractors shall meet with the Department monitoring staff regarding compliance with all construction employment requirements. During this pre-construction meeting, the Foundation shall present its plan to achieve its construction employment obligations, the sufficiency of which the City's monitoring staff shall approve as a precondition to the Closing (as defined in the Master Agreement). During the Construction of the Project Improvements, the Foundation shall submit all documentation required hereunder to the City's monitoring staff, including, without limitation, the following: (a) subcontractor's activity report; (b) contractor's certification concerning labor standards and prevailing wage requirements; (c) contractor letter of understanding; (d) monthly utilization report; (e) authorization for payroll agent; (f) certified payroll; (g) evidence that MBE/WBE contractor associations have been informed of the Project Improvements via written notice and hearings; and (h) evidence of compliance with job creation/job retention requirements.

*(Sub)Exhibit "B".*
*(To Use Agreement With The Barack Obama Foundation)*

*Depiction Of Subject Property.*



*(Sub)Exhibit "D".*
(To Use Agreement With The Barack Obama Foundation)

*Areas Of Presidential Center.*



*Exhibit "E".*
(To Ordinance)

*Master Agreement.*

This **MASTER AGREEMENT** ("**Agreement**") is made on or as of _____, 201__ (the "**Effective Date**"), by and between the **CITY OF CHICAGO**, an Illinois municipal corporation ("**City**"), acting by and through its Department of Planning and Development ("**DPD**"), having its principal offices at City Hall, 121 North LaSalle Street, Chicago, Illinois 60602, and **THE BARACK OBAMA FOUNDATION**, a District of Columbia nonprofit corporation (the "**Foundation**").

## RECITALS

A. The City, as a home rule unit of government under the 1970 Constitution of the State of Illinois, has the authority to promote the health, safety and welfare of its inhabitants, and to enter into contractual agreements with third parties for the purpose of achieving the aforesaid purposes.

B. A core project of the Foundation is the planning and development of the Obama Presidential Center (the "**Presidential Center**").

C. The Presidential Center is designed as a campus consisting of four buildings and an underground parking facility, complemented by a plaza, play areas, pedestrian and bicycle pathways and other landscaped open space, as more particularly described in the Use Agreement (hereinafter defined) and in PD 1409 (hereinafter defined). The buildings include the Museum Building, the Forum Building, the Library Building and the Program, Athletic and Activity Center (as defined in the Use Agreement).

D. The Foundation expects to receive all funds for construction of the Presidential Center from private fundraising.

E. The City is the owner of certain real property in Jackson Park, which consists of approximately 19.3 acres and is more particularly described on Exhibit A attached hereto and depicted on Exhibit B attached hereto (the "**Property**").

F. The City acquired the Property from the Chicago Park District, a municipal corporation organized and existing pursuant to the laws of the State of Illinois, 70 ILCS 1505/1 *et seq.* (the "**Park District**"), in order to facilitate the development of the Presidential Center.

G. The Park District conveyed the Property to the City by deed dated _____, and recorded in the Office of the Recorder of Deeds of Cook County, Illinois on ____ _____ as Document No. _____ _____.

H. The deed from the Park District to the City contains a reversionary clause, providing that the Property will revert to the Park District if the Property is not used as part of the Presidential Center.

I. The City and the Foundation plan to enter into a use agreement with respect to the Property in substantially the form attached hereto as Exhibit C (the "**Use Agreement**").

Case 1:18-cv-08424 Document #: 42-6 Filed: 06/20/19 Page 31 of 42 PageID #:1030

J.     The Foundation heretofore applied for and secured (i) approval of a planned development for the Property under the City of Chicago Zoning Ordinance, such planned development being designated as Institutional Planned Development No. 1409 ("**PD 1409**"), by ordinance adopted by the City Council on May 23, 2018, and published in the Journal of Proceedings of the City Council ("**Journal**") of such date on pages 77185 through 77214 (the "**PD Approval**"), and (ii) approval of Application No. 721 pursuant to the Lake Michigan and Chicago Lakefront Protection Ordinance set forth in Chapter 16-4 of the Municipal Code of Chicago for the proposed development of the Property for the Proposed Use (hereinafter defined) by resolution adopted by the Chicago Plan Commission dated May 17, 2018 (the "**LPO Approval**").

K.     The City Council, pursuant to an ordinance adopted on _____ and published at pages _____ through _____ in the Journal of such date, authorized the City to execute this Agreement, the Use Agreement and all other documents and instruments specified and contemplated herein, and to perform and observe all of the covenants and agreements of the City under such documents (the "**Ordinance**").

**NOW, THEREFORE**, for and in consideration of the mutual covenants and agreements set forth herein, together with other good and valuable consideration, the receipt and sufficiency of which are hereby confirmed and acknowledged by each of the parties hereto, and each of the parties intending to be bound thereby, the City and the Foundation agree as follows:

1.     Incorporation of Recitals. The foregoing recitals constitute an integral part of this Agreement and are incorporated herein by this reference with the same force and effect as if set forth herein as agreements of the parties.

2.     City's Representations. The City represents and warrants to the Foundation as follows, which representations and warranties shall be deemed to be remade as of the Closing Date (hereinafter defined):

(a)     Title. The City has good and indefeasible title to the Property, subject only to such matters as are of public record as of the Effective Date or that would be disclosed through an ALTA plat of survey of the Property, and such other liens, claims and encumbrances caused by or through the Foundation.

(b)     Parties in Possession. There are no parties in possession of any portion of the Property as lessees or, to the City's knowledge, tenants at sufferance.

(c)     Other Third Party Rights. There are no other contracts of sale or, to the City's knowledge, leases, license agreements or other agreements granting any third parties the right to purchase, use or occupy the Property.

(d)     Proceeding by Governmental Authority. There is no pending or, to the City's knowledge, threatened condemnation or eminent domain action or proceeding relating to the Property by any Governmental Authority. As used herein, the term "**Governmental Authority**" means the United States, the State of Illinois, the County of Cook, the City of Chicago, and any agency, department, commission, board, bureau or instrumentality of any of them.

Case 1:18-cv-00420 Document #14-6 Filed 04/20/21 Page 96 of 342 PageID #:1080

(e)  <u>Restrictive Covenants</u>.  To the knowledge of the City, the Proposed Use (hereinafter defined) of the Property would not violate any restrictive covenant or deed restriction (recorded or otherwise) affecting the Property, and the City is not aware of any proposed change in any Applicable Laws that might materially and adversely affect the Proposed Use of the Property by the Foundation.  As used herein, the term "**Applicable Laws**" means any law, statute, ordinance, rule, regulation, order or determination of any Governmental Authority, including applicable zoning ordinances and building codes, flood disaster laws, health laws, regulations of any board of fire underwriters (or other body exercising similar functions).

(f)  <u>Environmental</u>.  To the City's knowledge, except to the extent expressly described in the environmental reports specified in <u>Exhibit D</u> attached hereto, the Property:  (i) is not in violation of any Applicable Environmental Law (hereinafter defined); (ii) is not subject to any remedial obligations under any Applicable Environmental Law; (iii) has not been proposed for nor subject to any voluntary clean-up program; (iv) is not subject to any institutional controls limiting the uses to which the Property may be put or how construction may occur at the Property; (v) is not subject to any pending or threatened investigation or enforcement action under any Applicable Environmental Law; (vi) has not been found to have any recognized environmental conditions as that term is defined in ASTM Standard E-1527-13; and (vii) is not impacted by the presence of any Hazardous Material (hereinafter defined) in quantities that limit in any way its use for the construction or operation of the Presidential Center.  As used herein, the term "**Applicable Environmental Law**" means those applicable Federal, State, and local laws, as they exist on the date the representation is given, pertaining to health, safety or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("**CERCLA**"), and the Resource Conservation and Recovery Act of 1976, as amended ("**RCRA**").  The term "**Hazardous Material**" means:  (i) any "hazardous substance" as defined in CERCLA and regulations promulgated thereunder; (ii) any "hazardous waste" as defined in RCRA and regulations promulgated thereunder; (iii) any petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under the definition of hazardous substance in CERCLA as well as natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas), and other petroleum products and by-products; (iv) urea formaldehyde foam insulation, polychlorinated biphenyls, radon, perchlorate, and "source," "special nuclear" and "by-product" material as defined in the Atomic Energy Act of 1985, 42 U.S.C. §§ 3011 *et seq*.; (v) any material defined as hazardous or toxic under any statute or regulation of the State of Illinois or any agency thereof; and (vi) any other material or substance which is toxic, ignitable, reactive or corrosive and which is regulated by any Applicable Environmental Law; provided, all such terms shall be deemed to include all similar terms used in any Applicable Environmental Law or regulations thereunder (including by way of example, but not limitation, pollutant, contaminant, toxic substance, discharge and migration).

(g)  <u>No Unpaid Construction Obligations</u>.  There are no unpaid charges, debts, liabilities, claims or obligations arising from the Park District's or the City's

occupancy, ownership, use or operation of the Property which could give rise to any mechanic's or materialmen's or other statutory lien against the Property, or any part thereof, or for which the Foundation shall be responsible.

(h)  No Limitation on Use.  To the knowledge of the City, except for the review process associated with the Pre-Turnover Governmental Determinations (hereinafter defined) and any limitations imposed and consents required in connection with such Pre-Turnover Governmental Determinations, there exists no judicial, quasi-judicial, administrative or other proceeding or court order, deed restriction or restrictive covenant (recorded or otherwise) or other private limitation on, or consent required to permit use of the Property by the Foundation for the construction and operation of the Presidential Center and the other Project Improvements (as defined in the Use Agreement) as specified in the Use Agreement (herein called the "**Proposed Use**").

(i)  Litigation or Administrative Proceeding.  To the knowledge of the City, except for the pending litigation specified on Exhibit E attached hereto (the "**Pending POP Litigation**") and proceedings associated with the Pre-Turnover Governmental Determinations, there is no pending or threatened litigation or administrative proceedings which could materially adversely affect (i) title to the Property or any part thereof; (ii) the ability of the City to perform any of its obligations hereunder; (iii) the Proposed Use of the Property by the Foundation; or (iv) the Property.

(j)  No Adverse Fact.  To the City's knowledge, there exists no judicial or administrative action, or any action by adjacent landowners, or any natural or artificial conditions upon the Property, or any material adverse fact or condition relating to the Property or the Proposed Use by the Foundation, which would materially prevent, limit, or obstruct the Proposed Use.

(k)  No Commitments for Dedication.  Except as disclosed in the Commitment (hereinafter defined) and except for the Permitted Exceptions (hereinafter defined), the City has not made and, to the City's knowledge, the Park District has not made, any commitment to any Governmental Authority, utility company, school board, church or other religious body, or any homeowners or homeowners' association, or any other organization, group or individual, relating to the Property which would impose an obligation upon the Foundation or its successors or permitted assignees to make any contribution or dedications of money or land or to construct, install or maintain any improvements of a public or private nature on or off the Property.  Except as disclosed in the Commitment and except for the Permitted Exceptions, to the knowledge of the City, no Governmental Authority has imposed any requirement that any developer of the Property pay directly or indirectly any special fees or contributions or incur any special expenses or obligations (collectively, "**Assessments**") in connection with any development of the Property or any part thereof.

(l)  Corporation.  The City is a municipal corporation organized and legally existing and in good standing under the laws of the State of Illinois.  The execution and delivery of, and the City's performance under, this Agreement are within the City's

Case 1:18-cv-06204 Document #: 42-6 Filed: 04/20/21 Page 98 of 342 PageID #:1800

powers and have been duly authorized by all requisite corporate action. The person executing this Agreement on behalf of the City has the authority to do so. This Agreement constitutes the legal, valid and binding obligation of the City enforceable in accordance with its terms, subject to laws applicable generally to creditor's rights and applicable principles of equity. Performance of this Agreement will not result in any breach of, or constitute any default under, any agreement or other instrument to which the City is a party, or by which the City is bound.

(m)  Consent or Approval.  To the knowledge of the City, no consent or approval of any person or entity is required with respect to the execution and delivery of this Agreement by the City or the consummation by the City of the Closing (hereinafter defined) or the performance by the City of its obligations hereunder which has not been obtained.

(n)  No Service Contracts.  Neither the City nor the Park District has entered into any contracts related to the operation, ownership or management of the Property, including maintenance, service, construction, supply and equipment rental contracts, which could give rise to any mechanic's or materialmen's or other statutory lien against the Property, or any part thereof, or which, as applicable, would be an obligation of the Foundation after the Closing.

(o)  Employees.  There are no employees currently employed by the City or the Park District to manage, maintain or service the Property, or any portion thereof, whose contract with the City or the Park District would be an obligation of the Foundation after the Closing.

(p)  Contracts and Documents.  To the knowledge of the City, all contracts or documents delivered by the City to the Foundation in connection with this Agreement are, in all material respects, true, correct and complete originals or copies of such documents, and are in full force and effect, without default by (or notice of default to) any party.

(q)  Tax Exempt.  The City and the Park District are exempt from the obligation to pay real estate taxes or any other Impositions (as defined in the Use Agreement) in respect of the Property.

As used in this Section 2, the phrases "to the knowledge of the City," "to the City's knowledge," and "the City is not aware" or similar language, means the actual, current knowledge, after consultation with _____ of the Park District and Rebekah Scheinfeld of the Chicago Department of Transportation, but without independent investigation, of David L. Reifman, at the time such representations and warranties are made by the City hereunder. In order to remake such representations and warranties as of the Closing Date, Mr. Reifman again shall consult with _____ and Ms. Scheinfeld. If any of the specified individuals above, as of the Closing Date, shall no longer be in the employ of the Park District, the Chicago Department of Transportation or DPD, respectively, such individual(s) shall be replaced, for purposes of remaking such representations and warranties, by individuals who, in the good faith judgment of

the City, shall be in the best position to have knowledge of the matters to which such representations and warranties pertain.

3.     Foundation's Representations. The Foundation represents and warrants to the City as follows, which representations and warranties shall be deemed to be remade as of the Closing Date:

(a)   Corporation. The Foundation is a nonprofit corporation organized and legally existing and in good standing under the laws of the District of Columbia. The execution and delivery of, and the Foundation's performance under, this Agreement are within the Foundation's powers and have been duly authorized by all requisite corporate action. The person executing this Agreement on behalf of the Foundation has the authority to do so. This Agreement constitutes the legal, valid and binding obligation of the Foundation enforceable in accordance with its terms, subject to laws applicable generally to creditor's rights and applicable principles of equity. Performance of this Agreement shall not result in any breach of, or constitute any default under, any agreement or other instrument to which the Foundation is a party or by which the Foundation is bound.

(b)   Consent or Approval. Except for the approval of the Foundation's Board of Directors, no consent or approval of any person or entity is required with respect to the execution and delivery of this Agreement by the Foundation or the consummation by the Foundation of the Closing or the performance by the Foundation of its obligations hereunder.

(c)   Authority. The Foundation has all requisite authority and power (i) to select the Property as the location of the Presidential Center; and (ii) to plan, design, construct, complete, furnish and operate the Presidential Center on the Property, as contemplated herein.

(d)   Litigation or Administrative Proceeding. Except for the Pending POP Litigation, there is no pending or, to the knowledge of the Foundation, threatened litigation or administrative proceedings which, if decided against the Foundation, would materially adversely affect (i) the ability of the Foundation to perform any of its obligations hereunder; or (ii) the Proposed Use of the Property by the Foundation.

(e)   Contracts and Documents. To the knowledge of the Foundation, all contracts or documents delivered by the Foundation to the City in connection with this Agreement are true, correct and complete originals or copies of such documents, and are in full force and effect, without default by (or notice of default to) any party.

As used in this Agreement, the phrases "to the knowledge of the Foundation" and "to the Foundation's knowledge" or similar language mean the actual, current knowledge, without independent investigation, of Robbin Cohen, at the time such representations and warranties are made by the Foundation hereunder.

    4.    <u>Title</u>. Except to the extent set forth in <u>Section 2(a)</u> above, the City makes no warranty or representation with respect to the marketability or quality of title to the Property. The City shall furnish to the Foundation, within ten (10) business days following the Effective Date, copies of all abstracts of title, title reports, title insurance policies and plats of survey in the possession of the City and the Park District. The City, however, is not under any obligation to furnish any new or additional abstracts of title, title reports, title insurance policies in respect of the Property. The Foundation heretofore has been furnished with a title insurance commitment for the Property, with an effective date of June 5, 2017 (the "**Commitment**"), issued by Chicago Title Insurance Company. If it wishes to obtain title insurance in respect of the Property, and such title insurance is available for the Foundation's interest under the Use Agreement, the Foundation shall be solely responsible for, and shall pay all costs associated with, updating the Commitment (including all search, continuation and later-date fees), obtaining a new title commitment from another title insurance company (the title insurance company selected by the Foundation to issue the Title Policy (hereinafter defined) being herein referred to as the "**Title Company**"), and, except for the City's obligations described below, obtaining such title insurance, extended coverage or any other endorsements it deems necessary (the "**Title Policy**"). The Foundation shall be responsible for obtaining any utility letters or other documents needed to obtain extended coverage and the City will cooperate with the Foundation in connection therewith. The Foundation, at its own expense, shall obtain a plat of survey of the Property (the "**Survey**").

    The Foundation shall have the right to object to matters that are not Permitted Exceptions (hereinafter defined) shown on the Commitment, the documents referred to in the Commitment (the "**Title Documents**"), and the Survey and in any subsequent updates thereof (herein collectively called "**Other Exceptions**"). Any Other Exceptions to which the Foundation objects by delivery of written notice to the City are herein collectively called "**Title Objections**." The City, at or prior to the Closing, shall remove or cause to be removed Title Objections to the extent such Title Objections (a) are (i) recorded against or affect the Property, and (ii) are mechanics or materialmen's liens, mortgage financing documents, liens evidencing monetary encumbrances or liens created or suffered to exist by the City or the Park District or any of their respective agents or affiliates or (b) are otherwise required to be removed pursuant to the terms of this Agreement (collectively, "the **Required Clearance Exceptions**"). To the extent any Title Objections affecting the Property may be removed by the exercise of the City's eminent domain authority, the City will make reasonable, good faith efforts to obtain City Council approval to exercise such authority.

    In addition, the City may elect, but shall not be obligated, to remove or cause to be removed at its expense any other Title Objections. If any such other Title Objections are not cured or insured over in a manner reasonably acceptable to the Foundation, or are incapable of being cured, the Foundation may waive such Title Objections or elect to terminate this Agreement prior to the Closing by providing written notice to the City. After any such termination the only rights, duties, obligations and liabilities of the parties under this Agreement shall be those which survive termination, including but not limited to, <u>Section 8</u> (Inspections), <u>Section 17</u> (Real Estate Commissions) and <u>Section 37</u> (Survival) of this Agreement. By effectuating the Closing on the Closing Date, the Foundation shall be deemed to have accepted all uncured Title Objections. As used herein, the term "**Permitted Exceptions**" shall mean and include: (a) applicable zoning and building ordinances and land use regulations, (b) the lien of

taxes and assessments not yet due and payable, (c) any exceptions to title caused by the Foundation, its agents, representatives or employees, (d) the standard exceptions in an ALTA title insurance policy, and (e) two (2) utility corridors, each including a no-build restriction, as follows: (i) a 20' easement along the northern boundary line of the Property, and (ii) a 20' easement along the eastern boundary line of the Property.[1]

     5.    <u>Covenants of the City</u>. The City, with respect to the Property, covenants and agrees with the Foundation that between the Effective Date and the Closing Date:

     (a)   <u>Maintenance and Operation</u>. The City shall not (i) initiate or support any zoning reclassification of the Property, any variance under existing zoning ordinances applicable to the Property, the imposition of any restrictive covenants or easements or other encumbrances on the Property, or the execution or filing of any subdivision plat affecting the Property, without in each instance the prior written permission of the Foundation; (ii) enter into or renew, extend, modify or replace any agreement or other contractual obligation with respect to or affecting the Property, without the prior written permission of the Foundation, provided that such permission shall not be required if such agreement or other contractual obligation does not have a term extending beyond the Closing Date; (iii) cause or permit any grading, excavation or construction upon the Property or any addition, alteration or removal of any improvements forming a part of the Property, without the prior written permission of the Foundation, provided that such permission shall not be required if such work is conducted either (A) as part of the performance by the City of its obligations hereunder or under the Environmental Remediation Agreement (hereinafter defined) or, prior to the Closing, in connection with roadway and utility relocation work, or (B) in the ordinary course of the present use of the Property and is necessary to the continued use and operation of the Property as a public park; and (iv) initiate or support any change in any Applicable Laws, rulings or orders applicable specifically to the Property (as opposed to real property generally) without the prior written permission of the Foundation.

     (b)   <u>Notification of Litigation</u>. The City shall promptly notify the Foundation of any litigation or administrative proceeding, of which the City becomes aware, concerning or affecting the Property or the use or operation thereof or the ability of the City to perform its obligations under this Agreement.

     (c)   <u>Notification of Violation of Laws</u>. The City shall promptly notify the Foundation in writing of any alleged violation of Applicable Laws relating to the Property of which the City becomes aware, and promptly provide to the Foundation copies of any notices which it receives from Governmental Authorities with respect to the alleged violation of any Applicable Laws relating to the Property.

     (d)   <u>Notification of Change of Laws</u>. The City shall promptly notify the Foundation in writing of any proposed or effectuated change in any Applicable Laws,

---

[1] City and Foundation to review and finalize plans for relocation of 12" CPD sanitary sewer line, which may include/require widening of portions of the easement area on the eastern boundary, at its southern end, to up to 30' in width, and may require an easement along the southern boundary of the Property.

rulings or orders, of which the City is or becomes aware, that might affect the Proposed Use of the Property by the Foundation.

(e)  No Lien or Assignment.  The City shall not: (i) without the prior written consent of the Foundation, create, place or permit to be created or placed, or through any act or failure to act, acquiesce in the placing of, or allow to remain, any deed of trust, mortgage, voluntary or involuntary lien, whether statutory, constitutional or contractual, security interest, encumbrance or charge, or conditional sale or other title retention document, against or covering the Property, or any part thereof, and should any of the foregoing become attached hereafter in any manner to any part of the Property without the prior written consent of the Foundation, the City shall cause the same to be promptly discharged and released; or (ii) sell, exchange, assign, transfer, convey or otherwise dispose of all or any part of the Property or any interest therein, or permit any of the foregoing.

(f)  Tax Exempt Status.  The City shall not take any action, or fail to take any action, that eliminates or places at risk the tax exempt status of the Property.

(g)  Agreements.  The City shall not execute any agreement affecting the Property without the express prior written approval of the Foundation, which approval shall not be unreasonably withheld, provided that such written approval shall not be required if such agreement (i) does not have a term extending beyond the Closing Date, (ii) is terminable by the City on not more than 10 days prior notice, (iii) will not be binding on the Property or the Foundation after the Closing Date, and (iv) will not hinder any investigations of the condition of the Property by the Foundation.

(h)  Marketing.  The City shall not market or show the Property to any prospective purchasers.

(i)  Covenant of Further Assurances.  The City shall (i) promptly correct any defect, error or omission which may be discovered in the contents of this Agreement or in any of the Exhibits hereto; and (ii) do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Agreement, provided that if such acts will require City Council approval, the City shall endeavor to obtain such approval and, if obtained, shall do such acts.

(j)  No Frustration of Representations.  The City shall not enter into, approve, or permit any agreement, or take any action or fail to take any action, which would cause any of the representations and warranties set forth in Section 2 above to no longer be true and correct in all material respects.

(k)  Covenant to Defend Validity of Agreement.  The City agrees that, if the City's authority to enter into this Agreement or to perform its obligations hereunder is challenged, the City will defend the validity and enforceability of this Agreement.

(l)  Covenant re Pre-Turnover Utility Relocation Work.  The City will diligently perform or cause to be performed such work specified in paragraph (A) of

Exhibit F attached hereto (the "**Pre-Turnover Utility Relocation Work**") in accordance with the schedule for performance set forth on Exhibit F.

(m)  Covenant re Other Utility Relocation Work.  The City will diligently perform or cause to be performed such other work specified in Exhibit F attached hereto (together with the Pre-Turnover Utility Relocation Work, the "**Utility Relocation Work**") in accordance with the schedule for performance set forth on Exhibit F.

6.    Covenants of the Foundation.  The Foundation covenants and agrees with the City that between the Effective Date and the Closing Date:

(a)    Payment of Pre-Construction Obligations.  The Foundation shall cause all uncontested and lienable debts and liabilities of the Foundation for labor, material and services incurred in connection with pre-construction obligations relating to the Property, and all other uncontested and lienable pre-construction obligations of the Foundation, including architectural, design and engineering, to be paid in accordance with the terms of payment therefor.  If the Foundation contests any such debts or liabilities, the Foundation shall furnish such security as the City may deem reasonably necessary to insure the ultimate payment of the contested amount.

(b)    Notification of Litigation.  The Foundation shall promptly notify the City of any litigation or administrative proceeding, of which the Foundation becomes aware, concerning or affecting the Property or the use or operation thereof or the ability of the Foundation to perform its obligations under this Agreement.

(c)    Notification of Violation of Laws.  The Foundation shall promptly provide to the City copies of any notices which it receives from Governmental Authorities (other than the City) with respect to the alleged violation of any Applicable Laws relating to the Property.

(d)    Covenant of Further Assurances.  The Foundation shall (i) promptly correct any defect, error or omission which may be discovered in the contents of this Agreement or in any of the Exhibits hereto; and (ii) do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Agreement; provided that if such acts will require Foundation board approval, the Foundation shall endeavor to obtain such approval and, if obtained, shall do such acts.

7.    Environmental Matters.    Contemporaneously with the execution of this Agreement, the City and the Foundation shall execute and enter into that certain Environmental Remediation and Indemnity Agreement in the form attached hereto as Exhibit G (the "**Environmental Remediation Agreement**").

8.    Inspections and Pre-Closing Access to Property.  The Foundation's obligation to accept the Property is conditioned upon the Foundation being satisfied with the condition (including, but not limited to, the legal, physical and environmental condition) of the Property for the construction and operation of the Presidential Center and the other Project Improvements. The Foundation shall have the right, at its sole expense, to enter the Property to inspect the same,

perform surveys, environmental assessments, surface and subsurface tests, and any other due diligence it deems necessary or desirable to satisfy itself as to the condition of the Property, subject, however, to (a) the terms and conditions of the Environmental Remediation Agreement, and (b) prior approval of the National Park Service and the Federal Highway Administration of any physical work to be conducted on or in the Property by or on behalf of the Foundation during the period preceding the City's receipt of the Pre-Turnover Governmental Determinations (hereinafter defined). The City, as owner of the Property and applicant in respect of the Pre-Turnover Governmental Determinations, will initiate communications with the National Park Service and the Federal Highway Administration in connection with seeking approval of any such physical work, and the City and the Foundation will cooperate in support of the efforts to obtain such approvals. The Foundation shall perform any inspections or tests during normal business hours, and the City (and the Park District) shall have the right to have a representative present. The Foundation also shall have the right, provided it obtains the prior consent of the City (and the Park District), which consent will not be unreasonably withheld, to maintain periodic community, media and/or fundraising events on the Property prior to the Closing. Prior to entering the Property, the Foundation shall provide proof of insurance as required by that certain Property Access Agreement dated as of May 20, 2015, among the City, the Park District and the Foundation. The Foundation shall promptly repair any damage to the Property caused by any actions of the Foundation or its agents or contractors and restore the Property to substantially the condition which existed immediately prior to such activity. The Foundation shall indemnify, defend (through an attorney reasonably acceptable to the City), and hold the City, the Park District and their respective officers, employees, agents and representatives (collectively, the **"City Parties"**) harmless from any loss, injury, damage, claim, lien, cost or expense, including attorneys' fees and costs, sustained by the City Parties, or any one of them, caused as a result of or arising out of any such inspections, tests or special events by the Foundation or its representatives on the Property and such indemnification shall survive the termination of this Agreement (regardless of the reason for such termination) and shall survive the Closing. If the Foundation determines that it is not satisfied, in its sole discretion, with the condition (including, but not limited to, the legal, physical and environmental condition) of the Property, the Foundation may terminate this Agreement by written notice to the City any time on or subsequent to March 1, 2019 and prior to the earlier of (a) the Closing, or (b) the second anniversary of the Effective Date. After any such termination, the only rights, duties, obligations and liabilities of the parties under this Agreement shall be those which survive termination, including but not limited to, this Section 8 (Inspections), Section 17 (Real Estate Commissions) and Section 37 (Survival) of this Agreement.

9.     Governmental Determinations.

(a)     Foundation Obligations. The Foundation, at its sole expense, shall apply for and diligently pursue securing such permits, licenses and other approvals required to commence construction of the Presidential Center in accordance with Applicable Law, excluding the Pre-Turnover Governmental Determinations (hereinafter defined).

(b)     City Obligations. The City, at its sole expense, shall apply for and diligently pursue (i) securing final decision/approval documents under the National Environmental Policy Act ("NEPA") from the National Park Service for a conversion under the Urban Park and Recreation Recovery Act, (ii) securing final decision/approval

documents under NEPA from the Federal Highway Administration in anticipation of funding under the Federal-Aid Highway Act for roadway improvements in Jackson Park, and (iii) completion of a consultation process under Section 106 of the National Historic Preservation Act, including if necessary, entry by the City into a memorandum of agreement to address known adverse effects on historic properties (the "**Pre-Turnover Governmental Determinations**"). The Foundation shall cooperate with the City in furtherance of the City's efforts to obtain the Pre-Turnover Governmental Determinations, it being the intention of the City and the Foundation to obtain the Pre-Turnover Governmental Determinations prior to the Closing Date.

10.    Notification of Closing. The closing of the transactions contemplated under this Agreement (the "**Closing**") shall occur on a date (the "**Closing Date**") designated by the Foundation. The Foundation shall designate the Closing Date by sending a notice (the "**Closing Notice**") thereof to the City at least 30 days prior to the designated Closing Date.

11.    Conditions to the Foundation's Obligation to Close. The following shall be conditions precedent to the Foundation's obligation to close this transaction:

(a)    City's Representations, Warranties and Covenants. On the Closing Date, all of the City's representations in Section 2 of this Agreement shall be true and correct as if made on the Closing Date (except to the extent any such representations and warranties are made with respect to a specific date, in which event such representation and warranty shall be true and correct in all material respects as of such date), and the City shall not be in material breach of any covenants, agreements or obligations required to be performed by the City on or before the Closing Date hereunder or under the Environmental Remediation Agreement.

(b)    Not Affected by Disaster. On the Closing Date, neither the Property nor any material part thereof shall have been, or be threatened to be, materially adversely affected in any way as a result of fire, explosion, earthquake, disaster, accident, labor dispute, any action by the United States or any other Governmental Authority, flood, embargo, riot, civil disturbance, uprising, activity of armed forces, or act of God or public enemy.

(c)    No Condemnation. On the Closing Date, neither the Property nor any part thereof shall be subject to any condemnation or threat of condemnation.

(d)    Building Permit. On the Closing Date, no fact, condition or impediment shall exist which would prevent the Foundation from obtaining all necessary building permits from the appropriate Governmental Authorities for the Proposed Use on the Property.

(e)    Soil Tests. The Foundation shall have obtained the written opinion of a duly licensed soil engineer to the effect that there are no soil compaction or expansion characteristics, rock, surface or subterranean, water, or other conditions which shall require soil treatment or replacement, blasting, water diversion, or structural

construction on the Property for the Proposed Use other than the minimum required by the applicable building codes of the City.

(f)     Title.   On the Closing Date, the Foundation shall be satisfied with the condition of title and the Title Company shall be unconditionally committed (but for receipt of payment of the applicable premium and related costs and expenses) to issue the Title Policy (if such a policy is available).

(g)     Survey.   On the Closing Date, there shall not exist any easement, right-of-way, encroachment, conflict or protrusion with respect to the Property that is not acceptable to the Foundation.

(h)     Pre-Development Permits.   On the Closing Date, the Foundation shall have obtained such permits, licenses and other approvals as are necessary for the Foundation to commence site work on the Property, excluding the Pre-Turnover Governmental Determinations (collectively, the "**Pre-Development Permits**"), and there shall be in existence no judicial, quasi-judicial, administrative or other proceeding which might materially adversely affect their validity.

(i)     Pre-Turnover Governmental Determinations and Pre-Turnover Utility Relocation Work.   On the Closing Date, the City shall have (i) obtained the Pre-Turnover Governmental Determinations, and (ii) completed the Pre-Turnover Utility Relocation Work; provided, that in the event that the Closing Date designated by the Foundation in the Closing Notice is earlier than the Target Utility Relocation Date (as defined in Exhibit F hereto), and the condition to Closing set forth in clause (ii) of this Section 11(i) above has not been satisfied as of the occurrence of the Closing, then the Foundation shall be deemed to have waived the condition to Closing set forth in said clause (ii) of this Section 11(i) (but any such waiver of such condition to Closing shall not be deemed to relieve the City from its obligation to perform the Pre-Turnover Utility Relocation Work as provided in this Agreement, it being understood that the City shall complete the Pre-Turnover Utility Relocation Work after Closing in such event).

(j)     Architect.   On the Closing Date, there has been no notice from the Architect to the Foundation that the Architect is unable to design the Presidential Center on the Property.

(k)     Consent or Approval.   On the Closing Date all approvals and/or consents of all persons and/or entities shall have been obtained by the Foundation that are necessary or required for the consummation of the Closing.

(l)     Environmental.   If the City shall have elected to submit the Property or any portion thereof to the SRP (as defined in the Environmental Remediation Agreement), the Illinois Environmental Protection Agency shall have issued a Remedial Action Plan approval letter with respect to the Property or applicable portion thereof in accordance with the Environmental Remediation Agreement.

Case: 1:28-cv-02928 Document #: 426 Filed: 04/03/2020 Page 07 of 342 PageID #:4088

If any one of the above conditions is not satisfied, the Foundation may, at its option, waive such condition or the Foundation may terminate this Agreement by giving written notice of such termination to the City. After any such termination, the only rights, duties, obligations or liabilities of the parties under this Agreement shall be those which survive termination, including but not limited to, Section 8 (Inspections), Section 17 (Real Estate Commissions) and Section 37 (Survival) of this Agreement. If, however, any of the above conditions is not satisfied as a result of a breach by the City of any of the covenants or agreements to be performed or observed by the City hereunder, the Foundation may exercise such rights and remedies, if any, that the Foundation may have pursuant to the terms of Section 14 below.

12.　Conditions to the City's Obligation to Close. The following shall be conditions precedent to the City's obligation to close this transaction:

(a)　Foundation's Representations, Warranties and Covenants. On the Closing Date, all of the Foundation's representations and warranties set forth in Section 3 of this Agreement shall be true and correct in all material respects as if made on the Closing Date (except to the extent any such representations and warranties are made with respect to a specific date, in which event such representation and warranty shall be true and correct in all material respects as of such date) and the Foundation shall not be in material breach of any material covenants, agreements or obligations required to be performed by the Foundation on or before the Closing Date hereunder.

(b)　Pre-Development Permits. The Foundation shall have obtained the Pre-Development Permits, and there shall be in existence no judicial, quasi-judicial, administrative or other proceeding alleging a violation by the Foundation of Applicable Law which might materially adversely affect their validity.

(c)　Pre-Turnover Governmental Determinations. On the Closing Date, the City shall have obtained the Pre-Turnover Governmental Determinations.

(d)　Survey. The Foundation shall have furnished the City with a copy of the Survey.

(e)　Insurance. The Foundation shall have submitted to the City evidence of insurance coverage as required in the Use Agreement.

(f)　Plans. The Foundation shall have submitted to the City a copy of the plans and specifications prepared by the Foundation's architect (the "**Architect**"), as submitted to the City as the basis for obtaining PD Approval and the other then–issued Pre-Development Permits (the "**Current Plans**"), together with a certification of same from the Architect.

(g)　Budget. The Foundation shall have submitted to the City a written budget, prepared by the Foundation, showing the projected Total Construction Costs (as that term is defined in the Use Agreement) of the Presidential Center based on the Current Plans (the "**Projected Total Construction Costs**").

(h)　Construction Funds. The Foundation shall have submitted to the City a certification that the Foundation has received funds and/or gift pledge commitments in writing that in the aggregate equal or exceed the Projected Total Construction Costs of the Presidential Center.

(i)　MBE/WBE and City Residency Hiring Compliance Plan. The Foundation and the Foundation's general contractor and all major subcontractors shall have met with staff from DPD regarding compliance with the MBE/WBE, city residency hiring and other requirements set forth in the Use Agreement, and DPD shall have approved the Foundation's compliance plan in accordance therewith.

(j)　Endowment. The Foundation shall have established an endowment having as its sole purpose paying, as and when necessary, the costs to operate, enhance and maintain the Presidential Center and the other Project Improvements during the term of the Use Agreement.

If any one of the above conditions is not satisfied by the Closing Date, the City may, at its option, waive such condition or, if the City does not waive such condition, the Closing Date shall be deemed postponed until such later date designated by the Foundation in a subsequent Closing Notice. If any condition is not satisfied by the subsequent Closing Notice, then the Closing Date shall be deemed further postponed as described in the above sentence, and this procedure shall continue until the outstanding conditions are satisfied or waived. Postponements of the Closing Date, as contemplated in this paragraph are subject in all events to the City's and the Foundation's right to terminate this Agreement if the Closing shall have not occurred by the Outside Closing Date as contemplated in Section 14(a) below.

13.　The Closing. The Closing shall take place at the offices of the Foundation's legal counsel, Katten Muchin Rosenman LLP, in Chicago, Illinois, on the Closing Date specified in the Closing Notice.

(a)　Closing. In connection with the Closing:

(i)　Title Policy. If the Foundation has elected to obtain a Title Policy (and such Title Policy is available for the Foundation's interest under the Use Agreement), the Title Company shall issue the Title Policy.

(ii)　Closing Costs. The escrow fee charged by the Title Company shall be paid by the Foundation. The fee for any recording of the Use Agreement or a memorandum thereof shall be borne by the party that elects to effectuate such recording. Each party shall be responsible for the payment of its own attorneys' fees incurred in connection with the transaction which is the subject of this Agreement. All other costs and expenses incurred by the City and the Foundation prior to the execution of this Agreement shall be the sole responsibility of the party incurring such costs and expenses.

(iii)　Possession; Condition of Property at Closing. The City shall make the Property available to the Foundation at Closing, subject to Section 4.14 of the Use Agreement, in substantially the same condition as exists on the Effective

Date, except for (A) ordinary wear and tear and damage resulting from casualty or the Foundation's inspections; (B) such modifications to the Property resulting from the performance by the City of the Utility Relocation Work, roadway work, and such other obligations of the City set forth herein or in any other agreement executed by the City or the Park District; and (C) such other modifications to the condition of the Property as the Foundation shall have approved in writing.

(b)　City's Closing Deliveries. At Closing, the City shall deliver or cause to be delivered the following:

(i)　Use Agreement. The Use Agreement, substantially in the form of Exhibit C attached hereto, executed by the City.

(ii)　Non-Foreign Status Affidavit. A non-foreign status affidavit, as required by Section 1445 of the Internal Revenue Code, executed by the City.

(iii)　Evidence of Authority. Documentation to establish to the Foundation's reasonable satisfaction the due authorization of the City's execution of all documents contemplated by this Agreement.

(iv)　Update Certificate. A certificate, executed by the City, certifying that as of the Closing Date all of the representations and warranties of the City contained herein are true and correct (with appropriate modifications of such representations and warranties to reflect any changes therein not known to the City as of the Effective Date) or identifying any representation or warranty which is not, or no longer is, true and correct and explaining the state of facts giving rise to the change.

(v)　Other Documents. A closing statement, if applicable, executed by the City, and such other documents as may be reasonably required by the Title Company to effectuate the Closing.

(c)　Foundation Closing Deliveries. At the Closing, the Foundation shall deliver or cause to be delivered the following:

(i)　Use Agreement. The Use Agreement, substantially in the form attached hereto as Exhibit C, executed by the Foundation.

(ii)　Evidence of Authority. Documentation to establish to the City's reasonable satisfaction the due authorization of the Foundation's execution of all documents contemplated by this Agreement.

(iii)　Economic Disclosure Statement. An Economic Disclosure Statement, in the City's then current form, dated as of the Closing Date, to the extent then required by Applicable Laws.

(iv)　Update Certificate. A certificate, executed by the Foundation, certifying that as of the Closing Date all of the representations and warranties of

the Foundation contained herein are true and correct (with appropriate modifications of such representations and warranties to reflect any changes therein not known to the Foundation as of the Effective Date) or identifying any representation or warranty which is not, or no longer is, true and correct and explaining the state of facts giving rise to the change.

(v)     Other Documents. A closing statement, if applicable, executed by the Foundation, and such other documents as may be reasonably required by the Title Company to effectuate the Closing.

14.     Termination; Cure Obligation; Remedies.

(a)     Events of Termination. This Agreement may be terminated at any time prior to the Closing (unless another time period is specified in the referenced section) in and under the following circumstances, by:

(i)     the Foundation under the provisions of Section 4 (Title), Section 8 (Inspections), or Section 11 (Conditions to the Foundation's Obligation to Close) of this Agreement;

(ii)     the mutual written consent of the Foundation and the City;

(iii)     either the Foundation or the City, if the Closing shall not have occurred on or before the date (the "**Outside Closing Date**") that is the seventh (7th) anniversary of the Effective Date, by delivery of written notice of such termination not later than the fifth (5th) business day following the Outside Closing Date; provided that the right to terminate under this Section 14(a)(iii) shall not be available to any party whose failure to fulfill any obligation hereunder has been the cause of, or resulted in, the failure of the Closing to occur by such date.

(b)     Procedures for Termination. If a party is entitled to terminate this Agreement pursuant to Section 14(a) and chooses to do so, then such party shall deliver a notice to the other party to the effect that the notifying party thereby terminates this Agreement. The notice delivered pursuant to the immediately-preceding sentence must be in writing and must specify in reasonable detail the factual basis for the termination of this Agreement.

(c)     Effect of Termination. Upon a termination of this Agreement pursuant to this Section 14, neither the Foundation nor the City nor any of their respective directors, officers, employees, trustees, beneficiaries, agents, consultants, or attorneys (irrespective of when any such person held such status) shall have any further rights, duties, obligations or liabilities under this Agreement except for those which survive termination, including but not limited to, Section 8 (Inspections), Section 17 (Real Estate Commissions) and Section 37 (Survival) of this Agreement.

(d)     Cure Obligation. Each party shall use commercially reasonable efforts (which shall include the reasonable expenditure of necessary funds) to cure, prior to

Closing, (i) all material breaches of representations and warranties of such party (or matters requiring modification thereto due to changed circumstances), and (ii) all Required Clearance Exceptions.

(e)    Remedies - The City.    The Foundation shall be in default under this Agreement if (i) all of the conditions to the Foundation's obligation to close, as specified in Section 11 of this Agreement, have been satisfied or waived, and (ii) the Foundation fails or refuses to execute and deliver any of the items required by Section 13 of this Agreement to be executed and delivered by the Foundation for any reason other than a default by the City hereunder or the termination of this Agreement by the Foundation or the City pursuant to the terms and provisions of this Agreement. If the Foundation is in default under this Agreement as provided in this Section 14(e) or is in default under any other provision of this Agreement, the City, without regard to any limitations set forth elsewhere in this Agreement, shall have all of the rights and remedies available at law or in equity under the laws of the State of Illinois or other applicable law, **but not punitive, consequential or other special damages, recovery of which is hereby waived by the City.**

(f)    Remedies - The Foundation.    The City shall be in default under this Agreement if (i) all the conditions to the City's obligation to close, as specified in Section 12 of this Agreement, have been satisfied or waived, and (ii) the City fails or refuses to execute and deliver any of the items required by Section 13 of this Agreement to be executed and delivered by the City for any reason other than a default by the Foundation hereunder or the termination of this Agreement by the Foundation or the City pursuant to the terms and provisions of this Agreement. If the City is in default under this Agreement as provided in this Section 14(f) or is in default under any other provision of this Agreement, the Foundation, without regard to any limitations set forth elsewhere in this Agreement, shall have all of the rights and remedies available at law or equity under the laws of the State of Illinois or other applicable law, **but not punitive, consequential or other special damages, recovery of which is hereby waived by the Foundation.**

(g)    Mediation of Disputes.    If there is a dispute between the City and the Foundation in relation to the provisions of this Agreement (a **"Dispute"**), and such Dispute is not resolved within 15 days after same has arisen, each of the City and the Foundation shall have the right to submit such Dispute to non-binding mediation. Mediation of any Dispute may be initiated by either party by such party delivering a written demand therefor to the other. With respect to such mediation, the City and the Foundation shall, within ten days after delivery of such written notice to the other party, agree upon a mediator who is (a) a reputable person actively engaged in the commercial real estate industry for a continuous period of not less than ten years; and (b) not an affiliate or one who has had material business dealings with either party. If the parties are unable to agree upon a mediator, a mediator having the qualifications set forth above shall be appointed by the American Arbitration Association office in Chicago, Illinois. Such mediation shall occur within 30 days after the mediator has been agreed upon or appointed and shall occur at a mutually acceptable location in Chicago, Illinois. The costs of such mediation services shall be shared equally by the City and the

Foundation (but each party shall bear the cost of its own travel and attorneys' fees). Notwithstanding the provisions of this Section 14(g), the Foundation and the City may each exercise all remedies to which it is entitled while contemporaneously pursuing mediation pursuant to this Section 14(g).

15.    Further Agreements by the City.  In addition to the obligations required to be performed under this Agreement by the City at the Closing, the City agrees to perform such other acts, and to execute, acknowledge, and/or deliver subsequent to the Closing such other supporting instruments, documents and other materials as the Foundation may reasonably request in order to effectuate the consummation of the transactions contemplated in this Agreement.

16.    Further Agreements by the Foundation.  In addition to the obligations required to be performed under this Agreement by the Foundation at the Closing, the Foundation agrees to perform such other acts, and to execute, acknowledge, and/or deliver subsequent to the Closing such other instruments, documents, and other materials as the City may reasonably request in order to effectuate the consummation of the transactions contemplated in this Agreement.

17.    Real Estate Commissions.  Each party hereto represents to the other that it has not authorized any broker or finder to act on its behalf in connection with the transaction contemplated under this Agreement and that it has not dealt with any broker or finder purporting to act on behalf of any other party. Each party hereto agrees to indemnify and hold harmless the other party from and against any and all claims, losses, damages, costs or expenses of any kind or character arising out of or resulting from any agreement, arrangement or understanding alleged to have been made by such party or on its behalf with any broker or finder in connection with this Agreement or the transaction contemplated hereby. Notwithstanding anything to the contrary contained herein, this Section 17 shall survive the Closing or any earlier termination of this Agreement.

18.    Notice.    Any notice or communication required or permitted under this Agreement shall be given in writing, sent by (a) personal delivery; (b) commercial courier or delivery service with proof of delivery; (c) United States regular, registered or certified mail, postage prepaid; or (d) confirmed electronic transmission, addressed as follows:

|  |  |
|---|---|
| If to the City: | City of Chicago<br>Department of Planning & Development<br>121 North LaSalle Street, Room 1000<br>Chicago, Illinois 60602<br>Attn: Commissioner<br>E-mail: _____ |
| with a copy to: | City of Chicago Department of Law<br>121 North LaSalle Street, Suite 600<br>Chicago, Illinois 60602<br>Attn: Real Estate and Land Use Division<br>E-mail: _____ |

if to the Foundation:    The Barack Obama Foundation
                         5235 S. Harper Court, Suite 1100
                         Chicago, Illinois 60615
                         Attn: Robbin Cohen
                         E-mail: rcohen@obama.org

with a copy to:          Seth R. Madorsky
                         Katten Muchin Rosenman LLP
                         525 W. Monroe Street
                         Chicago, IL 60661-3693
                         E-mail: seth.madorsky@kattenlaw.com

or to such other address or to the attention of such other person as hereafter shall be designated in
writing by the applicable party sent in accordance herewith. Any such notice or communication
may be given by a party to this Agreement or by a party's attorney, and shall be effective when
delivered during normal business hours. If delivery of a notice is refused, it shall be deemed to
have been delivered at the time of such refusal of delivery.

    19.    Professional Fees. If any party hereto institutes any action or proceeding against
the other party with regard to this Agreement, the prevailing party in such action shall be entitled
to recover from the losing party, in addition to the costs and expenses of and related to the suit,
its actual reasonable attorneys' fees.

    20.    Survival of Representations and Warranties. All representations and warranties
made in this Agreement shall be continuing and shall be true and correct on and as of the Closing
Date with the same force and effect as if made at that time, and all of the representations,
warranties and covenants contained in this Agreement shall survive the Closing and shall not
merge with the Use Agreement and shall not be affected by any investigation, verification or
approval by any party hereto or by anyone acting on behalf of any such party.

    21.    Titles and Subtitles. The titles of the articles, sections, and subsections of this
Agreement are for convenience of reference only and are not to be considered in construing this
Agreement.

    22.    ENTIRE AGREEMENT. THIS AGREEMENT, TOGETHER WITH ALL
EXHIBITS ATTACHED HERETO, EMBODIES THE ENTIRE AGREEMENT BETWEEN
THE PARTIES RELATIVE TO THE SUBJECT MATTER HEREOF, AND THERE ARE NO
ORAL OR WRITTEN AGREEMENTS BETWEEN THE PARTIES, NOR ANY
REPRESENTATIONS MADE BY EITHER PARTY RELATIVE TO THE SUBJECT
MATTER HEREOF WHICH ARE NOT EXPRESSLY SET FORTH HEREIN.

    23.    Amendments. This Agreement may be amended only by a written instrument
executed by the City and the Foundation.

    24.    Waiver. Neither this Agreement nor any provision hereof may be waived,
discharged or terminated except as provided herein or by an instrument in writing signed by the
party against which the enforcement of such waiver, discharge or termination is sought, and then
only to the extent set forth in such instrument.

Case: 1:18-cv-02926 Document #: 416 Filed: 04/04/23 Page 113 of 342 PageID #:4096

25.    Assignability. The Foundation may not assign its interest in and to this Agreement. The City may not assign its interest in and to this Agreement, except to another Governmental Authority, provided that any such assignment shall not relieve the City of its obligations hereunder.

26.    Successors and Assigns. This Agreement and all terms, provisions, covenants and conditions contained in this Agreement shall apply to, be binding upon and shall inure to the benefit of and be enforceable by each of the parties to this Agreement and the respective successors and permitted assigns of the parties to this Agreement.

27.    Days and Time. Any reference in this Agreement to a "day" or "days" shall mean a calendar day or days, and not a business day or days, unless the provision expressly refers to a "business" day or day. In the event that a day or date or the last day of a period provided for or referred to in this Agreement shall fall on a Saturday, Sunday or legal holiday in the City of Chicago, then such day or date or the last day of such period shall be automatically extended to the next day which is not a Saturday, Sunday or legal holiday in the City of Chicago. If the term "business day" is used in this Agreement, such term means any day which is not a legal holiday in the City of Chicago.

28.    Time. Time is of the essence of this Agreement.

29.    Gender and Number. Words of any gender used in this Agreement shall be held and construed to include any other gender, and words in the singular or plural number shall be held to include the other, unless the context otherwise requires.

30.    Severability. If any provision of this Agreement or the application thereof to any person or circumstance is invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

31.    Counterparts; Electronic Signatures. This Agreement and any modification or amendment to this Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument. Receipt of an executed signature page to this Agreement or any modification or amendment of this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof.

32.    Rule of Construction Inapplicable. The parties to this Agreement acknowledge and confirm that their respective attorneys have participated jointly in the review and revision of this Agreement and that this Agreement has not been written solely by counsel for one of the parties. The parties to this Agreement therefore stipulate and agree that the rule of construction to the effect that any ambiguities are to or may be resolved against the drafting party shall not be employed in the interpretation of this Agreement to favor either party against the other.

33.    No Joint Venture. Nothing contained in this Agreement between the parties is intended by the parties to create a partnership or joint venture between the parties to this Agreement and any implication to the contrary is hereby expressly disavowed. It is understood and agreed that this Agreement does not create a joint enterprise, nor does it appoint either party

to this Agreement as an agent of the other for any purpose whatsoever. Neither party to this Agreement shall in any way assume any of the liability of the other for acts of the other or obligations of the other.

34.     No Third-Party Beneficiaries. Nothing in this Agreement is intended or shall be construed to confer upon any person or entity (other than the parties hereto and their respective successors and permitted assigns) any benefit, right, remedy or cause of action under or by reason of this Agreement.

35.     Governing Law; Venue. THIS AGREEMENT SHALL BE GOVERNED AND INTERPRETED AND THE RIGHTS OF THE PARTIES TO THIS AGREEMENT GOVERNED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS APPLICABLE TO AN AGREEMENT EXECUTED, DELIVERED AND PERFORMED IN SUCH STATE. Each party to this Agreement hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Northern District of Illinois, and, if such court does not have jurisdiction, to the courts of the State of Illinois in Cook, County, for the purposes of any action arising out of this Agreement, or the subject matter of this Agreement brought by any other party. Each party hereto hereby agrees to venue in Chicago, Illinois.

36.     Delays or Omissions. Except as otherwise provided herein to the contrary, no delay or omission to exercise any right, power or remedy inuring to any party to this Agreement upon any breach or default of any party under this Agreement shall impair any such right, power or remedy of such party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. All remedies either under this Agreement or by law or in equity afforded to the parties to this Agreement shall be cumulative and not alternative.

37.     Survival. Each provision of this Agreement containing rights and obligations that by their nature require the payment of money or the performance of obligations after the Closing or termination of this Agreement shall survive such Closing or termination.

*(Signature Page Follows)*

**IN WITNESS WHEREOF**, this Master Agreement is executed by the City and the Foundation as of the Effective Date.

**CITY OF CHICAGO**, an Illinois municipal corporation

By: _____

David L. Reifman
Commissioner of Planning & Development

**THE BARACK OBAMA FOUNDATION**, a District of Columbia non-profit corporation

By: _____

Name: _____

Its: _____

[(Sub)Exhibit "A" referred to in this Master Agreement with
The Barack Obama Foundation constitutes Exhibit "A"
to ordinance printed on pages 85887 and
85888 of this *Journal*.]

(Sub)Exhibit "B" referred to in this Master Agreement with The Barack Obama
Foundation printed on page 85972 of this *Journal*.]

[(Sub)Exhibit "C" referred to in this Master Agreement with The Barack Obama
Foundation constitutes Exhibit "D" to ordinance printed
on pages 85891 through 85934 of this *Journal*.]

[(Sub)Exhibit "D" referred to in this Master Agreement with The Barack Obama Foundation
constitutes (Sub)Exhibit "B" to Environmental Remediation and Indemnity
Agreement printed on page 85982 of this *Journal*.]

[(Sub)Exhibit "G" referred to in this Master Agreement with The Barack
Obama Foundation constitutes Exhibit "F" to ordinance printed
on pages 85973 through 85981 of this *Journal*.]

(Sub)Exhibit "E" and "F" referred to in this Master Agreement with The Barack Obama
Foundation read as follows:

*(Sub)Exhibit "E".*
(To Master Agreement With The Barack Obama Foundation)

*Pending And Threatened Claims.*

Protect Our Parks, LLC; Charlotte Adelman; Maria Valencia and Jeremiah Jurevis, Plaintiffs vs. Chicago Park District and City of Chicago, Defendants (1:18-CV-03434), filed May 14, 2018, United States District Court, Northern District of Illinois.

*(Sub)Exhibit "F".*
(To Master Agreement With The Barack Obama Foundation)

*Utility Relocation Work.*

(A)  Pre-Turnover Utility Relocation Work. The City shall use best efforts by the date (the "Target Utility Relocation Date") that is the later to occur of (i) the ___ day following receipt of the Pre-Turnover Governmental Determinations, and (ii) June 1, 2019, to:

  (1)  abandon, or cause to be abandoned, the 12-inch water main owned by the Park District, as depicted on the plan attached hereto as Schedule 1 (the "Utility Work Site Plan"), at no cost to the Foundation, provided that, if the Foundation elects to remove abandoned section(s) of the main within the Property, such removal shall be at the Foundation's sole cost and expense; and

  (2)  abandon, or cause to be abandoned, the Park District electrical ducts and equipment, as depicted on the Utility Work Site Plan, and then relocate such facilities outside the boundaries of the Property and/or within the 20-foot perimeter easement on the north and east boundaries of the Property (the "Utility Corridor"), as depicted on the Utility Work Site Plan, and release all associated easements and related rights encumbering the Property, all at no cost to the Foundation, provided that, if the Foundation elects to remove abandoned section(s) of the facilities within the Property, such removal shall be at the Foundation's sole cost and expense; and

Case: 1:21-cv-02006 Document #: 19-6 Filed: 04/15/2013 Page 118 of 342 Page ID #:2053

So long as the City uses best efforts to complete the Pre-Turnover Utility Relocation Work until such work is completed, the City's failure to complete the foregoing Pre-Turnover Utility Relocation Work by the Target Utility Relocation Date shall not be deemed a default under this Agreement.

(B)  Other Utility Relocation Work.  All utility lines known to exist as of the Effective Date on, under or over any portion of the Property, other than those specified in paragraph (A), shall be abandoned or relocated either outside the boundaries of the Property or within the Utility Corridor, and all associated easements and related rights encumbering the Property shall be released, all at no cost to the Foundation, provided that, if the Foundation elects to remove abandoned lines within the Property, such removal shall be at the Foundation's sole cost and expense.  All work with respect to the utility lines described in this paragraph (B) shall be conducted in accordance with a schedule hereafter approved by the City and the Foundation (and, where applicable, the Park District), it being contemplated by the Foundation and the City that such work shall be performed following the Closing in a coordinated manner with the construction of the Presidential Center and the other Project Improvements.

(C)  Reuse of Existing Lines.  If the Foundation, in consultation with the City and/or the Park District, determines in its sole discretion that it wishes to utilize in connection with its Proposed Use any utility lines to be abandoned or relocated by or on behalf of the City pursuant to paragraphs (A) and (B) above, and the Foundation specifically waives the City's obligation to abandon or relocate any such utility line(s) in a written instrument expressly citing the waiver of a portion of the requirements of Section 5, subsections (l) and (m) of the Master Agreement, the City shall be relieved of that portion of the Utility Relocation Work so waived by the Foundation, and the Foundation and the City shall cooperate in completing such documentation with the applicable utility service provider necessary to permit such utilization.

(D)  Identification of Unknown Underground Utility Facility.  If additional underground utility facilities are identified during construction on the Property, the Foundation shall notify the City and the Park District, and the City and the Park District will determine if the facility is active or abandoned.  The City shall relocate active facilities outside the boundaries of the Property or within the Utility Corridor, at its cost.  The Foundation shall remove abandoned facilities, as it elects, at its cost.

[Schedule 1 referred to in this Utility Relocation Work printed
on pages 85970 and 85971 of this *Journal.*]

Case: 1:18-cv-03424 Document #: 111-4 Filed: 04/05/19 Page 119 of 342 PageID #:4058

*(Sub)Exhibit "F" -- Schedule 1.*
(To Utility Relocation Work)
(Page 1 of 2)

*Utility Work Site Plan.*



(Proposed locations of utilities are depicted on page 2.)

Case: 1:18-cv-03424 Document #: 49-6 Filed: 11/21/18 Page 98 of 114 PageID #:1345

Case: 1:18-cv-03424 Document #: 49-6 Filed: 11/21/18 Page 99 of 114 PageID #:1346

*(Sub)Exhibit F -- Schedule 1.*
(To Utility Relocation Work)
(Page 2 of 2)

*Proposed Locations Of Utilities.*



*(Sub)Exhibit "B".*
(To Master Agreement With The Barack Obama Foundation)

*Site Plan Of Property.*



*Exhibit "F".*
(To Ordinance)

*Environmental Remediation And Indemnity Agreement.*

This **ENVIRONMENTAL REMEDIATION AND INDEMNITY AGREEMENT** ("**Agreement**") is made on or as of _____, 201_ (the "**Effective Date**"), by and between the **CITY OF CHICAGO**, an Illinois municipal corporation ("**City**"), acting by and through its Department of Planning and Development ("**DPD**") and its Department of Fleet and Facilities Management ("**2FM**"), and **THE BARACK OBAMA FOUNDATION**, a District of Columbia nonprofit corporation (the "**Foundation**"). The City and the Foundation shall be collectively referred to herein as the "**Parties**," and each individually as a "**Party**."

## RECITALS

A.   A core project of the Foundation is the planning and development of the Obama Presidential Center (the "**Presidential Center**"), which is designed as a campus consisting of four buildings and an underground parking facility, complemented by a plaza, play areas, pedestrian and bicycle pathways and other landscaped open space, as more particularly described in the Use Agreement (as hereinafter defined) to be executed by the City and the Foundation (collectively, the "**Presidential Center**"). The buildings include the Museum Building, the Forum Building, the Library Building and the Program, Athletic and Activity Center (as defined in the Use Agreement).

B.   The Foundation evaluated multiple proposed sites for the Presidential Center, including a site within Washington Park (the "**Washington Park Site**"), and a site within Jackson Park (the "**Jackson Park Site**").

C.   The Foundation ultimately selected the Jackson Park Site for the home of the Presidential Center, and the City has obtained title to the Jackson Park Site from the Chicago Park District ("**Park District**"). The Jackson Park Site is legally described on Exhibit A attached hereto.

D.   The City and the Foundation plan to enter into a use agreement with respect to the Jackson Park Site granting to the Foundation the right to construct and operate the Presidential Center (the "**Use Agreement**").

E.   The Parties agree that the Foundation (i) has considered environmental issues as one of the factors in evaluating the proposed sites for the Presidential Center; (ii) has conducted Phase I and limited Phase II environmental investigations to identify the likelihood of any contamination exceeding Residential Remediation Standards (as hereinafter defined) at the Jackson Park Site; and (iii) if such contamination is identified during investigation or construction activities, will remediate any contamination exceeding Illinois EPA's Site Remediation Program ("**SRP**") standards for residential properties as set forth in 35 Illinois Administrative Code ("**IAC**") Part 742 ("**Residential Remediation Standards**").

**NOW, THEREFORE**, in consideration of the covenants set forth in this Agreement, the Foundation and the City agree as follows:

1.   Incorporation of Recitals; Definitions. The above recitals are incorporated as part of this Agreement as though fully set forth herein. All terms used in this Agreement which are defined in the Illinois Environmental Protection Act ("**Act**"), 415 ILCS 5/1 et seq. or regulations

Case: 1:21-cv-02006 Document #: 1-4 Filed: 04/14/21 Page 123 of 342 PageID #:4049

promulgated thereunder will, unless otherwise defined, have the meanings provided in the Act and regulations. For purposes hereof, the term "**Master Agreement**" shall mean that certain Master Agreement dated of even date herewith between the City and the Foundation.

2.    Environmental Investigation Prior to Site Selection. The Foundation performed an environmental investigation of both the Washington Park Site and the Jackson Park Site prior to selecting the Jackson Park Site pursuant to that certain Property Access Agreement dated as of May 20, 2015, between the Foundation, the City and Park District. The Foundation has delivered to 2FM's Bureau of Environmental, Health and Safety Management ("**City's Environmental Bureau**") all Environmental Documents (as hereinafter defined) associated with its investigation of the Jackson Park Site, as identified in Exhibit B attached hereto, including an update (dated not more than 180 days prior to the City's acquisition of the Jackson Park Site from the Park District, and compliant with ASTM E-1527-13) to the Phase I Environmental Site Assessment prepared by Environmental Design International ("EDI") and dated January 12, 2018.

3.    Further Testing of the Jackson Park Site.    If the Foundation determines that additional sampling is needed to identify the presence of, or characterize the extent of, any contamination above the Residential Remediation Standards, or if during construction of the Presidential Center or the other Project Improvements (as defined in the Use Agreement) the Foundation discovers any environmental conditions at the Jackson Park Site, such as the presence of Hazardous Material (as defined in the Master Agreement) or an underground storage tank, that were in existence prior to the execution of the Use Agreement, then the Foundation shall notify the City and submit a proposed scope of work for supplemental testing. The City shall have the right to review and reasonably approve any proposed scope of work, it being the goal of the Parties that any contamination discovered on the Jackson Park Site be remediated to Residential Remediation Standards. If the City and the Foundation fail to reach agreement regarding any additional sampling, including the scope of work to identify or characterize any environmental conditions at the Jackson Park Site, then the Parties shall attempt to resolve the dispute through mediation as provided by Paragraph 10. The City has pre-approved the Foundation's request to perform six additional soil samples prior to the execution of the Use Agreement, subject, however, to (a) the City's right to review and reasonably approve the scope of work to be submitted to the City by EDI, and (b) prior approval of the National Park Service and the Federal Highway Administration of any physical work to be conducted on or in the Jackson Park Site by or on behalf of the Foundation during the period preceding the City's receipt of the Pre-Turnover Governmental Determinations (as defined in the Master Agreement). The City, as owner of the Jackson Park Site and applicant in respect of the Pre-Turnover Governmental Determinations, will initiate communications with the National Park Service and the Federal Highway Administration in connection with seeking approval of any such physical work, and the Parties will cooperate in support of the efforts to obtain such approvals.

4.    Remediation. If any contamination above Residential Remediation Standards is identified or discovered pursuant to Paragraph 3, then the Foundation shall complete all investigation, excavation, removal, response, disposal, remediation and other activities necessary to achieve the Residential Remediation Standards ("**Remediation Work**"). The Parties agree that the Remediation Work shall be based on: (a) risk-based cleanup objectives for residential use; and (b) a soil management plan that addresses the future uses of the Jackson Park Site for the construction and operation of the Presidential Center and the other Project Improvements, which

will include, but are not limited to, below-ground supports and/or basement areas and green spaces ("**Property Uses**"). The Parties acknowledge that, in addition to any risk-based residential standard, due to the Property Uses, it may be necessary to remediate the Jackson Park Site to specific soil remedial objectives that shall guarantee the suitability of the Jackson Park Site for the Property Uses. Neither Party shall be required to agree to any conditions, including engineered barriers or institutional controls that in its reasonable judgment may impair the Property Uses. Notwithstanding the foregoing, the Parties agree to rely upon use and maintenance of engineered barriers and other institutional controls acceptable to the Illinois Environmental Protection Agency ("**Illinois EPA**") under its voluntary Site Remediation Program ("**SRP**") when compatible with design and use goals, and the Parties agree that the City's ordinance prohibiting installation and use of potable water wells is a proper institutional control for any No Further Remediation letter(s) issued by the Illinois EPA SRP pursuant to this Agreement.

     5.     Performance of Remediation Work. The Foundation shall perform all Remediation Work in compliance with all applicable laws and regulations, and in a cost-effective and commercially reasonable manner so as to minimize Incremental Costs (as hereinafter defined in Paragraph 8 of this Agreement). At a minimum, any soil or soil gas not meeting the requirements of 35 IAC Section 742.305 must be removed; any underground storage tanks ("**USTs**") must be removed and closed in accordance with applicable regulations, including Title 41 of IAC Part 175; and any identified leaking USTs must be properly addressed in accordance with 35 IAC Part 734. The Foundation shall consult with the City's Environmental Bureau regarding the proposed scope, costs and methodology of all Remediation Work. The City and its representatives shall have the right to be present at the Jackson Park Site to observe the Remediation Work. In performing the Remediation Work, the Parties agree:

     (a)     Prior to commencing the Remediation Work, the Foundation shall prepare and deliver to the City's Environmental Bureau reasonable, good faith estimates of the Incremental Costs to complete the Remediation Work ("**Cost Estimates**"). The Cost Estimates shall be based upon bid packages or final engineering and architectural plans for the Presidential Center and the other Project Improvements and bid packages or final bids from the construction manager and subcontractors who will perform the work or, if such Remediation Work is required due to the discovery of contamination during construction activities, good faith estimates from the construction manager or subcontractors already on site, and such good faith estimates shall be reviewed and reasonably approved by the City. The Foundation shall cooperate and consult with the City's Environmental Bureau in developing the Cost Estimates, and shall provide the City's Environmental Bureau with regular updates of projected expenses for the Remediation Work. After developing the Cost Estimates, the Foundation shall notify the City's Environmental Bureau of any anticipated increases in the Cost Estimates prior to incurring such expenses. If the City and the Foundation fail to reach agreement regarding any Cost Estimates, then the Parties shall attempt to resolve the dispute through mediation as provided by Paragraph 10.

     (b)     The Foundation shall keep the City's Environmental Bureau informed of the status of the Remediation Work, including but not limited to providing the City's Environmental Bureau with copies of all reports, surveys, field data, correspondence and analytical results prepared by or for the Foundation (or otherwise obtained by the

Foundation) regarding the condition of the Jackson Park Site, including, without limitation, if applicable, any written communications delivered to or received from the Illinois EPA or other regulatory agencies with respect to the Remediation Work (collectively, "**Environmental Documents**").

(c)     The Foundation shall be solely responsible for the management, transportation, treatment, handling, storage and disposal of all wastes generated at the Jackson Park Site in connection with the Remediation Work, including, without limitation, completion of all manifests and other shipping and disposal documents. The City shall be deemed the generator on all manifests for the disposal of Hazardous Material and special waste resulting from the Remediation Work. The City's Environmental Bureau shall have the right to approve both disposers and disposal facilities, which approval shall not be unreasonably withheld. The Foundation shall furnish to the City's Environmental Bureau copies of all manifests and other information necessary to enable the City to fulfill its obligations as generator.

(d)     If within a reasonable time after discovery of contamination, the City determines that any portion of the Jackson Park Site should be enrolled in the SRP: (i) the Foundation shall enroll the Jackson Park Site (or the applicable portion thereof) in the SRP, and perform all necessary and proper work to obtain a Remedial Action Plan approval letter ("**RAP Approval Letter**") that covers all areas of the Jackson Park Site where environmental remediation may be required to achieve the Residential Remediation Standards; (ii) the City's Environmental Bureau shall have the right to review in advance and reasonably approve:  (A) such scope, costs and methodology; and (B) all documents submitted to Illinois EPA under the SRP Program, as amended or supplemented from time to time, including, without limitation, the four documents that the Foundation, as the Remedial Applicant, shall be required to submit to the Illinois EPA for approval:  the Site Investigation Report, the Remedial Objectives Report, the Remedial Action Plan, and the Remedial Action Completion Report (collectively, the "**SRP Reports**"); (iii) the Parties shall cooperate with Illinois EPA, including any Review and Evaluation Licensed Professional Engineer ("**RELPE**") approved by Illinois EPA, in its oversight of the investigation and any remediation; (iv) the Foundation shall ensure that all requirements of the SRP are satisfied and all information required for preparation of the Remedial Action Completion Report is collected during construction in an organized and timely manner, including, without limitation, all load tickets, gate receipts, waste manifests, disposal records, analytical data, permits, field logs, photographs and survey information for inclusion in the Remedial Action Completion Report.

6.     Community Relations. The Parties shall cooperate to inform the community as the activities contemplated hereunder progress and are completed.

7.     Indemnification.

(a)     The Foundation's Indemnification of the City.  The Foundation shall indemnify, defend, and hold the City, and its respective affiliates, agents, employees, and invitees, harmless from any claims, loss, liability, damages or expense, including those arising from any property damage or personal injury, in each case caused by or arising from

Case: 1:21-cv-02244 Document #: 31-4 Filed: 04/14/21 Page 126 of 342 PageID #:2662

activities hereunder of the Foundation and its employees, consultants, contractors, subcontractors, and agents, except to the extent of claims, loss, liability, damages or expense arising from the intentional acts or willful misconduct of the City, or any employee or agent of the City acting within the scope of its agency.

(b)     The City's Indemnification of the Foundation. The City shall indemnify, defend, and hold the Foundation and its respective affiliates, agents, employees and invitees, harmless from any claims, loss, liability, damages or expense, including those arising from any property damage or personal injury, in each case caused by or arising from activities hereunder of the City, and its employees, consultants, contractors, subcontractors, and agents, except to the extent of claims, loss, liability, damages or expense arising from the intentional acts or willful misconduct of the Foundation, or any employee or agent of the Foundation acting within the scope of its agency.

8.     Reimbursement of Incremental Costs of Remediation and SRP Expenses.

(a)     The City shall reimburse the Foundation for the following reasonable, necessary and documented costs:

(i)     environmental investigation costs of up to $75,000 for such costs incurred prior to the date hereof; and thereafter

(ii)     if the City determines that any portion of the Jackson Park Site shall be entered into the SRP, costs of (A) enrolling the Jackson Park Site in the SRP, (B) preparing the Comprehensive Site Investigation Reports, Remedial Objectives Reports, Remedial Action Plans and Remedial Action Completion Reports (collectively,     "**CSIR/ROR/RAP/RACR**"),     (C)     submittal     of CSIR/ROR/RAP/RACR to Illinois EPA and development of responses to Illinois EPA's comments and requests, including consulting fees and any SRP program and oversight fees, and (D) negotiation, review and filing of NFR Letter(s).; and

(iii)     Incremental Costs (as hereinafter defined) of the Remediation Work.

(b)     Actions by any RELPE shall be deemed to be actions of Illinois EPA, provided the City will not reimburse the Foundation for the cost of retaining a RELPE. Reimbursement of costs shall be due to the Foundation within 30 days of the Foundation's delivery of invoices or other documentation of costs to the City.

(c)     The term "**Incremental Costs**" means the additional costs the Foundation shall incur to construct the Presidential Center and the other Project Improvements attributable to the Remediation Work. These are costs the Foundation would not ordinarily incur but for the pre-existing environmental condition of the Jackson Park Site, including:

(i)     site investigation, laboratory analysis and reporting incurred due to the presence or suspected presence of contamination;

Case 1:21-cv-02006 Document #: 41-4 Filed: 04/04/21 Page 127 of 342 PageID #:4058

(ii)          development of a soil management plan for any reuse of contaminated soils onsite;

(iii)          incremental costs for (A) contaminated soil excavation, (B) contaminated soil hauling, (C) contaminated soil disposal, (D) dewatering of construction excavations, if the water needs to be treated or disposed of off-site; (E) in areas in which contaminated soil is removed, (1) clean fill sourcing (inclusive of Illinois EPA soil sampling requirements, laboratory analysis, and reporting costs, including such costs incurred before the soil arrives at the site), (2) clean fill hauling, placement, and compaction if not otherwise required for construction and (3) contractor tracking for, and reporting of, contaminated soil and related materials removed from the Jackson Park Site;

(iv)          construction of landscape (green space) barriers and other engineered barriers (such as parking lots or building foundations) in areas containing contaminated soil unless any such barriers would have been constructed as part of the Presidential Center or other applicable Project Improvements;

(v)          installation of soil gas barriers or vapor intrusion systems, and

(vi)          oversight of contaminated soil and material removal, as well as oversight of the resulting clean fill sourcing and placement.

(d)          The Foundation acknowledges and agrees that the term "Incremental Costs" does not include the costs of geotechnical sampling of fill material; erosion and sediment controls required for normal construction activities, including permits; storm water management plan preparation and implementation, including permits, unless such plan is required as a result of the environmental condition of the Jackson Park Site; attorney fees; delay or other consequential damages or the Foundation's in-house costs. The term also does not include costs associated with (i) the introduction of any Hazardous Material on, in, under or about the Jackson Park Site by the Foundation or its contractors, subcontractors or consultants (the "**Foundation Parties**"); (ii) any failure of the Foundation Parties to comply with any applicable laws or regulations or any permits issued thereunder; (iii) any failure of the Foundation Parties to comply with any obligation under this Agreement; (iv) the negligent exacerbation of any pre-existing environmental conditions by the Foundation Parties; and (v) any actual or alleged illness, disability, injury or death of any employee, agent, representative or invitee of the Foundation Parties, arising out of or allegedly arising out of exposure to any Hazardous Material now existing or hereafter introduced on, in, under or about the Jackson Park Site, where such exposure is attributable to the operations or activities of the Foundation Parties. Materials removed for geotechnical purposes are not considered Incremental Costs except as defined above.

9.          Jackson Park Site Access. The City shall grant the Foundation and its contractors and subcontractors access to the Jackson Park Site to perform activities contemplated hereunder pursuant to the terms of a separate Property Access Agreement among the Foundation, the City

and the Park District.

10.    Dispute Resolution. In the event that the Foundation and the City are unable to resolve a dispute under Paragraph 3 or Paragraph 5(a) within seven (7) days or another mutually agreed time period ("**Negotiation Period**"), then, at the written request of either Party, the Parties shall attempt to resolve the dispute as expeditiously as possible through confidential mediation with a third party consultant with expertise in the subject matter area of the dispute ("**Designated Consultant**"), who will review both Parties' positions. To select the Designated Consultant, the Foundation and the City shall informally agree on the selection of the Designated Consultant or, if the Foundation and the City are unable to agree on the Designated Consultant within seven (7) days after written notice from one Party to the other requesting mediation or another mutually agreed time period, each of the Foundation and the City shall select one (1) third party consultant with expertise in the subject matter area of the dispute and those two (2) consultants shall jointly select a third consultant with expertise in the subject matter area of the dispute and such third consultant shall act as the Designated Consultant hereunder. The Designated Consultant shall attempt to resolve the dispute within ten (10) days after being retained, based on review of the documents submitted by each Party in support of its position and a meeting with the Parties. The Designated Consultant shall not have worked for either the Foundation or the City within the last eighteen (18) months. Each Party shall bear its own fees and expenses attributable to the mediation, provided, however, that the costs, fees and expenses attributable to the Designated Consultant shall be borne equally (50/50) by the Foundation and the City. In the event either the Foundation or the City disagree with the Designated Consultant's resolution of a dispute involving $250,000 or more, either Party may seek judicial relief for the purpose of resolving such dispute. The Designated Consultant's decision in matters involving lesser amounts shall be binding upon the Parties.

11.    Notices. Any notice or communication required or permitted under this Agreement shall be given in writing, sent by (a) personal delivery; (b) commercial courier or delivery service with proof of delivery; (c) United States regular, registered or certified mail, postage prepaid; or (d) confirmed electronic transmission, addressed as follows:

| If to the City: | City of Chicago |
| | Department of Fleet & Facilities Management |
| | 30 North LaSalle Street, Suite 300 |
| | Chicago, Illinois 60602 |
| | Attn: Commissioner |
| | E-mail: _____ |
| | |
| with a copy to: | City of Chicago Department of Law |
| | 121 North LaSalle Street, Suite 600 |
| | Chicago, Illinois 60602 |
| | Attn: Real Estate and Land Use Division |
| | E-mail: _____ |
| | |
| if to the Foundation: | The Barack Obama Foundation |
| | 5325 South Harper Court, Suite 1140 |
| | Chicago, Illinois 60615 |

JOURNAL--CITY COUNCIL--CHICAGO

Attn: Robbin Cohen
E-mail: rcohen@obama.org

with a copy to:

Seth R. Madorsky
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661-3693
E-mail: seth.madorsky@kattenlaw.com

or to such other address or to the attention of such other person as hereafter shall be designated in writing by the applicable Party sent in accordance herewith. Any such notice or communication may be given by a Party to this Agreement or by a Party's attorney, and shall be effective when delivered during normal business hours. If delivery of a notice is refused, it shall be deemed to have been delivered at the time of such refusal of delivery.

12.    Governing Law; Venue. This Agreement shall be governed by the laws of the State of Illinois, and may not be amended except by the Parties' written agreement. The Parties hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the courts of the State of Illinois or the United States located in the City of Chicago, Illinois for any actions, suits or proceedings arising out of or relating to the terms of this Agreement and the transactions contemplated hereby, and agree not to commence any action, suit or proceeding relating thereto except in such courts.

13.    Authority. Each Party confirms to the other Party that the person signing this Agreement on its behalf has the authority to execute and bind such Party to the terms of this Agreement.

14.    Counterparts. This Agreement may be executed in any number of counterparts, all of which together shall constitute one original Agreement. Facsimile or electronic signatures shall have the same force and effect as original signatures.

15.    Legal Relationship. This Agreement does not create any legal relationship among the Parties, such as a joint venture or partnership.

16.    Waiver. The waiver by a Party of the performance of any covenant or condition by another Party shall not invalidate this Agreement, nor shall it be considered a waiver by the Party of any other covenant or condition under this Agreement.

17.    Severability. In the event that any provision or provisions of this Agreement are deemed unenforceable, the remaining provisions shall remain in full force and effect.

**IN WITNESS WHEREOF,** this Environmental Remediation and Indemnity Agreement is executed by the City and the Foundation as of the Effective Date.

                              **CITY OF CHICAGO,** an Illinois municipal
                              corporation

                    By: _____

                              David L. Reifman
                              Commissioner
                              Planning and Development

                    By: _____

                              David J. Reynolds
                              Commissioner
                              Fleet and Facilities Management

                              **THE BARACK OBAMA FOUNDATION,** a
                              District of Columbia non-profit corporation

                    By:_____
                              Name: _____
                              Its: _____

[(Sub)Exhibit "A" referred to in this Environmental Remediation and Indemnity Agreement with The Barak Obama Foundation constitutes Exhibit "A" to ordinance printed on pages 85887 and 85888 of this *Journal.*]

(Sub)Exhibit "B" referred to in this Environmental Remediation and Indemnity Agreement with The Barak Obama Foundation reads as follows:

85982          JOURNAL--CITY COUNCIL--CHICAGO          10/31/2018

*(Sub)Exhibit "B".*
(To Environmental Remediation And Indemnity Agreement
With The Barack Obama Foundation)

*List Of Environmental Documents.*

| # | Document Name | Issuance Date | Prepared For | Prepared By | Notes |
|---|---|---|---|---|---|
| 1 | Phase I Environmental Site Assessment Report | 12-Nov-2014 | The University of Chicago | Environmental Design International, Inc. | Report based upon UofC site proposal boundary |
| 2 | Draft Limited Phase I Environmental Site Assessment Report | 7-July-2015 | The Obama Foundation | E. Cooney Associates, Inc. | Report based upon UofC site proposal boundary |
| 3 | Subsurface Exploration and Preliminary Geotechnical Engineering Report | 22-Sept-2015 | The Obama Foundation | GEI Consultants, Inc. | Report based upon UofC site proposal boundary |
| 4 | Draft Limited Phase II Environmental Site Assessment Report | 29-Dec-2015 | The Obama Foundation | E. Cooney Associates, Inc. | Report based upon UofC site proposal boundary |
| 5 | Phase I Environmental Site Assessment Report | 12-Jan-2018 | The Obama Foundation | Environmental Design International, Inc. | Report based upon Exhibit A Legal Description |
| 6 | Phase II Environmental Site Assessment Report | 12-Jan-2018 | The Obama Foundation | Environmental Design International, Inc. | Report based upon Exhibit A Legal Description |
| 7 | Update to Phase II Environmental Site Assessment Report | 22-Aug-2018 | The Obama Foundation | Environmental Design International, Inc. | Report based upon Exhibit A Legal Description |

*(Sub)Exhibit "G".*
(To Ordinance)

*Depiction Of Road Closures.*



Case 1:21-cv-02240 Document #: 41-4 Filed: 07/04/21 Page 133 of 342 PageID #:1059

*Exhibit "H"-1.*
(To Ordinance)

*Description Of Transportation Improvements.*

- **Lake Shore Drive:** Lake Shore Drive from 57th Street to Hayes Drive would be widened to the west by approximately 11' to provide a third southbound lane. This segment of roadway is currently unbalanced, with two southbound lanes and three northbound lanes. Additionally, bridge modifications are required at the 63rd Street underpass, the 59th Street underpass and the bridge over the 59th Street inlet to accommodate the widening. The intersections of Lake Shore Drive with 57th Street, Science Drive, and Hayes Drive would also require modification to accommodate the third southbound lane.

- **Hayes Drive:** Hayes Drive is currently one through lane and one parking lane in each direction. To increase capacity on Hayes Drive while minimizing parkland impacts, existing parking would be removed on Hayes Drive from Lake Shore Drive to Cornell Drive to provide two through lanes in each direction. Modifications are needed at the Lake Shore Drive/Coast Guard Drive, Richards Drive and Cornell Drive intersections to accommodate the additional through lanes as well as to accommodate the proposed closure of Cornell Drive north of Hayes Drive. The existing triangular, stop-controlled intersection at Hayes Drive and Richards Drive would be reconfigured to create a signalized T-intersection. Hayes Drive would be realigned at Cornell Drive to provide a through movement for predominant travel along the east and south legs through the intersection. The existing portion of Hayes Drive between Stony Island Avenue and Cornell Drive would be realigned to create a signalized T-intersection with the realigned Hayes Drive and would be widened to accommodate new turn lanes.

- **Stony Island Avenue:** To accommodate diverted traffic from the roadway closures and provide operational and mobility improvements, Stony Island would need to be widened from 59th Street to 68th Street.

  - Stony Island Avenue from 59th Street to 65th Street would be widened up to 20' to the east to provide a second through lane in each direction. The east curb lane area in front of the proposed OPC from 62nd Street to 60th Street would be 10 feet wide to accommodate bus loading and unloading.

  - Stony Island Avenue from 65th to 68th Streets would be widened up to 30' to the east to provide a consistent cross section with Stony Island further south, including three northbound lanes and four southbound lanes separated by a raised median, and on-street parking on the west side.

Case: 1:21-cv-02006 Document #: 41-4 Filed: 04/04/21 Page 134 of 342 PageID #:4000

- • All intersections on Stony Island Avenue from 59th to 68th Streets would be reconfigured to accommodate the roadway widening and provide additional turn lanes. To consolidate the four closely-spaced traffic signals on Stony Island Avenue at 60th Street, 59th Street and eastbound and westbound Midway Plaisance, westerly access at the intersections of 59th and 60th Streets would be converted to right-in/right-out only and the traffic signals would be removed. The removal of these traffic signals will improve safety and reduce congestion. The existing stop-controlled intersection at Stony Island Avenue/64th Street would be converted to a signalized intersection to enhance pedestrian safety and maintain traffic progression through interconnected signals on Stony Island Avenue. The intersection of 67th Street and Cornell Drive, adjacent to the intersection of 67th Street and Stony Island Avenue, would be removed.

- • **Cornell Drive:** The three-lane, southbound-only segment of Cornell Drive from south of Hayes Drive to Stony Island Avenue would be widened up to 14' to accommodate two-way traffic and provide two lanes in each direction separated by a barrier median.

- • **Midway Plaisance:** The westbound segment of Midway Plaisance would be widened up to 20' to accommodate two-way traffic and provide two lanes in each direction.

Shared-use underpasses for pedestrians and bicyclists are proposed as continuations of existing CPD trails within Jackson Park as envisioned in the SLFP. These underpasses enhance connectivity through the park and to the lakefront, as well as improve traffic safety and operations on the roadway overhead. The locations for new grade-separated pedestrian and bike connections include:

- • At the intersection of Hayes Drive/Cornell Drive/63rd Street;
- • On Hayes Drive between Richards Drive and Lake Shore Drive;
- • On Jeffery Avenue between Marquette Drive and 67th Street; and
- • At the intersection of South Shore Drive and 67th Street.

Case 1:21-cv-04206 Document #: 49-4 Filed: 04/14/21 Page 135 of 342 PageID #:4068

*Exhibit "H"-2.*
(To Ordinance)

*Depiction Of Transportation Improvements.*



# EXHIBIT 3



U.S. Department
of Transportation

**Federal Highway
Administration**

**Illinois Division**

January 16, 2020

3250 Executive Park Dr.
Springfield, IL 62703
(217) 492-4640
www.fhwa.dot.gov/ildiv

In Reply Refer To:
HDA-IL

TO: All Section 106 Consulting Parties

SUBJECT: Section 106 Assessment of Effects to Historic Properties
From the Proposed Undertaking in and Adjacent to Jackson Park
Cook County, Chicago, Illinois

Dear Consulting Party:

Enclosed is a copy of the final Section 106 Assessment of Effects (AOE) to historic properties for a proposed undertaking in and adjacent to Jackson Park, Cook County, Chicago, Illinois. As a consulting party, you may either agree with or object to the Federal Highway Administration's (FHWA) finding. If you choose to provide a written response, it must be sent no later than February 18, 2020, which ends the review period for the final AOE. Responses should be submitted to the City of Chicago (Attention: Abby Monroe, Abby.Monroe@cityofchicago.org).

Additional documents included with the final AOE are:

- Historic Properties Inventory (HPI) Addendum. Subsequent to publication of the draft AOE on July 29, 2019, FHWA learned that the Chicago Park Boulevard System was listed on the National Register of Historic Places and is within this undertaking's Area of Potential Effect. The HPI Addendum documents the newly listed historic property.
- Disposition of comments received on the AOE. The disposition of comments summarizes the comments received on the draft AOE and the FHWA's responses.

The final AOE includes revisions made due to public and consulting party comments. The comments were received during the 30-day review and comment period on the draft AOE, which ended on August 30, 2019.

The FHWA will proceed to the next step in the Section 106 process if the Illinois State Historic Preservation Officer (SHPO) agrees with the finding, or does not provide a response, and no consulting party objects to the finding.

If within the review period the Illinois SHPO or any consulting party notifies FHWA in writing that it disagrees with the finding of effect and specifies the reasons for the disagreement in the notification, FHWA will either consult with the party to resolve the disagreement, or request the Advisory Council on Historic Preservation (ACHP) review the finding of effect and provide its opinion. The FHWA will take into account the ACHP's opinion in reaching its final decision on the finding and make it available to all consulting parties and the public.

Thank you for participating as a Section 106 consulting party and we look forward to working with you as the process is advanced.

Sincerely,

Arlene K. Kocher
Division Administrator

Enclosure

# Assessment of Effects to Historic Properties

Proposed Undertaking In and Adjacent to Jackson Park
Jackson Park, Chicago, Illinois

Prepared By:
City of Chicago Department of Planning and Development
Bureau of Planning, Sustainability and Historic Preservation
Chicago, IL

CNECT, LLC.
Chicago, IL

Quinn Evans Architects
Ann Arbor, MI

Prepared For:
Federal Highway Administration (Lead Federal Agency)
National Park Service
U.S. Army Corps of Engineers
Illinois Department of Transportation

January 2020

# Table of Contents

1.0     Introduction ...................................................................................................................1

   1.1     Project Overview and Description ...............................................................................3

      1.1.1   Non-Federal/City of Chicago Actions ........................................................................4

         1.1.1.1   Obama Presidential Center ................................................................................4

         1.1.1.2   Roadway Changes ...............................................................................................4

         1.1.1.3   Recreation Changes ............................................................................................4

   1.2     National Park Service Action .....................................................................................8

   1.3     Federal Highway Administration Action ...................................................................8

   1.4     U.S. Army Corps of Engineers Action.......................................................................9

2.0     Identification of Historic Properties within the Area of Potential Effects ......................11

   2.1     Area of Potential Effects...........................................................................................11

   2.2     Historic Properties in the Area of Potential Effects.................................................12

3.0     Assessment of Effects ......................................................................................................22

   3.1     Methodology ............................................................................................................22

      3.1.1   Definitions and Guidelines .......................................................................................22

      3.1.2   Noise, Traffic, and Visual Analysis Methodology....................................................24

   3.2     Determinations of No Effects ..................................................................................27

      3.2.1   Highway Traffic Noise ..............................................................................................30

      3.2.2   Traffic Analyses........................................................................................................30

      3.2.3   Visual Impact Analyses ............................................................................................31

   3.3     Historic Properties with Potential for Effects..........................................................37

   3.4     Presentation of Assessment .....................................................................................38

   3.5     Jackson Park Historic Landscape District and Midway Plaisance ...........................39

      3.5.1   Description of Jackson Park Historic Landscape District and Midway Plaisance....................39

      3.5.2   Assessment of Effects on Jackson Park Historic Landscape District and Midway Plaisance ..40

         3.5.2.1   Effect Determination ........................................................................................40

         3.5.2.2   Effects to the Cultural Landscape from Federal Actions ...........................................43

         3.5.2.3   Effects from Non-Federal Actions.....................................................................49

   3.6     The Chicago Park Boulevard System Historic District.............................................55

      3.6.1   Description of property .............................................................................................55

         3.6.1.1   Effect Determination ........................................................................................56

         3.6.1.2   Assessment of Effects on property....................................................................56

3.7     Other Historic Properties .................................................................................................58

    3.7.1     Stony Island State Trust & Savings Bank (Stony Island Arts Bank) ..................58

       3.7.1.1    Description of property ..........................................................................58

       3.7.1.2    Effect Determination ............................................................................58

       3.7.1.3    Assessment of Effects on property ......................................................59

    3.7.2     Island Terrace Apartment Building ...................................................................59

       3.7.2.1    Description of property ..........................................................................59

       3.7.2.2    Effect Determination ............................................................................60

       3.7.2.3    Assessment of Effects on property ......................................................61

    3.7.3     Hyde Park High School......................................................................................61

       3.7.3.1    Description of property ..........................................................................61

       3.7.3.2    Effect Determination ............................................................................62

       3.7.3.3    Assessment of Effects on property ......................................................62

    3.7.4     Jackson Park Terrace Historic District..............................................................63

       3.7.4.1    Description of property ..........................................................................63

       3.7.4.2    Effect Determination ............................................................................64

       3.7.4.3    Assessment of Effects on property ......................................................65

    3.7.5     Hyde Park-Kenwood Historic District ...............................................................65

       3.7.5.1    Description of property ..........................................................................65

       3.7.5.2    Effect Determination ............................................................................66

       3.7.5.3    Assessment of Effects on property ......................................................66

3.8     Cumulative Effects.........................................................................................................68

    3.8.1     Methodology ....................................................................................................68

    3.8.2     Analysis ............................................................................................................68

    3.8.3     Cumulative Effect – Conclusion .......................................................................71

**4.0     Consulting Party and Public Involvement .........................................................73**

**5.0     Avoidance and Minimization of Effects .............................................................75**

5.1     Avoidance Measures .....................................................................................................75

    5.1.1     City Action ........................................................................................................75

    5.1.2     NPS Action .......................................................................................................75

    5.1.3     FHWA Action ....................................................................................................76

    5.1.4     USACE Action ...................................................................................................76

5.2     Minimization Measures .................................................................................................77

    5.2.1     City Action ........................................................................................................77

5.2.2    NPS Action ................................................................................................................79

5.2.3    FHWA Action ..............................................................................................................79

5.2.4    USACE Action.............................................................................................................80

**6.0     Conclusions ............................................................................................................81**

**7.0     References ..............................................................................................................83**

## List of Tables

Table 1: Historic Properties or Districts Listed or Eligible for NRHP within the APE ..................................14

Table 2. Views from Street-Level Perspectives in Appendix D-1 ................................................25

Table 3. Views from Elevated Perspectives in Appendix D-2..........................................................26

Table 4: Historic Properties with No Effect from the Undertaking..............................................28

Table 5. Summary of Effects on Historic Properties in the APE ....................................................34

Table 6: Historic Properties with Potential for Effects.................................................................37

Table 7: Summary of Effect Findings.........................................................................................81

## Appendices

### Appendix A – Exhibits and Tables

Exhibit 1a & 1b:    Project Location Maps

Exhibit 2a & 2b:    Historic Properties

Exhibit 3a & 3b:    Jackson Park Historic Landscape District and Midway Plaisance – Contributing Resources

Exhibit 4a & 4b:    Jackson Park Historic Landscape District and Midway Plaisance – Referenced Cultural Landscape Features

Exhibit 5a & 5b:    Chicago Park Boulevard System Historic District – Contributing Resources

Exhibit 6:          Midway Plaisance Existing Conditions

Table 1:            Survey Data Summary Table from HPI Addendum

### Appendix B – Figures

Figure 1a:    Conceptual Site Plan – Obama Presidential Center (October 2019)

Figure 1b:    Proposed Excision from Section 1010 Map

Figure 2:     Proposed Roadway Closures

Figure 3:     Recreation Replacement, East End of Midway Plaisance (CPD, November 2019)

Figure 4:     Recreation Replacement Site Considerations

## Appendix C – Photos

Existing Conditions Photos – Historic Properties

## Appendix D – Visual Impact Analysis

Exhibit D-1:    Visual Impact Analysis – Streetview Analysis Locations
Visual Impact Analysis – Streetview Analysis of OPC Museum Building (Google Earth and Computer modeling)
Exhibit D-2:    Visual Impact Analysis – Elevated Viewshed Locations
Visual Impact Analysis – Elevated Modeling Analysis of OPC Museum Building

## Appendix E – Agency Correspondence

Section 106 Initiation Letter – SHPO (11/01/2017)
Section 106 Invitation Letter – ACHP (11/01/2017)
SHPO Concurrence – Archaeological Report (03/28/2018)
SHPO Concurrence – Historic Properties Identification Report (07/10/2018)
FHWA Lead Agency Letter – Section 106 (07/31/2018)
SHPO Concurrence – Archaeological Memorandum (September 2018)
IDOT Memorandum – NRHP Eligibility and Adverse Effects (September 10, 2019)

## Appendix F – Public Involvement

Consulting Party Invitation Sample Letter
Consulting Party Participant List (11/26/2018)
Consulting Party Meeting #1 (12/01/2017) – Meeting Summary
Consulting Party Meeting #2 (03/29/2018) – Meeting Summary
Summary of Consulting Party Comments – Draft Assessment of Effects
Consulting Party Comments – Draft Assessment of Effects
Public Comments and Responses

## Appendix G – Document Preparers

List of Staff

# 1.0   Introduction

This Assessment of Effects (AOE) report evaluates the potential effects to historic properties from the Obama Presidential Center (OPC) project and certain related Federal actions in and near Jackson Park (collectively, the proposed "undertaking"). As described more fully below, the undertaking comprises the construction of the OPC in Jackson Park by the Obama Foundation, the closure of roads to accommodate the OPC and to reconnect fragmented parkland, the relocation of an existing track and field on the OPC site to adjacent parkland in Jackson Park, and the construction of a variety of roadway, bicycle and pedestrian improvements in and adjacent to the park. The Federal actions proposed include the funding of roadway improvements and bicycle and pedestrian enhancements by FHWA; proposed amendment of the UPARR grant agreement and 1010 boundary by the NPS; and potential Section 404 permits and Section 408 permissions by the US army Corps of Engineers. The City of Chicago (City) has approved the construction of the OPC project in Jackson Park. The Barack Obama Foundation (Foundation) is privately funding the construction and future operation and maintenance of the OPC.

The analysis presented in this report will be used as a basis for consultation between the Federal Highway Administration (FHWA), the National Park Service (NPS), the U.S. Army Corps of Engineers (USACE), the City, the State Historic Preservation Officer (SHPO), the Advisory Council on Historic Preservation (ACHP), and other consulting parties concerning the effects of the Undertaking on historic properties that are listed or eligible for listing on the National Register of Historic Places (NRHP).

The FHWA is the lead agency for Section 106 compliance under the National Historic Preservation Act of 1966 (NHPA), 54 U.S.C. § 306108, and its implementing regulations (36 CFR Part 800). The Illinois Department of Transportation (IDOT), through a stewardship and oversight agreement with the FHWA, assists in reviewing the compliance of a project with environmental laws and conducts coordination with necessary state officials, including the State Historic Preservation Officer (SHPO). Although Section 106 review and NEPA review are distinct processes, they are being coordinated and are occurring in parallel for the Federal agency decision-making processes. The assessment of effects evaluates the effects from the undertaking based on the nature of the Federal actions and the scope of the Federal agency's authority, as required by the Section 106 regulations. In this case, the ACHP advised FHWA and NPS to take an expansive approach in describing the effects of the non-Federal actions.

Consistent with 36 CFR 800.2(a)(3), the City of Chicago Department of Planning and Development (DPD) and the Chicago Department of Transportation (CDOT) developed the information, analyses, and recommendations in this report. Staff from IDOT meeting the Secretary of the Interior's Qualification Standards reviewed the report and provided guidance to ensure the contents meet applicable standards and guidelines. Federal agency officials from NPS and FHWA provided guidance in preparation of the report and reviewed the contents to ensure it meets applicable standards and guidelines.

Section 106 compliance activities completed for the project to date include:  initiating the Section 106 process; identifying consulting parties; delineating the Area of Potential Effects (APE); completing an archeological survey and preparing an Archeology Report; identifying and evaluating above-ground historic properties within the APE and preparing a Historic Property Inventory (HPI) report; making assessments of potential effect; and consulting with the SHPO, the ACHP, the consulting parties, and the

public, see Section 2.0 for a summary of the HPI activities. Section 4.0 summarizes public and agency coordination efforts to date.

The draft AOE was made available to the consulting parties and the public for a 30-day review and comment period beginning July 29, 2019 and ending August 30, 2019. A record of the comments received from the consulting parties is included in Appendix F. This final AOE considers and addresses the comments received from consulting parties and will be made available to the consulting parties and the public. It also presents an additional NRHP listed property, the Chicago Park Boulevard System Historic District; information regarding the district can be found in Section 3.6.

Consulting parties may either concur or object to the effect findings in this final AOE within 30-days of receipt of this document. If any objection is received on the effect findings within 30-days, FHWA may either consult with the objecting party to resolve the disagreement, or FHWA may request the ACHP provide its opinion on the objection. The FHWA will take into account the ACHP's opinion upon issuing its final decision regarding effects. Upon concluding the effects analysis, the FHWA, the NPS and the USACE will proceed to the next step in the Section 106 process, see Section 6.0.

## 1.1    Project Overview and Description

After a lengthy and competitive search, the Barack Obama Foundation selected Chicago, and specifically Jackson Park, as the future home of the OPC. The City of Chicago and the Chicago Park District also conducted a lengthy and thorough public process to review the project design and related improvements in Jackson Park, and ultimately approved the Foundation's proposal to build the OPC on a 19-acre site on the western edge of Jackson Park, along with road closures to accommodate the OPC (and reconnect fragmented parkland) and the relocation of an existing track and field from the OPC site to adjacent parkland. The City's approval of the Foundation's proposal to locate the OPC in Jackson Park is a local land use decision and is not subject to the Federal approval process, including mitigation. The same is true of the roadway closures and the relocation of the track and field.

Other aspects of the OPC project, however, require Federal involvement and trigger compliance with Section 106. Jackson Park received two Federal matching grants under the Urban Park and Recreation Recovery (UPARR) program: one from 1980 in the amount of $125,300 for a tree planting program and community recreation program (an Innovation Grant), and the other from 1981 in the amount of $135,870 to replace approximately 700 trees and restore approximately 7,000 square yards of landscaped areas (a Rehabilitation Grant). The OPC site is located within the Section 1010 boundary established by the grants. Under Section 1010 of the UPARR Act (54 U.S.C. §200507) and as codified in 36 C.F.R. §72.72, no property improved or developed with UPARR assistance can be converted to other than public recreation uses without NPS approval. The City is seeking approval from NPS to convert the following portions of Jackson Park: (1) a 4.6-acre rectangular space within the OPC site on which the building campus will be situated, and (2) strips of parkland along existing roadways (approximately 5.25 acres) to accommodate proposed transportation improvements. NPS will not approve a conversion proposal until the City provides replacement property and recreational opportunities of reasonably equivalent location and usefulness. To meet this requirement the City has proposed to replace the converted parkland with 5.2 acres of open space on the east end of the Midway Plaisance (east of the railroad embankment), and approximately another 7.75 acres of new parkland created from road reconfigurations and road closures within Jackson Park. If NPS approves the City's conversion proposal, NPS will amend the original UPARR grant agreements to remove the grant conditions from the converted parkland and apply the grant conditions to the replacement property.

The City has proposed a variety of roadway improvements within and adjacent to Jackson Park to mitigate traffic impacts from the road closures and to improve bicycle and pedestrian access and circulation within Jackson Park. The City is seeking Federal funding for the transportation improvements from the Federal-Aid Highway Program, which requires approval from the FHWA.

In connection with the proposed roadway improvements, the City needs permits or permission from the USACE under sections 404 and 408 of the Clean Water Act to, respectively, discharge fill material into waters of the United States, and alter an ecosystem restoration project funded under the Great Lakes Fishery & Ecosystem Restoration (GLFER) program.

For the purpose of assessing effects to historic properties under Section 106, the above-described Federal actions (conversion approval, Federal funding for transportation improvements, and USACE permits) and the local actions (approval of the construction of OPC, road closures and track and field relocation) are collectively referred to in this AOE as the undertaking. For a map depicting the location of the Federal actions and the City actions, see Exhibit 1 in Appendix A. The component actions that comprise the undertaking are described in more detail below with relevant context.

### 1.1.1   Non-Federal/City of Chicago Actions

#### 1.1.1.1   *Obama Presidential Center*

The City has approved the construction of the OPC in Jackson Park. The OPC site is located on the east side of Stony Island Avenue between 59th and 62nd Streets, and is approximately 19.3 acres in size, see Exhibit 1a & 1b in Appendix A, and Figures 1-4 in Appendix B. The OPC includes four buildings that will occupy approximately 2.5 acres of the site, including the Museum Building, the Forum Building, the Library Building, and the Program, Athletic and Activity Center (PAAC), in addition to an underground parking facility. The remainder of the OPC site will include new pedestrian and bicycle pathways, a nature walk along the lagoon, a sloped great lawn that can accommodate a sledding hill, a fruit and vegetable garden, a play area and picnic areas. The underground parking facility is located on the OPC site between the PAAC and the Library Building. A conceptual site plan of the OPC is provided as Figure 1a in Appendix B. Visualizations of the OPC project are available at https://www.obama.org/opc-2019/.

#### 1.1.1.2   *Roadway Changes*

The City proposes the following permanent roadway closures and removals within Jackson Park: Cornell Drive between 63rd Street (Hayes Drive) and 59th Street, the northbound section of Cornell Drive between 68th Street and 65th Street, Marquette Drive between Stony Island Avenue and Richards Drive, and the eastbound portion of Midway Plaisance between Stony Island Avenue and Cornell Drive, see Figure 2 in Appendix B. Closures of the eastbound Midway Plaisance and Cornell Drive between 63rd Street and 59th Street are necessary to accommodate the development of the OPC, reduce vehicle conflict with visitors to the park, and improve connectivity to the lagoons and lakefront. The additional roadway closures will reduce the number of multilane roadways within the park.

The City also proposes improvements to the roadway, pedestrian, and bicycle network to address the changes in travel patterns that arise from the proposed roadway closures and to improve public safety, access and circulation throughout the park. The roadway changes including widening Lake Shore Drive (Hayes Drive to 57th Drive) one travel lane to the west; removing parking and replacing it with a gravel lane in each direction on Hayes Drive (Cornell Drive to Lake Shore Drive); widening Stone Island Avenue (67th Street to 65th Place) one travel lane to the east; widening Stony Island Avenue (65th Place to 59th Street) one travel lane in each direction; and the associated intersection improvements on each roadway. Proposed bicycle and pedestrian improvements include five new underpasses, additional trails, and enhanced access accommodations; these are further described in Section 1.3.

#### 1.1.1.3   *Recreation Changes*

The proposed changes in Jackson Park will impact existing recreation opportunities. The impacted area is depicted by a shaded box on the OPC conceptual site plan in Figure 1a of Appendix B. Figure 1b illustrates the area proposed for removal from the Section 1010 map along with traffic improvement measures (also areas that will be removed from the Section 1010 boundary). NPS will consider recreation opportunities lost and gained as part of its decision-making analysis. Recreation losses must be replaced with reasonably equivalent recreation opportunities under the ownership and jurisdiction of the City of Chicago that meet existing public recreation needs. Replacement recreation may be located on new or existing parkland but cannot be located within the existing Section 1010 boundary.

The OPC will affect all or a small portion of five recreational elements currently on the OPC site: (1) a portion of the footprint occupied by the existing track and field facility; (2) open recreation space, including existing trails used for biking or walking; (3) the existing picnic grove; (4) the Perennial Garden/Women's Garden; and (5) the 62nd Street playground. To address these recreation losses, the City will reconfigure or offset through replacement property, uses, and opportunities both on the OPC site as well as elsewhere within Jackson Park:

> The existing track and field will be replaced with a new track and field to be constructed in the area immediately south of the OPC site within Jackson Park.

> The Picnic Grove is used for picnicking, sitting, walking, gathering, pick-up games (such as soccer), play, and special events. The OPC will displace the Picnic Grove, but provide picnicking and other open space areas on the OPC campus for similar uses. The Picnic Grove's uses will be recouped through multiple picnicking opportunities available across the several areas on the larger OPC site amenable for picnicking. These include the Community Grove, Lagoon View Lawn, the Great Lawn and the Lagoon Grove, among other spaces. There will be a minimum of one acre of informal picnicking space collectively within these spaces. Other green areas of the OPC Site include the playground, the roof of the Forum building, the Women's Garden, etc.

> The Perennial Garden/Women's Garden is used for gardening, aesthetic enjoyment, commemorations, sitting, walking, nature observation, meditation, gathering, and play. Existing features of the historic garden will be removed and replaced with a new design of equivalent size and improved accessibility upon completion of the OPC.

> Opportunities for informal recreation will also be impacted by the OPC construction. Such areas have no formal uses, but are used informally for sitting, walking, gathering, pick-up games (soccer, other), play, and for landscaping or as buffer between recreation areas and sidewalks, paths, and roadways. These opportunities will continue to exist on the OPC site as well as in new landscaped areas made available by the closure of portions of the Midway Plaisance and Cornell Drive on the site, as discussed below.

> Opportunities for play on a structured facility will also be reconfigured. The 62nd Street playground will be relocated and expanded by the Foundation as part of the OPC construction to the immediate northwest of the current location, with an enlarged footprint and all new equipment, including custom-made experiential play features.

In addition to replacing existing recreational opportunities, the OPC includes the development of new recreational opportunities. The Program, Athletic and Activity Center will provide a new opportunity for indoor public recreational programs. Other new recreation amenities on the OPC site include a sledding hill, great lawn, nature trail, and woodland walk.

The proposed alterations of roadways that will remain in the park (e.g. changes that will improve traffic flow and safety) may affect various open park spaces used for informal recreation as well as some sidewalks and pathways used for walking, jogging, and biking. The park spaces that would be lost to roadway alterations are linear, narrow and mainly serve as landscape buffer between roadways and more functional recreation areas nearby. Although some pathways and sidewalks will be removed when the roadways described above are closed and converted to greenspace, new pathways and sidewalks are proposed to replace the affected pathways and sidewalks while also providing improved connectivity and circulation within the park. Proposed underpasses will also facilitate better connectivity and safety. As part of the OPC site development, the City intends to close certain roadways within Jackson Park and convert those roadways into parkland to also satisfy UPARR. The City will restore these new areas, comprising approximately 7.75 acres of open space, to provide replacement recreation opportunities.

Finally, the City proposes to replace recreational opportunities within the UPARR conversion area on the east end of the Midway Plaisance, located east of the ICRR embankment. It is bounded by the North and South Midway Plaisance, Stony Island Avenue, and the ICRR viaduct and embankment. This area is approximately 5.2 acres. It has two mixed-use trails and a sidewalk. The majority of the east end of Midway Plaisance is an open lawn lined with trees. The open space contains the historic Cheney Goode Memorial and non-historic features, including park benches, an informational kiosk, and a wetland. The Cheney Goode Memorial consists of a bench and sundial placed on the western side of the east end of the Midway Plaisance in 1932. The Cheney Goode Memorial location is noted on Figure 3 of Appendix B. Though tree patterns have changed in most of the area, the westernmost portion of the lawn area has an elevated landscape containing dense plantings and trees that have historically provided screening of the ICRR (now Metra Electric) rail line.

The east end of the Midway Plaisance was among seven potential sites the City evaluated for UPARR replacement recreation. These included Harold Washington Park and five vacant sites between 57th Street and 71st Street. The City evaluated the sites that could offer the same quality of recreational opportunities within a mature landscape, walkability to Chicago's lakefront, and walkability to neighborhoods surrounding the OPC site. The City also considered anticipated cost, feasibility, and complexity of using the sites for UPARR replacement recreation. The vacant sites and Harold Washington Park were ruled out for UPARR-designated recreation because they lack all or most of the key characteristics and because they present feasibility concerns. In contrast, the east end of the Midway Plaisance exhibits each of the key characteristics. The Midway Plaisance is already integrated into the same park system as Jackson Park and like Jackson Park, provides a historic setting for recreation. The City believes the historic setting is valuable and enhances the experience of the space. The City also owns the Midway Plaisance, substantially limiting the risk of unforeseen complexities like

environmental contamination. For these reasons, the City proposes the east end of Midway Plaisance for UPARR replacement recreation, see 36 CFR 72.72(b)(3).

To replace lost recreational opportunities, and respond to community requests for additional recreation opportunity, the City proposes to reconfigure the east end of Midway Plaisance to include a combination of open space and a formal play area. A concept plan of the proposed recreational changes within the east end of the Midway is presented in Figure 3 of Appendix B. The western side of the lawn would be altered with the addition of a play area. The installation of a missing historic walk and tree patterns rehabilitate historic spatial organization, to a historically open character with corner plantings. The sunken grade of the lawn area would be modified to facilitate infiltration and drainage and to enhance use of the open field. This work may require a Section 404 permit from USACE. There will be no alterations to the configuration of existing roadways or walking paths. The concept plan establishes a design envelope for the purpose of analyzing potential impacts to historic properties. Within these parameters, the City will make final design selections (such as specific playground equipment) with input from the public and in light of the historic nature of the Midway Plaisance, seeking to minimize any potential effects to historic resources, pathways, and plantings, to the extent possible. The schedule for public input for the final design will be announced by the City following completion of the Federal review process.

Finally, the City proposes to replace parkland converted to roadways (approximately 5.25 acres) with roadways converted to parkland (approximately 7.75 acres), resulting in a net gain of approximately 2.5 acres of open space in Jackson Park for additional public recreation use. The former roadways will be integrated into Jackson Park and support recreational opportunities similar to those lost as a result of road widening and other road improvements within the park in order to improve traffic. The nearly optimal equivalence of location and utility of this area made it the City's preferred location compared with locating additional recreation opportunities outside the park. Alternative locations outside Jackson Park would lack the exceptional integration afforded by the City's preferred alternative in historic Jackson Park and would require the City to purchase and/or remediate property and accept the risk of unknown site conditions.

## 1.2    National Park Service Action

The UPARR program, administered by the NPS, provided grant funds to Jackson Park in the early 1980s. These grants require the City to maintain public recreation uses within the UPARR boundary in Jackson Park. NPS will review and approve any changes within Jackson Park that convert a recreation use to a non-recreation use. NPS approval is conditioned upon the change being in accord with the current local park plan, adequate replacement recreation property, and opportunities of reasonably equivalent location and usefulness, see 54 U.S.C. §200507. While NPS reviews the adequacy of the replacement recreation, NPS does not have authority over local City land management, including the location and design of the OPC, proposed road closures, and the final design of the proposed recreation amenities.

The need for the NPS action arises from the City's decision to authorize the location of the OPC within Jackson Park and modify the roadway network in and around Jackson Park. Elements of these projects change areas that were previously in recreation use to non-recreation uses, thus triggering a partial conversion under UPARR. The purpose of the NPS action is to review and approve a partial conversion of UPARR parkland. If the conditions outlined in the law and regulations are met, the NPS will amend the original UPARR grant agreements to remove the area no longer in recreation and incorporate the City's proposed replacement recreation property.

Evaluation of the City's proposed replacement land includes the review of current recreation uses within the identified conversion areas. The UPARR conversion areas include a portion of the OPC site as well as areas where proposed roadway widening or realignment occurs. These conversion areas are shown and noted on Exhibits 2-5 in Appendix A.

The NPS will review the proposed recreation uses associated with the replacement areas along with the City's justification to determine if they are reasonably equivalent to lost opportunities based on regulatory criteria, described at 36 CFR 72.72. The UPARR regulations do not mandate acre-for-acre replacement of recreation land. The proposed replacement areas are shown on Exhibits 2-5 in Appendix A.

## 1.3    Federal Highway Administration Action

The purpose of the FHWA action is to (1) address changes in travel patterns resulting from closing roadways in Jackson Park, and (2) improve bicycle and pedestrian access and circulation.

The FHWA administers the Federal-Aid Highway Program, which makes available Federal funding to state departments of transportation and local agencies for roadway projects. The Chicago Department of Transportation (CDOT) proposes to use Federal-aid highway funding for roadway construction activities to mitigate traffic impacts from the proposed closure of roadways within Jackson Park. The FHWA does not have any authority under UPARR, including proposed boundary changes or replacement recreational land under UPARR. Nor does it have authority over the design and location of the OPC or proposed roadway closures by the City. Prior to the authorization of Federal-aid highway funds, the FHWA must ensure the transportation project meets all Federal requirements, including but not limited

to compliance with the National Environmental Policy Act (NEPA), Section 4(f) of the United States Department of Transportation (USDOT) Act of 1966, and Section 106 of the NHPA.

An alternatives analysis (available on the project website, www.tinyURL.com/JPImprovements) considered a wide range of proposed roadway, bicycle, and pedestrian alterations to meet the FHWA's purpose and need, while avoiding or minimizing impacts to historic properties and other resources. These considerations are further discussed in Section 5.0. Generally, the roadway alterations considered under the proposed FHWA action occur along Lake Shore Drive, Hayes Drive, and Stony Island Avenue and their intersecting roadways. Proposed bicycle and pedestrian improvements include five underpasses, additional trails, and enhanced access accommodations. This preliminary Preferred Alternative was found to best meet the transportation project's purpose and need while also minimizing impacts to historic properties and other resources.

The proposed roadway, bicycle, and pedestrian alterations considered under the FHWA action are shown on Exhibits 2-5 in Appendix A.

## 1.4    U.S. Army Corps of Engineers Action

The City will be requesting the USACE to take the following actions:

1) authorize proposed discharges of fill material into waters of the United States, and

2) to alter a Federally-funded ecosystem restoration project under the Great Lakes Fishery & Ecosystem Restoration (GLFER) program.

The City of Chicago's underlying purpose for requesting these authorizations is stated previously in Section 1.1 and 1.4.

The proposed roadway work will require three permits under Section 404 of the Clean Water Act (33 USC 1251 *et seq.*) authorizing the discharge of fill material to Federal waters. First is the City's proposal to widen Lake Shore Drive involves expanding the 59th Street bridge abutment. This work will result in a discharge of fill material and require a Section 404 permit. Second, the City's proposal to dewater the portion of the lagoon under Hayes Drive to complete bridge improvements will result in a discharge of fill material and will require a Section 404 permit. Third, the City's proposal to improve the east end of the Midway Plaisance for replacement recreation may require the City to fill a wetland, requiring a Section 404 permit. The construction of the OPC will also result in temporary and permanent impacts to the GLFER project in Jackson Park. This proposed alteration requires USACE permission pursuant to Section 14 of the Rivers and Harbors Act (RHA) of 1899 (33 USC 408), commonly referred to as "Section 408."

It is expected that the USACE will evaluate the Section 404 actions under the USACE Chicago District's Regional Permit Program (RPP), whereby USACE staff will determine whether the City's actions comply with the terms and conditions that were established as part of the public interest review undertaken in the establishment of the RPP. The USACE will "verify" that the activities are authorized by the RPP. If

the actions are not reviewed under the RPP, the USACE will process the requests under the Individual Permit process described at 33 CFR 325.

Evaluation of the USACE Section 408 action will be completed as described in Engineer Circular 1165-2-220. This includes a determination whether the proposed alteration will impair the usefulness of the GLFER project, and whether the proposed alteration is in the public interest.

The proposed locations requiring authorization of a Section 404 permit and areas associated with impacts to and replacement of the GLFER project under the USACE action are shown on Exhibits 2-5 in Appendix A.

## 3.3    Historic Properties with Potential for Effects

The properties that could potentially be affected by the undertaking are listed in Table 6. The undertaking occurs within or directly adjacent to these historic properties. The effect of the undertaking on each of the properties listed in Table 6 is assessed in Sections 3.5, 3.6, and 3.7.

*Table 6: Historic Properties with Potential for Effects*

| Historic Property | Analysis Required |
|---|---|
| Jackson Park Historic Landscape District and Midway Plaisance | Requires Effect Evaluation |
| Chicago Park Boulevard System Historic District | Requires Effect Evaluation |
| Stony Island State Trust and Savings Bank/Stony Island Arts Bank | Requires Effect Evaluation |
| Island Terrace Apartment Building | Requires Effect Evaluation |
| Hyde Park Academy High School | Requires Effect Evaluation |
| Jackson Park Terrace Historic District | Requires Effect Evaluation |
| Hyde Park-Kenwood Historic District | Requires Effect Evaluation |

## 3.4    Presentation of Assessment

Effects to historic properties listed in Table 6 above were assessed using the methodology described in Section 3.1. The following sections include an effect determination for each historic property based on the undertaking as a whole. In the case of the Jackson Park Historic District and Midway Plaisance, the discussion includes a detailed description of the effects from the individual components of the undertaking – i.e., the NPS action, the FHWA action, the USACE action, and the non-Federal actions that are connected to the Federal actions (roadway closures, the development of the OPC site, and the track and field relocation).

Following the assessment of effects to each historic property, a cumulative impacts analysis is included to evaluate the effect of the undertaking combined with the effect of projects that are likely to occur but are independent from the undertaking.

The project sponsor (the City of Chicago) has agreed to this request and has included an evaluation of effects from related non-Federal actions (roadway closures, the development of the OPC site, and the track and field relocation). Neither FHWA nor NPS has direct or indirect jurisdiction over these non-Federal actions. The inclusion of this evaluation does not obligate either NPS or FHWA to address mitigation related to these actions, nor does it commit either NPS or FHWA to proceeding similarly with respect to other undertakings or obligate these agencies to future mitigation actions not related to the Federal actions.

## 3.5    Jackson Park Historic Landscape District and Midway Plaisance

### 3.5.1    Description of Jackson Park Historic Landscape District and Midway Plaisance

The Jackson Park Historic Landscape District and Midway Plaisance is all part of one NRHP-listed historic property located on the South Side of Chicago, Illinois. East of Stony Island Avenue, Jackson Park is roughly bounded by 67th Street, 56th Street, and Lake Michigan. West of Stony Island Avenue, the Midway Plaisance is roughly bounded by 60th Street, Cottage Grove Avenue, and 59th Street. The historic property (district) consists of two parks, Jackson Park and the Midway Plaisance, respectively to the east and west of S. Stony Island Avenue. Established in the 1850s, the raised tracks of the ICCR railway line cross the Midway Plaisance near its eastern end, creating a portion of the park referred to in this AOE report as the east end of the Midway. The historic property is listed in the National Register of Historic Places (NRHP 1972) for national and state significance in the areas of landscape architecture, architecture, science, sculpture, and urban planning. Under Criterion C, the historic property embodies the distinctive characteristics of a type, period, or method of construction; or represents the work of a master; or possesses high artistic values; or represents a significant and distinguishable entity whose components may lack individual distinction.

The 2018 HPI report provides detailed background information on Jackson Park and the Midway Plaisance and its historical significance. In brief, these parks are set in a mixed-use urban context that includes, in the immediate vicinity and perimeter, residential, commercial, and civic development on a scale ranging from open lots to small residences to large structures of more than thirty stories in various architectural styles ranging from Beaux Arts to Gothic Revival to Modernist. The period of significance for Jackson Park and the Midway Plaisance spans nearly one-hundred years, from 1875 to 1968. The timeframe encompasses design and initial construction in the 1870s by Olmsted, Vaux & Co., the 1893 World's Colombian Exposition, subsequent redevelopment as a park based on the 1895-1897 plans by firms associated with Frederick Law Olmsted, Sr., and additions associated with the Works Progress Administration (WPA) and the Chicago Park District (CPD) through 1968. The seminal effort to create integrated parkland after the World's Columbian Exposition was the collaborative effort of the South Parks Commission with the Olmsted firm in its various manifestations: Olmsted, Olmsted & Eliot (1893-1897) and briefly F.L. and J.C. Olmsted (1897). The leading master landscape architects included Frederick Law Olmsted, Sr., his partners John Charles Olmsted, Charles Eliot and Frederick Law Olmsted, Jr., and collaborators Warren Henry Manning and Edward D. Bolton. In the twentieth century, renowned landscape architects working through the Chicago Park District, including May McAdams and Alfred Caldwell, designed harmonious landscape interventions during the period of significance. The result is a layered history reflecting both original design concepts and evolving expressions that together reflect the historical significance of Jackson Park and the Midway Plaisance.

The HPI report identifies the resources that contribute to the historic property, including 3 sites, 16 buildings, 12 structures, and 5 objects. Landscape features that contribute to the significance of the property reflect the design intent and principles that the original designer, the firm of Frederick Law Olmsted, Sr., applied in order to create a public park serving as open space for use by the community. A

full explanation of the historic design principles that informed the historic property's development is included on pages 11 and 12 of the HPI.

As community needs have changed, alterations to the park have been necessary to sustain its purpose, but the park continues to retain historic integrity because the overall effect of previous alterations retained consistency with the original design principles. For example, the early addition of major park amenities such as a golf course, gardens, bridges, buildings, and monuments reflected the original design principles, as did subsequent changes that fulfilled the 1905 and 1930 General Plans, which updated the original, post-1893 design. The period of significance includes many changes to accommodate the automobile as an increasingly important mode of transportation along the broad park drives; however, accommodation for high-volume commuter traffic affected the historic character and materials in many locations throughout the park. In later years, infill of the North and South Bayous and part of the East Lagoon removed visual and physical connection across the once-interconnected waterways, and the intentional demolition of ornate bridges and buildings in the 1960s introduced changes that were incongruous with the historic park character. However, community advocacy related to these incongruities led to changes that helped reestablish the many areas as public open space.

In aggregate, the majority of alterations to the historic property over time have been consistent with the original design principles applied by the firm of Frederick Law Olmsted, Sr. As established by the HPI, the combination of compatible and incompatible changes made to date do not impair the integrity of the existing character-defining features reflecting the original design principles.

Photographs of Jackson Park and the Midway Plaisance are provided in Photos 1 through 9 in Appendix C.

### 3.5.2 Assessment of Effects on Jackson Park Historic Landscape District and Midway Plaisance

Individual resources and features of the historic property referenced in this assessment of effects are identified in Appendix A, Exhibit 3: Jackson Park and Midway Plaisance Contributing Resources, and Exhibit 4: Jackson Park and Midway Plaisance – Referenced Cultural Landscape Features.

#### 3.5.2.1    Effect Determination

The proposed undertaking will have an ***adverse effect*** to Jackson Park Historic Landscape District and Midway Plaisance because it will alter, directly and indirectly, characteristics of the historic property that qualify it for inclusion in the National Register. While the determination of adverse effect is explained below, the Cultural Resources Unit of IDOT has reviewed the continued NRHP eligibility of the historic district in light of the effect determination and concluded that the proposed changes will not sufficiently diminish or remove the overall integrity of the historic district in such a way that it would no longer qualify for NRHP listing (See Appendix E: IDOT Memorandum).

The significance of Jackson Park and the Midway Plaisance is manifested in the integrity of extant landscape resources, as opposed to those no longer remaining or those planned but never built. The overall historic property conveys the character present during the period of significance from 1875-1968

and currently possesses historic integrity of location, design, setting, materials, workmanship, feeling, and association. Explanation of the integrity and features of the landscape is included in Appendix F of the HPI.

The proposed undertaking alters contributing resources of the historic property including one comprehensive site, which is defined as the cultural landscape. Affected landscape characteristics include: Spatial Organization, Land Use, and Views; Circulation; Topography; Vegetation; and Buildings, Structures, and Small Scale Elements.

The following assessment of the historic property includes two sections: *Summary of the Adverse Effect to the Cultural Landscape* and *Effects from Federal Actions*.

3.5.2.1.1        Summary of the Adverse Effect to the Cultural Landscape

This section includes a summary of the adverse effects to the cultural landscape organized by landscape characteristics identified as contributing features in the HPI as adapted from *The Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for the Treatment of Cultural Landscapes*.

Effects to Spatial Organization, Land Use, and Views
- The proposed undertaking alters historic, internal spatial divisions between Jackson Park and the Midway Plaisance, which were designed by the Olmsted firm to compose a single entity, the South Park System (consisting of Jackson Park, the Midway Plaisance, and Washington Park, a separate historic district outside of the APE). Changes to roadways and placement of buildings within the spatial geometries established by designed patterns of circulation, vegetation, and views between the Midway Plaisance and the parks to the east (Jackson Park) and west (Washington Park) alters the historic designed relationship that is a basic aspect of the design of the historic property.
- Overall, physical changes concentrated in the western perimeter of Jackson Park and the east end of the Midway Plaisance would impact adjacent park areas originally differentiated by the Olmsted firm, including the lagoons, fields, lake shore, and museum grounds. The changes alter the legibility of the design of the cultural landscape in ways that diminish the integrity of spatial organization demonstrated by internal divisions of the property.
    - The OPC campus development alters the historic spatial organization of distinct, historic spaces:
        - Perennial Garden/Women's Garden;
        - Western Perimeter Playground; and,
        - North field/gymnasium.
- The proposed undertaking alters portions of the historic road network, which provides a framework for the historic property's designed spatial organization (also see Circulation).
    - Roadway closures alter the shape, form, and function of the historic primary entrance to the property by changing the historic symmetrical roadway design and spatial patterns that define the designed connection between Jackson Park and the Midway Plaisance.

- Contributing recreational use of the western perimeter is altered with installation of a new museum, institutional buildings, parking, and associated landscape development.
- Development of the OPC alters the integrity of key historic viewpoints including the East Lagoon (Music Court) Bridge, the Wooded Island North Bridge, and the west side of the Wooded Island, within the lagoon area of the historic property.

Effects to Circulation

- The proposed undertaking alters portions of the historic road network, which changes the relationship between interconnected systems of pedestrian and vehicular circulation and the distribution of the road hierarchy as originally designed and developed during the period of significance.
- Reconfiguration of Hayes Drive relocates sections of the historic road and pedestrian routes at the intersection of Hayes and Richards Drives, changing the historic character associated with the relationship between vehicular and pedestrian routes.
- The proposed undertaking alters physical components of specific historic roads and paths:
  - Removal of paths:
    - U-shaped walk defining the Western Perimeter Playground;
    - Walks along the south side of the Midway Plaisance (South Roadway, eastbound) between Stony Island Avenue, Cornell Drive, and the west side of the north field/gymnasium; and,
    - Entry walks framing and leading to the Perennial Garden/Women's Garden within the western perimeter.
  - Removal of roadways:
    - Midway Plaisance (South Roadway; eastbound) between Stony Island Avenue and Cornell Drive;
    - Cornell Drive between 59th Street and Hayes Drive;
    - Northbound portion of Cornell Drive south of Hayes Drive between 65th Street and 67th Street;
    - Marquette Drive between Stony Island Avenue and Richards Drive; and,
    - Richards Drive and Marquette Drive intersection.

Effects to Topography

- The subtle berms at the edges of the north field/gymnasium (outer edge of the park and S. Cornell Drive) within the western perimeter are altered.
- The sunken topographic bowl of the Perennial Garden/Women's Garden is altered.

Effects to Water Features

- The proposed undertaking does not result in adverse effects to water features that are character defining features of the cultural landscape.

Effects to Vegetation

- Historic vegetation patterns are altered:
  - Canopy trees surrounding playing fields;
  - Street trees at the park perimeter; and,
  - Terraced planting beds of the Perennial Garden/Women's Garden within the western perimeter.

Effects to Buildings, Structures, and Small Scale Elements

- The setting of some contributing buildings, structures, and small-scale elements is changed in ways that are inconsistent with the *Secretary of the Interior's Standards for the Treatment of Historic Properties*:
  - The setting of the Statue of the Republic is changed by alterations to the Hayes Drive and Richards Drive intersection.
  - The setting of the English Comfort Station, formed by the Western Perimeter Playground, is altered with adjacent new buildings and a campus.
- The prominence of the Museum of Science and Industry building, which is part of the overall composition and design intent of balancing park scenery with specific built areas, is diminished by the addition of new prominent buildings within the historic district. New buildings and an associated campus removes, replaces, or otherwise alters historic resources and landscape features within portions of the historic property. New materials with modern functions differ from historic materials at a scale and intent that does not conform to the *Secretary of the Interior's Standards*. Integrity of workmanship is obscured by changes to the park design, the addition of new features and materials, and by the removal and alteration of historic fabric.
- The stone retaining walls forming the beds of the Perennial Garden/Women's Garden are removed.

The combined changes diminish the sense of the historic period within the historic district and impact the integrity of design, materials, workmanship, and feeling with respect to specific elements of the historic district. The changes impact how Jackson Park and the Midway Plaisance reflect conscious decisions made by the Olmsted firm in determining spatial organization, relationships between major features, views, patterns of circulation, arrangement of vegetation, and hierarchy of buildings and other constructed features.

### 3.5.2.2    Effects to the Cultural Landscape from Federal Actions

This section describes the effects of each Federal action on contributing resources of the historic district and explains the cause and nature of changes to extant historic character for each contributing feature of the cultural landscape.

UPARR Partial Conversion Area within Jackson Park

If approved by NPS, the partial conversion of the area around the OPC buildings in Jackson Park would result in lifting the existing UPARR restrictions from this area and transferring the restrictions to the east end of the Midway Plaisance (east of the railroad embankment and viaduct). The change in legal status of these areas does not in itself cause physical effects on historic properties.

City Proposed UPARR Replacement Area within the East End of the Midway Plaisance

The City's proposed use of the east end of the Midway Plaisance for replacement recreation would preserve the historic character of this section of the Midway. The current layout and recreation use on this area is described in Section 1.1.1.3. Designed as part of a formal boulevard and unrealized channel between Washington Park and Jackson Park, the east end of the Midway Plaisance has been maintained as sunken lawn with perimeter plantings since the early 1890s. The sunken landform defines the space and creates a simple, formal, designed connection between the rest of the Midway Plaisance west of the ICRR viaduct and the Perennial Garden/Women's Garden in Jackson Park. Aspects of remaining historic character include spatial organization, topography, and paths; however, spatial patterns of vegetation have changed and one path has been lost. Minor changes in grades over time have led to the emergence of a wetland near S. Stony Island Avenue that has become more prominent since the 1980s.

The City proposes to rehabilitate lost features of the historic landscape while also enhancing the site for recreation use. These goals are not mutually exclusive. Frequent flooding of the large sunken lawn on the site is currently an impediment to recreational use. Instead of filling the existing, non-historic wetland, the City proposes to (1) install a stormwater infiltration system to drain the site, (2) perform limited grading to return symmetrical balance in areas that have experienced minor topographic deviation over time, while retaining the sunken aspect of the lawn, (3) reestablish pre-1960s spatial planting patterns – namely triangular plantings in the four corners of the central lawn – to recreate a smaller, symmetrical, and roughly cruciform-shaped lawn, and (4) install a historic, missing north-south path in the area depicted on Figure 3 in Appendix B, creating open space for recreation. This work may require a section 404 permit from USACE. The City proposes to install a play area near the center of the new path adjacent to the Cheney Goode Memorial. The features of the play area would retain the simple formality of open space that reflects the historic design principle of informal symmetry and balance in design. The patterns of street trees and massing of plants along the ICRR embankment would be retained as vestiges of the historic planting pattern in this part of the Midway Plaisance that are different yet designed in relation to the panels west of the ICRR viaduct. The proposed changes do not alter the historic designed relationship that exists between this eastern panel, the remainder of the Midway Plaisance, and the designed extensions through roadway alignments into Jackson Park and Washington Park.

The proposed play area would minimally modify the setting and feeling of the historic Cheney Goode Memorial (Appendix A, Exhibit 3b: 34). The Memorial consists of a concrete bench and sundial placed on the western side of the eastern Midway Plaisance to honor women's rights advocates Flora Sylvester Cheney and Senator Katherine Hancock Goode in 1932. The addition of the path adjacent to the Memorial rehabilitates the alignment of a missing historic route and increases access to the Memorial. The changes would not alter the location, materials, workmanship, design, and association of the Memorial itself. The addition of a play area east of the Memorial would be designed by a design professional meeting Secretary of the Interior's Historic Preservation Professional Qualification Standards and in accordance with the Guidelines for Rehabilitating Cultural Landscapes.[5]

_____

[5] https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/approach.htm.

Proposed Changes along Lake Shore Drive

Proposed changes to Lake Shore Drive expand road width and affect related intersections but do not alter aspects of the road that retain integrity. As part of the historic vehicular circulation network, the road persists as a broad, multilane drive along a similar curvilinear alignment that defined the boundary between the lake shore and the interior of the park. Designed approximately 60' wide by the Olmsted firm in the 1890s, Lake Shore Drive has always been one of the widest roads in the park. The proposed widening and additional traffic anticipated along Lake Shore Drive will change traffic noise levels; however, the change between existing and future conditions is less than 3 dBA, which is not a perceptible change.

The widening of Lake Shore Drive requires the alteration of the contributing 59th Street Bridge (North Inlet Bridge). The alteration is consistent with the *Secretary of the Interior's Standards*. The project does not alter bridge features that convey integrity, including location, design, and feeling.

The widening of the 59th Street Bridge requires a Section 404 permit from the USACE. The widening of Lake Shore Drive expands the intersections at 57th Drive, Science Drive, and Hayes Drive. The existing roadway alignments at these three locations result from several modifications to alignment between the 1980s and 2000s. Contributing features are not impacted by the adjustment of these non-contributing roadway intersections.

The addition of a lane from E. 57th Street to E. Hayes Drive also results in removal of historic parkland along the west side of the contributing roadway (Appendix A, Exhibit 4a: 1-2k). The widening of approximately two feet for an additional lane generally follows the historic alignment of the road, creating only a minor change to the historic spatial organization, and does not significantly affect historic features and materials. The widening occurs within the historic view toward Lake Michigan from the adjacent Bowling Green located southwest of the Museum of Science and Industry; however, these changes do not change the character or type of features present within the viewshed and overall setting is not changed (Appendix A, Exhibit 4a: 1-4f). The widening increases the visual presence of the roadway from the Bowling Green by increasing the proximity of traffic, but the degree of change is minimal. The change in traffic noise levels between existing and future conditions is less than 3 dBA, which is not a perceptible change.

Areas affected by change from parkland to roadway along Lake Shore Drive will be revegetated and regraded to match the existing landscape following GLFER precedent and historic design principles. Vegetation and paths installed under GLFER, while not historic contributing features, align with the *Secretary of the Interior's Standards* as a rehabilitation of portions of the historic property. The narrow band of plantings associated with GLFER that are removed by lane expansion and realignment of the previously altered intersection of Lake Shore Drive and Hayes Drive will be replaced along the east bank of the Jackson Park Inner Harbor (Appendix A, Exhibit 3b). The additional lane and removal of parkland along the road conforms to the *Secretary of the Interior's Standards*. The project does not "radically

change, obscure, or destroy character-defining spatial organization and land patterns or features and materials."[6] These changes to the GLFER program require a Section 408 permission from the USACE.

Hayes Drive Reconfiguration

The reconfiguration of Hayes Drive between Stony Island Avenue and Lake Shore Drive includes sections of altered roadway that conform to the *Secretary of the Interior's Standards* and other sections that deviate from those standards. Overall, the widening of the roadway creates a minor change to spatial organization and does not significantly affect adjacent historic features. Changes in traffic noise levels between existing and future conditions along Hayes Drive are equal to or less than 3 dBA, which is not a perceptible change. The majority of the roadway alignment is maintained. Hayes Drive largely reflects its origin as a wide park drive (approximately 50 feet) following the Olmsted firm plans of the 1890s. The exceptions to the maintenance of existing alignments are at the Hayes Drive intersections with Cornell Drive and Richards Drive.

Realignment of the intersection of Hayes Drive and Cornell Drive is consistent with the *Secretary of the Interior's Standards*.[7] The proposed realignment replaces a non-contributing portion of Cornell Drive with a missing historic roadway pattern that provided a curved form to adjacent parkland (Appendix A, Exhibit 4b: 1-2h). The reconfiguration of the intersection includes two pedestrian underpasses that entail the alteration of historic pedestrian paths and low berms directly southeast of the intersection to accommodate the changes, which are intended to improve park safety and accessibility. The realignment overlaps areas of vegetation planted under the GLFER project around the previously altered intersection. Areas converted from roadway to parkland along Hayes Drive will be revegetated and regraded to match the existing landscape following GLFER precedent. Existing plantings will be replaced with new plantings of equivalent coverage along the east bank of the Inner Harbor following GLFER precedent. These changes to the GLFER program require a Section 408 permission from the USACE. Alterations from the realignment minimally affect the historic character of the circulation network and topography in this area. Underpasses are discussed under Bicycle/Pedestrian Enhancements below.

Realignment of the intersection of Hayes Drive with Richards Drive is not consistent with the *Secretary of the Interior's Standards*."[8] The realignment replaces the historic triangular intersection (Appendix A, Exhibit 4b: 1-2j) with a T-shaped intersection and changes roads and walks that define historic spatial organization and views within the setting of the *Statue of the Republic* (Appendix A, Exhibit 3b: 26). Rising above a circular traffic island, the statue marks the center of the triangular intersection of Hayes Drive and Richards Drive and commemorates the twenty-fifth anniversary of the 1893 World's Columbian Exposition in 1918. The historic design is arranged to highlight the statue as the central focal point of surrounding roads and position the monument to be viewed from vehicles or at a distance from walks. Placed on a traffic island with crossings located some distance away, the contributing statue was

---

[6]https://www.nps.gov/TPS/standards/four-treatments/landscape-guidelines/rehab/circulation.htm
https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/approach.htm
[7] https://www.nps.gov/TPS/standards/four-treatments/landscape-guidelines/rehab/circulation.htm
[8] https://www.nps.gov/TPS/standards/four-treatments/landscape-guidelines/rehab/circulation.htm

sited in a setting where it was not intended to be regularly accessed by park users on foot. The relationship between viewers and the statue is balanced by distance and speed.

The new design of the roadway bypasses the *Statue of the Republic* that is the focal point of the historic intersection. The construction of a pedestrian plaza replaces one of the last remaining historic vehicular triangular intersections within the park and the circular traffic island with a new feature (pedestrian plaza) that alters the historic circulation pattern. The contributing triangular intersection channels movement, directs views, and creates a setting for the statue. The new pedestrian zone changes the relationship between the vehicular intersection, pedestrian routes, and the statue. Although the shape of the pedestrian plaza reflects the portion of the removed roadway that formed the intersection, the intentional balance of the scale of the statue with the speed and alignment of the road is changed and the historic character of the design is altered. Realignment of the triangular intersection deviates from the design principles of informal symmetry and balance in design, unified composition, and orchestration of movement. In addition, the realignment will introduce visual elements that diminish the integrity the *Statue of the Republic*. While performing a safety function, the addition of a standard traffic signal adjacent to the statue introduces an upright, colored visual element that diminishes the integrity of the setting of the statue.

Alteration of Hayes Drive between Richards Drive and Lake Shore Drive is consistent with the *Secretary of the Interior's Standards* because it minimally affects contributing features and preserves the historic character of the historic property. The roadway alignment and footprint remain the same at the contributing Hayes Drive Bridge and do not alter features that contribute to the integrity of the historic bridge. Repairs to the Hayes Drive Bridge require a Section 404 permit from the USACE. Adjustment of the Hayes Drive curb line and adjacent paths removes slivers of parkland planted under GLFER. Areas affected will be revegetated and regraded to match the existing landscape following GLFER precedent. Existing plantings will be replaced with new plantings of equivalent coverage along the east bank of the Inner Harbor. These changes to the GLFER program require a Section 408 permission from the USACE. Accommodation of a pedestrian underpass on Hayes Drive west of Lake Shore Drive creates minor changes to the predominantly level topography and presents no change to the character of views from the roadway between the *Statue of the Republic* and Lake Michigan (Appendix A, Exhibit 4b).

Stony Island Avenue Improvements

Changes to Stony Island Avenue do not change the overall character of the use or contributing physical features of the historic property. Highway noise levels along Stony Island Avenue within Jackson Park will not change more than 3 dBA, which is considered not to be a perceptible change. Widening the roadway will occupy parkland along the historic property's perimeter, realign historic sidewalks, and modify the thinly screened buffer with tree rows, groves, and subtle berms (Appendix A, Exhibit 4b: 1-1a); however, the character of the features will not be substantially altered. The project will realign sidewalks and regrade adjacent berms; however, the association of the road with the sidewalk and setting of perimeter topography and vegetation remains. While contributing features are altered by additions for new use, historic character is preserved in accordance with the *Secretary of the Interior's Standards* that require "that these features are not radically changed, obscured, damaged, or

destroyed."[9] In addition, alteration of Stony Island Avenue at the intersection of the Midway Plaisance (North Roadway) includes minor widening of the road (Appendix A, Exhibit 4b). The change to circulation follows the historic alignment and is consistent with the *Secretary of the Interior's Standards*.

Other Proposed Transportation Changes

The FHWA action also proposes changes to the character of the historic property's use and physical features along the east bank of the Jackson Park Inner Harbor, along Marquette Drive between Richards Drive and Stony Island, and along Cornell Drive north of Hayes Drive. The project will rehabilitate a deteriorated historic path and lagoon overlook along the Inner Harbor (Appendix A, Exhibit 4b: 1-2u). New plantings between the path and the shore of the Inner Harbor consist of replacement vegetation for areas associated with the GLFER project that were removed by the FHWA action. The changes to the GLFER program require a Section 408 permission from the USACE. Plantings in this area follow historic design principles, align with the precedent of the GLFER project, and are consistent with the *Secretary of the Interior's Standards*.

In these areas, the construction of pedestrian-scale walks deviates from the 1895 design and the subsequent construction of the existing, interrelated vehicular and pedestrian circulation system, including broad, tree-lined roadways that help to establish historic spatial organization. Along Marquette Drive, the new walk follows the alignment of the removed portion of the historic roadway (Appendix A, Exhibit 4b: 1-2f). There are no perceptible (less than 3 dBA) noise level changes along these roadways as a result of the proposed improvements.

For the removed portion of Cornell Drive north of Hayes Drive, the new walk approximates the existing road alignment near the West Lagoon and connects to the walk proposed as a part of the OPC development. The walk maintains views over the West Lagoon as a pedestrian experience but removes these views as a vehicular experience (Appendix A, Exhibit 4a: 1-4a). Designed by the Olmsted firm in the 1890s as a 50' wide, multilane road, Cornell Drive is a principal organizing element that makes up the historic spatial organization of the park. While road size is close to the scale of the historic design, the character of current vehicular speed and volume is higher than historic vehicular usage, which has affected the character of historic feeling along the drive. The proposed changes eliminate the high traffic volume from the roadway. While the new walks help to minimize the impacts on historic designs from removal of roads they do not fully address the change in balance between pedestrian and vehicular circulation throughout the historic property that was part of the Olmsted principle of orchestration of movement. The new walks temporarily impact plantings associated with the GLFER project, requiring a Section 408 permission from the USACE.

Bicycle/Pedestrian Enhancements

The proposed enhancements for bicycle and pedestrian use through underpasses and additional access do not introduce visual elements that diminish the integrity of the historic property. The construction of five shared-use underpasses (1) at the east end of Hayes Drive, (2) at the middle of Jeffery Avenue, (3)

---

[9] https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/approach.htm

east of the intersection of Hayes Drive and Cornell Drive, (4) west of the intersection of Hayes Drive and Cornell Drive, and (5) at the southeast end of Marquette Drive, inserts a new type of circulation feature in the park for the purpose of improving park access and circulation while also enhancing public safety.[10] Although the underpasses require minor alterations to historic topography and vegetation, their design does not radically obscure the character-defining spatial organization or land patterns of the site (cultural landscape) and is consistent with the *Secretary of the Interior's Standards*.[11] The underpasses at Hayes Drive and Cornell Drive lower grades along historic walks and raise roadway grades along approximately 300 feet to accommodate the underpasses. Grades are repaired and new vegetation is installed reflecting historic patterns. New routes connect to existing walks in each location and facilitate continuity of the contributing pedestrian network across the historic property. The Hayes Drive and Cornell Drive underpasses will have impacts on plantings associated with the GLFER project, requiring a Section 408 permission from the USACE.

The addition of pedestrian refuge islands along Stony Island Avenue, Cornell Drive near the Museum of Science and Industry, and at the intersection of Hayes Drive and Richards Drive are consistent with the *Secretary of the Interior's Standards* associated with health and safety considerations. The addition of curb extensions along Stony Island Avenue are similarly consistent.[12]

In general, the installation of sidewalk ramps, upgrading of marked and unmarked crossings, and changes to traffic signals and timing sequences throughout the historic property are consistent with the *Secretary of the Interior's Standards* associated with health and safety considerations.[13]

### 3.5.2.3    Effects from Non-Federal Actions

<u>Roadway Closures</u>

The closure and subsequent removal of roadways results in physical damage to the historic vehicular network and individual historic road segments in the south and west parts of the historic property. Historic road segments proposed for removal include: Midway Plaisance (South Roadway; eastbound) between Stony Island Avenue and Cornell Drive; Cornell Drive between 59th and 62nd Streets; the northbound portion of Cornell Drive south of Hayes Drive from 65th Street to 66th Place; and Marquette Drive between Stony Island Avenue and Richards Drive. These roads retain historic alignments and continue to define interior spaces, compose the historic sequence of people's movement through the landscape, and provide access to key historic locations as intended by the historic design of the site (cultural landscape).

Road closures remove historic roadways that are part of the historic property and replace them with parkland. This action alters the historic circulation network and affects the balance of the designed road hierarchy. Roadway closures affect the designed relationship between vehicular and pedestrian circulation in which modes of movement, views, and vegetation are interrelated elements. Removal of

---

[10] https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/approach.htm
[11] https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/approach.htm
[12] https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/special.htm
[13] https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/special.htm

historic roadways alters spatial organization of the overall park, reduces differentiation of landscape character areas within the historic property, and is not consistent with the *Secretary of the Interior's Standards* that recommend the retention and preservation of historic land patterns and circulation systems.[14]

Closure of the Midway Plaisance (South Roadway; eastbound) between Stony Island Avenue and Cornell Drive removes a historic circulation route. This roadway segment demonstrates a particularly strong expression of historic landscape character related to the design of the property in the 1890s plans of the Olmsted firm. The south roadway of the Midway Plaisance forms part of the formal and balanced juncture between the eastern parts of the original South Park (Jackson Park, the Midway Plaisance, and Washington Park) as proposed prior to the World's Columbian Exposition in the 1871 plan. Closure of the roadway section removes an aspect of spatial organization that is basic to the historic design of Jackson Park at its connection to the Midway Plaisance. This closure removes contributing historic circulation and spatial organization at the primary public interface with both Jackson Park and the Midway Plaisance. The action would eliminate the purposeful connection between and symmetrical composition of this distinct portion of the historic property.

Closure of Marquette Drive between Stony Island Avenue and Richards Drive also converts a contributing roadway into parkland. Developed as an internal park drive (approximately 32 to 36 feet wide) following the 1905 General Plan, Marquette Drive reflects its historic alignment with the exception of the western connection to S. Cornell Drive. In addition to removal of this roadway segment, the change eliminates the original, contributing triangular intersection with Richards Drive (Appendix A, Exhibit 4b: 1-2g). This is one of the last remaining triangular intersections within the park. The intersection and Marquette Drive approximately between S. Creiger Avenue and Lake Shore Drive demonstrate particularly strong expressions of historic landscape character related to the design of the property. The road closures alter contributing spatial organization and circulation routes.

Closure of Cornell Drive north of Hayes Drive between 59th and 62nd Streets and the northbound portion of Cornell Drive south of Hayes Drive between 65th Street and 66th Place removes a road segment that contributes to the historic circulation network of the property.

Closure of Cornell Drive between 62nd and 65th Streets and between 66th Place and 67th Street will not alter the integrity of the historic property (district) because substantial modification of these roadway segments occurred previously, and these sections of road do not contribute to the significance of the cultural landscape.

OPC Site Development

Implementation of the OPC will affect the overall site/cultural landscape of the Jackson Park Landscape District and Midway Plaisance, including the Perennial Garden/Women's Garden, the English Comfort Station, and the Western Perimeter Playground (E. 62nd Street playground) (Appendix A, Exhibit 4a and 4b).

---

[14] https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/circulation.htm

The OPC will transform the cultural landscape within the project footprint and affect some contributing features beyond the footprint. The project site overlays part of the western perimeter of the historic property. The proposed design replaces contributing landscape characteristics, which include spatial organization, topography, vegetation, and circulation, with new features. While location of proposed partially underground buildings, development of green roofs on three of the buildings, and planting new trees reduces the visibility of new buildings within the landscape and provides the appearance of green space, its implementation will change the character of the historic landscape. In particular, the addition of the Museum Building and other buildings will alter the historic design principles of the prominence of landscape scenery, unified composition, and orchestration of use within the historic open space of the project footprint. This is not consistent with the *Secretary of the Interior's Standards* that state: "When alterations to a cultural landscape are needed to assure its continued use, it is most important that such alterations do not radically change, obscure, or destroy character-defining spatial organization and land patterns or features and materials."[15]

Changes to the cultural landscape directly north of the proposed OPC buildings but within the project footprint remove physical features that contribute to the significance of the historic property. A new garden will replace the historic Perennial Garden/Women's Garden, designed in 1936 by May McAdam, Chicago Park District's first female landscape architect (Appendix A, Exhibit 4a: 1-10). The garden lies within the center of the formal terminus of the Midway Plaisance in Jackson Park and was historically developed to be symmetrically framed by the main park drives and adjacent walks of the Midway Plaisance north and south roadways, Stony Island Avenue, and Cornell Drive. The sunken basin of the garden remains from incomplete excavations for a waterway proposed by the Olmsted firm along the Midway Plaisance following the removal of the Woman's Pavilion of the 1893 World Columbian Exposition. The changes to the garden will make the space universally accessible, by removing steps currently surrounding the garden, and introducing new accessible paths around the perimeter and down to the sunken garden. The new design incorporates several characteristics of the historic garden, including the approximate interior dimensions, general shape and location, three entry paths, walled edges, surrounding plant beds, and plant types. The new garden demonstrates aspects of the original design principles of juxtaposition of design formality, informal symmetry and balance, and sustainable design and environmental conservation; however, extant historic materials are removed and the organization of the space is altered to implement the proposed design. The symmetrical layout of concentric rings of planting beds and paths will be replaced with asymmetrical winding paths, gathering spaces, and planting areas. Historic materials including stone edged terraced planting beds, steps, and vegetation, will be removed. The symmetrical triangular path intersections at the east side of the space that define the transition from the Midway Plaisance to Jackson Park will be replaced with asymmetrical paths (Appendix A, Exhibit 4b: 1-2m). Removal of the relatively uniform topographic setting surrounding the sunken garden and replacement with undulating terrain does not correspond to the formality of the historic design in relation to its setting. The comprehensive changes to garden features also impact the direct, historical association of the garden to its legacy of female designers. Implementation of the new

---

[15] https://www.nps.gov/TPS/standards/four-treatments/landscape-guidelines/rehab/approach.htm

garden physically damages this part of the site (cultural landscape) that contributes to the historic property.

With the exception of the English Comfort Station building (Appendix A, Exhibit 3a-16), the remainder of the contributing historic features south of the Perennial Garden/Women's Garden to 62nd Street will be removed or altered to accommodate the elements associated with the OPC. The western perimeter exhibits integrity to the period of significance and demonstrates continuity in the larger patterns of spatial organization, land use, views, circulation, and tree massing. As noted on the 1895 General Plan, the western perimeter and the Museum of Science and Industry grounds were designed along formal, architectural lines as a park edge that interfaces with the adjacent residential areas and contrasts with the more scenic areas of the lake shore, fields, and lagoons. The formal areas of the park were to be lighted after dark and always kept open in contrast to the more rural areas. Portions of the OPC campus internally demonstrate this design directive; however, the overall development deviates from contributing spatial organization related to the full park perimeter and adjacent areas. The area designed and designated by the Olmsted firm as an outdoor place for exercise (he used the term "gymnasia") retains the designed composition and general form of two, symmetrical open fields surrounded by canopy trees that are joined in the middle by the layout of the Western Perimeter Playground and English Comfort Station (Appendix A, Exhibit 4a: 1-7). Olmsted's use of "men's gymnasium" and "women's gymnasium" for the north and south fields refers to the original meaning of the word as a general place of exercise, rather than as a room or building for enclosed sporting activities. Part of the Library Building, lawns, picnic areas, and a playground replace the open athletic field and track of the existing north field/gymnasium. Historic walks designed parallel to existing historic roadways will be removed between the north field/gymnasium along Cornell Drive and between Cornell Drive and the Midway Plaisance (South Roadway; eastbound). The changes to this portion of the historic property are not consistent with the *Secretary of the Interior's Standards* that stipulate the need to preserve contributing historic features and discourage "placing a new feature where it may cause damage to, or be intrusive in spatial organization and land patterns." The *Secretary of the Interior's Standards* cite an example of inserting a new visitor center that blocks or alters a historic view or vista."[16] The addition of buildings, service facilities, paths, and landscaping changes contributing spatial organization, topography, vegetation, and circulation in the location of the contributing playground and the historic fields of the western perimeter.

The addition of a two-level athletic center (the PAAC) and paved pedestrian paths and play area involve reconfiguration of historic paths, spaces, and play areas, and the replacement of vegetation. This alters historic design, setting, and feeling of the contributing spatial organization, walkways, and canopy trees of the Western Perimeter Playground. The contributing playground site provides a symmetrical landscape setting around the historic English Comfort Station and a designed fulcrum to the balanced layout of the historic fields to the north and south (Appendix A, Exhibit 4a: 1-2p). The current playground does not contain historic play equipment. Replacement of the character-defining, U-shaped walk with asymmetrical pathways around an athletic center (the PAAC) departs from the original application of historic design principles with respect to the setting of the historic resource and its

---

[16] https://www.nps.gov/TPS/standards/four-treatments/landscape-guidelines/rehab/spatial.htm

relationship to the cultural landscape. The new, substantially larger playground is located north of the existing playground. Historic and proposed uses remain dedicated to community recreation in this area. Although the new playground and picnic areas will be approximately nine times larger than the historic playground, the development of the PAAC and associated grounds results in removal of distinctive uses, features, and spatial relationships that characterize this portion of the historic property, and therefore is inconsistent with the *Secretary of the Interior's Standards* which emphasize the retention of historic character, distinctive features, and characteristic spatial relationships.

Historic views are part of the cultural landscape that contribute to the Jackson Park Landscape District and Midway Plaisance. Construction of the OPC includes the addition of new visual elements that diminish the integrity of views within Jackson Park and the Midway Plaisance along the western perimeter of this historic property. Tall buildings exist outside of the historic property but not within it. Within this historic property, the comparatively low-lying Museum of Science and Industry building was intended as the only building to be a "dominating object of interest" inside of Jackson Park and the Midway Plaisance.[17] The OPC Museum Building affects views within this historic property by drawing specific focus to an exceptionally prominent building. This building will disrupt historic, designed views over parkland from the East Lagoon (Music Court) Bridge (Appendix A, Exhibit 4a: 1-4b), the Wooded Island North Bridge (Appendix A, Exhibit 4a: 1-4c), and the west side of the Wooded Island (Appendix A, Exhibit 4a: 1-4d). Westward and southward views from these locations reveal a designed setting with features of the waterways, a backdrop of tree canopy, and tall buildings and residential development that recede into the background outside of the boundary of the historic property. In general, constructed OPC site elements and buildings are more densely concentrated near S. Stony Island Avenue than toward the east of the project footprint which is characterized by lawn and trees. Deliberate design and siting to blend into the landscape setting partially align to historic design principles; however, the proposed project diverges from the design principles of the prominence of landscape scenery and a unified composition by proposing new building mass and landforms within the park that draw specific focus on the façade of the Museum Building.

Views east from the Midway Plaisance west of the ICRR viaduct are typified by the linear arrangement of roads, walks, and trees with tall buildings at the edges or rising above the horizon in the distance. The views from the Midway Plaisance are indicators of the symmetrical organization of spatial patterns and axial relationship between the Midway Plaisance and Jackson Park. In contrast to the aforementioned views within Jackson Park, the contributing aspects of these views are minimally altered by the proposed OPC site development.

The OPC construction alters historically important topography that defines spaces, forms a unifying element along the western perimeter, and provides a sense of physical and visual separation between uses. Within the OPC footprint, the historic berms between E. 60th Street and E. 62nd Street and west of S. Cornell Drive are removed in some locations to provide level access and accentuated in height in other areas (Appendix A, Exhibit 4a: 1-1a, 1-1b). The proposed design provides topography that

---

[17] Correspondence from Olmsted to Donnersberger May 7, 1894. Washington DC, Library of Congress, Olmsted Papers) Series A34:79.

functions as a physical and visual buffer between the park and the neighborhood setting; however, the design adds buildings and landscape features that detract from and alter extant historic topography.

Construction of the OPC also changes existing historic vegetation in a way that is inconsistent with the *Secretary of the Interior's Standards* which emphasize the retention, preservation, protection, and maintenance of historic materials and features. The historic planting design and extant patterns of historic vegetation were designed to create interest in the landscape, provide buffers, define spaces, reinforce circulation routes and views, and create a sense of removal from the surrounding city. While new plantings associated with the OPC were designed to fulfill these functions for the new facilities of the OPC, the design results in partial removal of Olmsted-designed historic vegetation patterns including groves of canopy trees around the historic playing fields and regular rows of trees along the streetscape (Appendix A, Exhibit 4a: 1-5, 1-7). Placement of a small sewer lift station near the OPC site includes the placement of utility covers and a modified embankment in an area of GLFER plantings along the west bank of the West Lagoon. This requires a Section 408 permission from the USACE. The project does not affect the waterbody and the affected area will be revegetated and regraded to match the existing landscape. Existing plantings will be replaced with new plantings of equivalent coverage along the east bank of the Inner Harbor following GLFER precedent (Appendix A, Exhibit 4b: 1-2u).

Track and Field Relocation

This action relocates the track and field  to an area with ball fields that were added in the 1940s within one of the two open fields (or "gymnasia") designed for outdoor recreation along the western perimeter (Appendix A, Exhibit 4a: 1-7). The action raises a portion of the recessed topography to accommodate the track and field and realigns a historic path along Cornell Drive; however, it relocates existing features from a similar location that continues to demonstrate historic integrity. The proposed changes to contributing topography and walks on the west edge of the proposed track and field continue to demonstrate character-defining patterns.[18] The introduction of similar features will not further diminish the integrity of the historic property in the proposed location. The relocation is consistent with the *Secretary of the Interior's Standards* because it retains overall patterns and preserves the southern field as an open recreational space.[19]

---

[18] https://www.nps.gov/TPS/standards/four-treatments/landscape-guidelines/rehab/approach.htm
[19] https://www.nps.gov/TPS/standards/four-treatments/landscape-guidelines/rehab/spatial.htm

## 3.6     The Chicago Park Boulevard System Historic District

### 3.6.1   Description of property

The Chicago Park Boulevard System Historic District (CPBS Historic District) consists of approximately 1,700 acres along 26 miles within the City and roughly spans from W. Logan Boulevard and the Kennedy Expressway on the north to E. 67th Street and S. South Shore Drive on the south. The district includes 19 boulevards, 6 squares, 8 parks, and 2,096 adjacent buildings from the period of significance that face the parks, boulevards and squares and contribute to the significance of the system. The CPBS Historic District covers a vast geographic area and includes a total of 2,136 contributing resources.

The CPBS Historic District was listed on the NRHP in December 2018 under Criterion A at the national level for Community Planning and Development as the first comprehensive system of greenways for a major city in the United States. The system was created to foster healthful, livable neighborhoods and to spur residential development in what was then the outskirts of the City. The district is also significant under Criterion C at the local level for Architecture, representing the types and styles of buildings constructed in Chicago from 1869 through 1942, and for Landscape Architecture as a designed landscape that expresses a comprehensive artistic quality unlike any other in Chicago. The architectural streetscapes along the boulevards are identified in the nomination as a "frame" to the landscaped medians and parks upon which they sit, and in turn these landscaped spaces were the focal points for their neighborhoods. The buildings framing the CPBS Historic District exhibit a wide variety of architectural styles that distinguish them from buildings outside the CPBS and that express the stylistic development of Chicago.

The period of significance for the district is 1869 to 1942 and encompasses the years legislation was passed establishing the system through the end of substantial improvements to the system. The Chicago Park Boulevard System is associated with the country's most important early landscape architects and was one of the nation's first major systems. As noted in its nomination, the CPBS Historic District "goes beyond the story of the parks alone and beyond the narrative of a single segment of Chicago's continuous park and boulevard system. It attempts to view the city's park and boulevard system more holistically."  The NRHP nomination for the district notes that the integrity of individual resources and landscape features varies, but the historic district overall retains a high level of integrity.

The portion of the CPBS Historic District that lies within the APE for this undertaking generally includes 59th and 60th Streets between Cottage Grove and Stony Island Avenues, streets that surround Jackson Park (56th, 67th and Stony Island), as well as the entirety of the Jackson Park Historic Landscape District and Midway Plaisance. This part of the CPBS district overlaps with portions of the Hyde Park East Historic District [eligible] and the Hyde Park-Kenwood Historic District, and includes individually listed properties such as the Windermere East Hotel and Shoreline Apartments. See Table I in Appendix A and the HPI addendum for a summary of contributing resources.

The majority of the properties within the APE that contribute to the CPBS Historic District were previously identified in the HPI as either listed or eligible for listing on the NRHP. Individual resources

and features of the CPBS Historic District are identified in Appendix A, Exhibit 5: Chicago Park Boulevard System Historic District - Contributing Resources.

### 3.6.1.1    Effect Determination

The proposed undertaking will have an adverse effect to the CPBS Historic District because it will alter, directly and indirectly, characteristics of one portion of the district that qualify it for inclusion in the National Register. However, the proposed changes associated with the undertaking will not diminish the overall integrity of the CPBS Historic District in such a way that it would no longer qualify for NRHP listing.

The Jackson Park Historic Landscape District and Midway Plaisance is a contributing resource to the CPBS Historic District. The adverse effect on the Jackson Park Historic Landscape District and Midway Plaisance constitutes an adverse effect on a contributing resource of the CPBS Historic District. Both NRHP districts (CPBS and Jackson Park/Midway) have significance under Criterion C in the areas of urban planning/community planning and development, landscape architecture, and architecture. The assessment of effects for the Jackson Park Historic Landscape District and Midway Plaisance discussed in Section 3.5 also applies to the assessment of effects on the CPBS Historic District.

The effect on the CPBS Historic District stemming from the adverse effect on the Jackson Park Historic Landscape District and Midway Plaisance is limited to one park among twelve parks contributing to the CPBS Historic District, among thousands of other specific resources contributing to the roughly 1,700-acre district that stretches along 26 miles within the City. Also, as discussed above in Section 3.5, the Jackson Park Historic Landscape District and Midway Plaisance continues to be eligible for listing on the NRHP, meaning that it retains the integrity to convey its historic significance and, thus, to contribute to the CPBS Historic District. Thus, the noted adverse effect of the undertaking on the CPBS Historic District does not render it ineligible to qualify for NRHP listing.

The proposed undertaking will not significantly alter relevant characteristics of the remaining contributing resources in the CPBS Historic District. There are only three buildings that contribute solely to the CPBS Historic District and that may be affected by the undertaking: one along E. 67th Street and two along S. Stony Island Avenue. The effect of the proposed undertaking on these buildings is evaluated below.

### 3.6.1.2    Assessment of Effects on property

As summarized above, the buildings within the CPBS Historic District are significant due to their placement on the boulevard facing the open space, as well as their individual architectural quality. The siting of the individual properties is of primary importance since the grouping and density of buildings create the frame of the boulevard system. Changes to the landscaped areas upon which the buildings face have occurred, but such changes do not diminish the contribution of the buildings to the system as a whole.

The majority of the contributing resources of the CPBS Historic District are located outside the APE (approximately 23 of 26 miles of parks and boulevards). The portion within the APE includes portions of

two other historic districts, and, for the most part, the overlapping districts share the same contributing resources.

The two properties on S. Stony Island Avenue (6516-6520 S. Stony Island Avenue/1556-1558 E. 65th Place, and 6450-6460 S. Stony Island Avenue/1554-1556 E. 65th Street) which are contributing resources solely to the CPBS Historic District are located approximately 500 feet south (0.10 miles) of the site of future OPC buildings within the UPARR conversion area. The buildings are also located in the vicinity of proposed roadway changes, including sidewalk improvements, widening of S. Stony Island Avenue, and the realignment of S. Hayes Drive and S. Cornell Drive south of Hayes Drive. These resources comprise a Craftsman-style multiple dwelling and a Classical Revival-style multiple-use building, both of which are three stories in height and typical of early-twentieth-century architectural forms and styles in Chicago and mixed-use buildings commonly bordering the Boulevard system.

Although the undertaking will introduce physical changes to the setting of these properties, the visual and physical relationship between the buildings and Jackson Park will be maintained and none of the changes will affect features of their setting that contribute to their historic significance. It is unlikely that there will be significant visual effects to these properties associated with the project. The OPC Museum Building will not be visible at street-level, but may be visually perceptible at units on upper floors, see Photos at Location 8 in Appendix D-2. Despite the potential visibility of the undertaking from these properties, the potential changes will not impact features of the resources that contribute to the significance of the CPBS Historic District. The undertaking will not alter the integrity of location, design, workmanship, materials, feeling, and association of these two resources; further, the undertaking will not cause any physical changes or a change in use to the two contributing resources.

The property at 2015-17 E. 67th Street/6700-12 S. Chappel Avenue contributes to the CPBS Historic District solely and no effect was determined as documented above in Section 3.2. Also, Photo 22 in Appendix D-1 illustrates that the OPC is not visible.

The contribution of Jackson Park and the Midway Plaisance to the historic significance of the Chicago Park Boulevard System is discussed in the NRHP nomination for the CPBS Historic District. The undertaking has the potential to affect the Jackson Park Historic Landscape District and the Midway Plaisance, which is a contributing resource to the CPBS Historic District. The proposed undertaking alters the cultural landscape of the parks, including spatial organization, land use, and views; circulation; topography; vegetation; and buildings, structures, and small scale elements. Details of this assessment of effects can be found in Section 3.5. Because the undertaking adversely affects the Jackson Park Historic Landscape District and Midway Plaisance, which contributes to the significance of the CBPS Historic District, the undertaking will result in an adverse effect on the CPBS Historic District.

## 3.7    Other Historic Properties

Photographs to and from Jackson Park for each of the remaining historic properties identified in the HPI with potential effects from the Federal actions are provided in Photos 10 through 24 in Appendix C.

### 3.7.1   Stony Island State Trust & Savings Bank (Stony Island Arts Bank)

#### 3.7.1.1      Description of property

The Stony Island State Trust & Savings Bank, known today as the Stony Island Arts Bank, sits on the west side of S. Stony Island Avenue, between E. 67th Place and E. 68th Street at 6760 S. Stony Island Avenue, see Exhibit 2 in Appendix A. In December 2013, the Stony Island Trust & Savings Bank was individually listed in the NRHP under Criterion A for fine commercial architecture and its financial history and under Criterion C for architecture. During the property's Period of Significance of 1923 to 1931, the fine Classical Revival style bank served as a center of the South Shore community's economic life and symbol of the neighborhood prosperity of that era.

The Stony Island State Trust & Savings Bank retains a very high level of integrity of location, design, workmanship, and materials in relation to its architectural significance. After sitting vacant for over three decades, the building was restored and redeveloped by a non-profit arts organization for use as a community center and art gallery in 2013. Because the restoration project retained a substantial amount of the original fabric, and many interior spaces continue to express its original bank/office functions, the property also retains a high degree of integrity of feeling and association. However, the property retains a low degree of integrity of setting.

During its Period of Significance, the monumental Classical Revival style bank stood within a vibrant commercial district. Between the 1970s and the early 21st century, many of the surrounding small historic commercial buildings were razed. Some of the area's numerous open spaces have been redeveloped as small commercial strip malls with surface parking lots in front of the businesses. The property's integrity of setting has also been affected by several roadway projects including the widening of S. Stony Island Avenue (ca. 1940s, late 1960s, early 1980s) and construction of the S. Cornell Drive spur (ca. 1975) since the property's Period of Significance.

#### 3.7.1.2      Effect Determination

The undertaking will not alter the Stony Island Trust & Savings Bank's integrity of location, design, workmanship, materials, feeling and association. The property's integrity of setting is quite low. Since 1931, the end of the Period of Significance for this property as determined by its NRHP form, the Stony Island Trust & Savings Bank's setting has undergone substantial changes, as noted above. The OPC Museum Building may be visually perceptible from some vantage points (Photo 6 in Appendix D-1); however, it will only be seen in distant views, and there are other high-rises in closer proximity to the property. Although the OPC Museum Building will be more than minimally visible from the Stony Island State Trust and Savings Bank, the modified viewshed does not alter the characteristics and aspects of integrity that qualify the building for inclusion in the NRHP.  The undertaking will not further diminish

the property's already extremely low integrity of setting. Therefore, the undertaking will have **no adverse effect** to the Stony Island Trust & Savings Bank.

### 3.7.1.3     Assessment of Effects on property

The Stony Island Trust & Savings Bank is located a considerable distance from the site of the future OPC buildings within the UPARR conversion area – approximately 4,000 feet or 0.75 miles – but is closer in proximity to some of the associated roadway closures and improvements. The property is 600 feet from the southernmost limit of the northbound lanes of S. Cornell Drive north of E. 67th Street (within Jackson Park), which will be closed and is proposed as UPARR replacement land. It is also located along the southern end of the roadway improvement work along S. Stony Island Avenue at E. 68th Street. The roadway improvements include reconfiguration of the south approach to the S. Stony Island Avenue intersection with E. 67th Street resulting from the removal of the northbound lanes of S. Cornell Avenue from E. 68th Street to the north. Roadway widening along S. Stony Island Avenue is proposed north of the E. 67th Street intersection. Sidewalk improvements are also proposed along S. Stony Island Avenue. However, these improvements do not occur adjacent to the Stony Island Trust & Savings Bank, and there will be no physical changes to the property associated with the roadway closures and improvements. A noise analysis has determined that there will be no perceptible audible differences (less than a 3 dBA change in noise level) to the Stony Island Trust & Savings Bank associated with the roadway improvements. There may be some visual changes to the property's setting due to its location along a portion of the to-be-removed northbound lanes of S. Cornell Drive, but this roadway configuration was constructed in the late 1970s after the property's Period of Significance; therefore, these changes will have no effect on the property or the features of its setting that contribute to its significance.

The development of the OPC will not cause any physical changes to the Stony Island Trust & Savings Bank, though there may be some visual effects associated with the project. As shown in Photo 6 in Appendix D, the construction of the OPC Museum Building may be visually perceptible from the Stony Island Arts Bank. Although this addition may introduce a visual change within the park/neighborhood setting from the Stony Island Arts Bank, the construction of the high-rise Good Shepard Manor Senior Center apartments at 6720 S. Cornell Avenue in the late 1980s has previously altered this view.

The relocation of the Jackson Park track and field is located 3,400 feet (0.6 miles) from the Stony Island Trust & Savings Bank. It will not cause any physical changes to the property, nor will it be visible from the property. Similarly, due to their distance from the property, there are no effects to the Stony Island Trust & Savings Bank associated with the USACE Section 404 permit authorizations or Section 408 permission.

## 3.7.2   Island Terrace Apartment Building

### 3.7.2.1     Description of property

The Island Terrace Apartment Building is located on the west side of S. Stony Island Avenue between E. 64th and E. 65th Streets at 6430 S. Stony Island Avenue and was built in 1969, see Exhibit 2 in Appendix A. The Island Terrace Apartment Building was determined to be individually eligible for listing in the NRHP

under Criterion A for its Woodlawn community and affordable housing history and Criterion C for architecture on July 10, 2018 per the historic resource survey forms prepared for this project. Produced by the noteworthy architectural firm of Dubin, Dubin, Black, & Moutoussamy, the structure was one of the neighborhood's first Modern high-rises designed to provide affordable apartments to moderate and low-income renters.

The Island Terrace Apartment Building has had only minimal alterations since its completion in 1969 and thus retains a high level of integrity of location, design, workmanship, materials, feeling and association in relation to its architectural significance. The property also possesses integrity of feeling and association as a Modern building with high-quality, affordable apartments with close visual and physical access to Jackson Park and its expansive landscape.

The Island Terrace Apartment Building's integrity of setting, however, is low. Since the late 1960s, approximately a dozen structures north, south, northwest, and southwest of the Island Terrace Apartment Building have been demolished. By the mid-1990s, Walter Scott School, just northwest of the property, had also been razed and adjacent S. Harper Avenue was greened over. Mount Carmel High School built Haggerty Athletic Field on that site

The Island Terrace Apartment Building is bordered on the east by S. Stony Island Avenue and the green space of Jackson Park's western perimeter (labelled as LCA 1.1. in Figure 8 of the HPI), including the Jackson Park Field House to the northeast (built about a decade prior to the high-rise). To the southeast, the widening of S. Stony Island Avenue and construction of the S. Cornell Drive southbound spur to S. 65th Place were undertaken shortly after the Island Terrace Apartment Building was erected. The southern part of the western perimeter of Jackson Park has had few changes since the late 1960s when the Island Terrace Apartment Building was erected. However, due to the many other changes to the area, the property's integrity of setting has been considerably diminished.

### 3.7.2.2    Effect Determination

The undertaking will not alter the Island Terrace Apartment Building's integrity of location, design, workmanship, materials, feeling and association. Since 1978, the end of the Period of Significance for this property, the Island Terrace apartment's setting has undergone substantial changes. However, despite the property's low integrity of setting, the Island Terrace Apartment Building has continuously maintained its physical and visual relationship with Jackson Park. There may be some physical changes to the property's setting, including sidewalk improvements, widening of S. Stony Island Avenue, the realignment of S. Hayes Drive and S. Cornell Drive south of Hayes Drive, and new elements within its viewshed of Jackson Park such as visibility of the OPC Museum Building. The visual and physical relationship between the Island Terrace Apartments and Jackson Park will be maintained and none of these changes will cause effects to features that contribute to the significance of the Island Terrace Apartment Building and its eligibility to be listed on the National Register.  Although the OPC Museum Building will be more than minimally visible from the Island Terrace Apartment Building, the modified viewshed does not alter the characteristics and aspects of integrity that qualify the building for inclusion in the NRHP.  Therefore, the undertaking will have *no adverse effect* to the Island Terrace Apartment Building.

### 3.7.2.3    Assessment of Effects on property

The Island Terrace Apartment Building is located approximately 1,800 feet (0.3 miles) from the site of the future OPC buildings within the UPARR conversion area and approximately 300 feet west of the northbound S. Cornell Drive roadway closure considered as proposed UPARR replacement. The proposed UPARR replacement area along S. Cornell Drive may introduce some changes that could be visible from some units on the upper stories of the high-rise. However, the Island Terrace Apartment Building will continue to front onto S. Stony Island Avenue and will maintain its close physical and visual relationship with Jackson Park. Therefore, these visual changes would not alter the features of the property's setting that contribute to its historic significance. The proposed replacement recreation along S. Cornell Drive will consist of parkland and pathways, insulated from traffic, that offer improved opportunities for pedestrians and runners.

The Island Terrace Apartment Building is located along the west side of S. Stony Island Avenue where proposed roadway improvements from the FHWA action will occur. Roadway improvements include widening of S. Stony Island Avenue and improving intersections at E. 65th Street and E. 64th Street. Sidewalk improvements are proposed along the west side of S. Stony Island Avenue in front of the Island Terrace Apartment Building. This will include removing the existing narrow strip of parkway directly in front of the building. However, the property will continue to maintain its close physical and visual relationship with Jackson Park, and therefore, this minor alteration will not cause an effect on the features of the property's setting that contribute to its significance. In addition, there will be no perceptible audible changes (less than a 3 dBA change in noise level) associated with the proposed improvements.

The development of the OPC site and the relocation of the track and field may result in some new visual elements that may be seen from the Island Terrace Apartment building. As shown in Photos 8-9 in Appendix D-1 and Location 5 in Appendix D-2, the construction of the OPC Museum Building may be visible at street-level. The construction of the OPC Museum Building and the relocated track and field may also be visible from some units on the upper-levels of the building. The building will remain a Modern high-rise that fronts onto S. Stony Island Avenue and maintains close physical and visual relationships with Jackson Park and its expansive landscapes. Therefore, these changes will have no effect on the features of the property's setting that contributes to its significance.

Due to their distances from the property, there are no effects to the Island Terrace Apartment Building associated with the USACE Section 404 permit authorizations. Impacts to and replacement of GLFER plantings associated with the roadway improvements may be visible from the upper levels of the Island Terrace Apartment Building; however, the property will continue to maintain its close physical and visual relationship with Jackson Park, and therefore, this minor alteration will not cause an effect on the features of the property's setting that contribute to its significance.

No changes will occur to the Island Terrace Apartment building's use.

### 3.7.3   Hyde Park High School

### 3.7.3.1    Description of property

Hyde Park High School (known today as Hyde Park Academy High School) is located on the west side of S. Stony Island Avenue between E. 62nd and E. 63rd Streets at 6220 S. Stony Island Avenue, see Exhibit 2 in Appendix A. Hyde Park High School was determined to be individually eligible for listing in the NRHP under Criterion A for Hyde Park and Woodlawn community history, Criterion B for prominent alumni who attended such as Gwendolyn Brooks, and Criterion C for architecture on July 10, 2018 per the historic resource survey forms prepared for this project. Since its completion in 1913, the Beaux Arts style building housed a prominent public high school. The close physical and visual proximity to Jackson Park has always contributed to the property's significance.

Hyde Park High School retains excellent integrity of location, design, workmanship, and materials in relation to its architectural significance. Additions to the building were undertaken prior to the end of the 1978 Period of Significance, and were designed with compatible materials and design. The structure possesses integrity of feeling and association as a prominent public school that took full advantage of its proximity to and verdant views of Jackson Park. The property's integrity of setting has been somewhat diminished, however. Between the 1960s and 1980s, several properties south of Hyde Park High School were razed. These included low-rise apartment buildings; the Parkland Hotel at S. Stony Island and S. Harper Avenue; and a previous elevated railroad track and platform along E. 63d Street. The Chicago Public Schools installed a narrow rectangular surface parking lot south of the southern additions, and this was enlarged over the years.

Although the western perimeter of Jackson Park has had some changes over time (labelled as LCA 1.1 in Figure 8 of the HPI), lawn and trees have always been the predominant feature in views east from Hyde Park High School.

### 3.7.3.2    Effect Determination

The undertaking will not alter the Hyde Park High School's integrity of location, design, workmanship, materials, feeling and association. The property's integrity of setting has been somewhat diminished. Since 1978, the end of the Period of Significance for this property, the Hyde Park High School's setting has undergone substantial changes. However, despite this, Hyde Park High School's setting has continuously maintained its physical and visual relationship with Jackson Park. There may be some physical changes to the property's setting, including sidewalk improvements, widening of S. Stony Island Avenue, a realignment of S. Hayes Drive and S. Cornell Drive south of Hayes Drive in Jackson Park, and new elements such as the OPC Museum Building that may be perceptible within views from the Hyde Park High School. However, the visual and physical relationship between Hyde Park High School and Jackson Park will be maintained and none of these changes will cause effects to features that contribute to the significance of the Hyde Park High School Building and its eligibility to be listed on the National Register. Although the OPC Museum Building will be more than minimally visible from the Hyde Park School, the modified viewshed does not alter the characteristics and aspects of integrity that qualify the building for inclusion in the NRHP.  Therefore, the undertaking will have **no adverse effect** to the Hyde Park High School.

### 3.7.3.3    Assessment of Effects on property

Hyde Park High School is located approximately 750 feet (0.14 miles) south of the site of the future OPC buildings within the UPARR conversion area and approximately 575 feet (0.10 miles) west of S. Cornell Drive, which is proposed to be closed and used as replacement UPARR land. Despite the close proximity of the high school to the OPC site, the undertaking will not cause any physical changes to the property. The proposed UPARR replacement area along S. Cornell Drive may introduce some changes that could be visible from Hyde Park High School, but the school will continue to maintain its close physical and visual relationship with Jackson Park and, therefore, these visual changes will not affect the features of the property's setting that contribute to its historic significance.

The Hyde Park High School is located in close proximity to various proposed roadway improvements, including the widening of S. Stony Island Avenue, improvements at the E. 63rd Street and E. 62nd Street intersections, and sidewalk improvements along the west side of S. Stony Island Avenue in front of the school. None of these improvements will affect the features of the property's setting that contribute to its historic significance, as the property will continue to maintain its close physical and visual relationship with Jackson Park, and Stony Island Avenue has been historically widened over time. In addition, there will be no perceptible audible changes (less than a 3 dBA change in noise level) associated with the proposed roadway improvements.

The development of the OPC site and the relocation of the track and field may result in some new visual elements that could be perceptible within some views of the park from Hyde Park High School. As shown in Photo 10 in Appendix D-1 the construction of the OPC Museum Building may be visible at street-level. In addition, the Jackson Park track and field relocation is proposed to occur across the street from the property. As explained in the HPI, historically there were two oval tracks located at Jackson Park's western perimeter, and the south track (site of proposed relocated track) remained in the park longer than the track to the north. Even with these possible changes, Hyde Park High School will remain a fine Beaux Arts style school building that fronts onto S. Stony Island Avenue and maintains close physical and visual relationships with Jackson Park and its expansive landscapes.

Due to their distance from the Hyde Park High School, there are no effects to the Hyde Park High School associated with the USACE Section 404 permit authorizations. Impacts to and replacement of GLFER plantings may be visible from the Hyde Park High School, but the property will continue to maintain its close physical and visual relationship with Jackson Park and, therefore, this minor alteration will not affect the features of the property's setting that contribute to its significance.

The undertaking will not cause any changes to the Hyde Park High School's use.

### 3.7.4   Jackson Park Terrace Historic District

#### *3.7.4.1    Description of property*

The Jackson Park Terrace Historic District is located on the west side of S. Stony Island Avenue at 6018-6050 S. Stony Island Avenue / 6040-6050 S. Harper Avenue. Composed of 24 low-rise apartment structures and a 19-story high-rise, the complex is generally bounded by E. 61st Street, S. Blackstone Avenue, E. Public Way (S. Park Shore East), and S. Stony Island Avenue, see Exhibit 2 in Appendix A. The Jackson Park Terrace was determined to be eligible under Criterion A for Woodlawn Community and

housing history, Criterion B for its association with prominent community developers Leon D. Finney and E. Duke McNeil and Criterion C for architecture, listing as a historic district in the NRHP on July 10, 2018 per the historic resource survey forms prepared for this project. Developed by the Woodlawn Organization (TWO) to provide affordable housing and services in Woodlawn in the early 1970s, the complex was designed by renowned African-American planners and architects, Whitely-Whitley. This is the primary significance of this historic district: as a landmark development of the local African-American community in response to the threat of neighborhood urban renewal.

The Jackson Park Terrace Historic District retains a high degree of integrity of location, design, workmanship, and materials in relation to its architectural significance. It also retains a high level of integrity of feeling, and association as an affordable housing complex designed to take full advantage of its close proximity to Jackson Park and the Midway Plaisance. The Jackson Park Terrace's integrity of setting, however, has been somewhat diminished.

When the complex was built in the early 1970s, the area between its northernmost east-west street (one of two internal roadways called E. Public Way) and E. 60th Street was composed of lawn with the eight-story historic Plaisance Hotel at the corner of S. Stony Island Avenue and E. 60th Street. The hotel was demolished in the early 1980s, and a large rectangular surface parking lot was installed between the northern roadway (E. Public Way) and E. 60th Street around 2000. In addition, the Experiment Station/61st Street Farmer's Market (at E. 61st and S. Dorchester) installed an organic garden growing facility at the east end of the northern roadway (E. Public Way) in 2013. The area south of the Jackson Park Terrace complex, between E. 61st and E. 62nd Streets, was historically filled with low-rise apartments. These were replaced by the Park Shore East Co-op in 1980. Views east towards the western perimeter of Jackson Park (labelled as LCA 1.1 in Figure 8 of the HPI) have remained generally consistent over the years. Some park features have changed or were installed in the area across from the Jackson Park Terrace since its construction in 1974, including the 8-lane rubberized-surface track installed in 2000. Despite such changes, lawn and trees have always been the predominant features of east views.

### 3.7.4.2    Effect Determination

The undertaking will not alter the Jackson Park Terrace Historic District's integrity of location, design, workmanship, materials, feeling and association. The property's integrity of setting has been previously compromised. Since 1978, the end of the Period of Significance for this property, the areas north and south of the Jackson Park Terrace's setting have undergone substantial changes. To the east, some park features have changed since that time; however, the historic district has continuously maintained its physical and visual relationship with Jackson Park and the Midway Plaisance. While the OPC Museum Building will be visible, the property's setting with the visual and physical relationship between the property and Jackson Park and the Midway Plaisance will be maintained and none of these changes will cause effects to features that contribute to the significance of the Jackson Park Terrace Building and its eligibility to be listed on the National Register. Although the OPC Museum Building will be more than minimally visible from the Jackson Park Terrace Historic Distric, the modified viewshed does not alter the characteristics and aspects of integrity that qualify the building for inclusion in the NRHP.Therefore, the undertaking will have *no adverse effect* to the Jackson Park Terrace Historic District.

### 3.7.4.3    Assessment of Effects on property

The Jackson Park Terrace Historic District is located approximately 100 feet west of the future site of the OPC buildings within the UPARR conversion area across S. Stony Island Avenue. It is also located 350 feet (approximately 0.07 miles) south of the east end of the Midway Plaisance (a proposed site of UPARR replacement land). The district is also located along S. Stony Island Avenue in the vicinity of proposed roadway widening and intersection modifications at E. 60th Street and S. Midway Plaisance. Sidewalk improvements are also proposed along the west side of Stony Island Avenue in front of the property.

These roadway improvements may be perceptible within some views from the district, but will not affect any features of its setting that contribute to the property's historic significance as the property will continue to maintain its relationship with Jackson Park and the Midway Plaisance. In addition, there will be no perceptible audible changes (less than a 3 dBA change in noise level) associated with the proposed roadway improvements.

The development of the OPC site, roadway closures, and relocated track and field may also result in some new visual elements that could be perceptible within some views of units of the Jackson Park Terrace. As shown in Photo 11 in Appendix D-1, the OPC Museum Building will be visible from some vantage points within the complex. The removal of the 8-lane rubberized-surface track will have no impact on the historic district's integrity of setting because the track is not a historic feature and was constructed after the district's Period of Significance. Despite the introduction of some new visual elements, including views of the OPC Museum Building, the Jackson Park Terrace Historic District will maintain its close physical and visual relationships with Jackson Park, the Midway Plaisance, and their expansive landscapes.

Due to their distances from the property, there are no effects to the Jackson Park Terrace Historic District associated with the USACE Section 404 permit authorizations and Section 408 permission.

There will be no physical changes to the Jackson Park Terrace Historic District associated with the undertaking, nor will the undertaking cause any changes to the district's use.

## 3.7.5   Hyde Park-Kenwood Historic District

### 3.7.5.1    Description of property

The Hyde Park-Kenwood Historic District is bounded roughly by E. 59th Street on the south; E. 47th Street on the north; S. Lake Park Avenue from E. 47th Street to E. 56th Street and S. Stony Island Avenue from E. 56th Street to E. 59th Street on the east; and S. Cottage Grove Avenue on the west, see Exhibit 2 in Appendix A. In February 1979, the Hyde Park-Kenwood Historic District was officially listed on the NRHP under Criteria A, B, and C. Periods of Significance were not clearly specified in nomination forms of the 1970s; however, a Period of Significance of 1860-1937 can be inferred from the nomination form. Research and analysis were conducted for the HPI to evaluate properties erected between 1937 and 1978. This historic resources survey determined that numerous properties erected between 1937 and 1978 within the historic district could be deemed as contributing resources. Both the 1979 nomination and this recent survey determined that the Hyde Park-Kenwood Historic District possesses a large

collection of historic properties that have important associations with Jackson Park, the Midway Plaisance, and the University of Chicago.

The Hyde Park-Kenwood Historic District retains a high level of integrity of location, design, workmanship, and materials in relation to the architectural significance of its vast collection of buildings. The historic district also retains a high level of integrity of association, feeling, and setting as an exceptional residential and academic enclave with close physical and visual proximity to Jackson Park and the Midway Plaisance. The historic district is bisected by the ICRR (now Metra Electric) rail line. As shown in the HPI Figure 9, most of the Hyde Park-Kenwood Historic District lies outside of the APE boundaries and its setting is of an urban residential district. The historic resources survey determined that most of the structures built after 1978 have associations with the University of Chicago. Although the structures represent a broad range of architectural styles, designs, and materials, most of them are similar in scale and height to other nearby structures within the historic district. In addition, many have setbacks, courtyards, or other landscaped spaces that provide unity between these contemporary buildings, the historic properties, Jackson Park and the Midway Plaisance. Therefore, the addition of contemporary structures has not diminished the historic district's integrity of setting.

### 3.7.5.2    Effect Determination

The undertaking will not alter the Hyde Park-Kenwood Historic District integrity of location, design, workmanship, materials, feeling and association. There may be some physical changes to the property's setting (sidewalk improvements, widening of S. Stony Island Avenue, realignment of S. Hayes Drive and S. Cornell Drive south of Hayes Drive in Jackson Park, OPC Museum Building and other related new elements) that may be perceptible within views from some vantage points within the historic district. However, views of these changes will only be perceptible from a limited area within the historic district; the visual and physical relationship between Hyde Park-Kenwood Historic District and Jackson Park and the Midway Plaisance will be maintained and these changes will not affect features that contribute to the significance of the historic district or its setting. Although the OPC Museum Building will be more than minimally visible from the Hyde Park-Kenwood Historic District, the modified viewshed does not alter the characteristics and aspects of integrity that qualify the building for inclusion in the NRHP. Therefore, the undertaking will have **no adverse effect** to the Hyde Park-Kenwood Historic District.

### 3.7.5.3    Assessment of Effects on property

Most of the properties within the Hyde Park-Kenwood Historic District are located west of the ICRR viaduct and embankment and are a considerable distance away from the future site of the OPC buildings and the east end of the Midway Plaisance (a proposed site of UPARR replacement land). However, the southeast corner of the historic district (east of the viaduct and embankment) is located approximately 500 feet north (0.10 miles) of the site of the future OPC buildings within the UPARR conversion area and approximately 150 feet north of the east end of the Midway Plaisance (UPARR replacement land). Despite this close proximity, neither the future site of the OPC buildings nor the UPARR replacement land , either the east end of the Midway Plaisance or the site of roads that will be removed and converted to parkland, will cause any physical changes to the district or affect the features of its setting that contribute to its historic significance. The UPARR replacement areas on the east end of the Midway

Plaisance and along S. Cornell Drive may introduce changes that could be visible from vantage points within the historic district. Even with these changes, the Hyde Park-Kenwood Historic District will continue to maintain its close physical and visual relationship with Jackson Park and the Midway Plaisance and, therefore, these visual changes will not affect the features of the property's setting that contribute to its historic significance.

The southeast corner of the Hyde Park-Kenwood Historic District is located at the intersection of E. 59th Street and S. Stony Island Avenue, where some proposed intersection improvements will occur. Sidewalk improvements are also proposed at all corners of the intersection. There will be no physical changes to the historic district associated with this work, nor will the roadway improvements affect the features of the district's setting that contribute to its significance. In addition, there will be no perceptible audible changes (less than a 3 dBA change in noise level) associated with the proposed improvements.

Due to its distance from the property, there are no effects to the Hyde Park-Kenwood Historic District associated with the USACE Section 408 permission. The City will seek authorization under Section 404 of the Clean Water Act to allow for regrading and the installation of a sewer inlet to allow the wetland to drain, but the basic contours will remain the same. This area will be visible from some properties within the southeast corner of the Hyde Park-Kenwood Historic District; however, the district will continue to maintain its close physical and visual relationship with Jackson Park and the Midway Plaisance and, therefore, these visual changes will not affect the features of the property's setting that contribute to its historic significance.

The development of the OPC site, roadway closures, and relocated track and field may result in some new visual elements that could be perceptible within some vantage points within the Hyde Park-Kenwood Historic District. As shown in Photo 12 in Appendix D-1, from the Hyde Park-Kenwood Historic District, the OPC Museum Building will likely be visible from some vantage points, particularly along the southeast corner of the historic district. However, views 24, 25 and 26, Exhibit D-1 from within the district demonstrate there are no visual effects from these locations. The removal of the 8-lane rubberized-surface track will have no impact on the district's integrity of setting because the track is not a historic feature and was constructed after the district's Period of Significance. Despite some new visual elements, including views of the OPC Museum Building, the Hyde Park-Kenwood Historic District will maintain its close physical and visual relationships with Jackson Park, the Midway Plaisance, and their expansive landscapes as well as the integrity of its district setting as an urban, academic residential neighborhood.

No changes will occur to the uses of properties within the Hyde Park-Kenwood Historic District.

## 3.8    Cumulative Effects

### 3.8.1   Methodology

A cumulative effect is the impact on the environment which results from the incremental impact of the Federal action when added to other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person takes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

This analysis of cumulative effect assesses the result of combining the effects of the undertaking and other past, present, or reasonably foreseeable actions potentially affecting the same historic properties at the same time. The effects of the undertaking are described in detail in earlier sections of this report. These incremental effects are further assessed in combination with the effects of unrelated activities that are current and reasonably foreseeable and may impact the same historic resources. These activities include:

1) traffic signal interconnect improvements along Stony Island Avenue
2) improvements to separate the Lakefront Trail
3) the relocation and reconfiguration of baseball facilities in Jackson Park
4) improvements to the Osaka Garden on the Wooded Island
5) other improvements on the Wooded Island
6) potential improvements of the Columbia (Clarence Darrow) Bridge
7) resurfacing of eastbound and westbound Midway Plaisance between S. Payne Drive and S. Blackstone Avenue
8) Jackson Park Harbor Navigation Improvement project

These eight projects are independent of the undertaking that triggered this Section 106 process. If any of these separate projects qualifies as a Federal undertaking, it will undergo its own Section 106 process as appropriate before the individual project receives Federal approval. Each has also initiated, completed, or is not required to proceed through the City approval processes. Those projects requiring Federal and/or State review have either initiated or completed those reviews.

The current condition of the potentially affected historic properties reflects past effects on the historic properties and in turn informs the assessment of potential cumulative effects from the undertaking. Detailed descriptions of current condition, taking into account past changes, are provided in the 2018 Historic Property Inventory (HPI) (www.tinyURL.com/JPImprovements). For example, the HPI includes extensive analysis of how Jackson Park and the Midway Plaisance have undergone substantial change over time while maintaining historic value and function. As established by the HPI and summarized in Section 3.5 of this document, the combination of changes made to date have not impaired the integrity of the existing character-defining features reflecting the original design principles for the park.

### 3.8.2   Analysis

The undertaking will result in certain adverse effects on the historic landscape of the Jackson Park Historic Landscape District and Midway Plaisance, and as result, on the CPBS Historic District. The

components of the undertaking with adverse effect on the historic landscape include proposed changes to the Midway Plaisance, OPC site development, and certain roadway closures. Other components of the undertaking will deviate from the historic design and have primarily negative effects, such as the Hayes Drive reconfiguration and the changes along Marquette Drive and Cornell Drive. Other components of the undertaking will have minimal or no effects, including the Lake Shore Drive improvements and the bicycle and pedestrian improvements.

This section considers the combined effects of the undertaking and the following unrelated projects, several of which are noted in the 2018 South Lakefront Framework Plan (https://www.southlakefrontplan.com/):

- *Stony Island Avenue Traffic Signal Interconnect Improvements*
  The Chicago Department of Transportation (CDOT) is upgrading the signal equipment and communication along Stony Island Avenue/ Cornell Drive / 57th Drive from 95th and Stony Island to 57th and Lake Shore Drive. The project will upgrade existing traffic signal equipment (poles, mast arms, lens, cabinet, conduit) and will interconnect the traffic signals to improve operations along Stony Island Avenue, connecting into Lake Shore Drive. Where restoration is required for new traffic signal poles/conduit runs, the project will also upgrade existing ramps consistent with the Americans with Disabilities Act.

- *Lakefront Trail Separation*
  The Lakefront Trail connects 2,792 acres of parkland in 6 parks including Jackson Park. The trail is located east of Lake Shore Drive from 56th Street to Marquette Drive and north of Marquette Drive from Lake Shore Drive to 67th Street within Jackson Park. Considered a major recreational component in parks and a transportation network, the Lakefront Trail Separation project sought to alleviate areas of congestion by separating bicyclists from other trail users. The newly separated trail includes an 18-mile bike trail and lakefront path. The separation project is complete.

- *Baseball Facilities*
  The South Lakefront Framework Plan includes improvements to the area north of Hayes Drive and east of the Wooded Island. Currently there are two natural grass baseball fields and an overlapping natural grass soccer/football field. Preliminary design is in the early stages for two new senior baseball fields and renovations of one senior baseball field.

- *Osaka Garden and Other Improvements on the Wooded Island*
  Improvements to the Wooded Island and Osaka Garden are part of the Wooded Island Plan, which was incorporated into the South Lakefront Framework Plan. The plan includes improvements to the perimeter fence, a new main gate, pathway enhancements, new plantings and tree pruning, landscape lighting, feature stone placements in the garden, and a new teahouse. The plan also includes the addition of an overlook that will allow for viewing of an existing art installation and new berms surrounding the installation to integrate the site with the adjacent natural areas. These plans are still in design and are subject to funding availability and continued design refinement.

- *Clarence Darrow Bridge*

The Clarence Darrow Bridge is currently closed to all traffic, and CDOT is evaluating potential alternatives to accommodate bicyclists and pedestrians. Built in 1880 and modified in 1895, CDOT's evaluation has concluded that the bridge is so structurally deficient that it cannot be rehabilitated without affecting its historic integrity. Based on its condition, CDOT is considering rehabilitation or replacement of the bridge while retaining historic design elements and materials to the maximum extent possible. CDOT intends to follow the Department of the Interior's Standards for the Reconstruction of Historic Properties for the project.

- *Midway Plaisance Resurfacing*
  As part of the 2021 Arterial Resurfacing Program, CDOT will be resurfacing both eastbound and westbound Midway Plaisance between S. Payne Drive and S. Blackstone Avenue. The work will include milling existing pavement, installing new asphalt, installing ADA compliant curb ramps, replacing sidewalk in need of repair, filling missing sidewalk gaps, and complete streets/safety improvements within the existing curb lines.

- *Jackson Park Harbor Navigation Improvement Project*
  The Chicago Park District has submitted Federal permit applications for the construction of two new breakwaters at the Jackson Park Outer Harbor located at South Promontory Drive. For many years, the Chicago Park District has considered various alternatives to address damage caused by lake currents and waves at Jackson Park Outer Harbor. In recent years, harbor shoreline conditions have deteriorated, and an existing floating breakwater failed, which resulted in a partial closure of the harbor. Proposed improvement plans include two steel and stone groins totaling 280 feet in length. Both structures will be enveloped in steel sheet pile with a reinforced concrete crest. These proposed improvements will address the high lake levels of Lake Michigan by shielding boats from damaging waves, reducing sediment deposition in the harbor, and protecting the harbor shoreline.

The Stony Island Interconnect project will improve traffic operations and modernize signal equipment along Stony Island Avenue. These changes will not alter features of the Jackson Park Historic Landscape District and Midway Plaisance or the CPBS Historic District. The Lakefront Trail Separation Improvements project generally corresponds to existing and historic circulation within the property and minimally alters the Jackson Park Landscape District and Midway Plaisance. The baseball field complex improvements alter rehabilitated parkland around the Hayes Drive Bridge but minimally alter characteristics of the cultural landscape that contribute to the significance of the property. The Osaka Garden Improvements project seeks to enhance the historic garden and context, while preserving features that contribute significance to the historic property. Other Wooded Island Improvements will minimally alter characteristics of the historic property. Altogether, the foregoing projects will minimally alter characteristics of the Jackson Park Historic Landscape District and Midway Plaisance (cultural landscape) and the CPBS Historic District that contribute to the significance of these properties. They have beneficial and no adverse effects. Accordingly, the noted current and reasonably foreseeable activities do not provide context in which the undertaking would contribute cumulative effects to Jackson Park Historic Landscape District and Midway Plaisance or to the CPBS Historic District.

With respect to the Clarence Darrow Bridge, the potential effect of the project is being evaluated in a separate Section 106 process, which has not reached conclusion. The undertaking at issue in this document will be considered in the cumulative impacts assessment for the Clarence Darrow Bridge project, but at present the bridge project analysis has not resulted in a finding of adverse effect. Thus, no cumulative effect is currently identified for this undertaking in connection with the potential improvement of the bridge.

The effects of the road resurfacing project on the central and western portions of the Midway Plaisance will be evaluated in a separate Section 106 process, which has not reached conclusion. The undertaking at issue in this document will be considered in the cumulative impacts assessment for the resurfacing project, but at present the resurfacing project analysis has not resulted in a finding of effect. Thus, no cumulative effect is currently identified for this undertaking in connection with the potential roadway resurfacing improvement.

With respect to the Harbor Navigation Improvement Project, the potential adverse effect will be evaluated in a separate Section 106 process. The undertaking at issue in this document will be considered as appropriate in the cumulative impacts assessment for the harbor improvement project. The project area is a manmade shoreline consisting entirely of post-1920 landfill, armored with boulder revetments, steel walls, and beach sand. The adjacent lakebed immediately offshore contains no structures or historic properties. The project area lies at the outer southeastern perimeter of Jackson Park, well away from the area of the OPC in the northwest of Jackson Park. No cumulative effect is currently identified for this undertaking in connection with the planned improvement of the outer harbor.

Among the current and reasonably foreseeable activities noted above, only the Stony Island Traffic Signal Interconnect project has the potential to cause effects to a roadway of the CPBS Historic District outside of the Jackson Park Historic Landscape District and Midway Plaisance. The signalization project minimally alters the CPBS Historic District. Also, Stony Island Avenue has been previously widened and altered, and many of the properties along Stony Island Avenue have diminished integrity of setting. Thus, this undertaking does not contribute cumulative effects to the CPBS Historic District or the Jackson Park Historic Landscape District and Midway Plaisance in the context of the activities listed above in Section 3.5.1.

### 3.8.3   Cumulative Effect – Conclusion

The analysis of this undertaking in conjunction with past, present and reasonably foreseeable actions identified a cumulative adverse effect on the historic property of the Jackson Park Historic Landscape District and Midway Plaisance and the CPBS Historic District. The cumulative effect arises from combining the effects of the undertaking on the same historic resource at the same time, given the resource's current condition and taking into consideration the effects of past activities. Other current and reasonably foreseeable activities have indeterminate or beneficial effects in whose context the undertaking does not contribute cumulative effects to historic properties within or outside the Jackson Park Historic Landscape District and Midway Plaisance or the CPBS Historic District. Some of the reasonably foreseeable activities listed above in Section 3.8.1 may be further analyzed in a future

Section 106 process that would take into consideration the potential for cumulative effects with this undertaking.

# 4.0    Consulting Party and Public Involvement

Throughout the Section 106 process, opportunities were made available for the public and consulting parties to provide input. A current list of the identified and interested groups included as consulting parties for the project can be viewed under Public Involvement in Appendix E. Updates to this list are posted to the project website (www.tinyURL.com/JPImprovements) as necessary.

On December 1, 2017, a Consulting Party Kick-Off Meeting was held to discuss the Section 106 process, the APEs, and a preliminary summary of historic features within the APE, as documented in the HPI. Input received was evaluated and incorporated into the final delineation of APE boundaries and historic resources identified.

The second Consulting Party meeting was held on March 29, 2018 to discuss the results of the historic properties identification and the next steps in the Section 106 process. Prior to the meeting, the Archaeological Report and the draft HPI were distributed to consulting parties and the public for review and input. Audience members who attended the meeting asked several questions during the question and answer session following the meeting presentation. Twenty-nine comment letters were received outside of the meeting during the comment period ending April 19, 2018. Input received during the question and answer session of the meeting as well as during the 30-day comment period is summarized on the project website (www.tinyURL.com/JPImprovements).

The SHPO provided concurrence on the finding of no eligible archaeological sites for the NRHP as described in the Archaeological Report on March 28, 2018 and supplemental memorandum on September 12, 2018 (see Appendix D for correspondence). The HPI was revised based on comments received from the public, SHPO, and other reviewing agencies. A final HPI was submitted to the SHPO for approval on June 6, 2018. The SHPO provided written concurrence on the determinations of eligibility listed in the final HPI on July 10, 2018 (see Appendix D for correspondence). An Addendum to the HPI was prepared to document the inclusion of the Chicago Park Boulevard System Historic District in the APE and is being made available concurrently with the Final AOE.

The draft Assessment of Effects (AOE) was made available for the public, consulting parties, ACHP and SHPO for a 30-day review and comment period beginning July 29, 2019 and ending August 30, 2019. Consulting Party Meeting #3 was held on August 5, 2019 to discuss the results of the AOE and the next steps in the Section 106 process. The meeting was organized into two sessions: a smaller discussion with consulting parties only, followed by an evening meeting open to the public. The same presentation was given during each session, followed by a question and answer period. Forty-one comment letters were received during the 30-day comment period. Comments collected from the meeting and during the 30-day comment period are documented and summarized in Appendix F of this final AOE.

Consulting parties may either concur or object to the effect findings in this final AOE within 30-days of receipt of this document. If any objection is received on the effect findings within 30-days, FHWA may either consult with the objecting party to resolve the disagreement, or FHWA may request the ACHP provide its opinion on the objection. The FHWA will take into account the ACHP's opinion upon issuing

its final decision regarding effects. Upon concluding the effects analysis, the FHWA, the NPS and the USACE will proceed to the next step in the Section 106 process (see Section 6.0.).

# EXHIBIT 4



**Illinois Division**

3250 Executive Park Dr.
Springfield, IL 62703
(217) 492-4640
www.fhwa.dot.gov/ildiv

U.S. Department
of Transportation
**Federal Highway
Administration**

July 29, 2019

In Reply Refer To:
HDA-IL

TO: All Section 106 Consulting Parties

SUBJECT: Section 106 Assessment of Effects to Historic Properties
From the Proposed Undertaking in and Adjacent to Jackson Park
Cook County, Chicago, Illinois

Dear Consulting Party:

Enclosed for your review and comment is a copy of the Section 106 Assessment of Effects (AOE) to historic properties for a proposed undertaking in and adjacent to Jackson Park, Cook County, Chicago, Illinois. The Federal Highway Administration (FHWA) has determined that the subject undertaking will have an "adverse effect" to the Jackson Park Landscape District and Midway Plaisance. Any comments on the effect determinations contained in the AOE should be made no later than August 30, 2019 and be submitted to the City of Chicago (Attention: Abby Monroe, Abby.Monroe@cityofchicago.org).

**What is "the Undertaking?"**

For the purpose of assessing effects to historic properties under Section 106, collectively the proposed actions by the City of Chicago (City), the National Park Service (NPS), and the FHWA are considered "the undertaking."

The City's proposed actions include allowing construction of the Obama Presidential Center (OPC) in Jackson Park, which is not federally funded, and changes to roadways within Jackson Park. The proposed action by the Federal agencies include an amendment to the Urban Parks and Recreation agreements by the NPS and the authorization of Federal-aid Highway Program Funds by the FHWA. These proposed Federal actions occur in response to decisions made by the City.

**What steps in the Section 106 process have already been completed?**

The first two steps of the Section 106 process have been completed: (1) initiate the Section 106 process and (2) identify historic properties. In the first step, the section 106 process was initiated by inviting consulting parties to participate in the process. The second step concluded with the completion of the Historic Properties Inventory (HPI) and subsequent concurrence by the Illinois State Historic Preservation Officer with the determinations made in the HPI.

2

**What is the purpose of the AOE?**

The AOE documents the application of the criteria of adverse effect to historic properties within the undertaking's area of potential effect. The submittal of the AOE to consulting parties for review and comment formally initiates the third step of the Section 106 process, "assess adverse effects to historic properties."

The AOE was prepared on behalf of the FHWA as the lead Federal agency for the Section 106 process. The FHWA worked in cooperation with the City, the Illinois Department of Transportation (IDOT), and the NPS to complete the analysis and document the effect determinations in the AOE.

**What are the next steps in the Section 106 process?**

During the review period of the AOE, a consulting party meeting and a public open house will be held on August 5, 2019 to provide an overview of the effect determinations and receive comments. The public open house will cover the same content as the consulting parties meeting but will allow for a greater number of participants. Both meetings will be held at the Logan Center for the Arts, 915 E. 60th Street, Chicago, IL 60637. The specific meeting times and locations are as follows:

| Consulting Party Meeting | Public Open House |
|---|---|
| August 5, 2019 | August 5, 2019 |
| Logan Center for the Arts, 9th Floor | Logan Center for the Arts, |
| 3:00 – 5:00 PM | 1st Floor Theater and Lobby |
| RSVP to abby.monroe@cityofchicago.org | 6:00 – 8:00 PM |
| (required for up to two participants per | |
| consulting party) | |

After the review period on the AOE closes on August 30, 2019, the FHWA will consider any comments received, finalize the Assessment of Effects, and proceed to the final step in the Section 106 process, "resolve adverse effects."

The final step of the Section 106 process involves consultation with the FHWA, NPS, the City of Chicago, IDOT, the Illinois State Historic Preservation Officer (SHPO), the Advisory Council on Historic Preservation, and other consulting parties to seek ways to avoid, minimize or mitigate the adverse effects. A memorandum of agreement is executed among the FHWA, NPS, the City, IDOT, the Illinois SHPO, and the Advisory Council on Historic Preservation once an agreement is reached on how adverse effects are resolved.

Thank you for participating as a Section 106 consulting party and we look forward to working with you as the process is advanced.

Sincerely,

Arlene K. Kocher
Division Administrator

Enclosure

# Assessment of Effects to Historic Properties

Proposed Undertaking In and Adjacent to Jackson Park
Jackson Park, Chicago, Illinois

Prepared By:
City of Chicago Department of Planning and Development
Bureau of Planning, Sustainability and Historic Preservation
Chicago, IL

CNECT, LLC.
Chicago, IL

Quinn Evans Architects
Ann Arbor, MI

Prepared For:
National Park Service
Federal Highway Administration
Illinois Department of Transportation

July 2019

# Table of Contents

1.0     Introduction ..................................................................................................................... 1

    1.1     Undertaking Overview and Description ................................................................... 2

        1.1.1   City of Chicago Actions ....................................................................................... 2

            1.1.1.1   Obama Presidential Center ..................................................................... 2

            1.1.1.2   Roadway Changes .................................................................................... 2

            1.1.1.3   Recreation Changes ................................................................................. 3

    1.2     National Park Service Action ................................................................................... 5

    1.3     Federal Highway Administration Action ................................................................. 6

2.0     Identification of Historic Properties within the Area of Potential Effects .......................... 7

    2.1     Area of Potential Effect .......................................................................................... 7

    2.2     Historic Properties in the Area of Potential Effects ............................................... 8

3.0     Assessment of Effect .......................................................................................................... 13

    3.1     Methodology .......................................................................................................... 13

        3.1.1   Definitions and Guidelines ................................................................................ 13

        3.1.2   Noise, Traffic, and Visual Analysis Methodology ............................................. 14

        3.1.3   Determinations of No Effects ............................................................................ 15

        3.1.4   Historic Properties with Potential for Effects ................................................... 18

    3.2     Presentation of Assessment .................................................................................. 20

    3.3     Jackson Park Historic Landscape District and Midway Plaisance ......................... 21

        3.3.1   Description of Jackson Park Historic Landscape District and Midway Plaisance ............. 21

        3.3.2   Assessment of Effects on Jackson Park Historic Landscape District and Midway
                Plaisance ........................................................................................................... 22

            3.3.2.1   Effect Determination ............................................................................. 22

            3.3.2.2   Effects from Federal Actions ................................................................. 23

            3.3.2.3   Effects from Reasonably Foreseeable/Probable Actions ...................... 28

    3.4     Other Historic Properties ....................................................................................... 34

        3.4.1   Stony Island State Trust & Savings Bank (Stony Island Arts Bank) .................... 34

            3.4.1.1   Description of property .......................................................................... 34

            3.4.1.2   Effect Determination ............................................................................. 34

            3.4.1.3   Assessment of Effects on the Stony Island Trust & Savings Bank (Stony Island Arts
                      Bank) ...................................................................................................... 35

                3.4.1.3.1   Effects from Federal Actions ................................................... 35

3.4.1.3.2 Effects from Reasonably Foreseeable/Probable Actions ........................... 35

3.4.2 William Dexter Three-Flat ......................................................................... 36

 3.4.2.1 Description of property.................................................................. 36

 3.4.2.2 Effect Determination .................................................................... 36

 3.4.2.3 Assessment of Effects on property ................................................ 37

  3.4.2.3.1 Effects from Federal Actions ................................................. 37

  3.4.2.3.2 Effects from Reasonably Foreseeable/Probable Actions ........................... 37

3.4.3 Island Terrace Apartment Building .......................................................... 38

 3.4.3.1 Description of property.................................................................. 38

 3.4.3.2 Effect Determination .................................................................... 38

 3.4.3.3 Assessment of Effects on property ................................................ 39

  3.4.3.3.1 Effects from Federal Actions ................................................. 39

  3.4.3.3.2 Effects from Reasonably Foreseeable/Probable Actions ........................... 39

3.4.4 Hyde Park High School ............................................................................ 40

 3.4.4.1 Description of property.................................................................. 40

 3.4.4.2 Effect Determination .................................................................... 40

 3.4.4.3 Assessment of Effects on property ................................................ 41

  3.4.4.3.1 Effects from Federal Actions ................................................. 41

  3.4.4.3.2 Effects from Reasonably Foreseeable/Probable Actions ........................... 41

3.4.5 Jackson Park Terrace Historic District ...................................................... 41

 3.4.5.1 Description of property.................................................................. 41

 3.4.5.2 Effect Determination .................................................................... 42

 3.4.5.3 Assessment of Effects on property ................................................ 43

  3.4.5.3.1 Effects from Federal Actions ................................................. 43

  3.4.5.3.2 Effects from Reasonably Foreseeable/Probable Actions ........................... 43

3.4.6 Hyde Park-Kenwood Historic District....................................................... 43

 3.4.6.1 Description of property.................................................................. 43

 3.4.6.2 Effect Determination .................................................................... 44

 3.4.6.3 Assessment of Effects on property ................................................ 44

  3.4.6.3.1 Effects from Federal Actions ................................................. 44

  3.4.6.3.2 Effects from Reasonably Foreseeable/Probable Actions ........................... 45

3.5  Cumulative Effects ....................................................................................... 46

 3.5.1 Methodology ......................................................................................... 46

    **3.5.2    Analysis** ................................................................................................ 46

    **3.5.3    Cumulative Effect – Conclusion** .................................................... 49

**4.0        Public Involvement and SHPO Consultation** .................................... 50

**5.0        Minimization and Mitigation of Effects** ......................................... 51

**6.0        Conclusions** ............................................................................................. 53

**7.0        References** ............................................................................................... 55

## List of Tables

Table 1: Historic Properties Listed or Eligible for NRHP ............................................................. 9

Table 2: Historic Properties with Limited Potential for Effects .................................................. 16

Table 3: Historic Properties with Potential for Effects .............................................................. 19

Table 4: Summary of Effect Findings ......................................................................................... 53

## Appendices

### Appendix A – Exhibits

Exhibit 1:       Location Map
Exhibit 2:       Historic Properties
Exhibit 3:       Jackson Park and Midway Plaisance – Contributing Resources
Exhibit 4:       Jackson Park and Midway Plaisance – Referenced Cultural Landscape Features

### Appendix B – Figures

Figure 1:       Conceptual Site Plan – Obama Presidential Center (April 2019)
Figure 2:       Proposed Roadway Closures
Figure 3:       Recreation Replacement, East End of Midway Plaisance (CPD, July 2019)

### Appendix C – Photos

Existing Conditions Photos – Historic Properties
Exhibit C-1: Visual Impact Analysis – Rendering Viewpoint Locations
Visual Impact Analysis – OPC Museum Building (Google Earth and Google Sketchup)

### Appendix D – Agency Correspondence

Section 106 Initiation Letter – SHPO (11/01/2017)
Section 106 Invitation Letter – ACHP (11/01/2017)
SHPO Concurrence – Archaeological Report (03/28/2018)
SHPO Concurrence – Historic Properties Identification Report (07/10/2018)
FHWA Lead Agency Letter – Section 106 (07/31/2018)

### Appendix E – Public Involvement

Consulting Party Invitation Sample Letter
Consulting Party Participant List (11/26/2018)
Consulting Party Meeting #1 (12/01/2017) – Meeting Summary
Consulting Party Meeting #2 (03/29/2018) – Meeting Summary

### Appendix F – Document Preparers

List of Staff

# 1.0   Introduction

This Assessment of Effects (AOE) report documents the assessments of effect to National Register of Historic Places (NRHP) listed and eligible historic properties associated with the Proposed Undertaking In and Adjacent to Jackson Park. This report assesses potential effects to above-ground historic properties in accordance with 36 CFR 800.5 and is prepared for the National Park Service (NPS) and the Federal Highway Administration (FHWA). The proposed Federal actions by the NPS and the FHWA are described in Sections 1.2 and 1.3, respectively. The Illinois Department of Transportation (IDOT), through a stewardship and oversight agreement with the FHWA, assists in reviewing the compliance of a project with environmental laws and conducts coordination with necessary state officials, including the State Historic Preservation Officer (SHPO). Consistent with 36 CFR 800.2(a)(3), the information, analyses, and recommendations in this report were developed by the City of Chicago Department of Planning and Development (DPD) with assistance from CNECT, LLC. and Quinn Evans Architects as consultants. Staff from IDOT, who meet the Secretary of the Interior's Qualification Standards, reviewed the report and provided guidance to ensure the contents met applicable standards and guidelines. Federal Agency officials from NPS and FHWA provided guidance in preparation of the report and reviewed the contents to ensure it meets applicable standards and guidelines.

Section 106 compliance activities completed for the project to date include the delineation of the Area of Potential Effects (APE) and identification of historic properties. Above-ground historic properties were evaluated and identified in a Historic Property Inventory (HPI) Report. See Section 2.0 for a summary of the HPI activities. Section 4.0 summarizes public and agency coordination efforts to date. The Archaeological APE limits were defined by the limits of potential ground disturbance as a result of the proposed actions. A map of the Archaeological APE is available on the project website (www.tinyURL.com/JPImprovements). An archaeological survey was conducted in 2017 following Illinois and Federal guidelines during which no archaeological sites were identified that warranted eligibility for the NRHP. The final Archaeology Report is available on the project website (www.tinyURL.com/JPImprovements). SHPO provided concurrence with the Archaeological findings on March 28, 2018 which can be viewed under Agency Correspondence in Appendix D.

The Assessment of Effects is being made available to the consulting parties and the public for a 30-day review and comment period. The FHWA and NPS will consider the comments from the consulting parties and the public and as appropriate address them in the final Assessment of Effects.  The final Assessment of Effects will be made available to the consulting parties and the public and then FHWA and NPS will proceed to the next step in the Section 106 process (See Section 6.0).

## 1.1 Undertaking Overview and Description

The City of Chicago and Federal actions assessed in this report occur in and adjacent to Jackson Park in the City of Chicago. See Exhibit 1 in Appendix A. For the purposes of assessing effects to historic properties under Section 106, these actions are collectively considered "the undertaking". The Federal actions include an amendment to the Urban Parks and Recreation Recovery (UPARR) agreements by the National Park Service (NPS) and the authorization of Federal-Aid Highway Program Funds by the Federal Highway Administration (FHWA). These proposed Federal actions occur in response to decisions made by the City of Chicago (City). The City proposes to allow for the construction of the Obama Presidential Center (OPC) in Jackson Park. The City is also proposing changes to roadways within Jackson Park. Certain changes proposed by the City do not involve Federal funding and therefore only require local approval, as there is no additional federal approval authority associated with those projects or activities. Specifically, the decision to locate the OPC in Jackson Park, the design of the OPC site and the buildings within it, and the closures of roadways in Jackson Park do not require any federal approvals.

The component actions that comprise the undertaking are briefly described in the following sections.

### 1.1.1 City of Chicago Actions

#### 1.1.1.1 Obama Presidential Center

As mentioned, the City proposes to allow for the construction of the OPC in Jackson Park. The OPC site is planned on the east side of Stony Island Avenue between 59th and 62nd Streets, and is approximately 19.3 acres in size. See Exhibits 2-4 in Appendix A. The OPC site includes four buildings that will occupy approximately 2.5 acres of the site, including a Museum, Forum, Library, and an indoor Program, Athletic and Activity Center (PAAC), in addition to a parking facility. The remainder of the OPC site will include new public pathways for pedestrians and bicyclists, a nature walk along the lagoon, a sloped great lawn that can accommodate a sledding hill, a fruit and vegetable garden and play areas.  An underground parking facility is proposed within the OPC site boundary, east of Stony Island Avenue between the PAAC and the Library.  A conceptual site plan of the OPC is provided as Figure 1 in Appendix B.

#### 1.1.1.2 Roadway Changes

The City proposes the following permanent roadway closures within Jackson Park: Cornell Drive between 63rd Street (Hayes Drive) and 59th Street, the northbound section of Cornell Drive between 68th Street and 65th Street, Marquette Drive between Stony Island Avenue and Richards Drive, and the eastbound portion of Midway Plaisance between Stony Island Avenue and Cornell Drive. See Figure 2 in Appendix B. Closures of the eastbound Midway Plaisance and Cornell Drive between 63rd Street and 59th Street are necessary to accommodate the development of the OPC. The additional roadway closures will reduce the number of multilane roadways that currently divide Jackson Park to allow for a more continuous park.

The City also proposes improvements to the roadway, pedestrian, and bicyclist network to address the changes in travel patterns that arise from the proposed roadway closures and to improve public safety, access and circulation throughout the park. These are further described in Section 1.3.

### 1.1.1.3  Recreation Changes

As a result of proposed changes in Jackson Park, recreation opportunities will be impacted.  The impacted area is depicted by a shaded box on the OPC conceptual site plan in Figure 1 of Appendix B. NPS will consider opportunities lost and gained as part of its decision-making analysis.

In summary, the OPC project would affect all or a small portion of five recreational elements currently on the site: (1) a portion of the footprint occupied by the existing track and field facility; (2) open recreation space, including existing trails used for biking or walking; (3) the existing picnic grove; (4) a small strip of the Perennial Garden/Women's Garden; and (5) the 62nd Street playground.   Each of these elements will be reconfigured or offset by replacement property, uses, and opportunities both on the OPC site as well as elsewhere within Jackson Park and the Eastern Midway Plaisance:

> Opportunities related to the existing track and field will be replaced at a new track and field facility within Jackson Park.

> The Picnic Grove is used for picnicking and sitting, walking, gathering, pick-up games (such as soccer), play, and special events.  Because it will be displaced by elements of the OPC project, the Picnic Grove's uses will be recouped through multiple picnicking opportunities available across the several areas on the larger-OPC site amenable for picnicking.  These include the Lagoon View Lawn, the Great Lawn, and an area for picnicking in and around the Library roof, among others.  There will be a minimum of one acre of picnicking space.

> The Perennial Garden/Women's Garden is used for gardening, aesthetic enjoyment, and commemorations and for sitting, walking, nature observation, meditation, gathering, and play.  It will be temporarily impacted by construction.  The garden will be replaced with improved accessibility upon completion of the OPC.

> Opportunities for informal recreation will also be impacted by the OPC construction.  Such areas have no formal uses, but are used informally for sitting, walking, gathering, pick-up games (soccer, other), play, and for landscaping or as buffer between recreation areas and sidewalks, paths, and roadways.  These opportunities will continue to exist on the OPC site as well as in new landscaped areas made available by the closure of certain roads on the site, as discussed below.

> Opportunities for play on a structured facility will also be reconfigured.  The 62nd Street playground will be relocated and expanded by the Foundation as part of the OPC construction to the immediate northwest of the current location, with an enlarged footprint and all new equipment, including custom-made experiential play features.

The project includes the development of new recreational opportunities. The Program, Athletic and Activity Center will provide a new opportunity for public recreational programs. Other new recreation amenities proposed for the OPC project include: a sledding hill, great lawn, nature trail, and woodland walk.

The proposed roadway changes may affect various open park spaces used for informal recreation as well as some sidewalks and pathways used for walking, jogging, and biking. The park spaces that would be lost to roadway improvements are linear, narrow and mainly serve as landscape buffer space between roadways and more functional recreation areas nearby. Although some pathways and sidewalks will be affected by the project, new pathways and sidewalks are proposed to replace the affected pathways and sidewalks while also providing improved connectivity and circulation within the park. Proposed underpasses will also facilitate better connectivity and safety. As part of the OPC site development, the City intends to close certain roadways within Jackson Park and convert those roadways into open space. The City proposes to make these new areas of open space available to provide replacement recreation opportunities.

Finally, the City proposes to dedicate acreage as replacement recreation opportunity on the eastern portion of the Midway Plaisance bounded by the North and South Midway Plaisance, Stony Island Avenue, and the Metra railway. This area is approximately 5.2 acres. It has two mixed-use trails and a sidewalk. The majority of the eastern Midway is an open lawn lined with trees. Within the open space are park benches, trees, an informational kiosk, the Cheney Goode Memorial, and an isolated low-quality wetland. The Memorial consists of a bench and sundial placed on the western side of the eastern Midway Plaisance in 1932. The Cheney Goode Memorial location is noted on Figure 3 of Appendix B. The westernmost portion of the lawn area has an elevated landscape containing dense plantings and trees that provide screening of the Metra Electric Railway.

The City proposes modifying the Eastern Midway to accommodate a combination of open space and a formal play area. In order to accomplish this project, the central area would reduce in size. The western side of the historic sunken lawn would be altered with the addition of a play area and walks. The new fenced play area and placement of walks, trees, and recreational features would reduce the central lawn panel. Addition of trees at the margins of the open space would result in a minor modification of the site and the existing wetland would be filled to allow for enhanced recreational use. The City has committed that there will be no alterations to the configuration of existing roadways or walking paths. A concept plan of the proposed recreational changes within the Eastern Midway is presented in Figure 3 of Appendix B. The future public process regarding the changes on the Eastern Midway will carefully consider the historic nature of the Midway Plaisance and seek to minimize any potential effects to historic properties, pathways, and plantings, to the extent possible.

## 1.2    National Park Service Action

The purpose of the NPS action is to amend the original Urban Parks and Recreation Recovery (UPARR) agreements. The UPARR program, administered by the NPS, provided grant funds to Jackson Park in the early 1980's. Upon receiving these grants, the City committed to maintaining public recreation uses within the UPARR boundary in Jackson Park. Any changes within Jackson Park to a use that is not public recreation within the context of UPARR must be reviewed and approved by NPS. NPS approval is conditioned by the change being in accord with the current local park plan, adequate replacement recreation property, and reasonably equivalent recreation opportunities available on that replacement property.

The City's decision to locate the OPC within Jackson Park and improve the roadway network in and around Jackson Park changes areas that were previously in recreation use to something else, thus triggering a partial conversion.  As long as the City identifies adequate recreation replacement to account for public recreation losses associated with the OPC and roadway improvements, NPS will amend the original UPARR agreements to exclude areas no longer in recreation and expand the boundary to include the recreation replacement.

Evaluation of the NPS action includes the review of current recreation uses within the identified conversion. The UPARR conversion areas include a portion of the OPC site as well as areas where proposed roadway widening or realignment occurs. These conversion areas are shown and noted on Exhibits 2-4 in Appendix A. Loss of recreation must be replaced with new recreation opportunities that ensure adequate recreation properties and opportunities of reasonably equivalent usefulness and location.

NPS will review the proposed recreation uses associated with the replacement areas to determine if equivalent recreation opportunities are provided. These replacements are shown on Exhibits 2-4 in Appendix A. The NPS will evaluate and consider impacts associated with both the conversion and the replacement recreation prior to approving the recreation use changes and amending the UPARR agreements.

## 1.3     Federal Highway Administration Action

The purpose of the FHWA action is to (1) address changes in travel patterns resulting from closing roadways in Jackson Park and (2) improve bicycle and pedestrian access and circulation.

The FHWA administers the Federal-Aid Highway Program, which makes available federal funding to state departments of transportation and local agencies for roadway projects. The Chicago Department of Transportation (CDOT) proposes to use federal-aid highway funding for roadway construction activities to mitigate traffic impacts from the proposed closure of roadways within Jackson Park.  Prior to the authorization of federal-aid highway funds, the FHWA must ensure the project meets all federal requirements, including but not limited to the National Environmental Policy Act (NEPA), Section 4(f) of the United States Department of Transportation (USDOT) Act of 1966, and Section 106 of the NHPA.

An alternatives analysis (available on the project website, www.tinyURL.com/JPImprovements) considered a wide range of proposed improvements to meet the FHWA's purpose and need, while avoiding or minimizing impacts to historic properties. Generally, the roadway improvements considered under the proposed FHWA action occur along Lake Shore Drive, Hayes Drive, and Stony Island Avenue and their intersecting roadways. Proposed bicyclist and pedestrian improvements include five underpasses, additional trails, and enhanced access accommodations. This preliminary Preferred Alternative was found to best meet the project's purpose and need will also minimizing impacts to historic properties and other resources.

The proposed roadway, bicyclist, and pedestrian improvements considered under the FHWA action are shown on Exhibits 2-4 in Appendix A.

Collectively the actions by the City, NPS, and FHWA are considered "the undertaking," for the purposes of assessing effects to historic properties under Section 106.

# 2.0 Identification of Historic Properties within the Area of Potential Effects

## 2.1 Area of Potential Effect

The identification of above-ground historic properties began with the delineation of the Area of Potential Effects (APE). The APE boundaries were drawn to include the direct and indirect effects of the undertaking. The FHWA and NPS consulted with State Historic Preservation Office (SHPO), consulting parties, and the public in developing the APE boundaries.

The Historic Architecture APE was initially drawn to encompass all of Jackson Park, South Shore Cultural Center Park, a portion of the Midway Plaisance and Burnham Park, and generally one parcel along each of the streets bordering Jackson Park. Based on public input and SHPO consultation, the Historic Architecture APE was expanded to include a one-half mile radius around the OPC Museum Building (to capture potential viewshed impacts) and to include the entirety of the Midway Plaisance. The Historic Architecture APE is divided into two sub-areas: APE I east of the Illinois Central Railroad (ICRR) viaduct and APE II west of the viaduct. A map of the Historic Architecture APE is available on the project website. Further description of the Historic Architecture APE is provided in the Historic Properties Identification (HPI) Report, available on the project website (www.tinyURL.com/JPImprovements).

## 2.2    Historic Properties in the Area of Potential Effects

A Historic Properties Identification (HPI) Report (July 10, 2018, available on the project website, www.tinyURL.com/JPImprovements) was prepared to document above-ground historic resources identified within the Historic Architecture/Landscape APE.

Within the Historic Architecture APE, the HPI identified seven districts and 29 individual properties listed or eligible for listing on the NRHP.  Four NRHP listed historic districts (Jackson Park/Midway Plaisance, South Shore Country Club Historic District, Promontory Point, and Hyde Park-Kenwood) and seven individually NRHP listed properties were identified. Evaluation of the surrounding architecture within the APE resulted in the identification of three NRHP eligible historic districts (Hyde Park East, Jackson Park Terrace, and South Shore E. 67th Street Apartment District) and twenty-two individually NRHP eligible properties.

Historic properties within the Historic Architecture APE can be seen on Exhibit 2 and are listed in Table 1 below. The draft and final HPI reports were made available for consulting parties and the public to provide input, and are available on the project website (www.tinyURL.com/JPImprovements).  The SHPO provided concurrence with the determinations of eligibility in the final HPI on July 10, 2018, which can be viewed under Agency Correspondence in Appendix D.

*Table 1: Historic Properties Listed or Eligible for NRHP*

| Historic Property | Address | APE Subarea | NRHP Status [Year] |
|---|---|---|---|
| Jackson Park Historic Landscape District and Midway Plaisance | Roughly bounded by 67th Street, Stony Island Avenue, 56th Street, and Lake Michigan; 60th Street, Cottage Grove Avenue, 59th Street, Stony Island Avenue | I | Listed (Historic District) [1972] |
| Stony Island State Trust and Savings Bank/Stony Island Arts Bank | 6760 S. Stony Island Avenue | I | Listed (Individually) [2013] |
| William Dexter Three-Flat | 1549 E. 69th Place | I | Eligible (Individually) [2018] |
| Island Terrace Apartment Building | 6430 S. Stony Island Avenue | I | Eligible (Individually) [2018] |
| Hyde Park Academy High School | 6220 S. Stony Island Avenue | I | Eligible (Individually) [2018] |
| Jackson Park Terrace Historic District | Roughly bounded by 61st Street, Metra Electric Railroad, E. Public Way, and Stony Island Avenue | I | Eligible (Historic District) [2018] |
| Hyde Park-Kenwood Historic District | Roughly bounded by 59th Street, Cottage Grove Avenue, 40th Street, Metra Electric Railroad/Stony Island Avenue | I/II-A | Listed (Historic District) [1979] |
| South Shore Country Club Historic District (Currently known as the South Shore Cultural Center Park) | Roughly bounded by 71st Street, S. South Shore Drive, Lake Michigan | I | Listed (Historic District) [1975] |
| South Shore E. 67th Street Apartment Historic District | Roughly bounded by S. South Shore Drive, 67th Street, one parcel south of 67th Street, one parcel west of Merrill Avenue | I | Eligible (Historic District) [2018] |
| Residences at 6700 S. Crandon Avenue | 6700 S. Crandon Avenue | I | Eligible (Individually) [2018] |

| Historic Property | Address | APE Subarea | NRHP Status [Year] |
|---|---|---|---|
| Shoreline Apartments | 2231 E. 67th Street | I | Listed (Individually) [2017] |
| Residences at 2201-2211 E. 67th Street | 2201-2211 E. 67th Street | I | Eligible (Individually) [2018] |
| Leonard Graff House | 6700 S. Euclid Avenue | I | Eligible (Individually) [2018] |
| Dr. Paul Schutz House | 6701 S. Bennett Avenue | I | Eligible (Individually) [2018] |
| Morris N. Fox Three-Flat | 6700 S. Bennett Avenue | I | Eligible (Individually) [2018] |
| Residences at 6701 S. Constance Avenue | 6701 S. Constance Avenue | I | Eligible (Individually) [2018] |
| Tower Court Apartments | 6700-6708 S. Constance Avenue/ 1801-1811 E. 67th Street/ 6701-6711 S. Creiger Avenue | I | Eligible (Individually) [2018] |
| Hyde Park East Historic District | Roughly bounded by 56th Street, Metra Electric Railroad/one parcel west of S. Shore Drive, 54th Street/one parcel north of 56th Street, and S. Shore Drive | I | Eligible (Historic District) [2018] |
| Bret Harte Elementary School | 1556 E. 56th Street | I | Eligible (Individually) [2018] |
| Windermere East Hotel/Apartments | 1642-1660 E. 56th Street | I | Listed (Individually) [1982] |
| Jackson Towers | 5555 S. Everett Avenue | I | Eligible (Individually) [2018] |
| Promontory Apartments | 5530-5532 S. Shore Drive | I | Listed (Individually) [1996] |

| Historic Property | Address | APE Subarea | NRHP Status [Year] |
|---|---|---|---|
| The Flamingo on the Lake | 5500 S. Shore Drive | I | Listed (Multiple Properties Listing) [1986] |
| Jackson Shore Apartments | 5490 S. Shore Drive | I | Listed (Individually) [2010] |
| Shoreland Hotel | 5454 S. Shore Drive | I | Listed (Multiple Properties Listing) [1986] |
| Promontory Point Historic District | Roughly bounded by 56th Street (extended), S. Shore Drive, 54th Street (extended), and Lake Michigan | I | Listed (Historic District) [2018] |
| Helstein House | 5804-5806 S. Blackstone Avenue | II-A | Eligible (Individually) [2018] |
| Residence at 5812 S. Blackstone Avenue | 5812 S. Blackstone Avenue | II-A | Eligible (Individually) [2018] |
| Stein Building | 5825 S. Dorchester Avenue | II-A | Eligible (Individually) [2018] |
| Johnson House | 5617 S. Kenwood Avenue | II-A | Eligible (Individually) [2018] |
| Center for Continuing Education (Graduate Student Housing/Keller Center) | 1301-1311 E. 60th Street | II-B | Eligible (Individually) [2018] |
| Public Administration Building (Chapin Hall) | 1313 E. 60th Street | II-B | Eligible (Individually) [2018] |
| St. Paul's Universalist Church/Shankman Orthogenics School | 1375 E. 60th Street | II-B | Eligible (Individually) [2018] |
| University of Chicago Power Station | 6053 S. Blackstone Street | II-B | Eligible (Individually) [2018] |

| Historic Property | Address | APE Subarea | NRHP Status [Year] |
|---|---|---|---|
| E. 62nd Place Firehouse | 1405-1407 E. 62nd Place | II-B | Eligible (Individually) [2018] |
| Pridmore & Stanhope-designed Greystone | 6243 S. Woodlawn Avenue | II-B | Eligible (Individually) [2018] |

# 3.0 Assessment of Effect

This section assesses the effects of the undertaking on historic properties. For detailed background and historic context information regarding each of the evaluated elements, see the Historic Properties Inventory (HPI) Report, which can be viewed on the project website (www.tinyURL.com/JPImprovements).

Exhibit 2 in Appendix A depicts the listed and eligible historic properties in the APE that are assessed for possible adverse effects in this report. The activities involved with the undertaking are also depicted on Exhibits 2-4. Photographs of the historic properties to and from the undertaking are provided in Appendix C.

## 3.1 Methodology

### 3.1.1 Definitions and Guidelines

The assessment of effects proceeds by applying the "criteria of adverse effect" to historic properties within the area of potential effects. The criteria of adverse effect are described as follows (36 CFR 800.5(a)(1)):

> An **adverse effect** is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association. Consideration shall be given to all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the National Register. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance, or be cumulative.

Examples of adverse effects (36 CFR 800.5(a)(2)) on historic properties include, but are not limited to:

a. physical destruction of or damage to all or part of the property;

b. alteration of a property, including restoration, rehabilitation, repair, maintenance, stabilization, hazardous material remediation, and provision of handicapped access, that is not consistent with the Secretary's standards for the treatment of historic properties (36 CFR part 68) and applicable guidelines;

c. removal of the property from its historic location;

d. change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance;

e. introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features;

f.  neglect of a property which causes its deterioration, except where such neglect and deterioration are recognized qualities of a property of religious and cultural significance to an Indian tribe or Native Hawaiian organization; and

g.  transfer, lease, or sale of property out of Federal ownership or control without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance.

To evaluate the effects of alterations to a historic property, the Secretary of the Interior has published *Standards for the Treatment of Historic Properties* (codified at 36 CFR 68) as well as *Guidelines for the Treatment of Cultural Landscapes*, which illustrates how to apply these standards to cultural landscapes. A cultural landscape is a geographic area associated with a historic event, activity, or person or exhibiting other cultural or aesthetic values; small-scale features within the landscape may define the spatial character of the landscape as a whole. The Jackson Park Historic Landscape District and Midway Plaisance is an example of a cultural landscape. The *Standards* and *Guidelines* have been utilized in the assessment of effect to the Jackson Park Historic Landscape District and Midway Plaisance.

The assessment of each historic property will result in one of the three determinations: adverse effect, no adverse effect, or no effect. An adverse effect is determined if a potential direct, indirect, or cumulative effect meets the definition set forth above. A determination of no adverse effect means the undertaking's effect(s) do not meet the criteria described above, or conditions are imposed to avoid adverse effects. A determination of no effect means the undertaking has no impact on a particular historic property. The criteria of adverse effects is applied to determine if a potential effect is either adverse or not adverse; if there is no potential for an effect, justification is provided and the criteria of adverse effect need not apply.

If any adverse effects to a historic property are determined to occur as a result of direct, indirect, or cumulative effects from the undertaking, the overall project is determined to result in an Adverse Effect to Historic Properties.

### 3.1.2   Noise, Traffic, and Visual Analysis Methodology

A Highway Traffic Noise Analysis (available on the project website, www.tinyURL.com/JPImprovements) was conducted for the project to determine if any noise impacts at particular locations within and adjacent to Jackson Park and the Midway Plaisance would occur as a result of the FHWA action. Conclusions related to audible changes near historic properties are drawn from this study.

Sound pressure level, also referred to as "noise level", is measured in units called decibels (dBA). For the average human with normal hearing, a 3-dBA change in noise level is barely perceptible, especially if the change occurs gradually over time. A 5-dBA change in noise level is perceptible if the change occurs within a short span of time, but less perceptible if the change occurs gradually over time. A 10-dBA increase or decrease is perceptible and subjectively described by most humans as "twice as loud" or "twice as soft" as the original level. The distance from a sound source is also a factor in its magnitude. With respect to traffic on a typical highway, a doubling of the distance between the highway and the receptor will reduce the noise level by approximately 3 dBA to 4.5 dBA. For example, if the noise level at

50 feet from a highway is 70 dBA, the noise level at 100 feet would be approximately 65.5 dBA to 67 dBA. These concepts are further described within the Highway Traffic Noise Analysis Report.

Noise impacts during construction are also discussed as part of the Highway Traffic Noise Analysis. In general, construction noise is considered to be relatively temporary in nature, and perceptible changes in noise levels may be experienced during construction. However, the Illinois Department of Transportation proposes mitigation strategies to minimize or eliminate the effects of construction noise as part of the *Standard Specifications of Road and Bridge Construction* and *Highway Traffic Noise Assessment Manual.* These strategies should be considered and implemented if feasible during the design planning of the project, and are further detailed in the Highway Traffic Noise Analysis Report.

For each of the historic properties evaluated, the change in noise level (post-construction) as a result of the FHWA action is discussed and the effect of highway traffic noise on the property, if any, is described.

A Traffic Impact Study (TIS)[1] was conducted to determine the effects of traffic diversions as a result of the City's proposal to close roadways within Jackson Park. Conclusions related to the effects of traffic volume changes are drawn from this study. Primarily as a result of closing Cornell Drive, the TIS describes how traffic is anticipated to be diverted primarily to Lake Shore Drive to the east, Stony Island Avenue to the west, and other north-south roadways outside of the immediate area (including the Dan Ryan Expressway). Each of these roadways are primary routes that serve similar types of regional traffic and will not experience perceptible changes in traffic. Traffic volumes are not anticipated to be largely dispersed to lesser volume roadways through historic districts.

A visual impact analysis of the OPC Museum Building from each historic property was conducted using Google Earth and Google Sketchup. A to-scale model of the OPC Museum Building was built using Google Sketchup and imported into Google Earth where street-level viewpoints were captured from each historic property or feature toward the Museum Building. The ability to capture viewpoints from above-ground level (i.e. upper-levels of a multi-story building) is not available, however, possible views of the OPC Museum Building from elevated viewpoints are noted, as applicable, for historic properties. The visual impact analysis is referenced in the discussion of effects to historic properties and/or features.

### 3.1.3   Determinations of No Effects

Based on refinements in the scope of undertaking, some historic properties within the APE have no potential to be affected due to their considerable distance from the undertaking. These properties are presented in Table 2.

The properties within the APE that are listed in Table 2 will not experience any physical changes or alterations to any of the characteristics of the property that qualifies it for inclusion in or eligibility for the National Register. Additionally, an evaluation of indirect effects to the properties listed in Table 2,

---

[1] Sam Schwartz Engineering, LLC. *Jackson Park Revitalization Traffic Impact Study Final Report.* (February 2018). Retrieved from https://www.chicago.gov/content/dam/city/depts/dcd/supp_info/jackson/CDOT-Traffic-Impact-Study.pdf

including effects from highway traffic noise, traffic diversions, and visual effects, has determined that none of these properties experience changes or alterations that diminish the integrity of these properties. Therefore, the undertaking will have *no effect* to the properties presented in Table 2. Further description of the justifications of indirect effects follow Table 2.

*Table 2: Historic Properties with Limited Potential for Effects*

| Property Name | Effect Finding | Justification |
|---|---|---|
| Center for Continuing Education (Graduate Student Housing/Keller Center) | No Effect | No anticipated or perceptible changes in noise levels; Partial view of OPC Museum Building will not alter integrity of setting |
| Public Administration Building (Chapin Hall) | No Effect | |
| St. Paul's Universalist Church/Shankman Orthogenics School | No Effect | |
| Promontory Point Historic District | No Effect | No perceptible changes in noise levels; Partial view of OPC Museum Building will not alter integrity of setting |
| Hyde Park East Historic District | No Effect | No anticipated or perceptible changes in noise levels; Partial or possible view of OPC Museum Building will not alter integrity of setting |
| Bret Harte Elementary School | No Effect | |
| Windermere East Hotel/Apartments | No Effect | |
| Jackson Towers | No Effect | |
| Promontory Apartments | No Effect | |
| The Flamingo on the Lake | No Effect | |
| Jackson Shore Apartments | No Effect | |
| Shoreland Hotel | No Effect | |
| South Shore E. 67th Street Apartment Historic District | No Effect | No perceptible changes in noise levels; Possible views of OPC Museum Building will not alter integrity of setting |
| Residences at 6700 S. Crandon Avenue | No Effect | |
| Shoreline Apartments | No Effect | |
| Residences at 2201-2211 E. 67th Street | No Effect | |
| South Shore Country Club Historic District (Currently known as the South Shore Cultural Center Park) | No Effect | No anticipated or perceptible changes in noise levels; No view of OPC Museum Building |
| Leonard Graff House | No Effect | |
| Dr. Paul Schutz House | No Effect | |
| Morris N. Fox Three-Flat | No Effect | |
| Residences at 6701 S. Constance Avenue | No Effect | |
| Tower Court Apartments | No Effect | |
| Helstein House | No Effect | |
| Residence at 5812 S. Blackstone Avenue | No Effect | |
| Stein Building | No Effect | |

| Property Name | Effect Finding | Justification |
|---|---|---|
| Johnson House | No Effect | |
| University of Chicago Power Station | No Effect | |
| Pridmore & Stanhope-designed Greystone | No Effect | |

According to guidance from the FHWA, highway traffic noise typically does not cause impacts at distances greater than 500 feet, therefore, the Highway Traffic Noise Analysis considers the effects of highway traffic noise within a 500-foot boundary of the undertaking. Some of the identified historic properties, particularly those west of the Metra Electric Rail line, are therefore not evaluated in the Highway Traffic Noise Report, nor are they anticipated to be affected by highway traffic noise as a result of the undertaking. For the historic properties that are within the noise analysis boundary, the Highway Traffic Noise Analysis reports none of the properties listed within Table 2 are predicted to experience a perceptible change in noise levels.

As noted in Section 3.1.2, substantial increases in traffic volumes as a result of closing roadways within Jackson Park are not anticipated to occur on surrounding minor roadways. Specifically, traffic volumes along E. 67th Street, E. 56th Street, South Shore Drive, and the neighborhood roadway network north and south of the Midway Plaisance only experience minor traffic increases that will not be perceptible.

The visual impact analysis (Photo 37) demonstrates that the OPC Museum Building will be partially visible at street-level from some historic properties along 60th Street, west of the ICRR viaduct (Center for Continuing Education, Chapin Hall, St. Paul's Universalist Church). Views to and from the Midway Plaisance have been and will continue to be an important part of the setting that contributes to the significance of these properties. However, views to Jackson Park do not contribute to the integrity of the properties' setting due to the visual barrier of the ICRR viaduct and the properties' substantial distance from Jackson Park. Though minimally visible within the properties' distant viewsheds, the OPC Museum Building will not alter the setting of these historic properties.

As illustrated by Photo 38, the visual analysis indicates that the OPC Museum Building will be barely perceptible from the Promontory Point Historic District. The property has primary views of Lake Michigan to the east that contribute to its integrity of setting. Views southwest toward the Museum of Science and Industry will not be impacted. Therefore, the OPC Museum Building will not cause indirect effects that would alter the integrity of setting of the Promontory Point Historic District.

As shown in Photo 39, the street-level visual analysis demonstrates that the OPC Museum Building is minimally visible from the western corner of the Hyde Park East Historic District/Bret Harte Elementary School. While not visible at street-level, it is possible that OPC Museum Building and other portions of the OPC site development would be visible from some units of the upper levels of historic properties within this district, particularly those along E. 56th Street (Photo 40) (Windermere East Hotel/Apartments, 1700 E. 56th Street, Jackson Towers). Views to and from Jackson Park have been an important part of the setting that contributes to the significance these historic properties. While views of greenspace within Jackson Park will be impacted, the modern building is proposed along the edge of

Jackson Park within close proximity to the urban context which includes other tall buildings of various ages and designs. Thus, the OPC Museum Building will not adversely affect the integrity of setting for these properties at E. 56th Street. Other properties in this vicinity, including the Promontory Apartments, the Flamingo on the Lake, Jackson Shore Apartments, and the Shoreland Hotel, have primary views of Lake Michigan to the east. Jackson Park is not visible from these properties at either street-level (Photos 41 – 42) or from elevated viewpoints (Some buildings and units have no views towards Jackson Park, and others are blocked by adjacent high-rise buildings). The OPC Museum Building will not affect the views of these properties.

The visual analysis indicates that the OPC Museum Building will not be visible from the street-level of the properties along E. 67th Street (Photos 43 – 44, 46-47). However, the Museum Building may be visible from some units of some high-rise residential buildings within the South Shore E. 67th Street Apartments Historic District (such as units at 6700 S. Crandon Avenue, Shoreline Apartments, and the 2201-2211 E. 67th building.) While the OPC Museum Building may possibly be visible within distant views of these properties, the primary views of Jackson Park and Lake Michigan from these units will not be impacted. Therefore, there are no effects that would alter the integrity of setting of the South Shore E. 67th Street Apartments Historic District or properties therein.

Visual analysis demonstrates that the following properties will not have any visual effects of the OPC Museum Building (Photos 45 – 53):

- South Shore Country Club Historic District (Currently known as the South Shore Cultural Center Park)
- Leonard Graff House
- Dr. Paul Schutz House
- Morris N. Fox Three-Flat
- Residences at 6701 S. Constance Avenue
- Tower Court Apartments
- Helstein House
- Residence at 5812 S. Blackstone Avenue
- Stein Building
- Johnson House
- University of Chicago Power Station
- E. 62nd Place Firehouse
- Pridmore & Stanhope-designed Greystone

### 3.1.4   Historic Properties with Potential for Effects

The properties that could potentially be affected by the undertaking are listed in Table 3. The undertaking occurs within or directly adjacent to these historic properties. Each of the properties listed in Table 3 is assessed in Sections 3.3 and 3.4.

*Table 3: Historic Properties with Potential for Effects*

| Historic Property | Effect Finding |
|---|---|
| Jackson Park Historic Landscape District and Midway Plaisance | Requires Effect Evaluation |
| Stony Island State Trust and Savings Bank/Stony Island Arts Bank | Requires Effect Evaluation |
| William Dexter Three-Flat | Requires Effect Evaluation |
| Island Terrace Apartment Building | Requires Effect Evaluation |
| Hyde Park Academy High School | Requires Effect Evaluation |
| Jackson Park Terrace Historic District | Requires Effect Evaluation |
| Hyde Park-Kenwood Historic District | Requires Effect Evaluation |

## 3.2    Presentation of Assessment

Effects to historic properties that may be affected by the undertaking were assessed using the methodology described in Section 3.1. For each historic property, the effect determination is made for the undertaking, followed by a detailed description of the effects from the components of the undertaking, which includes the NPS action, FHWA action, and the City of Chicago actions (reasonably foreseeable/probable actions that are connected to the Federal actions). Reasonably foreseeable/probable actions that are connected to the Federal action include roadway closures, the development of the OPC site, and the track and field relocation.

Following the assessment of effects to each historic property, a cumulative impacts analysis is included to evaluate the effect of combining the effect from the undertaking along with projects that are likely to occur but are independent from this undertaking.

The Assessment of Effects evaluates the effects from the undertaking based on the scope of the Federal actions, as required by the Section 106 regulations. In this case, the Advisory Council on Historic Preservation (ACHP) advised FHWA and NPS take an expansive approach in describing the effects of other non-federal actions. The project sponsor (the City of Chicago) has agreed to this request and has included an evaluation of effects from related non-federal actions such as the development of OPC, roadway closures and movement of the track and field presented in the reasonably foreseeable/probable action section over which neither FHWA nor NPS has direct or indirect jurisdiction. This does not obligate either NPS or FHWA to address mitigation related to these reasonably foreseeable/probable actions.  Furthermore, inclusion of this evaluation does not commit either NPS or FHWA to proceeding similarly with respect to other undertakings or obligate these agencies to future mitigation actions not related to the federal actions.

## 3.3 Jackson Park Historic Landscape District and Midway Plaisance

### 3.3.1 Description of Jackson Park Historic Landscape District and Midway Plaisance

The Jackson Park Historic Landscape District and Midway Plaisance is all part of one NRHP listed historic property located on the South Side of Chicago, Illinois. East of Stony Island Avenue, Jackson Park is roughly bounded by 67th Street, 56th Street, and Lake Michigan. West of Stony Island Avenue, the Midway Plaisance is roughly bounded by 60th Street, Cottage Grove Avenue, and 59th Street. The historic property (district) consists of two parks, Jackson Park and the Midway Plaisance, respectively to the east and west of S. Stony Island Avenue. The historic property is listed in the National Register of Historic Places (NRHP) for national and state significance according to Criterion C in the areas of landscape architecture, architecture, science, sculpture, and urban planning. Under Criterion C, the historic property embodies the distinctive characteristics of a type, period, or method of construction; or represents the work of a master; or possesses high artistic values; or represents a significant and distinguishable entity whose components may lack individual distinction.

The 2018 HPI report provides detailed background information on Jackson Park and the Midway Plaisance and its historical significance.  In brief, the period of significance for Jackson Park and the Midway Plaisance is 1875 to 1968. The timeframe encompasses design and initial construction in the 1870s, the 1893 World's Columbian Exposition, subsequent redevelopment as a park based on the 1895-1897 plans by firms associated with Frederick Law Olmsted, Sr., and additions associated with the Works Progress Administration (WPA) and the Chicago Park District (CPD) through 1968.  The seminal effort to create integrated parkland after the World's Columbian Exposition was the collaborative effort of the South Parks Commission with the Olmsted firm in its various manifestations: Olmsted, Olmsted & Eliot (1893-1897) and briefly F.L. and J.C. Olmsted (1897). The leading master landscape architects included Frederick Law Olmsted, Sr., his partners John Charles Olmsted, Charles Eliot and Frederick Law Olmsted, Jr., and collaborators Warren Henry Manning and Edward D. Bolton.

The HPI report identifies the resources that contribute to the historic property, including 3 sites, 16 buildings, 12 structures, and 5 objects. Landscape features that contribute to the significance of the property reflect the design intent and principles that the original designer, the firm of Frederick Law Olmsted, Sr., applied in order to create a public park serving as open space for use by the community. A full explanation of the historic design principles that informed the historic property's development is included on pages 11 and 12 of the HPI.

As community needs have changed, alterations to the park have been necessary to sustain its purpose, but the park continues to retain historic integrity because the overall effect of previous alterations retained consistency with the original design principles.  For example, the early addition of major park amenities such as a golf course, gardens, bridges, buildings, and monuments reflected the original design principles, as did subsequent changes that fulfilled the 1905 and 1930 General Plans, which updated the original design.  In later years, infill of the North and South Bayous and part of the East Lagoon removed visual and physical connection across the once-interconnected waterways, and the

intentional demolition of ornate bridges and buildings in the 1960s introduced changes that were incongruous with the historic park character. However, community advocacy related to these incongruities led to changes that helped reestablish the area as public open space.

In aggregate, the majority of alterations to the historic property over time have been consistent with the original design principles applied by the firm of Frederick Law Olmsted, Sr. As established by the HPI, the combination of changes made to date do not impair the integrity of the existing character-defining features reflecting the original design principles.

Photographs of Jackson Park and Midway Plaisance are provided in Photos 1 through 9 in Appendix C. Renderings for viewshed analyses of the OPC Museum Building are provided in Photos 25-29 in Appendix C.

### 3.3.2 Assessment of Effects on Jackson Park Historic Landscape District and Midway Plaisance

Individual resources and features of the historic property referenced in this assessment of effects are identified in Appendix A, Exhibit 3: Jackson Park and Midway Plaisance Contributing Resources and Exhibit 4: Jackson Park and Midway Plaisance – Referenced Cultural Landscape Features.

#### 3.3.2.1 Effect Determination

The undertaking will have an ***adverse effect*** to Jackson Park Historic Landscape District and Midway Plaisance because it will alter, directly or indirectly, characteristics of the historic property that qualify it for inclusion in the National Register.

The significance of Jackson Park and the Midway Plaisance is manifested in the integrity of extant landscape characteristics. Explanation of the integrity and features of the cultural landscape is included in Appendix F of the HPI. The overall historic property conveys the character present during the period of significance from 1875-1968 and currently possesses historic integrity of location, design, setting, materials, workmanship, feeling, and association. The undertaking diminishes the historic property's integrity of design, materials, workmanship, and feeling.

- Primary physical changes that are concentrated in the western perimeter of Jackson Park and the eastern Midway Plaisance impact adjacent park areas including the Lagoons, Fields, and Lake Shore. The changes alter the legibility of the design of the cultural landscape in ways that diminish the overall integrity of spatial organization in the property as a whole.

- While most impacts to the cultural landscape occur in a limited spatial area, they diminish the historic property's overall integrity by altering historic, internal spatial divisions that were designed as a single entity.

- The undertaking impacts the overall historic road network, altering the historic property's designed spatial organization and the relationship between interconnected systems of pedestrian and vehicular circulation.

- The undertaking alters the shape, form, and function of the historic primary entrance to the property by changing the historic symmetrical roadway design and spatial patterns that define the connection between Jackson Park and the Midway Plaisance.

- Spatial organization and the landscape setting of some contributing resources (Cheney-Goode Memorial and Statue of the Republic) are transformed in ways that are inconsistent with the Secretary of the Interior's Standards for the Treatment of Historic Properties.

- The undertaking removes, replaces, or otherwise alters historic resources and landscape features within portions of the historic property. New materials with modern functions differ from historic materials at a scale and intent that does not conform to the Secretary of the Interior's Standards. Integrity of workmanship is obscured by changes to the integrity of park design, the addition of new features and materials, and by the removal and alteration of historic fabric that relates to material integrity.

- The size and scale of new buildings within the historic district diminish the intended prominence of the Museum of Science and Industry building and alter the overall composition and design intent of balancing park scenery with specific built areas.

- The combined changes diminish the sense of a particular period of time within the historic property and impact the integrity of feeling. The changes impact how Jackson Park and the Midway Plaisance reflect conscious decisions made by the Olmsted firm in determining the organization, forms, patterns of circulation, relationships between major features, arrangement of vegetation, and views.

### 3.3.2.2    Effects from Federal Actions

#### UPARR Partial Conversion Area within Jackson Park

If approved by NPS, the partial conversion would reduce the area subject to the provisions of UPARR within the Jackson Park Historic Landscape District around the OPC and would apply the provisions of UPARR to the eastern end of Midway Plaisance (east of the railroad embankment and viaduct) both of which are part of the historic property. The change in legal status of these areas does not in itself cause physical effects on historic properties.

City Proposed UPARR Replacement Area within the eastern Midway Plaisance

The requirement that equivalent recreation opportunities are provided within the replacement area would modify the historic character of the Midway Plaisance east of the railroad embankment and viaduct with the addition of physical features for a play area. Previously, the current layout and recreation use on this section of Midway Plaisance was articulated (see Section 1.1.1.3). The central area would reduce in size. The western side of the historic sunken lawn would be altered with the addition of a play area and walkways. The new fenced play area and placement of walks, trees, and recreational features would reduce and reconfigure the central lawn panel, deviating from the simple formality of open space that reflects the historic design principle of informal symmetry and balance in design. Addition of trees at the margins of the open space would result in a minor modification of historic spatial pattern on the eastern side of the historic sunken lawn. The addition of fences, paths, trees, and play equipment would alter the setting and feeling of the historic Cheney Goode Memorial (Exhibit 3b: 34); however, the addition of a path adjacent to the Memorial reestablishes the alignment of a missing historic route. The Memorial consists of a bench and sundial placed on the western side of the eastern Midway Plaisance in 1932. More specifically, a fenced play area directly in front of the Memorial bench would change the setting and feeling of the Memorial. The changes would not alter the location, materials, workmanship, design, and association of the Memorial itself. Therefore, the addition of fences, paths, trees, and play equipment alters historic aspects of design, setting, and feeling of the eastern end of the Midway Plaisance, resulting in a negative effect to the historic landscape.[2]

Improvements along Lake Shore Drive

Proposed changes to Lake Shore Drive expand road width and affect related intersections but do not alter aspects of the road that retain integrity. As part of the historic vehicular circulation network, the alignment remains and the road persists as broad, multilane drive that historically contained up to six lanes along a similar curvilinear alignment and defined the boundary between the lake shore and the interior of the park. The proposed widening and additional traffic anticipated along Lake Shore Drive will change traffic noise levels, however, changes between existing and future conditions is less than 3 dBA, which is not a perceptible change.

The widening of Lake Shore Drive requires the alteration of the contributing 59th Street Bridge (North Inlet Bridge). The alteration is consistent with the Secretary of the Interior (SOI) standards. Bridge features that convey integrity including location, design, and feeling are not altered by the project. The widening of Lake Shore Drive expands the intersections at 57th Drive, Science Drive, and Hayes Drive. The existing roadway alignments at these three locations result from several modifications to alignment between the 1980s and 2000s. Contributing features are not impacted by the adjustment of these non-contributing roadway intersections.

---

[2] https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/approach.htm; https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/spatial.htm.

The addition of a lane from E. 57th Street to E. Hayes Drive also results in removal of historic parkland along the west side of the contributing roadway (Exhibit 4b: 1-2k). The widening of approximately two-feet for an additional lane generally follows the historic alignment of the road, creating only a minor change to the historic spatial organization, and does not significantly affect historic features and materials. The widening occurs within the historic view toward Lake Michigan from the adjacent Bowling Green located southwest of the Museum of Science and Industry; however, these changes do not change the character or type of features present within the viewshed and overall setting have not changed (Exhibit 4b: 1-4f). The widening increases the visual presence of the roadway from the Bowling Green by increasing the proximity of traffic; however, the degree of change is minimal. The widening also decreases the distance between the Bowling Green and the roadway, however, the change in traffic noise levels between existing and future conditions is less than 3 dBA, which is not a perceptible change.

Areas affected by change from parkland to roadway along Lake Shore Drive will be revegetated and regraded to match the existing landscape or following historic design principles for areas associated with the Great Lakes Fishery and Ecosystem Restoration (GLFER) habitat restoration project. Vegetation and paths installed under GLFER, while not historic contributing features, align to SOI standards as a rehabilitation of portions of the historic property. The narrow band of plantings associated with GLFER that are removed by lane expansion and realignment of the previously altered intersection of Lake Shore Drive and Hayes Drive are replaced along the east bank of the Jackson Park Inner Harbor (Exhibit 3a). The additional lane and removal of parkland along the road conforms to the SOI standards. The project does not "radically change, obscure, or destroy character-defining spatial organization and land patterns or features and materials."[3]

Hayes Drive Reconfiguration

The reconfiguration of Hayes Drive between Stony Island Avenue and Lake Shore Drive includes sections of altered roadway that conform to the SOI standards and other sections that deviate from those standards. Overall, the widening of the roadway creates a minor change to spatial organization and does not significantly affect adjacent historic features. Changes in traffic noise levels between existing and future conditions along Hayes Drive is equal to or less than 3 dBA, which is not a perceptible change. The majority of the roadway alignment is maintained. The exceptions to the maintenance of existing alignments are at the Hayes Drive intersections with Cornell Drive and Richards Drive.

Realignment of the intersection of Hayes Drive and Cornell Drive is consistent with the SOI standards.[4] The proposed realignment replaces a non-contributing portion of Cornell Drive with a missing historic roadway pattern that provided a curved form to adjacent parkland (Exhibit 4a: 1-2h). The reconfiguration of the intersection includes two pedestrian underpasses that entail the alteration of historic pedestrian paths and low berms directly southeast of the intersection to accommodate the changes, which are intended to improve park safety and accessibility. The realignment overlaps areas of

[3]https://www.nps.gov/TPS/standards/four-treatments/landscape-guidelines/rehab/circulation.htm
https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/approach.htm
[4] https://www.nps.gov/TPS/standards/four-treatments/landscape-guidelines/rehab/circulation.htm

vegetation planted under the GLFER project around the previously altered intersection. Areas affected by change from parkland to roadway along Hayes Drive will be revegetated and regraded to match the existing landscape and following historic design principles for areas associated with the GLFER project. The equivalent extent of removed plantings are replaced following GLFER precedent along the east bank of the Inner Harbor. Alterations from the realignment minimally affect the historic character of the circulation network and topography in this area. Underpasses are discussed under Bicycle/Pedestrian Enhancements below.

Realignment of the intersection of Hayes Drive with Richards Drive is not consistent with the SOI standards."[5] The realignment replaces the historic triangular intersection (Exhibit 4a: 1-2j) with a T-shaped intersection and changes roads and walks that define historic spatial organization and views within the setting of the *Statue of the Republic* (Exhibit 3a: 26). Rising above a circular traffic island, the statue marks the center of the triangular intersection of Hayes Drive and Richards Drive and commemorates the twenty-fifth anniversary of the 1893 World's Columbian Exposition in 1918. The historic design is arranged to highlight the statue as the central focal point of surrounding roads and position the monument to be viewed from vehicles or at a distance from walks. The relationship between viewers and the statue is balanced by distance and speed.

The new design of the roadway bypasses the *Statue of the Republic* that is the focal point of the historic intersection. The construction of a pedestrian plaza replaces one of the last remaining historic vehicular triangular intersections within the park and the circular traffic island with a new feature (pedestrian plaza) that alters the historic circulation pattern.  The contributing triangular intersection channels movement, directs views, and creates a setting for the statue.  The new pedestrian zone changes the relationship between the vehicular intersection, pedestrian routes, and the statue. Although the shape of the pedestrian plaza reflects the portion of the removed roadway that formed the intersection, the intentional balance of the scale of the statue with the speed and alignment of the road is changed and the historic character of the design is altered. Realignment of the triangular intersection deviates from the design principles of informal symmetry and balance in design, unified composition, and orchestration of movement. In addition, the realignment will introduce visual elements that diminish the integrity the *Statue of the Republic*. While performing a safety function, the addition of a standard traffic signal adjacent to the statue introduces an upright, colored visual element that diminishes the integrity of the setting of the statue.

Alteration of Hayes Drive between Richards Drive and Lake Shore Drive is consistent with the SOI standards because it minimally affects contributing features and preserves historic character of the historic property. The roadway alignment and footprint remain the same at the contributing Hayes Drive Bridge and do not alter features that contribute to the integrity of the historic bridge.  Adjustment of the Hayes Drive curb line and adjacent paths removes slivers of parkland planted under GLFER. Areas affected will be revegetated and regraded to match the existing landscape following GLFER precedent. The equivalent extent of removed plantings are replaced along the east bank of the Inner Harbor.

---

[5] https://www.nps.gov/TPS/standards/four-treatments/landscape-guidelines/rehab/circulation.htm

Accommodation of a pedestrian underpass on Hayes Drive west of Lake Shore Drive creates minor changes to the predominantly level topography and presents no change to the character of views from the roadway between the *Statue of the Republic* and Lake Michigan (Exhibit 4a).

Stony Island Avenue Improvements

Changes to Stony Island Avenue do not change the overall character of the use or contributing physical features of the property. Highway noise levels along Stony Island Avenue within Jackson Park will not change more than 3 dBA, which is considered not to be a perceptible change. Widening the roadway will occupy parkland along the historic property's perimeter, realign historic sidewalks, and modify the thinly screened buffer with tree rows, groves, and subtle berms (Exhibit 4a: 1-1a); however, the character of the features will not be substantially altered. The project will realign sidewalks and regrade adjacent berms; however, the association of the road with the sidewalk and setting of perimeter topography and vegetation remains. While contributing features are altered by additions for new use, historic character is preserved in accordance with SOI standards that require "that these features are not radically changed, obscured, damaged, or destroyed."[6] In addition, alteration of Stony Island Avenue at the intersection of the Midway Plaisance (North Roadway) includes minor widening of the road (Exhibit 4a). The change to circulation follows the historic alignment and is consistent with the SOI standards.

Other Transportation Improvements

The FHWA action also proposes changes to the character of the property's use and physical features along the east bank of the Jackson Park Inner Harbor, along Marquette Drive between Richards Drive and Stony Island, and along Cornell Drive north of Hayes Drive. The project will rehabilitate a deteriorated historic path and lagoon overlook along the Inner Harbor (Exhibit 4a: 1-2u). New plantings between the path and the shore of the Inner Harbor consist of replacement vegetation for areas associated with the GLFER project that were removed by the Federal Undertaking. Plantings in this area follow historic design principles, align with the precedent of the GLFER project, and are consistent with the SOI standards.

In these areas, the construction of pedestrian-scale walks deviates from the 1895 design and the subsequent construction of the existing, interrelated vehicular and pedestrian circulation system including broad, tree-lined roadways that help to establish historic spatial organization. Along Marquette Drive, the new walk follows the alignment of the removed portion of the historic roadway (Exhibit 4a: 1-2f). There are no perceptible (less than 3 dBA) noise level changes along these roadways as a result of the proposed improvements.

For the removed portion of Cornell Drive north of Hayes Drive, the new walk approximates the existing road alignment near the West Lagoon and connects to the walk proposed as a part of the OPC development. The walk maintains views over the West Lagoon as a pedestrian rather than vehicular experience (Exhibit 4b: 1-4a). The new walks help to minimize the impacts from removal of roads but do

---

[6] https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/approach.htm

not fully address the change in balance between pedestrian and vehicular circulation throughout the historic property that was part of the Olmsted principle of orchestration of movement.

Bicycle/Pedestrian Enhancements

The proposed enhancements for bicyclist and pedestrian use through underpasses and additional access do not introduce visual elements that diminish the integrity of the historic property. The construction of five shared-use underpasses (1) at the east end of Hayes Drive, (2) at the middle of Jeffery Avenue, (3) east of the intersection of Hayes Drive and Cornell Drive, (4) west of the intersection of Hayes Drive and Cornell Drive, and (5) at the southeast end of Marquette Drive, inserts a new type of circulation feature in the park for the purpose of improving park access and circulation while also enhancing public safety.[7] Although the underpasses require minor alterations to historic topography and vegetation, their design does not radically obscure the character-defining spatial organization or land patterns of the site (cultural landscape) and is consistent with the SOI standards.[8] The underpasses at Hayes Drive and Cornell Drive lower grades along historic walks and raise roadway grades along approximately 300 feet to accommodate the underpasses. Grades are repaired and new vegetation is installed reflecting historic patterns. New routes connect to existing walks in each location and facilitate continuity of the contributing pedestrian network across the historic property.

The addition of pedestrian refuge islands along Stony Island Avenue, Cornell Drive near the Museum of Science and Industry, and at the intersection of Hayes Drive and Richards Drive are consistent with the SOI standards associated with health and safety considerations. The addition of curb extensions along Stoney Island Avenue are similarly consistent.[9]

In general, the installation of sidewalk ramps, upgrading of marked and unmarked crossings, and changes to traffic signals and timing sequences throughout the historic property are consistent with the SOI standards associated with health and safety considerations.[10]

### 3.3.2.3    Effects from Reasonably Foreseeable/Probable Actions

Roadway Closures

The closure and subsequent removal of roadways results in physical damage to the historic vehicular network in the south and west parts of the historic property. Historic road segments proposed for removal include: Midway Plaisance (South Roadway; eastbound) between Stony Island Avenue and Cornell Drive; Cornell Drive between the between 59th and 62nd Streets; the northbound portion of Cornell Drive south of Hayes Drive from 65th Street to 66th Place; and, Marquette Drive between Stony Island Avenue and Richards Drive. These roads retain historic alignments and continue to define interior

---

[7] https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/approach.htm
[8] https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/approach.htm
[9] https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/special.htm
[10] https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/special.htm

spaces, compose the historic sequence of people's movement through the landscape, and provide access to key historic locations as intended by the historic design of the site (cultural landscape).

Road closures remove historic roadways that are part of the historic property and replace them with parkland. This action alters the historic circulation network. Roadway closures affect the designed relationship between vehicular and pedestrian circulation in which modes of movement, views, and vegetation are interrelated elements. Removal of historic roadways alters spatial organization of the overall park, reduces differentiation of landscape character areas within the historic property, and is not consistent with SOI standards that recommend the retention and preservation of historic land patterns and circulation systems.[11]

Closure of the Midway Plaisance (South Roadway; eastbound) between Stony Island Avenue and Cornell Drive removes a historic circulation route. This roadway segment demonstrates a particularly strong expression of historic landscape character related to the design of the property. The south roadway of the Midway Plaisance forms part of the formal and balanced juncture between the eastern parts of the original South Park (Jackson Park, the Midway Plaisance, and Washington Park). Closure of the roadway section removes an aspect of spatial organization that is fundamental to the historic design of Jackson Park at its connection to the Midway Plaisance. This closure removes contributing historic circulation and spatial organization at the primary public interface with both Jackson Park and the Midway Plaisance. The action would eliminate the purposeful connection between and symmetrical composition of this distinct portion of the historic property.

Closure of Marquette Drive between Stony Island Avenue and Richards Drive also converts a contributing roadway into parkland. In addition, the removal of Marquette Drive eliminates the historic, contributing triangular intersection with Richards Drive (Exhibit 4a: 1-2g). This is one of the last remaining historic vehicular triangular intersections within the park. The intersection and Marquette Drive approximately between S. Cregier Avenue and Lake Shore Drive demonstrate particularly strong expressions of historic landscape character related to the design of the property. The road closures alter contributing spatial organization and circulation routes.

Closure of Cornell Drive north of Hayes Drive between 59th and 62nd Streets and the northbound portion of Cornell Drive south of Hayes Drive between 65th Street and 66th Place removes a road segment that contributes to the historic circulation network of the property.

Closure of Cornell Drive between 62nd and 65th Streets and between 66th Place and 67th Street will not alter the integrity of the historic property (district) because substantial modification of these roadway segments occurred previously, and these sections of road do not contribute to the significance of the cultural landscape.

---

[11] https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/rehab/circulation.htm

OPC Site Development

Implementation of the OPC proposed design will affect the overall site (cultural landscape), the Perennial Garden/Women's Garden, the English Comfort Station, and the Western Perimeter Playground (E. 62nd Street playground) (Exhibit 4b).

The OPC will transform the cultural landscape within the project footprint. The project site overlays part of the western park perimeter of the historic property. The proposed design replaces contributing landscape characteristics, which include spatial organization, topography, vegetation, and circulation, with new features. While location of proposed partially underground buildings and development of green roofs on three of the buildings reduces the visibility of new buildings within the landscape and provides the appearance of green space within the footprint of the project, its implementation will change the character of the historic landscape. In particular, the historic design principles of the prominence of landscape scenery, unified composition, and orchestration of use will be changed within the historic open space of the project footprint by the addition of the Museum Building and other buildings. This is not consistent with the SOI standards that state: "When alterations to a cultural landscape are needed to assure its continued use, it is most important that such alterations do not radically change, obscure, or destroy character-defining spatial organization and land patterns or features and materials."[12]

Changes to the cultural landscape directly north of the proposed OPC buildings but within the project footprint remove physical features that contribute to the significance of the historic property. A new garden will replace the historic Perennial Garden/Women's Garden, built in 1936 (Exhibit 4b: 1-10). The garden lies within the center of the formal terminus of the Midway Plaisance in Jackson Park and was historically developed to be symmetrically framed by the main park drives and adjacent walks of the Midway Plaisance north and south roadways, Stony Island Avenue, and Cornell Drive. The changes to the garden will make the space universally accessible, by removing steps currently surrounding the garden, and introducing new accessible paths around the perimeter and down to the sunken garden. The new design incorporates several characteristics of the historic garden, including the interior dimensions, general shape and location, surrounding plant beds, and plant types. The new garden demonstrates aspects of the original design principles of juxtaposition of design formality, informal symmetry and balance, and sustainable design and environmental conservation; however, extant historic materials are removed and the organization of the space is altered to implement the proposed design. The symmetrical layout of concentric rings of planting beds and paths will be replaced with a series of asymmetrical winding paths, gathering spaces, stormwater catchment areas, and plant beds. Historic materials including stone edged terraced planting beds, steps, and vegetation, will be removed. The symmetrical triangular path intersections at the east side of the space that define the transition from the Midway Plaisance to Jackson Park will be replaced with asymmetrical paths (Exhibit 4a: 1-2m). Removal of the relatively uniform topographic setting surrounding the sunken garden and replacement with undulating hills and swales does not correspond to the formality of the historic design in relation to

---

[12] https://www.nps.gov/TPS/standards/four-treatments/landscape-guidelines/rehab/approach.htm

its setting. Implementation of the new garden physically damages this part of the site (cultural landscape) that contributes to the historic property.

With the exception of the English Comfort Station building (Exhibit 3b-16), the remainder of the contributing historic features south of the Perennial Garden/Women's Garden to 62nd Street will be removed or altered to accommodate the elements associated with the OPC. The western perimeter exhibits integrity to the period of significance and demonstrates continuity in the larger patterns of spatial organization, land use, views, circulation, and tree massing. The area designed and designated by Olmsted as an outdoor place for exercise (he used the term "gymnasia") retains the designed composition and general form of two open fields surrounded by canopy trees that are joined in the middle by the historic layout of the Western Perimeter Playground and English Comfort Station (Exhibit 4b: 1-7). Olmsted's use of "men's gymnasium" and "women's gymnasium" for the north and south fields refers to the original meaning of the word as a general place of exercise, rather than as a room or building for enclosed sports activities. The change to this portion of the historic property is not consistent with SOI standards that stipulate the need to preserve contributing historic features and discourage "placing a new feature where it may cause damage to, or be intrusive in spatial organization and land patterns." The standards cite an example of inserting a new visitor center that blocks or alters a historic view or vista."[13] The addition of buildings, service facilities, paths, and landscaping changes contributing spatial organization, topography, vegetation, and circulation in the location of the contributing playground and the historic fields of the western perimeter.

Addition of a two-level athletic center (the PAAC) as well as paved pedestrian paths and play areas involves reconfiguration of historic paths, spaces, and play areas, and the replacement of vegetation. This alters historic design, setting, and feeling of the contributing spatial organization, walkways, and canopy trees of the Western Perimeter Playground. The contributing playground site provided a symmetrical landscape setting around the historic English Comfort Station and a designed fulcrum to the balanced layout of the historic fields to the north and south (Exhibit 4b: 1-2p). The current playground does not contain historic play equipment. Replacement of the character-defining, U-shaped walk with asymmetrical pathways around an athletic center (the PAAC) and series of new, dispersed playground areas departs from the original application of historic design principles with respect to the setting of the historic resource and its relationship to the cultural landscape; however, elements of the new playground design may internally demonstrate informal symmetry and balance in design, and a unified composition. Although the new playground and picnic areas will be approximately five times larger than the historic play areas, the development of the PAAC and associated grounds result in removal of distinctive uses, features, spaces, and spatial relationships that characterize this portion of the historic property, and therefore is inconsistent with the SOI standards which emphasize the retention of historic character, distinctive features, and characteristic spatial relationships.

---

[13] https://www.nps.gov/TPS/standards/four-treatments/landscape-guidelines/rehab/spatial.htm

Historic views are part of the site (cultural landscape) that contributes to the historic property. Construction of the OPC includes the addition of new visual elements that diminish the integrity of views along the western park perimeter within the historic property. Tall buildings exist outside of the historic property but not within it. Within the historic property, the comparatively low-lying Museum of Science and Industry building was intended as the only building to be a "dominating object of interest" inside of Jackson Park and the Midway Plaisance.[14] The proposed OPC Museum Building affects views within the historic property by drawing specific focus to an exceptionally prominent building. This building will disrupt historic, designed views over parkland from the East Lagoon (Music Court) Bridge (Exhibit 4b: 1-4b), the Wooded Island North Bridge (Exhibit 4b: 1-4c), and the west side of the Wooded Island (Exhibit 4b: 1-4d). Westward and southward views from these locations reveal a designed setting with features of the waterways, a backdrop of tree canopy, and tall buildings and residential development that recede into the background outside of the boundary of the historic property. Despite the design and siting of OPC site elements and buildings to blend into the landscape setting, the proposed project diverges from the design principles of the prominence of landscape scenery and a unified composition by proposing building mass and landforms within the park at the edge of the lagoons that draw specific focus on the proposed buildings including the façade of the proposed Museum Building.

The OPC construction alters historically important topography that defines spaces, forms a unifying element along the western perimeter, and provides a sense of physical and visual separation between uses. Within the OPC footprint, the historic berms between E. 60th Street and E. 62nd Street and west of S. Cornell Drive are removed in some locations to provide level access and accentuated in height in other areas (Exhibit 4b: 1-1a, 1-1b). The proposed design provides topography that functions as a physical and visual buffer between the park and the neighborhood setting; however, the design adds buildings and landscape features that detract from and alter extant historic topography.

Construction of the OPC also changes existing historic vegetation in a way that is inconsistent with SOI standards which emphasize the retention, preservation, protection, and maintenance of historic materials and features. The historic planting design and extant patterns of historic vegetation were designed to create interest in the landscape, provide buffers, define spaces, reinforce circulation routes and views, and create a sense of removal from the surrounding city. While new plantings associated with the OPC were designed to fulfill these functions for the new facilities of the OPC, the design results in partial removal of Olmsted designed historic vegetation patterns including groves of canopy trees around the historic playing fields and regular rows of trees along the streetscape (Exhibit 4b: 1-5, 1-7). Placement of a small water lift station near the OPC site includes the placement of utility covers and a modified embankment in an area of GLFER plantings along the west bank of the West Lagoon. The project does not affect the waterbody and the affected area will be revegetated and regraded to match the existing landscape. The equivalent extent of plantings replaced by the utility covers are installed following GLFER precedent along the east bank of the Inner Harbor (Exhibit 4a: 1-2u).

---

[14] Correspondence from Olmsted to Donnersberger May 7, 1894. Washington DC, Library of Congress, Olmsted Papers) Series A34:79.

<u>Track and Field Relocation</u>

This action relocates the track and field  to an area with ball fields that were added in the 1940s within one of the two open fields (or "gymnasia") designed for outdoor recreation along the western perimeter (Exhibit 4a: 1-7). The action raises a portion of the recessed topography to accommodate the track and field and realigns a historic path along Cornell Drive; however, it relocates existing features from a similar location that continues to demonstrate historic integrity. The proposed changes to contributing topography and walks on the west edge of the proposed track and field continue to demonstrate character-defining patterns.[15] The introduction of similar features will not further diminish the integrity of the historic property in the proposed location. The relocation is consistent with SOI standards because it retains overall patterns and preserves the southern field as an open recreational space.[16]



---

[15] https://www.nps.gov/TPS/standards/four-treatments/landscape-guidelines/rehab/approach.htm
[16] https://www.nps.gov/TPS/standards/four-treatments/landscape-guidelines/rehab/spatial.htm

## 3.4     Other Historic Properties

Photographs to and from Jackson Park for each of the remaining historic properties identified in the HPI with potential effects from the Federal actions are provided in Photos 10 through 24 in Appendix C. Renderings for viewshed analyses of the OPC Museum Building are provided in Photos 30 through 36.

### 3.4.1   Stony Island State Trust & Savings Bank (Stony Island Arts Bank)

#### 3.4.1.1     Description of property

The Stony Island State Trust & Savings Bank, known today as the Stony Island Arts Bank, sits on the west side of S. Stony Island Avenue, between E. 67th Place and E. 68th Street at 6760 S. Stony Island Avenue. See Exhibit 2. In December 2013, the Stony Island Trust & Savings Bank was individually listed in the NRHP under Criteria A and C. During the property's Period of Significance of 1923 to 1931, the fine Classical Revival style bank served as a center of the South Shore community's economic life and symbol of the neighborhood prosperity of that era.

The Stony Island State Trust & Savings Bank retains a very high level of integrity of location, design, workmanship, and materials in relation to its architectural significance.  After sitting vacant for over three decades, the building was restored and redeveloped by non-profit arts organization for use as a community center and art gallery in 2013.  Because the project retained a substantial original fabric, and many interior spaces continue to express its original bank/office functions, the property also retains a high degree of integrity of feeling and association.  However, the property retains a low degree of integrity of setting.

During its Period of Significance, the monumental Classical Revival style bank stood within a vibrant commercial district.  Between the 1970s and the early 21st century, many of the surrounding small historic commercial buildings were razed.  Some of the area's numerous open spaces have been redeveloped as small commercial strip malls with surface parking lots in front of the businesses.  The property's integrity of setting has also been affected by several roadway projects including the widening of S. Stony Island Avenue (ca. 1940s, late 1960s, early 1980s) and construction of the S. Cornell Drive spur (ca. 1975) since the property's Period of Significance.

#### 3.4.1.2     Effect Determination

The undertaking will not alter the Stony Island Trust & Savings Bank's integrity of location, design, workmanship, materials, feeling and association. The property's integrity of setting is quite low. Since 1931, the end of the Period of Significance for this property as determined by its NRHP form, the Stony Island Trust & Savings Bank's setting has undergone substantial changes.  These include the demolition of adjacent properties, previous roadway widenings along Stony Island Avenue, construction of the south end of the Cornell Drive spur, and the presence of numerous vacant lots and commercial strip developments.  The OPC Museum Building may be visually perceptible from some vantage points, however, it will only be seen in distant views, and there are other high-rises in closer proximity to the

property. The undertaking will not further diminish the property's already extremely low integrity of setting. Therefore, the undertaking will have *no adverse effect* to the Stony Island Trust & Savings Bank.

### 3.4.1.3 Assessment of Effects on the Stony Island Trust & Savings Bank (Stony Island Arts Bank)

#### 3.4.1.3.1 Effects from Federal Actions

The Stony Island Trust & Savings Bank is a considerable distance away from the NPS UPARR conversion area (approximately 4,000 feet (0.75 miles). However, the property is closer in proximity with some of the associated roadway closures, considered for UPARR replacement land.  It is located 600 feet from the southernmost limit of the northbound lanes of S. Cornell Drive north of E. 67th Street (within Jackson Park), which is considered part of the UPARR replacement land.  Neither the UPARR conversion nor replacement areas will cause any physical changes to the property or the features that contribute to its historic significance.

The Stony Island Trust & Savings Bank is located along the southern limit of the roadway improvements that are part of the FHWA action along S. Stony Island Avenue at E. 68th Street. The roadway improvements include reconfiguration of the south approach to the S. Stony Island Avenue intersection with E. 67th Street as a result of the removal of the northbound lanes of S. Cornell Avenue from E. 68th Street to the north. Roadway widening along S. Stony Island Avenue is proposed north of the E. 67th Street intersection. Sidewalk improvements are also proposed along S. Stony Island Avenue; however, these improvements do not occur adjacent to the Stony Island Trust & Savings Bank. There will be no physical changes to the Stony Island Trust & Savings Bank associated with the roadway improvement work. This action will not cause an effect on the features of the property's setting that contribute to its significance. A noise analysis determined that no perceptible audible differences (less than a 3 dBA change in noise level) to the Stony Island Trust & Savings Bank will be associated with the roadway improvements.

The Federal actions will not cause any changes in the use of the Stony Island Trust & Savings Bank.

#### 3.4.1.3.2 Effects from Reasonably Foreseeable/Probable Actions

The development of the OPC and proposed permanent roadway closures will not cause any physical changes to the Stony Island Trust & Savings Bank. There may be some visual effects associated with these projects. As shown in Photo 30 in Appendix C, the construction of the OPC Museum Building may be visually perceptible from the Stony Island Arts Bank. Although this addition may introduce a visual change within the park from the Stony Island Arts Bank, the construction of the high-rise Good Shepard Manor Senior Center apartments at 6720 S. Cornell Avenue in the late 1980s has previously altered this view.

In addition, there may be some potential visual changes to the Stony Island Trust & Savings Bank's setting because it is located along a portion of the proposed roadway removal of northbound S. Cornell Drive from E. 68th Street to the north. However, this roadway configuration was constructed in the late

1970s after the property's Period of Significance, therefore, these changes will have no effect on the property or the features of its setting that contribute to its significance.

The relocation of the Jackson Park track and field is located 3,400 feet (0.6 miles) from the Stony Island Trust & Savings Bank. It will not cause any physical changes to the property, nor will it be visible from the property.

### 3.4.2   William Dexter Three-Flat

#### 3.4.2.1   Description of property

The William Dexter Three-Flat is located at 1549 E. 65th Place, about a half-block west of S. Stony Island Avenue and the southwestern side of Jackson Park. See Exhibit 2. It was determined to be individually eligible under Criteria A and C for listing in the NRHP on July 10, 2018 per the historic resource survey forms prepared for this project. William Dexter, a successful butter manufacturer, commissioned architect N. Max Dunning to design this fine, spacious Craftsman style three-flat in 1912.  With close proximity to nearby Jackson Park and the lakefront as well as public transportation and other amenities along S. Stony Island, Dexter erected his low-rise apartment building in the fashionable Woodlawn neighborhood.

The William Dexter Three-Flat retains a high level of integrity of location, design, workmanship, materials, feeling and association in relation to its architectural significance.  However, its integrity of setting has been considerably diminished.  Since 1978, the end of the Period of Significance for this property, many nearby early 20th century structures on the 1500 block of E. 65th Place were razed. This includes the demolition of low-rise apartments that were directly east of the property.  Today, there is a large vacant lot that stretches from the east lot line of the William Dexter Three-Flat to S. Stony Island Avenue. There are also numerous contiguous vacant lots on both sides of E. 65th Street, towards the west end of the block. Because of these substantial changes, the William Dexter Three-Flat's integrity of setting is low.

#### 3.4.2.2   Effect Determination

The undertaking will not alter the William Dexter Three-Flat's integrity of location, design, workmanship, materials, feeling and association. The property's integrity of setting is quite low. Since 1978, the end of the Period of Significance for this property, the property's setting has undergone substantial changes primarily due to the demolition of adjacent historic properties and existence of vacant lots in their places.  Therefore, the property's integrity of setting has previously been compromised.  As described in the above assessment, the potential for effects to the William Dexter Three-Flat to the property's setting and integrity arises from the implementation of the OPC and adjacent roadway work. However, the OPC Museum Building will have little to no visual impact on the property and the roadway changes will not affect the property's low integrity of setting. The undertaking will have no impact on the property's significant historic features and, therefore, the undertaking will have ***no adverse effect*** to the William Dexter Three-Flat.

### 3.4.2.3    Assessment of Effects on property

#### 3.4.2.3.1    Effects from Federal Actions

The William Dexter Three-Flat is a considerable distance away from the NPS UPARR conversion area (approximately 2,500 feet (0.47 miles). However, it is closer in proximity with some of the associated roadway closures, considered for UPARR replacement land.  It is located 300 feet from the westernmost limit of the E. Marquette Drive roadway closure. Neither the UPARR conversion nor replacement areas will cause any physical changes that will cause effects to the property or the features than contribute to its historic significance.

The William Dexter Three-Flat is located just west of an expansive a vacant lot at E. 65th Street and S. Stony Island Avenue.  The vacancy of the lot allows for visual access to the intersection and roadway. In this area, the FHWA action includes roadway widening and intersection improvements at S. Stony Island Avenue and E. 65th Place. Roadway improvements include two-way traffic along S. Cornell Drive at the intersection, replacement of the existing landscaped median, and additional pavement width. Sidewalk improvements are also proposed along the east and west sides of S. Stony Island Avenue. There will be no physical changes to the William Dexter Three-Flat associated with this work. The roadway improvements will not cause any alterations to the features of the property's setting that contribute to its significance, as many nearby buildings have been demolished or newly constructed since the property's Period of Significance and Stony Island Avenue has been historically widened over time. A noise analysis determined that no perceptible audible differences (less than a 3 dBA change in noise level) to the William Dexter Three-Flat will be associated with the roadway improvements.

The Federal actions will not cause any changes in the use of the William Dexter Three-Flat.

#### 3.4.2.3.2    Effects from Reasonably Foreseeable/Probable Actions

The development of the OPC will not cause any physical changes to the William Dexter Three-Flat. In addition, it is unlikely that there will be visual effects associated with the project. As shown in Photo 31 in Appendix C, the construction of the OPC Museum Building will not be visible at street-level, and may not be visually perceptible at all.  Even if there is some visibility from upper stories of the property, this addition will not impact any historic features that relate to the significance of the William Dexter Three-Flat.

In addition, the proposed roadway closures of E. Marquette Drive and northbound Cornell Drive will not cause any physical changes the William Dexter Three Flat. The roadways currently are not highly visible from the property given their locations are one block south and 500 feet east of the property and views of these roadways are shielded by bordering vegetation along the west side of Jackson Park. Therefore, the roadway closures of E. Marquette Drive and northbound Cornell Drive will not cause any effects to the property or its setting.

The relocation of the Jackson Park track and field is located 1,800 feet (0.3 miles) from the William Dexter Three-Flat. It will not cause any physical changes to the property, nor will it be visible from the property.

### 3.4.3   Island Terrace Apartment Building

#### 3.4.3.1    Description of property

The Island Terrace Apartment Building is located on the west side of S. Stony Island Avenue between E. 64th and E. 65th Streets at 6430 S. Stony Island Avenue. See Exhibit 2. The Island Terrace Apartment Building was determined to be individually eligible for listing in the NRHP under Criteria A and C on July 10, 2018 per the historic resource survey forms prepared for this project. Produced by the noteworthy architectural firm of Dubin, Dubin, Black, & Moutousamy, the structure was one of the neighborhood's first Modern high-rises designed to provide affordable apartments to moderate and low-income renters. The structure was built in 1969, and its urban setting of Woodlawn along S. Stony Island Avenue and close physical and visual proximity to Jackson Park have always contributed to its significance.

The Island Terrace Apartment Building has had only minimal alterations since its completion in 1969 and thus retains a high level of integrity of location, design, workmanship, materials, feeling and association in relation to its architectural significance. The property also possesses integrity of feeling and association as a Modern building with high-quality, affordable apartments with close visual and physical access to Jackson Park and its expansive landscape.

The Island Terrace Apartment Building's integrity of setting, however, is low.  Since the late 1960s, approximately a dozen structures north, south, northwest, and southwest of the Island Terrace Apartment Building have been demolished. By the mid-1990s, Walter Scott School, just northwest of the property, had also been razed and adjacent S. Harper Avenue was greened over.  Mount Carmel High School built Haggerty Athletic Field on that site.

The Island Terrace Apartment Building is bordered on the east by S. Stony Island Avenue and the green space of Jackson Park's western perimeter (labelled as LCA 1.1. in Figure 8 of the HPI), including the Jackson Park Field House to the northeast (built about a decade prior to the high-rise). To the southeast, the widening of S. Stony Island Avenue and construction of the S. Cornell Drive southbound spur to S. 65th Place were undertaken shortly after the Island Terrace Apartment Building was erected. The southern part of the Western Perimeter of Jackson Park has had few changes since the late 1960s when the Island Terrace Apartment Building was erected.  However, due to the many other changes to the area, the property's integrity of setting has been considerably diminished.

#### 3.4.3.2    Effect Determination

The undertaking will not alter the Island Terrace Apartment Building's integrity of location, design, workmanship, materials, feeling and association. Since 1978, the end of the Period of Significance for this property, the Island Terrace apartment's setting has undergone substantial changes. However, despite the property's low integrity of setting, the Island Terrace Apartment Building has continuously maintained its physical and visual relationship with Jackson Park.  There may be some physical changes

to the property's setting including sidewalk improvements, widening of S. Stony Island Avenue, the realignment of S. Hayes Drive and S. Cornell Drive south of Hayes Drive, and new elements within its viewshed within Jackson Park. However, the visual and physical relationship between the Island Terrace Apartments and Jackson Park will be maintained and none of these changes will cause effects to features that contribute to the significance of the Island Terrace Apartment Building or its setting. Therefore, the undertaking will have **no adverse effect** to the Island Terrace Apartment Building.

### 3.4.3.3    Assessment of Effects on property

#### 3.4.3.3.1        Effects from Federal Actions

The Island Terrace Apartment Building is located approximately 1,800 feet (0.3 miles) from the NPS UPARR conversion area and approximately 300 feet west of the northbound S. Cornell Drive roadway closure considered for UPARR replacement. Despite the close proximity to the action, neither the UPARR conversion nor replacement areas will cause any physical changes that will cause effects to the property or the features of its setting that contribute to its historic significance. The UPARR conversion area does not introduce any visual changes to the property or its setting. The UPARR replacement area along S. Cornell Drive may introduce some changes that could be visible from some units on the upper stories of the high-rise. However, the Island Terrace Apartment Building will continue to front onto S. Stony Island Avenue and will maintain its close physical and visual relationship with Jackson Park. Therefore, these visual changes would not alter the features of the property's setting that contribute to its historic significance.

The Island Terrace Apartment Building is located along the west side of S. Stony Island Avenue where proposed roadway improvements from the FHWA action will occur. Roadway improvements include widening of S. Stony Island Avenue and improving intersections at E. 65th Street and E. 64th Street. Sidewalk improvements are proposed along the west side of S. Stony Island Avenue in front of the Island Terrace Apartment Building. This will include removing the existing narrow strip of parkway directly in front of the building. However, the property will continue to maintain its close physical and visual relationship with Jackson Park, and therefore, this minor alteration will not cause an effect on the features of the property's setting that contribute to its significance. In addition, there will be no perceptible audible changes (less than a 3 dBA change in noise level) associated with the proposed improvements.

No changes will occur to the Island Terrace Apartment Building's use.

#### 3.4.3.3.2        Effects from Reasonably Foreseeable/Probable Actions

The development of the OPC site, roadway closures, and relocated track and field may result in some new visual elements that could be perceptible within views from some units of the Island Terrace Apartment building. As shown in Photos 32-33 in Appendix C, the construction of the OPC Museum Building may be visible at street-level. The relocated track and field and proposed roadway closures within the park may also be visible from some units on the upper-levels of the building. However, the building will remain a Modern high-rise that fronts onto S. Stony Island Avenue and maintains close

physical and visual relationships with Jackson Park and its expansive landscapes. Therefore, these changes will have no effect on the features of the property's setting that contributes to its significance.

### 3.4.4  Hyde Park High School

#### 3.4.4.1    Description of property

Hyde Park High School (known today as Hyde Park Academy High School) is located on the west side of S. Stony Island Avenue between E. 62nd and 63rd Streets at 6220 S. Stony Island Avenue. See Exhibit 2. Hyde Park High School was determined to be individually eligible for listing in the NRHP under Criteria A, B, and C on July 10, 2018 per the historic resource survey forms prepared for this project. Since its completion in 1913, the Beaux Arts style building housed a prominent public high school.  The close physical and visual proximity to Jackson Park have always contributed to the property's significance.

Hyde Park High School retains excellent integrity of location, design, workmanship, and materials in relation to its architectural significance.  Additions to the building were undertaken prior to the end of the 1978 Period of Significance, and were designed with compatible materials and design. The structure possesses integrity of feeling, and association as a prominent public school that took full advantage of its proximity to and verdant views of Jackson Park. The property's integrity of setting has been somewhat diminished, however.  Between the 1960s and 1980s, several properties south of Hyde Park High School were razed.  These included low-rise apartment buildings; the Parkland Hotel at S. Stony Island and S. Harper Avenue; and a previous elevated railroad track and platform along E. 63d Street.  The Chicago Public Schools had installed a narrow rectangular surface parking lot south of the south additions, and this was enlarged over the years.

Although Jackson Park's Western Perimeter of Jackson Park has had some changes over time (labelled as LCA 1.1 in Figure 8 of the HPI), lawn and trees have always been the predominant feature in views east from Hyde Park High School.

#### 3.4.4.2    Effect Determination

The undertaking will not alter the Hyde Park High School's integrity of location, design, workmanship, materials, feeling and association. The property's integrity of setting has been somewhat diminished. Since 1978, the end of the Period of Significance for this property, the Hyde Park High School's setting has undergone substantial changes. However, despite this, Hyde Park High School's setting has continuously maintained its physical and visual relationship with Jackson Park.  There may be some physical changes to the property's setting including sidewalk improvements, widening of S. Stony Island Avenue, a realignment of S.  Hayes Drive and S. Cornell Drive south of Hayes Drive in Jackson Park, and new elements that may be perceptible within views from the Hyde Park High School. However, the visual and physical relationship between Hyde Park High School and Jackson Park will be maintained and none of these changes will cause effects to features that contribute to the significance of the Hyde Park High School or its setting. Therefore, the undertaking will have ***no adverse effect*** to the Hyde Park High School.

### 3.4.4.3    Assessment of Effects on property

#### 3.4.4.3.1    Effects from Federal Actions

Hyde Park High School is located approximately 750 feet (0.14 miles) south of the UPARR conversion area. It is also approximately 575 feet (0.10 miles) west of S. Cornell Drive, which is proposed as replacement UPARR land. Despite the close proximity to the action, neither the UPARR conversion nor replacement areas will cause any physical changes to the property or result in effects to features of its setting that contribute to its historic significance. The UPARR conversion area does not introduce any visual changes to the property or its setting. The UPARR replacement area along S. Cornell Drive may introduce some changes that could be visible from Hyde Park High School.  However, Hyde Park High School will continue to maintain its close physical and visual relationship with Jackson Park, and therefore, these visual changes would not affect the features of the property's setting that contribute to its historic significance.

Hyde Park High School is located along S. Stony Island Avenue north of its intersection with E. 63rd Street. The FHWA Action may include roadway improvements in this area such as widening of S. Stony Island Avenue and improvements at the E. 63rd Street and E. 62nd Street intersections. Sidewalk improvements are proposed along the west side of S. Stony Island Avenue in front of the Hyde Park High School. None of these improvements will cause an effect on the features of the property's setting that contribute to its significance, as the property will continue to maintain its close physical and visual relationship with Jackson Park and Stony Island Avenue has been historically widened over time. In addition, there will be no perceptible audible changes (less than a 3 dBA change in noise level) associated with the proposed improvements.

The Federal Actions will not cause any changes to the Hyde Park High School's use.

#### 3.4.4.3.2    Effects from Reasonably Foreseeable/Probable Actions

The development of the OPC site, roadway closures, and relocated track and field may result in some new visual elements that could be perceptible within some views of Hyde Park High School.  As shown in Photo 34 in Appendix C, the construction of the OPC Museum Building may be visible at street-level.  In addition, the Jackson Park track and field relocation is proposed to occur across the street from the property.  As explained in the project's HPI, historically there were two oval tracks located at Jackson Park's Western Perimeter and the south track (site of proposed relocated track) remained in the park longer than the track to the north.  Even with these possible changes, Hyde Park High School will remain a fine Beaux Arts style school building that fronts onto S. Stony Island Avenue and maintains close physical and visual relationships with Jackson Park and its expansive landscapes.

## 3.4.5    Jackson Park Terrace Historic District

### 3.4.5.1    Description of property

The Jackson Park Terrace Historic District is located on the west side of S. Stony Island Avenue at 6018-6050 S. Stony Island Avenue / 6040-6050 S. Harper Avenue. Composed of 24 low-rise apartment

structures and a 19-story high-rise, the complex is generally bounded by E. 61st Street, S. Blackstone Avenue, E. Public Way (S. Park Shore East), and S. Stony Island Avenue. See Exhibit 2. The Jackson Park Terrace was determined to be eligible under Criteria A and C for listing as a historic district in the NRHP on July 10, 2018 per the historic resource survey forms prepared for this project. Developed by the Woodlawn Organization (TWO) to provide affordable housing and services in Woodlawn in the early 1970s, the complex was designed by renowned African-American planners and architects, Whitely-Whitley.  As is clear from the name of the complex, its close visual and physical proximity to Jackson Park (and nearby Midway Plaisance) have always been considered one of the property's most important assets.

The Jackson Park Terrace Historic District retains a high degree of integrity of location, design, workmanship, and materials in relation to its architectural significance. It also retains a high level of integrity of feeling, and association as an affordable housing complex designed to take full advantage of its close proximity to Jackson Park and the Midway Plaisance.  The Jackson Park Terrace's integrity of setting, however, has been somewhat diminished.

When the complex was built in the early 1970s, the area between its northernmost east-west street (one of two internal roadways called E. Public Way) and E. 60th Street was composed of lawn with the eight-story historic Plaisance Hotel at the corner of S. Stony Island Avenue and E. 60th Street. The hotel was demolished in the early 1980s, and a large rectangular surface parking lot was installed between the northern roadway (E. Public Way) and E. 60th Street around 2000.  In addition, the Experiment Station/ 61st Street Farmer's Market (at E. 61st and S. Dorchester) installed an organic garden growing facility at the east end of the northern roadway in 2013.  The area south of the Jackson Park Terrace complex, between E. 61st and E. 62nd Streets, was historically filled with low-rise apartments.  These were replaced by the Park Shore East Co-op in 1980.  Views east towards the Western Perimeter of Jackson Park (labelled as LCA 1.1 in Figure 8 of the HPI) have remained generally consistent over the years.  Some park features have changed or were installed in the area across from the Jackson Park Terrace since its construction in 1974, including the 8-lane rubberized-surface track installed in 2000. Despite such changes, lawn and trees have always been the predominant features of east views.

### 3.4.5.2    Effect Determination

The undertaking will not alter the Jackson Park Terrace Historic District's integrity location, design, workmanship, materials, feeling and association. The property's integrity of setting has been previously compromised. Since 1978, the end of the Period of Significance for this property, the areas north and south of the Jackson Park Terrace's setting have undergone substantial changes. To the east, some park features have changed since that time; however, the historic district has continuously maintained its physical and visual relationship with Jackson Park and the Midway Plaisance.  There may be some physical changes to the property's setting that may be perceptible within views from the Jackson Park Terrace, however, the visual and physical relationship between the property and Jackson Park and the Midway Plaisance will be maintained and none of these changes will cause effects to features that

contribute to the significance of the Jackson Park Terrace or its setting. Therefore, the undertaking will have **no adverse effect** to the Jackson Park Terrace Historic District.

### 3.4.5.3    Assessment of Effects on property

#### 3.4.5.3.1    Effects from Federal Actions

The Jackson Park Terrace Historic District is located approximately 100 feet west of the UPARR conversion site, across S. Stony Island Avenue from Jackson Park. It is also located 350 feet (approximately 0.07 miles) south of the Midway Plaisance, a portion of which is proposed by the City of Chicago for UPARR replacement land. Despite the close proximity to the action, neither the UPARR conversion nor replacement areas will cause any physical changes to the property or result in effects to features of its setting that contribute to its historic significance as the property will continue to maintain its relationship with Jackson Park and the Midway Plaisance.

The Jackson Park Terrace Historic District is located along S. Stony Island Avenue where the FHWA Action proposes roadway widening and intersection modifications at E. 60th Street and S. Midway Plaisance. Sidewalk improvements are also proposed along the west side of Stony Island Avenue in front of the property. There will be no physical changes to the Jackson Park Terrace associated with this work. Some of the physical changes to the property's setting (widening of S. Stony Island Avenue and traffic intersection modifications), may be perceptible within some views from the district.  However, these changes will not cause any effect on the property's features that contribute to its significance as the property will continue to maintain its relationship with Jackson Park and the Midway Plaisance. In addition, there will be no perceptible audible changes (less than a 3 dBA change in noise level) associated with the proposed improvements.

The Federal Actions will not cause any changes to the Jackson Park Terrace's use.

#### 3.4.5.3.2    Effects from Reasonably Foreseeable/Probable Actions

The development of the OPC site, roadway closures, and relocated track and field may result in some new visual elements that could be perceptible within some views of units of the Jackson Park Terrace. As shown in Photo 35 in Appendix C, the construction of the OPC Museum Building will likely be visible from some vantage points within the complex.  The removal of the 8-lane rubberized-surface track will have no impact on the property's integrity of setting because the track is not a historic feature and was constructed after the property's Period of Significance.  Despite the introduction of some new visual elements, including views of the OPC Museum Building, Jackson Park Terrace will maintain its close physical and visual relationships with Jackson Park, the Midway Plaisance, and their expansive landscapes.

## 3.4.6    Hyde Park-Kenwood Historic District

### 3.4.6.1    Description of property

The Hyde Park-Kenwood Historic District is bounded roughly by E. 59th Street on the north; E. 47th Street on the south; S. Lake Park Avenue from E. 47th Street to E. 56th Street and S. Stony Island Avenue from E. 56th Street to E. 59th Street on the east; and S. Cottage Grove Avenue on the west. See Exhibit 2. In

February 1979, the Hyde Park-Kenwood Historic District was officially listed on the NRHP under Criteria A, B, and C. Periods of Significance were not clearly specified in nomination forms of the 1970s; however, a Period of Significance of 1860-1937 can be inferred from the nomination form. Research and analysis was conducted for the HPI produced for this project to evaluate properties erected between 1937 and 1978. The project determined that numerous properties erected between 1937 and 1978 within the historic district could be deemed as contributing resources. Both the 1979 nomination and this project determined that the Hyde Park-Kenwood Historic District possesses an enormous collection of historic properties that have important associations with Jackson Park, the Midway Plaisance, and the University of Chicago.

The Hyde Park-Kenwood Historic District retains a high level of integrity of location, design, workmanship, and materials in relation to the architectural significance of its vast collection of buildings. The historic district also retains a high level of integrity of association, feeling, and setting as an exceptional residential and academic enclave with close physical and visual proximity to Jackson Park and the Midway Plaisance. The historic district is bisected by the ICRR Viaduct and Embankments.  As shown in the HPI Figure 9, most of the Hyde Park-Kenwood Historic District lies outside of the APE boundaries. This project determined that most of structures built after 1978 have associations with the University of Chicago.  Although the structures represent a broad range of architectural styles, designs, and materials, most of them are similar in scale and height to other nearby structures within the historic district. In addition, many have setbacks, courtyards, or other landscaped spaces that provide unity between these contemporary buildings, the historic properties, Jackson Park and the Midway Plaisance. Therefore, the addition of contemporary structures has not diminished the historic district's integrity of setting.

### 3.4.6.2    Effect Determination

The undertaking will not alter the Hyde Park-Kenwood Historic District integrity of location, design, workmanship, materials, feeling and association. There may be some physical changes to the property's setting (sidewalk improvements; widening of S. Stony Island Avenue; realignment of S.  Hayes Drive and S. Cornell Drive south of Hayes Drive in Jackson Park; OPC Museum Building and other related new elements that may be perceptible within views from some vantage points within the historic district). However, views of these changes will only be perceptible from a limited area within the historic district; the visual and physical relationship between Hyde Park-Kenwood Historic District and Jackson Park and the Midway Plaisance will be maintained and these changes will not cause effects to features that contribute to the significance of the historic district or its setting.  Therefore, the undertaking will have **no adverse effect** to the Hyde Park-Kenwood Historic District.

### 3.4.6.3    Assessment of Effects on property

#### 3.4.6.3.1        Effects from Federal Actions

Most of the properties within the Hyde Park-Kenwood Historic District are located west of the ICRR Viaduct and Embankment and are a considerable distance away from the UPARR conversion and

replacement areas. However, the southeast corner of the Historic District (east of the Viaduct and Embankment) is located approximately 500 feet north (0.10 miles) of the UPARR conversion area and approximately 150 feet north of the east end of Midway Plaisance, for which a portion is considered for UPARR replacement land. Despite the close proximity of the action to the Hyde Park-Kenwood Historic District's southeast corner, neither the UPARR conversion nor replacement areas will cause any physical changes to the district or result in effects to features of its setting that contribute to its historic significance. The UPARR replacement areas on the east end of the Midway Plaisance and along S. Cornell Drive may introduce some changes that could be visible from vantage points within the historic district. Even with these changes, the Hyde Park-Kenwood Historic District will continue to maintain its close physical and visual relationship with Jackson Park and the Midway Plaisance and therefore, these visual changes would not affect the features of the property's setting that contribute to its historic significance.

The southeast corner of the Hyde Park-Kenwood Historic District is located at the intersection of E. 59th Street and S. Stony Island Avenue, where some proposed intersection improvements from the FHWA Action will occur. Sidewalk improvements are also proposed at all corners of the intersection. There will be no physical changes to the historic district associated with this work. These improvements will not cause any effect on the features of the Hyde Park-Kenwood Historic District's setting that contribute to its significance. In addition, there will be no perceptible audible changes (less than a 3 dBA change in noise level) associated with the proposed improvements.

No changes will occur to the uses of properties within the Hyde Park-Kenwood Historic District.

### 3.4.6.3.2 Effects from Reasonably Foreseeable/Probable Actions

The development of the OPC site, roadway closures, and relocated track and field may result in some new visual elements that could be perceptible within some vantage points within the Hyde Park-Kenwood Historic District. As shown in Photo 36 in Appendix C, the construction of the OPC Museum Building will likely be visible from some vantage points, particularly along the southeast corner of the historic district. The removal of the 8-lane rubberized-surface track will have no impact on the property's integrity of setting because the track is not a historic feature and was constructed after the district's Period of Significance. Despite some new visual elements, including views of the OPC Museum Building, the Hyde Park-Kenwood Historic District will maintain its close physical and visual relationships with Jackson Park, the Midway Plaisance, and their expansive landscapes.

## 3.5 Cumulative Effects

### 3.5.1 Methodology

A cumulative effect is the impact on the environment which results from the incremental impact of the Federal action when added to other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person takes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

This analysis of cumulative effect assesses the result of combining the effects of the undertaking and other past, present, or reasonably foreseeable actions potentially affecting the same historic properties at the same time. The effects of the undertaking are described in detail in earlier sections of this report. These incremental effects are further assessed in combination with the effects of unrelated activities that are current and reasonably foreseeable and may impact the same historic resources; these activities include:

1) traffic signal interconnect improvements along Stony Island Avenue
2) improvements to separate the Lakefront Trail
3) the relocation and reconfiguration of baseball facilities in Jackson Park
4) the Great Lakes Fishery and Ecosystem Restoration (GLFER) project
5) improvements to the Osaka Garden on the Wooded Island
6) other improvements on the Wooded Island
7) potential improvements of the Columbia (Clarence Darrow) Bridge

These seven activities are independent of the Federal actions that required the Section 106 process to be completed. If any of these separate projects qualifies as a federal undertaking, it will undergo its own Section 106 process before the individual project receives federal approval.

The current condition of the potentially affected historic properties reflects past effects on the historic properties and in turn informs the assessment of potential cumulative effects from the undertaking. Detailed descriptions of current condition, taking into account past changes, are provided in the 2018 Historic Property Inventory (HPI) (www.tinyURL.com/JPImprovements). For example, the HPI includes extensive analysis of how Jackson Park and Midway Plaisance have undergone substantial change over time while maintaining historic value and function. As established by the HPI and summarized in Section 3.3.1 of this document, the combination of changes made to date have not impaired the integrity of the existing character-defining features reflecting the original design principles for the park.

### 3.5.2 Analysis

As explained in Section 3.3.2.3, the undertaking will have an adverse effect on the historic landscape of Jackson Park and Midway Plaisance, and these effects will overlap in time. These effects arise from the Federal actions themselves and from the reasonably foreseeable actions following from those actions (collectively, these actions are "the undertaking"). As detailed in this report, some aspects of the undertaking will have negative effects while other aspects will have minimal or no effect. The

components of the undertaking with negative effect on the historic landscape include: proposed changes to the Midway Plaisance, OPC site development, and certain roadway closures. Others, such as Hayes Drive Reconfiguration and the changes along Marquette Drive and Cornell Drive, deviate from the historic design and have primarily negative effects. Those with minimal or no effects include: Lake Shore Drive improvements, and bicyclist and pedestrian improvements.

The undertaking will result in certain adverse effects on the historic landscape of Jackson Park and Midway Plaisance. The combined effect of the undertaking is further analyzed in the context of effects from the unrelated activities enumerated in Section 3.5.1. Several of these projects are noted in the 2018 South Lakefront Framework Plan. (https://www.southlakefrontplan.com/)

- *Stoney Island Avenue Traffic Improvements*
  Chicago Department of Transportation (CDOT) is upgrading the signal equipment and communication along Stony Island / Cornell Drive / 57th Drive from 95th and Stony Island to 57th and Lake Shore Drive. The project will upgrade existing traffic signal equipment (poles, mast arms, lens, cabinet, conduit) and will interconnect the traffic signals to improve operations along Stony Island, connecting into Lake Shore Drive. Where restoration is required for new traffic signal poles / conduit runs, the project will also upgrade existing ramps consistent with the Americans with Disabilities Act.

- *Lakefront Trail Separation*
  The Lakefront Trail connects 2,792 acres of parkland in 6 parks including Jackson Park. The trail is located east of Lake Shore Drive from 56th Street to Marquette Drive and north of Marquette Drive from Lake Shore Drive to 67th Street within Jackson Park. Considered a major recreational component in parks and a transportation network, the Lakefront Trail Separation project sought to alleviate areas of congestion by separating bicyclists from other trail users. The newly separated trail includes an 18-mile bike trail and lakefront path. The separation project is complete.

- *Baseball Facilities*
  The South Lakefront Framework plan includes improvements to area north of Hayes Drive and east of the Wooded Island. Currently there are two natural grass baseball fields and an overlapping natural grass soccer / football field. Preliminary design is in the early stages for two new senior baseball fields and renovations of one senior baseball field.

- *Great Lakes Fishery and Ecosystem Restoration (GLFER)*
  As part of an effort to restore bird, fish and wildlife habitat within the natural areas of Jackson Park, the Chicago Park District and the United States Army Corps of Engineers (USACE) entered into an agreement to initiate a 5-year ecological restoration project authorized through the Water Resources Development Act, Section 506, Great Lakes Fishery and Ecosystem Restoration (GLFER). The project aims to create or enhance nearly 147 acres of native habitat within the park and along the Lake Michigan shoreline. The project includes 24 acres of new natural areas and the installation of over 600,000 native plants that will increase the biological diversity of the park and provide critical habitat and beautiful scenery for park visitors. In addition, to improve

access and circulation throughout the park, the project includes installation of overlooks along the water's edge, new pathways, and the reconstruction of existing pathways on Wooded Island.

Project design started in May 2014, and construction began in January 2015. Improvements surrounding the lagoons, and work in areas north of Hayes Drive and west of Lake Shore Drive, are complete. In general, all the areas north of Hayes Drive have been planted, along with the removal of invasive plant species. The areas south of Hayes Drive have had the invasive plant species removed, but proposed replacement plantings have not been installed.

- *Osaka Garden and Other Improvements on the Wooded Island*
  Improvements to the Wooded Island and Osaka Garden are part of the Wooded Island Plan, which was incorporated into the South Lakefront Framework Plan. The plan includes improvements to the perimeter fence, a new main gate, pathway enhancements, new plantings and tree pruning, landscape lighting, feature stone placements in the garden, and a new teahouse. The plan also includes the addition of an overlook that will allow for viewing of an existing art installation and new berms surrounding the installation to integrate the site with the adjacent natural areas. These plans are still in design and are subject to funding availability and continued design refinement.

- *Clarence Darrow Bridge*
  The Clarence Darrow Bridge is currently closed to all traffic, and the City of Chicago Department of Transportation (CDOT) is evaluating potential alternatives to accommodate bicyclists and pedestrians. Built in 1880 and modified in 1895, CDOT's evaluation has concluded that the bridge is so structurally deficient that it cannot be rehabilitated without affecting its historic integrity. Based on its condition, CDOT is considering rehabilitation or replacement of the bridge while retaining historic design elements and materials to the maximum extent possible. CDOT intends follow the Department of the Interior's Standards for the Reconstruction of Historic Properties for the project.

The Stony Island Interconnect project will improve traffic operations and modernize signal equipment along Stony Island Avenue. These changes will not alter features of Jackson Park or the Midway Plaisance. The Lakefront Trail Separation Improvements project generally corresponds to existing and historic circulation within the property and minimally alters the historic property. The baseball field complex improvements alter rehabilitated parkland around the Hayes Drive Bridge but minimally alter characteristics of the cultural landscape that contribute to the significance of the property. The ongoing GLFER program rehabilitated the historic character of vegetation and other aspects of the site (cultural landscape) while accomplishing the objective of ecological restoration. The continuation of the GLFER project aligns to SOI standards and rehabilitates portions of the historic property. The Osaka Garden Improvements project seeks to enhance the historic garden and context, while preserving features that contribute significance to the historic property. Other Wooded Island Improvements will minimally alter characteristics of the historic property. Altogether, the foregoing projects will minimally alter characteristics of the Jackson Park Historic Landscape District and Midway Plaisance (cultural landscape)

that contribute to the significance of the property. They have beneficial and no adverse effects. Accordingly, the noted current and reasonably foreseeable activities do not provide context in which the undertaking would contribute cumulative effects to Jackson Park and Midway Plaisance.

With respect to Darrow Bridge, the potential adverse effect is being evaluated in a separate Section 106 process, which has not reached conclusion. The undertaking at issue in this document will be considered in the cumulative impacts assessment for the Clarence Darrow Bridge project, but at present the bridge project analysis has not resulted in a finding of effect. Thus, no cumulative effect is currently identified for this undertaking in connection with the potential improvement of Darrow Bridge.

Among the current and reasonably foreseeable activities noted above, only the Stony Island Interconnect has the potential to cause effects to properties <u>outside</u> Jackson Park and Midway Plaisance. However, Stony Island Avenue has been previously widened and altered, and many of the properties along Stony Island Avenue have diminished integrity of setting. Thus, this undertaking does not contribute cumulative effects outside Jackson Park and Midway Plaisance in the context of the activities listed above in Section 3.5.1.

### 3.5.3   Cumulative Effect – Conclusion

The analysis of this undertaking in conjunction with past, present and reasonably foreseeable actions identified a cumulative adverse effect on the historic property of Jackson Park and Midway Plaisance. The cumulative effect arises from combining the effects of the undertaking on the same historic resource at the same time, given the resource's current condition taking into consideration the effects of past activities. Other current and reasonably foreseeable activities have indeterminate or beneficial effects in whose context the undertaking does not contribute cumulative effects to historic properties within or outside Jackson Park and Midway Plaisance. Some of the reasonably foreseeable activities listed above in Section 3.5.1 may be further analyzed in a future Section 106 process that would take into consideration the potential for cumulative effects with this undertaking.

# 4.0   Public Involvement and SHPO Consultation

Throughout the Section 106 process, opportunities are made for the public and Consulting Parties to provide input. A current list of the identified and interested groups included as Consulting Parties for the projects can be viewed under Public Involvement in Appendix E. Updates to this list are posted to the project website (www.tinyURL.com/JPImprovements) as necessary.

On December 1, 2017, a Consulting Party Kick-Off Meeting was held to discuss the Section 106 process, the APEs, and a preliminary summary of historic features within the APE, as documented in the HPI. Input received was evaluated and incorporated into the final delineation of APE boundaries and historic resources identified.

The second Consulting Party meeting was held on March 29, 2018 to discuss the results of the historic properties identification and the next steps in the Section 106 process. Prior to the meeting, the Archaeological Report and the draft HPI were distributed to consulting parties and the public for review and input. Audience members who attended the meeting asked several questions during the question and answer session following the meeting presentation. Twenty-nine comment letters were received outside of the meeting during the comment period ending April 19, 2018. Input received during the question and answer session of the meeting as well as during the 30-day comment period is summarized on project website (www.tinyURL.com/JPImprovements).

The SHPO provided concurrence on the finding of no eligible archaeological sites for the NRHP as described in the Archaeological Report on March 28, 2018 (see Appendix C for correspondence). The HPI was revised based on comments received from the public, SHPO, and other reviewing agencies. A final HPI was submitted to the SHPO for approval on June 6, 2018. The SHPO provided written concurrence on the determinations of eligibility listed in the final HPI on July 10, 2018 (see Appendix D for correspondence).

This Assessment of Effects (AOE) will be made available for the public, Consulting Parties, ACHP and SHPO for a 30-day review and comment period. Consulting Party Meeting #3 is anticipated to be held in Summer 2019 to discuss the results of this report and gather input from attendees. Comments collected from the meeting and during the 30-day comment period will be documented and summarized within this section of the final AOE. A meeting summary and responses to comments will be included on the project website (www.tinyURL.com/JPImprovements) once available. The final AOE will be made available to consulting parties and the public after the comment period is concluded and comments received have been addressed.

# 5.0 Minimization and Mitigation of Effects

The following summarizes efforts made to minimize or avoid impacts or effects to historic properties.

<u>NPS Action</u>

The City of Chicago selected UPARR replacement site adheres to criteria set forth by the NPS, which generally considers sites proximate and of similar quality and use to the area of proposed conversion. The future public process regarding the changes on the Eastern Midway will carefully consider the historic nature of the Midway Plaisance and seek to minimize any potential effects to historic properties, pathways, and plantings, to the extent possible.

<u>FHWA Action</u>

As mentioned in Section 1.3, the FHWA considered a wide range of alternatives to avoid and minimize effects to Jackson Park while meeting the objectives of the project. As part of the alternative development process, planning efforts to minimize potential effects generally included the following:

- minimization of additional turn lanes to avoid excess capacity,
- minimization of through and turn lane widths,
- roadway reconfigurations to reduce widening needs and utilize existing roadway footprint, and
- minimization of roadway median barrier widths.

The specific minimization efforts considered for the transportation improvements are documented on the project website (www.tinyURL.com/JPImprovements).

The proposed transportation improvements also considered strategies to preserve or enhance the historic character of Jackson Park. These strategies generally include:

- consideration of historic roadway and pedestrian path alignments,
- minimization of potential tree impacts or removals, particularly larger trees of specific species,
- reduction of proposed grading to preserve landscape qualities and existing berms, and
- restoration of existing cladding on the 59th Street Inlet bridge.

<u>OPC Site Development</u>

Neither FHWA nor NPS has direct or indirect jurisdiction over the OPC Site Development, however, the City and the project proponents have incorporated minimization efforts into the design of the project to address the historic resources and character of the historic property. The OPC is proposed to be sited in the Park and neighborhood interface of the Park Perimeter Area which will minimize impacts to most historic resources and areas within the core of the historic property including the Lagoons, Fields, Lake Shore, and Museum Grounds Areas of Jackson Park. The project footprint has been developed to affect a relatively small area of the total acreage of the historic property (approximately three percent).

The height of the prominent OPC Museum Building enables a smaller footprint within the historic property than if the building was shorter. Also, the orientation, location, and materials of the Museum

Building have been developed with attention to views from the historic property and the skyline surrounding.

The visibility of other new OPC buildings within the park landscape has been minimized and the prominence of landscape scenery enhanced through the location of buildings, the design of green roofs, and the partial submergence of approximately forty percent of the project's occupied space, and underground parking. Further accommodation for the expression of green space within the footprint of the project involves the placement of subtle berms and planted buffers to minimize impacts to historic views and vistas within the historic district.

The changes associated with the OPC prioritize pedestrians over vehicles as well as internal circulation within the historic property over commuter traffic through the property. The shift is not a replication of historic design but enhances the prominence of landscape scenery. The design of circulation increases accessibility in the Western Perimeter of Jackson Park. The proposed garden design to replace the Perennial Garden/Women's Garden near the Midway Plaisance, for example, provides full accessibility and a safer to approach from surrounding parkland. At Cornell Drive between 59th and 62nd Streets, the conversion of a portion of the roadway to a pedestrian walkway associated with the OPC results in removal of high-speed traffic and reduction of non-historic road widths along Cornell Drive. The new walk generally follows the alignment of Cornell Drive, offers a wide pathway to interpret the historically wide drive, and provides for views over the West Lagoon.

Road closures incorporate new pedestrian walks and the remainder of the former roadways are converted to greenspace in most cases. The conversion from vehicular roads to pedestrian walks typically follows the alignment of the historic roadways including at the historic triangular intersections of Hayes Drive and Marquette Drive and at Marquette Drive and Richards Drive.

# 6.0   Conclusions

As summarized by this document, Table 4 summarizes the effect findings for each historic property associated with the undertaking. The result of the Assessment of Effects is that the undertaking will have an ***Adverse Effect*** to historic properties.

*Table 4: Summary of Effect Findings*

| Historic Property | Effect Finding |
|---|---|
| Jackson Park Historic Landscape District and Midway Plaisance | Adverse Effect |
| Stony Island State Trust and Savings Bank/Stony Island Arts Bank | No Adverse Effect |
| William Dexter Three-Flat | No Adverse Effect |
| Island Terrace Apartments | No Adverse Effect |
| Hyde Park Academy High School | No Adverse Effect |
| Jackson Park Terrace Historic District | No Adverse Effect |
| Hyde Park-Kenwood Historic District | No Adverse Effect |
| South Shore Country Club Historic District (Currently known as the South Shore Cultural Center Park) | No Effect |
| South Shore E. 67th Street Apartment Historic District | No Effect |
| Residences at 6700 S. Crandon Avenue | No Effect |
| Shoreline Apartments | No Effect |
| Residences at 2201-2211 E. 67th Street | No Effect |
| Leonard Graff House | No Effect |
| Dr. Paul Schutz House | No Effect |
| Morris N. Fox Three-Flat | No Effect |
| Residences at 6701 S. Constance Avenue | No Effect |
| Tower Court Apartments | No Effect |
| Hyde Park East Historic District | No Effect |
| Bret Harte Elementary School | No Effect |
| Windermere East Hotel/Apartments | No Effect |
| Jackson Towers | No Effect |
| Promontory Apartments | No Effect |
| The Flamingo on the Lake | No Effect |
| Jackson Shore Apartments | No Effect |
| Shoreland Hotel | No Effect |
| Promontory Point Historic District | No Effect |
| Helstein House | No Effect |
| Residence at 5812 S. Blackstone Avenue | No Effect |
| Stein Building | No Effect |
| Johnson House | No Effect |
| Center for Continuing Education (Graduate Student Housing/Keller Center) | No Effect |

| Historic Property | Effect Finding |
|---|---|
| Public Administration Building (Chapin Hall) | No Effect |
| St. Paul's Universalist Church/Shankman Orthogenics School | No Effect |
| University of Chicago Power Station | No Effect |
| E. 62nd Place Firehouse | No Effect |
| Pridmore & Stanhope-designed Greystone | No Effect |

As part of the NHPA Section 106 process, the project will continue to seek additional opportunities to reduce effects and impacts to historic and environmental resources. The City continues to investigate other potential mitigation strategies that will be further developed as part of the next stage of the Section 106 process, addressing adverse effects.

In the final step of the Section 106 process, the FHWA and NPS will explore measures to avoid, minimize, or mitigate adverse effects to historic properties from the Federal actions and to reach agreement with the Illinois State Historic Preservation Officer and the Advisory Council on Historic Preservation on measures to address them. Agreement on these measures will be documented in a Memorandum of Agreement (MOA). Consulting parties who may have responsibilities for implementing mitigation measures, such as the Illinois Department of Transportation and the City of Chicago, will be invited to sign the MOA. Other consulting parties will be invited to concur in the MOA, however, the refusal of any party invited to concur in the MOA does not invalidate it.

Measures necessary to mitigate adverse impacts from the Federal actions will be incorporated into the action and are eligible for FHWA funding when (1) the impacts for which the mitigation is proposed result from the Federal action; and (2) the proposed mitigation represents a reasonable public expenditure after considering the impacts of the action and the benefits of the proposed mitigation measures.

# 7.0   References

36 CFR Part 68 – The Secretary of the Interior's *Standards for the Treatment of Historic Properties*. Revised in 1992, Effective Date August 11, 1995.

36 CFR PART 800 – PROTECTION OF HISTORIC PROPERTIES (incorporating amendments effective August 5, 2004).

Andrus, Patrick, W. and Rebecca H. Shrimpton, ed. *How to Apply the National Register Criteria for Evaluation.*  Bulletin #15*,* National Register of Historic Places Program: Publications, National Park Service, 1990.  Revised for the Internet, 1995, 2001, 2002.

Birnbaum, Charles A. and Christine Capella Peters. *The Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for the Treatment of Cultural Landscapes.* Washington DC: U.S. Department of the Interior, National Park Service, 1996.

Center for Environmental Excellence by AASHTO. AASHTO Practitioner's Handbook. *Assessing Indirect Effects and Cumulative Impacts Under NEPA*. (August 2016).

Council on Environmental Quality and Advisory Council on Historic Preservation. (March 2013). *NEPA and NHPA: A Handbook for Integrating NEPA and Section 106.*

Keller, Timothy J. and Genevieve Keller, *How to Evaluate and Nominate Designed Historic Landscapes,* Bulletin #18, National Register of Historic Places Program: Publications, National Park Service, Revised.

McClelland, Linda Flint. *Guidelines for Evaluating and Documenting Rural Historic Landscapes, Bulletin #30,* National Register of Historic Places Program: Publications, National Park Service, 1999.

McClelland, Linda Flint, Carol Shull, et al. *Guidelines for Completing National Register of Historic Places Forms,* Bulletin #16A*,* National Register of Historic Places Program: Publications, National Park Service, 1997.

National Register of Historic Places – Nomination Form. Hyde Park-Kenwood Historic District (1979).

National Register of Historic Places – Nomination Form. Jackson Park Historic Landscape District and Midway Plaisance (1972).

National Register of Historic Places – Nomination Form. Stony Island Trust & Savings Bank (2013).

Prepared for the Chicago Department of Transportation (2019, July 2). *Highway Traffic Noise Analysis.* Retrieved from https://www.chicago.gov/city/en/depts/dcd/supp_info/jackson-park-improvements.html

Prepared for the Federal Highway Administration. (2018, April 18). *Alternatives to be Carried Forward*. Retrieved from https://www.cityofchicago.org/content/dam/city/depts/dcd/supp_info/jackson/2018-04-18-Draft-ATBCF_package.pdf

Prepared for: Federal Highway Administration and National Park Service. (2018, May 17). *Section 106 Historic Properties Identification Report: Federal Undertakings In and Adjacent to Jackson Park*.

Retrieved from https://www.cityofchicago.org/content/dam/city/depts/dcd/supp_info/jackson/hpi-report.pdf

Prepared for: Federal Highway Administration and National Park Service. (2018, May 17). *Section 106 Historic Properties Identification Report: Federal Undertakings In and Adjacent to Jackson Park*. Historic Resource Survey Forms. Retrieved from https://www.chicago.gov/content/dam/city/depts/dcd/supp_info/jackson/final_HPI.zip

Sam Schwartz Engineering, LLC. *Jackson Park Revitalization Traffic Impact Study Final Report.* (February 2018). Retrieved from https://www.chicago.gov/content/dam/city/depts/dcd/supp_info/jackson/CDOT-Traffic-Impact-Study.pdf

Secretary of the Interior. *Guidelines for the Treatment of Cultural Landscapes*. 1996. Retrieved from https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/index.htm

Weeks, Kay and Anne E. Grimmer. *The Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for Preserving, Rehabilitating, Restoring, and Reconstructing Historic Buildings,* Washington DC: U.S. Department of the Interior, National Park Service, 1995, Revised: 2017.

USDOT, Federal Highway Administration. (December 2011). *Highway Traffic Noise: Analysis and Abatement Guidance*. FHWA-HEP-10-025. Retrieved from https://www.fhwa.dot.gov/environment/noise/regulations_and_guidance/analysis_and_abatement_guidance/revguidance.pdf

# EXHIBIT 5

Chicago Reporter | (https://www.chicagoreporter.com/after-federal-assessment-whats-next-for-the-obama-presidential-center/)

We Recommend: See all of our COVID-19 coverage TOPICS ¿Cómo afecta COVID-19 a su barrio en Illinois? Coronavirus en Illinois: mapa actualizado diariamente

TOPICS    PERSPECTIVES    ABOUT    ARCHIVE    SUBSCRIBE    DONATE

ECONOMIC DEVELOPMENT

# After federal assessment, what's next for the Obama Presidential Center?

Officials are seeking public comment after a review found that the development could harm the historical status of the Jackson Park Historic Landscape District and Midway Plaisance.

By  **Josh McGhee** | August 7, 2019



Following last week's release of a federal review finding that the Obama Presidential Center will have an adverse effect on some historical properties, one common question from community members is: what's next?

On Monday, officials from the agencies responsible for the assessment held two meetings on the University of Chicago campus to discuss the findings and the process moving forward.

"During the next step of the process, we look at what all those adverse effects are for these historic properties, and we look for ways to avoid the impacts first, then to minimize effects," said Matt Fuller, environmental engineer at the Federal Highway Administration, the lead agency behind the assessment.

"The third option is mitigation, if the effects can't be avoided or minimized then you look at what mitigation options might be. And that's where we really look to the community" for what kind of mitigation efforts might help to offset that impact to the historic process, he said.

The Assessment of Effects (https://www.chicago.gov/city/en/depts/dcd/supp_info/jackson-park-improvements.html), which is required under Section 106 of the federal National Historic Preservation Act of 1966 (http://www.nps.gov/history/local-law/fhpl_histprsrvt.pdf), documents the impact the center's planned construction will have on historical aspects of Jackson Park and the surrounding community.

*A full recording of the consulting parties meeting is available here. (https://vimeo.com/351099536/d4efc013e8)*

During the meetings, Abby Monroe of the Chicago Department of Planning and Development explained the review, which found most — 29 out of 36 — of the historic properties would not be affected by the changes involved with construction of the Obama Presidential Center in Jackson Park.

It also notes that six historic properties would be affected but not adversely. The plan would have an "adverse effect" or could harm the historical status of the Jackson Park Historic Landscape District and Midway Plaisance.

The plaisance is more open than it was and includes monuments to individuals, including the Reverend George Goode Memorial placed there in 1932, according to the report.

The current city plans include dedicating 5.2 acres to replace lost recreational space on the eastern portion of the Midway Plaisance, between Stony Island Avenue and the Metra railroad.

Another question that drew cheers and boos on Monday was whether there was a chance the center would not be built in Jackson Park, but Monroe made it clear the location is not at stake in this process, according to the Hyde Park Herald (https://hpherald.com/2019/08/05/public-comment-period-on-adverse-affects-of-opc-to-remain-open-til-aug-30/) .

"The location itself is not something that would change," she said to the Hyde Park Herald. "The city is proposing Jackson Park and the Midway as the location for these projects, so that is, at this point, what the project entails."

Some attendees left the meeting feeling unheard, calling it a "blow-over," according to Block Club Chicago. (https://blockclubchicago.org/2019/08/06/future-obama-center-neighbors-walk-away-from-public-meeting-with-questions-still-unanswered/)

"People ask a question but don't really get an answer to it … I wanted to have a question-and-answer, back-and-forth conversation," said Torrence Cooks, who told Block Club Chicago he came to the meeting with an open mind.

The comments will be evaluated and used to determine whether the AOE needs to be revised. Then the finalized AOE will be released to the public, officials said.

The public comment period is open until 5 p.m. on Aug. 30th. Officials are looking for answers to the following questions: do you agree with the assessment, and if not why? What properties are you most concerned with? What suggestions do you have to lessen the impact?

Comments can be sent to abby.monroe@cityofchicago.org (mailto:abby.monroe@cityofchicago.org) .

Following the public comment, the next step will be officially issuing the Memorandum of Agreement that is compiled and given to all of the following organizations, who all must sign it: The Federal Highway Administration, National Park Service, State Historic Preservation Office and the Advisory Council of Historic Preservation.

The Illinois Department of Transportation, City of Chicago, and the Chicago Park District will also be invited to sign.

All of the consulting partes will be invited to concur with the findings, but their agreement will not be required to move forward.

A public meeting on the MOA is scheduled for October 2019. And the Section 106 process is scheduled to be completed by November 2019. A National Environmental Policy Act federal review will then begin next year with a public review period scheduled at the end of 2020.

You can read the full report here (https://www.documentcloud.org/documents/6224018-Assessment-of-Effects-to-Historic-Properties.html) .

*Have unanswered questions? Want to stay informed? We're inviting our readers to "Join The Beat" and better inform our coverage of change on the South Side. Start by taking this survey.* (https://docs.google.com/forms/d/e/1FAIpQLSd-dUkgvwrFd7de_BGeV2pZ9LFNPlSGKkncimWVgHw-0MRisQ/viewform? fbclid=IwAR11jHibGXxm5CtTLEcdzid2OTUi5erfeeRa6jmfuY829sbE3DN_mcE_tUo) *Sign up for our newsletter.* (https://www.chicagoreporter.com/signup/) *Or if you have other questions or want us to dig into something specific, you can email me directly at jmcghee@chicagoreporter.com (mailto:jmcghee@chicagoreporter.com) .*

ALSO ON THE CHICAGO REPORTER

Chicago has nearly
tripled per capita …

10 months ago • 2 comments

Chicago is spending more
on policing per person than
at any time in the last …

COVID-19 Relief Draws
Criticism - Chicago …

7 days ago • 1 comment

Several cities across the
nation received federal
discretionary dollars last …

Police solve just 2% of
all major crimes

8 months ago • 1 comment

When police arrest a
suspect who is then
convicted of the crime, it …

Soc
mo

9 mo

The
scan
drive

# EXHIBIT 6

## Assessment of Effects

# Section 106 Consulting Parties Meeting #3

August 5, 2019



**Logan Center for the Arts**
915 E. 60th St.
3:00 PM – 5:00 PM







# Section 106 Contacts and Website

| Agency | Contact(s) | Email |
|---|---|---|
| **LEAD AGENCY**<br>Federal Highway Administration (FHWA) | Matt Fuller | matt.fuller@dot.gov |
| National Park Service (NPS) | Lee Terzis | lee_terzis@nps.gov |
| Chicago Department of Planning and Development (DPD) | Abby Monroe | abby.monroe@cityofchicago.org |
| Chicago Department of Transportation (CDOT) | Nate Roseberry | nathan.roseberry@cityofchicago.org |
| Chicago Park District | Heather Gleason | heather.gleason@chicagoparkdistrict.com |
| Illinois Department of Transportation (IDOT) | Brad Koldehoff | brad.koldehoff@illinois.gov |

Project Website: **https://tinyurl.com/JPImprovements**

2

# Section 106 Process



# Agenda For Today

**Section 106 Consulting Parties**
**Meeting #3**



1. Assessment of Effects
   – Document Overview
   – Assessment Methodology
   – Key Findings

2. Small Group Discussion

3. Participant Questions

4. Next Steps in Section 106
   – Comment Process
   – Mitigation Overview and Examples

5. Project Timeline



**Assessment of Effects**

5

# Assessment of Effects: Purpose

- Document the Federal agencies evaluation of effects from the undertaking to historic properties
- Seek feedback from Section 106 consulting parties and the public on the evaluation of effects
- The undertaking includes:
  1. FHWA Action – Proposed roadway and bike/ped improvements
  2. NPS Action – UPARR conversion and replacement
  3. City actions that are reasonably foreseeable:
     - OPC Site Development
     - Road Closures
     - Track and Field relocation

6

# FHWA Action

**DRAFT**



**PROPOSED TRANSPORTATION IMPROVEMENTS**

# NPS Action



# Proposed UPARR Recreation Replacement



# Other Projects Considered in AOE Analysis

- Traffic signal interconnect along Stony Island
- Improvements to Lakefront Trail
- Relocation/reconfiguration of baseball facilities
- Great Lakes Fishery and Ecosystem Restoration (GLFER)
- Improvements to Osaka Garden
- Other improvements on Wooded Island
- Potential improvements of the Columbia (Clarence Darrow) Bridge

*The above projects are not directly related to the actions discussed today. They are included in the AOE analysis due to their proximity to the study area and because they are anticipated to be built in the near future.*

10

# Document Overview

1.  Describes the actions that are considered "the undertaking" for Section 106 purposes
2.  Provides an overview of the process to identify historic properties
3.  Assesses effects, or lack thereof, to historic properties from the undertaking
4.  Assesses the potential for cumulative effects from other independent, yet reasonably foreseeable actions by others
5.  Describes public involvement and SHPO consultation to date
6.  Identifies efforts made to minimize effects to historic properties
7.  Summarizes effect determinations for historic properties
8.  References, appendices, figures

11

# Appendix

- Maps of historic properties and contributing resources (including cultural landscape elements)
- Current OPC site plan
- Proposed City road closures
- Proposal for Midway Plaisance
- Photos of existing conditions
- Visual impact analysis
- Agency correspondence
- Public involvement to date



# Assessment Methodology

The assessment of effects applies the "criteria of adverse effect" described as follows (36 CFR 800.5(a)(1)):

An **adverse effect** is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association.

Consideration shall be given to all qualifying characteristics of a historic property, including those that **may have been identified subsequent** to the original evaluation of the property's eligibility for the National Register.

Adverse effects may include **reasonably foreseeable** effects caused by the undertaking that may occur later in time, be farther removed in distance, or be cumulative.

13

# Assessment Options

For each historic property, the Federal agency determines if the undertaking will have:

- **"no effect"** – no alteration to the characteristics of a historic property  qualifying it for inclusion in or eligibility for the National Register.

- **"no adverse effect"** – an undertaking may effect the historic property, but not in manor that alters directly or indirectly any of the characteristics of a historic property that qualify it for including in the National Register.

- an **"adverse effect"** – an undertaking alters directly or indirectly any of the characteristics of a historic property that qualify it for including in the National Register.

14

# Effect Determinations

| Finding | # of Historic Properties | Summary |
|---------|--------------------------|---------|
| "no effect" | 29 | No physical changes to these properties, no perceptible noise changes, setting or view shed not effected |
| "no adverse effect" | 6 | Minor physical changes, or minimal changes to setting or view shed |
| "adverse effect" | 1 | Jackson Park Landscape District and Midway Plaisance |

15

# Adverse Effects
## Jackson Park Historic District and Midway Plaisance

- Changes to:
  - Cultural landscape
  - Spatial organization of roadways
  - Spatial organization of contributing resources such as:
    - Cheney-Goode Memorial
    - Statue of the Republic
    - English Comfort Station
- Inclusion of new elements, e.g., OPC buildings, plaza
- Removal, replacement, or alteration to historic resources such as:
  - Women's Garden
  - Western Perimeter Playground
  - Eastern end of Midway Plaisance









**Next Steps**

17

# Public Comment Period

Written comments on the AOE are due by 5:00 PM on Friday, **August 30, 2019**.

Please submit by email to **abby.monroe@cityofchicago.org**.

Consider the following in your remarks:

1. Do you agree with the findings in the document? If you do not agree, please explain.
2. What effects to historic properties are you most concerned with?
3. What suggestions do you have to avoid, minimize, or mitigate the adverse effect?

18

# Memorandum of Agreement

| Official Signatories | Invited Signatories | Invited to Concur |
|---|---|---|
| • FHWA<br>• NPS<br>• SHPO<br>• ACHP | • IDOT<br>• City of Chicago<br>• Chicago Park District | • Consulting Parties |

19

# Mitigation Examples

- Update National Register nomination for Jackson Park/Midway Plaisance
- Develop National Register nominations for other properties or districts within the Area of Potential  Effect (APE)
- Develop multimedia educational and interpretive materials related to Jackson Park/Midway Plaisance
- Historic American Landscapes Survey (HALS) documentation



# Anticipated Timeline*



*All dates are subject to change.*

21

# EXHIBIT 7

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**WHEREAS,** the Federal Highway Administration (FHWA) plans to fund transportation improvements in and adjacent to Jackson Park, in the City of Chicago, Cook County, Illinois pursuant to the Federal-aid highway program as authorized by 23 U.S.C. § 101 et seq.; and

**WHEREAS,** the National Park Service (NPS) plans to approve the City of Chicago's request for a partial conversion in Jackson Park in the City of Chicago, Cook County, Illinois pursuant to the Urban Park and Recreation Recovery (UPARR) Act (54 U.S.C. § 200501 et seq.) and conversion requirements (36 C.F.R. § 72.72); and

**WHEREAS,** United States Army Corps of Engineers (USACE) plans to authorize (1) the City of Chicago's proposed discharges of fill material into waters of the United States, and (2) the Chicago Park District's proposal to alter a Federally-funded ecosystem restoration project under the Great Lakes Fishery & Ecosystem Restoration (GLFER) program pursuant to 33 U.S.C. § 1251 et seq. and 33 U.S.C. § 408, respectively; and

**WHEREAS,** the City of Chicago (City) has decided to close portions of South Midway Plaisance, Cornell Drive and Marquette Drive in Jackson Park and has authorized the construction of the Obama Presidential Center (OPC) in Jackson Park by a private organization, The Barack Obama Foundation (Obama Foundation), and has entered into a Master Agreement dated May 17, 2019 with the Obama Foundation to which is attached as Exhibit C a Use Agreement governing the area to be used by the Obama Foundation in Jackson Park, and these actions require no Federal approvals, licenses, permits, or authorizations; and

**WHEREAS**, the State of Illinois, through the Illinois Department of Transportation (IDOT), is contributing to the cost of the roadway improvements; and

**WHEREAS,** the City, an Illinois municipal corporation, is acting by and through its Department of Transportation for purposes of this Memorandum of Agreement; and

**WHEREAS**, the Chicago Department of Transportation (CDOT) proposes to use Federal-aid highway funding and State of Illinois funds for roadway improvement and related activities to mitigate traffic impacts from the proposed closure of roadways within Jackson Park and for bicycle and pedestrian improvements in and adjacent to Jackson Park; and

**WHEREAS,** the Chicago Park District was created by the Illinois Legislature under the Park Consolidation Act, under which the Chicago Park District exercises control over and supervises the operation of parks within the limits of the City, including for example owning Jackson Park (except roadways, under CDOT jurisdiction, and the 19.3 acre site planned for the OPC, owned by the City) and operating the Midway Plaisance; and

**WHEREAS,** the NPS and the USACE have designated the FHWA as the lead Federal agency to fulfill the Federal agencies' collective responsibilities under Section 106; and

**WHEREAS,** FHWA notified and invited the following federally recognized tribes to consult under Section 106 of the National Historic Preservation Act: Ho Chunk Nation, Miami Tribe of Oklahoma, Peoria Tribe of Indians of Oklahoma, Forest County Potawatomi Community, Potawatomi – Prairie Band, Potawatomi-Citizen Nation, Potawatomi-Hannahville Indian Community, Potawatomi-Pokagon Band of Potawatomi, Sac and Fox Nation of Missouri, Sac and Fox Nation of Oklahoma, and Sac and Fox Tribe of the Mississippi in Iowa; of these, Miami Tribe of Oklahoma and Potawatomi – Forest County accepted the invitation and no others responded to the invitation; and

**WHEREAS,** FHWA has defined the undertaking for the purposes of assessing potential effects on historic and/or cultural resources to include the construction of the OPC in Jackson Park by the Obama Foundation, the closure of roads to accommodate the OPC and to reconnect fragmented parkland, the relocation of an existing track and field on the OPC site to adjacent parkland in Jackson Park, and the construction of a variety of roadway, bicycle and pedestrian improvements in and adjacent to Jackson Park, the NPS approval of the UPARR partial conversion, and the USACE approval of Section 404 permits and Section 408 permissions; and

**WHEREAS,** FHWA has defined the undertaking's area of potential effects (APE) as shown in Attachment A; and

**WHEREAS,** FHWA has determined that the undertaking may have an adverse effect on (1) the *Jackson Park Historic Landscape District and Midway Plaisance* and (2) the *Chicago Park Boulevard System Historic District*, which are listed in the National Register of Historic Places, and has consulted with the Illinois State Historic Preservation Officer (Illinois SHPO) pursuant to 36 C.F.R. § Part 800, the regulations implementing Section 106 of the National Historic Preservation Act (54 U.S.C. § 306108); and

**WHEREAS**, in accordance with 36 C.F.R. § 800.6(a)(1), FHWA has notified the Advisory Council on Historic Preservation (ACHP) of its adverse effect determination with specified documentation, and the ACHP has chosen to participate in the consultation pursuant to 36 C.F.R. § 800.6(a)(1)(iii); and

**WHEREAS,** FHWA has consulted with the Consulting Parties regarding the effect of the undertaking on historic properties in accordance with 36 C.F.R. §800.6(a)(1); and

**WHEREAS,** FHWA has developed this MOA with appropriate public involvement in accordance with 36 C.F.R. §§ 800.2(d) and 800.6(a)(4);

**WHEREAS,** in accordance with 36 C.F.R. § 800.6(c)(2), FHWA has invited the NPS, USACE, the Illinois Department of Transportation, the City, CDOT, and the Chicago Park District to be signatories to this MOA; and

**WHEREAS**, for the purposes of this MOA, the term "signatory" shall mean FHWA, the Illinois SHPO and the ACHP; and

**WHEREAS,** for the purposes of this MOA, the term "invited signatory" shall mean an entity who, upon invitation from FHWA per 36 C.F.R. § 800.6(c)(2), becomes a party to this MOA by signing the MOA; and

**WHEREAS,** in accordance with 36 C.F.R. § 800.6(c)(3), FHWA has invited the Consulting Parties to sign this MOA as concurring parties to the extent not otherwise a signatory or invited signatory; and

**NOW, THEREFORE**, the FHWA, the Illinois SHPO, and the ACHP agree that the undertaking shall be implemented in accordance with the following stipulations in order to take into account the effect of the undertaking on historic properties.

### STIPULATIONS

FHWA, with the assistance of the City, acting by and through CDOT, and the Chicago Park District, shall ensure that the following measures are carried out:

### I.   MEASURES

*Research and Documentation*

A.   Updated NRHP Documentation.  CDOT and the Chicago Park District in consultation with the Illinois SHPO will prepare an updated nomination of the Jackson Park Historic Landscape District and Midway Plaisance to the National Register of Historic Places (NRHP).  The updated nomination will conform to the current standards for nominations to the NRHP and will be available to the public in digital form once final.  The updated nomination will be prepared by or under the supervision of individuals who meet the relevant Secretary of the Interior's (SOI) Professional Qualification Standards for history or architectural history (48 Fed. Reg. 44738-44739, Sept. 29, 1983).

B.   Field Documentation.  CDOT and the Chicago Park District will prepare photographs and drawings documenting existing conditions on (a) the 19.3-acre site planned for the OPC, (b) the east end of the Midway Plaisance, and (c) the areas planned for traffic improvements in Jackson Park.  The work will be prepared consistent with the Historic American Landscape Survey (HALS) guidelines for an existing conditions plan, vegetative plan, field photographs keyed to a site plan, and aerial photographs. The work will be prepared by or under the supervision of individuals who meet the relevant SOI Professional Qualification Standards for history or historic landscape architecture (62 Fed. Reg. 33720-33721, June 20, 1997).

C.   Cultural Landscape Report.  CDOT and the Chicago Park District, in consultation with the SHPO, will prepare Part 1 (site history, existing conditions, and analysis/evaluation) and Part 2 (long-term preservation strategy) of a Cultural Landscape Report (CLR) for Jackson Park, consistent with federal guidance for cultural landscape reports in: Robert R. Page, Cathy A. Gilbert, and Susan A. Dolan, *A Guide to Cultural Landscape Reports: Contents, Process, and Techniques* (Washington, DC: U.S. Department of the Interior, National Park Service, Cultural Resource Stewardship and Partnerships, Park Historic Structures and Cultural Landscapes Program, 1998).  The CLR will assemble and analyze pertinent historic documentation and will provide recommendations for the long-term management of Jackson Park based on significance, existing condition, and use, taking into consideration all changes to Jackson Park that are proposed as part of the undertaking.  The work on the CLR will be prepared by or under the supervision of individuals who meet the relevant SOI Professional Qualification Standards and are experienced in cultural landscape identification and evaluation and in the application of the SOI Standards for the Treatment of Cultural Landscapes.

*Interpretation*

D. <u>Interpretive Materials</u>.  CDOT and the Chicago Park District will develop and implement a plan (the plan) to install interpretive materials or carry out programs to commemorate and present the cultural and natural historical contributions of Jackson Park and its use by South Side residents. The plan for interpretive materials may encompass different formats for interpretation such as a digital program components and interpretive displays. The draft plan will be created in consultation with Consulting Parties, local museums, community groups, schools and universities, to determine the appropriate content, format, and locations for interpretive materials. The draft plan will be made available for 45-day review and comment by signatories, invited signatories, and concurring parties to this MOA.  CDOT and Chicago Park District will prepare and provide a comment/response document summarizing the comments received. In light of these comments, CDOT and Chicago Park District will prepare the final plan and provide it to signatories, invited signatories, and concurring parties to this MOA before implementing the final plan.

*Rehabilitation*

E. <u>English Stone Comfort Station</u>.  CDOT and the Chicago Park District will prepare a Historic Structures Report (HSR) for the English Stone Comfort Station and will rehabilitate it in light of the recommendation from the HSR.  The English Stone Comfort Station is located on the western perimeter of Jackson Park.  The recommendation provided in the HSR will be consistent with applicable SOI Standards for Rehabilitation (36 C.F.R. § 68.3(b)).  The HSR and future rehabilitation design will be provided to the Illinois SHPO for 45-day review and comment. CDOT and Chicago Park District will prepare and provide a comment/response document summarizing the comments received and will finalize the HSR and rehabilitation design in light of comments. The HSR and the final rehabilitation design will be performed by or under the direction of individuals meeting the SOI Professional Qualification Standards for historic architects (48 Fed. Reg. 44739, Sept. 29, 1983).

F. <u>Statue of the Republic</u>. CDOT and the Chicago Park District will prepare a conservation assessment and rehabilitation plan for the Statue of the Republic and will implement the rehabilitation in phases.  The Statue of the Republic is located at the intersection of East Hayes Drive and South Richards Drive in Jackson Park.  The rehabilitation plan will be consistent with applicable SOI Standards for Rehabilitation (36 C.F.R. 68.3(b)).  The draft rehabilitation plan will be provided to the Illinois SHPO for 45-day review and comment.  CDOT and Chicago Park District will prepare and provide a comment/response document summarizing the comments received and will finalize the documents in light of comments. The assessment, plan, and rehabilitation will be performed by or under the direction of professional objects conservators with experience in applying the SOI Standards for Rehabilitation and conserving outdoor statues.

*Design Review*

G. <u>Design Review for the East End of the Midway Plaisance</u>.  CDOT and the Chicago Park District plan modifications to the east end of the Midway Plaisance consistent with SOI Standards for the Rehabilitation of Historic Properties with respect to standards 9 and 10, which address compatible new additions.  CDOT and the Chicago Park District will provide the draft design for 45-day review and comment by the public and signatories, invited signatories, and concurring parties to this MOA concerning landscaping features and other character-defining elements of the design. In furtherance of the City's responsibilities under UPARR, the final design for the east end of the Midway Plaisance will include new play area features whose ultimate selection will be made by

the City after seeking public comment and consultation with the NPS on the final play-area design options from the Chicago Park District. CDOT and the Chicago Park District will prepare and implement a final design in light of comments concerning the draft design and the play area features.

*Planting Review*

H. <u>Review of Planting Plans for Required Tree Replacement</u>. CDOT and the Chicago Park District will ensure that planting plans detailing the species and placement of native plantings required in the GLFER mitigation areas are consistent with the original GLFER approval. USACE will be provided the final plans for review consistent with Section 408.

## II.   SUBMISSION OF DOCUMENTATION

A. CDOT will submit to IDOT, and IDOT will immediately submit to the Illinois SHPO for its review, such documents and plans as are identified for development pursuant to Stipulations I.A-H. In coordination with IDOT, CDOT will circulate such documents and plans as are identified for development pursuant to Stipulations I.D and I.G to signatories, invited signatories, and consulting parties as appropriate per the respective Stipulations I.D through I.G.

B. Illinois SHPO shall have 30 days after receipt of the field documentation for any of the construction areas identified in clauses (a)-(c) in Stipulation I.B (each, a Field Documentation Area) to review the field documentation. The City and Chicago Park District will not begin construction of any elements as defined by the Federal undertaking in any Field Documentation Area until the earlier of (a) the date IDOT receives written concurrence from Illinois SHPO that the field documentation referred to in Stipulation I.B for the subject Field Documentation Area is acceptable for documenting existing conditions, or (b) Illinois SHPO fails to concur or reject concurrence in writing within the 30 days for review. If Illinois SHPO rejects the field documentation for any Field Documentation Area, Illinois SHPO shall provide a written statement to CDOT indicating in adequate detail how CDOT has failed to complete the field documentation in conformity with Stipulation I.B., and what measures or acts will be necessary to obtain approval. CDOT shall then resubmit the field documentation to IDOT in compliance with Illinois SHPO's written statement, and Illinois SHPO shall have 15 days after IDOT's receipt of the submission to review the new or revised documentation. The field documentation shall be deemed approved unless Illinois SHPO determines in the 15-day period following submission that CDOT has failed to make a good faith effort to comply with Illinois SHPO's requirements, in which case the disagreement will be resolved in accordance with Stipulation VII.

C. The City and Chicago Park District will not begin construction at the eastern end of the Midway Plaisance until after IDOT receives written concurrence from the Illinois SHPO that the final design for the replacement recreation referred to in Stipulation I.G is consistent with the Secretary of the Interior Standards for the Treatment of Historic Properties, with respect to standards 9 and 10 which address compatible new additions.

## III.   DURATION

This MOA will expire if its terms are not carried out within five (5) years from the date of its execution. Prior to such time, FHWA may consult with the other signatories, including invited signatories who elect to sign the MOA, to reconsider the terms of the MOA and amend it in accordance with Stipulation VIII below.

## IV.   SCHEDULE, MONITORING AND REPORTING

CDOT and the Chicago Park District will endeavor to undertake the Measures specified in Stipulation I above according to the target schedule appended as Attachment C to this MOA.

No later than October of every year, following the execution of this MOA until all stipulations are implemented or the MOA expires or is terminated, FHWA shall provide all parties to this MOA a summary report detailing work undertaken pursuant to its terms. Such report shall include any scheduling changes proposed, any problems encountered, and any disputes and objections received in FHWA's efforts to carry out the terms of this MOA.  CDOT will ensure that the annual reports are made available to the public on a City website.

## V.   POST-REVIEW DISCOVERIES

If potential historic properties are discovered or unanticipated effects on historic properties found, the FHWA shall make reasonable efforts to avoid, minimize, or mitigate adverse effects to such properties and follow the requirements of 36 C.F.R. § Section 800.13(b).

## VI.   COORDINATION WITH OTHER FEDERAL REVIEWS

In the event that another federal agency not initially a party to or subject to this MOA receives an application for funding/license/permit for the undertaking as described in this MOA, that agency may fulfill its Section 106 responsibilities by stating in writing that it concurs with the terms of this MOA and notifying FHWA, Illinois SHPO, ACHP, NPS, USACE, IDOT, CDOT, and Chicago Park District that it intends to do so. Any necessary amendments will be considered in accordance with Stipulation VIII of this MOA.

## VII.   DISPUTE RESOLUTION

A. Parties to the MOA.  Should any signatory, invited signatory or concurring party to this MOA object at any time to any actions proposed or the way the terms of this MOA are implemented, FHWA shall consult with such party to resolve the objection. If FHWA determines that such objection cannot be resolved, FHWA will:

1. Forward all documentation relevant to the dispute, including any timely advice or comments regarding the dispute from the ACHP, signatories, invited signatories and concurring parties, and the FHWA's proposed resolution, to the ACHP. The ACHP shall provide FHWA with its advice on the resolution of the objection within thirty (30) days of receiving adequate documentation. Prior to reaching a final decision on the dispute, FHWA shall prepare a written response that takes into account any timely advice or comments regarding the dispute from the ACHP, signatories, invited signatories and concurring parties, and provide them with a copy of this written response. FHWA will then proceed according to its final decision.

2. If the ACHP does not provide its advice regarding the dispute within the thirty (30) day time period, FHWA may make a final decision on the dispute and proceed accordingly. Prior to reaching such a final decision, FHWA shall prepare a written response that takes into account any timely comments regarding the dispute from the signatories, invited signatories and concurring parties to the MOA, and provide them and the ACHP with a copy of such written response.

3. FHWA's responsibility to carry out all other actions subject to the terms of this MOA that are not the subject of the dispute remain unchanged.

B. Non-parties to the MOA. At any time during implementation of the measures stipulated in Stipulation I of this MOA ("Stipulation I measures"), should a member of the public, including any consulting party who is not a signatory, invited signatory or concurring party, raise an objection in writing pertaining to the sufficiency of implementation of Stipulation I measures to any signatory party to this MOA, that signatory party shall immediately notify FHWA. FHWA shall immediately notify the other signatory and invited signatory parties in writing of the objection. Any signatory and invited signatory party may choose to comment in writing on the objection to FHWA. FHWA shall establish a reasonable time frame for this comment period not to exceed 15 days. FHWA shall consider the objection, and in reaching its decision, FHWA will take all comments from the other signatory and invited signatory parties into account. Within 15 days following closure of the comment period, FHWA will render a decision regarding the objection to the implementation of Stipulation I measures and respond to the objecting party. FHWA will promptly notify the other signatory and invited signatory parties of its decision in writing, including a copy of the response to the objecting party. FHWA's decision regarding resolution of the objection will be final. Following issuance of its final decision, FHWA may authorize the Stipulation I measure subject to dispute hereunder to proceed in accordance with the terms of that decision. This section does not apply to Stipulation I(B), which is subject to review by Illinois SHPO under Stipulation II.

## VIII.   AMENDMENTS

This MOA may be amended when such an amendment is agreed to in writing by all signatories and invited signatories. The amendment will be effective on the date a copy signed by all the signatories and invited signatories.

## IX.   TERMINATION

If any signatory or invited signatory to this MOA determines that the signatory's responsibilities under the MOA will not or cannot be carried out, that party shall immediately consult with the other signatories to attempt to develop an amendment per Stipulation VIII, above. If within thirty (30) days (or another time period agreed to by all signatories) an amendment cannot be reached, any signatory or invited signatory may terminate the MOA upon written notification to the other signatories.

Once the MOA is terminated, and prior to work continuing under authorization from FHWA, the NPS, or USACE relating to the undertaking, FHWA must either (a) execute an MOA pursuant to 36 C.F.R. § 800.6 or (b) request, take into account, and respond to the comments of the ACHP under 36 C.F.R. § 800.7. FHWA shall notify the signatories and invited signatories as to the course of action it will pursue.

Execution of this MOA by the FHWA, the NPS, USACE, IDOT, the City acting through CDOT, the Chicago Park District, the Illinois SHPO, and the ACHP and implementation of its terms evidence that FHWA has taken into account the effects of this undertaking on historic properties and afforded the ACHP an opportunity to comment.

November 10, 2020

**REQUIRED SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Federal Highway Administration**

_____          12/15/2020
                                                  _____
Arlene K. Kocher                                  Date
Division Administrator

November 10, 2020

REQUIRED SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

Illinois State Historic Preservation Officer

_____     $11 - 11 - 2020$
Colleen Callahan                          Date
Director, Illinois Department of Natural Resources,
And Illinois State Historic Preservation Officer

-9-                                November 10, 2020

**REQUIRED SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Advisory Council on Historic Preservation**

_____              ___December 17, 2020_____
John M. Fowler                                Date
Executive Director

-10-                                          November 10, 2020

INVITED SIGNATORY PAGE

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**National Park Service**

HERBERT FROST
Digitally signed by HERBERT FROST
Date: 2020.12.14 14:30:36 -06'00'

_____          _____
Herbert C. Frost, Ph.D                    Date
NPS Regional Director
DOI Regions 3,4,5

**INVITED SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**United States Army Corps of Engineers – Chicago District**

_____          20 November 2020
                                          _____
COL Paul B. Culberson                     Date
District Engineer

November 10, 2020

INVITED SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

**Illinois Department of Transportation**

Anthony Quigley
Regional Engineer – Region 1

11-10-2020
Date

November 10, 2020

**INVITED SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Chicago Park District**

_____

Michael P. Kelly
General Superintendent and CEO
Chicago Park District

November 17, 2020

_____

Date

November 10, 2020

**INVITED SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**City of Chicago, by and through the**
**Chicago Department of Transportation**

_____          11/10/2020
                                         _____
Gia Biagi                                Date
Commissioner
Chicago Department of Transportation

-15-                                     November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**1Woodlawn**

_Byron J Brazier_
Byron Brazier

_November 24, 2020_
Date

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**5th Ward Service Office**

_____          November 23, 2020
Alderman Hairston                        Date

November 10, 2020

CONCURRING PARTY SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

**20th Ward Service Office**

_____
Alderman Taylor

11/17/20
_____
Date

November 10, 2020

CONCURRING PARTY SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

**The Barack Obama Foundation**

_____       _____11-18-20_____

~~Jamie-Clare Flaherty~~                Date
Robbin Cohen

November 10, 2020

CONCURRING PARTY SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

**Blacks in Green**

Naomi Davis

11-15-20

Date

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Brown Books and Paint Brushes**

_____                    November 16, 2020
Candace Washington                                 _____
                                                   Date

November 10, 2020

CONCURRING PARTY SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

**Business Leadership Council**

Karen Riley                                   11 - 16 - 2020
Avis LaVelle, Executive Director              Date

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Chicago Historical Society**

_____          November 10, 2020
Gary Johnson                                      Date
President

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Chicago Transit Authority**

Marlise Fratinardo
Digitally signed by Marlise Fratinardo
DN: cn=Marlise Fratinardo, o, ou,
email=mfratinardo@transitchicago.com, c=US
Date: 2020.11.20 13:33:57 -06'00'

_____          _____
Marlise Fratinardo                                                Date

November 10, 2020

CONCURRING PARTY SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

**Chicago Urban League**

_____          11/26/20 _____
Karen Freeman-Wilson                      Date
President and Chief Executive Officer

November 10, 2020

CONCURRING PARTY SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

Don Nash Park Advisory Council

_____          _____11/10/2020_____
Alisa Starks                                                       Date
President

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

DuSable Museum

Perri Irmer                                    10 Nov 2020
                                               Date

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**


**Emerald South**

_____          11/10/2020
Ghian Foreman                             _____
                                          Date



November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Federal Transit Administration**

KELLEY
BROOKINS

Digitally signed by KELLEY
BROOKINS
Date: 2020.11.13 15:41:53
-06'00'

_____                    _____
Kelley Brookins                                                              Date
Regional Administrator
Federal Transit Administration, Region V

November 10, 2020

CONCURRING PARTY SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

**Hyde Park Academy**

_____
Antonio Ross

11-19-20
Date

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Hyde Park Art Center**

_Kineret Jaffe_

Kineret Jaffe

_November 16, 2020_

Date

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Jackson Park Advisory Council**

_Louise McCurry_

Louise McCurry

JPAC President

_11/16/2020_

Date

## CONCURRING PARTY SIGNATORY PAGE

### MEMORANDUM OF AGREEMENT
### AMONG
### FEDERAL HIGHWAY ADMINISTRATION
### ILLINOIS STATE HISTORIC PRESERVATION OFFICER
### ADVISORY COUNCIL ON HISTORIC PRESERVATION
### REGARDING PROJECTS IN JACKSON PARK
### IN CHICAGO, COOK COUNTY, ILLINOIS

**Jackson Park Golf & Community
Leadership Council**

_____          NOVEMBER 10, 2020
Al DeBonnett                                          Date


November 10, 2020

CONCURRING PARTY SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

**Jackson Park Highlands Association**

Russell Pike
President

November 10, 2020
Date

November 10, 2020

CONCURRING PARTY SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

**Jackson Park Yacht Club**

Name: _____     Date _____ 11. 10. 2020

Janet Hansen
Commodore

November 10, 2020

CONCURRING PARTY SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

**KLEO Community Life Center**

_____          11-18-20
Torrey Barnett                            Date

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**La Rabida Children's Hospital**

_____         _____
Brenda Wolf                                                    Date
President and Chief Executive Officer

10 November 2020

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Landmarks Illinois**

*Bonnie McDonald*                              *November 19, 2020*
Bonnie McDonald                                Date

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Metra**

_____          11·19·2020
James M. Derwinski                       Date
CEO/Executive Director

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Museum of Science and Industry**

_____          ___11.10.2020_____
David Mosena                          Date

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Museum Shores Yacht Club**

_____          _____11-21-2020_____
Darryl Davis                                      Date

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS**

**National Association of Colored
Women's Clubs (NACWC)**

*Cassandra Cecelia Guice*　　　　　　*November 12, 2020*
Cassandra Cecelia Guice　　　　　　　Date
Local Federated Club President &
National Executive Council Member

November 10, 2020

CONCURRING PARTY SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

**Network of Woodlawn**

*Debra Buffington-Adams*                    11/21/2020
_____            _____
Debra Buffington-Adams                      Date

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**School of the Art Institute of Chicago**

Elissa Tenny
President

11.23.20
Date

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**South Shore Chamber**

_____     11/20/2020
Tonya Trice                         Date

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**South Shore Historical Society**

11/23/20

Candace Clark                                                  Date
President

November 10, 2020

CONCURRING PARTY SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

South Shore Works

_____          _____
~~Victoria Brady~~                      Date
CAROL L. Adams

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**South Shore YMCA**

_____          ___11/15/20_____
Cherese R. Ledet                          Date
South Side YMCA

November 10, 2020

CONCURRING PARTY SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

**Southern Shores Yacht Club**

_____        _____
Dwayne Digby                                                    Date   11/12/2020

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Southside Neighbors for Hope (SSN4H)**

_____          11/10/2020
Erin Adams                                          Date

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**University of Chicago**

_____                    _____November 20, 2020_____
                                                                           Date
Susan S. Sher



November 10, 2020

### CONCURRING PARTY SIGNATORY PAGE

### MEMORANDUM OF AGREEMENT
### AMONG
### FEDERAL HIGHWAY ADMINISTRATION
### ILLINOIS STATE HISTORIC PRESERVATION OFFICER
### ADVISORY COUNCIL ON HISTORIC PRESERVATION
### REGARDING PROJECTS IN JACKSON PARK
### IN CHICAGO, COOK COUNTY, ILLINOIS

**Vista Garage Building Cooperative**

Kay Poyner Brown

Date November 23, 2020

November 10, 2020

CONCURRING PARTY SIGNATORY PAGE

MEMORANDUM OF AGREEMENT
AMONG
FEDERAL HIGHWAY ADMINISTRATION
ILLINOIS STATE HISTORIC PRESERVATION OFFICER
ADVISORY COUNCIL ON HISTORIC PRESERVATION
REGARDING PROJECTS IN JACKSON PARK
IN CHICAGO, COOK COUNTY, ILLINOIS

**Washington Park Advisory Council**

_____          11-19-20
Cecilia Butler                                          _____
                                                              Date

November 10, 2020

**CONCURRING PARTY SIGNATORY PAGE**

**MEMORANDUM OF AGREEMENT**
**AMONG**
**FEDERAL HIGHWAY ADMINISTRATION**
**ILLINOIS STATE HISTORIC PRESERVATION OFFICER**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**
**REGARDING PROJECTS IN JACKSON PARK**
**IN CHICAGO, COOK COUNTY, ILLINOIS**

**Independent Consulting Party**

_____                    _November 10, 2020_
Mary Anton                                  Date

November 10, 2020

**ATTACHMENT A**

**Area of Potential Effect (APE)**

November 10, 2020



**LEGEND**

Existing Right-of-Way
Existing Park
OPC Site Structure
OPC Site Boundary
UPARR Conversion (NPS Undertaking)
UPARR Replacement (NPS Undertaking)
Pr. Roadway Imp.* (FHWA Undertaking)
Pr. Ped/Bike Imp. (FHWA Undertaking)
Pr. Ped/Bike Underpass (FHWA Undertaking)

Contributing Resource to CPBS HD

Section 404 Authorization (USACE Undertaking)
Pr. GLFER Impacts (USACE Undertaking)
Pr. GLFER Replacement (USACE Undertaking)
APE Sub-area I - Historic Architecture/Landscape
APE Sub-area II - Historic Architecture/Landscape

NRHP Status**
Listed (I)
Listed (HD)
Listed (MPL)
Eligible (I)
Eligible (HD)

**NOTES**

*Roadway widening also constitutes as a UPARR Conversion.
**NRHP Status determinations approved by SHPO on July 10, 2018. The Assessment of Effects (AOE) evaluates both listed and eligible properties on the NRHP. Historic districts (HD) are evaluated as one property which considers effects to contributing resources and the district as a whole. Individual (I) properties, including those within historic districts, are evaluated for effects to their historic integrity.

**HISTORIC PROPERTIES**

01  Jackson Park Historic Landscape District and Midway Plaisance
06  Jackson Park Terrace Historic District (Eligible)
07  Hyde Park-Kenwood Historic District (Listed)
18  Hyde Park East Historic District (Eligible)
19  Bret Harte Elementary School
20  Windermere East Hotel/Apartments
21  Jackson Towers
22  Promontory Apartments
23  The Flamingo on the Lake
24  Jackson Shore Apartments
25  Shoreland Hotel
26  Promontory Point Historic District
27  Heitstein House
28  Residence at 5812 S. Blackstone Avenue
29  Stein Building
30  Johnson House
31  Center for Continuing Education
32  Public Administration Building (Chapin Hall)
33  St. Paul's Universalist Church/Shankman Orthogenics School
34  University of Chicago Power Station
37  Chicago Park Boulevard System Historic District (Listed)
41  Frank Lillie House

Proposed Undertaking in and Adjacent to Jackson Park

**Assessment of Effects**

Historic Properties

January 2020

**Exhibit 2a**

MATCHLINE - SEE EXHIBIT 2b



MATCHLINE - SEE EXHIBIT 2a

**HISTORIC PROPERTIES**

01 Jackson Park Historic Landscape District and Midway Plaisance
02 Stony Island State Trust and Savings Bank
03 William Dexter Three-Flat
04 Island Terrace Apartment Building
05 Hyde Park Academy High School
06 South Shore Cultural Center Park
09 South Shore E. 67th Street Apartment Historic District (Eligible)
10 Residences at 6700 S. Crandon Avenue
11 Shoreline Apartments
12 Residences at 2201-2211 E. 67th Street
13 Leonard Graff House
14 Dr. Paul Schutz House
15 Morris N. Fox Three-Flat
16 Residences at 6701 S. Constance Avenue
17 Tower Court Apartments
35 E. 62nd Place Firehouse
36 Pridmore & Stanhope-designed Greystone
37 Chicago Park Boulevard System Historic District (Listed)
38 6450-6460 S. Stony Island Avenue
39 6516-6520 S. Stony Island Avenue
40 2015-2017 E. 67th Street/6700-6712 S. Chappel Avenue

**LEGEND**

**NOTES**

Proposed Undertaking in and Adjacent to Jackson Park

**Assessment of Effects**

Historic Properties

January 2020

**Exhibit 2b**

**ATTACHMENT B**

**Consulting Parties – MOA Roles**

**REQUIRED SIGNATORIES**

- Advisory Council on Historic Preservation
- Federal Highway Administration
- Illinois State Historic Preservation Officer

**INVITED SIGNATORIES (REQUESTED)**

- City of Chicago, Department of Transportation
- Chicago Park District
- Illinois Department of Transportation
- National Park Service
- U.S. Army Corps of Engineers – Chicago District

**CONCURRING PARTIES (REQUESTED)**

- 1Woodlawn
- 20th Ward Service Office
- 51st Street Business Association
- 5th Ward Service Office
- Blacks in Green
- Brown Books & Paint Brushes
- Business Leadership Council
- Chicago Historical Society
- Chicago Lawyers' Committee for Civil Rights
- Chicago Transit Authority
- Chicago Urban League
- Coalition for the Obama Presidential Center
- Cultural Landscape Foundation
- Don Nash Park Advisory Council
- DuSable Museum
- Emerald South
- Federal Transit Administration
- Friends of the Parks
- Golden Shore
- Hyde Park Academy
- Hyde Park Art Center
- Hyde Park Historical Society
- Hyde Park-Kenwood Community Conference
- Illinois Department of Agriculture, Bureau of Land and Water Resources
- Illinois Department of Natural Resources
- Illinois Environmental Protection Agency
- Illinois Natural Resources Conservation Service
- Illinois State Archaeological Survey

November 10, 2020

- Jack and Jill Moms Chicago
- Jackson Park Advisory Council
- Jackson Park Golf & Community Leadership Council
- Jackson Park Highlands Association
- Jackson Park Watch
- Jackson Park Yacht Club
- Kenwood-Oakland Community Association
- KLEO Community Life Center
- La Rabida Children's Hospital
- Landmarks Illinois
- LISC
- Local Chapter of NACWC
- Metra
- Midway Plaisance Advisory Council
- Museum of Science and Industry
- Museum Shores Yacht Club
- Nation of Islam
- National Association for Olmsted Parks
- National Trust for Historic Preservation- Chicago Office
- Network of Woodlawn
- Nichols Park Advisory Council
- The Barack Obama Foundation
- Openlands
- Preservation Chicago
- Pullman National Monument Preservation Society
- Real Men Charities, Inc., South Shore Current & West of the Ryan Magazines
- Save the Midway
- School of the Art Institute of Chicago
- South Shore Advisory Council, South Shore Cultural Center
- South Shore Chamber
- South Shore Historical Society
- South Shore Works
- South Shore YMCA
- Southern Shores Yacht Club
- Southside Neighbors for Hope (SSN4H)
- Southside Together Organizing for Power
- The Neighborhood Network Alliance
- Ho Chunk Nation
- Miami Tribe of Oklahoma
- Peoria Tribe of Indians of Oklahoma
- Potawatomi – Forest County
- Potawatomi – Prairie Band
- Potawatomi - Citizen Nation
- Potawatomi - Hannahville Indian Community
- Potawatomi - Pokagon Band of Potawatomi
- Sac and Fox Nation of Missouri
- Sac and Fox Nation of Oklahoma
- Sac and Fox Tribe of the Mississippi in Iowa

November 10, 2020

- U.S. Department of the Interior Fish & Wildlife Service
- U.S. Environmental Protection Agency
- University of Chicago
- Vista Garage Building Cooperative
- Vista Homes
- Washington Park Advisory Council
- Westside Health Authority
- Woodlawn Community Development Corporation
- Mary Anton - Independent Consulting Party
- Raymond Lodato - Independent Consulting Party
- Ross Peterson – Independent Consulting Party

November 10, 2020

**ATTACHMENT C**

**Target Schedule**

Stipulation I.A – Updated NRHP Documentation
- Submission of the updated nomination to Illinois SHPO: to be submitted by the end of 2025

Stipulation I.B – Field Documentation
- final portfolio of documentation: to be completed by the end of 2021

Stipulation I.C – Cultural Landscape Report
- final Cultural Landscape Report: to be submitted by 2024

Stipulation I.D – Interpretive Materials
- draft plan for interpretive materials: to be initiated in 2021

Stipulation I.E – Comfort Station
- final Historic Structures Report: to be submitted by the end of 2023

- rehabilitation work: to be initiated following approval of the Historic Structures Report and rehabilitation design

Stipulation I.F – Statue of the Republic
- final conservation assessment and proposed rehabilitation plan: to be submitted by the end of 2023

- rehabilitation work: to be initiated following approval of the conservation assessment and proposed rehabilitation plan

Stipulation I.G – Design Review for the East End of the Midway Plaisance
- input on the draft design from the public, signatories, invited signatories and concurring parties, and public input on the play area features: to be completed by 2022

Stipulation I.H – Planting Review
- Submission of planting plans: prior to planting of related replacement plants

November 10, 2020