# EXHIBIT 8

**MOBILITY IMPROVEMENTS TO SUPPORT THE SOUTH LAKEFRONT FRAMEWORK PLAN**
**CITY OF CHICAGO, COOK COUNTY, ILLINOIS**

FINAL SECTION 4(f) EVALUATION
Submitted Pursuant to 49 USC 303
by the

U.S. Department of Transportation
Federal Highway Administration

and

Illinois Department of Transportation

_____December 18, 2020_____          _____

Date of Approval                                    For FHWA

The following persons may be contacted for additional information concerning this document:

Arlene K. Kocher, P.E.                          Anthony Quigley, P.E.
Division Administrator                          Deputy Director, Region 1 Engineer
Federal Highway Administration                  Illinois Department of Transportation
3250 Executive Park Drive                       201 West Center Court
Springfield, Illinois 62703                     Schaumburg, IL 60196

ABSTRACT:

The proposed improvements for this project include roadway improvements within and adjacent to Jackson Park to accommodate changes in travel patterns as a result of roadway closures implemented by the City of Chicago (City). Bicycle and pedestrian facilities and connections are proposed to improve access and circulation to, from, and within Jackson Park.

Lake Shore Drive (U.S. Route 41) will be widened to the west to provide an additional southbound travel lane between 57th Street and Hayes Drive. To accommodate the additional travel lane, the 59th Street Inlet Bridge will be widened and modifications at the intersections of 57th Street, Science Drive, and Hayes Drive are proposed.

Hayes Drive will be reconfigured to remove existing on-street parking to provide two travel lanes in each direction with minimal widening. A traffic signal and intersection improvement is proposed at Richards Drive. Hayes Drive will be realigned at 63rd Street to provide a through movement for predominant travel. Southbound Cornell Drive will be widened to accommodate two-way traffic at Stony Island Avenue.

Stony Island Avenue will be widened to the east to accommodate additional through lanes and turn lanes at cross-street intersections. Intersections will be modified to accommodate the additional lanes. New traffic signals are proposed along Stony Island Avenue at 64th Street and 62nd Street. The N. Midway Plaisance (westbound only) will be widened to accommodate two-way traffic at Stony Island Avenue.

Proposed bicycle and pedestrian accommodations include the construction of four underpasses within Jackson Park. Proposed trails and connections along Cornell Drive, Hayes Drive, and Marquette Drive will improve circulation within the park and access to existing facilities. Curb extensions and pedestrian refuge islands are proposed along Stony Island Avenue and along Cornell Drive north of the Midway Plaisance to improve access to Jackson Park.

Jackson Park and the Midway Plaisance are jointly listed on the National Register of Historic Places (NRHP) as the Jackson Park Historic Landscape District and Midway Plaisance. They are also contributing resources to the Chicago Park Boulevard System (CPBS) Historic District.

This improvement will not require any acquisition from private properties. As design for transportation improvements has been developed, impacts have been refined and may differ from those provided in the Least Harms and Preferred Alternative analyses. Approximately 5.2 acres of Section 4(f) land within Jackson Park will be permanently used for transportation purposes. The City will close several roadways in Jackson Park and transfer 7.7 acres of right-of-way that is currently used for transportation purposes to the Chicago Park District (CPD), which will be incorporated into Jackson Park for recreational area and park purposes. A total of 417 trees are proposed for removal by the transportation project.

Approximately 18.5 acres of Section 4(f) land within Jackson Park will be temporarily used to construct the bicycle and pedestrian underpasses, trails, and connections. Additionally, temporary uses for construction staging and roadway grading affect approximately 5.0 acres of parkland, resulting in a total of 23.5 acres of temporary usage of Section 4(f) land. These temporary uses will be (1) temporary in duration and less than the time for construction of the entire project; (2) the scope of the work is minor and the nature and magnitude of the changes to the Section 4(f) properties are minimal; (3) there are no anticipated permanent adverse physical effects nor will there be interference with the protected activities, features, or attributes of the Section 4(f) properties, on either a temporary or permanent basis; and (4) the land will be fully restored to a condition that is at least as good as that which existed prior to the project. While the Chicago Park District provided concurrence of these conditions, concurrence was not received from all Officials with Jurisdiction (OWJ), therefore, these temporary uses cannot be declared exempt from Section 4(f) approval and are subject to approval under 23 CFR 774.3(a).

The total Section 4(f) use of land, including permanent and temporary uses, is 28.7 acres. This use affects Jackson Park (park/recreational land), the Jackson Park Historic Landscape District and Midway Plaisance, and the CPBS Historic District. However, after the transfer of closed roadways from the Chicago Department of Transportation to the CPD, there is a net increase in Section 4(f) park land of 2.5 acres in Jackson Park.

## Table of Contents

1.0     Introduction ......................................................................................................................... 1

2.0     Project Description .............................................................................................................. 2

2.1     Proposed Action – FHWA Action ........................................................................................ 2

2.2     Study Area ............................................................................................................................ 3

3.0     Purpose and Need – FHWA Action ..................................................................................... 5

3.1     Project Need ......................................................................................................................... 5

3.2     Project Purpose ..................................................................................................................... 8

4.0     Description of Section 4(f) Properties ................................................................................ 9

4.1     Jackson Park ....................................................................................................................... 13

4.1.1   Officials with Jurisdiction ................................................................................................. 13

4.1.2   Park and Recreational Function ........................................................................................ 13

4.1.3   Natural Areas ..................................................................................................................... 14

4.1.4   Access ................................................................................................................................ 16

4.1.5   Usage ................................................................................................................................. 17

4.1.6   Existing and Planned Facilities ......................................................................................... 18

4.1.7   Relationship to Similar Properties in Vicinity ................................................................. 18

4.1.8   Elements Affecting Ownership ......................................................................................... 18

4.1.9   Other Characteristics ........................................................................................................ 19

4.2     Midway Plaisance .............................................................................................................. 21

4.2.1   Officials with Jurisdiction ................................................................................................. 21

4.2.2   Park and Recreational Function ........................................................................................ 21

4.2.3   Access and Usage .............................................................................................................. 21

4.2.4   Existing and Planned Facilities ......................................................................................... 22

4.2.5   Relationship to Similar Properties in Vicinity ................................................................. 22

4.2.6   Elements Affecting Ownership ......................................................................................... 23

4.3     Jackson Park Historic Landscape District and Midway Plaisance ..................................... 23

4.3.1   Officials with Jurisdiction ................................................................................................. 23

4.3.2   Historic Significance .......................................................................................................... 23

4.3.2.1 Jackson Park ...................................................................................................................... 24

4.3.2.2 Midway Plaisance .............................................................................................................. 25

4.3.3   Access and Usage .............................................................................................................. 27

4.3.4   Existing and Planned Facilities ......................................................................................... 27

4.3.5    Relationship to Similar Properties in Vicinity .................................................. 27

4.3.6    Elements Affecting Ownership ........................................................................ 27

4.3.7    Other Characteristics ...................................................................................... 27

4.4    Island Terrace Apartments .............................................................................. 28

4.4.1    Officials with Jurisdiction ............................................................................... 28

4.4.2    Property Description ........................................................................................ 28

4.4.3    Historic Significance ........................................................................................ 29

4.4.4    Access ............................................................................................................... 30

4.4.5    Relationship to Similar Properties ................................................................ 30

4.4.6    Other Characteristics ...................................................................................... 30

4.5    Jackson Park Terrace Historic District ........................................................... 31

4.5.1    Officials with Jurisdiction ............................................................................... 31

4.5.2    Property Description ........................................................................................ 31

4.5.3    Historic Significance ........................................................................................ 33

4.5.4    Access ............................................................................................................... 34

4.5.5    Relationship to Similar Properties ................................................................ 34

4.5.6    Other Characteristics ...................................................................................... 34

4.6    Hyde Park High School/Academy .................................................................... 35

4.6.1    Officials with Jurisdiction ............................................................................... 35

4.6.2    Property Description ........................................................................................ 35

4.6.3    Historic Significance ........................................................................................ 36

4.6.4    Access ............................................................................................................... 37

4.7    Chicago Park Boulevard System (CPBS) Historic District .................................. 37

4.7.1    Officials with Jurisdiction ............................................................................... 37

4.7.2    Property Description ........................................................................................ 37

4.7.3    Historic Significance ........................................................................................ 39

4.7.4    Access and Usage ............................................................................................ 40

4.7.5    Existing and Planned Facilities ....................................................................... 41

4.7.6    Relationship to Similar Properties in the Vicinity .......................................... 41

4.7.7    Elements Affecting Ownership ....................................................................... 42

5.0    Avoidance Alternatives .................................................................................. 43

5.1    No-Action Alternative .................................................................................... 43

5.1.1    Evaluation ........................................................................................................ 44

5.2     Congestion Management Process Strategies .................................................. 47

5.2.1   Evaluation ................................................................................................... 47

6.0     Additional Alternatives Evaluated ................................................................ 50

6.1.1   Alternative 1 – Alternative Avoiding Parkland Use and Widen Stony Island Avenue ........ 50

6.1.2   Alternative 2 – Operational Changes to Roadways ................................................. 51

6.1.3   Alternative 3 – Mobility Improvement – Widen Lake Shore Drive ............................. 52

6.1.4   Alternative 4 – Mobility Improvement – Widen Stony Island Avenue .......................... 53

6.1.5   Alternative 5 – Mobility Improvement – Reconfigure Hayes Drive .............................. 53

6.1.6   Alternative 6 – Mobility Improvement – Widen Lake Shore Drive and Stony Island Avenue 54

6.1.7   Alternative 7 – Mobility Improvement – Widen Lake Shore Drive and Reconfigure Hayes Drive .............................................................................................. 55

6.1.8   Alternative 8 – Widen Stony Island Avenue and Reconfigure Hayes Drive ................... 56

6.1.9   Alternative 9 – Mobility Improvement – Widen Lake Shore Drive and Stony Island and reconfigure Hayes Drive ................................................................................ 56

6.1.10  Alternatives Summary .................................................................................... 57

7.0     Least Harms Analysis ...................................................................................... 59

7.1     Alternative with the Least Overall Harm ......................................................... 71

8.0     Impacts of Alternative 9B ............................................................................... 75

8.1     Acreage of Section 4(f) Land Use ................................................................... 75

8.2     Facilities and Functions Affected ................................................................... 77

8.2.1   Property Function .......................................................................................... 77

8.2.2   Great Lake Fishery and Ecosystem Restoration (GLFER) ...................................... 77

8.2.3   Tree Removals ............................................................................................... 77

8.2.4   Natural Areas ................................................................................................ 77

8.2.5   Water Resource Impacts ................................................................................. 78

8.2.6   Historic Significance ...................................................................................... 78

8.3     Access Restrictions ....................................................................................... 78

8.4     Closures and Detours ..................................................................................... 79

8.4.1   Conceptual Maintenance of Traffic During Construction .................................... 79

9.0     All Possible Planning to Minimize Harm ........................................................ 80

9.1     Design Measures that Minimize Use of Section 4(f) Property ......................... 80

9.1.1   Roadway Footprint ........................................................................................ 80

9.1.2   Underpass Alternatives................................................................................... 82

**9.1.3**     **Landscape and Tree Removal Minimization Efforts** .......................................................... 82

**9.2**     **Mitigation Measures** ........................................................................................................ **83**

**9.2.1**     **Land Use Mitigation** ........................................................................................................ 83

**9.2.2**     **Preliminary Tree Mitigation Strategies** ......................................................................... 83

**9.2.3**     **Mitigation Measures for Section 106 Resources** .......................................................... 84

**10.0**     **Coordination** ................................................................................................................... 86

**10.1**     **Officials with Jurisdiction** ............................................................................................. **86**

**10.1.1 Summary of Comments from OWJs** ............................................................................... 86

**10.2**     **Federal Encumbrances** ................................................................................................. **86**

**10.2.1 USACE Encumbrances** .................................................................................................... 87

**10.2.2 National Park Service Encumbrance** .............................................................................. 87

**10.2.3 Summary of Comments from Federal agencies with encumbrances** ............................ 88

**10.3**     **Public Coordination** ...................................................................................................... **88**

## List of Tables

Table 1: 2040 No-Action Alternative Intersection Levels of Service Intersection ....................................... 6

Table 2: Section 4(f) Properties ................................................................................................................. 11

Table 3: 2040 No-Action Alternative Intersection Levels of Service .......................................................... 45

Table 4: 2040 CMP Alternative Intersection Levels of Service ................................................................... 48

Table 5: Preliminary Alternatives Summary .............................................................................................. 58

Table 6: Least Harms Analysis Evaluation Summary – Alternatives Studied in Detail .............................. 59

Table 7: Least Harms Analysis Evaluation Summary – Section 4(f) Land Use ........................................... 61

Table 8: Least Overall Harm Summary – Alternatives 9A & 9B ................................................................. 71

Table 9: Summary of Minimization Efforts (Alternative 9B) ...................................................................... 81

## List of Photos

Photo 1: Island Terrace Apartments, 6430 S. Stony Island Avenue, ........................................................... 29

Photo 2: Jackson Park Terrace Housing Complex, three-story complex building, ...................................... 32

Photo 3: Jackson Park Terrace Housing Complex, 19-story Jackson Parkside Apartment high-rise, ......... 33

Photo 4: Hyde Park High School/Academy looking Southwest from S. Stony Island Avenue ................... 35

## Appendixes

Appendix A – General Exhibits

Appendix B – Section 4(f) Properties

Appendix C – Alternatives Analysis

Appendix D – Alternatives Studied in Detail

Appendix E – Least Harms Analysis

Appendix F – Impacts from Alternative 9B

Appendix G – Minimization and Mitigation Measures

Appendix H – Coordination

Appendix I – South Lakefront Framework Plan (SLFP)

Appendix J – Traffic Congestion Technical Memorandum (August 2020)

Appendix K – NHPA Section 106 Memorandum of Agreement

# 1.0   Introduction

Section 4(f) of the U.S. Department of Transportation Act of 1966, known as Section 4(f), provides for consideration of park and recreation lands, wildlife and waterfowl refuges, and historic sites during transportation project development. The law, now codified in 49 U.S.C. §303 and 23 U.S.C. §138, applies only to agencies within the U.S. Department of Transportation (U.S. DOT) and is implemented by the Federal Highway Administration (FHWA) and the Federal Transit Administration through the regulation at 23 CFR Part 774. Before approving a project that uses Section 4(f) property, FHWA must determine that there is no feasible and prudent alternative that avoids the Section 4(f) properties and that the project includes all possible planning to minimize harm to the Section 4(f) properties; or, FHWA makes a finding that the project has a de minimis impact on the Section 4(f) property.

Section 4(f) protects publicly owned park and recreation areas that are open to the general public, publicly owned wildlife and waterfowl refuges, and public or privately owned historic sites. The term historic sites includes prehistoric and historic districts, sites, buildings, structures or objects listed in, or eligible for, the National Register of Historic Places (NRHP).

Like Section 4(f), Section 106 of the National Historic Preservation Act (NHPA) of 1966 also mandates consideration of a project's effect on historic sites. The most important connection between the two statutes is that the Section 106 process is generally the method by which historic properties are identified that would be subject to consideration under Section 4(f). The results of the identification step under Section 106 - including the eligibility of the resource for listing on the NRHP, the delineation of NRHP boundaries, and the identification of contributing and non-contributing elements within the boundary of a historic district—are a critical part of determining the applicability of Section 4(f).

The most important difference between the two statutes is the way each of them measures impacts to historic sites. Whereas Section 106 is concerned with adverse effects, Section 4(f) is concerned with use. The two terms are not interchangeable and an adverse effect determination under Section 106 does not automatically equate to a Section 4(f) use of the property.

Use of a Section 4(f) property occurs: (1) when land is permanently incorporated into a transportation project; (2) when there is a temporary use of land that is adverse in terms of the statute's preservation purpose; or (3) when there is a constructive use (a project's proximity impacts are so severe that the protected activities, features, or attributes of a property are substantially impaired).

# 2.0   Project Description

## 2.1   Proposed Action – FHWA Action

The City of Chicago (City) is proposing to close roadways within Jackson Park, Chicago, Illinois to meet the planning and development objectives for Jackson Park which are fully described in the 2018 South Lakefront Framework Plan (SLFP)[1] in **Appendix I**. The permanent roadway closures include: Cornell Drive between 63rd Street (Hayes Drive) and 59th Street, the northbound section of Cornell Drive between 68th Street and 65th Street, Marquette Drive between Stony Island Avenue and Richards Drive, and South Midway Plaisance (eastbound only) between Stony Island Avenue and Cornell Drive. See **Exhibit A-3**. Closures of South Midway Plaisance and Cornell Drive between 62nd Street and 59th Street are necessary to accommodate the development of the Obama Presidential Center (OPC), a separate privately funded action that is part of the vision for the park described in the 2018 SLFP. The additional roadway closures will allow for a more connected park and enhanced access to important amenities within Jackson Park. The roadway closures and construction of the OPC are separate independent actions that do not require any Federal approvals and are therefore considered the baseline condition as well as the No-Action alternative.

The roadway closures and the decision to locate the OPC in Jackson Park are local land use and land management decisions by the City and are not under the jurisdiction of FHWA. These actions **are not** subject to Section 4(f) because:

(1)  These actions do not require an approval from FHWA in order to proceed;
(2)  These actions are not transportation projects;
(3)  These actions are being implemented to address a purpose that is unrelated to the movement of people, goods, and services from one place to another (i.e., a purpose that is not a transportation purpose.)

The City seeks Federal approval from the National Park Service related to the Urban Parks and Recreation Recovery (UPARR) program that encumbers Jackson Park. Section 4.1.10 discusses UPARR requirements in detail. Any proposed action by the National Park Service **is not** subject to the Section 4(f) requirements because:

(1)  The UPARR decision by the National Park Service does not require an approval from FHWA (or any other Federal transportation agency) in order to proceed;
(2)  The UPARR decision is not a transportation project;
(3)  The UPARR decision is being implemented to address a purpose that is unrelated to the movement of people, goods, and services from one place to another (i.e., a purpose that is not a transportation purpose.)

---

[1] The 2018 South Lakefront Framework Plan was presented to the Chicago Park District Board of Commissioners on April 11, 2018. As a framework plan for the CPD, it does not require a formal approval.

The City also seeks Federal approval from the U.S. Army Corps of Engineers (USACE) under Section 404 of the Clean Water Act and Section 14 of the Rivers and Harbors Act of 1899 ("Section 408"). Section 10.2.1 discusses USACE requirements in detail. Any proposed action by the USACE **is not** subject to the Section 4(f) requirements because:

(1) The USACE decisions do not require an approval from FHWA (or any other Federal transportation agency) in order to proceed;
(2) The USACE decision is not a transportation project;
(3) The USACE decision is being implemented to address a purpose that is unrelated to the movement of people, goods, and services from one place to another (i.e., a purpose that is not a transportation purpose.)

The roadway closures may require improvements to other roadways to mitigate traffic impacts. In order to meet the project's Purpose and Need, improvements to bicycle and pedestrian accommodations to improve access and circulation to and within Jackson Park may also be proposed. Improvements to bicycle and pedestrian accommodations to improve access and circulation to and within Jackson Park are consistent with the planning objectives described in the 2018 SLFP. The potential roadway improvements and bicycle and pedestrian accommodations may be funded through the FHWA Federal-Aid Highway Program, which would require approval from FHWA. Therefore, the proposed roadway and bicycle and pedestrian improvements are subject to Section 4(f) because:

(1) In order for the City to receive Federal-Aid funds for these improvements, FHWA must provide its approval;
(2) The roadway and bicycle and pedestrian improvements are transportation projects; and
(3) These improvements are being implemented to address a purpose and need that is related to the movement of people, goods, and services from one place to another.

## 2.2    Study Area

The Study Area is located in Chicago, Illinois, and encompasses Jackson Park. See **Exhibits A-1a, A-1b** and **A-2** in **Appendix A**. Jackson Park is bounded by 67th Street, Stony Island Avenue, 56th Street and Lake Michigan. Jackson Park is served by heavily travelled arterial roadways, including Lake Shore Drive (U.S. Route 41) to the east and Stony Island Avenue to the west. Within Jackson Park, 57th Drive carries east-west traffic from Lake Shore Drive to the Museum of Science and Industry (MSI). South of the Museum, 57th Drive becomes Cornell Drive which carries north-south traffic from the Museum toward park recreational facilities and beyond to residential neighborhoods. These roadway facilities provide an important route for eastbound morning commuters and westbound evening commuters between major commuter expressways and the City's Central Business District. Collector roadways within Jackson Park include Hayes Drive and Marquette Drive. Lake Shore Drive north of 57th Drive and Stony Island Avenue south of 57th Street are on the National Highway System, which consists of roadways that are important to the nation's economy, defense and mobility. The Lakefront Trail is parallel to the east side of Lake Shore Drive and serves recreational users, commuters, and tourists.

A full list of Section 4(f) properties considered under this evaluation is contained in Section 4.0.

# 3.0    Purpose and Need – FHWA Action

## 3.1    Project Need

The Proposed Action relates to the potential roadway improvements that are necessary to address traffic impacts that will result from roadway closures within Jackson Park. The roadway closures do not require any Federal approvals and are therefore considered the baseline condition as well as the No-Action Alternative.

Improvement needs vary within the project area, but fall into two broad categories:

- Accommodate changes in travel patterns
- Improve bicyclist and pedestrian access and circulation

The roadway closures considered in the No-Action Alternative will result in a change in travel patterns in the study area and will redistribute traffic to the surrounding roadway network. An analysis of the Intersection Levels of Service for 2040[2] projected traffic conditions of the No-Action Alternative are shown in **Table 1**.

---

[2] In October 2018, the Chicago Metropolitan Agency for Planning (CMAP) formally adopted their *ON TO 2050* regional plan.  In accordance with the adoption of the new regional plan, year 2050 traffic projections were obtained from CMAP and the traffic analyses were re-evaluated to ensure that traffic impacts would not significantly increase under year 2050 traffic volumes. This sensitivity analysis is discussed in Section 4 of **Appendix J**.  The results of the sensitivity analysis found that while traffic volumes do increase over 2040 levels, the conclusions reached from the 2040 traffic analyses do not change for any of the alternatives under 2050 traffic volumes.  It was therefore concluded that the original 2040 analyses are still valid for environmental review purposes.

| Table 1: 2040 No-Action Alternative Intersection Levels of Service Intersection | Intersection Level of Service and Delay (sec./veh.) | |
|---|---|---|
| | A.M. Peak Hour | P.M. Peak Hour |
| **Lake Shore Drive** | | |
| • Marquette Dr | C (22) | C (24) |
| • Hayes Dr | F (**) | F (**) |
| • Science Dr | B (19) | F (**) |
| • 57th Street | B (13) | F (**) |
| **Stony Island Avenue** | | |
| • 67th St | F (**) | F (**) |
| • Marquette Dr | D (50) | B (15) |
| • 65th Pl | F (**) | C (30) |
| • 64th St * | F (**) | F (**) |
| • 63rd St/Hayes Dr | F (**) | F (**) |
| • 60th St | C (20) | B (12) |
| • Midway Plaisance (EB) | B (13) | C (31) |
| • Midway Plaisance (WB) | F (**) | C (32) |
| • 59th St | F (**) | C (24) |
| • 57th St | F (**) | F (**) |
| • 56th St * | D (32) | D (31) |
| **Cornell Drive/57th Drive** | | |
| • 67th St | Closed | |
| • Marquette Drive | Closed | |
| • Hayes Dr | F (**) | F (**) |
| • Midway Plaisance (EB) | Closed | |
| • 57th St/MSI Drop off | F (**) | D (54) |
| • Hyde Park Blvd | C (23) | B (20) |
| **67th St** | | |
| • East End Ave * | B (12) | B (14) |
| • Cregier Ave * | B (13) | B (13) |
| • Jeffery Ave | B (20) | B (19) |
| • South Shore Dr | B (17) | B (19) |
| **Marquette Dr** | | |
| • Richards Dr (West) | Closed | |
| • Richards Dr (East) | Closed | |
| • La Rabida Entrance | B (14) | A (7) |
| **Richards Drive** | | |
| • Marquette Dr (North) | Closed | |
| • Hayes Dr * | A (9) | B (15) |
| **56th St** | | |
| • Hyde Park Blvd * | B (12) | B (12) |
| • Everett Ave * | A (8) | A (7) |

*Indicates All-way Stop-Controlled Intersection

** Indicates one or more movements operate over capacity (v/c>1). These intersections are listed with a Level of Service F per the Highway Capacity Manual definition.

Under the No-Action Alternative conditions, eleven signalized intersections and one stop sign controlled intersection experience a Level of Service (LOS) F or operate over capacity during either the morning or the evening peak hour, with expected average vehicle delays of 1.5 minutes to as much as 4 minutes. These LOS F intersections are a result of traffic diversions and traffic redistribution caused by the roadway closures. There is a need to improve roadway and intersection facilities to accommodate the future changes in travel patterns and provide acceptable levels of intersection safety and operation.

Jackson Park attracts many local residents, tourists, and recreational users each day as the home of the MSI, an outdoor track and field facility, baseball and softball diamonds, a golf course and driving range, soccer fields, beaches, harbors, gardens, and natural spaces, among many other park amenities.

Improvements along Lake Shore Drive completed in 2001 provided or improved underpasses for east-west bicycle and pedestrian access to the lakefront and the Lakefront Trail at several locations: Marquette Drive, Hayes Drive (63rd Street), 59th Street, 57th Street, and 55th Street (Promontory Point).

Other than the underpasses beneath Lake Shore Drive, no other grade separated bicyclist or pedestrian locations exist within the park. To circulate within the park, users must cross four to six lane heavily travelled roadways, either at signalized intersections or uncontrolled crosswalks, some of which are unmarked.

Crossing locations are typically spaced approximately 700 to 800 feet apart. One of the longest stretches within the park without a crossing location occurs along the six lane section of Cornell Drive between Hayes Drive and the Midway Plaisance, a length of over one-third of a mile (1,760 feet). The Clarence Darrow Bridge, which provides an east-west connection over the Columbia Basin south of the MSI, is in need of repair and is currently closed to all traffic due to its poor condition. Improvements to this structure are currently under preliminary design and environmental review as part of a separate federally funded project. The Clarence Darrow Bridge, currently closed to all pedestrian and bicyclist traffic due to its poor condition, is meant to provide an east-west connection over the Columbia Basin south of the MSI. Due to the current closure of the Clarence Darrow Bridge, pedestrians and bicyclists can only cross roadways at intersections or crosswalks in order to circulate within Jackson Park.

The *Chicago Streets for Cycling Plan 2020* aims to provide safe bicycle accommodations within 0.5 miles of every resident for access to and from homes, businesses and recreational facilities. Neighborhood routes are generally located along residential streets and provide connections between local destinations. Crosstown routes are identified along collector and arterial streets to connect major destinations through a variety of land uses. These routes may include treatments such as barrier or buffer protected on-street bike lanes, striped bike lanes, marked shared bike lanes, or signed routes. Both classes of routes in the *Streets for Cycling Plan* have been identified along roadways bordering and terminating into Jackson Park.

**Mobility Improvements to Support the South Lakefront Framework Plan**

Divvy is Chicago's bike share system, which allows users to rent bicycles for trips such as commuting to work, visiting Chicago's landmarks or enjoying a ride along the lakefront. Bicycles can be picked up or dropped off at any station, typically located at major end points of user routes.

With future plans to provide routes for local residents to Jackson Park, as well as several Divvy stations currently provided in the area, there is a need to provide safe and frequent access points and to improve facility conditions that allow for better circulation within Jackson Park.

Improvements to bicycle and pedestrian accommodations to improve access and circulation to and within Jackson Park are consistent with the planning objectives described in the 2018 SLFP and will enhance bicycle and pedestrian access to and enjoyment of Jackson Park.

## 3.2    Project Purpose

The purpose of the Proposed Action is to (1) address changes in travel patterns resulting from closing roadways in Jackson Park and (2) improve bicycle and pedestrian access and circulation.

# 4.0    Description of Section 4(f) Properties

As noted in Section 1.0, Section 4(f) properties include publicly owned park and recreation areas that are open to the general public, publicly owned wildlife and waterfowl refuges, and public or privately owned historic sites.

In compliance with Section 106 of NHPA, a Historic Property Inventory (HPI)[3] report surveyed properties within an identified Area of Potential Effect (APE)[4] for the project to determine properties that are listed in or considered eligible for the National Register of Historic Places (NRHP). The HPI was reviewed and the determinations concurred upon by the Illinois State Historic Preservation Officer (SHPO) on July 10, 2018. The HPI was amended on January 16, 2020 to include the Chicago Park Boulevard System (CPBS) Historic District, which was listed on the NHRP in December 2018. The HPI was used to identify Section 4(f) historic properties for this Section 4(f) evaluation.

In the study area, there are four Section 4(f) properties that have overlapping boundaries, either in whole or in part. Jackson Park and Midway Plaisance are protected by Section 4(f) because they are both publicly owned parks important for recreation in the community. Combined, Jackson Park and Midway Plaisance are protected by Section 4(f) because they are listed together on the NRHP as the Jackson Park Historic Landscape District and Midway Plaisance. Additionally, the CPBS Historic District, which is 26 miles in length, includes the entire boundary of the Jackson Park Historic Landscape District and Midway Plaisance. Any Section 4(f) use of Jackson Park or the Midway Plaisance also results in a Section 4(f) use of the historic properties of Jackson Park Historic Landscape District and Midway Plaisance and the CPBS Historic District. Detailed descriptions of these Section 4(f) resources are included below. Listed and eligible properties for the NRHP identified in the HPI[3] and the APE limits are shown on **Exhibit B-1**.

Wildlife and waterfowl refuges are defined as properties that are part of the National Wildlife Refuge or other publicly owned land that serve as locations for land conservation or management of endangered species, wildlife and waterfowl resources and their habitats. The U.S. Fish and Wildlife Service (USFWS) is the government agency dedicated to the conservation, protection and enhancement of fish, wildlife and plants, and their habitats and oversees the National Wildlife Refuge System. According to the USFWS database and shown on **Exhibit B-2**, there are no National Wildlife Refuges present within or nearby the project study area.

As part of the 2006 Chicago *Wildlife and Nature Plan*, the Chicago Department of Housing and Economic Development inventoried nearly 100 open space locations to produce the Chicago Nature Areas Directory. The Nature Areas Directory provides information on approximately 3,800 acres of existing and natural habitats and 920 acres of potential habitat restoration sites within the city limits.[5] Three natural areas are

---

[3] https://www.chicago.gov/content/dam/city/depts/dcd/supp_info/jackson/hpi-report.pdf
[4] https://www.chicago.gov/content/dam/city/depts/dcd/supp_info/jackson/2018-03-27-APE_Historical_Overall_halfmile_website.pdf
[5] City of Chicago. Nature Areas Directory.
https://www.cityofchicago.org/city/en/depts/dcd/supp_info/nature_areas_directory.html

located within Jackson Park and are further described in Section 4.1.3. There are no identified natural areas located within the Midway Plaisance.

**Table 2** provides a list of all Section 4(f) properties identified within the study area and NHPA APE boundary. The table indicates if a use of the Section 4(f) property is anticipated by any of the alternatives under consideration; properties which may be used by an alternative are further discussed in this section.

**Table 2: Section 4(f) Properties**

| Property Name | Section 4(f) Property Type | Officials with Jurisdiction (OWJ) | Section 4(f) Use Required (Alternative(s) requiring use) |
|---|---|---|---|
| Jackson Park | Park/Recreational Land | CPD | Yes (Congestion Management Process Strategies, Alternatives 2, 3, 4, 5, 6, 7, 8, 9A, 9B) |
| Midway Plaisance | Park/Recreational Land | CDOT, CPD | Yes (Alternative 9A) |
| Jackson Park Historic Landscape District and Midway Plaisance | Historic Property | SHPO, ACHP | Yes (Congestion Management Process Strategies, Alternatives 2, 3, 4, 5, 6, 7, 8, 9A, 9B) |
| Chicago Park Boulevard System Historic District[6] | Historic Property | SHPO, ACHP | Yes (Congestion Management Process Strategies, Alternatives 1, 2, 3, 4, 5, 6, 7, 8, 9A, 9B) |
| Island Terrace Apartments (6430 S. Stony Island Avenue) | Historic Property | SHPO, ACHP | Yes (Alternative 1) |
| Hyde Park High School/ Academy (6220 S. Stony Island Avenue) | Historic Property | SHPO, ACHP | Yes (Alternative 9A) |
| Jackson Park Terrace Historic District | Historic Property | SHPO, ACHP | Yes (Alternative 1) |
| Stony Island State Savings Bank/ Stony Island Arts Bank (6760 S. Stony Island Avenue) | Historic Property | SHPO, ACHP | No |
| William H. Dexter Three-Flat (1549 E. 65th Place) | Historic Property | SHPO, ACHP | No |
| Hyde Park-Kenwood Historic District (includes part of ICRR viaduct) | Historic Property | SHPO, ACHP | No |

---

[6] Contributing resources of the CPBS Historic District which are not individually listed or eligible for the NRHP that are impacted by the listed alternatives include the mixed-use building at 6450-60 S. Stony Island Avenue/1554-56 E. 65th Street and the apartment building at 6516-6520 S. Stony Island Avenue/1556-1558 E. 65th Place.

| Property Name | Section 4(f) Property Type | Officials with Jurisdiction (OWJ) | Section 4(f) Use Required (Alternative(s) requiring use) |
|---|---|---|---|
| South Shore Country Club Historic District | Historic Property | SHPO, ACHP | No |
| South Shore E. 67th Street Apartment Historic District | Historic Property | SHPO, ACHP | No |
| Residences at 6700 S. Crandon Avenue | Historic Property | SHPO, ACHP | No |
| Shoreline Apartments | Historic Property | SHPO, ACHP | No |
| Residences at 2201-2211 E. 67th Street | Historic Property | SHPO, ACHP | No |
| Leonard L. Graff House (6700 S. Euclid Avenue) | Historic Property | SHPO, ACHP | No |
| Dr. Paul Schutz House (6701 S. Bennett Avenue) | Historic Property | SHPO, ACHP | No |
| Morris N. Fox Three-Flat (6700 S. Bennett Avenue) | Historic Property | SHPO, ACHP | No |
| Residences at 6701 S. Constance Avenue | Historic Property | SHPO, ACHP | No |
| Tower Court Apartments (6700-08 S. Constance Ave./ 1801-11 E. 67th St. / 6701-11 S. Cregier Ave.) | Historic Property | SHPO, ACHP | No |
| Hyde Park East Historic District | Historic Property | SHPO, ACHP | No |
| Bret Harte Elementary School | Historic Property | SHPO, ACHP | No |
| Windermere East Hotel/Apartments | Historic Property | SHPO, ACHP | No |
| Jackson Towers | Historic Property | SHPO, ACHP | No |
| Promontory Apartments | Historic Property | SHPO, ACHP | No |
| The Flamingo on the Lake | Historic Property | SHPO, ACHP | No |
| Jackson Shore Apartments | Historic Property | SHPO, ACHP | No |
| Shoreland Hotel | Historic Property | SHPO, ACHP | No |
| Promontory Point Historic District | Historic Property | SHPO, ACHP | No |
| Helstein House | Historic Property | SHPO, ACHP | No |
| Residence at 5812 S. Blackstone Avenue | Historic Property | SHPO, ACHP | No |
| Stein Building | Historic Property | SHPO, ACHP | No |
| Johnson House | Historic Property | SHPO, ACHP | No |
| Center for Continuing Education (1301-1311 E. 60th Street) | Historic Property | SHPO, ACHP | No |

| Property Name | Section 4(f) Property Type | Officials with Jurisdiction (OWJ) | Section 4(f) Use Required (Alternative(s) requiring use) |
|---|---|---|---|
| Public Administration Building (Chapin Hall) (1313 E. 60th Street) | Historic Property | SHPO, ACHP | No |
| St. Paul's Universalist Church/ Shankman Orthogenic School (1375 E. 60th Street) | Historic Property | SHPO, ACHP | No |
| University of Chicago Power Station (6053 S. Blackstone Street) | Historic Property | SHPO, ACHP | No |
| 62nd Place Firehouse (1405-07 E. 62nd Place) | Historic Property | SHPO, ACHP | No |
| Pridmore & Stanhope – designed Greystone (6243 S. Woodlawn Avenue) | Historic Property | SHPO, ACHP | No |

Exhibits that identify aspects of the Section 4(f) resources can be found in **Appendix B** and are specifically referenced in the following sections.

## 4.1 Jackson Park

Jackson Park is a 551.52 acre park and recreation area that is generally bounded by 67th Street to the south, Stony Island Avenue to the west, 56th Street to the north and Lake Michigan to the east. Roadways within Jackson Park are owned by the Chicago Department of Transportation (CDOT), function as a transportation use, and are not considered Section 4(f) property. The limits of CDOT ownership lie within the roadway footprint from back-of-curb to back-of-curb, but also include the boulevard appurtenances behind the back-of-curb. The remainder is owned by the CPD and classified as Section 4(f) property. The property boundary can be found on **Exhibit B-3**. Any Section 4(f) use within Jackson Park as a park and recreation area would also result in Section 4(f) use of the NRHP listed Jackson Park Historic Landscape District and Midway Plaisance and CPBS Historic District.

### 4.1.1 Officials with Jurisdiction

For Jackson Park, the official(s) with jurisdiction (OWJ) include:

1. The CPD because it is the agency that owns most of and administers Jackson Park and is empowered to represent the agency on matters related to Jackson Park.

### 4.1.2 Park and Recreational Function

Jackson Park includes a variety of recreation areas that are open, public spaces. General areas of active recreation within Jackson Park are highlighted on **Exhibit B-4**. Active recreation uses include an 8-lane outdoor track, five soccer/football fields, two standard baseball diamonds, six softball/junior baseball

diamonds, four basketball courts, twenty-four tennis courts (twenty active courts), two bowling greens, a dog park (uses four of the twenty-four tennis courts), and the Jackson Park Fieldhouse fitness center and gymnasium. Golf facilities, including a driving range and an 18-hole golf course, are highlighted on **Exhibit B-5**.

With a shoreline along Lake Michigan, several water-based recreation opportunities are provided within Jackson Park, including beaches and harbors, as highlighted on **Exhibit B-6**. Along the Lake Michigan shoreline are two public beaches at 59th Street and 63rd Street. The 59th Street Harbor, Jackson Park Inner Harbor and Jackson Park Outer Harbor provide over 365 boat slips. Access points to the Lake Michigan Water Trail for non-motorized boating are provided at the 63rd Street Beach and the Inner Harbor. Other recreational use (such as fishing, canoeing, etc.) of the West Lagoon, East Lagoon, and Columbia Basin is currently restricted.

Passive recreation amenities of Jackson Park are highlighted on **Exhibit B-7**. These uses include seven playgrounds, twelve picnic groves, two formal gardens, one community production garden, and three natural areas (further discussed in Section 4.1.3). The Iowa Building, located northeast of the MSI, is a combination comfort/shelter station with a small open courtyard in the center. Picnic grove locations, accounting for more than half of permitted spaces within the park, are shown on **Exhibit B-8**.

### 4.1.3   Natural Areas

Three natural areas as listed in the Chicago Habitat Directory are located within Jackson Park: the Paul H. Douglas Nature Sanctuary, the Bobolink Meadow, and the 63rd Street Beach Dune. The natural areas are shown on **Exhibit B-9** and further discussed in the following sections. A summary of each location from the Chicago Habitat Directory can be found on **Exhibits B-10a** through **B-10c**.

#### 4.1.3.1        Paul H. Douglas Nature Sanctuary

The Paul H. Douglas Nature Sanctuary generally encompasses the Columbia Basin (south of the MSI), the Wooded Island, habitat islands, and the East and West Lagoons within Jackson Park. It is 57.62 acres in size and contains forest/woodland, riparian/water edge, and aquatic habitats. The sanctuary was named for the Illinois senator who played a vital role in the preservation of the Indiana Dunes National Lakeshore and other important natural areas in the 1960s.

The Paul H. Douglas Nature Sanctuary provides a natural area for native plant and wildlife species as well as a space for local residents and visitors to enjoy these unique features of Jackson Park. Jackson Park plays an important role in the refuge of migratory birds. Migratory birds are abundant during the spring and fall and over 250 species have been sighted. Fish within the lagoons are a source of food for migratory birds. Recreational boating or canoeing is prohibited within the lagoons and Columbia Basin.

Within and surrounding the Wooded Island is an existing trail system for walkers and bicyclists connected by two bridges on the north and south ends of the island. Several overlooks surrounding the lagoons are present for visitors to enjoy views of the water, plants and wildlife. The Japanese Garden, also known as the Osaka Garden or the Garden of the Phoenix, is present on the northeastern side of the Wooded Island. The Japanese Garden is home to a double pond surrounded by a trail system that traverses the pond by

a Moon bridge, as well as a shelter and the Torii Gate at its entrance. Bicycling is not permitted within the Japanese Garden. The Skylanding sculpture, the first large-scale public commission by Yoko Ono, was recently installed on the island in 2016.

The 2018 SLFP, found in Appendix I, proposes enhancements within and adjacent to the Paul H. Douglas Nature Sanctuary, including additional trails within the Osaka Garden on the Wooded Island and a potential bayou connecting the East and West Lagoons to the Jackson Park Inner Harbor. It should be noted the 2018 SLFP is a long-range plan for Jackson and South Shore Cultural Center Parks and funding sources for all of the intended improvements have not been identified. The 2018 SLFP is discussed further in Section 4.1.6.

Vehicular traffic is not permitted within the property itself, however, parking lots on the northeast and southwest corners of the property are available for visitor access. The existing trail system within Jackson Park provides connections surrounding and within the property. Two bridges on the north and south ends of the Wooded Island provide access for visitors to the island.

### 4.1.3.2 Bobolink Meadow

The Bobolink Meadow is located along the eastern edge of the East Lagoon, across from the Paul H. Douglas Nature Sanctuary. The meadow is named after an Illinois grassland bird that once nested in the space. It is 5.39 acres in size and contains prairie/grassland space for wildlife and plants. To the north of the Bobolink Meadow is Bobolink Woods, which provides separation between the meadow and park facilities (i.e. parking lot and tennis courts). The Bobolink Meadow was previously leased by the United States Army as a Nike missile base between 1956 and 1971. Upon removal in 1971, the CPD repurposed the space for native plant species and wildlife.

Bobolink Meadow provides habitat for wildlife and native plants. Recreational use of the space is intended for bird watching, walking, and nature study. Within Bobolink Meadow exists a mulch trail for pedestrian travel. At the southern end of the Bobolink Woods exists an overlook to the East Lagoon.

As part of the 2018 SLFP, the CPD plans for an expansion of the Bobolink Meadow to the east by narrowing the existing driving range that borders the meadow today. Additional trails are proposed within the expanded meadow. The 2018 SLFP is discussed further in Section 4.1.6.

A parking lot serving the Bobolink Meadow is located north of the facility. The parking lot can be accessed via Lake Shore Drive and Science Drive, then continuing south around the Music Court and across the Music Court bridge. Pedestrian trails connect from the parking lot through Bobolink Woods to Bobolink Meadow.

### 4.1.3.3 63rd Street Beach Dune

The Jackson Park 63rd Street Beach Dune is located on the easternmost side of the 63rd Street Beach along Lake Michigan. It is 3.01 acres in size and includes freshwater lake shoreline and dune habitat. The area provides habitat for invertebrates, fishes, and potentially mudpuppies. Native dune grasses including marram grass, little bluestem grass, and prickly pear cactus are in the restored dune area as well as some pockets of the state endangered sea rocket. This natural area is used during the migration seasons by

waterfowl, and several species of shorebirds have been observed here including the Tricolored Heron and the Federally endangered Piping Plover. [7]

The Casino Building of the 1893 World's Columbian Exposition was located on the 63rd Street Beach Dune. An adjacent Casino Pier was constructed as a breakwater. The Casino Building no longer exists, but the Casino Pier has been rebuilt several times and remains in place today.

All encompassed in the 63rd Street Beach area is the natural area for the Beach Dune, the 63rd Street Bathing Pavilion, a playground, and public beach area. Access to the Lake Michigan Water Trail for non-motorized water recreation is located just west of the dune area. The 63rd Street Beach is also a partial site for the World Basketball Festival (estimated 5,250 in attendance in 2014). This festival does not impact the natural area of the dune. See **Exhibit B-17**.

A parking lot east of the Lake Shore Drive and Hayes Drive intersection allows for vehicular access to the facility. The Lakefront Trail is present along the eastern edge of the site, allowing for north-south pedestrian and bicyclist access. An underpass north of the Lake Shore Drive and Hayes Drive intersection provides east-west access to the beach from Jackson Park.

### 4.1.4 Access

As shown on **Exhibits A-1a** and **A-1b**, Jackson Park is located on the South Side of Chicago, Illinois. Primary vehicular access routes include Lake Shore Drive (U.S. Route 41) and Stony Island Avenue which connect Jackson Park to the City's Central Business District to the north and the Chicago Skyway (Interstate 90), a major expressway to the south. As mentioned in Section 2.2, 57th Drive acts as a primary route carrying traffic from Lake Shore Drive to Cornell Drive, a 6-lane principal arterial, through Jackson Park. Collector roadways within the park include Hayes Drive and Marquette Drive. Visitors to Jackson Park can access both free and paid surface parking lots. MSI visitors have access to an underground parking structure as well as nearby metered parking lots. Free street parking is primarily provided along Stony Island Avenue, Hayes Drive, and Marquette Drive. Existing bridges carry Lake Shore Drive over the 59th Street Harbor Inlet and Jackson Park Harbor as well as Hayes Drive over the northern portion of the Jackson Park Inner Harbor. A map of the existing roadway configuration, parking facilities, and roadway bridges is provided on **Exhibit B-11**.

The Chicago Transit Authority (CTA) provides transit access to Jackson Park via local and express bus routes as well as the Metra Electric Railway line. See **Exhibit B-12**. The Metra-Electric line station is located west of Jackson Park along the North Midway Plaisance at 59th Street. The "Jeffery Jump" express bus line (J14) provides non-stop service from a stop at Jeffery Drive/67th Street to Columbus Drive/11th Street, just south of downtown. Nine other CTA routes provide access to, within, and surrounding the park.

Bicyclist and pedestrian access and circulation facilities are shown on **Exhibit B-13**. The Lakefront Trail, a regional trail within the City, is located east of Lake Shore Drive. Pedestrian underpasses at 57th Drive, 59th Street, 63rd Street, and Marquette Drive provide access for users between the park and lakeside. Other grade separated pedestrian facilities include the Music Court Bridge, the Clarence Darrow Bridge, and

---

[7] Chicago Park District. https://www.chicagoparkdistrict.com/parks-facilities/jackson-park-natural-areas

bridges to the north and south of the Wooded Island. The Clarence Darrow Bridge is currently closed to all traffic due to its poor condition. Improvements to this structure are currently under preliminary design and environmental review as part of a separate federally funded project. Several other trails and bicycle routes are present to provide circulation within the park. Several at-grade crossings, both marked and unmarked, of the park and surrounding roadway network are present. **Exhibit B-13** shows locations where bicycle racks are present, as well as bicycle share stations, part of the City's DIVVY bicycle share program.

## 4.1.5   Usage[8]

Jackson Park experiences visitors from all over the globe as well as regional and nearby locals to its attractions and institutions.  **Exhibit B-14** shows global use areas within Jackson Park, specifically the MSI, which attracted 1.5 million visitors in 2016. City and regional use areas of Jackson Park are primarily centered on recreation, including golf, boating, birding, and basketball, as highlighted on **Exhibit B-15**. La Rabida Children's Hospital also attracts city and regional use to its facility. Local use areas of Jackson Park are highlighted on **Exhibit B-16**. These areas include picnic groves, beaches, harbors, gardens, playgrounds, and athletic facilities.

Jackson Park is a host to special events throughout the year, including the Chicago Half Marathon (estimated 13,000 in attendance in 2017), the Chosen Few music festival (estimated 30,000 in attendance in 2017), the World Basketball Festival (estimated 5,250 in attendance in 2014), and Bike the Drive (estimated 20,000 in attendance in 2015). Facilities and areas used for these events can be seen on **Exhibit B-17**.

Jackson Park is host to a large number of CPD program participants, including 150 in seasonal sports, over 500 in extended and early bird camps, 450 in basketball and 870 junior lifeguards. Greater use of the active recreation facilities is observed due to the flexibility of playing fields. Nearby schools and neighborhoods are frequent users of facilities along Stony Island Avenue. In 2016, over 24,000 rounds of golf were played at the Jackson Park Golf Course, accounting for approximately 15% of golf rounds played in Chicago parks that year. Usage of the harbors within the park varies with harbor occupancies ranging from approximately 40% (Jackson Park Inner Harbor) to over 80% (Jackson Park Outer Harbor). Membership is not required to dock in the harbors. Users that are yacht club members reside in various areas within the City limits, surrounding Illinois counties, and neighboring states.

Open recreation spaces adjacent to active recreation spaces allow for multi-generational use within Jackson Park. Over 1,500 Natural Area Stewards volunteered to maintain and restore natural areas in Jackson Park in 2016.  The Wooded Island experiences over 1,000 youth visitors through CPD programs each year.

---

[8] *South Lakefront Framework Plan*. Chicago Park District, 2018. **Appendix I**.

### 4.1.6    Existing and Planned Facilities

Existing facilities within Jackson Park are depicted on **Exhibit B-18a** (as mapped in the 2018 SLFP). A summary table of the existing facilities, including their location and description, is included in **Table B-18b**.

As noted in Section 2.0, the CPD presented an update of the SLFP to the CPD Board of Commissioners in April 11, 2018. During the creation of the framework plan, a public engagement program was conducted to ensure the plan addressed the community's desires and needs. The proposed vision for these parks is available in the 2018 SLFP on the SLFP website at www.southlakefrontplan.com and shown on **Exhibit B-19**.

The roadway, bicycle and pedestrian improvements under consideration for the Proposed Action were developed to be consistent with the plans in the 2018 SLFP. The proposed roadway improvements are intended to support the future vision of Jackson Park while accommodating traffic needs as a result of the roadway closures.  It should be noted the 2018 SLFP is a long-range plan for Jackson and South Shore Cultural Center Parks and funding sources for all of the intended improvements have not been identified.

### 4.1.7    Relationship to Similar Properties in Vicinity

Jackson Park has distinct advantage of its lakeside location. It is the third largest park by acreage within the limits of the CPD, following fellow lakeside locations, Lincoln Park and Burnham Park.

At several points throughout its history, plans for Jackson Park have been considered in conjunction with other parks on the South Side of Chicago. In the original 1871 South Park Plan, Jackson Park was considered the Eastern Division of the three-park system which also encompassed what is now known as Washington Park and the Midway Plaisance. The site of the 1893 World's Columbian Exposition included both Jackson Park and the Midway Plaisance. These two parks together are included as one listing on the NRHP.

In more recent history, planning efforts by the CPD have included Jackson Park within a system of South Side parks which are collectively considered in the SLFP. The SLFP was originally authorized in 1999 and included a vision for Jackson Park and South Shore Cultural Center Park and their function as a whole. The 2018 SLFP provided an update on recommendations for Jackson Park and South Shore Cultural Center Park which includes the construction of the OPC and the roadway adjustments described herein.

### 4.1.8    Elements Affecting Ownership

Two institutions within Jackson Park currently have formal agreements with the CPD to occupy land: the MSI (21.21 acres) and La Rabida Children's Hospital (2.83 acres). The limits of the agreement boundaries for these properties are shown on **Exhibit B-20**. Elsewhere within Jackson Park, various agreements with the CPD are in place for specific facilities, such as the Jackson Park Yacht Club and South Shores Yacht Club.

### 4.1.9   Other Characteristics

CPD has received funding sources from both the National Park Service and the USACE for improvements within Jackson Park. These include grant funds from UPARR program, administered by the National Park Service, and funds from the Great Lakes Fishery and Ecosystem Restoration (GLFER) program, administered by USACE. Description of these funds are programs are described below.

During the early 1980's, Jackson Park received UPARR program funds from the Heritage Conservation and Recreation Service (now transferred to the National Park Service).

A provision of the UPARR Act is meant to keep the recreation areas or facilities receiving UPARR grant assistance in recreation use unless certain conditions are met to replace that recreational opportunity (formerly Section 1010 of the Act; now 54 U.S.C. §200507). That provision states the following:

> "No property improved or developed with assistance under this chapter shall, without the approval of the Secretary [delegated to the National Park Service], be converted to other than public recreation uses. The Secretary shall approve such a conversion only if the Secretary finds it to be in accord with the then-current local park and recreation recovery action program and only on such conditions as the Secretary considers necessary to ensure the provision of adequate recreation properties and opportunities of reasonably equivalent location and usefulness."

Additionally, UPARR conversion regulations were developed under 36 C.F.R. §72.72. The National Park Service must review and approve changes of use to assure compliance with legal requirements as well as the terms and conditions of the grant. 36 C.F.R. §72.72(d).  The Section 1010 boundary that encompasses the limits of the UPARR restriction can be found on **Exhibit B-21**.

As part of an effort to restore important bird, fish and wildlife habitat within the natural areas of Jackson Park, the CPD and the USACE entered into an agreement to initiate a 5-year ecological restoration project authorized through the Water Resources Development Act, Section 506, GLFER. The project aims to create or enhance nearly 147 acres of native habitat within the park and along the Lake Michigan shoreline. The project includes 24 acres of new natural areas and the installation of over 600,000 native plants that will increase the biological diversity of the park and provide critical habitat and beautiful scenery for park visitors. Additionally, to improve access and circulation throughout the park, the project includes installation of overlooks along the water's edge, new crushed stone pathways, and the reconstruction of existing pathways on Wooded Island. Project design started in May 2014 and construction began in January 2015. Improvements surrounding the lagoons, and the areas north of Hayes Drive and west of Lake Shore Drive are complete. In general, all the areas north of Hayes Drive have been planted, along with the removal of invasive plant species. The areas south of Hayes Drive have had the invasive plant species removed, but proposed replacement plantings have not been installed. The GLFER project boundary is shown on **Exhibit B-22**.

Flooding problems within the park have not been identified. Various shoreline types are present along Lake Michigan including beaches, breakwaters, and revetment walls. The condition of these shoreline types varies within the study area.

Jackson Park also accounts for a large tree population within the City. Tree surveys were conducted adjacent to areas of contemplated improvements; approximate 51% of the park was surveyed and counted over 5,000 trees, see **Exhibit B-22a**. These trees serve multiple purposes for Jackson Park as recreational resources for users, habitat for wildlife, and contributors to the historic landscape of the park.

## 4.2    Midway Plaisance

The Midway Plaisance is an 83 acre park and recreational area generally bounded by 60th Street to the south, Stony Island Avenue to the east, 59th Street to the north, and Cottage Grove to the west. The boundary can be found on **Exhibit B-23**.

### 4.2.1    Officials with Jurisdiction

For the Midway Plaisance, the OWJ include:

1. CDOT because it (through the City of Chicago) owns and administers the Midway Plaisance and is empowered to represent the agency on matters related to the Midway Plaisance.
2. The CPD because it manages recreational functions and activities within the Midway Plaisance.

### 4.2.2    Park and Recreational Function

Recreation areas within the Midway Plaisance include temporary soccer/football fields within the center of the Midway Plaisance between Cottage Grove Avenue and Dorchester Avenue. A refrigerated ice/skating rink and warming hut is used year-round and located between Ellis Avenue and Woodlawn Avenue. The CPD manages and programs these recreational areas. The remainder of the Midway Plaisance is open space that includes the University of Chicago's Winter Garden, trails, and monuments. These facilities are not under the ownership of the University; these gardens were a collaboration between the CPD and the University. See **Exhibit B-24**.

### 4.2.3    Access and Usage

As shown on **Exhibits A-1a** and **A-1b**, the Midway Plaisance is located on the South Side of Chicago, Illinois. It connects Washington Park to the west and Jackson Park to the east. Primary vehicular access routes to and through the Midway Plaisance include a network of connected principal arterials. The North Midway Plaisance and South Midway Plaisance are two-lane, one-way roadways that connect to Payne Drive/Morgan Drive through Washington Park and Cornell Drive through Jackson Park.    Payne Drive/Morgan Drive provides east-west access to the Jane Adams (I-90/I-94) Expressway and Cornell Drive provides north-south access to Stony Island Avenue and the Chicago Skyway (I-90). Woodlawn Avenue, a collector roadway, and Cottage Grove Avenue, a minor arterial, provide north-south access for local traffic to the Midway Plaisance.

Visitors to Midway Plaisance can access free on-street parking along both sides of the North and South Midway Plaisance roadways. Free on-street parking is also provided on bordering and surrounding roadways to the park, including 59th Street, 60th Street, Ingleside Avenue, Ellis Avenue, University Avenue, Woodlawn Avenue, Dorchester Avenue, Blackstone Avenue, and Stony Island Avenue. The Metra Electric railway, which crosses through the park, is carried via an overpass viaduct. Existing roadway bridges carry Ellis Avenue, Woodlawn Avenue, and Dorchester Avenue. A map of the existing roadway configuration, parking facilities, and bridges is provided on **Exhibit B-25**.

The CTA provides a part time transit service (Route 2) through the Midway Plaisance along 60th Street. Hyde Park bus routes (Route 171, 172, and 192) circulate through the Midway Plaisance along Ellis Avenue, 60th Street, Dorchester Avenue, and 59th Street. Several bus routes operation along Stony Island Avenue to the east (Routes 6, 15, and 28) and Cottage Grove Avenue to the west (Route 4). The Metra Electric commuter rail provides daily access at the 59th Street station to downtown. See existing transit accommodations on **Exhibit B-26**.

Bicyclist and pedestrian access and circulation facilities are shown on **Exhibit B-27**. Several paths and sidewalks are provided within and adjacent to the Midway Plaisance to provide access to facilities and the surrounding University of Chicago campus buildings. According to Chicago's *Streets for Cycling 2020*, bicycle routes are planned along North and South Midway Plaisance to connect to future routes along Stony Island Avenue and Best Drive. Pedestrian and bicyclist bridges are present along Ellis Avenue, Woodlawn Avenue, and Dorchester Avenue. **Exhibit B-27** shows locations where bicycle racks and DIVVY bike share stations are present.

Regional visitors to the Midway Plaisance would primarily be drawn by the adjacent University of Chicago facilities. Use of the facilities primarily consists of City and local visitors that would participate in recreation activities on the athletic fields or visit the ice/skating rink.

### 4.2.4   Existing and Planned Facilities

Existing facilities within the Midway Plaisance are depicted on **Exhibit B-28a**. A summary table of the existing facilities, including their location and description, is included in **Table B-28b**. Adjacent to, but outside the limits of the Midway Plaisance, are several facilities for the University of Chicago to the north and south.  The presence of the adjacent University facilities draws students and visitors to the Midway Plaisance.

In 2000, coordination between the CPD, the University of Chicago, and local community members resulted in the publishing of the Midway Plaisance Master Plan, as shown on **Exhibit B-29** (available on the Midway Plaisance Advisory Council website, http://midwaypac.org/visit-the-park/history).

To fulfill requirements of the UPARR Act, administered by the National Park Service, the east end of the Midway Plaisance is planned to be utilized for recreational replacement land as a result of lost recreation use in Jackson Park from the construction of the OPC. A conceptual plan for the site is shown on **Exhibit B-29a**.  The City will engage in a public process to discuss the design in detail once the National Park Service federal review process is complete. The National Park Service action is not subject to Section 4(f) requirements because it does not require FHWA approval nor is it a transportation project with a transportation purpose.

### 4.2.5   Relationship to Similar Properties in Vicinity

Similar to Jackson Park, the Midway Plaisance has been designed in consideration of a system of parks on the South Side of Chicago. It has historically acted as the connection between Jackson Park (originally known as the Eastern Division) and Washington Park (originally known as the Western Division). Plans for

the Midway Plaisance were included in Frederick Law Olmsted's 1871 Original Plan for South Park. Along with Jackson Park, it was host to the 1893 World's Columbian Exposition.

The Midway Plaisance is included with Jackson Park as one listing on the NRHP.

### 4.2.6    Elements Affecting Ownership

There are no identified elements that affect the ownership of the Midway Plaisance. Recreation programs within the Midway Plaisance, such as uses of the athletic fields, are coordinated through the CPD. The CPD independently manages and programs events within the Midway Plaisance.


## 4.3    Jackson Park Historic Landscape District and Midway Plaisance

Jackson Park Historic Landscape District and Midway Plaisance was nominated for the NRHP in 1972. Noted areas of significance include: landscape architecture, architecture, science, sculpture, and urban planning which were evaluated to establish a period of significance from 1875 to 1968. The limits of CDOT ownership lie within the roadway footprint from back-of-curb to back-of-curb, but also include the boulevard appurtenances behind the back-of-curb. The remainder is owned by the CPD (aside from the 19.3 acres comprising the OPC site owned by the City of Chicago) and classified as Section 4(f) property. The property boundary can be found on **Exhibit B-3**. Any Section 4(f) use within Jackson Park or Midway Plaisance would result in Section 4(f) use of the NRHP listed Jackson Park Historic Landscape District and Midway Plaisance.

### 4.3.1    Officials with Jurisdiction

For the Jackson Park Historic Landscape District and Midway Plaisance, the OWJ include:

1. The SHPO because the Jackson Park Historic Landscape District and Midway Plaisance is listed on the NRHP.
2. The Advisory Council on Historic Preservation (ACHP) because the Jackson Park Historic Landscape District and Midway Plaisance is listed on the NRHP and the ACHP is participating in Section 106 consultation.

### 4.3.2    Historic Significance[9]

Jackson Park and the Midway Plaisance are historic properties that are jointly listed on the NRHP as the Jackson Park Historic Landscape District and Midway Plaisance. Jackson Park, the Midway Plaisance, and Washington Park together were originally conceived as a single landscape known as the South Park, with the Midway Plaisance as a linear stretch of park between Jackson on the east and Washington Park on the west. Soon after the Illinois Legislature established the South Park Commission in 1869 to create and maintain the site, the newly-appointed commissioners hired Frederick Law Olmsted, Sr. (1822-1903) and

---

[9] Historic Property Identification Report: Federal Undertakings In and Adjacent to Jackson Park. May 2018.

his partner Calvert Vaux, the nationally renowned designers of New York's Central Park, to lay out the entire 1,055-acre park.

### 4.3.2.1  Jackson Park

Prior to its development, the Jackson Park site was marked by its flat, boggy conditions.  Although discouraging to Olmstead, he believed that Lake Michigan, the "one object of scenery near Chicago of special grandeur or sublimity", was a tremendous asset.  Water provided the unifying theme for Olmsted & Vaux's original plan.  The designers sought to transform the Eastern Division's marshy ground into a series of interior waterways that would connect with the lake and provide a magnificent landscape ideal for boating.  Olmsted & Vaux completed the original plan for South Park in 1871; however, problems with land acquisition and the loss of legal documents in the Great Fire delayed implementation of the Eastern Division.

Only minimal improvements had been made when the commissioners officially named the park in honor of President Andrew Jackson in 1880.  That still remained the case a decade later when Chicago was selected as the site for the 1893 World's Columbian Exposition.  Olmsted helped identify the site for the fairgrounds.  Stressing the importance of Lake Michigan as the backdrop for the 1893 World's Columbian Exposition and recognizing that Jackson Park remained largely unimproved, Olmsted suggested building the exposition there.  He then worked closely with architects Daniel H. Burnham and John Wellborn Root on what would become his second plan for Jackson Park. They designed a gleaming campus of classical buildings with a formal Court of Honor basin, interconnected lagoons, and a natural-looking Wooded Island. As most of the monumental buildings and sculptures were made of white-washed plaster, the fairgrounds became known as the "White City."

More than 27 million visitors attended the 1893 World's Columbian Exposition in Jackson Park over a six-month period in 1893.  After it closed, Olmsted's firm—then Olmsted, Olmsted & Eliot—began redesigning the site to return it to park.  Remaining true to the unrealized original plan, this scheme included an expansive interlinking lagoon system that preserved the Wooded Island.  Among the few remaining features of the 1893 World's Columbian Exposition were the Fine Arts Palace (later the Museum of Science and Industry) and the Wooded Island's Japanese Pavilion, known as the Ho-o-den.

Jackson Park continued to evolve. In 1899, the South Park Commissioners installed the first public golf course west of the Alleghenies there. To celebrate the 25th anniversary of the 1893 World's Columbian Exposition and Illinois' centennial of statehood, a smaller bronze version of the fair's iconic Statue of the Republic was erected near the golf course in 1918. The following year, commissioners expanded the park with a new beach following recommendations by the Olmsted Brothers.  Made of landfill, the new 63rd Street Beach opened in 1919 with an impressive towered bathing pavilion designed by South Park Commission in-house architects.

In 1934, the Great Depression spurred the consolidation of the South Park Commission and 21 other independent park agencies into the CPD.  George T. Donoghue (1884–1962), a professional engineer who had headed the South Park Commission since 1926, became the CPD's General Superintendent.  He and other South Park Commission professionals had recently been working on restoring Jackson Park's historic Ho-o-den and designing an adjacent Japanese garden.  The CPD received Works Progress Administration (WPA) funding to complete these projects and undertake several others in the park, including the creation of the Perennial Garden, construction of two combination shelter/comfort stations, maintenance/service

yard building, and one comfort station.  WPA funds also supported several roadway widenings and other traffic-related projects, meant to accommodate Chicago's increasing numbers of automobiles.

Although Jackson Park changed little during the World War II era, after the war, the park was substantially impacted by major events and projects.  In 1946, the Ho-o-den was destroyed by fire and the garden soon fell into a state of deterioration.  Between the mid-1950s and 1960, the federal government installed a Nike missile site in the park and, to make up for lost recreational space, the CPD filled in part of Jackson Park's historic lagoon system to create ball fields.  The CPD also erected a Modern field house designed by consulting engineer Ralph Burke.

Between the 1960s and the end of the 20th century, community activists requested additional sports and recreational facilities in Jackson Park. These organizations and individuals inspired the creation of the Paul H. Douglas Nature Sanctuary, the rehabilitation of the Japanese Garden and helped establish the Bobolink Meadow on the former Nike Missile Site.  Many roadway improvements were made during this time including a substantial improvement to S. Cornell Drive, changing it from a gently curving 40-foot wide roadway to an 80-foot widened and straightened roadway.

The 21st century brought additional park improvements.  The CPD completed an $8 million restoration of the 63rd Street Bathing Pavilion in 2000, and the nearby Casino Pier underwent major improvements several years later. CDOT and Illinois Department of Transportation (IDOT) worked together on an ambitious South Lake Shore Drive Reconstruction Project that included new medians, barriers, and underpasses, improved ADA accessibility, new bicycle paths, and reconfigured lanes stretching from E. 23rd Street to E. 67th Street.

### 4.3.2.2  Midway Plaisance

With Lake Michigan as a backdrop, Olmsted & Vaux used water as the guiding theme for the Midway Plaisance original plan of 1871. With the Eastern Division (Jackson Park) fronting onto Lake Michigan, the designers envisioned an intricate system of planted lagoons that would flow into a circular turning basin at the east end of the Midway Plaisance.  From here, water would flow into a long canal down the center of the Midway, and link with a small lagoon called the Mere in the Western Division (Washington Park).

Olmsted & Vaux named this center landscape the Midway Plaisance. The French word "plaisance," which roughly translates to "pleasure," is generally associated with boating. In addition to providing for boating, the broad linear park space would serve as a pleasure drive for visitors in carriages, on horseback, or on foot. Despite the importance of the canal to the overall design of the park system, its construction was put on hold due to financial problems after the Great Fire of 1871.

Two decades later, Olmsted helped select Jackson Park and the Midway Plaisance as the site for the 1893 World's Columbian Exposition. The Illinois Central Railroad (ICRR), which would play an important role by bringing thousands of visitors to the fairgrounds, constructed a new elevated viaduct over the Midway to minimize congestion for crowds at street level.

Olmsted worked closely with architect Daniel H. Burnham to transform the largely unfinished park into the gleaming "White City." The fair authorities decided to use the Midway Plaisance as the site of amusements, restaurants, foreign villages, and ethnological exhibits.  As these attractions were allowed

to charge visitors additional ticket fees, they helped the fair become a financial success. The most iconic attraction on the Midway was the world's first Ferris wheel, which stood 264 feet tall. Each twenty-minute ride made two revolutions and cost fifty cents per customer (the same as a full day admission ticket to the fair).

More than 27 million people visited the fair during its sixth month season in 1893. After the 1893 World's Columbian Exposition closed, the South Park Commissioners hired Olmsted's firm, then known as Olmsted, Olmsted & Eliot, to transform the fairgrounds back into useable park. Emphasizing the success of the electric launches, gondolas, and other types of boats at the exposition, Olmsted recommended that his vision for the Midway Plaisance canal should move forward. The commissioners agreed and instructed him to create a revised plan that would include the cost of the gondolas. They formally adopted the plan in 1894.

The Park Commissioners allocated funds to begin an initial phase of construction while negotiations were underway with the ICRR for permission to extend the waterway across the railroad right-of-way. Some digging took place, leaving a depressed trench at the center of the Midway. But, at the time, transforming the Jackson Park fairgrounds back into usable park was the priority, and the canal was becoming an expensive proposition. In addition to excavation costs, the project would require a series of locks to address the extreme differences in the elevations of the park lagoons and fluctuating water levels of Lake Michigan. Along with initial trenching, the commissioners installed sewers, drives, walks, and bridle paths; reconditioned the wide center lawn; and planted more than 500 elm trees in straight rows lining the driveway.

By the turn of the 20th century, the Midway Plaisance was a popular spot for ice skating and sledding in the winters and strolling and bicycling in the summers. Architect Henry Ives Cobb had created the original plan for the adjacent University of Chicago campus, and designed some of the institution's earliest Gothic buildings. Coach Amos Alonzo Stagg had his track team train for relay races on the Midway.

In 1908, preeminent sculptor Lorado Taft (1860-1936), who lived in the neighborhood and worked from his nearby Midway Studio, envisioned an ambitious plan to beautify the Midway Plaisance with a central canal that would be crossed by sculptural bridges and flanked by a pair of monumental fountains. Taft's 1922 *Fountain of Time* (at the western end of the Midway Plaisance within Washington Park) was the only part of his plan ever realized. A decade later, community members dedicated a commemorative bench and sundial just east of the Midway viaduct honoring two important South Side women, Flora Sylvester Cheney (1872–1929), a political activist, reformer, and legislator, and her longtime friend Katherine Hancock Goode (1872–1928), one of the first women to serve in the Illinois Senate.

After the consolidation of the CPD in 1934, further improvements to the Midway Plaisance and Jackson Park, between S. Stony Island Avenue and S. Cornell Drive, included the creation of the Perennial Garden on the site of what had been intended as the circular turning basin. Over the next several decades, the Midway Plaisance underwent few changes, other than the installation of the *Thomas Masaryk Monument* in 1955. The Midway gained its final sculpture in 1976, when Lincoln Park's *Carl von Linne Monument* was relocated here.

In the 21st century, the Midway Plaisance has benefitted from additional improvements.  In 2000, the CPD built a refrigerated ice-skating rink, in the center of the Midway. The 2005 Allison Davis Garden, designed by landscape architect Peter Lindsay Schaudt and located on the west end of the Midway, mirrors the historic Perennial Garden at the east end (within Jackson Park). It pays homage to renowned social anthropologist Allison Davis (1902 – 1983), a pioneering scholar and the University of Chicago's first tenured African-American professor.  A few years later, the CPD and University of Chicago also worked together on two additional gardens on the north side of the Midway Plaisance, the Winter Garden and the Readers' Garden.  The Midway Crossings, a 2011 streetscape project, features bridge-like crossings with enhanced lighting which create the allusion of water in the center of the Midway, although the canal has never existed.

### 4.3.3  Access and Usage

Accessibility and usage of Jackson Park and the Midway Plaisance are described in Sections 4.1.4 and 4.1.5 and Section 4.2.3 respectively.

### 4.3.4  Existing and Planned Facilities

Existing and planned facilities in Jackson Park and the Midway Plaisance are described in Section 4.1.6 and Section 4.2.4 respectively.

### 4.3.5  Relationship to Similar Properties in Vicinity

The historic relationship between Jackson Park, the Midway Plaisance, and Washington Park are discussed in Sections 4.1.7 and 4.2.5.

### 4.3.6  Elements Affecting Ownership

Elements affecting ownership in Jackson Park are discussed in Section 4.1.8.  There are no elements that affect ownership of the Midway Plaisance.

### 4.3.7  Other Characteristics

The CPD has received funding sources from both the National Park Service and the USACE for improvements within Jackson Park. These include grant funds from the UPARR program, administered by the National Park Service, and funds from the GLFER program, administered by USACE. Descriptions of these funds are discussed in Section 4.1.9.

## 4.4     Island Terrace Apartments

The Island Terrace Apartments are located at 6430 S. Stony Island Avenue in the Woodlawn neighborhood of Chicago, Illinois. This property was deemed individually eligible for listing on the NRHP under Criteria A and C as evaluated in the HPI and concurred upon by the SHPO.  The property is privately owned by Island Terrace, LLC and can been seen on **Exhibit B-30**.

### 4.4.1   Officials with Jurisdiction

For the Island Terrace Apartments, the OWJ include:

1. The Illinois SHPO because the Island Terrace Apartments are considered eligible for listing on the NRHP.
2. ACHP because the Island Terrace Apartments are considered eligible for listing on the NRHP and the ACHP is participating in Section 106 consultation.

### 4.4.2   Property Description

The Island Terrace Apartment building is a 21-story property that contains 241 one-, two-, and three-bedroom units for low and moderate income residents. Community amenities on the property include: a business center, an underground gated parking garage, a community room, a fitness center, and a laundry facility. [10] The modernistic building was built in 1969 and designed by the architectural firm Dubin, Dubin, Black & Moutoussamy.

To the west of the property are recreational fields associated with the nearby Mount Carmel High School. North of the Island Terrace Apartments is a vacant lot. To the south is a two-story mixed-use commercial and residential property. Jackson Park and the Jackson Park Fieldhouse are located across Stony Island Avenue from the property.

The Island Terrace Apartments can be seen below in **Photo 1**.

---

[10] Island Terrace Apartments. http://www.islandterraceliving.com/community.



*Photo 1: Island Terrace Apartments, 6430 S. Stony Island Avenue,*
*view looking southwest from Stony Island Avenue of the north and east facades*

### 4.4.3   Historic Significance[11]

The history behind the development of the Island Terrace Apartments not only captures the role of the federal government in modernizing the nation's housing stock, it also tells the story of one of the first African-American architects to become a partner in a major firm.

John Moutoussamy, a talented African-American architect, struggled through several jobs in the early 1950s before he was hired at PACE Associates in 1956. While working on the Lawless Gardens, a mixed community of low-rise and high-rise buildings that would go on to win numerous awards, Moutossamy developed a relationship with John Black and later joined his firm. He was named a partner in 1966. Throughout his career at the firm, he formed important relationships through the firm's connections to eventually become an active board member for the Art Institute and the Zoning Board of Appeals.

During the housing crisis occurring in Chicago in the mid-1960s, the Island Terrace Apartments was the first project by Dubin, Dubin, Black & Moutoussamy built to take advantage of Section 236 of the Fair Housing Act of 1968, which provided mortgage financing for apartment developers. It was the first federally-subsidized high-rise near Jackson Park and it overcame the cultural bias of high-rise living by providing this opportunity to African-Americans. It was designed to bring modern, urban lifestyle to moderate-income residents; Dubin, Dubin, Black & Moutoussamy understood the Federal Housing

---

[11] Historic Property Identification Report: Federal Undertakings in and Adjacent to Jackson Park. Island Terrace Apartments Historic Resource Survey Form. February 2018.

Authority restrictions on room sizes, materials, and many other features which helped them to succeed in their ability to provide quality housing.

The Island Terrace Apartments was seen as a solution to Chicago's South Side affordable housing crisis and adapted the views that luxury high-rise apartments were only available to the wealthy. It was constructed during an important point in history for the nation's housing crisis and marked an important time for the Dubin, Dubin, Black & Moutoussamy firm.

### 4.4.4   Access

Two driveway access points along Stony Island Avenue provide vehicular access to the property's gated parking facilities. Bus stops for CTA Routes 6, 15, and 28 are located at the corners of Stony Island Avenue/65th Street and Stony Island Avenue/64th Street for access to public transportation. A public sidewalk is present along the west side of Stony Island Avenue for bicyclist and pedestrian access to the property. The entrance to the property from the sidewalk is on the east side of the building.

### 4.4.5   Relationship to Similar Properties

In its immediate block, the Island Terrace Apartments is a dominant high-rise that stands over 15 stories higher than adjacent buildings. Properties of similar height in the nearby neighborhoods include the Jackson Park Terrace high-rise apartments (2 blocks to the north), Vista Homes (5 blocks to the north), and Good Shepard Manor (5 blocks to the south).

The Island Terrace Apartments were the first of several properties developed to bring high-rise living to the affordable housing community. Many other new high-rise developments were constructed in the surrounding area during the 1960s, including the Oglesby Tower Apartments (6700 S. Oglesby Avenue), Crandon House Apartments (6701 S. Crandon Avenue), and the Quadrangle House (6700 S. South Shore Drive).

### 4.4.6   Other Characteristics

As it was originally intended for, the Island Terrace Apartments provides housing for low-income residents. Today, the property is entered into a project-based Section 8 rental assistance (PBRA) program with the U.S. Department of Housing and Urban Development (HUD) in order to maintain affordable rental opportunities for low-income persons[12].  This program controls rental costs for low-income tenants by requiring tenants to contribute to rental costs based on 30% of their household income. As part of this arrangement, Island Terrace, LLC receives rental subsidies for some or all of its apartments.

---

[12] Affordable Housing Online. Island Terrace Apartments. https://affordablehousingonline.com/housing-search/Illinois/Chicago/Island-Terrace-Apartments/10008758

## 4.5    Jackson Park Terrace Historic District

The Jackson Park Terrace Historic District is generally bound by 60th Street/E. Public Way to the north, the Metra Electric Railway to the west, 61st Street to the south, and Stony Island Avenue to the east in the Woodlawn neighborhood of Chicago, Illinois. The complex was constructed in 1974 by Whitley-Whitley Architects and Planners. This historic district was deemed eligible as part of a historic district under Criterion A and C for listing on the NRHP as evaluated in the HPI and concurred upon by the SHPO.  The property is privately owned by Jackson Parkside Apartments and can been seen on **Exhibit B-31**.

### 4.5.1    Officials with Jurisdiction

For the Jackson Park Terrace Historic District, the OWJ include:

1.  The SHPO because the Jackson Park Terrace Historic District is considered eligible for listing on the NRHP.
2.  The ACHP because the Jackson Park Terrace Historic District is considered eligible for listing on the NRHP and the ACHP is participating in Section 106 consultation.

### 4.5.2    Property Description

The Jackson Park Terrace rental housing complex is approximately 7.8 acres in total size and includes a 19-story residential high-rise and 24 three-story apartment buildings. Trees and open space on the property give the complex a park-like feel. The community complex is bordered by the Metra-Electric Railway to the west, open space/public parking to the north, residential properties to the south, and Jackson Park to the east.

The complex is divided into four quadrants by Public Way and Harper Avenue. Public Way wraps around the northern and western perimeter of the complex. The center east-west roadway is also named Public Way. Harper Avenue is the north-south dividing roadway. These roadways are generally only used to circulate within the housing complex; they are not throughways for traffic nor do they provide routes for cut-through traffic. On-street parking is available along each of the roadways within the complex. An off-street parking lot is available in the northwest corner of the southeast quadrant.

The 24 three-story buildings are irregularly grouped into two or three building clusters which connect either by touching corners or a second story covering above a connecting sidewalk. Paved walkways are present throughout the complex and provide connections from entryways to parking spaces and roadway sidewalks. Although the complex buildings appear from street level to be two-stories high, some first floor apartments are sunken below grade. One of the 24 three-story complex buildings is shown in **Photo 2**.



*Photo 2: Jackson Park Terrace Housing Complex, three-story complex building,
looking west from E. Public Way toward north façade*

The 19-story Jackson Parkside Apartments high-rise is located in the northern half of the southwest quadrant. A three-story extension of the high-rise also containing apartment units is located to the south. There are entrances on the north and south ends of the building which access a first floor lobby. A small terrace with a raised lawn, circular drive and vegetation is near the south entrance and extension. The high-rise building can be seen below in **Photo 3**.



*Photo 3: Jackson Park Terrace Housing Complex, 19-story Jackson Parkside Apartment high-rise, looking northwest from Harper Avenue toward south façade*

### 4.5.3   Historic Significance[13]

The 322-unit mixed-income community of Jackson Park Terrace represented a major achievement in the rebuilding and revitalization of Chicago's Woodlawn neighborhood after years of deterioration and neglect.

Redevelopment plans by the nearby University of Chicago called for displacement of thousands of Woodlawn residents in the early 1960s. The Woodlawn Organization protested such plans and negotiated with the Chicago Department of Urban Renewal (DUR) to advance low and moderate income housing developments. Together with the Woodlawn Community Development Corporation (WCDC), The Woodlawn Organization-WCDC received funding to plan the Jackson Park Terrace community in 1974 and hired the African-American owned firm Whitley-Whitley Architects and Planners. During its planning and development stages, Jackson Park Terrace received funds from the Illinois Housing Development Authority to maintain affordable housing opportunities for low-income residents. The range of units offered for notably lower rental rates, as well as moderate finishes and amenities, rendered Jackson Park Terrace a major success.

The Jackson Park Terrace community was and continues to be an important symbol of community empowerment and provider of affordable housing. It was a product of an important time period in the local Woodlawn history, including the wave of urban renewal, history of African-Americans, and the Civil

---

[13] Historic Property Identification Report: Federal Undertakings in and Adjacent to Jackson Park. Jackson Park Terrace Historic Resource Survey Form. February 2018.

Rights Movement. It was planned and design by the prominent African-American led architecture firm, Whitley-Whitley and embodies the characteristics of a distinctive type, period, design, and artistic value.

### 4.5.4   Access

An access driveway from the center Public Way allows vehicles to enter the complex from Stony Island Avenue. Recently, driveway access from the northern Public Way to Stony Island Avenue was closed and has been replaced by a community gardening area. Several sidewalk connections in the complex connect entryways to public sidewalks and parking lots. Public sidewalks are provided along the west side of Stony Island Avenue and the north side of 61st Street, bordering the complex. Bus stops for CTA Routes 6, 15, and 28 are located at the corners of Stony Island Avenue/61st Street and Stony Island Avenue/S. Midway Plaisance for access to public transportation. Connections to CTA routes 2, 59, and 170 are also provided at Stony Island Avenue/S. Midway Plaisance. A transit stop at 59th Street/N. Midway Plaisance for the Metra-Electric Railway is located one block north of the complex.

### 4.5.5   Relationship to Similar Properties

The Jackson Park Terrace three-story buildings are similar in height and size to their immediate surrounding residences, both on the east and west sides of the Metra-Electric Railway and to the residents south of the property. The 19-story high rise is similar in height to the Vista Homes residences in Hyde Park, just one block north of the Jackson Park Terrace community and the Park Shore East Apartment high-rise, two block to the south also in Woodlawn.

Similar to other properties in the Woodlawn neighborhood developed in the 1960s and 1970s, Jackson Park Terrace community provides housing for low to moderate income residents.

### 4.5.6   Other Characteristics

The Jackson Park Terrace is entered into a PBRA program with HUD in order to maintain affordable rental opportunities for low-income persons[14]. This program controls rental costs for low-income tenants by requiring tenants to contribute to rental costs based on 30% of their household income. As part of this arrangement, Jackson Parkside Apartments receives rental subsidies for some of its apartments. The Jackson Park Terrace also receives funding through the Low Income Housing Tax Credit program[15]. Through this program, afforded to those whose household earning is less than 60% of the area median income, rental rates are controlled to not exceed the tax credit maximum as designated for that area.

---

[14] Affordable Housing Online. Jackson Park Terrace. https://affordablehousingonline.com/housing-search/Illinois/Chicago/Jackson-Park-Terrace/10008731

[15] U.S. Department of Housing and Urban Development. LITC Database. https://lihtc.huduser.gov/

## 4.6    Hyde Park High School/Academy

### 4.6.1    Officials with Jurisdiction

For the Hyde Park High School/Academy, the OWJ include:

1. The SHPO because Hyde Park High School/Academy is considered eligible for listing on the NRHP.
2. The ACHP because Hyde Park High School/Academy is considered eligible for listing on the NRHP and the ACHP is participating in Section 106 consultation.

### 4.6.2    Property Description

The high school is located on Stony Island Avenue across the street from Jackson Park and is bordered by E. 62nd Street to the north, E. 63rd Street to the south, and S. Harper Avenue to the west. The building is three stories, with an additional gabled fourth-story.

The building includes 348,478 square feet of space which houses 87 classrooms, 11 science labs, 7 Technology labs, technical labs, teleconference lab, two radio/TV studios, computer recycling center, 2 gymnasiums, media resource center, fitness room, health/dance room, and a full service cafeteria. Access to a baseball diamond, track, football/soccer fields is located across the street within Jackson Park.

The Hyde Park High School/Academy can be seen below in **Photo 4.**



*Photo 4: Hyde Park High School/Academy looking Southwest from S. Stony Island Avenue*

### 4.6.3   Historic Significance[16]

In 1911, the large new Hyde Park High School building was built after much overcrowding at the S. Kimbark Avenue location. The new high school was among Arthur F. Hussander's first major projects after his appointment as "acting architect." Located just west of Jackson Park and south of the Midway Plaisance, the large stately public building soon became a visual landmark for the entire South Side. As students from a broad geographic area including Woodlawn, Kenwood, and Hyde Park attended, the school also played an important role in the social histories of those community areas.

Enrollment grew throughout the 1930s to a student body of more than 4,000. To help alleviate overcrowding, an addition was completed at the south side of the structure in 1939. (This addition was the work of Board Architect John C. Christensen and his staff.)

Since its early history, the student body had included some percentage of African-American pupils. Those numbers grew in the late 1940s and early 1950s, at a time when Chicago Public School administrators, Parent Teacher Association representatives, and community members considered Hyde Park High School a model of harmonious racial integration. In 1959, Reverend

Carl Fuqua, executive secretary of the NAACP's Chicago Branch, announced that Melba Patillo would attend summer school at Hyde Park High School. Patillo, was one of "nine Negro children who were integrated into Little Rock's Central High School in September of 1957."

Rather than following the Supreme Court's order to integrate the school, Arkansas's governor closed the school down. The NAACP underwrote her costs to spend the summer in Chicago and attend the high school so that she could meet graduation requirements and attend college.

By the late 1960s, Hyde Park High School's racial balance changed. With African American families moving into Woodlawn and the opening of Kenwood High School approximately 1.5 miles to the north, Hyde Park High School became a "predominantly African American high school." In the mid- 1970s, CPS designated the school as a magnet and renamed it Hyde Park Career Academy. Twenty years later, the focus shifted to college preparation and an International Baccalaureate program was developed at the school.

Throughout its history, Hyde Park High School has maintained high academic standards and been known for excellence in its arts and sports programs. A recent website developed by Dan

Holder, a former Chicago teacher and assistant principal, reports that an impressive number of noteworthy Chicagoans attended Hyde Park High School. Famous alumni of the school, both black and white, made important contributions to many fields. Examples include: Illinois Poet Laureate Gwendolyn Brooks (1917 – 2000), early aviator Amelia Earhart (1897 – ?), Olympic swimmer and diver Jane Fauntz (1910 – 1989), musician Minnie Riperton (1947 – 1979), Nobel prize-winning economist Paul Samuelson (1915 – 2009) and musician Herbie Hancock (b. 1940).

---

[16] Historic Property Identification Report: Federal Undertakings in and Adjacent to Jackson Park. Hyde Park High School/Academy Historic Resource Survey Form. February 2018.

### 4.6.4   Access

Two access driveways on Harper Avenue allows vehicles to enter the parking lot for the school. Several sidewalk connections in the complex connect entryways to public sidewalks and parking lots. Public sidewalks are provided along the west side of Stony Island Avenue, the north side of 63rd Street, the east side of Harper Avenue, and the south side of 62nd Street.  Bus stops for CTA Routes 6, 15, and 28 are located at the corners of Stony Island Avenue/62nd Street and Stony Island Avenue/63rd Street.  A bus stop for CTA Route 63 is also located at Stony Island Avenue/63rd Street.   A transit stop at 63rd Street/Dorchester Avenue for the Metra-Electric Railway and the Metra-South Shore Line is located two blocks west of the school.

## 4.7   Chicago Park Boulevard System (CPBS) Historic District

The CPBS Historic District is a 26-mile stretch of contiguous parks and boulevards including parks, squares, boulevards and significant adjoining properties. The CPBS Historic District roughly spans from W. Logan Boulevard on the north and the Kennedy Expressway to E. 67th Street and S. South Shore Drive on the south as shown in **Exhibit A-4**. The district includes 19 boulevards, 6 squares, 8 parks, and 2,096 adjacent buildings from the period of significance that face the parks, boulevards and squares and contribute to the significance of the system. The CPBS Historic District covers a vast geographic area and includes a total of 2,136 contributing resources.

The portion of the CPBS Historic District potentially impacted by the proposed improvements generally includes 59th and 60th Streets between Cottage Grove and Stony Island Avenues, streets that surround Jackson Park (56th, 67th and Stony Island), as well as the entirety of the Jackson Park Historic Landscape District and Midway Plaisance. Roadways within the CPBS Historic District are already in transportation use and therefore any changes to those roadways are not considered a Section 4(f) use, so long as the changes occur within the existing roadway footprint.

### 4.7.1   Officials with Jurisdiction

For the CPBS Historic District, the OWJ include:

1. The SHPO because the CPBS Historic District is listed on the NRHP.
2. The ACHP because the CPBS Historic District is listed on the NRHP and the ACHP is participating in Section 106 consultation.

### 4.7.2   Property Description

The CPBS Historic District is an extensive park, square and boulevard system that extends approximately through the south and west sides of the City.  The portion of the CPBS that is directly affected by the proposed action includes Jackson Park, Midway Plaisance, and contributing properties along Stony Island Ave.  Detailed park and recreation functions of Jackson Park and Midway Plaisance are described in Section 4.1.2 and Section 4.2.2.

Contributing resources which are not individually listed or eligible for the NRHP include the mixed-use building at 6450-60 S. Stony Island Avenue/1554-56 E. 65th Street and the apartment building at 6516-6520 S. Stony Island Avenue/1556-1558 E. 65th Place.

The mixed-use building at 6450-60 S. Stony Island Avenue/1554-56 E. 65th Street is a three-story corner structure that includes storefront spaces on the first story and apartments above them. The housing units are known today as Chaney-Braggs Apartments and managed by the Woodlawn East Community and Neighbor non-profit organization. The property includes a total of 24-affordable units with 17 one-bedroom apartments, 2 two-bedroom apartments, and 4 single-occupancy units. The building was designed by architect William H. Lautz and constructed in 1925.

The apartment building at 6516-6520 S. Stony Island Avenue/1556-1558 E. 65th Place is a three-and-a-half story corner structure. Today, the multi-family structure contains 15 rental apartments. Most are two-bedroom units and there are some one-bedroom units. The building was designed by architects Ernest. J. Ohrenstein & Edward G. Hild and constructed in 1916.

Both buildings are located south of the Island Terrace Apartments, on the west side of Stony Island Ave. There is a vacant lot between the properties and a vacant lot south of 6516-6520 S. Stony Island Ave. The Jackson Park Fieldhouse is located across S. Stony Island Avenue to the east of the properties.



*Mixed-use building at 6450-60 S. Stony Island Avenue looking west from S. Stony Island Avenue towards the east façade*



*Apartment building at 6516-6520 S. Stony Island Avenue/1556-1558 E. 65th Place.*

### 4.7.3   Historic Significance[17]

The CPBS historic district is nationally significant as the first comprehensive system of greenways for a major city in the United States and is associated with many prominent early landscape architects. The system was created to foster healthful, livable neighborhoods and to spur residential development in what was then the outskirts of the City. the district is also significant at the local level for Architecture, representing the types and styles of buildings constructed in Chicago from 1869 through 1942, and for Landscape Architecture as a designed landscape that expresses a comprehensive artistic quality unlike any other in Chicago. The architectural streetscapes along the boulevards are identified in the nomination as a "frame" to the landscaped medians and parks upon which they sit, and in turn these landscaped spaces were the focal points for their neighborhoods. The buildings framing the CPBS Historic District exhibit a wide variety of architectural styles that distinguish them from buildings outside the CPBS and that express the stylistic development of Chicago.

The period of significance for the district is 1869 to 1942 and encompasses the years legislation was passed establishing the system through the end of substantial improvements to the system. As noted in its nomination, the CPBS Historic District "goes beyond the story of the parks alone and beyond the narrative of a single segment of Chicago's continuous park and boulevard system. It attempts to view the city's park and boulevard system more holistically." The NRHP nomination for the district notes that the integrity of individual resources and landscape features varies, but the historic district overall retains a high level of integrity.

As noted in Section 4.0, Jackson Park and the Midway Plaisance are historic properties that are jointly listed on the NRHP as the Jackson Park Historic Landscape District and Midway Plaisance. The Jackson Park Historic Landscape District and Midway Plaisance is a contributing resource to the CPBS Historic District.

---

[17] Historic Property Identification Report: Federal Undertakings In and Adjacent to Jackson Park, May 2018. Addendum to the Section 106 Historic Properties Identification Report, January 2020.

Detailed descriptions of the historic significance of Jackson Park and Midway Plaisance are provided in Section 4.2.3.

Both contributing properties at 6450-60 S. Stony Island Avenue/1554-56 E. 65th Street and 6516-20 S. Stony Island Avenue/1556-1558 E. 65th Place are significant due to their architectural style and ties to development of and social history of the Woodlawn community.

Woodlawn had a sparse population when it was first annexed to Chicago in 1889. But, shortly thereafter, when nearby Jackson Park was selected as the site of the World's Columbian Exposition, the community grew quite rapidly. The area had attracted thousands of new residents by the time the World's Columbian Exposition opened in 1893. The area didn't lose any allure in the years after the exposition closed.

By the 1910s, Stony Island Avenue had become a major north-south route for all types of traffic, extending from E. 57th Street for many miles, deep into the South Side. It was soon lined with stores, banks, businesses and low-rise apartment buildings. The real estate activity along the street was a precursor to the boom that soon happened in the 1920s in both Woodlawn and to the southeast in the South Shore community.

The building at 6516-6520 S. Stony Island Avenue/1556-1558 E. 65th Place was built by South Sider J.E. Metzger as an investment, spending an estimated $45,000 on it. He hired architects Ohrenstein & Hild to design the building. The duo of Ernest J. Ohrenstein (1867-1930) and Edward Garfield Hild (1885-1935) produced a large collection of buildings in the 1920s, including a Craftsman style bungalow at 3649 N. Avers in the Villa District (listed on the NRHP). The building has handsome primary facades fronting onto both Stony Island Avenue and E. 65th Place. The deep red of the brick facades has attractive trim of contrasting pale cream of limestone ornamentation. The cream-colored brick is laid in simple geometric patterns that outline the windows and provide accents at the corners and in the parapets. Two entrance doors on the S. Stony Island Avenue with accompanying sidelights and transom windows stand within exuberant brick and limestone surrounds.

The building at 6450-60 S. Stony Island Avenue/1554-56 E. 65th Street is a fine example of the Classic Revival style designed by the talented, but largely forgotten, Chicago architect William H. Lautz (1891-1973). Lautz designed many single and multi-family dwellings and commercial buildings, including a number of structures listed on the NRHP in the South Park Manor Historic District and other districts. The building was built by South Shore mason A.C. Larson in 1925 and completed in April 1926 at an estimated cost of $150,000. With a prominent curve at its northeast corner, the tan brick building is enlivened with fine limestone details.

### 4.7.4  Access and Usage

The CPBS Historic District is an extensive park, square and boulevard system that extends through the south and west sides of the City. The portion of the CPBS Historic District that is directly affected by the proposed action includes Jackson Park, Midway Plaisance, and contributing properties along Stony Island

Ave. The access and usage features of these two park resources are described in detail in Section 4.1.4 and 4.1.5 for Jackson Park, and in Section 4.2.3 for the Midway Plaisance.

Contributing properties can be accessed by automobiles via S. Stony Island Avenue, E. 65th Place, and E. 65th Place. Bus stops for CTA Routes 6, 15, and 28 are located at the corners of Stony Island Avenue/65th Street and Stony Island Avenue/64th Street for access to public transportation. A public sidewalk is present along the west side of Stony Island Avenue for bicyclist and pedestrian access to the properties.

### 4.7.5    Existing and Planned Facilities

The CPBS Historic District is an extensive park, square and boulevard system that extends through the south and west sides of the City. The portions of the CPBS Historic District that are potentially impacted by the proposed action includes Jackson Park, Midway Plaisance, and contributing properties along Stony Island Ave. The existing and planned facilities of the two park resources are described in detail in Section 4.1.6 for Jackson Park, and in Section 4.2.4 for the Midway Plaisance. There are no known facility plans for the contributing properties along S. Stony Island Avenue.

### 4.7.6    Relationship to Similar Properties in the Vicinity

The CPBS Historic District consists of eight parks and six squares connected by 19 different boulevard sections that form an arc through the south and west sides of the City. Jackson Park and the Midway Plaisance have been designed in consideration of this system of parks, squares and boulevards. Further details regarding Jackson Park and the Midway Plaisance is included in Sections 4.1.7 and 4.2.5, respectively.

The contributing property at 6450-60 S. Stony Island Avenue remains as one of the few low-rise mixed-use buildings found along S. Stony Island Avenue today. Historically, there were many similar buildings with storefronts on the street level and flats above. One of the only other remaining examples on Stony Island is located several blocks to the south at 6922-26 S. Stony Island Avenue. Built in 1928, that structure is also three stories tall and has a prominent curve at the corner of its two primary facades.

Historically, many well-designed brick low-rise apartment buildings similar to the contributing property at 6516-6520 S. Stony Island Avenue existed along S. Stony Island Avenue and nearby side streets such as E. 65th Place, E.65th Street, and E. Marquette Road. However, many of these structures were demolished in the 1980s and \1990s. The sites of most of these early 20th century structures are now vacant lots. While very few low-rise apartment buildings remain on S. Stony Island Ave. today, there are several on nearby side streets. These include the building directly west of this property, a 1911 low-rise at 6516-6520 S. Stony Island Avenue which is a contributing resource to the CPBS Historic District, and the William H. Dexter three-flat, which was built in 1912, across the street at 1549 E. 65th Street and is listed on the NRHP.

### 4.7.7   Elements Affecting Ownership

The elements affecting ownership of the portion of the CPBS Historic District within the project limits are the same as those for Jackson Park and Midway Plaisance (see Sections 4.1.8 and 4.2.6). The remaining CPBS Historic District may have other "elements affecting ownership" but these elements are not relevant to this 4(f) analysis because there is no proposed use outside of Jackson Park and Midway Plaisance, which are coincident with the CPBS Historic District.

# 5.0   Avoidance Alternatives

A document titled "Alternatives to be Carried Forward" (ATBCF) is included in **Appendix C** and includes additional detail for each alternative in this Section 4(f) evaluation. The Section 4(f) evaluation summarizes information from the ATBCF, and updates it where necessary, to describe the avoidance alternatives considered (described in Section 5.0) and additional alternatives evaluated (described in Section 6.0).

The ATBCF was prepared in April 2018 to evaluate alternatives and coordinate with resource and regulatory agencies as required by Illinois' National Environmental Policy Act (NEPA) NEPA-404[18] merger process. In Illinois, the FHWA and IDOT follow a NEPA-404 merger process when an Environmental Assessment also requires an individual section 404 permit. The NEPA-404 merger process ensures the resource and regulatory agencies can provide input on purpose and need, alternatives to be carried forward, and the preferred alternative prior to any decisions being finalized. The ATBCF documents the alternatives that were evaluated, alternatives that were dismissed and the rationale for dismissal, and the alternatives that will be studied in more detail in the NEPA process. The ATBCF continues to inform and support the FHWA's decision making process although the National Park Service is serving as the lead for the NEPA process.

Alternatives that avoided permanently incorporating Section 4(f) land into a transportation facility were considered first and are further discussed in Sections 5.1 and 5.2. The avoidance alternatives included:

- No-Action Alternative
- Congestion Management Process Strategies

These alternatives consider construction of the OPC site and roadway closures as previously approved by the City, but do not include modification of the existing roadway footprint. Because the project area is surrounded by 4(f) properties, these are the only avoidance alternatives. See **Appendix B** for all 4(f) properties in the project area.

## 5.1   No-Action Alternative

The No-Action Alternative[19] considers future conditions that assume the following:

- The OPC site is constructed within Jackson Park as proposed by the City. The OPC site can be found on **Exhibit A-2**. No FHWA approval is required for the OPC site to be constructed.
- The City closes roadways within Jackson Park, Chicago, Illinois to implement a portion of the SLFP, as described in Section 2.1 and depicted on **Exhibit A-3**. No FHWA approval is required for the roadways to be closed by the City.

---

[18] Federal Highway Administration, Illinois Division, NEPA/404 Merger Process, https://www.fhwa.dot.gov/ildiv/docs/nepa-404_merger_process_information.pdf
[19] The "No-Action" Alternative for the Section 4(f) Evaluation is consistent with Alternative B in the Environmental Assessment (EA). Alternative B in the EA is FHWA's No-Action Alternative for purposes of the NEPA evaluation. The EA was made available to the public for review on September 28, 2020 under the lead of the National Park Service.

- No roadway improvements are made in response to changed conditions caused by the roadway closures.

The No-Action Alternative is a condition in which regional improvements anticipated as part of the 2040 Regional Transportation Plan[20] are implemented, but no project specific improvements are undertaken. It provides a baseline condition by which all other alternatives are measured to determine if the benefits of a particular Build alternative outweigh the impacts that would result from that alternative. The no-build assumptions include local land use and land management decisions made by the City to close roadways and locate OPC in Jackson Park, which is within the City's authority to do. These local land use and land management decisions described in the "No-Action" alternative are consistent with the 2018 SLFP, which was developed with a coordinated public engagement effort by CPD to determine the vision for Jackson Park and South Shore Cultural Center. These local land use and land management decisions are outside of FHWA's control or jurisdiction and are pre-requisites for FHWA to take action for the transportation project. Without the decision to close roads by the City, there is no need for FHWA to consider action to mitigate traffic impacts from road closures.

### 5.1.1 Evaluation

While the No-Action Alternative would not convert any Section 4(f) land to a transportation use, nor would it involve any potential temporary use of Section 4(f) properties, it does not provide sufficient pedestrian and bicyclist accommodations to improve access and circulation to and within Jackson Park. See **Exhibit 4** in **Appendix C**. Unacceptable vehicular operational performance within the study area results from the No-Action Alternative.

The results of the traffic operational analysis for the No-Action Alternative are shown on **Exhibit 6** in **Appendix C** and summarized in **Table 3**. As shown in the table, eleven signalized intersections and a stop sign controlled intersection within the roadway network experience a LOS F and/or operate over capacity during either the morning or the evening peak hour. Roadways experiencing the greatest traffic impacts include Stony Island Avenue during the A.M. peak hour and Lake Shore Drive during the P.M. peak hour. Stony Island Avenue currently has only one travel lane in each direction north of 65th Street, and does not have available capacity for the amount of anticipated Cornell Drive traffic diversions during the A.M. peak hour. Similarly, Lake Shore Drive under existing conditions only has two southbound travel lanes south of 57th Drive, and the diverted Cornell Drive traffic during the P.M. peak hour exceeds the available capacity of the roadway.

---

[20] In October 2018, the Chicago Metropolitan Agency for Planning (CMAP) formally adopted their *ON TO 2050* regional plan. In accordance with the adoption of the new regional plan, year 2050 traffic projections were obtained from CMAP and the traffic analyses were re-evaluated to ensure that traffic impacts would not significantly increase under year 2050 traffic volumes. This sensitivity analysis is discussed in Section 4 of **Appendix J**. The results of the sensitivity analysis found that while traffic volumes do increase over 2040 levels, the conclusions reached from the 2040 traffic analyses do not change for any of the alternatives under 2050 traffic volumes. It was therefore concluded that the original 2040 analyses are still valid for environmental review purposes.

The traffic analysis results indicate that under the No-Action Alternative, many intersections will experience considerable increases in delay and operate over capacity, resulting in unacceptable operational performance within the study area as shown in **Table 3**. Paired with insufficient pedestrian and bicyclist accommodations within Jackson Park, the No-Action Alternative is not feasible and prudent because it (1) compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need; and (2) it results in unacceptable safety or operational problems. The No-Action Alternative does not meet the project's Purpose and Need and it would not be reasonable to continue with the project considering the stated Purpose and Need.

**Table 3: 2040 No-Action Alternative Intersection Levels of Service**

| Intersection | Intersection Level of Service and Delay (sec./veh.) | |
| --- | --- | --- |
| | A.M. Peak Hour | P.M. Peak Hour |
| Lake Shore Drive | | |
| • Marquette Dr | C (22) | C (24) |
| • Hayes Dr | F (**) | F (**) |
| • Science Dr | B (19) | F (**) |
| • 57th Street | B (13) | F (**) |
| Stony Island Avenue | | |
| • 67th St | F (**) | F (**) |
| • Marquette Dr | D (50) | B (15) |
| • 65th Pl | F (**) | C (30) |
| • 64th St * | F* (**) | F* (**) |
| • 63rd St/Hayes Dr | F (**) | F (**) |
| • 60th St | C (20) | B (12) |
| • Midway Plaisance (EB) | B (13) | C (31) |
| • Midway Plaisance (WB) | F (**) | C (32) |
| • 59th St | F (**) | C (24) |
| • 57th St | F (**) | F (**) |
| • 56th St * | D (32) | D (31) |
| Cornell Drive/57th Drive | | |
| • 67th St | Closed | |
| • Marquette Drive | Closed | |
| • Hayes Dr | F (**) | F (**) |
| • Midway Plaisance (EB) | Closed | |
| • 57th St/MSI Drop off | F (**) | D (54) |
| • Hyde Park Blvd | C (23) | B (20) |
| 67th St | | |
| • East End Ave * | B (12) | B (14) |
| • Cregier Ave * | B (13) | B (13) |
| • Jeffery Ave | B (20) | B (19) |
| • South Shore Dr | B (17) | B (19) |

**Mobility Improvements to Support the South Lakefront Framework Plan**

| Intersection | Intersection Level of Service and Delay (sec./veh.) | |
|---|---|---|
| | A.M. Peak Hour | P.M. Peak Hour |
| Marquette Dr | | |
| • Richards Dr (West) | *Closed* | |
| • Richards Dr (East) | *Closed* | |
| • La Rabida Entrance | B (14) | A (7) |
| Richards Drive | | |
| • Marquette Dr (North) | *Closed* | |
| • Hayes Dr * | A (9) | B (15) |
| 56th St | | |
| • Hyde Park Blvd * | B (12) | B (12) |
| • Everett Ave * | A (8) | A (7) |

*Indicates All-way Stop-Controlled Intersection

** Indicates one or more movements operate over capacity (v/c>1). These intersections are listed with a Level of Service F per the Highway Capacity Manual definition.

## 5.2    Congestion Management Process Strategies

Congestion Management Process (CMP) Strategies involve ways to reduce congestion in a transportation network that do not involve major construction and do not provide additional through capacity for single-occupancy vehicles. Improvements as part of this alternative consist of re-timing and/or modernization of signalized intersections within the study area. Proposed trails and underpass locations are provided within Jackson Park, in addition to curb extensions along Stony Island Avenue to enhance access to the park. See **Exhibit 7** in **Appendix C**.

### 5.2.1    Evaluation

CMP Strategies does not permanently convert Section 4(f) land to a transportation use, but involves 2.7 acres of temporary use of Section 4(f) land to construct trail connections along Cornell Drive and Hayes Drive as well as pedestrian underpasses at the following locations: Cornell Drive/Hayes Drive intersection, along Hayes Drive between Richards Drive and Lake Shore Drive, along Jeffery Drive between Marquette Drive and 67th Street, and the South Shore Drive/67th Street intersection.

The results of the traffic operational analysis for the CMP Alternative are shown on **Exhibit 9** in **Appendix C** and summarized in **Table 4**.  As shown in the table, the CMP strategies had limited effectiveness in improving traffic operations, as eleven intersections within the roadway network experience a LOS F and/or operate over capacity during either the morning or the evening peak hour.

**Table 4: 2040 CMP Alternative Intersection Levels of Service**

| Intersection | Intersection Level of Service and Delay (sec./veh.) | |
| --- | --- | --- |
| | A.M. Peak Hour | P.M. Peak Hour |
| **Lake Shore Drive** | | |
| • Marquette Dr | C (35) | C (24) |
| • Hayes Dr | C (35) | F (**) |
| • Science Dr | A (3) | F (**) |
| • 57th Dr | B (17) | F (**) |
| **Stony Island Avenue** | | |
| • 67th St | F (**) | F (**) |
| • Marquette Dr | F (**) | B (15) |
| • 65th Pl | D (46) | C (30) |
| • 64th St | F* (**) | F* (**) |
| • 63rd St/Hayes Dr | F (**) | F (**) |
| • 60th St | Right-in/Right-out | |
| • S Midway Plaisance (EB) | C (22) | B (18) |
| • N Midway Plaisance (WB) | F (**) | C (31) |
| • 59th St | Right-in/Right-out | |
| • 57th St | F (**) | F (**) |
| • 56th St * | D (32) | D (30) |
| **Cornell Drive/57th Drive** | | |
| • 67th St | Closed | |
| • Marquette Drive | Closed | |
| • Hayes Dr | A (2) | F(**) |
| • S Midway Plaisance (EB) | Closed | |
| • 57th St/MSI Drop off | F (**) | D (53) |
| • Hyde Park Blvd | C (24) | B (20) |
| **67th St** | | |
| • East End Ave * | B (12) | B (14) |
| • Cregier Ave * | B (13) | B (13) |
| • Jeffery Ave | C (20) | B (19) |
| • South Shore Dr | B (10) | B (19) |
| **Marquette Dr** | | |
| • Richards Dr (West) | Closed | |
| • Richards Dr (East) | Closed | |
| • La Rabida Entrance | A (6) | A (7) |
| **Richards Drive** | | |
| • Marquette Dr (North) | Closed | |
| • Hayes Dr | A* (9) | B* (14) |
| **56th St** | | |
| • Hyde Park Blvd * | B (12) | B (12) |

**Mobility Improvements to Support the South Lakefront Framework Plan**

| Intersection | Intersection Level of Service and Delay (sec./veh.) | |
|---|---|---|
| | A.M. Peak Hour | P.M. Peak Hour |
| • Everett Ave * | A (8) | A (7) |

*Indicates All-way Stop-Controlled Intersection

** Indicates one or more movements operate over capacity (v/c>1). These intersections are listed with a Level of Service F per the Highway Capacity Manual definition.

CMP Strategies Alternative is not feasible and prudent because it (1) compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need; and (2) it results in unacceptable safety or operational problems.

There is no feasible and prudent avoidance alternative to the use of land from the Section 4(f) property(ies).

# 6.0    Additional Alternatives Evaluated

As Section 5.0 demonstrated, there are no feasible and prudent alternatives that avoid the use of Section 4(f) resources. Additional alternatives were evaluated and considered in an effort to minimize Section 4(f) impacts and meet the project's Purpose and Need.

The following alternatives are analyzed in this section:

- Alternative 1 – Alternative Avoiding Parkland Use and Widen Stony Island Avenue
- Alternative 2 – Operational Changes to Roadways
- Alternative 3 – Mobility Improvement – Widen Lake Shore Drive
- Alternative 4 – Mobility Improvement – Widen Stony Island Avenue
- Alternative 5 – Mobility Improvement – Reconfigure Hayes Drive
- Alternative 6 – Mobility Improvement – Widen Lake Shore Drive and Widen Stony Island Avenue
- Alternative 7 – Mobility Improvement – Widen Lake Shore Drive and Reconfigure Hayes Drive
- Alternative 8 – Mobility Improvement – Widen Stony Island Avenue Reconfigure Hayes Drive
- Alternative 9 – Mobility Improvement – Widen Lake Shore Drive/Widen Stony Island Avenue /Reconfigure Hayes Drive

The alternative analysis aimed to incrementally improve operations and available transportation capacity in order to minimize permanent use of Section 4(f) resources.  As part of the analysis, intersections within the project area were evaluated for a LOS, which is a quantitative concept developed to characterize degrees of congestion as perceived by motorists. Letter designations A through F have been correlated to quantitative measures based on the amount of delay experienced. Level A represents the best conditions and Level F the worst. Per the *Highway Capacity Manual*, an intersection is also considered to operate at an LOS F if one or more movements operate over capacity, which is characterized by more vehicles arriving at the intersection than can be served by a specific movement during the analysis period. This is commonly evaluated using the volume-to-capacity (v/c) ratio. By definition, a movement exceeds its available capacity when the v/c ratio exceeds a value of one. Intersections operating at a LOS F are considered to have a failing LOS.

The subsequent sections describe the alternatives evaluated to minimize Section 4(f) impacts and meet the project's Purpose and Need.  To evaluate each alternative, potential permanent uses were calculated for each alternative, along with conceptual level potential temporary use.

## 6.1.1    Alternative 1 – Alternative Avoiding Parkland Use and Widen Stony Island Avenue

Alternative 1 aims to avoid any permanent or temporary Section 4(f) use of Jackson Park, the Midway Plaisance, and the Jackson Park Historic Landscape District and Midway Plaisance while providing improvements to reduce congestion from the roadway closures. Although it avoids Section 4(f) use from three Section 4(f) properties, Alternative 1 involves 0.8 acres of permanent Section 4(f) use of three historic properties: the Island Terrace Apartments, Jackson Park Terrace Historic District and the CPBS Historic District. Section 4(f) use of these historic properties would result in demolition of the Island

Terrace Apartments, one building contributing to the Jackson Park Terrace Historic District, and two buildings contributing to the CPBS Historic District (6450-60 and 6516-20 S. Stony Island Avenue). These demolitions result in the loss of 286 residential units, of which 270 serve low-income and minority populations. The demolition of the 6450-60 S. Stony Island Avenue building also results in the displacement of 6 commercial businesses.  Since the Jackson Park and Midway Plaisance property boundaries begin at the backs of roadway curbs along all roadways within and adjacent to the parks, any physical changes that require improvements beyond the existing back of curb in these areas would require incorporating Section 4(f) property into a transportation facility, resulting in a permanent use.

This alternative provides additional lanes along Stony Island Avenue by widening the roadway to the west between 67th Street and 60th Street. One-way streets at North Midway Plaisance and 65th Place will be converted to two-way operation within the existing roadway footprint.  Improving roadway capacity along Stony Island Avenue alone will not fully address the operational needs in the project area, as Alternative 1 results in almost a fifth (5 of 26) of the intersections failing intersection levels of service.  Intersections failing LOS are as follows:

- Lake Shore Drive and Hayes Drive
- Lake Shore Drive and Science Drive
- Lake Shore Drive and 57th Drive
- Stony Island Avenue and N. Midway Plaisance (WB)
- Stony Island Avenue and 56th Street

To minimize Section 4(f) use to Jackson Park and the Jackson Park Historic Landscape District and Midway Plaisance, this alternative proposes only minor bicyclist and pedestrian improvements.  ADA and crosswalk improvements will only occur at widened or modernized intersections.  Curb extensions will be provided at 9 of the 20 intersections and one midblock crossing.  Pedestrian refuge islands will be provided at only 5 of the 20 intersections and one midblock crossing.  Though pedestrian access and circulation would be improved along Stony Island Avenue, Alternative 1 would not improve pedestrian and bicycle access and circulation within Jackson Park, and park users would be subject to heavy traffic flows along Hayes Drive, Jeffrey Drive, South Shore Drive/67th Street.  Also, in order to avoid impacts to parkland, improvements to the trail network that would improve connectivity would not be constructed.

## 6.1.2   Alternative 2 – Operational Changes to Roadways

Alternative 2 attempts to accommodate diverted traffic flows through intersection improvements along Stony Island Avenue between 67th Street and 65th Street and at the Hayes Drive/Richards Drive intersection. Improvements also include retiming of existing traffic signals along Stony Island and Hayes Drive.

This alternative will improve pedestrian and bicycle access and circulation by grade separating pedestrian and bicycle movements from heavy traffic flows along Hayes Drive, Jeffrey Drive and South Shore Drive/67th Street, providing new trails along Cornell Drive and Hayes Drive, as well as installing curb extensions and refuge islands along Stony Island Avenue.

Alternative 2 converts 0.6 acres of Section 4(f) land from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District to a transportation use by converting and widening one way streets along North Midway Plaisance and southbound Cornell Drive to two-way operation, and by reconfiguring the Hayes Drive/Richards Drive intersection. This alternative also involves 2.7 acres of potential temporary use of Section 4(f) land from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and the CPBS Historic District to construct trail connections along Cornell Drive and Hayes Drive as well as four pedestrian underpasses.

However, these improvements alone will not address the operational needs in the project area, as Alternative 2 results in almost a quarter (6 of 26) of the intersections failing intersection levels of service. Intersections failing LOS are as follows:

- Lake Shore Drive and Hayes Drive
- Lake Shore Drive and Science Drive
- Lake Shore Drive and 57th Drive
- Stony Island Avenue and 67th Street
- Stony Island Avenue and Marquette Drive
- Cornell Drive/57th Drive and Hayes Drive

### 6.1.3 Alternative 3 – Mobility Improvement – Widen Lake Shore Drive

Alternative 3 proposes to convert 2.0 acres of Section 4(f) land from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District overlap with Jackson Park by adding an additional southbound through lane along Lake Shore Drive between 57th Drive and Hayes Drive. Intersection improvements to accommodate the additional lane are proposed at 57th Drive, Science Drive, and Hayes Drive with Lake Shore Drive. The 59th Street Inlet bridge is proposed to be widened to accommodate the additional travel lane. This alternative also involves 2.6 acres of potential temporary use of Section 4(f) land from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District overlap with Jackson Park to construct trail connections along Cornell Drive and Hayes Drive as well as four pedestrian underpasses.

This alternative will improve pedestrian and bicycle access and circulation by grade separating pedestrian and bicycle movements from heavy traffic flows along Hayes Drive, Jeffrey Drive and South Shore Drive/67th Street, providing new trails along Cornell Drive and Hayes Drive, as well as installing curb extensions and refuge islands along Stony Island Avenue.

Alternative 3 attempts to accommodate diverted traffic flows on portions of Lake Shore Drive, Hayes Drive, Cornell Drive and Stony Island Avenue. Also included is realigning and signalizing the Hayes Drive intersection with Richards Drive. However, these improvements alone will not address the operational needs in the project area, as Alternative 3 results in 4 of the 26 intersections failing intersection levels of service. Intersections failing LOS are as follows:

- Lake Shore Drive and Hayes Drive
- Stony Island Avenue and 67th Street

- Stony Island Avenue and Marquette Drive
- Cornell Drive/57th Drive and Hayes Drive

### 6.1.4 Alternative 4 – Mobility Improvement – Widen Stony Island Avenue

Alternative 4 proposes to converts 3.1 acres of Section 4(f) land from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District overlap with Jackson Park to a transportation use by adding one northbound and one southbound through lane on Stony Island Avenue between 65th Street and 60th Street and by adding one northbound lane between 67th Street and 65th Street. This alternative widens Stony Island Avenue to the east into Jackson Park to avoid any building removals. This alternative also involves 2.7 acres of potential temporary use of Section 4(f) land from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District to construct trail connections along Cornell Drive and Hayes Drive as well as four pedestrian underpasses.

This alternative will improve pedestrian and bicycle access and circulation by grade separating pedestrian and bicycle movements from heavy traffic flows along Hayes Drive, Jeffrey Drive and South Shore Drive/67th Street, providing new trails along Cornell Drive and Hayes Drive, as well as installing curb extensions and refuge islands along Stony Island Avenue.

The objective of Alternative 4 is to mitigate the impacts of traffic pattern and volume changes resulting from the roadway closures by redistributing traffic that currently uses Cornell Drive onto Stony Island Avenue. Alternative 4 would involve capacity improvements along Stony Island Avenue and its connector roadways to 57th/Cornell Drive that are needed to accommodate the diverted traffic volumes. Under this alternative, Stony Island would be widened to the east to avoid impacts to residences and commercial buildings that were affected by widening to the west under Alternative 1. However, these improvements alone will not address the operational needs in the project area, as Alternative 4 results in 4 of the 26 intersections failing intersection levels of service. Intersections failing LOS are as follows:

- Lake Shore Drive and Hayes Drive
- Lake Shore Drive and Science Drive
- Lake Shore Drive and 57th Drive
- Cornell Drive/57th Drive and Hayes Drive

### 6.1.5 Alternative 5 – Mobility Improvement – Reconfigure Hayes Drive

Alternative 5 converts 1.5 acres of Section 4(f) land from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District to a transportation use by reconfiguring Hayes Drive at the Richards Drive and Cornell Drive intersections, and by converting and widening one way streets along North Midway Plaisance and southbound Cornell Drive to two-way operation. Alternative 5 also proposes to remove parking along Hayes Drive to provide two lanes in each direction. Hayes Drive will also be realigned at the Hayes Drive/Cornell Drive/63rd Street intersection to provide a through movement for predominant travel. This alternative also involves 3.7 acres of potential temporary use of Section 4(f) land from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District to construct trail connections along Cornell Drive and Hayes Drive as well as four

pedestrian underpasses. This alternative will improve pedestrian and bicycle access and circulation by grade separating pedestrian and bicycle movements from heavy traffic flows along Hayes Drive, Jeffrey Drive and South Shore Drive/67th Street, providing new trails along Cornell Drive and Hayes Drive, as well as installing curb extensions and along Stony Island Avenue and pedestrian refuge islands at the Hayes Drive and Richards Drive intersection.

The mobility improvement that converts Hayes Drive to a 4-lane roadway in this alternative attempts to accommodate diverted traffic flows primarily on Hayes Drive as well as on portions of Cornell Drive and Stony Island Avenue south of 63rd Street. Also included is realigning and signalizing the Hayes Drive intersection with Richards Drive as well as reconfiguring the Hayes Drive/Cornell Drive/63rd Street intersection to accommodate predominant travel patterns as a through movement. Under Alternative 5, the majority of diverted traffic is expected to utilize Lake Shore Drive, Hayes Drive, Cornell Drive and Stony Island Avenue. However, these improvements alone will not address the operational needs in the project area as almost a fifth (5 of 26) of the intersections have failing intersection levels of service. Intersections failing LOS are as follows:

- Lake Shore Drive and Hayes Drive
- Lake Shore Drive and Science Drive
- Lake Shore Drive and 57th Drive
- Stony Island Avenue and 67th Street
- Stony Island Avenue and Marquette Drive

## 6.1.6 Alternative 6 – Mobility Improvement – Widen Lake Shore Drive and Stony Island Avenue

Alternative 6 proposes to combine Alternatives 3 (Widen Lake Shore Drive) and 4 (Widen Stony Island Avenue) to attempt to address congestion issues experienced in the two alternatives individually. This alternative converts 4.5 acres of Section 4(f) land from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District overlap with Jackson Park to a transportation use to construct an additional southbound travel lane along Lake Shore Drive, to widen Stony Island Avenue between 67th Street and 59th Street, to convert and widen one way streets along North Midway Plaisance and southbound Cornell Drive to two-way operation, and to reconfigure the Hayes Drive/Richards Drive intersection. This alternative also involves 2.6 acres of potential temporary use from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District overlap with Jackson Park to construct trail connections along Cornell Drive and Hayes Drive as well as four pedestrian underpasses.

This alternative will improve pedestrian and bicycle access and circulation by grade separating pedestrian and bicycle movements from heavy traffic flows along Hayes Drive, Jeffrey Drive and South Shore Drive/67th Street, providing new trails along Cornell Drive and Hayes Drive, as well as installing curb extensions and refuge islands along Stony Island Avenue.

Alternative 6 combines the features of Alternatives 3 and 4 to mitigate the impacts of traffic pattern and volume changes resulting from the roadway closures. The primary objective of Alternative 6 is to redistribute traffic that currently uses Cornell Drive onto Stony Island Avenue and Lake Shore Drive without affecting other roadways located within Jackson Park. However, these improvements alone will not address the operational needs in the project area as 2 of the 26 intersections have failing intersection levels of service. Intersections failing LOS are as follows:

- Lake Shore Drive and Hayes Drive
- Cornell Drive/57th Drive and Hayes Drive

### 6.1.7   Alternative 7 – Mobility Improvement – Widen Lake Shore Drive and Reconfigure Hayes Drive

Alternative 7 proposes to combine Alternatives 3 and 5 to attempt to address congestion issues experienced in the two alternatives individually. This alternative converts 3.2 acres of Section 4(f) land from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District to a transportation use to construct an additional southbound travel lane along Lake Shore Drive, to reconfigure Hayes Drive at the Lake Shore Drive, Richards Drive and Cornell Drive intersections, and to convert and widen one way streets along North Midway Plaisance and southbound Cornell Drive to two-way operation. This alternative also involves 3.6 acres of potential temporary use from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District overlap with Jackson Park to construct trail connections along Cornell Drive and Hayes Drive as well as pedestrian underpasses at four locations.

This alternative will improve pedestrian and bicycle access and circulation by grade separating pedestrian and bicycle movements from heavy traffic flows along Hayes Drive, Jeffrey Drive and South Shore Drive/67th Street, providing new trails along Cornell Drive and Hayes Drive, as well as installing curb extensions and along Stony Island Avenue and pedestrian refuge islands at the Hayes Drive and Richards Drive intersection.

Alternative 7 provides mobility improvement that widens Lake Shore Drive between 57th and Hayes Drives, reconfigures Hayes Drive between Stony Island Avenue and Lake Shore Drive, and attempts to accommodate diverted traffic flows on portions of Lake Shore Drive and Hayes Drive. This alternative also includes improvements to Cornell Drive south of Hayes and Stony Island Avenue south of Cornell. The majority of diverted traffic is expected to utilize Lake Shore Drive, Hayes, Cornell and Stony Island Avenue with the Alternative 7 roadway improvements. However, these improvements alone will not address the operational needs in the project area as 2 of the 26 intersection have failing intersection levels of service. Intersections failing LOS are as follows:

- Stony Island Avenue and 67th Street
- Stony Island Avenue and Marquette Drive

### 6.1.8   Alternative 8 – Widen Stony Island Avenue and Reconfigure Hayes Drive

Alternative 8 proposes to combine Alternatives 4 (Widen Stony Island Avenue) and 5 (Reconfigure Hayes Drive) to attempt to address congestion issues experienced in the two alternatives individually. Alternative 8 converts 3.9 acres of Section 4(f) land from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District to a transportation use to widen Stony Island Avenue between 67th Street and 59th Street, to reconfigure Hayes Drive at the Richards Drive and Cornell Drive intersections, and to convert and widen one way streets along North Midway Plaisance and southbound Cornell Drive to two-way operation. This alternative also involves 3.7 acres of potential temporary use from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District to construct trail connections along Cornell Drive and Hayes Drive as well as pedestrian underpasses at four locations.

This alternative will improve pedestrian and bicycle access and circulation by grade separating pedestrian and bicycle movements from heavy traffic flows along Hayes Drive, Jeffrey Drive and South Shore Drive/67th Street, providing new trails along Cornell Drive and Hayes Drive, as well as installing curb extensions and along Stony Island Avenue and pedestrian refuge islands along Stony Island Avenue and at the Hayes Drive and Richards Drive intersection.

The primary objective of Alternative 8 is to redistribute traffic that currently uses Cornell Drive onto Stony Island Avenue and Hayes Drive without affecting other roadways located within Jackson Park. Also included in the improvements is realigning and signalizing the Hayes Drive intersection with Richards Drive.  However, these improvements alone will not address the operational needs in the project area as 3 of the 26 intersections have failing intersection levels of service.  Intersections failing LOS are as follows:

- Lake Shore Drive and Science Drive
- Lake Shore Drive and 57th Drive
- Stony Island Avenue and 67th Street

### 6.1.9   Alternative 9 – Mobility Improvement – Widen Lake Shore Drive and Stony Island and reconfigure Hayes Drive

Alternative 9 proposes to combine Alternatives 3 (Widen Lake Shore Drive), 4 (Widen Stony Island Avenue) and 5 (Reconfigure Hayes Drive) to attempt to address congestion issues experienced in the three alternatives individually. This alternative converts 5.6 acres of Section 4(f) land from Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District to a transportation use to construct an additional southbound travel lane along Lake Shore Drive, to widen Stony Island Avenue between 67th Street and 59th Street, to reconfigure Hayes Drive at the Lake Shore Drive, Richards Drive and Cornell Drive intersections, and to convert and widen one way streets corresponding to North Midway Plaisance and southbound Cornell Drive to two-way operation. This alternative also involves 3.6 acres of potential temporary use from Jackson Park, the Jackson Park Historic

Landscape District and Midway Plaisance, and CPBS Historic District to construct trail connections along Cornell Drive and Hayes Drive as well as pedestrian underpasses at four locations.

This alternative will improve pedestrian and bicycle access and circulation by grade separating pedestrian and bicycle movements from heavy traffic flows along Hayes Drive, Jeffrey Drive and South Shore Drive/67th Street, providing new trails along Cornell Drive and Hayes Drive, as well as installing curb extensions and along Stony Island Avenue and pedestrian refuge islands along Stony Island Avenue and at the Hayes Drive and Richards Drive intersection.

The primary objective of Alternative 9 is to combine alternatives to redistribute traffic that currently uses Cornell Drive onto Lake Shore Drive, Stony Island Avenue and Hayes Drive without affecting other roadways located within Jackson Park to achieve acceptable levels of service. The mobility improvement that improves Lake Shore Drive and Stony Island Avenue and which reconfigures Hayes Drive into a 4-lane roadway attempts to accommodate diverted traffic flows on all three of those roadways. Also included is realigning and signalizing the Hayes Drive intersection with Richards Drive. Improving capacity along Lake Shore Drive, Stony Island Avenue and Hayes Drive fully addresses the operational needs in the project area. All major intersections would operate at desirable Levels of Service with limited traffic congestion. Therefore, Alternative 9 fully meets the project purpose of accommodating changes in travel patterns resulting from closing roadways in Jackson Park and improving pedestrian and bicyclist access and circulation to and from Jackson Park.

### 6.1.10  Alternatives Summary

**Table 5** summarizes each alternative's impacts to Section 4(f) properties and its ability to meet the purpose and need. Alternatives 1-8 do not fully satisfy the purpose and need for the project and they compromise the project to a degree that it is unreasonable to proceed with any of the Alternatives 1-8. Therefore, Alternative 1-8 were dismissed from further analysis. As shown in **Table 5**, only Alternative 9 accomplishes both criteria of the Purpose and Need and is therefore carried forward for detailed analysis.

**Table 5: Preliminary Alternatives Summary**

| Alternative Description | Purpose & Need Criteria | | Carry Forward for Detailed Analysis | Section 4(f) Impacts | |
|---|---|---|---|---|---|
| | Improves bicyclist and pedestrian access and circulation | Accommodates changes in travel patterns | | Total Acreage | Properties Impacted |
| Alt 1 - Avoid Parkland Use and Widen Stony Island | No | No *5 failing intersections* | No | 0.8 | • Island Terrace Apartments<br>• Jackson Park Terrace Historic District<br>• Hyde Park High School<br>• CPBS Historic District |
| Alt 2 - Operational Changes to Roadways | Yes | No *6 failing intersections* | No | 3.3 | • Jackson Park<br>• Jackson Park Historic Landscape District and Midway Plaisance<br>• CPBS Historic District |
| Alt 3 - Widen Lake Shore Drive | Yes | No *4 failing intersections* | No | 4.6 | • Jackson Park<br>• Jackson Park Historic Landscape District and Midway Plaisance<br>• CPBS Historic District |
| Alt 4 – Widen Stony Island Ave | Yes | No *4 failing intersections* | No | 5.8 | • Jackson Park<br>• Jackson Park Historic Landscape District and Midway Plaisance<br>• CPBS Historic District |
| Alt 5 - Reconfigure Hayes Drive | Yes | No *5 failing intersections* | No | 5.2 | • Jackson Park<br>• Jackson Park Historic Landscape District and Midway Plaisance<br>• CPBS Historic District |
| Alt 6 – Widen LSD/ Widen Stony Island | Yes | No *2 failing intersections* | No | 7.1 | • Jackson Park<br>• Jackson Park Historic Landscape District and Midway Plaisance<br>• CPBS Historic District |
| Alt 7 – Widen LSD / Reconfigure Hayes | Yes | No *2 failing intersections* | No | 6.8 | • Jackson Park<br>• Jackson Park Historic Landscape District and Midway Plaisance<br>• CPBS Historic District |
| Alt 8 - Widen Stony Island/ Reconfigure Hayes | Yes | No *3 failing intersections* | No | 7.6 | • Jackson Park<br>• Jackson Park Historic Landscape District and Midway Plaisance<br>• CPBS Historic District |
| Alt 9 - Widen LSD/ Widen Stony Island/ Reconfigure Hayes | Yes | Yes | Yes | 9.2 | • Jackson Park<br>• Jackson Park Historic Landscape District and Midway Plaisance<br>• CPBS Historic District |

# 7.0   Least Harms Analysis

After the preliminary alternatives were narrowed to determine which alternative should be carried forward for detailed analysis, Alternative 9 was refined based on further design studies and additional efforts to avoid or minimize a transportation use of Section 4(f) resources, including additional detail for potential temporary uses.  Sub-alternatives of Alternative 9 were investigated to explore further opportunities to reduce permanent conversion of Section 4(f) land to transportation use. All improvements along Lake Shore Drive will occur to the west of the existing roadway to avoid impacts to the Pitcher's (Dune) thistle, a native federal endangered species. As Section 4(f) land is present at the backs of curb along both sides of Lake Shore Drive, widening to the east would equally impact Section 4(f) land. The reconfiguration of Hayes Drive is generally contained within the existing roadway footprint. Therefore, analysis of sub-alternatives was focused on reducing use of Section 4(f) resources along Stony Island Avenue. Alternative 9A proposes to widen Stony Island Avenue to the west and Alternative 9B proposes to widen Stony Island Avenue to the east. Detailed descriptions and evaluations of the sub-alternatives are provided in the Preferred Alternative documentation in **Appendix D**.

**Appendix D - Alternatives Studied in Detail** was prepared on April 18, 2018 to describe the proposed rationale for a selecting a preferred alternative for highway improvements and coordinate with resource and regulatory agencies as required by Illinois' NEPA-404 merger process. The preferred alternative documentation describes the rationale for identifying a preferred alternative for highway improvements that best balances environmental impacts and achieves appropriate transportation performance. The preferred alternative documentation serves to coordinate with the resource and regulatory agencies and does not finalize the decision-making process. Rather, the information contained in the preferred alternative documentation is brought forward into the NEPA documentation, and updated as necessary, for formal public and agency review and comment prior to FHWA making a final decision on a preferred alternative at the conclusion of the NEPA process. The information in the preferred alternative documentation continues to inform the FHWA's decision making process with respect to highway transportation improvements although the National Park Service is serving as the lead for the NEPA process.

Both sub-alternatives consider the same cross-section along Stony Island Avenue to provide the necessary facilities to meet the project's Purpose and Need while attempting to minimize Section 4(f) use**.**

Impacts associated with the two alternatives were further refined from the Alternatives Studied in Detail analysis as more detailed development of the design has been completed.  A summary evaluation table of the alternatives is provided on **Table 6**.

**Table 6: Least Harms Analysis Evaluation Summary – Alternatives Studied in Detail**

| Criterion | Impact Measure | Alternative 9A | Alternative 9B |
|---|---|---|---|
| **Floodplain Impacts** | Acre-Feet | 0.032 | 0.032 |
| **Wetland Impacts** | Acres Filled | 0.0 | 0.0 |

Mobility Improvements to Support the South Lakefront Framework Plan

| Criterion | Impact Measure | Alternative 9A | Alternative 9B |
|---|---|---|---|
| Permanent Waterway Impacts | Acres Filled | 0.040 | 0.040 |
| Parking Loss - On-Street | Number of Spaces | 161 | 161 |
| Section 4(f) Use | Total (Acres) | 26.7 | 28.7 |
| | Permanent Use (Acres) | 3.9 | 5.2 |
| | Temporary Use (Acres) | 22.8 | 23.5 |
| | Properties Impacted | (1) Jackson Park<br>(2) Midway Plaisance<br>(3) Jackson Park Historic Landscape District and Midway Plaisance<br>(4) CPBS Historic District<br>(5) Island Terrace<br>(6) Jackson Park Terrace<br>(7) Hyde Park HS | (1) Jackson Park<br>(2) Midway Plaisance<br>(3) Jackson Park Historic Landscape District and Midway Plaisance<br>(4) CPBS Historic District |
| Residential Displacements | Number of units | 286 | 0 |
| Commercial Displacements | Number of units | 6 | 0 |
| Proposed Right-of-Way Acquisition (in addition to 4(f)) | Acres | 0.7 | 0 |
| Archaeological Sites listed/eligible for the NRHP Effected | | No | No |
| Historic Properties Demolished | Number of NRHP listed properties | 1 | 0 |
| | Number of contributing properties | 3 | 0 |
| Noise Impacts | Number of receptors impacted | 10 | 10 |
| Trees Removed | Number of trees | 250 to 300 | 350 to 400 |
| Pedestrian & Bike Safety and Mobility | | | |

| Criterion | Impact Measure | Alternative 9A | Alternative 9B |
|---|---|---|---|
| Pedestrian underpasses | Number of underpasses | 5 | 5 |
| Refuge islands | Number of locations | 8 | 8 |
| Curb extensions | Number of locations | 9 | 9 |
| Signalized intersection modernization | Number of locations | 6 | 6 |
| Convert intersection from stop-controlled to signalized | Number of locations | 2 | 2 |
| Additional Trails | | Yes | Yes |
| **Vehicular Safety** | | | |
| Signalized intersection modernization | Number of locations | 6 | 6 |
| Convert intersection from stop controlled to signalized | Number of locations | 2 | 2 |
| Exclusive turn lanes provided at intersection | Number of locations | 9 | 9 |
| Provide additional capacity | Number of locations | 15 | 15 |

*Acreage of impact for land included in two or more 4(f) resources is not duplicated. Impact is considered total area converted or occupied, regardless of number of properties impacted.

**Table 6** above shows the total Section 4(f) land converted to transportation use. **Table 7** below shows the amount of Section 4(f) land converted from each Section 4(f) property for each alternative. Because of overlapping boundaries of the Section 4(f) properties, any Section 4(f) use of Jackson Park or the Midway Plaisance also results in a Section 4(f) use of the historic properties of Jackson Park Historic Landscape District and Midway Plaisance and the CPBS Historic District. Therefore, the use of land from Jackson Park and Midway Plaisance, as shown in **Table 7**, is also reflected as a use from Jackson Park Historic Landscape District and Midway Plaisance and CPBS Historic District, in **Table 7**. There is no additional use of the Jackson Park Historic Landscape District and Midway Plaisance or CPBS Historic District for Alternative 9A and 9B outside of the use that is coincident with the use from Jackson Park and Midway Plaisance.

**Table 7: Least Harms Analysis Evaluation Summary – Section 4(f) Land Use**

| Section 4(f) property | Alternative 9A | | | Alternative 9B | | |
|---|---|---|---|---|---|---|
| | Perm Use (acres) | Temp Use (acres) | Total Use (acres) | Perm Use (acres) | Temp Use (acres) | Total Use (acres) |
| Jackson Park | 2.9 | 22.8 | 25.7 | 5.2 | 23.4 | 28.6 |
| Midway Plaisance | 0.1 | 0.0 | 0.1 | 0.0 | 0.1 | 0.1 |

| Section 4(f) property | Alternative 9A | | | Alternative 9B | | |
|---|---|---|---|---|---|---|
| | Perm Use (acres) | Temp Use (acres) | Total Use (acres) | Perm Use (acres) | Temp Use (acres) | Total Use (acres) |
| Jackson Park Historic Landscape District and Midway Plaisance | 3.0 | 22.8 | 25.8 | 5.2 | 23.5 | 28.7 |
| CPBS Historic District | 3.2 | 22.8 | 25.8 | 5.2 | 23.5 | 28.7 |
| Island Terrace Apartments | 0.1 | 0.0 | 0.1 | 0 | 0 | 0 |
| Jackson Park Terrace | 0.3 | 0.0 | 0.3 | 0 | 0 | 0 |
| Hyde Park High School/Academy | 0.3 | 0.0 | 0.3 | 0 | 0 | 0 |

Both Alternative 9A and 9B include components to achieve acceptable operations and improve bicyclist and pedestrian access and circulation within Jackson Park, therefore meeting the Purpose and Need for the Proposed Action and are evaluated in the Least Harms Analysis. These two alternatives that meet the Purpose and Need were evaluated based on the least overall harm factors found at 23 CFR 774.3(c).

The remaining two alternatives use Section 4(f) property and therefore this section evaluates them to determine which alternative causes the least overall harm in light of Section 4(f)'s preservation purposes. The least overall harm is determined by balancing the following factors:

i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);
ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;
iii. The relative significance of each Section 4(f) property;
iv. The views of the official(s) with jurisdiction over each Section 4(f) property;
v. The degree to which each alternative meets the purpose and need for the project;
vi. After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and
vii. Substantial differences in costs among the alternatives."

Alternatives 9A and 9B are depicted on **Exhibit E-1** and **Exhibit E-2**, respectively. Seven Section 4(f) properties are evaluated for permanent and temporary use by Alternatives 9A and 9B: Jackson Park Historic Landscape District and Midway Plaisance, Jackson Park, the CPBS Historic District, the Midway Plaisance, the Island Terrace Apartments, Hyde Park Academy High School, and the Jackson Park Terrace

Historic District. Alternative 9A results in the permanent use of Jackson Park Historic Landscape District and Midway Plaisance, Jackson Park, the CPBS Historic District (including two contributing buildings at 6450-60 S. Stony Island Avenue, and 6516-20 S. Stony Island Avenue), the Midway Plaisance, the Island Terrace Apartments, and one contributing building of the Jackson Park Terrace Historic District. Alternative 9A also involves right-of-way acquisition from the Hyde Park Academy High School property, although no permanent impacts of the building itself are required. Alternative 9B results in the permanent use of Jackson Park Historic Landscape District and Midway Plaisance, Jackson Park, and the CPBS. Permanent uses resulting from improvements along Lake Shore Drive and Hayes Drive are equal between both Alternative 9A and 9B; differences in permanent uses of Section 4(f) properties are only observed along Stony Island Avenue. Both alternatives involved similar temporary uses of Jackson Park Historic Landscape District and Midway Plaisance and Jackson Park for construction staging, roadway grading, and proposed trails and underpasses.

Alternatives 9A and 9B are evaluated against the least overall harm criteria below:

   i.   **The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);**

Both Alternatives 9A and 9B will mitigate for 4(f) property permanent uses within Jackson Park through the addition of parkland within the closed roadway footprints of Cornell Drive from 63rd Street to 59th Street, Marquette Drive from Stony Island Avenue to Richards Drive, South Midway Plaisance from Stony Island Avenue to Cornell Drive, and northbound Cornell Drive from 67th Street to 65th Street.[21] The additional areas will result in 7.7 acres of new parkland within the existing park space to be utilized for proposed trails and open green space that will enhance recreational uses and improve continuity of open spaces within Jackson Park.  This new parkland space will also provide a more contiguous area in comparison to the slivers of land along the roadways that is proposed for permanent use.

Mitigation for the adverse effect to Jackson Park Historic Landscape District and Midway Plaisance and the CPBS Historic District was addressed through the Section 106 process. Mitigation efforts include: updating the National Register nomination for Jackson Park Historic Landscape District and Midway Plaisance, field documentation of existing conditions, preparation of a Cultural Landscape Report, development of interpretive materials, rehabilitation of the English Stone Comfort Station and the Statue of the Republic, a design review of the east end of the Midway Plaisance, and a planting review for required tree replacements.  Mitigation measures are discussed in greater detail in Section 9.2.3.


By widening Stony Island Avenue to the west, Alternative 9A results in use of additional 4(f) properties, including the demolition of four buildings: the Island Terrace Apartments, one building contributing to the Jackson Park Terrace Historic District, and two buildings (6450-60 S. Stony Island Avenue, and 6516-20 S.

---

[21] Chicago Park District Ordinance Number 18-2969-0214-9D1 entitled "Ordinance Authorizing the Acceptance of City Right of Way Property Located Within Jackson (Andrew) Park Consisting of Approximately 8 Acres," Adopted by the Chicago Park District Board of Commissioners on February 14, 2018.

Stony Island Avenue) which contribute to the CPBS Historic District. Possible methods of mitigation could include collecting and preserving data from the historic buildings, develop National Register nominations for other properties or districts within the APE, and development of multimedia educational and interpretive materials related to historic properties or districts. Alternative 9A also requires the permanent use of the Midway Plaisance (0.1 acres). Replacement of this acreage within or adjacent to the site is limited due to the dense presence of the University of Chicago campus and private properties surrounding the park. However, the increase in parkland within Jackson Park would be appropriate mitigation for impacts to the Midway Plaisance.

Overall, Alternative 9A involves the permanent use of 0.1 acres of right-of-way from the Island Terrace Apartments, 0.3 acres of right-of-way from the Hyde Park Academy High School, 0.3 acres of right-of-way from the Jackson Park Terrace Historic District, 0.1 acres from the Midway Plaisance, 2.9 acres from Jackson Park, and 0.2 acres of right-of-way from the CPBS Historic District which is not within Jackson Park or Midway Plaisance. Because the two historic properties, the CPBS Historic District and the Jackson Park Historic Landscape District and Midway Plaisance, fully includes Jackson Park and Midway Plaisance within its boundary, any use of Jackson Park or the Midway Plaisance is also a use of these two historic properties. Therefore, the 3.0 acres converted to transportation use from Jackson Park and Midway Plaisance is also considered a use of the CPBS Historic District and the Jackson Park Historic Landscape District and Midway Plaisance. In total, there would be 3.9 acres of permanent Section 4(f) use with Alternative 9A.

Alternative 9B results in greater permanent use of Section 4(f) property relative to Alternative 9A (5.2 acres) and involves three Section 4(f) resources: Jackson Park, the Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District. The increase in use compared to Alternative 9A is largely along Stony Island Avenue in Jackson Park along the east side of the roadway between 67th Street and 59th Street and avoids use of all 4(f) resources to the west. The permanent uses from Alternative 9B of the 551.52 acres in Jackson Park result in less than 1% of the total park area. Alternative 9B results in the use of only one contributing resource to the CPBS Historic District (the Jackson Park Historic Landscape District and Midway Plaisance), compared to four contributing resources of the CPBS Historic District by Alternative 9A (the Jackson Park Historic Landscape District and Midway Plaisance, Hyde Park Academy High School, 6450-60 S. Stony Island Avenue, and 6516-20 S. Stony Island Avenue). Mitigation for impacts to Jackson Park Historic Landscape District and Midway Plaisance and CPBS Historic District as a historic property will be identified through the Section 106 process. Agreed upon Section 106 mitigation measures for addressing impacts to Section 4(f) historic properties will be described in the Final Section 4(f) evaluation.

ii. **The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;**

Jackson Park will continue to function as an open public park with recreational amenities after either Alternative 9A or 9B is implemented and mitigation efforts are completed. Addition of the bicycle and pedestrian facilities improve access to Jackson Park and contributes to the goals described in the CPD's 2018 SLFP. Through the addition of park space and new trails, these amenities and functions will be enhanced by proposed mitigation efforts.

Implementation of either Alternative 9A or 9B would diminish the historic integrity of the Jackson Park Historic Landscape District and Midway Plaisance and the CPBS Historic District, but each of these historic properties would continue to be listed on the NRHP.

Alternative 9A includes the demolition of the Island Terrace Apartments, one building within the Jackson Park Terrace Historic District, and two contributing buildings in the CPBS Historic District (6450-60 S. Stony Island Avenue, and 6516-20 S. Stony Island Avenue). Demolition of the Island Terrace Apartment building would make it no longer eligible for the NRHP. The Jackson Park Terrace Historic District's NRHP status would be substantially diminished with demolition of one of its buildings. The CPBS Historic District's NRHP status would be retained despite the demolition of two of the 2,096 contributing buildings.

### iii.    The relative significance of each Section 4(f) property;

Jackson Park includes a variety of recreation areas that are open, public spaces and several active recreation uses include an 8-lane outdoor track, five soccer/football fields, two standard baseball diamonds, six softball/junior baseball diamonds, four basketball courts, twenty-four tennis courts (twenty active courts), two bowling greens, a dog park (uses four of the twenty-four tennis courts), and the Jackson Park Fieldhouse fitness center and gymnasium. The property also includes golf facilities, inclusive of a driving range and an 18-hole golf course. With Jackson Park's proximity to Lake Michigan, water-based public recreation opportunities include the 59th Street and 63rd Street Beaches and 365 boat slips divided among the 59th Street Harbor, the Jackson Park Inner Harbor and the Jackson Park Outer Harbor. Passive recreation amenities include seven playgrounds, twelve picnic groves, two formal gardens, one community production garden, and three natural areas.

The Midway Plaisance provides a space for recreation including temporary soccer/football fields and a refrigerated ice/skating rink. Adjacent to ice/skating rink the warming hut is used year-round during various activities. The remainder of the Midway Plaisance is open space that includes the University of Chicago's Winter Garden, trails, and monuments.

The Jackson Park Historic Landscape District and Midway Plaisance was officially listed as a historic district in the NRHP in 1972. The nomination form indicated that the properties possess national and state significance, and represents the following areas of significance: architecture, landscape architecture, science, sculpture, and urban planning. The Section 106 HPI Report provided additional historic context for Jackson Park Historic Landscape District and Midway Plaisance, including the various phases of planning by the Olmsted firms and the development of the Western Perimeter as one of the nation's first outdoor gymnasia (HPI[22] p. 24). While the entire park/landscape retains good integrity overall, the integrity of the Western Perimeter has been compromised. As stated in the HPI (HPI pp. 63-64): "The widening and straightening of S. Cornell Drive and S. Stony Island Avenue has reduced the historic character in this area. The loss of the gently rolling berms that sloped down to a lawn with double tree rows along S. Stony Island Avenue to the west, and wider green space with dense tree canopy along the previously curving Cornell Drive to the east, changed the character of this portion of the Western Perimeter." The Supplementary Analysis of Landscape Integrity provides additional detail about ways in

---

[22] https://www.chicago.gov/content/dam/city/depts/dcd/supp_info/jackson/hpi-report.pdf

which the integrity of the Western Perimeter has been compromised. It states: "The middle and southern sections of the Western Perimeter continue broad patterns but have been modified by roadway projects, the addition of new facilities, and the loss of plantings. The general form of open fields surrounded by canopy trees remains in the area of the open-air gymnasia but exhibits simplification and loosening in the arrangement of vegetation and circulation features. More recent changes such as the rubberized track and artificial turf field reflect historic use but the materials are not consistent with those present during the period of significance." (HPI **Appendix F**[23], p. 35).

Listed on the NRHP in 1972 (along with Jackson Park) as a historic district, the Midway Plaisance possesses national significance relating to several historical themes. These include its association with Frederick Law Olmsted and its importance as the site of the 1893 World's Columbian Exposition. The Section 106 Historic Properties Inventory (HPI) Report provided a landscape analysis of Jackson Park Historic Landscape District and Midway Plaisance (**Appendix F**[21]). The report indicates that the existing alignment of roadways and configuration of the Midway lawns were part of the Olmsted, Olmsted & Eliot Plan of 1895 and the Midway Plaisance possesses national significance and retains good integrity.

The CPBS Historic District is listed on the NRHP under Criteria A and C. The CPBS Historic District is a 26-mile stretch of contiguous parks and boulevards including parks, squares, boulevards and significant adjoining properties. The CPBS Historic District roughly spans from W. Logan Boulevard on the north and the Kennedy Expressway to E. 67th Street and S. South Shore Drive on the south. The District is known historically "as the first comprehensive system of greenways for a major city in the United States. It was created in response to the belief that it would not only foster healthful, accessible and livable neighborhoods, but would also spur residential real estate development in what was then the outskirts of the city. The CPBS Historic District is associated with the country's most important early landscape architects and was one of the nation's first major system and, thus, seminal in the creation of similar systems across the United States. The historic district also includes adjacent buildings that face onto the system that were built during the period of significance.

The Island Terrace Apartment Building was determined to be individually eligible for listing in the NRHP under Criteria A and C. Produced by the noteworthy architectural firm of Dubin, Dubin, Black, & Moutoussamy, the structure was one of the neighborhood's first Modern high-rises designed to provide affordable apartments to moderate and low-income renters. Built in 1969, when more expensive high-rise rental apartments were being erected nearby in South Shore, the Island Terrace Apartment Building possesses strong local significance in relation to history of the Woodlawn community. The property retains a high level of architectural integrity by possessing the aspects of location, design, workmanship, materials, feeling and association. The property's integrity of setting is low, due in part to previous projects to widen Stony Island Avenue.

---

[23] https://www.chicago.gov/city/en/depts/dcd/supp_info/jackson-park-improvements.html - 2018 Milestones: Historic Properties Inventory Appendices (FINAL)

The Jackson Park Terrace was determined to be eligible for listing as a historic district in the NRHP under Criteria A and C. Designed by renowned African-American planners and architects, Whitely-Whitley, the complex was developed by The Woodlawn Organization, a grass-roots organization that had been fighting against slum clearance programs and displacement of existing residents since the early 1960s. The 1974 complex, which provided affordable housing and numerous services to its tenants, possesses strong local significance to Woodlawn's community history. The complex retains a high degree of integrity of location, design, workmanship, materials, feeling, and association. The existing setting has been affected by previous development nearby, but the district still maintains its integrity of setting.

The Hyde Park Academy High School was determined to be individually eligible for listing in the NRHP under Criteria A, B, and C. Hyde Park Academy High School is located on the west side of Stony Island Avenue in the Woodlawn neighborhood. It currently houses over 700 students in grades 9-12. The school has a history of noteworthy alumni and retains excellent historical integrity. The property is not currently on the NRHP but has been identified as an eligible property in the HPI.

While both Alternatives 9A and 9B involve the same permanent uses within Jackson Park Historic Landscape District and Midway Plaisance and the CPBS Historic District for roadway improvements along Lake Shore Drive and Hayes Drive as well as implementation of bike/pedestrian facilities, they differ in their effects to historic properties along Stony Island Avenue. Alternative 9A, along the west side of Stony Island Avenue, involves the elimination of one historic building (Island Terrace Apartments) and diminishes the integrity and NRHP status of another historic property (Jackson Park Terrace) by demolishing one of its buildings. Demolition of the Island Terrace Apartment building would cause the property to no longer retain integrity to be considered eligible for the NRHP. Alternative 9A also involves the permanent alteration to a portion of the Midway Plaisance and the demolition of two contributing properties to the CPBS Historic District.

Alternative 9B only involves permanent use of a portion of Jackson Park's Western Perimeter along the east side of Stony Island Avenue, which has diminished integrity. Because Jackson Park Historic Landscape District and Midway Plaisance is part of the CPBS Historic District, it also involves a permanent use of the CPBS Historic District, coincident with the use of Jackson Park Historic Landscape District and Midway Plaisance. Alternative 9B would not result in a change in either Jackson Park or the CPBS Historic District's listing on the NRHP or their eligibility for the NRHP.

The Jackson Park Historic Landscape District and Midway Plaisance and the CPBS Historic District possesses national significance while the Island Terrace Apartments, Jackson Park Terrace, Hyde Park High School/Academy possess significance at the local level. FHWA considers the relative significance of Jackson Park and the Midway Plaisance and the CPBS Historic District to be greater than the relative significance of the Island Terrace Apartment Building, the Jackson Park Terrace Historic District, and Hyde Park High School because of the national significance of the Jackson Park and the Midway Plaisance from a historic property perspective and the importance of Jackson Park as a public park and recreation area to the public. Despite the comparatively higher level of significance for the park, Alternative 9A will cause more harm to historic resources than Alternative 9B. Alternative 9A will result in the destruction of the

Island Terrace Apartments and substantially diminish the significance and integrity of the Jackson Park Terrace, as well as demolish two contributing properties within the CPBS Historic District. Alternative 9B will cause much lesser impacts to the significance and integrity of Jackson Park Historic Landscape District and Midway Plaisance because it results in "sliver" takes of right-of-way from the western edge of Jackson Park that minimally affects the integrity of the Jackson Park Historic Landscape District and Midway Plaisance as a historic property  and does not adversely affect the activities, features, and attributes that qualify Jackson Park as a Section 4(f) resource as a park and recreational area.  Similarly, there is a minimal impact to the significance and integrity of the CPBS Historic District because in context of the size of the CPBS (26 mile long resource) the sliver takes of right-of-way in Jackson Park have negligible effect on the integrity of the CPBS Historic District.

iv.     **The views of the official(s) with jurisdiction (OWJ) over each Section 4(f) property;**

As an OWJ of Jackson Park, the CPD is in support of the proposed transportation improvements, which are consistent with the plans presented in the 2018 SLFP.

CDOT and the CPD both act as the OWJ of the Midway Plaisance as a public park and recreational area. Alternative 9A involves permanent use of the eastern boundary of this site; which in turn, would impact the quantity of available replacement recreation. Alternative 9B, however, does not involve the permanent use of the Midway Plaisance and maximizes the available space for replacement recreation utility.

The OWJs for the historic properties include the SHPO and the ACHP. Coordination with the SHPO and ACHP occurred throughout the Section 106 process. The Draft Section 4(f) Evaluation was distributed to both the ACHP and SHPO for review on April 23, 2020. The ACHP formally declined the invitation to review the Draft Section 4(f) Evaluation in a response dated June 11, 2020. See **Appendix H**. The SHPO did not provide a formal response on the Draft Section 4(f) Evaluation.

v.      **The degree to which each alternative meets the purpose and need for the project;**

Both Alternative 9A and 9B satisfy the Purpose and Need for the project equally.

vi.     **After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f);**

By widening Stony Island Avenue to the west, Alternative 9A involves four property acquisitions requiring building demolition that results in the relocation of and assistance to all residents and tenants that occupy the building to equivalent and fair housing opportunities according to the Uniform Relocation Assistance and Real Property Acquisition Act (42 USC 61).   Building demolition includes one two-story mixed residential/commercial building at 6450-60 S. Stony Island Avenue (24 residential units and 6 businesses, one apartment building at 6516-6520 S. Stony Island Ave (15 units), the Island Terrace Apartment building (241 units), and a single building residence in the Jackson Park Terrace Historic District (6 units). Relocation of this many residents would severely disrupt existing community cohesion.   Proposed right-of-way acquisition from other non-historic private properties along the west side of Stony Island Avenue from 67th Street to 59th Street is also required (0.7 acres).

After mitigation efforts to relocate and provide assistance to these residents, tenants, and business owners, the community is left with fewer residential and business facilities available to the surrounding low-income and minority population, which are also along public transportation routes and adjacent to an open public park within a dense urban area.

Alternative 9B requires no residential relocations or acquisition of businesses.

Alternative 9A will require between 250 and 300 tree removals which would be replaced on a 1:1 ratio.

Alternative 9B will require between 350 to 400 tree removals which would be replaced on a 1:1 ratio.

### vii.     Substantial differences in costs among the alternatives.

The costs of constructing transportation improvements under Alternatives 9A and 9B are comparable, as the facilities are similar or identical in size and scale. However, Alternative 9A requires land acquisition from 27 parcels along the west side of Stony Island Ave including full acquisition and demolition of four multi-unit buildings which are historic or contribute to a historic district. Cost of acquisition, demolition and relocations associated with these four buildings is estimated to exceed $35 million dollars.[24] Based on comments provided by the United States Department of Housing and Urban Development (USHUD), the exact replacement value for the single building in Jackson Park Terrace has not been separately assessed by USHUD; however, Jackson Park Terrace had an estimated replacement cost exceeding $45 million when it was most recently refinanced with USHUD. Even if only one of the buildings of the property were to be taken pursuant to alternative 9A, the cost of condemning the premises, demolishing the property, and rehousing the affected families in affordable housing (if possible) would be considerable. Demolition of any units of Jackson Park Terrace violates the covenants of the Federal Housing Authority-insured mortgage and of the land lease from the University of Chicago to maintain 322 rental units at the property.  Additionally, USHUD stated that though it does not have access to a recent appraisal of the Island Terrace property, its estimated replacement cost in 2012 was determined to exceed $27 million. Since that time, the property has refinanced and performed renovations of building systems, and the surrounding rental market has strengthened considerably, resulting in the likely increase in property value.

Alternative 9B requires no acquisition of private property, therefore has no land acquisition cost.

The mitigation costs for Alternative 9B are also less than Alternative 9A, because the mitigation for impacts within Jackson Park are similar for both alternatives but Alternative 9A requires additional mitigation for the historic properties west of Stony Island.

---

[24]*The dollar amount noted is an estimate of the value of each property, building demolition, and the relocation of each business and resident.  These costs were obtained through a preliminary market analysis using data available from public sources.*

The cost of transportation improvements for Alternative 9B is approximately $174 million dollars. The additional costs of proposed right-of-way, building acquisitions and mitigation associated with Alternative 9A make the total cost of Alternative 9A substantially higher than Alternative 9B.

## 7.1    Alternative with the Least Overall Harm

**Table 8** shows a comparison of Alternatives 9A and 9B against the least overall harm criteria.

**Table 8: Least Overall Harm Summary – Alternatives 9A & 9B**

| LEAST OVERALL HARM (LOH) SUMMARY | | | |
|---|---|---|---|
| CRITERION | Alternative 9A | Alternative 9B | LOH Alternative |
| Ability to mitigate adverse impacts to Section 4(f) properties | • Demolished properties which are historic or contribute to a historic district (Island Terrace Apartments, Jackson Park Terrace building, 6450-60 S. Stony Island Avenue, 6516-6520 S. Stony Island Avenue) would be photo documented<br>• Net gain (+3.8 acres) in park/recreation land with closed roads right-of-way transferred to Jackson Park | • Roadways designed to minimize effects to Jackson Park as a public park, Jackson Park Historic Landscape District and Midway Plaisance as a historic district and CPBS Historic District as a historic district, Jackson Park Historic Landscape District and Midway Plaisance remains listed/eligible for NRHP and CPBS Historic District remains listed/eligible for NRHP<br>• Net gain (+2.5 acres) in park/recreation land with closed roads right-of-way transferred to Jackson Park | Alt 9B |
| Remaining harm of 4(f) properties after mitigation | • Net increase in park/rec land (+3.8 acres) after closed roads right-of-way transfers to Jackson Park<br>• Historic integrity of the Jackson Park Historic Landscape District and Midway Plaisance and CPBS Historic District is diminished and remains listed/eligible for the NRHP<br>• Permanent loss of one historic property (Island Terrace Apartments), no longer NRHP eligible<br>• Permanent loss of two contributing properties to the CPBS Historic District<br>• Substantially diminishes integrity of Jackson Park Terrace Historic District with demolition of one building, remains eligible for NRHP. | • Net increase in park/rec land (+2.5 acres) after closed roads right-of-way transfers to Jackson Park<br>• Historic integrity of Jackson Park Historic Landscape District and Midway Plaisance is diminished and remains listed/eligible for the NRHP and CPBS Historic District remains listed/eligible for NRHP | Alt 9B |

| | | | |
|---|---|---|---|
| **Relative significance of each 4(f) property** | • Island Terrace Apartments is NRHP eligible, locally significant, and demolished<br>• Jackson Park Terrace is NRHP eligible, locally significant, and one building is demolished.<br>• Hyde Park Academy High School is NRHP eligible, locally significant<br>• Midway Plaisance is listed on the NRHP, nationally significant<br>• CPBS Historic District is listed on the NRHP, nationally significant, and two buildings are demolished | • Jackson Park is a public park and recreational area with no adverse effect to its activities, features and attributes.<br>• Jackson Park Historic Landscape District and Midway Plaisance is listed on the NRHP, nationally significant, with sliver right-of-way acquisition.<br>• CPBS Historic District is listed on the NRHP, nationally significant, with sliver right-of-way acquisition from Jackson Park | Alt 9B |
| **OWJ views** | • CPD supports the project as it is consistent with their 2018 SLFP planning document.<br>• The City supports the project.<br>• ACHP and SHPO have not expressed views on this alternative. | • CPD supports the project as it is consistent with their 2018 SLFP planning document.<br>• CDOT supports the project.<br>• ACHP and SHPO have not expressed views on this alternative and have signed the MOA agreeing with the mitigation measures. | Neutral |
| **Degree that the alternative meets P&N** | Meets P&N | Meets P&N | Neutral |
| **Magnitude of impact after mitigation to resources not protected by Section 4(f)** | • 270 residential units displaced and relocated, community cohesion impact.<br>• 250-300 trees removed and replaced (neutral impact) | • 0 demolitions<br>• 0 residential units displaced<br>• 350-400 trees removed and replaced (neutral impact) | Alt 9B |
| **Substantial differences in costs** | +$35 million for property acquisition, demolition, and relocations for the apartment buildings and commercial/residential mixed-use building | N/A | Alt 9B |

The following summary demonstrates Alternative 9B to be the alternative which causes the least overall harm:

Alternative 9B requires more conversion of Section 4(f) land (5.2 acres) to a transportation use compared to Alternative 9A (3.9 acres). Alternative 9B acquires permanent Section 4(f) land from Jackson Park, Jackson Park Historic Landscape District and Midway Plaisance, and the CPBS Historic District, while Alternative 9A acquires permanent Section 4(f) land from Jackson Park, Midway Plaisance, Jackson Park

Historic Landscape District and Midway Plaisance, the CPBS Historic District, the Island Terrace Apartment Building, the Jackson Park Terrace Historic District, and Hyde Park High School.

FHWA considers the relative significance of Jackson Park, the Midway Plaisance, Jackson Park Historic Landscape District and Midway Plaisance, and the Chicago Park Boulevard Historic District to be greater than the relative significance of the Island Terrace Apartment Building, the Jackson Park Terrace Historic District, and Hyde Park High School because of the national significance of the Jackson Park, Midway Plaisance, Jackson Park Historic Landscape District and Midway Plaisance, and CPBS Historic District from a historic property perspective and the importance of Jackson Park as a public park and recreation area to the public. Alternative 9B requires 5.2 acres from Jackson Park, and consequently the Jackson Park Historic Landscape District and Midway Plaisance and the CPBS Historic District because Jackson Park is coincident with Historic District these two historic properties, and no land from Midway Plaisance. Alternative 9A requires 2.9 acres from Jackson Park (which is coincident with Jackson Park Historic Landscape District and Midway Plaisance and the CPBS Historic District), 0.1 acres from the Midway Plaisance, 0.1 acres from the Island Terrace Apartments, 0.3 acres from Hyde Park High School, 0.3 acres from Jackson Park Terrace, and an additional 0.2 acres from the CPBS Historic District not within Jackson Park (3.9 total acres). Therefore, Alternative 9B requires 2.0 more acres from 4(f) properties than Alternative 9A. Alternative 9A has fewer tree impacts than Alternative 9B, however, tree impacts will be mitigated by replacement of trees in Jackson Park in cooperation with Chicago Park District.

However, the balance of the other factors weighs in favor of Alternative 9B causing the least overall harm. First, even though Alternative 9B converts 2.0 more acres from Section 4(f) land than Alternative 9A, the activities, features, and attributes of Jackson Park as a public park and recreational area will remain and will not be substantially diminished with Alternative 9B. Additionally, roadways that are closed will have their right-of-way transferred to the Chicago Park District, resulting in net increase in park/recreational land (2.5 acres). Jackson Park Historic Landscape District and Midway Plaisance and the CPBS Historic District and the CPBS Historic District both will retain their historic integrity and eligibility for the NRHP even after the conversion of Section 4(f) land to a transportation use.

In contrast, Alternative 9A results in the complete demolition of one historic property (Island Terrace Apartments), one building from the Jackson Park Terrace Historic District, and contributing buildings within the CPBS Historic District (the residential building at 6516-20 S. Stony Island Avenue, and the residential/commercial mixed-use building at 6450-60 S. Stony Island Avenue). The Island Terrace Apartments would no longer exist as a historic property. Demolition of 6516-20 and 6450-60 S. Stony Island Avenue would eliminate two contributing properties from the CPBS Historic District but not affect the district's historical integrity, while the removal of one building from the Jackson Park Terrace Historic District would substantially diminish that historic property's integrity. While mitigation could be completed for these impacts, such as photographs and written documentation, it would not fully compensate for the loss of these historic structures.

Second, Alternative 9A results in the displacement of 270 residential units in low-income and minority housing in the project area. The demolition of the Island Terrace Apartments, one building from the Jackson Park Terrace Historic District, 6516-20 and 6450-60 S. Stony Island Avenue would require the relocation of and assistance to all residents and tenants that occupy the buildings to equivalent and fair

housing opportunities according to the Uniform Relocation Assistance and Real Property Acquisition Act (42 USC 61). These relocations may be to communities outside of the immediate area which would severely disrupt existing community cohesion. Alternative 9B has no residential or commercial displacements.

Third, Alternative 9A requires acquisition of 27 parcels along the west side of Stony Island Ave. Full acquisition of five parcels associated with the three residential and one commercial/residential mixed-use building to be demolished exceeds $35 million dollars in land and building value.[25]

The mitigation costs for Alternative 9B are also less than Alternative 9A, because the mitigation within Jackson Park is similar for both alternatives but Alternative 9A requires additional mitigation for the historic properties west of Stony Island.

---

[25] *The dollar amount noted is an estimate of the value of each property, building demolition, and the relocation of each business and resident. These costs were obtained through a preliminary market analysis using data available from public sources.*

# 8.0    Impacts of Alternative 9B

The impacts of Alternative 9B - Mobility Improvements - Widen Lake Shore Drive/Widen Stony Island East/Reconfigure Hayes are detailed in this section, including acreage of land use, facilities and functions affected, highway traffic noise, access restrictions, closures and detours, and other anticipated impacts.

## 8.1    Acreage of Section 4(f) Land Use

The total conversion of Section 4(f) land to transportation use is 28.7 acres (5.2 acres permanent use, 23.5 temporary use).

All 5.2 acres of the permanent Section 4(f) use occurs within Jackson Park. Because the boundaries of (1) Jackson Park Historic Landscape District and Midway Plaisance and (2) CPBS Historic District overlap with Jackson Park, this Section 4(f) use also occurs within these two historic properties. The permanent conversion of 5.2 acres of Section 4(f) property is necessary to construct an additional southbound travel lane along Lake Shore Drive, to widen Stony Island Avenue to the east between 67th Street and 59th Street, to reconfigure Hayes Drive at the Lake Shore Drive, Richards Drive and Cornell Drive intersections, and to convert and widen one way streets along North Midway Plaisance and southbound Cornell Drive to two-way operation. Section 4(f) property begins at the back of curb along roadways within and adjacent to Jackson Park; therefore, any roadway widening within the park that is required to provide the necessary improvements to meet the project's Purpose and Need results in a permanent conversion of Section 4(f) land.

All 23.5 acres of the temporary Section 4(f) use occurs within either Jackson Park or the Midway Plaisance. Because the boundaries of (1) Jackson Park Historic Landscape District and Midway Plaisance and (2) CPBS Historic District overlap with Jackson Park and the Midway Plaisance, this temporary Section 4(f) use also occurs within these two historic properties.

In the Midway Plaisance, 0.1 acres of Section 4(f) temporary use is required to reconstruct the existing sidewalk along the west side of Stony Island Avenue.

In Jackson Park, 18.4 acres of Section 4(f) temporary use is required to construct trail connections along Cornell Drive, Marquette Drive and Hayes Drive as well as pedestrian underpasses at the following locations: Cornell Drive/Hayes Drive intersection, along Hayes Drive between Richards Drive and Lake Shore Drive, along Jeffery Drive between Marquette Drive and 67th Street, and the South Shore Drive/67th Street intersection. These trail connections and underpasses are a benefit to Jackson Park providing improved safety and connectivity within the public park areas and are consistent with the CPD plans, as documented in the 2018 SLFP.

Also in Jackson Park, approximately 5.0 acres of temporary Section 4(f) use results from temporary grading impacts along roadways and construction staging areas. Final size and location of staging areas will be refined through final design and is subject to change as necessary to accommodate park programming at the time of construction.

**Mobility Improvements to Support the South Lakefront Framework Plan**

The temporary Section 4(f) uses described above which affect Jackson Park, Midway Plaisance, the Jackson Park Historic Landscape District and Midway Plaisance, and the CPBS Historic District will be (1) temporary in duration and less than the time for construction of the entire project; (2) the scope of the work is minor and the nature and magnitude of the changes to the Section 4(f) properties are minimal; (3) there are no anticipated permanent adverse physical effects nor will there be interference with the protected activities, features, or attributes of the Section 4(f) properties, on either a temporary or permanent basis; and (4) the land will be fully restored to a condition that is at least as good as that which existed prior to the project. While the Chicago Park District provided concurrence of these conditions, concurrence was not received from all OWJs, therefore, these temporary uses cannot be declared exempt from Section 4(f) approval and are subject to approval under 23 CFR 774.3(a).

The acreage and locations of the permanent and temporary uses of Section 4(f) lands can be found on **Exhibit F-1**.

Photographs of the existing conditions were collected where Section 4(f) uses will occur. A map indicating the location and orientation of each photograph is provided as **Exhibit F-2**. Photographs grouped by roadway corridor are provided as **Exhibits F-2a** through **F-2d**.

## 8.2    Facilities and Functions Affected

### 8.2.1    Property Function

The 5.2 acres of land in Jackson Park that will be converted to transportation use is open green space recreational land. New parkland space to be provided by closed roadway areas will provide a more contiguous area in comparison to the slivers of land along the roadways (5.2 Acres) that is proposed for permanent use. Temporary use areas (23.5 Acres) of the park are primarily open green space recreational land in addition to existing trails that will be improved by connections within proposed project. The transportation use of Jackson Park, together with the minimization and mitigation measures incorporated into the project, does not adversely affect the activities, features, and attributes that qualify Jackson Park for protection under Section 4(f) as a park and recreational area.

Because the boundaries of (1) Jackson Park Historic Landscape District and Midway Plaisance and (2) CPBS Historic District overlap with Jackson Park, the 5.2 acres of Section 4(f) use also occurs within these two historic properties. While the conversion of the 5.2 acres to transportation use from these two historic properties affects their historic integrity, both historic properties will retain their integrity-defining features and remain listed on the NRHP.

For locations that will be used temporarily during construction, the work will be coordinated with CPD to ensure access to the park's amenities will be maintained.

Easements will be established for utilities on CPD land. The easements will provide access to maintain utilities. The final acreage and locations are being coordinated with CPD.

### 8.2.2    Great Lake Fishery and Ecosystem Restoration (GLFER)

As part of an effort to restore bird, fish and wildlife habitat within the natural areas of Jackson Park, CPD and USACE entered into an agreement to initiate a 5-year ecological restoration project authorized through the Water Resources Development Act, Section 506, GLFER.

Alternative 9B results in an alteration of the existing GLFER project. Impacts to GLFER areas are identified in **Exhibit H-1a** and mitigation of these impacts are identified in **Exhibit H-1b**. Additional information regarding coordination of alterations of the GLFER project can be found in Section 10.2.1 of this document.

### 8.2.3    Tree Removals

This alternative results in the removal of 417 trees within Jackson Park. This removal accounts for less than 10% of the known tree population on the property. Tree removals associated with the transportation improvements are shown on **Exhibit F-3**.

Mitigation of these tree removals is discussed in Section 9.2.

### 8.2.4    Natural Areas

Alternative 9B will not use any land from any designated natural areas, as identified in Section 4.1.3.

### 8.2.5   Water Resource Impacts

The widening of southbound Lake Shore Drive will require modifications to the 59th Street Inlet Bridge, resulting in 0.04 acres of temporary and 0.04 acres of permanent impacts of Lake Michigan and its associated lagoons. See **Exhibit F-4a**. Minor repairs to a bridge on Hayes Drive over the South Lagoon are proposed. The minor repairs require a temporary impact of 0.20 acres due to the installation of cofferdams and dewatering during construction as well as area needed for access during the course of repairs. See **Exhibit F-4b.** Lake Michigan is considered to be a navigable water body under the jurisdiction of the USACE. The impacts described in this section must be coordinated with the USACE and will require a Section 404 Regional Permit. Permit requirements are being coordinated with the USACE. The Section 404 permit will be obtained during the detailed design stage of the project.

The 59th Street Bridge widening also results in a traverse encroachment of 0.03 acre-feet of fill within the 100-year floodplain. See **Exhibit F-4c**. This impact will not result in increased floodplain elevations or increase the risk of flooding in the area. Compensatory storage is not required. These impacts will require an individual permit, which requires public notice, to be obtained by the Illinois Department of Natural Resources, Office of Water Resources (IDNR-OWR) during the Phase II design stage.

Alternative 9B does not impact any wetlands identified within the study area.

### 8.2.6   Historic Significance

The historic landscape of Jackson Park is a primary contributor to listing of the Jackson Park Historic Landscape District and Midway Plaisance on the NRHP. Changes to the overall vehicular and pedestrian circulation networks within the park may deviate from historic plans and design principals. Topographic changes resulting from the proposed roadway configuration, including roadway widening, realignment, and vertical alterations, and proposed underpasses and trails may result in effects to characteristics of the historic landscape.  Within the park, the proposed roadway changes are inconsistent with the Secretary of Interior (SOI) standards except for portions of the Hayes Drive realignment which are consistent with the SOI standards. The improvements along Lake Shore Drive, improvements of Stony Island Avenue, bicycle/pedestrian enhancements and other transportation improvements proposed are consistent with the SOI standards. Jackson Park Historic Landscape District and Midway Plaisance will remain listed on the NRHP after Alternative 9B is implemented and retains its integrity for the NRHP listing.

Jackson Park is one of many parks, squares, boulevards and significant adjoining properties in the CPBS Historic District.  With Jackson Park's NRHP listing remaining intact after Alternative 9B is implemented, the CPBS Historic District will not experience decreased integrity as a result of the changes to Jackson Park and will remain listed on the NRHP.

## 8.3   Access Restrictions

The proposed improvement will maintain existing access points to park facilities from roadways within Jackson Park. Conversions of one-way streets at North Midway Plaisance and Cornell Drive to two-way traffic will accommodate traffic from roadway removals on South Midway Plaisance and northbound Cornell Drive.

## 8.4 Closures and Detours

Roadway closures that are considered as part of the No-Action Alternative are described in Section 2.1 and shown on **Exhibit A-3**. There are no proposed permanent roadway closures as part of FHWA's proposed action.

### 8.4.1 Conceptual Maintenance of Traffic During Construction

Maintenance of traffic during construction is proposed to occur in four phases over a period of approximately two years. Traffic is proposed to be maintained through a combination of roadway staging and temporary full closures requiring traffic detours. An IDOT Traffic Management Plan analysis of traffic delays during construction shows that the network will operate sufficiently when modifications to traffic signal timings and phasings are implemented.

Construction staging areas are proposed within Jackson Park in existing parking lots and grassy areas per coordination with CPD.  Use of these areas will minimize impacts to park access and recreation uses, as shown in **Exhibit F-1**. These areas result in a temporary use of Jackson Park during construction. Construction phases are staggered to ensure ample parking opportunities for park users is maintained during roadway construction. Throughout the remainder of Jackson Park, construction staging can be accommodated within existing roadway footprints.

Temporary closures of paths may be implemented in order to construct proposed underpasses and trail connections. Detours of any path closure will be provided as needed during construction.

With the exception of the Hayes Drive boat launch, surrounding recreational amenities will be made accessible to the public during construction. The 59th Street Inlet Harbor widening may impact harbor operations during construction. Construction on the harbor will occur during winter and off-peak seasons. Access to the Hayes Drive boat launch will be prohibited for the duration of the construction due to its use for construction staging.

# 9.0   All Possible Planning to Minimize Harm

## 9.1   Design Measures that Minimize Use of Section 4(f) Property

Additional planning efforts were made to minimize the permanent incorporation of Section 4(f) lands into the transportation network for Alternative 9B, while continuing to provide facilities that do not compromise the safety of users. The minimization efforts reduced Section 4(f) use by 2.1 acres (see **Table 9**).

### 9.1.1   Roadway Footprint

These efforts are described below with the corresponding number of acres reduced:

**Lake Shore Drive**
- To provide a third southbound travel lane, an 11'-4" travel lane (versus a desired lane width of 12 feet) is proposed to minimize permanent use of Section 4(f) land while providing a safe and efficient travel lane.
- Intersection modifications at 57th Drive are contained to the existing roadway footprint.
- Turn lane widths at intersections are proposed to be 10 feet wide (versus a desired lane width of 12 feet) to minimize permanent use of Section 4(f) land.
- Additional turn lanes and storage at Science Drive and Hayes Drive are minimized to avoid excess capacity while providing sufficient operations.
- **Amount of Section 4(f) use reduced = 0.5 acres**

**59th Street Lagoon Inlet Bridge**
- To provide a third southbound travel lane along Lake Shore Drive, bridge widening and modifications are minimized to 11 feet 4 inches (versus 12 feet to provide a desired lane width).

**Hayes Drive**
- Parking along Hayes Drive will be removed to allow Hayes Drive to be reconfigured for two lanes in each direction with less than 2 feet of widening occurring between Richards Drive and Lake Shore Drive. Between Richards Drive and the proposed realignment of Hayes Drive, the removal of parking allows the improvement to remain within the existing roadway footprint.
- Turn lane widths at intersections are proposed to be 10 feet wide (versus a desired lane width of 12 feet) to minimize permanent use of Section 4(f) land.
- At the Richards Drive and Cornell Drive/63rd Street intersections, additional turn lanes and storage have been minimized to avoid excess capacity while providing sufficient operations.
- The proposed 5'-6" median barrier has been minimized (versus a desired 16-18 foot median) to decrease the total proposed cross-section width.
- The Hayes Drive curved realignment at Hayes Drive/Cornell Drive/63rd Street is optimized to reduce conversion of Section 4(f) land while providing a safe facility to accommodate through movements for predominant travel.
- **Amount of Section 4(f) use reduced = 0.6 acres**

**Stony Island Avenue**

- Additional through lanes are proposed to be 11 feet wide (versus a desired lane width of 12 feet) to minimize permanent use of Section 4(f) land while providing a safe and efficient travel lane.
- Turn lanes are proposed to be 10 feet wide (versus a desired lane width of 12 feet) to minimize permanent use of Section 4(f) land while providing a safe and efficient turn lane.
- Proposed medians typically shadow left turn lanes which are proposed to be 10 feet (versus a desired lane width of 12 feet) and have been minimized to decrease the total proposed cross-section width.
- Additional turn lanes and storage at intersections with Stony Island Avenue are minimized to avoid excess capacity while providing sufficient operations.
- **Amount of Section 4(f) use reduced = 0.9 acres**

A summary of these minimization efforts completed for Alternative 9B is included in **Table 9** and depicted on **Exhibit F-1**. This includes a comparison of the Section 4(f) uses associated with providing standard and/or desired design criteria versus the proposed design.

**Table 9: Summary of Minimization Efforts (Alternative 9B)**

| Criterion | Impact Measure | Desired/ Standard Criteria | Amount of Section 4(f) Use reduced by design minimization efforts | Proposed Design |
|---|---|---|---|---|
| **Section 4(f) Land Permanent Use (Jackson Park)** | | | | |
| Lake Shore Drive | Acre | 1.8 | **0.5** | 1.3 |
| Stony Island Avenue | Acre | 3.3 | **0.9** | 2.4 |
| Hayes Drive | Acre | 1.7 | **0.6** | 1.1 |
| Other Roadways | Acre | 0.5 | **0.1** | 0.4 |
| Total (Jackson Park) | | 7.3 | **2.1** | 5.2 |
| **Section 4(f) Land Permanent Use (Midway Plaisance)** | Acre | 0 | - | 0 |
| **Right-of-Way Acquisition from Historic Properties** | Acre | 0 | - | 0 |

### 9.1.2   Underpass Alternatives

Several alternatives for the Hayes Drive/63rd Street underpasses were investigated to minimize grading impacts, required path improvements, visual impacts and tree removals in the vicinity of the intersection. Initially, the alternatives considered variations of maintaining versus raising the profile of the roadway. While maintaining the existing roadway height minimized visual impacts within Jackson Park, it resulted in the greatest amount grading areas and tree removals, particularly trees of large diameter. Proposing the underpasses at existing grade and fully raising the roadway above them resulted in less grading and tree impacts, by comparison, however, the roadway would become a visual barrier obstructing views within Jackson Park. Visual, grading, and tree impacts were balanced by proposing a partially raised roadway (4 feet above existing grade) to construct the proposed underpasses.

Further analysis of alternatives for the proposed underpass configuration considered varying roadway radii values to either preserve historic alignments versus providing radii for proposed design speeds. Orientation and location of the underpasses was also considered. Ultimately, a proposed radius to meet design speed criteria and the placement of the underpasses on the north and south legs of the intersection resulted in a safer roadway improvement, while minimizing grading impacts, path improvements, and tree removals.

### 9.1.3   Landscape and Tree Removal Minimization Efforts

Minimization efforts were made to preserve the existing berm along the east side of Stony Island Avenue within Jackson Park, which is a feature of Olmsted's landscape design principles. Proposed variations in roadway cross-slopes along Stony Island Avenue help to minimize grading impacts outside of the roadway footprint. The sidewalk along Stony Island Avenue is proposed to be located along the back of curb to minimize intrusion into the park. The proposed path along the east side of the berm will be located parallel to the berm to also minimize grading and impacts to the berm.

Tree impact minimization efforts have also been made for new and reconfigured trails that have been designed in accordance with the 2018 South Lakefront Framework Plan.  Where possible, proposed trails have been aligned within the footprint of existing roadways to be closed to provide safe, comfortable, and convenient biking and walking connectivity through the park with minimal tree removal.

In all cases, minimization efforts included reviewing the size, species and condition of existing trees, so that the preservation of large native species trees, and in particular Oak species, could be prioritized when possible.

Minimization of tree impact will continue to be refined through detailed design and construction coordination with CPD.

## 9.2    Mitigation Measures

In this section, preliminary mitigation measures are identified and coordination regarding mitigation measures to the permanent uses of Section 4(f) properties is ongoing. Additional mitigation measures will be considered through Section 106 consultation with consulting parties and the public and final mitigation measures for Section 4(f) use will be included in the Final Section 4(f) evaluation. Coordination with the following agencies will determine final mitigation measures that will be incorporated into the project:

- Chicago Park District (OWJ)
- City of Chicago (OWJ)
- State Historic Preservation Officer (OWJ)
- Advisory Council on Historic Preservation (OWJ)

### 9.2.1    Land Use Mitigation

The proposed improvements result in 5.2 acres of permanent use of Section 4(f) properties and 23.5 acres of temporary use of Section 4(f) land.  Permanent uses will be mitigated through the transfer of closed roadway footprints of Cornell Drive from 63rd Street (Hayes Drive) to 62nd Street, Marquette Drive from Stony Island Avenue to Richards Drive, and northbound Cornell Drive from 67th Street to 65th Street from CDOT to CPD for incorporation into Jackson Park as parkland. The conversion of these areas from roadway to parkland will result in 7.7 acres of new parkland within the existing park space to be utilized for proposed trails and open green space that will enhance recreational uses and improve continuity of open spaces within Jackson Park.  This new parkland space will also provide a more contiguous area in comparison to the slivers of land along the roadways that is proposed for permanent use. Land used for temporary use will be restored to at least as good condition as before construction and will remain under the ownership of CPD. Converting the existing roadways into parkland is part of the CPD's long range plan, as documented in the 2018 SLFP.

### 9.2.2    Preliminary Tree Mitigation Strategies

Tree removals associated with Alternative 9B will be replaced using a minimum 1:1 tree replacement ratio, as coordinated with CPD. This also meets requirements set forth by IDOT according to their policy on the preservation and replacement of trees[26].

Additionally, tree replacement will comply with the following CPD recommended replacement guidelines, in accordance with their design guidelines and standards[27]:

- Plant replacement selection should be appropriate and sensitive to the historic palette (where required)
- Plant replacement layout should be aesthetically pleasing

---

[26] Illinois Department of Transportation Departmental Policies: D&E-18 Preservation and Replacement of Trees. March 4, 2014.
[27] Chicago Park District: Design Guidelines & Standards. 2010

- Landscape plantings in or adjacent to historic landscapes should preserve and enhance the historic design intent
- All new plantings should conform to and complement the existing plant palette and landscape style

Restoration of trees will be proposed first within Jackson Park and along Stony Island Avenue, where tree removals would occur. Along Stony Island and within the public parkway, rows of street trees spaced approximately 25' on center will be utilized to comply with the requirements the City's Landscape Ordinance. Where large existing shade trees are being removed, replacement shade trees will be installed with the intent of providing a comparable functional replacement. Within the park areas, shade and understory trees will be clustered together in natural groupings. The CPD desires a re-introduction of smaller understory and flowering trees to create layers of planting, which is a trait of Olmsted's picturesque style of design and an original feature of Jackson Park. To the extent possible, understory tree plantings will be utilized in select areas and grouped together to achieve this effect, with appropriate consideration given to maintaining sightlines and park access. Historical planting plans and letters will be reviewed and consulted as a guide for developing a plan for locating replacement trees, as well as guidance on species selection.

Preliminary tree replacements are shown on **Exhibit G-2**. The preliminary tree replacements shown in this exhibit are only to show a 1:1 replacement within Jackson Park is feasible. A plan showing exact locations of proposed replacement trees will be developed in coordination with CPD during the detailed design phase of the project.

### 9.2.3   Mitigation Measures for Section 106 Resources

Mitigation measures for Section 4(f) use of historic properties were identified through the Section 106 process. As part of a Memorandum of Agreement (MOA) between the FHWA, the Illinois SHPO, and the ACHP, these parties agree that the undertaking (as defined in the Section 106 documentation to include the actions evaluated in this Section 4(f) Evaluation) shall be implemented in accordance with the following stipulations in order to resolve adverse effects to historic properties:

*Research and Documentation*

- CDOT and the CPD, in consultation with the Illinois SHPO, will prepare an updated nomination of the Jackson Park Historic Landscape District and Midway Plaisance to the NRHP.

- CDOT and the Chicago Park District will prepare photographs and drawings documenting existing conditions on (a) the 19.3-acre site planned for the OPC, (b) the east end of the Midway Plaisance, and (c) the areas planned for traffic improvements in Jackson Park.

- CDOT and the Chicago Park District, in consultation with the SHPO, will prepare Part 1 (site history, existing conditions, and analysis/evaluation) and Part 2 (long-term preservation strategy) of a Cultural Landscape Report (CLR) for Jackson Park, consistent with federal guidance for cultural landscape reports in: Robert R. Page, Cathy A. Gilbert, and Susan A. Dolan, *A Guide to Cultural Landscape Reports: Contents, Process, and Techniques* (Washington, DC: U.S.

Department of the Interior, National Park Service, Cultural Resource Stewardship and Partnerships, Park Historic Structures and Cultural Landscapes Program, 1998).

*Interpretation*

- CDOT and the Chicago Park District will develop and implement a plan to install interpretive materials or carry out programs to commemorate and present the cultural and natural historical contributions of Jackson Park and its use by South Side residents.

*Rehabilitation*

- CDOT and the Chicago Park District will prepare a Historic Structures Report (HSR) for the English Stone Comfort Station and will rehabilitate it in light of the recommendation from the HSR.

- CDOT and the Chicago Park District will prepare a conservation assessment and rehabilitation plan for the Statue of the Republic and will implement the rehabilitation in phases.

*Design Review*

- CDOT and the Chicago Park District plan modifications to the east end of the Midway Plaisance consistent with SOI Standards for the Rehabilitation of Historic Properties with respect to standards 9 and 10, which address compatible new additions. CDOT and the Chicago Park District will provide the draft design for 45-day review and comment by the public and signatories, invited signatories, and concurring parties to the MOA concerning landscaping features and other character-defining elements of the design.

*Planting Review*

- CDOT and the Chicago Park District will ensure that planting plans detailing the species and placement of native plantings required in the GLFER mitigation areas are consistent with the original GLFER approval. USACE will be provided the final plans for review consistent with Section 408.

These stipulations are detailed in the Final MOA, included as **Appendix K**.

# 10.0  Coordination

Coordination documentation with OWJs, Federal agencies with encumbrances, and the public is included in **Appendix H**.

## 10.1   Officials with Jurisdiction

The Draft Section 4(f) evaluation was circulated to all OWJs on April 23, 2020. See **Exhibit H-1a**. Comments received from OWJs are summarized below.

For Section 4(f) historic properties, the ACHP and SHPO are the OWJ. Through the Section 106 process, a HPI has been reviewed by the CPD, ACHP, and SHPO to identify listed and eligible properties for the NRHP. A final HPI received SHPO concurrence on determinations of eligibility on July 10, 2018. The HPI was amended in January 2020 to include the CPBS Historic District as a newly listed property on the NRHP. The HPI was used to identify Section 4(f) historic properties. The conclusion of the Section 106 process will result in a Memorandum of Agreement (MOA). Consulting parties who have responsibilities for implementing mitigation measures, such as IDOT and the City of Chicago, will be invited to sign the MOA. The MOA will identify measures to mitigate adverse effects to historic properties. As appropriate, those mitigation measures will be included in the Final Section 4(f) evaluation to as measures to mitigate harm to the Section 4(f) historic properties.

### 10.1.1  Summary of Comments from OWJs

Responses and comments were received from the ACHP and CPD during the Draft Section 4(f) evaluation comment period. See **Exhibit H-1b**. A summary of the comments is below:

- The ACHP declined the invitation to review the Draft Section 4(f) evaluation, citing it is outside the scope of Section 106 of the NHPA and its implementing regulations.
- The CPD supports the proposed roadway improvements, acknowledging they will benefit the park by providing improved park cohesiveness, accessibility, and safety for all park users.
- The CPD recognized that the proposed roadway vacations and underpasses would benefit the park by adding parkland within the property and improving park cohesiveness.
- The Illinois State Historic Preservation Officer did not provide a response or comments on the Draft Section 4(f) evaluation.

Coordination with the OWJs will be ongoing through design and construction.

## 10.2   Federal Encumbrances

The implementation of Alternative 9B requires additional authorizations/approvals by the USACE and NPS. A summary of each agency's authority, associated impacts of Alternative 9B, and coordination efforts to date is provided in Sections 10.2.1 and 10.2.2.

The Draft Section 4(f) evaluation was circulated to all Federal agencies with encumbrances on April 23, 2020. See **Exhibit H-2a**. Comments received from Federal agencies with encumbrances are summarized in Section 10.2.3.

## 10.2.1 USACE Encumbrances

Coordination efforts with the USACE regarding impacts of Alternative 9B are ongoing. The widening of Lake Shore Drive and modifications to the 59th Street Inlet Bridge and repairs to the Hayes Drive bridge result in impacts to Section 404 waters under the jurisdiction of the USACE. As a result of these impacts, a Section 404 Regional Permit must be obtained during detailed design.

The USACE noted the impacts to the GLFER project will include a request to alter the project pursuant to the procedures of Section 408 (codified 33 USC 408). Section 408 approval will be obtained during detailed design.

Impacts to GLFER areas associated with Alternative 9B are identified in **Exhibit H-2b**. The widening of Lake Shore Drive to the west will result in permanent impacts to existing GLFER areas. Existing sand berms that are incorporated in the GLFER restoration in this area are set back from Lake Shore Drive; permanent impacts to these berms will be avoided. Temporary impacts to the front slopes of these berms will be restored in place following construction. Improvements at the Lake Shore Drive/Hayes Drive intersection, along Hayes Drive, and at the Hayes Drive/Cornell Drive/63rd Street intersection result in permanent impacts to GLFER areas. Temporary GLFER impacts at the 63rd Street underpass (beneath Lake Shore Drive) and along Hayes Drive will be restored in place following construction. Through coordination with the CPD and USACE, areas to replace permanently impacted GLFER areas were identified and are shown on **Exhibit H-2c**. Final coordination of these impacts and mitigation measures between CDOT, CPD and USACE is ongoing.

The requirements of the Section 404 and 408 processes will be satisfied independent of the Section 4(f) approval.

## 10.2.2 National Park Service Encumbrance

As noted in Section 4.1.9, recreational uses within Jackson Park are protected by regulations of the UPARR Act. The National Park Service has the authority to review the proposed changes within Jackson Park and ensure the requirements of UPARR, as well as NEPA and NHPA, are met.

The widening and use of park for transportation purposes is anticipated to result in a conversion of recreation use to non-recreation use under the definition of UPARR. By regulation, the conversion will require replacement of equal recreation utility. UPARR areas, amenities, conversions, and replacements have been coordinated with the National Park Service and are shown on Maps 1-6 in **Exhibit H-2d**. Specifically, the areas of UPARR conversion related to transportation improvements from Alternative 9B are shown on **Exhibit H-2d**, Map 4.

The National Park Service action is currently undergoing review under NEPA and NHPA. The requirements of the UPARR program will be satisfied independent of the Section 4(f) approval.

### 10.2.3 Summary of Comments from Federal agencies with encumbrances

Comments were received from the USACE, DOI, and HUD during the Draft Section 4(f) evaluation comment period. See **Exhibit H-2e**. A summary of the comments and substantive revisions is below:

- The USACE does not have a position on the proposed impacts.
- The USACE requested temporary impacts as a result of dewatering beneath Hayes Drive be discussed. This discussion is provided in Sections 8.2.5 and 10.2.1 of the Final Section 4(f) evaluation.
- The USACE requested clarification of the permanent and temporary impacts to GLFER areas, specifically berms along Lake Shore Drive. This discussion is expanded in Section 10.2.1 of the Final Section 4(f) evaluation.
- The DOI has no objections to the Draft Section 4(f) evaluation.
- The Department of HUD strongly opposed any alternatives that would demolish Jackson Park Terrace and Island Terrace Apartments, in whole or in part.
- The Department of HUD provided further financial implications of impacts to the Jackson Park Terrace and Island Terrace Apartments. This information is expanded in Section 7.0 of the Final Section 4(f) evaluation.

## 10.3  Public Coordination

The Draft Section 4(f) evaluation does not require public input; however, it was made available for public review on the City's website. Comments received from the public are provided as **Exhibit H-3**. Comments received from the public are summarized below:

- Comments requested the FHWA consider a No-Action Alternative prior to roadway closures and construction of the OPC in Jackson Park. The roadway closures and the decision to locate the OPC in Jackson Park are local land use and land management decisions by the City and are not under the jurisdiction of FHWA and are therefore not subject to Section 4(f). See Section 2.1 for details of FHWA jurisdiction and actions subject to Section 4(f).
- Comments requested FHWA consider avoidance measures to avoid impacts that result from the construction of the OPC in Jackson Park and proposed roadway improvements. The roadway closures and the decision to locate the OPC in Jackson Park are local land use and land management decisions by the City and are not under the jurisdiction of FHWA and are therefore not subject to Section 4(f). See Section 2.1 for details of FHWA jurisdiction and actions subject to Section 4(f).
- Comments requested clarification of the construction sequencing. Conceptual maintenance of traffic during construction is detailed in Section 8.4.1. Detailed maintenance of traffic plans will be completed as part of the design phase.

FHWA's response letters to public comments are provided as **Exhibit H-4** in **Appendix H**.

# EXHIBIT 9



# THE OBAMA PRESIDENTIAL CENTER
### SITE PLAN

## LEGEND

### Existing Community Infrastructure
1. Burke Elementary School
2. University of Chicago 'Arts Block'
3. Chicago Transit Authority Green Line – Garfield Station
4. Chicago Transit Authority Overpass and Station House (Chicago Landmark)
5. Green Line Theatre (University of Chicago)
6. Washington Park Field House

### Site Features
1. Washington Park Arboretum (Existing)
2. Washington Park Arboretum Extension
3. Motorcade staging / Burke School Access
4. Colonnade / Reflecting Pool
5. Forum Hill and Ponds (Secured Public Access)
6. Forum Earth Terraces with Demountable Seating
7. Community Gardening: Sun-protected Raised Gardens
8. Public Rooftop Garden
9. Formal Entry Promenade and Reflecting Pool
10. Northern Entry Pavilion / Chicago Fire Department Access
11. Southern Entry Pavilion and Fountain (Primary)
12. Dedicated Bicycle Trail and Bicycle Underpass
13. Native Savannah Garden / Sheltered Seating
14. Obama Square: Entry Monuments
15. Obama Square: Boulevard Improvements and Traffic Calming
16. Arts Block Plaza and Outdoor Reflecting Rooms
17. Rare and Endangered Native Plant Gardens
18. Bog Garden
19. Fen Garden
20. Boardwalk and Perimeter Integrated Seating
21. Community Theater and Court Earth Terrace Seating
22. The Granite Slab

### New Architectural Features
1. Public Stair / Elevator Towers: Rooftop Access
2. Public Restrooms
3. Restaurant / Retail Space
4. The Barack Obama Foundation: Welcome Garden and Formal Entry
5. The Barack Obama Foundation: Offices and Presidential Quarters
6. Arboretum Visitors' Center
7. Public Viewing Terraces (Maeniana)
8. Gardening Education Center and Storage
9. Rostrum (Convertible for Interior and Exterior Use)
10. Wintergarden Community Loading and Northern Access
11. Wintergarden (Secured Public Access)
12. Museum Entry Hall, Security, and Ticketing
13. Monument Tower, Plaza, and Reflecting Pool
14. Sky Room Public Entry Hall
15. Athletic Center and Public Theater with Outdoor Pavilion Conversion
16. Hotel Guest Rooms Above Neighborhood Retail / Rooftop Solar Array
17. Integrated Parking Facility (Bus Unloading, CTA Kiss-and-Ride, OPC)
18. CTA Transit Hub - Underground Access
19. Hotel Entry and Hotel Restaurant
20. Presidential Reading Room (Above)
21. Welcome Kiosk and Cafe
22. Chicago Public Library - Obama Square Branch (Bridge)
23. Chicago Park District Nature Education and Outreach
24. Shared Chicago Park District / Arts Block Lyceum
25. Orchid Conservatory
26. Resident Artists' Open Studio
27. Site Maintenance Facility

© 2021 Grahm Balkany. Architect. Unauthorized use prohibited.
All rights reserved. Conceptual graphics - not intended for construction.



## ACCESS AND PROXIMITY

C.T.A. GREEN LINE

STATION HOUSES

NORTHBOUND SERVICE TO: MCCORMICK PLACE (3.75 M)
CHICAGO LOOP (5.75 M)

SOUTHBOUND SERVICE TO: ENGLEWOOD (2.75 M)
WOODLAWN (1.0 M)

C.T.A. RED LINE

STATION HOUSES

NORTHBOUND SERVICE TO: CHINATOWN (4.0 M)
CHICAGO LOOP (5.6 M)
NORTH SIDE / EVANSTON

SOUTHBOUND SERVICE TO: 95TH STREET (5.0 M)
PULLMAN (FUTURE) (10.5 M)

METRA ROCK ISLAND DISTRICT LINES

PROPOSED WHISTLE STOP STATION

NORTHBOUND SERVICE TO: LASALLE STREET STATION
CHICAGO LOOP (5.6 M)

SOUTHBOUND LOCAL TO: BEVERLY (6.0 M)
SOUTHBOUND REGIONAL TO: BLUE ISLAND / JOLIET (34.5 M)

PROPOSED GARFIELD / 55TH BUS RAPID TRANSIT

EASTBOUND SERVICE TO: METRA ELECTRIC DIST. (1.0 M)
LAKEFRONT PARKS (1.25 M)

WESTBOUND SERVICE TO: MIDWAY AIRPORT (6.5 M)
C.T.A. ORANGE LINE (6.5 M)

SITE OF OBAMA PRESIDENTIAL CENTER

© 2021 Grahm Balkany, Architect. Unauthorized use prohibited. All rights reserved.



# EXHIBIT 10

# Environmental Assessment

Federal Actions In and Adjacent to Jackson Park:
Urban Park and Recreation Recovery Amendment and Transportation
Improvements
Jackson Park, City of Chicago, Illinois

National Park Service
Federal Highway Administration
Illinois Department of Transportation

Estimated Lead Agency and
Consulting Total Costs
Associated with Developing
and Producing This EA:
$1,372,000

August 2020

**Federal Actions In and Adjacent to Jackson Park:**

UPARR Amendment and Transportation Improvements

## Section No. 17-B7203-00-ES

## Cook County, Illinois

### ENVIRONMENTAL ASSESSMENT

Submitted Pursuant to 42 U.S.C. 4332 (2)(c)
by the
U.S. Department of the Interior – National Park Service,
U.S. Department of Transportation – Federal Highway Administration,
and the
Illinois Department of Transportation

Cooperating Agency
U.S. Army Corps of Engineers

9/21/2020

_____
Date of Approval for Printing and
Release to Public

HERBERT FROST    Digitally signed by HERBERT FROST
Date: 2020.09.21 08:39:06 -05'00'

_____
For NPS

9/21/2020

_____
Date of Approval

_____
For IDOT

9/21/2020

_____
Date of Approval

_____
For FHWA

The following persons may be contacted for additional information concerning this document:

| | | |
|---|---|---|
| Arlene K. Kocher, P.E. | Joel Lynch | Greg Lupton, P.E. |
| Division Administrator | Chief, State and Local | Acting Engineer of Local Roads |
| Federal Highway Administration | Assistance Programs Division | and Streets |
| 3250 Executive Park Drive | National Park Service | Illinois Dept. of Transportation |
| Springfield, Illinois 62703 | 8449 C Street NW | 2300 S. Dirksen Parkway |
| Telephone: 217-492-4600 | Washington, D.C. 20240 | Springfield, Illinois 62764 |
| | Telephone: 202-354-6905 | Telephone: 217-785-1670 |

# Contents

1.0 Introduction ................................................................................................................................ 1

2.0 Background ................................................................................................................................ 2

    2.1 Jackson Park ........................................................................................................................ 3

    2.2 Midway Plaisance ............................................................................................................... 5

    2.3 Obama Presidential Center .................................................................................................. 6

    2.4 Roadway Closures and Improvements ................................................................................. 8

3.0 Purpose and Need ....................................................................................................................... 9

    3.1 National Park Service ......................................................................................................... 10

        3.1.1 NPS Authority and UPARR Background ..................................................................... 10

        3.1.2 NPS Purpose and Need ............................................................................................. 11

    3.2 Federal Highway Administration ........................................................................................ 11

        3.2.1 FHWA Funding Authority & Background .................................................................... 11

        3.2.2 FHWA Purpose and Need .......................................................................................... 12

    3.3 United States Army Corps of Engineers (USACE) ................................................................. 14

4.0 Alternatives .............................................................................................................................. 15

    4.1 Alternative A: No Action .................................................................................................... 16

    4.2 Alternative B: NPS Action (FHWA No Build) ....................................................................... 17

    4.3 Alternative C: NPS + FHWA Action (Preferred Alternative) ................................................. 20

        4.3.1 Capacity Improvements ............................................................................................ 22

        4.3.2 Bridge Modifications ................................................................................................ 23

        4.3.3 Intersection Modifications ........................................................................................ 23

        4.3.4 Pedestrian and Bicycle Enhancements ..................................................................... 25

    4.4 Alternatives Considered and Dismissed from Further Analysis ............................................ 26

        4.4.1 NPS ......................................................................................................................... 26

        4.4.2 FHWA ...................................................................................................................... 26

5.0 Affected Environment and Environmental Consequences ......................................................... 28

    5.1 Impact Topics Not Carried Forward for Further Analysis ..................................................... 28

        5.1.1 Agricultural Resources .............................................................................................. 28

        5.1.2 Special Status Species .............................................................................................. 28

        5.1.3 Other Wildlife and Wildlife Habitat .......................................................................... 29

        5.1.4 Air Quality ............................................................................................................... 30

5.1.5 Water Resources .................................................................................................. 30

5.1.6 Highway Traffic Noise ......................................................................................... 31

5.1.7 Archaeological Resources ................................................................................... 32

5.1.8 Construction Noise from the OPC ....................................................................... 32

5.2 Impact Topics Retained for Further Analysis ............................................................... 32

5.2.1 Past, Present, and Reasonably Foreseeable Future Actions ............................... 32

5.2.2 Recreation Resources ......................................................................................... 34

5.2.3 Traffic Congestion .............................................................................................. 41

5.2.4 Cultural Resources (Historic Properties) ............................................................ 49

5.2.5 Social and Economic Issues ............................................................................... 55

5.2.6 Great Lakes Fishery and Ecosystem Restoration (GLFER) ................................. 64

5.3 Impact Summary ......................................................................................................... 67

5.4 Preferred Alternative .................................................................................................. 67

6.0 Consultation and Coordination ............................................................................................. 68

6.1 Public Engagement ..................................................................................................... 68

6.1.1 Project Website .................................................................................................. 68

6.1.2 Public Information Meeting on Jackson Park Combined NPS and FHWA Process ...... 68

6.1.3 Public Hearings and Public Comment Period on the Environmental Assessment ...... 68

6.2 Compliance with Other Laws ....................................................................................... 69

6.2.1 Section 106 of the National Historic Preservation Act ....................................... 69

6.2.2 Section 4(f) of the U.S. Department of Transportation Act ................................ 69

6.3 Agency and Tribal Government Consultation ............................................................... 70

6.3.1 Tribal Government Consultation ......................................................................... 71

6.3.2 NEPA-404 Merger Meetings ............................................................................... 71

6.3.3 Jurisdictional Transfer of Roadways, Vacations and Dedications ....................... 72

6.3.4 Environmental Commitments, Permits, and Certifications ................................. 72

7.0 References ............................................................................................................................ REF-1

# List of Figures

Figure 1: Project Location ................................................................................................................. 2

Figure 2: Project Study Area ............................................................................................................. 3

Figure 3: Project Study Area Roadways and Trails (2017 Aerial and Trails) ................................. 5

Figure 4: Midway Plaisance Property Boundary .............................................................................. 6

Figure 5: OPC Design Development Site Plan (April 2020) ............................................................ 8

Figure 6: Roadway Closures ............................................................................................................. 9

Figure 7: Existing Section 1010 Boundary ..................................................................................... 10

Figure 8: Alternative A: No Action ................................................................................................. 17

Figure 9: Alternative B: NPS Action (FHWA No Build).................................................................. 18

Figure 10: Existing and Proposed Conceptual Recreation Replacement Opportunities on the East End of the Midway Plaisance ................................................................................................. 19

Figure 11: Proposed Conceptual Recreation Replacement Opportunities on the East End of the Midway Plaisance ............................................................................................................................ 20

Figure 12: Alternative C: NPS + FHWA Action (Preferred Alternative) ....................................... 21

Figure 13: Conceptual Representation of Conditions under Alternative C ................................... 22

# List of Tables

Table 1: 2040 Intersection Levels of Service for FHWA No Build ................................................ 13

Table 2: Roadway Closures and Conversions to UPARR Designated Land .................................. 40

Table 3: Direct Impacts to Historic Resources under Alternative C............................................. 54

Table 4: Estimated Total Job Creation from OPC Construction and Start-Up Phases, State of Illinois ...... 60

Table 5: Alternative B – GLFER Impacts ........................................................................................ 65

Table 6: Alternative C – Direct Transportation Improvement GLFER Impacts ........................... 66

Table 7: Proposed GLFER Impact and Replacement Summary..................................................... 66

Table 8: Section 4(f) Land Use........................................................................................................ 70

# Appendices

**Appendix A – Exhibits**

Intersection LOS ...................................................................................................Exhibit A-1

Existing Trail Network ...........................................................................................Exhibit A-2

Existing Typical Section (Lake Shore Drive – Hayes Drive to 57th Drive) ......................Exhibit A-3a

Proposed Typical Section (Lake Shore Drive – Hayes Drive to 57th Drive) ................. Exhibit A-3b

Existing Typical Section (Hayes Drive – Cornell Drive to Lake Shore Drive) .................Exhibit A-3c

Proposed Typical Section (Hayes Drive – Cornell Drive to Lake Shore Drive) .............. Exhibit A-3d

Existing Typical Section (Cornell Drive – North of 65th Street to Hayes Drive).............Exhibit A-3e

Proposed Typical Section (Cornell Drive – North of 65th Street to Hayes Drive)........... Exhibit A-3f

Existing Typical Section (Stony Island Avenue – 67th Street to Marquette Road) ........Exhibit A-3g

Proposed Typical Section (Stony Island Avenue – 67th Street to Marquette Road) ..... Exhibit A-3h

Existing Typical Section (Stony Island Avenue – Marquette Road to 65th Place) ...........Exhibit A-3i

Proposed Typical Section (Stony Island Avenue – Marquette Road to 65th Place) ........Exhibit A-3j


**Appendix B – Tables**

Historic Properties or Districts Listed or Eligible for NRHP within the APE .......................Table B-1

Impact Summary Table ............................................................................................ Table B-2


**Appendix C – Natural Resources Technical Memorandum**

Memorandum

Threatened and Endangered Species, Vicinity of Project Study Area ..................... Attachment C-1

CDOT Eastern Construction Limits Letter (08/01/2017).......................................... Attachment C-2

IDOT Natural Resources Review (2/28/2020)........................................................... Attachment C-3

IDOT/IDNR EcoCAT Coordination............................................................................ Attachment C-4

Jackson Park Natural Areas ..................................................................................... Attachment C-5


**Appendix D – Trees Technical Memorandum**

Memorandum

Tree Removals, OPC Site Limits (Table) ................................................................... Attachment D-1

Tree Removals, OPC Site Limits (Exhibit) ................................................................. Attachment D-2

Tree Removals, Track and Field Relocation (Table) .................................................. Attachment D-3

Tree Removals, Track and Field Relocation (Construction Plans)........................... Attachment D-4

Tree Removals, Alternative C (Table)........................................................................ Attachment D-5

Tree Removals, Alternative C (Exhibits)....................................................... Attachments D-6 to 19


**Appendix E – Air Quality Technical Memorandum**

Memorandum

IDOT COSIM Pre-Screen Coordination ....................................................................Attachment E-1

**Appendix F – Water Resources Technical Memorandum**
    Memorandum
    Wetland and Water Resources Delineation Map .....................................................Attachment F-1
    USACE Jurisdictional Determination ........................................................................Attachment F-2
    USACE Coordination................................................................................................Attachment F-3
    Flood Insurance Rate Map (FIRM) ..........................................................................Attachment F-4
    Wetland and Waters of the U.S. Impacts ...............................................................Attachment F-5
    USCG Coordination .................................................................................................Attachment F-6
    Floodplain Fill - Proposed Drainage Plan (Sheet 18 of 22).....................................Attachment F-7
    IDNR Coordination ..................................................................................................Attachment F-8
    IEPA Coordination ...................................................................................................Attachment F-9


**Appendix G –Recreation Technical Memorandum**


**Appendix H – Traffic Congestion Technical Memorandum**
    Memorandum
    Average Daily Traffic Volume and Travel Patterns – Existing (2016) Conditions .. Attachment H-1a
    Intersection Levels of Service – Existing (2016) Conditions.................................. Attachment H-1b
    Average Daily Traffic Volume and Travel Patterns – Alternative A (2040)............ Attachment H-2a
    Intersection Levels of Service – Alternative A (2040) ........................................... Attachment H-2b
    Average Daily Traffic Volume and Travel Patterns – Alternative B (2040) ............ Attachment H-3a
    Intersection Levels of Service – Alternative B (2040) ........................................... Attachment H-3b
    Average Daily Traffic Volume and Travel Patterns – Alternative C (2040) ............ Attachment H-4a
    Intersection Levels of Service – Alternative C (2040) ........................................... Attachment H-4b
    CMAP Coordination ............................................................................................. Attachment H-5
    Average Daily Traffic Volume and Travel Patterns – Alternative A (2050)............. Attachment H-6
    Average Daily Traffic Volume and Travel Patterns – Alternative B (2050) ............. Attachment H-7
    Average Daily Traffic Volume and Travel Patterns – Alternative C (2050) ............ Attachment H-8a
    Intersection Levels of Service – Alternative C (2050) ........................................... Attachment H-8b


**Appendix I – Social and Economic Analysis Technical Memorandum**
    Memorandum
    Project Location Map Inset ....................................................................................Attachment I-1
    Project Study Area and Surrounding Neighborhoods...............................................Attachment I-2
    South Shore Community Facilities ...........................................................................Attachment I-3
    Woodlawn Community Facilities .............................................................................Attachment I-4
    Hyde Park Community Facilities ..............................................................................Attachment I-5
    Transit Network .....................................................................................................Attachment I-6
    South Shore Neighborhood Current Land Use Map ................................................Attachment I-7a
    South Shore Neighborhood Current Zoning Map .................................................. Attachment I-7b
    Woodlawn Neighborhood Current Land Use Map .................................................Attachment I-8a
    Woodlawn Neighborhood Current Zoning Map .................................................... Attachment I-8b
    Woodlawn Community Development – Review of Previous Plans .........................Attachment I-8c

Hyde Park Neighborhood Current Land Use Map ....................................................Attachment I-9a

Hyde Park Neighborhood Current Zoning Map ...................................................... Attachment I-9b

**Appendix J – Great Lakes Fishery and Ecosystem Restoration (GLFER) Technical Memorandum**
Memorandum

GLFER Areas ................................................................................................... Attachment J-1

Utility Relocation GLFER Area Impacts ..................................................... Attachment J-2

Pathway Connections GLFER Area Impacts .............................................. Attachment J-3

GLFER Area Impacts ....................................................................................... Attachment J-4

Proposed GLFER Restoration and Replacement ...................................... Attachment J-5

USACE Coordination........................................................................................ Attachment J-6

**Appendix K – Section 4(f) (Draft)**

# Acronyms and Abbreviations

| | |
|---|---|
| **AADT** | Annual Average Daily Traffic |
| **ACS** | American Community Survey |
| **ADA** | Americans with Disabilities Act |
| **ADT** | Average Daily Traffic |
| **ADTT** | Average Daily Truck Traffic |
| **BDE** | Bureau of Design & Environment |
| **CAA** | Clean Air Act |
| **CBA** | Community Benefits Agreement |
| **CDOT** | Chicago Department of Transportation |
| **City** | City of Chicago |
| **CMAP** | Chicago Metropolitan Agency for Planning |
| **CPBSHD** | Chicago Park Boulevard System Historic District |
| **CPD** | Chicago Park District |
| **CRU** | [Illinois Department of Transportation] Cultural Resources Unit |
| **CTA** | Chicago Transit Authority |
| **CWA** | Clean Water Act |
| **DBH** | Diameter at Breast Height |
| **DWM** | Chicago Department of Water Management |
| **EA** | Environmental Assessment |
| **EAB** | Emerald Ash Borer |
| **EcoCAT** | Ecological Compliance Assessment Tool |
| **EO** | Executive Order |
| **ESA** | Federal Endangered Species Act |
| **ESC** | Erosion and Sedimentation Control |
| **Federal Actions** | Federal Actions in and adjacent to Jackson Park |
| **FEMA** | Federal Emergency Management Agency |
| **FHWA** | Federal Highway Administration |
| **FIRM** | Flood Insurance Rate Map |
| **FQI** | Floristic Quality Index |

| | |
|---|---|
| **FTA** | Federal Transit Administration |
| **GLFER** | Great Lakes Fishery and Ecosystem Restoration |
| **HCM** | Highway Capacity Manual |
| **HQAR** | High Quality Aquatic Resource |
| **IBA** | Important Bird Area |
| **IDNR** | Illinois Department of Natural Resources |
| **IDNR-OWR** | Illinois Department of Natural Resources – Office of Water Resources |
| **IDOT** | Illinois Department of Transportation |
| **IEPA** | Illinois Environmental Protection Agency |
| **INAI** | Illinois Natural Areas Inventory |
| **INPC** | Illinois Nature Preserves Commission |
| **IPaC** | Information for Planning and Conservation |
| **IWPA** | Illinois Interagency Wetland Policy Act |
| **KOCO** | Kenwood Oakland Community Organization |
| **LA** | Lakeside Alliance |
| **LISC** | Local Initiatives Support Corporation |
| **LOS** | Level of Service |
| **MOA** | Memorandum of Agreement |
| **MBE** | Minority business enterprises |
| **MBTA** | Migratory Bird Treaty Act |
| **MPO** | Metropolitan Planning Organization |
| **MSI** | Museum of Science and Industry |
| **Museum Act** | Illinois Park District Aquarium and Museum Act |
| **NAAQS** | National Ambient Air Quality Standards |
| **NARA** | National Archives and Records Administration |
| **NEPA** | National Environmental Policy Act |
| **NHPA** | National History Preservation Act |
| **NHS** | National Highway System |
| **NLEB** | Northern Long-Eared Bat |
| **NPS** | National Park Service |

| | |
|---|---|
| **NRHP** | National Register of Historic Places |
| **OHWM** | Ordinary High Water Mark |
| **OPC** | Obama Presidential Center |
| **POAH** | Preservation of Affordable Housing |
| **RAP** | Recovery Action Program |
| **RHA** | Rivers and Harbors Act |
| **RSP** | Regionally Significant Projects |
| **SAM** | Social Accounting Matrix |
| **SHPO** | State Historic Preservation Officer |
| **SIP** | State Implementation Plan |
| **SLFP** | South Lakefront Framework Plan |
| **SOI** | Secretary of the Interior |
| **SSE** | Sam Schwartz Engineering |
| **STOP** | Southside Together Organizing for Power |
| **TIP** | Transportation Improvement Program |
| **TIS** | Traffic Impact Study |
| **UPARR** | Urban Park and Recreation Recovery |
| **USACE** | U.S. Army Corps of Engineers |
| **USEPA** | U.S. Environmental Protection Agency |
| **USDOT** | U.S. Department of Transportation |
| **USFWS** | U.S. Fish & Wildlife Service |
| **v/c** | Volume to capacity |
| **vph** | Vehicles per hour |
| **WBE** | Women Business Enterprises |
| **WOTUS** | Waters of the United States |

# 1.0   Introduction

The City of Chicago (City) intends to make changes in and adjacent to Jackson Park that are a result of its approval of the construction of the privately funded Obama Presidential Center (OPC) and the adoption by the Chicago Park District (CPD) of the 2018 South Lakefront Framework Plan (SLFP). The City plans to allow for the closure of roadways and the construction of the privately funded OPC in Jackson Park and to make improvements to the roadway network in and around Jackson Park. These changes trigger the need for federal action and this Environmental Assessment pursuant to the National Environmental Policy Act (NEPA) prepared for the National Park Service (NPS) and the Federal Highway Administration (FHWA).

The proposed OPC project would impact lands currently managed consistent with the Urban Park and Recreation Recovery (UPARR) (Title 54 U.S.C. Chapter 2005) program, under which federal funds were provided by grants for improvements to Jackson Park. Any property improved or developed with UPARR grant funds may not be converted to non-recreation uses without the approval of the NPS. NPS will review and consider whether to approve a partial conversion of use at Jackson Park pursuant to UPARR program requirements. Under the UPARR Act, NPS shall approve a partial conversion when it is in accord with the current Jackson Park recovery action plan or similar plan and only if recreation properties and opportunities of reasonably equivalent location and usefulness are provided (54 U.S.C. §200507).

Before approving the partial conversion by amending the UPARR grant agreements and adjusting the UPARR boundary, the NPS must evaluate the City's proposed UPARR partial conversion including the proposed replacement property and planned development of recreation opportunities to compensate for property lost because of the conversion in Jackson Park. NPS has no legal authority over the presence or physical aspects of the OPC in Jackson Park, such as the design, configuration, materials, or workmanship of those projects. NPS has a statutory obligation to review the recreational impacts of local decisions affecting UPARR-assisted parks, and to approve conversion proposals if the local government meets the conditions outlined in the Act.

Under Title 23 U.S.C., the FHWA administers the Federal-Aid Highway Program, which makes available federal funding to state departments of transportation and local agencies for roadway projects. As a result of planned road closures related in part to the development of the OPC, the City proposes to make certain roadway improvements in Jackson Park using Federal-Aid Highway Program funds and to make bicycle and pedestrian improvements for better access to Jackson Park.

Authorizations required by the United States Army Corps of Engineers (USACE) arise principally from the proposed transportation improvements by the City. The USACE is a cooperating agency in this Environmental Assessment; the USACE federal authority and role in this project is discussed further in Section 3.3.

A minimum of a 30-day comment period will be open upon notice of the release of the Environmental Assessment. Public comments will be accepted via the NPS Planning, Environment, and Public Comment (PEPC) website at https://parkplanning.nps.gov/ChicagoJacksonPark. Two public hearing webinars will be held to present an overview of the Environmental Assessment and allow for public comment. A separate opportunity for the public to provide in person comments will also be provided. A hard copy of the report

will be available. Notices of the public hearings will be published in advance. All substantive public comments and responses will be made available to the public.

In addition, the City website has dedicated a page to the federal review of Jackson Park Improvements. The webpage provides important project milestone, documents, and updates that support both the OPC, the SLFP and the federal review process necessary to complete these improvements. Additional information is provided discussing the purpose of the federal review, proposed actions for FHWA and NPS, and the aspects of public participation in the Section 106 process and NEPA. The website can be accessed through the following URL: http://www.tinyURL.com/JPImprovements.

## 2.0   Background

Jackson Park is located on the south side of the City of Chicago, Cook County, Illinois. See Figure 1. The proposed changes occur within and adjacent to Jackson Park and a portion of the adjacent Midway Plaisance. See Figure 2. This section provides background on activities that have occurred prior to the need for federal decisions, including the City's approval of a proposal to locate the OPC in Jackson Park and the City's planning efforts to accommodate the OPC in Jackson Park.



*Figure 1: Project Location*



*Figure 2: Project Study Area*

## 2.1    Jackson Park

Jackson Park is a 551.52-acre park that is listed on the National Register of Historic Places (NRHP). With an original design and early improvements dating back to 1871, Jackson Park and the Midway Plaisance (jointly listed on the NRHP) became the site of the 1893 World's Columbian Exposition (World's Fair). Dozens of temporary buildings and pavilions were constructed in Jackson Park for the World's Fair. Some of the nation's most famous architects, landscape architects, and sculptors contributed to the development of Jackson Park and the Midway Plaisance, including Daniel Burnham and Frederick Law Olmsted. After the World's Fair, most of the buildings were dismantled or destroyed by fire, and Jackson Park underwent several redesigns and substantial change. However, several historic structures are still found in Jackson Park today, including the Kenneth C. Griffin Museum of Science and Industry (MSI), which originally served as the Palace of Fine Arts for the World's Fair.

Jackson Park's period of significance[1] for purposes of its listing on the NRHP is not etched in the distant past (NPS 1997). Here, the period of significance ranges from 1875 to 1968 including design and initial construction in the 1870s by Olmsted and the 1893 World's Colombian Exposition. It also includes subsequent redevelopment as a park between 1895-1897 based on plans by firms associated with Frederick Law Olmsted, Sr., and additions associated with the Works Progress Administration (WPA) and the CPD which occurred through 1968. As in the past, Jackson Park includes open spaces, natural settings, indoor and outdoor sports facilities, civic buildings, major temporary installations like the World's Fair, and large-scale events (festivals, marathons, etc.).

Presently, Jackson Park is an urban park surrounded by dense residential, commercial, and civic/ educational development, including large buildings and building complexes within Jackson Park (e.g., MSI, track & field facility, yacht club/marina, and the golf course clubhouse) and immediately outside Jackson Park (Quadrangle Towers, Oglesby Towers, Island Terrace, Hyde Park High School, Vista Homes, etc.). The range of uses reflects varied and changing public needs for Jackson Park. Jackson Park serves several surrounding neighborhoods, including South Shore, Woodlawn, and Hyde Park. Contributing landscape features reflect the intent of the original designer that a public park be created for use by the community. As community needs have changed, alterations to Jackson Park have been necessary to sustain its purpose as a park serving the community. Jackson Park, and all of its facilities, are fully described in Appendix G.

Jackson Park is served by heavily traveled arterial roadways, including Lake Shore Drive (U.S. Route 41) to the east and Stony Island Avenue to the west. Within Jackson Park, 57th Drive carries east-west traffic from Lake Shore Drive toward the MSI. South of the MSI, 57th Drive becomes Cornell Drive and carries north-south traffic from the MSI toward Jackson Park recreational facilities and beyond to residential neighborhoods. These roadway facilities provide an important connection route for northbound/ eastbound morning commuters and southbound/westbound evening commuters between major commuter expressways and the City's Central Business District. Collector roadways within Jackson Park, which gather traffic from local roads and direct it toward the arterial network, include Hayes Drive and Marquette Drive. Lake Shore Drive north of 57th Drive, 57th Drive between Lake Shore Drive and Cornell Drive, Cornell Drive between 57th Drive and Stony Island Avenue, and Stony Island Avenue south of 67th Street are on the National Highway System (NHS). The NHS consists of roadways that are important to the nation's economy, defense, and mobility. The Lakefront Trail, owned by the CPD, is a trail that runs parallel to the east side of Lake Shore Drive and serves recreational users, commuters, and tourists. See Figure 3 for the existing roadways and trails in the project study area.

Planning for Jackson Park is governed by the CPD's strategic plan for parks throughout the City. Jackson Park is addressed in the 1972 Lake Front Plan of Chicago, the 1999 Framework Plan, and most recently the SLFP, which respects the 1999 Framework Plan which included Jackson Park (CPD 2018).

---

[1] A period of significance is the length of time when a property was associated with important events, activities, or persons, or attained the characteristics which qualify it for National Register listing.



*Figure 3: Project Study Area Roadways and Trails (2017 Aerial and Trails)*

As stated in the SLFP, "a key impetus" for updating the plan was to integrate major projects such as the OPC into a "holistic vision for the South Lakefront." The public process started in June 2017 and included several rounds of public meetings to develop and refine concepts. A final preferred concept (based on public input) was presented to the CPD Board of Commissioners in April 2018. The SLFP provides eleven guiding principles for the South Lakefront area (including Jackson Park). For example, the plan calls for "serv[ing] the local community through a balance of diverse programmatic spaces—active to contemplative, athletics to arts." Another SLFP goal is to "reinvigorate [Jackson Park] as a global attraction with cultural destinations and historically significant landscapes." Under the SLFP it is important to "strengthen connections within the park and with the community through improved programming, access, and engagement" and "celebrate and reconnect with the water." Jackson Park plans should "integrate buildings and landscapes to shape beautiful parks that provide an enhanced quality of life for their users." A key tenet of the SLFP is to "continue to promote spaces that connect with nature." More information about the City's process relative to the SLFP can be found in Appendix G.

## 2.2   Midway Plaisance

The Midway Plaisance is an 83-acre green space that is generally bound by 60th Street to the south, Stony Island Avenue to the east, 59th Street to the north, and Cottage Grove Avenue to the west. See Figure 4. It is an open green space adjacent to Jackson Park and jointly listed with Jackson Park as a historic landscape district on the NRHP. In addition to open spaces, the Midway Plaisance also contains formal features for athletic activities and trails. The Midway Plaisance did not receive funding from the UPARR program; therefore, it is not currently a UPARR site.



*Figure 4: Midway Plaisance Property Boundary*

The Midway Plaisance connects Washington Park to the west and Jackson Park to the east. Primary vehicular access routes to and through the Midway Plaisance include a network of connected principal arterials. The North Midway Plaisance and South Midway Plaisance are two-lane one-way roadways that connect to Payne Drive/Morgan Drive through Washington Park and Cornell Drive through Jackson Park.

The easternmost portion of the Midway Plaisance bound by E. 60th Street, the Metra Electric Railway, E. 59th Street, and Stony Island Avenue occupies 5.2 acres and lies just west of Jackson Park.

In 1999, coordination between the CPD, the University of Chicago, and local community members, including the Midway Plaisance Advisory Council (MPAC), produced a conceptual plan for future improvements to the Midway Plaisance. It was later published in 2000 as the Midway Plaisance Master Plan (CPD 2000).

Currently, the majority of the east end of Midway Plaisance is an open lawn lined with trees. No organized CPD programs take place in the east end of Midway Plaisance and the CPD does not issue permits to reserve this portion of the Midway Plaisance. This part of the Midway Plaisance has two mixed-use trails and a sidewalk. Within the open space are park benches, trees, an informational kiosk, the Cheney Goode Memorial, and a 0.436-acre wetland. The westernmost portion of the lawn area has an elevated landscape containing dense plantings and trees that provide screening of the Metra Electric Railway. The open space allows for informal recreation such as pick-up games, walking, gathering, or open play. The proposed changes include altering the western side of the lawn with the addition of a play area.

## 2.3    Obama Presidential Center

The OPC is a privately funded project of the Obama Foundation that would chronicle the life and presidency of former President Barack Obama and Michelle Obama. It is meant to serve as a destination for gathering, education, and recreation. The decision to site the OPC in Jackson Park, the design of the OPC campus, and the related closure of roadways in Jackson Park do not require federal approval or funding. The City's decision to authorize the construction of the OPC within Jackson Park followed a national competition to find the host city for the OPC, extensive municipal proceedings once Chicago was chosen, and the approvals of the Chicago City Council, the Chicago Plan Commission, and the CPD Board of Commissioners.

The proposed OPC site is located along the western edge of Jackson Park where it connects to the Midway Plaisance. It comprises 19.3 acres within Jackson Park encompassing the area roughly bound by North

Midway Plaisance (Westbound), S. Cornell Drive, crossing Jackson Park on the southern end along the same latitude as E. 62nd Street, and S. Stony Island Avenue. Four buildings would occupy the proposed OPC site: a museum, a branch of the Chicago Public Library, a forum, and a combined Program, Athletic, and Activity Center (PAAC). In total, the buildings would occupy approximately 2.3 acres. Approximately 1.3 acres of the total building footprint would be comprised of publicly accessible outdoor spaces on the top of the forum and library since they would be built into the landscape. The museum would house exhibitions and public spaces such as a top floor that would offer views of Lake Michigan and the South Side of Chicago. The museum, forum and library are connected below ground. The OPC would also accommodate private offices of the former President and Foundation staff. The forum is intended to contain meeting spaces for performances, programming, and public functions. It would also have a restaurant. The library building would contain a branch of the Chicago Public Library. The library building would also have a public President's Reading Room that would feature a specially curated collection of books that have been of importance to the former President and Mrs. Obama and important manuscripts and other materials related to their lives. The roof of the forum would have publicly accessible outdoor space for informal gatherings. The library roof would include a fruit and vegetable garden which would provide a curated program aimed at local grade schools and community members. The library roof would also have a hardscape gathering area for small scale cultural offerings or large-group activities including informal gathering and space for picnicking. The forum, library, and museum would front an open plaza which would provide opportunities for free public events, including informal and planned gatherings. The PAAC is located at the southern edge of the OPC site along S. Stony Island Avenue. The PAAC would provide space for public activities and opportunities for programming partnerships with local organizations. It is intended to be a gymnasium-type building that would be used for various types of active recreation from basketball to yoga. It may also be used for hosting large-scale indoor events.

The landscaped site would include an area called the "Great Lawn" above an underground parking garage of 440 spaces for the OPC campus. It is intended to be a large, gently sloped, and wide-open grassy area for all types of recreation. It would have a plateau area, called the "Lagoon View Lawn," that would provide picnic opportunities, as would a Community Grove (at the high point of the Lagoon View Lawn) and a Lagoon Grove at the terminus of the slope of the Great Lawn. The sloped area is designed to be a sledding hill in winter. The site would also include a nature trail and other multi-use paths leading to and around the Great Lawn. The paths would go through the wooded area. A promenade would follow the lagoon. Lastly, the site contains a playground that would be equipped with a wide variety of experiential and exploratory play opportunities including custom-made experiential play features. The proximity of the PAAC to the landscape features would also allow for more coordinated indoor/outdoor recreation programs. Overall, the design for the OPC site is intended to reflect principles of landscape ecology relevant to storm water, tree and soil biology, biodiversity, bird habitat, and pollinators (The Obama Foundation 2020). Figure 5 includes the OPC Design Development Site Plan.

The 4.6-acre portion of the OPC site that is proposed for removal from the UPARR program would contain the following proposed OPC site elements: a museum, a branch of the Chicago Public Library, a forum building, an open plaza providing opportunities for free public events, and open space. The lost land uses from that area include formal as well as informal recreation opportunities as described further in the recreation section (5.2.3.1).



*Figure 5: OPC Design Development Site Plan (April 2020)*

## 2.4   Roadway Closures and Improvements

To accommodate the OPC construction and aspects of the SLFP, the Chicago City Council approved the following permanent roadway closures within Jackson Park:

- Cornell Drive between 63rd Street (Hayes Drive) and 59th Street,
- the northbound section of Cornell Drive between 68th Street and 65th Street,
- Marquette Drive between Stony Island Avenue and Richards Drive, and
- the eastbound portion of Midway Plaisance between Stony Island Avenue and Cornell Drive.

Closures of the eastbound Midway Plaisance and Cornell Drive between 63rd Street and 59th Street are necessary to accommodate the development of the OPC. The additional roadway closures would reduce the number of multilane roadways that currently divide Jackson Park to allow for a more continuous park. The planned closure of certain existing roads and rehabilitation of the roadway footprint would result in 11 acres of UPARR protected parkland to provide new bicycle/pedestrian paths, walking trails, and other open areas within Jackson Park. See Figure 6 for all roadway closures.

The City is also planning improvements to the roadway, pedestrian, and bicyclist network to address the changes in travel patterns that arise from the proposed roadway closures and to improve public safety,

access, and circulation throughout Jackson Park. These improvements are further described in Section 4.3. The Chicago Department of Transportation (CDOT) is seeking the use of Federal-Aid Highway Program funds for construction of these proposed roadway changes, pathways, and sidewalks. Prior to requesting Federal-Aid highway funds from FHWA, all federal requirements must be met, including satisfying NEPA and other environmental requirements.



*Figure 6: Roadway Closures*

## 3.0 Purpose and Need

The proposed Federal Actions to be taken in response to decisions made by the City are approval of the proposed partial conversion(s) through amendments to the UPARR grant agreements governing Jackson Park by the NPS, and the authorization of Federal-Aid Highway Program Funds by the FHWA.

The following sections describe the proposed Federal Actions in more detail and explain the "purpose and need" for each proposed action. Under NEPA, the "purpose and need" for a proposed Federal Action states what the agency plans to accomplish and explains the reason for taking action. The USACE is a cooperating agency in this Environmental Assessment with authorizations arising principally from the proposed transportation improvements, as detailed in Section 3.3.

## 3.1    National Park Service

### 3.1.1    NPS Authority and UPARR Background

The UPARR program provided grants to economically hard-pressed communities specifically for the rehabilitation of critically needed recreation areas, facilities, and development of improved recreation programs. The funding encouraged local governments to revitalize their park and recreation systems and to continue maintenance of these recreation areas. The federal government, via the UPARR program (Title 54 U.S.C. Chapter 2005) provided two grants to Jackson Park in 1980 ($125,300) and 1981 ($135,870).

As a condition of the UPARR grants, the City agreed to maintain Jackson Park for public recreation. As shown in Figure 7, the boundary for Jackson Park defined in the grant agreement encompasses "the area between the south line of 56th Street and the north line of 67th Street lying between the east line of Stony Island Avenue and the water edge of Lake Michigan, excluding the area occupied by the MSI, the La Rabida [Children's Hospital], and the roadways therein." This area is referred to as the "Section 1010 boundary" (referring to the applicable provision in the law).



*Figure 7: Existing Section 1010 Boundary*

Under the UPARR program, conversions or changes in use, whole or partial, must be reviewed and approved by the NPS. Under the UPARR Act, NPS would not approve a conversion unless it "finds it to be in accord with the then-current local park and recreation recovery action program and only on such conditions as the Secretary considers necessary to ensure the provision of adequate recreation properties and opportunities of reasonably equivalent location and usefulness." 54 U.S.C. §200507. The prerequisites

for conversion approval are further defined by regulation 36 C.F.R. 72.72[b]). Conversions must be reflected on the applicable Section 1010 boundary map and would depict the removed lands as well as those dedicated as replacement recreation property (36 C.F.R.§72.72[c]). The existing Section 1010 boundary in Jackson Park is shown in Figure 7.

### 3.1.2 NPS Purpose and Need

The purpose of the NPS action is to evaluate whether the City's proposed partial conversion meets the requirements of the UPARR Act and Regulations and, if so, to amend the UPARR grant agreement accordingly.

The need for the NPS action arises from the City's decision to close roadways, authorize the location of the OPC within Jackson Park, and improve the roadway network in and around Jackson Park. The NPS has determined that these projects would convert certain parts of the OPC site and areas of roadway improvements to non-recreational uses, thus triggering a partial conversion. The NPS must review current recreation uses within the identified conversion areas and then review the property identified as replacement including the planned new recreation opportunities to ensure adequate recreation properties and opportunities of reasonably equivalent usefulness and location would be provided. NPS does not have authority over the decision to site the OPC in Jackson Park or over the design of the campus; NPS's authority is limited to evaluating whether the proposed conversion meets the regulatory requirements under UPARR.

The NPS has determined that a 4.6-acre parcel containing the forum, library, and museum buildings and 5.2 acres of strips alongside existing roadways would include uses that do not qualify as recreational under UPARR. Specifically, the NPS would review the lost recreation facilities and opportunities: (1) within 4.6 acres of the 19.3-acre OPC site and (2) on an additional approximately 5.2 acres that would no longer qualify as open and available for public recreation under UPARR due to proposed roadway improvements. In accordance with the Act (54 U.S.C. 200507), the City has identified potential replacement property to accommodate these losses to recreation and articulate the equivalency of proposed replacement recreation opportunities that will be developed upon them. The prerequisites for conversion approval are set out in 36 C.F.R. § 72.72(b). They include: (1) whether practical alternatives to the conversion have been evaluated; (2) whether the proposed conversion and replacement are in accord with the current recreation plans; (3) whether the proposal assures reasonably equivalent replacement recreation opportunities; (4) whether the remainder of the Jackson Park remains recreationally viable; and (5) whether environmental requirements are satisfied. NPS would consider these factors in reaching a decision on the conversion proposal.

## 3.2 Federal Highway Administration

### 3.2.1 FHWA Funding Authority & Background

Under Title 23 U.S.C., the FHWA administers the Federal-Aid Highway Program, which makes available federal funding to state departments of transportation and local agencies for roadway projects. In Illinois, all Federal-Aid Highway Program funds are administered through the Illinois Department of

Transportation (IDOT) through a stewardship and oversight agreement with FHWA. Through this agreement, IDOT maintains responsibility for oversight of local agencies, including CDOT, when federal funding is sought for a project. CDOT proposes to use Federal-Aid Highway funding for roadway construction and bicycle and pedestrian improvements within Jackson Park. Prior to the authorization of Federal-Aid Highway funds, the FHWA must ensure the proposed construction activities meet all federal requirements and all applicable environmental laws.

## 3.2.2 FHWA Purpose and Need

The purpose of the FHWA funding is to (1) address changes in travel patterns resulting from closing roadways in Jackson Park and (2) improve bicycle and pedestrian access and circulation.

The need for the FHWA action arises as a result of changes in travel patterns caused by the closed roadways. Planners of transportation improvements typically analyze future traffic conditions to evaluate the operational performance of a potential improvement at least 20 years after construction. For Northeastern Illinois, these traffic projections are provided by the Chicago Metropolitan Agency for Planning (CMAP) using regional travel-demand analyses and comprehensive plans. Traffic projections are typically estimated 20 years beyond a project construction to account for traffic growth throughout the expected lifespan of a project. Initial traffic studies projected traffic to the year 2040 based on the CMAP GO TO 2040 Comprehensive Plan[2] (CMAP 2014).

Mobility at intersections is measured by calculating the average delay per vehicle and relating it to Level of Service (LOS) benchmarks. LOS is a quantitative concept that characterizes degrees of congestion as perceived by motorists. LOS letter designations A through F are correlated to quantitative measures based on the average seconds of delay per vehicle experienced at an intersection. A figure depicting the different LOSs can be found in Appendix A. LOS A represents the best conditions and LOS F the worst. These measurements are reported for the heaviest periods of travel, described as peak hours. The heaviest traveled hour in the morning (A.M. peak) and in the evening (P.M. peak) are commonly reported. The Highway Capacity Manual (HCM) also defines intersection congestion in terms of traffic volumes and available capacity; if a particular movement at an intersection is predicted to carry greater traffic than it has the desirable capacity to carry, it is said to operate over capacity. This condition is reported as a LOS F, regardless of the overall delay per vehicle experienced. At signalized intersections, LOS D is considered the lowest desirable level of traffic operations by most transportation agencies in the Chicago region. Table 1 shows Intersection LOSs for 2040 projected traffic conditions assuming the City's proposed roadway closures are in place without any new roadway improvements.

---

[2] In October 2018, the Chicago Metropolitan Agency for Planning (CMAP) formally adopted their *ON TO 2050* regional plan. In accordance with the adoption of the new regional plan, year 2050 traffic projections were obtained from CMAP and the traffic analyses were re-examined to ensure that traffic impacts would not substantially increase under year 2050 traffic volumes. This sensitivity analysis is discussed in Section 4 of Appendix H. The results of the sensitivity analysis found that while traffic volumes do increase over 2040 levels, the conclusions reached from the 2040 traffic analyses do not change for any of the alternatives under 2050 traffic volumes. It was therefore concluded that the original 2040 analyses are still valid for environmental review purposes.

*Table 1: 2040 Intersection Levels of Service for FHWA No Build*

| Intersection | Intersection Level of Service and Delay (sec./veh.) A.M. Peak Hour | Intersection Level of Service and Delay (sec./veh.) P.M. Peak Hour |
|---|---|---|
| Lake Shore Dr at Marquette Dr | C (21) | C (25) |
| Lake Shore Dr at Hayes Dr | F (**) | F (**) |
| Lake Shore Dr at Science Dr | B (17) | F (**) |
| Lake Shore Dr at 57th Street | B (14) | F (**) |
| Stony Island Ave at 67th St | F (**) | F (**) |
| Stony Island Ave at Marquette Dr | D (50) | B (16) |
| Stony Island Ave at 65th Pl | F (**) | C (29) |
| Stony Island Ave at 64th St * | F (**) | F (**) |
| Stony Island Ave at 63rd St/Hayes Dr | F (**) | C (21) |
| Stony Island Ave at 60th St | B (14) | B (11) |
| Stony Island Ave at Midway Plaisance (EB) | B (11) | F (**) |
| Stony Island Ave at Midway Plaisance (WB) | F (**) | F (**) |
| Stony Island Ave at 59th St | D (44) | B (17) |
| Stony Island Ave at 57th St | C (27) | C (23) |
| Stony Island Ave at 56th St * | D (34) | D (29) |
| Cornell Dr/57th Dr at 67th St | Closed | Closed |
| Cornell Dr/57th Dr at Marquette Drive | Closed | Closed |
| Cornell Dr/57th Dr at Hayes Dr | F (**) | F (**) |
| Cornell Dr/57th Dr at Midway Plaisance (EB) | Closed | Closed |
| Cornell Dr/57th Dr at 57th St/MSI Drop off | A (7) | C (24) |
| Cornell Dr/57th Dr at Hyde Park Blvd | C (20) | B (15) |
| 67th St at East End Ave * | B (12) | C (15) |
| 67th St at Cregier Ave * | B (13) | B (14) |
| 67th St at Jeffery Ave | B (19) | B (19) |
| 67th St at South Shore Dr | B (17) | B (19) |
| Marquette Dr at Richards Dr (West) | Closed | Closed |
| Marquette Dr at Richards Dr (East) | Closed | Closed |
| Marquette Dr at La Rabida Entrance | B (14) | A (7) |
| Richards Dr at Marquette Dr (North) | Closed | Closed |
| Richards Dr at Hayes Dr * | A (9) | B (14) |
| 56th St at Hyde Park Blvd * | B (12) | B (12) |
| 56th St at Everett Ave * | A (8) | A (7) |

*Indicates All-way Stop-Controlled Intersection
** Indicates one or more movements operate over capacity. These intersections are listed with a LOS F per the Highway Capacity Manual definition.

Under the conditions of the proposed road closures, by the year 2040 nine signalized intersections and one stop sign controlled intersection would experience a LOS F or operate over capacity during either the morning or the evening peak hour, with expected average vehicle delays of 1.5 minutes to as much as 4 minutes per vehicle. These LOS F intersections are a result of traffic diversions and traffic redistribution caused by the roadway closures. Details regarding intersection operation can be found in Appendix H.

Without improvements to address the road closures, many intersections would experience considerable increases in delay and operate over capacity. Thus, there is a need to improve roadway and intersection facilities to accommodate the future changes in travel patterns and provide desirable levels of intersection

safety and operation. In addition to the future congested traffic conditions, the need to improve the existing deficiencies in bicycle and pedestrian access and circulation in Jackson Park is being evaluated.

Jackson Park attracts many local residents, tourists, and recreational users each day as the home of the MSI, an outdoor track and field facility, baseball and softball diamonds, a golf course and driving range, soccer fields, beaches, harbors, gardens, and natural spaces, among many other park amenities. Improvements in 2003 along Lake Shore Drive provided improved underpasses for east-west bicycle and pedestrian access to the lakefront and the Lakefront Trail at several locations: Marquette Drive, Hayes Drive (63rd Street), 59th Street, 57th Street, and 55th Street (Promontory Point). Other than the underpasses beneath Lake Shore Drive, no other grade separated bicyclist or pedestrian locations exist within the Jackson Park. To circulate within Jackson Park, users must cross heavily traveled four to six-lane roadways, either at signalized intersections or uncontrolled crosswalks, some of which are unmarked.

Crossing locations within Jackson Park are typically spaced approximately 700 to 800 feet apart. One of the longest stretches within the Jackson Park without a crossing location occurs along the six-lane roadway of Cornell Drive between Hayes Drive and the Midway Plaisance, a length of more than one-third of a mile (1,760 feet). The Clarence Darrow Bridge, currently closed to all pedestrian and bicyclist traffic due to its poor condition, is meant to provide an east-west connection over the Columbia Basin south of the MSI. Improvements to this structure are being developed and are funded as part of a separate project. Due to the current closure of the Clarence Darrow Bridge, pedestrians and bicyclists can only cross roadways at intersections or crosswalks in order to circulate within Jackson Park.

The *Chicago Streets for Cycling Plan 2020* aims to provide safe bicycle accommodations within 0.5 miles of every resident for access to and from homes, businesses, and recreational facilities (CDOT 2020). Neighborhood routes are generally located along residential streets and provide connections between local destinations. Crosstown routes are identified along collector and arterial streets to connect major destinations through a variety of land uses. These routes may include treatments such as barrier or buffer protected on-street bike lanes, striped bike lanes, marked shared bike lanes, or signed routes. Both neighborhood and crosstown routes in the project study area have been identified along roadways bordering and terminating into Jackson Park as shown on page 35 of the *Streets for Cycling Plan*.

Divvy is Chicago's bike share system, which allows users to rent bicycles for trips such as commuting to and from work, visiting Chicago's landmarks or enjoying a ride along the lakefront. Bicycles can be picked up or dropped off at any station, typically located at major end points of user routes.

With future plans to provide bicycle routes for local residents to Jackson Park, as well as several Divvy stations currently provided in the area (See Exhibit A-2 in Appendix A) there is a need to provide safe and frequent access points and to improve facility conditions that allow for better circulation within Jackson Park.

## 3.3   United States Army Corps of Engineers (USACE)

The USACE is a cooperating agency in this Environmental Assessment. The City has requested the USACE take the following actions:

1) authorize proposed discharges of fill material into waters of the United States under Section 404 of the Clean Water Act (CWA) and

2) authorize impacts to an ecosystem restoration project constructed with federal funds under the Great Lakes Fishery & Ecosystem Restoration (GLFER) program.

The proposed roadway work would require authorization under Section 404 of the CWA (33 U.S.C. 1251 *et seq.*). The City's proposal to widen Lake Shore Drive involves expanding the 59th Street bridge abutment. This work would result in a discharge of fill material and require a Section 404 permit. Second, the City's proposal to dewater the portion of the lagoon under Hayes Drive to complete bridge improvements would result in a discharge of fill material and would require a Section 404 permit. Further, the City's proposal to improve the east end of the Midway Plaisance for replacement recreation anticipates alterations to the existing wetland on the site, although that work may only be subject to state requirements. The construction of the OPC would also result in temporary and permanent impacts to the GLFER project in Jackson Park. This proposed alteration requires USACE permission pursuant to Section 14 of the Rivers and Harbors Act (RHA) of 1899 (33 U.S.C. 408), commonly referred to as "Section 408."

It is expected that the USACE will evaluate the Section 404 actions under the USACE Chicago District's Regional Permit Program (RPP), whereby USACE staff will determine whether the City's actions comply with the terms and conditions that were established as part of the public interest review undertaken in the establishment of the RPP pursuant to Section 404(e). The USACE will "verify" that the activities are authorized by the RPP. If the actions do not meet the conditions of the RPP, the USACE will process the requests under the Individual Permit process described at 33 C.F.R. 325, including Appendix B.

Evaluation of the USACE Section 408 action will be completed as described in Engineer Circular 1165-2-220. This includes a determination whether the proposed alteration would impair the usefulness of the GLFER project, and whether the use of a categorical exclusion is appropriate.

Impacts of the actions that are regulated by USACE are considered below as direct or indirect impacts of the proposed roadway improvements or UPARR conversion approval. In addition, USACE is undertaking its own analysis of its regulatory actions pursuant to its own regulatory framework.

# 4.0   Alternatives

This Environmental Assessment evaluates three alternatives:

- Alternative A: No Action reflects no conversion of UPARR land in Jackson Park, and no roadway or bicycle and pedestrian improvements in or adjacent to Jackson Park. The City would not close any roads in Jackson Park, nor would it allow construction of the OPC in Jackson Park. The City and the CPD would continue to manage Jackson Park and the roadway network under existing management direction.

- Alternative B: NPS Action (FHWA No Build) reflects FHWA's "no build" scenario from which to compare the effects of proposed traffic improvement actions analyzed in Alternative C. This alternative reflects a future where NPS approves the City's proposed partial conversion of UPARR

lands in Jackson Park related to the OPC and proposed replacement of lost recreation opportunities on the east end of the Midway Plaisance. Under this Alternative, the proposed roadway closures occur and the OPC is constructed, but no additional transportation improvements are made.

- Alternative C: NPS + FHWA Action (Preferred Alternative) reflects a future where, similar to Alternative B, NPS approves the City's proposed partial conversion of UPARR lands related to the OPC and proposed replacement of lost recreation opportunities on the east end of the Midway Plaisance. The proposed roadway closures occur, and the OPC is constructed. In addition, this alternative also reflects a future where FHWA authorizes funding eligibility for the transportation improvements and those improvements are built. In this alternative, there is an additional conversion proposed which includes approval of lost recreation areas from the roadway improvement, being replaced with new recreation land gained by converting closed road corridors to recreation areas. Roadways in and adjacent to Jackson Park are improved to accommodate the change in traffic patterns resulting from the roadway closures and bicycle and pedestrian improvements are made in and adjacent to Jackson Park to improve connectivity.

## 4.1   Alternative A: No Action

Alternative A reflects the existing recreational opportunities and infrastructure within Jackson Park, subject to ongoing operation and maintenance. Alternative A would not trigger the need to amend the UPARR agreement or use federal funding for road improvements associated with the OPC and is evaluated as a baseline for comparison of action alternatives.

Jackson Park would remain unchanged with open space and roadways remaining as they currently function. See Appendix G. The City and/or CPD have several projects for ongoing operation and maintenance of Jackson Park, including the Lakefront Trail separation (completed), the relocation and reconfiguration of baseball facilities within Jackson Park, improvements to the Osaka Garden on the Wooded Island, other improvements on the Wooded Island, and the rehabilitation of a breakwater in the Jackson Park Harbor. The City would continue to pursue other projects that are not related to the proposed actions under consideration in this Environmental Assessment and would be evaluated in the future as appropriate.

The existing Section 1010 boundary would remain in its existing configuration under Alternative A. The City would not request the use of Federal-Aid Highway funds for transportation improvements and therefore there would be no need for FHWA involvement. Alternative A is shown in Figure 8.



*Figure 8: Alternative A: No Action*

## 4.2    Alternative B: NPS Action (FHWA No Build)

Alternative B reflects FHWA's "no build" scenario from which to compare the effects of proposed traffic improvement actions analyzed in Alternative C. Under Alternative B, the NPS would approve the City's proposed partial conversion of UPARR lands in Jackson Park and amend the UPARR grant agreement to remove a portion of the OPC site from the UPARR boundary and to include the proposed replacement property at the Midway Plaisance within the UPARR boundary. The City's proposed roadway closures, as described in Section 2.4, would be implemented in order to construct the OPC site and provide continuous parkland. The NPS has determined that the 4.6-acre parcel containing the OPC site's forum, library, and museum buildings will support uses that do not qualify as recreational uses under UPARR. Therefore, NPS is reviewing the UPARR recreation losses within the 4.6-acre footprint and the City's proposed replacement recreation opportunities on the east end of the Midway Plaisance. This alternative is depicted on Figure 9.

As described in Section 2.4, the Eastbound Midway Plaisance (Stony Island Avenue to Cornell Drive) and Cornell Drive (62nd Street to 59th Street) roadways would be closed for construction of the OPC. As part of the OPC improvements, these roadways would be physically removed and replaced with recreation by the private institution developing the site; however, under this alternative, these areas would not be added to the UPARR amendment boundary. The northbound section of Cornell Drive between 68th Street and 65th Street and Marquette Drive between Stony Island Avenue and Richards

Drive would be closed to traffic; however, in this alternative, no funding or improvements would be proposed for their physical removal.



*Figure 9: Alternative B: NPS Action (FHWA No Build)*

Alternative B serves as FHWA's No Build condition for evaluating alternatives and their ability to address the transportation needs and environmental impacts. Alternative B reflects the conditions that create the purpose and need for FHWA's proposed action and that would persist if FHWA took no action.

Under Alternative B, the NPS would compare the recreation losses that would result from construction of the OPC with the proposed replacement recreation opportunities on the east end of the Midway Plaisance bounded by the North and South Midway Plaisance, Stony Island Avenue, and the Metra Electric District. If the replacement property and planned recreation opportunities are determined acceptable by the NPS, the property would become subject to federal UPARR restrictions, requiring that the area remain dedicated to public recreational use. See Figure 10 for existing and proposed conditions for the east end of the Midway Plaisance.

Proposed recreation improvements on the Midway Plaisance property will provide a mix of formal and informal recreation space. Although final decisions on playground structures in this area will be decided through a public process, it is anticipated that formal playground recreation facilities will include inclusive play facilities as well as nature play facilities. Nature play facilities would include opportunities for natural plantings and structures such as tree sundials, mud kitchens, and log steppers; inclusive play facilities in the playground area would include play facilities for people with a wide range of disabilities, such as activity tables, swings, slide mounds, and quiet spaces. See Figure 11 for proposed conceptual play options.



Existing Layout



Proposed Layout

*Figure 10: Existing and Proposed Conceptual Recreation Replacement Opportunities on the East End of the Midway Plaisance*



*Figure 11: Proposed Conceptual Recreation Replacement Opportunities on
the East End of the Midway Plaisance*

The proposed flexible open space on the site would accommodate a variety of activities such as dog-walking, picnicking, and holding soccer practice. This open space area would be the size of one junior soccer field (approximately 30 by 50 yards). The sunken grade of the lawn area where a wetland is located would be modified to facilitate infiltration and drainage and to enhance use of the open field. The installation of a missing historic walk will improve access to the Cheney-Goode Memorial and the playground area, as well as rehabilitate a historic circulation pattern.

Within these parameters, the City will make final design selections (such as specific playground equipment) with input from the public and in light of the historic nature of the Midway Plaisance, seeking to minimize any potential effects to historic resources, pathways, and plantings, to the extent possible. The schedule for public input for the final design will be announced by the City following completion of the Federal review process.

## 4.3    Alternative C: NPS + FHWA Action (Preferred Alternative)

Alternative C incorporates the same UPARR boundary and recreation changes described under Alternative B and adds transportation improvements to mitigate traffic congestion as a result of roadway closures in Jackson Park. This alternative also increases continuity between existing park areas with proposed trails and underpasses for improved pedestrian and bicyclist access and circulation and provides replacement recreation for the road improvements to satisfy UPARR. See Figure 12.



*Figure 12: Alternative C: NPS + FHWA Action (Preferred Alternative)*

The planned paths build upon the existing network, which has a focus on trips along and to the Lakefront Trail. Continuous east/west corridors aligned with 59th Street, 63rd Street, and Marquette Drive are planned, in accordance with the *Chicago Streets for Cycling Plan 2020*, between Stony Island Avenue and the Lakefront Trail (CDOT 2020). A new north/south path within the OPC site, generally aligned along the vacated Cornell Drive, would connect these east/west corridors and provide additional access to the Lakefront Trail.

Five new underpasses would provide safer and more comfortable access for users by physically separating pedestrian and vehicular traffic. The combination of new paths and underpasses would allow users to enter at the far southwest corner of Jackson Park and travel all the way to the northeast corner without having to cross a road at grade. Additional access improvements along Stony Island Avenue to improve access to Jackson Park include two new traffic signals with marked crosswalks and spot improvements including new pedestrian refuge islands and curb extensions to reduce crossing distances.

A conceptual representation of salient conditions in Jackson Park under Alternative C (Preferred Alternative) is shown in Figure 13 below.



*Figure 13: Conceptual Representation of Conditions under Alternative C*

The FHWA Action under Alternative C considers the approval of Federal-Aid Highway Funds to provide improvements to the transportation network as a result of the City's proposed roadway closures.

FHWA's alternatives analysis process identified the transportation improvements that are incorporated into Alternative C. The alternative analysis process is detailed in the *Alternatives to Be Carried Forward* and *Preferred Alternative* documents. These documents are incorporated by reference and can be found in full at http://www.tinyURL.com/JPImprovements. The "preferred alternative" documentation concludes that Alternative 9B best meets the FHWA purpose and need while minimizing environmental impacts. Cross-sections for the proposed transportation improvements under Alternative C are included as Exhibits 3a-3j in Appendix A. The proposed transportation improvements are described below.

### 4.3.1   Capacity Improvements

Lake Shore Drive – Hayes Drive to 57th Drive

- This existing section of Lake Shore Drive consists of three northbound and two southbound travel lanes. This section would be widened to add an additional southbound travel lane, resulting in a proposed section that consists of three northbound and three southbound travel lanes.

Hayes Drive – Lake Shore Drive to Cornell Drive

- This existing section of Hayes Drive consists of one lane in each direction with on-street parking along both sides. In this alternative, 147 on-street parking spaces would be removed to increase the number of travel lanes to two lanes in each direction with a raised barrier median.

Cornell Drive – Stony Island Avenue to Hayes Drive

- This existing section of Cornell Drive consists of three southbound-only travel lanes. This section would be widened to accommodate an additional lane and converted to two-way traffic, resulting in the proposed section that consists of two southbound and two northbound lanes.

Stony Island Avenue – 67th Street to 65th Street

- This existing section of Stony Island Avenue consists of two northbound lanes, four southbound lanes, a raised median with left turn lanes, and on-street parking on the west side. This section would be widened to the east to add one northbound through lane along Stony Island Avenue to result in a proposed section that consists of three northbound lanes, four southbound lanes, a raised median with left turn lanes, and on-street parking on the west side.

Stony Island Avenue – 65th Street to Midway Plaisance

- This existing section of Stony Island Avenue consists of one lane each direction with on-street parking on each side. This section would be widened to the east to add one southbound lane, one northbound lane, a center raised median with left turn lanes, and space for bus loading lanes. The proposed Stony Island Avenue section then consists of two lanes in each direction, a raised median with left turn lanes, and on-street parking/bus loading lanes on each side of the street.

The information below on bridge modifications and intersection improvements provides greater detail on capacity improvements outlined above.

### 4.3.2 Bridge Modifications

Lake Shore Drive

- Widen the 59th Street underpass, the 59th Street Lagoon Inlet Bridge, and the 63rd Street underpass to accommodate the additional southbound lane proposed along Lake Shore Drive.

### 4.3.3 Intersection Modifications

Lake Shore Drive

- At 57th Drive, widen the intersection to accommodate the new third southbound lane, and re-time the traffic signal to optimize signal operations.

- At Science Drive, widen the intersection to accommodate the new third southbound lane, and re-time the traffic signal to optimize signal operations.

- At Hayes Drive, widen the intersection to accommodate the new third southbound lane on Lake Shore Drive, the two new through lanes on Hayes Drive, and new turn lanes. Also, modernize the

traffic signal installation and re-time the signal to optimize operations. Provide a new pedestrian crossing on the south leg.

Hayes Drive

- At Richards Drive, reconfigure the existing triangular, stop-controlled intersection to a signalized T-intersection. Provide new pedestrian crossings on the east and south legs.

- At Cornell Drive, reconfigure the intersection to provide a through movement for the predominant travel through the intersection. Realign the existing section of Hayes Drive between Stony Island Avenue and Cornell Drive to create a signalized T-intersection with the realigned Hayes Drive-Cornell Drive through movement.

Stony Island Avenue

- At 57th Street, re-time the traffic signal to optimize signal operations.

- At 59th Street, remove the existing traffic signal and restrict westerly access to right-in/right-out only.

- At North Midway Plaisance (westbound), widen the intersection to accommodate additional through and turning lanes on Stony Island Avenue, to convert North Midway Plaisance east of Stony Island Avenue to two-way traffic, and provide two lanes in each direction on North Midway Plaisance east of Stony Island Avenue. Re-time the traffic signal to optimize signal operations.

- At South Midway Plaisance (eastbound), widen the intersection to accommodate the additional lanes on Stony Island Avenue. Remove 14 on-street parking spaces on the west leg to provide an additional eastbound left-turn lane. Re-time the traffic signal to optimize signal operations.

- At 60th Street, remove the existing traffic signal and restrict westerly access to right-in/right-out only. Widen the intersection to accommodate the additional lanes on Stony Island Avenue.

- At 63rd Street/Hayes Drive, widen the intersection to accommodate the additional lanes on Stony Island Avenue, and shift the east leg to the north to provide better alignment for the westbound through movement across the intersection. Modernize the traffic signal installation and re-time the signal to optimize operations.

- At 64th Street, widen the intersection to accommodate the additional lanes on Stony Island Avenue, and convert the stop-controlled intersection to a signalized intersection to maintain traffic progression through interconnected signals on Stony Island Avenue.

- At 65th Place/Cornell Drive, widen the intersection to accommodate the additional lanes on Stony Island Avenue and Cornell Drive, to convert Cornell Drive east of Stony Island Avenue to two-way, and to provide additional turn lanes. Modernize the traffic signal installation and re-time the signal to optimize operations.

- At Marquette Street, widen the intersection to accommodate the additional lanes on Stony Island. Modernize the traffic signal installation and re-time the signal to optimize operations.

- At 67th Street, widen the intersection to accommodate the additional lanes on Stony Island Avenue. Modernize the traffic signal installation and re-time the signal to optimize operations.

57th Drive

- At Hyde Park Boulevard, re-time the traffic signal to optimize signal operations.
- At Cornell Drive/57th Street/MSI Drop-off, re-time the traffic signal to optimize signal operations.

Marquette Drive

- At Lake Shore Drive/Jeffery Drive, re-time the traffic signal to optimize signal operations.
- At the La Rabida Children's Hospital entrance, re-time the traffic signal to optimize signal operations.

67th Drive

- At Jeffery Drive/Jeffery Avenue, re-time the traffic signal to optimize signal operations.
- At South Shore Drive, modernize the traffic signal installation and re-time the signal to optimize operations.

### 4.3.4  Pedestrian and Bicycle Enhancements

- Americans with Disabilities Act (ADA) improvements at widened or modernized intersections including improvements to sidewalk slopes, installation of detectable warning tiles and installation of accessible pedestrian signals.
- Crosswalk improvements at widened or modernized intersections
- Additional trails (consistent with the City's *Streets for Cycling 2020* plan) along Cornell Drive and Hayes Drive
- Pedestrian underpasses at the following locations:
  - Two legs of the Cornell Drive/Hayes Drive intersection
  - Along Hayes Drive between Richards Drive and Lake Shore Drive
  - Along Jeffery Drive between Marquette Drive and 67th Street
  - South Shore Drive/67th Street intersection
- Curb extensions at the following intersections or mid-block crossings:
  - Stony Island Avenue at 60th Street
  - Stony Island Avenue at 61st Street
  - Stony Island Avenue at 62nd Street
  - Stony Island Avenue at 63rd Street
  - Stony Island Avenue at 64th Street
  - Stony Island Avenue at 65th Street
  - Stony Island Avenue at 65th Place
  - Stony Island Avenue at Marquette Street
  - Stony Island Avenue at 67th Street
  - Mid-Block Crossing of Cornell Drive between 57th Street and Stony Island Avenue
- Pedestrian refuge islands at the following intersections or mid-block crossings:
  - Hayes Drive at Richards Drive

- o   Stony Island Avenue at North Midway Plaisance
- o   Stony Island Avenue at 60th Street
- o   Stony Island Avenue at 62nd Street
- o   Stony Island Avenue at 64th Street
- o   Stony Island Avenue at 65th Street
- o   Stony Island Avenue at 65th Place
- o   Stony Island Avenue at Marquette Street
- o   Mid-Block Crossing of Cornell Drive between 57th Street and Stony Island Avenue

Under Alternative C, NPS would also evaluate and approve the conversion of UPARR recreation land caused by the roadway improvements in exchange for replacement land gained by converting closed road corridors to recreation areas. See Appendix G for more details. This would allow the closed roadways within Jackson Park to be converted into open space. The City proposes to add these new areas of open space to the new Section 1010 boundary to provide replacement recreation opportunities.

The areas within Jackson Park, where existing roadways would be converted to park space, offsets the recreation lost due to other roadway work (see Figure 12). The new recreation area within Jackson Park would predominantly include new informal recreation space, but would also include new pathways, sidewalks, and underpasses that are incorporated in the roadway improvements. The City intends for the roadway closures to improve park cohesiveness through better connected parkland; opportunities for expanded multi-use trails within Jackson Park; and improved accessibility within Jackson Park as a result of this increased trail system. This added area would provide similar, but improved recreation opportunities as the open space areas lost due to roadway improvements.

## 4.4   Alternatives Considered and Dismissed from Further Analysis

### 4.4.1   NPS

The NPS regulations implementing UPARR require an applicant for a conversion of recreational parkland to non-recreational uses to evaluate all practical alternatives to the proposed conversion. Alternatives that avoid conversion are evaluated as Alternative A in this Environmental Assessment. NPS did not consider alternatives that involve conversion within Jackson Park other than the proposed conversion because the ultimate decision to allow the placement of the OPC within Jackson Park is up to the City to make. Section 2.3 describes the processes used by the City to approve the placement of the OPC within Jackson Park. Further information regarding the UPARR application and site selection process is contained in the City of Chicago Analysis of its Proposal Related to Jackson Park, Cook County, Illinois under the Urban Park and Recreation Recovery Act Program (City of Chicago 2020).

### 4.4.2   FHWA

The FHWA alternatives analysis considered a wide range of proposed improvements to meet the FHWA's purpose and need, while avoiding or minimizing impacts to Jackson Park and other environmental resources. The *Alternatives to Be Carried Forward* and *Preferred Alternative* documents describe the

development and evaluation of alternatives and are incorporated by reference in full at http://www.tinyURL.com/JPImprovements. A summary of the documentation is provided below.

A "building block" approach allowed for incremental transportation improvements to be added to each of the eleven alternatives, which resulted in enhanced LOS and increased bicycle/pedestrian safety and access, consistent with the agencies' stated purpose and need. The base, or No Build, alternative includes no project specific improvements. Each alternative considered after the No Build alternative includes proposed bicyclist and pedestrian improvements, five underpasses, additional trails, and enhanced access accommodations. Subsequent alternatives also considered operational changes, such as traffic signal re-timing, prior to physical construction of additional through and/or turn lanes. Each of these alternatives failed to meet the FHWA purpose and need criteria due to poor operational performance and were eliminated from further study. Although the No Build also operated poorly, it is carried forward as a baseline for determining any impacts or benefits of a proposed action.

The subsequent group of alternatives, called Build alternatives, evaluated the performance of additional through and turning lanes along Lake Shore Drive, Hayes Drive, and Stony Island Avenue, where the majority of re-distributed traffic from the City's proposed roadway closures is anticipated to occur. Each of the Build alternatives include bicyclist and pedestrian improvements. Improvements along each individual roadway were evaluated, followed by combinations of improvements along two or more roadways. Only the combination of improvements along Lake Shore Drive, Hayes Drive, and Stony Island Avenue (identified as Alternative 9) meets the FHWA purpose and need and the remaining alternatives were dropped from further consideration.

The FHWA studied Alternative 9 - Mobility Improvements – Widen Lake Shore Drive/Reconfigure Hayes Drive/Widen Stony Island Avenue in detail to further minimize environmental impacts. Considering that the limits of Jackson Park begin at the backs of curb along all roadways within Jackson Park, opportunities to reduce impacts to Jackson Park while continuing to provide equivalent operational performance were limited to improvements along Stony Island Avenue. Sub-alternatives of Alternative 9 included widening Stony Island Avenue to the west (Alternative 9A) and widening Stony Island Avenue to the east (Alternative 9B). Alternative 9A resulted in greater impacts to private property, residences, businesses, and historic properties and was eliminated from further study. The transportation improvements described in Alternative 9B are therefore carried forward in this Environmental Assessment for detailed evaluation as explained above in Section 4.3 and those improvements are incorporated into Alternative C.

# 5.0    Affected Environment and Environmental Consequences

The following sections identify which resources are present in the project study area and whether they are carried forward for a detailed analysis.

## 5.1    Impact Topics Not Carried Forward for Further Analysis

### 5.1.1   Agricultural Resources

Agricultural resources are not a consideration for this project because there are no farms present, a farmland conversion does not occur, and there are no prime and important soils in the project study area. Because these resources are not present within the project study area, this impact topic is not carried forward for further analysis.

### 5.1.2   Special Status Species

The Endangered Species Act (ESA) of 1973 (16 U.S.C. 1531-1544) protects Federally threatened and endangered species. The United States Fish and Wildlife Service (USFWS) Information for Planning and Conservation (IPaC) tool was used to identify the federally-listed threatened and endangered species that USFWS lists as occurring in Cook County. USFWS lists all species by county (except for the Rusty Patched Bumble Bee, the USFWS uses High Potential Zones for this species). Suitable habitat occurs within the project area for the following federally-listed species: the Northern long-eared bat (NLEB), the Piping Plover, and the Rufa Red Knot. There is no suitable habitat within the project study area for other federally-listed species identified in the IPaC report. See Appendix C. The three federally-listed species with suitable habitat within the project study area and the potential to be impacted by construction activities are discussed below.

The NLEB suitable summer habitat consists of a wide variety of forested or wooded habitats where they roost, forage, and travel. There are no records of maternity roost trees within the project study area. Section 4(d) of the ESA allows USFWS to make special rules that prohibit certain types of incidental takes to a listed species. USFWS has issued a Programmatic Biological Opinion that defines the types of activities that may affect the NLEB but are not prohibited under the Final 4(d) Rule. Impacts associated with the project alternatives were evaluated in accordance with the USFWS Programmatic Biological Opinion on Final 4(d) Rule. The evaluation determined that tree removals within the project study area may affect the NLEB, but that any resulting incidental take of the NLEB is not prohibited by the Final 4(d) Rule. The Final 4(d) Rule evaluation was sent to USFWS for their review. A response was not received within 30 days; therefore, in accordance with ESA Section 7 guidelines, agency coordination for the NLEB is complete. See Appendix C.

CDOT provided a commitment that all construction activities related to the transportation improvements would generally occur west of Lake Shore Drive. Based on this commitment, a no effect determination was made for the federally-listed Piping Plover and the federally-listed Rufa Red Knot. See Appendix C.

The Illinois Endangered Species Protection Act (520 ILCS 10) also protects Threatened and Endangered species identified by the State of Illinois. State-listed species that may occur in the project study area were

identified using Illinois Department of Natural Resources (IDNR) Ecological Compliance and Assessment Tool (EcoCAT). Suitable habitat occurs within the project area for the following state-listed species: the Yellow-crowned Night Heron, the Black-crowned Night Heron, the Seaside Spurge, the Sea Rocket, and the Pitcher's (Dune) Thistle. There is no suitable habitat within the project study area for the other state-listed species identified in the EcoCAT report. See Appendix C.

In order to avoid impacts to the Yellow-crowned Night Heron and Black-crowned Night Heron, the City commits to prohibit tree removal during the breeding season, between March 1 and August 31 for projects assessed in this Environmental Assessment. This commitment excludes tree removal that may need to occur at any time during the year due to damage, disease, pests, or other unforeseen circumstances in the interest of public safety. If removal is needed, a staff expert at the CPD would inspect potentially impacted trees for signs of nesting activity prior to removal and postpone, if necessary. This commitment will avoid adverse impacts to nesting and fledging Black-crowned and Yellow-crowned Night Heron species. Habitat for the heron will be temporarily impacted by tree clearing; however, all trees removed will be replaced at a 1:1 replacement ratio (See Appendix D). Temporary construction impacts, such as noise or vibrations, are expected to have the potential to disrupt normal behavior in the immediate vicinity of the site, but impacts will be temporary and minimal.

In order to avoid impacts to the state-listed Seaside Spurge, the Sea Rocket, and the Pitcher's (Dune) Thistle, CDOT committed that all construction activities would occur to the west of Lake Shore Drive with the exception of some curb and gutter elements proposed in existing concrete areas. See Appendix C. This commitment will avoid adverse impacts to the Seaside Spurge, Sea Rocket, and Pitcher's (Dune) Thistle.

Based on the effect determinations made in coordination with the appropriate resource agencies, the impact topic of federal and state-listed special status species is not carried forward for further analysis. See Appendix C for additional detail.

## 5.1.3   Other Wildlife and Wildlife Habitat

Three natural areas are recognized by CPD and are listed in the Chicago Habitat Directory within Jackson Park: the Paul H. Douglas Nature Sanctuary (which includes the Wooded Island), the Bobolink Meadow, and the 63rd Street Beach Dune (see Appendix C). From mid-April through May, and then again from late August through mid-October, the Wooded Island generally has the most migratory birds within Jackson Park. The CPD designated the Wooded Island a Bird and Butterfly Sanctuary. From November through March, the greatest waterfowl diversity in Jackson Park is found off the 63rd Street Beach breakwater and in Jackson Park Inner and Outer Harbors, which straddle Coast Guard Drive from 63rd to 66th Streets.

The Lake Michigan shoreline serves as a resting place for migratory birds migrating along Lake Michigan, which is within the Mississippi Flyway. As such, the entirety of the Lake Michigan shoreline, including the limits of Jackson Park, has been designated an Audubon Important Bird Area within the state of Illinois because it is a location where shorebirds, waterfowl, and wading birds may gather.

Tree surveys were conducted within the OPC site, track and field replacement site, and adjacent to proposed transportation improvements. Previous tree surveys conducted for the CPD were also considered. The boundaries of these surveys extend to 57 percent of Jackson Park and identified 4,672

trees. The other 43 percent of Jackson Park, where proposed changes are not contemplated, contains an unknown number of trees. Of the 4,672 trees counted 17 percent would be affected by this project. See Appendix D for details. The preferred alternative would result in the removal of 789 trees: 326 trees anticipated to be removed within the OPC site, 39 trees were removed by the track and field relocation, 417 trees would be removed by the transportation improvements, and 7 trees would be removed by projects considered under cumulative analyses (2 trees were removed by the Lakefront Trail separation, 5 trees are anticipated for removal by the baseball field reconfiguration). The 417 trees removed by the transportation improvements would be replaced by the City at a 1:1 replacement ratio to compensate from the impacts, consistent with IDOT's tree replacement policy. The remaining 372 trees removed are proposed to be replaced at a 1:1 minimum replacement ratio by the CPD and the Foundation. All tree replacements on CPD property will be done in coordination with CPD, regarding species, placement of trees, etc. The replacement trees would be selected to be complementary to the historic landscape of Jackson Park. Replacement trees would also consider other functional elements including aesthetics, shade, sightlines, and access. The proposed actions do not impact the Wooded Island, the Bobolink Meadow, or the Lake Michigan shoreline. Additionally, migratory birds would be protected by the City commitment to restrict tree removal, between March 1 and August 31, for projects assessed in this Environmental Assessment. This commitment excludes tree removal that may need to occur at any time during the year due to damage, disease, pests, or other unforeseen circumstances in the interest of public safety. If removal is needed, a staff expert at the CPD would inspect potentially impacted trees for signs of nesting activity prior to removal and postpone, if necessary. With this commitment in place, there would be no effect on the nesting activity of migratory bird species by the project alternatives. Habitat for migratory birds would be temporarily impacted by tree clearing; however, all trees removed will be replaced at a 1:1 mitigation replacement ratio (See Appendix D).

In conclusion, the alternatives would result in no impacts on recognized natural areas, the Lake Michigan Shoreline, or on nesting for migratory birds. Additionally, any temporary impacts to wildlife habitat due to tree removal within Jackson Park would be minor, with ample habitat remaining throughout the property. Because Jackson Park is an urban park, wildlife within Jackson Park is acclimated to human activity and development. The proposed actions would not alter the overall quality of the wildlife habitat of Jackson Park. Therefore, the impact topic of other wildlife and wildlife habitat is not carried forward for further analysis.

## 5.1.4  Air Quality

The air quality analysis performed for the alternatives is documented in Appendix E. The air quality analysis indicated that the proposed transportation improvements would meet the air quality conformity requirements under the Clean Air Act (CAA). Furthermore, the relative differences in air quality levels for all three alternatives are not a discerning factor in their evaluation. Therefore, the impact topic of air quality is not carried forward for further analysis.

## 5.1.5  Water Resources

Water resources evaluated include Lake Michigan, the North and South Lagoons, one pond, and four wetlands. See Appendix F for additional details.

The 59th Street Inlet Bridge widening proposed in the alternatives would maintain the waterway opening of the existing bridge structure but would encroach into "waters of the United States" (WOTUS) subject to federal protections under the CWA, permanently impacting 0.04 acres of WOTUS. There are also anticipated 0.04 acres of temporary impacts required to construct the proposed bridge widening. Since the waterway opening is maintained, there is no obstruction of the use of Lake Michigan (navigable waterway). Additionally, there would be minor repairs to a bridge on Hayes Drive over the South Lagoon. The minor repairs would require a temporary impact of 0.20 acres due to the installation of cofferdams during construction as well as area needed for access during the course of repairs. The proposed impacts to the WOTUS are authorized under a CWA General Permit issued by USACE and coordination is ongoing with that agency.

If the City's plan for replacement recreation on the Midway Plaisance is approved, it would result in a 0.436-acre permanent impact to the wetland on the east end of the Midway Plaisance (referred to as Wetland 1 in Appendix F). The City received a Jurisdictional Determination from USACE dated May 18, 2020 stating this wetland is not subject to federal jurisdiction. See Appendix F. The wetland impacts will be mitigated to meet the requirements of the Illinois Interagency Wetland Policy Act. The impacted wetland acreage would be replaced at the Cedar Creek A1 wetland bank site at a mitigation ratio of 1.5 to 1.0.

A floodplain fill totaling 0.03 acre-feet would occur within the 100-year floodplain under Alternative C. This minor floodplain fill would not impact the adjacent areas by increasing floodplain elevations and would therefore not increase the risk of flooding. Fill occurring in the floodplain would not require compensatory storage. The unavoidable fill in the floodplain would require an individual permit from the Illinois Department of Natural Resources–Office of Water Resources (IDNR-OWR) Lake Michigan Section to demonstrate compliance with the rules set forth for public waters. The process for obtaining a permit to demonstrate compliance is ongoing and will be completed prior to construction.

The project study area is not located within an area of karst topography or within a watershed that has been designated by the Illinois Environmental Protection Agency (IEPA) as vital for a particularly sensitive ecological system. The project study area is not located in a Wellhead Protection Area or within an area designated as a special resource groundwater. Potable water supply wells are not present. Additionally, there are no Sole Source Aquifers, as designated under Section 1424(e) of the Safe Drinking Water Act, within the project study area.

The analysis in Appendix F found that impacts to water resources would be mitigated. Additionally, the impacts were not a discerning factor in evaluating alternatives. Therefore, the impact topic of water resources is not carried forward for further analysis.

## 5.1.6  Highway Traffic Noise

A Highway Traffic Noise Analysis conducted in accordance with FHWA Noise Regulations and IDOT's *Highway Traffic Noise Assessment Manual* identified highway noise impacts as a result of transportation improvements included in Alternative C. The installation of noise barriers for the highway improvements were studied and potential locations for barriers were modeled. An analysis of potential barriers revealed that they did not meet IDOT's feasibility and reasonableness criteria. Three barriers passed

evaluation for physical feasibility because a wall can be constructed that would achieve a 5-dBA reduction of highway traffic noise for at least two impacted receptors. Two of the three barriers passed acoustic feasibility, while one did not. These two noise barriers met the 8-dBA noise reduction reasonableness criterion. The two highway traffic noise barriers carried forward were evaluated for cost-reasonableness. Based on IDOT noise policy evaluations, neither noise barrier is cost-reasonable. Due to this, traffic noise abatement measures are not recommended to be implemented based on preliminary design. Therefore, the impact topic of highway traffic noise is not carried forward for further analysis. A *Highway Traffic Noise Analysis* report dated November 20, 2018 (with June 28, 2019 Addendum) is provided at http://www.tinyURL.com/JPImprovements.

### 5.1.7  Archaeological Resources

The study area for archaeological resources is the archaeological area of potential effect determined in consultation with the Illinois State Historic Preservation Officer (SHPO). This area consisted of all areas of potential ground disturbance associated with the proposed undertaking. As a result of survey efforts, no eligible archaeological resources were identified within the study area, and the Illinois SHPO concurred that no archaeological resources would be affected in letters dated March 28, 2018, and September 12, 2018. Therefore, the impact topic of Archeological Resources is not carried forward for further analysis.

### 5.1.8  Construction Noise from the OPC

The OPC site is surrounded by Jackson Park on all sides with the exception of a parking lot and apartment complex to the west, across South Stony Island Avenue. The noise from the construction of the OPC has the potential to result in unavoidable adverse short-term impacts. However, in compliance with the City Noise Ordinance (Section 8-32-140), construction activities would be limited to 8:00 AM to 8:00 PM. Therefore, the impact topic of construction noise is not carried forward for further analysis.

## 5.2    Impact Topics Retained for Further Analysis

The impacts on the topics of recreation, traffic congestion, cultural resources, social and economic issues, and GLFER areas are discussed below. The analysis of indirect effects includes an evaluation of effects from related non-federal actions such as the development of the OPC, roadway closures and relocation of the track and field. The analysis of cumulative impacts considers the incremental impacts of the Federal actions when added to other past, present, or reasonably foreseeable actions that could affect the same resources.

### 5.2.1  Past, Present, and Reasonably Foreseeable Future Actions

The following projects are included in the cumulative impacts analysis for this Environmental Assessment. The actions discussed below have occurred or will occur in the project area independent of the Federal Actions. If any of these separate projects qualifies as a Federal Action, it will undergo its own NEPA process before the individual project receives federal approval. Each of the seven identified projects has either completed construction or is programmed for construction. Each of them also has begun, completed, or is not required to proceed through the City approval processes. Of the seven projects considered in this Environmental Assessment, those that require federal and/or state review have either initiated or

completed those activities. The rehabilitation of the golf courses within Jackson Park is not considered because while a golf course project was noted in the SLFP, the final plans and design for the golf course project are not yet approved. Interim information previously shared about the project's layout, design, and other critical details will be further developed as part of a longer-term plan for Jackson Park. Considering the proposed elements of each of the considered projects, topics that would potentially be impacted by the project's action are identified. Impacts topics that are not listed would not involve potential impacts.

### 5.2.1.1    Stony Island Avenue Traffic Improvements

CDOT is upgrading the signal and communication equipment along Stony Island/Cornell Drive/57th Drive from 95th and Stony Island to 57th and Lake Shore Drive. The project will upgrade existing traffic signal equipment (poles, mast arms, lens, cabinet, conduit) and will interconnect the traffic signals to improve operations along Stony Island, connecting into Lake Shore Drive. Where restoration is required for new traffic signal poles/conduit runs, the project will also upgrade existing pedestrian ramps consistent with the ADA. This action has the potential to impact resources included under the impact topics of "Recreation Resources" and "Traffic Congestion."

### 5.2.1.2    Lakefront Trail Separation

The Lakefront Trail connects 2,792 acres of parkland in six parks along Chicago's lakefront including Jackson Park. The trail is located east of Lake Shore Drive from 56th Street to Marquette Drive and north of Marquette Drive from Lake Shore Drive to 67th Street within Jackson Park. Considered a major recreational component in the lakefront parks and a transportation network, the Lakefront Trail Separation project sought to alleviate areas of congestion by separating bicyclists from other trail users. The newly separated trail includes an 18-mile bike trail and lakefront path. The separation project is complete. This action has the potential to impact resources included under the impact topics of "Recreation Resources" and "Cultural Resources."

### 5.2.1.3    Baseball Facilities

The SLFP includes improvements to the area north of Hayes Drive and east of the Wooded Island in Jackson Park. Currently there are two natural grass baseball fields and an overlapping natural grass soccer/football field. Preliminary design is in the early stages for two new senior baseball fields and renovations of one senior baseball field. This action has the potential to impact resources included under the impact topics of "Recreation Resources" and "Cultural Resources."

### 5.2.1.4    Osaka Garden and Other Improvements on the Wooded Island

As part of larger planning efforts for the Osaka Garden, the Wooded Island, and SLFP, the CPD completed a survey of the garden and improvements to the existing waterfall. The ultimate plan includes improvements to the perimeter fence, a new main gate, pathway enhancements, new plantings and tree pruning, landscape lighting, feature stone placements in the garden, and a new teahouse. The plan also includes the addition of an overlook that will allow for viewing of an existing art installation and new berms surrounding the installation to integrate the site with the adjacent natural areas. For the

Environmental Assessment cumulative analysis, the completed survey and waterfall work are the activities that will be evaluated as they are the past, present, or reasonably foreseeable activities. This action has the potential to impact resources included under the impact topics of "Recreation Resources" and "Cultural Resources."

### 5.2.1.5    Clarence Darrow Bridge

The Clarence Darrow Bridge is currently closed to all pedestrian and vehicular traffic. CDOT is evaluating potential alternatives to accommodate bicyclists and pedestrians. Built in 1880 and modified in 1895, CDOT is considering rehabilitation or replacement of the bridge with plans to retain or reproduce historic design elements and materials to the maximum extent possible. CDOT intends to follow the Secretary of the Interior's (SOI) Standards for the Treatment of Historic Properties for Federal Actions in and Adjacent to Jackson Park. This funded action has the potential to impact resources included under the impact topic of "Recreation Resources."

### 5.2.1.6    Midway Plaisance Resurfacing

As part of the 2021 Arterial Resurfacing Program, CDOT will resurface both eastbound and westbound Midway Plaisance roadways between S. Payne Drive and S. Blackstone Avenue. The roadway work will include milling existing pavement, installing new asphalt, and installing ADA compliant curb ramps. Adjacent sidewalks in need of repair will be replaced. Complete Streets/safety improvements within the existing curb lines are proposed. This action has the potential to impact resources included under the impact topics of "Recreation Resources" and "Traffic Congestion."

### 5.2.1.7    Jackson Park Harbor Navigation Improvement Project

The CPD has submitted Federal permit applications for the construction of two new breakwaters at the Jackson Park Outer Harbor located at South Promontory Drive. For many years, the CPD has considered various alternatives to address damage caused by lake currents and waves at Jackson Park Outer Harbor. In recent years, harbor shoreline conditions have deteriorated, and an existing floating breakwater failed, which resulted in a partial closure of the harbor. Proposed improvement plans include two steel and stone groins totaling 280 feet in length. Both structures will be enveloped in steel sheet pile with a reinforced concrete crest. These proposed improvements will address the high lake levels of Lake Michigan by shielding boats from damaging waves, reducing sediment deposition in the harbor, and protecting the harbor shoreline. Any impacts that result from the Jackson Park Harbor Navigation Improvement Project would be evaluated and permitted separately by USACE. This action has the potential to impact resources included under the impact topics of "Recreation Resources" and "Cultural Resources."

## 5.2.2  Recreation Resources

Jackson Park is acknowledged as a vital community asset providing both formal and informal recreation opportunities. As a recipient of UPARR grant funds, the City must retain recreation uses within the existing Section 1010 boundary. Any conversions from recreation to non-recreation uses within Jackson Park requires NPS review.

As a result of constructing the OPC under Alternative B, there would be a partial conversion of recreation use. To compensate for this conversion, the City proposes replacement UPARR land and amenities on the east end of the Midway Plaisance. Under Alternative C, the City proposes an additional partial conversion of recreation use, taking parkland for road improvements and using closed roadways within Jackson Park as replacement land that will be developed with recreation opportunities.

### 5.2.2.1 Affected Environment – Recreation Resources

Jackson Park Recreation

Jackson Park attracts many recreation users, including tourists and members of the local community. Existing recreation opportunities in Jackson Park include the MSI, an outdoor track and field facility, baseball and softball diamonds, a golf course and driving range, soccer fields, beaches, harbors, gardens, and natural spaces, as described in Appendix G. Jackson Park also includes bike opportunities such as east-west bicycle and pedestrian access to the lakefront and the Lakefront Trail at several locations: Marquette Drive, Hayes Drive (63rd Street), 59th Street, 57th Street, and 55th Street (Promontory Point). Other than the underpasses beneath Lake Shore Drive, no other grade separated bicyclist or pedestrian locations exist within the Jackson Park. To circulate within Jackson Park, users must cross heavily traveled four to six- lane roadways, either at signalized intersections or uncontrolled crosswalks, some of which are unmarked. The OPC site within Jackson Park currently includes open space with paths that are used for walking or running, a track that is used for exercise, running, and walking, and an artificial turf field, bounded by the aforementioned track, which is used for playing football and soccer. The site also includes open picnic grove space that can be reserved by applying for a permit, a memorial garden (the Perennial or Women's Garden), and a portion of the 62nd Street Playground. Certain large public events use portions of the site. The Chicago Half Marathon traverses roadways surrounding the site. The remainder of open space on the site is used for informal recreation activities that are not tracked by the CPD.

The strips of land intended to be converted into roadways in Jackson Park, which are discussed in the Background Section 2.4, are currently parkland that are described as narrow, linear spaces that mainly serve as a buffer between roadways and more active recreation areas. These narrow, linear areas that are proposed for partial conversion of recreation use are not typically used for recreation purposes. There is, however, a north-south pathway in the area that is used for walking, jogging, and biking, but that recreation path is located outside the Lake Shore Drive conversion area.

Midway Plaisance Recreation

The east end of the Midway Plaisance is proposed as replacement property under UPARR to account for the proposed conversion in Jackson Park. As shown in Figure 9 in Appendix G, the majority of the east end of Midway Plaisance is an open lawn lined with trees. No organized CPD programs take place in the east end of Midway Plaisance and the CPD does not issue permits to reserve this portion of the Midway Plaisance. This part of the Midway Plaisance has two mixed-use trails and a sidewalk. Within the open space are park benches, trees, an informational kiosk, the Cheney Goode Memorial, and a 0.436-acre wetland. The westernmost portion of the lawn area has an elevated landscape containing dense plantings and trees that provide screening of the Metra Electric Railway. The open space allows for informal recreation such as pick-up games, walking, gathering, or open play. However, the CPD receives numerous

complaints from residents about lack of usable space on the eastern edge of the Midway Plaisance due to wet conditions. Sidewalks provide opportunities for walking and biking.

## 5.2.2.2    Alternative A: No Action – Recreation Resources

Direct Impacts

Under Alternative A, recreation within Jackson Park and the Midway Plaisance would continue under the current City and CPD management; there would be no change to the UPARR boundary. Within Jackson Park, existing pedestrian paths, track, and turf field would continue to be available for public use for walking, running, and team sports. Open picnic grove space would continue to be available by permit. Large public events would continue to utilize portions of the site, such as the Chicago Half Marathon along roadways surrounding the site. At the Midway Plaisance, the existing open lawn lined with trees would continue to be available for informal recreation, and the existing trails and sidewalk would continue to be available for walking and running. There would be no change to existing recreation within Jackson Park or the Midway Plaisance; therefore, there would be no direct impacts to the current UPARR boundary under Alternative A.

Indirect Impacts – City Actions

As discussed in the direct impacts section above, there would be no change to existing recreation within Jackson Park or the Midway Plaisance; therefore, there would be no indirect impacts to recreation under Alternative A.

Cumulative Impacts

Other past, present, or reasonably foreseeable future projects unrelated to the OPC project, as noted in Section 5.2.1, would result in enhancement of existing recreational opportunities by improving access, safety, and existing features. These projects are: the Stony Island Avenue Traffic Improvements, Lakefront Trail Separation, baseball facilities, Osaka Garden and the Wooded Island Improvements, Jackson Park Harbor Navigation Improvement Project, Midway Plaisance Resurfacing Project, and Clarence Darrow Bridge reconstruction (see section 5.2.1). Because there would be no direct or indirect impacts on recreation, Alternative A would not contribute to the cumulative impact on recreation.

## 5.2.2.3    Alternative B: NPS Action (FHWA No Build) – Recreation Resources

In order for the NPS to approve the UPARR conversion and replacement recreation on the east end of the Midway Plaisance, the City must improve the recreation opportunities on the east end of the Midway Plaisance in a manner that provides equivalent recreation opportunities to what was lost. The loss of recreational opportunities is considered an indirect effect of the Section 1010 boundary conversion and is discussed below in "Indirect Effects." This includes the development of formal facilities and improvement of the property to provide for informal recreation in the section of the Midway Plaisance to be included within the Section 1010 boundary.

Further, the plans for the Midway Plaisance include space large enough for soccer games and other pick-up team sports. The City's recreation plans for the Midway Plaisance will be reviewed by the NPS for their reasonable equivalence to existing recreational opportunities under UPARR.

<u>Direct Impacts</u>

The direct impacts resulting from alterations to the replacement recreation property are discussed in the paragraphs below. Indirect impacts, including the loss of recreational facilities within Jackson Park, are discussed separately in the "Indirect Effects" section following.

Under Alternative B, the concept plan for the Midway Plaisance would include new recreational opportunities to meet a variety of recreational needs. The City proposes modifying the site to accommodate a combination of a play area, open space, and rehabilitated walkways. The western side of the lawn would be altered with the addition of a play area. Final decisions on playground structures in this area would be decided through a public process but are anticipated to include inclusive play facilities as well as nature play facilities. Nature play facilities would include opportunities for natural plantings and structures such as tree sundials, mud kitchens, and log steppers; inclusive play facilities in the playground area would include play facilities for people with a wide range of disabilities, such as activity tables, swings, slide mounds, and quiet spaces. The proposed flexible open space on the site would accommodate a variety of activities such as dog-walking, picnicking, and holding soccer practice. The open space area would be the size of one junior soccer field (approximately 30 by 50 yards). The sunken grade of the lawn area that contains a 0.436-acre wetland would be modified to facilitate infiltration and drainage and to enhance use of the open field. The area would be improved to allow public use of the entire site for informal activities such as walking, sitting on the lawn, and strolling on sidewalks by rehabilitating infrastructure and restoring the sunken lawn that prevents use of much of the site. This would be an improvement over the current state of the area which can only be partially used because of the wetland on the site and degraded conditions. The installation of a missing historic walk would provide better access to the Cheney-Goode Memorial and the proposed playground area as well as rehabilitate a historic circulation pattern. Additional tree plantings in each corner would rehabilitate historic spatial organization, to a historically open character with corner plantings. See Figures 10 and 11. These improvements on the Midway Plaisance property would offer generally the same recreational resources and opportunities as lost in the 4.6-acre conversion area on the OPC site in that the same or similar activities can take place.

Construction activities at Midway Plaisance would result in additional noise, additional construction vehicles, temporary closures, and ground disturbing activities in the project area. While these impacts should not extend more than 12 months, visitors may avoid the area and be displaced to other areas of the Plaisance and other City recreation sites during construction. These are short term adverse impacts that would be resolved once the construction ends.

As part of Alternative B, as described in Section 2.4, the Eastbound Midway Plaisance (Stony Island Avenue to Cornell Drive) and Cornell Drive (62nd Street to 59th Street) roadways would be closed for construction of the OPC and then physically removed after construction is complete. Cornell Drive between 68th and 62nd, the northbound section of Cornell Drive between 68th Street and 65th Street,

and Marquette Drive between Stony Island Avenue and Richards Drive would remain in place but would be closed to traffic. Although other existing roads would remain open and used to divert traffic from closed roads, users may have to travel farther distances to access existing recreational opportunities. Additionally, recreational users may experience increased traffic due to this diverted traffic, particularly during peak morning and evening times, resulting in increased travel times to access existing recreational opportunities. See Appendix H for a detailed discussion on the traffic-related impacts of road closures. The farther distances and/or longer travel times may be detrimental to the enjoyment of recreational facilities within Jackson Park.

<u>Indirect Impacts – City Actions</u>

Construction of the OPC campus would impact several recreation opportunities. These include an existing picnic grove, open space, the track and field, the 62nd Street Playground and the Women's Garden; the recreation losses are described below. Access to the Women's Garden will be temporarily closed by construction. Upon completion of the OPC site's development, existing features of the Women's Garden will be replaced with a new design of equivalent size and improved accessibility, and current level of public use is expected to resume and potentially increase. Although these features do not count towards replacement recreation opportunities under UPARR, this description provides context for the action and describes what OPC-generated changes would occur in the areas of the site that remain subject to UPARR and open for public recreation.

The function of the 62nd Street Playground would, in essence, be relocated and expanded by the Foundation as part of the OPC construction to the immediate northwest of the current location, with an enlarged footprint and all new equipment, including custom-made experiential play features. The construction of the OPC would also impinge upon the existing track and field facility. The track, however, is nearing the end of its useful life, according to the CPD. The construction of a new track and field facility just south of the OPC site and still within Jackson Park will change and improve current recreational opportunities and uses. The City has indicated that the relocation of the new track and field facility results in the displacement of one junior baseball playing field and one senior baseball playing field. One of these fields will be moved within Jackson Park.

The four buildings on the OPC site, including the museum, a library building, a forum, and a PAAC, would all provide spaces open to the public for exhibitions, various informal and formal events, and spaces to enjoy Jackson Park such as a top floor in the museum building that will offer views of Lake Michigan and the South Side of Chicago. The roof of the library would include a fruit and vegetable garden which will feature a curated program aimed at local grade schools and community members and would also have a hardscape gathering area for small scale cultural offerings or group activities such as informal gathering or picnicking. The buildings would front an open plaza which would provide opportunities for free public events, including informal and planned gatherings.

Recreational elements generated within the OPC site would occur in the areas of the site that remain subject to UPARR and open for public recreation including several informal picnicking areas, the Great Lawn, a nature trail, a woodland walk, and the PAAC within the OPC site boundary. Therefore, while Alternative B would result in indirect impacts to recreation, these impacts would improve recreation in

the project area. See Appendix G for additional details regarding the impacts of the OPC to recreation. A detailed description of the OPC site is provided in Section 2.3 of this Environmental Assessment.

Cumulative Impacts

Other past, present, or reasonably foreseeable future projects unrelated to the OPC project, as noted in Section 5.2.1, would result in enhancement of existing recreational opportunities by improving access, safety, and existing features, as described in Alternative A. Alternative B would contribute additional benefits to recreation through facilitation of informal recreation experiences and interconnectedness by easing pedestrian and recreational transit within Jackson Park and improving certain recreation opportunities at the east end of the Midway Plaisance. When considered with the other projects described above, there would be a beneficial cumulative impact to recreation under Alternative B.

### 5.2.2.4     Alternative C: NPS + FHWA Action (Preferred Alternative) – Recreation Resources

This alternative incorporates impacts associated with Alternative B, as described above, in addition to impacts associated with improving roadways and bicyclist/pedestrian facilities. The analysis of impacts in this section will only discuss the additional impacts to recreation associated with the FHWA action under Alternative C.

Direct Impacts

The FHWA planned paths build upon the existing network, which has a focus on trips along and to the Lakefront Trail. Continuous east/west corridors aligned with 59th Street, 63rd Street, and Marquette Drive are planned, in accordance with the Chicago Streets for Cycling Plan 2020, between Stony Island Avenue and the Lakefront Trail. A new north/south path, generally aligned along the vacated Cornell Drive, will connect these east/west corridors and provide additional access to the Lakefront Trail.

FHWA funding will also pay for five new underpasses that will provide safer and more comfortable access for users by physically separating pedestrian and vehicular traffic. The combination of new paths and underpasses will allow users to enter at the far southwest corner of Jackson Park and travel all the way to the northeast corner without having to cross a road at grade. Additional access improvements along Stony Island Avenue to improve access to Jackson Park include two new traffic signals with marked crosswalks and spot improvements including new pedestrian refuge islands and curb extensions to reduce crossing distances. Collectively these actions would have beneficial impacts on recreation.

The planned roadway changes will have negligible effects on various open park spaces in Jackson Park used for informal recreation. The Jackson Park spaces that would be lost to roadway improvements are linear, narrow, and mainly serve as landscaped buffer space between roadways and more functional recreation areas nearby. The conversion of these areas to transportation use will not prevent park users from continuing to use the adjacent open areas of Jackson Park for informal recreation. Overall, the CPD does not expect any impact on the use of existing open spaces because the change in recreation use is undetectable; CPD has worked closely with CDOT to reconfigure pathways and open space following construction.

In Alternative C, the City proposes to add new areas of open space to provide replacement recreation opportunities under UPARR. Table 2 below shows the recreation opportunities created by the proposed trails and open areas within Jackson Park. In total, approximately 11 acres of new open areas and parkland would be designated by the conversion of closed roadways to parkland. These changes are depicted in Figure 16 in Appendix G.

*Table 2: Roadway Closures and Conversions to UPARR Designated Land*

| Location | Acreage | Recreation |
|---|---|---|
| Cornell Drive (62nd Street to 59th Street) | 3.3 Acres | Informal Recreation / New Trail |
| Cornell Drive (67th Street to 62nd Street) | 4.1 Acres | Informal Recreation |
| Cornell Drive (N Midway Plaisance to OPC Site boundary) | 0.1 Acre | Informal Recreation |
| Hayes Drive (Stony Island Avenue to Lake Shore Drive) | 0.5 Acre | Informal Recreation / Extension of Existing Trail |
| Richards Drive (Hayes Drive to Marquette Drive) | 1.0 Acre | Informal Recreation |
| Marquette Drive (Stony Island Avenue to Richards Drive) | 2.0 Acres | Informal Recreation / New Trail |

*Acreage associated with the closure of Cornell Drive between 62nd Street and 59th Street falls within the OPC site boundary; this area has been transferred to the City.

The additional recreation land resulting from the roadway changes would include safety elements to provide greater access and connectivity for recreation users in Jackson Park. The new replacement parkland would offer more user-friendly space than the areas that would be lost to road improvements and would provide enhanced recreation opportunities as compared to the linear spaces that would be impacted by roadway improvements. Specifically, the closures of Cornell Drive, Hayes Drive, Richards Drive, and Marquette Drive would provide expansive new areas of parkland insulated from traffic and new trails. The distance from the roadways of these trails would enhance user enjoyment and encourage additional use of Jackson Park. Further, new sidewalks in the areas of the roadway improvements would offer improved opportunities for pedestrians and runners.

Indirect Impacts – City Actions

The indirect impacts of the OPC project discussed under Alternative B in section 5.2.2.3 would apply under Alternative C. No additional indirect impacts to recreation are anticipated under Alternative C.

Cumulative Impacts

Other past, present, or reasonably foreseeable future projects unrelated to the OPC project, as noted in Section 5.2.1, would result in enhancement of existing recreational opportunities by improving access, safety, and existing features, as described for Alternative B. Alternative C would contribute additional benefits compared to Alternative B through improvements to pedestrian access, safety, and interconnectedness via new paths and underpasses. When considered with the other projects described above, there would be a beneficial cumulative impact to recreation under Alternative C.

### 5.2.3 Traffic Congestion

#### 5.2.3.1 Affected Environment – Traffic Congestion

Roadway-Specific Characteristics

Detailed descriptions of each of the roadways within Jackson Park are contained within Sections 2.1 and 2.2 of Appendix H. Summary descriptions of each roadway are provided below. Also refer to Figure 6.

Cornell Drive/57th Drive is classified as an "other principal arterial" between Lake Shore Drive and westbound Midway Plaisance, and also south of Hayes Drive to Stony Island Avenue. It is classified as a minor arterial between westbound Midway Plaisance and Hayes Drive. The sections classified as an "other principal arterial" are also part of the NHS. Cornell Drive has three lanes in each direction and narrows to two lanes in each direction between North Midway Plaisance and Lake Shore Drive.

U.S. Route 41 (Lake Shore Drive) is an "other principal arterial" roadway that has three lanes in each direction north of 57th Drive and two southbound and three northbound lanes between 57th Drive and Hayes Drive. This section of Lake Shore Drive is part of the NHS. Between Hayes Drive and Marquette Drive, Lake Shore Drive has two lanes in each direction and is classified as a minor arterial.

Stony Island Avenue is an "other principal arterial" roadway south of 67th Street and is a minor arterial north of 67th Street. The section south of 67th Street is on the NHS. Stony Island Avenue has one lane in each direction with on-street parallel parking from 56th Street to 59th Street and from 60th Street to 65th Street. Between 59th Street and 60th Street, parking is prohibited and two travel lanes in each direction are provided. Between 65th Street and 68th Street, four southbound lanes and two northbound lanes are provided due to the merging of southbound Stony Island Avenue and southbound Cornell Drive just south of 65th Street. On-street parking is permitted in the southbound direction in this section. South of 68th Street, four travel lanes in each direction are provided with on-street parking in both directions.

North and South Midway Plaisance are a one-way "other principal arterial" couplet (North Midway Plaisance is one-way westbound and South Midway Plaisance is one-way eastbound) running along the perimeter of the Midway Plaisance. South Midway Plaisance is on the NHS. Both North and South Midway Plaisance have two travel lanes in their designated direction of travel, with on-street parking permitted along both sides.

63rd Street is an east-west, two-lane, minor arterial roadway. East of Cornell Drive, 63rd Street becomes Hayes Drive and is classified as an "other principal arterial". Hayes Drive is on the NHS. Between Richards Drive and Lake Shore Drive, the roadway widens to two travel lanes in each direction. On-street parking is permitted west of Stony Island Avenue and between Cornell Drive and Richards Drive.

Richards Drive is a north-south major collector roadway located entirely within Jackson Park that serves as a connector between Hayes Drive and Marquette Drive. Richards Drive has two travel lanes striped in each direction. On-street parking is permitted in both directions along Richards Drive, which restricts the roadway from operating as a conventional four-lane roadway.

Marquette Road/Marquette Drive is an east-west oriented roadway that is located midway between 65th Street and 67th Street. West of Richards Drive, Marquette Road/Marquette Drive is classified as a local road. East of Richards Drive, Marquette Drive is classified as a major collector. West of Stony Island Avenue, Marquette Road has one travel lane in each direction with buffered bicycle lanes and no on-street parking or truck traffic. Between Stony Island Avenue and northbound Cornell Drive, Marquette Drive has one 16-foot-wide travel lane in each direction. Between Cornell Drive and Lake Shore Drive, Marquette Drive is striped to provide two travel lanes in each direction. On-street parking is permitted on Marquette Drive in this section. East of Lake Shore Drive, Marquette Drive is signed as U.S. Route 41 and has two 11-foot travel lanes in each direction. On-street parking is prohibited east of Lake Shore Drive.

67th Street is an east-west oriented, two-lane major collector roadway that acts as the southern boundary of Jackson Park. Parking is permitted along both sides of the street within the project study area.

Existing Travel Patterns

Currently, the majority of traffic through Jackson Park is concentrated on Cornell Drive/57th Drive and Lake Shore Drive. Lake Shore Drive provides access to the lakefront and downtown Chicago (Central Business District) for neighborhoods located along the south and southeast sections of the City. Cornell Drive/57th Drive serves as a connector between Stony Island Avenue and Lake Shore Drive, providing access between the lakefront and downtown Chicago to the Chicago Skyway and Interstate 94 to the south. Peak travel patterns generally follow commuter traffic flows, with the morning peak period having higher traffic volumes northbound towards downtown Chicago, and the evening peak period having higher southbound traffic volumes.

In addition to intersection traffic operations, the impact analysis evaluated travel times on routes that are expected to experience travel pattern or travel time changes. These routes are:

- 67th Street/Stony Island Avenue to Lake Shore Drive/57th Drive

- 67th Street/Stony Island Avenue to 56th Street/Stony Island Avenue

- Midway Plaisance/Stony Island Avenue to 57th Drive/Lake Shore Drive (Northbound)

- Midway Plaisance/Stony Island Avenue to 67th Street/Stony Island Avenue (Southbound)

The existing travel times along these routes are shown in Table 4 in Appendix H. Between 24 percent and 28 percent of the traffic from Cornell Drive may be diverted outside the project study area. Approximately half of this traffic is projected to divert to the Dan Ryan Expressway, while the remainder would likely be distributed over other north-south collectors and arterials to the west of Stony Island Avenue. Nevertheless, these diversions are not anticipated to result in roadways over capacity outside of the project study area (SSE 2018).

Existing Traffic Volumes

Existing Average Daily Traffic (ADT) and peak hour traffic volumes were collected in October 2016 in support of the *Jackson Park Revitalization Traffic Impact Study* (TIS)*,* completed in 2018. The summarized ADT volume data is included as Attachment H-1a in Appendix H for reference.

Existing Traffic Operations

As part of the *Jackson Park Revitalization TIS*, existing traffic operations were evaluated using the HCM methodology for signalized and unsignalized intersections within the project study area as implemented in the Synchro capacity analysis software. The results of the operational analysis for existing conditions are shown on Attachment H-1b in Appendix H. As indicated in the exhibit, most intersections operate at LOS C or better during both the morning and evening peak hours. Some intersections (Stony Island Avenue at 64th Street, 57th Street at Cornell Drive, and 57th Drive at Hyde Park Boulevard) have one or more movements with traffic volumes that exceed capacity under existing conditions, resulting in congestion and queuing within the roadway network near those intersections. Under existing conditions, traffic volumes at intersections along Lake Shore Drive do not exceed capacity (SSE 2018, Table 3-3).

Existing Parking Supply

On-street parking is currently permitted along the following roadways within Jackson Park:

- 56th Street between Shore Drive and Stony Island Avenue

- Everett Avenue between 56th Street and Cornell Drive

- Stony Island Avenue between 56th Street and 59th Street, and between 60th Street and 67th Street

- Hayes Drive between Cornell Drive and Lake Shore Drive

- Richards Drive between Hayes Drive and Marquette Drive

- Marquette Drive between Lake Shore Drive and Richards Drive

- South Midway Plaisance between the railroad viaduct and Stony Island Avenue

The *Jackson Park Revitalization TIS* included an inventory of the available existing on-street parking. *(See Section 5.0 of TIS report)*. The existing on-street parking supply is summarized in Table 5-1 of the TIS. Based on the parking inventory, there is currently curb length sufficient to provide 841 on-street parking spaces of 20 feet in length within and adjacent to Jackson Park. Individually marked parking spaces are generally not striped within the project study area.

## 5.2.3.2    Alternative A: No Action – Traffic Congestion

Alternative A (TIS 2040 No Action) represents future conditions assuming none of the proposed actions discussed in this Environmental Assessment is taken.

Direct Impacts

*Anticipated Travel Patterns*

Under Alternative A, travel patterns within Jackson Park would remain largely the same as described above or stable, with no shifts in traffic due to planned roadway capacity improvements or major proposed developments.

Appendix H depicts a comparative table of travel time changes between Alternative A and the existing conditions. Travel times along the analyzed routes are not expected to increase more than 36 seconds (0.6 minutes) through 2040.

*Anticipated Traffic Volumes*[3]

The traffic volume projections for the Alternative A (TIS 2040 No Action) scenario have no roadway network changes from current condition. About a 2.4 percent background traffic growth increase is projected by CMAP within Jackson Park as a result of implementation of the *GO TO 2040* regional plan between 2016 and 2040. The majority of this additional traffic growth is projected to occur on the arterials within the project study area, with the largest increase occurring on 57th Drive, where it is anticipated that the two-way hourly traffic volumes would increase by approximately 200 vehicles during peak hours compared to existing conditions. Additional increases in traffic within the project study area of about 150 vehicles in the morning and evening peak hours are anticipated in conjunction with the following University of Chicago campus improvements (SSE 2018):

- Parking garage and fitness facility located at Kimbark Avenue and 61st Street

- The Study hotel and restaurant located on west side of Kimbark Avenue at 60th Street

- Renovations to the David M. Rubenstein Forum located at Woodlawn Avenue and 60th Street

- Renovations to the Keller Center located on 60th Street between Kimbark Avenue and Kenwood Avenue

- Woodlawn Residential and Dining Commons located at Woodlawn Avenue and 61st Street

The Study hotel and restaurant, David M. Rubenstein Forum and Woodlawn Residential Dining Commons are currently under construction. The new parking garage and fitness center building has been proposed but construction has not begun. Renovations to the Keller Center were completed in 2019.

The ADT volumes for this alternative are shown on Attachment H-2a in Appendix H.

*Operational Performance*

Most intersections would continue to operate at similar LOS as under Existing Conditions if Alternative A is implemented, and no roadway or intersection improvements are constructed prior to 2040. However, some intersections would experience a degradation of traffic operations due to the increase in background traffic and the additional traffic generated by University of Chicago near-term campus development projects. Two intersections would degrade to a LOS F during at least one peak hour due to traffic growth, as described below:

---

[3] In October 2018, the Chicago Metropolitan Agency for Planning (CMAP) formally adopted their *ON TO 2050* regional plan. In accordance with the adoption of the new regional plan, year 2050 traffic projections were obtained from CMAP and the traffic analyses were re-examined to ensure that traffic impacts would not substantially increase under year 2050 traffic volumes. This sensitivity analysis is discussed in Section 4 of Appendix H. The results of the sensitivity analysis found that while traffic volumes do increase over 2040 levels, the conclusions reached from the 2040 traffic analyses do not change for any of the alternatives under 2050 traffic volumes. It was therefore concluded that the original 2040 analyses are still valid for environmental review purposes.

- Stony Island Avenue at 67th Street would degrade from a LOS D to a LOS F, as the southbound through movement exceeds capacity during the P.M. peak hour.

- Stony Island Avenue at S. Midway Plaisance would degrade from a LOS C to a LOS F due to the eastbound approach exceeding capacity during the P.M. peak hour.

The full results of the operational analysis from the *Jackson Park Revitalization TIS* for Alternative A are shown on Attachment H-2b in Appendix H. The operational analysis results for 2016 Existing Conditions are also shown in the table for comparison purposes.

Indirect Impacts – City Actions

There would be no indirect traffic impacts under Alternative A, because the proposed actions would not occur.

Cumulative Impacts

Past, present, and future actions described above would be expected to have short term adverse impacts to congestion, but long-term beneficial impacts once implemented. These include the Stony Island Avenue Traffic Improvements and the Midway Plaisance Resurfacing. Alternative A would not contribute to any cumulative impacts, as no additional federal action occurs under this alternative.

### 5.2.3.3 Alternative B: NPS Action (FHWA No Build) – Traffic Congestion

Alternative B includes NPS approval of the partial conversion of recreation within a portion of the OPC site, as well as the associated replacement of recreation opportunities on the east end of the Midway Plaisance. This alternative assumes that no roadway or intersection improvements would be constructed prior to 2040 to accommodate background traffic growth.

Direct Impacts

There are no direct traffic or parking impacts associated with Alternative B.

Indirect Impacts – City Actions

Alternative B represents future conditions in which the roadway closures are in place and that the OPC is constructed within Jackson Park. Under this alternative no other roadway or intersection improvements would be constructed prior to 2040 to accommodate reassignment of traffic from the roadway closures, OPC traffic generation, or background traffic growth. Indirect impacts of Alternative B would result in long-term negative impacts to traffic congestion within the project study area as a result of traffic diversions and traffic redistribution caused by the roadway closures.

*Anticipated Travel Patterns*

The closures would result in a change in travel patterns in the project study area and would redistribute traffic to the surrounding roadway network. As part of the *Jackson Park Revitalization TIS,* CMAP estimated approximately 24-28 percent of all vehicle trips would reroute to alternate roadways outside of the project study area.

The results of the travel demand modeling for the TIS indicated that traffic diversion to roadways outside Jackson Park would not be substantial. Analysis by CDOT determined that sufficient reserve capacity existed on parallel arterials and collector streets to absorb any diversions that would occur without adverse neighborhood impacts. These findings are summarized in the TIS (Table 3-3). As a result of these findings, the project study area in the TIS only included those roadways within Jackson Park.

As a result of closing Cornell Drive, some of the remaining vehicles within the network would divert to Stony Island Avenue to the west; however, the majority of the remaining vehicles would divert to Lake Shore Drive to the east. With the closure of Marquette Drive, many vehicles would reroute onto Hayes Drive to ultimately travel to and from Lake Shore Drive.

Travel times between 67th Street/Stony Island Avenue and 57th Street/Lake Shore Drive increased by more than 28 minutes per vehicle headed northbound in the morning peak hour and by 7.5 minutes per vehicle southbound in the evening peak hour due to the closure of Cornell Drive. Along Stony Island Avenue in the morning peak hour, travel between 67th Street and 56th Street increases by over 28 minutes per vehicle.

*Anticipated Traffic Volumes*

The 2040 traffic volumes developed for this alternative incorporated the CMAP reductions in traffic volumes for trip diversions to roadways outside of the project study area. Traffic volumes also included, additional visitor and employee traffic for the OPC, and reassignment of traffic to reflect diversions to other roadways as a result of the proposed closures. Because no roadway improvements would be constructed for this alternative, the remaining section of Cornell Drive between Hayes Drive and Stony Island Avenue would remain one-way southbound although the northbound split alignment section is closed. Additionally, North Midway Plaisance would remain one-way westbound east of Stony Island Avenue, resulting in Cornell Drive being one-way southbound south of 57th Street.

The closure of northbound Cornell Drive increases the northbound through volume by 925 vehicles, resulting in the northbound through volume doubling during the A.M. peak hour along Stony Island Avenue. Northbound vehicles that are destined for Lake Shore Drive would either turn right onto Hayes Drive, or remain on Stony Island Avenue and turn right onto 57th Street. During the P.M. peak hour, 875 additional southbound vehicles along Lake Shore Drive would turn right onto Hayes Drive. With the closure of Cornell Drive, the north leg of the Hayes Drive at Cornell Drive intersection would be removed, resulting in a T-intersection configuration and causing an additional 725 westbound left turns from diverted traffic. The ADT volumes for this alternative are shown on Attachment H-3a in Appendix H.

*Operational Performance*

Roadways experiencing the greatest traffic impacts include Stony Island Avenue during the A.M. peak hour and Lake Shore Drive during the P.M. peak hour. Stony Island Avenue currently has only one travel lane in each direction north of 65th Street and does not have available capacity for the amount of anticipated Cornell Drive traffic diversions during the A.M. peak hour. Similarly, Lake Shore Drive under existing conditions only has two southbound travel lanes south of 57th Drive, and the diverted Cornell Drive traffic during the P.M. peak hour exceeds the available capacity of the roadway.

Based on the traffic operation analysis findings shown in Table 9 in Appendix H, the number of signalized intersections with movements operating over capacity during at least one peak hour would increase from nine to thirteen under Alternative B. Two additional intersections would have increases in overall delay of at least 15 seconds per vehicle in Alternative B compared to Alternative A. These results are indicative of an increase in overall traffic congestion within the project study area as a result of the roadway closures in Alternative B.

The results of the operational analysis for Alternative B are shown on Attachment H-3b and in Table 9 in Appendix H. The operational analysis results for Alternative A are also shown in Table 9 for comparison purposes. Under Alternative B, nine additional signalized intersections within the roadway network experience a LOS F and/or operate over capacity during either the morning or the evening peak hour compared to Alternative A. These additional LOS F intersections are a result of traffic diversions and traffic redistribution caused by the roadway closures.

*Parking Supply*

The roadway closures in Alternative B would result in a loss of 128 public on-street parking spaces. Of the 128 spaces lost, 125 are within the section of Marquette Drive between Richards Drive and Stony Island Avenue. However, as discussed in Section 3.2.2.4 of Appendix H, although this section of Marquette Drive is currently signed to permit parking, it does not function as having on-street parking. Marquette Drive in this section is striped for two travel lanes in each direction, with no existing parking demand noted. Therefore, removal of this section of Marquette Drive in Alternative B would not impact existing parking demand. Table 10 in Appendix H summarizes the change in available on-street parking supply within and adjacent to Jackson Park as a result of the roadway closures in Alternative B.

Additional off-street parking is proposed under Alternative B as part of the OPC development to accommodate anticipated parking demand resulting from visitors to the center. The amount of off-street parking was evaluated as part of the Jackson Park Revitalization TIS. The number of off-street spaces proposed meets City zoning regulations and is sufficient to accommodate visitors to the OPC and its employees. The proposed off-street parking design has been approved by the City.

Cumulative Impacts

Several other ongoing or reasonably foreseeable projects have been identified in the project study area, as described in Alternative A. Alternative B would result in long-term negative impacts to traffic congestion within the project study area as a result of the roadway closures, traffic diversions and traffic redistribution caused by the roadway closures. As evaluated in Alternative A, the reasonably foreseeable projects with the potential to impact traffic contribute long-term, beneficial impacts. The actions in Alternative B would be the only long-term negative contribution to an overall negative cumulative impact.

## 5.2.3.4     Alternative C: NPS + FHWA Action (Preferred Alternative) – Traffic Congestion

This alternative incorporates impacts associated with Alternative B, in addition to those arising from improved roadways and bicyclist/pedestrian facilities and additional changes to the UPARR boundary. The analysis of impacts in this section will only discuss the additional impacts associated with Alternative C.

<u>Direct Impacts</u>

*Anticipated Travel Patterns*

Diverted traffic from the Alternative B roadway closures that remains within Jackson Park predominantly travels along Lake Shore Drive, Hayes Drive and Stony Island Avenue in Alternative C. However, due to the proposed roadway improvements in Alternative C, the diverted traffic would be dispersed among the improved roadways more evenly without overburdening any one roadway. Additionally, about half of the traffic that had diverted outside of the project study area in Alternative B due to the roadway closures would instead remain within the project study area under Alternative C as a result of the roadway network improvements.

Table 11 in Appendix H depicts travel time changes between Alternative C versus Alternative B and Alternative A. Alternative C would improve traffic congestion and travel times along all of the routes depicted in Table 11 compared to Alternative B. For drivers using Cornell Drive and Hayes Drive, travel times between 67th Street/Stony Island Avenue and 57th Drive/Lake Shore Drive, would improve by a range of 1.5 to over 8 minutes in the peak hour travel periods for Alternative C compared to Alternative B. Along Stony Island Avenue, northbound travel to 56th Street in the morning peak hour would improve by over 31 minutes in Alternative C compared to Alternative B. In comparison to Alternative A, Alternative C produced generally the same travel times for the routes shown in Table 11, with the maximum travel time increase being just over 45 seconds in the northbound direction for the route along Cornell Drive and Hayes Drive between 67th Street/Stony Island Avenue and 57th Drive/Lake Shore Drive.

*Anticipated Traffic Volumes*

The results of the CMAP travel demand modeling for this alternative indicated a shift in traffic destined to Lake Shore Drive from Stony Island Avenue onto the new two-way sections of Cornell Drive as the conversion of one-way sections to two-way sections provide additional capacity for those trips. The travel demand model determined that 1,280 vehicles would use the new northbound section of Cornell Drive between Stony Island Avenue and Hayes Drive during the A.M. peak hour, and that 200 vehicles would use the new northbound lanes on N. Midway Plaisance/Cornell Drive between Stony Island Avenue and 57th Drive during the A.M. peak hour. The ADT volumes for this alternative are shown on Attachment H-4a in Appendix H.

*Operational Performance*

The results of the operational analysis for Alternative C are summarized in Table 12 and shown on Attachment H-4b in Appendix H. The operational analysis results for Alternative B are also shown in Table 12 for comparison purposes. Alternative C would result in all major intersections operating at LOS D or better, meeting or exceeding the lowest level of traffic operations considered desirable by regional transportation agencies.

*Parking Supply*

The roadway improvements proposed in Alternative C would result in changes in the amount of on-street parking available within and adjacent to Jackson Park. Table 13 in Appendix H summarizes the available

on-street parking supply upon completion of the roadway improvements proposed in Alternative C. The parking supply available under Alternative B is also shown for comparison purposes.

As shown in the Table 13 of Appendix H, the proposed roadway improvements in Alternative C would result in a loss of 105 public on-street parking spaces in addition to lost parking spaces in Alternative B.

As part of the proposed roadway improvements, there are 84 new on-street parking spaces proposed in and around Jackson Park to minimize the loss of parking associated with the proposed vehicle capacity improvements. Based on the parking study completed as part of the *Jackson Park Revitalization TIS* (SSE 2018), even with the net loss of parking spaces, there is still an excess parking supply based on parking demands. As the implementation of the SLFP continues, the City will continue to work with CPD to implement additional parking supply in Jackson Park (CPD 2018) to ensure the parking needs of CPD are addressed.

<u>Indirect impacts – City Actions</u>

The indirect impacts of Alternative C are the same as those described in Alternative B. Alternative C addresses the long-term negative impacts of Alternative B by providing capacity improvements to address the redistributed traffic volumes and congestion caused by the roadway closures. Therefore, no additional indirect impacts result from implementing Alternative C.

<u>Cumulative Impacts</u>

Several other ongoing or reasonably foreseeable projects have been identified in the project study area, as described in Alternative A. As evaluated in Alternative A, the reasonably foreseeable projects with the potential to impact traffic contribute long-term, beneficial impacts. The actions proposed in Alternative C would have beneficial impacts and mitigate the majority of adverse impacts that result from Alternative B, resulting in negligible cumulative impacts to traffic congestion by implementing Alternative C.

## 5.2.4   Cultural Resources (Historic Properties)

### 5.2.4.1      Affected Environment – Cultural Resources (Historic Properties)

The study area for above ground cultural resources is the historic architecture area of potential effect that was determined in consultation with the Illinois SHPO during the Section 106 process. This area was defined in order to address all areas that may be affected, both directly and indirectly, by the proposed project. Within the study area, eight historic districts and 30 individual properties (for a total of 38 historic properties) have been listed or are eligible for listing in the NRHP; these properties were identified in the Historic Properties Inventory (HPI) and associated addendum, which are available at the project website (http://www.tinyURL.com/JPImprovements).

More information on the identified resources is contained within those reports. A summary table of the identified properties can be found in Table B-1 of Appendix B. The Illinois SHPO concurred with the findings of the HPI on July 10, 2018 and the HPI Addendum on February 18, 2020.

Of the numerous historic properties within the study area, most have no potential to be affected by the proposed action. An Assessment of Effect completed in consultation with the Illinois SHPO (available at

http://www.tinyURL.com/JPImprovements) narrowed the full list to eight resources with the potential to be affected by the proposed action, and of those, only two were found to be adversely affected: the Jackson Park Historic Landscape District & Midway Plaisance and the Chicago Park Boulevard System Historic District (CPBSHD). The Illinois SHPO concurred with these findings on February 18, 2020.

The Jackson Park Historic Landscape District and Midway Plaisance includes both Jackson Park and the Midway Plaisance. The CPBSHD is a 1,700-acre district consisting of boulevards, parks, squares, and buildings. The Jackson Park Historic Landscape District and Midway Plaisance is a major contributing feature of the CPBSHD. The discussion of impacts in the following sections focuses on these two resources.

### 5.2.4.2     Alternative A: No Action – Cultural Resources (Historic Properties)

Under Alternative A, no federal actions would be approved, and the proposed project areas would continue to be managed by their existing agencies. Jackson Park would remain under the jurisdiction of the CPD, and the City and IDOT would continue to manage the existing roadway network. Other planned and proposed projects with the potential to impact historic properties would be expected to continue under this alternative, even if the proposed federal actions are not approved. More information on planned and proposed projects in the vicinity can be found in Section 5.2.1.

Direct Impacts

No direct impacts on cultural resources would occur as a result of federal actions under Alternative A. No UPARR conversions or roadway improvements would occur. As a result, no direct impacts to the characteristics of the historic properties that qualify them for inclusion in the NRHP would occur as part of a federal action. The identified properties would remain in their existing locations, there would be no changes to existing viewsheds, and no changes would occur to the existing settings. The designed architectural features and landscape characteristics of the resources would remain intact, and their historic materials would remain in place. The historic resources would retain the features of their historic workmanship, and the properties would maintain the feeling and aesthetic of their periods of significance. Accordingly, the properties would preserve their historic associations.

Indirect Impacts – City Actions

As discussed in the direct impacts section above, there would be no change to existing cultural resources under Alternative A; therefore, there would be no indirect impacts to cultural resources under Alternative A.

Cumulative Impacts

Other past, present, or reasonably foreseeable future projects unrelated to the OPC project, as noted in Section 5.2.1, may result as part of other initiatives, but no cumulative impacts would occur as a result of Federal action under Alternative A, as no Federal action occurs.

### 5.2.4.3     Alternative B: NPS Action (FHWA No Build) – Cultural Resources (Historic Properties)

Under Alternative B, NPS would approve the partial conversion of recreation within a portion of the OPC site, as well as the associated replacement opportunities on the east end of the Midway Plaisance, but

FHWA would not authorize funding for any roadway improvements. Although the change in UPARR legal status would not in itself alter historic properties, the proposed use of the east end of the Midway Plaisance would occur as a result of the NPS action. Under Alternative B, the OPC site would be developed according to plans, but no roadway improvements would occur.

Direct Impacts

The replacement recreation proposed for the east end of the Midway Plaisance would have a direct impact on the Jackson Park Historic Landscape District and Midway Plaisance and the CPBSHD; however, these impacts would not be adverse and would be minimal in scale compared to the size of the 683-acre Jackson Park Historic Landscape District & Midway Plaisance and 1,700-acre CPBSHD. Contributing features of the Midway Plaisance would be impacted by the change in the recreational use; however, these impacts would not change the characteristics for which the resource is listed in the NRHP. The sunken lawn and historic Cheney-Goode Memorial would remain in their historic locations. The designed character of the sunken lawn would remain intact, and historic features would be restored, including a north-south path and historic vegetation patterns. The new playground would be designed to be compatible with the existing character of the Midway Plaisance. The overall setting of the resource would remain intact, most notably its relationship to the rest of the Midway Plaisance and Jackson Park. Material features of the Midway Plaisance would remain intact, including the sunken lawn and the Cheney-Goode Memorial. Due to the intact design and material features, the historic workmanship of the Midway Plaisance's design would remain intact. The area would retain the feeling, aesthetics, and associations that qualify it for listing on the NRHP.

Indirect Impacts – City Actions

The OPC development would have an adverse impact on the Jackson Park Historic Landscape District and Midway Plaisance and the CPBSHD that arises indirectly from the federal action on the UPARR conversion.

The development of the 19.3-acre OPC site would alter contributing physical elements of Jackson Park, including the Women's Garden, the Gymnasia Fields, the historic circulation patterns and associated features, and the designed topography and views within Jackson Park. These changes would alter notable landscape features of Jackson Park, including the historic location of features and their historic design. The setting of Jackson Park would be altered by the removal of historic designed features and the addition of a new museum building. Material elements of Jackson Park, such as the Women's Garden and historic roadways, would be removed. Due to the changes in design and materials, the workmanship of Olmsted's original design would be less apparent, and the feeling and aesthetic of Jackson Park would be altered. Due to the large-scale changes in this area of Jackson Park, its ability to convey historic associations would be diminished.

The development of the OPC would result in adverse impacts to historic features, but the area of change would be small in scale given the overall size of the historic resources; less than 3 percent of the 683-acre Jackson Park Historic Landscape District & Midway Plaisance and less than 2 percent of the 1,700-acre CPBSHD would be altered. Furthermore, the proposed changes would be compatible with the existing character of the area. Jackson Park has been continually utilized for cultural activities and institutions over its history, and the area has been altered over time to accommodate the contemporary needs of the

public. Historic alterations have included WPA era improvements, such as the English Comfort Station, and post-World War II additions, such as the baseball fieldhouse. Non-historic alterations have included the widening of roadways, the straightening of Cornell Drive, alterations to Marquette Drive, the removal of trees, and the construction of a golf driving range. These continual adaptive alterations to Jackson Park have also become part of the cultural landscape and developmental history of this facility. The proposed project would be a continuance of this developmental history. Mitigation strategies are currently being developed as part of the Section 106 consultation process, and this process is expected to culminate in the discussion and potential execution of a Memorandum of Agreement (MOA) outlining stipulations for mitigation under the National Historic Preservation Act (NHPA) as a result of this proposed project.

For the purposes of NEPA, the impacts to cultural resources would be adverse but would be small in proportion to the overall size of the historic resources and would be consistent with land use patterns and developmental history. Impacts would be further mitigated to the extent agreed upon in an MOA as part of the NHPA Section 106 process.

<u>Cumulative Impacts</u>

Other past, present, or reasonably foreseeable future projects unrelated to the OPC project, as noted in Section 5.2.1, would contribute minimal alterations to historic features, which would contribute a relatively small increment to the overall cumulative impact. Although the past, present, and reasonably foreseeable actions in the area would be expected to alter historic resources, the overall totality of these impacts would be minor; these impacts would not be expected to impact the integrity of historic resources in the area or diminish the features for which they are eligible for listing in the NRHP. Alternative B would contribute additional impacts to historic resources. Specifically, while the UPARR partial conversion itself would not contribute directly to cumulative impacts on the Jackson Park Historic District and Midway Plaisance or the CPBSHD, the UPARR partial conversion would contribute indirectly to cumulative impacts on these resources as a result of the development of the OPC. As noted above, these indirect impacts are adverse but small in proportion to the overall size of the historic resources and would be consistent with land use patterns and developmental history of the historic resources. The cumulative impacts to historic resources would not affect the eligibility of these historic resources for listing in the NRHP.

<u>Mitigation</u>

Measures to minimize impacts have been undertaken as part of the project development process. For example, the UPARR replacement location selection of the east end of the Midway Plaisance allows for restoration of the historic sunken lawn, which has degraded into a non-historic wetland over time. Additionally, the new playground in this location would be designed to be compatible with the historic character of the area. Within Jackson Park, impacts would be minimized because of the following design elements: the replacement of the Women's Garden would incorporate design and material elements of the existing garden, impacts to the English Comfort Station would be avoided, proposed topography and walkways would be designed to reflect the character of the historic landscape design, and the track and field would be relocated to an area with existing active recreational uses. Impacts on circulation patterns and features would be minimized because conversion of the closed roadways to pedestrian walks and greenspace would be designed to maintain the historic character as much as possible. Impacts on the

viewshed would be minimized because the use of earth toned building materials, the use of berms and planted buffers, and the partial submergence of several of the OPC buildings would reduce their visibility.

Mitigation strategies are currently being developed as part of the Section 106 consultation process and may culminate in the execution of an MOA outlining stipulations for mitigation under the NHPA as a result of this proposed project.

For the purposes of NEPA, the impacts to cultural resources would be adverse but would be small in proportion to the overall size of the historic resources and would be consistent with land use patterns and developmental history. Impacts would be further mitigated to the extent agreed upon with the SHPO as part of the NHPA Section 106 process.

### 5.2.4.4   Alternative C: NPS + FHWA Action (Preferred Alternative) – Cultural Resources (Historic Properties)

Under Alternative C, NPS would approve the proposed partial conversion of UPARR lands related to the OPC and the transportation improvements (as well as associated replacement of lost recreation opportunities), and FHWA would authorize funding for the transportation improvements. Historic properties under Alternative C would experience the same impacts as under Alternative B as described above in section 5.2.4.3, plus additional impacts related to the transportation improvements. These additional impacts are discussed below.

<u>Direct Impacts</u>

Under Alternative C, additional impacts would occur to historic resources due to the proposed FHWA roadway improvements. These roadway improvements would have a direct impact on the Jackson Park Historic Landscape District & Midway Plaisance and the CPBSHD, and these impacts would be adverse. Contributing features of the historic resources would be altered in a way that diminishes the characteristics for which the resources are listed in the NRHP (see Table 4 for more details). Some contributing features would no longer remain in their historic locations; specifically, the Hayes Drive/Richards Drive intersection would be moved. Important design features of the resources would be altered as a result of project implementation. The historic triangular design of the Hayes Drive/Richards Drive intersection and its design emphasis on the Statue of the Republic would be removed as a result of the proposed project. The designed character of Marquette Drive and Richards Drive would be adversely affected by their closure to roadway traffic and the reduction of their paved areas for use as pedestrian paths. The setting of the historic resources would be altered by these changes to the design and location of contributing historic features, and as a result, the integrity of setting would be diminished. Material features would be lost as a result of project implementation due to the removal of historic roadways. These alterations would diminish the evident historic workmanship of Olmsted's design implementation by altering the spatial organization of Jackson Park, and the historic properties' feeling and aesthetic would be negatively impacted by these changes. By removing elements of the historic design, the associations of the historic properties that qualify it for listing on the NRHP would be diminished.

*Table 3: Direct Impacts to Historic Resources under Alternative C*

| Impacted Features | Summary of Impacts* |
|---|---|
| Lake Shore Drive | Widening and intersection improvements |
| Hayes Drive Reconfiguration | Widening of the roadway; realignment of intersections with Cornell Drive and Richards Drive; introduction of new traffic signals |
| Stony Island Avenue Improvements | Widening of the roadway; realignment of sidewalks; topography changes |
| Marquette Drive and Cornell Drive closures | Roadway closures to vehicular traffic |
| Jackson Park Inner Harbor | Replacement GLFER areas provide rehabilitation of a deteriorated historic path and lagoon overlook; replacement vegetation |
| Bicycle/Pedestrian Improvements | New underpasses, additional access points, new pedestrian refuge islands, additional pedestrian ramps, traffic timing and signal improvements, pavement markings |

*The impacts reflected in this table are in addition to the impacts discussed under Alternative B in Section 5.2.4.3.

Indirect Impacts – City Actions

For Alternative C, the indirect impacts are expected to be the same as Alternative B plus the indirect impacts from the transportation improvements that would be implemented under Alternative C. As described in Alternative B, Section 5.2.4.3 above, the impacts from the development of the OPC are described as indirect impacts, relative to the federal action of UPARR partial conversion. The development of the OPC would have an adverse impact on the Jackson Park Historic Landscape District and Midway Plaisance and the CPBSHD that arises indirectly form the federal action on the UPARR conversion. Under Alternative C, roadway improvements would not induce changes in the pattern of land use or growth rate in the vicinity of Jackson Park that would result in alterations to historic resources. Therefore, no additional indirect impacts to cultural resources are expected as a result of the roadway improvements under Alternative C.

Cumulative Impacts

Other past, present, or reasonably foreseeable future projects unrelated to the OPC project, as noted in Section 5.2.1, would contribute minimal alterations to historic features, which would contribute a relatively small increment to the overall cumulative impact. Although the past, present, and reasonably foreseeable actions in the area would be expected to alter historic resources, the overall totality of these impacts would be minor; these impacts would not be expected to impact the integrity of historic resources in the area or diminish the features for which they are eligible for listing in the NRHP. Alternative C would contribute additional impacts to historic resources. The UPARR partial conversion would contribute indirectly to cumulative impacts on the Jackson Park Historic District and Midway Plaisance and the CPBSHD. As noted above, these indirect impacts are adverse but small in proportion to the overall size of the historic resources and would be consistent with land use patterns and developmental history of the historic resources. The roadway improvements would contribute minor adverse additional impacts. Both historic resources would retain their overall historic character and use patterns, and they would remain eligible for listing in the NRHP.

Mitigation

Minimization and avoidance measures have been undertaken as part of project development. For example, widening and intersection improvements along Lake Shore Drive would remain consistent with the historic road alignment and with the previous 3-lane typical section of the southbound road. Additionally, the replacement vegetation would follow GLFER precedent and historic design principles. The Hayes Drive reconfiguration would avoid physical impacts to the Statue of the Republic, and the Stony Island Avenue improvements would avoid traffic noise increases. Roadway closures of Marquette Drive and Cornell Drive would maintain the alignments as a pedestrian pathway, which would retain the spatial organization within Jackson Park. The bicycle and pedestrian improvements would be designed to minimize alterations to the historic topography and vegetation within Jackson Park.

Mitigation strategies are currently being developed as part of the Section 106 consultation process, and this process may culminate in the execution of an MOA outlining stipulations for mitigation under the NHPA as a result of this proposed project.

For the purposes of NEPA, the impacts to cultural resources would be adverse but would be mitigated to the extent described in this EA. Impacts would be small in proportion to the overall size of the historic resources and would be consistent with land use patterns and developmental history.

## 5.2.5  Social and Economic Issues

### 5.2.5.1   Affected Environment – Social and Economic Issues

The project study area neighborhoods of South Shore, Woodlawn, and Hyde Park (see Attachment I-2 of Appendix I) have a combined population totaling more than 100,500 residents.[4] The predominant racial groups in the project study area and surrounding neighborhoods are black/African American at 74.0 percent of the total population and white at 17.7 percent. The racial composition of the project study area differs from that of the City of Chicago in which 49.1 percent of the population is white and 30.5 percent is black/African American. The proportion of people of Hispanic origin is less than in the City of Chicago, at 3.6 percent in the project study area and 29.0 percent in the City. The demographic profile of the project study area is presented in detail in in Appendix I, specifically Table 2.

Of the three neighborhoods, South Shore has the largest population under the age of 18 at 27.9 percent, which is slightly higher than the City of Chicago's percentage of 21.5 percent. South Shore also has the largest percentage of senior citizens, with 3.6 percent of persons 65 years of age or older, which is less than the 11.7 percent of persons in that age group in the City of Chicago. Hyde Park has the largest proportion of persons between the ages of 18 and 64, with 80.3 percent of the population in this age range. The median age is 36.8 for South Shore, 34.3 for Woodlawn, and 32.9 for Hyde Park. Data on ages of population are presented in Table 3 of Appendix I.

Of the three neighborhoods, South Shore and Woodlawn have a greater number of people with only a high school degree than Hyde Park, accounting for 19.0 percent and 16.0 percent respectively. Hyde Park

---

[4] Demographic, poverty, labor, and housing data presented in this section are from U.S. Census Bureau, 2019.

has the greatest number of people with a bachelor's degree or higher for people 25 years of age or older, accounting for 16.0 percent of the neighborhood's population. Overall, the percent of people in the project study area with educational degrees is lower than that of the City of Chicago. Data on the educational attainment of population are presented in Table 4 of Appendix I.

Within the project study area, 38.8 percent of people in South Shore and 38.0 percent of people in Woodlawn live below the poverty line, exceeding the overall percentage of people below the poverty line in the City of Chicago by 18.2 percent and 17.4 percent respectively. Hyde Park has the highest median household income and exceeds that of the City of Chicago. Both South Shore and Woodlawn are considered low-income with populations of concern for purposes of this report, because the percentage of people below the poverty line within a neighborhood is at least 10 percent more than the City of Chicago average. Tables indicating federal poverty guidelines for 2017 (Table 5), median income (Table 6), and number and percentage of people below the poverty line (Table 7) can be found in Appendix I.

In all three neighborhoods the labor force participation rates (persons in the labor force divided by population 16 years and older) fall below those of the City of Chicago and the State of Illinois (see Table 8 of Appendix I). Unemployment rates (percentage of unemployed workers in the total labor force) for South Shore and Woodlawn from 2013 to 2017 were considerably higher than the City of Chicago and Illinois, while that of Hyde Park was below.

Within the project study area and surrounding neighborhoods, the percentage of home ownership ranges from 21.0 percent to 36.6 percent, with 21.0 percent home ownership in South Shore, 23.5 percent in Woodlawn, and 36.3 percent in Hyde Park. Overall fewer people in the project study area own homes than in the City of Chicago as a whole (25.9 percent compared to 44.6 percent). Median housing values in South Shore and Woodlawn, $184,142 and $154,752, respectively fall below the City of Chicago median of $234,500, while the median house value in the Hyde Park neighborhood of $272,758 is approximately $38,000 higher. Renter occupied housing accounts for 79.0 percent of housing in South Shore, 76.5 percent in Woodlawn, and 63.7 percent in Hyde Park. The number of renters in all three neighborhoods exceeds the citywide percentage of 55.4 percent. Median rental rates for South Shore and Woodlawn ($877 and $938, respectively) are lower than the City of Chicago median rate ($1,029), while the median rental rate in Hyde Park ($1,109) is higher.

Recent population trends in the project study area's neighborhoods have been varied. In its *Woodlawn Community Area Economic Analysis* commissioned by the Network of Woodlawn, AECOM found strong population growth (AECOM 2019). From 2010 to 2018, Woodlawn saw an increase of 2,941 residents (13.7 percent growth). This represented 28.3 percent of the growth the City of Chicago as a whole experienced. Growth was more moderate in Hyde Park, which had a 3.6 percent increase in population (931 residents). The largest neighborhood in the project study area, South Shore, experienced a 1.5 percent decline in its population over the 8-year period. The project study area as a whole saw a 3.3 percent rise in population, substantially stronger than the 0.4 percent population growth of the City of Chicago during the same time period. Table 10 of Appendix I presents the population change in the neighborhoods within the project study area.

Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority and Low-Income Populations," requires agencies to analyze the environmental effects of a proposed action on minority and low-income communities and to avoid the disproportionate placement of high and adverse environmental, economic, social, or health impacts from federal actions and policies on minority and low-income populations (1994). The Environmental Justice (EJ) analysis was conducted in accordance with EO 12898. The analysis involved several steps: defining the study area, identifying minority and low-income populations, identifying any high and adverse human health or environmental impacts, and determining whether any high and adverse impacts would disproportionately affect minority or low-income populations.

The study area was defined as Census tracts within the South Shore, Woodlawn, and Hyde Park neighborhoods. Each of the tracts in the South Shore and Woodlawn neighborhoods was found to meet the criteria of an EJ Area. Within the Hyde Park neighborhood, all tracts but Tract 4111 meet the EJ Area criteria. South Shore has a minority population of 97 percent and a low-income population of 38 percent. Woodlawn has a minority population of 91 percent and low-income of 38 percent. Hyde Park's minority population is 53 percent and low-income population is 23 percent. Identification of these minority and low-income populations was collected via the U.S. Census Bureau (U.S. Census Bureau 2019). See Table 13 of Appendix I.

### 5.2.5.2  Alternative A: No Action – Social and Economic Issues

Alternative A assumes that there is no UPARR boundary conversion, the OPC is not constructed, and no roads are closed.

Direct Impacts

Because no federal actions would occur under Alternative A, there would be no additional direct social economic impacts.

Indirect Impacts – City Actions

As discussed in the direct impacts section above, there would be no change to existing social and economic issues; therefore, there would be no indirect impacts to social and economic issues under Alternative A.

Cumulative Impacts

Other past, present, or reasonably foreseeable future projects, unrelated to the OPC project, as noted in Section 5.2.1, would have negligible impacts on the social and economic environment as a whole. Alternative A would not contribute to any cumulative impacts, as the Federal action does not occur under this alternative.

### 5.2.5.3  Alternative B: NPS Action (FHWA No Build) – Social and Economic Issues

Alternative B includes NPS approval of the partial conversion of the UPARR boundary within a portion of the OPC site as well as associated replacement of recreation opportunities on the east end of the Midway Plaisance.

<u>Direct Impacts</u>

NPS's approval of the partial conversion of recreation in Jackson Park under UPARR does not authorize construction of the OPC or other changes in Jackson Park. However, it does affect the Midway Plaisance because conversion approval assumes the City will make improvements to the replacement site. The proposed development of recreation opportunities on the Midway Plaisance would have temporary impacts on the local community, such as a slight increase in short term employment arising from the construction activity at the proposed replacement recreation site. None of the other socioeconomic factors detailed in the above Socioeconomic Affected Environment section, such as the population level or population composition, is expected to change as a result of the action. Likewise, housing trends are not anticipated to be impacted. Public space impacts are expected to be positive and limited to the change in recreation use at the east end of the Midway Plaisance, improving the recreational amenities of the area.

Direct impacts associated with the UPARR conversion would not physically change existing conditions outside of the Midway Plaisance, nor would it directly impact community cohesion or otherwise geographically divide or isolate the residents or businesses within South Shore, Woodlawn, or Hyde Park.

<u>Indirect Impacts – City Actions</u>

*Economic*

Indirect impacts are primarily related to the OPC planned for Jackson Park. The Chicago Community Trust commissioned Deloitte Consulting LLP to evaluate the overall economic impact, including direct, indirect, and induced effects (defined in Appendix I), of the construction and operation of the OPC and the ongoing operations of the Obama Foundation (Deloitte Consulting LLC 2016 and Obama 2016). The economic impact study methodology and results are discussed in detail in Section 4.2.2 of Appendix I (results are based on 2016 estimates, with an assumption that the construction and start-up period is anticipated to last approximately 6 years).

Total expenditures regarding OPC construction and start-up are projected to be approximately $402.0 million. Of this total, 82 percent ($328.5 million) is anticipated to be spent within Illinois and 64 percent ($258.1 million) is expected to be spent within Cook County. Table 19 in Appendix I summarizes construction spending.

Labor requirements during the OPC's anticipated six-year start-up activities were evaluated. Although the timeline has been extended, the labor requirements provide a baseline level of anticipated economic activity. An estimated 1,528 12-month jobs will be created during the OPC's start-up. Ninety percent of these jobs (1,375 jobs) are expected to be in Illinois, with 1,224 jobs in Cook County. The South Side is anticipated to see 657 jobs generated during the OPC's startup. Table 20 in Appendix I summarizes estimated job creation during the OPC's six-year startup phase.

Non-labor expenses budgeted for the OPC's start-up efforts were also evaluated. These non-labor expenses are expected to be approximately $69.2 million. Non-labor expenses include the following cost categories:

National Archives and Records Administration off-site facility expenses[5], corporate and administrative, public engagement, communications, digital, development, and contingency/miscellaneous. Eighty percent ($55.0 million) of the expenses are anticipated to be spent in the State of Illinois. Cook County is forecast to receive 70 percent ($48.4 million) in spending, with the South Side receiving 34 percent ($23.4 million). Table 21 in Appendix I summarizes the anticipated non-labor expenditures by geography.

Within the State of Illinois, the direct impacts of the OPC construction include 2,017 jobs, which will provide income of $123.9 million. Output[6] associated with the direct expenditures of the OPC is expected to total $305.5 million. Indirect effects, reflecting business to business spending, are projected to generate 673 jobs and $41.1 million in income in Illinois during the OPC's construction. These effects are also anticipated to contribute $115.9 million in output to the state's economy. Induced effects from household spending are expected to generate an additional 992 jobs, income of $49.6 million, and output of $148.2 million to Illinois' economy during the OPC's construction phase.

In total, 3,682 jobs, with an associated total income of $214.6 million, are forecast to be created in Illinois through the construction of the OPC. Additionally, $569.6 million in output is expected to be added to the state's economy. Table 22 in Appendix I summarizes the economic impacts to the State of Illinois during the OPC's construction.

In Cook County, the direct impacts of the OPC's construction include 1,569 jobs which will provide income of $109.8 million. Output associated with the direct expenditures of the OPC are expected to total $242.8 million. Indirect effects from business to business spending are projected to generate 439 jobs and $29.5 million in income in Cook County during the OPC's construction. These effects are also anticipated to contribute $72.7 million in output to the county's economy. Induced effects, which arise from household spending, are expected to generate an additional 675 jobs, income of $35.9 million, and output of $100.0 million to Cook County's economy during the OPC's construction phase.

In total, 2,683 jobs, with an associated total income of $175.3 million, are forecast to be created in Cook County through the construction of the OPC. Additionally, $415.0 million in output is expected to be added to the county's economy. Table 24 in Appendix I summarizes the economic impacts to Cook County during the OPC's construction.

Table 5 below summarizes the jobs forecasted to be created within the State of Illinois from OPC start-up activities and construction, including direct and indirect impacts.

---

[5] National Archives and Records Administration (NARA) activities were anticipated to be located in the Chicago suburbs and then on-site at the time of the 2016 study; however, current plans do not call for material NARA activities on-site.
[6] Output includes employment compensation, other proprietary income, other property type income, intermediate expenditures, and taxes.

*Table 4: Estimated Total Job Creation from OPC Construction and Start-Up Phases, State of Illinois*

| Project Phase | 12-Month Jobs |
|---|---|
| **Start-Up** | |
| OPC start-up activities | 1,375 |
| **Start-Up Total** | **1,375** |
| **Construction (direct and indirect)** | |
| OPC construction (direct) | 2,017 |
| Business-to-business spending (indirect) | 673 |
| Household spending (indirect) | 992 |
| **Construction Total** | **3,682** |

The CMAP developed population forecasts at the neighborhood level through 2050. The projections assume the development of OPC, along with other anticipated projects (CMAP 2018). Table 11 in Appendix I summarizes CMAP's projections through 2050.

The neighborhoods in the project study area are forecast to experience approximately a 14.2 percent increase in population between 2015 and 2050. Woodlawn is expected to have the fastest growing population, with a 23.9 percent growth between 2015 and 2050. Hyde Park is anticipated to grow 10.8 percent by 2050.

The OPC's construction and start-up phase and annual operations phase will have a positive impact on the tax revenues of the State of Illinois and local governments. As part of the *Economic Impact Assessment*, (Obama 2016) estimated taxes for the indirect and induced effects were approximately $16.5M in tax payments. These payments exclude the direct taxes paid by the Obama Foundation and its employees. Table 36 in Appendix I summarizes the total state and local taxes during the construction and start-up phase.

*Housing*

The possibility of gentrification and the impact of the OPC on housing within the project study area have been raised as concerns by a variety of stakeholders and interested parties. As noted previously, the Network of Woodlawn put forth its own plan to grow inclusively, and the Community Benefits Agreement Coalition crafted legislation to protect residents from displacement, which was introduced to City Council in July 2019 (Obama CBAC 2020). Importantly, the City of Chicago owns nearly 25 percent of Woodlawn's vacant land, and approximately 30 percent of the existing housing stock has long-term affordability guarantees. These characteristics are expected to assist Woodlawn in withstanding potential rising property values without losing substantial existing residents.

In addition, through a proposed ordinance (City of Chicago Department of Housing 2020), the City would make a commitment to Woodlawn to:

- help protect existing residents from displacement;
- create new rental and for-sale housing opportunities that are affordable to households at a range of incomes;

- ensure that existing housing stock offers good quality housing for residents;
- promote housing options to support equitable and inclusive income diversity in Woodlawn; and
- support economic development opportunities.

*Community Cohesion*

Community cohesion is not anticipated to be negatively impacted by the OPC. The proposed construction and operations of the OPC will not geographically divide or isolate the residents or businesses within South Shore, Woodlawn, or Hyde Park. Rather, as a presidential center highlighting the first African American president, the OPC is expected to enhance the cultural richness of the neighboring African American communities. The OPC's construction and operation are not anticipated to encroach upon residential property or disrupt access to education and childcare facilities, community centers, or places of worship. As part of the improvements related to the OPC's construction, bicycle and pedestrian access will be enhanced and neighborhood access to Jackson Park improved, supporting community cohesion.

*Traffic Congestion*

The increase in traffic congestion from the closed roads would lead to an adverse economic effect. The economic impacts of the proposed road closures may include increased fuel consumption and lost productivity due to increased congestion and vehicle delays.

Cumulative Impacts

As discussed above, the direct impacts associated with the NPS action would not physically change existing conditions outside of the Midway Plaisance, and the indirect impacts from the development and operation of the OPC would provide increased employment and income in the project area. Moreover, certain other projects in Jackson Park, unrelated to the OPC project but potentially having impacts to the same resources, were considered in Section 5.2.1. Most of those other projects would provide slight increases in employment. The impact of the construction and operation of the OPC under Alternative B would create a substantial number of jobs in Cook County. However, the increase in traffic congestion from the closed roads would lead to an adverse economic effect. The economic impacts of the proposed road closures may include increased fuel consumption and lost productivity due to increased congestion and vehicle delays. When considered with the other projects described above, there would be a beneficial cumulative impact to social and economic conditions under Alternative B.

Environmental Justice

Various economic, social, environmental, and health impacts associated with Alternative B were evaluated. For the impacts warranting detailed analysis (recreation, traffic access, cultural resources, and social and economic issues), Alternative B would not result in high and adverse impacts. Therefore, Alternative B would not cause disproportionately high or adverse impacts to the low-income and minority communities in the project study area. Moreover, Alternative B would not take private land, displace any residents, or divide or cause isolation to neighborhoods within the project study area. Minimal positive employment impacts may arise from construction and operational activities associated with the proposed NPS action. Input from the public is also an important consideration in the EJ process. The proposed action

has been the subject of a comprehensive public outreach and involvement program to encourage public involvement by residents in these neighborhoods. The City and the CPD held or participated in over 50 meetings to discuss the OPC campus location, the design and uses of the proposed buildings, proposed roadway changes and proposed park improvements. There were over 6,000 total attendees at these various meetings, which ranged from large gatherings in the hundreds at two different McCormick Place events to a handful of area residents in building-specific discussions. No groups or individuals have been, or will be, excluded from participation in public involvement activities, denied the benefit of the project, or subjected to discrimination in any way on the basis of ethnicity, religion, race, elderly, color, age, sex, national origin, or religion.

### 5.2.5.4   Alternative C: NPS + FHWA Action (Preferred Alternative) – Social and Economic Issues

This alternative incorporates impacts associated with Alternative B, in addition to those arising from improved roadways and bicyclist/pedestrian facilities and additional changes to the UPARR boundary. The analysis of impacts in this section will only discuss the additional impacts associated with Alternative C.

Direct Impacts

The direct adverse impacts to socioeconomic resources would be similar to Alternative B, but there would be a notable additional public investment in infrastructure related to the roadway improvements. As described in Appendix H, the Federal Actions will provide improvements to traffic operations. The proposed roadway and bike/pedestrian improvements will cause temporary impacts to employment and income during the construction period. In total, the construction projects are estimated to cost $174 million. Construction will occur in three phases lasting one to two years each. An estimated 166 full-time equivalent construction jobs are anticipated to be generated directly during the projects, with estimated labor expenditures of $52.6 million. An additional 56 construction management jobs are expected to be created, with expenditures of $14 million. Table 41 in Appendix I summarizes the direct expenditures and expected labor association with the proposed actions.

No additional long-term employment and income impacts are expected to arise from the Federal Actions in Alternative C compared to Alternative B. Additionally, the proposed transportation improvements are not expected to impact population level or demographics nor geographically divide or isolate the residents or businesses within the South Shore, Woodlawn, or Hyde Park neighborhoods. The proposed transportation improvements would alleviate the economic impacts of traffic congestion described in Alternative B.

Indirect Impacts – City Actions

The indirect adverse impacts to socioeconomic resources would be similar to Alternative B, in addition to the indirect impacts from the transportation improvements under Alternative C. As described in Alternative B, section 5.2.5.3 above, the impacts from the development of the OPC are described as indirect impacts, relative to the federal action of UPARR partial conversion. The development of the OPC would include indirect impacts on economics, housing, and community cohesion. Alternative C would also include the impacts from the transportation improvements. Indirect impacts from the proposed transportation improvements of Alternative C would include the jobs and economic impacts that arise

from the expenditures of household income generated by the direct and indirect impacts (spending by workers). Therefore, there are no additional adverse indirect impacts under Alternative C.

Cumulative Impacts

As discussed above, the direct impacts associated with the FHWA action would provide increased employment and income, compared to the impacts of Alternative B. Moreover, certain other projects unrelated to the OPC project, but potentially having impacts to the same resources were considered in Section 5.2.1. Most of those other projects would provide slight increases in employment and would alleviate the traffic congestion impacts of Alternative B. There may be some positive impacts from decreased fuel consumption and increased productivity associated with reducing traffic delays under Alternative C, compared to Alternative B. The impact of the actions in Alternative C would not be adverse in relation to overall social and economic impacts of the region.

Environmental Justice

Similar to Alternative B, the impacts warranting detailed analysis (recreation, traffic access, cultural resources, and social and economic issues), Alternative C would not result in high and adverse impacts. Therefore, Alternative C would not cause disproportionately high or adverse impacts to the low-income and minority communities in the project study area.

Impacts related to EJ that would occur due to the NPS action are discussed under Alternative B above (Section 5.2.6.3). The EJ impacts that would occur due to the FHWA action added to the impacts of Alternative B are discussed below.

Section 4.2.2 of Appendix I summarizes the economic and employment impacts of the project and the opportunities they create for the communities of South Shore, Woodlawn, and Hyde Park. Minimal positive employment impacts may arise from construction activities associated with the proposed FHWA action. From a sociological perspective, the proposed action would not divide or cause isolation to neighborhoods within the project study area. There will be no right-of-way acquisition or relocations of residential or commercial properties. The roadway improvements will include rerouting traffic in the area but will overall improve transportation reliability. There will be no adverse impacts to transit services. Existing bicycle/pedestrian facilities will be improved, and new bicycle/pedestrian facilities will be constructed improving neighborhood access to Jackson Park.

Input from the public is also an important consideration in the EJ process. The proposed action has been the subject of a comprehensive public outreach and involvement program to encourage public involvement by residents in these neighborhoods. The City and the CPD held or participated in over 50 meetings to discuss the OPC campus location, the design and uses of the proposed buildings, proposed roadway changes and proposed park improvements. There were over 6,000 total attendees at these various meetings, which ranged from large gatherings in the hundreds at two different McCormick Place events to a handful of area residents in building-specific discussions. No groups or individuals have been, or will be, excluded from participation in public involvement activities, denied the benefit of the project, or subjected to discrimination in any way on the basis of ethnicity, religion, race, elderly, color, age, sex, national origin, or religion.

Minimal positive employment impacts may arise from construction activities associated with the proposed FHWA action. From a sociological perspective, the proposed action would not divide or cause isolation to neighborhoods within the project study area. There will be no right-of-way acquisition or relocations of residential or commercial properties. The roadway improvements will include rerouting traffic in the area but will overall improve transportation reliability. There will be no adverse impacts to transit services. Existing bicycle/pedestrian facilities will be improved, and new bicycle/pedestrian facilities will be constructed.

## 5.2.6  Great Lakes Fishery and Ecosystem Restoration (GLFER)

### 5.2.6.1  Affected Environment – GLFER

As part of an effort to restore bird, fish, and wildlife habitat within the natural areas of Jackson Park, the CPD and the USACE entered into a Project Partnership Agreement signed in August 2014. A five-year construction contract was awarded in September 2014. The Water Resources Development Act, Section 506, GLFER, authorized the ecological restoration project. The GLFER project aims to create or enhance nearly 147 acres of native habitat within Jackson Park and along the Lake Michigan shoreline. The project includes 24 acres of new natural areas and the installation of over 600,000 native plants that will increase the biological diversity of Jackson Park and provide critical habitat and beautiful scenery for Jackson Park visitors. In addition, to improve access and circulation throughout Jackson Park, the project includes installation of overlooks along the water's edge, new pathways, and the reconstruction of existing pathways on the Wooded Island. Refer to Appendix J.

The GLFER project includes restoration and planting for areas throughout Jackson Park. In the existing condition from the overall original plan, only the areas north of Hayes Street have been implemented and planted, with no current funding proposed to complete the areas south of Hayes Drive. See Attachment J-1 in Appendix J for GLFER areas.

### 5.2.6.2  Alternative A: No Action – GLFER

Alternative A assumes that there is no UPARR boundary conversion, the OPC is not constructed, and no roads are closed.

Direct Impacts

There would be no changes in the GLFER restored areas under Alternative A, because the proposed actions would not occur.

Indirect Impacts – City Actions

There would be no indirect GLFER impacts under Alternative A, because the proposed actions would not occur.

Cumulative Impacts

None of the projects discussed in Section 5.2.1.1 result in impacts to GLFER restoration areas. Alternative A would not contribute to any cumulative impacts, as no federal action occurs under this alternative.

### 5.2.6.3    Alternative B: NPS Action (FHWA No Build) – GLFER

Alternative B includes NPS approval of the partial conversion of recreation within a portion of the OPC site, as well as associated replacement of recreation opportunities on the east end of the Midway Plaisance.

<u>Direct Impacts</u>

There are no impacts to GLFER restoration areas associated with the 4.6-acre conversion area on the OPC campus or replacement of UPARR areas within the east end of the Midway Plaisance because there are no GLFER restored areas in the conversion area or in the east end of the Midway Plaisance.

<u>Indirect Impacts – City Actions</u>

Along the east side of Cornell Drive, the CPD proposes to construct a new lift station to intercept and reroute an existing sanitary sewer main that in the existing condition is under the proposed OPC site. In addition, CPD is installing a new electrical duct bank to re-route an existing high voltage electrical duct bank. Temporary fencing along the east side of Cornell Drive would result in temporary impacts to restored GLFER areas. The proposed lift station would result in permanent impacts. See Attachment J-2 in Appendix J.

The Foundation proposes to construct accessible pathway connections from the OPC site to existing GLFER pathways and replace the existing crushed stone screening covered paths with concrete, resulting in temporary impacts to GLFER areas. See Attachment J-3 in Appendix J.

There are no impacts to GLFER areas within Jackson Park associated with the track and field relocation or the proposed roadway closures because there are no GLFER restored areas near the track and field relocation area. A summary of the temporary and permanent GLFER impacts associated with this proposed work is provided in Table 6.

*Table 5: Alternative B – GLFER Impacts*

| Scope of Work | Permanent Impact | Temporary Impact | Total Area |
|---|---|---|---|
| Lift station, sanitary sewer | 78 sq. ft. (0.002 acres) | 2870 sq. ft. (0.06 acres) | 2948 sq. ft. (0.062 acres) |
| Path connections, grading | 0.00 acres | 0.166 acres | 0.166 acres |
| **Total** | **0.002 acres** | **0.226 acres** | **0.228 acres** |

All replacements and restoration location areas were identified in coordination with the CPD and the USACE. The temporary impacts associated with Alternative B would be restored in place. The permanent impacts to GLFER areas (0.002 acres) associated with Alternative B would be replaced on the east side of the Jackson Park Inner Harbor to the south of Hayes Drive.

<u>Cumulative Impacts</u>

None of the projects discussed in Section 5.2.1.1 result in impacts to GLFER restoration areas. The actions of Alternative B would be the only impacts that contribute to the overall negligible cumulative impacts.

5.2.6.4      Alternative C: NPS + FHWA Action (Preferred Alternative) – GLFER

This alternative incorporates impacts associated with Alternative B, in addition to those arising from improved roadways and bicyclist/pedestrian facilities and additional changes to the UPARR boundary. The analysis of impacts in this section will only discuss the additional impacts associated with Alternative C.

<u>Direct Impacts</u>

The widening of southbound Lake Shore Drive to the west would have permanent and temporary impacts to the restored GLFER areas from grading and utility work. Along the west side of Lake Shore Drive, there would be impacts to dunes and meadows. The proposed pedestrian underpasses near the intersections of Lake Shore Drive and Hayes Drive as well as Cornell Drive and Hayes Drive would also result in permanent and temporary impacts. The GLFER impacts along Cornell Drive and Hayes Drive include meadows, savannas, woodlands, sedge lawns, and transition prairies. Table 7 below summarizes the impacts along each section of proposed roadway. These impacts are depicted in Attachment J-4 in Appendix J. The impact areas have been broken into two different classifications. The permanent impacts represent areas such as the widening of Lake Shore Drive that would permanently impact the GLFER areas. The temporary grading impacts and temporary utility impacts are areas that would be restored in place.

*Table 6: Alternative C – Direct Transportation Improvement GLFER Impacts*

| Location/Roadway | Permanent Impact (acres) | Temporary Impact (acres) | Total Area (acres) |
|---|---|---|---|
| Lake Shore Drive | 0.71 | 1.40 | 2.11 |
| Hayes Drive | 0.58 | 0.07 | 0.65 |
| Cornell Drive | 0.03 | 0.00 | 0.03 |
| **Total** | **1.32** | **1.47** | **2.79** |

All impacts to GLFER areas would be restored or replaced within Jackson Park. Areas impacted temporarily by construction would be restored using the GLFER planting palate as a guide. Permanently impacted GLFER areas would be replaced on the east side of the Jackson Park Inner Harbor to the south of Hayes Drive. The original USACE GLFER restoration planting plans included this area but has not yet been implemented. Therefore, implementing the GLFER planting in this area would serve as a replacement for the permanent impacts by providing a net gain of 1.11 acres compared to the existing restoration area. This implementation is consistent with the overall restoration plan. Replacement and restoration area plans are included in Attachment J-5 in Appendix J. All replacement and restoration locations were coordinated with the CPD and the USACE. Table 8 provides a summary of the GLFER impact replacement areas.

*Table 7: Proposed GLFER Impact and Replacement Summary*

| Impact Type | Impact (acres) | Replacement (acres) | Net Difference (acres) |
|---|---|---|---|
| Temporary | 1.70 | 1.70 | 0.00 |
| Permanent | 1.32 | 2.43 | +1.11 |

The CPD sent a Section 408 alteration request to the USACE on August 20, 2019. A letter received from the USACE on February 26, 2020 indicated that the Section 408 request is complete, and a review is expected to be completed within 90 days. This letter and previous coordination meeting minutes with the USACE are included in Attachment J-6 in Appendix J.

Indirect Impacts – City Actions

Alternative C would have the same indirect impacts described in Alternative B. Alternative C would not result in additional indirect impacts because the impacts of the proposed action would be limited to the roadway improvements.

Cumulative Impacts

None of the projects discussed in Section 5.2.1.1 result in impacts to GLFER restoration areas. The actions of Alternative C would be the only impacts that contribute to the overall beneficial cumulative impacts.

## 5.3    Impact Summary

Table B-2 in Appendix B provides a summary of the direct, indirect, and cumulative impacts associated with each alternative for each impact topic evaluated in the Environmental Assessment. The table also includes potential mitigation measures that have been identified as appropriate strategies to minimize and offset likely impacts associated with the proposed project.

## 5.4    Preferred Alternative

Three alternatives were evaluated against the NPS and FHWA purposes and needs for action:

- Alternative A – No Action
- Alternative B – NPS Action/FHWA No Build
- Alternative C – NPS + FHWA Action (Preferred Alternative)

Alternative A is not a viable or practical alternative as it does not meet either agency's purpose and need for action.

In Alternative B, NPS would allow for the evaluation and approval of the partial conversion from the OPC site with replacement property and equivalent recreation at the east end of Midway Plaisance. The City's closure of east bound Midway Plaisance (Stony Island Avenue to Cornell Drive) and Cornell Drive (63rd Street to 59th Street) would increase traffic congestion. By taking no action in Alternative B, FHWA would not fulfill its purpose and need to address changes in travel patterns from closing the roadways and to improve bicycle and pedestrian access and circulation.

In Alternative C, NPS would allow for evaluation and approval of the partial conversion at the OPC site and along roadways in Jackson Park, as well as associated replacement recreation in the Midway Plaisance and in vacated roadways not currently part of the UPARR boundary within Jackson Park. This alternative fully evaluates the partial conversion(s) outlined in the NPS purpose and need. In addition, in Alternative C, FHWA would approve federal funding for transportation improvements to respond to traffic congestion resulting from the roadway closures in Jackson Park and for improved pedestrian and bicyclist access and

circulation because federal analysis requirements are met. As discussed in Section 4.3, FHWA evaluated nine transportation alternatives as part of its alternative analysis process, which concluded that Alternative 9B best meets the FHWA purpose and need while minimizing environmental impacts.

Because Alternative C meets the purposes and needs of both NPS and FHWA, Alternative C is selected as the preferred alternative.

# 6.0   Consultation and Coordination

## 6.1   Public Engagement

The public engagement efforts undertaken by the City are summarized in Section 2.3, including the municipal processes associated with the OPC site and the CPD engagement for the 2018 SLFP. The SLFP process described in Section 2.3 and the public engagement described in this section informed to the federal review process.

### 6.1.1   Project Website

The City has dedicated a website to the federal review of Jackson Park Improvements. The website provides reference documents and updates that support the OPC, the SLFP, and the federal review process necessary to complete these improvements. The project website can be accessed at http://www.tinyURL.com/JPImprovements. The Environmental Assessment will be available for review, and public comments on this Environmental Assessment are being collected on the NPS PEPC website at https://parkplanning.nps.gov/ChicagoJacksonPark for a minimum of 30-days. After the public comment period closes, substantive comments will be responded to and agency responses will be publicly available via a public comment analysis report and included in the final decision document.

### 6.1.2   Public Information Meeting on Jackson Park Combined NPS and FHWA Process

A Public Information Meeting held on September 17, 2018 at the South Shore Cultural Center provided the public with information regarding the federal review process. Information included a summary of the timeline for the federal process to date and the roles and responsibilities of each federal agency. Additional information included draft purpose and need statements, and a description of each proposed Federal Action, the City's actions, and the next steps in the federal review. Meeting materials, including a meeting summary, are available at http://www.tinyURL.com/JPImprovements.

### 6.1.3   Public Hearings and Public Comment Period on the Environmental Assessment

Two public hearing webinars will be held to present an overview of the Environmental Assessment and allow for public comment. A separate opportunity for the public to provide in person comments will also be provided. A hard copy of the report will be available. A minimum of a 30-day comment period will be granted upon notice of the release of the Environmental Assessment. An electronic copy is available at the NPS PEPC link https://parkplanning.nps.gov/ChicagoJacksonPark where public comments may be entered electronically. Notices of the public hearings will be published in advance and it will be held in a

format consistent with NPS and IDOT public hearing requirements. Public hearing presentation materials will be made available online.

## 6.2    Compliance with Other Laws

### 6.2.1    Section 106 of the National Historic Preservation Act

Compliance with Section 106 of the NHPA (36 C.F.R. Part 800) is being conducted separately from but concurrently to this NEPA process. More information on the Section 106 process can be found in the AOE and on the project website (http://www.tinyURL.com/JPImprovements). More information about impacts to Cultural Resources under NEPA is located in section 5.2.4 of this document.

### 6.2.2    Section 4(f) of the U.S. Department of Transportation Act

Section 4(f) of the U.S. Department of Transportation Act of 1966, known as Section 4(f), provides for consideration of park and recreation lands, wildlife and waterfowl refuges, and historic sites (prehistoric and historic districts, sites, buildings, structures, or objects listed in, or eligible for, the NRHP) during transportation project development. The law, now codified in 49 U.S.C. §303 and 23 U.S.C. §138, applies only to agencies within the U.S. Department of Transportation (USDOT) and is implemented by the FHWA and the Federal Transit Administration (FTA) through the regulation at 23 C.F.R. Part 774.

The following actions (local and federal) described in this Environmental Assessment are not subject to Section 4(f) requirements because (1) the actions do not require an approval from the FHWA to proceed, (2) the actions are not transportation projects, and (3) the actions are being implemented to address a purpose that is unrelated to the movement of people, good, and services from one place to another:

- City's decision to close roadways in Jackson Park;
- The City's decision to allow construction of OPC in Jackson Park;
- The NPS decision with respect to the partial conversion of UPARR land in Jackson Park and the replacement recreational opportunity;
- The USACE decision with respect to Section 404 permits and Section 408 permissions.

A total of 41 properties are protected by Section 4(f) within the project area. Of these properties, 4 of the properties are not avoided by the transportation project. Each of the Section 4(f) properties may have a Section 4(f) use, including Jackson Park, Midway Plaisance, Jackson Park Historic Landscape District and Midway Plaisance, and the CPBSHD. Permanent and temporary use acreages are summarized in Table 9 below.

*Table 8: Section 4(f) Land Use*

| Section 4(f) Property | Perm Use (acres) | Temp Use (acres) | Total Use (acres) |
|---|---|---|---|
| Jackson Park | 5.2 | 23.4 | 28.6 |
| Midway Plaisance | 0.0 | 0.1 | 0.1 |
| Jackson Park Historic Landscape District and Midway Plaisance | 5.2 | 23.5 | 28.7 |
| CPBS Historic District | 5.2 | 23.5 | 28.7 |

Minimization and mitigation measures for the transportation improvements, proposed for FHWA funding and described as part of Alternative C, are subject to Section 4(f) requirements and are fully evaluated in a Draft Section 4(f) Evaluation, located in Appendix K.

On April 22, 2020, the Draft Section 4(f) Evaluation was released to the Officials with Jurisdiction (OWJs) and Federal agencies with encumbrances on Section 4(f) land for a comment period that concludes on June 12, 2020. The Draft Section 4(f) Evaluation was also made available on the City's website (http://www.tinyURL.com/JPImprovements) for public review. After the close of the comment period, FHWA will consider the comments received and complete the Final Section 4(f) Evaluation. The Final Section 4(f) Evaluation will be completed prior to, or concurrent with, the conclusion of FHWA's NEPA process. The Draft Section 4(f) Evaluation is incorporated by reference and can be found in full at Appendix K.

## 6.3   Agency and Tribal Government Consultation

The following agencies have been consulted with in relation to their specific roles and responsibilities for Federal Actions in and Adjacent to Jackson Park:

- Advisory Council on Historic Preservation

- Federal Transit Administration

- Illinois Department of Natural Resources

- Illinois Environmental Protection Agency

- Illinois State Historic Preservation Office

- U.S. Coast Guard

- U.S. Department of the Interior Fish & Wildlife Service

- U.S. Environmental Protection Agency

Consultation with the appropriate agencies will continue to ensure environmental laws and regulations are fulfilled.

### 6.3.1   Tribal Government Consultation

There are no known tribal lands within the project study area. However, in accordance with the Tribal Memorandum of Understanding for Illinois transportation projects, the FHWA initiated consultation with Tribal governments with an interest in Illinois lands. The Forest County Potawatomi Community expressed an interest in any project archaeological information as part of the Section 106 NHPA Consultation. On behalf of FHWA, IDOT completed archaeological investigations for Alternative B and C and found no archaeological resources listed or eligible for listing in the NRHP. The result of the archaeological investigations was shared with the Tribal governments. No further coordination is required. However, if human remains are found FHWA will contact the Tribes in accordance with Native American Graves Protection and Repatriation Act.

### 6.3.2   NEPA-404 Merger Meetings

In Illinois, the FHWA and IDOT follow a NEPA-404 merger process when an Environmental Assessment is being prepared and an Individual Section 404 permit is anticipated to be required. The process is described in a Statewide Implementation Agreement titled "National Environmental Policy Act and Clean Water Act Section 404 Concurrent NEPA/404 Processes for Transportation Projects in Illinois." Commonly referred to as the "NEPA-404 merger process," the process ensures that the resource and regulatory agencies can provide input on purpose and need, alternatives to be carried forward, and the preferred alternative prior to any decisions being finalized on projects that require a Section 404 permit from the USACE and require either an Environmental Assessment or Environmental Impact Statement from the FHWA.

The FHWA began its NEPA process in November 2017 when it issued Cooperating Agency letters to relevant state and federal agencies. The focus of the FHWA NEPA process was on the roadway improvements necessary to address congestion as the result of the City's plans to close roadways in Jackson Park and to improve bicycle and pedestrian access and facilities in Jackson Park. Because the NEPA class of action documentation was an Environmental Assessment, and a Section 404 permit was an anticipated requirement with the roadway improvements, FHWA determined that the project would complete the NEPA-404 merger process.

The Purpose and Need for the FHWA action was presented to the NEPA-404 merger agencies on March 16, 2018 and concurrence was received from the USEPA, USACE, IDNR at the meeting and subsequently by e-mail from the USFWS and the Illinois SHPO.

The Alternatives to be Carried Forward for the FHWA action was presented to the NEPA-404 merger agencies on May 4, 2018 and concurrence was received from the USFWS, USEPA, Illinois SHPO, and subsequently by e-mail from the USACE.

The preliminary preferred alternative was presented at the June 21, 2018 NEPA-404 merger meeting. It was noted at the meeting that NPS and FHWA agreed to prepare a single Environmental Assessment and coordinate the preferred alternative for highway improvements with the merger agencies. FHWA requested concurrence by e-mail on 6/28/2018 and received concurrence from USEPA (7/6/2018), USFWS (7/24/2018), and USACE (8/2/2018).

FHWA's identification of a "preferred alternative" during the NEPA-404 merger process is a preliminary determination for coordination purposes. The preferred alternative documentation serves to coordinate with the resource and regulatory agencies and does not finalize the decision-making process. Rather, the information contained in the preferred alternative documentation for the NEPA-404 merger process is brought forward into the NEPA documentation and, updated as necessary, for formal public and agency review and comment. FHWA's final decision on a preferred alternative is only concluded at the completion of the NEPA process after all federal requirements are satisfied. These documents are incorporated by reference and can be found in full at http://www.tinyURL.com/JPImprovements.

### 6.3.3  Jurisdictional Transfer of Roadways, Vacations and Dedications

CDOT has requested a jurisdictional transfer of roadways from IDOT in response to the City's proposed roadway closures and resulting improvements to the roadway network. The following roadways will be transferred from IDOT to CDOT jurisdiction: 57th Drive from 57th Street to Lake Shore Drive, Cornell Drive from 67th Street to 57th Street, Stony Island Avenue from 69th Street to 65th Place and Hyde Park Boulevard from 57th Street to 55th Street. Coordination of a jurisdictional transfer agreement is ongoing.

Coordination is ongoing between CDOT and CPD regarding the vacation and dedication of public way in Jackson Park to accommodate the City's proposed increase in park space and roadway improvements to offset the roadway closures in Jackson Park.

### 6.3.4  Environmental Commitments, Permits, and Certifications

A list of environmental commitments, permits, or certifications is provided below:

#### 6.3.4.1    Environmental Commitments

- Wetland mitigation will occur at the Cedar Creek A1 Bank site if required as a condition of the USACE 404 permit or to meet the requirements of the Illinois Interagency Wetland Policy Act. A mitigation ratio of 1.5 to 1.0 will be applied. Wetland credits will be purchased prior to construction.

- To avoid impacts to threatened and endangered species located within and along the shoreline of Lake Michigan including the Piping Plover, Rufa Red Knot, Pitcher's (Dune) Thistle, Seaside Spurge, or Sea Rocket, the City's construction will generally occur west of Lake Shore Drive, with the exception of some curb and gutter elements proposed in existing concrete areas.

- To avoid impacts to the Yellow-crowned Night Heron and Black-crowned Night Heron, the City commits to prohibit tree removal during the breeding season, between March 1 and August 31 for projects assessed in this Environmental Assessment. This commitment excludes tree removal that may need to occur at any time during the year due to damage, disease, pests, or other unforeseen circumstances in the interest of public safety. If removal is needed, a staff expert at the CPD would inspect potentially impacted trees for signs of nesting activity prior to removal and postpone, if necessary. Impacted trees will be replaced at a 1:1 ratio and will be in keeping with historic designs. Specific details regarding tree replacement can be found in Section 5.1.2 of the Tree Impact Evaluation Memorandum contained in Appendix D.

- Effects to GLFER areas will be restored or replaced within Jackson Park. Areas impacted temporarily for construction will be restored in place using the GLFER planting palette as a guide. Permanent effects to GLFER areas will be replaced on the east side of the Jackson Park Inner Harbor to the south of Hayes Drive.

- Erosion Control Blankets made of sod, straw mats, or synthetic materials will be placed over areas containing soils susceptible to erosion during construction as a temporary erosion control method. Landscaping, coordinated with CPD, will be completed in these areas following construction to promote vegetation growth in order to prevent future erosion.

- A Stormwater Pollution Prevention Plan will be developed during the design stage of the transportation improvements project.

- Dust and airborne dirt generated by roadway construction activities will be controlled through dust control procedures outlined in IDOT's Standard Specifications for Road and Bridge Construction.

- To minimize the effect of roadway construction noise on adjacent properties, as part of its mitigation measures, the City will ensure that IDOT's Standard Specifications for Road and Bridge Construction, particularly Article 107.35, are incorporated into the City's plan and bid documents so that any selected contractor will implement such specifications.

- Continuity of pedestrian and bicycle facilities will be maintained throughout construction. When necessary, detour routes will be constructed if necessary and signed.

- Access to CPD facilities will be maintained throughout construction.

- CDOT will transfer ownership of the right-of-way from the abandoned roadways (described in Section 2.4) to the CPD in the amount of 7.7 acres. All areas in Jackson Park that are used temporarily for construction purposes will remain in the ownership of the CPD, and those areas will be returned to a condition as good, or better, then they were in prior to construction.

- All Section 106 mitigation measures described in the fully executed MOA will be incorporated as part of the project to address adverse effects to historic properties.

### 6.3.4.2 Permits/Certifications Required

Following the conclusion of the NEPA process, detailed construction plans are developed and all necessary permits and approvals are obtained during the design phase of the project. The following permits will be required for this project:

- A USACE Clean Water Act/Section 404 Regional Permit is required for the discharge of fill material to WOTUS related to roadway improvements. A Section 404 Regional Permit is required for the widening of the 59th Street Inlet Bridge and for temporary dewatering beneath the Hayes Drive bridge for repairs to the structure. The Section 404 Regional Permit is currently under review.

- USACE Rivers and Harbors Act/Section 408 authorization is required for alterations to GLFER areas and is currently under review.

- The IDNR Office of Water Resources – Part 3704 Regulation of Public Waters permit, which requires a public notice, will be submitted for approval concurrent with the NEPA Public Hearing for the project.

- The IEPA Section 39 Final Determination for Water Quality permit has been approved.

- NPDES - This project will result in the disturbance of one or more hectares (five or more acres) of total land area. Accordingly, it is subject to the requirement for a National Pollutant Discharge Elimination System (NPDES) permit for stormwater discharges from the construction sites. Permit coverage for the project will be obtained under the IEPA General Permit for Stormwater Discharges from Construction Site Activities (NPDES Permit No, ILR10). Requirements applicable to such a permit will be followed, including the preparation of a Stormwater Pollution Prevention Plan. Such a plan shall identify potential sources of pollution which may reasonably be expected to affect the quality of stormwater discharges from the construction site and shall describe and ensure the implementation of practices which will be used to reduce the pollutants in discharges associated with construction site activity and to assure compliance with the terms of the permit. This plan is currently in progress.

# 7.0   References

AECOM
2019        "Final Draft: Woodlawn Community Area Economic Analysis." Report commissioned by the Network of Woodlawn. Accessed July 10, 2020. https://www.chicago.gov/content/dam/city/depts/dcd/supp_info/woodlawn/aecom_woodlawn_04_22_2019.pdf.

Chicago Department of Housing, City of
2020        Woodlawn Affordable Housing Preservation Ordinance. Accessed July 10, 2020. https://www.chicago.gov/city/en/depts/doh/supp_info/woodlawn-housing-ordinance.html.

Chicago Department of Transportation (CDOT)
2020        *Chicago Streets for Cycling Plan 2020.* Chicago: Chicago Department of Transportation. Accessed July 10, 2020. https://www.chicago.gov/content/dam/city/depts/cdot/bike/general/ChicagoStreetsforCycling2020.pdf.

Chicago Metropolitan Agency for Planning
2014        Update to "GO TO 2040 Comprehensive Plan." Accessed July 10, 2020. https://www.cmap.illinois.gov/documents/10180/17842/long_plan_FINAL_100610_web.pdf/1e1ff482-7013-4f5f-90d5-90d395087a53.

2018        "2050 Forecast of Population, Households and Employment: County and Local Projections." Accessed July 10, 2020. https://datahub.cmap.illinois.gov/dataset/2050-forecast-of-population-households-and-employment.

Chicago Park District (CPD)
2000        *Midway Plaisance Master Plan*. Accessed July 10, 2020. http://midwaypac.org/visit-the-park/history.

2018        *South Lakefront Framework Plan*. Chicago: Chicago Park District. Accessed July 10, 2020. https://assets.chicagoparkdistrict.com/s3fs-public/documents/page/South%20Lakefront%20Framework%20Plan.pdf.

City of Chicago

2020        "City of Chicago Analysis of its Proposal Related to Jackson Park, Cook County, Illinois under the Urban Park and Recreation Recovery Act Program."

Deloitte Consulting LLP
2016        "Finalized Assumptions Modeled Inputs" (updated 2019 by The Obama Foundation only to remove non-public personally identifiable information). Accessed July 17, 2020. https://www.obama.org/wp-content/uploads/finalized-assumptions-modeled-inputs-11-7-19-for-posting.pdf.

Executive Order 12898
    1994       3 C.F.R. 859. Accessed July 10, 2020. https://www.archives.gov/files/federal-register/executive-orders/pdf/12898.pdf.

National Park Service, U.S. Department of the Interior
    1997       "Period of Significance." *National Register Bulletin: How to Complete the National Register Registration Form*. U.S. Government Printing Office, 1997. Accessed July 10, 2020. https://www.nps.gov/subjects/nationalregister/upload/NRB16A-Complete.pdf.

Obama Community Benefits Agreement Coalition
    2020       "Community Benefits Agreement (CBA) for the area around the Obama Center." Accessed July 21, 2020. http://www.obamacba.org/.

Obama Foundation, The
    2018       *Our Commitment to Our Neighbors.* Accessed July 21, 2020. https://www.obama.org/updates/community-commitments/.

    2020       "Obama Presidential Center: Reinforcing Landscape Ecology." Accessed July 21, 2020. https://www.obama.org/wp-content/uploads/2020.04.30-OPC-Reinforcing-Landscape-Ecology_sm.pdf.

Obama Presidential Center and Obama Foundation
    2016       "Economic Impact Assessment." Accessed July 21, 2020. https://www.obama.org/wp-content/uploads/Economic_Impact_Assessment_-Report_OPC.pdf.

Sam Schwartz Engineering (SSE), LLC
    2018       "Jackson Park Revitalization Traffic Impact Study Final Report." Accessed July 21, 2020. https://www.chicago.gov/content/dam/city/depts/dcd/supp_info/jackson/CDOT-Traffic-Impact-Study.pdf.

U.S. Census Bureau
    2019       "American Community Survey 5-year estimates." Accessed July 21, 2020. https://www.census.gov/data/developers/data-sets/acs-5year.2017.html.

# EXHIBIT 11

**U.S. DEPARTMENT OF INTERIOR - National Park Service**

**AND**

**U.S. DEPARTMENT OF TRANSPORTATION - Federal Highway Administration**

**FINDING OF NO SIGNIFICANT IMPACT**
**FEDERAL ACTIONS IN AND ADJACENT TO JACKSON PARK:**
**URBAN PARK AND RECREATION RECOVERY AMENDMENT AND**
**TRANSPORTATION IMPROVEMENTS**

**Jackson Park**
**Chicago, Illinois**

## INTRODUCTION

In compliance with the National Environmental Policy Act (NEPA), the National Park Service (NPS), the Federal Highway Administration (FHWA), and the Illinois Department of Transportation (IDOT) prepared an environmental assessment (EA) to examine alternative actions and environmental impacts associated with proposed federal actions in and adjacent to Jackson Park in Chicago, Illinois. In the selected alternative, the NPS would amend the Urban Park and Recreation Recovery Act (UPARR) (54 U.S.C. 2005) grant agreements between the City of Chicago (the City) and the NPS relating to Jackson Park, and the FHWA would authorize funding under the Federal-Aid Highway Program for certain transportation improvements that include Stony Island, Lake Shore Drive, Hayes Drive, and pedestrian improvements made in and adjacent to Jackson Park. In this Finding of No Significant Impact (FONSI), the NPS and FHWA conclude that there is no significant impact to the human environment associated with these decisions. Mitigation measures designed to avoid, minimize, and/or mitigate impacts to affected resources and a summary of public engagement by the agencies are also provided. A summary of agency consultation and tribal coordination can be found in Attachment A, and a summary of public involvement and comment analysis can be found in Attachment B. Attachment C documents, via an *errata,* provide revisions to the EA.

## BACKGROUND

The City intends to make changes in and adjacent to Jackson Park that are a result of its approval for the construction of the privately funded Obama Presidential Center (OPC) identified in the 2018 South Lakefront Framework Plan (SLFP). The City plans to close roadways to allow the construction of the OPC in Jackson Park. These changes triggered the need for specific federal actions by the NPS and FHWA under their individual authorities that apply to certain aspects of the City's plans. The federal agencies do not have approval authority over the placement of the OPC in Jackson Park (or of its design); nor do they have approval authority over the road closures in Jackson Park. The NPS and FHWA prepared the *Environmental Assessment for Federal Actions in and Adjacent to Jackson Park: Urban Park Recreation Recovery Amendment and Transportation Improvements* (EA) to evaluate alternatives to the proposed federal agency actions and their potential impacts on the natural, cultural, and human environment. The EA is available online at https://parkplanning.nps.gov/ChicagoJacksonPark.

The City's planned OPC project would impact lands subject to provisions of UPARR as two grants (providing federal funding) were awarded to the City for improvements to Jackson Park. Any property improved or developed with UPARR grant funds may not be converted to non-recreation uses without the approval of the NPS. The NPS reviewed and considered whether to approve a partial conversion of use at Jackson Park pursuant to UPARR program requirements. Under the UPARR Act, the NPS shall approve a partial conversion when it is in accord with the current Jackson Park recovery action plan or similar plan and only if recreation properties and opportunities of reasonably equivalent location and usefulness are provided (54 U.S.C. 200507).

The NPS had to evaluate the City's proposed UPARR partial conversion in Jackson Park, including the proposed replacement property and planned development of recreation opportunities, to compensate for lost recreation before making a decision to amend the UPARR grant agreements and adjust the UPARR boundary. The NPS has no legal authority over the presence or physical aspects of the OPC in Jackson Park such as the design, configuration, materials, or workmanship of those projects. The NPS has an obligation to review the recreational impacts of the City's decisions affecting Jackson Park and to approve conversion proposals if the City meets the conditions outlined in the Act and conversion requirements regulations (36 CFR 72.72).

Under Title 23 U.S.C., the FHWA administers the Federal-Aid Highway Program, which makes available federal funding to state departments of transportation and local agencies for transportation projects. In Illinois, all Federal-Aid Highway Program funds are administered through IDOT through a stewardship and oversight agreement with FHWA. Through this agreement, IDOT maintains responsibility for oversight of local agencies, including Chicago Department of Transportation (CDOT), when federal funding is sought for a project. CDOT proposes to use Federal-Aid Highway funding for roadway construction and bicycle and pedestrian improvements within Jackson Park. Prior to the authorization of Federal-Aid Highway funds, the FHWA had to ensure that the proposed construction activities meet all federal requirements and all applicable environmental laws.

The statements and conclusions reached in this FONSI are based on documentation and analysis provided in the EA, the errata that have been prepared in response to public and agency comments (see Attachment C), and associated decision file.

**SELECTED ACTION**

The NPS and FHWA selected Alternative C: NPS + FHWA Action (the Preferred Alternative) for implementation. The selected action is described in detail Sections 4.2 and 4.3 of the EA and is summarized below.

Under the selected action, the NPS would approve the City's proposed partial conversion of UPARR lands in Jackson Park by amending the original grant agreements to document the changes in two areas: (1) The NPS would remove a 4.6-acre portion of the OPC site containing the forum, library, and museum buildings from the UPARR boundary and include within the UPARR boundary the 5.2-acre proposed replacement property at the east end of Midway Plaisance; (2) The NPS would remove areas of parkland lost due to road improvements and replace them with new recreation land gained by converting closed roadways to recreation areas.

To resolve the removal of 4.6 acres from recreation use for the OPC site, the City has identified the east end of Midway Plaisance as possible replacement property that would require improvements in order to provide a mix of formal and informal recreation space. The City will:

- Develop formal playground recreation facilities, including inclusive play facilities as well as nature play facilities.

- Modify the sunken lawn area where a wetland is currently located to enhance use of the flexible open field and facilitate infiltration and drainage. The flexible open space on the site would accommodate a variety of activities such as dog-walking, picnicking, and soccer practice.

- Install a missing historic walk to improve access to the Cheney-Goode Memorial and the playground area as well as rehabilitate a historic circulation pattern.

- Confirm with the NPS these formal and informal recreation opportunities meet the statutory equivalency requirement after the design review outlined in the Memorandum of Agreement executed December 17, 2020 is completed.

With respect to roadway improvements, approximately 5.2 acres of parkland would be converted from Jackson Park to accommodate the FHWA funded improvements. These areas are currently used for aesthetic vegetated buffer areas or informal recreation (walking or running along roadway alignments). The City intends to use permanently closed roadways as replacement property. The following roadways within Jackson Park would be closed (see Section 2.4 of the EA for more detail):

- Cornell Drive between 63rd Street (Hayes Drive) and 59th Street,

- the northbound section of Cornell Drive between 68th Street and 65th Street,

- Marquette Drive between Stony Island Avenue and Richards Drive, and

- the eastbound portion of Midway Plaisance between Stony Island Avenue and Cornell Drive.

The closure of roadways does not require any federal approval from FHWA or from the NPS. These closed roadways would be converted to parkland. Because roadway improvements to Stony Island, Lake Shore Drive, and Hayes Drive would require NPS approval for the conversion of UPARR recreation land, the closed roadway corridors would be used for replacement UPARR land dedicated to recreation. The new recreation opportunities provided in these areas within Jackson Park would:

- predominantly include new informal recreation space, and

- include new pathways, sidewalks, and underpasses that are incorporated in the roadway improvements.

The portion of the selected action under FHWA authority includes transportation improvements to mitigate traffic congestion as a result of roadway closures in Jackson Park. Transportation improvements throughout Jackson Park would include capacity improvements, bridge modifications, intersection modifications, and pedestrian and bicycle enhancements. See Section 4.3 of the EA for details. Roadway improvements would occur primarily along Stony Island Avenue, Lake Shore Drive, and Hayes Drive. Lake Shore Drive would be widened to the west to add an additional

southbound travel lane between Hayes Drive and 57th Drive. Stony Island Avenue would be widened to the east to allow for additional lanes between 67th Street and N. Midway Plaisance. Hayes Drive would be reconfigured to allow for two lanes in each direction between Cornell Drive and Lake Shore Drive. Pedestrian and bicyclist improvements generally consist of Americans with Disabilities Act (ADA) enhancements at intersections, pedestrian underpasses, curb extensions, pedestrian refuge islands, high visibility crosswalk markings, and pedestrian countdown signals.

**Mitigation Measures**

The selected action incorporates mitigation measures as described under the applicable impact topics in Section 5.0 and Appendix B of the EA. To avoid, minimize, and/or mitigate impacts on the natural, cultural, and human environment, the following environmental commitments would be implemented, as described in Section 6.3.4.1 of the EA:

- Wetland mitigation would occur at the Cedar Creek A1 Bank site to meet the requirements of the Illinois Interagency Wetland Policy Act. A mitigation ratio of 1.5 to 1.0 would be applied. Wetland credits would be purchased prior to construction.

- To avoid impacts to threatened and endangered species that may be located within and along the shoreline of Lake Michigan, including the Piping Plover, Rufa Red Knot, Pitcher's (Dune) Thistle, Seaside Spurge, or Sea Rocket, the City's construction would generally occur west of Lake Shore Drive, with the exception of some curb and gutter elements proposed in existing concrete areas.

- To avoid impacts to the Yellow-crowned Night Heron and Black-crowned Night Heron, the City commits to prohibit tree removal during the breeding season, between March 1 and August 31. This commitment excludes tree removal that may need to occur at any time during the year due to damage, disease, pests, or other unforeseen circumstances in the interest of public safety. If removal is needed, a staff expert at the Chicago Park District (CPD) would inspect potentially impacted trees for signs of nesting activity prior to removal and postpone, if necessary. Impacted trees would be replaced at a 1:1 ratio and would be in keeping with historic designs. Specific details regarding tree replacement can be found in Section 5.1.2 of the Tree Impact Evaluation Memorandum contained in Appendix D of the EA.

- Great Lakes Fishery and Ecosystem Restoration (GLFER) areas would be restored or replaced within Jackson Park. Areas impacted temporarily for construction would be restored in place using the GLFER planting palette as a guide. Permanent effects to GLFER areas would be replaced on the east side of the Jackson Park Inner Harbor to the south of Hayes Drive.

- Erosion Control Blankets made of sod, straw mats, or synthetic materials would be placed over areas containing soils susceptible to erosion during construction as a temporary erosion control method. Landscaping, coordinated with CPD, would be completed in these areas following construction to promote vegetation growth in order to prevent future erosion.

- A Stormwater Pollution Prevention Plan would be developed during the design stage of the transportation improvements project.

- Dust and airborne dirt generated by roadway construction activities would be controlled through dust control procedures outlined in the IDOT Standard Specifications for Road and Bridge Construction.

- To minimize the effect of roadway construction noise on adjacent properties, as part of its mitigation measures, the City would ensure that IDOT's Standard Specifications for Road and Bridge Construction, particularly Article 107.35, are incorporated into the City's plan and bid documents so that any selected contractor would implement such specifications.

- Continuity of pedestrian and bicycle facilities would be maintained throughout construction. When necessary, detour routes would be constructed and signed.

- Access to CPD facilities would be maintained throughout construction.

- CDOT would transfer ownership of the right-of-way from the abandoned roadways (described in Section 2.4 of the EA) to the CPD in the amount of 7.7 acres. All areas in Jackson Park that are used temporarily for construction purposes would remain in the ownership of the CPD, and those areas would be returned to a condition as good, or better, then they were in prior to construction.

- All mitigation measures developed as part of the Section 106 of the National Historic Preservation Act (NHPA) process, described in the fully executed Memorandum of Agreement (MOA), would be incorporated as part of the project to address adverse effects to historic properties.

## FINDING OF NO SIGNIFICANT IMPACT

As described in the EA, impacts on natural, cultural, and human resources would occur as a result of implementing the selected action. The potential for these impacts to be significant was analyzed considering relevant context and the intensity of impacts as required by Council on Environmental Quality (CEQ) regulations at 40 CFR 1508.27. As explained below for each resource, these impacts would not be significant.

### Recreation Resources

As described in Section 5.2.2 of the EA, the selected action would include loss of recreation facilities and opportunities in some areas and the replacement of recreation facilities in other areas. Construction of the OPC campus would result in the loss of an existing picnic grove, open space, track and field, the 62nd Street Playground, and, temporarily, the Perennial or Women's Garden. The track and field and the 62nd Street Playground would be relocated by the City within Jackson Park. Upon completion of the OPC campus, the Women's Garden would be replaced with a new garden of equivalent size and improved accessibility.

For UPARR, the loss of recreational facilities and opportunities resulting from the OPC campus would be replaced at the east end of the Midway Plaisance. The new play area would provide new recreational opportunities, including facilities for people with a wide range of disabilities. The improved infiltration and drainage of the sunken lawn area would enhance use of this area as open space for informal recreation. This would be an improvement over the current state of the area, which can only be partially used because of the wetland on the site and degraded conditions. Additionally, the installation of a missing historic walk would provide better access to the Cheney-Goode Memorial and new play area.

The NPS will amend the grant agreement to reflect these changes but request the City to confirm these formal and informal recreation opportunities meet the statutory equivalency requirement after the design review outlined in the Memorandum of Agreement executed December 17, 2020 is completed.

Loss of recreational facilities and opportunities would result from roadway changes that remove linear, narrow, informal recreation spaces available for walking, running, or biking. However, conversion of these areas to transportation use would not prevent park users from continuing to use the adjacent open areas of Jackson Park for informal recreation. Additional UPARR-designated land would be added through the closure of roads and conversion to open space.

The FHWA improvements would improve connectivity for recreation users. New paths and underpasses would provide safer and more comfortable access for users by physically separating pedestrian and vehicular traffic. The combination of new paths and underpasses would allow users to enter at the far southwest corner of Jackson Park and travel all the way to the northeast corner without having to cross a road at grade.

Overall, the selected action would result in a net gain of 6.4 acres of UPARR-designated land. Recreation facilities and opportunities that would be lost (directly or indirectly) as a result of the selected action would be replaced with facilities and opportunities of equivalent location and usefulness. Therefore, the impacts on recreation resources would not be significant.

**Traffic Congestion**

Traffic congestion is addressed in Section 5.2.3 of the EA. As described in Section 5.2.3 of the EA, the selected action would result in acceptable levels of service for the movement of people and goods in the project area. If no improvements were made to the roadway system, the road closures by the City of Chicago would cause poor levels of service on the transportation network. Thirteen signalized intersections would experience a failing Level of Service (LOS) and/or operate over capacity. Under the selected action, the congestion and delays caused by the roadway closures would be mitigated by the roadway improvements and all intersections would operate at an acceptable level of service. The selected action would result in a loss of 233 on-street parking spaces available due to road closures and improvements. However, parking demands indicate that even with the loss of parking spaces, there would continue to be an excess of parking in Jackson Park. Therefore, the impacts on traffic congestion will not be significant.

**Cultural Resources (Historic Properties)**

As described in Section 5.2.4 of the EA, the selected action would have an impact on cultural resources (historic properties) within the project area, including the Jackson Park Historic Landscape District and Midway Plaisance (684-acres) and the Chicago Park Boulevard System Historic District (CPBSHD) (1,700 acres).

The replacement recreation proposed for the east end of the Midway Plaisance would have a direct impact on the Jackson Park Historic Landscape District and Midway Plaisance and the Chicago Park Boulevard System Historic District (CPBSHD); however, these impacts would be minimal in scale compared to the size of the 683-acre Jackson Park Historic Landscape District and Midway Plaisance and 1,700-acre CPBSHD. Contributing features of the Midway Plaisance would be impacted by the

change in the recreational use. Transportation improvements would also have a direct impact on the Jackson Park Historic Landscape District and Midway Plaisance and the CPBSHD.

The selected action would indirectly result in impacts from the development of the OPC. The development of the 19.3-acre OPC site would alter contributing physical elements of Jackson Park; however, the area of change would be small in scale given the overall size of the historic resources.

The combined direct and indirect impacts on the historic properties diminishes the characteristics for which the historic properties are listed on the National Register of Historic Places. Historic integrity of location, design, setting, materials, feeling, and association would be diminished. However, the combined direct and indirect impacts are small in scale given the overall size of the historic resources Specifically, less than 3 percent of the 683-acre Jackson Park Historic Landscape District and Midway Plaisance and less than 2 percent of the 1,700-acre CPBSHD would be altered. Moreover, the proposed changes are compatible with the existing character of the area, including land use patterns and developmental history. Jackson Park has offered a variety of cultural activities and institutions over its history and has been altered to suit the public's changing needs. Alterations, to both historic and non-historic elements, have reflected a continual adaptation that is part of the park's cultural landscape and development history and the proposed changes are compatible with the existing character of the area. Mitigation measures for impacts to historic properties were developed as part of the consultation process under Section 106 of the National Historic Preservation Act of 1966, which help to offset the impacts to historic properties.

The mitigation measures have been committed to in a Section 106 Memorandum of Agreement, which was fully executed on December 17, 2020. After implementation of the selected alternative, the historic properties will retain enough historic integrity to remain eligible for and listed on the National Register of Historic Places.

Therefore, the impact on cultural resources (historic properties) would not be significant.

**Social and Economic Issues**

As described in Section 5.2.5.1 (pages 56-57) of the EA, all Census tracts within the South Shore and Woodlawn neighborhoods were found to meet the criteria of an Environmental Justice area, and all but Tract 4111 in the Hyde Park neighborhood also meet the criteria. As discussed in Sections 5.2.5.3 and 5.2.5.4 of the EA, the selected action would result in short-term employment increases related to construction activities. These increases would arise directly from the selected action such as for development of recreation opportunities on the east end of Midway Plaisance and for roadway and bicycle/pedestrian improvements. Both short- and long-term employment increases would also arise indirectly such as for construction, startup, and operations of the OPC campus. In total, approximately 3,904 jobs would be provided with $214.6 million in income to the State of Illinois. The transportation construction projects proposed for FWHA funding are estimated to cost $174 million.

Although there would be increases in employment and income under the selected action, none of the other socioeconomic factors detailed in Section 5.2.5.1 of the EA, such as the population level or population composition, are expected to change as a result of the selected action. Likewise, housing trends are not anticipated to be affected. Public space impacts are expected to be positive, improving the recreational amenities of the area. The selected action would not impact community cohesion or

otherwise geographically divide or isolate the residents or businesses within South Shore, Woodlawn, or Hyde Park. Therefore, the impacts on social and economic issues are not anticipated to be significant.

**Great Lakes Fishery and Ecosystem Restoration Areas (GLFER)**

As discussed in Section 5.2.6 of the EA, both permanent and temporary impacts would occur on GLFER restoration areas as a result of the selected action. Impacts would occur directly as a result of the selected action due to roadway improvements such as widening, grading, utility work, and installation of pedestrian underpasses. In total, these actions would result in 1.32 acres of permanent impacts and 1.47 acres of temporary impacts, for a total of 2.79 acres of impacts.

Indirect impacts would occur as a result of CPD's proposed new lift station, sanitary sewer, and electrical duct bank as well as due to the Obama Foundation's (the Foundation's) proposed accessible pathway connections from existing pathways to the OPC site. In total, these actions would result in 0.002 acres of permanent impacts and 0.226 acres of temporary impacts, for a total of 0.228 acres of impacts.

Although the selected action would result (directly and indirectly) in 3.02 acres of total impacts to GLFER restoration areas, all impact areas would be restored or replaced within Jackson Park. All areas temporarily impacted by construction would be restored using the GLFER planting palate as a guide. Permanently impacted GLFER areas would be replaced with 2.43 acres of new restoration area on the east side of the Jackson Park Inner Harbor to the south of Hayes Drive. Overall, there would be a net increase of 1.11 acres of GLFER restoration areas in Jackson Park. Therefore, the impacts on GLFER restoration areas are not expected to be significant.

**Cumulative Impacts**

As discussed in Section 5.2.1 of the EA, other past, present, or reasonably foreseeable actions in conjunction with the selected action would result in cumulative impacts on recreation resources, traffic congestion, cultural resources (historic properties), and social and economic issues. Together with the other actions described in Section 5.2.1 of the EA, the selected action would have a beneficial impact to recreation, negligible impacts on traffic congestion, a minor adverse impact on cultural resources (historic properties), and impact on social and economic issues would not differ overall for the region; there also would be minimal impact on GLFER restoration areas. Although the selected action would contribute to the cumulative impact on the resources discussed above, the overall cumulative impacts would be negligible, minor, or otherwise relatively small; therefore, the selected action would not result in a significant cumulative impact on any resources, as discussed in Section 5.2 of the EA.

**Finding**

The NPS and FHWA have determined that the selected alternative (Alternative C) will have no significant impact on the human environment. This FONSI is based on the attached EA and its Errata which has been independently evaluated by the NPS and FHWA and determined to adequately and accurately discuss the need, environmental issues, and impacts of the proposed action and appropriate mitigation measures. It provides sufficient evidence and analysis for determining that an EIS is not required.

**DECISION REACHED AND RATIONALE**

The NPS and FHWA have selected Alternative C for implementation because it best meets the purposes and needs of both NPS and FHWA. For the NPS, Alternative C allows for the evaluation and approval of the partial UPARR conversion at the OPC site and along roadways in Jackson Park as well as associated replacement recreation in the east end of Midway Plaisance and in vacated roadways not currently part of the UPARR boundary within Jackson Park.

In addition, Alternative C addresses traffic congestion resulting from roads that will be closed by the City of Chicago and improves bicycle and pedestrian access to Jackson Park. The transportation improvements included in Alternative C best balance impacts to the environment with providing acceptable performance of the transportation system. Alternative C results in a Section 4(f) use under the United States (U.S.) Department of Transportation Act of 1966. The FHWA evaluated avoidance alternatives and completed a least harms analysis, which was documented in a Final Section 4(f) evaluation. The Final Section 4(f) evaluation was approved by FHWA on December 18, 2020, and the transportation improvements selected in the Final Section 4(f) evaluation are consistent with the transportation improvements selected in this FONSI.

Alternative A is not a viable or practical alternative as it does not meet either agency's purpose and need for action. Under Alternative B, the City's closure of east bound Midway Plaisance (Stony Island Avenue to Cornell Drive) and Cornell Drive (63rd Street to 59th Street) would increase traffic congestion. By taking no action in Alternative B, the FHWA would not fulfill its purpose and need to address changes in travel patterns from closing the roadways and to improve bicycle and pedestrian access and circulation.

**CONCLUSION**

As described above, the selected action would not have a significant impact on the human environment in accordance with Section 102(2)(C) of NEPA. Therefore, it has been determined that an Environmental Impact Statement is not required for this project and therefore will not be prepared. For these reasons and in consideration of the likely environmental impacts described in the EA and this FONSI, Alternative C has been selected for implementation.

FINDING OF NO SIGNIFICANT IMPACT
FEDERAL ACTIONS IN AND ADJACENT TO JACKSON PARK
JANUARY 21, 2021

Approved:  HERBERT FROST                  Digitally signed by HERBERT FROST
                                          Date: 2021.01.29 16:26:31 -06'00'
_____

         Herbert C. Frost                        Date of Approval
         Regional Director
         Regions 3, 4, and 5, National Park Service

Approved:  _____     January 21, 2021

         Arlene K. Kocher                        Date of Approval
         Division Administrator
         Federal Highway Administration

Attachment A:  Agency and Tribal Consultation
Attachment B:  Comment Analysis Report
Attachment C:  Errata

**ATTACHMENT A**
**AGENCY CONSULTATION AND TRIBAL COORDINATION**

**AGENCY CONSULTATION**

Throughout the planning process, the National Park Service (NPS) and the Federal Highway Administration (FHWA) consulted with the following agencies, as described in Section 6.3 of the *Environmental Assessment for Federal Actions in and Adjacent to Jackson Park: Urban Park Recreation Recovery Amendment and Transportation Improvements* (the EA):

- Advisory Council on Historic Preservation
- Federal Transit Administration
- Illinois Department of Natural Resources
- Illinois Environmental Protection Agency
- Illinois State Historic Preservation Officer
- U.S. Coast Guard
- U.S. Department of the Interior Fish & Wildlife Service
- U.S. Environmental Protection Agency
- U.S. Army Corps of Engineers

**Section 106 of the National Historic Preservation Act**

Section 106 of the National Historic Preservation Act of 1966 (NHPA), 54 U.S.C. 306108, and its implementing regulations (36 CFR Part 800) require federal agencies to take into account the impacts of their undertakings on historic properties and offer the Advisory Council on Historic Preservation the opportunity to comment. The FHWA is the lead agency for Section 106 compliance under the NHPA for this project. The Illinois Department of Transportation (IDOT), through a stewardship and oversight agreement with the FHWA, assists in reviewing the compliance of a project with environmental laws and conducts coordination with necessary state officials, including the State Historic Preservation Officer (SHPO). Compliance under Section 106 was conducted separately from but concurrently with this NEPA process. The process is summarized below and more information and documents mentioned in the summary can be found on the project website at http://www.tinyURL.com/JPImprovements.

Under Section 106, the FHWA made a finding of an *adverse effect* for this undertaking for the Jackson Park Historic Landscape District and Midway Plaisance as well as for the Chicago Park Boulevard System Historic District. This finding is documented in an assessment of effect (AOE) on historic properties, available on the project website at http://www.tinyURL.com/JPImprovements.

On April 1, 2020, the Advisory Council on Historic Preservation (ACHP) issued an advisory opinion concerning the AOE and concluded that FHWA had correctly applied the criteria of adverse effect in the AOE. On April 14, 2020, FHWA released Errata with respect to the AOE in light of comments received from consulting parties and the public during the AOE comment period. The revisions do not change the conclusions or analysis in the AOE. The Errata is available on the project website at http://www.tinyURL.com/JPImprovements.

On April 14, 2020, the FHWA notified consulting parties that it had concluded the assessment of effects step in the Section 106 process and had determined that the proposed undertaking will have an "adverse effect" on historic properties. Four consulting party meetings followed to discuss the resolution of the adverse effect to historic properties. These meetings were each held via webinar and included a presentation followed by Q&A sessions and/or opportunities for the consulting parties to

provide comments. Presentations, transcripts, and chat pod transcripts for each meeting are available on the City's website at http://www.tinyurl.com/JPImprovements.

The FHWA consulted with the ACHP, the Illinois SHPO, and numerous consulting parties, invited consulting parties, and other interested parties to develop a Memorandum of Agreement (MOA) that outlines the stipulations for mitigation under the NHPA as a result of the selected action. The final MOA was fully executed on December 17, 2020, and is available on the City's website at http://www.tinyurl.com/JPImprovements.

**Section 4(f) of the U.S. Department of Transportation Act**

Section 4(f) of the U.S. Department of Transportation Act of 1966, known as Section 4(f), provides for consideration of park and recreation lands, wildlife and waterfowl refuges, and historic sites (prehistoric and historic districts, sites, buildings, structures, or objects listed in, or eligible for, the National Register of Historic Places) during transportation project development. The law, now codified in 49 U.S.C. §303 and 23 U.S.C. §138, applies only to agencies within the U.S. Department of Transportation (USDOT) and is implemented by the FHWA and the Federal Transit Administration (FTA) through the regulation at 23 C.F.R. Part 774.

A total of 41 properties are protected by Section 4(f) within the project area. Of these properties, four are not avoided by the transportation project and would have a Section 4(f) use. These properties are Jackson Park, Midway Plaisance, Jackson Park Historic Landscape District and Midway Plaisance, and the Chicago Park Boulevard System Historic District.

A Draft Section 4(f) Evaluation was approved and is located in Appendix K of the EA.[1] It was approved on April 22, 2020, and sent to the officials with jurisdiction and federal agencies with encumbrances on Section 4(f) land for a comment period that concluded on June 12, 2020. The Draft Section 4(f) Evaluation was also made available on the City's website (http://www.tinyURL.com/JPImprovements) for public review. After the close of the comment period, the FHWA considered the comments received and completed the Final Section 4(f) Evaluation. The Final Section 4(f) Evaluation was approved on December 18, 2020, and is available on the City's website (http://www.tinyURL.com/JPImprovements).

The total Section 4(f) use of land, including permanent and temporary uses, is 28.7 acres. Approximately 23.5 acres are temporary uses only. Approximately 5.2 acres of Section 4(f) land within Jackson Park will be permanently used for transportation purposes. The City will close several roadways in Jackson Park and transfer 7.7 acres of right-of-way that is currently used for transportation purposes to the Chicago Park District (CPD), which will be incorporated into Jackson Park for recreational area and park purposes and to satisfy the UPARR conversion provisions. After the transfer of closed roadways from the Chicago Department of Transportation to the CPD and after the temporary uses are ended, there is a net increase in Section 4(f) park land of 2.5 acres in Jackson Park.

---

[1] The "No-Action" alternative for the Section 4(f) evaluation is consistent with Alternative B in the Environmental Assessment (EA). Alternative B in the EA is FHWA's no-action alternative for the purposes of the NEPA evaluation. The EA was made available to the public on September 28, 2020 under the lead of the National Park Service.

**TRIBAL COORDINATION**

There are no known tribal lands within the project study area. However, in accordance with the Tribal Memorandum of Understanding for Illinois transportation projects, the FHWA initiated coordination with tribal governments with an interest in Illinois lands. The Forest County Potawatomi Community and the Miami Tribe of Oklahoma expressed an interest in any project archaeological information as part of the Section 106 NHPA consultation. On behalf of the FHWA, IDOT completed archeological investigations for Alternatives B and C and found no archaeological resources listed or eligible for listing in the National Register of Historic Places. The result of the archaeological investigations was shared with the tribal governments. No further coordination is required. However, if human remains are found, the FHWA will contact the tribes in accordance with the Tribal Memorandum of Understanding for Illinois transportation projects.

## ATTACHMENT B
## PUBLIC COMMENT ANALYSIS REPORT

**SUMMARY OF PUBLIC INVOLVEMENT**

**Project Website**

The City of Chicago (the City) dedicated a website to the federal review of the proposed project, which can be accessed at http://www.tinyURL.com/JPImprovements. The website provides reference documents and updates that support the environmental review and permitting processes necessary to arrive at the federal decisions. The National Park Service (NPS) Planning, Environment and Public Comment (PEPC) website also provided resources related to the project at https://parkplanning.nps.gov/ChicagoJacksonPark.

**Public Information Meeting on Jackson Park Combined NPS and FHWA Process**

A Public Information Meeting was held on September 17, 2018, at the South Shore Cultural Center and provided the public with information regarding the federal review process. Information included a summary of the timeline for the federal process to date and the roles and responsibilities of each federal agency. Additional information included draft purpose and need statements and a description of each proposed federal action, the City's actions, and the next steps in the federal review.

**Public Hearings and Public Comment Period on the Environmental Assessment**

The Environmental Assessment (EA) was available for review and comment September 28, 2020, through October 30, 2020. An electronic version of the EA was available on the NPS PEPC website at https://parkplanning.nps.gov/ChicagoJacksonPark. Hard copies of the EA were available at the South Shore Cultural Center.

Public Hearing notices were published on September 28, 2020 and October 6, 2020 in the Chicago Sun Times. Notice was also published in a local newspaper, the Hyde Park Herald (October 1, 2020), and an advertisement was published in a locally circulated magazine, the South Shore Current (October 2, 2020). Both the City's project website (http://tinyURL.com/JPImprovements) and the NPS PEPC website (https://parkplanning.nps.gov/ChicagoJacksonPark) were updated to include information for the Public Hearing. A Public Hearing flyer was mailed to property owners within 500 feet of the project limits and email notifications were sent to interested parties. The NPS and the Chicago Department of Transportation (CDOT) distributed a press release to various media outlets. The Public Hearing was also announced in the City of Chicago Department of Planning and Development newsletter.

Public comments were accepted electronically via the NPS PEPC website or the project email address, in hard copy via mail, or verbally via one of the two webinars or the in-person appointment.

A Public Hearing consisting of two online webinar sessions was held on Tuesday, October 13, 2020, and Wednesday, October 14, 2020. The meetings were scheduled to occur between 5:00 p.m. and 8:00 p.m. to allow for public comments. The duration of the webinar on October 13, 2020, was between 5:00 p.m. and approximately 6:30 p.m. and the duration of the webinar on October 14 was between 5:00 p.m. and approximately 6:00 p.m. The webinar sessions utilized the Zoom platform.

The Public Hearing began with a presentation, followed by public comments for members of the public who submitted speaking requests. Any member of the public was able to view each webinar during the date and time of the hearing via the following link: https://tinyurl.com/JacksonParkPublicHearing. A court reporter was present to transcribe each of the Public Hearing webinar sessions.

Webinar session #1 included 18 public comment participants and approximately 50 people viewing on the live streaming service. Webinar session #2 included 9 public comment participants and approximately 45 people viewing on the live streaming service.

An opportunity for the public to speak with a court reporter was held on Thursday, October 15, 2020, from 3:00 p.m. to 5:00 p.m. at the South Shore Cultural Center (7059 S. South Shore Drive, Chicago, Illinois 60649). Four people attended and provided comments to the court reporter.

**SUMMARY OF PUBLIC REVIEW OF THE EA**

The NPS is the lead federal agency for the EA. Pursuant to the National Environmental Policy Act of 1969, as amended (NEPA) and its implementing regulations (40 CFR 1500-1508), and NPS Director's Order #12, *Conservation Planning, Environmental Impact Analysis, and Decision-Making* (DO-12, 2011), and accompanying NPS NEPA Handbook (2015), the NPS considered public and agency comments submitted on the *Environmental Assessment for Federal Actions In and Adjacent to Jackson Park: Urban Park Recreation Recovery Amendment and Transportation Improvements*. The Federal Highway Administration (FHWA) also considered public and agency comments submitted on this EA as part of its own process. This report describes how the federal agencies considered all of the comments received and provides responses to substantive comments. This EA was initiated before the 2020 Council on Environmental Quality (CEQ) Implementing NEPA Regulations were in effect, and therefore it was developed in accordance with the 1978 CEQ NEPA Regulations and 2008 Department of the Interior NEPA regulations. The process for this EA and content is consistent with those regulations.

**Comment Analysis Methodology**

During the comment period, a total of 185 pieces of correspondence were received by one of the following methods: hard copy letter via mail, verbal statement provided at a public webinar, verbal statement via an in-person appointment, e-mail, or entered directly into the PEPC website. All correspondence delivered by any of those methods were entered into the PEPC system for analysis.

Once all the correspondence was entered into PEPC, each was read, and specific comments within each correspondence were identified. A total of 394 comments were derived from the correspondence received. When identifying comments, every attempt was made to capture the full breadth of comments submitted.

During analysis, comments were classified as substantive or non-substantive. As explained in section 4.6 of the 2015 NPS NEPA Handbook, a substantive comment does one or more of the following:

- Question, with reasonable basis, the accuracy of information presented in the EA;
- Question, with reasonable basis, the adequacy of the environmental analysis;
- Present reasonable alternatives other than those presented in the EA; and/or
- Cause changes or revisions in the proposal.

Substantive comments raise, debate, or question a point of fact or policy. Comments in favor of or against the proposed action or alternatives, or comments that only agree or disagree with NPS policy, are not considered substantive. While all comments were read, considered, and part of the record, only those determined to be substantive under the handbook's definition are explicitly addressed by the NPS responses provided in this report.

Substantive comments were grouped by similar themes, and those groups were summarized with a "concern statement." A concern statement summarizes the issues and ideas expressed in the comments that are grouped under that concern.

**Public Review of Environmental Assessment**

A total of 170 substantive comments were identified. These comments are summarized into concern statements below along with the federal agencies' responses to those concern statements.

A total of 224 non-substantive comments were identified. Many of those comments expressed support for the Obama Presidential Center (OPC) generally, including the NPS action to approve the Urban Park and Recreation Recovery Act (UPARR) boundary changes and the FHWA action to make roadway changes and improvements. Some commenters expressed their opposition to the City decisions concerning the location and/or design of the OPC campus buildings. Some commenters expressed their opposition for the City's selection of land at the east end of the Midway Plaisance as replacement property to satisfy UPARR, and some commenters expressed their opposition for closing and/or widening roadways within Jackson Park. Some commenters suggested other actions that the city should undertake in Jackson Park that are outside the scope of this project. These include repairing and maintaining the historic buildings and structures throughout Jackson Park as well as creating community land trusts and housing preservation funds to address speculative land development and displacement.

**Analysis of Substantive Comments Received with NPS Responses**

Concern statements derived from comments received are provided below. NPS and FHWA responses are provided for each concern statement. In some cases, changes were made to the text of the EA as a result of public comments. The changes are explained in the response and are shown in the errata in Attachment C.

**NEPA PROCESS**

**Concern #1:** **An Environmental Impact Statement (EIS) should be done for this project due to the impacts on trees, historic properties, the roadway network, open green space, and natural resources, as well as due to the cost to taxpayers and the public controversy surrounding the OPC. An EIS would also allow for additional public involvement to define the range of issues and potential alternatives to be addressed.**

*Response*: Impacts to these resources were all considered in the EA. Detailed technical appendices addressed impacts to natural resources, trees, open green space, and traffic (Appendices C, D, G, and H, respectively). Impacts to historic properties were also considered in detail in the Section 106 process pursuant to the National Historic Preservation Act (NHPA).

The EA was prepared to determine if a significant impact would occur there were no significant impacts identified. This determination by the federal agencies, based on the analysis presented in the EA, will be provided in the agencies' NEPA decision document, a Finding of no Significant Impact.

Public involvement in this process has been substantial and included opportunities both in the NEPA process and in the NHPA process, which informed the EA analysis. The NEPA process and related public involvement are summarized above at the beginning of this Attachment B.

The discussion over the cost to taxpayers and the use of Jackson Park for the site of the OPC does not warrant an EIS for two reasons. First, "public controversy" concerning either the local project decision or the federal decisions does not trigger preparation of an EIS. The reference in the former Council on Environmental Quality NEPA regulations to "public controversy" relates to substantive disagreements over the nature and scale of potential environmental impacts or other technical disputes. Based on review of the comments received, those circumstances are not present here. Second, the decisions to close the roadways to support locating the OPC in Jackson Park are purely municipal decisions with no federal involvement. The City's decisions with respect to the OPC were made through municipal processes that included extensive public engagement, including the development of the 2018 South Lakefront Framework Plan (SLFP). See http://www.tinyURL.com/JPImprovements.

**Concern #2:** **The public involvement process for this project was inadequate for the following reasons:**

- **The public was not able to adequately receive information and comment on all project stages, including the alternatives considered, and the federal agencies only presented predetermined decisions to the public.**

- **The EA comment period of 30 days was too short considering the length of the EA, its appendices, and the information provided on the project website.**

- **The public webinars held for the EA release were not adequate replacements for public hearings because they did not allow for any public discussion outside of prepared public statements that were made at the end of the webinar.**

- **The OPC plan and the associated roadway changes were unveiled to the public without public discussion. There were no opportunities for deep public discussion of the plans or possible alternatives.**

- **The public process was confusing because of the number of plans, actions, processes, and federal agencies for which the public was asked to comment or attend meetings.**

- **The public meetings did not give adequate time or space for the public to ask questions and submit ideas regarding the proposed alternatives or the avoidance, minimization, and mitigation measures. The meetings felt like the agencies were presenting predetermined outcomes.**

*Response:*     A summary of the public involvement activities associated with the federal review is presented in the summary provided at the outset of this Attachment B. The federal agencies confirm that all legal requirements have been met.

## UPARR ANALYSIS

**Concern #3:**     **The UPARR analysis failed to fully meet the statutory requirements to determine whether or not the siting of the OPC and the associated UPARR conversion is consistent with the local park and recreation recovery action program (54 U.S.C. §200507). Instead, the EA concludes that the NPS is not authorized to site OPC in Jackson Park or approve the design of the campus, that it also does not have jurisdiction to evaluate whether the proposed siting is consistent with all of the UPARR prerequisite conditions, including whether alternatives to the current proposal would avoid such conversion. As a result, alternatives that did not require conversion were never explored in the EA, nor were alternatives explored in the EA for lost UPARR replacement land.**

*Response*:     The EA summarizes the City's OPC project and its impact on Jackson Park, a UPARR-assisted property. If the City chooses to change the public recreation use to a non-recreation use, the UPARR Act provides one remedy to do so; and as long as certain conditions and prerequisites are met, the Secretary of the Interior will provide approval through the NPS. The City's decision to use a portion of the site for non-recreation purposes triggers a conversion of use. The conditions outlined in the Act include that the replacement property is in accord with the then-current local park and recreation recovery action program, is adequate recreation property, and contains reasonably equivalent recreation opportunities.

Under the UPARR regulations, a list of prerequisites that must be met for conversion approval are provided. One of those prerequisites is if the applicant can demonstrate that "[a]ll practical alternatives to the proposed conversion have been evaluated" 36 C.F.R. 72.72 (b)(1). In other words, the City should have reviewed and eliminated all practical alternatives before requesting approval for a UPARR conversion. The nature of the alternatives analysis is explained on page 26 of the EA, which refers to the "City of Chicago Analysis of its Proposal Related to Jackson Park, Cook County, Illinois" for the City's evaluation of alternatives to the proposed conversion. The NPS lacks the authority to second guess an applicant's local land use decisions. As mentioned previously, the NPS reviews conversion packages to ensure both the conditions of the Act and prerequisites of the conversion regulations are met before providing an approval.

In the Environmental Assessment, the NPS evaluated the proposed federal action, which is a narrow one in light of the NPS's statutory authority. As part of this evaluation, the City's proposed use of the Eastern Midway as replacement property that will have recreational opportunities developed for public recreation. Under UPARR, the NPS must determine whether the applicant has provided "adequate recreation properties and opportunities of reasonably equivalent usefulness and location" 54 U.S.C. 200507). This analysis was comprehensively explained in

Appendix G to the EA. This Appendix G includes the City's evaluation of potential replacement properties.

**Concern #4:** **Taking an already recreational space and claiming it as replacement UPARR land violates the letter and spirit of UPARR regulations.**

The purpose of UPARR funding was to rehabilitate and protect urban parks. Existing parkland that is not currently subject to UPARR may be used as replacement property. Jackson Park itself was a park when the UPARR grant was first issued. In this instance, the proposal will result in substantial recreational enhancements to the replacement property and will ensure that the property remains available for public recreational use as required under UPARR.

## PURPOSE AND NEED

**Concern #5:** **Dividing the purpose and need based on the agency that oversees the action is not adequate. It segments the NEPA review and does not allow for a full consideration of all proposed actions of the project and how they would impact the natural and human environment. Segmenting the EA in this way also narrows each agencies' oversight so that a broader required review under NEPA, Section 106, Section 4(f), and UPARR was not conducted.**

**Additionally, the EA relies on the passage of the South Lakefront Framework Plan to segment projects out of analysis in the EA such as the OPC itself and the golf course project.**

*Response*: As stated in the EA Section 1.0 (page 1), the need for federal review under NEPA is triggered by the City's actions to allow for the construction and operation of the OPC, to close roadways within Jackson Park, and to make improvements to the roadway network in and adjacent to Jackson Park. The decision to site the OPC in Jackson Park, the design of the OPC campus, and the related closure of roadways in Jackson Park do not require federal approval or funding. The federal actions include (1) an amendment of the original UPARR grants by the NPS, following the review of a partial conversion of use in Jackson Park and evaluation of replacement recreation opportunities pursuant to the UPARR program, and (2) the authorization of Federal-Aid Highway Program funds for roadway improvements and bicyclist and pedestrian facilities by the FHWA.

The agencies' Environmental Assessment did not "segment" actions subject to NEPA review. This NEPA compliance strategy is consistent with the "One Federal Decision" approach to federal environmental reviews and permitting. Consistent with that approach, each agency has determined a purpose and need pursuant to their scope of authority. This procedural decision allowed the public to understand more completely the impacts of related federal actions in and around Jackson Park in a single EA and to review those actions in their proper context. The purpose and need for each agency depends on the nature of its statutory authority and the action proposed be taken; these cannot be combined because each agency has specific authority and proposed actions to be evaluated in the EA. The agencies' regulatory authorities and purpose and need statements are described in the EA Section 3.0 (pages 9-15).

The analysis presented in the EA considers potential connected impacts of the City's actions. Construction of the OPC in Jackson Park and the decision to close roadways in Jackson Park are analyzed as indirect effects of the NPS decision in Alternatives B and C. All impacts are considered, and review is not segmented by the way impacts are categorized in the EA.

Section 4(f) of the U.S. Department of Transportation (USDOT) Act of 1966 provides for consideration of park and recreation lands, wildlife and waterfowl refuges, and historic sites (prehistoric and historic districts, sites, buildings, structures, or objects listed in, or eligible for, the National Register of Historic Places) during transportation project development. It applies only to agencies within the USDOT and is implemented by the FHWA and the Federal Transit Administration (FTA). Section 6.2.2 of the EA (pages 69-70) describes why the following actions (local and federal) are not subject to Section 4(f) requirements because (1) the actions do not require an approval from the FHWA to proceed, (2) the actions are not transportation projects, and (3) the actions are being implemented to address a purpose that is unrelated to the movement of people, good, and services from one place to another:

- The City's decision to close roadways in Jackson Park;

- The City's decision to allow construction of OPC in Jackson Park;

- The NPS decision with respect to the partial conversion of UPARR land in Jackson Park and the replacement recreational opportunity; and

- The U.S. Army Corps of Engineers (USACE) decision with respect to Section 404 permits and Section 408 permissions.

Section 6.2.2 of the EA (pages 69-70) further describes the status and next steps associated with the separate Section 4(f) Evaluation process.

The past, present, and reasonably foreseeable future actions analyzed as part of this EA are described in Section 5.2.1 (pages 32-34). The golf course consolidation/expansion proposal is an independent project from this federal review process. The golf course consolidation/expansion proposal contained in the 2018 SLFP is not included as a "reasonably foreseeable action" for the purposes of the cumulative impact assessment because the scope and detail of this project are largely aspirational and not sufficiently developed to allow for the kind of reasoned analysis that meaningfully informs federal decision-making. It is not anticipated to be completed or programmed (i.e., funding committed for the project construction) in the near future.

As stated in Section 2.4 of the EA (pages 8-9), the proposed roadway closures of Marquette Drive between Stony Island Avenue and Richards Drive and the northbound section of Cornell Drive between 68th Street and 65th Street would implement long-standing planning recommendations to reduce the number of multilane roadways that currently divide Jackson Park and allow for a more contiguous park. The roadway closures do not require any federal approvals. The golf course would be subject to a separate approval process under the Lake Michigan and

Chicago Lakefront Protection Ordinance. If any federal approval, funding, or permit is required for the golf course consolidation/expansion in the future, then federal requirements would be the responsibility of the relevant federal agency.

**Concern #6:** **The purpose and need is inadequately articulated in the EA and fails to define a true need for either the FHWA or the NPS. The EA never provides a statement of need but rather references that it arises from the City's actions to site the OPC in Jackson Park and alter roadways. No clear need is defined in either case, only a condition that brings about the need.**

*Response*: Each agency's authority and purpose and need for review is defined in Section 3.0 (pages 9-15) of the EA. The federal review is conducted to evaluate the potential impacts of the federal decisions by each agency, namely, the amendment of the UPARR agreements with conversion approval by the NPS and the potential use of Federal-aid Highway Program funds authorized by the FHWA.

Section 1.0 (page 1) explains the reason for the proposed federal decisions—the City's decisions to allow for the construction of the OPC in Jackson Park and to close roadways and improve the roadway network in and adjacent to Jackson Park. The decision to site the OPC in Jackson Park, the design of the OPC campus, and the related closure of roadways in Jackson Park do not require federal approval or funding.

## ALTERNATIVES

**Concern #7:** **The EA does not fully consider rising lake levels and the feasibility of the alternatives in light of this issue. There is flooding on Lake Shore Drive due to rising lake levels. Cornell is the only other major alternative route during floods, and it would be closed for this project. This will result in major traffic when Lake Shore Drive is closed due to flooding. The EA does not consider the feasibility of road and underpass construction close to the lake given the rising levels. Additionally, the EA does not consider how the tower itself and the proposed underground parking garage would affect the floodplain or how they would be affected by groundwater flooding. The EA does not consider how flood events related to rising lake levels would disrupt construction activities and staging areas.**

*Response*: Lake Shore Drive and Hayes Drive are adjacent to Lake Michigan, the East and West Lagoons, and the South Lagoon in Jackson Park. Each of the lagoons are hydraulically connected to Lake Michigan. The existing elevations of both Lake Shore Drive and Hayes Drive are approximately 2-3 feet above the established 100-year floodplain elevation. Marquette Drive also does not fall within the 100-year floodplain. The elevations of these roadways will remain approximately the same following the proposed transportation improvements along each individual roadway. Therefore, frequent flooding of these roadways is not anticipated to occur in the future, even when current high lake levels are observed. Recent recorded events that resulted in full or partial closures of Lake Shore Drive occurred from overtopping wave action. Within the limits of Jackson Park, the only location reported to observe flooding is at the intersection of S. South Shore Drive and 67th Street. Shoreline improvements are outside the scope of this project; however, improvements to the

shoreline in this area were identified in the SLFP. The proposed transportation improvements will not exacerbate any existing flooding conditions; new stormwater pump stations will be installed at the 59th Street and 67th Street underpass locations along Lake Shore Drive. The analysis of impacts to water resources is documented in Appendix F of the EA.

The OPC site is not located within a FEMA Special Flood Hazard Area nor is it within a geomorphic floodplain. The proposed activities will not increase any flooding impacts on adjacent floodplain areas. A detailed analysis of existing and proposed drainage conditions, including an analysis of water levels in the lagoons and detailed drawings of floodplain limits, is provided in the Location Drainage Study, available on the City's website (https://tinyURL.com/JPImprovements).

**Concern #8:** **Improvements to the east end of the Midway should not include a playground. Only the proposed nature play area should be constructed. Plastic and steel playground equipment should not be added to the area and would be redundant because the 62nd Street playground would be relocated and expanded. The EA does not consider whether the east end of the Midway Plaisance is an appropriate place for a children's playground or whether the playground is needed or would be regularly used. This location is difficult to access and is somewhat isolated due to being bound by roads with heavy traffic.**

*Response*: The new recreational opportunities proposed for the Midway Plaisance must meet the requirements of UPARR. The NPS evaluates the proposal in relation to the recreation opportunities that would be lost in the area of conversion in Jackson Park. The EA analyzes the impacts of the proposed new recreation on the Midway Plaisance based on the design parameters proposed by the City. The improvements will include restoring historic tree plantings and a walkway; installing playground structures (both nature play and inclusive play facilities) on the west side of the site; and improving the drainage on the eastside to provide a sunken lawn (approx. 30 by 50 yards) for informal recreation. Within those parameters, final decisions on playground materials and equipment have not been made. Once the NPS has determined that UPARR criteria are satisfied, the remaining decisions will be made by the City, with NPS confirmation, through a public process.

**Concern #9:** **The proposed action should include replacement of the full 20 acres that will be removed for the construction of the OPC.**

*Response*: The proposed actions will result in additional acreage within the park becoming available for recreational park uses instead of roads. Within the 19.3-acre area where the OPC will be built, a 4.6-acre area containing the forum, library, and museum buildings was determined to not qualify as public recreation under UPARR. The NPS understands through correspondence with the City that the remaining 14.7 acres of the OPC site will remain open and available to the public for recreational use consistent with UPARR. A Use Agreement between the City and the Obama Foundation (the Foundation) will govern the Foundation's development and use of the site, ensuring continued public access to the property. Based on this information, only the 4.6 acres for the OPC campus buildings requires replacement acreage with equivalent recreation opportunity consistent with UPARR.

**Concern #10:** **The federal agencies have not considered a reasonable range of alternatives for analysis. The EA doesn't evaluate alternatives beyond those presented by the City for either UPARR conversion or roadway changes. Other locations for the OPC campus and the UPARR replacement area should have been considered in the EA. The UPARR evaluation report was referenced in the EA but is not available to the public; this evaluation should be more transparent. The EA references that FHWA analyzed 11 alternatives for roadway improvements, but it fails to list or otherwise describe those alternatives considered. The document posted to the City of Chicago website (linked in the EA) is only a draft document; a final document analyzing the alternatives should be completed and made available to the public.**

*Response:*      The federal agencies have evaluated alternatives within the scope of their authority. None of the federal agencies has the authority over the siting, construction, or operation of the OPC, which is subject to municipal authority nor do they have the authority to either close or prevent the closure of roads owned, operated, and maintained by the City. Section 2.3 on the EA (pages 6-8) describes the processes used by the City to approve the placement of the OPC within Jackson Park.

The NPS regulations implementing UPARR require an applicant for a conversion of recreational parkland to non-recreational uses to evaluate all practical alternatives to the proposed conversion. For NEPA purposes, an alternative that avoids conversion is evaluated as Alternative A in this EA. As explained in Section 4.4.1 of the EA (page 26), the NPS did not consider any other alternatives than the proposed conversion because the ultimate decision to allow the placement of the OPC within Jackson Park is up to the City to make. However, as part of its submission to the NPS, the City described its process for approving the Jackson Park site for the OPC and its proposal of the Midway Plaisance for replacement recreation.

The FHWA alternatives analysis considered a wide range of proposed improvements to meet the FHWA's purpose and need, while avoiding or minimizing impacts to Jackson Park and other environmental resources. The *Alternatives to Be Carried Forward* and *Preferred Alternative* documents describe the development and evaluation of alternatives and are incorporated by reference in full at http://www.tinyURL.com/JPImprovements.

**Concern #11:** **Some commenters offered new suggestions for alternative elements. These include the following:**

1) **Shift the OPC campus footprint approximately 250 feet to the south to avoid impacts on the Women's Garden and the south twin road of the Midway Plaisance. Preserve the existing historic Women's Garden with minor accessibility improvements.**

2) **Keep roadbeds after closing Cornell Drive and redesign the area as a hardscape plaza where events and festivals can be held.**

3) **Close all roads to vehicular traffic through the park to make it more pedestrian-friendly.**

4) **Include additional safe pedestrian crossings, either underpasses or crosswalks with raised pavement and flashing signs, across Hayes Drive and the remaining portion of Cornell Drive.**

5) **Add additional points of access for pedestrians, particularly to the Wooded Island.**

6) **Add an underground connection for visitors to the OPC campus should be added to avoid the need to close the roads in Jackson Park.**

7) **Rather than closing Cornell Drive and Marquette Drive as proposed, narrow Cornell Drive to a four-lane roadway and Marquette Drive to one lane in each direction. An additional southbound lane could be added to Lake Shore Drive from 57th Street to Marquette Drive.**

8) **Add on-street parking to Marquette Drive to retain parking in the south side of Jackson Park.**

9) **Improve transit access to the park, such as creating a footbridge to the 59th Street Metra station.**

10) **Enhance, rather than remove, the existing wetland at the east end of the Midway Plaisance by installing a small, narrow, designed water feature.**

*Response*:    The federal agencies do not have authority over the siting, construction, design, or operation of the OPC, which is subject to municipal authority, nor do they have the authority to either close or prevent the closure of roads owned, operated, and maintained by the City. The roadway closures and construction of the OPC are separate local land use and land management decisions by the City and do not require any federal approvals. The authority of each of the federal agencies is described in Section 3.0 (pages 9-15) of the EA, and the alternatives assessed in the EA present a reasonable range of alternatives consistent with the federal authorities.

Many of the alternatives suggested and summarized above pertain to the details of project design rather than the proposed federal actions. However, the analysis in the EA addresses many of the concepts embodied in these alternatives.

Impacts to the Women's Garden under NEPA are discussed in Section 5.2.4.3 of the EA.

The City proposes improvements for pedestrian and bicyclists within and adjacent to Jackson Park, including the following: ADA enhancements at intersections, pedestrian underpasses, curb extensions, pedestrian refuge islands, high visibility crosswalk markings, and pedestrian countdown signals. These enhancements strive to improve pedestrian access, comfort, and safety for residents from Hyde Park and Woodlawn aiming to access Jackson Park. Access across Stony Island Avenue to and from the 59th Street Metra station as well as access and circulation within Jackson Park will also be enhanced by the proposed pedestrian and bicyclist improvements. All these project elements fulfill the identified FHWA Purpose and Need regarding enhanced bike and pedestrian access and circulation. A complete list of pedestrian and bicyclist enhancements is provided in Section 4.3.4 of the EA (pages 25-26).

The existing transit network is acknowledged in Exhibit I-6 in Appendix I of the EA. Several Chicago Transit Authority (CTA) routes provide transit access through Jackson Park and the surrounding communities. While improvements to transit accommodations are not requirements for meeting the FHWA Purpose and Need, transit enhancements are proposed by the City as part of the transportation improvements. These include measures to improve transit operations such as consolidating signalized intersections, converting all-way stop controlled intersections to signalized intersections, interconnecting all signals, and modernizing signals for transit signal priority capabilities. In addition, ten bus stop consolidations and relocations and three bus bulbs are proposed along Stony Island Avenue.

Considering these accommodations and the transportation improvements provided for addressing congestion in the study area, the EA adequately considers a reasonable range of alternatives with respect to a variety of key transportation issues, including congestion, safety, and access to transit services.

The UPARR regulations require that replacement recreation opportunities be of "reasonably equivalent usefulness and location." The sunken lawn on the proposed UPARR replacement parcel is currently used for informal recreation, but it floods frequently and the City reports that many area residents complain that the site is unusable. By installing a stormwater drainage system, the sunken lawn will become a reliably usable destination for recreation activities such as dog-walking and picnicking.

**Concern #12:** **The EA relies on a false baseline No-Action Alternative that presumes the OPC and other overlapping or related projects will be built. This skews the forecasts, projections, and alternatives described in the EA. There are two baselines used in the EA. The NPS actions are evaluated against the Alternative A, and the FHWA actions are evaluated against Alternative B. The FHWA has incorrectly assumed a baseline condition in their Purpose and Need statement that considers a condition where the City's proposed roadway closures are in place. A proper no-action baseline should consider the existing conditions of the project area for both the NPS and FHWA actions.**

*Response:* The relevant baselines for NEPA analysis are different for the NPS and the FHWA because their proposed actions are premised on different conditions. Because the federal agencies collaborated on a consolidated NEPA analysis, the EA addresses the baseline conditions of both agencies. The EA describes the No-Action Alternative as the alternative under which no federal actions are triggered. As a result, neither the OPC nor the road closures would occur as proposed. Under Alternative B, the City would close roadways and move forward with plans to build the OPC, thus taking part of Jackson Park out of recreation and triggering a conversion of use needing the NPS to approve a partial UPARR conversion. The resulting traffic impacts under Alternative B create the baseline condition that leads to FHWA's proposed action, which is to approve federal funding eligibility for transportation improvements that alleviate the traffic problems arising under Alternative B. The roadway closures and resulting traffic impacts are the predicate condition—the baseline —for the FHWA's proposed action, which is considered as part of Alternative C. The FHWA's need to

remove additional parkland for roadway improvements would result in additional partial conversion that the NPS needs to review for approval. This formulation of alternatives properly characterizes each agency's proposed action in relation to the appropriate baseline. Considering the impacts of federal funding for transportation improvements in the absence of the OPC development and proposed road closures would not be useful to the decisionmaker because that scenario is not an expected outcome.

**Concern #13:** **The EA inappropriately concludes that the location, design, and road closures of the OPC campus are outside of the federal agencies' jurisdiction and, therefore, are out of the scope of the NEPA review process. This resulted in a lack of analysis of a reasonable range of alternatives for the project as well as a lack of consideration for all avoidance, minimization, and mitigation measures.**

*Response*:   The federal agencies have evaluated alternatives within the scope of their authority. The range of alternatives considered during the NEPA process is appropriate to inform the federal agencies about reasonable alternative actions that would avoid or minimize the impacts of the proposed action. Concerns regarding the sufficiency of the alternatives analysis are addressed in Concerns #10 and #12 above.

The EA discusses a variety of avoidance, minimization, and mitigation measures within the discussion of impacts on various resource topics. For example, mitigation measures for impacts on cultural resources are discussed on pages 52 and 55 of the EA. Additionally, the NHPA AOE discusses avoidance and minimization efforts in Section 5.0 (pages 75-80 of the AOE). In another example as explained in Appendix D of the EA, tree removal is restricted to March 1 through August 31 to avoid any possible impacts to protected bird species. The transportation improvements were also designed to minimize impacts to Jackson Park. These efforts are summarized in Section 5.1 of Appendix D (pages 16-17) of the EA. These are just some examples of avoidance, minimization, and mitigation efforts considered as part of the EA.

## IMPACT TOPICS CONSIDERED BUT DISMISSED

**Concern #14:** **The EA impact analysis didn't adequately consider the impacts of the loss of tree canopy and habitat due to tree removal and replacement. There is no consideration for how tree canopy removal would affect air quality. The EA does not evaluate the drastic change in view that would occur due to the removal of hundreds of trees along Lake Shore Drive and Stony Island Drive as well as due to the clearcutting of 19.2 acres of trees. Replacing 3-foot-diameter trees with 3-inch-diameter trees is not sufficient, and the assessment didn't consider that it would take decades for the saplings to grow to the size of the existing trees. These proposed mitigation trees would be too small for many of the nesting bird species who prefer to nest in places inaccessible and concealed from view, which the existing trees provide. Additionally, the proposed mitigation trees would not supply the same amount of food as the existing larger trees. These impacts are considered "temporary" in the EA, but they should be**

**considered "permanent" due to the time frame for tree growth. The EA lacks a census of trees in the park as a baseline to understand what percentage of trees will be affected.**

*Response*:      As noted in Section 3.0 of Appendix D (pages 2-5) of the EA, tree surveys were conducted within the OPC site, track and field replacement site, and adjacent to proposed transportation improvements. Previous tree surveys conducted for the Chicago Park District (CPD) were also considered. The boundaries of these surveys extend to 57 percent of Jackson Park and identified 4,672 trees. The other 43 percent of Jackson Park, where proposed changes are not contemplated, contains an unknown number of trees.

Appendix D of the EA describes in detail the existing conditions of the trees, the trees to be removed, and trees used as replacements. An evaluation of the existing tree species diversity and changes in canopy in Jackson Park over the years is also provided in Section 3.1 of Appendix D (page 4).

As noted in Section 5.1.3 of the EA (pages 29-30), the preferred alternative would result in the removal of 789 trees: 326 trees anticipated to be removed within the OPC site, 39 trees were removed by the track and field relocation, 417 trees would be removed by the transportation improvements, and 7 trees would be removed by projects considered under cumulative analyses (2 trees were removed by the Lakefront Trail separation, 5 trees are anticipated for removal by the baseball field reconfiguration). A total of 17 percent of the trees identified by the surveys would be affected by this project.

Studies were completed for the OPC site to observe existing tree and soil biology conditions (*Obama Presidential Center: Reinforcing Landscape Ecology* [see link provided under Section 7.0 References in the EA]). The report notes that approximately 40% of the trees within the OPC site are in declining condition. The report also strategizes how to repurpose, relocate, or preserve the mature and legacy tree populations on site.

The transportation improvements were designed to minimize impacts to Jackson Park. These efforts are summarized in Section 5.1 of Appendix D (pages 16-17) of the EA. In all cases, minimization efforts included reviewing the size, species, and condition of existing trees so that the preservation of large native species trees, and in particular oak species, could be prioritized when possible.

The EA recognizes the loss of trees on the site and the temporal loss of habitat as the site is revegetated and matures. The size of replacement trees is driven by experience with newly planted trees, which suggests that smaller trees establish faster and with more success. Tree diversity will be improved, as will broader vegetative diversity in the understory and at the groundplane across the OPC site. While the new trees will take some time to mature and to provide suitable habitat, the temporal impact is small given the size of the park and remaining mature trees, the availability of other habitat, and the acclimation of wildlife to human activity.

As stated in Section 5.2 of Appendix D of the EA, impacts to trees would be replaced at a minimum ratio of 1:1. New replacement trees will be a mix of 2.5- and 4-inch caliper trees. The preference is to use 2.5-inch caliper as much as possible, as this size based on experience by CDOT and CPD has shown to transplant from nurseries better and establish faster than larger trees. In areas that are more heavily trafficked, including areas along Stony Island Avenue, larger 4-inch caliper trees will be used. This larger size ensures that the tree can be pruned such that limbs will be above head height and also provides more of an instant-landscape effect upon installation.

Replacement tree species were preliminarily determined to include a mix of shade and ornamental trees. Species selection also considered largely native species and a diverse population to avoid the potential for mass removal due to disease, as was required after the introduction of Emerald Ash Borer (EAB) in 2002, which unexpectedly decimated the Chicago region's ash population.

Potential impacts to tree canopy resulting from the project alternatives were evaluated using details available in the existing tree surveys, as well as preliminary planting plans for the proposed road improvements and private development. The following impacts to the existing canopy are added to the EA in the Errata in Attachment C.

Under Alternative A, there are no proposed changes to the tree population; therefore, there are no changes to the existing canopy in Jackson Park.

Under Alternative B, there are no tree removals proposed as part of the proposed roadway closures. The tree removals associated with the relocation of the track and field resulted in a canopy loss of 0.26 acres. The proposed planting plan for the relocated track and field work is anticipated to restore a total of 0.57 acres at maturity, resulting in a net gain of 0.31 acres of tree canopy. The tree removals associated with the OPC site development would result in a loss 5.4 acres of canopy. The preliminary planting plan for the OPC anticipates 7.79 acres of canopy at maturity, resulting in a net gain of 2.2 acres of tree canopy at maturity on the OPC site. As detailed in *Obama Presidential Center: Reinforcing Landscape Ecology* (see link provided under Section 7.0 References in the EA), the Foundation recognizes the importance of tree cover, which brings longevity to the site and plays a major role in moderating local micro-climate. The proposed tree cover for the OPC site is more diverse and advances efforts to provide varied habitat for vital ecosystem function. The proposed design also looks to reinstate and enhance the important middle layers. Currently, there are few shrub-scaled plants on the site, which means that the site is missing a critical layer in the ecosystem. This planting layer typically provides cover, screening, and shelter from weather. Shrubs will be used strategically on the OPC site to help develop soil structure, provide habitat, and serve as a source of food for wildlife.

Under Alternative C, the proposed tree removals would result in a canopy loss of 4.8 acres. Considering the mix of shade and ornamental tree species proposed as part of the mitigation plan, approximately 9.2 acres of canopy will be restored at maturity, resulting in a net gain of 4.4 acres of tree canopy in Jackson Park.

**Concern #15:** **The EA impact analysis didn't incorporate impacts of the OPC building in terms of the migratory flyway, including doppler radar studies done by the US Fish & Wildlife Service.**

*Response*:     As noted in public correspondence received during the comment period, the United States Fish & Wildlife Service (USFWS) completed a study of migratory birds as documented in the *Great Lakes Avian Radar Technical Report Lake Michigan Shoreline*, Spring 2017. The report studies activity patterns, timing, and magnitude of migration using radar units located at Montrose Point (in Lincoln Park, Chicago, IL) and the Indiana Dunes State Park (Porter County, IN). Similar to the EA (Section 3.2 of Appendix C, page 5), the USFWS report recognizes the Lake Michigan shoreline as an Audubon Important Bird Area and acknowledges stopover habitats along the lakeshore.

All actions evaluated as part of the EA, including both federal actions and City actions, are proposed to occur west of Lake Shore Drive, with the exception of minor ADA improvements at the Hayes Drive/Lake Shore Drive intersection. Therefore, there will be no impacts to resting areas for migratory birds that may occur along the Lake Michigan shoreline.

During migration season, the Wooded Island generally has the most migratory birds within Jackson Park. Both the Wooded Island and Bobolink Meadow are popular birding locations within Jackson Park. There are no proposed construction activities or tree removals that will occur on the Wooded Island or in the Bobolink Meadow as part of the considered federal and City actions.

To avoid impacts to state-listed endangered bird species, the City proposes to restrict tree removals between March 1 and August 31 for projects assessed in the EA. Migratory birds, as a result, would also be protected by this commitment during nesting season. Habitat for migratory birds would be temporarily impacted by tree clearing; however, all trees removed would be replaced at a 1:1 mitigation replacement ratio (See EA Appendix D). Therefore, there are no permanent direct impacts to migratory birds as a result of the federal or City actions.

While the USFWS report provides statistical and trend information regarding direction, altitude, and timing of migratory bird flight patterns, it does not provide specific additional information regarding the potential impacts of the federal actions to migratory bird species beyond the considerations listed above or in the EA. While the design of the OPC campus falls outside the scope of the federal agencies' authority, the Foundation recognizes the importance of Jackson Park as a stopover for migratory birds along the Mississippi Flyway and took steps incorporate bird friendly strategies within the design of the OPC, some of which are highlighted within the *Obama Presidential Center: Reinforcing Landscape Ecology* (see link provided under Section 7.0 References in the EA).

The report, as well as outreach efforts with bird advocates, has influenced the lighting, landscape, and architectural features of and around the OPC buildings to consider migratory bird movement and habitat. The landscape design incorporates diverse plant selections and vegetative layering to serve as habitat for migratory

birds. As discussed in *Reinforcing Landscape Ecology* on pages 64-67, the OPC's design will also explore the use of alternative materials to minimize transparent or reflective glass, while also consisting largely of opaque surfaces. The OPC's design will also reduce the amount of direct window-to-window building corners wherever possible and will avoid the placement of interior plants in areas where birds may perceive them as continuation of the canopy. These design elements will reduce the threat of bird strikes. Additionally, the design targets the Light Pollution Reduction LEED Credit, which is designed in part to minimize impact on migratory birds. The Foundation will also support the City's efforts (and comply with all ordinances) with respect to satisfying the Audubon Society's "Lights Out" goals or City equivalent, which seeks to reduce excess exterior lighting that can disorient birds during the months that migrating birds are flying between their nesting and wintering grounds.

**Concern #16:** **The EA impact analysis doesn't note the return of federally protected shorebirds within the project area, most notably the piping plover.**

*Response*: As stated in Appendix C of the EA, Piping Plover and Rufa Red Knot habitat is present in the project study area east of Lake Shore Drive. To avoid impacts to these species, CDOT committed that all construction activities would occur to the west of Lake Shore Drive with the exception of some curb and gutter elements proposed in existing concrete areas. This commitment will avoid effects to the Piping Plover and Rufa Red Knot. See Attachment C-2 of Appendix C of the EA for details of the commitment. Because there would be no effect on these species, the impact topic was considered and dismissed from further analysis in the EA. See Appendix C of the EA for more details of the analysis and determination of no effect.

**Concern #17:** **The EA didn't properly assess the impacts of the shadow cast by the proposed OPC campus building. The shadow will impact the ecology of recent Great Lakes Fishery and Ecosystem Restoration (GLFER) project areas, the Wooded Island, and the Bobolink Meadow, as well as cover the Women's Garden during winter months. The shadow study presented by the Barack Obama Foundation did not consider shadows cast during the spring equinox or any time after 4 p.m.**

*Response*: When the sun is out, the shadow cast by the Museum Building will constantly shift with the passing of the sun across the sky and will not rest in any single place for an extended period. The shadow study projects the expected shadow location at five times during the course of the day, on three dates during the year, in order to depict both daily and seasonal variation. Shadow positions at other dates and times can be interpolated in relation to the studied dates and times. The study shows that the Museum Building's shadow will generally be confined to the OPC site, occasionally reaching into the Midway Plaisance to the west (early in the morning) and across the lagoon (late in the day). These shadows will be temporary and are consistent with natural shading provided by trees and clouds. The GLFER project used native species, which are well adapted to prevailing conditions of sun and shade. Within the OPC site, the planting plan will take into consideration the prevailing conditions as well. The citation for the shadow study is added to the EA in the Errata in Attachment C.

**Concern #18:** **The EA analysis of impact topics considered but dismissed is cursory and vague, particularly for the resources of wildlife, special status species, air quality, and water quality. The EA concludes that it will avoid impacts on state threatened or endangered species but does not say how it reached that conclusion or what those impacts would be. The EA also concludes that water resources will be affected but does not state how. The EA does not analyze whether increased noise, light, pollution, salt spray or splash, vibration, or construction activities will affect wildlife known to frequent the area. The EA also doesn't discuss potential impacts on natural resources as a result of construction work along the shoreline on the southeast corner of the park beyond the terminus of Lake Shore Drive.**

*Response*:     The EA summarizes the agencies' evaluation of impacts to special status species, wildlife, habitat, air quality, and water resources and concludes that there will be no or minimal impacts. The details of this review are included in the Technical Memorandum Appendices C, E, and F which were available for public review and comment.

With respect to state or federally listed species, the EA recognizes that there is suitable habitat for a number of such species. See EA Section 5.1.2 (pages 28-29). No effects to federally listed Piping Plover and Red Rufa Knot species are expected to occur. The EA analysis determined tree removals within the project study area may affect the northern long-eared bat (NLEB). The USFWS has issued a Programmatic Biological Opinion that defined the types of activities that may affect the NLEB but are not prohibited under the Final 4(d) Rule. Impacts associated with the project alternatives were evaluated in accordance with the USFWS Programmatic Biological Opinion on the Final 4(d) Rule and sent to the USFWS for review. A response was not received within 30 days; therefore, in accordance with the Endangered Species Act (ESA) Section 7 guidelines, agency coordination for the NLEB is complete. See Attachment C-3 in Appendix C of the EA.

With respect to state-listed species, the agencies concluded that, with a combination of avoidance of suitable habitat and seasonal tree removal restrictions, adverse effects are unlikely. No project construction will take place along lakeshore beaches in areas of suitable habitat for state-listed plants. Seasonal tree removal restrictions will minimize all impacts to state listed birds, if any were to be present. This is further explained in Appendix C. Temporary impacts of construction activity are acknowledged, but impacts on any wildlife or habitat are expected to be minimal and are speculative given the commitments to abide by seasonal construction restrictions and to confine construction to areas not suitable for state-listed plants.

With respect to migratory birds, Appendix C recognizes the importance of the Lake Michigan shoreline and its status as an Audubon Important Bird Area and the popularity of Jackson Park for recreational birding. Frequent birding tours take place in parts of the park that will be unaffected by the project—the Wooded Island and the Bobolink Meadow—and the Jackson Park shoreline is an important area for birds. Appendix C explains that some habitat will be temporarily impacted by the work at the OPC site and that tree removal will not occur during breeding season and that all

trees removed will be replaced and the site enhanced. The agencies expect that while some temporary displacement of birds may occur as the site is developed and matures, Jackson Park and nearby parks are sufficiently large to allow birds and birdwatchers to adapt around construction activities—especially given that the primary parts of the park used for recreational birding will be unaffected. Further, as detailed in the report titled *Obama Presidential Center: Reinforcing Landscape Ecology* (see link provided under Section 7.0 References in the EA), design of the OPC site was specifically tailored to accommodate and protect migratory birds, including bird-sensitive landscape features, lighting, and architectural design. See Response to Concern #16 for additional information.

Potential impacts to water resources are summarized in the EA and explained further in Appendix F. That Appendix carefully identifies the minor expected impacts to surface waters, the lack of any implications for the flood plain or ground water, and the plans to accommodate surface water runoff and the need for minor additional drainage. As explained in various submissions to the federal agencies, including the report titled *Obama Presidential Center: Reinforcing Landscape Ecology* (see link provided under Section 7.0 References in the EA), the OPC site will be designed to achieve advanced stormwater management goals.

Potential air quality impacts are explained in detail in Appendix E. As summarized in the EA, impacts are expected to be short term and would meet applicable regulations and standards.

The proposed underpass at South Shore Drive and 67th Street is intentionally designed to avoid any impacts to the shoreline. The limits of work are constrained to areas currently occupied by existing pathways.

**Concern #19:** **The EA does not address light pollution that would result from illuminating the OPC campus and how the air and light pollution would affect children at nearby schools.**

*Response*: Neither lighting nor air emissions are anticipated to have a notable impact on people, including children at nearby schools.

With respect to lighting, the majority of the OPC site consists of open park areas consistent with the rest of Jackson Park. No lighting will be directed beyond the boundary of the OPC campus, although some may be visible from beyond the site boundaries. As noted in the "Report to the Chicago Plan Commission from the Department of Planning and Development" dated May 17, 2018, for approval of the OPC's Planned Development application, the addition of improved lighting and resurfaced pathways with clearer sightlines will create a safer means to traverse the park. As detailed in *Obama Presidential Center: Reinforcing Landscape Ecology* (see link provided under Section 7.0 References in the EA), the OPC is designed to achieve LEED (Leadership in Energy and Environmental Design) certification, including specifically the Light Pollution Reduction LEED Credit. Certification to LEED standards is widely recognized and involves third-party evaluation of a design. The LEED lighting credit involves using luminaires that do not exceed specified uplight ratings; achieving specific backlight and glare ratings; ensuring that exterior

signage does not exceed luminance of 200 cd/m$^2$ (candela per square meter) during nighttime hours and 2,000 cd/m$^2$ during daytime hours; and using exterior lighting that reduces impacts to people and wildlife. Additionally, as explained above in response to Concern #15, the design targets the Light Pollution Reduction LEED Credit, which is designed in part to minimize impact on migratory birds. The Foundation will also support the City's efforts (and comply with all ordinances) with respect to satisfying the Audubon Society's "Lights Out" goals or City equivalent, which seeks to reduce excess exterior lighting that can disorient birds during the months that migrating birds are flying between their nesting and wintering grounds.

Collectively, these measures help to ensure that, compared to traditional buildings, lighting associated with the OPC will have substantially less impact on people and wildlife.

The analysis of air quality impacts, available in Attachment E to the EA, recognizes that construction activities at the OPC site may result in short-term air quality concerns from construction equipment or airborne dust particles. As noted in the EA (Appendix E, Section 4.1.2.2, page10), air quality effects can be limited through standard practices such as the selection of construction equipment, idle times, equipment maintenance, and fuels and by following erosion and sedimentation control protocols and best management practices. Construction is also subject to municipal laws. These include the City's noise ordinance (Section 8-32-140), which generally limits construction activities within 600 feet of residential buildings, but exempts work on public improvements 8:00 a.m. to 8:00 p.m. unless approved by the Aldermanic office serving the local community, and the City's dust control ordinance (Section 14B-33-3324), which requires construction contractors to minimize dirt and debris from construction vehicles and to use dust-tight chutes or containers for debris removal from elevation, among other requirements.

*Concern #20:* **Commenters questioned why there were no highway traffic noise impacts observed under Alternative B and why the EA did not include an analysis of noise levels under both ordinary and peak traffic conditions.**

*Response:* As noted in the EA (Section 5.1.6, pages 31-32), highway traffic noise was studied in accordance with FHWA Noise Regulations to determine highway noise impacts as a result of the transportation improvements included in Alternative C. The *Highway Traffic Noise Analysis Report*, referenced in the EA and available on the City's website (http://www.tinyURL.com/JPImprovements), was produced to comply with these regulations, which apply only to "Federal or Federal-aid Highway Projects authorized under title 23, United States Code." (23 CFR 772.7). There are no actions that occur or require authorizations under title 23 of the United States Code under Alternatives A or B.

Alternative B as described in the EA, also referred to in the *Highway Traffic Noise Analysis* as the "2040 No-Build Condition," was analyzed to determine a baseline condition of highway traffic noise levels for purposes of comparison to proposed conditions. Alternative C, referred to in the *Highway Traffic Noise Analysis* as the "2040 Build Condition," determined the highway traffic noise levels experienced once the proposed transportation improvements are in place.

Highway traffic noise impacts are observed if the predicted noise level of a receptor location approaches, meets, or exceeds the Noise Abatement Criteria, or when predicted highway traffic noise levels are substantially higher than the existing condition. (23 CFR 772.11, *Highway Traffic Noise Analysis,* Section I-C).

When predicting noise levels and assessing impacts, highway traffic noise analyses are conducted during the worst traffic-noise conditions. This condition occurs during the period of analysis when the projected traffic volumes along a particular roadway are higher and traveling at or near posted speed limits, yielding the greatest traffic noise level observed by a receptor. This methodology yields relevant data to assess maximum noise impacts and does not require a distinction between "ordinary" and "peak" traffic conditions.

As reported in the *Highway Traffic Noise* Analysis Tables A-3.1 and A-3.2, predicted noise levels of Alternative C (2040 Build Condition) will not be noticeably greater than noise levels under the modeled baseline (2040 No-Build Condition) at all of the representative receptors both outside and inside of Jackson Park. Changes in noise levels from the proposed transportation improvements would be 3 decibels (dBA) or less. A change in noise levels of 3 dBA is barely perceptible to an average human with normal hearing.

## RECREATION RESOURCES

**Concern #21:** **Impacts on recreation would be significant. The EA claims only 20 acres of the whole 643-acre project area would be affected. However, the EA does not take into account the fact that much of Jackson Park is limited to specific use such as for the Museum of Science and Industry, La Rabida, the golf course, the lagoons, harbors, and nature sanctuary. Therefore, the actual park space available for casual recreation is more limited, making the loss of 20 acres a significant loss. Additionally, the cumulative effect would result in an additional 40 acres taken by the planned golf course, which brings the total park land lost for general use up to 25% of the 268 acres not taken by water, golf, La Rabida, and the Museum of Science and Industry. Although there will be open space available on the OPC campus after construction, existing informal uses of the area such as barbequing and other gatherings will not be permitted.**

*Response*:    As detailed in Appendix G, several picnicking opportunities would be available across the OPC campus. Those areas include: Community Grove, Lagoon View Lawn, and the Great Lawn, among other spaces. There would be a minimum of one acre of informal picnicking space collectively within these spaces. Opportunities for informal recreation include areas used informally for sitting, walking, gathering, pick-up games (soccer, other), play, and for landscaping or as buffer between recreation areas and sidewalks, paths, and roadways. These opportunities would continue to exist on the OPC site as well as in new landscaped areas made available by the closure of certain roads on the site.

As the park's natural areas (including the lagoons) and recreational facilities (including harbors and museums) are part of the recreation experience for Jackson Park, there will not be a loss of 20 acres of recreation opportunity. Rather, the OPC

site will remain public park land owned by the City. While a 4.6-acre area containing the forum, library, and museum buildings includes uses that the NPS has determined do not qualify as public recreation under UPARR, the remaining 14.7 acres of the OPC site will remain open and available to the public for UPARR-qualified recreational use. Furthermore, a Use Agreement between the City and the Foundation will govern the Foundation's development and use of the site, ensuring continued public access to the property. The remainder of the 551-acre park will continue to be available for all the current recreational uses, and the closed roadways in Jackson Park will add open space for informal recreation.

**Concern #22:** **There is a finite quantity of parkland in the City; the impact on humans in terms of nature's importance to maintaining good physical and mental health as well as child development was not adequately addressed by the EA impact analysis.**

*Response*: The Proposed Action will not result in a loss of parkland in the City and is therefore not anticipated to negatively impact human physical and mental health or child development. The Proposed Action will provide several recreation opportunities, including a new play area, improved open space, and rehabilitated walkways. In addition, the reclaimed roadways in Jackson Park will be converted to park space and will provide recreation opportunities such as informal recreation trails and multiuse recreation opportunities. There will, in fact, be a net increase of 6.4 acres of parkland under the Proposed Action (see Table B-2: Impact Summary Table in Appendix B of the EA).

## TRAFFIC CONGESTION

**Concern #23:** **Commenters requested an analysis of additional air and noise impacts and potential access reduction that may result from the creation of T-intersections.**

*Response:* The analysis in the EA reviews the traffic operations, air quality and highway traffic noise for existing and projected traffic volumes. Traffic operations are reviewed to determine the Level of Service (LOS) benchmarks at intersections based on delay experienced per vehicle as an indicator for how well an intersection operates under projected traffic conditions. The air quality and noise analysis is also based on the projected traffic volumes. As a result of the City's proposed closure of Cornell Drive between 63rd Street (Hayes Drive) and 59th Street, the signalized intersection of 63rd Street (Hayes Drive) and Cornell Drive is converted from a four-legged intersection to a three-legged intersection (or "T-intersection") and the three-legged intersection of Cornell Drive at North Midway Plaisance is removed. In addition, the City's proposed closure of Marquette Drive between Stony Island Avenue and Richards Drive converts the signalized intersection at Marquette Drive and Stony Island Avenue from a four-legged intersection to a three-legged intersection.

Section 5.2.3 (pages 41-49) and Appendix H of the EA provide analysis of traffic conditions for each of the project alternatives. Under Alternative C with transportation improvements in place, the 2040 intersection LOS at 63rd Street (Hayes Drive) and Cornell Drive operate at LOS A and LOS B in the morning and evening peak hours, respectively. These operations are observed as a result of the improvements to the roadway network, as well as by providing a through movement

for predominant travel through the intersection. Under the same conditions of Alternative C, the intersection of Marquette Drive/Stony Island Avenue experiences a LOS B for both peak hours. For both intersections, results are similar to those experienced under 2016 existing conditions and 2040 projected conditions in Alternative A and provides substantial improvement to traffic congestion compared to conditions in Alternative B.

Section 5.1.4 (page 30) and Appendix E of the EA provide analysis of Air Quality impacts for each of the alternatives. The transportation improvements included in Alternative C were determined to meet conformity requirements under the Clean Air Act (CAA). The improvements under Alternative C were also determined to be compatible with the Transportation Improvement Program (TIP) through the Chicago Metropolitan Agency for Planning (CMAP) amendment process. See Appendix E.

Section 5.1.6 (pages 31-32) and a separate *Highway Traffic Noise Analysis* report analyzes the potential for highway traffic noise impacts associated with Alternative C. The analysis of predicted noise levels for receptors adjacent to the Marquette Drive/Stony Island Avenue intersection show predicted noise levels change by 1 dBA or less and result in no noise impacts. The same analysis for receptors adjacent to the 63rd Street (Hayes Drive)/Cornell Drive intersection show predicted noise levels change by 3 dBA or less. As noted in the *Highway Traffic Noise Analysis* report (Section I-B), for the average human with normal hearing, a 3 dBA change in noise level is barely perceptible, especially if the change occurs gradually over time.

Vehicular access to amenities within Jackson Park will be maintained under Alternative C. In addition, pedestrian and bicyclist access to and throughout Jackson Park will be enhanced by the proposed improvements under Alternative C.

**Concern #24:** **The analysis of traffic congestion in the EA is inadequate for the following reasons:**

- **The traffic study used as a baseline is outdated using the CMAP GoTo 2040 traffic projections. Since that study, new projections were released in the CMAP long-range regional plan, OnTo 2050. The EA did not consider changes in vehicle transportation and commuting habits related to the pandemic.**

- **The EA does not explain how the maximum projected capacity values for the roads in Table 1 were calculated or obtained.**

- **The EA does not explain what counts as an acceptable travel time before presenting travel time comparisons in the traffic technical memorandum.**

- **The analysis did not take into account traffic during special events at the OPC or consider other multimodal factors such as transit, bicycle, taxis, rideshares, school buses, etc.**

*Response*: Traffic congestion is discussed and analyzed in EA Section 5.2.3 (pages 41-49) and Appendix H. As discussed in Appendix H Section 2.4 (pages 5-6), mobility at intersections is typically measured by calculating the average control delay experienced by vehicles passing through an intersection and relating it to LOS

benchmarks. Peak hour conditions are analyzed to accommodate the highest traffic volume during both morning and peak hours of travel. Providing roadway capacity for atypical conditions, such as special event traffic or temporary roadway closures, would result in excess roadway capacity, additional costs, and further impacts by roadway construction. Section 6.2 of the Use Agreement (Public Access) between the City and the Foundation requires the Foundation to conduct special events "in accordance with standards and procedures set forth in a written agreement to be negotiated in good faith between the City, the Park District and the Foundation . . . [regarding] coordination among the parties on the advance scheduling of events so as to account for security considerations, the avoidance of conflict with other events in and around Jackson Park and other logistical and public access considerations." This agreement was passed by the City Council on October 31, 2018 and is available on the City Clerk's website.[2]

Projected traffic volumes are typically analyzed to ensure a transportation improvement accommodates future traffic volumes through the typical life-cycle of the facility. For Northeastern Illinois, projections of future travel demands are provided by CMAP using regional travel-demand analyses and comprehensive plans. These plans consider regional planned transportation improvements as well as multimodal travel factors. CMAP provided traffic projections for the year 2040 in accordance with their *GO TO 2040* regional plan. These traffic volumes are presented for comparison through the EA analyses. In October 2018, CMAP adopted their *ON TO 2050* comprehensive plan. Further coordination with CMAP was conducted to ensure the proposed transportation improvements would perform satisfactorily. The 2050 sensitivity analysis demonstrated that intersections would continue to operate satisfactorily under 2050 projected traffic volumes in Alternative C and would not materially change the alternatives analysis completed by the FHWA. A summary of this analysis is provided in Appendix H Section 4.0 (pages 26-29). Varying restrictions relating to the pandemic have affected traffic patterns generally, but the long-term effects of these dynamic circumstances in Jackson Park and environs remain entirely speculative.

As part of an initial study documented as part of the *Jackson Park Revitalization Traffic Impact Study*, CMAP estimated approximately 24-28 percent of all vehicle trips will reroute to alternative roadways outside of the project area. The results of the travel demand modeling indicated that traffic diversion to roadways outside of Jackson Park can be accommodated without providing additional capacity on alternate collector and arterial roadways. See Table 1 in Appendix H of the EA. The maximum projected capacity values for the roadways in this table were validated by transportation engineering planning tools and factoring local system knowledge, such as driver behaviors and network operations.

The design of the transportation improvements also considers multimodal travel, providing improvements targets for improved transit operations within the network,

---

[2] See https://chicago.legistar.com/View.ashx?M=F&ID=6685246&GUID=F7A31359-2809-4E1B-B7D1-F330FC094611

accommodating bus operations at the OPC site, and improving pedestrian and bicyclist access and circulation.

As part of the impact analysis provided in Section 3.0 of Appendix H (pages 10-26), anticipated travel times for predominant travel routes are presented. The purpose of this analysis is to provide a comparison of impacts across the project alternatives, as opposed to a comparison against a singular measured value.

**Concern #25:** **Traffic congestion resulting from closing roadways in Jackson Park and diverting traffic to alternate routes will cause increased congestion that extends outside of the project area and into the local neighborhoods. These changes to traffic circulation patterns will cause unnecessary inconvenience and congestion as well as endanger residents and school children due to faster traffic on Stony Island Avenue.**

*Response:* The *Jackson Park Revitalization Traffic Impact Study* (TIS) was completed to evaluate the potential traffic impacts as a result of proposed changes within and adjacent to Jackson Park. CMAP assisted in the development of future traffic volumes from the regional travel demand model developed for the *GO TO 2040* regional plan. The results of the travel demand modeling indicated that traffic diversion to roadways outside of Jackson Park can be accommodated without providing additional capacity on alternate collector and arterial roadways. See Table 1 in Appendix H of the EA. Sufficient reserve capacity exists on parallel arterials to absorb any traffic diversions that would occur without adverse neighborhood impacts.

The City proposes improvements for pedestrians and bicyclists, including the following: ADA enhancements at intersections, pedestrian underpasses, curb extensions, pedestrian refuge islands, high visibility crosswalk markings, and pedestrian countdown signals. Along Stony Island Avenue, where schools are present, curb extensions, refuge islands, high visibility crosswalk markings, and pedestrian countdown signals will be provided. These enhancements strive to improve pedestrian access, comfort, and safety for residents from Hyde Park and Woodlawn aiming to access Jackson Park. These project elements fulfill the identified FHWA Purpose and Need regarding enhanced bike and pedestrian access and circulation. A complete list of pedestrian and bicyclist enhancements proposed is provided in Section 4.3.4 of the EA (pages 25-26).

**Concern #26:** **The assessment of impacts related to parking supply is inadequate for the following reasons:**

- **The analysis is based on a parking study conducted in the fall of 2018, which is a time when Jackson Park usage is typically lower than in the summer; therefore, the baseline does not reflect typical park usage. It also didn't take into account the change in demand for park use during the pandemic and the reduction in use of public transportation or rideshares.**

- **The loss of parking along Hayes Drive would violate the intent of the Americans with Disabilities Act (ADA) by making the park less accessible. Parking on Stony Island is not suitable for all people and is likely to be filled up by visitors to the OPC.**

- **Addressing lost on-street parking with a new parking garage does not take into account the fact that on-street parking is currently free and the garage would be fee-based. This would result in more visitors seeking free parking on nearby streets. Additionally, the garage would likely be filled with visitors to the OPC rather than visitors using the rest of Jackson Park.**

- **The analysis did not take into account parking demand for special events at the OPC.**

*Response:*   Table 14 in Appendix H of the EA summarizes the parking supply impacts as a result of implementing Alternative C. Alternative C results in a loss of 105 unmarked on-street parking spaces. When added to the parking impacts under Alternative B, Alternative C results in total net loss of 233 unmarked on-street parking spaces.

As part of the OPC development, additional off-street parking is proposed to accommodate anticipated parking demand resulting from the visitors to the center. The amount of off-street parking was evaluated as part of the *Jackson Park Revitalization TIS* (See Section 5.0 of the TIS). The OPC parking demand study is not seasonally dependent. The parking analysis completed for the study used standard methodologies based on assumptions concerning estimated annual attendance, the percentage of visitors that are likely to use personal vehicles, the average "dwell-time" for a visit, and how busy the OPC will be across different times of the day to determine the appropriate on-site parking capacity (i.e., number of parking spaces in the planned garage).

The number of off-street spaces proposed meets City zoning regulations and is sufficient to accommodate visitors to the OPC and its employees. The proposed off-street parking design has been approved by the City. The parking garage for the OPC is also intended to accommodate parking demand for the OPC and some demand for the remainder of Jackson Park. The use of parking fees is intended to allow for more frequent turnover of the parking spaces, allowing for more visitors to use fewer parking spaces. The overall project provides a combination of new free and paid parking, similar to existing conditions.

The City has the ability to enact specific parking regulations for on-street parking in the event that it is deemed necessary, such as permit parking, duration-based parking, or others if an issue arises with a portion of existing free parking not being available for nearby residents. The *Jackson Park Revitalization TIS*'s study of the existing on-street parking inventory concluded that there were more than sufficient existing spaces to accommodate demand, especially during weekdays. As part of Alternative C, the proposed transportation improvements include the addition of 84 new on-street parking spaces. The parking study conducted as part of the *Jackson Park Revitalization TIS* concluded that, even with the additional loss of 105 unmarked on-street parking spaces, there is still an excess parking supply in Jackson Park based on

parking demands. While the physical count for the TIS was taken in the fall, it is not uncommon for a TIS or parking study to analyze typical conditions rather than conditions that only occur only 10-15 days per year (i.e., summer Saturdays).

Varying restrictions relating to the pandemic have affected traffic patterns generally, but the long-term effects of these dynamic circumstances in Jackson Park and environs remain entirely speculative. As the implementation of the South Lakefront Framework Plan continues in Jackson Park, the City will continue to work with the CPD to implement additional parking supply as needed in Jackson Park. The plan includes additional parking options such as 60 additional spaces at the East Meadow (Driving Range), 170 at the 63rd Street Beach, 200 at the golf course, 90 at the boat launch, 101 in the Promontory Drive Lot and 19 more on Promontory Drive, and 40 at the South Shore Cultural Center, totaling an additional 680 potential parking spaces. These additions to parking supply, when fully implemented, would more than offset the loss of 105 unmarked on-street parking spaces due to the transportation improvements.

The additional 31 on-street parking spaces along Marquette Drive (between Richards Drive and Lake Shore Drive) and the proposed off-street spaces at the golf course will provide similar parking accommodations to amenities accessed by previous unmarked on-street parking spaces lost along Marquette Drive between Stony Island Avenue and Richards Drive. Similarly, additional off-street parking spaces proposed at the East Meadow and boat launch provide similar parking accommodations to amenities accessed by previous on-street parking spaces along Hayes Drive. The proposed changes to parking do not impact any existing on-street accessible parking spaces and the proposed new parking spaces provide similar ADA access to park amenities as existing conditions.

**Concern #27:** **The traffic technical memorandum notes that 680 additional parking spaces would be constructed at the completion of the South Lakefront Framework Plan; however, this is only a vision for the park and is dependent upon construction timelines and funding commitments. Therefore, those parking spaces should not be considered mitigation for lost parking spaces.**

*Response*: The parking supply contemplated with the South Lakefront Framework Plan provides the City and the CPD with options to implement additional parking supply as needed in Jackson Park, with options for up to 680 spaces. Per the *Jackson Park Revitalization TIS*, the existing parking demand does not warrant the installation of all 680 spaces. The City and CPD will utilize this plan as a framework to meet future parking demand if it increases and will also aim to balance the needs of parking demand with a goal to minimize excess pavement area within Jackson Park. The plan demonstrates that there will be more than sufficient opportunities for new parking within Jackson Park to offset the removal of some existing parking supplies and meet future parking demands.

## CULTURAL RESOURCES

**Concern #28:** **Impacts on cultural resources are downplayed in the EA and are actually significant. The EA does not provide a solid basis for the claim that though the AOE determined the project would have an adverse effect on historic properties under Section 106, the properties would remain listed in the National Register of Historic Places. Even if the historic properties remain listed on the National Register and mitigation measures have been developed, that is an inappropriate threshold to use when determining significance of impacts.**

*Response:*      As noted in the EA, a finding of an adverse effect on a historic property under the NHPA does not require a finding of a significant impact under NEPA. The Advisory Council on Historic Preservation (ACHP) regulations explicitly recognize this (36 C.F.R. 800.8). Under the NHPA, the criteria for identifying an "adverse effect" ask whether an undertaking would alter qualifying characteristics of a property in a manner that diminishes its integrity (36 CFR 800.5). In contrast, NEPA specifically considers whether an impact is significant. The local, regional, or national context of the affected area as well as the degree or intensity of the impact bear on the significance of an impact under NEPA. Accordingly, the EA properly considered the impacts on cultural resources, and a FONSI was prepared that determined that the impact does not rise to the level of NEPA significance.

The AOE prepared pursuant to NHPA provides a detailed analysis of the effects of the federal and nonfederal actions on the cultural landscape and historic features of the Jackson Park Historic Landscape District and Midway Plaisance. As explained in the AOE, the anticipated effect does not so alter the characteristics and aspects of integrity that qualify this cultural landscape for listing on the National Register of Historic Places, as to render the cultural landscape ineligible for listing (see supporting documentation in Appendix E to the AOE available on the project website: http://www.tinyURL.com/JPImprovements).

The context of Jackson Park includes that it is an urban park surrounded by dense residential, commercial, and civic/educational developments, including large buildings and complexes within the park (e.g., the Museum of Science and Industry and the La Rabida Children's Hospital) and immediately outside the park (e.g., various residential towers and multi-building communities and the Hyde Park Academy High School). The park's context also includes the City's distinctive tradition of including large civic buildings—in particular museums—in the City's parks, including within Jackson Park. Jackson Park's textured history includes mixed and changing uses across a broad spectrum, including open spaces, natural settings, indoor and outdoor sports facilities, civic buildings, major temporary installations like the World's Fair and the Nike Missile Site, and large-scale events such as festivals and marathons. This is reflected in the park's broad period of significance from 1875 to 1968. The breadth and dynamic range of uses over time are an important aspect of Jackson Park and distinguish it from other historic properties whose importance is confined to a particular event (e.g., the birthplace of a president or the site of a historic battle) and a narrow period of time.

With the affected area's context in mind, the degree of impact to Jackson Park is limited. The proposed changes will affect specific portions of the historic district's character-defining elements, leaving intact a very large majority of the park. The federal and nonfederal actions do not destroy the park or its ability to project its cultural significance, and they enhance the park's ability to support uses that have long been integral to the park such as outdoor recreation, enjoyment of natural settings, civic-educational programming, and athletics. As shown in the visual studies supporting the AOE, the visual effect of the OPC site, in particular the Museum Building, will be distinctive but not dominant, located at the park's western edge where it meets the urban architecture of the surrounding community, away from the central visual axis extending south from the Museum of Science and Industry. Overall, the purpose and scale of the proposed changes in the park fit comfortably within the park's dynamic range and will add historic significance to the park by virtue of the OPC's memorialization of a nationally historic and locally relevant presidency.

## SOCIAL AND ECONOMIC ISSUES

**Concern #29:** **The socioeconomic analysis in the EA does not adequately assess the effects of the OPC on communities in the immediate vicinity for the following reasons:**

- **It does not consider an estimate of economic costs that may be borne by nearby communities as a result of the OPC.**

- **It does not consider how the OPC will impact affordability and gentrification of the nearby communities.**

- **It does not provide any contextual discussion of decades of institutional racism and historic practices such as redlining and resource allocation nor does it have contextual discussion of recent social unrest.**

*Response*: The EA, supported by Appendix I, presents a socioeconomic analysis of the effects of the federal actions on local populations and communities according to NEPA requirements. These effects include direct effects of the NPS and FHWA actions, as well as the indirect effects associated with the OPC. The analysis concluded that the presence of the OPC would necessitate additional police and fire protection activity but otherwise would not have a substantial impact on public facilities in the study area. State and local tax revenue resulting from the OPC's development and start-up is estimated at $16.5 million, plus $11.3 million annually during the operating phase. A portion of these revenues would be available to defray the additional costs of police and fire protection.

The socioeconomic analysis addresses potential housing impacts and the issue of gentrification (Appendix I, pp. 38-40). Based on relevant plans, studies, and housing projections, the analysis found that the City owns nearly 25 percent of Woodlawn's vacant land. Further, approximately 30 percent of the existing housing stock has long-term affordability guarantees (EA, p. 60). In September 2020, the Chicago City Council passed the Woodlawn Housing Ordinance, which is described in the Errata (see Attachment https://doimspp.sharepoint.com/:w:/r/sites/JacksonParkUPARRFHWAEAMayreview

/Shared%20Documents/Public%20comment%20analysis/2020_01_09%20Jackson%
20Response%20to%20PublicComment_ef%20mcc%20by%20%20memory%20.docx
?d=w86df01041dbe42f3909e3c506c7be8b5&csf=1&web=1&e=e6V9UDC). This
ordinance is "designed to ensure the Woodlawn community and other Chicago
residents can benefit from the unprecedented economic and cultural opportunities
created by the future Obama Presidential Center."[3] Key components include:

- On 25% of city-owned vacant land, 30% of units in each project must be
  affordable at 30-50% of area median income (AMI).

- $1.5 million for the Preservation of Existing Affordable Rental (PEAR) to
  help existing apartment building owners refinance their property to keep
  tenants in place and rents affordable.

- $1.175 million for Renew Woodlawn, a rehab homeownership program
  tailored for low to moderate income households.

- $1.52 million supplement for the Woodlawn Loan Fund to purchase and
  rehabilitate vacant units to create new affordable housing.

- $1 million for the Woodlawn Long-term Homeowner Home Improvement
  Grant Program to assist homeowners with five or more years of residency in
  their home with a grant of up to $20,000 for home repairs.

- Tenant Right of First Refusal pilot program for larger apartment buildings.

The EA and Appendix I describe existing socioeconomic conditions in the
communities of Woodlawn, South Side, and Hyde Park, as they have been affected
by past practices. Neither the proposed federal actions nor the OPC will encourage or
support institutional racism, redlining, or biased resource allocation. Rather, these
projects will enhance the socioeconomic conditions in these communities. As
described in Appendix I, the Foundation has taken steps to ensure that the workforce
for construction and operations of the OPC is diverse and inclusive (pp. 40, 41).
Further, Lakeside Alliance, the Foundation's construction manager, has opened a
South Side Resource Center, allowing residents storefront access to the OPC builders
and to information about subcontractor and workforce opportunities related to the
project. The public comments received from local residents attest to the strong
community desire to see these changes. The overall conclusion of the socioeconomic
study is that local communities will experience positive impacts, particularly in jobs
and income.

**Concern #30:** **The socioeconomic analysis is not valid because it is based on outdated data. The
analysis also does not take into account the changes in use and access that has
occurred due to the pandemic. The economic benefits associated with the OPC
are speculative at best.**

---

[3] Office of the Mayor, City of Chicago. September 9, 2020. "City Council Passes the Woodlawn Housing Ordinance."
Accessed November 10, 2020.
https://www.chicago.gov/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2020/September/W
oodlawnHousingOrdinance.pdf

*Response:*   The socioeconomic study relies on a wide variety of data from the US Census Bureau's American Community Survey (ACS), CMAP, AECOM, Deloitte Consulting, and CDOT. In each case, the study used the most recent data available at the time, as is standard protocol in a socioeconomic study. Census ACS data are vintage 2017, which were the most recent available at the time the data were gathered (Fall 2019). For smaller geographies, such as the tracts and block groups examined for this study, the data available are five-year estimates. These five-year estimates benefit from a large sample size and are considered to be highly reliable. Five-year data has the additional quality of smoothing out short-term anomalies to provide a more stable view of the populations. Therefore, year-to-year variations in ACS estimates are typically small. Only the Decennial Census produces demographic, housing, and income/poverty data from surveys gathered from a larger population. As presented in Appendix I, AECOM's analysis of populations in Hyde Park, Woodlawn, and Southside was released in 2019 and covers the period from 2010 through 2018 (p. 7). CMAP's population and housing projections forecast neighborhood trends for the 2015 through 2050 period (p. 7). These projections were produced in 2018 and provide relevant data for evaluating available housing stock and vacant land.

The Deloitte Consulting report on economic impacts was published in October 2016 using estimates of construction and operating costs from the developer. Any cost increase from inflation will be borne by donors, rather than by governmental entities.[4] Increases in construction and operational spending will lead to greater economic impacts than those presented. Therefore, the economic impacts should be considered conservative. In evaluating indirect and induced economic impacts (secondary impacts) of the OPC, Deloitte Consulting applied the widely used IMPLAN model, which is briefly described in Appendix I (p. 24). The model is based on a national input-output dollar flow table called the Social Accounting Matrix (SAM), which measures the purchasing relationships between industry and household sectors and between government, industry, and household sectors. The model is updated annually. While an updated model would likely result in revised numbers, due in part to inflation, the overall conclusion that the OPC would generate substantial personal income, jobs, and tax revenue would be unchanged, since regardless of economic conditions, hiring workers and purchasing materials and supplies, within a defined area, have a direct, positive relationship with income, jobs, and tax revenues within that area.

The direct impacts from the FHWA action, as presented in the EA (p. 62) and Appendix I (p. 44), include current construction cost estimates from CDOT. Direct labor expenditures and direct jobs are also presented and are the most currently available data. Diversity and workforce development plans and construction minimization efforts provide further relevant information for evaluating the effects of the proposed federal action on the local communities.

In summary, the socioeconomic analyses use recent Census data and customary analytical methods. The conclusions presented in the study are not speculative but are

---

[4] https://www.obama.org/chicago/opc-faq/

based on extensive, available information concerning existing conditions and the effects of the proposed federal actions, as described in the record.

The effects of the COVID-19 pandemic are highly dynamic, undermining the utility of using limited interim data in predicting modeling for long-term projects. Overall, participation in outdoor recreation in the United States appears to have increased, despite the closure of various facilities and amenities. The Outdoor Industry Association has reported interim data (relating to April, May, and June 2020) from an ongoing full-year study (to be reported in 2021) showing that running, bicycling, day hiking, bird watching, and camping by urban respondents increased noticeably.[5] Likewise, IMPLAN has been developing a new data set for modeling, based on a single quarter (2nd quarter 2020).[6] However, pending more complete data and analysis, it would be both imprudent and highly speculative to assume that use of Jackson Park would be either materially diminished or materially increased over the long term as a result of the pandemic.

A commenter expressed a concern related to the "shaky finances" of the State of Illinois and the City of Chicago. The budgets of these entities are unrelated to the decision related to the proposed federal action and are outside the scope of the EA and the NEPA process.

**Concern #31:** **The topic of environmental justice is inadequately addressed because there is no discussion of equitable access to public park space and facilities. Despite the EA's assertion that there are ample public parks on the South Side of Chicago, there are statistics from the Mayor's office and others that show a distinct lack of parks on the South Side. Additionally, the parks are generally plentiful in Hyde Park but not in Woodlawn or South Shore. The loss of acres to the OPC in Jackson Park would be felt more in Woodlawn and South Shore than in Hyde Park.**

*Response:* The basis for the City's selection of the Midway Plaisance for replacement recreation under UPARR is explained in the "City of Chicago Analysis of its Proposal Related to Jackson Park, Cook County, Illinois" (referred to on page 26 of the EA), which the NPS considered in its review under UPARR. This document identifies the criteria and sites that the City evaluated as alternatives to the Midway Plaisance.

The City confirmed that each of Woodlawn, South Shore, and Hyde Park meets the CitySpace criteria that the CPD strives to achieve, namely proximity to open space within a half mile or a ten-minute walk. In addition, each of the neighborhoods reflects the CPD's goal of 2 acres of open space per 1,000 residents.

None of the federal and nonfederal actions considered in the EA will diminish the size of Jackson Park. There will be a net increase of improved parkland under the Proposed Action (see Table B-2: Impact Summary Table in Appendix B of the EA). All of Jackson Park's acreage will remain available to the public on terms consistent with the use of amenities elsewhere in the park. Municipal law ensures that public

---

[5] See: https://outdoorindustry.org/article/increase-outdoor-activities-due-covid-19/
[6] See: https://blog.implan.com/modeling-coronavirus

access to Jackson Park, including the OPC, is not and will not be based on or limited by the ethnic, religious, sexual, economic, or other protected status of any individual or group.

## GLFER

**Concern #32:** **The impact analysis under the impact topic of GLFER is inadequate. The EA does not discuss how stormwater from the OPC will be discharged into the lagoon and how it would affect the GLFER project areas within the Jackson Park Lagoons. Additionally, the EA does not discuss the deleterious effects of tearing out Cornell Drive along a substantial edge of a GLFER area between 59th and 63rd Streets. These effects combined with the removal of a berm and adjacent area of GLFER plantings on the west side of South Lake Shore Drive cannot be mitigated elsewhere. The EA fails to take a hard look at these impacts.**

*Response*: The habitat improvement project completed under the GLFER program is subject to the jurisdiction of the USACE. The USACE is a cooperating agency as part of this EA. The USACE will complete its own NEPA decision to evaluate the environmental impacts of decisions pursuant to its authority.

With respect to habitat impacts, this EA considered stormwater management and the impacts of the NPS and FHWA actions on the area.

In the existing condition, stormwater runoff from Cornell Drive roadway pavement discharges directly into the Jackson Park East and West lagoons. The removal of the Cornel Drive roadway pavement and associated roadway runoff will provide a benefit to the lagoon water quality. The proposed OPC site drainage is also designed to encourage on-site infiltration that would meet or exceed the City of Chicago stormwater regulations. This design will assist in protecting the ecology of the adjacent lagoon system while reducing stress on the City's storm sewer system. Only extraordinary rainfall events are expected to require active routing of excess stormwater using the existing outfall system. On those rare occasions, systems designed to meet the required City stormwater quality threshold will be used. The OPC site design complies with the City of Chicago's Stormwater Ordinance and separate LEED and SITES certification criteria.

The Location Drainage Study (available on the project website: http://www.tinyURL.com/JPImprovements) also includes a detailed hydrologic analysis that determines the impact of removing the drainage area associated with existing Cornell Drive from the adjacent lagoon. The analysis determined that there would be no impact on lagoon water levels.

As discussed in the EA Section 5.2.6 (pages 64-67) and Appendix J, any impacts to the existing berms (dunes) along the west side of Lake Shore Drive will be maintained in place or relocated further to the west along Lake Shore Drive.

**Concern #33:** **The EA approach to mitigating impacts on GLFER areas improperly assumes that the only issue involves acreage and not the specific purpose, placement, or value of the GLFER areas proposed to be removed. The GLFER areas do not share a uniform design and it undermines the conditions, purposes, and outputs of the GLFER project to take out one piece of land and create another piece elsewhere.**

*Response*: The intent of the GLFER improvements was for ecological restoration of various areas within Jackson Park. The effort aims to create or enhance nearly 147 acres of native habitat within Jackson Park and along the Lake Michigan shoreline including 24 acres of new natural areas. By restoring aquatic and buffering habitats and addressing invasive species issues, the GLFER project provides habitat for fish, migratory birds, reptiles, and amphibians within a highly urbanized area.

A total of four areas were identified to be improved under the GLFER project in Jackson Park. The four improvement areas were grouped by their geographic location: the East and West Lagoons (Project Area 1), the Jackson Park Inner Harbor (Project Area 2), the Jackson Park Golf Course (Project Area 3), and the area near La Rabida Children's Hospital (Project Area 4). All improvements in Project Area 1 were generally bound by Lake Shore Drive to the east, Hayes Drive to the south, Cornell Drive to the west, and the Museum of Science and Industry to the north. Project Area 1 received funding and a construction contract was awarded in 2014. These improvements were completed in 2019 and included a five-year maintenance and monitoring program. The remaining three project areas were identified as options to improve under the GLFER program, should funding become available.

The proposed project will permanently impact 1.32 acres and temporarily impact 1.69 acres of existing GLFER areas. The majority of the impacted areas restored in place, and none of the previously created buffer areas will be completely eliminated. By providing 2.43 acres of replacement GLFER improvements to the Jackson Park Inner Harbor (identified in the GLFER project as Project Area 2), proposed modifications and additions would maintain the intent of the initial improvements and help further achieve the project goals by restoring additional areas. USACE is considering whether this meets the requirements for approving an alteration to the GLFER project. USACE will prepare a NEPA analysis specific to its proposed action, to inform its decision whether to permit changes to the GLFER project.

## IMPACT ANALYSIS — OTHER

**Concern #34:** **The EA states that the UPARR conversion would not impact trees but does not consider impacts on the ground cover of shrubs, grasses, aesthetics, wildlife habitat, or migratory birds, nor does it consider the impacts of drainage and use patterns.**

*Response*: The conversion of UPARR area does not have physical on-the-ground impacts, because the conversion represents a legal change in UPARR status only. This is discussed in the EA Appendix C: Natural Resources Technical Memorandum (Section 3.1) and Appendix D: Trees Technical Memorandum (Section 4.2). The impacts associated with the development of the OPC, which cause the 4.6-acre

UPARR conversion within the site, are evaluated as indirect impacts under Alternatives B and C. The EA focuses its analysis on the key resources that would be affected by the alternatives. Several impact topics were considered but not carried forward for further analysis as described in Section 5.1 of the EA (pages 28-32). These resources include special status species (including migratory birds) and other wildlife and wildlife habitat. Aesthetics are considered in the EA as part of the analysis of Cultural Resources (EA page 51) as well as the analysis of tree impacts (EA page 30 and Appendix D page 20). Drainage is discussed in Appendix F: Water Resources Technical Memorandum as well as in response to Concern #32 above.

**Concern #35:** **The EA does not consider the implications of disturbing contaminated soils on the site, including the former NIKE missile installation west of Lake Shore Drive that extends through the Bobolink Meadow, the East Lagoon, and the Wooded Island.**

*Response*:    No proposed construction activities will occur within the limits of the former NIKE missile site, through the Bobolink Meadow, the East Lagoon, or on the Wooded Island.

The City and the Foundation have performed environmental testing and soil sampling at the OPC site and have concluded that the site does not contain contaminated soils. If contaminated soil or other environmental hazards are discovered during construction, the Foundation and the OPC construction manager will comply with all applicable laws and regulations for the handling of such soils. Because the City is the owner of the land, the Environmental Remediation and Indemnity Agreement between the City and the Foundation provides additional information as to how such a discovery will be handled. See Exhibit F to the ordinance adopted on October 31, 2018, (link provided in Concern #24 above) and published at pages 85875 to 85986 in the Journal of Proceedings of the City Council of such date.

A Preliminary Environmental Site Assessment (PESA) was completed for the transportation improvements to document the potential for special waste and determine appropriate treatments, if needed. The PESA identified 48 sites with Recognized Environmental Conditions (REC). As excavation activities are associated with the proposed transportation improvements, a Preliminary Site Investigation (PSI) report will be completed during detailed engineering. If any special waste or hazardous materials are present, proper procedures for handling and disposing will be specified in the design plans in accordance with IDOT standard specifications.

**Concern #36:** **The EA fails to conduct a proper indirect impact analysis. Under the impact topic of Recreation, the EA describes the loss of recreational opportunities within the OPC footprint as an indirect impact of the UPARR boundary conversion, but it treats the replacement of those lost recreational opportunities as a direct impact. This does not meet the separate requirement of taking a hard look at indirect impacts under NEPA. Additionally, the traffic impacts under Alternative B are described as indirect impacts, although they would be a result of the closure of roadways.**

*Response*:      The EA thoroughly evaluates all impacts of the proposed agency actions in one comprehensive document and the labeling of them as direct or indirect is not relevant to the sufficiency of the analysis. CEQ regulations (40 CFR 1502.16) require a discussion of all impacts of the proposed action and alternatives, but do not require a separate indirect impact analysis. Similarly, the 2015 NPS NEPA Handbook (pg. 62) does not require direct and indirect impacts to be differentiated in the analysis, provided all impacts are described. However, with respect to the impacts related to the NPS action, the implications of using the Eastern Midway as replacement property are considered as direct impacts because the NPS must approve the use of that site as replacement property subject to appropriate conditions agreed to by the NPS. The development of the OPC is treated as an indirect effect of NPS's approval of the proposed conversion because the NPS does not approve the nature of the use of the converted site itself or the design of the facility. The NPS can only base its conversion decision on the UPARR regulatory factors. Similarly, traffic impacts are considered indirect impacts because the road closures that give rise to the traffic impacts are City actions in relation to OPC and are not part of the federal approval.

## CUMULATIVE IMPACT ANALYSIS

**Concern #37:**  **The cumulative impact analysis incorrectly omits the consideration of the Jackson Park and South Shore Golf Course projects. The roadway improvements that FHWA considers in the EA are designed to accommodate the golf course projects; therefore, how can it be premature to consider as cumulative actions? The golf course projects would affect the historic resources, recreation resources, socioeconomics, and natural resources. It is negligent to ignore these projects and their impacts in combination with the OPC project.**

*Response:*      The EA provides an analysis of cumulative impacts, including the following projects:

- Stony Island Avenue Traffic Improvements
- Lakefront Trail Separation
- Baseball Facilities
- Osaka Garden and Other Improvements on the Wooded Island
- Clarence Darrow Bridge
- Midway Plaisance Resurfacing
- Jackson Park Harbor Navigation Project

See EA Section 5.2.1 (pages 32-34) for project descriptions. These actions have occurred or will occur in the project study area, independent of the federal actions. If any of these separate projects qualifies as a federal action, it will undergo its own NEPA process before the individual project receives federal approval. Each of the seven identified projects has either completed construction or is programmed for construction. Each of them also has begun, completed, or is not required to proceed through the City approval processes. Of the seven projects considered in this EA, those that require federal and/or state review have either initiated or completed those activities.

The golf course consolidation/expansion proposal contained in the 2018 SLFP is not included as a "reasonably foreseeable action" because the scope and detail of this project are largely aspirational and not sufficiently developed to allow for the kind of reasoned analysis that meaningfully informs federal decision-making. And no funding is available or foreseeable at this point. The golf course will be subject to a separate approval process under the Lake Michigan and Chicago Lakefront Protection Ordinance. If any federal approval, funding, or permit is required for the golf course consolidation/expansion in the future, then federal requirements would be the responsibility of the relevant federal agency.

**Concern #38:** **The EA should include climate change as a foreseeable future action. The analysis should consider how climate change will affect the park and how trees and other plantings can sustain the current and evolving environments.**

*Response*: The consequences of climate change for Jackson Park and for the City's actions in the park are outside the scope of the agency review. Neither the NPS nor the FHWA has authority or responsibility for planning for changes to the park that may be caused by climate change. To the extent the commenter seeks analysis of how the environmental setting of the federal actions may change in the future and result in unanticipated impacts, such changes are not reasonably foreseeable and are within the City's authority to address as part of its management of its municipal parks. The City has its own climate change resiliency plans.

**Concern #39:** **The cumulative impact analysis in the EA is inadequate, and the reasonably foreseeable future actions are improperly defined. The cumulative actions analyzed in the EA are limited to public projects conducted by CDOT and CPD, which is unreasonably constrained. The analysis lacks detail about the expected impacts from the cumulative actions described in Section 5.2.1 of the EA. The analysis does not include a discussion of the cumulative effects on GLFER areas or socioeconomic resources.**

*Response*: Section 5.2.1 of the EA (pages 32-34) addresses the past, present, and reasonably foreseeable actions considered as part of the cumulative impact analysis, regardless of their association with CDOT or CPD. This section describes the projects that have occurred or will occur in the project area that affect the same resources as those affected by the alternatives. To assess the cumulative impact of the alternatives in the EA, the analysis considers the overall impact of the other actions when combined rather than providing a detailed discussion of the impacts of each action. To that overall impact, the impacts of each alternative are added, resulting in the cumulative impact of the alternative and the other actions. Cumulative impacts are assessed for each of the alternatives and each of the resources evaluated in the EA, including socioeconomic resources and GLFER. Cumulative effects on socioeconomic resources are discussed under each alternative in Section 5.2.5 (pages 57, 61, and 63). As discussed in Section 5.2.6 of the EA (pages 64, 65, and 67), because none of the cumulative actions considered would result in impacts on GLFER resources, the alternatives presented in the EA would not contribute to any cumulative impacts on GLFER areas.

## MITIGATION

**Concern #40:**   **The proposed mitigation for wetland impacts is inadequate because although the proposed mitigation to purchase a replacement segment in a wetland bank in Will County will replace the acreage, the evaluation of this mitigation gives no consideration to the function of the current wetland in regards to stormwater storage or sediment retention.**

*Response*:   Impacts to the wetland located within the east end of the Midway Plaisance and the associated mitigation requirements are discussed in EA Section 5.1.5 (pages 30-31) and are further detailed in Appendix F. This wetland is not subject to federal jurisdiction. The impacts to the wetland will be mitigated as required by the Illinois Interagency Wetland Policy Act, as described in Section 4.2 of Appendix F (pages 7-8). The requirements take into consideration the functional value of wetlands, and the replacement wetland is located in the closest available wetland banking site. Note that the any sediment retention properties for the existing wetland area are low because the wetland is isolated and there are no streams or aquatic resources flowing in or out of the area and there are no adjacent eroded areas (the entire area outside the wetland is vegetated or paved). The proposed modifications to the east end of the Midway Plaisance include regrading of the area as well as placement of a proposed drainage structure to provide positive drainage and allow for enhanced recreational use of the site. The drainage structure will discharge stormwater to the City's combined storm sewer system along Stony Island Avenue. In addition, the future development of this site by the City will be required to comply with the City of Chicago Stormwater Management Ordinance for site infiltration as well as volume control (stormwater detention).

**Concern #41:**   **All of the Environmental Commitments stated in Section 6.3.4.1 of the EA should be formalized by including them in the NEPA decision document.**

*Response*:   The environmental commitments stated in Section 6.3.4.1 of the EA (pages 72-73) that have been formalized will be included in the Finding of No Significant Impact (FONSI) under the heading, "Mitigation Measures."

**Concern #42:**   **Mitigation measures are not clearly described in the EA and those developed under Section 106, Section 4(f), the USACE 404 review, and USACE 408 review are not laid out in the EA. There is no information in the EA about how impacts on special status species will be mitigated. Because of these shortfalls, the EA does not demonstrate that mitigation measures will be adequate to compensate for severe disturbances and should not be used to justify a finding of no significant impacts.**

*Response*:   The EA Section 4.4 (pages 26-27) discusses the alternatives considered which included consideration of avoidance or minimization of impacts. Mitigation is also considered in the EA with respect to specific resources. For example, the City has committed to seasonal restrictions on tree removal to reduce potential impacts to nesting birds. Impacts to water resources would be mitigated as explained in Appendix F. Impacts from construction noise will be mitigated through the City's noise ordinance. Other similar mitigation efforts are addressed throughout the EA and

appendices. Section 6.3.4.1 of the EA (pages 72–72) describe environmental commitments that will be implemented to avoid, minimize, and mitigate impacts. These commitments are included in the FONSI under the heading, "Mitigation Measures."

The purpose of the EA is to evaluate impacts of proposed alternatives in accordance with NEPA. Section 106 of the NHPA, Section 4(f) of the USDOT Act of 1966, and authorizations by the USACE under Section 404 of the Clean Water Act and Section 14 of the Rivers and Harbors Act, referred to as Section 408, are separate processes that are being conducted by the appropriate agencies and pursuant to their respective authorities.

Compliance with Section 106 of the NHPA and Section 4(f) of the USDOT Act of 1966 is acknowledged and referenced in the EA Section 6.2 (pages 69-70).

Avoidance and minimization of adverse effects is documented in the NHPA Section 106 Assessment of Effects, Section 5.0. Measures to further address adverse effects are detailed under Stipulations of the Memorandum of Agreement.

Section 4(f) applies to all agencies within the U.S. DOT, including the FHWA. Transportation projects that do not require the approval of a U.S. DOT agency are not subject to the requirements of Section 4(f). The Draft Section 4(f) Evaluation documents the consideration given to all prudent and feasible alternatives to avoid, minimize, and mitigate impacts to Section 4(f) resources from the proposed action by the FHWA. The Draft Section 4(f) Evaluation is incorporated by reference in the EA as Appendix K. Section 4(f) mitigation measures are discussed in Appendix K Section 9.2 (pages 81-82).

The Final Section 4(f) Evaluation was completed separately from the NEPA process and incorporates all final mitigation measures, including those related to Section 106 discussed below. The NHPA Section 106 process was conducted separately, but in parallel to, the NEPA process. Avoidance and minimization of adverse effects is documented in the NHPA Section 106 AOE, Section 5.0 (pages 75-80 of the AOE). Measures to further address adverse effects are detailed under Stipulations of the Memorandum of Agreement.

Impacts of the alternatives that fall under the USACE Section 404 authorization, namely, impacts to Waters of the United States, are documented in Appendix F. There are no impacts to jurisdictional waters that require mitigation. Impacts of the alternatives to areas improved under the GLFER project, which require USACE permission under Section 408, are documented in Appendix J. Proposed GLFER replacement areas adjacent to the Jackson Park Inner Harbor are described and detailed in the EA Section 5.2.6 (pages 64-67) and Appendix J Section 3.0 (pages 2-6).

As detailed in Appendix C and Section 5.1.2 (pages 28-29) of the EA, there are no effects to federally listed Piping Plover or Red Rufa Knot species expected to occur. The evaluation of impacts to the NLEB are detailed in the response to Concern #18. With respect to state-listed species, the agencies concluded that, with a combination

of avoidance of suitable habitat and seasonal tree removal restrictions, adverse effects are unlikely.

**Concern #43:** **The EA does not provide any enforcement mechanism to ensure promises of replacement park land, new park amenities such as the playground at the Midway Plaisance, and restoration of the Cheney-Goode Memorial are completed as proposed.**

*Response*:        The replacement recreation is a condition of regulatory approval under UPARR and will be a legal requirement. It will be embodied in a written agreement signed by the City and the NPS with which the City must comply.

## AGENCY CONSULTATION AND COMPLIANCE WITH OTHER LAWS

**Concern #44:** **The EA is inappropriately segmented, leading to inadequate impact analyses. The related compliance processes including NEPA, NHPA Section 106, USDOT Section 4(f), and the USACE Section 404/NEPA merger processes were undertaken separately and segmented, which allowed the EA to erroneously downplay the intensity of the effects. Conclusions from these separate processes should be included in the impact analysis of the EA.**

*Response*:        The EA analyzes all environmental effects of the federal actions in compliance with NEPA. This includes effects that are also subject to reviews or regulatory approvals under other statutes and requirements such as Section 404 of the Clean Water Act, Section 408 of the Rivers and Harbors Act, Section 106 of NHPA, and Section 4(f) of the USDOT Act of 1966. The EA expressly acknowledges and relies upon the analysis generated pursuant to the other requirements. However, each of these other laws has its own requirements for documentation and review resulting in stand-alone documents and decisions under each law's specific requirements. Consistent with federal policy and to the extent practicable, the federal agencies conducted their statutory analyses in coordination with one another to ensure that each agency had a thorough understanding of impacts as reflected in the federal EA. USACE was a cooperating agency but is preparing separate decision documents in coordination
with the FHWA and the NPS, taking into account the information developed as part of this EA.

**Concern #45:** **An update on the status of coordination with the officials with jurisdiction (OWJs) under Section 4(f) should be added to the EA, including clarifying if the proposed temporary uses for construction are considered an exemption to Section 4(f) approval or if they are considered a use. A final EA should include the Final Section 4(f) evaluation, which itself should include a copy of the executed MOA under Section 106 of the NHPA.**

*Response*:        Coordination of the Draft Section 4(f) Evaluation with the OWJs, including addressing the exemption for temporary occupancy, is documented in the Final Section 4(f) Evaluation. The Final Section 4(f) Evaluation is available on the City's website.

**Concern #46:** **No consultation with the US Fish and Wildlife Service is documented in the EA. Was it completed?**

*Response:* Consultation with the U.S. Fish & Wildlife Service is described in Section 5.1.2 of the EA (pages 28-29). Correspondence documentation is provided in Appendix C of the EA. No further consultation with USFWS is required.

**Concern #47:** **An updated summary of Section 106 consultation, including the ACHP/SHPO concurrence on the adverse impacts on historic properties and a summary of mitigation measures should be included in a final EA. Additionally, the EA should include a summary of the disputed effects finding that several of the project stakeholders raised to FHWA during the Section 106 process.**

*Response*: An updated summary of the Section 106 consultation is documented as part of the FONSI. See Attachment A of the FONSI.

Although the EA is informed by the Section 106 process, it was undertaken separately from the NEPA process. Details of the Section 106 process, including the effects finding, objections received during that process, and the resolution of those objections are available in documentation on the project website at: http://www.tinyURL.com/JPImprovements.

## ATTACHMENT C
## ERRATA

These errata document changes to the text of the environmental assessment (EA) as a result of public and agency comment during the 30-day review period. Changes to the EA text below are noted by section and page number. Unless otherwise noted, additions to the text are denoted by underlines and deletions are denoted by strikeouts.

**ERRATA**

**EA, Section 2.3, Background, Obama Presidential Center, Page 7**

The proximity of the PAAC to the landscape features would also allow for more coordinated indoor/outdoor recreation programs. The planting plan of the OPC site would take into consideration the shadow that would be cast by the OPC Museum Building and would consider species that are well adapted to prevailing conditions of sun and shade. A shade study conducted by the Foundation in 2018 showed that the Museum Building's shadow would generally be confined to the OPC site, occasionally reaching into the east end of Midway Plaisance to the west (early in the morning) and across the lagoon (late in the day) (TWBTA 2018). These shadows would be temporary and are consistent with natural shading provided by trees and clouds. Overall, the design for the OPC site is intended to reflect principles of landscape ecology relevant to storm water, tree and soil biology, biodiversity, bird habitat, and pollinators (The Obama Foundation 2020). Figure 5 includes the OPC Design Development Site Plan.

With respect to lighting, the majority of the OPC site consists of open park areas consistent with the rest of Jackson Park. No lighting will be directed beyond the boundary of the OPC campus, although some may be visible from beyond the site boundaries. As detailed in *Obama Presidential Center: Reinforcing Landscape Ecology* (The Obama Foundation 2020), the OPC is designed to achieve Leadership in Energy and Environmental Design (LEED) certification, including specifically the Light Pollution Reduction LEED Credit. Certification to LEED standards is widely recognized and involves third-party evaluation of a design. The LEED lighting credit involves using luminaires that do not exceed specified uplight ratings; achieving specific backlight and glare ratings; ensuring that exterior signage does not exceed luminance of 200 cd/m2 (candela per square meter) during nighttime hours and 2,000 cd/m2 during daytime hours; and using exterior lighting that reduces impacts to people and wildlife.

**EA, Section 5.1.3 Affected Environment and Environmental Consequences, Impact Topics Not Carried Forward for Further Analysis, Other Wildlife and Wildlife Habitat, Page 29**

The following text is added to the end of the second paragraph in this section:

The OPC buildings are designed to achieve Leadership in Energy and Environmental Design (LEED) certification, including specifically the Light Pollution Reduction LEED Credit. In part, the design of the OPC buildings intends to minimize impact on migratory birds. The Foundation will also support the City's efforts (and comply with all ordinances) with respect to satisfying the Audubon Society's "Lights Out" goals or City equivalent, which seeks to reduce excess exterior lighting that can disorient birds during the months that migrating birds are flying between their nesting and wintering grounds.

**EA, Section 5.2.5.3, Alternative B: NPS Action (FHWA No Build) – Social and Economic Issues, Housing, Page 60-61**

The following text replaces the final paragraph under the "Housing" subheading:

On September 9, 2020, the Chicago City Council passed the Woodlawn Housing Ordinance. This ordinance is "designed to ensure the Woodlawn community and other Chicago residents can benefit from the unprecedented economic and cultural opportunities created by the future Obama Presidential Center" (Office of the Mayor 2020). Key components include:

- On 25% of city-owned vacant land, 30% of units in each project must be affordable at 30-50% of area median income (AMI).
- $1.5 million for the Preservation of Existing Affordable Rental (PEAR) to help existing apartment building owners refinance their property to keep tenants in place and rents affordable.
- $1.175 million for Renew Woodlawn, a rehab homeownership program tailored for low to moderate income households.
- $1.52 million supplement for the Woodlawn Loan Fund to purchase and rehabilitate vacant units to create new affordable housing.
- $1 million for the Woodlawn Long-term Homeowner Home Improvement Grant Program to assist homeowners with 5 or more years of residency in their home with a grant of up to $20,000 for home repairs.
- Tenant Right of First Refusal pilot program for larger apartment buildings.

**EA, Section 6.3.3, Jurisdictional Transfer of Roadways, Vacations and Dedications, Page 72**

- The following roadways will be transferred from IDOT to CDOT jurisdiction: 57th Drive from 57th Street to ~~Lake Shore Drive~~ Hyde Park Boulevard, Cornell Drive from 67th Street to 57th Street, Stony Island Avenue from 69th Street to 65th Place and Hyde Park Boulevard from 57th Street to ~~55th Street~~ East Hyde Park Boulevard. Coordination of a jurisdictional transfer agreement is ongoing.EA, Section 7.0, References, Page REF-2

The following citations are added to the references list:

Office of the Mayor, City of Chicago
2020    "City Council Passes the Woodlawn Housing Ordinance." September 9, 2020. Accessed November 10, 2020. https://www.chicago.gov/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2020/September/WoodlawnHousingOrdinance.pdf.

TWBTA
2018    "Obama Presidential Center Shade Study," May 10, 2018. Accessed December 21, 2020. http://www.tinyURL.com/JPImprovements. [NOTE: final date and URL to be updated when document posted online by City.]

**Appendix D, Section 4.1.1 Alternative A: No Action, Direct Impacts, Page 6**

There are no direct impacts to trees associated with Alternative A. <u>There are no proposed changes to the tree population; therefore, there are no changes to the existing canopy in Jackson Park.</u>

**Appendix D, Section 4.2.2.2 Alternative B: NPS Action (FHWA No Build), Indirect Impacts— City Actions, OPC Site Development, Page 9**

The following text is added as a final paragraph in this section:

> The tree removals associated with the OPC site development would result in a loss 5.4 acres of canopy. The preliminary planting plan for the OPC anticipates 7.79 acres of canopy at maturity, resulting in a net gain of 2.2 acres of tree canopy at maturity on the OPC site. As detailed in *Obama Presidential Center: Reinforcing Landscape Ecology* (see link provided under Section 7.0 References in the EA), the Foundation recognizes the importance of tree cover, which brings longevity to the site and plays a major role in moderating local micro-climate. The proposed tree cover for the OPC site is more diverse and advances efforts to provide varied habitat for vital ecosystem function. The proposed design also looks to reinstate and enhance the important middle layers. Currently, there are few shrub-scaled plants on the site, which means that the site is missing a critical layer in the ecosystem. This planting layer typically provides cover, screening, and shelter from weather. Shrubs will be used strategically on the OPC site to help develop soil structure, provide habitat, and serve as a source of food for wildlife.

**Appendix D, Section 4.2.2.2 Alternative B: NPS Action (FHWA No Build), Indirect Impacts— City Actions, Track and Field Relocation, Page 12**

The following text is added as a final paragraph in this section:

> The tree removals associated with the relocation of the track and field resulted in a canopy loss of 0.26 acres. The proposed planting plan for the relocated track and field work is anticipated to restore a total of 0.57 acres at maturity, resulting in a net gain of 0.31 acres of tree canopy.

**Appendix D, Section 4.3.1 Alternative C: NPS + FHWA Action, Direct Impacts, Page 15**

The following text is added as a final paragraph in this section:

> Under Alternative C, the proposed tree removals would result in a canopy loss of 4.8 acres. Considering the mix of shade and ornamental tree species proposed as part of the mitigation plan, approximately 9.2 acres of canopy will be restored at maturity, resulting in a net gain of 4.4 acres of tree canopy in Jackson Park.

**Appendix G, Section 3.0 Existing Conditions, Page 5**

The following text is added before the first paragraph:

> The following sections provide an overview of information regarding the existing conditions within Jackson Park, and describe the recreational uses of and facilities within the affected areas by the proposed alternatives. Background information was provided by the Chicago Park District as well as the data collected for the 2018 South Lakefront Framework Plan (SLFP).

**Appendix G, Section 3.2.2 Existing Recreation Use and Opportunities, Page 11**

The CPD has one picnic grove within the footprint of the OPC site—grove 11. According to data compiled by the ~~Jackson~~ Chicago Park District, the grove…

**Appendix G, Section 4.2.1 Direct Impacts, Page 20**

Under Alternative A, recreation within Jackson Park ~~and the~~ would continue under the current CPD ownership and management, and recreation within the Midway Plaisance would continue under the current City ownership and CPD management; there would be no change to the UPARR boundary.

**Appendix G, Footer, Pages II – 38**

~~UPARR~~ Recreation Technical Memorandum

**Appendix I, Section 4.2.2.5, Alternative B: NPS Action (FHWA No Build) – Indirect Impacts of City Actions, Housing, Housing Costs, Page 40**

The following text replaces the second paragraph and bulleted list on page 40:

> On September 9, 2020, the Chicago City Council passed the Woodlawn Housing Ordinance. This ordinance is "designed to ensure the Woodlawn community and other Chicago residents can benefit from the unprecedented economic and cultural opportunities created by the future Obama Presidential Center" (Office of the Mayor 2020). Key components include:
>
> - On 25% of city-owned vacant land, 30% of units in each project must be affordable at 30-50% of area median income (AMI).
> - $1.5 million for the Preservation of Existing Affordable Rental (PEAR) to help existing apartment building owners refinance their property to keep tenants in place and rents affordable.
> - $1.175 million for Renew Woodlawn, a rehab homeownership program tailored for low to moderate income households.
> - $1.52 million supplement for the Woodlawn Loan Fund to purchase and rehabilitate vacant units to create new affordable housing.
> - $1 million for the Woodlawn Long-term Homeowner Home Improvement Grant Program to assist homeowners with 5 or more years of residency in their home with a grant of up to $20,000 for home repairs.
> - Tenant Right of First Refusal pilot program for larger apartment buildings.

**Appendix I, Section 5.0, References, Page 47**

The following citation is added to the references list:

Office of the Mayor, City of Chicago
2020     "City Council Passes the Woodlawn Housing Ordinance." September 9, 2020. Accessed November 10, 2020. https://www.chicago.gov/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2020/September/WoodlawnHousingOrdinance.pdf.

**Appendix J, Section 3.2.2.2, Alternative B: NPS Action (FHWA No Build), Indirect Impacts – City Actions, OPC Site Development, Page 3**

The following text is added as a final paragraph in this section:

A shade study was conducted by the Foundation in 2018 to determine the extent of the shadow that would be cast by the OPC Museum Building at various times of day (TWBTA 2018). The study shows that the Museum Building's shadow would generally be confined to the OPC site, occasionally reaching into the east end of Midway Plaisance to the west (early in the morning) and across the lagoon (late in the day). These shadows would be temporary and are consistent with natural shading provided by trees and clouds. The GLFER project utilized native species, which are well adapted to prevailing conditions of sun and shade.

**Appendix J, Section 5.0, References, Page 8**

The following citation is added to the references list:

TWBTA
2018     "Obama Presidential Center Shade Study," May 10, 2018. Accessed December 21, 2020. http://www.tinyURL.com/JPImprovements. [NOTE: final date and URL to be updated when document posted online by City.]

# EXHIBIT 12

*Barack Obama Presidential Library – Washington Park Site, University of Chicago*

## EXECUTIVE SUMMARY

Sam Schwartz Engineering, DPC (SSE) conducted a traffic impact study for the proposed University of Chicago Washington Park site for the Barack Obama Presidential Library (OPL). Existing and future conditions in the study area have been described, analyzed, and evaluated with respect to transportation operations and the impact of the proposed development.

The location of the Washington Park site is easy to access for visitors and staff. It is located approximately 0.75 miles from the Dan Ryan Expressway and is directly adjacent to the CTA Green Line station at Garfield.

The study analyzed the following major intersections within the proximity of the site:

- Garfield Boulevard/Wells Street
- Garfield Boulevard/Wentworth Avenue
- Garfield Boulevard/Martin Luther King Drive
- Garfield Boulevard/Ellsworth Drive/Morgan Drive
- 51st Street/Martin Luther King Drive/Ellsworth Drive

Garfield Boulevard, part of Chicago's system of historic boulevards, has a right of way of 200' and provides three travel lanes in both the eastbound and westbound directions. Peak hour parking regulations provide a forth lane in each direction. Garfield Boulevard has significant vehicular capacity between the site and the Dan Ryan Expressway. Traffic currently moves along Garfield Boulevard without much delay and the additional traffic generated by the OPL can be accommodated without adding significant delay to any of the study intersections. Overall, vehicles will be able to easily access the site and the OPL will not have a significant impact on the traffic operations in the neighborhoods.

The following details the recommendations for parking, access, and improvements to the safety and operations of multi-modal access.

- Access to visitor parking should be provided on Prairie Avenue and/or 54th Street. Access should be prohibited on Garfield Boulevard in order to create a direct pedestrian connection between the Garfield Green Line station and the site.

- Service access and secure access can be provided from Martin Luther King Drive or Ellsworth Drive.

- Minor traffic signal timing/phasing modifications should be implemented along Garfield Park, as appropriate, to provide optimal operations and to facilitate traffic to and from the OPL.

- Ellsworth Drive should be vacated, between Garfield Boulevard and 51st Street, and be considered as a secondary access for handicap parking, taxis, tour buses and service vehicles. Vacating Ellsworth Drive will not only potentially reduce the amount of asphalt within Washington Park, but it will also significantly improve the safety and operations of the

intersections of 51st Street/Martin Luther King Drive/Ellsworth Drive and Garfield Boulevard/Morgan Drive/Ellsworth Drive. Closing Ellsworth Drive at 51st Street/Martin Luther King Drive will necessitate a redesign of signals, striping and some curbs at that intersection. It is recommended that pedestrian facilities be updated in the redesign.

- A traffic signal and signalized and marked pedestrian crossings should be installed at the intersection of Garfield Boulevard/Morgan Drive/Ellsworth Drive to improve the safety for all users.

- It is estimated that the site will generate a peak parking demand of 404 parking spaces on the 30th highest visitor day of the year (typical design day). It is recommended that all parking be provided on the portion of the site located on the northwest corner of Garfield Boulevard and Martin Luther King Drive.

- There are a number of options to accommodate any overflow parking for special events and the highest visitor days, including the garages that serve the University of Chicago Medicine and the University of Chicago at Ellis Avenue. There is also a considerable amount of available on-street parking in the area.

- It is estimated that the site will generate a peak bus demand of 5 buses on the 30th most popular day (typical design day). Special programs and exhibits within the OPL can increase the demand for buses. It is recommended that buses be staged on Ellsworth Drive or on the portion of the site located on the northwest corner of Garfield Boulevard and Martin Luther King Drive.

- A staff member should be given the responsibility of coordinating all transportation, particularly for special events.

- There are plans to provide bus rapid transit on Garfield Boulevard. This would provide additional transit access for residents on the west side of the city and visitors arriving on the Red Line. It is recommended that bus shelters be provided for both the northbound and southbound stops at Garfield Boulevard for the #3 bus. Train arrival information should be provided at street level, and possibly within the Library entrance, for the Garfield Green Line station. The Garfield Green Line station should be renamed Garfield-Obama Library to make it easy for visitors to identify their stop.

- The streets within the park were originally designed to allow horse and buggies to easily traverse through them. This design provided excess space for modern vehicles, which has led to vehicles using these streets to speed through the park. The following are the recommended geometrics for each internal street:

  o Morgan Drive, between Rainey Drive and Payne Drive: Reduce lane width to 10.5 feet and parking lane on the east side to 8 feet. This would reduce the street by 15 feet in width and remove approximately 0.35 acres of asphalt.

- o Payne Drive, between Rainey Drive and Morgan Drive: Reduce lane width to 10.5 feet and the parking lanes to 8 feet. This would reduce the street by 7 feet in width and remove approximately 0.08 acres of asphalt.

- o Rainey Drive, between Payne Drive and Morgan Drive: Reduce lane width to 10.5 feet. This would reduce the street by 19 feet in width and remove approximately 0.35 acres of asphalt.

- A roundabout should be considered at the intersection of Morgan Drive/Rainey Drive and Payne Drive/Rainey Drive. Additional traffic calming measures, such as speed humps, chicanes, and signage should be installed within the park streets.

- Safe pedestrian crossings should be installed at Morgan Drive/Rainey Drive and Payne Drive/Rainey Drive if roundabouts are not installed. They may include underpasses, stop control, or speed tables, similar to other pedestrian crossings within the University of Chicago.

- The sidewalk on the north side of Garfield Boulevard, between Prairie Avenue and Martin Luther King Drive, should be widened to at least 18 feet.

- The sidewalk on the west side of Martin Luther King Drive should be widened to 18 feet.

- A 12-foot wide sidewalk should be provided on the east side of Martin Luther King Drive, between 51st Street and Garfield Boulevard.

- Consideration should be given to developing a streetscape for Martin Luther King Drive and removing the guard rail.

- The intersection of Garfield Boulevard and Martin Luther King Drive should be modified to provide more safety and priority for pedestrians.

- There is currently a cycle track on 55th Street, which allows for safe bicycle travel on 55th Street protected from vehicular traffic. An on-street bike lane connects this facility through Washington Park, requiring bicyclists to ride next to fast-moving traffic through the park. It is recommended that a shared use path be designated within Washington Park that connects the 55th Street cycle track to the OPL. This should connect to the future bicycle facility on Garfield Boulevard.

## INTRODUCTION

Sam Schwartz Engineering, DPC (SSE) was retained by the University of Chicago to conduct a traffic impact study for the proposed Washington Park site for the Barack Obama Presidential Library (OPL). The Washington Park site location is illustrated on ***Figure 1***.

The following report presents and documents SSE's methodology, data collection, analyses, and identifies improvements, as necessary, to mitigate impacts the development's traffic may have on the adjacent roadway network.

As proposed, the project consists of the construction of the library itself within Washington Park between Martin Luther King Drive and Ellsworth Drive, north of Garfield Avenue. Visitor parking will be provided on the west portion of the site, on the northwest corner of Martin Luther King Drive and Garfield Boulevard. Vehicular access to visitor parking can be provided via 54th Street and Martin Luther King Drive and/or Prairie Avenue and Garfield Boulevard. This study analyzes the more conservative scenario where primary access is via Martin Luther King Drive, which carries more traffic than Prairie Avenue.

Ellsworth Drive will be vacated and closed to through traffic. Vehicular access to the site will be provided by Ellsworth Drive at Garfield Boulevard. This access will be used for handicapped parking, visitor pick-up and drop-off by private vehicles and taxis, and tour bus pick-up and drop-off, and service vehicle access.

The purpose of this study is to fulfill the criteria for accessibility, circulation and parking set forth by the Barack Obama Foundation. The objectives of the study are as follows:
- Analyze the existing traffic, parking and multi-modal operations in the study area.
- Estimate the new traffic generated by the proposed Presidential Library.
- Analyze the future traffic, parking and multi-modal operations in the study area.
- Analyze the future site access and circulation.
- Provide mitigation strategies and recommendations related to traffic, parking and multi-modal operations, site access and circulations, as well as to the management of traffic during construction.

The study area, with the study intersections identified, is shown on ***Figure 2***.



Not to Scale



**Figure 1**
**Site Location Map**

Sam
Schwartz
Engineering
D.P.C.



Not to Scale



**Figure 2**
**Study Intersections Map**
● = Study Intersection

Sam
Schwartz
Engineering
D.P.C.

## EXISTING CONDITIONS

This section of the study provides a description of the Washington Park site, the adjacent land uses, a summary of the data collection process and an analysis of the existing transportation conditions.

### Site Location
The eastern portion of the site, where the OPL would sit is owned by the Chicago Park District. Current use of the site is parkland and path, with no formal recreational uses. The Chicago Park District is home to many of the nation's and city's most popular museums and attractions, including the Museum of Science and Industry, the Field Museum, the Shedd Aquarium, the Adler Planetarium, the DuSable Museum and the Lincoln Park Zoo. The western portion of the site is currently owned by the Chicago Transit Authority (CTA) and the University of Chicago. Current uses include the CTA Garfield Green Line station, surface parking for the CTA station, a Citgo gas station, and empty lots, including a lot which was used for staging of vehicles and buses during the reconstruction of the Green Line station.

### Proposed Presidential Library Use and Operation
The Barack Obama Presidential Library will serve as a repository of the historical documents related to Barack Obama, the 44th President of the United States of America. It will include exhibits, displays, and souvenir shops. The building footprint is estimated at approximately 200,000 square feet. The typical hours of operation are anticipated to be between 9:00 AM and 5:00 PM and it is expected to be closed on major holidays such as Thanksgiving, Christmas, and New Year's Day. An estimated 800,000 visitors will come to the OPL each year, of which, approximately 350,000 are expected to be from outside the Chicagoland area.

### Area Land Use
The site is currently unoccupied and owned by the City of Chicago. To the west of the site is the CTA Garfield Green Line station. To the northwest and southwest are mainly vacant lots and residential land uses. To the east of the site is Washington Park, including sports fields and the DuSable Museum. East of Washington Park is the University of Chicago and Medical Center.

### Existing Area Roadway System
Unless otherwise noted, all streets described below are under the jurisdiction of the Chicago Department of Transportation (CDOT). Roads are described in the study area from west to east, then from north to south.

***Garfield Boulevard*** is a 6-lane 200-foot wide roadway, with eastbound and westbound lanes separated by an 80-foot median with grass and trees. Garfield Boulevard is part of Chicago's historic boulevard system. On-street parking exists on the north and south curbs and is restricted during peak hours, providing an additional travel lane during those times. At its signalized intersection with Wentworth/Dan Ryan northbound ramps, Garfield Boulevard provides four through lanes and one right-turn lane in the westbound direction, and three through lanes and two left-turn

lanes in the eastbound direction. At its signalized intersection with Wells Street/Dan Ryan southbound ramps, it provides three through lanes and two left-turn lanes in the westbound directions, and provides five through lanes and one right-turn lane in the eastbound direction. At its intersection with Martin Luther King Drive it provides three lanes in the eastbound direction, and three lanes and a left-turn lane in the westbound direction. At its intersection with Morgan Drive, it provides a left-turn lane and two right-turn lanes in the eastbound direction.

***Martin Luther King Drive*** is a two-lane, 38-foot roadway. On-street parking is provided on the west side of the roadway. Bike lanes are provided in the northbound and southbound directions. North of 51st Street, it also provides a service drive on the each side of the roadway which provides two lanes of parking each. At its signalized intersection with Garfield Boulevard it provides one lane in the northbound direction, and two lanes in the southbound direction. At its intersection with 51st Street and Ellsworth Drive, it provides one wide lane in the northbound direction, and a left-turn lane, a through lane to Ellsworth and a shared through/right-turn lane in the southbound direction.

***Ellsworth Drive*** is a two-lane, 46-foot roadway. Parking is provided. Buffered bike lanes are provided in the northbound and southbound directions. At its signalized intersection with Martin Luther King Drive, it provides a shared through/right-turn lane and a left-turn lane in the northbound direction. At its unsignalized intersection with Garfield Boulevard and Morgan Drive, it provides a shared through/right-turn lane with right-turn channelization.

***51st Street*** is a two-lane, 38-foot roadway. On-street parking is provided on the north and south sides of the street. At its signalized intersection with Martin Luther King Drive & Ellsworth Drive, 51st Street provides a right-turn pocket, a through lane and a left-turn lane in the eastbound direction, and two lanes and a left-turn lane in the westbound direction.

## Pedestrian/Bike Facilities

Numerous paths for pedestrian travel are provided within the park. Sidewalks are provided along all study roadways on both sides of the street with the following exceptions. No sidewalks are provided along Ellsworth Drive within Washington Park and no sidewalk is provided on the east side of Martin Luther King Drive along the park. No sidewalks are provided on the interior median of Garfield Boulevard. Crosswalks are not provided on the west side of Wentworth Avenue and the east side of Wells Street at Garfield Boulevard. A bike route is provided along Martin Luther King Drive, Morgan Drive, and Ellsworth Drive. A Divvy bikeshare docking station is provided at the Garfield Green Line station. This is currently the last bikeshare station going south and west. Additional stations to expand the service in 2015 are planned along Garfield and at the CTA Garfield Red Line station.

## Existing Transit Service

The proposed site is well-served by public transportation. The Chicago Transit Authority (CTA) operates multiple existing bus routes adjacent to the proposed site, as listed below:

- #55 - Garfield
- #3 - MLK

- #15 - Jeffrey Local
- #59 - 59th / 61st

The Green Line Garfield station is just within and west of the site.  The #55 bus route connects riders 0.75 miles to the Garfield Red Line station as well.

**Existing Traffic Volumes**

Existing traffic volumes were determined by manual traffic counts conducted in October 2014 during the weekday and Saturday midday peak periods (10:00 AM to 2:00 PM) at the following intersections:

- Garfield Boulevard at Wentworth Avenue/Dan Ryan Expressway northbound ramps
- Garfield Boulevard at Wells Street/Dan Ryan southbound ramps
- Garfield Boulevard at Martin Luther King Drive
- Garfield Boulevard at Ellsworth Drive and Morgan Drive
- 51st Street at Martin Luther King Drive and Ellsworth Drive

Intersection traffic counts include measuring the auto and bicycle traffic passing through each intersection as well as the number of pedestrians crossing each intersection approach in order to best represent existing operations at the study intersections.  The weekday afternoon and Saturday peak periods were chosen since they coincide with the anticipated peak periods of the surrounding roadway system and the proposed development.  The results indicate that the peak hour of existing traffic during the weekday midday peak occurred from 1:00 pm to 2:00 pm and the Saturday midday peak occurred from 11:30 am to 12:30 pm.

Based on traffic count data retrieved from the Illinois Department of Transportation website, the average daily traffic in the vicinity of the development is:

- 30,2000 vehicles on Garfield Boulevard, (year 2010)
- 8,700 vehicles on Martin Luther King Drive (year 2010)
- 2,800 vehicles on Indiana Avenue (year 2010)
- 3,500 vehicles on Michigan Avenue (year 2010)
- 3,020 vehicles on Morgan Drive (year 2010)
- 11,600 vehicles on Rainey Drive (year 2010)

The existing peak hour volumes are illustrated on ***Figure 3***.  ***Figure 4*** depicts the pedestrian volumes.



**Figure 3**

**Existing Traffic Volumes**

xx = Weekday Midday Street
     Peak Hour (1:00-2:00 pm)
(xx) = Saturday Midday Street
     Peak Hour
     (11:30 am-12:30 pm)
⊗ = Existing Traffic Signal

Sam
Schwartz
Engineering
D.P.C.



**Figure 4**

**Existing Pedestrian Volumes**

xx = Weekday Midday Street
      Peak Hour (1:00-2:00 pm)
(xx) = Saturday Midday Street
      Peak Hour
      (11:30 am-12:30 pm)
⊗ = Existing Traffic Signal

*Barack Obama Presidential Library – Washington Park Site, University of Chicago*

## Existing Operations

The effectiveness of an intersection's operation is measured in terms of Level of Service (LOS), which is assigned a letter from A to F based on the average total delay experienced by each vehicle passing through an intersection. LOS A is the highest, representing the least delay, LOS E represents saturated or at-capacity conditions, and LOS F represents oversaturated conditions. The minimum intersection LOS that is generally accepted by industry standards is LOS D.

An intersection capacity analysis was performed for the study intersections for the weekday and Saturday peak hour using the methodologies outlined in the *Highway Capacity Manual (HCM)*[1], using Synchro software for the analysis. The existing timings at this intersection were obtained from the Chicago Department of Transportation. The results in **Table 1** show that all approaches at the study intersections operate at acceptable levels of services, at LOS C, or better.

**Table 1: Existing Intersection Level-of-Service**

| Intersection/Peak Hour/Lane | Weekday Midday Peak Hour | | Saturday Midday Peak Hour | |
|---|---|---|---|---|
| | Delay [A] | LOS [B] | Delay | LOS |
| **Garfield EB at Wentworth Ave** | | | | |
| LT EB approach | 7.5 | A | 7.9 | A |
| TR NB approach | 25.7 | C | 27.7 | C |
| **Overall Intersection** | **17.3** | **B** | **19.3** | **B** |
| **Garfield WB at Wentworth Ave** | | | | |
| TR WB approach | 23.9 | C | 22.5 | C |
| LT NB approach | 1.8 | A | 1.9 | A |
| **Overall Intersection** | **13.0** | **B** | **11.9** | **B** |
| **Garfield EB at Wells Street** | | | | |
| TR EB approach | 20.0 | B | 18.7 | B |
| LT SB approach | 2.2 | A | 2.2 | A |
| **Overall Intersection** | **10.0** | **B** | **9.6** | **A** |
| **Garfield WB at Wells Street** | | | | |
| LT WB approach | 7.6 | A | 7.8 | A |
| TR SB approach | 28.8 | C | 29.1 | C |
| **Overall Intersection** | **17.7** | **B** | **18.0** | **B** |
| **Garfield EB at MLK Drive** | | | | |
| LTR EB approach | 17.9 | B | 20.1 | C |
| TR NB approach | 18.1 | B | 20.9 | C |
| LT SB approach | 6.5 | A | 8.1 | A |
| **Overall Intersection** | **15.7** | **B** | **18.9** | **B** |
| **Garfield WB at MLK Drive** | | | | |
| LTR WB approach | 18.2 | B | 17.5 | B |
| LT NB approach | 6.6 | A | 5.8 | A |
| TR SB approach | 14.6 | B | 11.5 | B |
| **Overall Intersection** | **15.4** | **B** | **13.3** | **B** |
| **MLK Drive at 51st Street/Ellsworth Drive** | | | | |
| LTR EB approach | 24.2 | C | 24.7 | C |
| LTR WB approach | 24.2 | C | 25.2 | C |
| LTR NB approach | 23.7 | C | 30.6 | C |
| LTR SB approach | 31.1 | C | 33.5 | C |
| LTR NWB approach | 29.6 | C | 32.6 | C |
| **Overall Intersection** | **26.3** | **C** | **28.8** | **C** |

[A] Average control delay in seconds per vehicle.
[B] Level of service.

---

[1]Highway Capacity Manual, Transportation Research Board, National Research Council, Washington, D.C., 2010.

Sam
Schwartz
Engineering
D.P.C.

## FUTURE TRAFFIC CHARACTERISTICS

This section of the report presents the traffic characteristics associated with the OPL Washington Park Site and evaluates the impact of future traffic on the area street system. This includes discussions regarding site development plans, site-generated traffic volumes and their distributions on the surrounding roadway network. Site access, site traffic assignment and future traffic volumes will also be discussed.

### Traffic Growth

Construction and occupancy of the proposed OPL is currently expected to occur in seven years, by the year 2021. It is anticipated that this development would stimulate the redevelopment of Garfield Boulevard corridor. Accordingly, in order to account for the general traffic growth associated with new development in the surrounding area as the proposed development is constructed, SSE applied an annual, compounded growth rate of 2% to existing traffic volumes along Garfield Boulevard and 0.5% to the remaining study area roadways.

### 2021 No-Build Conditions (without Proposed Presidential Library)

The 2021 No-Build peak hour traffic volumes were accordingly developed by applying the base 2.0 percent and 0.5 percent annual growth rate (approximately 1.14 and 1.04 percent over 7 years, respectively) on Garfield Boulevard and other roadways, respectively, to the existing traffic (Figure 3). The 2021 No-Build traffic-flow networks are graphically depicted on ***Figure 5***.

### Proposed Development Plan

The proposed development plan includes the construction of the Barack Obama Presidential Library. The building footprint is estimated at approximately 200,000 square feet. Its anticipated typical hours of operation are between 9:00 AM and 5:00 PM and closed on major holidays such as Thanksgiving, Christmas, and New Year's Day. It is estimated that 800,000 visitors will come to the OPL each year, of which, approximately 350,000 are expected to be from outside the Chicagoland area. It is anticipated to be served by a minimum of 404 vehicular parking spaces on site. It will provide a dedicated bus area for drop-off/pick-up operations and storage for a minimum of 5 buses.

The proposed development plan includes the vacation of Ellsworth Drive within Washington Park. Traffic currently using Ellsworth Drive will be rerouted. The re-assignment of 2021 No-Build traffic is graphically depicted on ***Figure 6***.



**Figure 5**

**2021 No-Build**

xx = Weekday Midday Street
Peak Hour (1:00-2:00 pm)
(xx) = Saturday Midday Street
Peak Hour
(11:30 am-12:30 pm)
⊗ = Existing Traffic Signal

Sam
Schwartz
Engineering
D.P.C.



**Figure 6**

**Reassignment of 2021 No Build Traffic with Closure of Ellsworth Dr**

xx = Weekday Midday Street Peak Hour (1:00-2:00 pm)
(xx) = Saturday Midday Street Peak Hour (11:30 am-12:30 pm)
⊗ = Existing Traffic Signal

Sam Schwartz Engineering D.P.C.

**Site Access**

With the location of the OPL Washington Park site in close proximity to major roadways (Lake Shore Drive, Dan Ryan Expressway), as well as the University of Chicago Campus, Chicago's lakefront, other cultural attractions, and public transportation, OPL visitors will use a variety modes of transportation to access the site. All visitors arriving by automobile (personal or taxi) will enter and exit the site via the proposed access on Prairie Avenue, 54th Street, or Martin Luther King Drive. Buses associated with student or other organized groups are planned to pick-up/drop-off OPL visitors using a dedicated bus area to be located as close to the site as possible either within the site or curbside along Martin Luther King Drive.

Public transportation options such as the CTA Green Line, CTA Red Line, and CTA bus provide excellent access to the OPL Washington Park site. The CTA Garfield Green Line station is located adjacent to the site. CTA bus routes operate along Garfield Boulevard and Martin Luther King Drive.

Based on data from other museums in the City of Chicago, travel time data, and availability of public transportation to the OPL Washington Park site, the mode of transportation distribution assumed for visitors to and from the proposed site is summarized in *Table 2*.

**Table 2: Mode of Transportation**

| Mode | Percentage |
|---|---|
| Car | 50% |
| Walk | 10% |
| Taxi | 10% |
| Transit | 20% |
| Tour / School Bus | 9% |
| Bike | 1% |
| **Total** | **100%** |

**Trip Generation**

The amount of traffic generated by a development depends on the type and density of the land use being proposed. SSE estimated the trip generation for the proposed OPL based on visitor estimates provided by the University of Chicago, mode of transportation data in the site vicinity, and data from other museums in the City of Chicago and New York City.

SSE used the following assumptions to develop the trip generation for the OPL Washington Park site:

- 800,000 visitors
- Approximately 4,919 visitors would arrive on the 30th day (design day)
- Approximately 8,694 visitors would arrive on the peak day
- 50% of the visitors would travel by car

- 10% of the visitors would arrive by taxi
- 9% of the visitors would arrive via a tour / school bus
- The average automobile occupancy would be 2.56 persons per vehicle
- The average bus occupancy would be 41 persons
- The average visitor time would be 2.5 hours

*Table 3* presents the estimated trip generation for the proposed OPL Washington Park site.

**Table 3: Estimated Trip Generation**

| Vehicle | Weekday / Saturday Midday Peak Hour | | |
|---|---|---|---|
| | In | Out | Total |
| Automobile (Car/Taxi) | 208 | 202 | 410 |
| Bus | 2 | 2 | 4 |
| **Total Development** | **210** | **204** | **414** |

As shown in Table 3, during the weekday midday peak hour, the development is expected to generate approximately 414 new vehicle trips (210 entering and 204 exiting) during the 30th day peak hour.

**Directional Distribution**

The directional distribution of the site-generated traffic is a function of several variables, including the proposed land use, the adjacent roadway network and access, information from the University of Chicago, and engineering judgment. Accordingly, the anticipated origin and destination of the OPL visitors is summarized in *Table 4*.

**Table 4: Visitor Origin / Destination**

| Origin / Destination | Percentage |
|---|---|
| North Side (Chicago) | 8% |
| Near West Side (Chicago) | 4% |
| Central (Chicago) | 30% |
| South Side (Chicago) | 8% |
| Other (Chicago) | 15% |
| Outside Chicago City Limits | 35% |
| **Total** | **100%** |

The resulting expected directional distribution of site traffic for the proposed OPL Washington Park site is illustrated on *Figure 7*.



Figure 7
**Directional Distribution**

xx = Percent Distribution
⊗ = Existing Traffic Signal

**Site Traffic Assignment**

Based on the direction of travel, the site-generated trips were assigned to the roadway network by utilizing the site estimated trips listed in Table 4 and the anticipated directional distribution outlined on Figure 7.  The site traffic assignment is illustrated on ***Figure 8***.

**2021 Build Traffic Assignment (with Presidential Library, Washington Park site)**

The site-generated traffic volumes (Figure 8) were then added to the 2021 No-Build traffic volumes (Figure 6) to develop the 2021 Build traffic volumes.   The total traffic volumes for the year 2021 are shown on ***Figure 9***.

**Background Development (Master Plan) Traffic Growth**

Traffic growth would also be associated with the expected land developments in the study area.  However, there are no known background developments in the study area.  There are no "vested" trips to include in this analysis.



**Figure 8**
**Site Generated Traffic**

xx = Weekday Midday Street
Peak Hour (1:00-2:00 pm)
(xx) = Saturday Midday Street
Peak Hour
(11:30 am-12:30 pm)
⊗ = Existing Traffic Signal

Sam
Schwartz
Engineering
D.P.C.



Figure 9

2021 Total Traffic

xx = Weekday Midday Street
Peak Hour (1:00-2:00 pm)
(xx) = Saturday Midday Street
Peak Hour
(11:30 am-12:30 pm)
⊗ = Existing Traffic Signal

Sam
Schwartz
Engineering
D.P.C.

*Barack Obama Presidential Library – Washington Park Site, University of Chicago*

## TRAFFIC ANALYSIS

The following provides a discussion of the evaluation conducted of the weekday midday and Saturday midday peak hours to determine the impact of the proposed Barack Obama Presidential Library on the surrounding roadway system. These analyses include an examination of turn lane needs, traffic control improvements, functional capacity, parking demand, internal circulation, multi-modal assessment, and construction traffic management.

### Capacity Analysis

Capacity analyses were conducted for assessing future traffic conditions of the weekday midday and Saturday midday peak hours, again using the methodologies outlined in the *Highway Capacity Manual*, using Synchro software. Summaries of the capacity analysis results indicating the LOS for all study intersections under future conditions are presented in ***Table 5*** and are discussed below.

**Table 5: Future Level-of-Service Summary**

| Intersection/Peak Hour/Lane | 2014 Existing | | 2021 Build (with Library) | |
|---|---|---|---|---|
| | Delay [A] | LOS [B] | Delay | LOS |
| **Garfield EB at Wentworth Ave** | | | | |
| *Weekday Midday Peak Hour* | | | | |
| LT EB approach | 7.5 | A | 7.7 | A |
| TR NB approach | 25.7 | C | 26.8 | C |
| **Overall Intersection** | **17.3** | **B** | **17.4** | **B** |
| *Saturday Midday Peak Hour* | | | | |
| LT EB approach | 7.9 | A | 9.2 | A |
| TR NB approach | 27.7 | C | 30.5 | C |
| **Overall Intersection** | **19.3** | **B** | **20.7** | **C** |
| **Garfield WB at Wentworth Ave** | | | | |
| *Weekday Midday Peak Hour* | | | | |
| TR WB approach | 23.9 | C | 49.8 | D |
| LT NB approach | 1.8 | A | 2.0 | A |
| **Overall Intersection** | **13.0** | **B** | **29.1** | **C** |
| *Saturday Midday Peak Hour* | | | | |
| TR WB approach | 22.5 | C | 36.0 | D |
| LT NB approach | 1.9 | A | 2.1 | A |
| **Overall Intersection** | **11.9** | **B** | **20.8** | **C** |
| **Garfield EB at Wells Street** | | | | |
| *Weekday Midday Peak Hour* | | | | |
| TR EB approach | 20.0 | B | 20.8 | C |
| LT SB approach | 2.2 | A | 2.4 | A |
| **Overall Intersection** | **10.0** | **B** | **9.9** | **A** |
| *Saturday Midday Peak Hour* | | | | |
| TR EB approach | 18.7 | B | 20.0 | C |
| LT SB approach | 2.2 | A | 2.9 | A |
| **Overall Intersection** | **9.6** | **A** | **10.0** | **A** |

Sam
Schwartz
Engineering
D.P.C.

*Barack Obama Presidential Library – Washington Park Site, University of Chicago*

| | | | | |
|---|---|---|---|---|
| **Garfield WB at Wells Street** | | | | |
| *Weekday Midday Peak Hour* | | | | |
| LT WB approach | 7.6 | A | 7.7 | A |
| TR SB approach | 28.8 | C | 30.8 | C |
| **Overall Intersection** | **17.7** | **B** | **18.8** | **B** |
| *Saturday Midday Peak Hour* | | | | |
| LT WB approach | 7.8 | A | 7.7 | A |
| TR SB approach | 29.1 | C | 31.6 | C |
| **Overall Intersection** | **18.0** | **B** | **19.4** | **B** |
| **Garfield EB at MLK Drive** | | | | |
| *Weekday Midday Peak Hour* | | | | |
| LTR EB approach | 17.9 | B | 21.7 | C |
| TR NB approach | 18.1 | B | 18.5 | B |
| LT SB approach | 6.5 | A | 6.8 | A |
| **Overall Intersection** | **15.7** | **B** | **17.7** | **B** |
| *Saturday Midday Peak Hour* | | | | |
| LTR EB approach | 20.1 | C | 51.4 | D |
| TR NB approach | 20.9 | C | 21.3 | C |
| LT SB approach | 8.1 | A | 9.4 | A |
| **Overall Intersection** | **18.9** | **B** | **40.2** | **D** |
| **Garfield WB at MLK Drive** | | | | |
| *Weekday Midday Peak Hour* | | | | |
| LTR WB approach | 18.2 | B | 26.3 | C |
| LT NB approach | 6.6 | A | 23.6 | C |
| TR SB approach | 14.6 | B | 15.0 | B |
| **Overall Intersection** | **15.4** | **B** | **22.4** | **C** |
| *Saturday Midday Peak Hour* | | | | |
| LTR WB approach | 17.5 | B | 24.2 | C |
| LT NB approach | 5.8 | A | 21.6 | C |
| TR SB approach | 11.5 | B | 10.7 | B |
| **Overall Intersection** | **13.3** | **B** | **19.7** | **B** |
| **MLK Drive at 51st Street/Ellsworth Drive** | | | | |
| *Weekday Midday Peak Hour* | | | | |
| LTR EB approach | 24.2 | C | 22.7 | C |
| LTR WB approach | 24.2 | C | 21.1 | C |
| LTR NB approach | 23.7 | C | 9.1 | A |
| LTR SB approach | 31.1 | C | 10.7 | C |
| LTR NWB approach | 29.6 | C | - | - |
| **Overall Intersection** | **26.3** | **C** | **15.5** | **B** |
| *Saturday Midday Peak Hour* | | | | |
| LTR EB approach | 24.7 | C | 23.0 | C |
| LTR WB approach | 25.2 | C | 21.6 | C |
| LTR NB approach | 30.6 | C | 13.1 | B |
| LTR SB approach | 33.5 | C | 11.1 | B |
| LTR NWB approach | 32.6 | C | - | - |
| **Overall Intersection** | **28.8** | **C** | **16.8** | **B** |
| **Garfield EB at Morgan Drive** | | | | |
| *Weekday Midday Peak Hour* | | | | |
| LR EB approach | - | - | 11.4 | B |
| TR SB approach | - | - | 14.0 | B |
| TR NW approach | - | - | 0.5 | A |
| **Overall Intersection** | **-** | **-** | **6.3** | **A** |
| *Saturday Midday Peak Hour* | | | | |
| LR EB approach | - | - | 12.4 | B |
| TR SB approach | - | - | 13.0 | B |
| T NWB approach | - | - | 0.3 | A |
| **Overall Intersection** | **-** | **-** | **8.3** | **A** |

Sam
Schwartz
Engineering
D.P.C.

*Barack Obama Presidential Library – Washington Park Site, University of Chicago*

| **Garfield WB at Ellsworth Drive** | | | | |
|---|---|---|---|---|
| *Weekday Midday Peak Hour* | | | | |
| LR NB approach | - | - | 8.4 | A |
| TR SB approach | - | - | 9.3 | A |
| **Overall Intersection** | **-** | **-** | **8.5** | **A** |
| *Saturday Midday Peak Hour* | | | | |
| LR NB approach | - | - | 6.4 | A |
| LTR SB approach | - | - | 9.8 | A |
| **Overall Intersection** | **-** | **-** | **6.6** | **A** |

[A] Average control delay in seconds per vehicle.
[B] Level of service.

As shown in Table 5, approach and intersection LOS does not degrade below LOS D in the build condition. In the Saturday peak hour, the intersection of Garfield Boulevard eastbound and Martin Luther King Drive degrades from an LOS B to LOS D in the build condition, with the eastbound approach degrading form an LOS C to LOS D. The intersection LOS can be mitigated to an LOS C by shifting two seconds from the north-south clearance phase to the east-west phase, without degradation to the intersection LOS at the coupled intersection at Garfield Boulevard westbound and Martin Luther King Drive. Additionally, it is anticipated that a higher volume of pedestrians will be crossing Martin Luther King Drive at Garfield Boulevard from the Green Line station and the visitor parking. To accommodate this activity and provide greater safety to pedestrians, a three second leading pedestrian interval could be added in advance of the east-west vehicle phase, by removing time from the north-south phase, without degradation of intersection LOS below level of service C.

**Intersection Recommendations**
Pedestrian conditions at 54th Street and 53rd Street should be evaluated with the parking and OPL site layout. If the desired walking path to the museum crosses either of these intersections, pedestrian upgrades are recommended, including installing an all way stop at 54th Street, bumpouts on the west side of Martin Luther King Drive, and installation of international crosswalks.

It is recommended that the intersections of Garfield Boulevard and Ellsworth Drive and Morgan Drive be upgraded to a signalized intersection for the safety and convenience of all users at the intersection. This also creates a better pedestrian experience for park users. The intersection should have pedestrian signals and crosswalks.

The vacation of Ellsworth Drive will have geometric impacts to the existing intersection of 51st Street and Martin Luther King Drive. It will be necessary to redesign the signals, striping and curbs for this intersection. The conversion of this intersection to a 4-leg intersection from a 5-leg intersection will have significant safety advantages for all intersection users and will improve vehicle capacity.

**Access Recommendations**
Access to visitor parking should be provided on Prairie Avenue and/or 54th Street. Access should be prohibited on Garfield Boulevard in order to create a direct pedestrian connection between the Garfield Green Line station and the site.

*Barack Obama Presidential Library – Washington Park Site, University of Chicago*

Additional access must be provided for service vehicles and to provide secure access. This can be provided from either Martin Luther King Drive or the vacated Ellsworth Drive, depending on the final design of the building. A transportation security plan will be developed to ensure safe and secure travel for VIPs and to minimize the operations of area traffic.

**Wayfinding Recommendations**

Due to the expected amount of visitors from outside the Hyde Park neighborhood, a considerable amount of wayfinding should be provided. This includes signs on the Dan Ryan Expressway and Lake Shore Drive, and on local streets directing vehicles to parking. It should be very clear to drivers where they are going. It is suggested that any existing wayfinding signs on the Dan Ryan Expressway and Lake Shore Drive that identify the University of Chicago be modified to include the Library.

*Barack Obama Presidential Library – Washington Park Site, University of Chicago*

## VEHICLE AND TOUR BUS PARKING ANALYSIS

**Existing Parking Conditions**

SSE conducted parking utilization counts on a typical weekday and weekend within the study area to understand the availability of on-street parking.  The counts were conducted in the following study area:

- 51st Street, between Michigan Avenue and Martin Luther King Drive
- 53rd Street, between Michigan Avenue and Martin Luther King Drive
- 54th Street, between Indiana Avenue and Martin Luther King Drive
- Garfield Boulevard, between Michigan Avenue and Martin Luther King Drive
- 55th Place, between Indiana Avenue and Martin Luther King Drive
- 56th Street, between Michigan Avenue and Martin Luther King Drive
- 57th Street, between Michigan Avenue and Martin Luther King Drive
- 58th Street, between Michigan Avenue and Martin Luther King Drive
- 59th Street, between Michigan Avenue and Martin Luther King Drive
- 60th Street, between Michigan Avenue and Martin Luther King Drive
- 61st Street, between Michigan Avenue and Martin Luther King Drive
- 63rd Street, between Michigan Avenue and Martin Luther King Drive
- Michigan Avenue, between 51st Street and 63rd Street
- Indiana Avenue, between 51st Street and 63rd Street
- Prairie Avenue, between 51st Street and 63rd Street
- Calumet Avenue, between 51st Street and 63rd Street
- Martin Luther King Drive, between 51st Street and 63rd Street

All of the parking surveyed is free parking.  There are approximately 3,725 on-street spaces in this overall area.

Based on the surveys conducted by SSE, the utilization of on-street parking in the study area on a weekday and Saturday is approximately 30%.  There is a considerable amount of on-street parking available.

There are a number of off-street parking lots in the area of the site, including:

- University of Chicago Ellis Avenue Garage
- University of Chicago Medicine Main Garage
- Dyett High School

**Estimated Parking Demand**

In order to estimate the parking demand generated by the site, SSE gathered historical data from other museums in Chicago to understand the modal split and utilized daily and hourly distribution information from traffic studies conducted for the World Trade Center Memorial & Museum and the Chicago Children's Museum.

Sam
Schwartz
Engineering
D.P.C.

Parking is typically designed to accommodate the 30th most popular day of a facility and it is our recommendation that the OPL site be designed to accommodate this demand. Designing a parking facility for the peak day means that for 364 days of the year, there will be excess parking that is unused. Designing the parking at the Washington Park site to meet the demand of the 30th most popular day will ensure that visitors have an excellent experience accessing the site and that costs and land are used in the most efficient manner.

SSE used the following assumptions to develop the parking demand:

- 800,000 visitors
- Approximately 4,919 visitors would arrive on the 30th day (design day)
- Approximately 8,694 visitors would arrive on the peak day
- 50% of visitors would travel by car
- The average vehicle occupancy would be 2.5 persons per vehicle
- The average visitor time would be 2.5 hours

**Table 6** displays the hourly parking demand for the site. As can be seen below, the peak hour of parking demand occurs between 11:00 AM and 12:00 PM. This would require 404 parking spaces for the design day and 713 parking spaces for the peak day.

**Table 6**
**Parking Utilization Estimates**

| hr begin | % of visitors in facility | # of visitors | | # of visitors in vehicles | | # of vehicles | |
|---|---|---|---|---|---|---|---|
| | | 30th Day | Peak Day | 30th Day | Peak Day | 30th Day | Peak Day |
| 9:00 AM | 15% | 738 | 1304 | 369 | 652 | 144 | 255 |
| 10:00 AM | 35% | 1722 | 3043 | 861 | 1522 | 336 | 595 |
| 11:00 AM | 42% | 2066 | 3651 | 1033 | 1826 | 404 | 713 |
| 12:00 PM | 36% | 1771 | 3130 | 886 | 1565 | 346 | 611 |
| 1:00 PM | 37% | 1820 | 3217 | 910 | 1609 | 355 | 629 |
| 2:00 PM | 38% | 1869 | 3304 | 935 | 1652 | 365 | 645 |
| 3:00 PM | 28% | 1377 | 2434 | 689 | 1217 | 269 | 475 |
| 4:00 PM | 14% | 689 | 1217 | 345 | 609 | 135 | 238 |
| 5:00 PM | 4% | 197 | 348 | 99 | 174 | 39 | 68 |

**Parking Recommendations**

It is recommended that the Washington Park site provide enough parking to meet the design day demand, which equates to 404 parking spaces. The parking should be located on the portion of the site on the northwest corner of Garfield Boulevard and Martin Luther King Drive.

There will be days when the parking demand exceeds supply provided by the on-site parking garage. This situation is common for many large generators of visitors, and there are a number of

different strategies to accommodate this overflow demand.  As stated earlier, there are 3,725 on-street parking spaces within walking distance of the Library and there is very low utilization by the current residents.  The University of Chicago will have three large parking structures, two at the University of Chicago Medicine and one at 5500 S. Ellis, within a five minute drive and a fifteen minute walk of the location that could be used to manage peak parking demands.   There are a number of locations that can accommodate this additional demand, including the parking lots and structures on the University of Chicago campus and on-street parking.  It is recommended that a staff member be given the responsibility of being the transportation coordinator and that person identify these peak days and either valet service or remote shuttles be provided so that visitors can park easily and access the Library.

It is recommended that 100 bicycle parking spaces be provided (1 bicycle space per 4 vehicle spaces) in a highly visible location that is convenient to the visitor access of the Library.

**Estimated Tour Bus Demand and Recommendations**
In order to estimate the tour bus demand generated by the site, SSE utilized the same data from the parking demand study.

SSE used the following assumptions to develop the parking demand:
- 800,000 visitors
- Approximately 4,919 visitors would arrive on the 30th day (design day)
- Approximately 8,694 visitors would arrive on the peak day
- 9% of visitors would travel by car
- The average bus occupancy would be 41 persons per vehicle
- The average visitor time would be 2.5 hours

This would require 5 bus parking spaces for the design day and 9 bus parking spaces for the peak day.  It is recommended that buses drop-off and pick-up as close to the site as possible, either curbside or to the west of the Green Line station on-site.  There is ample space on-street, both on Martin Luther King Drive and Garfield Boulevard, to accomplish this if it cannot be completed on the site itself.

*Barack Obama Presidential Library – Washington Park Site, University of Chicago*

## MULTI-MODAL ASSESSMENT AND RECOMMENDATIONS

As discussed earlier, the Washington Park site has excellent transit access. It is located adjacent to the CTA Green Line, which connects to the Loop and all of the CTA rail lines, the Cermak Road corridor (McCormick Place and Chinatown) and the west side of Chicago. The CTA Red Line is located approximately 0.75 miles to the west of the site and two CTA routes (#3 and #55) run adjacent to the site. Sidewalks are provided on Garfield Boulevard and on the west side of Martin Luther King Drive. A cycle track is provided on 55th Street, to the east of Washington Park, and there are a number of shared use paths within Washington Park.

The following recommendations will enhance the multi-modal safety and connectivity for all users and make transit, walking, or biking to the site a much more attractive option, reducing the traffic impact on the adjacent neighborhoods.

Transit Connectivity and Operations

The Garfield Green Line station should be renamed Garfield-Obama Library to make it easy for visitors to identify their stop, similar to the Cermak-Chinatown, Sox-35th, and 35th-Bronzeville-IIT stations. Train arrival information should be provided at street level, and possibly within the Library entrance, for the Garfield Green Line station.

The bus and pedestrian connections should also be improved at the Green Line station. This includes larger and better bus stops and a traffic signal to allow pedestrians to cross the street with protection.

It is recommended that bus shelters be provided for both the northbound and southbound stops at Garfield Boulevard for the #3 bus and all bus shelters should be improved to provide arrival information.

There are plans to provide bus rapid transit on Garfield Boulevard. This would provide additional transit access for residents on the west side of the city and visitors arriving on the Red Line.

The existing Divvy bikeshare station at the Garfield Green Line station should be expanded and relocated to provide more convenient access to both the Library and the Green Line station.

A future Metra station is proposed on Garfield Boulevard for the Metra Rock Island Line. When constructed, it should be clearly named after the Library to make it easy for visitors to identify their stop. The design of the station should make transfers to the CTA bus seamless and also connect with the CTA Red Line.

Pedestrian Safety and Connectivity

It is likely that the amount of pedestrians in the area of the site will increase considerably with the OPL. To accommodate this increased demand, it is recommended that sidewalks around the site should be widened. The sidewalks on the north side of Garfield Boulevard, between Prairie Avenue

Sam
Schwartz
Engineering
D.P.C.

and Martin Luther King Drive, and on the west side of Martin Luther King Drive should be widened to at least 18 feet. A 12-foot wide sidewalk should be provided on the east side of Martin Luther King Drive, between 51st Street and Garfield Boulevard. Consideration should be given to developing a streetscape for Martin Luther King Drive and removing the guard rail.

The intersection of Garfield Boulevard and Martin Luther King Drive should be modified to provide safety and priority for pedestrians. This includes wider international crosswalks, reducing the turning radius on to Garfield Boulevard, narrowing the street crossing distance by providing bumpouts, and leading pedestrian intervals.

The streets within Washington Park were originally constructed to allow two horse and buggies to pass one another. With modern automobiles, these wide streets encourage vehicles to speed through the Park and make it difficult for pedestrians to access and traverse different parts of the park. A roundabout should be considered at the intersection of Morgan Drive/Rainey Drive and Payne Drive/Rainey Drive. Additional traffic calming measures, such as speed humps, chicanes, and signage should be installed within the park streets. Safe pedestrian crossings should be installed at Morgan Drive/Rainey Drive and Payne Drive/Rainey Drive if roundabouts are not installed. They may include underpasses, stop control, or speed tables, similar to other pedestrian crossings within the city of Chicago.

<u>Bicycle Safety and Connectivity</u>

The cycle track on 55th Street, east of Washington Park, allows for safe bicycle travel on 55th Street, protected from vehicular traffic. An on-street bike lane connects this facility through Washington Park, requiring bicyclists to ride next to vehicles speeding through the Park.

It is recommended that a shared use path be designated within Washington Park that connects the 55th Street cycle track to the OPL. A shared use path is a trail that is physically separated from vehicular traffic that can be used by pedestrians and bicyclists. This would allow for a safe connection between the 55th Street Cycle Track and the OPL. This path should connect to the future bicycle facility on Garfield Boulevard.

Signage should be provided to direct bicyclists to the park trail and the Library. The crossing at 55th Street/Payne Drive should be improved for bicyclists.

*Barack Obama Presidential Library – Washington Park Site, University of Chicago*

## CONSTRUCTION TRAFFIC MANAGEMENT

There are no SRA routes within the project limits. Garfield Boulevard and Martin Luther King Drive should not be used for construction access.   Ellsworth Drive should be closed during construction. The construction entrance to the sites should be provided on 54th Street or Ellsworth Drive. Construction employees should use Ellsworth Drive for parking.

## CONCLUSION

Analyses have been conducted under existing and future conditions of the intersections in the study area to determine the impact from the proposed Barack Obama Presidential Library (OPL) Washington Park site.  The capacity analysis results indicate that the implementation of geometric and signal improvements permits the surrounding roadways to operate at acceptable levels of service under all design hours to accommodate the increase in projected traffic due to the OPL, along with general traffic growth associated with new development in the surrounding area.  Overall, vehicles will be able to easily access the site and the OPL will not have a significant impact on the traffic operations in the neighborhoods.

The following details the recommendations for parking, access, and improvements to the safety and operations of multi-modal access.

- Access to visitor parking should be provided on Prairie Avenue and/or 54th Street.  Access should be prohibited on Garfield Boulevard in order to create a direct pedestrian connection between the Garfield Green Line Station and the site.

- Service access and secure access can be provided from Martin Luther King Drive or Ellsworth Drive.

- Minor traffic signal timing/phasing modifications should be implemented along Garfield Park, as appropriate, to provide optimal operations and to facilitate traffic to and from the OPL.

- Ellsworth Drive should be vacated, between Garfield Boulevard 51st Street, and be considered as a secondary access for handicap parking, taxis, tour buses and service vehicles.  Vacating Ellsworth Drive will not only potentially reduce the amount of asphalt within Washington Park, but it will also significantly improve the safety and operations of the intersections of 51st Street/Martin Luther King Drive/Ellsworth Drive and Garfield Boulevard/Morgan Drive/Ellsworth Drive.  Closing Ellsworth Drive at 51st St/Martin Luther King Drive would necessitate a redesign of signals, striping and some curbs at that intersection.  It is recommended that pedestrian facilities be updated in the redesign.

- A traffic signal and signalized and marked pedestrian crossings should be installed at the intersection of Garfield Boulevard/Morgan Drive/Ellsworth Drive to improve the safety for all users.

- It is estimated that the site will generate a peak parking demand of 404 parking spaces on the 30th highest visitor day of the year (typical design day).  It is recommended that all parking be provided on the portion of the site located on the northwest corner of Garfield Boulevard and Martin Luther King Drive.

- There are a number of options to accommodate any overflow parking for special events and the highest visitor days, including the garages that serve the University of Chicago Medicine

and the University of Chicago at Ellis Avenue.  There is also a considerable amount of available on-street parking in the area.

- It is estimated that the site will generate a peak bus demand of 5 buses on the 30th most popular day (typical design day).  Special programs and exhibits within the OPL can increase the demand for buses.  It is recommended that buses be staged on Ellsworth Drive or on the portion of the site located on the northwest corner of Garfield Boulevard and Martin Luther King Drive.

- A staff member should be given the responsibility of coordinating all transportation, particularly for special events.

- There are plans to provide bus rapid transit on Garfield Boulevard.  This would provide additional transit access for residents on the west side of the city and visitors arriving on the Red Line.  It is recommended that bus shelter be provided for both the northbound and southbound stops at Garfield Boulevard for the #3 bus.  Train arrival information should be provided at street level, and possibly within the Library entrance, for the Garfield Green Line station.  The Garfield Green Line station should be renamed Garfield-Obama Library to make it easy for visitors to identify their stop.

- The streets within the park were originally designed to allow horse and buggies to easily traverse through them.  This design provided excess space for modern vehicles, which has led to vehicles using these streets to speed through the park.  The following are the recommended geometrics for each internal street:

  o Morgan Drive, between Rainey Drive and Payne Drive:  Reduce lane width to 10.5 feet and parking lane on the east side to 8 feet.  This would reduce the street by 15 feet in width and remove approximately 0.35 acres of asphalt.

  o Payne Drive, between Rainey Drive and Morgan Drive:  Reduce lane width to 10.5 feet and the parking lanes to 8 feet.  This would reduce the street by 7 feet in width and remove approximately 0.08 acres of asphalt.

  o Rainey Drive, between Payne Drive and Morgan Drive:  Reduce lane width to 10.5 feet.  This would reduce the street by 19 feet in width and remove approximately 0.35 acres of asphalt.

- A roundabout should be considered at the intersection of Morgan Drive/Rainey Drive and Payne Drive/Rainey Drive.  Additional traffic calming measures, such as speed humps, chicanes, and signage should be installed within the Park streets.

- Safe pedestrian crossings should be installed at Morgan Drive/Rainey Drive and Payne Drive/Rainey Drive if roundabouts are not installed.  They may include underpasses, stop control, or speed tables, similar to other pedestrian crossings within the University of Chicago.

- The sidewalk on the north side of Garfield Boulevard, between Prairie Avenue and Martin Luther King Drive, should be widened to at least 18 feet.

- The sidewalk on the west side of Martin Luther King Drive should be widened to 18 feet.

- A 12-foot wide sidewalk should be provided on the east side of Martin Luther King Drive, between 51st Street and Garfield Boulevard.

- Consideration should be given to developing a streetscape for Martin Luther King Drive and removing the guard rail.

- The intersection of Garfield Boulevard and Martin Luther King Drive should be modified to provide more safety and priority for pedestrians.

- There is currently a cycle track on 55th Street, which allows for safe bicycle travel on 55th Street protected from vehicular traffic. An on-street bike lane connects this facility through Washington Park, requiring bicyclists to ride next to vehicles speeding through the park. It is recommended that a shared use path be designated within Washington Park that connects the 55th Street cycle track to the OPL. This should connect to the future bicycle facility on Garfield Boulevard.

# APPENDIX – MULTI-MODAL EXHIBITS

- Existing Transit
- Existing Bicycle Infrastructure
- Travel Times to Site
- Multi-modal Recommendations







LEGEND

Sites

Protected Bike Lane
Bike Lane
Neighborhood Greenway
Planned Divvy Station
Existing Divvy Station



# EXHIBIT 13



**PUBLIC NOTICE**

**REQUEST FOR PERMISSION TO MODIFY A U.S. ARMY CORPS OF ENGINEERS PROJECT UNDER SECTION 408**

**U.S. ARMY CORPS OF ENGINEERS
CHICAGO DISTRICT**

**PUBLIC NOTICE/APPLICATION NUMBER: 19-17 Jackson Park**

**COMMENT PERIOD BEGINS:** 01 April 2020
**COMMENT PERIOD EXPIRES:** 01 May 2020

U.S. Army Corps of Engineers, Chicago District
231 S. LaSalle Street, Suite 1500
Chicago, IL 60604

**REQUESTER**
Chicago Park District
541 N Fairbanks, Chicago, IL 60611

**PROPOSED ACTION**
The proposed federal actions are in response to the decision made by the City to allow for the construction of the Obama Presidential Center (OPC) in Jackson Park and to improve the roadway network in and around Jackson Park. These actions would alter the USACE Section 506 Great Lakes Fishery and Ecosystem Restoration (GLFER) Project in Jackson Park. Proposed actions include Chicago Department of Transportation (CDOT) roadway improvements, Chicago Park District (CPD) utility relocation, and the connection of pathways within the Obama Presidential Center (OPC) site to existing GLFER project pathways. GLFER areas that would be temporarily impacted by proposed actions would be restored in place and permanently impacted areas would be replaced at a different location within the GLFER project boundaries. A detailed description of this proposal is provided on page 2 of this notice.

-2-

**LOCATION OF PROPOSED ACTION**
Location: Chicago, Illinois; Jackson Park

Interested parties are hereby notified that a request for permission to modify a Federal project has been received for the activity described herein and as shown on the attached drawings. You are invited to provide your comments by **01 May 2020** on the proposed work, which will become part of the record and will be considered in the decision on the request.  Permission will be issued or denied under Section 14 of the Rivers and Harbors Act of 1899 (33 U.S.C. 408).

**Written comments shall be mailed to:**

U.S. Army Corps of Engineers, Chicago District,
Planning, Programs and Project Management Division,
Project Management Branch
ATTN, Ms. Natalie Mills, Section 408 Program Manager
231 South LaSalle Street, Suite 1500
Chicago, Illinois 60604-1437

**Electronic comments may be sent to:**

chicagodistrict.pao@usace.army.mil

It should be noted that ALL comments received by this office (via hard copy or electronic) will only be accepted with the full name and address of the individual commenting, and must be received by the close of the public notice period.


**PROJECT DESCRIPTION**
The Jackson Park Ecosystem Restoration project was completed in 2019. The purpose of the project was to restore ecological health to natural areas at Jackson Park while preserving the historical and cultural integrity of the Park. Native plants and seeds were used to establish habitat including fringe wetland marsh, dune and swale, and oak savanna. New walking paths and scenic overlooks were constructed to allow park users to circulate throughout the park. The completed project provides valuable habitat for a wide variety of insects and wildlife. Presently, CDOT, CPD, and OPC have proposed projects that would have both temporary and permanent impacts to the restored GLFER areas within Jackson Park.

Roadway improvements proposed by CDOT involve the widening of southbound Lake Shore Drive including the 59th Street inlet bridge. Pedestrian underpasses are proposed near the intersections of Lake Shore Drive and Hayes Drive as well as Cornell Drive and Hayes Drive.

OPC and CPD propose to close Cornell Drive from 59th Street to 63rd Street and convert the area to open space. Grading will occur and pathways will be constructed to connect

-3-

OPC walking paths with the GLFER trails. GLFER paths in the northwest portion of the project area will be converted from crushed stone to concrete. CPD proposed to construct a new lift station and electrical ductbank east of Cornell Drive.

The proposed work discussed above will have both temporary and permanent impacts to the restored GLFER areas. Temporary impacts are anticipated to be 1.7 acres and will be restored in place using the GLFER planting guidelines. Permanent impacts are expected to be 1.32 acres, and will be replaced with 2.43 acres of restored natural area in GLFER project area 2. Project area 2 was identified as the next highest priority area for the GLFER project had funding been available to execute the work.

**ANTICIPATED ENVIRONMENTAL IMPACTS**
Based on an initial review of the documentation provided by the CPD, it does not appear that the proposed project would result in any significant adverse environmental impacts.

**REGULATORY AUTHORITY**
This request will be reviewed according to the provisions of Section 14 of the Rivers and Harbors Act of 1899

**JURISDICTION**
This request will be reviewed according to the provisions of Section 14 of the Rivers and Harbors Act of 1899.

**EVALUATION FACTORS**
The decision whether to grant the requested permission for project modification under Section 408 will be based on several factors. That decision will reflect the national concern for both protection and utilization of important resources. The benefit which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. Review of the requests for modification will be reviewed by a USACE technical review team considering the following factors:

1) Impair the Usefulness of the Project Determination. The review team will determine if the proposed alteration would limit the ability of the project to function as authorized, or would compromise or change any authorized project conditions, purposes or outputs. The decision whether to approve a request for modification would be based on a determination of no impairments.

2) Injurious to the Public Interest Determination. Proposed alterations will be reviewed to determine the probable impacts, including cumulative impacts, on the public interest. Factors that may be relevant to the public interest depend upon the type of USACE project being altered and may include, but are not limited to, such things as conservation, economic development, historic properties, cultural resources, environmental impacts, water supply, water quality, flood hazards, floodplains, residual risk, induced damages, navigation,

-4-

shore erosion or accretion, and recreation. This evaluation will consider information received from the interested parties, including tribes, agencies, and the public.  The decision whether to approve the requested modification will be determined by the consideration of whether benefits are commensurate with risks associated with the proposed modification.  If the potential detriments are found to outweigh the potential benefits, then it may be determined that the proposed alteration is injurious to the public interest.

3) <u>Environmental Compliance.</u>  A decision on a Section 408 request is a Federal action, and therefore subject to the National Environmental Policy Act (NEPA) and other environmental compliance requirements. While ensuring compliance is the responsibility of USACE, the requester is responsible for providing all information that the USACE district identifies as necessary to satisfy all applicable Federal laws, executive orders, regulations, policies, and ordinances. NEPA and other analysis completed to comply with other environmental statutes (e.g. Endangered Species Act) should be commensurate with the scale and potential effects of the activity that would alter the USACE project. The district will work with the requester to determine the requirements, which will be scaled to the likely impacts of the proposed alteration and should convey the relevant considerations and impacts in a concise and effective manner.

All factors that may be relevant to the proposal will be considered, including the potential cumulative effects associated with the proposed project.  The review will consider whether the proposed project is injurious to the public interest, and its potential impact to the usefulness of the Federal project.  Policy and legal compliance will also be considered.

The USACE is also soliciting comments from the public, Federal, state and local agencies, Indian tribes, and other interested parties in order to consider and evaluate the potential impacts of the proposed activity.  Once this office completes a review of the comments received, it will determine whether to determine whether to provide permission to modify the project under Section 408.

To prepare this decision, comments are taken into consideration to assess impacts on the public interest factors listed above, as well as endangered species, historic properties, water quality, and general environmental effects.  Comments will be used in the preparation of environmental compliance documentation as required by the National Environmental Policy Act (NEPA).

**PRELIMINARY EVALUATION OF SELECTED FACTORS**

**<u>INJURIOUS TO THE PUBLIC INTEREST DETERMINATION</u>**
It has been determined that the proposed alteration to the Jackson Park GLFER project to construct roadway improvements, relocate utilities, resurface and connect walking paths will not be injurious to the public interest. All areas

-5-

impacted temporarily for construction will be restored using the GLFER planting plan as a guide and permanent areas will be replaced in GLFER project area 2, so the alteration will not affect any of the public interest factors. There will be a net gain of 1.11 acres of restored native GLFER areas resulting from the proposed actions.  Consequently, factors relevant to the public interest including conservation, economic development, historic properties, cultural resources, environmental impacts, water quality, flood hazards, residual risk, and induced damages, etc. are not changed by the alteration.  All of these public interest factors were evaluated under NEPA and documented in the original project's environmental assessment (EA) during the pre-authorization phase of the project, and remain unchanged by the proposed alteration.

## USEFULNESS OF THE PROJECT
It has been determined that the proposed alteration would have no deleterious impact on the usefulness of the Jackson Park GLFER project.  To the contrary, the design of the proposed alteration will improve usefulness of the GLFER project by increasing natural area acreage as well as improving park accessibility through pathway connections to the Obama Presidential Center.

## ENVIRONMENTAL COMPLIANCE
An evaluation of environmental compliance has been initiated to support the issuance of permission under Section 408.  An initial review of the documentation provided by the applicant, CPD, and the existing EA for Federal Actions In and Adjacent to Jackson Park has been completed.  A preliminary determination has been made that the applicant's request will not have a significant effect on the human or natural environment. Therefore, the EA supports a Finding of No Significant Impact, and a decision has been made that an Environmental Impact Statement (EIS) is not required.  Upon completion of the public notice period, consideration will be given to comments received.

## ENVIRONMENTAL IMPACT STATEMENT
A preliminary determination has been made that an environmental impact statement is not required for the proposed work.

## SUMMARY
It should be noted that materials submitted as part of the Section 408 request become part of the public record and are thus available to the general public under the procedures of the Freedom of Information Act (FOIA).  Individuals may submit a written request to obtain materials under FOIA or make an appointment to view the project file at the Chicago District Corps of Engineers, Office of Counsel.

Interested parties wishing to comment on the proposed activity must do so in writing no later **29 April 2020**.  It is presumed that all parties receiving this notice will wish to respond to this public notice;  therefore, a lack of response will be interpreted as meaning that there is no objection to the project as described.

-6-

This public notice is not a paid advertisement and is for public information only. Issuance of this notice does not imply Corps of Engineers endorsement of the project as described.

If you have any questions, please contact Ms. Natalie Mills, Section 408 Program Manager, by telephone at 312-846-5561 or via email at ChicagoDistrict.PAO@usace.army.mil. **It should be noted that ALL comments received by this office (via hard copy or electronic) will only be accepted with the full name and address of the individual commenting**.

FOR THE DISTRICT COMMANDER:

**ORIGINAL SIGNED**

*Susanne J. Davis*

Susanne J. Davis, P.E.
Chief, Planning Branch



Jackson Park GLFER
Project Impacts

0    500    1,000    2,000 Feet

Widen 59th Street Inlet Bridge

Pave crushed stone paths with concrete

Relocate utilities

Covert Cornell Dr. to greenspace

Improve LSD, Hayes, & intersections to accomodate diverted traffic

Proposed pedestrian underpass

Mitigation planting area

# Mitigation Planting - GLFER Project Area 2



**LEGEND:**
- Dune
- Fringe Wetland
- Meadow
- Open Woodland/Woodland
- Savanna
- Sedge Lawn
- Transition Prairie

**DRAFT**
**FOR DISCUSSION ONLY**

# EXHIBIT 14



**DEPARTMENT OF THE ARMY**

CHICAGO DISTRICT, CORPS OF ENGINEERS
231 SOUTH LA SALLE STREET
CHICAGO, ILLINOIS 60604-1437

REPLY TO

ATTENTION OF:

January 19, 2021

Operations Division
Regulatory Branch
LRC-2017-00676

SUBJECT:  Discharge of 0.04 acre of new embankment fill and 0.04 acre of temporary
dewatering for construction access at an existing bridge (Lake Shore Drive over the 59th Street
Lagoon Inlet off Lake Michigan) and 0.20 acre of temporary dewatering for construction access
at the East Hayes Drive bridge over the South Lagoon off Lake Michigan, in Sections 13 & 24,
Township 38 North, Range 14 East, City of Chicago, Cook County, Illinois  (Latitude 41.78819,
Longitude -87.57786)

Daniel Burke
Chicago Department of Transportation
30 North LaSalle Street, Suite 400
Chicago, Illinois 60602

Dear Mr. Burke:

This office has verified that your proposed activity complies with the terms and
conditions of Regional Permit 3 (Transportation Projects) and the General Conditions for all
activities authorized under the Regional Permit Program.

This verification expires three (3) years from the date of this letter and covers only your
activity as described in your notification and as shown on the plans entitled "General Plan –
Permanent Wetland Impacts, S. Lake Shore Drive over 59th Street Lagoon Inlet" and "General
Plan – Temporary Wetland Impacts, S. Lake Shore Drive over 59th Street Lagoon Inlet" as
plotted 9/29/2017, and "General Plan and Elevation, Hayes Drive Over Jackson Park Lagoon" as
plotted 3/28/2019, prepared by Alfred Benesch & Company. Caution must be taken to prevent
construction materials and activities from impacting waters of the United States beyond the
scope of this authorization.  If you anticipate changing the design or location of the activity, you
should contact this office to determine the need for further authorization.

Please be aware that the activity may not be completed until you submit the following
information to our office:

1. Prior to the commencement of any work, you shall receive a determination by the Will-
   South Cook Soil and Water Conservation District (SWCD) that the Soil Erosion and
   Sediment Control (SESC) plans meet technical standards.

Upon receipt of the above information, the activity may be completed without further authorization from this office provided the activity is conducted in compliance with the terms and conditions of the RPP, including conditions of water quality certification issued under Section 401 of the Clean Water Act by the Illinois Environmental Protection Agency (IEPA). If the design, location, or purpose of the project is changed, you should contact this office to determine the need for further authorization

The following special conditions are a requirement of your authorization:

2. You shall undertake and complete the project as described in the plans titled, "General Plan – Permanent Wetland Impacts, S. Lake Shore Drive over 59th Street Lagoon Inlet" and "General Plan – Temporary Wetland Impacts, S. Lake Shore Drive over 59th Street Lagoon Inlet" as plotted 9/29/2017, and "General Plan and Elevation, Hayes Drive Over Jackson Park Lagoon" as plotted 3/28/2019, prepared by Alfred Benesch & Company, including all relevant documentation to the project plans as proposed.

3. This authorization is contingent upon implementing and maintaining soil erosion and sediment controls in a serviceable condition throughout the duration of the project. You shall comply with the SWCD's written and verbal recommendations regarding the SESC plan and the installation and maintenance requirements of the SESC practices on-site.

   a. You shall schedule a preconstruction meeting with SWCD to discuss the SESC plan and the installation and maintenance requirements of the SESC practices on the site. You shall contact the SWCD at least 10 calendar days prior to the preconstruction meeting so that a representative may attend.

   b. You shall notify the SWCD of any changes or modifications to the approved plan set. Field conditions during project construction may require the implementation of additional SESC measures. If you fail to implement corrective measures, this office may require more frequent site inspections to ensure the installed SESC measures are acceptable.

   c. Prior to commencement of any dewatering work, you shall submit constructions plans and a detailed narrative to the SWCD that disclose the contractor's preferred method of cofferdam and dewatering method. Work in the waterway shall NOT commence until the SWCD notifies you, in writing, that the plans have been approved.

4. Work in the waterway should be timed to take place during low or no-flow conditions. Low flow conditions are flow at or below the normal water elevation.

5. The plan must be designed to allow for the conveyance of the 2-year peak flow past the work area without overtopping the cofferdam. The Corps has the discretion to reduce this requirement if documented by the applicant to be infeasible or unnecessary.

- 3 -

6. Water shall be isolated from the in-stream work area using a cofferdam constructed of non-erodible materials (steel sheets, aqua barriers, rip rap and geotextile liner, etc.). Earthen cofferdams are not permissible.

7. The cofferdam must be constructed from the upland area and no equipment may enter flowing water at any time. If the installation of the cofferdam cannot be completed from shore and access is needed to reach the area to be coffered, other measures, such as the construction of a causeway, will be necessary to ensure that equipment does not enter the water. Once the cofferdam is in place and the isolated area is dewatered, equipment may enter the coffered area to perform the required work.

8. If bypass pumping is necessary, the intake hose shall be placed on a stable surface or floated to prevent sediment from entering the hose. The bypass discharge shall be placed on a non-erodible, energy dissipating surface prior to rejoining the stream flow and shall not cause erosion. Filtering of bypass water is not necessary unless the bypass water has become sediment-laden as a result of the current construction activities.

9. During dewatering of the coffered work area, all sediment-laden water must be filtered to remove sediment. Possible options for sediment removal include baffle systems, anionic polymers systems, dewatering bags, or other appropriate methods. Water shall have sediment removed prior to being re-introduced to the downstream waterway. A stabilized conveyance from the dewatering device to the waterway must be identified in the plan. Discharge water is considered clean if it does not result in a visually identifiable degradation of water clarity.

10. The portion of the side slope that is above the observed water elevation shall be stabilized as specified in the plans prior to accepting flows. The substrate and toe of slope that has been disturbed due to construction activities shall be restored to proposed or pre-construction conditions and fully stabilized prior to accepting flows.

11. This site is within the aboriginal homelands of several American Indian Tribes. If any human remains, Native American cultural items or archaeological evidence are discovered during any phase of this project, interested Tribes request immediate consultation with the entity of jurisdiction for the location of discovery. In such case, please contact Mr. Colin C. Smalley, PG, by telephone at 312-846-5538, or email at colin.c.smalley@usace.army.mil.

12. You are responsible for all work authorized herein and for ensuring that all contractors are aware of the terms and conditions of this authorization.

13. A copy of this authorization must be present at the project site during all phases of construction.

14. You shall notify this office of any proposed modifications to the project, including revisions to any of the plans or documents cited in this authorization. You must receive approval from this office before work affected by the proposed modification is

- 4 -

performed.

15. You shall notify this office prior to the transfer of this authorization and liabilities associated with compliance with its terms and conditions.

16. You must contact the United States Coast Guard, Marine Safety Unit Chicago, Waterways Management Division, (630-986-2155 or D09-DG-MSUChicago-Waterways@uscg.mil) at least 30 days prior to the anticipated start of construction to determine whether a Notice to Mariners is advisable for any construction period(s) and/or to notify mariners of the new completed structure. You must retain documentation of any such discussions, and you must provide such information to the USCG as they may require to prepare the Notice(s) to Mariners prior to commencing construction of the structure. If you anticipate starting construction within 30 days of this authorization, you must contact the MSU within 3 business days of this authorization.

17. Within 21 days of completion of construction, in order to facilitate updating federal navigation charts, you must file a "Permit/Public Notice Report" form with the NOAA National Ocean Service, Office of the Coast Survey, including as-built drawings and geo-referenced CADD or GIS files in electronic format. Submit the form, drawings, and files to ocs.ndb@noaa.gov and Colin.C.Smalley@usace.army.mil.

This verification does not obviate the need to obtain all other required Federal, state, or local approvals before starting work. **This verification does not authorize the Chicago Park District's request pursuant to Section 14 of the Rivers and Harbors Act of 1899. A final determination on that request will be sent to the Chicago Park District under separate cover.** Please note that Section 401 Water Quality Certification has been issued by IEPA for this RP. If you have any questions regarding Section 401 certification, please contact Mr. Darin LeCrone at IEPA Division of Water Pollution Control, Permit Section #15, by telephone at (217) 782-0610.

Once you have completed the authorized activity, please sign and return the enclosed compliance certification. If you have any questions, please contact Mr. Colin C. Smalley, PG of my staff by telephone at (312) 846-5538, or email at Colin.C.Smalley@usace.army.mil.

Sincerely,

CHERNICH.KATHLEEN.G.1230365616
Digitally signed by CHERNICH.KATHLEEN.G.123036561 6
Date: 2021.01.19 23:53:08 -06'00'

Kathleen G. Chernich
Chief, East Section
Regulatory Branch

Enclosures

Copy Furnished:

U.S. Federal Highway Administration (Matt Fuller)
U.S. National Park Service (Morgan Elmer)
U.S. Fish and Wildlife Service (Shawn Cirton)
U.S. Environmental Protection Agency (Ken Westlake, Liz Pelloso)
U.S. Coast Guard, Marine Safety Unit Chicago (LT Tiziana Garner)
Illinois Department of Natural Resources/OWR (James Casey)
Illinois Department of Transportation (Bill Raffensperger)
Metropolitan Water Reclamation District of Greater Chicago (Dan Feltes)
Will-South Cook SWCD (Dan Jay)
Chicago Park District (Heather Gleason)
Civiltech Engineering, Inc. (Jen Hyman, Tom Lilienseik)



# PERMIT COMPLIANCE

# CERTIFICATION

Permit Number:     LRC-2017-00676

Permittee:     Daniel Burke
                  Chicago Department of Transportation

Date:     January 19, 2021

I hereby certify that the work authorized by the above-referenced permit has been completed in accordance with the terms and conditions of said permit and if applicable, compensatory wetland mitigation was completed in accordance with the approved mitigation plan.[1]

_____
PERMITTEE                    DATE

Upon completion of the activity authorized by this permit and any mitigation required by the permit, this certification must be signed and returned to the following address:

          U.S. Army Corps of Engineers
          Chicago District, Regulatory Branch
          231 South LaSalle Street, Suite 1500
          Chicago, Illinois 60604-1437

Please note that your permitted activity is subject to compliance inspections by Corps of Engineers representatives.  If you fail to comply with this permit, you may be subject to permit suspension, modification, or revocation.

---

[1] If compensatory mitigation was required as part of your authorization, you are certifying that the mitigation area has been graded and planted in accordance with the approved plan.  You are acknowledging that the maintenance and monitoring period will begin after a site inspection by a Corps of Engineers representative or after thirty days of the Corps' receipt of this certification.  You agree to comply with all permit terms and conditions, including additional reporting requirements, for the duration of the maintenance and monitoring period.

# EXHIBIT 15



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, CHICAGO DISTRICT
231 SOUTH LASALLE STREET SUITE 1500
CHICAGO, IL 60604

January 27, 2021

SUBJECT: Section 408 Request Number 19-17

Ms. Cathy Breitenbach
Director of Natural and Cultural Resources
Chicago Park District
541 North Fairbanks
Chicago, Illinois 60611

Dear Ms. Breitenbach:

The Chicago District ("District") of the U.S. Army Corps of Engineers has received your request for changes related to the City of Chicago Department of Transportation roadway improvements, Chicago Park District ("CPD") utility relocation, and the connection of pathways within the Obama Presidential Center site to existing project pathways, to the Section 506 Great Lakes Fishery and Ecosystem Restoration Project, Jackson Park, operated and maintained by the CPD. Your request was reviewed under Section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. 408 ("Section 408") as implemented by Engineer Circular 1165-2-220.

Based on this evaluation, the District is granting permission to permanently impact a total of 1.32 acres of the improved portions of the Federal project, which will be offset by implementation of 2.43 acres of the planned but unconstructed GLFER Project Area 2 in Jackson Park, and the temporary impact and restoration of 1.70 acres of the improved portions of the Federal project, as specified in your request and subject to compliance with the enclosed terms and conditions, as well as the special conditions below.

a. Once permission is granted, you must notify the District at least two days before work is started so that post-permission oversight can be performed by USACE.

b. You must submit any necessary revisions to USACE for review and approval.

c. You must submit one electronic copy of "as-built" drawings to the District, including as-built survey data and GIS data in NAVD 88, within thirty days of completion of work showing the new work as it relates to identifiable features of the federal project.

d. You must submit proposed changes to the Operations and Maintenance Manual that reflect the long-term management of the Project Area 2 plantings for USACE approval and integration into the Operations and Maintenance Manual for the project. You must submit these proposed changes within 30 days of completion of work.

- 2 -

For any questions regarding this decision, please contact Mr. Colin C. Smalley, PG, Section 408 Coordinator, by phone at 312-846-5538 or by e-mail at Colin.C.Smalley@usace.army.mil.

Sincerely,

Paul B. Culberson
Colonel, U.S. Army
Commanding

Enclosure

cc:
U.S. Federal Highway Administration (Matt Fuller)
U.S. National Park Service (Morgan Elmer)
U.S. Fish and Wildlife Service (Shawn Cirton)
U.S. Environmental Protection Agency (Ken Westlake, Liz Pelloso)
Illinois Department of Transportation (Bill Raffensperger)
City of Chicago, Department of Transportation (Nate Roseberry)
City of Chicago, Department of Planning and Development (Todd Wyatt, Eleanor Gorski)
Civiltech Engineering, Inc. (Jen Hyman, Tom Lilienseik)

Standard Terms and Conditions

From Appendix K to Engineer Circular 1165-2-220 (September 10, 2018)

LIMITS OF THE AUTHORIZATION

1. This permission only authorizes you, the requester, to undertake the activity described herein under the authority provided in Section 14 of the Rivers and Harbors Act of 1899, as amended (33 USC 408). This permission does not obviate the need to obtain other federal, state, or local authorizations required by law. This permission does not grant any property rights or exclusive privileges, and you must have appropriate real estate instruments in place prior to construction and/or installation.

2. The time limit for completing the work authorized ends on **December 31, 2025**. If you find that you need more time to complete the authorized activity, submit your request for a time extension to this office for consideration at least one month before the above date is reached.

3. Without prior written approval of the USACE, you must neither transfer nor assign this permission nor sublet the premises or any part thereof, nor grant any interest, privilege or license whatsoever in connection with this permission. Failure to comply with this condition will constitute noncompliance for which the permission may be revoked immediately by USACE.

4. The requester understands and agrees that, if future operations by the United States require the removal, relocation, or other alteration of the work herein authorized, or if, in the opinion of the Secretary of the Army or an authorized representative, said work will cause unreasonable conditions and/or obstruction of USACE project authorized design, the requester will be required upon due notice from the USACE, to remove, relocate, or alter the structural work or obstructions caused thereby, without expense to the United States. No claim can be made against the United States on account of any such removal or alteration.

INDEMNIFICATION AND HOLD HARMLESS

5. The United States will in no case be liable for:

    a. any damage or injury to the structures or work authorized by this permission that may be caused or result from future operations undertaken by the United States, and no claim or right to compensation will accrue from any damage; or

    b. damage claims associated with any future modification, suspension, or revocation of this permission.

6. The United States will not be responsible for damages or injuries which may arise from or be incident to the construction, maintenance, and use of the project requested by you, nor for damages to the property or injuries to your officers, agents, servants, or employees, or others who may be on your premises or project work areas or the federal project(s) rights-of-way. By accepting this permission, you hereby agree to fully defend, indemnify, and hold harmless the United States and USACE from any and all such claims, subject to any limitations in law.

7. Any damage to the water resources development project or other portions of any federal project(s) resulting from your activities must be repaired at your expense.

REEVALUATION OF PERMISSION

8. The determination that the activity authorized by this permission would not impair the usefulness of the federal project and would not be injurious to the public interest was made in reliance on the information you provided.

9. This office, at its sole discretion, may reevaluate its decision to issue this permission at any time circumstances warrant, which may result in a determination that it is appropriate or necessary to modify or revoke this permission. Circumstances that could require a reevaluation include, but are not limited to, the following:

    a. you fail to comply with the terms and conditions of this permission;

    b. the information provided in support of your application for permission proves to have been inaccurate or incomplete; or

    c. significant new information surfaces which this office did not consider in reaching the original decision that the activity would not impair the usefulness of the water resources development project and would not be injurious to the public interest.

CONDUCT OF WORK UNDER THIS PERMISSION

10. You are responsible for implementing any requirements for mitigation, reasonable and prudent alternatives, or other conditions or requirements imposed as a result of environmental compliance.

11. Work/usage allowed under this permission must proceed in a manner that avoids interference with the inspection, operation, and maintenance of the federal project.

12. In the event of any deficiency in the design or construction of the requested activity, you are solely responsible for taking remedial action to correct the deficiency.

13. The right is reserved to the USACE to enter upon the premises at any time and for any purpose necessary or convenient in connection with government purposes, to make inspections, to operate and/or to make any other use of the lands as may be necessary in connection with government purposes, and you will have no claim for damages on account thereof against the United States or any officer, agent or employee thereof.

14. You must provide copies of pertinent design, construction, and/or usage submittals/documents. USACE may request that survey and photographic documentation of the alteration work and the impacted project area be provided before, during, and after construction and/or installation.

15. You may be required to perform an inspection of the federal project with the USACE, prior to your use of the structure, to document existing conditions.

16. USACE shall not be responsible for the technical sufficiency of the alteration design nor for the construction and/or installation work.

# EXHIBIT 16

Case: 1:21-cv-02006 Document #: 1-2 Filed: 04/14/21 Page 311 of 326 PageID #:735

# CHICAGO SUN★TIMES

Log In | Try 1 month for $1    Subscribe

**NEWS    CHICAGO    COLUMNISTS**

# Jackson Park trees cut down near Obama Center site despite lawsuit, promises

By Lynn Sweet  |  Aug 6, 2018, 9:03pm CDT



Cut trees in Jackson Park, across from the Hyde Park Academy High School. | Rick Majewski/For the Sun-Times.

**The Chicago Sun-Times is supported by readers like you.** Get unlimited access to quality local journalism for only $29.99/year.

JOIN TODAY

WASHINGTON — The city and Chicago Park District are cutting down trees in Jackson Park – in a project related to the Obama Presidential Center – despite a pending lawsuit, city and federal approvals still needed and a pledge from the Obama Foundation CEO to keep trees intact until the permitting process is complete.

The Chicago Park District is digging up baseball fields in Jackson Park south of the proposed Obama Center complex.

The reason?

The diamonds are being removed to make room for a track field displaced by the Obama Center, to be located on 19.3 acres carved out of Jackson Park.

The Obama Foundation is paying the Chicago Park District up to $3.5 million to fund a new multisport athletic field on the baseball site. That's because the field is being bumped for the Obama Foundation. The projects are inextricably connected.

On Monday, earth moving equipment, a truck from the Clean Cut Tree Service and downed trees could be seen inside the park. The baseball site is bounded by Cornell and Hayes Drives, Stony Island Ave. and 62nd St.

Case: 1:21-cv-02006 Document #: 1-2 Filed: 04/14/21 Page 312 of 326 PageID #:736

Since former President Barack Obama picked Jackson Park for his center in August 2016, a series of intertwined projects in and around Jackson Park has made the impact much larger than just the 19.3 acres to be occupied by the center, including retooling roadways and relocating athletic fields.

Jackson Park, designed by the famed landscape architects Fredrick Law Olmsted and Calvert Vaux, was listed on the federal National Register of Historic Places in 1972.

In January, Obama Foundation CEO David Simas was asked about cutting down Jackson Park trees during a meeting with the Sun-Times Editorial board.

Until the foundation has all the permits, "There will be no trees removed or cut down," Simas said. It turns out he was referring only to the 19.3 acres – and not the trees being cut down in the related athletic field project being bankrolled by the foundation.

Asked about the tree cuttings, the Foundation did not acknowledge the reason the fields need to be relocated was to make room for the Obama Center complex.

A Foundation spokesman told the Sun-Times, "While the track and field of Jackson Park is not on the Obama Presidential Center site, the Obama Foundation offered to fund the construction of the new track to ensure continuity of access to the track for the community.

"The construction schedule put forward by the Chicago Park District ensures the new track will be ready for students and fall sports leagues."

The Chicago Park District – an entity controlled by Mayor Rahm Emanuel — secured approval for the new athletic field from the Chicago Plan Commission last April.

In May, several park preservationists filed a federal lawsuit against the City of Chicago and the Chicago Park District to block construction of the Obama Center in Jackson Park.

On June 28, lawyers for the city and the park district argued in a joint brief that the lawsuit was "premature" because "the terms of the agreement do not yet exist, nor has the City Council authorized the city to enter into an agreement with the Foundation or approved the terms.

"...The City Council has yet to introduce, much less enact, an ordinance authorizing the construction and operation of the Center," the brief said.

Federal reviews will run at least through the end of the year. The City Council may not act until the fall.

Despite what the court was told, trees have been cut down. The next hearing on the case is on Aug. 28.

Herbert Caplan, one of the players behind the lawsuit, said his team was considering going to court sooner in the wake of the tree cutting.

Margaret Schmid, the co-founder of the watchdog Jackson Park Watch said she was "alarmed that the Park District would feel free to move ahead in disregard of the clauses contained in OPC (Obama Presidential Center) and CDOT (Chicago Department of Transportation) applications to the Chicago Plan Commission — and approved by it — committing the Obama Foundation and CDOT to wait until the conclusion of the federal reviews before beginning construction.

Case: 1:21-cv-02006 Document #: 1-2 Filed: 04/14/21 Page 313 of 326 PageID #:737

"It is disingenuous to suggest that all of these projects are not closely tied together."

Earth-moving equipment in Jackson Park on Aug. 6, 2018. Hyde Park High School is in the background.



Earth-moving equipment in Jackson Park on Aug. 6, 2018. Hyde Park High School is in the background. | Rick Majewski/For the Sun-Times

# EXHIBIT 17

## DONATION AGREEMENT BETWEEN THE CHICAGO PARK DISTRICT AND THE OBAMA FOUNDATION

This Donation Agreement (this "Agreement") is made as of February 26, 2018, by and among the Chicago Park District, an Illinois municipal corporation (the "Park District"), and The Barack Obama Foundation ("Foundation"), a District of Columbia 501 (c)(3) organization. The Park District and the Foundation are sometimes referred to below each as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, the Park District is the owner of over 8,000 acres of land in the City of Chicago, County of Cook and the State of Illinois and one of these properties within the Park System (the "System") is commonly known as Jackson Park (the "Park"), with an address of 5700-6400 S. Lake Shore Drive, Chicago, IL, and;

WHEREAS, the Foundation is tasked with funding, planning and constructing the Obama Presidential Center ("OPC") in Jackson Park on land owned by the Park District that will be transferred to the City of Chicago pursuant to Park District Board and City Council approval, in recognition of the long-standing ties the former President has with the community, and;

WHEREAS, the site selected for the OPC would necessitate the relocation of an existing multi-use artificial turf field with a running track (the "Original Field"), and;

WHEREAS, the Park District has designated an area within Jackson Park as described on attached Exhibit A ("Field Site"), as land fit for the relocation, construct and operation of the Field, and;

WHEREAS, the Foundation has agreed to fund the construction of a replacement Field on the Field Site (the "Project"), as further described in the plans set forth in Exhibit B, attached and incorporated by this reference, and;

WHEREAS, the Foundation agrees to donate an amount not to exceed $3,500,000.00 to the Park District to assist with the construction of the Project; and

WHEREAS, the Park District desires to acquire and accept the funds and will design, construct, maintain and operate the Field;

**NOW THEREFORE,** for and in consideration of the foregoing recitals incorporated by this reference, the promises, mutual covenants, representations, warranties and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

SECTION 1. THE PROJECT.

1.01    The Project will be constructed by the Park District in accordance with the designs and specifications set forth in Exhibit B attached hereto, and no other. Once finalized, such designs and specifications shall be updated and listed on Exhibit B upon mutual agreement by the Parties (the "Final Plans and Specifications"). Thereafter, and for the avoidance of doubt, there will be no changes or modification to Exhibit B without prior written approval of both parties.

1.02    In consideration for Foundation's donation, Foundation will be recognized on signage and otherwise throughout the useful life of the improvement features, but in no event less than the length of the Term (as defined below). Recognition shall be on a non-exclusive basis, except as noted in this Agreement. The content, size, specifications, installation and location of all signage shall be as shown in Exhibit B, which shall be approved by both Foundation and the Park District according to both Park District and City of Chicago sign regulations, and which approval shall not be unnecessarily or unreasonably delayed or withheld. Donation recognition rights do not in any way include the undertaking of any official Park or Park Feature naming actions or undertaking pursuant to Chapter VII of the Code of the Chicago Park District and should not be construed as such by either the donors or their associated companies, agents, or any party associated with this Agreement. No other sponsor, donor, entity or individual shall be mentioned or recognized in the Park more prominently than Foundation. Notwithstanding anything in this Agreement to the contrary, any Park District obligations to the Chicago Bears associated with the Original Field with regard to (i) donor recognition; or (ii) naming rights shall transfer with and apply equally to the Field. This includes, but is not limited to, inclusion of the Chicago Bears logo in the current size, location, materials and methodology on the Original Field on the Field as well as the same placement and installation of the bronze donor plaque formally recognizing the Chicago Bears and/or Bears Care donation, sponsorship and/or contribution to the Field, at no additional cost to the Chicago Bears or the Chicago Park District.

1.03    The Parties shall coordinate mutually agreeable schedules and activities in connection with all groundbreaking and opening day ceremonies for the Project, which shall include an announcement of Park District plans to relocate any baseball fields displaced by the Project; however, said baseball field relocation(s) shall only be announced upon completion of an updated framework plan for the surrounding areas of the Park; provided that, in no event shall such announcement take place after the date on which construction on the Field commences. The Foundation shall be mentioned prominently in all public comment, press releases and other publicity and advertising for the Project. Foundation shall have the right to approve all publicity mentioning the Project and no such publicity will issue without mutual approval of the Parties. No Party shall use the name or logo of the other Party in any publicity or news release without the prior written approval of both Parties. It is the intent of the Park District and the Foundation that this Project is being undertaken primarily to benefit the Field's neighboring community and established youth sports organizations. In furtherance of that goal, the Park District agrees to waive its permit fees for the use of the Field for such neighborhood organizations that apply for a

permit at least thirty (30) days in advance for use of the Field. Further, Foundation shall have the right to schedule up to two (2) days per year for a community oriented Event ("**Event**") in proximity to the Project, without charge for the permit. Further, Foundation shall have priority in scheduling this Event, and will be required to book said date at least 60 (sixty) days in advance. Unused Event days may not be accumulated and carried over to the subsequent years. Event days shall be available to Foundation throughout the Term.

1.04    The term of this Agreement (the "**Term**") shall begin on the Effective Date and terminate on December 31, 2021. If the Agreement is terminated prior to such date or if the Project is not completed according to Exhibit B and ready for use and occupancy on or before September 15, 2018, then the Park District shall immediately refund to Foundation the funds contributed by Foundation to the Project. In the case that the project cannot be completed by September 15, 2018, but construction has already begun, Park District may request that Foundation extend the deadline by a reasonable amount of time in order to complete the necessary work, and the granting of such extension shall be at the Foundation's sole discretion. In the event that the Project's completion deadline is extended pursuant to this Section 1.04, the Park District shall identify and facilitate the use of an alternative multi-use artificial turf field with a running track for use by community groups and youth sports organizations until such time as the Project is completed and made available for public use.

1.05    Foundation's sole obligation under this Agreement is the timely deposit of the donation amount, according to the following schedule:

   a)    $875,000 upon execution of this Agreement;
   b)    $875,000 upon commencement of construction;
   c)    $875,000 upon construction of the Project being 50% complete, the assessment of such milestone to be mutually agreed upon by both Parties; and
   d)    Upon completion and opening of the Project to public use, the Foundation will make its final timely deposit of the donation amount, such amount to be the lesser of:
       i)    $875,000; or
       ii)    the total documented cost of the Project less all amounts previously deposited and/or otherwise paid by the Foundation to the Park District for the Project

   Upon making the full donation amount, Foundation shall be deemed to have satisfied all its obligations under this Agreement. Notwithstanding any provision set forth elsewhere in this Agreement to the contrary, Foundation shall not be obligated, responsible or liable to pay or deposit any additional monies (whether for Project costs, cost overruns or otherwise) and shall not be responsible or liable in any way for the design, construction, operation or use of the Project.

1.06    Foundation shall not have any liability whatsoever as to Project design, construction, maintenance, upkeep, or any liability relating to the Project or injuries thereon.

1.07     The Park District shall commence construction of the Project and proceed on a steady and consistent basis until all work is completed in a commercially reasonable prompt manner.

1.08     The Park District shall provide or contract for all labor and materials necessary for construction of the Project, including the engagement of a General Contractor. The Park District agrees the Project will be completed substantially in accordance with the Final Plans and Specifications approved by the Park District, as amended by change orders. All work will be done in a workmanlike manner and shall be in compliance with all local, state and federal building codes, laws and regulations.

1.09     The Park District shall communicate regularly with Foundation throughout the construction of the Project and provide any information as is reasonably requested by the Foundation regarding the Project's status and budget.

1.10     In compliance with the Code of The Chicago Park District, the Park District shall pay for all costs of unreasonable delay it causes and for all optional changes.

1.11     The Park District shall meet or exceed all MBE/WBE and local residency targets for construction of the Project, as proscribed by the Code of The Chicago Park District.

1.12     The Park District shall, at its sole cost and expense, maintain the Project and the rest of the Project Site in a safe condition and consistent with Park District standards and shall maintain the Project in reasonably good condition. Without limiting the foregoing, the Park District shall repair any damage to the Project as quickly as possible using construction and materials consistent with those used in the initial construction and will remove graffiti and litter promptly, consistent with its standards for other, similar parks managed by the Park District. The Park District shall further follow all manufacturers' recommendations regarding the proper maintenance of the Field.

SECTION 2. BUDGETS.

2.01     The proposed budget of the Project is attached hereto as Exhibit C. The Park District represents that the Project cost shall not exceed Three Million US Dollars ($3,000,000).

2.02     Unless otherwise specifically stated in this Agreement, the only additional costs the Park District shall be responsible for are costs of unreasonable delay it causes, all Optional Changes, and any budget overruns attributable to the Park District's acts or omissions. The Park District shall pay such costs within 30 days of demand by Foundation.

SECTION 3. INSURANCE

3.01.    The Parties acknowledge the Park District is a self-insured entity and the Park District shall be responsible for obtaining all insurance coverage related to the design and construction of the Project, if any, in the coverage and amounts the Park District determines in its own discretion.

## SECTION 4. INDEMNIFICATION.

4.01. Foundation agrees to defend, indemnify, keep and hold harmless the Park District, its Commissioners, officers, representatives, employees, volunteers and agents (the "Park District Indemnified Parties) from and against any and all third party claims, demands, losses, costs, damages, liabilities, suits, actions, causes of action and expenses the Park District Indemnified Parties may each suffer, incur or sustain or for which the indemnified party may become liable resulting from, arising out of, or relating to: (i) any claims arising from the gross negligence or intentional misconduct in Foundation's performance under this Agreement as it relates to the Field, or (ii) the filing of any liens affecting the Project, or any part thereof, by any contractor, subcontractor or agent of Foundation at any time. Foundation's obligations under this Section 4.01 shall survive the termination of this Agreement.

4.02. Except to the extent limited by the provisions on non-appropriation in Section 17(i) of the Act, the Park District agrees to defend, indemnify, keep and hold harmless Foundation, its directors, officers, shareholders, representatives, employees, contractors, subcontractors, volunteers and agents (the "Foundation Indemnified Parties") from and against any and all third-party claims, losses, costs, damages, liabilities, suits, actions, causes of action and expenses the Foundation Indemnified Parties may each suffer, incur or sustain or for which it or they may become liable resulting from, arising out of, or relating to: (i) any act or omission of the Park District in connection with the Project, as such act or omission may relate to the Project or this Agreement and liabilities; (ii) maintenance, operation, or the condition of a Field or Field Site; (iii) any person's use of the Field; (iv) any claims in any way related to a Field filed from and after the Acceptance Date of such Field; and (v) any breach of any representation, warranty or covenant in this Agreement; provided, however, the Park District's obligations under this paragraph 4.02 shall not extend to any indemnity of a Foundation Indemnified Party for injuries for which the Foundation indemnity in Section 4.01 applies. The Park District's obligations under this Section 4.02 shall survive the termination of this Agreement.

Notwithstanding the foregoing, for claims in any way related to events or occurrences prior to the completion of construction of the Field, the Parties agree to submit such claims to the insurance carrier of the General Contractor for the Field Site (see Section 3 above). To the extent such claims are covered by such insurance, the Park District's indemnity obligation shall be reduced by the amount actually paid by the insurer.

## SECTION 5. EVENTS OF DEFAULT AND REMEDIES.

5.01. In the event of a material breach of this Agreement by the Park District not cured within 45 days of written notice of such breach by Foundation, then, upon written notice to the Park District, this Agreement shall terminate and all obligations of the Parties under this Agreement (other than those obligations set forth in Section 4 and in this Section 5) shall cease and the Park District shall reimburse Foundation in full.

5.02. Each Party agrees monetary damages could be inadequate to compensate the other Parties for any breach of any covenant or agreement set forth herein. Accordingly, each Party agrees and acknowledges any such violation or threatened violation could cause irreparable

injury to the other Parties and in addition to any other remedies which may be available, in law, in equity or otherwise, the other Parties shall be entitled to seek injunctive relief against the threatened breach of this Agreement or continuation of any such breach, without the necessity of proving actual damages. However, the Parties agree prior to seeking the remedy contained in this Section 5.02, the General Superintendent of the Park District and the Executive Director of the Foundation will use good faith efforts to resolve any disputes between the Parties.

SECTION 6.   REPRESENTATIONS AND WARRANTIES.

6.01.   The Park District represents and warrants it has the right and authority to enter into this Agreement and to take all actions necessary to fulfill its obligations hereunder and to permit Foundation to fulfill its obligations hereunder. The Park District represents and warrants, to its knowledge, this Agreement does not conflict with the Chicago Park District Act (the "Act"), the Park District Code, or with the Public Officer Prohibited Activities Act or any other applicable law, rule, code or regulation.

6.02.   Foundation represents and warrants it is authorized to enter into this Agreement and carry out its obligations hereunder.

SECTION 7. MISCELLANEOUS.

7.01.   Amendment. This Agreement may not be amended or modified without the prior written consent of the Parties hereto.

7.02.   Assignment. No Party may sell, assign or otherwise transfer its interest in this Agreement in whole or in part without the prior written consent of the other Party, which consent shall be in each Party's sole discretion.

7.03.   Binding Effect and Disclaimer of Third-Party Beneficiaries. This Agreement shall be binding upon the Parties and their respective successors and permitted assigns (as provided herein) and shall inure to the benefit of the Parties and their respective successors and permitted assigns (as provided herein). Nothing contained in this Agreement, nor any act of a Party, shall be deemed or construed by any of the Parties or by any person, to create or imply any relationship of third-party beneficiary, principal, agent, limited or general partnership, joint venture or any association or relationship involving the Park District or Foundation.

7.04.   Construction. The term "include" (in all its forms) means "include without limitation," unless the context clearly states otherwise. The paragraph and section headings contained herein are for convenience only and are not intended to limit, vary, define or expand the content thereof. All references to a number of days mean calendar days, unless indicated otherwise. "Business Day" means any day other than a Saturday, a Sunday or any day in which banks in Illinois are authorized or obligated by law or executive order to close.

7.05.    Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.

7.06.    Entire Agreement. This Agreement (including the preamble, recitals and each attached Exhibit), reflects and constitutes the entire Agreement between the Parties and it supersedes all prior agreements, negotiations and discussions between the Parties relative to the subject matter hereof. There are no other representations, inducements or other rights or obligations being extended to any party with regard to the Project or any Field.

7.07.    Further Assurances. Foundation and the Park District each agrees to take such actions, including the execution and delivery of such documents, instruments, petitions and certifications as may become necessary or appropriate to carry out the terms, provisions and intent of this Agreement.

7.08.    Force Majeure. No Party shall be considered in breach of or in default of its obligations under this Agreement in the event of any delay caused by damage or destruction by fire or other casualty, terrorist act, declaration of emergency by government authorities, shortage of material, unusually adverse weather conditions such as, by way of illustration and not limitation, severe rain storms or below freezing temperatures of abnormal degree or for an abnormal duration, tornadoes or cyclones which in fact interferes with the reasonable ability of such Party to discharge its obligations hereunder. The Party relying on this Section 7.08 with respect to any such delay shall, upon the occurrence of the event causing such delay, immediately give written notice to the other Parties and may only rely on this Section with respect to any such delay to the extent of the actual number of days of delay effected by any such events described above.

7.09.    Governing Law, Venue and Consent to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois, without regard to its conflicts of law principles. If there is a lawsuit under this Agreement, each Party hereto agrees to submit to the jurisdiction of the courts of Cook County, the State of Illinois or the United States District Court for the Northern District of Illinois.

7.10.    Limitation of Liability. No member, official, director, officer, trustee, agent, contractor, subcontractor, volunteer or employee of the Park District or Foundation shall be personally liable to any other Party or any successor in interest in the event of any default or breach by any of the Parties, as applicable, or for any amount which may become due to or from such Party or any permitted successor in interest or on any obligation under the terms of this Agreement.

7.11    Notice. All notices pursuant to this Agreement shall be made via reputable overnight courier to the following addresses:

        if to the Park District:        General Superintendent
                                        Chicago Park District
                                        541 N. Fairbanks
                                        Chicago, IL 60611

with a copy to:          General Counsel
                         Chicago Park District
                         541 N. Fairbanks
                         Chicago, IL 60611

if to Foundation:        The Barack Obama Foundation
                         5235 S. Harper Court, Suite 1140
                         Chicago, IL 60615
                         Attn: Robbin Cohen


with a copy to:

Any notice, demand or request sent by guaranteed overnight courier shall be deemed received on the business day immediately following acceptance for delivery by the overnight courier.

7.12. <u>Remedies Cumulative</u>. The remedies of a Party hereunder are cumulative and the exercise of any one or more of the remedies provided for herein shall not be construed as a waiver of any other remedies of such Party unless specifically so provided herein.

7.13. <u>Severability</u>. If any provision in this Agreement or any paragraph, sentence, clause, phrase, word or the application thereof, in any circumstance, is held invalid, this Agreement shall be construed as if such invalid part were never included herein and the remainder of this Agreement shall be and remain valid and enforceable to the fullest extent permitted by law.

7.14. <u>Waiver</u>. Waiver by Foundation or the Park District with respect to any breach of this Agreement shall not be considered or treated as a waiver of the rights of the respective Party with respect to any other default or with respect to any particular default, except to the extent specifically waived by Foundation or the Park District in writing.

7.15 <u>Dispute Resolution</u>. A dispute between the Park District and Foundation involving this Agreement or the Project which has not been resolved, shall be referred to the Park District's General Superintendent and Chief Executive Officer (the "**General Superintendent**") and the Executive Director or Chief Executive Officer of Foundation (the "**Foundation Executive**"). Either party may give written notice of the dispute to both the General Superintendent and the Foundation Executive, who shall meet within 10 days of notification to resolve the dispute. In the event the General Superintendent and the Foundation Executive fail to resolve the dispute, each party may pursue its remedies at law, and shall endeavor to do so within one (1) year of the date notification of the dispute is given.


**[signature page follows]**

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their duly authorized representatives.

CHICAGO PARK DISTRICT,
an Illinois municipal corporation

By: _____
Michael P. Kelly
General Superintendent and CEO

Attest:

By: _____
Kantrice Ogletree, Secretary
Board of Commissioners

THE BARACK OBAMA FOUNDATION, a
District of Columbia not-for-profit corporation

By: _____
Name: Robbin Cohen
Its: _____

# EXHIBIT A

## JACKSON PARK SITE LOCATIONS



