**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PROTECT OUR PARKS, INC., *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 21 CV 2006 |
| | ) | |
| PETE BUTTIGIEG | ) | Judge John Robert Blakey |
| SECRETARY OF THE U.S. | ) | |
| DEPARTMENT OF TRANSPORTATION, | ) | |
| *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS THE CITY OF CHICAGO, THE CHICAGO PARK DISTRICT, AND
THE BARACK OBAMA FOUNDATION'S MEMORANDUM IN SUPPORT OF THEIR
*MOTION TO DISMISS PLAINTIFFS' STATE LAW CLAIMS***

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 5

      A.     The Presidential Center ............................................................................ 5

      B.     The Municipal Approval Process ............................................................ 7

      C.     The Use Agreement ................................................................................. 8

      D.     The City Council's Findings .................................................................... 9

      E.     The Prior Litigation ............................................................................... 10

      F.     The Complaint ....................................................................................... 11

ARGUMENT ................................................................................................................ 12

   I.     The Presidential Center Does Not Violate the State Public Trust Doctrine
      (Count VI). ......................................................................................................... 13

      A.     The Museum Act's Authorization of the Presidential Center
               Disposes of Plaintiffs' Public Trust Claim. ......................................... 13

          1.     The General Assembly May Authorize Particular Uses of the
                   Parkland It Created. ..................................................................... 14

          2.     The Text of the Museum Act Authorizes Presidential Centers
                   on Parkland. .................................................................................. 16

      B.     The Presidential Center Is Lawful Under the Alternative Public
               Trust Standards. .................................................................................... 18

      C.     Plaintiffs' Proposed "Heightened Scrutiny" Is Not the Standard. .......... 20

   II.    Plaintiffs Have No *Ultra Vires* Claim (Count VII) Because State Law
      Authorizes the Transfer of Park District Land to the City. ................................. 23

   III.   Plaintiffs Have No Public Purpose Claim (Count VIII). ..................................... 26

   IV.   Plaintiffs' Claim Under the Illinois Takings Clause (Count IX) Should Be
      Dismissed. .......................................................................................................... 28

   V.    Plaintiffs Have Failed to State a Claim of Improper Delegation of
      Legislative Authority Under the Illinois Constitution (Count XI) ...................... 31

   VI.   Plaintiffs Have No Due Process Claim (Count XII). ........................................... 34

   VII.  Plaintiffs Fail to State a Claim That a Special Privilege Was Granted in
      Violation of the Illinois Constitution (Count XIII). ............................................ 37

   VIII. Plaintiffs Have No Alternative Claim Under the Illinois State Agency
      Historic Preservation Resources Act (Count XV). ............................................. 38

CONCLUSION ............................................................................................................. 40

i

## **TABLE OF AUTHORITIES**

**Cases**                                                                                              **Page(s)**

*A.B.A.T.E. of Ill., Inc. v. Quinn,*
   957 N.E.2d 876 (Ill. 2011) ........................................................................................28

*A.B.A.T.E. of Illinois, Inc. v. Giannoulias,*
   929 N.E.2d 1188 (Ill. App. 2010) ...........................................................................29

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)..................................................................................................12

*Bd. of Regents of State Colleges v. Roth,*
   408 U.S. 564 (1972)..................................................................................................29

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)..................................................................................................12

*Big Sky Excavating, Inc. v. Ill. Bell Tel. Co.,*
   840 N.E.2d 1174 (2005)...........................................................................................34

*Bogie v. Rosenberg,*
   705 F.3d 603 (7th Cir. 2013) ...................................................................................28

*City of Chicago v. Eychaner,*
   26 N.E.3d 501 (Ill. App. Ct. 2015) ..........................................................................30

*Clement v. O'Malley,*
   420 N.E.2d 533 (Ill. App. Ct. 1981) ........................................................................14

*Curielli v. Quinn,*
   38 N.E.3d 159 (Ill. App. Ct. 2015) ..........................................................................36

*Denius v. Dunlap,*
   330 F.3d 919 (7th Cir. 2003) .....................................................................................5

*DiSabato v. Bd. of Trs. of State Emps' Ret. Sys. of Ill.,*
   674 N.E.2d 852 (Ill. 1996)........................................................................................38

*Empress Casino Joliet Corp. v. Giannoulias,*
   896 N.E.2d 277 (Ill. 2008)..................................................................................27, 37

*Entek GRB, LLC v. Stull Ranches, LLC,*
   840 F.3d 1239 (10th Cir. 2016) (Gorsuch, J.)...........................................................13

*Fairbank v. Stratton,*
   152 N.E.2d 569 (1958)..............................................................................................27

*Falkner v. City of Chicago*,
    150 F. Supp. 3d 973 (N.D. Ill. 2015) ........................................................................31

*Friends of the Parks v. Chicago Park District*,
    786 N.E.2d 161 (Ill. 2003) ............................................................... *passim*

*Fumarolo v. Chicago Bd. of Educ.*,
    566 N.E.2d 1283 (1990) ................................................................................35

*Furlong v. South Park Comm'rs*,
    151 N.E. 510 (1926).................................................................................15, 27

*Groenings v. City of St. Charles*,
    574 N.E.2d 1316 (2d Dist. 1991).................................................................34

*Hampton v. Metro. Water Reclamation Dist. of Greater Chicago*,
    57 N.E.3d 1229 (Ill. 2016) ...........................................................................30

*Homola v. Miles*,
    56 F.3d 67, 1995 WL 309627 (7th Cir. May 18, 1995).............................13

*Ill. Collaboration on Youth v. Dimas*,
    81 N.E.3d 63 (Ill. App. Ct. 2017) ...............................................................35

*Indep. Voters of Ill. Indep. Precinct Org. v. Ahmad*,
    13 N.E.3d 251 (Ill. App. Ct. 2014) .............................................................28

*Kelo v. City of New London*,
    545 U.S. 469 (2005)......................................................................................30

*King v. Johnson*,
    265 N.E.2d 874 (Ill. 1970)...........................................................................38

*Laramore v. Ill. Sports Facilities*,
    1996 WL 153672 (N.D. Ill. Apr. 1, 1996) ..................................................23

*Latham v. Bd. of Ed. of City of Chicago*,
    201 N.E.2d 111 (Ill. 1964)...........................................................................33

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
    128 F.R.D. 243 (N.D. Ill. 1989)..................................................................39

*Newcomb v. Brennan*,
    558 F.2d 825 (7th Cir. 1977) .........................................................................5

*Paepcke v. Public Bldg. Comm'n of Chicago*,
    263 N.E.2d 11 (Ill. 1970)................................................................. *passim*

*People v. City of Chicago,*
    182 N.E. 419 (Ill. 1932) ........................................................................................38

*People v. Ill. State Toll Highway Comm'n,*
    120 N.E.2d 35 (Ill. 1954) ......................................................................................16

*People ex rel. Bransom v. Walsh,*
    96 Ill. 232 (Ill. 1880) ............................................................................................15

*People ex rel. Gutknecht v. City of Chicago,*
    121 N.E.2d 791 (Ill. 1954) ...................................................................................15

*People ex rel. Lumpkin v. Cassidy,*
    703 N.E.2d 1 (Ill. 1998) .......................................................................................36

*People ex rel. Scott v. Chicago Park Dist.,*
    360 N.E.2d 773 (Ill. 1976) ...................................................................................18

*Petersen v. Chicago Plan Comm'n,*
    707 N.E.2d 150 (1st Dist. 1998) ..........................................................................35

*Protect Our Parks, Inc. v. Chicago,*
    -- S. Ct. --, 2021 WL 1602736 (U.S. Apr. 26, 2021) ..........................................11

*Protect Our Parks, Inc. v. Chicago Park Dist.,*
    385 F. Supp. 3d 662 (N.D. Ill. 2019) ........................................................ *passim*

*Protect Our Parks, Inc. v. Chicago Park Dist,*
    971 F.3d 722 (7th Cir. 2020) ..................................................................... *passim*

*Pyrolyx USA Ind., LLC v. Zeppelin Sys. GmbH,*
    Case No. 2:20-cv-00108, 2020 WL 3976975 (S.D. Ind. July 14, 2020) ..............13

*Reed v. Farmers Ins. Grp.,*
    720 N.E.2d 1052 (1998) ................................................................................36, 37

*Reichelderfer v. Quinn,*
    287 U.S. 315 (1932) .............................................................................................29

*River Park v. City of Highland Park,*
    23 F.3d 164 (7th Cir. 1994) ............................................................................22, 23

*Wildey v. Springs,*
    47 F.3d 1475 (7th Cir. 1995) ...............................................................................21

*Williamson v. Curran,*
    714 F.3d 432 (7th Cir. 2013) ............................................................................5, 12

iv

*Yeftich v. Navistar, Inc.,*
    722 F.3d 911 (7th Cir. 2013) ...............................................................................12

**Constitution and Statutes**

Administrative Procedure Act.................................................................................1, 38

Ilinois State Agency Historic Preservation Resources Act.......................................39, 40

National Historic Preservation Act of 1966 Section 106..........................................39, 40

Ill. Const. Art. I, § 15............................................................................................28

Ill. Const. Art. I, § 16............................................................................................37, 38

Ill. Const. Art. II, § 1.............................................................................................31

Ill. Const. Art. VII, § 10(a).....................................................................................25

Ill. Const. Art. VII, § 6..........................................................................................31

Ill. Const. Art. VIII, § 1(a).....................................................................................12, 26

5 ILCS 220/3........................................................................................................25

20 ILCS 3420/4(g)................................................................................................39

50 ILCS 605/1, *et seq.*..........................................................................................24

50 ILCS 605/2......................................................................................................10, 24

70 ILCS 1205/1-2(d).............................................................................................23

70 ILCS 1205/10-7(b)...........................................................................................10

70 ILCS 1205/10-7, *et seq.* ..................................................................................23

70 ILCS 1290/1 .................................................................................................. *passim*

Private Laws 1869, vol. 1, p. 358, *et seq.* ...........................................................14, 28, 32

**Rules and Regulations**

Federal Rule of Evidence 201.................................................................................7

Federal Rule of Civil Procedure 8(d)......................................................................39

Federal Rule of Civil Procedure 12(b)(6) ...............................................................5, 12, 19

**Other Authorities**

18B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
  § 4478.4 Law of the Case—Coordinate Courts (2d ed. 2002)..................................................13

## INTRODUCTION

This lawsuit is the second time Plaintiff Protect Our Parks has asked a federal court to overturn state and municipal judgments that the Obama Presidential Center is a worthy use of a small piece of Jackson Park—a park that has already been the home of buildings devoted to cultural, educational, and recreational enrichment for over a century. State and municipal bodies reached that decision over the course of a half decade of review, and after many public hearings and opportunities for public comment. In 2019 and 2020, this Court—and the Seventh Circuit—refused to second-guess those legislative judgments when Protect Our Parks brought its first lawsuit, and the Court should do the same again here.

To be sure, part of this lawsuit is different from the first. It includes claims under federal statutes challenging the recent decisions of federal agencies authorizing certain actions the City intends to take in connection with the project. *See* Compl., Counts I–V, X, XIV. Those federal claims are not at issue in this Motion, however, as they will be addressed in due course after submission of the federal administrative record. That is the typical process for resolving claims of this type challenging agency action under the federal Administrative Procedure Act.

But the rest of this lawsuit is not new. It brings claims under state law seeking to block the Presidential Center, which do no more than rehash the same basic arguments—and many of the exact same claims—that were rejected in the prior case. And these state law claims are ripe for dismissal now. While the prior case was resolved at summary judgment, this time the Court can and should dispose of the state law claims on a motion to dismiss, because they all suffer from fundamental legal defects that require no factual development. Unlike in the first case, the Court now has the benefit of not only its own ruling in the prior case, but also the Seventh Circuit's opinion, both of which resolved issues of law that are dispositive here.

1

Most crucially, Plaintiffs' first state law claim here is a repeat of the public trust claim from the first case—except, this time, Plaintiffs make no allegation that the Jackson Park site was previously submerged. *See* Compl., Count VI. They recognize, as they must, that Jackson Park is subject to a public trust only because the Illinois General Assembly created one on existing land. This means that their public trust claim fails as a matter of law, by operation of state statute, without any need for discovery: as this Court and the Seventh Circuit recognized in the prior case, the General Assembly has the discretion to pass statutes authorizing new uses of parkland that it previously created. And this Court held that the General Assembly did precisely that in the Illinois Park District Aquarium and Museum Act, which is a "clear legislative directive" showing "a broad, comprehensive and definite intention to allow the City to contract with directors or trustees of a museum (the Foundation) to build a presidential center (the OPC) in a public park (Jackson Park)." *Protect Our Parks, Inc. v. Chicago Park Dist. ("Protect Our Parks I")*, 385 F. Supp. 3d 662, 679 (N.D. Ill. 2019), *aff'd in part, vacated in part*, 971 F.3d 722 (7th Cir. 2020). On the basis of this legislative authorization in the Museum Act, this Court thus "[could not] find, as a matter of law, that the [Presidential Center] violates the public trust doctrine." *Id.* at 681. This holding—that the Museum Act alone resolves the public trust claim—necessarily leads to dismissal of Plaintiffs' public trust claim as a matter of law.

This Court's and the Seventh Circuit's prior holdings provide a clear path for dismissal of the other state law claims as well. Plaintiffs' takings and due process claims under the Illinois Constitution, *see* Compl., Counts IX, XII, simply repackage the federal versions from the prior case. The Seventh Circuit rejected the prior claims on the legal ground that, under Illinois law, one's status as a public trust beneficiary does not give rise to a private property interest in Jackson Park—a "fundamental defect" in both claims. *Protect Our Parks, Inc. v. Chicago Park*

2

*Dist. ("Protect Our Parks II")*, 971 F.3d 722, 737 (7th Cir. 2020). This Court likewise held that "no unconstitutional taking can occur where, as here, the relevant property is already public," *Protect Our Parks I*, 385 F. Supp. 3d at 686, and plaintiffs could not "establish a deprivation of *any* interest under their procedural due process claim, *id.* at 687 (emphasis added). Plaintiffs' Illinois takings and due process claims here suffer from these same legal defects (as well as others), and can therefore be resolved on the law, because they rely on the same purported private property right that simply does not exist under Illinois law.

Equally repetitious is Plaintiffs' claim that the transfer of the Jackson Park site to the City is *ultra vires* under Illinois statutes, *see* Compl. Count VII, a claim the Court rejected in the prior case after reviewing the relevant statutory text and holding that the transfer is authorized under Illinois law. *Protect Our Parks I*, 385 F. Supp. 3d at 687-91. And as for Plaintiffs' claim that the Presidential Center violates the Illinois Constitution by using public land without a public purpose, *see* Count VIII, the Court already held that the "educational and recreational benefits of the [Presidential Center] serve a public purpose" under the Constitution. *Id.* at 690 n.15.

Nor can Plaintiffs escape the prior legal holdings by bringing newly-pleaded claims that the City unlawfully delegated legislative authority to or granted an irrevocable special privilege to the Foundation. *See* Compl., Counts XI, XIII. These are just new "variants of the theory that the Obama Presidential Center does not serve the public interest but rather the private interest of its sponsor, [T]he Barack Obama Foundation." *Protect Our Parks II*, 971 F.3d at 728. This Court dispensed with similar efforts in the prior case to "attempt to twist [the Presidential Center's] public benefit into a private purpose"—an "unconvincing[]" "mischaracterization" of the Presidential Center and its purpose. *Protect Our Parks I*, 385 F. Supp. 3d at 682–83. Plaintiffs' new spin on this same discredited theory should be rejected here as a matter of law.

3

Rejecting these claims, like the claims before, requires the Court to do nothing more than construe the governing City ordinances and the Use Agreement—something this Court did already in the prior case in rejecting similar claims. Those publicly-approved documents show that the City Council fully retained and exercised its legislative authority in approving the Presidential Center and in authorizing a revocable, rather than irrevocable, Use Agreement.

Fundamentally, the Seventh Circuit held in the prior case that the City's judgment about the merits of the project is "entitled to deference," and the Seventh Circuit would not "second-guess the City's determination that building the Center—with its museum, public library branch, auditorium, athletic center, gardens, and more—is a use with public benefits." *Protect Our Parks II,* 971 F.3d at 737. That conclusion, along with the particular legal holdings made in the prior litigation, warrant dismissal of the state law claims here as a matter of law. While the Seventh Circuit ultimately vacated a portion of this Court's decision in the prior case on standing grounds, nothing in the Seventh Circuit's decision called into question this Court's legal reasoning on the merits of the claims. In fact, the Seventh Circuit agreed with this Court's framework for considering the public trust doctrine, and affirmed judgment on Plaintiffs' federal due process and takings claims. Now, Plaintiffs have advanced new factual allegations, not presented in the prior case, to establish their Article III standing. *See* Compl. ¶¶ 11–22; *Protect Our Parks II,* 971 F.3d at 731 n.1 (observing that no similar allegations were made by Protect Our Parks and other plaintiffs in the prior case). This Court should therefore proceed to promptly reaffirm its prior merits rulings and dismiss each of Plaintiffs' state law claims.

This Court concluded at the close of the prior case that construction of the Presidential Center "should commence without delay." *Protect Our Parks I*, 385 F. Supp. 3d at 667. That is even truer today as the Foundation plans to begin construction in mid-August. There is no basis

for allowing Plaintiffs' flawed legal theories to persist, and the Court should clear away this underbrush now and dismiss the state law claims with prejudice.

## BACKGROUND

### A.    The Presidential Center

This case attempts to thwart construction of the Obama Presidential Center, which is set to "provide[] a multitude of benefits to the public," as this Court already concluded after examining the same documents relied on in Plaintiffs' Complaint and attached to this motion. *Protect Our Parks I*, 385 F. Supp. 3d at 682; Compl., Ex. 2, Ex. D thereto (Use Agreement); Ex. 1 hereto City Ordinance SO2018-123 ("Planned Development Ordinance"); Ex. 2 hereto May 17, 2018 Chicago Plan Commission Resolution ("LPO Resolution").[1]  The Presidential Center "will offer a range of cultural, artistic, and recreational opportunities—including an educational museum, branch of the Chicago Public Library, and space for large-scale athletic events—as well as provide increased access to other areas of Jackson Park and the Museum of Science and Industry."  *Protect Our Parks I*, 385 F. Supp. 3d at 682; *see also id.* at 669–70.

Most notably, the museum—the Presidential Center's "principal building and 'central mission'"—will educate the public by telling "'the stories of the first African American President and First Lady of the United States, their connection to Chicago, and the individuals,

---

[1] The Court may consider the Planned Development Ordinance on this Rule 12 motion because it is the ordinance containing the zoning change referenced in Paragraph 62 of the Complaint, and because it is an official legislative record subject to judicial notice and is available on the City Clerk's website.  *See Williamson v. Curran*, 714 F.3d 432, 435–36 (7th Cir. 2013); *Denius v. Dunlap*, 330 F.3d 919, 926–27 (7th Cir. 2003); *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977.  Similarly, the Court may consider Exhibit 2, the resolution of the Chicago Plan Commission containing the approvals and report discussed in Paragraphs 60 & 61 of the Complaint, and an official record of a government body, and Exhibit 3, City Ordinance SO2018-7018 ("Transportation Ordinance") an official legislative record available on the City Clerk's website.

communities, and social currents that shaped their local and national journey.'" *Id.* at 683; Compl., Ex. 2, Ex. D thereto (Use Agreement), Sub-Ex C. thereto (OPC Mission Statement) & Sub-Ex. E thereto (Statement of OPC Uses). The museum will feature artifacts and records from President Obama's presidency on loan from the National Archives and Records Administration ("NARA") as well as other sources. Compl., Ex. 2, Ex. D thereto (Use Agreement), Recital J & § 6.3(e). It will add another museum to Jackson Park, joining the Museum of Science and Industry in Jackson Park and ten other museums located in Chicago parks, and will further the City's goal of developing a "Museum Campus South," connecting major institutions on the South Side and creating new opportunities for collaboration and growth. Compl. Ex. 2 thereto (Operating Ordinance), at 85878; *id.*, Ex. D thereto (Use Agreement), at 85897.

The Presidential Center will provide extensive open areas and recreational spaces which will be generally available to the public during regular Park District hours. Compl., Ex. 2, Ex. D thereto (Use Agreement) at 85895–96, 85898; *id.*, § 6.2, Sub-Ex. C thereto & Recital M & Sub-Ex. D thereto (Areas of Presidential Center). The "design for the [Presidential Center] green space includes purposeful features such as: (1) play areas for children; (2) contemplative spaces; (3) a sledding hill; (4) a sloped lawn for picnicking, recreation and community and special events; (5) walking paths; and (6) a nature walk along the lagoon." *Protect Our Parks I*, 385 F. Supp. 3d at 689; Compl., Ex. 2, Ex. D thereto (Use Agreement), Recital M & Sub-Ex. D thereto (Areas of Presidential Center). Natural landscaping features will integrate some of the buildings into the surrounding green space. Ex. 1 hereto (Planned Development Ordinance), at CITY_011781-92. In short, as the official records governing the operation of the Presidential Center show, "the site will not destroy or greatly impair the land's original use; activities such as picnicking, jogging, and meadow bird nesting will not only be accessible in other areas of the

park, but also within certain parts of the [Presidential Center] site." *Protect Our Parks I*, 385 F. Supp. 3d at 685; Compl., Ex. 2, Ex. D thereto (Use Agreement), § 6.2, Recital M & Sub-Ex. D thereto (Areas of Presidential Center); Ex. 2 hereto (LPO Resolution) at CITY_012118, CITY_012124.

The Presidential Center will sit on a narrow sliver of the western edge of Jackson Park, occupying only 3.5% of the park's 551.52 acres.[2]  Ex. 1 hereto (Planned Development Ordinance) at CITY_011767, Planned Development Statement No. 1; *id.* at CITY_011777–78. The site is currently isolated from the remainder of Jackson Park by busy roads. *Id.* at CITY_011777–78; Ex. 2 hereto (LPO Resolution), at CITY_012112.  Portions of two of those roads will be vacated, creating new parkland and restoring the site's connection to the rest of the park, the lagoons, and the Museum of Science and Industry. Ex. 1 hereto (Planned Development Ordinance), at CITY_011777–79; Ex. 2 hereto (LPO Resolution), at CITY_012111–2.

## B.    The Municipal Approval Process

In July 2016, the Foundation selected Jackson Park as the site for the Presidential Center. Compl. ¶ 51.  The project then underwent an extensive review and approval process involving multiple public bodies and public hearings.  "The City enacted four separate ordinances approving various aspects of the Center." *Protect Our Parks II*, 971 F.3d at 738.  "The votes on those ordinances came after multiple public hearings at which residents could raise their concerns about the City's intended plans."  *Id.*

First, in 2015, the City Council enacted an ordinance authorizing acceptance of a transfer of the proposed Jackson Park site from the Park District to the City, finding it "useful, desirable,

---

[2] The 551.52 acre figure for Jackson Park is subject to judicial notice because it "is not subject to reasonable dispute," as it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201, and is available on the Chicago Park District's website, https://www.chicagoparkdistrict.com/parks-facilities/jackson-park.

necessary and convenient" for the City to acquire the selected site "for the public purpose of facilitating the location, development, construction and operation of" the Presidential Center. Compl., Ex. 1 (2015 Ordinance), at 2, 5.

Second, in May 2018, the City Council enacted a "Planned Development Ordinance" approving the use of the Jackson Park site for the Presidential Center. Ex 1 hereto (Planned Development Ordinance). This ordinance followed review by the Chicago Plan Commission, which had approved the proposal after a public hearing. *See* Compl. ¶ 59. The Commission adopted as its findings of fact a staff report prepared by the Department of Planning and Development ("DPD Study"), which itself had recommended approval of the Presidential Center in Jackson Park after an extensive review. Ex. 2 hereto (LPO Resolution (attaching DPD study)). The City Council's Committee on Zoning, Landmarks and Building Standards had also recommended that the City Council approve the project after holding its own public hearing. Compl. ¶ 61.

Finally, in October 2018, the City Council enacted the "Operating Ordinance," which authorized the City to accept title to the current Jackson Park site from the Park District and enter into agreements with the Foundation governing its use of the site, Compl. ¶ 64 & Ex. 2 thereto (Operating Ordinance), and a fourth ordinance which authorized the City to vacate portions of Midway Plaisance Drive South and Cornell Drive, Ex. 3 hereto (Transportation Ordinance). The relevant City Council Committees held public hearings on these ordinances before unanimously recommending approval. Compl., Ex. 2 thereto (Operating Ordinance), at 85875-76; Ex. 3 hereto (Transportation Ordinance), at CITY_011909–10.

### C. The Use Agreement

The Operating Ordinance authorized the Use Agreement, which sets the terms of the Foundation's use of the Jackson Park site. Compl., Ex. 2 thereto (Operating Ordinance), § 5, Ex.

8

D thereto (Use Agreement).  Along with the Planned Development Ordinance and the Operating

Ordinance, the Use Agreement governs the Presidential Center's nature and operations.

The Use Agreement authorizes the Foundation to use the site only to operate the

Presidential Center.  Compl., Ex. 2, Ex. D thereto (Use Agreement), § 2.1.  The City will retain

ownership of the Presidential Center site.  *Id.*  And if the Foundation ceases to use the

Presidential Center for its permitted uses, the City may terminate the contract.  *Id.* § 16.2.  The

Foundation will construct the Presidential Center's buildings at its own expense and, upon

completion, transfer ownership of the structures and other site improvements to the City at no

charge.  *Id.* §§ 2.1, 4.4.  The Foundation will also maintain the Presidential Center site and

buildings at its sole expense for the entire life of the Use Agreement.  *Id.* §§ 2.2, 7.1.  The

Foundation must operate the Presidential Center in accord with the Museum Act's free

admission requirements, including free admission to all Illinois residents at least 52 days out of

the year and to all Illinois school children accompanied by a teacher.  *Id.* §§ 6.1–6.2; 70 ILCS

1290/1.

### D. The City Council's Findings

Through its review process, the City Council made legislative findings that the

Presidential Center will benefit the City and the public: the Presidential Center will offer

Chicago residents the opportunity to experience a presidential museum "telling the story of our

nation's first African-American President and First Lady, their journey to the White House, [and]

their historical connection to Chicago."  Compl., Ex. 2 thereto (Operating Ordinance), at 85876.

It will beautify the grounds, and the Foundation will provide ongoing financial and operational

support for public historical, cultural, and recreational enrichment activities.  *Id.* at 85883.  The

City will receive title to all buildings and improvements at no charge, while the Foundation will

operate, maintain, and insure such buildings and improvements.  *Id.*  And "[c]onstruction of the

[Presidential Center] and development of the [Presidential Center] Site will support local businesses and encourage additional investments in the area." *Id.* at 85882.

The Council thus explained that "the Foundation's selection of Chicago for the [Presidential Center] is a great honor and unparalleled opportunity for the State of Illinois, all of the City, and especially the South Side[, and] location of the [Presidential Center] in Jackson Park will . . . encourage greater use and enjoyment of the park and lakefront." *Id.* at 85885. "[I]n sum," the Council concluded, "the [Presidential Center] will feature a museum that memorializes and examines President Obama's historic presidency within the larger story of American history, inspire visitors to engage actively in their own communities, showcase the South Side and Jackson Park to the nation and world, enhance the park's recreational value, attract cultural tourism to the South Side, create direct and indirect economic development benefits, strengthen Chicago's reputation as a global city, and enable the City to directly advance its previously adopted Cultural Plan." *Id.* at 85886.

### E.     The Prior Litigation

Plaintiff Protect Our Parks and others brought a previous lawsuit in this Court in 2018 challenging the location of the Presidential Center in Jackson Park. Protect Our Parks asserted public trust and *ultra vires* claims and "maintained that the use agreement between the City and the Foundation violates Illinois law because, among other things, it delegates decision-making authority to the Foundation, grants the Foundation an illegal lease in all but name, 70 ILCS 1290/1, exchanges the property for less than equal value, 70 ILCS 1205/10-7(b), and fails to require the City to 'use, occupy, or improve' the land transferred to it from the Park District, 50 ILCS 605/2." *Protect Our Parks II*, 971 F.3d at 728. Protect Our Parks similarly brought takings and due process clause claims under the federal Constitution. *Id.* at 728–29.

This Court granted summary judgment on all of these claims. *Protect Our Parks I*, 385 F. Supp. 3d 662. The Seventh Circuit affirmed judgment on Protect Our Parks's federal constitutional claims, finding them "easily dispatched" on the merits. *Protect Our Parks II*, 971 F.3d at 737. The Seventh Circuit reversed the judgment on Protect Our Parks's state law claims. The court agreed that "[d]edication to a public purpose isn't an 'irrevocable commitment'" and that "judicial review of any reallocation is deferential." *Id.* at 730. But the court found that the plaintiffs lacked standing to bring these claims in federal court. *Id.* at 730–36. The court noted that "Plaintiffs did not allege . . . that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id.* at 731 n. 1. The state law claims were accordingly dismissed without prejudice. The Supreme Court denied Protect Our Parks's petition for certiorari on April 26, 2021. *Protect Our Parks, Inc. v. Chicago*, -- S. Ct. --, 2021 WL 1602736, at \*1 (U.S. Apr. 26, 2021).

### F. The Complaint

Plaintiffs filed this new action on April 14, 2021. This time, they allege that they use and have used Jackson Park and surrounding areas and that they believe the "aesthetic and recreational values of Jackson Park would be irreparably diminished and harmed by the proposed [Presidential Center]." Compl. ¶¶ 12-19.

A portion of the Complaint challenges decisions by three federal agencies, made under various federal laws, related to the City's decision to site the Presidential Center in Jackson Park and make roadway improvements. *See* Compl., Counts I–V, X & XIV. But Plaintiffs have also tacked onto their Complaint the same, and variations of the same, state law claims which Protect Our Parks already asserted, and this Court rejected, in the prior suit. As in the prior suit, Plaintiffs assert public trust and *ultra vires* claims. *Compare* Compl., Counts VI & VII, *with* Case No. 1:18-cv-3424, Dkt. 91 ("2019 Am. Compl."), Counts II & III. Plaintiffs allege that

11

Article VIII, Section 1(a) of the Illinois Constitution prohibited the Use Agreement. *Compare* Compl., Count VIII, *with* 2019 Am. Compl. ¶ 64. And they maintain that the Use Agreement "violates Illinois law because . . . it delegates decision-making authority to the Foundation," *compare Protect our Parks II*, 971 F.3d at 728; *with* Compl., Count XI; "grants the Foundation an illegal lease in all but name," *compare Protect Our Parks II*, 971 F.3d at 728; *with* Compl. ¶¶ 232–33, 240–41; and "exchanges the property for less than equal value," *compare Protect Our Parks II*, 971 F.3d at 728; *with* Compl. ¶¶ 47–48, 239. While Plaintiffs do not reassert the federal constitutional claims, they allege takings and due process claims under parallel provisions of the Illinois Constitution. *Compare* Compl. Counts IX & XII, *with* 2019 Am. Compl. Count I.

## ARGUMENT

To survive Defendants' motion under Federal Rule of Civil Procedure 12(b)(6), the Complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). Rule 12(b)(6) allows the Court to consider "allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson*, 714 F.3d at 436. The Court construes the Complaint in the light most favorable to Plaintiffs, accepts as true all well-pleaded facts, and draws all reasonable inferences in their favor. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). The Court need not, however, "accept as true statements of law." *Id.*

I.     **The Presidential Center Does Not Violate the State Public Trust Doctrine (Count VI).**

    A.     **The Museum Act's Authorization of the Presidential Center Disposes of Plaintiffs' Public Trust Claim.**

In Count VI, Plaintiffs allege a violation of the public trust doctrine under Illinois law. Compl. ¶¶ 224–36. Plaintiffs brought this same claim in *Protect Our Parks I*, and it fails now for the same reasons that it failed before. As this Court held, 385 F. Supp. 3d at 678–81, the Museum Act grants specific statutory authorization for parkland to be used for a presidential center, and thus disposes of Plaintiffs' public trust claim as a matter of law. *See, e.g.*, *Homola v. Miles*, 56 F.3d 67, 1995 WL 309627, at *3 (7th Cir. May 18, 1995) (holding that, even where the doctrines of claim and issue preclusion did not mandate dismissal of an action that was previously dismissed without prejudice, "the reasons justifying dismissal of the previous case equally justify dismissal of the complaint before the Court").[3]

In one notable change from the prior lawsuit, Plaintiffs no longer contend that a public trust applies because the Presidential Center site was supposedly once submerged under Lake Michigan. This is unsurprising: as this Court previously determined—relying on an 1822 map obtained from the Illinois State Archives—"the factual record confirms that the OPC site constitutes never-submerged land under the public trust doctrine." *Protect Our Parks I*, 385 F. Supp. 3d at 677. The sole theory that Plaintiffs now advance is that an 1869 Illinois statute

---

[3] *See also, e.g.*, 18B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4478.4 Law of the Case—Coordinate Courts (2d ed. 2002) (where the same dispute is "framed in formally separate actions . . . later courts tend to adhere to earlier rulings by other courts for the same reasons that inform general law-of-the-case practices"); *Pyrolyx USA Ind., LLC v. Zeppelin Sys. GmbH*, Case No. 2:20-cv-00108, 2020 WL 3976975, at *7 (S.D. Ind. July 14, 2020) ("Because the questions . . . have already been litigated by essentially the same parties, under the law of the case doctrine, that should be the end of the matter. And it is." (citations and quotation marks omitted)); *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1240 (10th Cir. 2016) (Gorsuch, J.) (rejecting attempt to relitigate a previously rejected argument because "an adverse judicial decision" is not "an invitation to take a mulligan").

subjects Jackson Park to a public trust.  *See* Compl ¶¶ 3, 37, 64, 226.  Because Plaintiffs now

pursue only a *statutory* public trust claim, the Court need look no further than the Museum Act—

with its express authorization for the use of public parkland for a presidential center—to dispose

of Plaintiffs' public trust claim, just as it did before.

### 1. The General Assembly May Authorize Particular Uses of the Parkland It Created.

The 1869 Illinois statute invoked by Plaintiffs is titled "An Act to Provide for the

Location and Maintenance of a Park for the Towns of South Chicago, Hyde Park and Lake."

Private Laws 1869, vol. 1, p. 358, *et seq*.  The statute created the South Park Commissioners (a

predecessor to the Chicago Park District), and directed them to acquire lands encompassing

today's Jackson Park and hold the land "as a public park, for the recreation, health and benefit of

the public, and free to all persons forever, subject to such necessary rules and regulations as shall

from time to time be adopted by said commissioners and their successors."  *See* 1869 Statute,

§§ 1, 4; *see also Clement v. O'Malley*, 420 N.E.2d 533, 536–37 (Ill. App. Ct. 1981) (explaining

that Jackson Park was created by, and is subject to, the 1869 statute), *aff'd sub nom. Clement v.

Chicago Park Dist.*, 449 N.E.2d 81 (Ill. 1983).

This language, however, does not permanently control what uses are permissible in

Jackson Park.  As the Seventh Circuit explained in *Protect Our Parks II*, under Illinois law,

where the General Assembly establishes parkland by statute, legislators retain the right to later

authorize development on that parkland, so long as they enact a statute that contains a "sufficient

manifestation of legislative intent to permit the diversion and reallocation."  971 F.3d at 730

(quoting *Paepcke v. Public Bldg. Comm'n of Chicago*, 263 N.E.2d 11, 18 (Ill. 1970)).  Thus,

while "judicial review of any reallocation is deferential," this is "particularly" so where the land

was dedicated to the public trust by statute, and not because the land is or was once submerged.

*Id.* Indeed, as the Court held in *Protect Our Parks I*, "[t]he Illinois Supreme Court recognizes that Illinois legislators retain significant control over never-submerged land they themselves choose to designate within the public trust; and thus, when applying the public trust doctrine to land that is not—and never has been—submerged, reviewing courts must ask only whether sufficient legislative intent exists for a given land reallocation or diversion." 385 F. Supp. 3d at 678 (citing *Paepcke*, 263 N.E.2d at 19).

Plaintiffs' claim that the 1869 statute's restrictions last "in perpetuity," Compl. ¶ 37, is therefore wrong as a matter of law. As the Seventh Circuit explained, under the Illinois Supreme Court's decision in *Paepcke*, "[d]edication to a public purpose isn't an "'irrevocable commitment.'" *Protect Our Parks II*, 971 F.3d at 730 (quoting *Paepcke*, 263 N.E.2d at 16). In fact, like this case, *Paepcke* involved a development on parkland created by the 1869 statute. And it expressly rejected the theory that "as far as the rights of the public in public trust lands are concerned, . . . the legislature could never, by appropriate action, change or reallocate the use in any way." *Paepcke*, 263 N.E.2d at 18. *Paepcke* therefore "made clear that the state legislature, having created the parkland, could reallocate its use." *Protect Our Parks I*, 385 F. Supp. 3d at 680–81. Indeed, the longstanding rule is that "the legislature represents the public," and "[s]o far as concerns the public, it may authorize one use [of land] to-day and another and different use tomorrow." *People ex rel. Bransom v. Walsh*, 96 Ill. 232, 250 (Ill. 1880); *see also Furlong v. South Park Comm'rs*, 151 N.E. 510, 511 (1926) (finding "[p]ark purposes are not confined to a tract of land with trees, grass, and seats," and that "[t]he construction of and maintenance of a

15

building for museums, art galleries, botanical and zoological gardens, and many other purposes, for the public benefit, are recognized as legitimate purposes").[4]

### 2. The Text of the Museum Act Authorizes Presidential Centers on Parkland.

As this Court previously held, the Museum Act provides the required "sufficient manifestation of legislative intent" to authorize the Presidential Center in Jackson Park notwithstanding the 1869 statute. *Protect Our Parks I*, 385 F. Supp. 3d at 678–81. The Museum Act stands as a "clear legislative directive stat[ing] a broad, comprehensive and definite intention to allow the City to contract with directors or trustees of a museum (the Foundation) to build a presidential center (the OPC) in a public park (Jackson Park)." *Id.* at 679. Based on this legislative authorization, the Court explained, it "cannot find, as a matter of law, that the [Presidential Center] violates the public trust doctrine." *Id.* at 681.

A review of the Museum Act directs the same result as before. The Museum Act specifically contemplates the construction and operation of presidential centers on parkland. It states that cities and park districts with control or supervision over public parks are "authorized to purchase, erect, and maintain within any such public park or parks edifices to be used as aquariums or as museums of art, industry, science, or natural or other history, *including presidential libraries, centers, and museums* . . . ." 70 ILCS 1290/1 (emphasis added). In addition, the Museum Act authorizes the City to contract with the Foundation to build and operate a presidential center, expressly authorizing cities to "permit the directors or trustees of any corporation or society organized for the construction or maintenance and operation of an

---

[4] In fact, "[p]roperty devoted to the public use may be taken by authority of the legislature for a different public use, even if *the earlier enterprise is thereby wholly destroyed*." *People v. Ill. State Toll Highway Comm'n*, 120 N.E.2d 35, 44 (Ill. 1954), *superseded on other grounds by Graham v. Ill. State Toll Highway Auth.*, 695 N.E.2d 360 (Ill. 1998) (emphasis added).

aquarium or museum as hereinabove described" to build the museum or presidential center, and further "*to contract* with any such directors or trustees of any such aquarium or museum *relative to*" development and operation of the museum or presidential center. *Id.* (emphasis added). Here, the Foundation is an entity organized for the construction or maintenance and operation of the Presidential Center, *see* Compl. ¶ 34, and thus is permitted to enter into the Use Agreement so as to build and operate the Presidential Center on parkland.

While Plaintiffs contend that the Museum Act requires the contract to be a lease, *see* Compl. ¶ 241, the Act requires no such thing. This Court previously rejected this very same argument in *Protect Our Parks I*, 385 F. Supp. at 688. The Act *permits* a city to enter into a lease of parkland for the development of a museum, but nothing in the Act *mandates* that any agreement must be a lease. It would be nonsensical to read *permission* to use a lease as *foreclosing* the Use Agreement—a contract that reserves greater rights to the City than would a lease. *See, e.g.*, Compl. Ex. 2, Ex. D thereto (Use Agreement), § 6.2(a)-(c) (not conferring on the Foundation the right to exclude others from the Presidential Site, and instead requiring that the site generally remain open to the public during Park District hours).

Finally, the Museum Act's authorization encompasses Jackson Park, for the first sentence states that the statute governs "any" public park controlled by a city or park district. *See Protect Our Parks*, 385 F. Supp. at 680; *see also Paepcke*, 263 N.E.2d at 18–19 (holding that later-enacted statutes authorizing schools and recreational facilities in parks were sufficient to authorize development in Washington Park—which, like Jackson Park, became parkland under the 1869 statute—even though the subsequent laws did not specifically identify Washington Park). For these reasons—and as the Court in *Protect Our Parks I* held—"sufficient legislative

intent exists [in the Museum Act] to permit diverting a portion of Jackson Park for the [Presidential Center]."  385 F. Supp. 3d at 678.

### B. The Presidential Center Is Lawful Under the Alternative Public Trust Standards.

As this Court previously recognized, the Court need not address whether the public trust analysis that applies to submerged lands is satisfied because the Presidential Center site was never submerged.  *Protect Our Parks I*, 385 F. Supp. 3d at 676–78.  Plaintiffs here do not allege otherwise.  *See supra* at 13–14.  Regardless, as the Court also concluded in *Protect Our Parks I*, the Presidential Center amply satisfies the tests for either formerly or currently submerged lands. 385 F. Supp. 3d at 681–83.  The Court concluded that although the deference given to formerly or currently submerged lands differs, both tests effectively look at the public benefits as compared to the private interest benefit.  *See id.*[5]

First, as the Court already recognized, the Use Agreement ensures that the City will retain ownership of the Presidential Center site and its buildings, and will exercise control over what the Foundation is allowed to do on the site.  *Supra* at Background, Section C; *Protect our Parks I*, 385 F. Supp. 3d at 681.  *See Friends of the Parks*, 786 N.E.2d at 170 (renovations to Soldier Field did not violate public trust where the Park District "is, and will remain, the owner of the Burnham Park property," and "[t]here is no abdication of control over the property to the

---

[5] In the case of land that was once submerged under navigable waters, the inquiry is still extremely deferential; it examines (in addition to legislative authorization) whether a project "primarily benefits a private entity, with no corresponding public benefit."  *Protect Our Parks I*, 385 F. Supp. 3d at 681 (citing *Friends of the Parks v. Chicago Park District*, 786 N.E.2d 161, 169–70 (Ill. 2003)).  And in the case of land that is presently submerged, the Court in *Protect Our Parks I* discerned a similarly deferential standard, one that examines whether the primary purpose of a legislative grant is to benefit a private interest.  *Id.* at 682 (citing, inter alia, *People ex rel. Scott v. Chicago Park Dist.*, 360 N.E.2d 773, 781 (Ill. 1976)).

Bears"). Second, as the Court noted, "clear [legislative] authorization exists" for the Presidential Center project "in the form of the Museum Act." *Protect Our Parks I*, 385 F. Supp. 3d at 682.

In addition, per the Use Agreement, the Planned Development Ordinance, and the LPO Resolution, the Presidential Center "surely provides a multitude of benefits to the public. It will offer a range of cultural, artistic, and recreational opportunities—including an educational museum, branch of the Chicago Public Library, and space for large-scale athletic events—as well as provide increased access to other areas of Jackson Park and the Museum of Science and Industry." *Id.* at 682; Compl., Ex. 2, Ex. D thereto (Use Agreement); Ex. 1 hereto (Planned Development Ordinance); Ex. 2 hereto (LPO Resolution). The Presidential Center thus will renew the site, just as the plan in *Friends of the Parks* did. *See Friends of the Parks*, 786 N.E.2d at 170 ("The public [would] now enjoy a fully renovated, multiuse stadium, instead of a deteriorating 78-year-old facility."). And just as the Soldier Field renovations created "better [public] access to the stadium, the museums, and the lakefront generally," *id.*, converting portions of the surrounding roadways to open parkland will connect the site to the Jackson Park grounds immediately to the north and east, add new trails and pathways, improve bicycle and pedestrian access to lagoons and the lakefront for those coming from the west of Jackson Park, and enhance the area's overall attractiveness. *See supra*, at Background, Section A.[6]

As illustrated by the existence of the eleven other museums in Chicago parks, state and local policymakers have long recognized that parkland museums are an important public good.

---

[6] Because these myriad public benefits are apparent from the official City documents attached to or cited in the Complaint, they may properly be considered at the Rule 12 stage and could not be reasonably disputed in any event. Indeed, the court in *Friends of the Parks* demonstrated that a court's review of the public benefits of a project is limited to the handful of official documents governing the renovation: "the Act, the implementing agreements, [and] the project documents." 786 N.E.2d at 170; *see also id.* at 165 (explaining that "[t]he terms and conditions of the project are set out principally in three separate agreements").

The General Assembly codified this recognition in the Museum Act, which states that parkland aquariums, presidential centers, and museums "serve valuable public purposes, including, but not limited to, furthering human knowledge and understanding, educating and inspiring the public, and expanding recreational and cultural resources and opportunities." 70 ILCS 1290/1. In the words of the Seventh Circuit, "[i]t's hard to see, then, how we could second-guess the City's determination that building the Center—with its museum, public library branch, auditorium, athletic center, gardens, and more—is a use with public benefits." *See Protect Our Parks II*, 971 F. 3d at 737 (internal quotation marks omitted).

Last, Plaintiffs' effort to cast this project as a giveaway to private interests is easily dismissed. As the Illinois Supreme Court recognized in *Friends of the Parks*, nearly any public project involving a private entity will help that entity in some way, but the public trust is satisfied so long as the public benefits too. *See* 786 N.E.2d at 166–67; *see also id.* at 168–70 (upholding Soldier Field renovations "even though the Bears [would] also benefit" by using the renovated stadium to charge admission for football games played by a private sports franchise). As this Court concluded after reviewing the official City documents, "*Friends of the Parks* confirms that any benefits the Foundation receives from the OPC do not render the OPC violative of the public trust doctrine," for "the OPC surely provides a multitude of benefits to the *public.*" *Protect Our Parks I*, 385 F. Supp. 3d at 682 (emphasis added).

## C. Plaintiffs' Proposed "Heightened Scrutiny" Is Not the Standard.

Unable to satisfy any public trust test known to Illinois law, Plaintiffs submit that the City's authorization of the Presidential Center is subject to a "heightened degree of scrutiny" that imposes fiduciary "duties of diligence, loyalty, care and candor" on the City. Compl. ¶¶ 228, 235. Plaintiffs contend that the City violated these duties by, for example, "transfer[ring]" the Presidential Center site to the Foundation, delegating to the Foundation authority over the

Presidential Center's location, failing to consider alternative locations for the Presidential Center, failing to appraise the fair market value of the Presidential Center site, and deciding to spend close to $200 million for improving the road system in Jackson Park. Compl. ¶¶ 229–34. As an initial matter, these claims grossly mischaracterize the arms-length relationship between the City and Foundation, for the City retained and exercised all of its review and approval authority, *see infra*, Sections V and VI (discussing Plaintiffs' nondelegation and due process claims), and the City continues to own the site and will exert control over the Foundation's use of the site.[7] In any event, Plaintiffs' proposed "heightened scrutiny" is simply not the test under Illinois law— and "[e]xpanding the perimeters of a state's considered cause of action is not" the function of a federal court. *Wildey v. Springs*, 47 F.3d 1475, 1484 (7th Cir. 1995).

As explained, *supra*, Section I.A., the sole question under Illinois law is whether the General Assembly made clear its intention to authorize presidential centers on parkland. Under *Paepcke*, which is binding Illinois Supreme Court precedent, the fact that the Museum Act authorizes presidential centers ends the inquiry; the public trust doctrine is satisfied. There is no requirement that, for instance, the City examine alternative sites, determine the fair market value of the chosen site, or not spend public money in support of the Presidential Center.

Plaintiffs' fiduciary duty standard would go beyond the pure statutory question and enlist this Court in ignoring controlling precedent and second-guessing the particular merits of

---

[7] As *Protect Our Parks I* held after reviewing the Use Agreement, rather than transfer the Presidential Center site to the Foundation, the City "will retain ownership over the [Presidential Center] site" and "will not abdicate control." 385 F. Supp. 3d at 681. *See also* Compl., Ex. 2, Ex. D thereto (Use Agreement), § 2.1–2.2, 4.4. Moreover, the Use Agreement authorizes the Foundation to use the Presidential Center site only for the limited, City-approved purpose of operating the Presidential Center. *Id.* § 6.1. If the Foundation ceases using the site for the Presidential Center, then the City can terminate the agreement, and the Foundation must vacate the property. *Id.* §§ 16.2, 18.1, 18.2.

legislative judgments. That is not the law. To the contrary, such value judgments are "for the legislature and not the courts. The courts can serve only as an instrument of determining legislative intent as evidenced by existing legislation measured against constitutional limitations. In this process the courts must deal with legislation as enacted and not with speculative considerations of legislative wisdom." *Paepcke*, 263 N.E.2d at 21.

Plaintiffs' "heightened scrutiny" theory also has no support even under the form of public trust review that applies to formerly or currently submerged lands (and which therefore is inapplicable here). Indeed, this Court in *Protect Our Parks I* rejected the idea that a "heightened scrutiny" applies under any of the forms of Illinois public trust doctrine, and explained that, instead, Illinois law applies "varying levels of *deference*, based on the property's relationship to navigable waterways." 385 F. Supp. 3d at 677–78 (emphasis added). In none of the alternative public trust tests that apply to formerly or current submerged land does a court look beyond whether a project provides a public benefit or whether instead a private entity will be the primary beneficiary. The court does not examine whether a city satisfied fiduciary duties, examined alternative sites, or maximized the value of the land. *See supra*, Section I.B. And it does not undertake to determine whether the city might have developed at another location or whether such an alternative would have been a better choice or less expensive. *Cf. Friends of the Parks*, 786 N.E.2d at 322–28.

As *Protect Our Parks I* explained, Illinois public trust law "imposes no obligation upon this Court to revisit the cost-benefit assessments of state and local lawmakers or otherwise sift through impact studies on its own to determine whether [which among an array of possible locations] constitutes the best location for the OPC." *Id.* at 685. "'Federal courts are not boards of zoning appeals,'" *id.* (quoting *River Park v. City of Highland Park*, 23 F.3d 164, 165 (7th Cir.

22

1994)), and such "value dependent assessments of the best use of the property are highly subjective and irrelevant to an analysis of the propriety of a grant of public land." *Id.* at 685 (internal quotation marks omitted); *see also Laramore v. Ill. Sports Facilities*, 1996 WL 153672, at *25 (N.D. Ill. Apr. 1, 1996) ("Federal courts have traditionally been reluctant to interfere with local development plans."). In sum, Plaintiffs' proposed legal test has no support in Illinois law and cannot be the basis for a public trust claim.

## II.    Plaintiffs Have No *Ultra Vires* Claim (Count VII) Because State Law Authorizes the Transfer of Park District Land to the City.

Plaintiffs contend in Count VII that the Park District's transfer of the Jackson Park site to the City for use as the Presidential Center is *ultra vires* because it violates various Illinois statutes. Compl. ¶¶ 237–41. This is the same claim that Protect Our Parks asserted in its prior lawsuit. *See* 2019 Am. Compl. ¶¶ 97–99. Like the public trust claim, this Court rejected the claim as a matter of law because state law plainly authorizes the Park District to transfer property to the City, and further authorizes the City to contract with the Foundation to use and improve the property. *Protect Our Parks I*, 385 F. Supp. at 687–91.

Nothing in Plaintiffs' new Complaint supports a different result. Plaintiffs first contend that the Park District transferred the land to the City (rather than the Foundation) to evade a statutory restriction that prohibits the Park District from transferring parkland to private entities unless the Park District receives "real property of substantially equal or greater value" in exchange. Compl. ¶ 239. While Count VII does not cite the statute containing this purported restriction, the quoted language comes from the Park District Code, *see* 70 ILCS 1205/10-7, *et seq.*, which Plaintiffs cite earlier in the Complaint, *see* Compl. ¶ 47. But the Park District Code places no restrictions on the Chicago Park District or its property. *See* 70 ILCS 1205/1-2(d) ("Nothing set forth herein shall be construed to disturb, alter, amend, limit, or broaden the

23

powers of the Chicago Park District or any other park district heretofore formed under special

charter.").  That is precisely what the Court concluded in *Protect Our Parks I*:  "[T]he Park

District Code explicitly states that it does not apply to the Chicago Park District," and, therefore,

"Plaintiffs' *ultra vires* claim cannot succeed based upon this theory."  385 F. 3d at 690, n.14.

Next, Plaintiffs argue that the transfer to the City was unlawful under the Local

Government Property Transfer Act ("Property Transfer Act"), 50 ILCS 605/1, *et seq.  See*

Compl. ¶ 240.  This argument, too, was rejected by the Court in *Protect Our Parks I*, *see* 385 F.

Supp. 3d at 689–91, because the Property Transfer Act expressly permits property transfers like

the one here.  Under Section 2 of the statute, one "municipality" (defined under the act to include

a "park district") seeking to acquire property from another, whose territory is within or

coextensive with the former's borders, may "by ordinance declare that it is necessary or

convenient for it to use, occupy or improve any real estate held by [the transferring municipality]

in the making of any public improvement or for any public purpose."  50 ILCS 605/2.  Once the

acquiring municipality so declares, "the corporate authorities of the [transferring] municipality

shall have the power to transfer all of the right, title and interest held by it immediately prior to

such transfer, in and to such real estate . . . upon such terms as may be agreed upon by the

corporate authorities of both municipalities."  *Id.*  The Operating Ordinance contains the

declaration required by the Property Transfer Act, *see* Compl. Ex. 2, Ex. D thereto (Use

Agreement), at 85886 (§ 2), and as discussed in Section I.B., *supra*, the Presidential Center will

be a public improvement that advances important public purposes.

Plaintiffs contend that the Property Transfer Act does not apply because the City will not

occupy the land.  Compl. ¶ 240.  This is wrong as a matter of law.  As the governing legal

document—the Use Agreement—makes clear, the City will occupy the land because it will hold

24

title to the improvements that are built on the property, and it will also retain control over the Foundation's occupancy of the land. *See* Compl., Ex. 2, Ex. D thereto (Use Agreement), §§ 2.1, 4.4. Moreover, the City's occupation of the land is not even necessary, for section 2 of the statute permits transfers where the receiving municipality simply "use[s]" or "improve[s]" the land. The City will be doing both by contracting with the Foundation for development of a presidential center for the City's and the public's benefit, and over which the City will retain ultimate control. *See id.*

In addition, nothing in the Property Transfer Act prevents the City from contracting with the Foundation to develop and operate the Presidential Center on the land the City received from the Park District. As this Court wrote in *Protect Our Parks I*, reading the statute as prohibiting contracting with third parties "would create the nonsensical result of prohibiting transferee municipalities from ever contracting with engineers, architects, or builders to improve a site." 385 F. 3d at 690. Such a reading is even more untenable in light of the constitutional and statutory provisions that affirmatively empower the City to contract with the Foundation. As explained above, the Museum Act expressly allows cities to contract with private entities for the construction and operation of museums in parkland. *See supra*, at Section I.A. And Article VII, section 10(a) of the Illinois Constitution likewise provides that units of local government have the power to "contract and otherwise associate with individuals, associations, and corporations in any manner."[8] "[R]ead together with the Property Transfer Act, these provisions demonstrate

---

[8] Article VII, section 10(a) of the Illinois Constitution additionally provides that local governments may "transfer any power or function" between themselves, so long as neither is "prohibited by law or by ordinance" Similarly, the Intergovernmental Cooperation Act allows the "powers, privileges, functions, or authority exercised or which may be exercised by a public agency of [the State of Illinois]," including a municipality, to be "transferred . . . with any other public agency . . . except where . . . expressly prohibited by law." 5 ILCS 220/3. *See also Protect Our Parks I*, 385 F. Supp. 3d at 690.

that: (1) [the City and Park District], as an individual unit of local government, can separately contract with third parties on land that they already own; and (2) [the City and/or Park District] can transfer land to the other, along with their power to contract with third parties on that land." *Protect Our Parks I*, 385 F. 3d at 690.

## III.     Plaintiffs Have No Public Purpose Claim (Count VIII).

The Public Purpose clause of the Illinois Constitution states that "[p]ublic funds, property or credit shall be used only for public purposes." Ill. Const. Art. VIII, §1(a). Plaintiffs contend in Count VIII that this provision is violated because public land (the Presidential Center site) is not being used "only for public purposes" and is instead being used for the "sole benefit" of a private party (the Foundation). Compl. ¶¶ 242–45.

This Court rejected the same contention in *Protect Our Parks I*, holding that the "educational and recreational benefits [of the OPC] serve a public purpose" under Article VIII, § 1(a). 385 F. Supp. 3d at 690 n.15. And the Seventh Circuit likewise affirmed in connection with the federal claims that the Presidential Center serves a public purpose. *See Protect Our Parks II*, 971 F.3d at 737. Nothing in Plaintiffs' Complaint here supports departing from those decisions now.

Moreover, this Court's and the Seventh Circuit's decisions were plainly correct. In reviewing this claim, the Court is "to defer to the legislative findings" of a public purpose "unless the plaintiffs make a threshold showing that the findings are evasive and that the purpose of the legislation is principally to benefit private interests." *Friends of the Parks*, 786 N.E.2d at 166-67. This deferential standard recognizes that "what is for the public good and what are public purposes are questions which the legislature must in the first instance decide," and that "'public purpose' is not a static concept, but is flexible and capable of expansion to meet the changing conditions of a complex society." *Id.* at 166.

26

Plaintiffs' claim fails as a matter of law under these principles. The legislative findings in the Museum Act establish that using public parkland for presidential centers "serve[s] valuable public purposes, including, but not limited to, furthering human knowledge and understanding, educating and inspiring the public, and expanding recreational and cultural resources and opportunities." 70 ILCS 1290/1. Likewise, the City Council found in the 2018 Operating Ordinance that allowing the Presidential Center in Jackson Park will benefit the public in many ways—by providing a world-class campus with a presidential museum and facilities for education, recreation, and cultural enrichment; by enhancing and beautifying natural outdoor areas in the park; by providing jobs; and by stimulating economic and cultural growth in the surrounding community. *See supra*, at Background, Section D. Plaintiffs cannot overcome the deference owed to these legislative findings, which reflect the plain reality—long recognized by "well-established" Illinois case law—that locating museums in public parks benefits the public. *Protect Our Parks I*, 385 F. Supp. 3d at 683 (citing *Furlong*, 151 N.E. 510 at 511, and *Fairbank v. Stratton*, 152 N.E.2d 569 (1958)).

Nor can Plaintiffs establish that the Presidential Center principally benefits a private interest. Just as there is no public trust violation simply because, in addition to benefiting the public, the Presidential Center also furthers the Foundation's goals, so too there is no public purpose violation. *See, e.g., Friends of the Parks*, 786 N.E.2d at 169 (holding that a series of improvements to Soldier Field did not violate the Public Purpose Clause—even though the Bears football team, a private, for-profit entity, stood to reap a "financial benefit" from the renovations—because "the renovated Soldier Field will be used and enjoyed by the public for a wide variety of public purposes"); *see also Empress Casino Joliet Corp. v. Giannoulias*, 896 N.E.2d 277, 295 (Ill. 2008) (finding no public purpose violation where 100% of the revenues

collected under a statute were given to private horse racing tracks, because the "principal purpose" of the statute was public); *Indep. Voters of Ill. Indep. Precinct Org. v. Ahmad*, 13 N.E.3d 251, 264 (Ill. App. Ct. 2014) (affirming dismissal of public purpose claim where City contract gave private firm the right to collect future parking meter fees, because the agreement "provides numerous public benefits"). Count VIII should therefore be dismissed.

## IV. Plaintiffs' Claim Under the Illinois Takings Clause (Count IX) Should Be Dismissed.

In Count IX, Plaintiffs contend that the supposed "transfer of property" to the Foundation by the City violates the Takings Clause of the Illinois Constitution. *See* Compl. ¶¶ 246–50 (citing Ill. Const. Art. I, § 15). This claim fails for multiple, independent reasons.

First, the City's action in authorizing the Foundation to use the Jackson Park site for the Presidential Center involves *public*—not private—property.[9] *See* Compl. ¶¶ 36–37 (alleging that Jackson Park is a public park); Private Laws, 1869, vol. 1, p. 358 (establishing a public park encompassing lands including the Jackson Park site). That fact is dispositive because, like the federal Takings Clause, the Illinois Constitution's Takings Clause applies only to takings of "private property." *See* Ill. Const., Art. I, § 15 ("*Private property* shall not be taken or damaged for public use without just compensation as provided by law.") (emphasis added); *A.B.A.T.E. of Ill., Inc. v. Quinn*, 957 N.E.2d 876, 884 (Ill. 2011) ("Since the funds held in the [Cycle Rider Safety Training Fund (CRSTF)] remained public funds, the legislature's sweep of monies out of

---

[9] As set forth at Section I.B., *supra*, the documents attached to the Complaint make clear that the City's authorization of the Use Agreement did not entail any "transfer of property to the Obama Foundation." This Court may therefore disregard Plaintiffs' allegation that a "transfer of property" took place for purposes of the Takings Clause. *See Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) ("When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss."). Regardless, even if there had been a "transfer of property," the Takings Clause would not be implicated because the property at issue is public property.

the CRSTF . . . did not constitute an unconstitutional taking of private property."); *A.B.A.T.E. of Illinois, Inc. v. Giannoulias*, 929 N.E.2d 1188, 1194 (Ill. App. 2010) (no Takings Clause violation where "plaintiffs cannot show any private money was taken, an essential element of showing a violation of the takings clause of the Illinois and United States Constitutions").

Plaintiffs argue that they "and other citizens of Illinois have a beneficial fractional ownership in such public trust property." Compl. ¶ 249. But in *Paepcke*, the Illinois Supreme Court rejected the notion that any beneficial interest in public parkland constitutes a private property interest. 263 N.E.2d at 16–17 (concluding that nearby residents held no "private property right to continuation of" a particular park use) (citing *Reichelderfer v. Quinn*, 287 U.S. 315, 317 (1932) ("[p]roperty was not taken" under the U.S. Constitution when legislation authorized new development on public parkland)). Indeed, the Seventh Circuit previously rejected Plaintiffs' "beneficial interest" theory when it affirmed dismissal of Protect Our Parks' claim under the federal Takings Clause. In the Seventh Circuit's words, "*Paepcke* is particularly devastating: in that case, the Illinois Supreme Court held that those owning land adjacent to or in the vicinity of a public park possess no private property right in having the parkland committed to a particular use. If adjacent landowners have no protected interested in public land, then the plaintiffs don't have one either." *Protect Our Parks II*, 971 F.3d at 737 (citations omitted). The Plaintiffs' "lack of a property interest" in the Jackson Park site was a "fundamental defect" that meant their federal Takings Clause claim was "easily dispatched."[10] *Id.*; *see also Protect Our*

---

[10] Even though the Seventh Circuit addressed this issue in the context of a federal constitutional claim, its holding is binding here because the alleged property interest in that claim was a creature of state law. "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

*Parks I*, 385 F. Supp. 3d at 686 ("by the clause's plain language, no unconstitutional taking can occur where, as here, the relevant property is already public").  Plaintiffs' claim here is dispatched just as easily, as the Illinois Takings Clause is in this respect identical to its federal counterpart.  *See Hampton v. Metro. Water Reclamation Dist. of Greater Chicago*, 57 N.E.3d 1229, 1240 (Ill. 2016) ("[W]hat constitutes a taking is the same under both clauses.").

Moreover, "[t]he lack of a property interest" is "by no means the only" defect in Plaintiffs' Takings Clause claim.  *Protect Our Parks II*, 971 F.3d at 737.  As in the prior case, Plaintiffs' "seek injunctive relief but not money damages."  *Id.*; *see* Compl. at 81–82 (requesting declaratory and injunctive relief).  Thus, "their complaint is that the Center does not qualify as a 'public use' rather than that the City has failed to pay them 'just compensation.'"  *Protect Our Parks II*, 971 F.3d at 737.  "This is a losing argument," *id.*, under both state and federal law.  As the Seventh Circuit explained with respect to the federal Takings Clause, "[e]ven assuming that the City's use agreement with the Foundation qualifies as a transfer to a private party, . . . a transfer to a private owner can still be constitutional if it is done for a 'public purpose.'"  *Id.* (citing *Kelo v. City of New London*, 545 U.S. 469, 483–84 (2005)).  Because the City's judgment that the Presidential Center serves a public purpose "is entitled to deference," the Seventh Circuit held that the prior plaintiffs' federal takings claim failed as a matter of law.  *Id.*  Precisely the same analysis dooms Plaintiffs' claim in this case under the Illinois Takings Clause.  *See City of Chicago v. Eychaner*, 26 N.E.3d 501, 518–20 (Ill. App. Ct. 2015) (holding *Kelo*'s public purpose principles apply equally under Illinois law) (citing *People ex rel. Gutknecht v. City of Chicago*, 121 N.E.2d 791 (Ill. 1954)).

V.      **Plaintiffs Have Failed to State a Claim of Improper Delegation of Legislative Authority Under the Illinois Constitution (Count XI).**

In Count XI, Plaintiffs contend that the City "delegated its decision-making authority over the location and design [of the Presidential Center] to a private party, the Obama Foundation," in supposed violation of Ill. Const. Art. II, § 1 ("The legislative, executive and judicial branches are separate.  No branch shall exercise powers properly belonging to another.").[11]  This claim likewise fails, because there was no delegation of legislative authority within the meaning of Illinois law.

Legislative authority is the "power to determine what the law shall be."  *Paepcke*, 263 N.E.2d at 21 (rejecting claim that legislative authorization of new use of parkland constituted delegation of legislative authority).  While the power to determine what the law shall be rests with the legislature, the legislature is free to delegate *administration* of the law to others.  "The fundamental distinction is between a delegation of power to make the law, which involves a discretion as to what the law shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law.  The first cannot be done; the latter is unobjectionable."  *Falkner v. City of Chicago*, 150 F. Supp. 3d 973, 981 (N.D. Ill. 2015) (applying Illinois law).

Here, as the Illinois statutes and the Exhibits to the Complaint make clear, only the appropriate legislative bodies have determined what the law shall be with respect to use of the Jackson Park site.  First, in 1869, the General Assembly determined that the site would be

---

[11] By its title, Article II purports to enumerate "the powers of the state," and it goes on to address the three branches of state government.  The article makes no reference to home rule municipal governments, like the City, the structure and powers of which are otherwise addressed in detail in Article VII.  *See* Art. VII, § 6.  For purposes of this motion only, the City assumes but does not concede that Ill. Const. Article II, § 1 delegation doctrine applies to it even though it is not a branch of state government, and the City reserves the right to contest the point.

designated parkland. *See* Private Laws, 1869, vol. 1, p. 358. Subsequently, in 2016, the General Assembly explicitly stated that parkland—including the Jackson Park site—could appropriately be used for the siting of a presidential center. 70 ILCS 1290/1 (the Museum Act). And then, in 2018, the Chicago City Council enacted the Operating Ordinance authorizing the Foundation to use the Jackson Park site for the Obama Presidential Center. Compl., Ex. 2 thereto (Operating Ordinance) at 85879. Each of these legislative determinations was made *by a legislature*—not improperly delegated to the Foundation or any other entity.

Plaintiffs point to a lone statement in a whereas clause of the 2015 Ordinance as support for their delegation claim, *see* Compl. ¶ 256 (quoting Compl., Ex. 1 thereto (2015 Ordinance) at 4), but nowhere in the operative terms of the 2015 Ordinance did the City Council delegate any authority to the Foundation to make law. And even their cited statement does not suggest any delegation.

In the 2015 Ordinance, the City Council indicated the City's "robust commitment" to supporting the various proposals for Chicago-based sites for the Presidential Center that had been put forward by the University of Chicago and University of Illinois at Chicago (UIC), so as to "giv[e] our City the greatest chance for selection." Compl., Ex. 1 thereto (2015 Ordinance) at 2–4. The City Council proclaimed that it was "confident in the quality and thoroughness" of all of the proposals, and that it would "defer[] to the sound judgment of the President and his Foundation as to" which of these sites would best serve the needs of the Presidential Center. *Id.* at 4.

Plaintiffs seize on this last statement as a supposed "delegation of legislative authority," Compl. ¶ 257, but the statement in no way suggests that the City Council was abdicating its legislative function to review the propriety of the site chosen by the Foundation. Indeed, the City

Council expressly indicated that before the Foundation could build the Presidential Center, it would be necessary for the City Council—*i.e.*, the legislature—to "introduce a separate ordinance authorizing the development[,] construction, and operation of the Presidential Center." Compl., Ex. 1 thereto (2015 Ordinance) at 4. And that is precisely what the City Council did in 2018, when it duly considered and authorized the Planned Development Ordinance and the Operating Ordinance, with the latter authorizing the Use Agreement, under which the Foundation is permitted to develop and operate the Presidential Center on the Jackson Park site.[12] *See* Compl., Ex. 2 thereto (Operating Ordinance) at 85886–87; Ex. 1 hereto (Planned Development Ordinance).

To be sure, the City Council in the 2015 Ordinance invited the Foundation to identify its preferred site for the Presidential Center among specified options—but the ultimate authorization for use of the selected Jackson Park site came from the legislature's own action*, taken after full legislative proceedings, in the 2018 ordinances. *See Latham*, 201 N.E.2d at 117 (holding there was no unlawful delegation of legislative authority to a commission that provided "advice and suggestions," but could not "bind the members of the city council, whose approval is required"). And there is nothing uncommon about a land use applicant selecting a site and developing a proposal and then presenting that package to the City for approval. Applicants choose and

---

[12] Nor does the Use Agreement grant the Foundation any authority to make law. That Agreement instead permits the Foundation to use the Jackson Park site for the purpose of developing and operating the Presidential Center under contractually specified terms, and grants the City the right to terminate the Agreement if the Foundation ceases to use the Presidential Center as permitted. Compl., Ex. 2, Ex. D thereto (Use Agreement), at 85905 (§ 6.1); *id.* at 85922, (§ 16.1). *See Latham v. Bd. of Ed. of City of Chicago*, 201 N.E.2d 111, 116 (Ill. 1964) (no unlawful delegation of legislative authority to Chicago Board of Education where "the Board's functions and powers are expressly defined," and "it is apparent that the powers of the Board are not absolute, unregulated or undefined").

design their projects, and the City decides whether to approve them. That is precisely what happened here.

If anything, it is Plaintiffs who seek to intrude on the City Council's legislative authority, by asking this Court to undo the City Council's determination that the Presidential Center should proceed in Jackson Park, in service of the public interest. Plaintiffs plainly disagree with the City Council's judgment on this score, but "[t]he resolution of this conflict in any given case is for the legislature and not the courts." *Paepcke*, 263 N.E.2d at 21; *see also Protect Our Parks II*, 971 F.3d at 737 ("It's hard to see … how we could second-guess the City's determination" that the Presidential Center "is a use with public benefits.") (internal quotation marks omitted).

## VI.     Plaintiffs Have No Due Process Claim (Count XII).

Plaintiffs allege in Count XII that their procedural and substantive due process rights under the Illinois Constitution were violated because the City and Park District "rubber stamp[ed]" the Foundation's demands in the course of approving the Presidential Center. *See* Compl. ¶¶ 259–63. This already rejected concept fails to state a claim for several reasons.

First, in "any due process analysis, one must first ascertain that a protected interest has been interfered with by the state;" and "[i]f no protected interest is present, due process protections are not triggered." *Big Sky Excavating, Inc. v. Ill. Bell Tel. Co.*, 840 N.E.2d 1174, 1186 (2005); *Groenings v. City of St. Charles*, 574 N.E.2d 1316, 1324 (2d Dist. 1991) (plaintiff "must first establish" a protected interest regardless of whether due process claim is "substantive or procedural"). Plaintiffs contend that their protected property interest is a "fractional beneficial interest in public trust property." Compl. ¶ 260. But as discussed in connection with Plaintiffs' takings claim, Plaintiffs have no constitutionally protected property interest in Jackson Park, even under their fractional beneficial interest theory. *Supra*, Section IV. This lack of a protected interest is the main reason the Seventh Circuit rejected the federal due process claim in *Protect*

34

*Our Parks II*, and Plaintiffs' Illinois due process claim suffers from the same flaw. 971 F.3d at 737; *see also Petersen v. Chicago Plan Comm'n*, 707 N.E.2d 150, 155 (1st Dist. 1998) (rejecting a due process challenge under the United States and Illinois Constitutions to the expansion of a museum building (the Museum of Science and Industry) in Jackson Park because an "interest as citizens entitl[ing] [plaintiffs] to enjoy the park and to desire that it be preserved" and "remain untouched" does not rise to the level of a due process property interest under Illinois law).

The due process claim also fails because the City Council's legislative approval of the Presidential Center provided all the process that was due as a matter of law.  As the Seventh Circuit noted in rejecting the plaintiffs' federal procedural due process claim, "a 'legislative determination provides all the process that is due.'"  *Protect Our Parks II*, 971 F. 3d at 738 (quoting *Dibble v. Quinn*, 793 F.3d 803, 809 (7th Cir. 2015)).  And the same principle applies under the Illinois Due Process clause.  *See Fumarolo v. Chicago Bd. of Educ.*, 566 N.E.2d 1283, 1307 (1990) (explaining that "the legislative process itself created all the procedural safeguards necessary to provide the plaintiffs with due process," and rejecting claim where "normal legislative process was followed"); *Ill. Collaboration on Youth v. Dimas*, 81 N.E.3d 63 (Ill. App. Ct. 2017).

Here, the legislative process followed by the City was robust.  *See supra* at Background, Section B.  As the Seventh Circuit explained in *Protect Our Parks II*, "[t]he City enacted four separate ordinances approving various aspects of the Center.  The votes on those ordinances came after multiple public hearings at which residents could raise their concerns about the City's intended plans.  And the Illinois General Assembly amended the Illinois Park District Aquarium and Museum Act to explicitly authorize cities and park districts to erect, operate, and maintain 'presidential libraries, centers, and museums' in public parks.  70 ILCS 1290/1."  971 F. 3d at

35

738. The Seventh Circuit concluded that "[i]f one legislative determination is enough" to satisfy due process, "then *five* determinations are overkill." *Id.*

Plaintiffs are not helped by their allegation that the City simply "rubber stamp[ed]" the Foundation's demands. Compl. ¶ 262. Plaintiffs do not allege—nor could they in light of the public record considered by the Seventh Circuit—that the City's legislative officials did not duly consider and vote upon the ordinances authorizing the Presidential Center. *See also supra*, Section V.[13]

Finally, the City's approval of the Presidential Center did not violate substantive due process. Such a claim is reviewed under the rational basis test, meaning that the City's approval is valid so long as "the legislation bears a rational relationship to a legitimate governmental interest." *Reed v. Farmers Ins. Grp.*, 720 N.E.2d 1052, 1058 (1998). This test is extremely deferential. The legislature is given "broad latitude and discretion" to make decisions in furtherance of the public welfare, and whether a statute "is wise or sets forth the best means to achieve the desired result are matters for the legislature, not the courts." *Curielli v. Quinn*, 38 N.E.3d 159, 168 (Ill. App. Ct. 2015). The test is satisfied so long as a rational basis can be "hypothesize[d]," meaning that it "may be based on rational speculation unsupported by evidence or empirical data," and need not have been the actual reason that "motivate[d] the legislative action." *People ex rel. Lumpkin v. Cassidy*, 703 N.E.2d 1, 4 (Ill. 1998). Indeed, "[i]f there is any conceivable basis for finding a rational relationship, the law will be upheld." *Id.*

---

[13] Plaintiffs also claim that the coronavirus pandemic "curtailed the ability of Plaintiffs to meaningfully participate in the various meetings and reviews." Compl. ¶ 263. But the City's approval process was completed in 2018, *see* Compl. ¶¶ 58–69, and it is common knowledge that the coronavirus pandemic began in the United States in 2020. The pandemic therefore played no role in Plaintiffs' ability to participate in the City's approval process for the Presidential Center.

Here, the rational basis for the City's approval of the Presidential Center is clear. As explained throughout this brief, the Presidential Center will benefit the City and its residents by enhancing Jackson Park with new cultural, recreational, and community amenities. These benefits alone supply a rational basis. But even more, these were also the findings that the City Council specifically made in the 2018 Ordinance. *See* Compl., Ex. 2 thereto (Operating Ordinance); *see also supra*, Background, Section I.D. Those findings are entitled to deference under the rational basis test, even if the Plaintiffs personally hold a different view than the legislature. *E.g.*, *Empress Casino Joliet Corp.*, 896 N.E.2d at 286–88; *Reed*, N.E.2d at 1058. For all these reasons, Plaintiffs fail to state a due process claim and this claim should be dismissed with prejudice.

## VII. Plaintiffs Fail to State a Claim That a Special Privilege Was Granted in Violation of the Illinois Constitution (Count XIII).

In Count XIII, Plaintiffs allege a violation of Article I, Section 16 of the Illinois Constitution (formerly Article II, § 14 of the 1870 Illinois Constitution). Compl. ¶¶ 264–66. Article I, Section 16 states that "[n]o . . . law . . . making an irrevocable grant of special privileges or immunities, shall be passed." Count XIII fails to state a claim because the Operating Ordinance, which authorizes the City to enter into the Use Agreement with the Foundation, made no irrevocable grant and because the law is not a special privilege, but instead furthers a legitimate state interest. For both of these reasons, Count XIII should be dismissed.

To begin, Plaintiffs contend that "the City's approval of a 99-year use agreement provides an irrevocable and special privilege to the Obama Foundation." Compl. ¶ 266. This is directly contradicted by the Use Agreement, which on its face is not "irrevocable." The Use Agreement grants the City the right to terminate the agreement if the Foundation fails to use the Presidential Center site for its permitted Presidential Center uses, including if the Foundation

37

ceases operation of a museum.  *See, e.g.*, Compl., Ex. 2 thereto (Operating Ordinance) at 85883,

Ex. D thereto (Use Agreement), § 16.2.  Laws that make grants that are subject to revocation, as

the Use Agreement is, are not "irrevocable" under Article I, § 16.  *See People v. City of Chicago*,

182 N.E. 419, 433 (Ill. 1932) (holding that grant issued pursuant to statute and ordinance did not

violate predecessor to Article I, § 16 because the grant was not irrevocable).  In addition, the Use

Agreement is limited to a 99-year term.  This length of time is hardly unique, as terms of 99

years for agreements to situate museums in parks are expressly authorized under the Museum

Act.  70 ILCS 1290/1 § 1.  Because the Use Agreement creates a revocable, non-perpetual grant

of authority as to the Jackson Park site, the claim fails as a matter of law.

Second, Plaintiffs' claim fails because the Operating Ordinance plainly serves a

legitimate state interest.  A claim of special privilege fails where there is a rational basis for the

challenged law.  *See King v. Johnson*, 265 N.E.2d 874, 876 (Ill. 1970) ("[T]he court will not

interfere with the legislative judgment unless it is without rational basis."); *accord DiSabato v.

Bd. of Trs. of State Emps' Ret. Sys. of Ill.*, 674 N.E.2d 852, 859 (Ill. 1996).  As just explained

above, there is ample rational basis for the City's approval of the Presidential Center in Jackson

Park, *see supra*, at Section VI (discussing the due process claim), and the Operating Ordinance

effectuates that goal by authorizing the legal vehicle—the Use Agreement—by which the

Foundation will build and operate the center.

## VIII.  Plaintiffs Have No Alternative Claim Under the Illinois State Agency Historic Preservation Resources Act (Count XV).

In Count XV, Plaintiffs claim in the alternative to several of their federal Administrative

Procedure Act claims (specifically, Counts I, II, and IV) that state officials,[14] the City, the Park

---

[14] Count XV purports to be advanced against "All State Officials."  *See* Compl., at 80.  But no state officials are listed in the Complaint's caption, nor, according to the Court's docket, has any summons been issued to any state official.

District, and the Foundation violated the Illinois State Agency Historic Preservation Resources Act. However, Plaintiffs do not have a claim under the Act because that Act does not apply where there has been a federal Section 106 review. Specifically, the state Act provides: "When an undertaking is being reviewed pursuant to Section 106 of the National Historic Preservation Act of 1966, *the procedures of this law shall not apply* and any review or comment by the Director on such undertaking shall be within the framework or procedures of the federal law." 20 ILCS 3420/4(g) (emphasis added). Here, the Complaint alleges that there has been a review pursuant to Section 106 of the National Historic Preservation Act. *See, e.g.*, Compl. ¶¶ 75–85, 196–97. Plaintiffs also attached reports that were part of the Section 106 process, including the January 16, 2020 Assessment of Effects Report. *See* Compl., Exs. 3 and 4. Accordingly, because Plaintiffs allege (and the exhibits to the Complaint irrefutably confirm) that there has been a Section 106 review, the State Agency Historic Preservation Resources Act has no application here. *See* 20 ILCS 3420/4(g).

Plaintiffs' claim under the Act cannot be preserved by pleading in the alternative. Although Federal Rule of Civil Procedure 8(d) allows for alternative pleading of inconsistent *legal theories*, Rule 8 does not authorize plaintiffs to plead inconsistent facts—particularly where the facts are not legitimately in doubt. *See, e.g.*, Rule 8. General Rules of Pleading, 1 Federal Rules of Civil Procedure, Rules and Commentary Rule 8 ("While Rule 8 allows parties to plead claims and defenses in the alternative, it does not specifically authorize parties to plead their facts in a way that is inherently self-contradictory."); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 128 F.R.D. 243, 244 n.1 (N.D. Ill. 1989) ("[T]he court finds that the alternative *facts* proposed by the plaintiffs here stretch the rule [(Rule 8)] to the breaking point."). Here, Plaintiffs cannot plead both that a Section 106 review has occurred, and then bring a claim—

their claim under the state Act—that necessarily must presume that no Section 106 review has occurred.

Accordingly, Plaintiffs cannot plead a claim under the Illinois State Agency Historic Preservation Resources Act in the alternative, and Count XV should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' state law claims with prejudice.

Date:    June 15, 2021                                      *Respectfully submitted,*


                                                            CELIA MEZA,
                                                            Acting Corporation Counsel for the City of
                                                            Chicago

By: /s/ *Joseph P. Roddy*                                   By: /s/ *Andrew Worseck*

Richard W. Burke                                            John Hendricks
Joseph P. Roddy                                            Deputy Corporation Counsel
Elizabeth Meyer Pall                                        Andrew W. Worseck
BURKE, WARREN, MACKAY &                                     Chief Assistant Corporation Counsel
SERRITELLA, P.C.                                            City of Chicago, Department of Law
330 North Wabash Avenue, Suite 2100                         Constitutional and Commercial Litigation
Chicago, Illinois 60611                                     Division
(312) 840-7000                                              2 North LaSalle Street, Suite 520
rburkesr@burkelaw.com                                       Chicago, Illinois 60602
jroddy@burkelaw.com                                         (312) 744-6975 / 4-7129
epall@burkelaw.com                                          john.hendricks@cityofchicago.org
                                                            andrew.worseck@cityofchicago.org
*Attorneys for Defendant Chicago Park District*

By: /s/ *David H. Hoffman*                             By: /s/ *Ann D. Navaro*

David H. Hoffman                                        Ann D. Navaro
Tacy F. Flint                                           Kevin A. Ewing
Rachel L. Hampton                              BRACEWELL LLP
SIDLEY AUSTIN  LLP                         2001 M Street NW, Suite 900
One South Dearborn Street                Washington, D.C. 20036
Chicago, IL 60603                              (202) 828-5800
(312) 853-7000                                ann.navaro@bracewell.com
david.hoffman@sidley.com               kevin.ewing@bracewell.com
tflint@sidley.com
rhampton@sidley.com                    *Attorneys for Defendant City of Chicago*

Peter R. Steenland
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
(202) 736-8000
psteenland@sidley.com

*Attorneys for Defendant The Barack Obama Foundation*

41

## CERTIFICATE OF SERVICE

I, Andrew W. Worseck, an attorney, hereby certify that on this, the 15th day of June, 2021, I caused copies of **Defendants the City of Chicago, the Chicago Park District, and The Barack Obama Foundation's Memorandum in Support of Their Motion to Dismiss Plaintiffs' State Law Claims** to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois using the CM/ECF system, which will send notification of such filing to all parties that have appeared in this action.

*/s/ Andrew W. Worseck*

42