**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PROTECT OUR PARKS, INC., *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 21 CV 2006 |
| | ) | |
| PETE BUTTIGIEG | ) | Judge John Robert Blakey |
| SECRETARY OF THE U.S. | ) | |
| DEPARTMENT OF TRANSPORTATION, | ) | |
| *et al.* | ) | |
| | ) | |
| Defendants. | ) | |


**DEFENDANTS CITY OF CHICAGO AND CHICAGO PARK DISTRICT'S
MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A
<u>PRELIMINARY INJUNCTION</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

    A.    The Obama Presidential Center And Jackson Park. ................................. 3

    B.    The Federal Involvement. ........................................................................ 6

ARGUMENT ........................................................................................................................ 7

I.    Plaintiffs Have Not Established A Likelihood Of Success On The Merits. ...................... 8

    A.    NPS complied with UPARR. .................................................................. 9

    B.    Section 4(f) does not apply to the Presidential Center or related road closures. ................................................................................................. 12

    C.    NEPA does not allow the agencies to second-guess the City's decision to locate the Presidential Center in Jackson Park. ....................................... 14

    D.    The Federal Agencies complied with the National Historic Preservation Act. ......................................................................................................... 21

        1.    The agencies met their obligations under Section 106. ............................. 21

        2.    The Agencies met their obligations under Section 110k. ......................... 25

II.    Plaintiffs Have Not Shown Irreparable Harm. ................................................................ 26

III.    The Balance Of Harms Weighs Decidedly Against An Injunction. ................................ 31

    A.    An injunction will severely harm the City, Park District, and public interest. .................................................................................................... 31

    B.    Plaintiffs' appeal to the public interest rings hollow. ............................ 36

CONCLUSION .................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                      **Page(s)**

*Aircraft Owners & Pilots Association v. Hinson,*
96-cv-05793 ND Ill. (Sept. 27, 1996) (Gottschall, J.), *aff'd* 102 F.3d 1421 (7th
Cir. 1996) ............................................................................ 32, 33, 35, 36, 38

*Brady Campaign to Prevent Gun Violence v. Salazar,*
612 F. Supp. 2d 1 (D.D.C. 2009) ............................................................ 32

*Brooklyn Heights Association v. National Park Service,*
777 F. Supp. 2d 424 (E.D. NY 2011) ...................................................... 12, 25

*Citizens Advocate Team v. U.S. Dep't of Transp.,*
2004 WL 725279 (N.D. Ill. Mar. 31, 2004) ............................................... 13

*Citizens Against Burlington v. Busey,*
938 F.2d 190 (D.C. Cir. 1991) .............................................................. 19, 20, 21

*Citizens to Protect Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) ............................................................................. 40

*City of Alexandria, Va. v. Slater,*
198 F.3d 862 (D.C. Cir. 1999) ............................................................... 7, 22

*City of Grapevine, Tex. v. Dept. of Transp.,*
17 F.3d 1502 (D.C. Cir. 1994) ............................................................... 21

*Conn. Trust for Historic Pres. v. ICC,*
841 F.2d 479 (2nd Cir. 1988) ................................................................ 23

*Dept. of Transp. v. Pub. Citizen,*
541 U.S. 752 (2004) ............................................................................. 15, 19, 20

*Diginet, Inc. v. W. Union ATS, Inc.,*
958 F.2d 1388 (7th Cir. 1992) ............................................................... 35

*Foundation on Economic Trends v. Heckler,*
56 F.2d 143 (D.C. Cir. 1985) ................................................................ 38

*Frank v. Walker,*
769 F.3d 494 (7th Cir. 2014) ................................................................ 36

*Fund for Animals v. Norton,*
124 F. Supp. 3d 796 (N.D. Ill. 2015) ...................................................... 32

*Gibson & Perin Co. v. City of Cincinnati,*
480 F.2d 936 (6th Cir. 1973) ................................................................ 9

*Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*,
    593 F. Supp. 2d 1019 (E.D. Wis. 2009)................................................................... 16

*Ill. Bell Tel. Co. v. WorldCom Technologies, Inc.*,
    157 F.3d 500 (7th Cir. 1998) ................................................................................. 36

*Ill. Republican Party v. Pritzker*,
    973 F.3d 760 (7th Cir. 2020) ................................................................................... 8

*Ind. Forest All., Inc. v. U.S. Forest Serv.*,
    325 F.3d 851 (7th Cir. 2003) ................................................................................... 9

*Int'l Brh. of Teamsters v. U.S. Dept. of Transp.*,
    724 F.3d 206 (D.C. Cir. 2013) ............................................................................... 19

*Jacksonville Port Authority v. Adams*,
    556 F.2d 52 (D.C. Cir. 1977) ................................................................................. 38

*Ka Makani 'O Kohala Ohana Inc. v. Dept. of Water Supply*,
    295 F.3d 955 (9th Cir. 2002) ................................................................................. 21

*Kammeyer v. Oneida Total Integrated Enterprises*,
    2015 WL 5031959 (C.D. Cal. Aug. 24, 2015)........................................................ 25

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................................... 31

*In re: Medicare Reimbursement Litigation*,
    309 F. Supp. 2d 89 (D.D.C. 2004) ......................................................................... 38

*Michigan v. U.S. Army Corps of Eng'rs*,
    667 F.3d 765 (7th Cir. 2011) ............................................................................. 8, 32

*Monsanto v. Geertson Seed Farms*,
    561 U.S. 139 (2010).......................................................................... 8, 31, 37, 38

*Munoz-Medoza v. Pierce*,
    711 F.2d 421 (1st Cir. 1983).................................................................................... 9

*Nat'l Trust for Historic Preservation v. FDIC*,
    1993 WL 328134 (D.D.C. May 7, 1993)................................................................ 25

*National Treasury Employees Union v. U.S.*,
    101 F.3d 1423 (D.C. Cir. 1996) ............................................................................. 31

*National Wildlife Federation v. Burford*,
    835 F.2d 305 (D.C. Cir. 1987) ............................................................................... 38

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................. 8

*Old Town Neighborhood Ass'n Inc. v. Kauffman*,
  333 F.3d 732 (7th Cir. 2003) ................................................................. 13

*Openlands v. U.S. Department of Transportation*,
  124 F. Supp. 3d 796 (N.D. Ill. 2015) .................................................... 21

*Protect Our Parks Inc. v. Chicago Park Dist.*,
  385 F. Supp. 3d 662 (N.D. Ill. 2019) ................................... 2, 3, 33, 35

*Quechan Indian Tribe of Fort Yuma Indian Reservation v. U.S. Department of Interior*,
  2007 WL 1890267 (D. Ariz. June 29, 2007) ........................................ 19

*Quechan Tribe of Fort Yuma v. U.S. Dep't of the Interior*,
  755 F. Supp. 2d 1104 (S.D. Cal. 2010).................................................. 40

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989)............................................................................ 7, 19

*Sauk Prairie Conservation All. v. U.S. Dept. of Interior*,
  944 F.3d 664 (7th Cir. 2019) ................................................................. 20

*Sierra Club v. Bostick*,
  539 Fed. Appx. 885 (10th Cir. 2013)..................................................... 39

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  645 F.3d 978 (8th Cir. 2011) ................................................................. 39

*Sierra Club v. U.S. Army Corps of Engineers*,
  990 F. Supp. 2d 9 (D.D.C. 2013).................................................... 27. 31

*South Fork Band Council of Western Shoshone of Nevada v. U.S. Dep't of the Interior*,
  588 F.3d 718 (9th Cir. 2009) ................................................................. 40

*Stand Up for California! v. U.S. Dep't of the Interior*,
  919 F. Supp. 2d 51 (D.D.C. 2013)......................................................... 34

*Valley Cmty. Pres. Comm'n v. Mineta*,
  373 F.3d 1078 (10th Cir. 2004) ............................................................. 22

*Waterford Citizens' Ass'n v. Reilly*,
  970 F.2d 1287 (4th Cir. 1992) ........................................................ 23, 24

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ...................................................................................... 37

*Weiss v Kempthorne,*
    683 F. Supp. 2d 549 (W.D.Mich. 2010) .......................................... 20, 21

*Wemhoff v. Bush,*
    31 Fed. App'x 204 (D.C. Cir. 2002) ................................................... 33

*Wicker Park Historic Dist. Pres. Fund v. Pierce,*
    565 F. Supp. 1066 (N.D. Ill. 1982) .................................................... 22

*Winnebago Tribe of Neb. v. Ray,*
    621 F.2d 269 (8th Cir. 1980) ............................................................. 21

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................. 7, 8, 32, 37, 38

*Wisconsin v. Weinberger,*
    745 F.2d 412 (7th Cir. 1984) ............................................................. 37

**Statutes**

Administrative Procedure Act ............................................................... 9, 40

Clean Water Act, 33 U.S.C. § 404 ............................................................ 6

Department of Transportation Act of 1966 § 4(f) ................... 6, 12, 13, 14, 16

National Environmental Policy Act ............................................. *passim*

National Historic Preservation Act § 106 ..................................... *passim*

National Historic Preservation Act § 110(k) ................................. 25, 26, 27

Rivers and Harbors Act, 33 U.S.C. § 408 ................................................ 6

Urban Park and Recreation Recovery Act (UPARR), 16 U.S.C. § 200501, *et seq.* .............. *passim*

**Regulations**

23 C.F.R. Pt. 771 ...................................................................... 15, 20

23 C.F.R. Pt. 774 .................................................................. 12, 13, 14

36 C.F.R. Pt. 72 ....................................................................... 9, 10, 11

36 C.F.R. Pt. 800 ........................................................ 15, 22, 23, 24, 26

40 C.F.R. Pt. 1506.................................................................................................................. 15

40 C.F.R. Pt. 1508........................................................................................................... 15, 19, 20

43 C.F.R Pt. 46............................................................................................................... 15, 20

## INTRODUCTION

A preliminary injunction is extraordinary in any case, but especially here, where Plaintiffs seek to block construction of one of the City's and Park District's most important park development projects ever, one approved by the City's elected officials after years of local review and deliberation.  Plaintiffs fail to carry their burden on any of the requirements for relief.

First, Plaintiffs cannot show a likelihood of success on the merits.[1]  Plaintiffs' arguments boil down to the contention that federal law obligated the federal government to second-guess and even override the local decisions to approve the Obama Presidential Center in Jackson Park. As a matter of law, however, none of the federal agencies had authority over that question, nor did federal law allow or compel them to consider alternative sites for the Center.  Instead, the role of the federal agencies was limited to approving certain narrow requests by the City and Park District.  And before approving those requests, the federal agencies considered the impacts of their approvals on environmental and historic resources, as required by the National Environmental Policy Act ("NEPA") and National Historic Preservation Act ("NHPA").  That review, moreover, included extensively considering the impact of the Center on Jackson Park. Nothing about this thorough federal process was contrary to law or arbitrary and capricious, and Plaintiffs' federal claims therefore fail as a matter of law.

Second, Plaintiffs fail to show that they will be irreparably harmed if the Presidential Center proceeds in Jackson Park.  Indeed, in Protect Our Parks' prior lawsuit, and after development of a full factual record, this Court concluded that "the disappointment" of those

---

[1]  The merits discussion in this brief focuses on rebutting Plaintiffs' erroneous claims that the federal statutes compelled the federal agencies to second-guess the City's and Park District's decisions to approve Jackson Park as the location for the Presidential Center.  This legal point is of central and unique concern to the City and Park District, as it was their prerogative – and not that of the federal agencies – to decide where to locate the Presidential Center.  The City and Park District defer to the Federal Defendants for a more fulsome response to Plaintiffs' merits arguments.

wanting to use the site for its former purposes would be "slight" following construction of the Center. *Protect Our Parks Inc. v. Chicago Park Dist.*, 385 F. Supp. 3d 662, 685 (N.D. Ill. 2019) ("POP I"), *aff'd in part, vacated in part, Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722 (7th Cir. 2020). This was because "the site will not destroy or greatly impair the land's original use; activities such as picnicking, jogging, and meadow bird nesting will not only be accessible in other areas of the park, but also within certain parts of the OPC site." *Id.* In addition, the Presidential Center would only take up a "small amount of land . . . relative to total park acreage," and would contain its own "green space areas." *Id.* Here, Plaintiffs' vague claims of injury to their use of the park are no more compelling. Indeed, they ignore that Jackson Park is "not a forest preserve," *id.* at 683, nor is it frozen in time – the park has evolved for more than a century to suit local needs, as extensively documented by the federal agencies.

Last, the harm to the City, Park District – and the entire public – from an injunction far outweighs Plaintiffs' unhappiness with the project. The Center's campus of amenities and benefits will enhance the park and the community, bring thousands of jobs and other economic development, and spur a long-overdue revitalization of the South Side. These have always been crucial benefits, but it is even more critical now that the project proceed without delay as the City emerges from the pandemic, and the South Side yearns for tangible signs that better days are ahead. The people of Chicago have been waiting for the Presidential Center for five years. Through their elected representatives, they have weighed the project's benefits and costs. They have decided that the Presidential Center is a worthy addition to Jackson Park and in their overall interest. This Court likewise has recognized that construction of the Center should commence "without delay." *POP I*, 385 F. Supp. 3d at 667. It is now time to start the work. Plaintiffs' motion should be denied.

## BACKGROUND

**A.     The Obama Presidential Center And Jackson Park.**

The City Council and Park District approved the Presidential Center after a lengthy and public review process, and state law authorizes the Center's placement in Jackson Park.[2]  *See generally POP I*, 385 F. Supp. at 668–73; Defs.' Mot. to Dismiss, Dkt. 29, at 5–10.  Pursuant to the plan developed jointly by the City and the Foundation, the Presidential Center campus will provide numerous amenities and considerable publicly-accessible open park space.  *See* Ex. F hereto; Fed. Ex. 10, App. I (DPD Study), at 4–6; *POP I*, 385 F. Supp. at 669–70.  The plan includes permanently closing certain roadways in the park, which will create 11 acres of new parkland and restore the site's connectivity to the rest of the park, as well the park's historic feel.  Fed. Ex. 17, Environmental Assessment at 8–9, 40 (Aug. 2020) ("EA"); Fed. Ex. 11, Assessment of Effects to Historic Properties at 4 (Jan. 2020) ("AOE").  Improvements to the remaining road network as well as to trails, paths, and sidewalks will improve public safety, access, and circulation in the park.  Fed. Ex. 17 (EA), at 8–9; *see also* Ex. F hereto.

The Presidential Center is a critical development project for the City that enjoys broad community support, as reflected in the City Council's decision approving the Center.  Fed. Ex. 10 (UPARR Proposal), at 5.  It is expected to spark renewal of South Side neighborhoods and generate long-term economic and community benefits for the South Side.  Fed. Ex. 17 (EA),

---

[2]  This process included more than 50 meetings with more than 6,000 community members to discuss the campus location, design, proposed roadway changes, and proposed park improvements.  Fed. Ex. 10, City of Chicago Analysis of UPARR Proposal ("UPARR Proposal"), App. I., Chicago Plan Commission Resolution and Staff Report ("DPD Study"), at 19. The process included a Park District-led community planning process that culminated in the 2018 South Lakefront Framework Plan, a 2018 Park District decision to confirm authorization of the Presidential Center in Jackson Park, a 2018 decision by the Chicago Plan Commission made under the City's Lakefront Protection Ordinance after a public hearing, and multiple City ordinances enacted by the City Council after public hearings.  Fed. Ex. 10 (UPARR Proposal), at 5.  *See also POP I*, 385 F. Supp. 3d at 670–74.

App. I; Fed. Ex. 17 (EA), at 58–59; Ex. A hereto, Decl. of Maurice Cox, ¶¶ 6–13 ("Cox Decl"). And Jackson Park is a uniquely fitting location because it continues the City and Park District's long tradition of placing significant cultural institutions in municipal parks and reflects the former President and First Lady's connection to the South Side.

The Presidential Center, moreover, is just the latest enhancement in a long history of change to Jackson Park, an urban park that has constantly evolved over a century to suit the needs of the community. This is explained at length in the Historic Properties Identification Report ("HPI"), one of the core documents prepared by the federal agencies. Fed. Ex. 5 (HPI), at 3–72 (Mar. 2018). The park was designed in 1871 by Olmsted, Vaux & Co., but the original plan was never fully executed. Later plans transformed the park into the fairgrounds for the 1893 World's Columbian Exposition, followed by new plans developed in 1895 by Olmsted, Olmsted & Eliot. After that, the park was changed in numerous ways that deviated from the 1895 plan, including changes to accommodate traffic. These changes resulted in the loss of original features, the cutting of trees to expand roadways, and the addition of elements that do not qualify as "contributing resources" – that is, features that relate to the historic significance of the property. *See* Fed. Ex. 11 (AOE), App. E, Mem. from Elizabeth Roman to Brad Koldehoff (Sept. 9, 2019) ("Roman Memo").

For example, Cornell Drive is now approximately twice its original width and accommodates substantially more traffic than the carriage path envisioned by Olmsted. Fed. Ex. 5 (HPI), at 67; Fed. Ex. 11 (AOE), at 48; Fed. Ex. 10, App. E, Chicago Park District, South Lakefront Plan at 8 (2018) ("SLFP") ("Olmsted's forty-foot wide roadways, designed for 'pleasure carriages,' have given way to wider roadways carrying speeding automobiles"). And in the 1950s, a Nike anti-aircraft missile system was installed in the park by the U.S. Army,

resulting in cutting down hundreds of trees and filling parts of the historic lagoon system. Fed Ex. 5 (HPI), at 39. As for the trees currently in and around the Presidential Center site, "few" of them relate to the original plantings. *Id.* at 70. In fact, the "original plantings were historically far more complex with extensive use of understory trees and shrubs at intersections and for additional screening." *Id.* at 70. Further, Jackson Park has playgrounds, parking lots, utility buildings, bridges, traffic underpasses, a boat launch, and monuments and kiosks. *Id.* at 59, 63– 64. Nevertheless, Jackson Park retains – and will continue to retain after the Presidential Center is built – the elements that qualify it for listing on the National Register of Historic Places: its integrity of location, design, setting, materials, workmanship, feeling, and association. *See* Fed. Ex. 5 (HPI), at 57–59; Fed. Ex. 11 (AOE), at 40; Fed. Ex. 10, App. I (DPD Study), at 5–6.

Indeed, the historic "period of significance" that qualifies Jackson Park for listing on the National Register is not limited to a few years in the late 19th century, but reflects nearly a century of active change to the park, spanning 1875 to 1968. Fed Ex. 5 (HPI), at 57; Fed. Ex. 11 (AOE), at 39–40. And since then, Jackson Park's further evolution has been actively managed pursuant to various municipal plans. Formal management of the park was first addressed in the 1972 Lake Front Plan of Chicago, then in the 1999 Framework Plan, and most recently in the Park District's SLFP. Fed. Ex. 10 (UPARR Proposal) at 38. The SLFP, which endorses the Presidential Center in Jackson Park, is a "starting point for a long term process of change that will enhance and preserve the park's character, as well as anticipate future needs." Fed. Ex. 10 App. E (SLFP), at 1; Ex. B hereto, Decl. of Michael Kelly at ¶¶ 8–10 ("Kelly Decl.") ("The Presidential Center is consistent with the [SLFP]'s broader vision for Jackson and South Shore Cultural Center Parks and is critical to furthering the plan's goals and principles.").

In short, Jackson Park has changed over more than a century to support the needs of the urban communities it serves, all while maintaining its historic integrity. The same will be true after the Presidential Center augments the park's cultural amenities, updates the landscape with new natural features, and adds the unique and powerful history of Chicago's first President.

**B.      The Federal Involvement.**

In contrast to the City's and Park District's overarching responsibility for reviewing and approving the Presidential Center in Jackson Park, the role of the Federal Defendants was constrained to each agency's narrow authority as prescribed by federal law. No federal law gives the federal agencies the authority to approve the location or design of the Presidential Center. Rather, the Urban Park and Recreation Recovery Act (UPARR), 16 U.S.C. § 200501, *et seq*., authorized the National Park Service (NPS) to review the City's request to convert a small amount of land to non-recreation use and offset it with new recreation land nearby. *See* Fed. Ex. 29, NPS Letter to Mayor Lightfoot re: UPARR Conversion and attachments (May 18, 2021) ("UPARR Amendment"). The Federal Highway Administration acted under the U.S. Department of Transportation Act, 49 U.S.C. § 303, to address the City's request to be eligible to use federal funds to pay for the Jackson Park roadway improvements that the City designed. *See* Fed. Ex. 21, Final Section 4(f) Evaluation ("4(f) Evaluation"). The U.S. Army Corps of Engineers (USACE) acted under the Rivers and Harbors Act, 33 U.S.C. § 408, to approve minor modifications to a habitat restoration project in the park, and under the Clean Water Act, 33 U.S.C. § 404, to authorize minor discharges into jurisdictional waters incident to roadway improvements. *See* Fed. Ex. 23, USACE Letter to CDOT Verifying 404 Permit (Jan. 19, 2021); Fed. Ex. 27, USACE Approved Revisions to 408 Permit (Jan. 27, 2021). These statutes are the agencies' substantive "action authorities" – the statutes authorizing the agencies to take the proposed "actions" at issue here, such as approving the City's conversion request as described

above.  None allowed or compelled the federal government to "approve" the Presidential Center, as Plaintiffs contend.

In the course of reaching decisions under their specific action authorities, the federal agencies also conducted the review processes required by both NEPA, 42 U.S.C. § 4321 *et seq.*, and the NHPA, 54 U.S.C. § 300101, *et seq.  See generally* Fed. Ex. 17 (EA); Fed. Ex. 11 (AOE); Fed. Ex. 20, Section 106 Memorandum of Agreement (Nov. 10, 2020) ("MOA").[3]  NEPA and the NHPA required the federal agencies to consider the potential impacts to the environment and to historic properties of the specific "actions" they were asked to take.  It is well established that neither statute compels any particular outcome – such as approval or denial of a proposed request – nor do they give the agencies the authority to dictate the location of a nonfederal project like the Presidential Center.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999).  All of these statutes – those authorizing the agencies' specific actions, and those requiring the environmental and historic resource reviews – have different standards and requirements, which Plaintiffs conflate or confuse to bolster their preference that the Presidential Center be sited elsewhere. None supports the outcome sought by Plaintiffs.

## ARGUMENT

A preliminary injunction "is an extraordinary remedy that may be awarded only upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008).  To prevail, a plaintiff "must establish that he is likely to succeed on the

---

[3]  The federal review process is documented at the City's project website. *See* https://www.chicago.gov/city/en/depts/dcd/supp_info/jackson-park-improvements.html.  That website, which has been available to the public since early in the process, includes documents issued by the federal agencies during that process, such as the Environmental Assessment and the Finding of No Significant Impact, and also includes information related to public meetings that were part of the process.

merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Where, as here, the defendant is a governmental body, the last two factors merge, and the harm to the defendant and the public are considered as one. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A plaintiff seeking preliminary relief bears a "significant burden." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). He must make a "strong" showing that he is likely to succeed on the merits; "a mere possibility of success is not enough." *Id.* at 762. He must also show that harm is "likely" in the absence of an injunction, *Winter*, 555 U.S. at 22, rather than a "possibility of some remote future injury," *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). And even then, a court should deny the preliminary injunction if the harm to the defendant and to the public outweighs the benefit to the plaintiff. *Id.* at 789. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal quotation omitted). Indeed, "it is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather a court must determine that an injunction *should* issue under the traditional four-factor test set out above." *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010). Plaintiffs fail to show why an injunction *should* issue, as they do not make the required showing under any of the injunctive factors.

## I.      Plaintiffs Have No Likelihood Of Success On The Merits.

Plaintiffs have not established a likelihood of success on the merits of their federal claims.[4] Plaintiffs bear a heavy burden. Under the Administrative Procedure Act, 5 U.S.C.

---

[4] Plaintiffs purport to bring claims against the City and Park District under the federal laws. *See* Compl. at 40, 45, 58, 60, 63, Dkt. 1. No such claims can lie against the City and Park District. Review of the

§ 701 *et seq.* ("APA"), they must show that the agencies' decisions are "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 858 (7th Cir. 2003) (quoting 5 U.S.C. § 706(2)(A)). They have not even remotely done so. The City's decision to allow the Presidential Center in Jackson Park, the design of the Center's campus, and the related road closures within Jackson Park do not require federal approval, and none of the agencies' action authorities or review obligations "federalized" these non-federal projects. *See* Fed. Ex. 17 (EA), at 6. Each agency explained this repeatedly in response to public comments, and Plaintiffs have failed to demonstrate how the agencies' reasoned conclusions on each decision fail under APA standards.

### A. NPS complied with UPARR.

UPARR is involved in this case because, in the early 1980s, the City received two federal grants from NPS (totaling $261,170) for landscape work and recreational programs in Jackson Park. Under UPARR, in exchange for the grants, the City agreed to keep Jackson Park dedicated to recreation uses in perpetuity unless NPS approved a "conversion" to non-recreation uses. *See* 36 C.F.R. § 72.72 (regulations implementing UPARR); Fed. Ex. 17 (EA), at 11.[5] Nearly forty years later, this "conversion" process was triggered when NPS determined that portions of three of the Presidential Center's buildings (the Museum, the Forum, and the Library), on 4.6 acres of

---

federal agency decisions at issue here may be pursued only under the Administrative Procedure Act, which applies solely to federal agencies. 5 U.S.C. § 701(b). *See Munoz-Medoza v. Pierce*, 711 F.2d 421, 430 (1st Cir. 1983); *Gibson & Perin Co. v. City of Cincinnati*, 480 F.2d 936, 941 (6th Cir. 1973). The City and Park District have not moved to dismiss these claims at this time, and will address this issue in further merits briefing, because they otherwise would have sought to intervene in this action to protect their interests.

[5]  The various administrative documents refer to the area subject to this agreement for recreational use as the "Section 1010" boundary, named after the section number from the original codification of the UPARR statute. *See* Urban Park and Recreation Recovery Act of 1978, Pub. L, 95-625, 92 Stat. 3538. The Section 1010 boundary at issue here covered all of Jackson Park except the roadways. *See* Map of Alternative A, Ex. C hereto.

the 19.3-acre site, would not be used for recreation as NPS construes the term under UPARR, and thus would be "converted." Fed. Ex. 17 (EA), at 11. In addition, NPS determined that roadway modifications in Jackson Park will convert 5.2 acres of linear strips of parkland abutting those roadways to non-recreation use. *See* Fed. Ex. 17 (EA), at 11; Fed. Ex. 17 (EA), App. G.

In light of the conversions, UPARR required the City to provide replacement recreation property that would offset the recreation property being converted. *See* 54 U.S.C. § 200507. Importantly, however, UPARR says nothing about – and does not supplant – the City's antecedent decisions to approve the Presidential Center, close roads, and undertake related transportation enhancements in Jackson Park. Rather, the inquiry for NPS under UPARR is constrained to deciding whether to approve the conversion proposal, and UPARR directs the agency to approve the conversion if it "finds it to be in accord with the then-current local park and recreation recovery action program and only on such conditions as the Secretary considers necessary to ensure the provision of adequate recreation properties and opportunities of reasonably equivalent location and usefulness." 54 U.S.C. § 200507. Regulations set forth factors the Secretary is to consider when reviewing a conversion proposal. 36 C.F.R. § 72.72(a).

Here, the City proposed two types of replacement recreation property to offset the conversions described above: (1) 11.1 acres of new parkland within Jackson Park itself (which will be created from closing certain roadways); and (2) rehabilitation of 5.2 acres at the eastern end of the Midway Plaisance, which will return more of its historic form and offer expanded recreation uses. Fed. Ex. 17 (EA), at 34–41; Fed. Ex. 17 (EA), App. G. The City therefore proposed a total of 16.3 acres of replacement recreation land to offset the 9.8 acres of converted land, for a net *gain* of 6.5 acres. And those 16.3 replacement acres are now subject to UPARR. *See* Fed. Ex. 10 (UPARR Proposal), at 1; Fed. Ex. 29 (UPARR Amendments).

-10-

Plaintiffs argue that NPS violated UPARR by not considering alternatives to the City's proposal to use the eastern end of the Midway Plaisance for replacement recreation land.[6]  This argument fails for the simple reason that UPARR does not require NPS to consider alternatives to the replacement recreation land proposed by a municipality.  Plaintiffs cite no authority for that proposition, and there is none.  The regulations require only that the City propose "adequate recreation properties of reasonably equivalent usefulness and location" to the converted land.  36 C.F.R. § 72.72(b)(3)(i)-(ii).  They make no mention of requiring or comparing alternative proposals or sites for the replacement recreation property.  Even so, the City explained its reasoning for choosing Midway Plaisance over other sites for replacement recreation, *see* Fed. Ex. 28, NPS Review of UPARR Compliance at 2 (May 13, 2021), and NPS considered this information in the course of its review. Fed. Ex. 24, Finding of No Significant Impact at B-32 (Jan. 21, 2021) ("FONSI").

To be sure, the UPARR regulations require NPS to consider whether certain "alternatives *to the proposed conversion* have been evaluated" *by the applicant*.  36 C.F.R. § 72.72(b)(1) (emphasis added).  But Plaintiffs do not argue that NPS violated this requirement, which is different from a purported requirement that *NPS* consider alternatives to the proposed *replacement recreation land*.  In this case, the proposed conversion is not the improvements to the Midway Plaisance site, but the change in use within the 4.6 acres of the Presidential Center site, and the 5.2 acres of parkland alongside roads in Jackson Park.  Fed. Ex. 24 (FONSI) at 2.  And NPS considered whether the City evaluated practical alternatives to the conversion and found that it had done so.  Fed. Ex. 28, NPS Review of UPARR Compliance at 2.  In short, NPS

---

[6]  Plaintiffs also argue that NPS violated Section 106 of the NHPA by failing to consider the impacts of the proposed use of the Midway Plaisance (with its modifications to enhance recreation) as replacement recreation under UPARR.  Mem. at 27.  This is simply wrong; the proposal is analyzed in the Section 106 Assessment of Effects.  *See* Fed. Ex. 11 (AOE), at 44.

squarely fulfilled its obligations under UPARR, and Plaintiffs' UPARR claim has no chance of success.[7]

### B.   Section 4(f) does not apply to the Presidential Center or related road closures.

Plaintiffs argue that FHWA violated Section 4(f) of the Department of Transportation Act ("DOT Act"), 49 U.S.C. § 303 and 23 U.S.C. § 138,[8] by failing to consider "feasible and prudent alternatives" to the road closures and the siting of the Presidential Center in Jackson Park. Mem. at 23–24. This argument, another attempt to compel the federal agencies to second-guess the decisions of City officials, suffers from a fatal legal flaw: the DOT Act simply does not apply to the Presidential Center or road closures, as is apparent from its plain language.

Under Section 4(f), if a transportation project subject to the Act will "use" certain enumerated properties, such as public parks or historic sites, FHWA must follow certain evaluation procedures, which include considering whether there is a "prudent and feasible" alternative to the use of that property. Critically, however, Section 4(f) can only come into play if the project is subject to the DOT Act in the first place. And for a project to be subject to the Act, it must: (i) be an improvement to a "Federal-aid highway system[]," (ii) use federal money authorized by the Act, and (iii) constitute a transportation program or project. 23 U.S.C. § 101(b), 49 U.S.C. § 303(b).[9] *See also Citizens Advocate Team v. U.S. Dep't of Transp.*, 2004

---

[7]  Plaintiffs offer *Brooklyn Heights Association v. National Park Service*, 777 F. Supp. 2d 424 (E.D. NY 2011), for the proposition that an injunction is appropriate in these circumstances. Mem. at 27. But in that case there was "no dispute" that the NPS did not follow the conversion process laid out in the relevant statute, which in that case was the Land and Water Conservation Fund Act and not UPARR. *Brooklyn Heights* at 426. The opposite is true here.

[8]  These two statutory provisions were "originally enacted as Section 4(f) of the Department of Transportation Act of 1966 and are still commonly referred to as 'Section 4(f).'" 23 C.F.R. § 774.1.

[9]  A "Federal-aid highway" "means a public highway eligible for assistance  . . . ." 23 U.S.C. § 101(a)(6).

WL 725279, at *11 (N.D. Ill. Mar. 31, 2004) (Section 4(f) requires "certain measures if [FHWA] determines that *a transportation project* will 'use'" resources subject to the statute) (internal citations omitted, emphasis added); *Old Town Neighborhood Ass'n Inc. v. Kauffman*, 333 F.3d 732, 735–36 (7th Cir. 2003) (no federal dollars used for street widening meant federal laws did not apply).  Here, the Presidential Center and the road closures have none of the attributes that would make them subject to the Act:  they are not improvements to a federal-aid highway; they are not (and cannot) use funds approved under the DOT Act; and they are not transportation projects.  Plaintiffs provide no facts or law to the contrary and cannot justify their assertion that the FHWA should have taken jurisdiction over the Presidential Center or roadway closures.[10]

To be sure, the City may apply to use Federal-Aid Highway funding for the *roadway improvements*, such as the widening of roads used for vehicular traffic in Jackson Park – work that, if federal funds are used, would constitute "use" of a 4(f) property within the meaning of the DOT Act.  *See* 23 U.S.C. § 138(a); 49 U.S.C. § 303(a)-(b); 23 C.F.R. § 774.3.  But as to these projects, which are not challenged in Plaintiffs' 4(f) arguments, FHWA fully complied with 4(f): it examined alternatives, considered impacts, evaluated ways to minimize harm as well as mitigation, and made the required findings.  *See generally* Fed. Ex. 21 (4(f) Evaluation). *See also* 49 U.S.C. § 303; 23 C.F.R. § 774.17 (defining Section 4(f) property).  Further, the FHWA explained (in response to comment from Plaintiff Protect Our Parks) that, in contrast to the

---

[10]  An additional reason why Section 4(f) does not apply is that there is no "use" of Section 4(f) property. A "use" occurs "[w]hen land is permanently incorporated into a transportation facility" or when there is temporary and adverse occupancy or "constructive use" of 4(f) land by a transportation project.  23 C.F.R. § 774.17 (defining use).  Here, the Presidential Center and the new parkland that results from the road closures are not land that is incorporated into a transportation facility or a transportation project.  As FHWA explained with respect to both the Presidential Center and the roadway closures, these "actions are being implemented to address a purpose that is unrelated to the movement of people, goods, and services from one place to another" within the meaning of the DOT Act.  Fed. Ex. 21 (4(f) Evaluation), at 2.

transportation improvements, the roadway closures and the Presidential Center construction are not subject to 4(f) because they "do not require approval from FHWA," "are not transportation projects," and have no "transportation purpose." Fed. Ex. 21 (4(f) Evaluation), App. H-4. *See also* Fed. Ex. 21 (4(f) Evaluation), at 2–3; Fed. Ex. 17 (EA), at 69–70; Fed. Ex. 24 (FONSI), at B-6–B-8. Plaintiffs make no effort to demonstrate that FHWA's explanation of its authority is "arbitrary and capricious or otherwise not in accordance with the law," and any effort would have failed for the reasons above.

### C. NEPA does not allow the agencies to second-guess the City's decision to locate the Presidential Center in Jackson Park.

Plaintiffs contend that the Federal Defendants violated NEPA in a number of ways, including by allegedly failing to consider an alternative to Jackson Park as the site of the Presidential Center. Plaintiffs are incorrect. As we explain below, that question was not within the agencies' purview, and NEPA does not require such a significant intrusion by the federal agencies into the City and Park District's decisions about how to manage their municipal parks or which park is the appropriate site of the Presidential Center. Rather, NEPA's purpose simply is to ensure that the federal agencies fully considered a reasonable range of alternatives to their specific actions – that is, their approvals of the City and Park District's particular requests – and the indirect, direct, and cumulative impacts of their actions on environmental and historic resources. The agencies did all of that here – including considering all of the impacts that Plaintiffs allege were overlooked, such as the Presidential Center's impact on Jackson Park.[11]

---

[11] The Federal Defendants will explain how the agencies' analysis of impacts on environmental resources, which included consideration of mitigation, satisfied NEPA and why no Environmental Impact Statement was required. However, we note that in attacking the lack of an EIS and in arguing that the impacts on Jackson Park require an EIS, Plaintiffs ignore the "context" of the federal actions – an inquiry that is the required predicate to the consideration of impacts. 40 C.F.R. § 1508.27(a) (2019). Here, the "context" is an urban multi-use park, one that has already changed greatly over the years, *see* Fed. Ex. 5 (HPI), at 3–53, and that now abuts various multi-story buildings and busy roads, Fed. Ex. 17 (EA) at 3–4;

An "Environmental Assessment" (EA) – the NEPA analysis prepared here – must "include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E) [of NEPA], *of the environmental impacts of the proposed action and alternatives,* and a listing of agencies and persons consulted" 40 C.F.R. § 1508.9(b) (2019) (emphasis added).[12] Thus, identifying the "proposed action" is the critical predicate for defining the scope of review of alternatives under NEPA. *See also* Fed. Ex. 17 (EA), at 9–15. Once the proposed action is identified, the alternatives to the action (as well as the impacts of the action and of the alternatives) can be identified and compared. *See Dept. of Transp. v. Pub. Citizen*, 541 U.S. 752, 757–58 (2004) (EA is prepared to examine the "agency's proposed action"). Accordingly, the EA here describes the proposed federal actions as the approvals sought by the City and Park District: (1) approval by NPS of the proposed UPARR conversions; (2) authorization of the federal transportation funding; and (3) authorization by USACE of "discharges of dredge or fill material into waters of the United States" and "impacts to an ecosystem restoration project." Fed. Ex. 17 (EA), at 9, 11–15.[13] Based on these proposed federal actions, the agencies then considered a reasonable range of alternatives, including a "no action" alternative appropriate to each agency as the baseline for it to assess the environmental impacts of its action.[14]

---

Fed. Ex. 24 (FONSI), at 7. Furthermore, the State of Illinois, City, and Park District have for decades committed to locating museums in public parks for the benefit of the community. The agencies properly considered this important context of Jackson Park in evaluating the impacts of the Presidential Center on that park. *See* Fed. Ex. 24 (FONSI), at 5, B-28–B-29.

[12] Plaintiffs suggest that the federal agencies improperly delegated analysis under NEPA and the NHPA to the City. *See* Mem. at 20. This is incorrect. Regulations allow the applicant to prepare analyses under both statutes. *See* 40 C.F.R. § 1506.5; 43 C.F.R § 46.105; 36 C.F.R. § 800.2(b)(3); 23 C.F.R. § 771.107.

[13] *See also* NPS, NEPA Handbook at 48 (2015), https://www.nps.gov/subjects/nepa/upload/NPS_NEPAHandbook_Final_508.pdf ("NPS NEPA Handbook") ("[A] proposed action is 'the bureau activity under consideration.'").

[14] The EA also explained the agencies' "purpose and need," which "represent the [agency's] purpose and need for taking action." In the case of externally generated proposals, such as an application for a NPS

-15-

The first alternative ("Alternative A") was a "no action" alternative, because it assumed a future where none of the federal agencies would take action – for instance, neither the UPARR conversion nor the request for federal transportation funding eligibility would be approved. Fed. Ex. 17 (EA), at 16. *See, e.g.*, *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 593 F. Supp. 2d 1019, 1027 n.13 (E.D. Wis. 2009) (describing the no-action alternative requirement). Alternative A was used as the baseline from which to assess the environmental impacts (the "direct, indirect, and cumulative effects") that would result if NPS were to approve the conversion. *See* Ex. C hereto, Map of Alternative A.

The second alternative ("Alternative B") assumed "a future where NPS would approve the City's proposed partial UPARR conversion proposal" as to the 4.6 acres on the site of the Presidential Center and the replacement recreation land at the Midway Plaisance. Fed. Ex. 17 (EA), at 15–16. Also under this scenario, the roadways in Jackson Park would be closed in connection with construction of the Center. But this scenario assumed that the FHWA would not take action – that is, the transportation funding would not be approved. *Id.* Accordingly, Alternative B was an "action" alternative as to NPS, but a "no action" alternative as to FHWA (or, in FHWA parlance, a "no build" alternative). *Id.* at 15. Alternative B therefore allowed FHWA to consider the impacts to traffic that would occur if the Center were built and the road closures took place in Jackson Park, but the transportation improvements *did not*.[15]

_____

permit, "the purpose and need should reflect the NPS purpose and need (e.g. determining whether to issue a permit for a cell tower) as opposed to the applicant's need for a permit (e.g., enhance cell coverage by building a new tower)." NPS NEPA Handbook at 47–48. *See also* Guidance for Preparing and Processing Environmental and Section 4(f) Documents (Oct. 30, 1987), https://www.environment.fhwa.dot.gov/legislation/nepa/guidance_preparing_env_documents.aspx, (noting that purpose and need should account for whether there is a "Federal, State, or local government mandate for the action").

[15] This was an appropriate "no action" alternative for FHWA because construction of the Center and the road closures were the only events that could trigger the need for the roadway improvements (and hence

The third and final alternative ("Alternative C") assumed that both the NPS and FHWA would approve their respective requests, and thus is an "action" alternative for both agencies. And the scope of the NPS action considered in this alternative was broader than just the conversion relating to the 4.6 acres on the Presidential Center site discussed above – it included the additional conversion of 5.2 acres of strips of Jackson Park land to make way for the transportation improvements. Because the 5.2 acre conversion is attributable only to the transportation improvements, and not to construction of the Presidential Center itself, it was appropriately made part of Alternative C, not Alternative B. Fed. Ex. 17 (EA), at 16. Consequently – and importantly – Alternative C allowed the agencies to analyze the full range of environmental impacts from *both* the Center and road closures (as in Alternative B, where NPS was assumed to approve the conversion request as to the 4.6 acres on the Presidential Center site) *and* of the transportation improvements being built (because Alternative C assumed the FHWA would approve the City's federal funding request and NPS would approve the conversion of the additional 5.2 acres to accommodate the roadway improvements). Fed. Ex. 17 (EA), at 16. *See* Ex. E hereto, Map of Alternative C.

Far from being a "ploy," this structuring of the alternatives analysis allowed the agencies to clarify which effects flowed from each of their respective federal actions, and to fully consider the entire range of reasonably foreseeable impacts from those actions. *See* Fed. Ex. 17 (EA), at 15–26. This fulfilled NEPA's goal of informing the public and agencies about the environmental impacts of federal decisions. Nothing more was required.

Plaintiffs are wrong that the agencies structured the EA in a way that "presupposes construction of the OPC" and conducted an analysis "without ever reviewing either the

---

the request to FHWA to take action in approving federal funding). Fed. Ex. 17 (EA), at 17–18. *See* Ex. D hereto, Map of Alternative B.

environmental impacts of constructing the OPC at its proposed location, or the removal of all current roadwork needed to complete the project." Mem. at 18. The agencies' analysis did include consideration of the impacts of the Presidential Center being built in Jackson Park, because construction of the Center and the associated road closures were considered as an "indirect effect" of the NPS' conversion approval. The EA therefore analyzed (and at great length, *see* Fed. Ex. 17 (EA), at 28–68 and appendices) the environmental impacts from construction of the Center in the park.

Plaintiffs' fundamental grievance therefore is not that the environmental impacts of the Presidential Center were ignored, but that the agencies did not include the construction of the Center and roadway closures as part of the "proposed actions" themselves, which Plaintiffs believe would have required the agencies' alternatives analysis to have included other sites for the Center. Plaintiffs even suggest that the agencies could have chosen a "superior" site. Mem. at 19. Yet analyzing the *impacts* of the Center and road closures as indirect outgrowths of the agencies' actions does not mean they should have been *part* of the proposed actions and alternatives themselves – that would conflate two distinct elements of the NEPA analysis. 40 C.F.R. § 1508.8 (defining effects as distinct from actions); *see also Dept. of Transp. v. Pub. Citizen*, 541 U.S. 752, 772–73 (2004) (emissions outside agency's regulatory authority did not become part of "agency action").

It is well-established that NEPA "does not mandate particular results, but simply prescribes the necessary process" for considering alternatives to and environmental impacts of federal decisions. *Methow Valley Citizens Council*, 490 U.S. at 350. The statute does not expand the scope of the agencies' inquiries under their underlying action authorities (here, UPARR and the DOT Act) such that the agencies could consider a different location for the

Center.  *See Int'l Brh. of Teamsters v. U.S. Dept. of Transp.*, 724 F.3d 206, 217 (D.C. Cir. 2013) (holding that an "agency lacks authority to impose the [NEPA] alternatives proposed by the Teamsters and those alternatives would beyond the scope of the [program under review]");  *Quechan Indian Tribe of Fort Yuma Indian Reservation v. U.S. Department of Interior*, 2007 WL 1890267 (D. Ariz. June 29, 2007) ("NEPA does not dictate substantive results or expand agency jurisdiction over land uses").  As is clear from sections I.A and I.B above, the authority of the agencies was limited:  NPS was to decide whether to approve conversions under UPARR, and FHWA was to decide whether to approve federal highway funding for transportation enhancements.  The agencies did not have the authority to approve the whole project or make a decision as to where the Presidential Center should be located.  In enacting NEPA, "Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be."  *Citizens Against Burlington v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991).

Inclusion of alternative sites for the Center would also have violated the "rule of reason," which governs "'which alternatives the agency must discuss.'"  *Citizens Against Burlington*, 938 F.2d at 195.  Under the "rule of reason," the court's review is deferential; it will uphold an agency's discussion of alternatives "so long as the alternatives are reasonable and the agency discusses them in reasonable detail."  *Id.* at 196.  Here, consideration of alternative sites for the Presidential Center would have been unreasonable because the agencies' action authorities did not give them authority to consider alternative sites for the Center.  As NPS explains, an "alternative is not considered reasonable if . . . jurisdictional obstacles make the ability to implement the alternative remote and speculative."  NPS NEPA Handbook at 53.  Further, evaluating an alternative site would serve neither of NEPA's aims – it would not inform the public or the agencies about the consequences of the agencies' actions, since the federal agencies

-19-

have no authority over the project or ability to place it elsewhere. *See Public Citizen*, 541 U.S. at

768 (2004) (describing the goals of informing agency decisions and informing the public);

*accord Sauk Prairie Conservation All. v. U.S. Dept. of Interior*, 944 F.3d 664, 680 (7th Cir.

2019). Requiring the agencies to consider alternatives that are neither part of the proposed action

nor within an agency's power to perform would violate NEPA's "rule of reason." *Public*

*Citizen*, 541 U.S. at 769.

An illustrative example is *Weiss v Kempthorne*, 683 F. Supp. 2d 549 (W.D.Mich. 2010),

*vacated in part*, 459 Fed. Appx. 497 (6th Cir. 2012) (NEPA claims moot). In assessing claims

against NPS under the Land and Water Conservation Fund Act, which has a conversion

provision similar to UPARR's, the court held that NPS properly focused on its own action, the

proposed conversion. *Id.* at 557. The court held that NEPA did not require NPS to include the

overall development in its scope of its review, and that the larger project was not "federalized"

for NPS purposes. *Id*. at 560.[16] Like this one, *Weiss* was *not* "a case where an agency had

arbitrarily confined the scope of its analysis to some activities within a particular project to the

exclusion of other, related activities that are within its jurisdiction." *Id*. at 561. Rather, the scope

of NPS's analysis was tied precisely to the action it was authorized to consider – the conversion.

---

[16] Nonfederal projects that may require federal review for some aspect are "federalized" for NEPA purposes only if they are "potentially subject to federal control and responsibility." 40 C.F.R. § 1508.18 (2019). *See also* 43 C.F.R. § 46.100 (DOI), 46.30 (DOI); 23 C.F.R. § 771.109(a)(1) (FHWA). That is not the case here. As explained herein, none of the federal action authorities grant the federal agencies control or responsibility over the placement or design of the Presidential Center or the City's and Park District's decisions regarding management of a municipal park. *See also Winnebago Tribe of Neb. v. Ray*, 621 F.2d 269, 272 (8th Cir. 1980) ("discretion must be exercised within the scope of the agency's authority"); *Ka Makani 'O Kohala Ohana Inc. v. Dept. of Water Supply*, 295 F. 3d 955, 960–61 (9th Cir. 2002) (local action not federalized for NEPA purposes despite federal involvement); *City of Grapevine, Tex. v. Dept. of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) ("where a federal agency is not the sponsor of a project, 'the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project'") (quoting *Citizens Against Burlington*, 938 F.2d at 197–98).

On the other hand, *Openlands v. U.S. Department of Transportation*, a case cited by

Plaintiffs, is irrelevant. There, an environmental impact statement was remanded when the

federal agencies' "no-action" alternative (their Alternative A) implicitly assumed that the federal

action had in fact occurred (their Alternative B). 124 F. Supp. 3d 796, 806 (N.D. Ill. 2015).

More precisely, when considering the no-action alternative, the agency erroneously relied on a

study that assumed that the project at issue – the proposed Iliana Corridor – was built and in

service. *Id.* By contrast, Plaintiffs here point to nothing in the EA that shows Alternative A

presumes the NPS action has occurred or in Alternative B that presumes that the FHWA action

has occurred. *See* Mem. at 19–21. As described above, each of these alternatives was an

appropriate "no action" alternative for the respective agencies.

For all these reasons, the federal agencies appropriately excluded consideration of

alternative sites for the Presidential Center from their NEPA analysis.

> **D.** **The Federal Agencies complied with the National Historic Preservation Act.**
>
> **1.** **The agencies met their obligations under Section 106.**

The NHPA, 54 U.S.C. § 300101, *et seq*., established the Section 106 review process that

requires federal agencies to assess the effects of their undertakings on historic properties and to

consider ways to avoid or minimize any harm.[17] *See Wicker Park Historic Dist. Pres. Fund v.*

*Pierce*, 565 F. Supp. 1066, 1072–73 (N.D. Ill. 1982) (explaining Section 106). Like NEPA,

Section 106 is procedural in nature and does not mandate preservation of historic resources or

mitigation of impacts on them. *See City of Alexandria, Va.*, 198 F.3d at 871; *Valley Cmty. Pres.*

*Comm'n v. Mineta*, 373 F.3d 1078, 1084–85 (10th Cir. 2004). Rather, Section 106 requires a

---

[17] Section 106 is codified at 54 U.S.C. § 306108 (formerly 16 U.S.C. § 470f). Implementing regulations for Section 106 are in 36 C.F.R. Part 800. *See* 36 C.F.R. § 800.16(y) (defining undertaking); 36 C.F.R. § 800.3 (first step is to "establish undertaking").

"consultation" process between the agencies and various other interested consulting parties, as well as the preparation of an Assessment of Effects (AOE) report that documents any impacts on historic resources.

The Federal Defendants will discuss the NHPA in more detail, but two points bear mention here. First, Plaintiffs are wrong that the agencies ignored the impact of the Presidential Center on historic resources in Jackson Park. The AOE could not be more clear that those impacts were considered: "This Assessment of Effects (AOE) report evaluates the potential effects to historic properties from the OPC project and certain related Federal actions in and near Jackson Park." Fed. Ex. 11 (AOE), at 1.[18] These impacts were included in the consideration because the agencies defined the "undertaking" subject to Section 106 review broadly, encompassing *both* the "Federal actions" (*e.g.*, the UPARR conversion and transportation funding eligibility under the DOT Act) and the "non-Federal actions" (*e.g.*, the City's decision to site the Presidential Center in Jackson Park and to close the roadways). *See*, *e.g.*, Fed. Ex. 11 (AOE), at 49–54.[19] The agencies took this "expansive approach" to defining the undertaking, including *both* the City's actions and the federal actions, based on advice from the ACHP, the

---

[18] The agencies evaluated the effects on historic properties using the Standards for the Treatment of Historic Properties and the Guidelines for the Treatment of Cultural Landscapes. Fed. Ex. 11 (AOE), at 23. As the Illinois Department of Transportation's expert explained: "Historic districts and cultural landscapes are historic property types that lend themselves to alterations that may cause adverse effects, but the effects typically are not substantial enough to cause removal of overall integrity." Fed. Ex. 11, App. E (Roman Memo). IDOT also concluded that the "proposed changes will not sufficiently diminish or remove the overall integrity of the historic district in such a way that it would no longer qualify for NRHP listing." Fed. Ex. 11 (AOE), at 40.

[19] Contrary to Plaintiffs' claims, not just any effect, even an adverse one, on historic resources necessarily warrants an EIS under NEPA. As the ACHP explains: "An adverse effect in the Section 106 process does not necessarily mean an agency will be unable to reach a FONSI … neither NEPA nor Section 106 requires the preparation of an EIS solely because the proposed undertaking has the potential to adversely affect a historic property." NEPA and NHPA: A Handbook for Integrating NEPA and Section 106 at 25 (Mar. 2013), https://www.achp.gov/sites/default/files/2017-02/NEPA_NHPA_Section_106_Handbook_Mar2013_0.pdf; *see also* 36 C.F.R. § 800.8(a)(1).

federal agency charged with implementation of the NHPA. *Id.* at 22. By doing so, they fully considered the impacts on historic resources of concern to Plaintiffs. *Id.* at 22–57.[20]

Second, Plaintiffs are wrong that the agencies should have compelled the City to adopt measures for avoiding, minimizing, or mitigating impacts that were not agreed to by the City. The NHPA does not give the agencies that authority, and Plaintiffs fail to support their bald assertion to the contrary. *See Waterford Citizens' Ass'n v. Reilly*, 970 F.2d 1287, 1290–91 (4th Cir. 1992) (explaining that Section 106 places no general obligation on federal agencies to "affirmatively protect preservation interests"); *Conn. Trust for Historic Pres. v. ICC*, 841 F.2d 479, 484 (2nd Cir. 1988) (NHPA only requires "that agencies acquire information before acting"). To be sure, the Section 106 consultation process may result in a memorandum of agreement ("MOA") between the consulting parties, which memorializes *agreed-upon* measures to avoid, minimize, or mitigate impacts on historic resources. *See* 36 C.F.R. § 800.2(a)(4). And an MOA was agreed to here. *See* Fed. Ex. 20 (MOA). But an MOA is voluntary; it is not required and cannot be imposed. *See* 36 C.F.R. § 800.7; *Waterford Citizens' Ass'n*, 970 F.2d at 1290–91 (explaining that if consultation is not productive it may be terminated without resolution of adverse effects, and that agencies' role is "limited" because "the regulations state

---

[20] As the Federal Defendants will explain, this process was robust. *See* https://www.chicago.gov/city/en/depts/dcd/supp_info/jackson-park-improvements.html. What Plaintiffs call a "skimpy review" spanned nearly four years. *See* Fed. Ex. 10 (UPARR Proposal), at 1 (describing initial City engagement with NPS in 2015). And rather than perform a cursory review, the agencies found an "adverse effect" within the meaning of the NHPA on the "Jackson Park Historic Landscape District and Midway Plaisance" and on the "Chicago Boulevard System Historic District" (of which the Jackson Park Historic District is a part), but also found that the adverse effects would be small as well as consistent with land use patterns and developmental history. Fed. Ex. 11 (AOE), at 40, 56. The consultation process resulted in a Memorandum of Agreement signed by 39 consulting parties, as well as the ACHP and the Illinois State Historic Preservation Officer. Fed. Ex. 2 (MOA), at 2. *See also* 36 C.F.R. § 800.6(c) (an MOA "executed and implemented pursuant to this section evidences the agency official's compliance with this section 106").

that if the parties are unable to agree to an accommodation of interest, *they* may end the section

106 process") (emphasis added).

Nevertheless, and as the agencies acknowledged, the City took a number of steps to avoid

and minimize impacts from the Presidential Center and road closures through the City's own

evaluation of project siting, project design, and alternatives.  *See* Fed. Ex. 11 (AOE), at 38, 75–

79.  In addition, the City duly evaluated specific design suggestions from the FHWA, including

suggestions regarding the Women's Garden and the pathway replacing Cornell Drive.  *See* Fed.

Ex. 14, Letter from Arlene Kocher to Eleanor Gorski (June 9, 2020).  And the City also

evaluated three specific design alteration suggestions raised by consulting parties in the MOA

process – shifting the campus to the south, undertaking the Midway Plaisance work in

compliance with the Secretary of the Interior's "Standards for Rehabilitation," and reconstructing

Cornell Drive to its "Olmsted appearance."  Fed. Ex. 16, Letter from Eleanor Gorski to Arlene

Kocher re: Section 106 Consulting Party Comments at 5–8 (June 25, 2020) ("Gorski Letter").

After review, the City noted that the Midway Plaisance work could (and will) be conducted as

suggested.  *Id.* at 7.[21]  As to the campus location, however, the City explained that the

Foundation proposed the more northerly location over the original southern location after further

consideration, and the City Council approved the revised location to "improve safety and access

to the lagoons and lakefront."  *Id.* at 6–7.  And as to Cornell Drive, the City concluded that the

pedestrian pathway replacing Cornell Drive "better matches Olmsted's carriage path than the

current Cornell Drive in this area both in terms of the location and experience with respect to its

---

[21]  In another example of Plaintiffs ignoring the facts, Plaintiffs argue that the historic features of the
Midway Plaisance will be negatively impacted by using it for replacement recreation under UPARR.  The
opposite is true:  the City and Park District's plans for the Midway Plaisance will "preserve the historic
character" of the site and "rehabilitate lost features of the historic landscape …."  Fed. Ex. 11 (AOE), at
44.

sweeping curves." *Id.* at 7. Critically, all of these decisions – whether to agree to suggestions or reject them – were the City's decisions to make; the City's decision not to agree to change the project location or design does not render the federal agencies in violation of NHPA.[22]

### 2. The agencies met their obligations under Section 110(k).

Plaintiffs claim that the federal agencies violated the NHPA in a second way – they failed to follow the correct procedure under the NHPA after learning that the Park District had cleared some trees on a parcel in Jackson Park south of the Presidential Center site. The work was part of the Park District's early efforts to prepare the parcel for a new track and field. Plaintiffs contend that the Park District's efforts constituted "anticipatory demolition" of historic property under federal review and that the agencies violated the NHPA by later issuing the federal approvals sought by the City and Park District despite this "demolition." However, the FHWA properly concluded that no "anticipatory demolition" occurred. Nothing more was required under the NHPA.

Section 110(k) of the NHPA prohibits a federal agency from granting a permit to an applicant who "with intent to avoid the requirements of section [106] of this title, has intentionally significantly adversely affected a historic property." 54 USC § 306113. A shorthand phrase for this conduct is "anticipatory demolition," and the federal permitting agency determines whether an anticipatory demolition occurred. 36 C.F.R. § 800.9(c)(1)-(2).

---

[22] Plaintiffs cite a string of cases for the unremarkable proposition that sometimes courts grant motions for preliminary injunctions based on NPHA claims. Mem. at 26. Plaintiffs have not made the required injunctive showing in this case, however. Further, none of Plaintiffs cases involved, as does this case, a Section 106 process that concluded with an MOA after extensive review. *See Kammeyer v. Oneida Total Integrated Enterprises*, 2015 WL 5031959, at *3, *8-9 (C.D. Cal. Aug. 24, 2015) (no dispute that agency did not consider impacts of concern; *Brooklyn Heights Ass'n, Inc. v. NPS*, 777 F. Supp. 2d 424, 437 n.11 (E.D.N.Y. 2011) (court did not reach NHPA claim); *Nat'l Trust for Historic Preservation v. FDIC*, 1993 WL 328134, at *1-2 (D.D.C. May 7, 1993) (issue was applicability of NHPA).

All of the necessary steps were followed here. In August 2018, the ACHP notified the FHWA that the area where the trees were cleared for the new track and field was in a portion of Jackson Park being reviewed under Section 106, and expressly flagged the requirements of Section 110(k). Fed. Ex. 7, Letter from ACHP to FHWA at 1 (Aug. 21, 2018). The FHWA then made due inquiry of the City, which provided an extensive explanation of the City's and Park District's actions and intentions, including the fact that the City had coordinated about the tree clearing in advance with NPS. Fed. Ex. 8, Letter from Chicago DOT To FHWA at 2, 3 (Sept. 14, 2018). Nevertheless, the City and Park District voluntarily agreed to cease further work on the new track and field until the Section 106 review was complete. *Id.* at 1.

At the close of its review, FHWA concluded that "the City did not take these actions with the intent to avoid the requirements of Section 106" and "that Section 110(k) of the National Historic Preservation Act **is not applicable** under these circumstances." Fed. Ex. 9, Letter from FHWA to ACHP at 3 (Sept. 24, 2018) (emphasis in original). These determinations are consistent in every respect with the statutory and regulatory standard. They were made by the lead federal permitting agency charged with NHPA responsibilities (FHWA), and they focused precisely on the intent required under Section 110(k) for actions to be deemed anticipatory demolition. They were based on record evidence of due inquiry by the agency and comprehensive explanation by the City and Park District. Having concluded that no anticipatory demolition had occurred, the FHWA documented its conclusions and had no further obligation.

## II.    Plaintiffs Have Not Shown Irreparable Harm.

Plaintiffs' request for injunctive relief also fails because they do not establish that the Presidential Center will cause irreparable harm. Plaintiffs' vague and general allegations of harm are insufficient to justify casting into doubt the future of this critical City and Park District project.

To begin, many of the alleged harms to individuals are temporary. While construction will necessarily require the presence of equipment on parkland, most of the park will remain accessible during construction, including the Wooded Island, the golf and tennis courts that Plaintiff Mitchell claims to use, *see* Mitchell Decl. ¶ 5, and other green spaces and recreational areas throughout the park. And once construction is complete, the site will be comprised largely of publicly accessible parkland and buildings that improve the setting. Fed. Ex. 17 (EA), at 7. *See also* Fed. Ex. 10, App. I (DPD Study), at 14, 18.

The remaining alleged harms are not enough to warrant the extraordinary relief of a preliminary injunction, either. Many of Plaintiffs' allegations are vague and speak generically of the park as a whole, rather than describe how the Presidential Center site and locations of the roadway work will cause specific injury to their use of the park. While generalized allegations of aesthetic, cultural, or environmental harms may suffice for standing purposes, they are insufficient to support preliminary equitable relief. *See Sierra Club v. U.S. Army Corps of Engineers*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013) ("Plaintiffs have offered little proof of the type of permanent, devastating impact on the environment that has convinced other courts to enjoin construction projects.").[23] Here, of the tens of thousands of people who use Jackson Park every year, Plaintiffs have only one declarant, Ms. Franklin, who claims personal use of the

---

[23] Plaintiffs use the Mitchell Declaration to argue that the City's plans will irreparably harm Jackson Park. But the declaration states no more than a conclusory opinion. It fails to grapple with, much less undermine, the conclusion of the EA that any adverse effects are not significant, and the conclusion of the AOE that the effects do not endanger Jackson Park's listing on the National Register of Historic Places in any way. Further, the Mitchell Declaration ignores all post-1871 history of the park, does not address applicable NPS guidance and standards for assessing impacts to historic resources, and fails to even minimally analyze the elements of historic landscape integrity considered by the federal agencies. He also never availed himself of the opportunity to comment on the federal analysis with his contrary "professional" view. The Mitchell Declaration does not provide support for Plaintiffs' claim that "controversy" requires an EIS or that the effect on the park amounts to sufficient harm to warrant the extraordinary relief sought. *See* Fed. Ex. 24 (FONSI), at B-2 (agencies finding no controversy "present here").

Presidential Center site and affected roadways.  But her claims are insufficient, for she does not explain how the changes will cause her irreparable harm.  Dkt. 31-1, Ex. 4 thereto, ¶¶ 5–7 (describing generic harms to the Nichols Park Advisory Council and members).  Indeed, she ignores that, for example, the Women's Garden will be rebuilt in an equivalent size using some of the original stones, and it will have improved accessibility.  Fed. Ex. 19, Found. Cmt. to EA at 16; AOE Cmt. Resp., Cmt. No. 58[24]; Fed. Ex. 17 (EA), at 38; Fed. Ex. 17 (EA), App. G at 28. And as to Cornell Drive, its closure will restore pedestrian access through the heart of Jackson Park, consistent with Olmsted and Vaux's original plans for the experience of the Wooded Island and lagoons.  Fed. Ex. 10, App. I (DPD Study) at 15.  As the City's Plan Commission found, this "will have a positive effect on the rehabilitation of [the] historic circulation system of the park." *Id.* at 16.  Plaintiffs' other two declarants, Dr. Mitchell and Mr. Caplan, likewise do not establish how their use of any particular resource in Jackson Park will be permanently impaired by the Presidential Center.[25]

Plaintiffs refer to tree removal, but the tree survey they rely on covers only slightly more than half the park, and, even within that half, approximately 83 per cent of the trees will remain untouched, along with all the trees in the remainder of the park.  Fed. Ex. 17 (EA), App. D at 3, 20.  As to the small portion of trees that will be removed, they will be replaced with substantial 2.5-inch and 4-inch caliper native species at a one-for-one ratio throughout Jackson Park.  *See id.*

---

[24]  Available at
https://www.chicago.gov/content/dam/city/depts/dcd/supp_info/jackson/comment_disposition.pdf.

[25]  The Federal Defendants will explain how the agencies properly considered impacts to the habitat restoration project completed by USACE and the Park District pursuant to the Great Lakes Fishery and Ecosystem Restoration (GLFER) Act project.  *See, e.g.*, Fed. Ex. 17 (EA), App. J.  However, we note here that the alterations to the GLFER project are consistent with the Park District's plans for the project and will continue to create the same benefits anticipated when the project was first planned.  *See* Ex. B, Kelly Decl. at ¶¶ 21–22.

at 17.[26]  Significantly, the approximately 350 trees to be removed for the Presidential Center –

many of which are failing, non-native species – were not part of Olmsted's original plan.  Fed.

Ex. 10, App. I (DPD Study), at 10.  Indeed, the Presidential Center site is not a nature preserve,

and Jackson Park is a managed park where trees are routinely planted and removed for various

reasons – including prior instances where new structures were built and roadways were widened.

*See* Fed. Ex. 5 (HPI), at 37 (describing Works Progress Administration-funded tree-planting

initiative); *id.* at 39 (describing removal of hundreds of trees and filling of portion of North and

South Bayous to accommodate Nike missile systems); *id.* at 41 (removal of hundreds of trees for

roadway widening).

        Moreover, Plaintiffs ignore that the alleged harms were extensively considered as part of

the federal agencies' review processes.  Fed. Ex. 17 (EA), at 29–30 (trees and wildlife), 31–32

(noise), 41–48 (traffic), 50–53 (aesthetics).  Of particular note, the agencies concluded that tree

removal would only be happening in a small area of Jackson Park and that other trees would

continue to provide habitat for wildlife.  *Id.* at 30.  Further, the agencies found that wildlife in

urban Jackson Park could reasonably be expected to acclimate to human activity, and tree

removal in accord with seasonal restrictions would result in "no effect on the nesting activity of

migratory bird species by the project alternatives."  *Id.*  In addition, the federal agencies

considered the effects, both beneficial and adverse, of the Presidential Center and roadway

improvements on the historic character of Jackson Park.  Fed. Ex. 11 (AOE), at 40.  All of the

---

[26]  Tree surveys covered 57% of the park and identified 4,672 trees in the surveyed areas.  Of these
identified trees, 17% would be affected by the project (about 790).  Fed. Ex. 17 (EA), App. D at 3, 20.
Plaintiffs critique the tree replacements as a "motley mix," but replacement trees are curated and
overwhelmingly native to ensure hardiness and suitability for habitat.  *See id.* at 17–22 (detailed list of
proposed species mix, consisting of 655 shade trees and 35 percent ornamental trees identified by species,
of which only two are non-native (plus three blight-resistant substitutes for the native Elm, which suffers
from Dutch elm disease)).

municipal and federal reviews have been transparently conducted, and Plaintiffs' failure to identify non-temporary harms that rise above generic concerns cannot support the extraordinary remedy of a preliminary injunction.

Next, Plaintiffs do not establish "organizational harm," because building the Presidential Center will not impede activities central to the missions of the Plaintiff organizations. *See* Mem. at 35. Indeed, Plaintiff Nichols Park Advisory Council ("NPAC") states that its "primary focus is the stewardship of Nichols Park," not Jackson Park. Dkt. 31-1, Ex. 4 thereto, ¶ 4. And even if NPAC can lay claim to Jackson Park, it will still be able to pursue its mission of "ensur[ing] that public parks remain open and free, and maintain their aesthetic beauty and public recreational access," *id.*, after the Presidential Center is built, because it will be free to engage in whatever advocacy and community engagement it wishes. Likewise, according to Plaintiff Protect Our Parks, its mission is to "protect existing public parks and to advocate for improving and expanding natural public parks and open space . . . in programs and policies at all levels of government." Dkt. 31-1, Ex. 5 thereto, ¶ 3. But it too will be able to pursue these advocacy activities with governmental bodies after the Center is built. The fact that the Presidential Center may be an *outcome* contrary to the professed goals of these organizations is irrelevant, for it does not impair their ability to *pursue their missions* through their organization and advocacy. As Plaintiffs' own authorities recognize, Plaintiffs must show that the Presidential Center would make "the [organizations'] *activities* more difficult." Mem. at 36.[27]

---

[27] The cases cited by Plaintiffs to support their organizational injury argument are thus inapposite. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (changes in voter registration requirements made it more difficult for League to pursue its mission of registering voters); *National Treasury Employees Union v. U.S.*, 101 F.3d 1423 (D.C. Cir. 1996) (issue was whether injury was sufficient for standing).

Finally, Plaintiffs claim that they "will suffer irreparable procedural harms" if construction is allowed to proceed. Mem. at 36. But they concede that any alleged procedural harm, standing alone, does not constitute irreparable harm. *Id.* Nor do Plaintiffs allege any future procedural harms that this Court could enjoin – the process that Plaintiffs claim was flawed lies in the past. In any event, Plaintiffs do not identify procedural violations that frustrated public participation in the federal agency review and consultation processes. Indeed, Plaintiffs participated fulsomely in meetings and during comment periods for the federal reviews. *See* Mem. at 36–37; Mitchell Decl. ¶ 6; Fed. Ex. 30, Protect Our Parks Comment, Document 106746, Correspondence 175 & 183 (Oct. 30, 2020). Moreover, an alleged violation of NEPA is insufficient to constitute "irreparable injury" for purposes of issuing a preliminary injunction. *Sierra Club*, 990 F. Supp. 2d at 41 ("unproven procedural violation" of NEPA not sufficient for irreparable harm); *Monsanto*, 561 U.S. at 147–58 (procedural harm claims do not support injunctive relief).[28] For all these reasons, Plaintiffs fall far short of establishing any irreparable injury that would justify the drastic injunction they seek.

## III. The Balance Of Harms Weighs Decidedly Against An Injunction.

### A. An injunction will severely harm the City, Park District, and public interest.

A final reason for denying Plaintiffs' injunction is that it would cause severe harm to Defendants – and to the public as a whole – that far outweighs any impact to the three Plaintiffs

---

[28] Plaintiffs cite two cases on their theory of procedural harm. In *Brady Campaign to Prevent Gun Violence v. Salazar*, the Department of the Interior did not conduct *any* NEPA review for a rulemaking regarding visitor permissions to carry firearms in national parks. 612 F. Supp. 2d 1, 7 (D.D.C. 2009). In this case, in contrast, all federal agencies taking action conducted NEPA review. In *Fund for Animals v. Norton*, the U.S. Fish & Wildlife Service erred when it provided only a two-week comment period on a draft EA and failed to disclose pertinent information regarding impacts that would facilitate public participation. 281 F. Supp. 2d 209, 226–29 (D.D.C. 2003). By contrast, Plaintiffs here identify no such procedural flaws and Plaintiffs' declarants describe their own extensive involvement in federal and local processes dating back several years. *See* Franklin Decl. ¶ 4; Mitchell Decl. ¶ 6; Caplan Decl. ¶ 5.

who claim vague injury by alteration of Jackson Park. The Supreme Court has stressed "the importance" – even in an environmental case – of courts "assessing the balance of equities and the public interest in determining whether to grant a preliminary injunction." *Winter*, 555 U.S. at 26. The Seventh Circuit likewise has made clear that injunctions should be denied where "the balance of harms" favors government defendants. *Michigan*, 667 F.3d at 795–96. These equities weigh decidedly against an injunction.

First, an injunction would cause severe disruption to the schedule for an extremely significant and complex public construction project. As another judge in this District concluded previously, such delay causes significant harm that weighs against injunctive relief. In *Aircraft Owners & Pilots Association v. Hinson*, 96-cv-05793 ND Ill. (Sept. 27, 1996) (Gottschall, J.), *aff'd* 102 F.3d 1421 (7th Cir. 1996), attached as Ex. G, the court rejected a preliminary injunction that would have prevented the Park District from starting renovation work on Northerly Island. An injunction was improper because the work was part of "an extensive and temporally and financially integrated series of improvements to the lakefront," and an injunction would therefore "derail[]" a "series of expensive and complex projects." *Id.* at 40–41. *See also Wemhoff v. Bush*, 31 Fed. App'x 204, 205 (D.C. Cir. 2002) (delay to public project's "expeditious construction" weighed against injunction).

The situation here is the same. The long-planned Presidential Center campus and related transportation improvements in Jackson Park are complex interrelated endeavors. They involve careful coordination between the Foundation, City, and Park District, and are estimated to cost more than $800 million and take at least four years to construct. *See* Found. Resp. § III.C (describing Presidential Center's project costs of $700 million); *Protect Our Parks I*, 385 F. Supp. 3d at 674 (explaining City estimate of between $174-175 million for Jackson Park

transportation improvements).  Any delay in commencing this work will "derail" the ultimate plans for these extensive public works projects, as well as cause severe financial and operational harm to the Foundation in particular.  *See* Found. Resp. §§ III.A-C.

Such intrusive and disruptive construction delay is reason alone to deny an injunction, but a delay will also irreparably harm the public.  Most immediately, it will put on indefinite hold a much-needed economic jolt to the South Side that construction will bring.  During its construction phase, and in addition to the construction jobs themselves, the Presidential Center is estimated to give rise to approximately 1,407 jobs, $86 million in associated income, and a total of $339 million in economic impact to Chicago's South Side.  Fed. Ex. 17 (EA), App. I at 25, 31; Found. Resp. § IV.C.  *See also Protect Our Parks I*, 385 F. Supp. 3d at 674 (discussing broader economic benefits from Presidential Center).  The infusion of jobs and economic activity would begin as early as August, *see* Foundation Response § IV.C, and is sorely needed as soon as possible in the South Side, particularly because the community has been hard hit by the COVID pandemic.[29]  All of these immediate economic benefits to the South Side would be delayed if the Presidential Center cannot proceed in August.  *See Stand Up for California! v. U.S. Dep't of the Interior*, 919 F. Supp. 2d 51, 84 (D.D.C. 2013) (denying preliminary injunction that would "bring to a screeching halt" economic benefits to a community "in dire economic straits").

Breathing new economic life into the long-underinvested South Side neighborhoods near the Presidential Center is one of the City's most urgent priorities – as shown not only in the City's vigorous support of the Presidential Center itself, but also in the City's comprehensive economic development policies established in its 2019 Invest South/West initiative and its 2020

---

[29]  *See* Chicago Dept. of Public Health, COVID-19 Community Vulnerability Report at 14–15 (Jan. 25, 2021), https://www.environment.fhwa.dot.gov/legislation/nepa/guidance_preparing_env_documents.aspx.

Woodlawn Plan Consolidation Report.  Ex. A hereto, Cox. Decl. ¶¶ 9–11.  The Presidential

Center is a key component of the Woodlawn Plan in particular, as Jackson Park is in the

Woodlawn neighborhood.  *Id.* ¶ 9.  And as the plan observes, the Woodlawn community, in

which 38% of residents are below the poverty line, "is poised for transformational change" in

light of the anticipated investments to be made by the Foundation and others.  *Id.* ¶ 10.  But the

success of these policies depends on there being actual, tangible signs of progress on highly

visible projects.  *Id.* ¶¶ 8, 12-14.  Those signs provide assurance to private investors and

community members alike that change in the community is real and worthy of their time and

commitment – both of which are critical for overcoming the inertia that has dissuaded past

investment, and for sustaining broader, long-term economic development.  *Id.*  And there will be

no more tangible sign of a new day on the South Side than breaking ground on the Presidential

Center.  *Id.* ¶ 14.  But that crucial momentum will be lost if the project is enjoined.  Placing the

Presidential Center under a cloud of uncertainly at the exact time the City is emerging from the

pandemic will devastate public morale after the five-year wait for the Center.

An injunction, moreover, will delay all the benefits that the Presidential Center will bring

once it opens.  The campus will revitalize Jackson Park with an array of cultural and recreational

amenities and enhanced natural areas, anchored by a Presidential museum honoring the Nation's

first African-American President and First Lady that will inspire Chicagoans and visitors alike.

*See Protect Our Parks I*, 385 F. Supp. 3d at 669–70, 673–74; Mot. to Dismiss, Dkt. 29, at 5–10;

Ex. B hereto, Kelly Decl. ¶¶ 13–16.  Moreover, on an annual basis, the South Side is expected to

gain 2,175 jobs, $81 million in associated income, and $177 million in total economic impact

due to the Presidential Center's operations.  Fed. Ex. 17 (EA), App. I at 36.  *See also* Found.

Resp., § IV.C (discussing multitude of economic benefits provided by construction of Center).

The City also anticipates that the Presidential Center will spur the creation of new non-profit organizations and small businesses that will provide economic and community benefits to the neighborhood.  *See* Compl., Ex. 2 thereto (Operating Ordinance), at 85882; Ex. A hereto, Cox. Decl. ¶¶ 11–12.  And of critical importance to the South Side in particular, the Center's proximity to the Museum of Science and Industry, the University of Chicago, and the DuSable Museum of African American Art will further the 2012 Chicago Cultural Plan's vision of creating a vibrant Museum Campus on the South Side.  Fed. Ex. 10, App. I (DPD Study), at 15; Ex. B hereto, Kelly Decl. ¶¶ 8–10.  Any delay in these ultimate economic, cultural, recreational, and community benefits would irreparably harm the public, for there is no way to compensate them for the lost time during which they cannot enjoy the benefits.  *See Diginet, Inc. v. W. Union ATS, Inc.*, 958 F.2d 1388, 1394 (7th Cir. 1992) (public could not be made whole if the benefits from defendant's project were delayed because "they will never be compensated for the delay"); *Hinson*, Ex. G, at 42 (discussing "the public's interest in the speedy completion of the planned public park facilities on Northerly Island").

Finally, an injunction would cause irreparable harm to the City and Park District themselves by undermining their sovereign decisions to approve the use of their land for the Presidential Center.  Indeed, the City Council found that the Presidential Center in Jackson Park "is a great honor and unparalleled opportunity for the State of Illinois, all of the City, and especially the South Side," and that locating the Center in Jackson Park will "underscore the vital role the [Presidential Center] plays in the public life of Chicago and will encourage greater use and enjoyment of the park and lakefront."  Compl., Ex. 2.

Any interference in the City's and Park District's ability to execute upon this municipal vision causes them irreparable harm.  As *Hinson* observed when asked to enjoin the Park

District's Northerly Island plans, the "action of a court, which erroneously interferes with the governance decisions of the people's elected representatives, causes those representatives, and the public, irreparable injury, whether or not those elected officials' view of the public interest is correct." *Hinson*, Ex. G, at 41. *See also Hinson*, 102 F.3d at 1424. Indeed, as the Seventh Circuit has explained, "[w]hen the opposing party is the representative of the political branches of a government the court must consider that all judicial interference with a public program has the cost of diminishing the scope of democratic governance." *Ill. Bell Tel. Co. v. WorldCom Technologies, Inc.*, 157 F.3d 500, 503 (7th Cir. 1998). *Cf. Frank v. Walker*, 769 F.3d 494, 496 (7th Cir. 2014) (per curiam) (staying injunction against enforcement of law due to "the public interest in using laws enacted through the democratic process, until the laws' validity has been finally determined").

In short, any alleged injury to the few Plaintiffs here from construction of the Presidential Center pales in comparison to the severe irreparable harm to the thousands of people across the South Side and the City as a whole who will benefit from the Presidential Center starting as soon as possible. Nor is Plaintiffs' claimed harm remotely a basis for thwarting the City and Park District from implementing an extensively vetted public works project that has been years in the making. Plaintiffs characterize the injury from an injunction as nothing more than a few weeks or months of delay, Mem. at 37, but that myopic focus on calendar dates ignores the very real and widespread logistical, economic, and social harms that delay will cause.

### B. Plaintiffs' appeal to the public interest rings hollow.

Despite the broad public support for the Presidential Center, Plaintiffs argue that *stopping* the project serves the public interest because the public has an interest in seeing that the federal agencies comply with their statutory mandates. Mem. at 38–39. This argument has two flaws. First, it merges the likelihood of success on the merits factor with the public interest factor,

because it assumes that a statutory violation automatically means that the project is against the public interest. But the Supreme Court and Seventh Circuit have mandated that courts are to separately assess injury to the public apart from any alleged statutory violation. *See supra* at 8 (discussing *Winter*, 555 U.S. at 24). Indeed, the Supreme Court has expressly instructed that courts are not to "presume that an injunction is the proper remedy for a NEPA violation," *Monsanto*, 561 U.S. at 157, as has the Seventh Circuit, *see Wisconsin v. Weinberger*, 745 F.2d 412, 428 (7th Cir. 1984) (rejecting the idea that NEPA "presumes" that injunctions should issue simply from a violation of the statute). As the Seventh Circuit explained in *Wisconsin*, where it reversed a preliminary injunction in a NEPA case, "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law." 745 F.2d at 425 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982)). "Although the goal of NEPA is to force agencies to consider the environmental consequences of major federal actions, that goal is not to be achieved at the expense of a total disregard for countervailing public interests." *Id.* at 426 (internal citations omitted). Plaintiffs cite no Supreme Court or Seventh Circuit precedent to the contrary.[30] In fact, even *Foundation on Economic Trends v. Heckler*, cited by Plaintiffs,

---

[30] All of Plaintiffs' cases are out of circuit, and most of them do not support the proposition that a statutory violation, alone, means that the public interest would be harmed. For instance, *Foundation on Economic Trends v. Heckler*, 56 F.2d 143 (D.C. Cir. 1985), did not address the public interest factor at all. And in *National Wildlife Federation v. Burford*, 835 F.2d 305, 326 (D.C. Cir. 1987), the public interest weighed in favor of an injunction not simply because a statute was allegedly violated, but because the program at issue lifted development restrictions on approximately 180 million acres of federal land in seventeen states. *In re: Medicare Reimbursement Litigation*, 309 F. Supp. 2d 89 (D.D.C. 2004), was not an environmental case but instead addressed the amount of reimbursements due to hospitals under the federal Medicare program. Nor did it involve a preliminary injunction, but rather a request for mandamus. *Jacksonville Port Authority v. Adams*, 556 F.2d 52 (D.C. Cir. 1977), also was not an environmental case, but addressed airport funding decisions under a federal program.

recognized that the equities need to be balanced even if injury can be said to occur from the mere violation of NEPA – and the "balancing of this harm against other factors is necessarily particularized." *Heckler*, 756 F.2d at 157.[31]

Second, it is uniquely shortsighted in this case to assume that the public is harmed by a statutory violation, because the federal statues are not the sole embodiment of public interests. This case involves the decisions made by the City Council and the Park District, the governmental bodies closest to the people of Chicago and who most accurately reflect the public's wishes here. *See Hinson*, at 41 (the "public officials who run the City and the Park District have made governance decisions which presumably are, in their view, in the public interest"). Unlike the general procedural requirements in the federal statutes, which do not (and cannot) speak to whether any particular project should proceed, the City and Park District decided to approve the projects at issue here after broad public input by the very group – the people of Chicago – that stands to benefit or lose the most from the Presidential Center moving forward. Only after this process ran its course did the public, through their representatives in Chicago government, decide that the benefits of the Center outweigh any changes it will make to Jackson Park. To upset that decision would be against the public's express interest and desire that the Presidential Center proceed.[32]

---

[31] In the course of balancing the equities in *Hinson*, the court remarked that "if the plaintiffs are right that the FAA failed in its obligations under NEPA, the public interest would favor an injunction." *Hinson*, at 42. That statement does not support the proposition that an injunction may issue simply because there is a purported NEPA violation. For one, the harm to the defendants and the public interest from granting an injunction would still need to be considered and balanced – something that the *Hinson* court expressly did. *See id.* at 41–42. Indeed, to the extent that the statement would be read as allowing an injunction based only on a purported statutory violation, it is not good law in light of *Monsanto*, *Winter* and *Wisconsin*. Further, the statement is *dicta*, because the court found that there was not a likelihood of success as to the NEPA claim in that case. *See id.* at 37, 43.

[32] In arguing that an injunction is in the public interest, Plaintiffs rely primarily on *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978 (8th Cir. 2011). But *Sierra Club* is easily distinguished. In *Sierra*

Plaintiffs therefore miss the mark in arguing that environmental interests normally outweigh "a project proponent's financial interests." Mot. at 38. Not only is this statement incorrect, *see, e.g.*, *Sierra Club v. Bostick*, 539 Fed. Appx. 885, 891–92 (10th Cir. 2013) (discussing cases), but regardless of the financial injury to the Foundation – which in all events would be severe, *see* Foundation Response, § III.C – an injunction would cause irreparable harm to the *public* and the *City and Park District*, as described above.

For these reasons, Plaintiffs' equitable balancing cases are distinguishable, because they did not address the kinds of public and local governmental harms that an injunction would cause in this case. Unlike the typical situation in plaintiffs' cases, the question here is not whether to enjoin a private power plant or mining operation from being built on a sensitive environmental or cultural site.[33] The Presidential Center, rather, is a campus of public cultural and recreational enhancements being made in an urban park – a park that is already the site of similar facilities and has been built upon and altered from its inception while retaining its historic integrity. *See*

---

*Club*, there was "one huge equity" that weighed in favor of an injunction: the developer began construction before the necessary federal permit had issued. *Id.* at 996. Here, in contrast, the City and Park District have patiently waited for years for the federal review process to run its course. In addition, as the case came to the appellate court in *Sierra Club*, no body charged with representing the public was opposed to the injunction. *See id.* at 997. Here, of course, the City and Park District vehemently oppose an injunction due to the harm to the public that an injunction would cause. Last, in *Sierra Club*, the developer offered only "bare assertions" that an injunction would jeopardize jobs and deprive the region of a needed supply of electricity. *Id.* at 997. Here, in contrast, there is ample evidence that delaying construction of the Presidential Center will jeopardize jobs, and there is no question that the Center will otherwise benefit the public by providing important amenities and features that do not currently exist in the South Side. *Sierra Club* therefore lends no support to Plaintiffs.

[33] *See Quechan Tribe of Fort Yuma v. U.S. Dep't of the Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010) (power plant project on land containing prehistoric Native American settlements and burial sites); *South Fork Band Council of Western Shoshone of Nevada v. U.S. Dep't of the Interior*, 588 F.3d 718 (9th Cir. 2009) (private mining operation on and near a sacred tribal site that could lead to air and water pollution). And *Citizens to Protect Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971), was not a preliminary injunction case at all. It addressed only the merits questions whether a section 4(f) decision is subject to review under the Administrative Procedure Act, and what standard of review applies to such a decision.

*supra*, at 4.  It is a project that has the emphatic backing of the people of Chicago, as expressed through their local representative bodies who (unlike the federal agencies) were actually charged with weighing the project's ultimate benefits and costs.  They decided that the Presidential Center should proceed because it is overwhelmingly in their interest – it will provide a once-in-a-lifetime array of cultural, educational, and recreational benefits while revitalizing one of the City' signature public parks and driving broader economic and community development on the South Side.  The public interest emphatically favors construction beginning without delay.

## CONCLUSION

For all of the above reasons, Plaintiffs' motion for preliminary injunction should be denied.

Date:  July 15, 2021

*Respectfully submitted,*

CELIA MEZA
Corporation Counsel for the City of Chicago

By: /s/ *Joseph P. Roddy*

Richard W. Burke
Joseph P. Roddy
Elisabeth Meyer Pall
BURKE, WARREN, MACKAY &
SERRITELLA, P.C.
330 North Wabash Avenue, Suite 2100
Chicago, Illinois 60611
(312) 840-7000
rburkesr@burkelaw.com
jroddy@burkelaw.com
epall@burkelaw.com

*Attorneys for Defendant Chicago Park District*

By: /s/ *Andrew W. Worseck*

John Hendricks
Deputy Corporation Counsel
Andrew W. Worseck
Chief Assistant Corporation Counsel
City of Chicago, Department of Law
Constitutional and Commercial Litigation
Division
2 North LaSalle Street, Suite 520
Chicago, Illinois 60602
(312) 744-6975 / 4-7129
john.hendricks@cityofchicago.org
anderw.worseck@cityofchicago.org

By: /s/ *Ann D. Navaro*

Ann D. Navaro
Kevin A. Ewing
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, D.C. 20036
(202) 828-5800
ann.navaro@bracewell.com
kevin.ewing@bracewell.com

*Attorneys for Defendant City of Chicago*

## CERTIFICATE OF SERVICE

I, Andrew W. Worseck, an attorney, hereby certify that on this day, the 15th of July, 2021, I caused copies of **Defendants the City of Chicago and the Chicago Park District's Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction** to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois using the CM/ECF system, which will send notification of such filing to all parties that have appeared in this action.

*/s/ Andrew W. Worseck*