**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PROTECT OUR PARKS, INC., *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 21 CV 2006 |
| | ) | |
| PETE BUTTIGIEG, | ) | Judge John Robert Blakey |
| SECRETARY OF THE U.S. | ) | |
| DEPARTMENT OF TRANSPORTATION, | ) | |
| *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

\\

Richard A. Epstein
16 Thomas Place
Norwalk CT 06853
raepstein43@gmail.com

Michael Rachlis
RACHLIS DUFF & PEEL, LLC
542 South Dearborn, Suite 900
Chicago, IL  60605
(312) 733-3950
mrachlis@rdaplaw.net


*Attorneys for Plaintiffs*

## Table of Contents

Table of Authorities ......................................................................................................... iii

RELEVANT BACKGROUND ..........................................................................................2

    I.   Jackson Park And The Obama Presidential Center .................................................2

    II.  The Municipal Process And Failures Of Diligence And Excessive Delegation......4

    III. Plaintiffs' State Law Claims Are Not A Rehash Or Resolved By *POP I*...............8

ARGUMENT .....................................................................................................................9

    I.      Plaintiffs State A Claim For Violation Of The Public Trust Doctrine, And Authorization Under The Museum Act, Or Any Other Argument Presented By Defendants, Does Not Exempt The OPC From The Specific Requirements Of The Public Trust Doctrine (Count VI) ........................................................................10

         A.  Simple legislative authorization never satisfies the requisites of the public trust doctrine, no matter what kind of trust property is involved..............10

         B.  Subsequent Illinois decisions confirm that Plaintiffs have stated a claim that constructing the OPC in Jackson Park violates the public trust doctrine ..21

    II.     The "Use" Agreement Between The City And The Obama Foundation Is A Sham Transaction That Transfers Virtually Full Ownership To The Obama Foundation In Violation Of The Public Trust Doctrine ................................................................24

    III.   Plaintiffs Have Stated A Claim For Improper Delegation (Count XI) .................27

    IV.   Plaintiffs' Alternative Claim For Review Under The Illinois State Historic Preservation Act Is Not Properly Subject To Dismissal (Count XV)....................31

    V.    Plaintiffs State A Claim For State Due Process Rights Which Cannot Be Resolved On Defendants' Motion To Dismiss (Count XII) ...................................................32

    VI.   Plaintiffs State A Claim For Violation Of Special Privileges And Irrevocable Grant Clause Of The Illinois Constitution (Count XIII)...................................................34

    VII.  Plaintiffs State An Ultra Vires Claim Which Is Not Properly Resolved On A Motion To Dismiss (Count VII) .........................................................................................35

i

VIII.    Plaintiffs State A Claim For Violation Of State Law Takings, Which Is Not Barred By The Decision Of The Seventh Circuit in *POP II* ..............................................36

IX.    Plaintiffs State A Claim For Violation Of Article VIII, Section I, Which Cannot Be Resolved On A Motion To Dismiss (Count VIII) .................................................38

CONCLUSION.......................................................................................................................39

## Table of Authorities

*1550 MP Road LLC v. Teamsters Local Union No. 700,*
2019 IL 123046 (Ill. March 21, 2019) .................................................................35

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .............................................................................................9

*Branigar v. Village of Riverdale,*
396 Ill. 534 (Ill. 1957) .......................................................................................35

*Brodner v. City of Elgin*,
420 N.E.2d 1176 (Ill. Ct. App. 1981) ...............................................................28

*Burgess v. M/V Tamano,*
370 F. Supp. 247 (D. Me. 1973) ...................................................................18, 19

*Carlson v. City of Fremont, Dodge County,*
180 Neb. 262 (1966) ......................................................................................18 n.5

*Carter v. Carter Coal Co.,*
298 U.S. 238 (1936) ...........................................................................................29

*City of Cincinnati v. The Lessee of White,*
31 U.S. 431 (1832) .......................................................................................20, 37

*City of Madison v. State,*
83 N.W. 2d 674 (Wis. 1957) .......................................................................... 14-15

*Corliss v. Bowers,*
281 U.S. 376 (1930) ...........................................................................................26

*Dept. of Transp. v. Assoc. of American Railroads,*
575 U.S. 43 (2015) .............................................................................................29

*Doane v. Lake Street Elevated Railroad Co.,*
165 Ill. 510 (1896) .......................................................................................19 n.5

*Douglass v. City Council of Montgomery,*
24 So. 745 (Ala. 1898) .................................................................................. 19-20

*Droste v. Kerner,*
217 N.E. 2d 73 (1966).........................................................................................17

iii

*E & E Hauling, Inc. v. Pollution Control Board,*
    451 N.E.2d 555 (1983)................................................................33

*E & E Hauling, Inc. v. Pollution Control Board,*
    481 N.E.2d 664 (1985)................................................................33

*Fielding v. Board of Education of Paterson*,
    76 N.J. Super. 50 (1962)........................................................18 n.5

*Friends of the Parks v. The Chicago Park District*,
    786 N.E.2d 161 (Ill. 2003)..........................................................26

*Friends of the Parks v. The Chicago Park District* (*Lucas*),
    2015 WL 1188615 (N.D. Ill. March 15, 2015) ............................ 24-25

*Hampton v. Metro. Water Reclamation Dist. of Greater Chicago*,
    57 N.E.3d 1229 (Ill. 2016) ....................................................... 36-37

*Homola v. Miles,*
    1995 WL 309627 (7th Cir. May 18, 1995) ...........................................8

*Horn v. City of Chicago*,
    403 Ill. 549 (1949) ...............................................................19 n.5

*Illinois Cent. R. Co. v. State of Ill.,*
    146 U.S. 387 (1892)..................................................................25

*Illinois Cent. R. Co. v. City of Chicago,*
    50 N.E. 1104 (Ill. 1898)..............................................................21

*Kelo v. City of New London,*
    545 U.S. 469 (2005)............................................................. 37-38

*Lake Michigan Federation v. U.S. Army Corps of Engineers,*
    742 F. Supp. 441 (D. Ill 1990) ................................................ 21-23

*Landmarks Illinois v. Rock Island County Board,*
    2020 Ill. App. (3d) 190159 ..........................................................32

*La Salle Nat. Trust, N.A. v. Village of Westmont,*
    636 N.E.2d 1157 (Ill. Ct. App. 1994) ........................................ 28-29

iv

*Latham v. Board of Education of the City of Chicago,*
  31 Ill. 2d 178 (1964) ................................................................................................ 29-30

*McCormick Harvesting Machine Co. v. Aultman & Co.,*
  169 U.S. 606 (1898) ....................................................................................................... 14

*Microsoft Corp. v. DAK Indus.,*
  66 F.3d 1091 (9th Cir. 1995) ......................................................................................... 27

*Milhau v. Sharp,*
  15 Barb. 193 (N.Y. Gen Term 1853) ...................................................................... 11-12

*Paepcke* v. *Public Bldg. Comm'n of Chicago,*
  263 N.E.2d 11 (Ill. 1970) ................................................. 13-19, 21, 22, 24, 34, 37

*People ex rel. Chicago Dryer Co. v. City of Chicago,*
  109 N.E.2d 201 (1952) ............................................................................................ 28, 29

*People ex rel. Scott v. Chicago Park District,*
  360 N.E.2d 773 (Ill. 1976) ................................................................. 10-11, 13, 21

*People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove,*
  157 N.E.2d 33 (Ill. 1959) ............................................................................................... 29

*Petersen v. Chicago Plan Commission,*
  302 Ill. App. 3d 461 (Ill. App. 1998) ............................................................................ 33

*Pierce v. Pierce,*
  351 Ill. App. 336 (Ill. App. 1953) ................................................................................. 25

*Protect Our Parks, Inc. v. Chicago Park Dist.,*
  385 F. Supp. 3d 662 (N.D. Ill. 2019) (*POP I*) ..................... 1, 3, 8, 9, 10, 12, 13, 15, 22-23, 38

*Protect Our Parks, Inc. v. Chicago Park Dist.*
  971 F.3d 722 (7th Cir. 2020) (*POP II*) ................................................................. 1, 15, 36

*Reichelderfer v. Quinn,*
  287 U.S. 315 (1932) ........................................................................................................ 19

*South Park Comm'rs v. Montgomery Ward & Co.,*
  93 N.E. 910 (1910) ......................................................................................................... 17

*Southwestern Illinois Development Authority v. National City Environmental, LLC,*
  768 N.E.2d 1 (Ill. 2002) ...................................................................................................38

*Stetson v. Chicago and Evanston Railroad Co.,*
  75 Ill. 74 (1874) .....................................................................................................19 n.5

*Stevens v. Mayor and Council of City of Vinita,*
  315 P.2d 776 (Okl. 1957)........................................................................................19 n.5

*Swanson v. Citibank, N.A.,*
  614 F.3d 400 (7th Cir. 2010) ................................................................................... 9-10

*Thayer v. City of Boston,*
  206 F. 969 (D. Mass. 1913) ...................................................................................18 n.5

*Town of Castle Rock v. Gonzales,*
  545 U.S. 748 (2005).....................................................................................................36

*Wisconsin v. Public Service Commission,*
  81 N.W.2d 71 (Wis. 1957) ..................................................................................... 14-15

*Yellow Cab Co. v. City of Chicago,*
  23 Ill.2d 453, 178 N.E.2d 330 (1961) .......................................................................33

## Other Authorities

16 U.S.C. § 470a *et seq.* (National Historic Preservation Act).......................................7

16 U.S.C. § 470f (Section 106 of the National Historic Preservation Act) ............................ 31-32

42 U.S.C. § 4321 et seq (National Environmental Policy Act) .......................................7

54 U.S.C. §§ 200501-200511 (Urban Park and Recreation Recovery Act ("UPARR"))..............35

Fed. R. Civ. P. 12 ........................................................................................2, 24, 27, 35, 38

Fed. R. Civ. P. 12(b)(6)...........................................................................................*Passim*

Fed R. Evid. 201(b).......................................................................................................2

Ill. Const. 1970, art. I, § 15 .....................................................................................34, 36

Ill. Const. 1970, art. VIII, § 1 ...................................................................................................38

20 ILCS 3410/ (Illinois State Historic Preservation Act) ..........................................................31

20 ILCS 3420/1, *et seq*. (Illinois State Agency Historic Resources Preservation Act) ...............31

20 ILCS 3420/4(d) ....................................................................................................................32

20 ILCS 3420/4(g) .............................................................................................................. 31-32

Restatement (Second) Torts § 821B (1979) ...............................................................................19

Private Laws, 1869, vol. 1 .....................................................................................................4, 13

Richard A. Epstein, *The Public Trust Doctrine*, 7 Cato Journal 411 (1987) ................................13

Joseph D. Kearney & Thomas W. Merrill, Lakefront: Public Trust and Private Rights in Chicago, ch. 3 (Cornell University Press 2021) ........................................................................17

Robert G. Natelson, *Legal Origins of the Necessary and Proper Clause,* 57-60, *in* Gary Lawson et al.*,* The Origins of the Necessary and Proper Clause (2010) ...........................................12

Robert G. Natelson, *The Constitution and the Public Trust,* 52 Buff. L. Rev. 1077 (2004) ........12

Joseph Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471 (1970) ....................................................................................................11

Wright & Miller, *Federal Practice and Procedure*, Section 1357 (3d Ed. 2021) ..........................9

On June 15, 2021, the Defendants filed a motion to dismiss the Plaintiffs' various state law claims (Defendants' supporting brief referred to hereafter as "Br. __") challenging the Defendants' plans to build the Obama Presidential Center (OPC) in Jackson Park. The Plaintiffs alleged *inter alia,* that the Barack Obama Foundation's (the "Foundation's") agreement with the City of Chicago and Chicago Park District (collectively the "City") violates a number of vital state law doctrines, including the public trust doctrine, the nondelegation doctrine, and various protections under the Illinois state constitution.  Defendants' Rule 12(b)(6) motion relies heavily on the proposition that this matter is the same as a prior action brought by Protect Our Parks and other individuals, which was resolved against those plaintiffs and therefore should dictate the same result here.  That however is an inaccurate representation of both the prior action and this new action.

As to the prior action, that action involved different plaintiffs (other than Protect our Parks), different defendants (other than the City), and largely different claims as they did not involve the federal claims raised herein.  As to the state law claims raised in the prior action, the Seventh Circuit determined that for purposes of that complaint, there was no subject matter jurisdiction the plaintiffs' state law claims raised therein, and reversed this Court's rulings on summary judgment. *See*, *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 738 (7th Cir. 2020).  Having made that determination, the prior dismissal was not on the merits; the underlying statements of this Court relative to such claims are a nullity.

As to the matter at bar, this action makes new and <u>never before brought</u> challenges to various federal reviews and actions, including many that were not even completed until after *Protect Our Parks, Inc. v. Chicago Park Dist.*, 385 F. Supp. 3d 662, 674 (N.D. Ill. 2019) (POP I) was handed down in June 2019.  Plaintiffs' complaint also raises new and different state law claims.  But even as to the two claims—public trust and ultra vires—that have similarity to claims

previously raised, the current complaint highlights their different facts and larger contexts, including new federal claims that set the stage for the state law claims. As further discussed below, Defendants' effort here to brush aside Plaintiffs' claims at that stage is not warranted under Rule 12 in light of the allegations set forth in the Complaint (and reasonable inferences from such allegations) and the applicable law. The Defendants' motion to dismiss should be denied.

## RELEVANT BACKGROUND

**I.    Jackson Park And The Obama Presidential Center.**

Defendants' Motion declares that "the Obama Presidential Center is "a worthy use of a small piece of Jackson Park," Br. at 1, and further that the "[t]he Presidential Center will sit on a narrow sliver of the western edge of Jackson Park, occupying only 3.5% of the park's 551.52 acres." (Br. at 7) Their short summary contains many material misstatements and omissions.

The proposed plan for Jackson Park requires at a minimum building the OPC on 19.3 acres of public land that the Foundation will receive under a 99-year "use agreement," which, as further discussed *infra* (Argument, Section II), just relabels the initial 99-year lease arrangement between the City and the Foundation proposed in 2015.

The Defendants proffer the seductive 3.5 percent figure (19.3 acres divided by 551.52) as the land in Jackson Park dedicated to the OPC. As a factual matter that number describes neither the scope of the OPC construction effort nor its area of direct impact. Accordingly, these measurements are not facts for which judicial notice can be taken, and thus preclude reliance upon such matters for purposes of a motion to dismiss. *See* FRE 201(b) (noting that a court may only take judicial notice of a fact "*not* subject to reasonable dispute" when it is "generally known within the trial court's territorial jurisdiction" or "can be accurately or readily determined from sources whose accuracy cannot reasonably be questioned.").

These factual disagreements start from the simple fact that about half of Jackson Park is water, including the nearby West Lagoon. Additional amounts are already dedicated to a golf course and the Museum of Science and Industry.[1] At this point, the OPC gobbles up far more of Jackson Park, when measured against a smaller, corrected base, which is between one-third and one-half of the total acreage of Jackson Park. Accordingly, that 3.5 percent figures leaps to anywhere between 7 to 10 % of Jackson Park.

In addition, further adjustments are needed because the proposed roadwork on Lake Shore Drive and Stony Island Avenue takes up to about 11 acres of the remaining land. The total acreage devoted to the OPC rises to about 30 acres, driving the figure over 16% percent the OPC of the available land inside Jackson Park. To that figure must be added the acreage lost from the ripping up of Cornell Drive, the closing of the Midway Plaisance going east, and the restructuring Hayes and Marquette Avenues, further contradicting the figures relied upon by the Defendants. (Complaint, ¶ 79; *see also* Counts I, II & IV (discussing roadway issues) In addition, the Defendants wrongly include some 4.7 acres of "new" parkland as a benefit from the OPC, even though those lands come from the destruction of the "hardscape" of Cornell Drive, which is an essential part of the original Olmsted design (*POP I* at 674) and already considered parkland. Plaintiffs further allege the destruction of the 30 acres worth of mature trees accounted for in the figures advanced by the Defendants. (*Id.,* ¶¶ 164-66). None of this takes into account the overall impacts to the Park that make the acreage lost far greater. Indeed, even the faulty federal reviews performed recognized broad adverse effects upon on the entirety of Jackson Park, the Midway Plaisance and other areas in numerous ways, whether it be the historic roads, the viewsheds, the topography, vegetation – the park as a whole. (Complaint, ¶¶ 77-79 & Ex. 4 at 30-32) These

---

[1] *See* Docket No. 31, Ex.2 (Declaration of W.J.T. Mitchell, ¶ 7)

specific lands and waters are among the most used and traveled in the park so the percentage of *value* lost is significantly greater than an acreage numbers suggest.

Moreover, to build on that "narrow sliver," the OPC will require extensive underground pilons and other support, which acts to compromise both the nearby land, especially after the trees are clear-cut, and perhaps impinge on the West Lagoon—all relevant environmental risks whose nature has yet to be specified or defended, and for which the taxpayers are responsible. This is a significant issue in light of facts that Lake Michigan levels have been experiencing great change, wreaking havoc along the shoreline were the OPC is being proposed: "A clash between elemental forces – sun rain, heat and ice – is what is threatening to upend centuries of relative stability along the Great Lakes' 10,000 miles of shoreline, including the 22 miles that define Chicago's eastern edge," including Jackson Park. Dan Egan, "The Climate Crisis Haunts Chicago's Future. A Battle Between a Great City and a Great Lake," https://www.nytimes.com/interactive/2021/07/07/climate/chicago-river-lake-michigan.html

## II.     The Municipal Process And Failures Of Diligence And Excessive Delegation.

Jackson Park was dedicated by a specific land grant from the Illinois legislature in 1869 to Park Commissioners, placing it in public trust. (Complaint, ¶¶ 37, 226) The Illinois General Assembly deeded the real estate comprising Jackson Park to what would become the Defendant Chicago Park District. Such grant is subject to restrictions in perpetuity on the purposes for which the property may be used, as the grant expressly provided that the demised property "shall be held, managed and controlled by [the Commissioners] and their successors as a public park, for the recreation, health and benefit of the public, and free to all persons forever." Private Laws, 1869, vol. 1, p. 360; *see* Complaint, ¶¶ 37, 226.

Despite the express and protective grant, in the 2014 and 2015 time period, the Foundation began focusing on choosing a location for what was originally a proposed presidential library. Defendants City of Chicago and Park District gave free rein to the Foundation as to how to proceed in developing that presidential library:

> WHEREAS, While the City Council is **confident** in the quality and thoroughness of both UIC's and UChicago's proposals, ***the City defers to the sound judgment of the President and his Foundation as to the ultimate location of the Presidential Library.*** (Emphasis supplied)

(Complaint, ¶¶ 45, 256)   And so the choice of land for the purported presidential library was to be made exclusively by the Foundation, which would dictate its demands to the City solely to advance its interests even though the property at issue belonged to the public.

And that is precisely what transpired.  Effectively being in a position to do what it wants, where it wants and how it wants, the Foundation dictated that Jackson Park would be the location where the OPC campus (*no longer* a library as of 2016) would be placed.  Pursuant to plan, the Foundation demanded extraordinary changes and destructive elements to Jackson Park, its environment, and surrounding.  For example, and as the City Council acknowledged, it was the Foundation's plans and demands regarding the placement and design of the OPC. Those decisions utterly destroyed the Midway Plaisance, and cut out the heart of Olmsted's Jackson Park by closing Cornell Drive (creating massive traffic disruption and dislocation): "***the Foundation has proposed shifting the boundaries of the Original Site to the north and east to incorporate portions of the Midway Plaisance and Cornell Drive, and CDOT has proposed closing these and additional road segments within the park.***" (Emphasis supplied.) (Complaint, ¶ 66)  If this were not enough, the Foundation's plan appropriated specially designated recreational land in Jackson Park for private non-recreational use, land protected by the Urban Park and Recreation Recovery Act; under such circumstances, new recreational space is to be located and designated as replacement land.

5

(Complaint, ¶¶ 188-190)  In this regard, the 2018 Ordinance peremptorily and in predetermined fashion ordained the eastern end of the Midway Plaisance as replacement parkland solely to accommodate the Foundation's decision to construct the OPC in Jackson Park.  (*Id.*)  Once again discovery in regards to how that recreational area was selected, when and why all create factual disputes.  Similarly, the expansion of Stony Island and Lake Shore Drive is necessitated by locating the OPC in Jackson Park, thereby leading to the major road closures and the conduct of other destructive activities in Jackson Park; indeed, those road closures necessitated by the OPC are precisely the reason why the road expansions are being implemented:  "The need for the FHWA action arises as a result of changes in travel patterns caused by the closed roadways."  (Complaint, Ex. 10 at 12)

At every juncture, the City rubber-stamped the actions and demands of the Foundation.  To that point, the City performed no due diligence about the project before it was selected by the Foundation.  The City undertook no systematic planning work to identify and locate the most beneficial and appropriate location for such a project even though the OPC was being proposed to be built on public, not private, land owned by the Foundation.   And so the City failed to prepare any report that ever considered or suggested means to address negative aspects from choosing Jackson Park, such as road closings, disrupted traffic patterns, the mass destruction of mature trees, and the adverse impact of the new construction on the visual, operational, and historic integrity of Jackson Park, or its environment.  Nor did it address any of the environmental issues raised by the massive footprint of the OPC. (*See* Complaint, ¶¶ 46-47; 52-53)

The Defendants extol various hearings which they proclaim supplied "extensive review and approval involving multiple public bodies and public hearings."  (Br. at 7)  But these gestures were superficial, and their approval of the OPC preordained.  The "extensive" hearings cited

6

totaled a precious few – all themselves irregular given the improper delegation described above – that were riddled with a collection of boilerplate and conclusory statements designed to validate the predetermined outcome originally set forth in the 2015 Ordinance.

However, even these pre-determined and rubber-stamped proceedings recognized that their determinations were vulnerable to attack from the looming federal reviews. To that point, the approvals from the City expressly provided that they were "subject to continuing review under the National Environmental Policy Act and the National Historic Preservation Act." (*See* Ex. 1 (excerpt of resolution from Chicago Department of Planning)) And so the City – despite being the applicant for the federal reviews – proceeded to act as a judge in its own cause as it controlled meetings and information held and reviewed as part of the federal review process, starting in December 2017. (Complaint, ¶¶ 74-76, 81) Indeed, its authoritarian overreach was instantly apparent in a meeting on August 5, 2019, where after significant concerns were raised from the floor about the constant effort to avoid addressing these adverse concerns, the leader of the discussion – a city official – shut down all further public discussion that might well have considered alternatives to Jackson Park for the siting of the OPC. (Complaint, ¶ 81 & Ex. 5)

This manipulation of the process and timing continued apace as the COVID-19 pandemic wrought havoc throughout the City and the World. Specifically, after the August 2019 meeting, no further meeting regarding the federal reviews was scheduled until May 2020 when individuals and groups were locked under stay-at-home orders. Indeed, it is beyond coincidence that while the City and nation were gripped with efforts to work through the pandemic, the largest number of meetings were scheduled and reports issued[2] – including an in-person meeting at a South Side

---

[2] As reported on the City's website (https://www.chicago.gov/city/en/depts/dcd/supp_info/jackson-park-improvements.html) in regards to the meetings and reports issued within the federal review process, those included: (i) April 2020 – issuance of draft Section 4(f) reports; (ii) May 6, 2020 – "meeting" controlled by the City about resolution of adverse effects; (iii) May 20, 2020 – a second meeting controlled by the

7

location on October 15, 2021 just as local citizens were being encouraged to stay home. Put differently, even though Defendants have suggested that a lengthy, extensive, and constitutional process was followed, in fact, virtually the entire record on behalf of the OPC was being developed and completed at the height of the pandemic – all under the City's thumb. (Complaint, ¶¶ 74, 252, 253, 263)

### III.     Plaintiffs' State Law Claims Are Not A Rehash Or Resolved By *POP I.*

The Defendants characterize the state law claims as a "rehash" of earlier arguments that have been rejected by this Court in its earlier decision on this matter in *POP I.* They cite *Homola v. Miles,* 1995 WL 309627 (7th Cir. May 18, 1995), a simple garnishment action, for the proposition that that the reasoning in an earlier decision should be normally followed by the second court when the claim is dismissed for want of jurisdiction. But *Homola* also stated in no uncertain terms that "A dismissal without prejudice does not operate as an adjudication upon the merits, and does not have res judicata effect." 1995 WL 309627 at *2.

Separately, while some issues and some parties overlap the earlier case, much has changed in the two years since the initial decision of this Court in June, 2019. Indeed, those federal reviews are at the heart of this new action and provide important new information and context for this new suit (which involves new plaintiffs and new defendants, including the Obama Foundation), as well as a host of other reports and information including but not limited to the publication of a report entitled "Assessment of Effects to Historic Properties" (Complaint Ex. 4), published in July 2019,

---

City about resolution of adverse effects (comments due May 26, 2020); (iv) July 2020 – MOA issued; (v) July 2020 – meeting on MOA; (vi) September 28, 2020 – Environmental Assessment issued requesting comments; (vii) October 13, 14, and 15, 2020 – meetings regarding EA including in person; (viii) October 30, 2020 – meeting regarding MOA; (ix) November 2020 – MOA Issued; (x) Section 4(f) report issued; (xi) FONSI issued.

which identified many adverse events that the construction of the OPC would have on the physical integrity and cultural heritage of Jackson Park. These include the height and location of the OPC, the closure of various roads, the clear-cutting of mature trees, and the destruction of the viewshed and distinctive ambience of the original Frederick Law Olmsted design for Jackson Park. [*Id.*] Furthermore, other meetings have occurred in the federal review process through which the City (and therefore the Foundation) have skewed those meetings and the resulting work product. These further inform and contextualize the state law claims and their basis, including, *inter alia,* the discussion of the public trust doctrine (Argument Section I, *infra*) below, which demonstrate the distinction for submerged lands, formerly submerged lands, and never submerged lands is unsupported as a theoretical and doctrinal matter. Accordingly, to the extent there is overlap, a fresh look is urgently needed of *POP* I, which the Plaintiffs will show contains systematic and pervasive mistakes that undermine the Defendant's motion to dismiss and brief in support under Fed. R. Civ. P. 12(b)(6).

## ARGUMENT

It is well recognized that "the question on a motion to dismiss under Rule 12(b)(6) is whether in the light most favorable to the plaintiff and with every doubt resolved in the pleader's favor—but disregarding mere conclusory statements—the complaint states any legally cognizable claim for relief. If the answer to the question is in the affirmative, the motion to dismiss must be denied and the action should be permitted to continue." Wright & Miller, *Federal Practice and Procedure*, Section 1357 (3d Ed. 2021). A Rule 12 (b)(6) motion cannot be used to resolve factual disputes or the merits of a dispute. Dismissal is only appropriate when Plaintiffs have not provided fair notice of their claims and factual allegations that – when accepted as true – are plausible. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Under these standards, the motion to dismiss must be denied because the "plaintiff [has provided] enough details about the subject-matter of the case

to present a story that holds together." *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010) (reversing in part grant of Rule 12(b)(6) motion).

**I.**    **Plaintiffs State A Claim For Violation Of The Public Trust Doctrine, And Authorization Under The Museum Act, Or Any Other Argument Presented By Defendants, Does Not Exempt The OPC From The Specific Requirements Of The Public Trust Doctrine. (Count VI)**

A close reading of Defendants' motion reveals that they do not truly contest that Plaintiffs have actually stated a claim for a public trust violation; for example, they do not contest that public trust property is at issue here, and they do not contest that Plaintiffs have alleged a transfer of such public trust property to a private party without proper diligence and at the insistence and for the benefit of that private party. Instead, the motion is clearly based on an effort to resolve facts and the merits at this stage, which is simply not permissible under a Rule 12(b)(6) motion. Furthermore, discovery on the public trust issues is necessary, particularly in light of the various work performed in the federal reviews which detail more information regarding the transfers and impacts upon the public that further demonstrate the public trust violation. That said, Plaintiffs will address and explain the weaknesses of Defendants' arguments raised in their motion.

   *A.*    *Simple legislative authorization never satisfies the requisites of the public trust doctrine, no matter what kind of trust property is involved.*

Defendants argue, including based upon this Court's prior statements in *POP I*, that "sufficient legislative intent exists [in the Museum Act] to permit diverting a portion [sic] of Jackson Park for the [Presidential Center]." *POP I*, 385 F. Supp. 3d at 678; Br. at 17-18, 21. That proposition, which would render the public trust doctrine a dead letter, is flatly inconsistent with Illinois law. *People ex rel. Scott v. Chicago Park District,* 360 N.E.2d 773 (Ill. 1976). The *Scott* court writes: "While the courts certainly should consider the General Assembly's declaration that given legislation is to serve a described purpose, this court recognized . . . that the 'self-serving

10

recitation of a public purpose within a legislative enactment is not conclusive of the existence of such purpose.'" *Id.* at 781 (citation omitted). While *Scott's* precise holding was limited to tidal lands, *Scott* understood the management of all public resources was a potential source of government abuse. Thus, *Scott* quoted Joseph Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 MICH. L. REV. 471 (1970): "'When a state holds a resource which is available for the free use of the general public, a court will look with considerable skepticism upon Any governmental conduct which is calculated Either to reallocate that resource to more restricted uses Or to subject public uses to the self-interest of private parties.' *Scott*, 360 N.E.2d at 780 (citing Sax). Indeed, Sax was opposed to allowing any sale of public property out of a deep suspicion that most deals made between governments and private parties were rip-offs from government because of a deep-seated fear that such a transaction would illicitly transfer wealth. He wrote that the legislative grant got "everything backwards" (Sax at 489) by taking from the general taxpayer to line the pockets of "a substantial public enterprise," making this transaction "particularly egregious" (*Id*. at 490), which led him to endorse the position that the 1000 acres of land in Lake Michigan were indeed not alienable at all. It hardly follows that the absolute prohibition of some—but by no means all—transfers of submerged lands require, or even allow, any court to do a complete reversal and apply a rule of complete deference to never submerged lands, when dangers of corruption and self-interest present equal risks in all settings.

Thus, one early and forceful application of the public trust doctrine to never submerged lands is found in *Milhau v. Sharp*, 15 Barb. 193, 206-207 (N.Y. Gen Term 1853), which applied the public trust doctrine to overturn a contract for the construction of an elevated private train down Broadway issued for a "trifling" sum that was below other competitive bids. *Milhau* is consistent with the historical view that any trust over any kind of resource, whether public or

11

private, imposes a standard set of fiduciary duties—loyalty, care and candor—on all trustees Professor Robert Natelson, after exhaustive historical research, identifies six standard fiduciary duties, all of which exist and were violated by the City in this case: A. The Duty to Follow Instructions and Remain Within Authority; B. The Duties of Loyalty and Good Faith; C. The Duty of Care; D. The Duty to Exercise Personal Discretion; E. The Duty to Account, and F. The Duty of Impartiality. Natelson, *Legal Origins of the Necessary and Proper Clause,* 57-60*, in* Gary Lawson et al., THE ORIGINS OF THE NECESSARY AND PROPER CLAUSE (2010). Earlier he noted: "I have not been able to find a single public pronouncement in the constitutional debate contending or implying that the comparison of government officials and private fiduciaries was inapt. The fiduciary metaphor seems to rank just below 'liberty' and 'republicanism' as an element of the ideology of the day." Natelson, *The Constitution and the Public Trust,* 52 BUFF. L. REV. 1077, 1086 (2004).

That is, until now. As against the entire weight of history and practice, Defendants argue (Br. at 21-22) in reliance upon this Court's opinion in *POP I*, 385 F. Supp.3d at 678, that "Illinois public trust cases require courts to apply the doctrine using varying levels of deference, based upon the property's relationship to navigable waterways." But an examination of all the relevant cases show that the exact opposite is true.

Whether land was currently submerged, formerly submerged or never submerged has absolutely nothing whatsoever to do with the appropriate level of deference given to government in a public trust case. Neither the Defendants (nor the prior opinion of this Court that is relied upon) offer any explanation as to why that distinction does anything other than obfuscate the sound principles of judicial administration. Nor is it a sufficient answer to say that a court should never engage in "second-guessing the particular merits of legislative judgments." (Br. at 21-22) A

12

similar standard applied to private fiduciaries would allow them to run riot, and the evident dangers of self-interest political actors has led courts to repeatedly affirm that some judicial oversight is strictly necessary, as *Scott* explicitly holds. Indeed, as a general matter, through unregulated self-dealing lies the path for looting the public treasury, as in this case. Just as governments cannot confiscate property without paying just compensation, in the public trust context the correct synthesis reads "nor shall public property be transferred to private use, without just compensation." Richard A. Epstein, The Public Trust Doctrine, 7 Cato J. 411 (1987). The just compensation element plays little role in public-to-public transfers, but it is critical in public-to private transfers such that payment of compensation *by* private bodies *to* public bodies carries a very different valence than the payment *by* public bodies *to* private parties, which is occurring to the tune of hundreds of millions of dollars, in both cash and kind, to the OPC from the public at large.

To avoid these conclusions, Defendants (Br. at 21) look again to *POP I*, 385 F. Supp. at 676-679, as they rely upon several passages in *Paepcke v. Public Bldg. Comm'n of Chicago*, 263 N.E.2d 11 (Ill. 1970), where the Court discusses rules for the interpretation of grants that do not require an explicit authorization. *Paepcke*, 263 N.E.2d at 18-21. But those passages must be read in context. First, on the facts, the two cases could not be more dissimilar: four acres in Washington Park, out of a total of 380, transferred from one public use to another in *Paepcke*: huge chunks of Jackson Park to be destroyed by construction of the OPC by a private party.

Doctrinally, the differences are equally large. Both cases begin with the same initial dedication made to the Park Commissioners, providing that covered lands should be used "as a public park, for the recreation, health and benefit of the public, and free to all persons forever, subject to such necessary rules and regulations as shall from time to time be adopted by said commissioners and their successors." *See* Complaint, ¶ 37, *citing* 1869 Statute, §§ 1, 4. Unlike

legislation, this is a specific grant of property. Under Supreme Court authority, such grants follow the rules applicable to patents and land grants, such that once issued, they are "entitled to the same legal protection as other property," *and thus cannot be set aside by legislative action. See McCormick Harvesting Machine Co. v. Aultman & Co.*, 169 U.S. 606, 608-609 (1898).

In light of this general background, Justice Burt in *Paepcke* well knew that these legislative dedications could not be repealed or modified at will. He therefore sought to find a middle path between two extremes. The grant should not be so literally construed so as to admit no exception. The grant should not be so weak that it imposed no restrictions at all. Ultimately, he concluded:

> [W]e think it appropriate to refer to the approach developed by the courts of our sister State, Wisconsin, in dealing with diversion problems. In at least two cases, *City of Madison v. State*, 1 Wis.2d 252, 83 N.W.2d 674; and *State v. Public Service Com*., 275 Wis. 112, 81 N.W.2d 71, the Supreme Court of Wisconsin approved proposed diversions in the use of public trust lands under conditions which demonstrated (1) that public bodies would control use of the area in question, (2) that the area would be devoted to public purposes and open to the public, (3) the diminution of the area of original use would be small compared with the entire area, (4) that none of the public uses of the original area would be destroyed or greatly impaired and (5) that the disappointment of those wanting to use the area of new use for former purposes was negligible when compared to the greater convenience to be afforded those members of the public using the new facility. We believe that the present plans for Washington Park meet all of these tests.

*Paepcke,* 263 N.E.2d at 19.

In the *City of Madison v. State*, 83 N.W. 2d 674 (Wis. 1957), the Wisconsin Supreme Court held that the Wisconsin legislature could not stop Madison from building a public auditorium and civic center, on a filled in portion of Lake Monona. Similarly, *Wisconsin v. Public Service Comm'n*, 81 N.W.2d 71 (Wis. 1957), allowed for a dredge and fill permit for 1.25% of Lake Wingra, which was approved because on balance it improved overall navigation. The Court well understood that to insist that there be no deference to navigation anywhere sets an impossible standard, so that it insisted, as should be understood in the case of Jackson Park, that *net benefits and net costs* have to be considered, lest too many sensible projects be destroyed. *See discussion,*

14

*Lake Michigan Federation, infra,* at 21. In sum, a uniform standard applied no matter whether the trust held submerged lands (*Wisconsin*), filled lands (*Madison*), or dry land (*Paepcke*).

The Defendants (and this Court previously) cite these provisions, but then overlook their import, wrongly concluding that under *Paepcke*, 263 N.E.2d at 19, because the OPC site sits upon never-submerged, statutorily designated park land, "reviewing courts must ask only whether sufficient legislation intent exists for a given land reallocation or diversion." *POP I* at 678; *see also,* Br. at 15. That same position was taken by then-Judge Amy Barrett in *Protect Our Parks, Inc. v. Chicago Park. Dist.* 971 F.3d 722 (7th Cir. 2020) (*POP II*) when she wrote:

> Once such land has been dedicated to a public purpose, the Illinois Supreme Court has explained, the government "hold[s] the properties in trust for the uses and purposes specified and for the benefit of the public." Paepcke, 263 N.E.2d at 15. Dedication to a public purpose isn't an "irrevocable commitment[]," *id.* at 16, and judicial review of any reallocation is deferential, particularly if the land in question has never been submerged. Nonetheless, the doctrine requires courts to ensure that the legislature has made a "sufficient manifestation of legislative intent to permit the diversion and reallocation" to a more restrictive, less public use. *Id.* at 18.

971 F.3d at 730.

This passage inelegantly stitches together three disconnected statements from pages 15, 16 and 18 of *Paepcke* and thus misstates the logic of *Paepcke*. The two words "irrevocable commitment" come from a passage in *Paepcke* discussing how Professor Sax thought a revised public trust doctrine should apply. The two words "deferential" and "submerged" are nowhere found in *Paepcke*. Finally, the last phrase gives guidance for the construction of grants, without addressing any of *Paepcke's* five factors.

At this point the Defendants' motion to dismiss cannot be granted because Plaintiffs clearly state a claim for violation of the public trust doctrine, with factual disputes to be resolved and discovery necessary on all five portions of the *Paepcke* test, where the OPC transaction is manifestly vulnerable. In *Paepcke*, the conversion of a part of Washington Park to a school did

not require the public to lose control over any portion of Washington Park. The OPC, in contrast, cedes control over a huge section of Jackson Park to a private entity in the form of a disguised 99-year lease. Second, while a public school is open to the public, the OPC has control over the extent to which it will admit people into its buildings, just as if all the building in the OPC complex were built at its own expense of private lands. Third, the four-acre loss in Washington Park is tiny relative to the total size, and its impact equally controlled. The land used or destroyed by the OPC represents a huge chunk, both by acreage and value of Jackson Park, whose accurate extent and value can only be determined after discovery. (*See* Docket No. 31-1, Exhibit 2, Mitchell Declaration) Fourth, the school had only a modest effect on public uses in Washington Park. In contrast the OPC will wreck, in the name of "improvements," huge portions of Jackson Park, ripping out roads, cutting down trees, obstructing bird migration, and removing historical resources. Surely discovery is needed to question the extent of the destruction of Jackson Park. Fifth, the political opposition, if any, to the school in *Paepcke* was limited. The incursion into Jackson Park by the Foundation has been wrapped in controversy from the beginning. It is not possible to dismiss these multiple protests with a wave of the hand before discovery, when the disappointment, indeed outrage, is not negligible, and there is much dispute over whether there is some "greater convenience" to users of Jackson Park that could not be satisfied by moving this entire complex to a unitary site outside of Washington Park or to any other site. To be sure, as noted, the five *Paepcke* factors do not take into account the huge subsidies conferred by the city, state and nation, on the OPC. But that additional factor only strengthens the need for discovery for the entire project given the admitted financial burdens to the public at large.

The next question asks what is the uniform standard derived from *Paepcke*. That question is heavily tied with *Paepcke's* discussion of whether anyone had standing to challenge the acts of

a state trustee. Justice Burt first noted that in many cases involving Montgomery Ward & Co*., see e.g.*, *South Park Comm'rs v. Montgomery Ward & Co*., 93 N.E. 910 (1910), the Illinois Supreme Court, using standard trust principles, had recognized standing for Montgomery Ward and other private parties that held private property on the west side of Michigan Avenue to enforce limitations on the use of public property on the east side of Michigan Avenue. *See* Joseph D. Kearney & Thomas W. Merrill, LAKEFRONT: PUBLIC TRUST AND PRIVATE RIGHTS IN CHICAGO, ch. 3 (Cornell University Press 2021).

The Montgomery Ward line of cases, however, did not cover the situation in *Paepcke,* where there were no designated beneficiaries of the dedication. One response to this new situation would have held that *no one* had standing no matter how grievous the public trust violation. An earlier case, *Droste v. Kerner*, 217 N.E. 2d 73 (1966), did just that: "this court [in Droste] held that an individual taxpayer or property owner, in the absence of statutory authority conferring that right, had no standing in equity to enjoin an alleged misuse of property held in trust for the public unless he alleges and proves that he will suffer special damage, different in degree and kind from that suffered by the public at large." *Paepcke,* 263 N.E.2d at 18. *Paepcke* "on serious consideration" then "overruled" *Droste*, thereby allowing these actions to be brought, without proving special damages. *Paepcke* has clear constitutional weight under Illinois law: "If the 'public trust' doctrine is to have any meaning or vitality at all, the members of the public, at least taxpayers who are the beneficiaries of that trust, must have the right and standing to enforce it. To tell them that they must wait upon governmental action is often an effectual denial of the right for all time. The conclusion we have reached is in accord with decisions in other jurisdictions." *Id* at 18. It is also the case that the finding in *Paepcke* necessarily precludes the passage of any state statute that

17

stipulated "no citizen or taxpayer shall have the right to enforce any dedication of property held by any state agency (or its successor in title)."

Two points stand out. First, the standing in question is *in equity* so that there is no need to figure out which of the identified beneficiaries suffered which kinds of losses—a problem that can easily arise when different classes of plaintiffs seek damages for, say, some pollution of waters held in public trust. *See, e.g.*, *Burgess v. M/V Tamano*, 370 F. Supp. 247 (D. Me. 1973) (allowing actions to commercial fishermen and clam diggers, but not owners and operators of motels, trailer parks, camp grounds, restaurants, grocery stores, and similar establishments). That injunctive relief would protect any and all parties in the same fashion.

Second, *Paepcke* consciously uses the term "beneficiaries," to reinforce the view that the public trust doctrine has a precise parallel to private trust in requiring duties of care and loyalty. It would be utterly pointless to grant standing to give "meaning and vitality" to the state's public trust obligation, only to conclude that any attack on the statutory repeal or modification is destined to fail on the merits no matter how egregious the defendant's behavior. Instead, for the public trust doctrine to have any bite at all, some actions of the state or local government must run afoul of the rule—a constraint that necessarily applies equally to never-submerged lands in cases like *Paepcke*.

Justice Burt then uses precedent to chart a middle path between total rigidity and total plasticity. He relies on *Reichelderfer v. Quinn*, 287 U.S. 315 (1932), in which certain lands "were perpetually dedicated and set apart as a public park or pleasure ground for the benefit and enjoyment of the people of the United States." *Id.* at 317. Justice Harlan Fiske Stone held that the dedication's terms did not preclude the construction of a fire engine house in the park.[3] The

---

[3]    For similar cases, cited in *Paepcke*, 263 N.E. 2d at 17, all of which involve public-to-public transfers, see *Thayer v. City of Boston,* 206 F. 969 (D. Mass. 1913) (schoolhouse in park); *Fielding v. Board of Education of the City of Paterson*, 76 N.J.Super. 50, 183 A.2d 767 (1962) (schoolhouse in park); *Carlson v. City of Fremont, Dodge County*, 180 Neb. 262, 142 N.W.2d 157 (1966) (fire

plaintiffs, nearby neighbors (as the plaintiffs in *Paepcke*), sought to prevent the construction of the fire engine house in the park. Initially, unlike the pollution in *Burgess*, that building could not be enjoined as either a private or public nuisance, *see* Restatement (Second) Torts § 821B, Public Nuisance, because it did not amount to an unreasonable interference with the plaintiff's quiet enjoyment of his own property, any more than a similar fire engine house would do so if constructed on private lands. Hence the plaintiffs sought to circumvent that obstacle by insisting that the dedication conferred *on them* an "easement" that the land could be only used for park purposes—which was violated by the construction of the fire house. But Justice Stone held that no such easement to a neighbor could be inferred from the general dedication of the subject property to a public trust. But at no point did Stone say anything to undermine the central holding in *Paepcke* that citizens had an undivided interest in public lands as beneficiaries, regardless of where they live. Indeed, he explicitly distinguished the failed easement from the basic public trust situation:

> A different question is presented in the cases relied on by the court below which indicate that a dedication of land to the public, by an individual, or a conveyance to a municipality, to be used as a park, is subject to a condition or imposes a trust that the use be continued, breach of which may be restrained. There rights in the land or against the municipality were said to have been reserved in the grantor or created in the owners of neighboring land by the terms of the grant—[the situation in the *Montgomery Ward* cases.]

*Id.* at 323 n.3.

Chief Justice Stone then cited cases that held no local government can dispose of public trust property in a manner that is inconsistent with the limitations of the trust. Thus, in *Douglass*

---

station in park); *Stevens v. Mayor and Council of City of Vinita,* 315 P.2d 776 (Okl. 1957) (fire station in park). Generally see: *Horn v. City of Chicago*, 403 Ill. 549, 87 N.E.2d 642 (1949); *Doane v. Lake Street Elevated Railroad Co.*, 165 Ill. 510, 46 N.E. 520 (1896); *Stetson v. Chicago and Evanston Railroad Co.*, 75 Ill. 74 (1874).

*v. City Council of Montgomery*, 24 So. 745 (Ala. 1898), land was conveyed to the City solely for use as a public park. The City purported to convey it to a private party for use as a railroad line, in what "appeared to be the necessity of better transportation facilities and the exigencies of the public business." Nonetheless that conveyance "was an illegal transaction and a fraud in law," notwithstanding the absence of any particular intention on the part of the city to engage in wrongful activity. Hence the condition in the deed "was inserted, not as a provision to enable the city authorities to abandon or divert it at will, if accepted for the purposes intended, but to prevent their doing so." *Id.* at 746-47. In effect the grant to the government failed, and the property reverted to the next private party in the chain of title.

The Defendants claim that the Plaintiffs cannot enforce their claims under Illinois law "because, like the federal Takings Clause, the Illinois Constitution's Takings Clause applies to only to takings of 'private property.'" Br. at 28. But that assertion would imply that the Plaintiffs again have no remedy for breach of a public trust, which *Paepcke* rejects. In any event, the gap here has, however, long been filled by principles of equity, which protect the beneficiaries of both public and private trusts. In *City of Cincinnati v. The Lessee of White*, 31 U.S. 431 (1832):

> It was admitted at the bar, that dedications of land for charitable and religious purposes, and for public highways, were valid, without any grantee to whom the fee could be conveyed. Although such are the cases which most frequently occur and are to be found in the books, it is not perceived how any well grounded distinction can be made between such cases and the present [case of a park dedication]. The same necessity exists in the one case as in the other, for the purpose of effecting the object intended. The principle, if well founded in the law, must have a general application to all appropriations and dedications for public use, where there is no grantee in esse to take the fee. But this forms an exception to the rule applicable to private grants, and grows out of the necessity of the case.

*Id*. at 435-36.

B. *Subsequent Illinois decisions confirm that Plaintiffs have stated a claim that constructing the OPC in Jackson Park violates the public trust doctrine.*

The first important post-*Paepcke* case, *Scott, supra* at 10-11, involved an explicit Illinois conveyance of 194.6 acres of submerged land to the U.S. Steel Corporation for $19,460, which appears to have been its fair market value. That transfer was presumptively allowable under the public trust doctrine because it "may afford foundation for wharves, piers, docks and other structures in aid of commerce," *id.* at 777, where "commerce" is a broader term than "navigation." *Scott* however set aside the transaction solely because of its adverse effects on the use of other public waters:

> The general area in question is bordered on the north by a public beach, Rainbow Park, at 79th Street; on the south by the United States Government breakwater protecting Calumet Harbor, and on the east by the Illinois-Indiana state line in Lake Michigan. These waters, which are adjacent to waters presently in important public use, would be irretrievably removed from the use of the people of Illinois. It cannot be said there will not be an adverse effect on the public use of these adjacent waters. We would also observe that in Illinois Central II it was said of the grant there: '(T)he sole purpose seems to be to appropriate the submerged land for the private use of the railroad company.' 487, 50 N.E. 1104, 1109. Here, too, we can perceive only a private purpose for the grant.

*Id.* at 780-81.

The Court's analysis in *Scott* is of high relevance here and further bolsters Plaintiffs' claim. Indeed, the impacts upon public trust Jackson Park property (and its roads and vistas, as well as its lagoon, topography and the like) far exceed the relatively minor impacts on the public use of other public waters that supported blocking the conveyance in *Scott*. It cannot be the case that trivial harms to water interests are fully taken into account, when massive intrusions to land interests are ignored, when *Paepcke* treats both types of resources the same way.

Next, in *Lake Michigan Federation v. U.S. Army Corps of Engineers,* 742 F. Supp. 441 (D. Ill 1990) (*Loyola*), Judge Aspen noted correctly that, "The very purpose of the public trust doctrine is to police the legislature's disposition of public lands. If courts were to rubber stamp legislative

21

decisions, as Loyola advocates, the doctrine would have no teeth." *Id.* at 446. Applying those principles, Judge Aspen struck down the University's plan to expand its campus by reclaiming (with public approvals, city, state and federal) twenty acres of submerged land in Lake Michigan. Loyola's program would have protected the shoreline from erosion and have constructed new athletic facilities open to the reasonable public use, but subject to Loyola's ownership rights. "By the terms of the conveyance, Loyola is not allowed to construct buildings or parking areas on the lakefill. The state also has a right of reentry should Loyola attempt to transfer the property to any entity which does not operate as a nonprofit educational institution." *Id.* at 445. Judge Aspen nonetheless concluded that "while the project has some aspects which are beneficial to the public, the primary purpose of the grant is to satisfy a private interest [of expanding its campus]," and further that the public will lose its current "unrestricted access to the submerged lands." *Id.* at 445-46. He then rejected Loyola's argument that "the public will gain from the construction of the lakefill is merely a value dependent assessment of the best use of the property. This judgment is not only highly subjective, but also irrelevant to an analysis of the propriety of a grant of public land." *Id.* at 446.

Judge Aspen's analysis seriously mischaracterized the public trust doctrine by only citing the general rule against the transfer of Lake Michigan proper, without once mentioning its vital exception relating to the construction of wharves, piers and docks, applicable in *Loyola*, and thus requires, unlike *Paepcke*, consideration of Loyola's financial contribution *to* the project, which arguably made it a win/win transaction.

The scattered reference to *Loyola* by Defendants and *POP I* (385 F.3d at 676, 678, 672) uses rose-colored glasses to defend this transaction without noting any of its negative effects: "the OPC surely provides a multitude of benefits to the public. It will offer a range of cultural, artistic,

and recreational opportunities—including an educational museum, branch of the Chicago Public Library, and space for large-scale athletic events—as well as provide increased access to other areas of Jackson Park and the Museum of Science and Industry." *POP I* at 682. *See also*, Br. at 18 n.5, 22. The "surely" is a massive exaggeration, for it is incorrect to posit multiple speculative benefits to the public, without once considering the multiple identifiable costs to the public from that same project.

Indeed, once these costs are taken into account, an enormous chasm emerges between the two cases. In *Loyola*, the property in question was kept open to the public; here the OPC will be kept under the Foundation's lock and key; in *Loyola* all construction was banned; here massive and complex construction is contemplated; in *Loyola* the university incurred costs that benefitted the public (which Judge Aspen noted); in the instant case, the OPC is only made possible with subsidies in cash and in kind that run to hundreds of millions of dollars; in *Loyola*, all parties undertook exhaustive environmental reviews; in the instant case the "local" nature of the OPC project has been the pretext to block any federal environmental and other reviews of the OPC site; in *Loyola,* controlling erosion is a major environmental benefit; here the construction of the OPC will have significant consequences to Jackson Park. None of these comparisons are dulled by bland assurances that the project will produce increased public access to other areas of the park, in isolation to the wholesale disruption of traffic both during and after construction is completed, which is likely to snarl, not improve access to the Griffin Museum of Science and Industry and other areas in and near the park. The *Loyola* deal may well have been win/win, but was struck down. The OPC looks like a win for the Foundation and a loss for everyone else. It is incomprehensible that the *Loyola* deal was struck down for violating the trust if the OPC gets a free pass go forward on a Rule 12(b)(6) motion.

Finally, in *Friends of the Parks v. Chicago Park District,* 2015 WL 1188615 (N.D. Ill. March 12, 2015) (*Lucas*), Judge Darrah refused to grant the Defendant's Rule 12 motion to dismiss the Plaintiff's complaint, which included a public trust challenge associated with the transfer of public trust property for the construction of the Lucas Museum of Narrative Arts. Like *Loyola*, *Lucas* offers far more powerful reasons to reject the Defendants' motion to dismiss in this case. In *Lucas*, the Plaintiffs were prepared to spend millions of their own money to build their museum on an abandoned parking lot south of Soldier Field. That project required no public subsidies, and did not dismantle a world-class park, by removing rubble from Chicago's lakeshore. On balance, the private funding of the *Lucas* project could arguably produce a net benefit to the public, even if it did not satisfy all the *Paepcke* factors, given the huge infusion of cash from the Lucas Foundation. Yet to much public outcry, the Lucas Museum pulled up stakes and eventually was located in Los Angeles. In any event, the district court denied the Rule 12(b)(6) motion filed by the City and Park District in that public trust action, and a similar result is warranted here.

## II. The "Use" Agreement Between The City And The Obama Foundation Is A Sham Transaction That Transfers Virtually Full Ownership To The Obama Foundation In Violation Of The Public Trust Doctrine.

It is a basic proposition of trust law that a trustee is not allowed to transfer any property held in trust to a private party unless, at the very least, he or she receives full compensation for the property transferred. This constraint is binding on both public and private trustees, and it cannot be evaded by the simple expedient of swapping out an outright conveyance for a long-term lease of virtually identical value. The point was brought home in *Lucas*, where Judge Darrah cast doubt on the explicit lease arrangement between the Park District and the Lucas Museum of Narrative Arts:

> There is also no indication the Park District will remain the owner of the property or would remain as a landlord under a lease agreement. However, as explained

above, the Park District cannot abdicate its trust over public land so as to leave it entirely under the use and control of private parties. *Illinois Cent. R. Co.,* 146 U.S. at 453. The Complaint alleges enough facts to state that Defendants intend to transfer the exclusive right to use and control the Museum Site to a private entity. The Complaint plausibly states a claim that the agreement violates the public trust doctrine.

2015 WL 1188615 at *7.

*Lucas* is surely correct: transfer of a 99-year lease for $10 in total is tantamount to the outright transfer of the fee. It is pure fabrication to say that "the City will retain ownership of the Presidential Center site." Br. at 9. All the economic value will go to the Foundation, so that the supposed "ownership" interest of the City is the right to receive zero rents for 99 years plus the right to the return of the land (and the fully depreciated building) thereafter, a mere pittance in comparison to the hundreds of millions of dollars that the site is worth to the City today.

*Lucas* was decided while the negotiations were taking place between the City and the Obama Foundation over 99-year lease—then denominated at such—for the 19.3 acre site in Jackson Park. Well aware of *Lucas's* potential impact, the parties consciously shifted course by entering instead into a "use" agreement that also transferred the 19.3 three acres of Jackson Park for 99 years. The Defendants' motion to dismiss sets out the many terms and conditions of that agreement, *see* Br. at 8-9, but at no point does it identify a single substantive difference in the terms between the initial lease and the hastily concocted use agreement. That use agreement moreover coyly refuses to specify whether the Foundation's use is exclusive or nonexclusive, leaving that an issue of fact where discovery could help determine whether an exclusive use agreement was just a 99-year lease in disguise and reflective of a transfer equivalent to a sale. *See Pierce v. Pierce,* 351 Ill. App. 336 (Ill. App. 1953) (finding lease to be equivalent of sale such that right of partition applied to leaseholder).

25

This use agreement, moreover, is quite distinct from the agreement between the Chicago Bears and the Chicago Park District that was upheld in *Friends of the Parks v. The Chicago Park District*, 786 N.E.2d 161 (Ill. 2003) (in which both lawyers here appeared as counsel for the Plaintiffs), because there the Park District retained full economic rights to permit other groups to use the facility. The Bears' control over Soldier Field was thus a limited number of days per year, which allowed the Park District to enter its recent three-year deal that lets the Chicago Fire soccer team to play its home games at Soldier Field. "Chicago Fire Signs Deal with city to return to Soldier Field" Chicago Business Journal, 10/8/2019, https://www.bizjournals.com/chicago/news/2019/10/08/chicago-fire-signs-deal-with-city-to-return.html.

In contrast, the proposed transparent evasion of admitted public trust violation cannot be papered over by mere words. As between themselves, the City and the Foundation can call the transaction whatever they please. But the moment the transaction is subject to any external constraint, it is incumbent to peel back the label to decide whether this "use" agreement gives away exclusive rights for free. The public trust doctrine must be read in the context of other regulatory and tax schemes. "[T]axation is not so much concerned with the refinements of title as it is with the actual command over the property taxed — the actual benefit for which the tax is paid." *Corliss v. Bowers*, 281 U.S. 376, 378 (1930) (income from a revocable trust taxed to the settler, not the beneficiary). Nor can parties evade their obligations to pay social security tax, supply medical benefits, and worker compensation laws by simply labeling their employees independent contractors. They must also show in fact these workers meet objective tests to merit the independent contractor label. *See, e.g.*, U.S. Department of Labor Wage and Hour Division, ("economic reality," not "technical concepts" separate an employee from an independent

contractor, available at https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/whdfs13.pdf).

And closer still, under the patent law, by statute the rights of the patentee only extend as far as the

"first sale". Accordingly, the parties cannot evade the limitations of the first sale doctrine by

calling (similar to the situation here) a subsequent sale a mere license to use—especially when the

license runs for the duration of the patent. In determining whether a transaction is a sale or a

license, courts must analyze the "economic realities" of the transaction. *Microsoft Corp. v. DAK*

*Indus., Inc.*, 66 F.3d 1091, 1095 (9th Cir. 1995). "[T]he fact that the agreement labels itself a

'license' ... does not control our analysis." *Id.* at 1095 n.2. The purported retention of title to the

land on which the OPC sits is a sham given that the real power of exclusive possession is vested

in the Obama Foundation. Plaintiffs have raised such claims, and the Defendants' Rule 12 motion

should be denied.

### III.  Plaintiffs Have Stated A Claim For Improper Delegation. (Count XI)

The Defendants seek dismissal of Plaintiffs' non-delegation claim as a matter of law

through a fanciful narrative that ignores the explicit delegation from the City Council to the Obama

Foundation, a wholly private party (Br. at 31). Recall that the 2015 Ordinance states

unambiguously:

> WHEREAS, While the City Council is **confident** in the quality and thoroughness
> of both UIC's and UChicago's proposals, ***the City defers to the sound judgment of
> the President and his Foundation as to the ultimate location of the Presidential
> Library.*** (Emphasis supplied)

Drawing all inferences in favor of the nonmoving party, this itself provides the basis for

the improper delegation of authority claim: the express "defer[ence]" regarding the project reflects

its delegation to the Foundation and the "confidence" is a rubber stamp of the choice of the former

President and his Foundation, using whatever procedural devices to conceal that illicit surrender

of power. The decisions of the former President and the Foundation were not just "advice" to the

City Council, as the Defendants' Claim. (Br. at 33)  Rather, the City Council pre-committed to the former President and his Foundation's choice at stage one of the process, and consistent with that fact, provided a *pro forma* review of that determination thereafter, all without meaningful or critical debate or discussion.  These defects were not cured by the virtually unanimous ratification by the City Council in 2018 when the ordinance was passed – which was nothing but a rubber stamp, provided without performing an independent review of alternative sites, including one near Washington Park, despite the fact that the proposed development involves public, not private land. Plaintiffs allege that these 2018 hearings were a sham, and that the decision to ratify the Foundations' choice of Jackson Park was made *before* those *pro forma* hearings took place. Discovery will provide further information in regards to these matters that involve questions of fact.

The action of the City Council is, moreover, inconsistent with the Illinois courts' long-standing hostility to improper delegations of legislative authority to private parties. In a landmark 1952 decision, the Illinois Supreme Court held that a statute allowing owners of property to vote to rename the street violated the nondelegation doctrine. The court noted that such a statute "is not a mere contingency," but rather "give[s] the property owners unbridled discretion of what the law shall be," *People ex rel. Chicago Dryer Co. v. City of Chicago*, 109 N.E.2d 201, 205 (1952), such that "the [municipal] authorities become a mere *automatic register* of their action and the will of the property owners is given the effect of law." *Id.* (emphasis added).  In so doing, the municipality allowed a majority of property owners to overrule both a minority of property owners and the town at large. *Id.* at 205-206.  Illinois courts routinely apply this holding to all types of land use disputes. *See Brodner v. City of Elgin*, 420 N.E.2d 1176, 1178 (Ill. Ct. App. 1981); *La Salle Nat. Trust, N.A. v. Village of Westmont*, 636 N.E.2d 1157, 1169 (Ill. Ct. App. 1994) ("legislative power may not

be delegated to private individuals"). Illinois law is, moreover, buttressed by decisions from the U.S. Supreme Court: "By any measure, handing off regulatory power to a private entity is 'legislative delegation in its most obnoxious form.'" *Dept. of Transp. v. Assoc. of American Railroads*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)).

More concretely, the 2015 Ordinance speaks not in terms of mere "advice" but of "deference"—a different animal altogether—to the former President and his Foundation. The delegation confers on a powerful private party an unfettered choice of location for its own private development which utilizes 100% public land, leaving it free to ignore the greater interest of the community, with its tailor-made "use agreement" intended to avoid the public trust doctrine. That unilateral choice in turn imposed drastic adverse impacts on roads, historical sites, and environmental impacts—all far more dangerous than the delegation of the ability to name streets in *Dryer*. Legislative power can be delegated to municipal governments, but not private parties. *See People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove*, 157 N.E.2d 33, 35 (Ill. 1959).

The Defendants seek solace in *Latham v. Board of Education of the City of Chicago*, 31 Ill. 2d 178 (1964), where plaintiffs challenged the actions of the mayor who received a list of names from an advisory council whom he could nominate for the school board, when their appointments were subject to approval by the City Council. The Illinois Supreme Court held that this practice was not an improper delegation of authority:

> No action by the mayor could bind the members of the city council, whose approval is required by section 34-3. The mayor has not, by seeking the advice and suggestions of the advisory commission, legally restricted his appointees to those individuals thus recommended. If such pre-election statements of intention were made, they would not prevent his subsequent action to the contrary, if his judgment

so dictates. As the trial court aptly stated in referring to the relationship between the mayor and the commission, 'consultation is not abdication'.

*Id.* at 187-88.

Defendants' effort to equate *Latham* to the site selection for the OPC is specious. Letting the former President and his Foundation make land use decisions was not just advice from some random person without political clout; it was an order, whose impact was far greater than putting names on an advisory board. In *Latham*, the mayor had unfettered discretion not to accept the names of individuals, and the City Council had discretion to vote them down. In contrast, here the City Council pre-committed itself, both based on the language of the ordinance and their subsequent (and corroborative) conduct which all reflect that the City abdicated its decision-making authority to a private party. At every instance the Council approval was well-nigh instantaneous and unanimous, and, as discovery will also likely demonstrate, agreed upon and pre-drafted before any public hearings began. This, as the *Latham* court warned, is "abdication," not "consultation." *Id*.

Defendants also rely upon the statement that "there is nothing uncommon about a land use applicant selecting a site and developing a proposal and then presenting that package to the City for approval." (Br. at 33, note 12). This assertion of fact is disputed and cannot be resolved on a motion to dismiss. Indeed, contrary facts would demonstrate that is unprecedented for the City to invite in advance a private developer of enormous influence and close connections to the powers-that-be to construct a massive project at any site to its liking, including any public trust property it desired. The text of the ordinance let the Foundation and the former President do what they wanted, for at no point did it direct the Foundation to use any substantive criteria or procedural safeguards to guide its deliberations. The abnegation of the City was compounded by its continued insistence that the federal agencies had no power to review its highly controversial decisions of

30

location and design of the OPC, even though the City and state supplied no independent environmental review on their own.

This pattern of influence and abuse certainly states a claim. Further, discovery is appropriate and necessary to provide additional evidence. For all these reasons, the motion to dismiss the non-delegation claim must be denied.

**IV. Plaintiffs' Alternative Claim For Review Under The Illinois State Historic Preservation Act Is Not Properly Subject To Dismissal. (Count XV)**

Plaintiffs' complaint alleges that there were major gaps in the federal reviews performed pursuant to Section 106 of the National Historic Preservation Act, which should have addressed many of the adverse effects in Jackson Park. Plaintiffs allege that the Defendants' tactics erroneously broke a unified project into pieces, each of which, the Defendants hoped, would be small enough to insulate the placement of the OPC in Jackson Park from federal review as "local" actions. The Plaintiffs have vigorously attacked that effort done to avoid a Section 106 Review that would involve review of steps to avoid, minimize, or mitigate (in that order) adverse effects on historic resources. (*See* Complaint, ¶¶ 75-85; 196-204) Having orchestrated such an effort, it would be utterly improper to escape review under the Illinois State Agency Historic Resources Preservation Act, 20 ILCS 3420/1, *et. seq.*, if they somehow manage to escape federal review. Accordingly, Plaintiffs plead their state law claim as an alternative to the federal claim. Defendants therefore jump the gun in seeking to escape the state law claim given the role of Section 106 when they state (Br. at 39):

> "[w]hen an undertaking is being reviewed pursuant to Section 106 of the National Historic Preservation Act of 1966, *the procedures of this law shall not apply* and any review or comment by the Director on such undertaking shall be within the framework or procedures of the federal law." 20 ILCS 3420/4(g) (emphasis added).

31

That statement is true *if* the federal Section 106 process is applicable. To that point, the Plaintiffs' complaint alleges that federal agencies improperly *declined* review of the adverse effects of the OPC based on what they claimed were purely "local" issues associated with that development. If so then Illinois review under 20 ILCS 3420/4(g) would no longer be duplicative of the federal review under Section 106. But if that federal review properly avoided a review of alternatives, it is manifestly clear that the state Historic Preservation Act *would* apply given the involvement of state and local funds, local transportation work, coupled with the necessity for state permits, including those from the Illinois Department of Natural Resources (e.g. Complaint, ¶ 285) *See Landmarks Illinois v. Rock Island County Board,* 2020 Ill. App. (3d) 190159, (enforcing consultation provisions of state preservation act where local municipality action required state permit); 20 ILCS 3420/4(d) (outlining review to be performed).

Ultimately, Plaintiffs' alternative claim is grounded in the fact that the Defendants cannot have it both ways. If they acknowledge that the federal review was improperly done, then that review will need to be reopened and a state review is not needed because the federal review takes precedence. But if the Defendants somehow elude federal review, they must face review under Illinois law, lest they escape all review at *both* state and federal levels. Hence, pleading the alternative claim is proper and *not* an effort to plead alternative facts as suggested by Defendants.

V. **Plaintiffs State A Claim For Violation Of State Due Process Rights Which Cannot Be Resolved On Defendants' Motion To Dismiss. (Count XII)**

Defendants' dismissal motion in regards to Plaintiffs' *state* due process claim largely rests upon the Seventh Circuit's treatment of the *federal* due process claim previously brought by Protect Our Parks. (Br. 34-37)

On the procedural due process issue, Defendants robotically repeat references to the four hearings referenced by the Seventh Circuit. Nonetheless the Plaintiffs still have their state law due process claims – which were not adjudicated – and require proceedings such as those at issue here that are not predetermined, shams or rubber-stamped exercises. (*See* Complaint, ¶¶ 262-263) Illinois law provides that:

> The notice and hearing requirements in the Ordinance were provided not to protect individuals from deprivation of property rights, but based on concerns about how best to preserve the environmental, recreational, cultural, historical, community and aesthetic interests and values of Lake Michigan and Chicago's Lakefront. Chicago Municipal Code § 16–4–020 (1990) [citations omitted]. These are concerns that are "essentially matters of public policy, not specific benefits that State law has conferred on individuals." *E & E Hauling, Inc. v. Pollution Control Board,* 451 N.E.2d 555 (1983), *aff'd,* 481 N.E.2d 664 (1985).

> [Even though] the Plan Commission's role was to conduct a fact-gathering proceeding instead of presiding over a full adversarial hearing, all aspects of due process protection need not be afforded at an administrative hearing conducted by the Plan Commission…all parties interested should be given the fullest opportunity to present evidence before the commission to aid commission in coming to an informed opinion but testimony not required to be under oath. See *Yellow Cab Co. v. City of Chicago,* 23 Ill.2d 453, 178 N.E.2d 330, 334 (1961).

*Petersen v. Chicago Plan Commission,* 302 Ill. App. 3d 461, 467-68 (Ill. App. 1998)

Short-changing hearings to a predetermined partisan end is an abdication of their state constitutional law duties. Accordingly, Plaintiffs are entitled to discovery to demonstrate that the 2015 Ordinance approval, the May 2018 plan commission hearings, and the October 2018 Ordinance approval were conducted deliberately in slipshod and/or predetermined fashion by the City, who then largely orchestrated and controlled a nominal federal review process during a most difficult lockdown period. (*See* Complaint, ¶¶ 74, 252-253, 262-63) Defendants suggest that the allegation of acting in rubber stamped fashion is somehow deficient because it does not state "that the City's legislative officials did not duly consider and vote upon the ordinances authorizing the Presidential Center." However, the epitome of a rubber stamp involves just that failure to duly

consider such matters by yielding to the demands of the private party, as discovery on these issues could well demonstrate. That discovery should include e-mail communications and agreements. The motion to dismiss this claim must be denied.

On the issue of substantive due process, the Defendants wrongly presume that a rational basis test applies to the violation of the initial dedication. Yet a higher standard is required under *Paepcke*, as argued in Argument Section I, *supra*, for otherwise the decision to confer standing on public plaintiffs would be pointless if their actions are always barred under some low rational basis test.

## VI. Plaintiffs State A Claim For Violation Of Special Privileges And Irrevocable Grant Clause Of The Illinois Constitution. (Count XIII)

Plaintiffs' new claim alleges that the City's transfer of property to the Foundation violates Article I, Section 16 of the Illinois Constitution which provides: "No ex post facto law, or law impairing the obligation of contracts or making an irrevocable grant of special privileges or immunities, shall be passed." Plaintiffs allege that the sham use agreement constitutes a 99-year lease that runs afoul of this restriction.

Defendants suggest that the "use" agreement is revocable and therefore falls outside of this constitutional protection. (Br. at 37-38) As discussed earlier, the use agreement involves an express and implied transfer that connotes irrevocability. *See* Argument, Section II, *supra*. Further, the exclusive rights associated with this use agreement further confirm this claim. For example, Section 16.2 of the "use" agreement denies that the City can exercise termination as of right. Instead, its powers of termination are at most conditional and limited rights, which are subject to cure and further undercut the revocability arguments advanced by the Foundation. Furthermore, the issue of revocability is one of intent and inherently involve questions of fact that are the proper subjects of discovery and not proper on a Rule 12(b)(6) motion.

Defendants' alternative argument that there is a legitimate state interest served through the OPC is addressed in earlier sections which show that the transaction is a breach of the public trust doctrine and violates other principles above (for example non-delegation), which all demonstrate for purposes of addressing a Rule 12 motion that there is no legitimate state interest being served. For all of these reasons, the motion to dismiss must be denied.

### VII.   Plaintiffs State An Ultra Vires Claim Which Is Not Properly Resolved On A Motion To Dismiss.  (Count VII)

An act is generally "**ultra vires**" in two situations: one, where the corporation has no power to take an act, the second where the corporation has the power to perform an act and but there is an irregular exercise of such power.  *See Branigar v. Village of Riverdale,* 396 Ill. 534, 542 (Ill. 1957).  Acts that abdicate public authority to a private party are *ultra vires* for both reasons.

The complaint here identifies many activities that are *ultra vires*.  For example, the City's failure under UPARR to perform an adequate review of the relevant alternatives but still proceed to allow the usurpation of recreational land.  (Complaint, ¶¶ 88-89; 190-92)  Furthermore, the City acted *ultra vires* in its actions and activities during the  federal review process, where it exerted improper dominance and control over those processes – all with the goal of orchestrating and advancing the goals of the private entity, the Obama Foundation. Such acts, however described, are beyond the authority of the municipality here, and as alleged in the complaint, are ultra vires. (*Id.,* ¶ 74).  *See 1550 MP Road LLC v. Teamsters Local Union No. 700*, 2019 IL 123046 (Ill. March 21, 2019) (holding that where a municipality exceeds its statutory authority in entering into a contract, the municipality's act is ultra vires, and the resulting contract is void ab initio).  The convoluted effort to transfer property a private party where a transfer was made from the Park District to the City to the Foundation thorough a lease turned use agreement (Complaint, ¶¶ 239-

35

240) is also an irregular practice in light of various state statutes, and further evidences *ultra vires* acts.

### VIII. Plaintiffs State A Claim For Violation Of State Law Takings, Which Is Not Barred By The Decision Of The Seventh Circuit In *POP II.* (Count IX)

Defendants argue that because the Seventh Circuit has rejected a federal takings claim brought by one party, that ruling precludes all Plaintiffs' state law takings claims presented here. Defendants argue dismissal is appropriate "as the Illinois Takings Clause is in this respect identical to its federal counterpart". *See Hampton v. Metro. Water Reclamation Dist. of Greater Chicago*, 57 N.E.3d 1229, 1240 (Ill. 2016) ("[W]hat constitutes a taking is the same under both clauses.")." (Br. at 30)

Defendants' argument ignores first that in this case the federal takings claim was dismissed on grounds peculiar to federal law:

> And even if the [public trust] doctrine conferred a property interest on members of the public, that interest would not necessarily qualify for protection under the Constitution. *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 757, (2005) ("Although the underlying substantive interest is created by 'an independent source such as state law,' *federal constitutional law* determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." (citation omitted) (italics in original)).

*POP II*, 971 F.3d at 737 n.5.

The explicit reference to federal law means that the state law claim is not touched by the decision in *POP II*. In addition, the Illinois takings provision is both different from and broader than its federal counterpart: "Private property shall not be taken **or damaged** for public use without just compensation as provided by law. Such compensation shall be determined **by a jury as provided by law."** Ill. Const. 1970, art. I, § 15 (emphasis supplied). The federal constitution *does not* include the highlighted language. As the Illinois takings provision has more expanded

coverage, federal law and state law in this regard are not the same. *See Hampton*, 57 N.E.3d at 1235 ("The relevant difference in the two clauses is the explicit inclusion in the Illinois clause of protection for property that is 'damaged' and the requirement that compensation be determined 'by a jury as provided by law.'")

Plaintiffs have relied upon this expanded Illinois provision alleging damage to Jackson Park by specifying "the damage to the landscape, destruction of the integrity of the park, the loss of hundreds of trees, the Women's Garden, and the roadways that comprise this special and unique Olmsted park." (Complaint, ¶ 250)  Such allegations provide a state law cause of action, for otherwise the decision in *Paepcke* to expand the public trust doctrine becomes utterly meaningless. *See discussion,* Section I, *supra*, noting that equitable principles will not tolerate the creation of a right without recognizing an interest to enforce it. *See discussion of City of Cincinnati v. The Lessee of White*, *supra* at 20.

Finally, Defendants argue that even if the use agreement transferred land to a private party (and it did), that still passes constitutional muster because it meets the definition of public purpose under *Kelo v. City of New London, Connecticut,* 545 U.S. 469 (2005).  (Br. at 30)   But the point overlooks one obvious difference. *Kelo* was concerned with the transfer of private property to the public, while this case involves the opposite—the transfer of public property to private hands. And here the requirements under *Paepcke* are stricter than those in *Kelo*, for as noted in Section I, *supra*, the 1869 dedication controls this transfer.  *Kelo* does not apply.  But even if it did, that case makes it clear that explicit transfers to private parties (unlike the development of New London), are excluded as "it has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B,* even though *A* is paid just compensation."

*Id.* at 477.  Yet the Foundation has never offered to pay fair market value for the land that it receives under the supposed use agreement.

### IX.  Plaintiffs State A Claim For Violation Of Article VIII, Section 1, Which Cannot Be Resolved On A Motion To Dismiss.  (Count VIII)

Article VIII, Section 1 of the Illinois Constitution prohibits the use of public property and monies for anything other than public purposes.  The Defendants seek dismissal of this claim suggesting that there is a public benefit from the project, based upon the Seventh Circuit's decision addressing a federal taking claim, and simply by looking at the statements of benefits set forth by the City Council which require deference.  (Br. at 26-28)

These arguments do not support dismissal of the claim, for they ignore the multitude of dislocations involved in bringing the OPC to Jackson Park, which were not discussed in *POP I,* which also show that the Foundation—a private party—is the primary beneficiary of the property transfer.  *See generally Southwestern Illinois Development Authority v. National City Environmental, LLC,* 768 N.E.2d 1, 10 (Ill. 2002) (reversing taking of private property by public entity who then provided property to private entity: "We do not require a bright-line test to find that this taking bestows a purely private benefit and lacks a showing of a supporting legislative purpose. As was the case in *Limits Industrial,* members of the public are not the primary intended beneficiaries of this taking.")

A grant of a Rule 12 motion is improper because the issue of who a primary beneficiary is involves factual disputes in regards to those benefits.  For purpose of a 12(b)(6) motion, the transfer here does not pass constitutional muster based on a single alleged benefit, because, if it did, *no* transfer would ever flunk, and making the constitutional protection under Article VIII, Section 1 (as well as the public trust doctrine) a nullity.  None of the decisions relied upon by Defendants support a Rule 12(b)(6) dismissal in these circumstances.

38

**CONCLUSION**

For the reasons set forth above, Defendants' Rule 12(b)(6) motion should be denied. However, to the extent the Court grants the motion to dismiss as to any claim, Plaintiffs respectfully request an opportunity to file an amended complaint pursuant to Fed. R. Civ. P. 15(b).

Dated: July 13, 2021            Respectfully Submitted,

                                             Protect Our Parks, Inc.; Nichols Park Advisory Council; Stephanie Franklin; Sid E. Williams; Bren E. Sheriff; W.J.T. Mitchell; and Jamie Kalven

                                             By:     /s/Richard A. Epstein
                                                         One of their attorneys

Richard Epstein
16 Thomas Place
Norwalk CT 06853
Raepstein43@gmail.com

Michael Rachlis (ARDC No. 6203745)
Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, Illinois 60605
(312) 733-3950 (gen.)
(312) 733-3952 (fax)
mrachlis@rdaplaw.net

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 16, 2021, I electronically filed the foregoing **Plaintiffs' Opposition to Motion to Dismiss** with the Clerk of the United States District Court for the Northern District of Illinois, using the CM/ECF system. Copies of the opposition were served upon counsel of record via the CM/ECF system.

/s/ Michael Rachlis

Rachlis Duff & Peel, LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
Phone  (312) 733-3950
Fax     (312) 733-3952
mrachlis@rdaplaw.net

# EXHIBIT 1

FINAL



DEPARTMENT OF PLANNING AND DEVELOPMENT
CITY OF CHICAGO

## 5901-6201 SOUTH STONY ISLAND AVENUE
## PROPOSED LAKE MICHIGAN AND
## CHICAGO LAKEFRONT PROTECTION ORDINANCE
## (APPLICATION NO. 721)

### RESOLUTION

**WHEREAS,** the applicant, The Barack Obama Foundation, has submitted an application seeking approval for a development pursuant to the regulations and requirements of the Lake Michigan and Chicago Lakefront Protection Ordinance; and,

**WHEREAS,** the applicant proposes to construct; (i) a 235'-tall building with cultural exhibit and office space; (ii) two, two-story cultural buildings with exhibit, program, office and public space; and, (iii) a two-story athletic and community center; public open space and a below-grade, accessory, vehicular parking garage will also be established with no more than 450 such parking spaces; and,

**WHEREAS,** the applicant's request for development approval pursuant to the regulations and requirements of the Lake Michigan and Chicago Lakefront Protection Ordinance was filed with the Department of Planning and Development on January 10, 2018; and,

**WHEREAS,** proper legal notice of the hearing for this application before the Plan Commission was published in the Chicago Sun-Times on May 2, 2018; the applicant was separately notified of this hearing and this application was considered at a public hearing by this Plan Commission on May 17, 2018; and,

**WHEREAS,** the Plan Commission has reviewed the application with respect to the applicable provisions of the Lake Michigan and Chicago Lakefront Protection Ordinance and finds that the proposal will be consistent with said provisions; and,

**WHEREAS,** the Department of Planning and Development recommended approval of the application, with the recommendations and explanations contained in the written report dated May 17, 2018, a copy of which is attached hereto and made a part hereof; and,

**WHEREAS,** the Plan Commission has fully reviewed the application, all associated informational submissions and the report and recommendation of the Commissioner of the Department of Planning and Development and all other

CITY_012107

FINAL

testimony presented at the public hearing held on May 17, 2018, giving consideration to the Lake Michigan and Chicago Lakefront Protection Ordinance.

**NOW, THEREFORE, BE IT RESOLVED BY THE CHICAGO PLAN COMMISSION:**

1. THAT the above-stated recitals to this resolution together with the report of the Commissioner of the Department of Planning and Development be adopted as the findings of fact of the Plan Commission regarding this Lake Michigan and Chicago Lakefront Protection Ordinance application; and,

2. THAT the final application presented on May 17, 2018 be approved as being in conformance with the applicable provisions, terms and conditions of the Lake Michigan and Chicago Lakefront Protection Ordinance application; and,

3. THAT the final application is subject to continuing review under the National Environmental Policy Act and the National Historic Preservation Act, and any minor changes to the application arising from such review shall be deemed approved as being in conformance with the Lake Michigan and Chicago Lakefront Protection Ordinance.

Martin Cabrera, Jr.
Chairman
Chicago Plan Commission

LMCLPO No. 721
Approved: May 17, 2018