**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PROTECT OUR PARKS, INC., et al.,

      Plaintiffs,

      v.

PETE BUTTIGIEG, et al.

      Defendants.

Case No. 21-cv-2006

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

On August 16, 2021, construction is set to start on the Obama Presidential Center (OPC) in Chicago's Jackson Park. Since the City of Chicago made the decision to locate the OPC in Jackson Park in 2016, efforts to preempt the construction at that site have persisted. In 2018, Plaintiff Protect Our Parks, Inc. and several individuals sued the City of Chicago and the Chicago Park District in this Court under various federal and state laws attempting to halt construction. This attempt was unsuccessful: this Court granted summary judgment in the defendants' favor on all claims, and the Seventh Circuit affirmed on the federal claims and held that the plaintiffs lacked standing to pursue their state-law claims.

Notwithstanding, six months after the Seventh Circuit's decision and just four months before groundbreaking, Plaintiff Protect Our Parks and several other new Plaintiffs have again sued to halt construction on the OPC. This time they sue not only the City and Park District, but also the Barack Obama Foundation and several

1

federal and state agencies under a series of federal- and state-law theories, some old and some new. More recently, Plaintiffs moved for a preliminary injunction on their federal claims, asking this Court to enjoin the imminent groundbreaking at Jackson Park. [30]. In support of their motion, Plaintiffs argued that various federal agencies failed in performing statutorily mandated reviews concerning construction of the OPC and its effects on the environment, historical resources, and wildlife, among other things. If the agencies had adequately performed these reviews, Plaintiffs claimed, the agencies would have concluded that a superior site to Jackson Park exists to host the OPC. As explained further below, this Court denied the motion. [83].

## I.    Background

### A.    Procedural History

In May 2018, Plaintiff Protect Our Parks and several individuals sued the City of Chicago and the Chicago Park District under federal and state law seeking to stop the construction of the OPC in Jackson Park. This Court granted summary judgment to the defendants on all claims, and the plaintiffs appealed. *See Protect Our Parks, Inc. v. Chicago Park District*, 971 F.3d 722, 728 (7th Cir. 2020) (*PoP II*), *cert. denied sub nom. Protect Our Parks, Inc. v. City of Chicago*, No. 20-1259, 2021 WL 1602736 (U.S. Apr. 26, 2021). On appeal, the Seventh Circuit affirmed this Court's grant of summary judgment on the plaintiffs' two federal claims—that the defendants took their property in violation of the Fifth and Fourteenth Amendments. *Id.* at 736. The court of appeals vacated summary judgment, however, on the plaintiffs' claims under Illinois law, which alleged violations of the public trust doctrine and ultra vires

actions, finding that the plaintiffs lacked Article III standing to sue on those claims. *Id.* at 732. On remand, this Court, consistent with the Seventh Circuit's holding, dismissed the state-law claims for lack of jurisdiction.

Undeterred, Plaintiff Protect Our Parks, along with Nichols Park Advisory Council (NPAC), and individuals Sid Williams, Stephanie Franklin, Bren Sheriff, Dr. W.J.T. Mitchell, and Jamie Kalvin have sued again seeking to halt construction on the OPC. [1]. Plaintiffs claim that the construction project has triggered several major federal regulatory reviews, specifically, those under: (1) § 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c) and 23 U.S.C. § 138(a); § 106 of the National History Preservation Act of 1966 (NHPA), 54 U.S.C. § 306108; the Urban Park and Recreation Recovery Act (UPARR), 54 U.S.C. §§ 200501–200511; and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347. *Id.* at ¶ 2. According to Plaintiffs, these federal statutes require comprehensive reviews of alternatives to determine how to address any adverse effects created by the OPC and to evaluate opportunities to avoid, minimize, or mitigate future adverse effects. *Id.* at ¶ 2. Defendants, Plaintiffs assert, have essentially ignored the regulatory frameworks requiring them to evaluate alternative sites to Jackson Park. *Id.* at ¶¶ 2–3.

As a result, Plaintiffs have now sued, in addition to Defendants the City of Chicago (the City), the Chicago Park District (the Park District), and the Barack Obama Foundation (the Foundation), Pete Buttigieg in his official capacity as Secretary of the Department of Transportation; Stephanie Pollack in her official

capacity as Acting Administrator of the Federal Highway Administration (FHWA); Arlene Kocher in her official capacity as the Division Administrator of the Illinois Division of the FHWA; Matt Fuller in his official capacity as the Environmental Programs Engineer of the Illinois Division of the FHWA; Anthony Quigley, P.E., in his official capacity as the Deputy Director, Region 1 Engineer of the Illinois Department of Transportation; Deb Haaland in her capacity as the Secretary of the United States Department of the Interior; Shawn Benge in his capacity as Deputy Director of Operations of the National Park Service (NPS), exercising the delegated authority of the Director of the NPS; John E. Whitley in his capacity as Acting Secretary of the Army; and Paul Culberson in his capacity as Commanding Officer of the Army Corps of Engineers. *Id.* at ¶¶ 23–34.

The fifteen-count complaint asserts claims for: (1) violation of section 4(f) of the Department of Transportation Act against the federal and state transportation and highway administration Defendants, the City, the Park District, and the Foundation (Count I); (2) violation of NEPA against all Defendants (Count II); violation of UPARR against the Interior Department, NPS, the City, the Park District, and the Foundation (Count III); violation of section 106 of the NHPA against all Defendants (Count IV); violations of Rivers and Harbor Act and Clean Water Act against the Army Corps Defendants, the City and the Park District (Count V); violation of the public trust doctrine against the City, the Park District, and the Foundation (Count VI); an ultra vires claim against the City and the Park District (Count VII); violation of article VIII, section 1 of the Illinois Constitution against the City, the Park District,

and the Foundation (Count VIII); violation of the Illinois Constitution Takings Clause against the City, the Park District, and the Foundation (Count IX); improper delegation of authority under federal statutes against all Defendants (Count X); improper delegation of authority in violation of the Illinois Constitution against the City, the Park District, and the Foundation (Count XI), violation of article I, section 2 of the Illinois Constitution against the City, the Park District, and the Foundation (Count XII), violation of article I, section 16 of the Illinois Constitution against the City and the Foundation (Count XIII); violation of section 110(k) of the National Historic Preservation Act against all Defendants (Count XIV); and, in the alternative to Counts I, II, and IV, violation of the Illinois State Agency Historic Preservation Resources Act against all state officials, the City, the Park District, and the Foundation (Count XV).

Plaintiffs seek a preliminary injunction on their federal claims. [31] at 17.

## B.    Factual Background[1]

### 1.    The City Approves Jackson Park as the Site of the OPC

In 2014, the Foundation began a nationwide search for the future location of the Barack Obama presidential library. *PoP II*, 971 F.3d at 728. Eventually, it settled upon Jackson Park, a public park owned by the Chicago Park District, on Chicago's South Side as the site of the OPC. *Id.*; *PoP I*, 385 F. Supp. 3d at 668. The

---

[1] This Court presumes familiarity with the facts concerning the inception of the OPC and the decision by the City of Chicago to locate the OPC in Jackson Park, as set forth in great detail in this Court's prior order on the parties' cross-motions for summary judgment, *Protect Our Parks, Inc. v. Chicago Park District*, 385 F. Supp. 3d 662 (N.D. Ill. 2019) (*PoP I*), and the Seventh Circuit's opinion in *PoP II*. This Court therefore only briefly revisits the facts relevant to Plaintiffs' present motion.

site selected for the OPC within Jackson Park comprises 19.3 acres, or 3.5% of the 551.52 acres that make up the Park. *PoP I*, 38 F. Supp. 3d at 668. The site lies on the western edge of Jackson Park and includes parkland bounded by South Stony Island Avenue to the west, East Midway Plaisance Drive North to the north, South Cornell Drive to the east, and South 62nd Street to the south. *Id.* The OPC site also includes land within the park currently existing as city streets: the portion of East Midway Plaisance Drive North between Stony Island Avenue and South Cornell Drive, and a portion of South Cornell Drive between Eastern Midway Plaisance Drive South and East Hayes Drive. *Id.* at 668–69. As part of the construction, these street portions will be closed and removed to restore the landscape's connection to the lagoon and lake. *Id.* at 669. When built, the OPC will consist of a campus containing open green space, a plaza, and four buildings: the Museum Building; the Forum Building; a Library Building; and a Program, Athletic, and Activity Center. *Id.* at 669.

Upon selection of Jackson Park as the site of the OPC, the City acquired the 19.3 acres necessary for the OPC from the Park District, enacted ordinances required to approve construction of the OPC, and entered into a use agreement with the Foundation that governs the terms of construction, ownership, and operation. *PoP II*, 971 F.3d at 728.

### 2. Declarations For and Against the Preliminary Injunction

At the parties' request, this Court set Plaintiffs' motion for preliminary injunction for oral argument on July 20, 2021; the parties declined to present any live witnesses, opting instead just to argue their respective positions. This Court

therefore relies upon the arguments and evidence presented in the parties' briefs, including the various declarations submitted by each side and the administrative record.

### a.    Robbin Cohen for the Foundation

The Foundation submitted the declaration of Robbin Cohen, Executive Vice President – Obama Presidential Center, Strategy, and Technology. [48-1]. Cohen attests that the federal reviews were completed in February 2021 and the OPC's construction start date is August 16, 2021. *Id.* at ¶¶ 4–5. Assuming construction stays on schedule, construction will take four years and two months and the OPC will open in Fall 2025. *Id.* at ¶ 5. The Foundation itself will pay for the construction and operation of the OPC, and the total project will cost approximately $700 million, paid for by donations to the Foundation. *Id.* at ¶ 6.

As for the selection of Jackson Park as the site of the OPC, Cohen explains that in 2014, the Foundation issued a "Request for Qualifications" relating to the future OPC; after receiving over a dozen responses proposing locations around the country, the Foundation issued a "Request for Proposals" to applicants from Chicago, New York, and Hawaii. *Id.* at ¶ 10. Then, in May 2015, the Foundation announced it selected the South Side of Chicago for the future home of the OPC and that it would consider certain South Side sites that had been presented to it. *Id.* In July 2016, the Foundation announced it selected Jackson Park on Chicago's South Side as the site of the OPC. *Id.*

The Foundation then applied to the City for various approvals to move the project forward in Jackson Park. *Id.* at ¶ 11. The City ultimately approved Jackson Park for the site of the OPC. *Id.* The City and Foundation then executed a "Master Agreement" in May 2019, which provides that the Foundation will construct, install, occupy, use, maintain, operate, and alter the OPC and related buildings and green spaces upon the completion of certain conditions, including the resolution of federal agency reviews. *Id.* at ¶ 13.

### b.  Plaintiffs' Declarations

Plaintiffs also submitted several declarations in support of their motion. One of their declarants, Plaintiff W.J.T. Mitchell, serves as a professor of English and Art History at the University of Chicago and lives in Hyde Park on Chicago's South Side. [31-1] at 8–14. Mitchell attests that he frequently visits Jackson Park as a place for rest and recreation, namely, for walking, biking, golfing, and tennis. *Id.* at 9. According to Mitchell, the proposed reconfiguration and destruction of Jackson Park land and the Midway Plaisance will "irreparably diminish and harm the aesthetic, recreational, environmental, and historic values" of those places. *Id.* at 10. Mitchell also believes that the placement of the OPC involves one of the most prized parts of Jackson Park—the Midway Plaisance, Woman's Garden, and the scenic woodland containing mature trees adjacent to Stony Island. *Id.* In particular, Mitchell states that the Midway Plaisance serves as a crucial east-west artery connecting South Side neighborhoods with Jackson Park and Washington Park, and that the OPC's plan to

close the eastbound lane will have the effect of destroying the essential function of the historic space and crucial component of urban infrastructure. *Id.* at 12–13.

Another declarant, Plaintiff Stephanie Franklin, is a Hyde Park homeowner and has used and enjoyed the aesthetic benefits of Jackson Park and Midway Plaisance throughout her life. *Id.* at 20. Franklin serves as the president of Nichols Park Advisory Council (NPAC), another Plaintiff in this case. *Id.* According to Franklin, NPAC constitutes a park advisory council organization that advises the Park District; she and the NPAC believe that the aesthetic and recreational values of Jackson Park will be irreparably diminished and harmed by the proposed OPC. *Id.* at 20–22.

Herb Caplan, the president of Plaintiff Protect Our Parks, also proffered a declaration. [31-1] at 31. He, like Franklin and Mitchell, also believes that the OPC's construction will diminish and harm the aesthetic, environmental, and recreational value of Jackson Park. *Id.* at 33.

### 3. Federal Reviews

Although the federal government had nothing to do with the initial decision to situate the OPC in Jackson Park, the City's action did trigger a number of federally-mandated reviews and actions, the adequacy of which Plaintiffs now challenge.

### a. UPARR Conversion

First, the City's decision to approve Jackson Park as the location of the OPC necessitated action by the NPS under the UPARR Act. Congress established the UPARR Act in 1978 to provide federal assistance for the rehabilitation of recreational facilities in economically distressed urban communities. *See* 54 U.S.C. §§ 200501–

9

200511; 36 C.F.R. § 72.72(a) ("The UPARR program has made funds available for the renovation and rehabilitation of numerous urban parks and recreation facilities."); [61-10] at 7. The Act authorizes NPS to convert property assisted under UPARR to non-public recreation uses only if it "finds it to be in accord with the then-current local park . . . and only on such conditions as [NPS] considers necessary to ensure the provision of adequate recreation properties and opportunities of *reasonably equivalent location and usefulness*." 54 U.S.C. § 200507 (emphasis added).

The OPC's placement in Jackson Park triggered UPARR because the project would require conversion of UPARR-assisted property. In the 1980s, the City received federal funds for Jackson Park under UPARR grants, in exchange for which the City agreed to maintain Jackson Park for public recreation uses. [61-10] at 7; [61-22] at 13, 22. Upon the City's decision to place the OPC in Jackson Park, the NPS determined that the construction would require a conversion of 4.6 acres of parkland to non-recreation uses within the boundary of the OPC buildings, as well as an additional conversion of 5.2 acres for the proposed transportation improvements to non-recreation uses. [61-22] at 23.

To balance those potential losses of Jackson Park land to non-recreational uses, the City identified a potential replacement area just outside of the Park to convert to recreational uses. [61-10] at 33. That replacement property sits on the east end of the Midway Plaisance between Stony Island Avenue and the Metra Electric Railway, just west of Jackson Park. *Id.* Per the City's proposal, the replacement property will be converted into a new play area and will include

improved open space and rehabilitated walkways. *Id.* at 33–34. As conceived, the City's proposed replacement elements would amount to a *net gain* of approximately 6.6 acres of recreational uses in Jackson Park. *Id.* at 36. After assessing the City's proposal, NPS concluded that the replacement properties satisfied regulatory requirements for the partial conversion of UPARR-funded properties in Jackson Park. *Id.* at 47.

### b.     FHWA's Section 4(f) Review

The City's decision to close portions of three roadways within Jackson Park to accommodate the OPC also prompted the Chicago Department of Transportation (CDOT) to propose use of federal funding for roadway construction and bicycle and pedestrian improvements within the Park. [61-22] at 20–21. This in turn triggered the FHWA's review under section 4(f) of the Department of Transportation Act of 1966, which permits the Secretary of Transportation to "approve a transportation program or project" that requires the "use of publicly owned land of a public park . . . or land of an historic site of national, State, or local significance . . . only if . . . (1) there is no prudent and feasible alternative to using that land; and . . . (2) the program or project includes all possible planning to minimize harm to the [publicly owned land] resulting from the use." 49 U.S.C. § 303(c); *see Old Town Neighborhood Ass'n Inc. v. Kauffman*, 333 F.3d 732, 736 (7th Cir. 2003) (noting that section 4(f) is triggered where a project requests approval from the Secretary of Transportation and stating that entities "that proceed on their own dime need not meet conditions for federal assistance or approval"); *see also* [61-35] (final section 4(f) evaluation).

11

The proposed OPC location in Jackson Park implicated four section 4(f) properties (public parks and historic sites): Jackson Park, Midway Plaisance, Jackson Park Historic Landscape District and Midway Plaisance, and the Chicago Park Boulevard System Historic District (CPBS). [61-35] at 17. Ultimately, after undergoing multiple analyses, the FHWA's section 4(f) evaluation found no feasible and prudent alternative to the use of those section 4(f) properties. *Id.* at 51–57.

Because the FHWA found that no feasible and prudent alternatives existed to using section 4(f) property, the FHWA then examined how to best minimize and mitigate any adverse impact from using the section 4(f) properties affected by the construction. *Id.* at 58. The FHWA assessed nine alternatives that included, for instance, widening Lake Shore Drive, "aimed to incrementally improve operations and available transportation capacity in order to minimize permanent use of Section 4(f) resources." *Id.* Ultimately, the FHWA found that only one alternative, Alternative 9 (widening Lake Shore Drive, widening Stony Island Avenue, and reconfiguring Hayes Drive), fully met the project purpose of accommodating changes in travel patterns resulting from closing roadways in Jackson Park and improving pedestrian and bicycle access and circulation to and from Jackson Park. *Id.* at 65. The FHWA then conducted further analysis to generate sub-alternatives representing different means to implement Alternative 9 and subjected two of those sub-alternatives, 9A and 9B, to a "least harms analysis." *Id.* at 67. Ultimately, the FHWA found that Alternative 9B caused the least overall harm to section 4(f) properties. *Id.* at 80–82.

### c. USACE Permits

The City's choice of Jackson Park for the OPC also necessitated the involvement of the U.S. Army Corps of Engineers (USACE), which administers both the Rivers and Harbors Appropriation Act of 1899 (RHA) and the Clean Water Act (CWA).

In 2014, the Park District and the USACE entered into an agreement to complete an ecological restoration project within Jackson Park and along the Lake Michigan shoreline. [61-22] at 76. This project, known as the Great Lakes Fishery and Ecosystem Restoration (GLFER), includes about 147 acres of native habitat within Jackson Park along the shoreline and 24 acres of new natural areas, as well as the installation of over 600,000 native plants. *Id.* It is the existence of the GLFER that implicates USACE's involvement under the RHA.

Section 408 of the RHA makes it "unlawful for any person or persons to take possession of or make use of for any purpose . . . work built by the United States," but authorizes the USACE to "grant permission for the alteration or permanent occupation or use of . . . [a] public work[] when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work." 33 U.S.C. § 408. The Park District requested a permit pursuant to section 408 of the RHA from USACE on August 20, 2019. [61-22] at 79; *see also* [61-46] at 2. The Park District made this permit request because the OPC's construction will permanently impact the GLFER, specifically by co-opting narrow strips located along the project perimeter to accommodate roadway improvements,

for a total of 1.32 acres. [61-44] at 16. The Park District proposed mitigating these adverse impacts by planting 2.43 acres of native plants and by rehabilitating a deteriorated historic path and lagoon overlook along the Inner Harbor. *Id.* After reviewing the section 408 permit and preparing an Environmental Assessment, USACE found that the Park District's proposal qualified for a section 408 permit because it would "not adversely impact the usefulness of the USACE project. To the contrary, the design of the proposed alteration will improve usefulness of the GLFER project by increasing the restored natural areas acreage as well as improving park accessibility through pathway connections to the Obama Presidential Center." [61-45] at 4. In January 2021, the USACE granted a section 408 permit, allowing the Park District to "permanently impact a total of 1.32 acres" of the GLFER, "which will be offset by implementation of 2.43 acres" of a planned mitigation area in Jackson Park. [61-46] at 2.

The City's proposed transportation improvements also implicated section 404 of the CWA because the need to provide construction access at two existing bridges will require temporarily dewatering a total of 0.24 acres of waters of the United States and expansion of the 59th Street Inlet Bridge will require 0.04 acres of new fill in waters of the United States. [61-42] at 2. Under section 404 regulations, "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States." *Fox Bay Partners v. U.S. Corps of Eng'rs*, 831 F. Supp. 605, 609 (N.D. Ill. 1993) (quoting 40 C.F.R. § 230.10(c)).

The USACE determined that the transportation project complies with the terms and conditions to receive a Regional Permit 3, which applies to projects "that impact no more than 0.5 acres of waters of the U.S." [61-42] at 2; [61-3] at 2. The USACE found, specifically, that the project "will result in no more than minimal individual and cumulative adverse effects on the aquatic environment and will not be contrary to the public interest." [61-41] at 14. The USACE therefore approved the issuance of a permit for the construction. [61-41]; [61-42] at 2.

### d. NEPA

The City's decision to place the OPC in Jackson Park also prompted various agencies, including NPS and FHWA, to prepare an Environmental Assessment (EA) pursuant to NEPA to evaluate the environmental impacts of the proposed federal actions. [61-22] at 3, 13–14.

Signed into law in 1970, NEPA establishes a national policy to "encourage productive and enjoyable harmony between man and his environment." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321)); *see also Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 953 (7th Cir. 2003) (observing that NEPA reflects a "broad national commitment to protecting and promoting the environment"). Under NEPA, federal agencies must "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official" on:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). This "detailed statement" is called an environmental impact statement (EIS). *Pub. Citizen*, 541 U.S. at 757. The Council of Environmental Quality (CEQ), established by NEPA to issue regulations interpretating NEPA, has promulgated regulations guiding agencies in determining which actions require the preparation of an EIS. *Id.* Relevant here, the regulations allow an agency to permit a more "limited document," an environmental assessment (EA), if the agency's proposed action "neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS." *Id.*; *see also Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 525 (7th Cir. 2012).

Under the operative regulations,[2] the EA is a "concise public document" that provides "sufficient evidence and analysis for determining whether to prepare" an EIS. *Pub. Citizen*, 541 U.S. at 757 (quoting 40 C.F.R. § 1508.9(a) (2019)). If, pursuant to an EA, an agency determines that the regulations do not require it to prepare an EIS, it must issue a "finding of no significant impact" (FONSI), which "briefly

---

[2] The regulations were amended in July 2020 and became effective in September 2020, a month after the issuance of the EA in this case. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020); [61-22] at 2. The parties agree that the new regulations do not apply here.

presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Id.* at 757–58 (citing 40 C.F.R. §§ 150.1(e), 1508.13 (2019)). Put simply, an agency's preparation of an EA leads either to a FONSI, or alternatively, to a finding that it must prepare an EIS. *Hoosier Env't Council, Inc. v. U.S. Army Corps of Eng'rs*, 105 F. Supp. 2d 953, 970 (S.D. Ind. 2000) (citing *Rhodes v. Johnson*, 153 F.3d 785, 788 (7th Cir. 1998)). In this case, the agencies did not prepare an EIS. Instead, they prepared an EA, *see* [61-22], and then a FONSI in which NPS and FHWA concluded that "there is no significant impact to the human environment associated with" the federal actions with respect to the OPC—namely, NPS' approval of the conversion of UPARR-assisted land in Jackson Park and the FHWA's authorization of funding for transportation improvements, [61-43] at 2.

NEPA also requires that agencies "study, develop, and describe appropriate alternatives" to major federal projects. 42 U.S.C. § 4332(2)(C)(iii), (2)(E). Here, the EA examined three such alternatives: Alternative A, the no-action alternative, where NPS does not approve the UPARR conversion, the OPC is not built, and no roads are closed; Alternative B, where NPS approves the UPARR conversion, the OPC is built, and roads are closed, but the FHWA does not approve funding for the transportation improvements; and Alternative C, where the NPS approves the UPARR conversion and the FHWA approves funding of the transportation improvements identified in Alternative 9B of the FHWA's section 4(f) Evaluation. [61-22] at 27–28. After review, the agencies selected Alternative C as the "preferred alternative" because it best

"meets the purposes and needs of both NPS and FHWA." *Id.* at 79–80. Those agencies concluded that the analysis in the EA demonstrated that the selected action would not have a significant impact on the environment. [61-42] at 2.

### e. NHPA

The City's decision to place the OPC in Jackson Park also triggered the application of section 106 of NHPA, which requires federal agencies to "take into account the effect" of any "undertaking on any historic property" prior to approving the expenditure of federal funds. 54 U.S.C. § 306108. Under NHPA, a federal agency must make a reasonable and good faith effort to identify historic properties, 36 C.F.R. § 800.4; assess the adverse effects of the undertaking on any eligible historic properties, *id.* § 800.5(a); and consult with "other consulting parties" to "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects" on those historic properties, *id.* § 800.6(a).

The FHWA served as the lead agency in preparing an assessment of effects to historic properties (AOE) from the "undertaking"—the OPC's construction and related federal actions by NPS, FHWA, and USACE. [61-13] at 7–8. The AOE identified two historical properties that would be adversely affected by the OPC's construction: (1) Jackson Park and Midway Plaisance; and (2) the CPBS Historic District. *Id.* at 46–47, 62, 87–88. The AOE described those adverse effects, as well as actions the various agencies and the City will take to avoid, minimize, and mitigate the impacts from the OPC and road closures. *Id.* at 46–47, 62, 81–86.

## f.  The City's Tree Removal in 2018

Finally, this Court summarizes the facts relating to Plaintiffs' anticipatory demolition claim under section 110(k) of NHPA.  Section 110(k) prohibits federal agencies from issuing a loan, permit, license, or other assistance to an applicant who, "with intent to avoid the requirements [of section 106 of NHPA], has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed the significant adverse effect to occur."  54 U.S.C. § 306113.  An exception exists, however, if the agency "determines that circumstances justify granting the assistance despite the adverse effect created or permitted by the applicant."  *Id.*

In August 2018, the Advisory Council on Historic Preservation (ACHP)[3] notified FHWA that it became aware that trees were being cleared in Jackson Park, which was then already undergoing section 106 review.  *See* [61-7]; *see also* [61-6].  The FHWA then flagged this issue for the City, which subsequently provided a written explanation for its actions.  [61-8].  The City explained that, in August 2018, the Park District began site preparation (including removing trees and grading the surface) for the building of a new track and field in Jackson Park.  *Id.* at 2.  The City further explained that the Foundation had agreed to donate the funds for the track and placed no conditions on the donation related to approval of the OPC.  *Id.* at 3.  The work, according to the City, lies entirely outside the area proposed for the OPC

---

[3] The ACHP is the federal agency charged with administering the NHPA.  *See Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752, 755 (D.C. Cir. 2003).

and outside the area where any proposed traffic improvements would be made; the work is intended to provide improved track and field and recreational opportunities in the Park, despite the eventual OPC construction. *Id.* The City also explained that it had consulted NPS prior to its work on the track and field and that it understood NPS agreed that the new track and field were not subject to federal review. *Id.* at 4. Nevertheless, the City agreed to cease construction until the completion of section 106 reviews. *Id.* at 2.

In response to the City, the FHWA issued a letter in September 2018 stating that although construction of the track and field portion did not itself implicate federal review, it *does* factor into the section 106 and NEPA processes. [61-9] at 4–5. Ultimately, however, the FHWA determined that section 110(k) did not apply to the City's work with respect to the track and field facilities because the City did not take any actions with the intent to avoid the requirements under section 106. *Id.* at 5.

## II.    Legal Standard

A preliminary injunction constitutes "an extraordinary remedy" reserved for exceptional cases. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *LHO Chi. River, L.L.C. v. Rosemoor Suites, LLC*, 988 F.3d 962, 968 (7th Cir. 2021). A party seeking a preliminary injunction must establish it has a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if a preliminary injunction is denied. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020).

If the moving party meets these threshold requirements, this Court then "must weigh the harm the denial of the preliminary injunction would cause the

plaintiff against the harm to the defendant if the court were to grant it." *Id.*; *see also Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020), *cert. denied*, No. 20-1244, 2021 WL 2519129 (U.S. June 21, 2021). To do so, this Court must also consider the public interest in granting or denying the injunction. *Speech First*, 968 F.3d at 637. This Court uses a "sliding scale approach" when weighing these considerations. *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021).

## III. Analysis

Before considering the merits of the claims, this Court summarizes the appropriate standard of review of the federal agencies' actions surrounding the OPC. Plaintiffs ask this Court to review the agencies' actions under the Administrative Procedure Act (APA), which sets "forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020). The APA directs a "reviewing court" to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts find an agency decision arbitrary and capricious if it "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Dep't of Workforce Dev.-Div. of Vocational Rehab. v. U.S. Dep't of Educ.*, 980 F.3d 558, 565–66 (7th Cir. 2020) (quoting *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 668 (7th Cir. 2016)). Judicial review under this standard is deferential, and "a court may not substitute its own policy judgment for that of the agency." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158

(2021). This Court's task "simply ensures that the agency has acted within a zone of reasonableness" and "has reasonably considered the relevant issues and reasonably explained the decision." *Id.* In reviewing an agency's decision under the arbitrary and capricious standard, this Court looks at the "entire record," and upholds the agency actions if it discerns a "rational basis for the agency's choice" even it disagrees with the agency's action. *Boucher v. U.S. Dep't of Agric.*, 934 F.3d 530, 547 (7th Cir. 2019) (quoting *Israel v. U.S. Dep't of Agric.*, 282 F.3d 521, 526 (7th Cir. 2002)).

With these standards in mind, this Court turns next to determining whether Plaintiffs demonstrate a likelihood of success on the merits of their claims.

### A.    NEPA Claim

This Court begins its analysis with Plaintiffs' NEPA claim. Plaintiffs raise two primary challenges under NEPA. First, they argue that agencies acted arbitrarily and capriciously by issuing a FONSI at the conclusion of their EA and by not preparing a more detailed EIS. [31] at 19–25. Second, they contend that the agencies failed to consider alternative locations to Jackson Park for the OPC. *Id.* at 25–32. This Court will consider those arguments in order below.

### 1.    Decision to Forego the EIS

Plaintiffs contend that the agencies improperly elected to forego an EIS, arguing that an EIS was mandated based upon any assessment of the evident environmental impacts and the relevant regulatory factors.

### a.    Environmental Impacts

First, Plaintiffs posit that "entire swaths" of the EA ignore and understate environmental impacts. [31] at 20. They complain that the EA acknowledges that

22

close to 1,000 mature trees must be cut to make way for the OPC and expansion of roadways, but "treats that massive transformation . . . as insignificant and fully mitigated" by the commitment to plant an equal number of saplings. *Id.* at 20. Plaintiffs also take issue with the cutting of hundreds of trees on the eastern and western edges of Jackson Park due to the impact on air quality and migratory birds. *Id.* These complaints, however, amount to nothing more than disagreements about substantive decisions that the various Defendants made to address the environmental impacts caused by the OPC. NEPA "does not mandate particular results," and so long as "adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Mineta*, 349 F.3d at 953 (quotation omitted); *accord Indian River County v. U.S. Dep't of Transp.*, 945 F.3d 515, 522 (D.C. Cir. 2019) ("NEPA is not a suitable vehicle for airing grievances about the substantive policies adopted by an agency, as NEPA was not intended to resolve fundamental policy disputes."), *cert. denied sub nom. Indian River County v. Dep't of Transp.*, 141 S. Ct. 243 (2020).

This Court thus does not evaluate whether the agencies made the "right" decisions, but rather whether in making those decisions they followed the NEPA procedures. *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 593 F. Supp. 2d 1019, 1024 (E.D. Wis. 2009), *aff'd sub nom. Habitat Educ. Ctr. v. U.S. Forest Serv.*, 609 F.3d 897 (7th Cir. 2010). And the agencies indisputably did so here with respect to trees and the impacts of cutting down the trees to migratory birds. The EA includes as Appendix

D a 75-page "Tree Technical Memorandum" which identifies and discusses the impacts from the anticipated removal of trees to accommodate the OPC. [61-22] at 164–239. Among other things, the Tree Memo identifies the species, size, and health of each tree that will be removed, *id.* at 179–81, and extensively details strategies to mitigate the effects of tree removal, including replacing each tree (on a 1:1 ratio) with 2.5-inch to 4-inch caliper trees that will complement the historic landscape of Jackson Park and that will serve functional purposes related to aesthetics, shade, sightlines, and access, *id.* at 183–86, *see also id.* at 42.

The EA also extensively considers the environmental impacts of the OPC to migratory birds, acknowledging that the habitat for migratory birds will be temporarily impacted by the clearing of 789 trees from Jackson Park and that the City has committed to ban tree removal from March 1 to August 31 to protect the birds during breeding season. *Id.* at 41–42, 84, 121–25.

Further, the EA includes an air quality analysis detailed in Appendix E. *See id.* at 42, 240–300.

Based upon their assessments, the agencies concluded in the EA that its tree replacement plan would result in "long-term beneficial impacts to the overall tree population, tree species diversity, and anticipated tree canopy when the replanted trees reach maturity." *Id.* at 182. Upon examination of the EA, this Court finds that the agencies satisfied NEPA's requirements by analyzing the serious impacts from tree removal to the overall environment, air quality, and migratory birds. This Court thus lacks a basis to disturb their substantive judgment that the tree replacement

24

project will result in a net benefit to Jackson Park. *See Boucher*, 934 F.3d at 547 (instructing courts to defer to agencies as long as they can discern a "rational basis for the agency's choice").

### b. Regulatory Factors

Plaintiffs next complain that the agencies failed to adequately consider certain enumerated regulatory factors relevant to a finding of whether there exist "significant" environmental impacts from the project that would warrant an EIS. [31] at 21. Because the agencies failed to adequately consider these factors, Plaintiffs argue, the EA erroneously finds the non-existence of "significant" environmental impacts, and thus is not entitled to deference. *Id.*

Under the operative regulations, whether a project "significantly" affects the human environment such as to require the preparation of an EIS depends upon two elements: context and intensity. 40 C.F.R. § 1508.27(a)–(b) (2019); *see Mineta*, 349 F.3d at 953. Plaintiffs emphasize the intensity element. The regulations enumerate ten factors that "should be considered" in assessing the "intensity" element. 40 C.F.R. § 1508.27(b) (2019). Plaintiffs contend that the agencies insufficiently considered the following four factors: (1) "unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas"; (2) the "degree to which the effects on the quality of the human environment are likely to be highly controversial"; (3) the "degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic

25

Places or may cause loss or destruction of significant scientific, cultural, or historical resources"; and (4) whether "the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.*; *see* [31] at 20–25.

This Court will consider whether the agencies sufficiently addressed these regulatory factors relevant to "intensity," bearing in mind that as long as "an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Ind. Forest*, 325 F.3d at 859; *accord Del. Audubon Soc'y v. Salazar*, 829 F. Supp. 2d 273, 284 (D. Del. 2011) ("Presence of enumerated intensity factors does not mandate a finding of significance; rather, the agency must establish only that it addressed and evaluated the factors.") (citing *Coliseum Square Ass'n, Inc. v. Jackson,* 465 F.3d 215, 233–34 (5th Cir. 2006)).

<u>Unique Characteristics</u>. First, this Court finds no merit to Plaintiffs' argument that the agencies failed to consider the unique characteristics of Jackson Park. *Contra* [31] at 21–22. In fact, the EA places great emphasis and focus upon the unique geographic characteristics of Jackson Park. For instance, the EA discusses in detail impacts: to water resources (Lake Michigan, the North and South Lagoons, a pond, and four wetlands), [61-22] at 42–43; archaeological resources, *id.* at 44; wildlife, *id.* at 40–42, and air quality, *id.* at 42. The EA further details mitigating measures the agencies would take to protect Jackson Park's unique characteristics, such as, for example, prohibiting tree removal through August 31 to protect certain bird species during their breeding season. *Id.* at 41. Plaintiffs may not agree with

the agencies' determination that the construction would not significantly impact the unique geographical characteristics of the area, but this Court cannot second-guess their substantive decisions *de novo*. *Ind. Forest,* 325 F.3d at 859.

Controversy. Plaintiffs next contend that the agencies failed to consider "the degree to which the effects on the quality of the human environment are likely to be highly controversial." C.F.R. § 1508.27(b)(4) (2019); *see* [31] at 22. This Court employs a two-step analysis to determine whether an agency adequately evaluated this factor: first, the plaintiffs must initially demonstrate that "experts and state and federal agencies disagree about the effects of the [construction] on the human environment"; and second, assuming plaintiffs meet that initial burden, this Court then decides whether the record shows that "these concerns were addressed . . . in finding that the project would not significantly affect the environment." *Ind. Forest*, 325 F.3d at 860 (quotation omitted).

To meet the first of these two prongs—the existence of a disagreement— Plaintiffs argue that a controversy exists about the construction's size, nature, and impact, including the disruption of traffic patterns, the destruction of trees, the size of the OPC building and its placement on the Midway Plaisance, the destruction of "key features" of Jackson Park, and the decision to place the OPC in a public park designed by Frederick Law Olmsted.[4] [31] at 22. In support, Plaintiffs point to the declaration of Plaintiff W.J.T. Mitchell, a landscape historian and professor at the University of Chicago, whose declaration highlights some of these points of

---

[4] Frederick Law Olmsted, known as the father of American Landscape architecture, designed the site now known as Jackson Park.

disagreement with the City, namely his belief that there exists "a mistaken idea that nineteen plus acres confiscated by the OPC plan do not represent a large part of Jackson Park," and that the planned closing of the east-bound lane of Midway Plaisance, which serves as an east/west artery connecting South Side neighborhoods with Jackson Park and Washington Park, will destroy both the effect of Midway Plaisance as a historical space and a crucial part of urban infrastructure, [31-1] at 12, 13. Yet the scope of this Court's NEPA review "is limited to the administrative record that was before the agency at the time it made its decision." *E. Band of Cherokee Indians v. U.S. Dep't of the Interior*, No. CV 20-757 (JEB), 2021 WL 1518379, at *25 (D.D.C. Apr. 16, 2021) (quoting *Rock Creek Pack Station, Inc. v. Blackwell*, 344 F. Supp. 2d 192, 201 (D.D.C. 2004)). Plaintiffs fail to demonstrate that Mitchell's views were before the agencies at the time they prepared the EA, and accordingly, may not use that piece of evidence to demonstrate a disagreement.

Regardless, even if Plaintiffs could demonstrate a genuine disagreement with the agencies about the impact to certain features of Jackson Park, that disagreement does not "render the defendants out of compliance under this [controversy] factor." *Mineta*, 349 F.3d at 957. Plaintiffs must also demonstrate the second step of the "controversy" inquiry—that their concerns were not addressed by the agencies in finding that the project would not significantly affect the environment. *Ind. Forest*, 325 F.3d at 860. And Plaintiffs fall short on this second step too because the EA fully addresses these effects. *See* [61-22] at 24–26, 32–38 (change in traffic patterns), 164–239 (tree removal), 18–20 (size of the OPC building and relationship to Midway

Plaisance), 61–67 (historic properties). In sum, because the record "is replete with scientific data addressing the concerns" which Plaintiffs raise, this Court cannot say (for the purposes of the instant motion) that the agencies acted arbitrarily and capriciously in finding no significant impact and not ordering an EIS. *Ind. Forest*, 325 F.3d at 861.

Effects on historic sites, districts, or highways. Plaintiffs next argue that the EA ignores impacts on three National Register historic resources—Jackson Park, the Midway Plaisance, and the Chicago Boulevards Historic District—as well as "other unique and irreplaceable features of Jackson Park." [31] at 22–23. Far from ignoring these issues, however, the EA discusses these resources at length. [61-22] at 61–67. Thus, again, the record undermines the notion that the agencies acted arbitrarily and capriciously in addressing this factor and in finding no significant impact. *See Mineta*, 349 F.3d at 957 ("That conclusion was informed and reasoned, and thus cannot be second-guessed.").

Cumulative effects. Plaintiffs also argue that the agencies improperly ignored a number of cumulative effects that will arise from the OPC's construction. [31] at 23–25. Not so. The EA addresses all of the effects Plaintiffs claim have been ignored. For instance, Plaintiffs claim the construction involves not only the OPC building, but also the destruction of a road system and creation of a new roadway system that will narrow the park and expose Jackson Park to noise, fumes, dirt, and other types of pollution. *Id.* at 24. But the EA plainly considers the creation of a new roadway system and the effects stemming of this project. [61-22] at 13, 20–26. Plaintiffs also

29

claim that the EA includes only a cursory cumulative impact analysis with respect to the GLFER area in Jackson Park, [31] at 24, yet the EA devotes an entire section to analyzing the impacts of the OPC's construction on GLFER, *see* [61-22] at 76–79. Finally, Plaintiffs complain that the EA "makes no reference" to a golf course that has been targeted for future destruction. [31] at 24. Contrary to this assertion, however, the EA discusses the golf courses within Jackson Park but notes that, at the time of the assessment, the rehabilitation of those golf courses was "not considered" because "final plans and design" for the courses had not yet been approved. [61-22] at 44–45. An agency does not act arbitrarily or capriciously by excluding from a cumulative impacts analysis "any project that cannot be meaningfully discussed at the time" the EA is issued. *Habitat Educ. Ctr.*, 673 F.3d at 527. Thus, in sum, none of Plaintiffs' objections to the EA's cumulative impacts analysis square with the record.

For these reasons, this Court cannot find that Plaintiffs are likely to succeed on the merits of their contention that the agencies acted arbitrarily and capriciously by foregoing an EIS.

## 2. Inquiry Into Reasonable Alternatives

Plaintiffs also argue that the agencies failed to "study, develop, and describe appropriate" alternatives, as required under NEPA. [31] at 25–32. This inquiry into reasonable alternatives remains operative even if, as is the case here, the agency finds no significant environmental impact. *Mineta*, 349 F.3d at 960 (citing *River Rd. All., Inc. v. Corps of Eng'rs of U.S. Army*, 764 F.2d 445, 452 (7th Cir. 1985)); *see* 42 U.S.C. § 4332(2)(C)(iii), (2)(E). This Court's review "is not of the agency's substantive

judgment, but of the sufficiency of the agency's consideration of the reasonable alternatives." *Mineta*, 349 F.3d at 960. The regulations require that an agency always study a no-action alternative. *Habitat Educ. Ctr.*, 593 F. Supp. 2d at 1027 n.13 (citing 40 C.F.R. § 1502.14(d) (2019)).

The EA examined three alternatives: Alternative A, the statutorily required no-action alternative, where NPS does not approve the UPARR conversion, the OPC is not built, and no roads are closed; Alternative B, where NPS approves the UPARR conversion, the OPC is built, and roads are closed, but the FHWA does not approve funding for the transportation improvements; and Alternative C, where the NPS approves the UPARR conversion and the FHWA approves funding of the transportation improvements identified in Alternative 9B of the FHWA's section 4(f) Evaluation. [61-22] at 27–28. After review, the agencies selected Alternative C because it best "meets the purposes and needs of both NPS and FHWA." *Id.* at 80. Plaintiffs fault the agencies' review of alternatives in several ways.

First, Plaintiffs devoted much of their briefing and oral argument to accusing the agencies of engaging in segmentation. *See* [31] at 26; [80] at 14–24. Segmentation refers to an improper practice by which an agency attempts to circumvent NEPA by dividing a federal action into smaller components to mask the overall impacts of the single action. *Mineta*, 349 F.3d at 962; *see also Louie v. Dickson*, 964 F.3d 50, 56 (D.C. Cir. 2020). The "classic example" of improper segmentation occurs where an agency builds small portions of a highway (and performs separate NEPA reviews of each portion) to avoid assessing the overall effects of the highway as a whole. *See Oak*

31

*Ridge Env't Peace All. v. Perry*, 412 F. Supp. 3d 786, 832 (E.D. Tenn. 2019), *appeal dismissed*, No. 19-6332, 2021 WL 2102583 (6th Cir. Jan. 14, 2021); *see also, e.g.*, *Del. Riverkeeper Network v. F.E.R.C.*, 753 F.3d 1304, 1318 (D.C. Cir. 2014) (concluding that an agency engaged in improper segmentation when it failed to consider the comprehensive effects of four related and connected pipeline projects).

Invoking this doctrine, Plaintiffs complain that the agencies engaged in "segmentation" by limiting their NEPA review of "reasonable alternatives" to those presuming that the OPC is either built on Jackson Park (Alternatives B and C) or not (Alternative A), without also assessing whether alternatives sites *outside of* Jackson Park also exist. *See* [31] at 26–28. The agencies' decision, so the argument goes, resulted in a flawed assessment of "reasonable alternatives" under NEPA because the agencies failed to evaluate allegedly superior substitute sites *outside of* Jackson Park as alternatives. *Id.* at 28 (arguing that if "required reviews of possible alternatives had been properly performed, . . . at least one such site, located just to the west of Washington Park, would have been found to be not only prudent and feasible, but also superior to the Jackson Park site"); [80] at 22 (arguing that "Defendants carefully choreographed their narrowing of the scope of [their federal reviews], making it impossible to consider any site other than the one that was chosen").

Based on the record, Plaintiffs' improper segmentation theory fails. Improper segmentation occurs when an agency attempts to engage in piecemeal NEPA reviews "of projects that are 'connected, contemporaneous, closely related, and

interdependent,' when the *entire project at issue is subject to federal review*." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 50 (D.C. Cir. 2015) (emphasis added) (quoting *Del. Riverkeeper*, 753 F.3d at 1308). The decision to locate the OPC in Jackson Park was not itself subject to federal review. Rather, as discussed in *PoP I* and *PoP II*, and in the unrebutted declaration of the Foundation's Robbin Cohen, the City—together with the Foundation—made the decision to locate the OPC in Jackson Park, and there exists no evidence that this decision required federal review or involvement. Accordingly, there simply is no basis to conclude that the agencies engaged in improper segmentation when one of the alleged project "segments" does not actually fall under federal review.

Even when considered outside the contours of the anti-segmentation doctrine, Plaintiffs' argument that the agencies should have considered sites outside of Jackson Park as part of their "reasonable alternatives" analysis fails under NEPA. NEPA does not "expand agency jurisdiction over land uses." *Quechan Indian Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, No. CV 07-0677-PHX-JAT, 2007 WL 1890267, at *8 (D. Ariz. June 29, 2007); *see Scottsdale Mall v. State of Indiana*, 549 F.2d 484, 488 (7th Cir. 1977) (noting that NEPA "does not infringe on the right of a state to select a project to be financed solely out of its own funds"). NEPA only requires that agencies explore "reasonable alternatives," *Envtl. Law & Policy Ctr. v. U.S. Nuclear Regulatory Comm'n*, 470 F.3d 676, 685 (7th Cir. 2006), and agencies need not explore alternatives that "present unique problems, or are impractical or infeasible," *Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*,

756 F.3d 447, 470 (6th Cir. 2014); *see also Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 217 (D.C. Cir. 2013) (noting, with respect to the plaintiffs' proposals of alternatives under NEPA, that "the short and dispositive answer to the [plaintiffs'] argument is that the agency lacks authority to impose the alternatives proposed by the [plaintiffs] and those alternatives would go beyond the scope of the pilot program"); *Nat. Res. Def. Council, Inc. v. F.A.A.*, 564 F.3d 549, 557 (2d Cir. 2009) (noting that NEPA does not require agencies to consider any alternatives that could only be implemented after changes in government policy or legislation) (citing *Nat. Res. Def. Council, Inc. v. Callaway,* 524 F.2d 79, 93 (2d Cir. 1975)). Because the agencies have no authority to choose an alternative site to Jackson Park, or to force the City to build the OPC in Washington Park, they acted neither arbitrarily nor capriciously by confining their review of "reasonable alternatives" to those involving Jackson Park.

Plaintiffs also rely upon *Openlands v. United States Department of Transportation* to support their argument that the agencies engaged in a flawed study of alternatives. 124 F. Supp. 3d 796 (N.D. Ill. 2015). In *Openlands*, the district court considered the adequacy of an EIS studying the environmental impacts of a proposed interstate tollway project. *Id.* at 804–05. The court found that the agencies preparing the EIS acted arbitrarily and capriciously in considering alternatives under NEPA. *Id.* at 806–08. More specifically, the agencies included a "fatally flawed" no-action alternative that assumed that the project would be built already. *Id.* at 806. Here, in contrast, the no-action alternative—Alternative A—assumes that

the OPC is *not* built and that the federal government takes no actions. [61-22] at 27–28. *Openlands* therefore does not apply.

Finally, Plaintiffs accuse the EA of "separat[ing] out the OPC and its construction from the remainder of the work needed to repair the damage wrought by" the construction, namely, the closure of certain roads, improvement of other roads, and relocation of a track and field within Jackson Park. [31] at 26. That clearly did not occur here. Rather, as discussed in detail above, the entire EA concerns itself with the overall impacts of the OPC's construction on the environment, roads, historical properties, and other resources.

In sum, Plaintiffs have pointed to no errors in the agencies' consideration of alternatives. On the contrary, the agencies "followed required procedures, evaluated relevant factors and reached a reasoned decision." *Envtl Law & Policy Ctr*, 470 F.3d at 685. Thus, this Court finds it unlikely that Plaintiffs will succeed on the merits of their claim that the agencies failed to adequately consider reasonable alternatives under NEPA.

## B. Section 4(f) Claim

Plaintiffs also seek a preliminary injunction on their section 4(f) claim. Section 4(f) of the Transportation Act provides that the Secretary of Transportation may only approve a "transportation program or project" "requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance" if "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the

park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c).

As with their NEPA claim, Plaintiffs argue that the Secretary of Transportation failed to consider "feasible alternatives" to the road closures and the decision to place the OPC in Jackson Park. [31] at 32–33. This argument fares no better under section 4(f) than under NEPA. To reiterate, the City made the decision to use Jackson Park as the site of the OPC. Moreover, neither the OPC's construction nor its operation requires federal funding or approval, and the OPC itself is not a transportation project. Because § 4(f) applies only to transportation projects requiring federal approval, 49 U.S.C. § 303(c), the FHWA had no jurisdiction over the City's decision to situate the OPC within Jackson Park and no authority to evaluate alternatives to the *site* itself; neither the FHWA nor this Court can compel the City to force the OPC to build its compound in Washington Park instead of Jackson Park. Accordingly, it was neither arbitrary nor capricious for the FHWA not to consider sites outside of Jackson Park in its "feasible alternatives" analysis.

To be sure, the OPC project did still trigger section 4(f) review because the City requests federal funding for certain roadway, bike, and pedestrian improvements that it intends to make, and the improvements constitute a transportation project that requires the use of section 4(f) properties (i.e., Jackson Park, Midway Plaisance). *See* [61-35] at 11, 17; 49 U.S.C. § 303(c). And the statute requires FHWA to confirm that "there is no prudent and feasible alternative to using that land," and to then

ensure that the project includes all possible planning to minimize harm. 49 U.S.C. § 303(c).

The record confirms that the FHWA adequately performed these statutory duties. As to the first of those duties to confirm that there exists no feasible and prudent alternative to using § 4(f) land, as stated in the § 4(f) report, because the project area "is surrounded by 4(f) properties," only two avoidance alternatives exist: (1) the no-action alternative, which presumes that the OPC site is located in Jackson Park, that the City closes certain roadways within Jackson Park, and that no roadway improvements are completed in response to the closed roadways; and (2) so-called "congestion management process strategies," which involve ways to reduce congestion that do not involve major construction. [61-35] at 51–57. But, as the report concludes, neither avoidance alternative is feasible and prudent. *Id.* Specifically, the report states that a traffic analysis revealed that the no-action alternative is not feasible and prudent because it does not provide sufficient pedestrian and bicyclist accommodations to improve access and circulation to Jackson Park. [61-35] at 52. And similarly, the report finds that the "congestion management process strategies" are not feasible and prudent because a traffic analysis shows that the strategies would have limited effectiveness in improving traffic operations. *Id.* at 55.

Plaintiffs suggest that the FHWA failed to meet its second duty under the statute—to ensure that the roadway improvements project included all possible planning to minimize harm to the Park. [31] at 33; *see* 49 U.S.C. § 303(c). Plaintiffs

37

fail to specifically articulate how the agencies failed in this regard, and therefore waive this argument. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

Regardless, the record confirms that the FHWA abundantly considered harm minimization. The section 4(f) report includes a fulsome discussion and analysis of harm minimization, assessing nine alternative construction schemes to improve transportation capacity and minimize the use of section 4(f) resources. [61-35] at 58–82.

In sum, Plaintiffs' arguments that the agencies acted arbitrarily and capriciously in conducting their section 4(f) review lacks support in the record, and Plaintiffs have failed to demonstrate any likelihood that they could succeed on their section 4(f) claim.

## C.    NHPA Section 106 Claim

Next, this Court considers Plaintiffs' likelihood of success on their section 106 claim under NHPA. The NHPA comprises a "series of measures designed to encourage preservation of sites and structures of historic, architectural, or cultural significance." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 108 n.1 (1978); *see Maudlin v. Fed. Emergency Mgmt. Agency*, 138 F. Supp. 3d 994, 1000 (S.D. Ind. 2015) ("The NHPA reflects Congress's longstanding interest in historic preservation."). Section 106 of the NHPA provides:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having

> authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property.

54 U.S.C. § 306108. Under NHPA, a federal agency must make a reasonable and good faith effort to identify historic properties, 36 C.F.R. § 800.4; assess the adverse effects of the undertaking on any eligible historic properties, *id.* § 800.5(a); and, with the input of consulting parties, "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects" on those historic properties, *id.* § 800.6(a).

In moving for a preliminary injunction on their NHPA claim, Plaintiffs again assert that the FHWA precluded such review by engaging in "segmentation"—that is, by failing to include the OPC project itself in its review, and instead focusing upon only the effects to Jackson Park adjacent to the project. [31] at 34. This argument is baseless. As discussed, the OPC itself is not a federal project, and thus the doctrine of segmentation is simply not applicable in this context. Moreover, Plaintiffs' contention that the FHWA focused only upon effects adjacent the project, as opposed to effects caused by the project itself, is unsupported. After FHWA determined that the historical properties that would be adversely affected by the OPC's construction included Jackson Park, Midway Plaisance, and the CPBS Historic District, [61-13] at 45–63, it then analyzed in great detail the effects the OPC's construction and placement in Jackson Park would have on historic properties, including the destruction of roadways, *id.* at 55, and removal and replacement of certain parts of the historical landscape (such as the Perennial Garden/Women's Garden) to

accommodate the OPC, *id.* at 56–60. Defendants have thus unquestionably addressed the adverse effects created by the OPC project itself.

Ostensibly, Plaintiffs also argue that the law required Defendants to consider alternatives to Jackson Park itself as part of their duties to evaluate avoidance, minimization, and mitigation measures. *See* [31] at 34 (arguing that "mitigation measures were the only game in town – not avoidance or minimization – assuming the destruction of Jackson Park was a done deal"). That argument again is based upon the false notion that the agencies were involved in the decision to locate the OPC in Jackson Park. As explained above already, the City (and others), not federal agencies, made the decision to locate the OPC in Jackson Park. And neither NHPA nor the regulations imposed upon the agencies a "duty to consider alternative sites for construction"; rather, the regulations' "references to alternatives are . . . more sensibly interpreted as applying only to changes in the *existing* proposal that could make it more compatible with its surrounding environment." *Wicker Park Historic Dist. Pres. Fund v. Pierce*, 565 F. Supp. 1066, 1075–76 (N.D. Ill. 1982) (emphasis in original). Indeed, the City's decision to locate the OPC in Jackson Park constrained the agencies' evaluation of alternatives and modifications under NHPA, as it did under NEPA.

Plaintiffs' claim also fails to the extent that they believe section 106 compels a certain result. It does not. Section 106 is merely a procedural statute requiring a federal agency to take certain steps prior to beginning a project. *Narragansett Indian Tribe ex rel. Narragansett Indian Tribal Historic Pres. Office v. Nason*, No. CV 20-576

(RC), 2020 WL 4201633, at *2 (D.D.C. July 22, 2020) (citing *See Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 755 (D.C. Cir. 2003)); *see also see also Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 846 (10th Cir. 2019) (emphasizing that the section 106 process "does not demand a particular result"), *reh'g denied* (June 24, 2019); *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, 608 F.3d 592, 610 (9th Cir. 2010) (describing the NHPA as a "procedural statute requiring government agencies to 'stop, look, and listen' before proceeding with agency action"); *Waterford Citizens' Ass'n v. Reilly*, 970 F.2d 1287, 1291 (4th Cir. 1992) (observing that "Congress did not intend this provision to impose general obligations on federal agencies to affirmatively protect preservation interests"). Accordingly, this Court does not second-guess the agencies' substantive decisions based upon its own *de novo* review; instead, this Court confines its review to the very narrow question of whether the agencies followed through with their mandate to meaningfully evaluate ways to avoid, mitigate, and minimize adverse effects to historic properties. 36 C.F.R. § 800.6(a). The agencies indisputably did, as evidenced by the AOE's discussion of the actions the various agencies and the City will take to avoid, minimize, and mitigate the impacts from the OPC and road closures. [61-13] at 46–47, 62, 81–86. Accordingly, this Court finds Plaintiffs have failed to demonstrate any likelihood of success on their § 106 claim.

### D. UPARR Claim

Next, this Court considers the likelihood of success on the merits of Plaintiffs' UPARR claim. The UPARR Act focuses upon providing recreational opportunities in economically distressed urban communities. *See* 54 U.S.C. §§ 200501–200511; 36

C.F.R. § 72.72(a) ("The UPARR program has made funds available for the renovation and rehabilitation of numerous urban parks and recreation facilities."). Under the applicable regulations, "all recipients of funds for renovation and rehabilitation projects are obligated . . . to continually maintain the site or facility for public recreation use." 36 C.F.R. § 72.72(a).

UPARR authorizes NPS to convert property assisted under UPARR to non-public recreation uses. The statute provides that:

> The Secretary shall approve such a conversion only if the Secretary finds it to be in accord with the then-current local park and recreation recovery action program and only on such conditions as the Secretary considers necessary to ensure the provision of adequate recreation properties and opportunities of reasonably equivalent location and usefulness.

54 U.S.C. § 200507. The regulations further provide that "NPS will only consider conversion requests" if certain "prerequisites have been met." 36 C.F.R. § 72.72(b). One such prerequisite stipulates that the conversion proposal "assures the provision of adequate recreation properties and opportunities of reasonably equivalent usefulness and location." *Id.* § 72.72(b)(3). Another requires that "All practical alternatives to the proposed conversion have been evaluated." *Id.* § 72.72(b)(1).

Plaintiffs' sole argument on this claim posits that NPS failed to evaluate other practical alternatives and focused solely upon the eastern end of the Midway Plaisance as the replacement recreation site for the conversion. [31] at 35–36. This argument fails for two reasons. First, the regulations do not require the NPS itself to consider alternatives *to the replacement recreation sites*. Instead, the regulations state that NPS "will only consider conversion requests" if the applicant (here, the

City) has demonstrated that "All practical alternatives *to the proposed conversion* have been evaluated." 36 C.F.R. § 72.72(b) (emphasis added). The *proposed conversion* is the conversion of Park land to accommodate the OPC. And NPS did consider whether the City evaluated practical alternatives to this *proposed conversion*. In the NPS' final UPARR Stewardship Review, NPS evaluated the City's considerations of alternatives to the conversion and concluded that it appropriately ruled out alternatives to the actual converting actions. [61-47] at 3. More specifically, NPS noted that the proposed conversions "were necessary to avoid serious traffic impacts," and thus, as corroborated by FHWA's section 4(f) analysis, no practical alternatives exist as to the conversion of strips of parkland along certain roadways. *Id.* Similarly, NPS explained that it found that the City's UPARR conversion proposal appropriately evaluated other alternatives against the backdrop of its objectives—locating the OPC in a community where the former President worked and lived, for example—and ultimately concluded that no practical alternatives to the conversion existed. *Id.* In short, NPS did what the regulations required by ensuring that the City demonstrated that it considered all practical alternatives to the conversion. 36 C.F.R. § 72.72(b).

Second, to the extent Plaintiffs suggest that Defendants failed to fully consider replacement recreational sites, that assertion similarly lacks any basis in fact or law. While the regulations require that NPS consider conversion requests only if the proposal "assures the provision of adequate recreation properties and opportunities of reasonably equivalent usefulness and location," 36 C.F.R. § 72.72(b)(3), the record

demonstrates that the City's proposal meets this prerequisite. The City considered seven potential replacement sites, including the eastern end of the Midway Plaisance (which it ultimately chose), Harold Washington Park, and five other vacant sites located between 57th and 71st streets in Chicago. [61-10] at 41–43. The City ruled out Harold Washington Park and the vacant lots because none of them are: (1) close to the conversion area in Jackson Park; (2) designed by Olmsted, the designer of Jackson Park; or (3) listed on the National Register of Historic Places. *Id.* at 42. Four of the vacant sites, the City noted, also are not wholly owned by the City, and therefore using them would have required the City to acquire those unowned portions. *Id.* The eastern end of the Midway Plaisance, on the other hand, checked more of the City's boxes because it sits directly across the street from the OPC conversion area, is well suited for diverse forms of recreation like the areas to be converted, and is designed by Olmsted. *Id.* NPS considered this information from the City in approving its conversion request, finding that the City demonstrated the replacement area would provide adequate recreation properties and opportunities of reasonably equivalent usefulness and location. *See* [61-47] at 3–4. Contrary to Plaintiffs' argument, the NPS had no further duties under UPARR to examine any alternative properties or to itself consider alternatives to conversion. Thus, Plaintiffs are unlikely to succeed on the merits of their UPARR claim.

### E.    USACE Permits

This Court next considers Plaintiffs' claims implicating the USACE. The RHA makes it unlawful to "alter, deface, destroy, move, injure . . . or . . . impair the usefulness of any . . . work built by the United States . . . for the preservation and

improvement of any of its navigable waters, but also authorizes the USACE to "grant permission for the alteration or permanent occupation or use of" a public work "when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work." 33 U.S.C. § 408. The CWA authorizes the USACE to issue permits for the "discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). Plaintiffs advance two arguments for why they believe USACE acted arbitrarily and capriciously when granting permits under the RHA and CWA, but neither has merit.

First, Plaintiffs argue that they are likely to succeed in having the USACE-issued permits voided "given the possibility of prudent and feasible alternatives" that would eliminate the need for the permits at all. [31] at 37. This argument fails for the same reasons it did under NEPA, NHPA, and UPARR: USACE simply had no control over the initial decision to place the OPC in Jackson Park and no jurisdiction to compel the City to pick a different site chosen by federal authorities.

Second, Plaintiffs complain that the RHA permit allows the GLFER to be modified despite it being an "interconnected system that cannot be pulled apart and relocated." *Id.* at 38–39. Despite their dismay about the fact that GLFER will be altered, however, Plaintiffs do not address any statutory criteria governing the USACE's issuance of a section 408 permit; nor do they explain why they believe the USACE's actions were arbitrary or capricious.

Regardless, this Court cannot find that USACE acted arbitrarily or capriciously based upon the record. After reviewing the section 408 permit and

preparing an Environmental Assessment, USACE found that the Park District's proposal qualified for a section 408 permit because it would "not adversely impact the usefulness of the USACE project," and that to the contrary, the "design of the proposed alteration will improve usefulness of the GLFER project by increasing the restored natural areas acreage." [61-45] at 4. This fulfills USACE's statutory duty to grant a permit because, in its judgment, the proposed project "will not be injurious to the public interest and will not impair the usefulness of such work." 33 U.S.C. § 408.

For these reasons, this Court finds that Plaintiffs are unlikely to succeed on the merits of their RHA and CWA claims.

### F. Anticipatory Demolition

Finally, Plaintiffs move for a preliminary injunction on their "anticipatory demolition" claim. Section 110(k) of the NHPA prohibits federal agencies from issuing a loan, permit, license, or other assistance to an applicant who, "with intent to avoid the requirements [of section 106 of NHPA], has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed the significant adverse effect to occur." 54 U.S.C. § 306113.

Invoking this provision, Plaintiffs argue that the City and Park District intentionally removed trees and demolished an athletic field to accommodate the OPC, and that this action amounts to a violation of section 110(k) precluding FHWA and USACE from granting their respective funding and permits. [31] at 39. In making this argument, Plaintiffs assume the fact that the City removed the trees

46

makes it automatically liable for anticipatory demolition under § 110(k) such that the agencies erred by granting funding and permits. [31] at 41 (arguing that the "acts taken by the City, Park District and Foundation, both in regards to the destruction of the trees and in regards to the development of OPC, involve adverse effects that constitute anticipatory demolition in violation of Section 110(k)"). But as with many of their other claims, Plaintiffs fail to focus correctly on the appropriate statutory inquiry—in this case, whether a federal agency has found that the City, "*with intent to avoid the requirements*" under NHPA, has "significantly adversely affected a historic property." 54 U.S.C. § 306113 (emphasis added).

In this case, the FHWA accepted the City's explanation that it believed the construction work on the track and field did not implicate federal review, thus concluding that the City did not undertake that work with the intent to avoid NHPA review under section 106. [61-9] at 4–5. The FHWA acted neither arbitrarily nor capriciously in reaching this conclusion. The City explained the reasons it began the track and field work while section 106 review remained pending, including that the work lies entirely outside the area affected by the OPC, that the track and field would provide recreational opportunities to counter those lost due to the OPC's construction, and that it had consulted with NPS, which indicated the track and field itself was not subject to federal review. *See* [61-8]. This record supports the conclusion that the City engaged in this early construction *not* with the intent to avoid section 106 review, but because it genuinely believed the construction did not implicate federal review. Plaintiffs argue that FHWA engaged in a "blanket acceptance of the City's

47

explanation that it did not intend to circumvent the Section 106 review process," [80] at 27, suggesting a naivete; yet they offer nothing to undermine the City's explanation. Therefore, this Court cannot say that FHWA acted arbitrary and capriciously in accepting the City's reasonable explanation of its actions and subsequently concluding that the City did not engage in an anticipatory demolition. This Court accordingly finds it unlikely that Plaintiffs will succeed on their anticipatory demolition claim.

### G. Plaintiffs Fail to Meet a Threshold Preliminary Injunction Element

To obtain a preliminary injunction, Plaintiffs must establish some likelihood of success on the merits, that they lack an adequate remedy at law, and that without an injunction they will suffer irreparable harm. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019), *cert. denied sub nom. GEFT Outdoor L.L.C. v. City of Westfield*, 140 S. Ct. 268 (2019). This Court must deny the injunction if they fail to meet any of these threshold elements. *Id.* (citing *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008)). Plaintiffs have failed to demonstrate that any of their federal claims are likely to succeed, and thus, this Court denies their motion for preliminary injunction for failure to meet this threshold element. In light of this finding, this Court need not address the other requisite elements.

**IV.    Conclusion**

For the reasons stated above, this Court denied Plaintiffs' motion for preliminary injunction [30] by prior minute order [83].

Dated: August 12, 2021

Entered:

_____
John Robert Blakey
United States District Judge