## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PROTECT OUR PARKS, INC, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 21-CV-2006 |
| | ) | |
| v. | ) | |
| | ) | |
| PETE BUTTIGIEG, et al., | ) | Judge John Robert Blakey |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

This dispute is the latest effort by Plaintiff Protect Our Parks, joined by various individuals and the Nichols Park Advisory Council to block the construction of the Obama Presidential Center ("OPC") in Jackson Park on the south side of Chicago. Plaintiffs sue the City of Chicago ("City"), the Chicago Park District ("Park District"), the Barack Obama Foundation ("Obama Foundation") and various federal agencies, bringing eight state law claims and seven federal claims. [1]. The City, Park District and Obama Foundation move to dismiss all of the state law claims, [28]. For the reasons set forth below, the Court grants Defendants' motion [28] in its entirety.

## I.      Factual Background[1]

In 1869, the Illinois General Assembly passed "An Act to Provide for the Location and Maintenance of a Park for the Towns of South Chicago, Hyde Park and

---

[1] The Court takes these facts from the Plaintiffs' Complaint and its attachments. Given the extensive history of this case, the Court assumes general familiarity with the factual background and this Court's prior orders (incorporated herein by reference as needed) and limits its factual recitation to a brief summary of those facts essential to the motion to dismiss now before it.

Lake." [1] ¶ 37; Private Laws, 1869, vol. 1, p. 358. The statute provided for the formation of a board of public park commissioners to be known as the "South Park Commissioners." *Id*. The Act authorized these commissioners to select certain lands, which, when acquired by said Commissioners, "shall be held, managed and controlled by them and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever." Private Laws, 1869, vol. 1, p. 360. Pursuant to this authority, the commissioners acquired the land now known as Jackson Park. [1] ¶ 37. The Illinois Legislature enacted the Park District Consolidation Act in 1934, which consolidated the existing park districts, including the South Park District, into the Chicago Park District. *Id*.; 70 ILCS 1505/1. The Park District therefore came to hold Jackson Park in the public trust.

In March 2014, the Obama Foundation initiated a nationwide search for the future site of the OPC. [1] ¶ 39. Both the University of Chicago and the University of Illinois Chicago proposed potential locations in Chicago. *Id*. ¶ 40. In 2015, the City Counsel passed an ordinance ("2015 Ordinance") outlining a number of proposed sites for the OPC and authorizing the transfer of a portion of Jackson Park to the City, in the event the Obama Foundation was interested in building and operating the OPC in Jackson Park. *Id*. ¶ 111; [1-1], Ex. 1. The proposed Jackson Park site lies on the western edge of Jackson Park and includes existing parkland bounded by South Stony Island Avenue on the west, North Midway Plaisance on the north, South Cornell Drive on the east, and East Hayes Drive on the south. [1] ¶ 54; [29-1] ("Report

to the Planning Commission") at 2.[2]  Around the same time, the Illinois General Assembly also amended the Illinois Park District Aquarium and Museum Act ("Museum Act") to explicitly authorize cities and park districts to purchase, erect, and maintain museums, including presidential libraries, in public parks and to permit certain third parties to build, improve, maintain and operate these museums.  *See* 70 ILCS 1290/1.

The Chicago Plan Commission and Chicago City Council reviewed the matter, held public hearings, and subsequently approved this inter-governmental transfer of a portion of Jackson Park.  [1] ¶¶ 58–63; [1-1].  As part of its approval, the City Council passed an ordinance ("2018 Ordinance") allowing the City to accept title to the Jackson Park site from the Park District and to enter into agreements governing the Obama Foundation's use of the site.  [1] ¶¶ 63–66; [1-1], Ex. 2.  One of the agreements authorized by the 2018 Ordinance—the 2018 Use Agreement—sets the terms by which the Obama Foundation may use the Jackson Park site for the OPC. [1-1], Ex. 2 (Ex. D).  In addition to the various structures that will comprise the OPC, the site will include new parkland created by vacating portions of streets adjacent to existing parkland.  [1] ¶¶ 54–57, 65–67, 73; [29-2] ("May 17, 2018 Report to the Chicago Plan Commission").[3]

---

[2] Plaintiffs rely on the Planning Commission Report in their Complaint, [1] ¶ 60, so the Court may properly consider it on a motion to dismiss.

[3] The Court may also rely on this Report because Plaintiffs rely on it in their Complaint, [1] ¶¶ 61–62.

## II.     Procedural Background

In May 2018, Plaintiff Protect Our Parks and several individuals sued the City of Chicago and the Chicago Park District seeking to stop the construction of the OPC in Jackson Park, bringing public use doctrine and *ultra vires* state law claims and multiple federal constitutional claims.  This Court granted summary judgment to the defendants on all claims, *see Protect Our Parks, Inc. v. Chi. Park Dist.*, 385 F. Supp. 3d 662 (2019) (*POP I*); and plaintiffs appealed, *see Protect Our Parks, Inc. v. Chicago Park District*, 971 F.3d 722, 728 (7th Cir. 2020) (*POP II*), *cert. denied sub nom. Protect Our Parks, Inc. v. City of Chicago*, No. 20-1259, 2021 WL 1602736 (U.S. Apr. 26, 2021).  The Seventh Circuit affirmed summary judgment on the federal claims but vacated the ruling on the state law claims, finding that the plaintiffs failed to demonstrate Article III standing.  *Id.* at 732.  On remand, this Court dismissed the state law claims for lack of jurisdiction.

Undeterred, Protect Our Parks, along with new individuals and the Nichols Park Advisory Council (collectively "Plaintiffs") sue again to stop construction on the OPC.  [1].  They again bring familiar public trust doctrine and *ultra vires* claims (Counts VI and VII), but add six new state law claims for: violation of Article VIII, Section 1 of the Illinois Constitution (Count VIII); violation of the Illinois Constitution Takings Clause (Count IX); improper delegation of authority (Count XI); violation of Article I, Section 2 of the Illinois Constitution (Count XII); violation of Article I, Section 16 of the Illinois Constitution (Count XIII); and violation of the Illinois State Agency Historic Preservation Resources Act (Count XV).  *Id*.  They also bring seven federal claims relating to the OPC project's federal regulatory review.  Accordingly,

4

in addition to suing the City, the Park District, and the Obama Foundation, they also sue numerous federal officials in their official capacities. *Id.*

Plaintiffs moved for a preliminary injunction based upon their federal claims, which the Court denied. [94]. An appeal of that decision remains pending.[4] The City, Park District and Obama Foundation ("Defendants" for purposes of this opinion) also moved to dismiss all eight state law claims, [28], and is now ripe for decision.

Before the Court considers the merits of Defendants' motion [28], however, it pauses to address the binding effect of the rulings in the prior iteration of this dispute. This Court's prior summary judgment ruling on the state law claims does not implicate res judicata principles, nor does it constitute law of the case, since the Seventh Circuit found the plaintiffs lacked standing. *POP II,* 971 F.3d at 728. Of course, the Seventh Circuit's decision, however, does bind this Court and the parties, and constitutes law of the case.

---

[4] Of course, this Court retains jurisdiction to decide Defendants' motion to dismiss notwithstanding the pending preliminary injunction appeal. *See, e.g., Wis. Mut. Ins. Co v. United States,* 441 F.3d 502, 505 (7th Cir. 2006) ("[A]n appeal taken from an interlocutory decision does not prevent the district court from finishing its work and rendering a final decision. This is so for appeals concerning preliminary injunctions." (citing *Kusay v. United States,* 62 F.3d 192, 193–94 (7th Cir. 1995)). Further, the Court finds no reason to delay decision on this motion to dismiss the state law claims pending outcome of Plaintiffs' injunction appeal, because Plaintiffs only sought a preliminary injunction based on their federal law claims. *Cf. May v. Sheahan,* 226 F.3d 876, 880 n.2 (7th Cir. 2000) (holding that even in those cases in which an interlocutory appeal may divest a district court of some aspects of a case, the district court has "authority to proceed forward with portions of the case not related to the claims on appeal, such as claims against other defendants or claims" that "cannot be (or simply are not) appealed."); *City of Chi. v. Sessions,* 321 F. Supp. 3d 855, 881 (N.D. Ill. 2018) (noting that, even if a district court retains jurisdiction to decide the merits of a case while an interlocutory injunction appeal remains pending, it "should use such power only in a manner that preserves the status quo and thus the integrity of the appeal.").

### III.    Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raises a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2019). It tests the sufficiency of the complaint, not the merits of the case. *See Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). A court must accept as true all well-pled factual allegations; it need not accept mere legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Further, when an exhibit "incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

### IV.    Analysis

#### A.    Standing

The Seventh Circuit's decision in *POP II* provided a strong reminder that, before a court can address the merits of any claim, it must assure itself of its jurisdiction. 971 F.3d at 729. Defendants summarily posit that Plaintiffs now sufficiently allege standing, [29] at 11, but the Court will nevertheless spend a moment on standing before proceeding to the merits.

To establish Article III standing, a plaintiff must show that it has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). In *POP II*, the

Seventh Circuit held that the plaintiffs lacked Article III standing on their state law claims because they did not identify any injuries to their "separate concrete interests." 971 F.3d. at 731. The court also held that their status as municipal taxpayers did not confer standing because they failed to establish that the City spent any taxpayer monies on the allegedly illegal actions. *Id*. at 734.

Here, to establish standing, Plaintiffs newly allege that, for years, the individual Plaintiffs, as well as members of Protect Our Parks and NPAC, have used and enjoyed Jackson Park and the surrounding public areas and intend to continue using them for recreation and to, *inter alia*, study the architecture and enjoy the aesthetics and animal population. [1] ¶¶ 12–19. The Complaint also alleges that Plaintiffs have standing as municipal taxpayers. *Id*. ¶ 22

The allegations regarding Plaintiffs' use and enjoyment of the property suffice to demonstrate a concrete injury cognizable under Article III for their state law claims *See POP II*, 971 F.3d at 731 n.1 (noting that such injuries suffice to establish Article III standing but finding plaintiffs had failed to allege such injuries (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000) and citing *Lujan*, 504 U.S. at 562–63 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing.")).[5] The Court now proceeds to the merits.

---

[5] As in the last case, Plaintiffs again fail to establish standing for their state law claims based on their alleged status as municipal taxpayers. In *POP II,* the court held that Plaintiffs' municipal taxpayer status did not confer standing because they failed to identify both "an action on the city's part that is allegedly illegal" related to the City's monetary expenditures or "adequately show[] that city tax dollars will be spent on that illegal activity." 971 F.3d at 736. So too here, and thus *POP II* controls. Plaintiffs do not allege anything new on these points. Accordingly, even though they have standing for their

### B.  Public Trust Violation (Count VI)

In *POP II* and again here, Plaintiffs' primary state law claim rests on the public trust doctrine.  [1].  As the Seventh Circuit succinctly explained, "the public trust doctrine, established by American law in *Illinois Central Railroad Co. v. Illinois*, prohibits a state from alienating its interest in public lands submerged beneath navigable waterways to a private party for a private purpose."  *POP II*, 971 F.3d 722, 729 (7th Cir. 2020).  It may only alienate such public land to a private party "if the property will be 'used in promoting the interests of the public' or 'can be disposed of without any substantial impairment of the public interest in the lands and water remaining.'"  *Id*. (quoting *Illinois Central*, 146 U.S. at 453).

Although this original doctrine only applied to "navigable waterways," Illinois has extended the doctrine to other land such that, once the "land has been dedicated to a public purpose,…the government 'holds the properties in trust for the uses and purposes specified and for the benefit of the public.'"  *POP II*, 971 F.3d at 730 (quoting *Paepcke v. Pub. Bldg. Comm'n of Chi.*, 263 N.E.2d 11, 15 (Ill. 1970)).  This is precisely how Jackson Park became public trust land pursuant to the Illinois Legislature's 1869 grant.  *See* § I, *supra*.

### 1.  The Standard of Review Applicable to Plaintiffs' Public Trust Claim.

In moving to dismiss Plaintiffs' public trust claim, Defendants argue that Illinois law affords different levels of deference to a legislature's reallocation of public

---

state law claims (to the extent that the claims rest upon Defendants' alleged illegal use of Jackson Park), they do not have standing via any expenditure of City money related to the OPC site projects.

trust land depending on whether the land constitutes never submerged, formerly submerged, or presently submerged land.  [29] at 20.  Defendants contend that the OPC site constitutes never submerged public land[6] and argue that Illinois law affords great deference to the legislature's reallocation of statutorily-created, never submerged land pursuant to *Paepcke*, 263 N.E.2d at 15–16.  [29] at 20–21.  According to Defendants, pursuant to *Paepcke*, the Court need only look to the Museum Act to determine whether it reflects the requisite "manifestation of legislative intent" to reallocate portions of Jackson Park here.  [29] at 21.

Plaintiffs disagree. They do not dispute that Jackson Park constitutes never submerged land.  Instead, they argue that Illinois law does not (or perhaps should not) adjust its level of scrutiny based on the type of land at issue.  [69] at 20 (arguing that "[w]hether land was currently submerged, formerly submerged or never submerged has absolutely nothing whatsoever to do with the appropriate level of deference").  Plaintiffs contend that the Court cannot look solely to the Museum Act because "[s]imple legislative authorization never satisfies the requisites of the public trust doctrine."  *Id*. at 19.  Plaintiffs argue that the Court must apply Wisconsin's five-part test, which Plaintiffs insist the *Paepcke* Court adopted as the standard to resolve public trust reallocation disputes.  *Id*. at 22 (quoting *Paepcke*, 263 N.E.2d at 19 and discussing Wisconsin's five-part test set out in *City of Madison v. State*, 83 N.W.2d 674 (Wis. 1957)).

---

[6] This was a hotly disputed issue in the prior case.  *See POP I*, 385 F. Supp. 3d at 677–78 (discussing the parties' dispute and finding that Jackson Park constitutes never submerged land).

Here, Defendants' approach prevails. Illinois applies the public trust doctrine using varying levels of deference, based upon the property's relationship to navigable waterways. *See, e.g.*, *Paepcke*, 263 N.E.2d at 15−19 (applying public trust doctrine to never-submerged park land); *Friends of the Parks v. Chi. Park Dist.*, 786 N.E.2d 161, 169−170 (Ill. 2003) (applying public trust doctrine to formerly submerged land); *Lake Michigan Fed'n v. United States Army Corp. of Eng'rs*, 742 F. Supp. 441, 444−46 (N.D. Ill. 1990) (applying public trust doctrine to presently submerged land). The Illinois Supreme Court in *Paepcke* recognized that the Illinois legislature enjoys significant control over allocation of statutorily created never-submerged public trust land. There, the court considered allowing Chicago's Public Building Commission, with the Park District's cooperation, to construct a school-park facility on never-submerged land within Washington Park. *Id*. at 14. As in this case, the land at issue derived from the 1869 Act. *Id*. at 13. The *Paepcke* Court affirmed the trial court's dismissal of plaintiffs' challenge under the public trust doctrine because "sufficient manifestation of legislative intent" existed to "permit the diversion and reallocation contemplated" by defendants' plan. *Id*. at 18−19.

During oral argument on Defendants' motion, Plaintiffs insisted that "there is no hint in [*Paepcke*] of any deference that was given to the government." [113] at 46:7−8. Not so. The *Paepcke* Court held that "courts can serve only as an instrument of determining legislative intent as evidenced by existing legislation measured against constitutional limitations" and "[i]n this process the courts must deal with legislation as enacted and not with speculative considerations of legislative wisdom."

*Id*. This language plainly underscores deference to legislative intent over reallocation of statutorily-created public use land.

Further, contrary to Plaintiffs' insistence, *Paepcke* did not adopt Wisconsin's five-factor approach to resolve reallocation disputes. [69] at 22. Although the *Paepcke* Court noted the approach that Wisconsin had taken in two cases, it explicitly held that the Wisconsin approach was "not controlling under the issues as presented in this case" because there existed a statute that evinced the requisite legislative intent. 263 N.E.2d at 19; *see also Friends of the Parks v. Chi. Park Dist.*, 14-cv-9096, 2015 WL 1188615, at *5 (N.D. Ill. Mar. 12, 2015) (*Lucas I*) (noting that the "'Wisconsin test' . . . was not adopted as applicable in public trust cases, and the Illinois Supreme Court again declined to use the test in *Friends of the Parks*." (citing *Friends of the Parks*, 786 N.E.2d at 170)). Instead, the court merely commented that Wisconsin's factors "might serve as a useful guide for future administrative action." [7] *Paepcke*, 263 N.E.2d at 19.

Notably, although Plaintiffs insist that *Paepcke* adopted the Wisconsin approach, they acknowledged in their brief, [69] at 23, and at oral argument, [113] at 30:15–21, 40:6–12, that the Seventh Circuit disagrees when it held:

> Once such land has been dedicated to a public purpose, the Illinois Supreme Court has explained, the government "hold[s] the properties in trust for the uses and purposes specified and for the benefit of the

---

[7] At most, *Paepcke* suggests that, if no authorizing legislation exists from which a court can infer legislative intent, then the Wisconsin factors may prove useful. For example, in *Clement v. O'Malley*, the Appellate Court affirmed dismissal of a public trust claim relating to the Park District's proposal to construct a golf driving range in Jackson Park. 420 N.E.2d 533, 540–41 (Ill. App. Ct. 1981), *af'd sub nom. Clement v. Chi. Park Dist.*, 449 N.E.2d 81, 84 (Ill. 1983). There, the court found that there did not exist any authorizing legislation from which the court could infer sufficient legislative intent, so instead it applied the Wisconsin approach to affirm dismissal. *Id.*

11

> public." *Paepcke*, 263 N.E.2d at 15. Dedication to a public purpose isn't an "irrevocable commitment[]," *id*. at 16, and judicial review of any reallocation is deferential, particularly if the land in question has never been submerged. Nonetheless, the doctrine requires courts to ensure that the legislature has made a "sufficient manifestation of legislative intent to permit the diversion and reallocation" to a more restrictive, less public use. *Id*. at 18.

*POP II*, 971 F.3d at 730. Plaintiffs argue that the Seventh Circuit "inelegantly stitches together three disconnected statements" from *Paepcke* and "thus misstates" its logic. [69] at 23; *see also* [131] at 42:6–10, 48:20–49:2. Despite Plaintiff's unfounded criticism, however, the Seventh Circuit's interpretation controls here.

Finally, Plaintiffs also argue that this case requires a "heightened degree of scrutiny given both the lack of diligence and self-evident insider favoritism" that led to the "flawed transactions that the City and Park District have entered into with the Obama Foundation." [1] ¶ 235. According to Plaintiffs, this purported heightened scrutiny derives from the private trust context, which imposes fiduciary duties on trustees; and thus, public trusts impose (or perhaps, should impose) the same fiduciary obligations on government actors. [69] at 19–20. ("[A]ny trust over any kind of resource, whether public or private, imposes a standard set of fiduciary duties."). Because of these purported fiduciary duties, Plaintiffs argue, this Court must "second-guess" the "particular merits of legislative judgments" about reallocation of any public trust land to counter "the evident dangers of self-interest [*sic*] political actors." *Id*. at 21.

As Defendants rightly point out, [29] at 28, Illinois law does not impose public trust fiduciary duties analogous to those in the private trust context, nor does it recognize some "heightened scrutiny" based upon the concept of public trust fiduciary

duties.  This Court, sitting in diversity, must apply Illinois law as it exists, not as Plaintiffs think it ought to be.  As the Supreme Court instructs, "state law is to be applied in the federal as well as the state courts and it is the duty of the former in every case to ascertain from all the available data what the state law is and apply it rather than to prescribe a different rule, however superior it may appear from the viewpoint of 'general law'."  *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940).  Having done that above, the Court concludes that Illinois law affords considerable deference to reallocation of statutorily-created public use land.  Courts need only examine whether there exists "'sufficient manifestation of legislative intent to permit the diversion and reallocation" at issue.  *Paepcke*, 263 N.E.2d at 18).  If it finds such an intent, then any public trust claim fails as a matter of law.

### 2.    Legislative Intent and The Museum Act

The Court now looks to the legislative intent here. Defendants argue that the Museum Act's language reflects the requisite "manifestation of legislative intent." [29] at 23 (quoting 70 ILCS 1290/1).  The Court agrees.

The Museum Act explicitly authorizes cities and park districts with control or supervision over public parks to:

> purchase, erect, and maintain within any such public park or parks edifices to be used as aquariums or as museums of art, industry, science, or natural or other history, *including presidential libraries, centers, and museums*....

70 ILCS 1290/1 (emphasis added).  The Museum Act also permits the City to contract with private parties to build a presidential center:

> The corporate authorities of cities and park districts...[may] permit the directors or trustees of any corporation or society organized for the

> construction or maintenance and operation of an aquarium or museum as herinabove described to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate its aquarium or museum within an public park...*and to contract with any such directors or trustees of any such aquarium or museum relative to the erection, enlargement, ornamentation, building, rebuilding, rehabilitation, improvement, maintenance, ownership, and operation of such aquarium or museum.*

*Id.* (emphasis added).

Overall, this legislative directive states a clear, broad, comprehensive, and definite intention to allow the City to contract with directors or trustees of the museum (the Obama Foundation) to build a president center (the OPC) in a public park (Jackson Park). *See, e.g., People v. Pack*, 862 N.E.2d 938, 940 (Ill. 2007) ("The best indication of legislative intent is the statutory language, given its plain and ordinary meaning."). The above quoted language also reflects the legislature's determination that presidential centers, as a type of museum, remain consistent with a parcel's designation as public parkland. *See, e.g., Furlong v. S. Park Comm'rs.*, 151 N.E. 510, 511 (Ill. 1926) (declining to enjoin South Park Commissioner's efforts to issue bonds to renovate the Fine Arts Building to include a museum—now the Museum of Science and Industry—in Jackson Park, because park purposes "are not confined to a tract of land with trees, grass and seats, but mean a tract of land ornamented and improved as a place of resort for the public, for recreation and amusement of the public."); *Fairbanks v. Stratton*, 152 N.E.2d 569, 575 (Ill. 1958) (upholding construction of an exposition building and auditorium—now McCormick Place convention center—on submerged land under the public trust doctrine).

14

Overall, the Illinois General Assembly, through the Museum Act, sufficiently authorizes the construction and operation of the OPC in Jackson Park.

Nonetheless, Plaintiffs argue that the reallocation here also violates the Public Trust Doctrine because the 2018 Use Agreement essentially gave the Obama Foundation the OPC site for free during which time the Obama Foundation will enjoy exclusive use of it and derive all economic value from it. [69] at 32–33. They argue that a trustee may never "transfer any property held in trust to a private party unless, at the very least, he or she receives full compensation for the property transferred." [69] at 32. Plaintiffs acknowledge that the Use Agreement does not explicitly grant the Obama Foundation exclusive use, but instead insist that discovery must proceed to determine whether the Use Agreement is, in fact, a "lease in disguise and reflective of a transfer equivalent to a sale." [69] at 33. Overall, Plaintiffs argue that, if the Use Agreement constitutes a lease equivalent to a sale, then the Public Use Doctrine requires that the Obama Foundation pay the City "full compensation" for the sale. *Id.*

Plaintiffs rely heavily upon *Friends of the Park v. Chicago Park Dist.*, 160 F. Supp. 3d 1060, 1068 (N.D. Ill. 2016) (*Lucas II*), in which a court evaluated a Park District proposal to enter into a 99-year ground lease with the Lucas Museum of Native Arts under the Museum Act. [69] at 32–35. There, the court denied the plaintiffs' motion to dismiss public trust doctrine, due process and *ultra vires* claims, finding that, *inter alia,* the 99-year ground lease, by its terms, suggested the leaseholders were "owners" in a "constitutional sense" because it gave the

15

leaseholders ownership rights over the museum facilities and other improvements, and "exclusive control over the construction, maintenance and operation, repair and management of the building." *Lucas II*, 160 F. Supp. 3d at 1062–63, 1068.

Even assuming that *Lucas II* was rightly decided (which this Court need not address), that ruling is inapposite. First, it involved formerly submerged land, rather than statutorily-created, never-submerged parkland, and thus the case involved a different level of deference. *Id*. at 1063. Second, the ground lease at issue there cannot be analogized to the 2018 Use Agreement here. The 2018 Use Agreement— which Plaintiffs attach to the Complaint, [1-2], Ex. 2 (Ex. D)—unambiguously provides that the City retains ownership over the OPC site. *Id*. §§ 2.1–2.2, 4.4. Further, unlike the lease agreement with the private party in *Lucas II*, the Obama Foundation will bear the cost to construct the OPC facilities, and then must give the City ownership over the facilities upon completion. *Id.* Clearly, the City also does not give up control over the OPC site: if the Foundation ceases to use the OPC for its permitted purposes under the Use Agreement, the City may terminate the Agreement. *Id*. §§ 6.1–6.2. And, as Defendants point out, [29] at 24, the 2018 Use Agreement does not give the Obama Foundation the right to exclude the public from the OPC site but requires it to remain open to the public during Park District hours, [1-2] § 6.2(a)–(c).

Simply put, the 2018 Use Agreement is not a lease agreement giving the Obama Foundation effective "ownership" in the "constitutional sense." Plaintiffs' contrary allegations fail as a matter of law. *See Forrest v. Universal Savs. Bank, F.A.*,

16

507 F.3d 540, 542 (7th Cir. 2007) (holding that a court need not credit allegations contradicted by exhibits attached to a complaint).

Overall, the Court finds that the OPC does not violate the public trust doctrine as a matter of law, based upon the legislature's manifestation of intent in the Museum Act (which is all this Court must examine). Nonetheless, in the alternative, the Court next analyzes Plaintiffs' public trust claim based upon the level of scrutiny applicable to formerly submerged public trust land for clarity and finality.

### 3. Formerly Submerged Land: No Corresponding Benefits Test

The scrutiny used for formerly submerged land holds that a diversion of formerly submerged parkland violates the public trust only if it: (1) does not contain sufficient legislative authorization, pursuant to *Paepcke*; and (2) primarily benefits a private entity, with no corresponding public benefit. *See Friends of the Parks*, 786 N.E.2d at 169−70 (citing *Paepcke*, 263 N.E.2d at 21).

In *Friends of the Parks,* the Illinois Supreme Court examined a project to improve Burnham Park and Soldier Field and give the Chicago Bears football team certain use rights. *Id*. The plaintiffs argued that the project (and the legislation that permitted it) violated the public trust doctrine because it allowed a private party (the Bears) to use and control Soldier Field "for its primary benefit with no corresponding public benefit." *Id*. The court disagreed. It first noted that the City will continue to own Burnham Park and Soldier Field and did not abdicate control or ownership to the Bears. It also found that the legislature, through the Sports Facilities Authority Act, had manifested clear intent for the park's reallocation and renovations. And,

17

finally, it found that the public will benefit from the improvements to Soldier Field and Burnham Park. *Id*. Notably, it also held that the project did not violate the public trust doctrine even if the Bears would also benefit from it. *Friends of the Parks*, 786 N.E.2d at 170.

The same holds true here as a matter of law. As discussed above, the City did not abdicate control or ownership of the OPC site to the Obama Foundation and the Museum Act manifests clear legislative intent for the OPC. Further, the Museum Act confirms that presidential centers, like the OPC here, confer a public benefit because they "serve valuable public purposes, including, but not limited to, furthering human knowledge and understanding, educating and inspiring the public, and expanding recreational and cultural resources and opportunities." 70 ILCS 1290.[8] This explanation of the OPC's public benefits aligns with well-established caselaw. *See, e.g.*, *Furlong*, 151 N.E. at 511 (Ill. 1926) (finding that because parks exist as places "of resort for the public, for recreation and amusement" the "construction and maintenance of a building for museums, art galleries…and many other purposes, for the public benefit" are legitimate park purposes."); *Fairbanks*, 152 N.E.2d at 575 (upholding construction of an exposition building and auditorium on submerged land

---

[8] While *Friends of the Parks* was decided on summary judgment, the court focused on the legislation and the government's stated purpose for the project, rather than engage in an independent analysis of the purpose. It also relied on *People ex rel City of Urbana v. Paley*, 368 N.E.2d 915 (Ill. 1977) in which the Illinois Supreme Court found redevelopment of blighted public land conferred a public benefit after reviewing the government's stated public purpose for the redevelopment project. *See Friends of the Parks*, 368 N.E.2d at 910–11. Here, because the legislature set out the public benefit of presidential centers and also allowed the City to contract with third parties to construct, maintain and operate such a facility, Plaintiffs' public trust doctrine claim can be resolved as a matter of law on a motion to dismiss even under the heightened standard for formerly-submerged public trust land.

in Burnham Park because they were "in the public interest" and thus did not violate the public trust doctrine).

Plaintiffs insist the OPC primarily benefits the Obama Foundation because the 2018 Use Agreement gives to the Obama Foundation all "economic value" associated with it while the City (and public) get virtually nothing in return. [69] at 33. Even if the Court assumes that the Obama Foundation will enjoy all the "economic value"—even though that allegation finds no support in 2018 Use Agreement[9]—that does not invalidate it under *Friends of the Park*'s heightened scrutiny test. Plaintiffs' narrow focus on the OPC's "economic value" ignores the incontrovertible fact that public benefits are not measured merely in terms of "economic value." As set out above, the OPC will confer public benefits even if they are not "economic" in nature. And, as the *Friends of the Park* Court made clear, private parties may enjoy private benefits from public land use without it running afoul of the public trust doctrine. 786 N.E.2d at 169–70.

Accordingly, even accepting Plaintiffs' unsupported "economic value" allegation as true, the OPC does not violate the public trust doctrine under the *Friends of the Parks* heightened burden standard applicable to formerly-submerged lands. Accordingly, Plaintiffs' public trust doctrine claim still fails as a matter of law under the heightened (and inapplicable) standard.

---

[9] The 2018 Use Agreement's terms demonstrate that the City will enjoy some "economic value." First, the Obama Foundation will bear the cost to construct the OPC, which it must then give to the City. This certainly constitutes a significant "economic value" for the City. It also provides that all the revenue the Obama Foundation collects shall go to the "the use, maintenance and management" of the OPC or shall be deposited into the Obama Foundation's Endowment whose sole purpose is to pay "the costs to operate, enhance and maintain" the OPC. [1-1], Ex. 2 (Ex. D § 6.9). Thus, the City will enjoy some of the "economic value" of revenue used to maintain property and facilities that it owns.

19

C.    *Ultra Vires* **Claim (Count VII)**

Plaintiffs also bring a claim that the City and Park District acted *ultra vires* based on multiple theories.  First, Plaintiffs allege that the Park District's transfer of the Jackson Park site to the City violated the Illinois Property Transfer Act, 50 ILCS 605/1, and contravened law that prohibits "the Park District from a transfer to a non-governmental entity without an 'exchange for other real property of substantially equal or greater value.'" *Id.* ¶¶ 239–40.  Second, Plaintiffs allege that the 2018 Use Agreement violates the Museum Act, which "requires that a lease be utilized by the City." *Id.* ¶ 241.  Third, in their Response, Plaintiffs contend that the City acted *ultra vires* during the federal review process, when it failed to review alternatives and "exerted improper dominance and control over" the process.  [69] at 43.

In moving to dismiss, Defendants argue that a plain reading of the relevant statutes dispels Plaintiffs' theories.  [29] at 23–24, 30–33.  They also argue that Plaintiffs fail to allege how the City acted beyond its authority during the federal review process; and even if they could marshal such evidence, the City's actions during that process have no bearing on whether the Park District could transfer the land to the City, or whether the Foundation may use the OPC site.  [78] at 18.  Again, the Defendants prevail on the record here.

1.    **The Property Transfer Act Authorizes the Park District's Transfer to the City.**

Plaintiffs' *ultra vires* theory based upon the Property Transfer Act, 50 ILCS 605/1, rests on Section 2 of the Act, which provides:

> If the territory of any municipality shall be wholly within, coextensive with, or partly within and partly without the corporate limits of any

other municipality . . . and the first mentioned municipality (herein called "transferee municipality"), shall by ordinance declare that it is necessary or convenient *for it to use, occupy or improve* any real estate held by the last mentioned municipality (herein called the "transferor municipality") in the making of any public improvement or for any public purpose, the corporate authorities of the transferor municipality shall have the power to transfer *all of the right, title and interest* held by it immediately prior to such transfer, in and to such real estate, whether located within or without either or both of said municipalities, to the transferee municipality upon such terms as may be agreed upon by the corporate authorities of both municipalities . . .

*Id.* at 605/2 (emphases added). Plaintiffs contend that this provision only authorizes the Park District to transfer the Jackson Park site if the transferee itself (here, the City) will "use, occupy, or improve" the site. [1] ¶¶ 239–40. Because, according to Plaintiffs, the City impermissibly "transferred exclusive possession to the Obama Foundation," the Park District's transfer violates the Property Transfer Act. *Id.*

First, to the extent Plaintiffs' claim rests on the theory that the 2018 Use Agreement gives the Obama Foundation "exclusive possession" of the OPC site, the Court already found that it does not. It only gives the Obama Foundation the right to use, maintain, operate and improve the OPC site. [1-1], Ex. 2 (Ex. D).

Second, Plaintiffs fail to read the relevant statutory provisions in context. The Property Transfer Act remains silent as to whether municipalities can contract with third parties to improve, operate or maintain transferred land. *See* 50 ILCS 605/2. But the Museum Act expressly authorizes the City to contract with third parties "to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate" a presidential center. 70 ILCS 1290/0.01. Further, Article VII, § 10(a) of the Illinois Constitution permits units of local government to "contract and otherwise associate with individuals, associations, and corporations" in any manner not

21

prohibited by law. That same section also allows local governments to "transfer any power or function, in any manner not prohibited by law or ordinance" to other units of local government. Likewise, the Intergovernmental Cooperation Act, 5 ILCS 220/2−3, allows units of local governments to exercise, combine, transfer, and "enjoy jointly" any of their "powers, privileges, functions, or authority," except where expressly prohibited by law. Read together with the Property Transfer Act, these provisions demonstrate that: (1) the Park District and City, as individual units of local government, can separately contract with third parties on land that they already own; and (2) either of them can transfer land to the other, along with their power to contract with third parties on that land.

Moreover, Plaintiffs' proposed reading of the Property Transfer Act would create the absurd result of prohibiting transferee municipalities from ever contracting with engineers, architects, or builders to improve or manage a site. This Court rejects Plaintiffs' approach, and instead reads each of the relevant provisions of Illinois law in context, together, and gives each statute effect according to its plain terms.[10] Accordingly, Plaintiffs fail as a matter of law to make out a claim that the Park District acted *ultra vires* when it transferred the property to the City.[11]

---

[10] Even if the Property Transfer Act's silence could somehow be construed as ambiguous (which it is not), this Court would reach the same result by reading each provision and construing them together (Property Transfer Act, Museum Act, Intergovernmental Cooperation Act, and Article VII, section 10(a) of the Illinois Constitution). *People v. 1946 Buick, VIN 34423520*, 537 N.E.2d 748, 750 (Ill. 1989) (Illinois recognizes the doctrine of *in pari materia*, but only to resolve statutory ambiguities).

[11] Plaintiffs' Complaint also alleges that the Park District acted *ultra vires* because the Park District cannot transfer public property "to a non-governmental entity without an 'exchange for other real property of substantially equal or greater value.'" *Id.* ¶¶ 239–40. The Complaint does not identify the legal basis for this allegation, and Plaintiffs fail to address it in their opposition. To the extent this refers to the Illinois Park District Code, 70 ILCS 1205/10-7, which includes the Complaint's quoted

### 2. The Museum Act Does Not Require A Lease

Plaintiffs next allege that the City acted *ultra vires* because the Museum Act requires the City to lease the site to the Obama Foundation. [1] ¶ 241.[12] Again, not so. The Museum Act states that the City "*may* enter into a lease for an initial term not to exceed 99 years . . . to erect, enlarge, ornament, build, rebuild, rehabilitate, improve, maintain, and operate" a presidential center "together with grounds immediately adjacent". 70 ILCS 1290/0.01 (emphasis added). But it does not require a lease. Instead, the Museum Act's prior sentence—not relating to leases—controls. It authorizes the City to "contract" with "the directors or trustees of any corporation or society organized for the construction or maintenance and operation of" a presidential center relative to its "erection, enlargement, ornamentation, building, rebuilding, rehabilitation, improvement, maintenance, ownership, and operation." *Id* The 2018 Use Agreement constitutes such a "contract." Accordingly, as a matter of law, the City did not act *ultra vires* when it entered into it.

### 3. Plaintiffs Fail to Identify Any other *Ultra Vires* Actions.

The Court has now addressed Plaintiffs' *ultra vires* claims as set forth in their Complaint. [1] ¶¶ 239–41. Nonetheless, in their Response, Plaintiffs conclusorily state that their Complaint "identifies many activities that are *ultra vires*" including the City's conduct during the federal review process. [69] at 43. Specifically,

---

"exchange" language, *id*. § 10-7(b), Plaintiffs' theory fails as a matter of law because the Park District Code does not apply to the Chicago Park District. *See id*. § 1-2(d).

[12] Of course, elsewhere Plaintiffs allege that the 2018 Use Agreement, in fact, constitutes a lease agreement (albeit an impermissible one). Because the Court found that the 2018 Use Agreement by its plain terms does not constitute a Lease Agreement, the Court will still consider Plaintiffs' *ultra vires* argument notwithstanding these inconsistent allegations.

Plaintiffs assert that the City failed to review certain alternatives and "exerted improper dominance and control over" the federal review process. *Id.* (citing [1] ¶¶ 74, 88–89, 190–92). With respect to its federal review process allegations, Plaintiffs fail to explain how such conduct, even if true, constitutes an *ultra vires* act.[13] To the extent Plaintiffs imply that the City's conduct during the federal review process rendered *ultra vires* the 2018 Use Agreement or land transfer, this too fails to state a plausible claim. As Defendants point out, the City's actions in the 2018 federal review process—undertaken after the Park District transferred the land to the City and after the City executed the 2018 Use Agreement—have no bearing on whether state law authorized the land transfer or the 2018 Use Agreement.

Finally, although Plaintiffs assert that the Complaint somehow "identifies many activities that are *ultra vires*," [69] at 43, the Court need not accept as true such conclusory allegations, nor will it attempt to divine other theoretical *ultra vires* acts from the Complaint's factual allegations that Plaintiffs have failed to develop in their briefing. In short, Plaintiffs' Complaint fails to allege a plausible *ultra vires* claim, and thus, it is dismissed without prejudice.

### D.    Illinois Constitution Article VIII, Section 1 (Count VIII)

Plaintiffs' Count VIII alleges that the 2018 Use Agreement also violates Article VIII, Section 1 of the Illinois Constitution. [1] ¶¶ 242–45. This provision, known as the Public Purpose Clause, states that "[p]ublic funds, property or credit shall be used

---

[13] Plaintiffs bring separate federal claims based, in part, on these federal review process allegations. The Court offers no opinion here about the viability of those claims.

only for public purposes." Ill. Const. Art. VIII, § 1(a). Plaintiffs allege that the Use Agreement violates this clause because it transfers public property to the Obama Foundation for its sole private benefit and at public expense. [1] ¶¶ 242–45.

In order to "proceed under article VIII, section 1(a) of the Illinois Constitution, facts must be alleged indicating that governmental action has been taken which directly benefits a private interest without a corresponding public benefit." *Empress Casino Joliet Corp. v. Giannoulias*, 896 N.E.2d 277, 293 (Ill. 2008) (quoting *Paschen v. Vill. of Winnetka*, 392 N.E.2d 306 (Ill. App. Ct. 1979)). Yet, "what is for the public good and what are public purposes are questions which the legislature must in the first instance decide." *Empress Casino*, 896 N.E.2d at 294. Thus, "the judgment of the legislature is to be accepted in the absence of a clear showing that the purported public purpose is but an evasion and that the purpose is, in fact, private." *Id.*

Defendants move to dismiss, arguing that the Museum Act and City's 2018 Ordinance, attached to the Complaint, evinces a clear "public benefit" and Plaintiffs fail to "make a threshold showing that the findings are evasive and that the purpose of the legislation is principally to benefit private interests." [29] at 33 (quoting *Friends of the Parks*, 786 N.E.2d at 166–67). In response, Plaintiff insist that their claim must proceed to discovery to determine "who is a primary beneficiary" of the OPC. [69] at 46. They also contend that the City clearly intended to benefit the Obama Foundation and the Complaint alleges numerous "dislocations involved in bringing the OPC to Jackson Park" that support their claim. *Id*. Once again, Defendants win the day.

First, Plaintiffs contend that the key question under the Public Purpose Clause is whether the "primary beneficiary" is the public or a private entity. *Id*. This implies that the test is comparative. Not true. Illinois law asks whether there exists a public benefit, and if the "purpose sought to be achieved by the legislation is a public one and it contains elements of public benefit, then the question of how much benefit the public derives is for the legislature, not the courts." *Empress Casino*, 896 N.E.2d at 295. Therefore, if the OPC site serves a public purpose, then it does not matter if the Obama Foundation will also enjoy a private benefit or precisely how much of a benefit it may enjoy. *See, e.g., People ex rel. City of Urbana v. Paley*, 368 N.E.2d 915, 921 (Ill. 1977) ("[I]f the principal purpose and objective in a given enactment is public in nature, it does not matter that there will be an incidental benefit to private interests." (collecting cases)).

As discussed above, the Museum Act clearly indicates that museums and presidential centers like the OPC have a public purpose and provide important public benefits. Here, Plaintiffs allege nothing to demonstrate that this legislative finding is evasive or deceptive.[14] That ends the matter. But Plaintiffs disagree, asserting that their Complaint purportedly contains numerous "dislocations involved in bringing the OPC to Jackson Park" that support the claim. [69] at 46. Plaintiffs do not explain what "dislocations" they mean by this undeveloped argument, but

---

[14] Plaintiffs also admit that the City's 2018 Ordinance outlined "extensive benefits" to the public, [1] ¶ 66, but allege that the City rubber-stamped the 2018 Ordinance and Use Agreement to benefit the Obama Foundation, *id*. ¶¶ 7, 44, 244. Regardless of these conclusory allegations, however, Plaintiffs fail to allege how the Museum Act's findings were, in fact, evasive or deceptive.

26

presumably they refer to the roadwork, environment remediation, and construction of other facilities around the OPC site.  *See, e.g.,* [1] ¶¶ 67, 74, 222.

Nevertheless, such "dislocations" are not material to whether the OPC site has a public purpose.[15]  Even if these "dislocations" constitute costs, Plaintiffs fail to explain how they undermine the OPC's public purpose set out in the Museum Act. Plaintiffs fail to cite any legal authority that no public purpose exists if the record also includes incidental public costs,[16] or that the Public Purpose Clause requires that property be used for public purposes that confer the highest net public benefit (as defined by a court, rather than the legislature).  Based upon the clear legislative determination that the OPC site has a public purpose and confers a public benefit, the Court denies Count VIII as a matter of law.

### E.    Violation of Illinois Constitution Takings Clause (Count IX)

In the prior case before this Court, the plaintiffs asserted a due process claim based upon the US Constitution's Fifth Amendment Takings Clause.  This Court dismissed the claim on summary judgment, finding that it failed as a matter of law because the federal Takings Clause only applies to private property, not property that is already public.  *POP I*, 385 F. Supp. 3d at 686.  The Seventh Circuit affirmed, holding that: (1) the Takings Clause only applies to private property and under Illinois law, public trust beneficiaries do not have a private property interest in public

---

[15] As the Seventh Circuit noted during its discussion of standing, the City's projects are not relevant to plaintiffs' claims over the transfer or use of the OPC site.  *See POP II*, 971 F.3d at 735.  The same reasoning applies equally here.

[16] Taking such a theory to its logical conclusion, the government would always violate the Public Purpose Doctrine when it used public funds because, by definition, any such use imposes public costs (*i.e.*, the money itself).

trust land; and (2) regardless, the Takings Clause only calls for "just compensation" and the plaintiffs sought only declaratory and injunctive relief. *POP II*, 971 F.3d at 737.

Unsatisfied, Plaintiffs seek another bite at the apple with their takings clause theory, but this time bring it under the Illinois Constitution's Takings Clause. [1] ¶¶ 246–50.[17] They allege that, as Illinois citizens, they "have a beneficial fractional ownership interest in such public trust property" and Defendants violated Illinois' Taking Clause as to them through its "giveaway and damage" of Jackson Park "without payment of any compensation, let alone just compensation." *Id.* ¶¶ 249–50. Again, they only seek declaratory and injunctive relief. *Id.* at 81–82.

Plaintiffs' new version of the old claim fares no better, and indeed, it runs directly contrary to the Seventh Circuit's findings in *POP II*. Like the federal Takings Clause, Illinois' Takings Clause states that "*[p]rivate property* shall not be taken or damaged for public use without just compensation as provided by law." Ill. Const. Art. I § 15 (emphasis added). As the Seventh Circuit held, "the Illinois cases make clear that the public trust doctrine functions as a restraint on government action, not as an affirmative grant of property rights." *POP II*, 971 F.3d at 737. As a matter of law,

---

[17] Of course, the Illinois' Takings Clause is coterminous with its federal counterpart generally, and coterminous specifically with respect to "what constitutes a taking." *Hampton v. Metro Water Reclamation Dist. Of Greater Chi.*, 57 N.E.3d 1229, 1240 (Ill. 2016). Nonetheless, Plaintiffs contend that their reassertion of a rejected claim possesses merit, notwithstanding the Seventh Circuit's clear ruling, because the Seventh Circuit noted that "even if the [public trust] doctrine conferred a property interest on members of the public, that interest would not necessarily qualify for protection under the [Federal] Constitution." [69] at 44 (quoting *POP II*, 971 F.3d at 737 n.5). The Seventh Circuit, however, also found that Illinois does not confer upon the public a property interest in public trust land. *See POP II*, 971 F.3d at 737. Thus, Plaintiffs fail to present any good-faith reason to revisit the Takings Clause issue, and their efforts at a "do-over" border on the frivolous.

"absent a 'built in' cause of action and special property interest given by statute," Illinois citizens do not have a beneficial fractional ownership interest in public trust property. *Paepcke*, 263 N.E.2d at 17 (holding that owners of property adjacent to or in the vicinity of public use parks do not have a private property interest in those parks). Thus, Plaintiffs have no private property interest in Jackson Park. This proves dispositive of Plaintiffs' state Takings claim as a matter of law. The Court dismisses Count IX with prejudice.

### F. Plaintiff's Procedural and Substantive Due Process Claim Pursuant to Illinois Constitution Article I, Section 2 (Count XII)

In the prior case before this Court, the plaintiffs also brought a federal procedural due process claim. The Seventh Circuit affirmed dismissal on summary judgment. *POP II*, 971 F.3d at 737–38. Now, Plaintiffs try again, this time bringing a state law procedural and substantive due process claim. [1] ¶¶ 259–63. They allege that the City and Park district violated their state due process rights by allowing the Obama Foundation to control decision-making, and "by rubber stamping" the Foundation's demands to transfer critical public trust land to it. *Id*. They also allege that the City accelerated the improper approval process during the ongoing coronavirus pandemic, which curtailed Plaintiffs' rights to meaningfully participate in the City's meetings and reviews. *Id*. ¶ 264. Defendants move to dismiss arguing the claim fails as a matter of law. [29] at 41–44.

Like its federal counterpart, Illinois due process protections "pertain to deprivations of life, liberty or property" and a procedural due process claim cannot succeed without a threshold showing that the government interfered with one of these

protected interests. *See Big Sky Excavating, Inc. v. Ill. Bell-Tel. Co.*, 840 N.E.2d 1174, 1186 (Ill. 2005) ("If no protected interest is present, due process protections are not triggered"). As discussed, Plaintiffs do not have a property interest in Jackson Park. Thus, Plaintiffs fail to allege a protected interest and their procedural due process claim does not get off the ground.

Regardless, even if Plaintiffs possessed a cognizable property interest, Plaintiffs fail to adequately allege any deprivation of that interest. The Court found above that the General Assembly—through the Museum Act—authorized the OPC. Further, Plaintiffs' Complaint agrees that the City took four separate votes to approve aspects of the OPC. [1] ¶¶ 42, 58–63. As the Seventh Circuit held in affirming dismissal of the federal due process claims in the last case, "legislative determination provides all the process that is due" and if "one legislative determination is enough, then *five* determinations are overkill." *POP II*, 971 F.3d at 738. The same holds true for Plaintiffs' state law procedural due process claim and it fails as a matter of law.[18]

Turning to Plaintiffs' substantive due process claim, Defendants argue that the City's 2018 Ordinance approval must only meet the rational basis test. [29] at 43. Plaintiffs disagree, arguing that *Paepcke* requires a heightened showing because it

---

[18] Plaintiffs complain that the City's votes merely "rubber-stamped" the Obama Foundation's demands. But this characterization simply attacks the elected officials' internal reasoning in voting in favor of the OPC, not whether votes took place pursuant to a legislative process. Plaintiffs also assert, without support, that the coronavirus pandemic curtailed their ability to participate in the City's meetings about the OPC. But Plaintiffs fail to explain how the coronavirus pandemic could have any bearing on their ability to meaningfully participate in meetings and votes, especially ones which all occurred in 2018 or earlier.

would be pointless to confer standing to sue if "some low rational basis test" always applies. [69] at 42.

The Court already found that *Paepcke* affords significant deference to decisions involving statutorily-created public trust land. Nothing in that opinion indicates that courts should apply a heightened standard to a substantive due process claim over such legislative decisions. The rational basis test applies.

Under Illinois law, a rational basis exists if the Court can "hypothesize" one, even if it is "based on rational speculation unsupported by evidence or empirical data" and even if that basis did not actually motivate the legislative action. *People ex rel. Lumpkin v. Cassidy*, 703 N.E.2d 1, 4 (Ill. 1998). Here, the Museum Act offers a rational basis for the 2018 Ordinance and the OPC: "furthering human knowledge and understanding, educating and inspiring the public, and expanding recreational and cultural resources and opportunities." 70 ILCS 1290/0.01. The 2018 Ordinance's findings also set out reasons. [1-1], Ex. 2. There also exists a rational basis for the City to allow a third party to operate the OPC site where that third party's sole purpose relates to the OPC and where it will cover the cost to build the facilities (which the City will then own).

Of course, Plaintiffs believe that any public benefits that the OPC may provide do not compare, in their view, to the benefits that Jackson Park provided in its former glory. But as the *Paepcke* Court emphasized:

> [T]he issues presented in this case illustrate the classic struggle between those members of the public who would preserve our parks and open lands in their pristine purity and those charged with administrative responsibilities who, under the pressures of the changing needs of an

> increasingly complex society, find it necessary, in good faith and for the
> public good, to encroach to some extent upon lands heretofore considered
> inviolate to change. The resolution of this conflict in any given case is
> for the legislature and not the courts.

*Paepcke*, 263 N.E.2d at 21. There exists a rational basis for the 2018 Ordinance.

Thus, Plaintiffs' substantive due process claim fails as a matter of law.

## G. Illinois Constitution—Improper Delegation of Authority (Count XI)

Plaintiffs' Count XI alleges that the City violated Article II, Section 1 of the

Illinois Constitution because it improperly delegated to the Obama Foundation its

decision-making authority about the location and design of the OPC. [1] ¶ 256. To

support this allegation, Plaintiffs rely on the following clause in the 2015 Ordinance:

> WHEREAS, While the City Council is confident in the quality and
> thoroughness of both UIC's and UChicago's proposals, the City defers to
> the sound judgment of the President and his Foundation as to the
> ultimate location of the Presidential Library.

*Id.* (quoting [1-1], Ex. 1 (2015 Ordinance)).

Defendants move to dismiss, arguing that the ordinances and laws at issue

demonstrate, as a matter of law, that "only the appropriate legislative bodies have

determined what the law shall be with respect to use of the Jackson Park site." [29]

at 38.[19] Plaintiffs disagree, arguing that the 2015 Ordinance does not speak "in terms

of mere 'advice' but of 'deference'" to the Obama Foundation and, therefore, it

conferred "on a powerful private party an unfettered choice of location for its own

private development." [69] at 37.

---

[19] Defendants also comment that Article II of the Constitution may not apply to home rule municipal governments like the City, but Defendants do not move to dismiss on that basis. [29] at 38 n.11.

Article II, Section 1 of the Illinois Constitution provides: "The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another." [1] ¶ 258. Illinois has long held, however, that while the "legislature may not divest itself of its proper functions, or delegate its general legislative authority, it may still authorize others to do those things which it might properly, yet cannot understandingly or advantageously do itself." *Hamann v. Lawrence*, 188 N.E. 333, 335 (Ill. 1933).[20]

The 2015 Ordinance found that the City identified numerous locations proposed by University of Illinois–Chicago ("UIC") and University of Chicago ("UChicago"), and noted various benefits, risks and challenges as to each. [1-1], Ex. 2. Although the 2015 Ordinance states that "the City defers to the sound judgment of the President and his Foundation as to the ultimate location of the Presidential Library", this plainly refers to the Foundation's ongoing nationwide selection process and the City's desire to offer proposals to the Obama Foundation that give "our City the greatest chance for selection" by the Foundation. *Id*. The 2015 Ordinance also makes clear that, if the Foundation likes a site located in a Chicago parkland, then

---

[20] Cases that consider nondelegation under the federal constitution reveal that Plaintiffs' nondelegation theory—which is sometimes referred to as the private nondelegation doctrine—may flow from concepts of due process rather than the provision on which they rely. *See, e.g., Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (relying on the Fifth Amendment's due process clause to invalidate a statute that gave a group of coal producers the right to set regulations to bind the coal industry). *But see Dep't of Transp. v. Ass'n of Am. R.Rs.*, 135 S. Ct. 1225, 1237–38, 1252–53 (Alito, J. and Thomas, J. concurring) (implying that the private nondelegation doctrine is rooted in the Constitution's Vesting Clauses). Overall, the exact contours of this doctrine remain uncertain under both the U.S. Constitution and the constitutions of the states, but the Court need not enter into this ongoing constitutional debate, because the record shows that the City did not delegate its decision-making authority to the Obama Foundation.

the City will need to "introduce a separate ordinance authorizing the development construction and operation of the Presidential Center on the Selected Site." *Id*.

Read in full, the 2015 Ordinance did not abdicate the City's decision-making authority regarding public parkland use to the Obama Foundation. Instead, it reaffirmed its desire to have the OPC in Chicago and held that the City would consider and vote on a second ordinance if the Obama Foundation wished to build and operate the OPC on public parkland. And that is exactly what happened: the City considered and approved the Jackson Park site through the 2018 Ordinance. Simply put, Plaintiffs' claim fails as a matter of law because the 2015 and 2018 ordinances belie their allegations. The Court dismisses Count XI with prejudice.

## H. Violation of Illinois Constitution Article I, Section 16 (Count XIII)

Count XIII alleges that the City's 2018 Ordinance, which approved the 2018 Use Agreement, violated Article I, Section 16 of the Illinois Constitution, which states: "No ex post facto law, or law impairing the obligation of contracts or making an irrevocable grant of special privileges or immunities, shall be passed." [1] ¶¶ 265–66 (quoting Ill. Const. Art. I, § 16). Plaintiffs maintain that the 2018 Use Agreement constitutes an "irrevocable grant of special privileges" to the Obama Foundation because it transferred to it "perpetual and largely full control over a large portion of Jackson Park." *Id*. ¶ 266.

Plaintiffs' theory fails as a matter of law. As the Court already found, the 2018 Use Agreement did not transfer ownership of the OPC site to the Obama Foundation nor did it give the Foundation any irrevocable rights to it. Instead, it gives the Obama

Foundation the right to use, maintain and build upon the land, provides that these rights expire after 99 years, and states that the City may revoke the Foundation's use early under certain conditions. Thus, the 2018 Use Agreement does not constitute an irrevocable grant of special privileges. *See, e.g., People v. Chi. Transit Auth.*, 64 N.E.2d 4 (Ill. 1945) (finding no "irrevocable grant of special privileges" for City ordinance that gave the Chicago Transit Authority certain rights); *People v. City of Chi.*, 182 N.E. 419 (Ill. 1932) (same regarding an Act relating to the City's right to grant permits to operate the local transportation system because the grant was terminable for misuse and did not grant exclusive street rights).

In addition, as Defendants correctly point out, Illinois law also states that a contract or law giving special privileges to a certain group does not violate Article I, Section 16 if there exists a "rational basis" for it. *See DiSabato v. Bd. of Trustees of State Emps.' Ret. Sys. of Ill.*, 674 N.E.2d 852 (Ill. 1996) (finding that, even though the State Employees' Retirement System calculated benefits differently for police officers than other employees, this did not violate the Special Privileges Clause because there existed a rational basis to do so). As discussed above, there exists a rational basis for the 2018 Use Agreement and any privileges that it affords the Obama Foundation. Accordingly, Plaintiffs' Count XIII fails as a matter of law.

## I. Violation of Illinois State Agency Historic Preservation Act (Count XV)

Plaintiffs' final state law claim relies on Illinois State Agency Historic Preservation Act, 20 ILCS 3420. Plaintiffs allege the Defendants violated this act by failing to review alternatives to the OPC site project given its adverse effects on

35

historic resources (here Jackson Park, Midway Plaisance, and Chicago Boulevard Historic District). [1] ¶¶ 280–88. Plaintiffs bring this claim as an alternative to their federal claims for violations of the Department of Transportation Act § 4(f) (Count I); National Environmental Policy Act (Count II); and National Historic Preservation Act, § 106 (Count IV). *Id.*

Defendants move to dismiss arguing that Illinois' State Agency Historic Preservation Act does not apply where there has been a federal Section 106 review, which occurred in this case. [29] at 46. In response, Plaintiffs agree that Illinois' State Agency Historic Preservation Act does not apply if a federal Section 106 process is applicable, but they insist their claim may still be viable because the "federal agencies improperly *declined* review of the adverse effects of the OPC based on what they claimed were purely 'local' issues associated with" it. [69] at 40. That is, Plaintiffs agree that their state law claim fails if the federal review *improperly* declined to review alternatives, because then federal review will need to be reopened and will take precedence. *Id.* But, they argue, if the federal review *properly* avoided a review of alternatives, then the Illinois State Agency Historic Preservation Act applies. *Id.*

As a matter of law, the plain language of the Illinois State Agency Historic Preservation Act easily defeats Plaintiffs' theory. It states that, when an "undertaking is being reviewed pursuant to Section 106 of the National Historic Preservation Act of 1966, the procedures of this law shall not apply." 20 ILCS 3420/4(g). Plaintiffs identify no authority that conditions non-application on the

findings and breadth of the Section 106 review. Instead, the law clearly states it does not apply to projects reviewed pursuant to Section 106, and even Plaintiffs' own Complaint admits that the "magnitude, location and funding of the proposed project has triggered several major federal reviews" including a Section 106 review. [1] ¶ 2; *see also id.* ¶¶ 75–85. Accordingly, the Illinois State Agency Historic Preservation Act does not apply, and Plaintiffs' Count XV fails as a matter of law.

## V.    Conclusion

For the foregoing reasons, the Court grants Defendants' motions to dismiss [28]. The Court dismisses with prejudice Counts VI, VIII, IX, XI, XII, XIII and XV and dismisses without prejudice Count VII.

Dated: March 29, 2022

Entered:

John Robert Blakey
United States District Judge

37